```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
                    TYLER DIVISION

SMARTFLASH, LLC, et al.,      )(
                              )(
          Plaintiffs,         )(   Case No. 6:13-cv-447
     v.                       )(   TYLER, TEXAS
                              )(
APPLE, INC., et al.,          )(   December, 2014
                              )(   9:00 a.m.
          Defendants.         )(
_____

SMARTFLASH, LLC, et al.,      )(
                              )(
          Plaintiffs,         )(   Case No. 6:13-cv-448
     v.                       )(   TYLER, TEXAS
                              )(
SAMSUNG ELECTRONICS CO.,      )(   December 2, 2014
LTD., et al,                  )(   9:00 a.m.
                              )(
          Defendants.         )(

_____

     UNSEALED PORTION OF DISPOSITIVE MOTIONS HEARING
        BEFORE THE HONORABLE NICOLE K. MITCHELL
            UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

FOR THE PLAINTIFFS:  (See sign-in sheet.)

FOR THE DEFENDANTS:  (See sign-in sheet.)

COURT REPORTER:  JILL E. McFADDEN, CSR
                 Deputy Official Reporter
                 P.O. Box 480
                 Tyler, Texas  75710
                 (903) 530-3163
                 jmcfaddencsr@aol.com


(Proceedings recorded by mechanical stenography,

transcript produced on a CAT system.)
```

```
1                    I N D E X
2   December 2, 2014
3                                              Page
4        Appearances                             1
5        Hearing                                 3
6        Court Reporter's Certificate          292
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    THE COURT:  Good morning.  Please be
 2    seated.
 3                    Ms. Hardwick, if you'll call the cases,
 4    please.
 5                    COURTROOM DEPUTY:  Yes, Your Honor.
 6                    The Court calls Civil Action Number
 7    6:13-cv-447, Smartflash, LLC, et al. versus Apple, Inc.,
 8    et al.
 9                    THE COURT:  Announcements.
10                    MR. CALDWELL:  Good morning, Your Honor.
11    Brad Caldwell on behalf of the plaintiff Smartflash
12    entities.  Depending on what comes up, we're going to
13    follow the advice of the -- at the bench bar conference
14    and allow those who -- no different issues, better that
15    others argue.
16                    So there actually may be eight or nine of
17    us that argue today, and it would either by myself,
18    Mr. Austin Curry, Jason Cassady, John Summers, Chris
19    Stewart, Justin Nemunaitis or Hamad Hamad, depending on
20    what it is that comes up.
21                    THE COURT:  Okay.
22                    MR. CALDWELL:  The plaintiff is ready.
23    And with one observation, Your Honor, there is one
24    motion where the potential for sealing the courtroom is
25    an issue, and from our perspective, based on a
```

```
 1   correspondence between the parties, it looks like some

 2   parties on the left side of the courtroom want to just

 3   blurt it out.

 4               And so my request is that as to that

 5   issue, which they know full well that local counsel has

 6   already approached me, that maybe we could at least take

 7   it up at the bench to determine as a preliminary matter

 8   whether the courtroom should be sealed so that the

 9   purpose of it isn't negated by just blurting something

10   out.

11               THE COURT:  Okay.  Why don't you-all

12   bring that up when we get there.

13               MR. CALDWELL:  Thank you, Your Honor.

14               MR. GARDNER:  Good morning, Your Honor,

15   Allen Gardner.  And as I told Mr. Caldwell two minutes

16   ago, I have no intention -- we have no intention of

17   blurting anything out.  And I told him that I would be

18   happy to talk with the Court at a mutually agreeable

19   time; so, I respectfully don't quite agree with that

20   statement.

21               Your Honor, Allen Gardner here for

22   Samsung.  With me today is Mr. Charlie Verhoeven,  Ms.

23   Melissa Baily, Mr. Kevin Smith, and also our client, Ms.

24   Julie Hahn, and we are ready to proceed, Your Honor.

25               THE COURT:  Good morning.
```

```
 1                   MR. BATCHELDER:  Good morning, Your
 2   Honor.  On behalf of defendant Apple, Inc., James
 3   Batchelder.  I'm here with my colleagues from Ropes &
 4   Gray, Ching-Lee Fukuda --
 5                   THE COURT:  Good morning.
 6                   MR. BATCHELDER:  -- Kevin Post --
 7                   THE COURT:  Good morning.
 8                   MR. BATCHELDER:  -- Megan Raymond.  And
 9   Eric Albritton is also here with Apple.
10                   MR. ALBRITTON:  Good morning, Your Honor.
11                   THE COURT:  Good morning.
12                   MR. DUNWOODY:  Your Honor, Wallace
13   Dunwoody here for Game Circus defendant.
14                   THE COURT:  Good morning.
15                   MS. AINSWORTH:  Good morning, Your Honor.
16   Jennifer Ainsworth for the HTC defendant and Exedea.
17                   THE COURT:  Good morning.  Did we get
18   everyone?  All right.
19                   MR. POST:  I think we got everybody.
20                   THE COURT:  Okay.
21                   MR. POST:  Good morning, Your Honor.
22   Kevin Post on behalf of Apple.  I just wanted to let you
23   know that last night defendants and the plaintiffs
24   discussed a possible schedule to get through the
25   motions today.
```

```
 1                 THE COURT:  Good.

 2                 MR. POST:  So, if it suits Your Honor, we

 3   would propose that we start with the 101 motion and then

 4   have a -- what Mr. Cassady and I have described as a

 5   block of experts.

 6                 The -- the plaintiffs' motion to strike

 7   Mr. Wechselberger's opinions, and Mr. Becker's would

 8   follow, and I think we would propose arguing those two

 9   sort of in that order.

10                 So, Wechselberger and Becker from

11   plaintiffs' perspective and then defendants' response,

12   and then proceed to the three defendant Daubert motions

13   in the order Jones, Wecker, then Mills.

14                 Then turn to -- to plaintiff's O2 Micro

15   motion, and then turn to defendants' motion for summary

16   judgment of invalidity under the Gruse reference --

17   that's the 102-103 argument -- then take up plaintiffs'

18   motion to strike I believe the Reibstein, Ugone and

19   Napper opinions, then turn back to defendants for motion

20   for summary judgment for willfulness.

21                 And there are two motions, I believe,

22   there.  We would propose those get argued together just

23   for -- for efficiencies and convenience sake.

24                 Then Game Circus has some -- some motions

25   that it would like to argue, that would follow, followed
```

 1  by indefiniteness, and then the last motion would be the
 2  non-infringing motions.
 3                    And again, those are two.  We propose
 4  those go together.  So I think I got that right.
 5                    MR. CURRY:  That's right, your Honor.
 6                    THE COURT:  Sounds good.
 7                    All right.  Then we can begin with the
 8  101 motion.  And I am just fine with whoever wants to
 9  argue each motion.  That's -- that's just fine with me,
10  so...
11                    MR. VERHOEVEN:  Your Honor,
12  Mr. Verhoeven.  I'll be handling most of the argument
13  for the defendants on this issue.  I have some slide
14  decks.
15                    How many copies would y'all -- two?
16  Three?  Two?
17                    Good morning, Your Honor.
18                    THE COURT:  Good morning.
19                    MR. VERHOEVEN:  The first motion on tap
20  for today is based on the Supreme Court's landmark
21  decision in the Alice versus CLS Bank case, Your Honor.
22  So, the motion is for summary judgment of invalidity as
23  to all the asserted patents on the grounds that they
24  don't have eligible patent subject matter under section
25  101.

```
 1              So, I'll start, Your Honor, with the test
 2   as articulated in the landmark Alice decision, and that
 3   test is to ask first, Are the claims directed to an
 4   abstract idea?  Yes or No.
 5              If they are addressed in abstract idea,
 6   then you proceed to the second step of the test which
 7   is, Do the claims disclose an inventive concept that is
 8   significantly more than an abstract idea?
 9              If the answer to that is no, then under
10   the Alice decision the Court must find as a matter of
11   law that the patent's directed to ineligible subject
12   matter.
13              So let's dive right into it, Your Honor,
14   to the first step, Are the claims directed to an
15   abstract idea?  Now, in looking at this, it's helpful, I
16   think, to look at post-Alice cases and what -- that have
17   found patent ineligibility and ask, Well, what were
18   their abstract ideas?
19              And so, on this next slide, slide 4 here,
20   we have listed three of them.  The Ultramercial II case,
21   the Federal Circuit recently found that controlling
22   access to music, videos, games, et cetera, based on
23   rules related to advertising over the Internet was an
24   abstract idea that was patent ineligible.
25              In the Loyalty Conversion case recently
```

1  in the Eastern District of Texas, the Court found

2  exchanging loyalty award credits of different vendors so

3  that they can be used to make purchases of items offered

4  by different loyalty programs, that that method of

5  loyalty award credits over the Internet was invalid,

6  ineligible subject matter, an abstract idea.

7            And in the McRO versus Naughty Dog case,

8  the District Court found, Animating three-dimensional

9  characters using rules related to weighted morph targets

10 for lip synchronization was nothing more than an

11 ineligible abstract idea.

12           I think it particularly helpful, Your

13 Honor, to look at the Ultramercial II case which just

14 came out during the briefing in the Federal Circuit.  In

15 that case, the court found, quote -- and I'm  quoting

16 from 722 F.3d at page 1337 -- quote, The 545 patent

17 claims a method for distributing copyrighted products,

18 (e.g., songs, movies, books) over the Internet where the

19 consumer receives a copyrighted product for free in

20 exchange for viewing an advertisement, and the

21 advertiser pays for the copyrighted content.

22           So here you have a method of conducting

23 commerce over the Internet that's being described here

24 involving advertisers that pay in exchange for a deal.

25 The case continues at page 1349 through '50, quote, The

1  545 patent seeks to remedy problems with prior art

2  banner advertising over the Internet, such as declining

3  click-through rates, by introducing a method of product

4  distribution that forces consumers to view and possibly

5  even interact with advertisements before permitting

6  access to the desired media product.

7              So again, very similar, as we'll see, to

8  the patent at issue in this case which is directed to

9  payment and controlling access over the Internet.  Very

10  similar steps.

11             In fact, if you go to the next slide,

12  this is a -- was quoted in the Federal Circuit at page

13  1352, and you can see it's a very detailed flow chart of

14  process steps that take place in order to facilitate

15  controlling access to music, videos, games, et cetera.

16  The facilitator transmits an ad, consumer views the ad.

17  There's a question whether the ad's interactive or not.

18             If it is, one thing happens; if not,

19  another thing happens.  Responses are received.  They're

20  sent back and forth across the Internet.

21             But yet the Federal Circuit said this:

22  We take out of that the abstract idea of this commerce

23  that's happening over the Internet, and that is a -- a

24  fundamental building block.  It's just an abstract idea.

25  And unless there's something more, it's not going to be

```
 1   patentable.
 2                   This quote from Ultra -- Ultramercial II,
 3   I -- I think, Your Honor is -- describing that very
 4   figure, I think, is helpful for the Court's
 5   consideration.  The Federal Circuit said, This ordered
 6   combination of steps recites an abstraction, dash, an
 7   idea, having no particular concrete or tangible form.
 8                   The process of receiving copyrighted
 9   media, selecting an ad, offering the media in exchange
10   for watching the selected ad, displaying the ad,
11   allowing the consumer access to the media and receiving
12   payment from the sponsor of the ad all describe an
13   abstract idea.  Well, I would submit, Your Honor, the
14   same is true here.
15                   Now, let's turn to some examples of the
16   claims from the patents in this case.  Now there's
17   multiple patents and multiple claims, but they all --
18   we're down to the same specification, Your Honor.  And
19   we submit if you look at the claims, you'll find they
20   are all directed to the abstract idea of payment and
21   control for access.
22                   So, this is an example of a claim that's
23   particularly egregious in terms of 101.  Claim 18 of the
24   '317 patent, as you can see, this is directed to
25   payment.  And all the -- all the entire claim -- claims
```

1   is -- is abstract idea.  A method of providing data to a

2   data requester comprising; receiving a request for data

3   from the requester; receiving payment for the item.

4               It says, receiving payment data from the

5   requester relating to payment.  Transmitting the

6   requested data, providing the item.  And then

7   distributing payment.  Reading the payment distribution

8   information from a data store; and outputting payment

9   data to a payment system for distributing payment to the

10  requested data.

11              Now, this is clearly -- if you -- if you

12  look at the precedent that we've seen with Alice in

13  Ultramercial II, an abstract idea that is -- that under

14  the first step under Alice is patent ineligible.

15  There's an exception to what's patent eligible.

16              If you look at Claim 31 of the '598

17  patent, here's a -- here's a particular egregious

18  example of abstract idea claiming the control of access,

19  Your Honor.  And this is slide 13 in the -- in the deck

20  here.

21              A method of controlling access to content

22  date, the method comprising.  Receiving a data access

23  request from a user for a content date.  Reading rules

24  for providing access to the item.  It says, Reading the

25  use data status in one or more rules.  Evaluating the --

```
 1   whether the rules for access are met.
 2                 The claim says, Evaluating the use
 3   status data using one or more rules to determine
 4   whether access to the content data item is permitted.
 5                 And then enabling access, providing
 6   access if it is permitted.  This is basic commerce.
 7   This is not anything inventive, Your Honor.
 8                 Controlling access and distributing
 9   payment has been around for ages.  In fact, as we put
10   in our briefs at page 4 through 5 in our initial
11   motion, these concepts are involved as far back as the
12   1600s with toll roads.
13                 Real property in the 1600s, paying a
14   fee or bartering service for access to land.
15   Libraries are a good example, paying a fee to rent a
16   book.  With alcohol in the 1800s requiring proof of
17   age before serving alcohol.  In airports, requiring
18   compliance with security rules before permitting
19   access.  Blockbuster paying a variable fee to rent a
20   video.  These are all based -- this -- this sort of
21   payment and access, these abstract ideas, are basic
22   building blocks of commerce.
23                 As I showed back -- pointing back to
24   what I showed before -- this is on slide 19 -- the
25   Ultramerical II case found that part of the abstract
```

 1   idea that was patent ineligible was just that, paying

 2   for -- the advertising paying for the copyrighted

 3   content before permitting access to the desired media.

 4              So Ultramercial II is directly on

 5   point.  And it really can't be argued, Your Honor,

 6   that the first step of this patent -- when you're

 7   looking at these patents, does result in the

 8   conclusion that the patents are claiming an abstract

 9   idea of payment and access.

10              So then let's go to the second step.

11   Given that payment and access is an abstract idea, Do

12   the claims disclose an inventive concept that is

13   significantly more than an abstract idea?

14              As Your Honor's aware, merely requiring

15   generic computer implementation fails to transform an

16   abstract idea into a patent-eligible invention.

17              In the buySAFE case, it says, A claim

18   directed to an abstract idea does not move into

19   section 101 eligibility territory by merely requiring

20   generic computer implementation.

21              And again, the Loyalty.  The mere

22   recitation of a generic computer cannot transform a

23   patent-ineligible abstract idea into an invention.

24              And Ultramerical, Adding routine

25   additional steps such as updating an activity log,

```
 1  requiring a request from a consumer to view the ad,
 2  restrictions on public access, and use of the Internet
 3  does not transform an otherwise abstract idea into
 4  patent-eligible subject matter.
 5              Well, that's what we have here as I'll
 6  show, Your Honor.  Just as in Ultramerical II, all we
 7  have in addition to the abstract concept is the
 8  addition of routine steps like updating logs and
 9  checking rules, and we'll see that as we go through.
10              But one more quote from Ultramerical
11  since it's directly on point, Your Honor.  Referring
12  to this very chart, this detailed flow chart,
13  Ultramercial says, The claimed sequence of steps
14  compromises only conventional steps, specified at a
15  high level of generality, which is insufficient to
16  supply an inventive concept.
17              Well, I would submit that patent had
18  more detail in its steps than the specifications in
19  these patents.  Alice also said electric
20  recordkeeping, obtaining data, adjusting account
21  balances, issuing automated instructions.  These are
22  all things that are not inventive in step two.
23              You can't point to those basic things
24  in step two and say, Well, that's an invention.
25              So, we have a -- is this it here?
```

```
 1                    MS. BAILY:  Yeah.

 2                    MR. VERHOEVEN:  Your Honor, we're going

 3   to go through, with your permission, an exemplary claim

 4   and show -- and go through element by element.

 5                    As you know from Alice and Ultramercial

 6   II, when you do step two, you're supposed to look at the

 7   claim element by element and as a whole.  And so we're

 8   going to do that in one claim.

 9                    There's been a contention in the

10   opposition and sur-replies -- there's been argument that

11   we didn't -- we should have done element by element for

12   every single claim in our brief.

13                    Well, we didn't have page space to do

14   that, Your Honor, but we did provide -- create for the

15   Court's convenience -- and we'll give a copy to the

16   other side -- this very analysis I'm going to show you

17   for every single claim that's asserted.

18                    THE COURT:  And it is your contention

19   that all of the asserted claims are directed at an

20   abstract idea?

21                    MR. VERHOEVEN:  Yes, Your Honor.

22                    THE COURT:  Okay.

23                    MR. VERHOEVEN:  So, now just using Claim

24   11 as an example, if you look at the structure of this

25   you can see that there's device elements and then
```

1  there's software elements that are claimed together.

2                 And so the claim says, A data access

3  device for retrieving stored data from a data carrier.

4  And the first hard -- hardware element is a user

5  interface.  Well, we all know that a user interface is a

6  generic computer hardware, and so we cited Loyalty in

7  support of that.

8                 Claims involving that element have been

9  invalidated.  A data carrier interface.  Similarly, Your

10 Honor, this is a very common component that has been

11 found not to be inventive.

12                 We cite the Open Text case there.

13 Storage, a program -- program store for storing code is

14 generic computer hardware.  Alice itself had data

15 storage elements in it and was -- the patent found -- or

16 the court found the patent was -- didn't meet step two.

17                 And then a processor.  Well, you can't

18 get more generic than just a processor, and several

19 courts have found that claims reciting processor does

20 claim anything inventive.

21                 So, we've got -- we've got an interface,

22 couple of interfaces, storage, and a processor.  That's

23 all that's claimed in the hardware, Your Honor.

24                 Okay.  Let's see what's claimed in the

25 software.

```
 1            THE COURT:  Well, before you get there, I
 2   mean, I understand that you've gone through and shown
 3   that each of -- or you're electing that each of -- each
 4   of these pieces of hardware is generic, but aren't you
 5   missing the point that they are configured in a
 6   non-generic way?  I mean, aren't you kind of just trying
 7   to strip that away and get to the abstract behind this
 8   hardware theory?
 9            MR. VERHOEVEN:  No, Your Honor.  In fact,
10   as I quoted from Ultramercial, Your Honor --
11            If we could go back to slide 24.
12            Actually, I'm going to go -- if you look
13   at this figure here, Figure 2, and -- and the quote
14   there, The claimed sequence of steps comprises only
15   conventional steps, which are insufficient to supply an
16   inventive concept.
17            And the Ultramercial says adding routine
18   additional steps does not take you out of inventive.
19   So, when you're talking about your question, the
20   specific configuration, this is what the court is
21   saying.
22            You know, you can't say, well, we've got
23   a bunch of steps configured a specific way.  And if you
24   read the -- read Ultramercial and read Alice, it says
25   exactly that.  That does not take you out of patent
```

 1 | eligibility, otherwise you could always say that.  And
 2 | that's very clear in Ultramercial and in Alice, Your
 3 | Honor.
 4 |     Can we go back to 31.
 5 |     But in any event, even looking at this
 6 | claim, Your Honor, a user interface, data carrier,
 7 | storage, and a processor is not something that's
 8 | configured in any way that's special.  Those are basic
 9 | components.  You're just -- you're not describing
10 | anything at that point.  Those are basic components of a
11 | communication system.
12 |     So then what else is claimed?  Well, all
13 | else that's claimed in Claim 11 are code to, code to.
14 | And then functions.  So we have code to retrieve use
15 | status data indicating use status of data stored in the
16 | carrier.
17 |     We just saw Ultramercial and Alice say
18 | use status data -- updating use status data is not
19 | something that takes you out of inventiveness.
20 |     Here we cite Planet Bingo for claims
21 | reciting a program for retrieving various types of
22 | information.  So retrieving information does not take
23 | you out of inventiveness.
24 |     The next section, code to evaluate use
25 | status data using rules to determine whether access is

1 permitted.  So, all this is stating is it's not -- is a

2 function.  It's a step in a business method.  You're

3 evaluating use status data, using use rules.

4             And as one example, the SmartGene case,

5 Claims reciting a computing device comprising rules for

6 evaluating data have been invalidated.

7             The next step, code to access the stored

8 data when access is permitted.  That's just describing

9 the functional step of access.  It doesn't describe

10 anything inventive.

11             Accessing stored data is something that's

12 common across all computer applications, and we've cited

13 Loyalty Conversion for the proposition that claims

14 reciting program instructions to enable access to the

15 loyalty program accounts are not inventive.

16             And then the last element, wherein said

17 rules -- excuse me -- wherein said use rules permit

18 partial use of a data item stored on the carrier and

19 further comprising code to write partial use status data

20 to the carrier when only part of a stored data has been

21 accessed.  Again, these are just use rules.

22             Claims reciting receiving at least two

23 rules having certain characteristics have been

24 invalidated.  Walker Digital is one example of several.

25             Alice says, Your Honor, at page 2358,

1  Given the ubiquity of computers, wholly generic computer

2  implementation is not generally the sort of  additional

3  feature that provides any practical assurance that the

4  process is more than a drafting effort designed to

5  monopolize the abstract idea itself.

6  It's notable here, Your Honor, that the

7  claimed inventor of the asserted patents does not even

8  know how to write code.  So, you if you can't write

9  code, the most you can do when he's claiming these

10  things is claim functions.  You can't even implement

11  those functions.

12  This is exactly the type of situation

13  Alice is telling the district courts, Watch out for.

14  We've got a guy who can't even write code, and he's got

15  an idea and he's trying to patent the idea.  He can't

16  even implement the idea, Your Honor.  This is what Alice

17  directs district courts to be suspicious of so that the

18  drafting function doesn't get around 101.  That's why we

19  have this new test with Alice.

20  If you look at the patents, every piece

21  of hardware and every asserted claim is generic and

22  known.  We've listed them here.  I'm not going to go

23  through all of them, Your Honor.

24  Indeed, even in the -- in the patent

25  specification itself, it says -- and this is at column

1  12, lines 38 through 41 -- the physical embodiment of

2  the system is not critical and a skilled person will

3  understand that the terminals, date processing systems

4  and the like can all take a variety of forms.

5             They're even saying this is generic

6  hardware, and the functions are just functions.  The

7  inventor can't even write code.  Couldn't be anything

8  more than functions.

9             But let's look at the software.  Every

10 single software function claimed as well, Your Honor, is

11 simply a generic computer function.

12             Receiving, reading, evaluating,

13 displaying, forwarding, retrieving, writing,

14 transmitting, outputting, these are all basic computer

15 functions, Your Honor.

16             And the only thing that brings anything

17 out of those is the abstract idea of controlling access

18 to payment.  Everything else for the implementation of

19 it, Your Honor, is completely pedestrian.  There's

20 absolutely nothing novel about it.

21             If we go to the next slide.

22             The buySAFE case versus Google, Federal

23 Circuit 2014, says at page 1355, The claims' invocation

24 of computers adds no incentive concept - indeed, quite

25 limited.  A computer receives a request for a guarantee

1  and transmits an offer of guarantee in return.

2                  There's no further detail.  That a

3  computer receives and sends information over a network

4  is not even arguably inventive.

5                  And then in the Loyalty Conversion case,

6  Loyalty argues that the computer referenced in its

7  claims is not a generic computer, but instead is a

8  special purpose computer able to grant loyalty points to

9  members of the loyalty program of the commerce partner

10 and able to redeem customer possessed loyalty points for

11 goods or services that the commerce partner provides.

12                  That is an accurate description of the

13 functions of the claimed computer performs.  The problem

14 for Loyalty, however, is that all of those functions

15 consist of simple forms of data recording, storage, and

16 calculation, all of which are conventional functions

17 that can be performed by a generic computer or

18 improvement in the operation of the computer itself.

19                  Loyalty Conversion Systems, Eastern

20 District of Texas, September 3, 2014, directly on point.

21 All we're doing in this case are simple forms of data

22 recording, payment, checking, rules.  There's nothing

23 sophisticated going on in these functions, Your Honor.

24                  If you look at our -- these claims, you

25 look at the arguments that you hear the defendants

1  making about, well, it's a special argument of steps and

2  whatnot, then go look at how these cases are coming

3  down.  They're rejecting those arguments, Your Honor,

4  every single one of them.

5           One final thing I'll do before I conclude

6  on step two is compare our claims to the claim in Alice.

7  But I'm going to address this briefly, Your Honor,

8  because what we did is we put this chart -- didn't have

9  the color coding -- but we put the chart in our brief,

10  and in the sur-reply received some criticism saying,

11  Well, we've put in brackets there and so therefore we're

12  somehow mis -- being misleading in this chart.

13           So, I think we should just take the

14  brackets out and take a look at it, Your Honor.  This is

15  comparing where we took an example claim, Claim 11 of

16  the '458 patent, against claim 26, which is the claim

17  invalidated in Alice.

18           So, here is the full text of both claims,

19  Your Honor, and I'm not going to read it all.  It's here

20  in the slide for you to review.  But you'll see they

21  both are divided by having hardware steps to begin with

22  and then that hardware is configured with supposed

23  software that is simply function steps.  Code steps that

24  are just function steps.

25           This is exactly the structure of the

1  claims in our case, too, that have hardware elements

2  that are nothing but basic things like user interfaces

3  and storage, and then there's software elements are just

4  basic process steps with -- that are performed by

5  generic computer hardware and software.  They're no more

6  than function steps.

7            So, if you look at the top, now we've

8  pulled out the hardware elements, comparing them.

9  Communication controllers.  A device that's coupled to

10 the controller, data storage, computer coupled to the

11 data storage.  That's Claim 26.

12            Claim 11, a user interface, data carrier,

13 storage.  A processor that's coupled to those things.

14 Very similar claiming of basic generic computer

15 hardware.

16            And then if you look at the software

17 claims, you'll see very similarly what we're doing is

18 they're just reciting software functionality.  So Claim

19 26 in Alice, the software -- or the devices are

20 configured to receive a transaction.  Electronically

21 adjust said first account, and it goes on.

22            Insuring that a first party have adequate

23 value.  Generating an instruction to said first exchange

24 institution to make an adjustment in account.  These are

25 all basic business functionality.  They're carried out

1   by basic software.

2              If you look at Claim 11 of '458, it's a

3   similar sort of thing.  Code to receive use status data.

4   Code to evaluate use status data.  To determine whether

5   access is permitted.  A code to access the storage data

6   when access is permitted.  So basic software functions.

7              And similarly, final point here is they

8   both also recite rules and using the rules to decide

9   whether access is allowed or not.  So, when you look at

10  the claims, Your Honor, and compare them to the claims

11  that have already been invalidated in Ultramercial and

12  Alice, you see that there's a high similarity.

13             Very briefly, I'd like to show you

14  also -- it doesn't compare one for one exactly, but it's

15  also illuminating to look at Claim 2 that was

16  invalidated by the Federal Circuit in Ultramercial and

17  compare it to an example claim in our case.

18             So, taking Claim 18 of the '317 patent

19  against Claim 2, we see that they both recite a method

20  of providing data items to consumers.

21             You can pull that out.

22             They both recite receiving a request from

23  the consumer, requesting access to the data.  That's the

24  little red there.  It's behind it.  And we can pull it

25  out so you can read it better, but they're both talking

1   about receiving or request for data.  They both recite

2   receiving payment for data.  And it's up there on the

3   red on the left, and down below the pull-out on the red

4   on the right.

5            And the next slide just pulls that out so

6   you can read it.  You can see they both recite receiving

7   payment data.  They both recite transmitting or allowing

8   access to data as a function step.  And that's in the

9   red there, and we'll pull it out here.

10           Transmitting the requested data to the

11  requester.  Allowing said consumer access to said media

12  product.  And they both recite steps to distribute

13  payment to the content provider.

14           So those I've highlighted in that red on

15  this slide, Your Honor, and then I'm pulling it out

16  here.  So, reading payment distribution information from

17  a data store, outputting payment data in Claim 18.

18  Claim 2, paying royalties to the content provider.

19           So, when you look at the claims here at

20  these patents and compare them to the claims that are

21  invalidated both in Alice and in Ultramercial II, Your

22  Honor, you see that they are remarkably similar and that

23  the methodology used by the United States Supreme Court

24  and the Federal Circuit applies equally to the patent

25  family in this case.

1              So, in summary, are the claims

2  directed -- are directed to an abstract idea?  Yes, they

3  are.

4              Access to content and payment.  Do the

5  claims contain inventive concept that is significantly

6  more?  No.  They just claim hardware elements.  They're

7  generic and basic function process steps in the software

8  claims.

9              Now, briefly, I'm going to skip some of

10  these slides in the interest of time and maybe I'll come

11  back in rebuttal, but I want to address some of

12  Smartflash's arguments, if I may, Your Honor.

13              I think it's interesting to note at the

14  outset, Your Honor, that in Smartflash's opposition,

15  they -- they characterize their claims very similarly in

16  terms of what is it -- whether there's an abstract idea.

17              They say, The asserted claims are

18  directed at devices configured to digitally execute

19  payment and control access to digital content in new,

20  novel, and useful ways.

21              And it's almost the same as what we claim

22  it is, the abstract idea of the concept of payment for

23  something and controlling access to something.  The only

24  thing they're doing is they're making into a specific

25  field devices configured to digitally access content.

```
 1                    And as we know from the Federal Circuit
 2   precedent, limiting your abstract idea to a particular
 3   field does not make it patent eligible.  In their
 4   briefs, they say, well, there's something more than just
 5   those things.  Our concept is also whether access is
 6   permitted to content already in the possession of the
 7   device owner and that makes our -- takes us -- our
 8   concept out of being patent-ineligible abstract idea.
 9                    Well, we disagree.  Here's some examples
10   of exactly that functionality.  Lock boxes.  Well, you
11   have your content in the box.  You need a code required
12   to access the contents.
13                    Arcade games.  You want to play the game,
14   you have to put in a token.
15                    Gun trigger locks.  You already have the
16   gun.  You already have the ammo.  You need a key or code
17   required to enable a shot.
18                    Child proof medicine caps.  Well, you
19   already have the medicine, but you need some code or
20   some key, but in this case, you need to know how to open
21   the child-proof top in order to gain access.
22                    Barbecue.  You have these new barbecue
23   lighters.  You can't just click the thing on.  You have
24   to open a safety.  You already have everything you want,
25   but you can't get access to it.
```

```
 1              Pre-paid phone cards.  I can go on and on

 2   and on, Your Honor.  This sort of functionality does not

 3   take it out of being patent-eligible.

 4              THE COURT:  Is the non-volatile memory

 5   that was referenced in there -- I mean, is that generic

 6   hardware?  What is that?

 7              MR. VERHOEVEN:  Absolutely.  Non-volatile

 8   memory -- there's two types of memory generally.  I'm

 9   being generic here, but there's volatile and

10   non-volatile.  Right?  Non-volatile is memory that when

11   you turn your computer off, it still stays there; and

12   when you turn it back on, it's still there.

13              Volatile is like RAM, and when you turn

14   off your computer, it's gone.  This is basic memory.

15   It's nothing new there.  It's -- I've seen those phrases

16   used over and over in literally hundreds of different

17   patents, Your Honor.

18              I'm not going to read all of this, Your

19   Honor, because in the interest of time.  But in their

20   brief, at page 7, they list other -- take other stabs at

21   describing what their abstract idea is and it's almost

22   basically the same re -- re-packagings of the same

23   abstract idea.

24              Paying for content, selecting and paying

25   content, updating access rule, providing data with
```

```
 1   purchase content, controlling access.  All of that -- as
 2   I've cited already, because I'm not going to re-read
 3   is -- is expressly found not to be inventive by Loyalty,
 4   by Amdocs, which we cited, Alice, Ultra -- Ultramercial
 5   II.  We can go on and on.
 6                    In its opposition, Smartflash argues the
 7   claims are directed to something computer-specific, but
 8   Ultramercial II invalidated claims exactly like that
 9   that were tied to general purpose computer.  And Alice
10   invalidated claims that required the use of a computer,
11   so that argument is unavailing.
12                    In its sur-reply -- and I'll try to be
13   brief on this, Your Honor -- Smartflash argues that its
14   invention is -- it sort of characterizes it a little
15   differently, and it repeatedly says its invention is
16   storing two types of memory -- or two types of
17   information on memory.
18                    And I'm not going to read all these in
19   the interest of time, but there's -- one, two, three,
20   four, five, six, seven, eight -- nine times they say
21   that in their sur-reply, so they're taking another stab
22   at recharacterizing what it is their abstract idea is.
23                    Storing two types of information on
24   memory is exactly part of the abstract idea invalidated
25   by the Supreme Court in Alice.
```

```
 1                    And here we have Claim 26.  It says, a
 2   data storage unit having stored therein; (a) information
 3   about a first count; and (b) information about a third
 4   account.  Well, that's two types of data, so that
 5   argument is unavailing.
 6                    Very briefly -- if Your Honor wants me to
 7   move on, I will --
 8                    THE COURT:  Well, you've just been going
 9   about 30 minutes and we have a lot of ground to cover
10   this morning, so --
11                    MR. VERHOEVEN:  Well, we -- our intention
12   was to be much more brief on some of the later motions.
13   We may even submit those on papers if we need to.
14                    THE COURT:  Okay.
15                    MR. VERHOEVEN:  We consider this our most
16   important motion because --
17                    THE COURT:  Well, then I want to give you
18   the time that -- I want to give you the time that you
19   have, so...
20                    MR. VERHOEVEN:  I'll be very brief.  I'll
21   try to be very brief.  I won't be very brief.  I'll try
22   to be brief.  In its opposition, Smartflash cites 11
23   cases; 10 of those cases are pre-Alice.  I think that's
24   telling, Your Honor.
25                    They cite TQP Development versus Intuit,
```

1   which is a Judge Bryson case.   TQP predates Alice.   What

2   they don't cite is Loyalty.   Loyalty Conversion is a

3   Bryson case.   It goes the other way and that's a

4   post-Alice case.   I think that's telling, Your Honor.

5                       They cite Ultramercial in their opening

6   brief saying, Nothing in Alice is inconsistent with or

7   overrules Ultramercial and it remains persuasive

8   authority of the Federal Circuit's view of this murky,

9   developing area of the law.   That's when the Federal

10  Circuit had found Ultramercial I and found it was patent

11  eligible.

12                      And then right after they said that, the

13  Federal Circuit came out and rejected that very

14  proposition, Your Honor, and found that in Ultramerical

15  II -- that in light of Alice, that Ultramercial does not

16  have patent-eligible claims.

17                      And, the claimed sequence of steps are

18  only conventional, specified at a high level of

19  generality.   So that's telling, Your Honor.

20                      Then in their sur-reply, they switch

21  completely their strategies and they don't rely on any

22  of that.   They don't even talk about Alice.   They don't

23  even talk about -- well, they talk a little bit about

24  Ultramercial II, but they rely primarily on Diamond

25  versus Diehr, 1981 case, Your Honor.   The -- it's way

1  before Alice.

2          And it might be useful for some side

3  point, but the question for Your Honor is we have a

4  landmark decision that's changed the law and how does

5  that affect things, and they just put their head in the

6  sand in their sur-reply about Alice and they talk about

7  Diehr.

8          Well, very briefly, Diehr was a process

9  for molding raw, uncured synthetic rubber into cured

10 precision products.  This is not an abstract idea over

11 the Internet in a way to conduct commerce.  In Diehr,

12 the Supreme Court says, We think that a physical and

13 chemical process for molding precision synthetic rubber

14 products...

15         That's what they're talking about.

16 Transformation -- physical transformation of an article,

17 in this case, raw uncured synthetic rubber, into a

18 different state or thing is an industrial process is

19 what the court found.  That is not at all comparable to

20 our patents here.  And, obviously, Alice is much more

21 comparable.

22         I think I just stated that, so I won't

23 repeat what's on this slide.

24         The other point I'd like to make, though,

25 Your Honor, is in Diehr there was no dispute that an

```
 1   inventive concept was claimed, which is not the case
 2   here.
 3                    Just editing myself, Your Honor.
 4                    All right.  If we go to slide 81.
 5                    I'm going to do this very briefly, Your
 6   Honor, but to be complete --
 7                    MS. BAILY:  I'm really sorry to
 8   interrupt.  In this section of patent preemption, there
 9   is one word in the corner of one slide that I think
10   Smartflash contends we have to seal the courtroom to --
11   and I just realized that right now.
12                    THE COURT:  Why don't y'all confer about
13   that real quick.
14                    MR. VERHOEVEN:  I might be able to skip
15   it in the interest of time, Your Honor.
16                    THE COURT:  Okay.
17                    MR. VERHOEVEN:  Your Honor, can we do it
18   this way, can I just have you look at it?  And we won't
19   put it on the screen and we won't mention the word.
20                    THE COURT:  That's fine with me.
21                    Is that fine with plaintiffs?
22                    MR. CALDWELL:  That's fine.  Sure.
23                    THE COURT:  Okay.
24                    MR. VERHOEVEN:  Can you make sure
25   Mr. Fisher knows the number of the slide so we don't
```

1   accidentally put it up?

2                   MS. BAILY:  It's 84.

3                   MR. CALDWELL:  And so, Your Honor, our

4   request about that is -- also applies to the slides

5   because we don't know who they're passing them out to.

6                   And there's been some correspondence by

7   the parties that they want to actually take this

8   information and hand it to third parties.  They actively

9   want to do that.

10                  So, just for clarity, I'm certainly fine

11  with the procedure for in the courtroom, but I think

12  there also needs to be clarity.  They understand we've

13  designated that attorney eyes only - confidential, and

14  the fact they put it on the slide doesn't mean that

15  after this hearing they can go start passing out the

16  slides, and I think that ought to be clarified.

17                  MR. GARDNER:  Your Honor, this is really

18  a motion for protective order that they never filed, and

19  this is a much bigger issue than they're making it out

20  to be, and I really do -- I really would like to talk to

21  the Court about it.

22                  Obviously, if they want to make this

23  position, you know, that's fine.  But they threatened me

24  this morning with a violation of protective order.  They

25  threatened all of us.

```
 1                    THE COURT:  Why don't y'all approach.

 2                    MR. GARDNER:  Yes, Your Honor.

 3                    (Sealed portion of transcript.)

 4

 5

 6

 7

 8

 9                    (Open court:)

10                    UNIDENTIFIED SPEAKER:  I'm sorry to

11     interrupt, Your Honor.  I can hear everything back here.

12                    THE COURT:  Hmm...  My mic is off.  Thank

13     you.

14                    MR. CALDWELL:  Mr. Gardner is just

15     talking loud, I think.

16                    THE COURT:  He seems to be talking

17     quietly.  You guys be real quiet.

18                    MR. VERHOEVEN:  Write down the word you

19     need.

20                    MR. GARDNER:  I'm likely going to get a

21     protective order sanctions motion in about five minutes.

22                    (Sealed portion of transcript.)

23

24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19                    (End of sealed portion.)

20                    THE COURT:  All right.  So, Mr.

21   Verhoeven, we're going to not show that slide and

22   continue on with this 101 argument?

23                    MR. VERHOEVEN:  Yes, Your Honor.

24                    THE COURT:  Okay.

25                    MR. VERHOEVEN:  I'd like to briefly
```

1    address two other points and then I'll sit down.  First,

2    there is a preemption inquiry that's also involved in

3    this whole analysis.  It's not the specific Ellis test,

4    but it's something that the courts talk about as being a

5    concern under 101.

6                    And the second point is, very briefly,

7    the machine transformation test is questionable, is --

8    is not controlling now but courts look at it -- still

9    consider it as well.

10                   So, very briefly, on the preemption

11   inquiry -- and this is very important, and I'm citing to

12   the United States Supreme Court -- the underlying

13   functional concern here is a relative one how much

14   future innovation is foreclosed relative to the

15   contribution of the inventor.

16                   That is stated recently by the United

17   States Supreme Court what the relevant inquiry is.  It's

18   a relative one.  And the reason I stress this, Your

19   Honor, is throughout the briefing, plaintiff misstates

20   the test suggesting that you have to preempt an entire

21   field.  That is not the test.

22                   In Loyalty -- I'm on slide 83 now --

23   says, These patents like other similar business methods

24   have the potential to foreclose future information

25   disproportionately relative to the contribution of the

```
 1  inventor.
 2              That, again, is the test from Mayo.  And
 3  so the next slide I think is the one I can't show.
 4              Is that right?
 5              MS. BAILY:  Yes.
 6              MR. VERHOEVEN:  So I direct Your Honor to
 7  the next slide, slide 84.
 8              MS. BAILY:  Slide 85.
 9              MR. VERHOEVEN:  Or 85.  You can turn off
10  the screen.
11              MS. BAILY:  Oh, sorry.
12              MR. VERHOEVEN:  I'm directing the Court
13  to it.
14              Thank you.
15              MS. BAILY:  Sorry.
16              MR. VERHOEVEN:  I think the Court is
17  still allowed to look at it.
18              All you need to do, really, to do a check
19  on this preemption issue is look at the accused
20  products.  I mean, Smartflash has accused every phone,
21  tablet, and app regardless of information.
22              And I'm not going to read it all out, but
23  if you look at the chart, then this is Exhibit B and
24  Exhibit A, and we've pulled it out and summarized.  You
25  can see the vast swath of different products regardless
```

1  of how they're implemented across different systems that

2  are being accused in this case, across multiple

3  different parties and multiple different products and

4  multiple different systems.

5           We're talking about a patent that just

6  talks about generic computers talking to each other

7  about payment and access.  This is exactly what the

8  preemption inquiry is talking about being concerned

9  about.

10          Another example, if we could go to the

11 next slide.  I think this is -- we can put this one

12 up -- is very telling when you're looking at the

13 relative inquiries.  Smartflash had conducted surveys in

14 which it's alleging is entitled to damages for the

15 infringement of the accused products.

16          In describing the scope of their

17 products' patent protection, look how broadly they

18 describe it.  Question 4 of Exhibit A of Docket 330, For

19 each device listed below, did the capability to purchase

20 apps.

21          Oh, they're patenting the capability of

22 purchasing apps?

23          And then another question.  For each

24 device listed below, did the capability to rent and

25 download movies and TV shows.

```
 1                    I mean, these are giant fields
 2  that they're -- they're -- this is no joke.  They're
 3  saying they're entitled to damages because their patent
 4  covers that giant field.  That's what their survey is
 5  saying.  We think their survey is not worth the paper
 6  it's printed on, but that's what they did.  That's how
 7  they're characterizing it.
 8                    Again, I'm not going to read all of
 9  these, but Smartflash overstates the preemption inquiry.
10                    Here on slide 86, we've -- we've quoted
11  how they characterize it, Your Honor.
12                    And in slide 87, we show you how it's
13  different from the law.  So here at page 11, they say,
14  Complete preemption of a field is required to render a
15  claim patent ineligible.
16                    But we know the Supreme Court did not say
17  that in Mayo.  I'm not going to repeat it.  I just read
18  it.
19                    And in Loyalty Conversion as well,
20  quoting Mayo -- in this district, Judge Bryson repeated
21  the correct standard, not the one that defendants would
22  have you use.  Other districts have also used the exact
23  same standard, and I've cited a couple of cases on this
24  slide for it.  This is the Walker Digital case and the
25  Game Tech case.
```

```
 1              Smartflash's argument is to point to --
 2   (a) there's a non-infringing alternatives so you can
 3   subscribe versus streaming.  But just think about that.
 4   They're saying what's not -- they're saying the claims
 5   only preempt storage, not streaming.
 6              So, they preempt the entire field of
 7   storage?  Is what they're saying?  I mean, their
 8   argument proves our point.
 9              Citing a non-infringing alternative like
10   streaming for stored actually demonstrates preemption
11   here in the McRO versus Naughty Dog case, Southern
12   District of California case recently, September 2014.
13              The court found while the patents do not
14   preempt the field of automatic lip synchronization for
15   computer-generated 3D animation, they do preempt the
16   field of such lip synchronization using a real based
17   morph target approach.
18              So, here you see it's the district court
19   interpreting this relative test expressly saying they
20   don't preempt an entire field but they do preempt a
21   subset that's broad.  In -- in here, the claims are much
22   more broader.
23              Now, really briefly, Your Honor, the
24   machine transformation test and I'll be done.  The tests
25   here, are the claims tied to a particular machine or
```

```
 1  apparatus; and two, do they transform into a different

 2  state or thing.  Here again, I'm just repeating myself

 3  under a different test.  The claims are performed on

 4  general purpose computer, not a particular machine.

 5              Smartflash own expert, Dr. Jones,

 6  testified that the functional code to limitations can be

 7  performed by general purpose computer's processor.

 8              The claims also do not transform an

 9  article.  They record only the data be read,

10  transmitted, and received.  Unlike Diehr, No article is

11  transformed in a different state or thing.

12              Smartflash argues that in some instances,

13  the asserted claims transform data.  But in Cybersource,

14  the Federal Circuit found that transforming data does

15  not meet the machine transformation test as a matter of

16  law, Your Honor.

17              So, unless Your Honor has any other

18  questions, I appreciate your patience with that long

19  argument, but I am complete.

20              THE COURT:  All right.  Response.

21              MR. SUMMERS:  Thank you, Your Honor.

22              John Summers for plaintiff Smartflash.

23  Your Honor, what you just heard was that software is

24  patent ineligible.  That's what the argument was.  You

25  have to ignore anything that's generic hardware.  You
```

```
 1   have to ignore any instruction.
 2               And then after that, abstract idea,
 3   patent ineligible.  But that's not the rule, and Alice
 4   explicitly stated that wasn't the rule.  It said that
 5   computer implemented-inventions can be and sometimes are
 6   patent eligible.
 7               And now in the section 101 analysis,
 8   there are a lot of moving parts, but all those moving
 9   parts sort of get at one fundamental issue.  What are
10   the claims trying to do?  What are the claims trying to
11   solve?
12               And so in Alice, you saw that the claims
13   weren't trying to solve anything specific on a computer.
14   They were taking a solution from somewhere else and
15   using the draftsman's art to just try to claim that idea
16   on a computer.  It wasn't trying to improve computer
17   systems, computer networks, computer communications.
18               And what you'll see in the post-Alice
19   framework, yes, there are a lot of district courts that
20   have invalidated patents under Alice.  But when they do
21   that, it's because the patents aren't addressing
22   computer problems.  They're addressing non-computer
23   problems.
24               So, really, what the Court needs to do,
25   even though there are, you know, all these parts of the
```

1 analysis, you have to decide whether something's token

2 activity or an inventive concept.  You have to

3 describe -- decide whether there's an abstract and what

4 it is.

5             It all boils down to, What are the claims

6 addressing?  And when the claims address a

7 computer-specific problem, those claims are patent

8 eligible.  And you can see this in the relevant Supreme

9 Court cases leading up to Alice, and that starts with

10 Diamond versus Diehr.

11             And now opposing counsel talked about

12 that a little bit and tried to pin it into a physical

13 transformation case, but that's not what it was.  That's

14 not what Alice says it was.  Alice says it's an abstract

15 idea that improves a technological process.  That's why

16 the patent in Diamond versus Diehr was patent eligible.

17             And so as opposing counsel was talking

18 about, Diamond versus Diehr was about a rubber curing

19 process.  And in that rubber curing process, people were

20 already curing rubber.  That was already known.  And

21 there was an algorithm in Diamond versus Diehr, and

22 people were -- already knew about that algorithm.  And

23 there was a computer in Diamond versus Diehr and people

24 already knew about that computer.

25             What was inventive in Diamond versus

```
 1  Diehr was taking this abstract concept, taking this
 2  mathematical formula, and using it to solve a particular
 3  problem.  Because in the rubber curing process, they
 4  couldn't figure out just the exact time when to open the
 5  mold and an abstract idea solved that.
 6              So you can't just dissect the claim into
 7  all these component parts and say, step one; people
 8  already did that; step two, people already did that;
 9  step three, that seems abstract.  Diamond versus Diehr
10  specifically rejected that.
11              That's what Justice Stephens in his
12  dissent was saying the Supreme Court ought to do, and
13  they didn't do that.  Diamond versus Diehr is still good
14  law and it was reaffirmed in Alice.
15              So, what Alice did was just take the
16  mantle of a previous case, Parker versus Flook.  And
17  Parker versus Flook is really important to compare with
18  Diamond versus Diehr.  And Parker versus Flook was also
19  a mathematical formula case, but there it was a method
20  of calculating alarm limit.
21              And all it claimed in Parker versus Flook
22  was an improved method of calculating the alarm limits.
23  It wasn't an improved process for the catalytic
24  conversion which is what the algorithm was used for.
25  The claim didn't talk about the catalytic conversion
```

1  process.  It didn't improve the catalytic conversion

2  process.  It was just a better method of calculating.

3              And so what those two cases stand for is

4  that just because there's something abstract in your

5  claim, that doesn't mean it's non-inventive.  It doesn't

6  mean it's patent ineligible.  You have to look at what

7  those ideas are doing in the context of the invention.

8              And that brings me to Alice.  And the

9  reason that the patents were ineligible in Alice was not

10 because they were just implemented on a computer, it was

11 because the patents were directed to a non-computer

12 problem.  They were just about enabling the management

13 of risk.  It was just the computer being the

14 intermediary and intermediate -- intermediated

15 settlement.

16             And so all Alice did was if you take a

17 non-computer problem and you put computer components

18 on it, that's not going to be enough because that's

19 just the draftsman's art.  And that's really what the

20 Court has to decide here is the limitations in the

21 claims.

22             Are they just additions to cover up

23 that it's just an abstract idea, or are they actually

24 doing something?  Are they actually solving a computer

25 problem?

```
 1                THE COURT:  Couldn't you argue, though,
 2   that the problem in Alice was a computer problem, that
 3   it was trying to minimize the risk of computer
 4   transactions?
 5                MR. SUMMERS:  Well, but all it was
 6   doing -- yes, Your Honor.  Minimizing the risk and
 7   minimizing the risk in transactions generally had
 8   already been solved.
 9                And so, minimizing risk in computer
10   transactions is the same thing as minimizing risk in
11   non-computer transactions, and so that's why it wasn't
12   inventive.  The only idea was to put it on a computer.
13   The only idea was to think that this would be helpful to
14   put in a computer environment.
15                And so it was just a field of use
16   limitation, confining it to a technological environment.
17   It wasn't improving the computer.  It wasn't improving
18   how computers share data or communicate with one another
19   or anything like that.
20                And so, to see this distinction, I think
21   it is -- as opposing counsel was talking about, it is
22   helpful to look at recent district court opinions.
23                And one especially interesting thing is I
24   want to draw Your Honor's attention to six different
25   court opinions and the interesting part of them is it's
```

1 three different judges, all in the last calendar year.

2              And those three different judges have

3 each decided one computer-implemented invention as

4 patent ineligible and one computer implemented invention

5 as patent eligible.  So I want to start with Judge Stark

6 in the District of Delaware.

7              And we saw citation to Walker Digital,

8 but in Walker Digital, the claims were just a method of

9 controlled disclosure of information, and that's

10 something that headhunters have been doing for dozens --

11 hundreds of years.  So that was patent ineligible.

12              But then in Helios Software, you have

13 very similar kind of language, but it recited a method

14 of remotely monitoring an Internet session.  That was a

15 computer problem.  That was patent eligible.

16              And then Judge Pflaezer in the Central

17 District of California, in Enfish, LLC, the invention

18 was directed to just information management and a

19 database system.  That's something that people had

20 already been doing.  So it was just that idea,

21 recognizing that that idea would work well on a

22 computer.  And so that wasn't inventive.

23              But in Cal. Tech versus Hughes, it was a

24 method and apparatus related to error correction and

25 data transmission.  And so the instructions in these

1   claims, in these cases are still -- you know, they're

2   software cases.  They're still somewhat functional.  But

3   if it's trying to solve a computer problem, it's patent

4   eligible.

5                   And the same thing with Judge Bryson.

6   Even though TQP was before Alice, the claims in TQP and

7   the claims in Loyalty Conversion are nothing like each

8   other.  Loyalty Conversion, method of converting loyalty

9   points from one entity to another.  That's -- that's

10  something that's non-computer.  That's a non-computer

11  solution implemented on a computer.

12                  But in TQP, it's about encryption.  It's

13  about communications between computers.  And even though

14  the claims are still somewhat general, somewhat

15  functional, it was solving a computer problem that's

16  patent eligible.

17                  And so what all those cases stand for is

18  just -- if you've got a computer-implemented claim, you

19  have to look at what it's trying to do.

20                  And Ultramercial fits right into this.

21  And the claim in Ultramercial wasn't about a computer

22  problem.  It was about a business problem.  It was about

23  getting money for advertisements.

24                  And now, I think something is especially

25  telling about the argument we just heard.  When they

1   were citing to what Ultramercial was about, they were

2   citing to Ultramercial I.  They were citing to the

3   characterization by Chief Justice Rader of how the

4   claims were a computer problem.

5                      And so what the Federal Circuit did

6   between Ultramercial I and Ultramercial II is they just

7   re-read the claims in light of Alice and determined not

8   the computer solutions to computer problems aren't

9   patent eligible.  They just saw through the claims and

10  recognized that this was addressing a business problem

11  created by the Internet but not any specific Internet

12  issue.

13                     So that brings me to our claims and what

14  our claims do.  And the problem that was addressed was

15  not any business objective.  It was data piracy.  And

16  that problem was created by generic computers.  It was

17  created by the Internet.  It's a computer problem to

18  figure out how to deal with this, how to deal with the

19  free flow of generic data between computers.

20                     THE COURT:  Couldn't you also argue,

21  though, that the problem is granting access to data in

22  exchange for payment?  I mean, you're framing your

23  problem is a computer problem and all the other cases as

24  business problems, but couldn't I frame yours as a

25  business problem?

1           MR. SUMMERS:  You could frame it that

2   way, Your Honor, but you have to look at the

3   specification and you have to look at the claims and you

4   have to look at the limitations in the claims and see

5   what they're trying to do.

6                   And yes, there are limitations in the

7   claims about payment.  And yes, there are limitations in

8   the claims about controlling access.  But you have to

9   remember there are also limitations about data storage.

10                  And when you see those data storage

11  limitations in the context of what was trying to be

12  solved, it wasn't trying to invent a way to pay for

13  something on the Internet.  It was a way to figure out

14  if you're going to pay for something on the Internet,

15  how can you give the content owners, how can you give

16  the TV studios, how can you give them a way to maintain

17  control over their data.

18                  They're solving -- although the solution

19  to the computer problem does have an affect on business,

20  it does create a market.

21                  What it's doing is it's enabling a

22  device, enabling storage to, you know, reach the

23  compromise that device owners and content owners -- or

24  device owners and rights holders were looking for so

25  that you could store this data.  But the content owners

```
 1   could write the rules into your data and so sometimes
 2   you could carry your data around.
 3                   And it's not just a generic computer
 4   doing generic things.  It's using a particular part of
 5   one computer in the context of interaction between
 6   computers to make sure that the data transfer is
 7   something that everyone can get on board with.
 8                   THE COURT:  I think my concern is --
 9   well, what I'm not hearing you do is distinguish the
10   claims in Ultramercial from your claims, because I see
11   Ultramercial as a restriction on viewing based on a
12   payment.
13                   Now, the payment was watching advertising
14   whereas yours is payment with money, but tell me how
15   it's different.
16                   MR. SUMMERS:  It's different, Your
17   Honor -- for one, it's different because of the abstract
18   idea that the Federal Circuit found that the claims were
19   directed to.  And an abstract idea wasn't controlling
20   access to music.  It was using advertising as a
21   currency.
22                   And so, all of the steps before using
23   advertising as a currency and all the steps after using
24   advertising as a currency didn't add anything.  So,
25   requiring access to be controlled to the public when the
```

```
 1  abstract idea is using advertising as currency, that's
 2  not adding anything.
 3              That's just -- that's just making it so
 4  the idea can be implemented.  It's just making the
 5  audience, creating the market as opposed to our claims
 6  where, yes, it makes people more likely to pay for
 7  things, but it's solving the problem of after you pay
 8  for things, what can you do with that data.  How can you
 9  make your computer better so that people are okay with
10  data distribution.
11              And I just want to show, Your Honor, just
12  how the claims do that.  And these are limitations that
13  opposing counsel didn't talk about.  And that's that you
14  have to get the data and the data has to be stored into
15  the data carrier.  You have to get the access rule from
16  the data supplier, and you write it into the data
17  carrier, and then sometimes the rule is dependent on
18  payment.
19              And so these are all the sorts of
20  limitations that were sort of just overlooked in the
21  briefing and in the argument about what -- what do those
22  limitations do, what do they solve.  It's not just
23  controlling access to something.  It's controlling
24  access to something -- getting the rule from somewhere
25  else and having it be stored into the data carrier.
```

```
 1                    And so it's not just that a computer can
 2    store things.  It's deciding that as between the
 3    interaction between two computers, that the better way,
 4    the inventive way to do it is to put it all on the
 5    customers' memory.
 6                    And it's the same way with things that
 7    don't have access rules.  It's not just paying for
 8    something.  It's a way of paying for something.  You
 9    have to get the payment data from somewhere, from the
10    carrier.  And the payment data isn't sent until you get
11    other data, payment validation data, from the data
12    supplier.
13                    And so, by pigeonholing all this into one
14    computer environment, it's ignoring the inventive
15    context of the invention, and that's transfer, data
16    transfer, who does what in the interaction between
17    content owners and between purchasers or device owners
18    who want to download data.
19                    And so, even if -- even if the idea of
20    paying for something or the idea of controlling access
21    to something is abstract, if that's just an idea, it's
22    implemented in these claims to solve a computer problem,
23    to solve generic storage, to solve a computer not being
24    able to know that this is protected proprietary content.
25                    To get into the idea of preemption and
```

1  what the preemption test is, there are a lot of

2  different ways to sell content.  There are a lot of

3  different ways to control access to content.  You can

4  stream, you can side-load the data, you can control

5  access from the server, or you can do different ways of

6  paying for the data.

7            The payment data doesn't have to come

8  from the carrier, or it doesn't have to be responsive to

9  retrieving the content.  Doesn't have to be responsive

10  to the payment data transmission.  And those are all

11  limitations that are within their claimed abstract

12  ideas.

13            There are better ways of paying for

14  digital content.  There are better ways of controlling

15  access to digital content because you can control access

16  in other ways.  You can pay for things in other ways.

17            So, to go to the idea of relative to the

18  contribution of the inventor and what does that mean,

19  and when you look at Mayo, and when you look at cases

20  citing that portion of Mayo, all they're really saying

21  is that if all the inventor did was come up with an

22  abstract idea and recognize that it would be useful in

23  some technological environment, then relative to the

24  contribution of the inventor, preempting that idea in

25  that technological environment isn't appropriate.

```
 1                    That's too much because all the inventor
 2    did was think that a pre-existing abstract idea, that a
 3    non-computer abstract idea might be useful on a
 4    computer.  So relative to the contribution of the
 5    inventor, those claims are going to be invalid.
 6                    But there's really no case, and it
 7    doesn't even seem workable to figure out what exactly is
 8    everything new in a claim and just decide whether that's
 9    too broad.  There's -- it just doesn't make any sense,
10    especially in the software context where software claims
11    are written in functional language because that's the
12    person of ordinary skill.  That enables someone to do
13    this.
14                    And so I just want to show, Your Honor, a
15    particular patent.  And this is Apple's slide to unlock
16    that.  And Apple asserted this against Samsung to
17    verdict about six months ago, I think.  And this -- just
18    goes to show you this is what software patents look
19    like.
20                    A portable electronic device,
21    compromising:  A display; memory; one or more
22    processors.  One or more modules.  Instructions:  To
23    detect, to move, in accordance with movement to the
24    detected content, unlock.
25                    Now, I'm not saying that this isn't
```

1 | ineligible invention.  All I'm trying to say is that

2 | this idea that Mr. Racz couldn't program software -- if

3 | one of Apple's star engineers had thought of this

4 | concept in 1999, if one of Samsung's star engineers had

5 | thought of this concept in 1999, the patent would look

6 | the same because it contributes to the art.  It enables

7 | someone of ordinary skill to implement the invention in

8 | a useful way.

9 | So, Your Honor, I just want to touch a

10 | little bit on some of the other arguments that opposing

11 | counsel made, and one of them was this idea of the

12 | survey and how we surveyed these broad categories.  And

13 | that's not totally accurate.

14 | What we did was we surveyed people's

15 | value of the patented feature -- or of the accused

16 | infringement, and then what we did was we surveyed how

17 | much more they value that over the non-infringing

18 | alternatives over the reason that our claims don't

19 | preempt the field.

20 | And so, it wasn't that we thought our

21 | claims covered all of that or any way to pay for apps or

22 | any way to download content.  It was just we wanted to

23 | see how much value that idea had, and then we wanted to

24 | see how much value that was over the other ways to do

25 | it, over our inventive contribution.

```
 1                  So, Your Honor, again, these are data
 2   transfer, data storage.  Those are computer problems.
 3   Just because computers have memory and just because
 4   computers can do functions, you have to look at the
 5   context of the claims.  You have to look at the
 6   inventive context, see what the claims are trying to do.
 7                  And different claims try to do different
 8   things, which is why you can't just look at a couple of
 9   claims and say, oh, this is the same.  They solve
10   computer problems and that's why they're patent
11   eligible.
12                  Thank you, Your Honor.
13                  THE COURT:  All right.
14                  MR. VERHOEVEN:  Your Honor, just brief
15   response, please.  Thank you.
16                  Thank you, Your Honor.
17                  Could we go to slide 77, please.
18                  This I didn't get a chance to get to.
19   Your Honor, this is exactly what you just heard, which
20   is we saw basically for the first time in the sur-reply
21   which is -- I'll call it the Hail Mary argument, but
22   it's this invention of a new test that doesn't exist in
23   the law.  Is it a computer problem or a computer
24   solution?  That is not a test you find articulated in
25   Alice.  That's not a test you find articulated in
```

 1  Ultramercial.  It's a test made up by the plaintiff in

 2  this case, is not found in the law.

 3                  Look at Ultramercial, Your Honor.  This

 4  is 722 F.3d at 1349 through '50.  The '545 patent seeks

 5  to remedy -- seeks to remedy problems with prior art

 6  banner advertising over the Internet, such as declining

 7  click-through rates by introducing a method of product

 8  distribution.  Their argument runs straight into

 9  Ultramercial II which is controlling in this case.

10                  And Your Honor's comment a couple of

11  times is very insightful.  I can take this language and

12  make the same argument and say this is computer problem,

13  computer solution.  Look at it.

14                  It says right there the problem is with

15  advertising over the Internet, and it's got a better

16  solution for advertising over the Internet.  But

17  nevertheless, the Federal Circuit in the controlling

18  opinion has found, no, this is an abstract concept.

19                  And so you can characterize this just

20  like you can characterize our patents as a business

21  method, payment and access, or you can characterize it

22  in the specific field, which is the data.  We know from

23  the precedent the characterizing an abstract idea within

24  a specific field does not take it out of abstraction.

25                  The test, Your Honor, is not, Is it a

1  computer problem solution?  That's not the test.

2              The test is Alice, and Alice says, What's

3  the first step?  You tease out the abstract idea and

4  that -- and you look at that idea and say, Is that

5  patent ineligible?  Is this a basic building block

6  that's used for centuries to conduct commerce?  In our

7  case it is.

8              I -- I suggest a persuasive piece of

9  evidence on this is what's happened at the PTAB.  And so

10  here we're citing on slide 79, this is -- you know,

11  Smartflash is saying it's claiming a technological

12  invention, computer solution to computer problem.  And

13  it's not just a business method.

14              Well, the PTAB's already found, Your

15  Honor, that the asserted patents are business method

16  patents, not technical patents that are eligible for

17  covered business method review.  So the very -- the test

18  itself is not the real test.

19              But, Your Honor, if that was the test,

20  the PTAB's already said right here the problem being

21  solved by Claim 8 is a business problem, data piracy.

22  It's not a computer problem.  The PTAB has said so.

23              And then the next slide again.

24              Over and over Claim 18, Claim 12, Claim 7

25  of these patents, the PTAB said, yes, this is a business

1  problem.  Data piracy not -- is not a technical problem

2  solution.  So, point one, the test is wrong.  Computer

3  solution is not the right test.  Step two, even if it

4  was, we would totally satisfy it as shown by the PTAB.

5                    Final point, Your Honor, is we saw

6  slides where -- couple of slides from counsel -- I don't

7  have copies -- that said it's not just paying for

8  something; it's a specific way of paying for something.

9  And it's not just controlling access to something, but

10  it's a way.

11                    And they talked about the steps of

12  implementing that.  They showed steps of receiving and

13  whatnot.  Well, that's -- what they're ignoring is Alice

14  again.  In Alice, the way is step two.  The way to step

15  two, you're supposed to tease out the abstract idea

16  first and then ask is the way they're performing that

17  abstract idea something that's novel or innovative.

18                    So, Your Honor, saying -- saying in step

19  one that it's the way of doing something is ignoring,

20  again, Alice.  And with that, Your Honor, I'll sit down.

21                    THE COURT:  Thank you.

22                    Final word, Mr. Summers.

23                    MR. SUMMERS:  Thank you, Your Honor.

24                    Again, counsel's citation of the

25  Ultramercial opinion when characterizing what the claims

```
 1   are directed to, that was Ultramercial I.

 2                    And after Alice, the Federal Circuit said

 3   that's not what the claims were directed to.  They were

 4   directed to advertising as currency.  So, they were

 5   rejecting that in the context of those specific claims.

 6   It was a computer problem.

 7                    And to go back to Ultramercial, it's

 8   important to remember that Ultramercial, yes, generic

 9   hardware doesn't necessarily apply an inventive concept.

10   But the claims in Ultramercial were pure method claims.

11   There was no specifics in the interaction between the

12   customer and between the content provider.

13                    And again, all of the limitations in

14   Ultramercial just set up the environment to execute that

15   abstract idea.  All of them.  The controlling access,

16   the clicking content, all of that is necessary to use

17   advertisement as currency.

18                    All of that is necessary so that all of

19   those limitations were token limitations because all it

20   was doing was setting up how to use advertising as

21   currency.  That's not what our claims do for paying for

22   things.  That's not what our claims do for controlling

23   access to things.  There are specific ways to control

24   access to things.  There are specific ways to pay for

25   things.
```

```
 1                   And I just want to show Your Honor to one
 2   specific claim from the '772 just to show you again
 3   how -- how there are additional limitations in the
 4   controlling access process.  It has to be written.
 5                   MR. CALDWELL:  The underlining is my old
 6   copy, so ignore the underlining.
 7                   MR. SUMMERS:  It has to be written into
 8   the non-volatile memory.  The rules have to be written
 9   into the non-volatile memory.  Once the rules are there,
10   you have to compare the status and the rules.
11                   It's not just a highly generalized have
12   access control.  It's not a highly generalized get
13   content.  It's a way of doing that, and it's a way that
14   improved data transmission and how data is transmitted
15   from content owners and customers.
16                   Thank you, Your Honor.
17                   MR. VERHOEVEN:  Just one point.  I'm
18   sorry.  It was raised for the first time.  Counsel made
19   the comment that Ultramercial II is just method claims
20   as if that was a distinguishing factor.
21                   Your Honor, if you look at Alice
22   Corporation -- you've got it.  Okay.  I won't make it
23   then.
24                   THE COURT:  Okay.  What claim did you put
25   up there?  I just didn't get it.
```

```
 1                     MR. SUMMERS:  It's '772, Claim 25.  The

 2    one that's asserted is 26, which it just depends upon

 3    it.

 4                     THE COURT:  Okay.  All right.  So we've

 5    been going about an hour and a half.

 6                     Yes, Mr. Caldwell.

 7                     MR. CALDWELL:  I'm sorry.  On this point,

 8    I think what ended up happening is we pointed out you

 9    have to look claim by claim and they never did.  But

10    then today they said, okay, well, we've done it now in

11    our slides.

12                     So, I guess my -- my concern is that if

13    Your Honor wants to entertain the now unrebutted new

14    information on them going slide by slide, please notify

15    us if -- if the Court wants some sort of further

16    submission on that.

17                     THE COURT:  Okay.  We're going to take a

18    break, and so why don't you look at these slides.  And

19    when we come back, I may hear some -- some argument.

20    You know, if you want to address those slides, if you

21    want to talk a little bit more about them, I know that

22    we're -- we've got a lot of ground to cover today, but

23    this is an important motion and I want you -- I want you

24    to fully argue it, so...

25                     Also, though, during the break, I'd like
```

```
 1  counsel to discuss this sealing of the courtroom issue
 2  and dispute, and what I'm going to do is we're going to
 3  take a 20-minute break for everybody, but in 15 minutes
 4  I'm going to come back and talk with those of you that
 5  need to talk with me about that specific issue.  Okay.
 6              So, I will be back in here at 10:45 to
 7  deal with that issue.  Everybody else that's not subject
 8  to that or part of that or involved in it, don't come
 9  back in the courtroom.  We'll let you know when you can
10  come back in.  Okay.
11              We'll be in recess.
12              (Sealed portion of transcript.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9                    (End of sealed portion.)
10                    THE COURT:  All right.  So, we're still
11   on the 101 motion.  Did you guys talk about whether
12   we're going to go through this --
13                    MR. VERHOEVEN:  We did.
14                    THE COURT:  Okay.
15                    MR. SUMMERS:  Yes, Your Honor.  We had
16   the opportunity to look at the 247 slides that they
17   prepared and --
18                    MR. SMITH:  I'm sorry.  Your Honor, I
19   don't know if you -- is in-house counsel for Google,
20   also?
21                    MS. BAILY:  Yes.  We're -- we've moved
22   on.
23                    MR. SMITH:  Oh, okay.  I'm sorry.  I'm
24   sorry, I didn't mean to interrupt.  I wasn't sure.
25                    THE COURT:  Tell me your name.
```

1           MR. SMITH:  I'm Kevin Smith.

2           THE COURT:  Okay.  Mr. Smith, I just

3    wanted to get it for the court reporter.

4           MR. SMITH:  I'm sorry.  I didn't mean to

5    interrupt.  I just wanted to make sure since it's such a

6    sensitive issue.

7           MR. SUMMERS:  So I had the opportunity to

8    look through the 247 slides, and it looks like what they

9    did -- you know, I can't go through 247 slides.  We

10   don't have all day.  But what they did for each claim is

11   they did exactly what they did for the representative

12   claim.  They just took ever limitation, they dissected

13   it, and said in one case this wasn't enough.  In this

14   case, it wasn't enough.  In this case, it wasn't enough.

15          But as you can tell from Diamond versus

16   Diehr and the progeny afterwards, that's too simplistic

17   of a way to view it.  You have to look at it in the

18   context of the invention.

19          And just before I sit down, Your Honor, I

20   just want to take a look at the Ultramercial claims and

21   take a look at our claims.  And, Your Honor, this is the

22   Ultramercial claim and we've heard a lot about how

23   there's a step of restricting public access.  There's a

24   step of offering to a consumer access to media.

25          But in Ultramercial, it doesn't tell you

```
 1   anything, anything about how to do that.  It doesn't
 2   tell you how to restrict access.  It doesn't tell you
 3   how to -- how the consumer is supposed to get this
 4   content.
 5                   And now I want to show you our claims.
 6   And, Your Honor, this is Claim 3, which is the
 7   independent asserted Claim 13 in the '720 patent.  This
 8   claim tells you how to pay for content and how to
 9   control access to it after you get it.
10                   You have to read payment data from the
11   data carrier.  You have to receive payment validation
12   data.  Responsive to payment validation data to
13   retrieve.  Responsive to the payment validation.  To
14   receive an access rule from the data supplier.  Write it
15   into the data carrier.  And give certain conditions for
16   what the access rules should be, what it should contain.
17                   That's not just controlling access to
18   something.  That's a way to implement it that solves the
19   data piracy problem, that's a computer solution, and
20   that's a patent eligible invention.
21                   Thank you, Your Honor.
22                   THE COURT:  Response.
23                   MR. VERHOEVEN:  Very briefly, Your Honor,
24   if I may.  First, if I now have permission, I think the
25   other side can hand up that deck.
```

1            THE COURT:  Yes.

2            MR. VERHOEVEN:  And I think that counsel

3   accurately characterized it being nothing more than we

4   did for Claim 11.  We contend that Claim 11 covers all

5   the functional -- or the other claims anyway, they're

6   similar, but in case there's any question, we just went

7   through it for the record.  So I'll just hand that up.

8            I want to note, Your Honor, on this issue

9   of whether we need to brief all the claims or not and go

10  element by element by every claim, the Ultramerical case

11  expressly says -- and this is at -- I don't have the

12  Fed 3.d pages yet, but it's at star 2 from the Westlaw

13  site.

14            Quote, As the other claims of the patent

15  are drawn to a similar process, they suffer from the

16  same infirmity as Claim 1 and need not be considered

17  further.

18            And if you look at Alice and Ultramercial

19  and all these cases, you find that they analyze a

20  representative claim as part of the opinion.  They don't

21  go through and -- you know, rote claim by claim element.

22  They pick one and they say -- and then they address the

23  arguments that are made.  I mean, if there's some other

24  claim that the patentee wants to point to and say, hey,

25  you missed this, well, that will come out through the

```
 1   briefing process.

 2              So, also I note the Amdocs case, Your

 3   Honor, Fed. supp. 3d -- and this is a new case, Your

 4   Honor, so it doesn't have formal cites -- Eastern

 5   District of Virginia case.  At star 5 also notes, Both

 6   Amdocs and Opennet only -- only present arguments

 7   regarding Claim 1.

 8              This accords with Alice, Mayo, and Bilski

 9   in which the Supreme Court found that various claim

10   types, method system, et cetera, directed to the same

11   invention should rise or fall together.  So, we don't

12   believe we have to do this, but we've done it for, Your

13   Honor.

14              Then just briefly to address the point

15   that they keep going back to about the specifics,

16   they're talking about the way to do something.

17   That's -- you're ignoring Alice again.  First step is

18   you extract the abstract idea, and that -- they haven't

19   addressed that.

20              What is the abstract idea?  They're

21   pointing to specific process steps that accomplish the

22   payment and the controlling, and that's step two.  And

23   when you apply step two, Your Honor, you'll see that all

24   of those steps are just routine hardware and software

25   components.
```

```
 1                    And final point I want to note is they
 2     got up -- their final point is to distinguish
 3     Ultramerical.  They're opening brief, they embraced
 4     Ultramercial.  They said that patent was just like our
 5     patent.  So their arguments, I would submit, change
 6     because the Ultramerical II case came out, and now
 7     suddenly they're distinguishing the very patent that
 8     they embraced before.
 9                    MS. FUKUDA:  Your Honor, if I may have
10     just less than one minute.
11                    THE COURT:  Sure.
12                    MS. FUKUDA:  Smartflash has repeatedly
13     put up exemplary claims where they point to the fact
14     that content is written to memory or that use rules are
15     stored in this non-volatile memory as the distinguishing
16     factor that should take them out of the world of
17     abstract ideas, and I just wanted to emphasize the point
18     that the Eastern District of Texas in Loyalty has
19     addressed this very issue on slide -- I think this is
20     slide 40 of Mr. Verhoeven's presentation.
21                    It says that -- specifically addresses --
22     oh, 41.
23                    UNIDENTIFIED SPEAKER:  Is it the appendix
24     or --
25                    MS. FUKUDA:  It ought to be the first one
```

```
 1  after --
 2              MR. VERHOEVEN:  No, not the appendix.
 3              MS. FUKUDA:  Well, I can just read it
 4  for the Court.
 5              MR. VERHOEVEN:  There it is.
 6              MS. FUKUDA:  It says that all those
 7  functions consist of simple forms of data recording,
 8  storage, and calculation, all of which are conventional
 9  functions that can be performed by a generic computer
10  without any novel programming or improvement.
11              That's all their claims -- the Smartflash
12  claims are directed to.  The shared storage into
13  non-volatile memory is not anything inventive.  It's
14  completely generic computer orientation.
15              Thank you, Your Honor.
16              THE COURT:  Thank you.
17              All right.  Mr. Summers.
18              MR. SUMMERS:  Your Honor, just three
19  quick points.  First, in our initial briefing, we didn't
20  say our claims were exactly like the Ultramercial
21  claims.  We were saying our claims improve computer
22  technology.  And the Federal Circuit just looked at the
23  claims and saw that they weren't improving computer
24  technology, and our claims are different as we just
25  showed you.
```

```
 1              And, Your Honor, opposing counsel just
 2   made one of our points for us, that you can't just say
 3   all these inventions are the same.  There are different
 4   limitations in different claims and they do different
 5   things.
 6              And so that's why it's our position, Your
 7   Honor, that they have the burden to show all of the
 8   claims.  Any claim they want to prove invalid, they have
 9   to show you why that isn't inventive other than just
10   saying, oh, this is generic, or things like that.
11              And so, Your Honor, the claims that were
12   shown aren't representative.  They aren't
13   representative.  They didn't have comparison of use
14   status and use rules.  They didn't have necessarily
15   stored into non-volatile memory.  And so, Your Honor,
16   has to look at the claims -- Your Honor has to look at
17   the what the claims are trying to do in the context of
18   the invention.
19              When you see Loyalty conversion,
20   that's -- it wasn't about transfer.  It wasn't about
21   moving things between two computers.  It was just a
22   computer storing something, and so that's why the
23   holding was, you're just taking an abstract idea and
24   dolling it up with computer hardware.
25              That's not what the claims do.  They use
```

1  specifics of one computer hardware to solve a problem

2  that arises from the interaction of data and the

3  interaction of computers.

4              Thank you, Your Honor.

5              THE COURT:  All right.

6              We're going to move on.

7              MR. VERHOEVEN:  I'd just be repeating

8  myself if I got up, Your Honor.

9              THE COURT:  All right.  Then what is

10  next?

11              MR. CALDWELL:  Your Honor, I believe the

12  next agreed motion would be in the Apple case, Docket

13  Number 277, which is plaintiff's motion to strike

14  portions of the rebuttal expert report of Anthony

15  Wechselberger.  He's one of Apple's technical retained

16  persons.

17              May it please the Court.

18              THE COURT:  Yes.

19              MR. CALDWELL:  Note that it's apparent

20  from the title slide what this motion is, is to strike

21  portions of the Mr. Wechselberger's report.  We're not

22  seeking to strike his entire -- entire report.

23              And what Mr. Wechselberger did is he's

24  given opinions on non-infringement, things on

25  invalidity.  I think he's made remarks about 101 or

1  maybe 112, just a variety of different things.

2  But one thing he did in a rebuttal report

3  is really what we're addressing here.  This isn't

4  seeking to strike his non-infringing or invalidity

5  arguments, nor is it seeking to strike their attacks on

6  survey methodology and that sort of thing.

7  What Smartflash is seeking to strike with

8  this motion is just Apple's identification through this

9  expert of alternatives -- alleged non-infringing

10  alternatives that Apple says it could switch to but that

11  they did not tell us about during discovery, and they

12  still haven't provided discovery.

13  Now, it's interesting because we've been

14  talking about this other third party issue.  Keep in

15  mind this isn't some third party over which no one took

16  discovery or anything like this.  This is Apple refusing

17  to answer our discovery as to what they could switch to

18  and then putting out, not in their burden report even

19  but in their rebuttal report -- maybe that doesn't

20  matter -- but in the rebuttal report as late as

21  possible -- these alternatives that said we could have

22  switched to.

23  And to this day, they have not answered

24  the interrogatory about non-infringing alternatives they

25  could switch to.  To this day, they are standing on a

1   refusal for us to get to depose somebody on it.  And

2   I'll get around to this in a minute, but I'd like to --

3   I'd like to make it clear.

4                    I mean, you've seen arguments like this,

5   right?  Something like this happens in all these kind of

6   cases it seems like.  And often -- I'm not jealous of

7   the position the Court's in in this sort of situation.

8                    And one of the things that comes out of

9   it quite frequently is, well, the solution is, I know

10  everybody's busy but you've got a bunch of lawyers, why

11  don't you go depose the guy now.  Give them the update

12  to the interrogatory.  You go depose the guy and that

13  will cure it.  Well, it won't.

14                   Because what happened is Smartflash, at

15  significant expense to ourselves, ran a survey and in

16  reliance on Apple saying, no, we don't have

17  alternatives.  Not just standing on objections, saying

18  we don't have alternatives.  So, allowing even a cure of

19  it now and allowing this undiscovered information to

20  slip in through the back door is terribly prejudicial

21  to -- to Smartflash.

22                   I'll try and go through the slides pretty

23  quickly, but I just wanted to give context.

24  Interrogatory Number 6 is a common interrogatory.

25  And -- and for the Court's background, the way the

```
 1   discovery order came out in this case because of the
 2   overlap, even though there's two civil action numbers,
 3   there were certain interrogatories that they could
 4   propound on us commonly and we could propound on them
 5   commonly and they'd all have to answer it.
 6                     This is one of the ones we use as a
 7   common interrogatory because it's just sort of your -- a
 8   typical rog you ask in almost every case -- every patent
 9   case.  Identify and describe what you contend is your
10   best alternative to infringing Smartflash's patents and
11   all associated costs.
12                     We've proceeded down two lines.  Two cars
13   were on the same highway for a little bit.  The two cars
14   on that highway were Apple and Samsung, both of them
15   refusing to answer this.  Samsung drew a line in the
16   sand and said, No, we're standing on our objections.  We
17   will not be answering that interrogatory.
18                     So, you may remember we had a motion to
19   compel, and then the date for providing the information
20   came and went and it was followed up upon at the Markman
21   hearing.  Eventually, we got an answer in discovery to
22   this question from Samsung.  Okay.  And then when it
23   came time for their burden reports, they address it --
24   they address it there.
25                     Apple -- as I say, they were on the same
```

1  highway for a while and they gave basically the -- the

2  objection-type answer, not -- not addressing it

3  substantively.

4           And just for the record, I have skipped

5  over the -- two-thirds of a page of boiler plate that

6  would be before this, and -- and what I'm doing at slide

7  3 is directing the Court to the closest thing you could

8  say is sort of a need to bear answer to this

9  interrogatory.

10          And it says, As of the date of this

11  supplemental response -- and this is, like, maybe

12  the second or third time they had supplemented -- Apple

13  has not yet developed specific contentions regarding the

14  best alternative in any event -- in the event that

15  anything is found to infringe.  Discovery's still

16  ongoing.  We reserve our right to supplement.

17          So, the natural question may be, okay,

18  you filed your motion on -- on Samsung.  Why don't you

19  revise and file one over in the '447 case against Apple.

20  But there's more to the story.

21          We also served 30(b)(6) notices on Apple

22  and these were kind of customized per defendant.  But

23  the Apple one had several topics really getting at this

24  issue, some more than others but certainly on this

25  issue.  One was all efforts to design around the

1  patents-in-suit, have there been any.

2            Topic 164 I'd really like the Court to

3  pay very close attention to this one, because I'll come

4  back to it in a minute.  Any allegedly non-infringing

5  alternatives to the invention claimed in the

6  patents-in-suit and the cost and acceptability of such

7  allegedly non-infringing alternatives in the

8  marketplace.  We asked that to Apple.

9            Any efforts to acquire a license that you

10 would need for any of these design-arounds, and any

11 customer feedback or complaints regarding any allegedly

12 non-infringing alternatives you've implemented.  So if

13 you've ever done one of these things before, do people

14 like it or not.

15           But -- and I realize some of them are

16 sort of specific.  It's like, Did you get licenses?  Did

17 you get customer feedback?

18           Plainly, Topic 164 is your generic.  You

19 got to tell me what it is that you think you might do as

20 a non-infringement alternatives.  We got the usual

21 objections on it.  I understand that -- that slide

22 number 5 is kind of zoomed out.  I'm happy to give it to

23 you if you care to read it.

24           But this is the boiler plate part of the

25 objections that's broad, unduly burdensome, vague and

1  ambiguous, so on and so forth.  But the telling part, I

2  think, is on the -- when it carries over to the second

3  page, their objection to Topic 164, where the substance

4  of Apple's objections, I guess, or responses to that

5  notice says, Subject to the foregoing general and

6  specific objections, Apple will meet and confer with

7  Smartflash after providing a supplemental response to

8  Smartflash's common interrogatories on -- on this

9  non-infringing alternative and/or design-arounds to

10  determine whether a witness can be identified.

11              So, as to the 30(b)(6), it's like, well,

12  we refuse to answer your rog on it, and I'm not going to

13  give you a witness because I haven't answered your rog;

14  but if I ever deem to answer your rog, then I'll give

15  you a witness on it.

16              And what ended up happening at this point

17  is we had a lengthy dialogue.  And this is sort in the

18  same timeframe that we were moving to compel against

19  Samsung, but -- and I have to say, for the most part,

20  we've gotten along with Apple very well in

21  communications.  The communications are always civil, I

22  think, and -- from both sides and we've been able to

23  resolve a lot of things.

24              And so this is actually something that,

25  in that vein, the parties worked on for quite a while to

1  see if we could head towards some common ground.  And

2  there was a lot discussion on this.  But at the end of

3  the day, you know, we said, Guys, we cannot wait on this

4  anymore.

5            And what's happening is, at this point,

6  our survey guy -- and they hire, like, third parties

7  that administer the actual tests.  I mean, we're --

8  we're pumping large amounts of money into this.  The

9  experts have contributed to defining questions that will

10 be in there and defining possibly alternatives so you

11 can kind of try and evaluate how consumers react to

12 differences if you switch to something that would be

13 non-infringing.  We put a lot of effort into that.

14            And we're telling Apple we got to know

15 what's going on here.  And we finally get sort of a

16 clear answer in a letter from Apple's counsel, and I'll

17 zoom in here.  Basically, the long and short of it, the

18 Court's free to read the whole photograph, obviously,

19 but the long and short of it is, To date:  Apple has not

20 identified any such design-arounds/non-infringing

21 alternatives and opinions of counsel.  Accordingly,

22 there is no testimony for an Apple corporate witness to

23 provide on these.

24            I didn't want to highlight literally

25 everything in there, but one thing that's kind of --

 1  kind of telling -- because this is basically the last

 2  time that Apple really said, Here's our position.  We're

 3  not giving it to you.  We're not giving you some

 4  non-infringing alternatives or answering your

 5  interrogatory.

 6            The middle white portion of the text --

 7  it's not highlighted -- is pretty important.  Apple says

 8  because there are claim construction disputes pending

 9  with the court, Apple reserves its right to identify any

10  such design-arounds/non-infringing alternatives and

11  opinions after an order construing the claims is issued

12  by the court.

13            What I think is telling about that is

14  sort of two-fold; one, I think it was Judge Everingham

15  that once observed, Guys, you can't stiff the other

16  party on discovery just because there's not actually an

17  order from the Court on claim construction.  Once the

18  fights -- once the issues have been joined by the

19  positions the party took on claim construction and

20  you're on notice, you got to -- you got to provide

21  discovery.

22            And I think it was in the context of

23  maybe an order denying leave to add a knew DOE theory or

24  something along those lines.  You can't claim to be

25  surprised because one of you got the construction you

1   asked for six or eight months ago.  So I take issue with

2   that.  I don't think that's a grounds to -- to withhold

3   discovery anyways.

4                    But more to the point, when Apple

5   eventually put these non-infringing alternatives out on

6   us, that was before -- that was still before the Court's

7   claim construction.  So when their expert did it in his

8   rebuttal report, it was still before the Court's claim

9   construction.

10                   And they have -- to this day, even in

11  view of the Court's claim construction, which basically

12  adopted either plain meaning or constructions along with

13  the parties, still haven't done anything on the

14  interrogatory or the 30(b)(6) notice, which I say at

15  this point it's -- it's too late for a cure.

16                   So, to get to really what -- what

17  happened, nothing happened in the close of discovery,

18  and then nothing happened with the burden reports.  But

19  then you get to the rebuttal reports and this is where

20  Dr. Wechselberger starts to address this issue.

21                   What I'm showing here on slide 8 are some

22  excerpts from Anthony Wechselberger's rebuttal reports.

23  And what he says is, well, Dr. Jones -- okay.  For

24  background on the survey, if you're going to compare

25  features versus alternatives, you need to be able to

1   propose something, and it's got to be in some sort of

2   plain English that a juror can -- a juror -- the survey

3   recipient can understand and that sort of thing,

4   obviously.

5              So, what happened was, to make sure that

6   it is tied to what's going on, we had our survey guy

7   Dr. Wecker, we had our economist Mr. Mills, and we had

8   professor Mark Jones who's on the technical side, and

9   counsel looking at cases, and people work together to

10  craft the right kinds of questions to make sure that

11  they're fair and they address the points correctly and

12  they're understandable.  That took a lot of time.

13             Well, what Mr. Wechselberger does, he

14  comes back at the end and says, Well, what Dr. Jones --

15  when he was supplying his technical input to those

16  surveys, what he did, what he says are the alternative,

17  those aren't the alternatives he should have used.  He

18  ignores that other potential alternatives exist -- and

19  this is where it even gets more interesting -- some of

20  those -- some of which would be less burdensome on Apple

21  and its customers.

22             So, Apple has refused not only to tell us

23  what alternatives they have, not tell us what the best

24  ones are, and not tell us what the cost or acceptability

25  is, but now their guy in rebuttal is saying, I've got

1  ones that would be much better to Apple.  And, Oh, by

2  the way, Apple still won't give us the discovery.  Says

3  that again, same point.  But, basically, there are less

4  burdensome changes -- less burdensome changes that could

5  be made to iTunes ecosystem that wouldn't infringe.

6              Now, in the briefing -- Apple did not

7  file a sur-reply on this.  They filed a -- they did file

8  their response.  Their response I think -- there's

9  something that's revealed, I think, in the -- in the

10  structure of the response.  One of the points we had

11  made is that this is improper rebuttal.

12             I honestly -- I don't think you -- I

13  don't think the Court needs to get to the issue of

14  whether this should have been in a burden report or in a

15  rebuttal report.  I don't -- I don't know that that at

16  the end of the day has to carry the day, because the

17  point is there are Federal rules that say you don't get

18  to not tell somebody in discovery and then come up and

19  cross-examine someone and put it in at trial.

20             But what's interesting is Apple's whole

21  brief is about whether it's proper rebuttal or not.

22  They don't say whether this is discoverable information

23  that you were able to ask an interrogatory about or ask

24  a 30(b)(6) about, because it plainly is.  It's plainly

25  discoverable information as to their contentions.

```
 1              So, what -- what we did is we've gone
 2  back and looked at what are these things that
 3  Mr. Wechselberger introduces, because what Apple's
 4  trying to do is say, Well, gosh, we never could have
 5  identified this stuff before.  It's just -- it's just
 6  impossible.  It's just plainly not true.
 7              Mr. Wechselberger says, For example,
 8  similar to the iTunes session model, content can be
 9  provided to a user on credit with payment and payment
10  validation to take place at a later time.
11              Is that okay with the studios?  Is
12  Paramount cool with that?  Is Disney okay with that?
13  You can have everybody download Frozen and see if they
14  can pay for it later.  I don't know.  But you know what?
15  Wasn't able to go ask anyone at Apple about that, wasn't
16  able to see what their -- their contracts are about
17  that, wasn't able to investigate whether that's even --
18  even a possibility.
19              Similarly, although they say we are
20  rebutting what Dr. Jones pointed to as payment
21  information, they've got this other allegation which --
22  subtle difference.  For example, rather than reading
23  payment distribution information from a data store, this
24  information could be manually input by Apple prior to
25  distributing royalties to content owner.
```

1             So even though Dr. Jones was testing --

2   was testing some issues related to payment data that

3   might go from your iPhone to the iTunes store, they're

4   now saying, Well, one thing we could do that's totally

5   unrelated to that is back at the back end, when it comes

6   time for Apple to pass on the revenues to all the

7   different app guys, the thousands and thousands and

8   thousands of app guys, we can just do all that by hand

9   entry.  That's something we could do.

10            And then also in another example, rather

11  than allowing users to download apps from the app store,

12  Apple devices could just be preloaded with some number

13  of the most popular apps, like 10 or 20 of the most

14  popular apps.

15            Who's going to pay for that?  Are they

16  passing that along to the consumer so the phone price

17  goes up?  Is Apple just going to pick that up and

18  reimburse the app guys?  Are the app guys cool with

19  that?  Are users cool with having that memory taken up?

20            I don't know.  Never got to ask Apple.

21  But not one of those is something Apple couldn't have

22  told us about during discovery and let us go -- let us

23  go investigate.

24            And at the end of the day, if we boil it

25  down, how -- how is it in the American legal system

1  where you have discovery to avoid this sort of thing

2  that Apple would be allowed to testify about this or

3  criticize our survey and our technical expert saying,

4  Here's stuff you should have testified that we refused

5  to tell you about?  That's really where we get super

6  harmed on this.

7            And as I'm saying, there's other

8  examples, just things like you could download the

9  content.  You have it on your phone, but you can

10  actually only play it when you have an active Internet

11  connection.  So, you can download it but you can't play

12  it on the subway if you're in New York, or play it on an

13  airplane.  You got to have an active Internet

14  connection.

15            Again, we didn't get to investigate

16  whether the marketing guys would be real happy with

17  that, the music you can download but can't play during

18  your commute.

19            So, remember, we're not talking about a

20  case where it's some third party's nobody took discovery

21  at the end of discovery might do.  It's Apple's

22  expert -- paid expert saying what would be okay with

23  Apple and not burdensome to Apple, but Apple never --

24  never has addressed it.

25            And the Court is going to be familiar

1  with this, Rule 37.  There -- there are consequences

2  when you withhold something in the discovery, and I

3  won't read all of Rule 37(c)(1), but if a party fails to

4  provide information or identify a witness as required by

5  26(a) or (e) -- and 26 (e) is about supplementing

6  interrogatories and what not -- the party is not allowed

7  to use that information or witness to supply evidence on

8  a motion, at hearing, at trial, unless the failure was

9  substantially justified or is harmless.

10             Their failure is not justified and it's

11  certainly not harmless.  I think those two things I

12  won't repeat.  There are other sanctions that the Court

13  could give in lieu of those.  There's other things the

14  Court can do like pay expenses or inform the jury of the

15  party's failure or other appropriate sanctions.

16             I mean, I think in this instance -- as I

17  say, we're not seeking to strike everything that

18  Mr. Wechselberger did or all the criticisms of all of

19  our experts.  But in this instance, this one, I think

20  the appropriate sanction is -- or the appropriate result

21  is simply to say, Hey, guys if you're not going to

22  disclose what you yourself, your company could do -- and

23  they've never claimed privilege over it, not once.

24  That's not the issue.  But if you're not going to

25  disclose it, you can't come back and use it to throw

1  stones when it comes time for -- for trial.

2          So, I'm trying to figure out why Apple

3  thinks they don't have to actually provide discovery on

4  it.  And it's not actually clear, but the best I can

5  understand as to why Apple says they didn't have to

6  provide discovery on it is because they say they don't

7  actually care whether any of these alternatives their

8  expert is pointing out are even available.  They don't

9  actually care about that.  It doesn't matter if it's

10 something you could actually do.

11         And this -- I'm looking to this part of

12 their response brief.  It's at page 3.  Apple has not

13 argued in it's expert report, summary judgment briefs,

14 or Daubert motions that the availability of a

15 non-infringing alternative is a factor that should

16 result in lower reasonable royalty.  Apple has not

17 suggested that the availability of non-infringing

18 alternatives is a factor that should be considered at

19 all during hypothetical negotiation for determining a

20 reasonable royalty rate.  Absent such a contention,

21 there is no burden on Apple to postulate non-infringing

22 alternatives for Smartflash's experts to then use to

23 create a survey.

24         And maybe I'm reading this wrong, but

25 what is crystal clear to me is it may just be that Apple

1 | is saying, well, we didn't have to put it in our burden

2 | report.  But as to whether there was no burden to

3 | provide it, the Federal Rules of Evidence -- or -- I'm

4 | sorry -- Federal Rules of Civil Procedure as to

5 | interrogatories and 30(b)(6) depositions say -say

6 | otherwise.

7 |           So -- and finally 23, I mean, if their

8 | point really is that, We don't have to give you this

9 | information because who cares if the alternative is

10 | actually available, why would we have a trial where our

11 | experts are being criticized for not considering

12 | something that's even available, even an alternative?  I

13 | don't -- I don't get it.

14 |           But I think that point is sort of

15 | irrelevant because there was a valid discovery request

16 | requesting discoverable information that just was no --

17 | was not answered without explanation, no mention of the

18 | 30(b)(6) topic that we had out, no mention in the

19 | response of the letter that I could -- that I recall

20 | anyways.

21 |           And at the end of the day, Apple just

22 | tries to say, Well, it's surprise, because we learned

23 | in -- we learned for the first time in Dr. Jones'

24 | report -- Smartflash disclosed its position that options

25 | like streaming content would not infringe at least some

1  of the asserted claims.  And I have highlighting,

2  obviously, to help streamline the reading.  Your Honor

3  is welcome to read all of it.

4             They also -- one of the parts that's

5  not -- that's not highlighted -- I will say another

6  alternative -- like they learn that manually entering

7  payment information into a website is outside the scope

8  of the asserted claims.  I cannot conceive how they

9  learned of that for the first time in an expert report.

10 That has never been accused of infringement of these

11 claims.  Like, oh, you're buying something on your

12 iPhone.  Hold on.  Let me go over here to a website

13 and -- and do my payment separately.  That's never been

14 accused.  They didn't learn that in -- in Dr. Jones'

15 report.

16            And as to the position that streaming may

17 not infringe some of the claims, that's been crystal

18 clear since day one.  Apple in its brief says, But --

19 but they accused AppleTV second and third generation

20 that stream.

21            Well, yeah.  It's always been the case

22 that that was accused as to some but not all.  Even the

23 claim they point to -- '720, Claim 1 -- mentions this

24 AppleTV.  But the next one -- the next independent

25 claim -- '723 in our contentions -- does not accuse it.

1  Same as when you get in the allocations -- allegations

2  of that claim, '720, Claim 1 accuses that AppleTV

3  functionality, '723 doesn't.  Nor does 95 percent of the

4  asserted claims even -- were they ever asserted in

5  streaming.

6            And one of the -- I think maybe the only

7  other one that is, although I don't want to misrepresent

8  that to the Court, '772, Claim 5.  Which is just a

9  little dependent claim, before we have the construction

10  for supplementary data we had said supplementary data

11  must be streaming content.  That's -- to my knowledge, I

12  think that's the only time we actually even referred to

13  streaming is in one dependent claim of one of the six

14  patents in our contentions.

15            So, acting as though Apple has suddenly

16  realized through Dr. Jones' opinion that streaming does

17  not infringe all claims, I can't really reconcile that

18  with reality.  I think what it is, is just a post-doc

19  explanation for why -- why they never gave us any sort

20  of discovery.

21            I've already been through this, but

22  basically these things they say he learned about

23  streaming and manually entering payment information,

24  they didn't just learn them.  And those things don't

25  justify the new alternatives that Mr. Wechselberger put

```
 1  out.
 2              So, in conclusion, I think it's pretty
 3  telling that Apple focuses on the sequence of reports,
 4  not on what they didn't do during fact discovery.  And I
 5  think they're just flat wrong on the discovery side of
 6  it.  I mean, they didn't really address -- didn't
 7  provide information.  But, in any event, they chose not
 8  to.  It was tactical.
 9              And I'll remind the Court, we would
10  have -- I mean, we -- we take quite seriously bringing a
11  motion to the Court.  And there was months of -- I think
12  a month or two of meet and confers with Samsung before
13  we ever brought the first one, and then there were more
14  problems before we brought the second one.
15              We've had a good rapport with Apple's
16  counsel, and we negotiated this for a long time.  And we
17  absolutely would have moved on it but the problem is the
18  letter.  The letter doesn't say, I'm standing on an
19  objection because I think it's not discoverable.  It
20  says, We don't have an alternative.
21              And at some point, you've got to be able
22  to rely on discovery without just the sneak attack that
23  says, I know we didn't tell you about it, but here's
24  something else we could have said and didn't.
25              So, in conclusion, not all of
```

```
 1   Dr. Wechselberger's report but the non-infringing
 2   alternatives that he adds in his rebuttal report should
 3   be stricken so that that criticism can't be made by him
 4   and nor should it be levied on Dr. Jones or Dr. Wecker
 5   in cross-examination when we weren't able to test them.
 6                   As a reminder to the Court, it's
 7   Smartflash's position that whereas typically things of
 8   this nature can be cured, at some point you have almost
 9   like an estoppel effect.  I mean, if someone represents
10   there isn't something, you do it -- you take actions in
11   reliance.  I can't -- I can't cure that now.  I mean, I
12   could go get some criticisms of it, but if their guy's
13   allowed to come in and say, Well, here's all the reasons
14   that survey you spent a bunch of money on is flawed,
15   that doesn't really fix my problem.
16                   Thank you.
17                   THE COURT:  Thank you.
18                   Response.
19                   MR. POST:  Got a couple of binders, Your
20   Honor, if I can pass those up.
21                   THE COURT:  Sure.
22                   MR. POST:  All right.  So just -- just
23   one quick point.  I think one of the issues that the
24   parties had briefed is whether Apple had an affirmative
25   burden to -- to present this information in its burden
```

 1  report.

 2             I misplaced my clicker.

 3             And Apple's position in its response was

 4  that that's not the case, that Apple is not

 5  affirmatively putting forth alternatives to form a basis

 6  for something like a cap on royalties.  And the slide --

 7  I think it sounds like from Mr. Caldwell's argument and

 8  I think the briefing, the way it played out, makes clear

 9  that that's not really what the issue is, but I wanted

10  to be clear that Apple's position is that that is not

11  something it had a burden to present affirmatively.

12             It's not something that's underpinning as

13  you'll see and hear in the next series of arguments as

14  this survey issue rolls forward through the various

15  experts, but it was -- it was forming the basis for its

16  own survey for capping its own damages.  So I think it

17  sounds like that issue is something that wasn't raised

18  in their reply brief is -- is no longer an issue.  I

19  want to be clear on that.

20             So, Mr. Caldwell mentioned that in his

21  perspective, really it's that later point, the

22  undisclosed factual contentions that are the main issue.

23  In their -- in their motion, both the question of

24  whether or not this was an improper rebuttal and whether

25  Mr. Wechselberger's opinions were based on some

```
 1   undisclosed contentions were raised, and I do think that
 2   both of those are relevant to the issue.
 3               We did in the responsive brief focus
 4   on -- in part on that -- the question about whether or
 5   not this is improper rebuttal because this is an
 6   important question, I think, in the -- the overall
 7   context of the motion.  And as we'll -- we'll step
 8   through those in order if you want both to have some air
 9   time, but as you'll see, each of those arguments does in
10   fact fail.
11               So, the parties agreed on -- on what the
12   three-part test was for rebuttal evidence, and I'm not
13   going to spend a tremendous amount of time on this
14   because I think Mr. Caldwell stepped through this.
15   We're generally in agreement, and I think the briefing
16   lays that out.
17               There are three -- three questions that
18   the Court looks at to determine whether or not an expert
19   opinion is improper rebuttal.  The first and second
20   questions are really related to one another.  Now, the
21   first is, What evidence does the rebuttal expert purport
22   to contradict or rebut?
23               And I think it's important here to
24   remember and keep in mind exactly what it is that
25   Dr. Jones said he was doing in his alternatives
```

1  discussion.  He was laying out for a variety of

2  scenarios what he believed the best alternative was for

3  Apple or its customers in order to form the basis of

4  these scenarios that were ultimately tested in the

5  survey.  And those were -- were Dr. Jones' opinions.

6  They were his subjective analysis of something being the

7  best and an alternative.

8          And what Mr. Wechselberger did is -- is

9  challenge that -- question that.  Did Dr. Jones apply

10  those two subjected tests consistently across his

11  various scenarios?

12          As Your Honor may be familiar, there

13  are -- I think there are about 13 different scenario

14  alternatives that were used in the survey, and those

15  focus on different features, different aspects of the

16  accused products.  So the question Mr. Wechselberger was

17  asked was, you know, are those consistent, were they

18  consistently applied.  And we'll -- we'll talk about

19  that in a minute.

20          But as to whether or not what the focus

21  of the rebuttal opinion is, it's on those alternatives

22  and whether in fact they are the best.

23          THE COURT:  But aren't they -- aren't

24  those statements contrary to Apple's position during

25  discovery of we don't have any non-infringing

 1  alternatives?   I mean, that's what's troublesome.

 2                    MR. POST:   So, I think the question --

 3  and Mr. Caldwell focused on Topic 164 of the 30(b)(6)

 4  notice.   You know, that -- that focused on really what

 5  the cost and acceptability of alternatives was.

 6                    You know, I think if -- if Apple were to

 7  come forth and say some alternative would be beneficial,

 8  would be less expensive, could be implemented at some

 9  small cost, and that should be a cap on damages, that

10  may be a different question, but that's not what's --

11  what's at issue here is not what Apple has done in the

12  rebuttal expert report.

13                    THE COURT:   Okay.   But the common

14  interrogatory says, Identify and describe what you

15  contend is your best alternative to infringing

16  Smartflash's patents.   And your response ultimately was,

17  We don't have one.

18                    MR. POST:   Sure.

19                    THE COURT:   And now you've got an expert

20  saying, Yeah, there are these others.

21                    MR. POST:   Sure.   So let's -- let's

22  actually jump ahead.   I think that the slides are clear

23  and doesn't sound like we have a dispute on whether or

24  not this is improper rebuttal as a matter of law.   If we

25  want to go back to that, certainly happy to, Your Honor.

1            But jumping ahead to the question about

2   whether or not this is in fact an undisclosed factual

3   contention, respectfully, when Apple was accused of

4   infringement for the first time in the case, AppleTV was

5   one of the accused products.  I don't think that's

6   disputed.

7            And there are claims for which in the

8   initial preliminary infringement contentions, AppleTV

9   devices that solely stream content were accused of

10  infringement.  So, faced with those contentions, it's --

11  it's Apple's position that that -- the belief that

12  streaming content, its streaming functionality was

13  accused was a reasonable belief based on those

14  contentions that -- that Apple was seeing and had been

15  accused of infringing based on.

16           It wasn't until Dr. Jones in his opening

17  expert report said, not streaming -- it's non-infringing

18  and it's an alternative that -- that one could use.  The

19  issue is taking that streaming example, he then applied

20  it inconsistently between some of these alternatives.

21           And that's what Mr. Wechselberger was

22  responding to, that if streaming is not infringing,

23  that's your position?  It doesn't infringe.

24           It should be an alternative anywhere

25  streaming content could be employed.  And that's what he

1  did when he stepped through each of those alternatives

2  and say, well, you know, you say streaming's

3  non-infringing, well, it could be an alternative for

4  this particular alternative.

5            So, at the time in discovery when asked

6  whether it was the common rog, whether it was the

7  specific Rule 30(b)(6) deposition topics, it was Apple's

8  position.  And, you know, my name was at the bottom of

9  that letter and I stand by what we said at the time.

10           Based on the contentions -- the breadth

11  of the contentions that we were facing, Apple did not

12  have any contentions about what would be the best

13  alternative for practicing those claims.

14           And it's not just the streaming context.

15  We also talked about payment information.  Again, this

16  is a screen shot from Smartflash's preliminary

17  infringement contentions.  An example of payment

18  information that's input into -- you can see here this

19  is the iTunes' client on I believe -- I know it's

20  device.  What's presented there is essentially a web

21  page.

22           Again, this is what Dr. Jones now says is

23  an alternative, what he contends is the best alternative

24  for practicing certain of the claims.  This was their

25  infringement contention.  So, again, faced with a

1  contention like this -- a broad contention like this in

2  discovery, that was Apple's position that no

3  alternatives had been identified, and we stand by that.

4  Based on that, that was Apple's belief during discovery.

5              Now, Dr. Jones presents his opinions and

6  Mr. Wechselberger responds to those.  And just stepping

7  back to -- I think it is relevant to this point.

8  Turning to the -- the question about rebuttal evidence,

9  one of the cases that Smartflash cites is Tramonte v.

10 Fibreboard case.  It's a 5th Circuit case from 1991 and

11 its dealing with fairness.

12             Is it fair for a party to face something

13 new in a rebuttal that they have no opportunity to

14 respond to.  I think it's important for this case to

15 know what exactly the -- the chronology of events were.

16 The Court was considering a request to admit that

17 certain deposition testimony in the rebuttal phase of

18 the case.  So this wasn't rebuttal report.  This wasn't

19 defendant's case in chief where some information was

20 coming out.  This was literally in the rebuttal, and it

21 was information that had been attempted to be introduced

22 in plaintiff's opening case.  Court denied that.

23             There, the Court was concerned that

24 there's no further opportunity to consider that evidence

25 to have responsive evidence submitted and there's --

1  there's prejudice there.  That isn't the case here.

2           Mr. Wechselberger put forth in his

3  rebuttal report his opinions about whether responding to

4  Dr. Jones' opinions, they have been applied

5  consistently, whether they were truly the best

6  alternatives available.  So best alternatives, period.

7  And Dr. Jones submitted a supplemental expert report

8  responding to those, so he himself had the opportunity

9  to respond.

10           Both experts have been deposed in the

11  case.  Presumably at trial, Dr. Jones will submit during

12  plaintiff's opening his belief as to the -- the best

13  alternatives.  Mr. Wechselberger will have the

14  opportunity to respond in Apple's case in chief, and

15  then the rebuttal phase presumably, if Smartflash wishes

16  to, expect that Dr. Jones could -- could revisit those

17  opinions in -- in the rebuttal phase.

18           So, respectfully, we believe there's

19  no -- no prejudice here and that nothing untoward has

20  been done to Smartflash.  Thank you.

21           THE COURT:  All right.  Mr. Caldwell, I

22  would like to hear your response on the notion that

23  initially some of what are now non-infringing

24  alternative ideas for your expert were infringement

25  contentions.  All right?

```
 1              MR. CALDWELL:  Okay.  One, if that were

 2   true, I don't think that could ever be a reason why you

 3   don't provide discovery.  Because let's be clear,

 4   they're saying they couldn't have done it before because

 5   they just learned that those functionalities don't

 6   infringe all claims.

 7              Even if what he's saying were true -- and

 8   I want to actually address that in just a second -- even

 9   if what he were saying were true, none of that was ever

10   asserted on all claims.  It was always the case that

11   some of the asserted claims would not have been met.

12   And that's why -- these alternatives aren't necessarily

13   meant to get around every single claim in the patent.

14   It's just various combinations.

15              So, I think it's actually missing the

16   point because a lot of those things were not accused on

17   all claims from the beginning, which is the very basis

18   they raise now as to what -- what their shock and

19   surprise was.

20              Two, if -- in discovery you have to allow

21   for the possibility -- I mean, for example, they have to

22   answer a non-infringing -- a non-infringement

23   interrogatory, right?  You have to allow yourself for

24   the fact that things are going to evolve throughout the

25   case, and they should have answered the discovery
```

1  because if they contend that one of things doesn't

2  infringe, they need to say, I don't think streaming

3  infringes and here's also another alternative.

4           But more to the point, I actually want to

5  address whether what Mr. Post said -- I'm not suggesting

6  he's -- he is misleading the Court, but let's -- let's

7  be clear.  He said the way you know streaming was at

8  issue in the infringement contentions is because there

9  were acquisitions against AppleTV, second and third

10 generation, which I think streams stuff.  There are

11 still allegations against AppleTV second and third

12 generations.  I think it's '317, Claim 18.  That's still

13 in Dr. Jones report.

14          So it was always only in some.  It is

15 still only in some.  That hasn't changed.  And, we never

16 said you infringe by going to a website and entering

17 payment information.  What that slide is talking

18 about -- and Mr. Hamad is going to stand up and call me

19 a liar if I'm wrong about this because I'm just -- you

20 know, unless we -- we said something that is not what I

21 remember it to be.  Because that wasn't in the briefing.

22 That is new to me.

23          What that slide is talking about is that

24 when you first register your Apple ID, you set up an

25 account back on the server that is going to be able to

1  bill you.  Our allegation as to what is the payment

2  information has been, always been when you go, you say

3  you want to buy your app, you enter your Apple ID and

4  that -- a representation of that is sent.

5                So, it's not that they said you guys are

6  actually accusing just -- all you do is you go and -- go

7  separate to a website.  We were always accusing that

8  when you buy, you -- you do your Apple ID.  And so, I

9  don't doubt that that slide's in our contention.  I

10 mean, we have like 8,000 pages worth of contentions for

11 Apple with the various claims and whatnot.  I don't

12 doubt that that's in there.  It's not that what we've

13 done is we've made an about face on our -- on our

14 payment allegation.  It's always been that you send your

15 Apple ID.

16                So, also -- Mr. Hamad, do you have my

17 slide that showed -- it's about number 5?  It's the one

18 that shows the 30(b)(6) topics.  It may be right before

19 that.  Number 4.

20                When Mr. Post characterized, Oh, it's

21 okay.  We didn't necessarily have to answer number

22 164 -- and there was a reason I directed you to that

23 one.  It doesn't say just the cost and acceptability of

24 non-infringing alternatives.  It says any alleged

25 non-infringing alternatives to the invention claimed by

1  patent-in-suit and the cost and acceptability of those.

2  So, I don't know that this point may have gotten lost in

3  his argument.  I'm not sure -- I don't think he was

4  trying to misrepresent the topic, but that topic

5  absolutely would get at what is -- what is at issue

6  here.

7            And finally, just to be super brief -- do

8  you mind if I show your slide 11, Mr. Post?  It's fine

9  if we can switch over?

10            MR. POST:  That's fine.

11            MR. CALDWELL:  This really gets to the

12  heart of this issue.  I'm looking at Mr. Post's slide,

13  slide 11.  If we look at the last bullet points, But

14  here, Smartflash faces no risk, as Dr. Jones can address

15  Mr. Wechselberger's opinions in Smartflash's rebuttal

16  case, if he so chooses.

17            How does that help with my survey, right?

18  I have -- I have invested a lot.  The client has spent a

19  lot investing in this survey that we ran in reliance we

20  don't have alternatives.  And so, now a guy gets to come

21  up and sling mud and their response is, Well, it's cool

22  we got to sling our mud.  You can come back and say why

23  some of that's wrong.

24            One, that's problem enough and for that

25  reason it should be -- it should be granted, the motion

1  should be, because we can't deal with the survey aspect

2  of it, even if Dr. Jones can get into a technical fight.

3              But more to the point, Dr. Jones can

4  address his opinions.  How?  They're still not telling

5  me the cost, the availability, how this thing would

6  work, whether their contracts would permit it.  So my

7  guy's supposed to say, Yeah, based on precisely no

8  information, I think your stuff is wrong.

9              I mean, he has been able to infer lots of

10  criticisms about their stuff.  And we've tried.  Okay?

11  We've tried.  But suggesting that it's -- everything's a

12  level playing field here and Dr. Jones can come up in

13  rebuttal while, We're still not telling you the facts of

14  this, and just after they've already disparaged the

15  survey, that he can fix that on rebuttal, that doesn't

16  cure it.

17              And that -- I think the fact that that's

18  what Apple has to go to to say there is no risk to

19  Smartflash, it just basically illustrates my point as to

20  why granting the motion is really the only solution.

21              MR. POST:  Just a very brief response,

22  Your Honor.  Just -- just three quick points that

23  Mr. Caldwell mentioned.  It's not our contention that

24  all claims had to be accused of infringing a certain

25  feature for there to be an alternative.  I believe that

1  Dr. Jones in his report was focusing on particular sets

2  of claims.  At least that -- at least as to the claims

3  that for which AppleTV was asserted.  And remember, the

4  AppleTV assertion was that -- that that remote device,

5  that that server component that was the data carrier

6  from which content was being retrieved, that's certainly

7  a reasonable position to understand that streaming

8  was -- was --

9          THE COURT:  What about as to the rest of

10  the claims where you provided no response to direct

11  questions in discovery?

12          MR. POST:  Right.  Well, I think as to

13  those other claims even Dr. --

14          THE COURT:  I said that wrong.  Not no

15  response.  The response is None, which is different.

16          MR. POST:  Right.  I think Dr. Jones'

17  opinions about what alternatives existed weren't based

18  on any particular set of claims in his report.  I think

19  during his deposition he did clarify that as he was

20  going through those, he did consider claim here and

21  claim there to be part of that opinion.  And that's what

22  Mr. Wechselberger responded to.

23          So, for those claims to which streaming

24  could be a -- an alternative to which Dr. Jones applied

25  in one case and not in another, that's what

1   Mr. Wechselberger was doing.  Not saying that as to some

2   other set of claims that now streaming was available to

3   those.  The focus is on Dr. Jones' set of claims for

4   each of those.

5                THE COURT:  But the real prejudice here

6   is the notion of Dr. Jones made those statements relying

7   on the fact that you had said, No, there are no

8   non-infringing alternatives.  And they did these

9   expensive surveys based on that knowledge.  And now

10  we're here at the report, and now in response, Oh, yes,

11  there is a non-infringing alternative, that's something

12  that if it was going to be relied on by your expert, it

13  should have been disclosed.

14               MR. POST:  Well, this isn't a

15  circumstance where a new set of alternatives that as

16  Apple's presenting as saying, Well, these could be done

17  and they're less expensive.  And, Look, here's --

18  78 percent of customers would say, Yep, that's the best

19  thing that I would pick.  That's not what -- what's at

20  issue here.

21               What's at issue here is whether or not

22  the alternatives that Smartflash chose to test were

23  consistent internally.  But that what Dr. Jones, based

24  on his understanding of the way the products worked and

25  the way users interact with them, that that -- what he

1  was saying was, Okay, I'm going to remove that feature,

2  I'm going to change that feature, but somewhere else I'm

3  going to tweak the feature, I'm going to say you can do

4  it rather than remove rentals as an option.

5              So -- let me just clarify it this way.

6  One of the alternatives that you'll hear about is a

7  circumstance where the ability to rank content is

8  eliminated.  Now, elsewhere he concludes that you can

9  stream certain things and that would be an acceptable

10 alternative.

11             Why didn't he apply it to that first

12 example where rentals were saying being removed rather

13 than simply being streamed?  And that's all

14 Mr. Wechselberger's response rebuttal opinion was

15 focused on for that particular example.  So, stream it,

16 don't remove it.

17             We're not saying that streaming it would

18 come at some cost and that that should be a cap on

19 damages.  Again, that's not what the focus of -- as

20 you'll hear as you go through the -- the survey and

21 ultimately the damages experts.  That's not what's at

22 issue.  The question is whether Dr. Jones, who sits at

23 the base of all of this, the alternatives that he's

24 picked out and said he believes are the best

25 alternatives, whether or not he's applied that -- that

1  logic consistently.  And that's really a fairly narrow

2  response that Mr. Wechselberger has.  It's not that for

3  some other area Apple believes that a -- an available

4  alternative at some low cost exists.

5           One other point that was made that didn't

6  appear in the briefing was that Dr. Jones shouldn't be

7  cross-examined on his opinions about whether or not

8  certain things are best alternatives.  I respectfully

9  disagree to the extent Dr. Jones is expressing opinion

10 as an expert, that he believes the subjective things are

11 in fact best alternatives, that he should certainly be

12 subject to cross-examination on that.  And we don't

13 believe that -- that any sort of request of sanction or

14 otherwise preventing that from taken place to be

15 appropriate.

16           That's all I have.

17           THE COURT:  Okay.  Any final word, Mr.

18 Caldwell?

19           MR. CALDWELL:  I think Your Honor has a

20 real good handle on -- on what happened here and what

21 the prejudice is.  I'm not suggesting that they can't go

22 cross-examine Dr. Jones on things that would be just

23 fair cross-examination in the ordinary course, but you

24 can't -- I don't think you can come back and be like,

25 Isn't it correct that they could do this change and this

1    change and this change and that would be less burdensome

2    and there'd be -- I mean, the things that they should

3    have told us in the interrogatory.

4                    But as to the other thing, I think the

5    plain -- I think the harm to Smartflash is plain, and it

6    just can't be fixed by having our guy come back on

7    rebuttal and not being able to explain effectively to

8    the jury what -- what happened because they've withheld

9    all this information, and they're still withholding it.

10                   MR. POST:  Just, respectfully, Your

11   Honor, on cross-examination point, Dr. Jones set forth

12   his opinions about these best alternatives.  We should

13   absolutely be allowed to examine him on whether or not

14   those opinions were correct, consistent, and applied

15   consistently.  Thank you.

16                   MR. CALDWELL:  I'm sorry.

17                   MR. POST:  I won't stand up again, I

18   promise.

19                   MR. CALDWELL:  He's aware there's a

20   letter that says we haven't identified any alternatives.

21   So, I -- he -- he tried to come up with alternatives,

22   like, to help out and put himself in the shoes of them

23   so we'd have things to test against.

24                   And as I say, I mean, I don't know if

25   these things are amenable to perfect delineation in a

```
 1  hearing, but the point is I -- whatever you could cross
 2  him on just -- it's normal cross-examination of his
 3  opinion I think is fair game.
 4              My problem is something that you should
 5  have disclosed, and you can't come in and have -- like,
 6  for example, you couldn't have your corporate
 7  representative come in and go, You know what we'd like
 8  to do?  This would be a less burdensome alternative.
 9  We'd like to do this.  And then, Aha, Dr. Jones, you
10  didn't take that into account.
11              I mean, that sort of thing would be just
12  fundamentally unfair.  And having their expert come up
13  and throw stones would be just fundamentally unfair.
14              THE COURT:  All right.  We are going to
15  take our lunch break, and I will come back this
16  afternoon but only until 5:00.  So, we've got still a
17  lot of ground to cover and I want you to talk over lunch
18  and see about how we can make sure that we can get it
19  all covered by the end of the day.
20              All right.  We'll be in -- we'll be in
21  recess until 1:15.
22              (Recess.)
23              THE COURT:  Hello again.  Please be
24  seated.  All right.
25              MR. VERHOEVEN:  Your Honor, Mr.
```

1   Verhoeven.  We have conferred amongst the parties, as

2   you instructed, over the lunch break.  Given the limited

3   amount of time available -- I thank you for telling us

4   how long we had -- the parties have reached an

5   aspirational agreement to try and use equal amounts of

6   time, which would be, roughly, 90 minutes each.

7                   And so you can see sort of a road map of

8   where we're going, these are going to be much shorter

9   arguments, obviously, and what we're going to try to do

10  is for the first half of that time period focus on the

11  Daubert-related motions, evidentiary motions, and then

12  with the second half, we intend to focus on the

13  merits -- remaining merits-based motion such as

14  invalidity, willfulness.  Game Circus has their own

15  motion.  That'll be in that second tronce, Your Honor.

16                   THE COURT:  Okay.  All right.  And then

17  right before we adjourn today, I want to talk to you-all

18  just logistically about drawing a district judge, all of

19  the things we need to do to get the cases ready for

20  trial, so...

21                   MR. VERHOEVEN:  Great.  Thank you, Your

22  Honor.

23                   MR. CASSADY:  Before we get started, Your

24  Honor, one...  On the break, Ms. Baily and I discussed

25  the sealing issue, at least for the next part of this

```
 1   day, and I think -- I'm under the impression that

 2   everybody here is either in-house or a lawyer for

 3   somebody that's in this case, other than Google, and

 4   that's Ken Maikish -- Maikish and he is the gentleman in

 5   the back.  He's for Google.

 6               Obviously, we have a case against Google

 7   as well.  We're happy for him to be in-house counsel

 8   that's aware of the issue that we're all talking about,

 9   so I guess what I'd say is as long as everybody in the

10   room understands we're not talking about this outside of

11   this room except for with each other, then we're okay

12   with just, you know, going forward with the case as long

13   as more people don't come into the courtroom during the

14   afternoon.

15               THE COURT:  Okay.  That sounds like a

16   good agreement.

17               Ms. Baily.

18               MS. BAILY:  That's our understanding just

19   so that you know this doesn't preclude us from

20   contending later that nothing here is confidential, but

21   for purposes of today that's our agreement.

22               THE COURT:  Okay.  And -- and if you-all

23   just help me keep a watch on the door.  If you see

24   someone you don't recognize, just stop me.  Okay.

25               All right.  Let's get started.
```

 1 | Mr. Nelson [sic].

 2 |             MR. NEMUNAITIS:  Good afternoon, Your

 3 | Honor.  Justin Nemunaitis for Smartflash.  The next

 4 | issue is Smartflash's motion to strike Apple's damages

 5 | expert Dr. Stephen Becker.

 6 |             In this case, both sides damages experts

 7 | agree that reasonable royalty damages should be

 8 | calculated as the result of a 2008 hypothetical

 9 | negotiation between Apple and the inventor Patrick Racz

10 | who owned the patents at the time.

11 |             Apple's damages expert Dr. Becker, when

12 | he tried to perform that calculation, he doesn't look at

13 | the value that the patents provide to the specific

14 | accused products.  He doesn't look at the importance of

15 | the technology to Apple's customers, he doesn't consider

16 | Apple's profit margins, and he doesn't conduct his own

17 | survey to see how important this technology is to

18 | Apple's customers.

19 |             Instead, what he does is he imagines what

20 | would have happened if Mr. Racz -- if instead of

21 | inventing a new technology and try to build his own

22 | business he had taken that money that he used towards

23 | creating his new technology and instead invested it in

24 | the stock market or a hedge fund or some other type of

25 | investment vehicle.

1          He then takes that number adjusted by

2   Apple market share for MP3 players and smartphones and

3   he calls that a reasonable royalty.  This approach has

4   no connection to the technology at issue in the case.

5   It has no connection to the specific accused products.

6          If he's allowed to tell the jury that

7   this is an acceptable way to calculate reasonable

8   royalty damages, it would be extremely prejudicial to

9   Smartflash.

10         Now, there's no dispute on the law that

11  needs to be applied in deciding this motion.  Section

12  284 states that upon finding for the claimant, the court

13  shall award the claimant damages adequate to compensate

14  for the infringement, but in no event, less than a

15  reasonable royalty for the use made of the invention by

16  the infringer.

17         The issue for this Daubert motion is

18  whether or not Apple has met its burden of showing that

19  Dr. Becker has provided testimony that will assist the

20  jury in deciding what is a reasonable royalty based on

21  the use made of the invention by Apple and whether or

22  not he's applied or relied on methodology to get there.

23  And Apple can't meet either of those burdens.

24         I'm going to walk through briefly

25  Dr. Becker's overall methodology and point out problems

1  with it along the way.  He employs three basic steps;

2  first, he calculates the negotiating range from

3  100 percent of the value of the patents, then he adjusts

4  that range based on a market share estimate, and then he

5  selects a final royalty within his final adjusted range.

6          Now, right off the bat this should raise

7  a red flag.  Dr. Becker claims not just that he can

8  determine the outcome of a hypothetical negotiation

9  between Mr. Racz and Apple, but he can actually

10  calculate the value -- or 100 percent of the value of

11  the patents-in-suit to any company that might

12  conceivably want to use the technology.

13          Now, both sides cited a lot of different

14  cases in the briefing and neither one dealt with this

15  issue of an expert taking on this sort of extreme

16  project, so I can't say as a matter of law that the

17  Federal Circuit's looked at this issue and it said

18  that -- there's just no way to calculate 100 percent of

19  the value of the patent.

20          But certainly, based on the amount of

21  rigor that they require for a two-part hypothetical

22  negotiation, I mean, this is a very extreme task that

23  Dr. Becker's undertaking.

24          Now, the way he goes about trying to

25  calculate this 100 percent value negotiating range is

1  not by trying to define the market sort of in a lost

2  profits type of way and seeing how this technology is

3  used in different projects; instead, he just looks at

4  two e-mails that were sent by inventor Patrick Racz, and

5  to understand why he selected those two e-mails is

6  helpful to very quickly walk through the history of

7  Smartflash.

8              At a very high level, in 1999, Mr. Racz

9  filed initial patent application for the technology.

10  Over the next few years he tried to develop and

11  commercialize that technology, and he ended up

12  negotiating and signing deals with companies like

13  Disney, Viacom, Britney Spears for content, and he

14  negotiated a deal with Gemplus to assist in

15  manufacturing actual products that would practice the

16  technology.

17              Unfortunately, things went wrong in 2003.

18  Gemplus started developing a competing product without

19  his knowledge, and the company filed in 2003.

20  Fast-forward seven years later, his first patent finally

21  issues on his original -- on his patent application, and

22  in 2010 he signed a deal with his current business

23  partners to inject new capital into his business.

24              Dr. Becker focuses on e-mails that were

25  sent during this 2003 to 2010 time period when Mr. Racz

1  was trying to drum up support and reinvigorate the

2  business.  The first of those e-mails he relies on is a

3  2009 e-mail sent from Patrick Racz to a potential

4  investor named Jeff Ronaldi.

5              And there's one sentence in that e-mail

6  that after Mr. Racz walks through the history of

7  Smartflash, at the end, he says, Look, my intention in

8  sending you this e-mail is that I want to make a return

9  on the investment that I've made.

10             Dr. Becker looks at that statement and

11 says, Okay.  Well, Mr. Racz, I'm going to assume he

12 invested about $3 million in the venture, so I think a

13 fair rate of return would be $5.1 million.

14             This is good evidence that Mr. Racz would

15 not accept less than $5.1 million for an industry-wide

16 license to his patents.  He calculates the upper bound

17 on his range by looking at a very similar e-mail sent to

18 a group of potential investors associated with a company

19 called Celebrity Kiss.

20             And in that e-mail, Mr. Racz states, My

21 intention in saying -- this e-mail said, I'd like to

22 make a substantial ROI over the life of any granted

23 patents.  And based on that e-mail, Dr. Becker concludes

24 that the maximum amount that Mr. Racz would accept for

25 industry-wide license is around $20 million.

```
 1                 Now, there's again some big red flags
 2    with this approach.  First, this is all the evidence he
 3    relies on to calculate this initial negotiating range
 4    for what would effectively be an industry-wide license.
 5    He doesn't consider who the market players are in the
 6    license.  He doesn't consider how many products are
 7    sold.  He doesn't consider how the technology is used in
 8    those products.
 9                 It doesn't matter if one infringing
10    product will be sold or billions of products will be
11    sold.  It doesn't matter if the patented technology
12    covers an insignificant feature that no one has ever
13    cared about or if it covers the entirety of the iPhone.
14    His range stays the same.
15                 The complete disconnect between what he
16    claims is 100 percent of the value -- or the negotiating
17    range for 100 percent of the value of these patents and
18    how the technology is actually used is completely
19    contrary to what section 284 requires.
20                 The other major problem is that there's
21    just no fact support for his conclusions.  He takes two
22    sentences that are almost identical and draws completely
23    opposite conclusions from them.  On the one hand, he
24    says that he's established a minimum based on the
25    sentence for Mr. Racz.  On the other hand, he says that
```

1  he's established the maximum based on almost the same

2  sentence.

3              And the problems get even bigger when he

4  looked more closely at this 2005 e-mail.  In 2005,

5  Mr. Racz had a discussion over the phone with Celebrity

6  Kiss investors about a potential partnership between

7  their two companies, Smartflash and Celebrity Kiss.

8              After that phone call, Celebrity Kiss

9  wrote them back and proposed some terms for this

10 partnership.  They proposed forming a new company and

11 dividing up the equity equally among all the investors.

12             With regard to IP, they proposed that

13 Smartflash's IP rights -- that they be repaid

14 150,000 pounds for their IP rights and 50,000 pounds for

15 the Celebrity Kiss IP rights.

16             And finally, they proposed that all

17 parties agree to work on this new venture on a Nil

18 charge basis.  It's Mr. Racz's response to this e-mail

19 that Dr. Becker relies on.

20             Now, in response he states that there's a

21 fundamental difference of opinion over the valuation and

22 short/medium/long term consideration of IP from our

23 side.  For the avoidance of doubt I'm not valuing the IP

24 in Smartflash at 150,000 pounds, as this represents a

25 fraction of the time and personal funds (in excess of

1   $3 million) invested over the past 6 years.  My

2   intention is to realize a substantial ROI over the life

3   of any granted patents in excess of my own personal

4   investment.

5               There is no statement in this e-mail that

6   he has self-imposed a maximum value on his patents of

7   $20 million.  There's just no support for that critical

8   conclusion that this supports an upper cap on what the

9   negotiating range should be.

10              Even if he had stated in here, You know

11   what, for purposes of this deal with Celebrity Kiss, I

12   think we should value my patents at $20 million, that's

13   not enough to support Dr. Becker's conclusions because

14   this is simply a completely different scenario from what

15   would happen in a hypothetical negotiation with Apple.

16              This e-mail was written before any of the

17   patents issued, before Mr. Racz knew what claim scope he

18   was going to get out of the Patent Office and before any

19   of the accused products that form the basis of

20   Smartflash's damages claim had been released.

21              There's just no way that Mr. Racz could

22   have predicted that Apple would release the iPhone, that

23   he would get patents covering the iPhone, and that Apple

24   would make billions of dollars by infringing his

25   patents.  And because of that disconnect in the facts,

1  Mr. Becker can't support that upper -- that upper bound

2  to his hundred percent negotiating range.

3              And these are the two big problems with

4  his hundred percent value calculation.  First, he's just

5  completely untethered from the use made of the invention

6  by the infringer, and second, he lacks factual support.

7              If he cannot sustain this calculation,

8  his entire damages model falls apart, because he starts

9  from this big number and whittles it down to a smaller

10 number, and if he can't reliably calculate this big

11 number, he has no way of reliably calculating reasonable

12 royalty damages for Apple.

13             Now, what argument that comes up in the

14 briefing from Apple is that, Okay.  Well, maybe there's

15 some problems with the hundred percent value

16 calculation, but that's okay because Dr. Becker will

17 later adjust that amount based on Apple's market share.

18 But that cannot save his opinions.

19             The Federal Circuit explained that

20 beginning from a fundamentally flawed premise and

21 adjusting it based on legitimate considerations specific

22 to the facts of the case nevertheless results in a

23 fundamentally flawed conclusion.  And that makes sense.

24             If you start from the wrong number,

25 26 percent of the wrong number is still the wrong

1  number.  I also want to talk about how Dr. Becker

2  adjusts for Apple's market share because there are some

3  problems with that as well.

4              Now, he doesn't define the market for the

5  patented technology.  He doesn't identify what specific

6  companies he thinks are using the technology or what

7  specific products are using it or what products get the

8  most benefit out of this technology.

9              Instead, he makes two important

10  assumptions.  He assumes that all smart phones, PCs, and

11  MP3 players sold in the U.S. in 2008 infringe, and he

12  assumes that the patents impart equal value to all of

13  those infringing devices.

14              Now, we know that this is not true.

15  There are certain types of products like iPod minis and

16  iPod classics that have never been accused in this case.

17  Those are MP3 players.  So we know right off the bat

18  that these assumptions are wrong.

19              But the fact is when we got to this point

20  in the briefing, Apple didn't even attempt to justify

21  these assumptions.  They said, Well, look, it doesn't

22  even matter if these are accurate or not.  But it does.

23  The problem here is not that Dr. Becker might be off by

24  5 or 10 percent or 50 percent.

25              The problem is, if he hasn't done the

1  analysis to know what the market is for the patented

2  technology, then he has no reliable way of making a

3  market share adjustment.  And if he can't complete the

4  second step in his analysis, he can't present a reliable

5  reasonable royalty calculation to the jury.

6          Now, one last point I want to make is

7  that -- another way we can think about this is to

8  consider what's the base and rate that Dr. Becker is

9  using.  Now, he doesn't specifically say, Here's the

10  royalty base I'm using.  Here's the royalty rate I'm

11  using.

12          But there's only one base of revenue that

13  he considers in calculating a reasonable royalty, and

14  that's the amount of money that Mr. Racz would have

15  made if he had invested in the stock market instead of

16  trying to build his own company and inventing a new

17  idea.

18          With that as his royalty base, there's

19  only one number that he adjusted by -- or multiples it

20  by to get to his final reasonable royalty number, and

21  that's the 26 percent market share number.

22          Now, it's clear that those two values,

23  the royalty base and the rate, they're just not tied to

24  the patented technology, they're not tied to the

25  specifically accused features, and so there's just no

1  way that that can be a reliable way to calculate a

2  reasonable royalty.

3              And for those reasons, we think that

4  Dr. Becker's testimony should be struck.

5              THE COURT:  Thank you.

6              Response.

7              MR. BATCHELDER:  Your Honor, good

8  afternoon.  James Batchelder for Apple.  I think maybe

9  the best place to start in light of counsel's comments

10 is at the very end of -- of the binder, which is with

11 the Personal Audio Case, just to set some legal

12 framework.  The facts are actually very similar.  That

13 was the case involving Apple.

14             The reasonable royalty calculation of --

15 of Apple's -- and it was a defendant -- its damages

16 expert was based primarily on patent owner's previous

17 offer to sell one of the patents-in-suit for $5 million.

18 The jury awarded $8 million, and plaintiff filed JMOL

19 motion claiming that Apple's calculation was not

20 sufficiently based on the use that Apple would make of

21 the invention, the Georgia-Pacific Factor 11.  And so it

22 said there was insufficient evidence to support damages

23 calculation.  And the whole thing was to deny the JMOL

24 motion.

25             And in particular, what Judge Clark

 1  said -- and this is in 2011 -- was in analyzing the

 2  sufficiency of the evidence, the Court concludes that

 3  the jury could and should have given substantial weight

 4  to the inventor's 2008 offer to sell the

 5  patents-in-suit -- or the patent-in-suit here -- or one

 6  of them for $5 million.

 7                    This was an offer to sell, not merely a

 8  license, and it was the actual patents-in-suit, not

 9  merely comparable technology.  So, very similar facts

10  here.

11                    Let me now step you through those facts

12  and why I think they're analogous.  They say that the

13  first 14 pages of the deck that I've handed up are

14  simply the Georgia-Pacific Analysis factors as

15  Dr. Becker stepped through them in his report.  And each

16  factor shows the page number in Dr. Becker's report

17  where he first addresses that factor just so you have

18  those bookmarks.

19                    But if we can go to slide number 15,

20  please.

21                    So, here we have the Priority application

22  filed in October of 1999.  Of course, by filing this

23  application, and now in this lawsuit claiming priority

24  to it, Smartflash is representing to the court and

25  everyone else that all the inventions that it's now

1  claimed in the subsequent patents are in that Priority

2  application, so they're all down there.

3              Next slide, please.

4              This clicker is not working, so I'm just

5  going to have to ask you to step through it.

6              Okay.  And then we have a 2005 e-mail

7  between Mr. Racz and a potential joint venture partner.

8  And I want to be clear at the outset, this was not a

9  response by Mr. Racz as someone asking for a license.

10             It was someone saying, Let's form a joint

11 venture.  We'll get some IP from over here, we'll get

12 your IP, and at the end of the joint venture, once it's

13 formed, the venture will own your IP.  So we're offering

14 to buy your IP for 150,000 pounds, about 260-something

15 thousand dollars essentially.

16             So he's responding to an offer to

17 purchase all of his patent rights that are at issue in

18 this case for about 260-something thousand dollars, 150

19 pounds -- 150,000 pounds.

20             And he responds by saying, For the

21 avoidance of doubt, I'm not valuing the IP in Smartflash

22 at 150,000 pounds, as this represents a fraction of the

23 time and personal funds in excess of    $3 million

24 invested over the past six years.  My intention is to

25 realize a substantial or ROI -- that is return on

1  investment -- over the life of any granted patents in

2  excess of my own personal investment.

3                    So, you have an offer to purchase the

4  patents for 150,000 pounds, and he says, No, what I want

5  is a substantial ROI over the life of my patents.  Then

6  we have -- see if this works now.

7                    This clicker is not working, so if we

8  could have the next slide, please.

9                    MR. CALDWELL:  And that's ours.

10                   MR. BATCHELDER:  So then we have the

11 hypothetical negotiation.

12                   And next slide also, please.

13                   We have the patents issuing and that

14 would essentially happen at the same time.  The first

15 patent issues in February 2008, and the hypothetical

16 negotiation, the parties agree, would have occurred

17 then.  And then in 2009, we have another similar

18 document.

19                   And can we click on that one, please.

20                   So, here in 2009 -- and keep in mind this

21 is after the iPhone has come out, and the iTunes Music

22 Store has been up for many years now -- Mr. Racz is

23 explaining to a potential investor about the history of

24 Smartflash.

25                   And he says, We've invested over $10

1   million of which $2 million was my own in Internet plc.

2   Then it goes on to say, My intention is to realize a

3   return on the investment I have made.  So, what is that

4   investment?  We said it's $2 million.

5                    So, before the hypothetical negotiation,

6   before the iPhone issues, before the first patent

7   issues, says I'm looking for substantial return on

8   investment in response to an offer to purchase his

9   patents for 150,000 pounds.

10                   After the '720 patent issues and after

11  the hypothetical negotiation, essentially says the same

12  kind of thing.  What I'm looking for is a return on the

13  investment I've made, and he specifies what that

14  investment was, which was $2 million.

15                   Now, counsel said, I think, that those

16  are the only things he looked at, but he cited a lot of

17  other evidence.  And frankly, it renders his analysis

18  quite conservative.

19                   One example --

20                   On slide 20, please.

21                   -- is this is again in 2009, after the

22  hypothetical negotiation, after the iPhones come out,

23  after the '720 patent's issued, he's talking here with a

24  broker.

25                   And the broker says to him, As I

1  mentioned earlier, we are interested in exploring the

2  purchase of the '720 patent.

3                This broker had reached out to would-be

4  purchasers.

5                He says, Offers for this project have

6  come in anywhere between $50,000.00 and $250,000.00 so

7  far - of course, every patent is different.

8                And then slide 21 is extremely relevant.

9  And it's consistent with his ROI e-mails, and it's very

10  consistent with what we saw in the Personal Audio Case.

11  Mr. Racz himself is -- is holding out an offer to the

12  world and he's -- he's looking for money.

13                And the offer is a 20 percent -- and this

14  is his own writing -- a 20 percent stake in a company

15  that owns granted U.S. Patent '720 and all future

16  continuations.

17                And what is he asking for that 20 percent

18  stake?  $200,000.00.  Well, if you normalize 20 percent

19  to 100 percent backwards at $200,000.00, it would be a

20  million dollars.  And that's an offer for sale.

21                It's very similar to the Personal Audio

22  situation.  That document alone would be a substantial

23  basis for reasonable royalty calculation.

24                And frankly, you have two fundamental

25  choices as a damages expert.  You can try to take this

1  device, for example, and you see it's got a thousand

2  hardware features, none of which are invented, has a

3  thousand software features, one of which was invented,

4  and I can try to isolate the value of that one software

5  feature.  That's really hard to do.

6            Before I can look much more directly at

7  what the inventor who said he owned the patent rights

8  was saying his patent's worth, and here when you have

9  that kind of contemporaneous documentation from the

10 inventor offering a chunk of it for sale, for example, a

11 fifth of it for sale for $200,000.00 saying in response

12 to offers, What I'm looking for is return on my

13 investment and my investment was $2 million or

14 3 million, those are very good direct benchmarks for

15 reasonable royalty calculation.

16            And that's exactly what the damages

17 expert did in Personal Audio.

18            Quickly, slide 24.

19            This is Georgia-Pacific Factor 11.  The

20 extent of use, Dr. Becker did take this into account.

21            In slide 25, he looked at, again,

22 plaintiff's own contemporaneous documentation defining

23 the market itself, and it defined the market as these

24 factors.  He very conservatively then took only the

25 factors that Apple participated in to calculate market

1   share, mobile phones, computers, MP3 players.

2             And then in slide 33, he -- he says Apple

3   has 26.8 percent of that market.  And so conservatively,

4   let's use that much bigger number because it's certainly

5   at a much lower percentage of the overall market, and he

6   came up with a cap of $5.7 million.

7             And this graphic is just designed to show

8   that if Apple's use had been half; that is, if his

9   market share had been half, then his cap would have been

10  on the left, $2.9 million.  If Apple's market share had

11  been double, then his cap would have been $11.5 million.

12  And that certainly is taking into account Apple's use.

13            And again, in his Georgia-Pacific

14  analysis, he talks at some length about other facts he's

15  aware of that factor into the extent to which Apple was

16  and was not using this invention, including the fact

17  that before the hypothetical negotiation, began taking

18  DRM off of its music, and soon thereafter it took it off

19  all together, and so he cited that as a significant

20  factor.

21            I know my -- my time is short.  I'm

22  already getting looks from my co-defendants.  Let me

23  just finish by pointing out one more case and that's

24  slide 35, which is the SSL Services case, Federal

25  Circuit 2014.  Here the district court permitted a

1  damages expert to rely on non-patent agreements in

2  connection with its assessment.

3          These agreements did not license the

4  patents-in-suit.  The agreements referenced one of the

5  patents-in-suit saying it was relevant to the technology

6  underlying the agreements, but, as the final bullet

7  says, the agreement gave distribution rates to a

8  software product and that product did not even use the

9  patents' claimed technology.

10          The district court said nonetheless, you

11  know, that's sufficiently tied to these facts that I'm

12  going to go ahead and let a damages expert use that

13  agreement, and the Federal Circuit affirmed.

14          Now, I would submit that these agreements

15  in the SSL Services case are so much further removed

16  from what matters than Mr. Racz's own e-mails about the

17  value of the very patents-in-suit where he's saying,

18  yeah, you can buy a fifth of them for $200,000.00 or --

19  or you can buy all of my patent rights for an ROI that

20  would give me, you know, a substantial return in

21  connection with my 2- or 3-million-dollar investment.

22          So, what Dr. Becker has done here I think

23  is very defensible.  Again, I think far more defensible

24  than it would have been for him to guess at the

25  incremental contribution of one software feature in a

 1  phone that had, you know, thousands of features, both

 2  hardware and software, is much more direct evidence and

 3  it's quite defensible under the law.

 4                    Thank you, Your Honor.

 5                    THE COURT:  Thank you.

 6                    Mr. Nemunaitis, you've got final word.

 7                    MR. NEMUNAITIS:  Mr. Batchelder talked

 8  about the Personal Audio case and the -- the 2010

 9  document involving Mr. Racz.  Neither of those were

10  submitted in the briefing -- or I haven't had a chance

11  to consider those, so perhaps we could submit some

12  supplemental brief on that if the Court thinks it's

13  appropriate, but I don't think they change any of the

14  real issues.

15                    One of the points he made in talking

16  about the 2005 e-mail and the 2009 e-mail is that they

17  basically say the same kind of thing, and that's exactly

18  the problem.  And he can put up different types of

19  documents that Mr. -- Dr. Becker did rely on one and

20  that may have been introduced in the case, but what

21  really matters is has Apple shown that Dr. Becker's

22  analysis is based on reliable methodology and reliable

23  facts.

24                    The fact that he relies on to set that

25  maximum amount is the 2005 e-mail.  That's what we're

1  talking about.  And that's what Apple needs to show is

2  based on a -- a reliable interpretation of what that

3  e-mail is, that it's a cap on the amount of money that

4  Mr. Racz would except for an industry-wide license.

5              I think there's -- there's two ways to

6  think about this that kind of get confused when we're

7  talking about this.  Inventor testimony about -- or

8  inventor statements about the value of his patents I

9  think in some cases could be valuable, and it could be

10  valuable in two -- there's two ways to consider why it

11  might be valuable.

12              One is, well, because the inventor would

13  participate in the hypothetical negotiation -- or

14  assuming that the inventor owns the patents, because

15  they would be there in a hypothetical negotiation, if we

16  have a document that says how they're going to act in

17  that negotiation, then we should be able to assume

18  they're going to act the same way in a hypothetical

19  negotiation with Apple.

20              But that's not quite right.  That's sort

21  of like assuming that we're playing a hand of poker,

22  Apple uncovered what Mr. Racz's cards are, and they're

23  not going to show their cards and so a damages expert

24  can just look at those cards and use that to figure out

25  what the hypothetical negotiation should turn out to be.

1                 Another problem is this.  We plan to call

2      Mr. Racz at trial and he may testify regarding what his

3      expectations were, what he thinks the value of his

4      patent is.  If he testifies that he would expect to make

5      money from his invention based on the value that his

6      patent provides to Apple's products and based on hard

7      evidence like customer service, about how important that

8      technology is, then that should be sufficient evidence,

9      under Dr. Becker's own methodology, to support a jury

10     verdict if the jury ultimately accepts Mr. Mill's

11     damages number.

12                 And so if that's the world we're living

13     in, then I think we just need to know that from Apple,

14     because at that point they shouldn't be allowed to file

15     a JMOL or appeal on damages issue at that point if

16     that's the sort of analysis we're going through to

17     figure out why Mr. Racz's statement are -- are relevant.

18                 The other way we can think about this is

19     that a statement from Mr. Racz could be relevant to the

20     hypothetical negotiation if he considered all the facts

21     that would have been around in that negotiation and he

22     basically performed his own damages analysis and he

23     decided, Okay, here's my detailed reasons why I think

24     the value of my patent to Apple is $20 million.  But

25     there's no evidence that that's what he did in this

1   case.

2               The e-mail that we're talking about, and

3   the only evidence that matters for deciding this motion,

4   is that 2005 e-mail that was sent before the iPhone was

5   released, before anyone could have known the extent of

6   infringement, and so there's no way that that could be

7   considered almost a comparable license used in a damages

8   analysis.  And so for those reasons, Dr. Becker's

9   testimony should be struck.

10              MR. BATCHELDER:  In the interest of time,

11  Your Honor, I will restrain myself.

12              THE COURT:  Thank you.

13              All right.  What's next?

14              MR. VERHOEVEN:  Move on to the --

15  defendant's motion to exclude Dr. Jones.  May I

16  approach?

17              THE COURT:  Sure.

18              MR. VERHOEVEN:  Your Honor, this motion

19  is pretty straightforward and I'll just march right

20  through it.  Defendants believe portions of Dr. Jones'

21  opinion should be excluded.  Those certain aspects fall

22  into two general categories, Your Honor.

23              The first is Dr. Jones proffering

24  opinions that are just simply not within his scope of

25  expertise, and we list -- we list four of those.  And

1  secondly, there's two opinions that Dr. Jones is

2  providing that we consider to be new opinions and were

3  not properly disclosed during litigation.

4              So, the first category, opinions outside

5  of his expertise, we have four categories, Your Honor.

6  He testifies improperly about corporate intent, survey

7  design and methodology, contract interpretation, and he

8  offers an opinion on interrogatory response time that

9  has nothing to do with any computer expertise.

10             To set the stage here, slide 4, Dr. Jones

11  admits that his only expertise is computing.

12             Question:

13             Do you consider yourself to have any

14  particular field of expertise?

15             Answer:  Computing.

16             Question:  Anything else?

17             Answer:  Beyond computing, no.

18             That's from October 3rd transcript, page

19  25, lines 21 through 25.  But he goes on to offer

20  opinions in these other four categories, opinions, Your

21  Honor, that are outside the computer scope.

22             So the first category is corporate

23  intent.  Now, in Smartflash's opposition, they state

24  that Dr. Jones offers no opinions regarding defendants'

25  corporate intent.  But that's just not true.

```
 1              If you look at the report, here you see
 2   at page 43 of his August 24 report, Similarly, to the
 3   extent that Samsung argues that its customers perform
 4   the steps of Smartflash's method claims in the United
 5   States, Samsung still infringes Smartflash's method
 6   claims by inducing that direct infringement.
 7              Goes on at page 43, The is evidence from
 8   which the jury can conclude that Samsung subjectively
 9   believed in a high probability that it infringed
10   Smartflash patents before filing the lawsuit.  He's
11   saying there is evidence of this.
12              And then at page 44 through 45, we've
13   highlighted out, he says, I believe that the jury could
14   find that Samsung willfully blinded itself to its
15   infringement of Smartflash patents.  He has no expertise
16   in willfulness.
17              At deposition -- I'm not going to read
18   all these cites in the interest of time, Your Honor, but
19   they're in the slides.  But he's asked whether he
20   considered himself to be an expert in marketing -- this
21   is slide 8 -- he said, No.
22              Question:  Are you -- you're not an
23   expert in organizational behavior.  Is that right?
24              Answer:  That's correct.
25              Question:  You're not an expert in
```

```
 1  industrial organization?
 2              Answer:  That's correct.
 3              Question:  You're not an expert in
 4  economics?
 5              Answer:  That's correct.
 6              Next slide, slide 9.
 7              Question:  You're not an expert in
 8  psychology?
 9              Answer:  No.
10              Question:  You're not an expert in
11  consumer behavior?
12              Answer:  No.
13              Question:  You're not an expert in
14  assessing individual's motives?
15              Answer:  No.
16              So, the law is pretty clear here.  It's
17  not appropriate to have a talking head get up, go
18  through all the evidence and say, Well, they must have
19  been willful.
20              And I cite for that the Western District
21  of Pennsylvania case on slide 10, and this is -- you can
22  find this throughout several different cases for the
23  proposition, An expert simply is not in any better
24  position than the jury to assess another's subjective
25  intent.
```

```
 1              That's not appropriate.  We cited in our
 2  brief, Your Honor, multiple cases -- this is slide 11 --
 3  in which courts have excluded opinion testimony on
 4  intent and willfulness.  But here, it's not just
 5  excluding based on willfulness because it's not
 6  appropriate expert testimony.  Here the expert admits he
 7  doesn't have any expertise in the area of willfulness.
 8              So even if you could make the argument
 9  that -- that willfulness is properly subject to expert
10  testimony, which we believe is not, but even if you have
11  did entertain that notion, he's not an expert in it.
12              And so, when you look at cases they cite,
13  Spreadsheet Automation Corp., in fact the plaintiff
14  expert offered to testify about patent prosecution, not
15  willful intent, and the court determined before allowing
16  it that that particular expert have all the expertise in
17  patent prosecution and it wouldn't be helpful to the
18  jury.
19              Well, that's a completely different
20  situation, Your Honor, and so on and so forth.  So, the
21  corporate intent is another area in which this expert
22  should not be providing testimony to the jury.
23              The next category, survey design, Your
24  Honor, Dr. Jones admits he's not an expert in survey
25  design.  We cite the testimony here on slide 15.
```

```
 1                    Are you an expert in survey design?
 2                    Answer:  No.
 3                    Are you an expert in survey methodology?
 4                    Answer:  No.
 5                    Yet in his expert report -- and here's an
 6   example on slide 16 from page 3 of his September 15th
 7   report -- it goes on to offer opinions about the survey
 8   design and methodology where he has no opinion on it --
 9   or no expertise on it.
10                    So he says doctor -- the other side's
11   doctor left it up to survey respondents, did not inform
12   survey respondents of such certain things, did not
13   specify certain things.  This is not his area of
14   expertise, how he designed a survey, and he shouldn't be
15   allowed to present opinions on it.
16                    Moving on, Your Honor, contract
17   interpretation.  He testified he has no expertise in
18   this area as well.
19                    Question:  So I'm correct that you're not
20   an expert in law?
21                    That's correct.
22                    And you're not a lawyer.  Right?
23                    That's correct.
24                    And you're not an expert in contract
25   interpretation?
```

1              That's correct.

2              But yet he goes on to talk about what the

3    contractual obligations of the parties are as part of

4    the basis of his opinion.

5              So, here at page 26 of his August 24th

6    report, he's basing his opinion in part on the

7    interpretation of the contract.  Samsung is

8    contractually obligated.

9              And he goes on to do this over and over

10   and over.  Defendants are contractually obligated about

11   certain things.  Samsung is also contractually

12   obligated.  HTC is contractually obligated.  Over and

13   over.

14             You know, I'm not going to quote all of

15   these.  They're in the slides.  But you can see this is

16   not some stray comment.  He is using contract

17   interpretation and he shouldn't be doing so unless

18   he's -- unless he's relying on some other expert that

19   has expertise in how to interpret contracts.  He

20   doesn't.

21             And then final, fourth category, Your

22   Honor.  Time -- he has an opinion for interrogatory

23   response time equals the same thing as the time to

24   formulate non-infringing alternatives.

25             Now, if this was a technical expert

1 saying, This is how long it would take in my opinion to

2 build something, that might be something.  But what his

3 basis is, is the amount of time it would take -- he

4 says -- he associates the amount of time it took to file

5 a supplemental response to the amount of time it would

6 take to scientifically develop something.

7           Well, that's not -- that's not reliable

8 evidence or helpful to the jury.  It's -- it's a false

9 comparison.  Let me move on, Your Honor.  Those are the

10 four categories that he does have expertise in.

11           Let's go to the two new opinions.  This

12 was confidential but we've worked out.  The first is

13 Amazon infringement.  Now, you heard -- you heard a

14 whole motion about striking an Apple rebuttal report.

15           Well, take a look at this one.  This is a

16 new theory that was first revealed and stuck in a

17 rebuttal report, Your Honor.  As you know, privilege

18 cannot be used as a sword and a shield.  We disclosed

19 that Amazon was a non-infringing alternative in this

20 case expressly to the plaintiff.

21           And we did it for every single asserted

22 patent.  It wasn't just a one-off buried thing.  It was

23 repeated over and over and over again.

24           We propounded a Request For Admission

25 No. 17:  Admit that the Amazon Appstore for Android on

1  the accused products does not infringe the accused

2  claims of the patents-in-suit.

3           They wrote back and said it's attorney

4  client/privilege, therefore we deny it.  We don't even

5  answer.  That was the response, Your Honor.

6           We propounded the interrogatory

7  requesting who else do you think infringes, and they

8  never disclosed that they accused Amazon infringes.

9           The very first time, Your Honor --

10  there's a whole bunch of letters back and forth where we

11  try to get answers I don't have time to go into.  They

12  refuse to disclose that they considered Amazon to be

13  infringing or non-infringing.  They said attorney/client

14  privilege.

15           Then when we got the rebuttal report,

16  Your Honor, we found 3,168-page Amazon claim chart for

17  the very first time.  All right.  That needs to be

18  stricken.  The opinion on Amazon needs to be stricken.

19           Conclusory eleventh-hour disclosures that

20  don't comport with the disclosure requirements must be

21  stricken.  Rule 37(c)(1) says the same thing, Your

22  Honor.  So, we believe that that opinion should be

23  stricken.

24           And very briefly, Your Honor, the second

25  opinion we believe is new and should be stricken is a

1  new analysis of Claim 11 of the '458 patent.

2            And I'll just show you two slides here,

3  Your Honor.  I'm skipping to slide 42 in the interest of

4  time.  There are several slides that -- we submit

5  there's more.  But the original infringement contention

6  with respect to Claim 17 for Play Movies were rental,

7  time period for rental.  That's what they said may

8  permit partial use of the data term.  All right.

9            The new theory that we got for the first

10 time is not timely.  It's a completely different

11 functionality for the very first time, and that is to

12 the user's pause state, not a rental.

13            That's not -- it's not a subset.  That's

14 a completely different functionality.  And -- it's --

15 and we'll go through that.

16            Same thing is with Books.  For Books they

17 said a rental period met this claim, and now their brand

18 new theory is you go into airplane mode and pause it.

19            Okay.  Your Honor, those are new theories

20 and they should be stricken.  With that, Your Honor,

21 I'll sit down.

22            THE COURT:  Response.

23            MR. CURRY:  Good afternoon, Your Honor.

24 Austin Curry for plaintiffs.  May it please the Court.

25            I'll try to go a little slower to unpack

1  some of these issues.  The first is corporate intent,

2  and what they focus on a lot is the low hanging fruit of

3  case after case after case that said experts can't opine

4  to intent.

5          We've already said we're not going to do

6  it.  They go back to his report.  He did make an opinion

7  in his report, but we're saying he's not going to do it.

8          And so the low hanging fruit cases of

9  experts can't talk about matters of intent are just not

10 applicable to this situation.  The only cases that are

11 applicable are the Spreadsheet Automation and the Tivo

12 v. Echostar cases.

13         And the defendants tried to distinguish

14 those cases as hinging on that the experts were

15 qualified as patent prosecution experts, but in reality

16 what those cases hinged on is Judge Fulsom's

17 understanding that having a technical expert not testify

18 about intent but instead present evidence from which the

19 jury can make that conclusion, that presentation would

20 be helpful to the jury.  And it makes sense.

21         You know, we -- we go through these cases

22 and we trudge through with the checks with all the

23 claims and at the end of it, if there's not something to

24 tie the technical side of the infringement case to how

25 the jury can evaluate facts for the liability, 271 (a),

```
 1   (b), (c), the acts of infringement with respect to what

 2   they do with their products that meet the claims,

 3   it's -- it's going to leave the jury in a lurch.  And

 4   that's why we want to do it.  I -- I really think it

 5   will be helpful to a jury.

 6                    And they say, Well, Dr. Jones admitted

 7   that he's not a patent prosecution expert.  Okay.  Well,

 8   the evidence that -- part of the evidence that would be

 9   submitted, at least, would be when was a patent of

10   Smartflash's cited against a Samsung patent.

11                    You don't need to know the ends and outs

12   of the MPEP to figure out the date on which that

13   happened.  If you have a -- a passing understanding of

14   how prosecution histories are laid out and how they're

15   sequenced in a file, you can figure out that date.

16                    And so while it's not something that, you

17   know, a lay person would have someone with -- with no

18   experience interviewing patent prosecution histories,

19   Dr. Jones certainly has that.  I mean, they have a slide

20   that says, well, you know, and -- in the Tivo case,

21   the -- the party offering the witness met its burden and

22   they didn't.  Why, because you said so?

23                    I mean, Dr. Jones has spent lots of time

24   looking up prosecution histories, and -- and if they

25   actually had a factual dispute of, Oh, no, Smartflash's
```

1  patent wasn't cited against the Samsung patent that

2  day -- I mean, in other words, if he was wrong on that

3  issue, they would have certainly brought it up.

4              So, the issue really is will the

5  presentation that we want to take the jury through with

6  the help of Dr. Jones be helpful to the jury.  And it

7  will.

8              With respect to survey design, I don't

9  know -- Mr. Verhoeven didn't argue this, but originally,

10  what they tried to do is they tried to say, well,

11  Dr. Jones isn't an expert on survey design, therefore

12  strike his criticisms of Reibstein, and by the way,

13  strike his non-infringing alternative opinions as well.

14              Well, we called them on it in their

15  response, and they -- they tried to support it in the --

16  their reply, and, you know, we went through the

17  sur-reply.  Mr. Verhoeven didn't argue it.

18              I don't know if they're still saying that

19  Dr. Jones shouldn't be able to give opinions as to what

20  a non-infringing alternative is.

21              But in any event, the only thing that was

22  argued today was that they say that Dr. Jones'

23  criticisms of their expert, Dr. Reibstein, should be

24  struck because he's not a survey design expert.

25              But here's what the issue is, so what

1    happened is Dr. Reibstein has a report and in the very

2    beginning of his report, he says Amazon isn't accused of

3    infringement, therefore it must be non-infringing.

4                   Reibstein offers no technical analysis.

5    Zero.  If there were some, I'd show it to you and say,

6    Well, this is deficient for the following reasons, but

7    there's nothing to show you.

8                   And so Reibstein goes out and he creates

9    screenshots that look like this, which is on your

10   screen, to make the Amazon Appstore for Android and the

11   Google Play Store look as identical as possible.

12                  Now, Reibstein, in doing this analysis,

13   never stopped, not -- not once, to consider any actual

14   technical differences between the Amazon Appstore and

15   the Google Play Store.  And it's a -- it's a defect that

16   he carried into his survey.

17                  And his conclusion of the survey is, it's

18   acceptable to this extent; in other words, it's a

19   non-infringing alternative that is acceptable to a

20   certain extent.

21                  There's just this huge gap in Reibstein's

22   report, and he uses the -- the results of the survey to

23   support his opinion that they are -- in the degree to

24   which the two are acceptable.

25                  But what Dr. Jones says to criticize

1   Reibstein is, Not so fast.  You didn't stop at all to

2   consider the actual technical differences.  And if your

3   survey doesn't test acceptability of an alternative,

4   number one, it's not non-infringing; but number two, you

5   didn't evidently appreciate the technical differences,

6   so you yourself were not equipped to tell your survey

7   respondents of the technical differences.

8                  So any -- the point is the fact that

9   Reibstein carried through this mistake into a survey

10  can't shield him from that criticism.  And it's not --

11  it's not something that we're offering Dr. Jones as a

12  survey expert on.  We're offering him as an expert in

13  his technical capacity to show the extent to which in

14  the gaps of Reibstein's opinion.

15                 Contract interpretation is a very similar

16  issue.  What happened there is they have another expert,

17  Dr. Goldberg, and what Goldberg says is he comes up --

18  he looks at the scope of the claims and based on the

19  different nuances of the claims, he says, Change that.

20  That's a non-infringing alternative.

21                 And his conclusion is, And it's an

22  alternative that is technically feasible, and then he

23  makes this huge jump from technical feasibility to

24  availability.

25                 And similar to Reibstein having a gap in

1   his analysis, not once did Goldberg ever stop to

2   consider that technical feasibility and availability

3   aren't the same thing.

4              And so what Dr. Jones says is, You don't

5   have the right.  And if you do, you haven't explained

6   it, Goldberg, of how Samsung and HTC have some unknown

7   right to go implement any technically feasible

8   alternative if it means, you know, avoiding paying for a

9   patent license.

10             And so what they're -- what they're

11  saying is, Well, no.  Stop.  Jones can't say that

12  because that's contract interpretation.  Well, it's --

13  what it is, it's an opinion as to the availability of a

14  technical allegedly non-infringing alternative.

15             It's not that this is hinging between the

16  experts on some disputed contractual term.  That's not

17  what's at issue.  There are contracts that Dr. Jones

18  cites.  And on the plain face of them, you don't need to

19  be a contract expert to read them and understand them.

20             On the face of them, they say -- they lay

21  out the rights between Samsung and HTC and Google on the

22  other hand.  And so, again, it's a criticism of Jones'

23  against Goldberg.  And that's what they're really trying

24  to protect against.

25             They know that there's a huge gap in

```
 1   Goldberg's analysis where he conflates technical
 2   feasibility with availability.  They don't want that
 3   criticism raised.  And this Daubert is their method of
 4   doing it.  They're trying to squelch the criticism of
 5   this huge gap in Goldberg's analysis.
 6               Similarly, what Goldberg does with
 7   respect to the time to calculate the non-infringing
 8   alternatives is Goldberg, for each of his alternatives,
 9   he has the same boilerplate language in his expert
10   report, and it's basically, I've been an expert for X
11   number of years.  Based on my expertise and in
12   conversations with different engineers, it would take
13   three months for this alternative, eight for this one,
14   twelve for that one.
15               It's totally opaque.  It's -- it's
16   impossible for us to actually test.  It's pure
17   speculation.  It can't be tested.  No discernible
18   methodology in these time estimates that Goldberg said.
19               So what Jones does is say, Well, I just
20   know you're wrong.  How do I know you're wrong?  Because
21   one of two things:  Either you credited Samsung and HTC
22   for having the ability to immediately come up with a
23   non-infringing alternative, and that'd be wrong; or, you
24   didn't include that time in your analysis.
25               In other words, you started at that point
```

1  where they have it, they have the non-infringing

2  alternative contention, and just how long now does it

3  take to implement it.

4            Well, we know how long it took these

5  defendants to come up with their non-infringing

6  alternatives.  And what's funny is in -- in our

7  response, I pointed out that they were very careful in

8  their motion -- in their Daubert motion against Jones to

9  say that in reality, in a non-litigation context, they

10  could have come up with these alternatives any quicker

11  than they did in this litigation because then 37 -- Rule

12  37 would trigger, and they should be excluded on that

13  basis.

14            So, if we assume that they timely

15  supplemented their interrogatories and they timely

16  submitted these non-infringing alternative contentions,

17  we know empirically, just empirically, how long it took

18  Samsung and HTC to come up with their non-infringing

19  alternatives.

20            And so what they say is, Well, that's not

21  something that can be used to estimate the time to come

22  up with an alternative and so Dr. Jones' testimony

23  should be stricken as not reliable.  It's not something

24  that scientists use.

25            But that's not what we're doing and

1  that's not what Dr. Jones is doing.  He's criticizing

2  Goldberg by something that we know to be empirically

3  true.

4              There's no Daubert issue here.  There's

5  no methodology issue here.  There's a fact issue that's

6  bad for them, good for us, and they're trying to act

7  like it's a Daubert issue to, again, keep criticism

8  from -- their experts from coming into this trial.

9              And then just keeping in course with the

10 ways and -- or the sequence in which Mr. Verhoeven

11 argued; so, they say that there is a new infringement

12 theory for one claim of one of the asserted patents, and

13 specifically Claim 11 of the '458 patent.

14              May I have the document camera?

15              Now, what this claim relates to is

16 partial use of a data item for one part, and that's the

17 part that we point to.  We always have and we still do

18 point to that as movie rentals.

19              But here's where they are going wrong.

20 The second part -- I hope I didn't destroy the words

21 with my sloppy underlining, but the second part is, and

22 further comprising code to write partial use status data

23 to the data carrier when only part of a stored data item

24 has been accessed.

25              So, in our infringement contentions, we

1  didn't corral all the evidence that the second part of

2  Claim 11 has met because there's no requirement to

3  corral all evidence.  We laid out our case that this

4  claim relates to movie rentals and here's how.

5           In the infringement report, clearly we

6  meet every claim and every limitation through

7  explanation and evidence.  And that's what's going on

8  here.  The claim requires that you write the partial use

9  status data to the data carrier.

10          The role of the Airplane Mode and

11 powering the device on and off is to provide evidence

12 that that is actually happening.  In other words, we

13 know it's -- it's written to the data carrier because I

14 powered the device off so it's not just stored, you

15 know, somewhere in volatile memory.  And when I powered

16 it back on, it's still there.

17          Now, what Airplane Mode tells me is, I'm

18 not going and fetching it off the Internet.  So, these

19 claims and the -- the theory still relate to movie

20 rentals.  The Airplane Mode was evidence of

21 infringement.

22          And now -- slides, please.

23          So, finally, there's the sword shield

24 argument, and it's much different from the -- Apple

25 telling us they don't have alternatives and then later

```
 1   coming back with their expert and low and behold they
 2   did.
 3            If we're going to deconstruct what
 4   happened with this Amazon issue -- and I know
 5   Mr. Cassady will get into it more later with respect to
 6   Smartflash's motion, but this is a case against Samsung
 7   and HTC for use of Google Play.
 8            And in discovery, the defendants had
 9   tried to get into attorney/client communications and
10   work product about what else infringes, and we -- we did
11   shield that.  But, very importantly, those
12   communications were properly protected.
13            This isn't a scenario where in response
14   to their conclusory allegation that Amazon isn't accused
15   therefore it infringes, we had Mr. Racz say, Well,
16   Amazon infringes because my attorneys told me so, and
17   then shut down, you know, further attempts on
18   questioning on that based on the attorney/client
19   communication.
20            There was no selective favorable waiver
21   of attorney/client communications or work product.  And
22   so that's why in our reply we cited the case that stands
23   for the proposition that when you disclose things in
24   litigation, that doesn't make things that come before it
25   automatically waived and it doesn't destroy the waiver
```

1  for those things.

2              Easy example.  They sent us an

3  interrogatory.  We serve our response in 30 days.  That

4  doesn't mean that our disclosure of our interrogatory

5  response destroys the attorney/client communication and

6  the work product that led up to that disclosure.

7              And here, that's what happened.  There's

8  stuff that -- in attorney/client communications and work

9  product that is properly protected and is still properly

10  protected, and they don't dispute that point.  They

11  admit that there's been no waiver.  They said that in

12  their reply.

13              They said, Y'all, we're totally missing

14  the boat.  There's been no waiver.  But that's our point

15  exactly.

16              This is a Fifth Circuit case, Willy v.

17  Administrative Review Board, 2005, and the case says

18  that the sword and shield analogy, is a product of our

19  paralleled reasoning behind the doctrine of implied

20  waiver:  A party may not use privileged information both

21  offensively and defensively at the same time.  In other

22  words, when a party entitled to claim the

23  attorney/client privilege uses confidential information

24  against his adversary (the sword), he implicitly waives

25  its use or -- protectively (the shield) under that

1  privilege.

2              Their admission that there's been no

3  waiver; in other words, we properly protected

4  attorney/client communications and work product, and

5  later made a timely disclosures, means that there's no

6  sword/shield violation here.

7              So, in other words -- in sum, Your Honor,

8  this -- this attack on Jones is -- you know, allegedly,

9  untimely disclosures and areas where they say, Oh, he's

10  going so far outside of his field of expertise, they're

11  just trying to throw as much on the board to see what

12  sticks as possible to avoid criticism of their experts,

13  to avoid evidence of infringement, to make it to where

14  they can be the only ones that say, Oh, Amazon infringes

15  because it wasn't accused, and have nothing said in

16  response.  It's just improper.  Every single one of

17  their attacks on Jones is completely without merit.

18              Thank you.

19              MR. VERHOEVEN:  If I may Your Honor.

20              THE COURT:  Uh-huh.

21              MR. VERHOEVEN:  I'll be really brief, but

22  I have five brief rebuttal points to make.  First, on

23  willfulness, the statement was made that this will be

24  helpful for the jury.  What they want to do is have an

25  expert get on the stand and interpret a bunch of

1  evidence and say to the jury that this is willful.

2              It's like saying my closing argument is

3  helpful for the jury.  It's not evidence.  It's somebody

4  interpreting evidence.  And it's fine if the jury needs

5  some assistance in understanding technical concepts.

6              But did somebody act with subjective bad

7  faith, did somebody intend something to happen, those

8  are not subjects that you hire expert witnesses to put

9  on the stand for.  And even if they were, Your Honor,

10 their expert doesn't have the background expertise to

11 even qualify.  That's point number one.

12             Point number two, Your Honor, on the

13 survey.  What you heard on the survey was that our

14 survey expert, Dr. Reibstein, had problems with his

15 survey.  And attacks on that.  Well, that's fine.  They

16 can cross-examination him.

17             They have their own survey expert who has

18 survey expertise and does actually criticize Reibstein

19 for the same sort of stuff.  He's got expertise, but

20 Mr. -- Dr. Jones is a computer scientist.  He doesn't

21 have expertise.

22             So, the fact that their critique of

23 Reibstein, even if there's merit to it, if there's some

24 way to critique it, the answer doesn't mean that their

25 unqualified expert should be able to do that attack.

1          They have to find the right mechanism to

2    do that attempt, which is cross-examine or their own

3    qualified survey expert.  Jones is admittedly not a

4    qualified survey expert.

5          Point number three, Your Honor, on the

6    contract claim.  I wrote this down when he said it.  He

7    said, You don't need to be a contract expert to read and

8    understand these terms.

9          Well, then why do you need an expert?

10   You only have an expert to interpret things if it's

11   necessary to be helpful for the jury.  If we need an

12   expert to talk about it, then that expert has to have

13   qualifications in the area.  Mr. Jones doesn't have

14   qualifications in the area.  Either the contracts don't

15   need expert interpretation, the expert shouldn't be

16   interpreting them; or, if they do, then we need a

17   qualified expert, not a computer science person.

18          Fourth point, Claim 11.

19          Put up slide 44.

20          You heard counsel admit as to this

21   element of Claim 11 up there on the right, to write

22   partial use status data to the data carrier when only

23   part of the stored data item has been accessed.

24          He stated, Well, we didn't have anything

25   in our infringement contentions on that element.  He

 1  just said that.  And now they're putting a new theory

 2  here.

 3                   Now, what we cite is what they did have

 4  in their contentions, Your Honor, corresponding to that

 5  element, and it was time period for rental.  Now they've

 6  got a completely different accused methodology.

 7                   Go to the next slide, please.

 8                   Their new infringement theory is

 9  completely different for that element, is stored in

10  non-volatile memory that can be accessed after the

11  device is powered down and restarted while in airplane

12  mode.

13                   Okay.  That, immediately from counsel,

14  was not in their contentions.  This is a new theory.  It

15  should be stricken.

16                   Fourth [sic] point, Your Honor, on

17  Amazon.  Counsel missed completely and fundamentally

18  misunderstands the sword and shield doctrine, Your

19  Honor.  This isn't about whether you've waived

20  something.  It's about misusing your privilege for your

21  own advantage.

22                   So, the misuse of the sword and shield

23  is, for example, if you -- in this case, you hide your

24  contentions under the privilege doctrine until the

25  rebuttal report when they can't be -- all the responses

1  are done.  It's the last report and you spring a brand

2  new theory.

3               That is to our disadvantage, their

4  advantage.  They use the attorney/client privilege as a

5  shield, and then it was to their advantage they remove

6  the shield in that same subject matter and use it as a

7  sword.

8               Now, they cite the Willy case, and I saw

9  it on that slide.  The sword and shield doctrine applies

10 both ways, Your Honor.  And they cite this Willy case.

11 That's when they're using it as a sword first.  Right?

12 And if you use it as a sword, then you've implied you've

13 waived the rest of it.

14               There's a famous Supreme Court case I'm

15 blanking on the name of where they had a single document

16 and the prosecutor used a part of it and didn't want to

17 produce the other part, and he had to produce the whole

18 thing under the sword and shield doctrine.  Well, that's

19 the offensive use, the sword.  It applies the other way,

20 too.

21               If you use it as a shield, then you can't

22 later use it as a sword.  You've made your -- you've

23 made your bed; you have to live with it.

24               So, this isn't about waiver by producing

25 something.  This is about not being able to raise an

1  argument because they asserted the -- privilege as a

2  shield.

3                   Thank you, Your Honor.  That's all I

4  have.

5                   MR. CURRY:  Just a couple of points,

6  because I don't think we're making much traction in

7  addition to what's already been briefed.

8                   With respect to the notion that Dr. Jones

9  must be a contract expert to offer a criticism that a

10  non-infringing alternative is or is not available,

11  consider what their expert did, Dr. Goldberg.  He jumped

12  from technical feasibility all the way to a conclusion

13  of availability.

14                   So, if anyone is making any sort of

15  contractual opinions, it's Dr. Goldberg who says tacitly

16  and without any explanation or any evidence that any

17  technically feasible alternative is available to Samsung

18  and HTC if it is technically feasible despite any

19  contracts.  In other words, Dr. Goldberg just

20  short-circuits it.  That's his opinion.

21                   Finally, with respect to the sword

22  shield, Smartflash made a timely disclosure.  We

23  actually answered the interrogatory saying things like

24  Amazon might infringe; we just didn't know.  We denied

25  their RFA.  We didn't stand on our privilege and refuse

1  to answer.  We actually provided a denial when they

2  said, Admit that it does not infringe.  We denied.

3              We didn't deny because of the

4  attorney/client communication or work product doctrine.

5  What we did is we denied because we didn't have any

6  information.  We haven't even finished any sort of

7  analysis at that point.

8              When it came time to responding to their

9  unsubstantiated exactly zero analysis of saying it's not

10  accused, therefore it infringes -- or it doesn't

11  infringe, we were then able to make a timely disclosure

12  on it.

13              And what you didn't hear was any sort of

14  argument that there's been any waiver of what was

15  previous -- previously shielded.  Our attorney/client

16  communications about Amazon are still protected.

17  They're still in tact despite the Jones' rebuttal report

18  on Amazon.  There's no argument to the contrary.  None.

19              And the purpose of citing the Fifth

20  Circuit case in 2005 is that it -- it explains that the

21  Sword Shield Doctrine in applied waiver rise and fall

22  together.  They don't say waiver.  That in itself -- in

23  fact they admit that there's been no waiver.  That shows

24  that there's no misuse of the sword shield, no misuse of

25  attorney/client communication.

```
 1                    And -- and contrary to what Mr. Verhoeven
 2   reads that case to read -- to say, it doesn't say that
 3   the sequence matters.  It's well established that, you
 4   know, again, when we make a disclosure in litigation,
 5   that doesn't destroy privilege and protected information
 6   that came before it.
 7                    If that were the case, well, I would
 8   expect all of their work product and attorney/client
 9   communication around the issue of invalidity.  They
10   haven't given it to us, yet they've given us their
11   invalidity contentions and reports.  They've made that
12   disclosure to us.
13                    Again, it's -- it's recognition that --
14   it's not the sequence.  It's that there's no waiver.
15   There's no sword shield of misuse.
16                    Thank you.
17                    THE COURT:  All right.
18                    MR. VERHOEVEN:  Nothing further, Your
19   Honor.
20                    THE COURT:  Okay.  What's next?
21                    MR. VERHOEVEN:  The next motion is
22   defendant's motion to -- to exclude expert testimony
23   related to surveys.  This is the Wecker base one.
24                    May I approach, Your Honor?
25                    THE COURT:  Yes.
```

1          MR. VERHOEVEN:  Okay.  Your Honor, this

2   first slide summarizes basically what the motion is.

3   Dr. Wecker is a survey expert that was retained by

4   plaintiff.  Dr. Wecker conducted four surveys on

5   consumer motivation to purchase their tablet or

6   smartphone.

7          Smartflash uses the responses to those

8   questions -- motivation to purchase questions -- to

9   attempt to satisfy the LaserDynamics damages standard,

10  Your Honor.  Neither of the survey questions nor the

11  responses are consistent with the LaserDynamics test,

12  the sole motivation test.  They've got the wrong

13  question.

14         Smartflash can't meet its burden of

15  showing the survey was prepared in accordance with

16  reliable principles and methods, Your Honor, because the

17  test -- the question they asked on motivation is not

18  consistent with the test of LaserDynamics.

19         So, really quickly, Dr. Wecker prepared

20  four surveys related to the smartphone and tablet

21  purchasing decisions; an App Store survey, Movies and

22  TV shows survey, Music survey, Books and Parental

23  Controls survey.

24         The surveys asked respondents whether

25  certain features motivated them to buy their device.

1   These are examples from the Wecker survey.

2                  Question 5:  Did the capability to rent

3   and download motivate you to buy the device?

4                  Question 4:  Did the capabilities to

5   purchase apps motivate you to buy the device?

6                  Question 11:  Did the capability to make

7   in-app purchases -- same phrase -- motivate you to buy

8   the device?

9                  Question 4b:  Did the capability to

10  purchase and download books motivate you to buy the

11  device?

12                 And that question -- that framework is

13  used consistently throughout the survey with the

14  motivate questions.

15                 Now, it's undisputed -- it can't be

16  disputed, really, that Mr. Mills, the damages expert,

17  takes those motivation question results and plugs them

18  in to his damages analysis for the purpose of meeting

19  the LaserDynamics test.

20                 Here we have deposition testimony at 71.

21                 Question:  Now, Mr. Mills, in connection

22  with your work in this case, you have relied on certain

23  surveys that were done by Mr. Wecker; is that correct?

24                 Answer:  I've relied on Dr. Wecker's

25  surveys, yes.

1          Next slide.  At page 121 of Mills

2  deposition;

3          Question:  Okay.  But did you use that in

4  the royalty base calculation?

5          Answer:  No, I used the question

6  regarding motivation to purchase.

7          That's the Wecker motivation to purchase

8  questions.

9          And then at 122;

10         Question:  Why did you do it that way?

11         And this is their damages expert.

12         Well, in part because my understanding

13  of -- well, the -- the phrase motivation to purchase or

14  motivation to buy is something that's found in

15  LaserDynamics, and so based on my understanding of the

16  current state of the law, I thought that that would be

17  an appropriate question to use to apportion the base.

18         Right there he says he used the

19  motivation questions to satisfy the test in

20  LaserDynamics.

21         Question:  So that's based on your

22  interpretation of LaserDynamics; fair enough?

23         Yes.  In part, yes.  I also think it's a

24  reasonable approach, but the language itself appears in

25  that case.

1          Well, Your Honor, as you know, when you

2   read the holding of LaserDynamics, there's a very

3   important word that exists in the holding that was left

4   out of the survey.  LaserDynamics -- this is at page

5   69 -- 694 F.3d 51.

6          On the record before us, the patented

7   method is best understood as a useful commodity-type

8   feature that consumers expect will be present in all

9   laptop computers.  There is no evidence that this

10  feature alone motivates consumers to purchase a laptop

11  computer, such that the value of the entire computer can

12  be attributable to the patented disc discrimination

13  method.

14         It's very clear.  We're not talking about

15  just the motivation.  It has to be -- the feature alone

16  motivates to buy.  That's the law.  That's

17  LaserDynamics.  There's no question about it.

18         You read further, on page 68, But proof

19  the consumers would not want a laptop computer without

20  such features is not tantamount to proof that any one of

21  those features alone drives the market for laptop

22  computers.

23         LaserDynamics says just because you show

24  people like it, not enough.  You have to show that the

25  feature alone drives the market for laptop computers.

```
 1                    Proof that consumers would choose the
 2   laptop computer having the disc discrimination
 3   functionally -- functionality -- which was the
 4   functionality at issue in that case -- says nothing as
 5   to whether the presence of that function is what
 6   motivates consumers to buy a laptop computer in the
 7   first place.
 8                    So, they've got the wrong test, Your
 9   Honor.  And -- and you don't have to just take my word
10   for it.  You can see the results of the test demonstrate
11   beyond refute that the survey respondents interpreted
12   the motivation question to not be motivate alone.
13                    So if we could go to slide 16.
14                    So this a -- this data is not disputed,
15   Your Honor.  This is a amalgam of data from the
16   respondents.  And you can see here -- oops -- this
17   doesn't work on the screen.
18                    If you look on the screen and take a row,
19   number of Respondents Overlap percentage, you see
20   iPhone, for example, they're asked whether a certain
21   scenario -- any -- the survey asks the respondent
22   whether a particular accused feature motivated their
23   purchase.  And then they ask for another -- another
24   feature, a different feature, and whether that motivated
25   their purchase.
```

1            And as you can see here -- I'll just use

2    the iPhone -- 23 of the respondents out of, I guess, 56

3    respondents said Both, different features, motivated

4    them to buy.

5            Well, that necessarily means that it

6    didn't solely motivate them to buy, Your Honor.  And if

7    we let this survey in, we're going to have a skunk in

8    the jury box because this is -- this is going to --

9    they're going to say this is sole motivation.

10           In fact, if you go back a couple of

11   slides, that's what Mr. Mills says he's assuming when he

12   plugs the survey results into his report.  And we know

13   from the survey results themselves that can't be the

14   case.  It simply can't be the case.

15           They've taken a -- they've applied the

16   wrong test, and that's not fixable.  That doesn't go to

17   weight, Your Honor.

18           Another tell here is if you add up the

19   sum of the motivation responses, it's 135 percent.  If

20   it was sole motivation question, it would be way below

21   100 percent, Your Honor.  It mathematically doesn't make

22   any sense what -- what these are -- these survey results

23   are showing.

24           And when you look at all the other

25   features that might be motivations, battery life,

1   processor speed, memory size, camera quality, ability to

2   send and receive text messages, screen quality, all

3   these are major, major features on phones that are

4   completely not analyzed.  And if you put the sole in

5   front of motivation, those features will probably be

6   more important to consumers I would suggest, Your Honor.

7              Plain meaning of motivate does not mean

8   sole motivation.  You can be motivated by all kinds of

9   things.  That's not the LaserDynamics test.

10             Okay.  Smartflash can't take that test

11  and prove to you that they used reliable methodology,

12  Your Honor.  Nothing was done in those tests to ensure

13  the respondents understood that the motivation questions

14  were asking for their sole motivation.

15             Three of the four of surveys weren't even

16  pretested, Your Honor.  None of the motivation

17  questions, zero, were pretested, Your Honor.  The survey

18  responses will -- fail Dr. Wecker's own standard for

19  reliability, which is the number of "I don't knows."

20             And finally, the motivation questions in

21  issue were drafted by the lawyers in this case, lawyers

22  who know LaserDynamics, Your Honor.  This is not a

23  mistake.  It was a choice.  And the choice is a broken

24  test.

25             Given the amount of time I have left, if

1   I could just have one second to organize my thoughts.

2                    (Pause in proceedings.)

3                    MR. VERHOEVEN:   I think I'll reserve my

4   remaining time for rebuttal.

5                    THE COURT:  Okay.  Response.

6                    MR. CASSADY:  May it please the Court.

7   Jason Cassaday the plaintiff.

8                    Your Honor, I'm going to go in reverse

9   order here and -- and I'm going to do that because,

10  apparently, no matter how we say it in the briefing,

11  separating the issue of LaserDynamics from the survey

12  versus LaserDynamics for the damages expert doesn't seem

13  to work.  So maybe this is reverse order so we can deal

14  with the Wecker issues.  And I'm going to talk about

15  LaserDynamics, but I can't do that without talking about

16  both Mills and Wecker.

17                   So, first off, in this case like in every

18  case against a defendant, we asked the defendants, Hey

19  how do you guys evaluate?  How do you guys do it?  How

20  do you figure out whether a feature is important or

21  valuable or you want to put it in there?  We asked that

22  question, and that's the one here.

23                   If Apple does not know, why don't you

24  tell us how you might figure it out.  And of course the

25  answer we get back is, We don't know how to do it.  We

1  don't do it during the ordinary course, which we -- we

2  know they do run surveys but they don't put that in

3  there.  And they talk about all these issues and say, We

4  couldn't do it.

5          Then we say -- what we heard today --

6  what about the non-infringing alternatives.  And we say,

7  What about non-infringing alternatives?  What do you

8  got?  Apple gives us nothing.  Samsung, HTC wait till

9  five minutes before the end of discovery to give us

10 theirs.  That's where we were.

11         And so, you know, during Mr. Caldwell's

12 argument today about the prejudice that we had under

13 Dr. Wechselberger, having his opinion about

14 non-infringing alternatives, here's the prejudice.  We

15 didn't just stop there and stood on our hands.  We went

16 and spent hundreds of thousands of dollars, hundreds of

17 thousands of dollars just on the surveys.

18         That's not attorney time.  That's not

19 other experts' time.  That's not other people involved.

20 It was hundreds of thousands of dollars invested in

21 trying to figure out the answer to this question by

22 running a survey.  And so we did it.

23         So, let's get Dr. Wecker first.

24 Questions of Survey Methodology Go To the Weight of the

25 Evidence.  End of story.  It's crystal clear in hundreds

1  of cases that if you don't like a little nitpicky thing

2  about the survey, tell the jury about it.  It goes to

3  weight.  It's not a methodology issue.

4           And so here, Stated differently,

5  methodological errors generally speak to weight, not

6  admissibility.  Finally, we note that defendants are

7  permitted to attempt to discredit Dr. Wecker and his

8  survey through aggressive cross-examination.

9           And that's what you just heard all those

10  arguments about.  We're just -- it's all

11  cross-examination fodder.  They can -- they have a good

12  time with that at trial, and they can try and get the

13  jury to be the finder of fact on that issue.

14           So, we go forward, and what you also

15  heard subtly underneath there -- they get into it in a

16  lot of detail.  The motion says it quite a bit -- was

17  that Dr. Wecker wasn't qualified.  You've already heard

18  Dr. Jones wasn't qualified, and Mr. Mills I'm sure soon

19  will get told he's not qualified.

20           But the reality of the situation is those

21  three experts together, two Ph.D's, a master's degree, I

22  believe an MBA, a number of other degrees on top of also

23  working with the counsel in this case, which I think

24  very highly of -- so, on top of all that, those parties,

25  they put the survey together.  Those experts spent all

1   that time.  They did all this work.

2             Dr. Wecker in his testimony said, I've

3   been doing surveys since the '70s.  I've been working on

4   surveys.  I've been doing these things.  I've been

5   working on the methodology, and just like that.  He's

6   testified in cases like this.  He's worked for

7   third-party people.  So he's qualified.  There's no

8   question of that.  And the methodology he followed in

9   this case follows that.

10            And so with regards to pretesting,

11  Dr. Wecker unequivocally testified, I ran a pretest.  He

12  says -- we asked, Are there any other surveys that were

13  performed in connection with this case that you're aware

14  of?

15            He says, No, they're not, although in

16  addition to the four surveys described there was a

17  pretest, but that information was provided in my

18  disclosures.

19            And what counsel for the defense is

20  trying to say is, because you didn't pretest each and

21  every survey, that that means there's no pretesting done

22  for the surveys.

23            But, your Honor, if you look through the

24  surveys, the formatting is very similar for all the

25  surveys.  The question-asking is very similar for all

```
 1  the surveys.  The pretesting was a single survey, the
 2  exact one we relied on which is the App Store survey.
 3  That is the pretest that is for the all the surveys.
 4              And Dr. Wecker testified that he made
 5  that pretest.  He did that, he made some adjustments
 6  based on it, and he went forward with the -- with the
 7  surveys.
 8              As I said, Your Honor, the majority of
 9  damages in this case are based on the single survey that
10  the pretest was specifically for, the one that was rated
11  an app -- in-app purchases.  So again, these
12  methodological issues go there.
13              So, then, you also heard Mr. Verhoeven
14  say that with regards to the pretesting, he didn't
15  follow his on standard.  Now, Dr. Wecker said that he
16  likes to do a pretest and see if he notes any confusion
17  in the questions, but he conservatively uses "I don't
18  knows" against the -- basically the negative side of
19  what he's doing.
20              So, for instance, in the Motivated To Buy
21  question, if he asks you yes or no, and I don't know, I
22  don't know counts as a no answer.  Which means to the
23  extent there's confusion, he puts the confusion against
24  Smartflash.  That's what he does.  And he's done that in
25  other cases.
```

1              Now, their own survey expert in this

2   case, when he ran a survey for Samsung -- so Dr. Wecker

3   says, I -- I instructed you not to guess.  Those are

4   SATs, Your Honor.  Do not guess.  He said, Do not guess.

5   Don't do it.  That's what Dr. Wecker says to them.

6              Dr. Reibstein won't even include an "I

7   don't know" in his questions in his survey.  His survey

8   is all of a sudden, you know, reliable.  He -- he just

9   assumes they understand the question, gives them no

10  option for I don't know.

11             And you know why he does that, Your

12  Honor, because he doesn't like what happens when he does

13  "I don't knows."  When he puts "I don't knows" in, he

14  gets people to answer I don't know against the question

15  he's trying to get answered.  And so he doesn't like it.

16             He says, You end up having a

17  disproportionate number of people that actually select

18  the "Do not -- Do not know."  So I actually believe that

19  what is going -- going to do is distort the data from

20  people that actually do have an opinion and yet don't

21  know with certainty.

22             Your Honor, in all of our tests, I don't

23  think more than 25 percent or 26 percent of people said

24  "I don't know" to our questions.  So, people understood

25  the question.  And Dr. Wecker understood that they did

```
 1   that, and Dr. Reibstein -- Reibstein just decided to
 2   dodge that issue.
 3              And so the point in going through all
 4   this is to just say to Your Honor, all the
 5   methodological issues that were towards the end of
 6   Mr. Verhoeven's analysis are all weight issues.  They're
 7   all cross-issues.
 8              And in fact, Your Honor, they're all
 9   "death by a thousand paper cut" complaints.  They're
10   little -- little thing here, little thing there.  And
11   that's what that -- put that in front of the jury.
12              Explain to the jury that there's a bunch
13   of little things that we think he could have done a
14   little bit better in his survey, and you can blow it up
15   and make it is as big as you'd like to but that is not a
16   methodological flaw that causes us a Daubert.  It goes
17   to weight, and -- and it goes in front of that jury.
18              And with regards to the survey here,
19   place LaserDynamics' attacks on Dr. Wecker.  Dr. Wecker
20   is out taking his survey and he's asking the questions.
21   His survey is sound methodologically.
22              Now, the real question is, the defendants
23   don't believe that he got Mr. Mills over the hurtle of
24   whether or not he can rely on that for damages.  That's
25   entirely irrelevant to this survey.  This survey is
```

1   methodologically sound.  It comes in.  That's the way it

2   should work, and they can cross it.  And that's how

3   Wecker's works.

4              Now, with regards to LaserDynamics and

5   with regards to Mr. Mills, you know, the issue there

6   is -- what happened is they're trying to couch the

7   scenario that we're in in this case as an entire market

8   value rule argument.  They're saying that we're taking

9   all the total revenues and we're -- we're multiplying it

10  by royalty rate in clear fashion against the non -- or

11  against the LaserDynamics or -- heck, against

12  Garretson's entire market value rule argument.  You go

13  back in time.

14             But here's the reality of it, Your Honor.

15  This is the total revenues, 182 -- $182 million -- or

16  $182 billion, Your Honor.  And that's just Apple as an

17  example.  They end up being the much larger party here

18  based on the fact that certain percentages work out much

19  more in their favor.

20             For instance, people perceive Apple as

21  being the content leader, they don't perceive Samsung as

22  being the content leader, so therefore the Motivated To

23  Buy people are higher for Apple than they are for

24  Samsung.

25             People tend to buy Samsung not for those

1    reasons, and so their damages number, although they may

2    sell as many devices as Apple, is significantly smaller

3    because the way the analysis was done.  But we didn't

4    take $182 billion.  That's not part of our analysis.

5    It's patently false that we did that.

6                    What we did was take the Motivated To Buy

7    question for the Apple App Survey and we -- we took that

8    Motivated To Buy which people -- I believe is about

9    17 percent said they were motivated to buy their device

10   for the access to the App Store.

11                   Very simple question, very simple to

12   understand.  And yes, all of our experts testified that

13   they believe that meant -- at least -- at least it's my

14   understanding as I sit here -- believe that meant only.

15                   So that led to $32 billion being left

16   over.  And that's the bottom right, Your Honor.  So,

17   that's -- that represents 17 percent of the total

18   revenues.  And that's -- we're just talking about the

19   revenue base right now, Your Honor.  We're not talking

20   about the damages or the royalty rates or anything like

21   that.

22                   So, that's an 83 percent apportionment.

23   That means 83 percent of Apple's devices we asked for a

24   zero dollar royalty.  Not because they don't infringe,

25   not because the product doesn't use the invention, not

1  because it's not important.  I don't think anybody in

2  this room with a smartphone hasn't, you know, purchased

3  an app at some point.  So we're all here; we've all got

4  our phones.

5                We reduced it down to people that thought

6  it was critical.  And that's what we did.  We went from

7  the top down to the critical people.  And we didn't need

8  to do that.  We could have done a different analysis for

9  those 83 percent of the people, but we didn't do that.

10  We conservatively estimated zero royalties for

11  83 percent of the persons with the Apple iPhone or other

12  devices.

13                So we go from there.  And so what I would

14  tell Your Honor is we're -- we're analyzing the at-risk

15  profit right now.  We are not in the entire market value

16  real world.  This is apportioned at-risk profit that

17  we're talking about.

18                But even assuming that the parties -- the

19  defendants are right, that we are entire market value

20  rule, let's talk about that then.  And that's where

21  LaserDynamics comes in, not Wecker but on Mills.

22                And so we go to that.  We go to that -- I

23  think it's probably a good time to tell you -- to say

24  this.  Okay.  So, when we were doing this opinion -- the

25  VirnetX opinion is up on appeal at the Federal Circuit.

1   And my counsel and I, we all had a lot of conversations

2   about what to do given that the worse case scenario

3   could happen out of the Fed. Circuit.

4            Lots of things could change.  What do we

5   do?  So we said, Let's prepare for the worst.  Let's

6   prepare for the very worst that would could happen out

7   of the Fed. Circuit, assuming they do anything with the

8   opinion.  And we did that.  And that's why we ran the

9   survey, and that's why we did these extra steps that

10  nobody does in these cases.  And we did these extra

11  steps and went through this process.

12           And what I will tell the Court -- I think

13  Your Honor's familiar with my arguments in the VirnetX

14  case.  Nothing that we said in the VirnetX case about

15  the surveys or about entire market value rule, none of

16  these things were overturned by the VirnetX opinion, not

17  one thing.

18           VirnetX opinion was cited in this Daubert

19  a couple of times, I think with insinuation that was the

20  case.  Absolutely nothing.  In the surveys that Apple

21  ran, held up at the Fed. Circuit.  They just -- they

22  just can't split them the way they were split in that

23  case before the Fed. Circuit.  And then small sellable

24  unit, they change the law.  Nothing you can prepare for

25  when they change the law.

1       But we're not in this situation here.

2  We're squarely talking about LaserDynamics.  And so to

3  that, I want to walk through LaserDynamics with the

4  survey and show the Court what we did.

5       Can I get the document camera, please?

6       Okay.  This is from LaserDynamics; this

7  is page 25.  This is just a PDF, so I don't have that

8  specific cite, I apologize.  And so, here's -- here's

9  what we're talking about.

10       In LaserDynamics, they unequivocally used

11  every single laptop's entire revenue and they multiply

12  it.  We didn't do that.  But again, assuming that the

13  Court believes that we're still in the entire market

14  value of our world, let's go forward on that analysis.

15       First, we say because LaserDynamics

16  failed to present evidence showing that the patented

17  disc discrimination method drove demand for laptop

18  computers, in LaserDynamics there was no evidence, there

19  was no survey run.  There was only evidence that

20  basically people liked disc drives.  That was the only

21  evidence in the case according to the Federal Circuit

22  opinion.

23       Next thing, It is not enough to merely

24  show that the disc discrimination method is viewed as

25  valuable, important or even essential to the use of the

1  laptop computer.

2              Your Honor, we didn't do that.  We're not

3  talking about, Hey, people like this.  It's important.

4  That's why 83 percent of people have disappeared off the

5  map in our damages analysis because we didn't stop

6  there.  We could have stopped there but with regards to

7  a different kind of analysis.  We didn't do that because

8  we believed we were going to follow this opinion.

9              So, what do we -- and I apologize.  Can

10 we flip back?  Where do this a couple of times.

11             So, first question out the gate we ask

12 is, Do you use the accused feature?  And we list it by

13 product and we list it by how often you use it, and we

14 found it was a very large percentage of the population

15 used the feature.

16             Again, we did that because we wanted to

17 know how online our survey was with Apple's survey.  We

18 wanted to know how important our feature was.  We didn't

19 use that to stop and say said that's what our analysis

20 was.  So we went and got the evidence from

21 LaserDynamics, step one, but we didn't stop there.

22             So then we go to step two of

23 LaserDynamics.

24             Only two more times.  One more time back

25 to this, please.  Thank you.

```
 1                    Step two of LaserDynamics talks about,
 2    well, if you have two otherwise equivalent laptop
 3    computers and only one of which practices the -- the
 4    patent improvement, proof that consumers would choose a
 5    laptop computer having the disc discrimination
 6    functionality says nothing as to whether the presence of
 7    the functionality is what motivates consumers to buy a
 8    laptop computer in the first place.
 9                    And what that's talking about, Your
10    Honor, is affirmative purchase decisions versus -- only
11    other way to say this is negative for commercially
12    viable purchase decisions that, yeah, generally people
13    would choose the more features, but they don't go there
14    to purchase the product with the more features.
15                    And so we -- we ask the question -- and
16    again, I apologize, back to the slides.
17                    So, here we ask the question -- and this
18    is where we took the non-infringing alternative, the
19    best ones we could identify.  And the question is,
20    Suppose that the feature at the App Store application
21    that allows you to browse for and purchase and install
22    the apps offered for sale were disabled on your device,
23    instead -- and now instead you could browse for and
24    install apps offered for sale, but before using the app
25    you'd need to complete each purchase by separately
```

1  visiting a website, enter your payment information to

2  unlock the app.

3            And so here we're presenting to the jury

4  the step two of LaserDynamics.  Ladies and gentlemen, if

5  you -- the purchased product that you bought didn't have

6  the feature that it has on it now but it had a more

7  difficult or non-infringing feature on it, would you

8  still have bought it at the price you paid for it?

9            Okay.  So that's what we asked, and a

10 good percentage of people said, No, I wouldn't have

11 bought it at the price I paid for it.

12           We didn't stop there.  We go to the next

13 step.  The next step we took was, well, how about if we

14 gave you a discount, would you still have bought it?

15           And so we took the discount now and we

16 said, Okay.  Now, would you have bought it but for this

17 discount?  And they -- a number of people said, I don't

18 care how much you discount it, I don't care if you put

19 it down to a hundred dollars, if you make me do this

20 non-infringing alternative, I don't want this product.

21 I'm done; I'm out; it's over.

22           But again, Your Honor, there's all kinds

23 of analysis where we could have stopped there and we

24 didn't do that.  We took the final step --

25           One more time -- one more time, please,

1   back to the docket camera.  Thank you.

2                We took the final step.  And here's what

3   LaserDynamics asked us to do.  In this case,

4   LaserDynamics' expert never conducted a market survey or

5   study -- or a consumer survey to ascertain whether the

6   demand for laptop computer is driven by the patented

7   feature.

8                On the record before us, the patented

9   method is best understood as a useful -- useful

10  commodity-type feature that consumers expect will be

11  present in all laptop computers.

12               We're well beyond that second sentence in

13  this.  The evidence in this case will be unargued that

14  it's an important feature, App Store's critical, that

15  all these defendants' documents are going to say that,

16  about each other even, Your Honor.  So we're gone now.

17               So we took this step, we conducted our

18  survey, we asked all those three prior questions, and

19  then last time --

20               Back to my slide, please, and I promise I

21  won't do it to you again.

22               So we ask the final question, for each

23  device listed below, did the capability to purchase apps

24  from the Apple's App Store, Google's Play Store, Android

25  Market or Samsung App -- and that question was basically

1  delineated by what you said you had.  You said you had

2  an iPhone, we asked you about the iPhone, and says, Did

3  that motivate you to buy this device?

4                   Simple, easy question.  Yes, no, or I

5  don't know.  If you thought, hey, maybe this and

6  something else motivated me to buy it, I'd say no or I'd

7  say I don't know.  But if this was the feature that

8  motivated me -- motivated me to buy, I'd say yes.  And

9  that's how it worked.

10                   And we got that analysis back.  We got

11  those numbers back.  And those are the numbers, Your

12  Honor, that were used to apportion the royalty base

13  down, was based on this question, a portion of the

14  royalty base down to the 17 percent of the iPhones -- or

15  iPhone or IOS devices.

16                   And like I said, Your Honor, I believe

17  with Samsung it was 11 percent, I think in HTC it was

18  some percent around there, but I don't have those exact

19  memorized.

20                   So -- and we didn't stop there, Your

21  Honor.  We took this analysis in line with the three

22  questions prior and we took the relationship between all

23  those together and we said, Let's determine the at-risk

24  profit.

25                   And so we said this.  If the guy's

 1  motivated to buy it, but he said he would buy it at a

 2  discount, we're going to give that to Apple.  If the guy

 3  said he wasn't motivated to buy it but he uses it, we're

 4  going to give that to Apple.  Zero royalty.  No royalty

 5  at all.

 6              So, if Apple -- even though Apple and all

 7  these guys here say they would never do a discount for

 8  something like this, we still gave them credit and said,

 9  We assume you still would have captured some of those

10  guys.  In fact, we assumed you'd capture them all.  We

11  said 0.0 royalty for 83 percent of the devices.  I think

12  with -- Samsung might have been 90 percent of the

13  devices.  It ended up being larger than Apple's.

14              Then the analysis comes down to what we

15  did, which is we take the credit for the people who are

16  motivated to buy, who also said, I don't care what you

17  did to this thing price-wise, I don't want that

18  non-infringing alternative, and I'm not buying this

19  device with that.  I was motivated to buy for this

20  feature and I wouldn't buy another product.

21              And those are the people that are our

22  royalty.  That's where our reasonable royalty came from.

23              And their own experts agree and admitted

24  that the vast majority of the revenues in this case are

25  out.  They're not even part of this case, and that our

1  royalty is a percentage of a percentage of a percentage
2  of a percentage.
3          And the only argument they have against
4  that, Your Honor, is to say, Well, Your Honor,
5  multiplication is associative, and so since
6  multiplication is associative, this is an entire market
7  value rule case.  And that's the argument they've got.
8  That's what it boils down to.
9          And so that's with regard to survey, but
10 it doesn't stop there, Your Honor.  We could have used
11 Apple's surveys.  We could have used Samsung or HTC's
12 surveys.  And the biggest argument -- and I call it the
13 double yes argument -- that Mr. Verhoeven and Apple --
14 they all have is that, Well, why would somebody in all
15 these surveys say yes to all these questions if they're
16 truly answering them motivated to buy?
17         Well, the answer is there is nobody who
18 answered all those questions and said yes to all those
19 things.  That is a bold-face lie.  Those surveys were
20 separately tested.  There is no soul, no soul who
21 answered, I would buy my iPhone for the App Store and I
22 would buy my iPhone for Books.  There is not a soul.
23         Those surveys were done separately, and
24 what they've done is they've taken the similar features
25 that were run in each survey and they collected them

1  together and they add them to other surveys that are not

2  related to those surveys and made it look as if we get

3  over a hundred percent, and that ignores a number of

4  very large issues in the surveys, which is what I just

5  said, Your Honor.

6              They're separate surveys.  They were not

7  done all together with the same population, one.  Two,

8  the double yes within a survey, for instance, the movie

9  surveys -- let's see if I can get to it real fast, Your

10  Honor.  The movie surveys.  Example.  When we ask the

11  movie survey, we asked the same population of people,

12  Your Honor, about renting and downloading and about

13  purchasing and downloading.

14              Now, those are very, very closely related

15  features, both of which are related to our patent, both

16  of which are patent enables.  Those are very, very, very

17  close features, so it does not surprise us that the same

18  person might say yes to those two things because those

19  are similar if not the same feature.

20              And so what's happened is there's a

21  little bit of shuffling of the numbers to try and show

22  Your Honor that we're getting over a hundred percent.

23  But it gets further than that.  If you look at the

24  numbers up here on the board, Your Honor, at the far

25  right, the people who said yes on the iPhone amounted to

1   8.9 percent.

2                    Do you see that, Your Honor?  I don't

3   have a laser pointer.  8.9 percent at top right.

4                    Well, that is the -- that's the middle --

5   that's -- what's the word?  Mean -- the meaning of the

6   number?  That's not what Mr. Mills used.  Mr. Mills used

7   the lower confidence interval in order to account for a

8   number of economic factors in this case.  He used that

9   5.45 percent, which is the lowest one.

10                   And Your Honor understands how that

11  works.  Everybody does.  There's a survey that gets done

12  in politics, it says, We believe X guy is going beat Y

13  guy by 5 percent, but there's a plus or minus 3 percent,

14  which means he could win by as much as 9 percent but he

15  could lose by as much as 2.

16                   That's the scenario here, except we

17  assume the standard deviation away from our analysis.

18  And we took the lowest number, 5.45 percent, and that's

19  where we are.  We're at the lowest standard deviation,

20  and we took that in our analysis.

21                   That's not the number they add up, Your

22  Honor.  The number they add up is back to the mean

23  again.  So it's not the number we're using.

24                   And again, Your Honor, those numbers

25  here -- the people who answered this survey here didn't

1  answer the other surveys, but they act as if they did

2  and they add them all up together.

3            But even assuming that one person did

4  answer all those surveys, Your Honor, all of those

5  surveys are very, very, very similar technological

6  issues of getting content.

7            And so it's not a surprise, even if it

8  were to go across the mall, that someone would answer

9  that way saying yes to that because it's -- it's

10 unequivocal that Apple's devices have been driven by the

11 availability of content.  Unequivocal.  If they get up

12 and tell me otherwise, I'd be shocked.

13            And so, to go back and show Apple's own

14 surveys also supporting this analysis, it's easy enough

15 to go back to their own surveys.  Here in 2011 -- that's

16 another issue they say.  We took the study in 2014, so

17 how can we apply it backwards in time.  This is the

18 reason why.  Use apps from the App Store comes out to

19 66 percent of -- of users plan to use it that way.

20            On the next slide, in 2013, when you look

21 at use App Store, it's 52 percent.  It actually went

22 down.  Our analysis over time is conservative.  2014 is

23 actually a time when the content stops being as

24 important as it used to be regards to Apple's devices,

25 and we've got the surveys to prove it.

```
 1                    But more to the point, Your Honor, is
 2   this.  When Apple -- when Apple asks surveys, they ask
 3   people, Pick two things that are your drivers.  They
 4   say, What are your two drivers?  Give us two.
 5                    And when they ask the question -- if
 6   these guys are right, that our survey question is asking
 7   the wrong question, then our number should be the same
 8   as their numbers.  Because if they're right and people
 9   understood the question to mean this is one of many
10   features, then we should get the same number they get.
11   We don't.  17 percent is our number.  That's the number
12   in the App Store.
13                    Access to the App Store, 74 percent in
14   the United States.  74 percent.  That's five times our
15   number.  Five times our number.  We are clearly asking
16   the question we needed to ask.
17                    We're asking the question, which is, Are
18   you motivated by this feature?  And what's happening in
19   these surveys here, Are you motivated by this or a few
20   other features?  And when it's motivated by a few other
21   features, it's a massive percentage.
22                    Their own surveys prove us right, that
23   people understood question to mean this is the motivated
24   feature.  And if they didn't understand it, Your Honor,
25   they'd say I don't know, because Dr. Wecker allowed for
```

1   that conservatively against Smartflash.

2               And Dr. Reibstein's own admission is that

3   the number would have been higher for us had we not had

4   an "I don't know," in there because people who had

5   opinions but decided to not guess said, I don't know.

6   So there are those surveys.

7               Then their own documents -- this is what

8   I'm talking about, Your Honor -- Apple generated 42

9   percent volume share through App Store launch in

10  July 2008.  That's exactly what we're talking about in

11  this case is this -- this functionality in the App

12  Store.

13              That's not an Apple document, Your Honor.

14  That's Samsung.  That's Samsung's own admittance that if

15  we don't get into this industry right now, Apple is

16  killing us by doing this.  So, what does Samsung do?

17  They copied Apple.  Created the same store.  And so the

18  point is these guys know full well that this is critical

19  to them.  They understand that.

20              This case is not a situation of a date

21  picker or some sub-feature of a laser disc drive.  This

22  is the feature that helps them drive these products.

23  And -- I mean, how many commercials do you hear, There's

24  an app for that, there's an app for that, there's an app

25  for that?

1          What does Samsung do to -- to go back on

2   that?  They did the same thing.  Oh, we have other apps,

3   and apps, apps, apps.  That's -- that's what this is

4   about.

5          So, the last -- the last thing they do is

6   they say this, Your Honor.  You know what, Your Honor,

7   you know why we know their question's wrong about

8   motivation, because it's just not possible.  That's why.

9   It's just not possible.  The smartphone has got so many

10  features on it there's just no way a single feature can

11  drive it.

12          And what that is, is a number of years of

13  taking Fed. Circuit opinions and shoe-horning their

14  business model into the Fed. Circuit opinions to try and

15  come into courtrooms and kill patent analysis.

16          Say, finally, to this date, they've never

17  said it before, Your Honor, never said a single feature

18  could -- couldn't drive it.  Never said an opinion.  The

19  Fed. Circuit's never said in any of its opinions that a

20  single feature couldn't drive a multi-component like a

21  laptop or a smartphone.  They didn't say that in

22  VirnetX.  Didn't say it in LaserDynamics.

23          If the Fed. Circuit, you know, is assumed

24  to have intellectual honesty, which I think we all do

25  assume they have superior intellectual honesty, then

1  they would just say that in the opinion.  They wouldn't

2  lay out impossible tests.  They would say in there it's

3  not attainable.

4              VirnetX you can't possibly prove that

5  they have a single feature driving the product instead

6  of saying here's the test for that.  Go run a study.

7  They would never say that.

8              And you know why we know that's right?

9  Dr. Reibstein admitted it.  Un -- unasked for, he said,

10  Yeah, when I looked into buying my car -- you know, I

11  went to buy my car with full features.

12              Mr. Pearson says, So what -- what if I

13  want -- what if I want a convertible -- oh, that's his

14  answer.  Sorry.  Can you tell us what that is?  What

15  were the features?

16              And he says, What I wanted was

17  front-wheel or four-wheel drive and those are the two

18  primary factors.  And I might note, by the way, that

19  most people -- well, an automobile is a very complex

20  product but most people make decisions on small

21  dimensions that happen to be important to them.

22              And that's what we asked about in our

23  survey, Your Honor.  We tried to figure out what it was

24  that was motivating these people.  That's what we asked.

25              And then we asked Dr. Becker about the

```
 1  same thing.  I said, I just want to be clear.  Apple's
 2  position is you can't ever, you know, have an Apple
 3  iPhone sale motivated by single future?
 4                   I'm trying to understand.  Are you
 5  conflating usage with motivated to buy?
 6                   He said, No, those are two separate
 7  tings.  As I've got on the screen here.
 8                   And I said, I just want to be clear about
 9  this.  So, if a user of a device had a single feature
10  that drove him to purchase a device, if he even later
11  regularly started using the device in some other fashion
12  other than the reason he bought it, you don't believe
13  that would break his reason to purchase a device -- his
14  drive for the purchase of the device, right?
15                   He says, No, you can't.  It doesn't go
16  back in time and undo your hypothetical that that's
17  what's driving it.  He said, If they become a regular
18  user of some feature, that would be a reasonable thing.
19  It reduces the probability that their next purchase
20  might be driven by that one feature.  But once the
21  purchase has happened, the motivation's done.
22                   Their own expert is admitting that people
23  go to the store; they pick a single feature; they pick
24  their device; they buy it.  Just because they go and use
25  it for a whole lot of other things, like all the things
```

1   that were listed by Mr. Verhoeven, has nothing to do

2   with whether they were motivated by a single feature

3   like we said in the survey.

4                    And ultimately, all the features that

5   Mr. Verhoeven put out in front of you are on a flip

6   phone, Your Honor.  And their own witnesses have all

7   said smartphones, it's about having App Store and it's

8   about having apps.  That's what they've all said, and

9   that's what this case is about.  And at the end of the

10  day, there's no reason that the analysis we put forward

11  with this survey shouldn't support that.

12                    So with that I'll close.

13                    THE COURT:  Okay.

14                    MR. VERHOEVEN:  Thank you, Your Honor.

15  I'll try to be brief.  And I do have a couple of

16  follow-up ones.

17                    THE COURT:  Okay.

18                    MR. VERHOEVEN:  Do you want to take a

19  break now, Your Honor, or should we keep...

20                    THE COURT:  I'd rather just push through

21  this motion, but we -- we do need to take a break, so...

22                    MR. VERHOEVEN:  I'll try to be brief.

23                    Smartflash -- counsel for Smartflash went

24  through a series of slides saying they were very

25  carefully applying the LaserDynamics test when they did

1  this survey, and they were very careful, and he went

2  back and forth, you remember, from ELMO to the slides

3  showing how the survey tracks LaserDynamics.  We didn't

4  hear that argument in their brief, Your Honor.

5                     Can we have slide 32?

6                     In their brief, they claimed

7  LaserDynamics is irrelevant to our motion and that

8  LaserDynamics is irrelevant to the Wecker opinion.  They

9  say LaserDynamics doesn't apply.  It's a theory on which

10 it does not rely.  So, now they've completely changed

11 from their opposition and they're saying no, Your Honor,

12 you should believe that we carefully tracked

13 LaserDynamics in the way we did this survey.

14                     Those two things can't both be true.

15 There's no question that the standard in LaserDynamics

16 is sole motivation, or as they call it motivated by a

17 single feature.  That was not tested in the Wecker

18 analysis.

19                     Now, one of the things that counsel for

20 plaintiff said is that the entire market value rule

21 doesn't apply, so therefore LaserDynamics shouldn't be

22 rigorously needed to be followed.  That's not true.

23 That goes more to the Mills motion, Your Honor, so I'm

24 not going to address the entire market value rule.

25 Counsel for Apple will do that.

```
 1                        But -- but the fact of the matter is that
 2    Mills admits it, Your Honor.  And you saw --
 3                        If we could go back to slide 8.
 4                        He used the question regarding motivation
 5    to purchase, he said, when he did the royalty based
 6    calculation.  Why did you do it that way?  We looked at
 7    this, Your Honor.  He did it because of LaserDynamics.
 8    Okay.  He's doing the motivation question because of
 9    LaserDynamics.  That's what their expert says, not their
10    lawyers trying to get out of it.
11                        LaserDynamics applies to this case.  They
12    know it and that's why they gave up their first
13    argument, and now they're arguing that they carefully
14    tracked it.
15                        Another point I'd like to make, Your
16    Honor, is you saw counsel put up a bunch of questions
17    from the survey implying that Mr. Mills used those
18    questions in determining whether there's motivation.
19    That's not true.  And what's more important, Your Honor,
20    is we're not moving on those questions.
21                        Could we go to slide 5?
22                        We're moving on the questions on which
23    Mr. Mills relied to do his calculations, were the
24    motivation-to-buy questions.  And he tied those directly
25    to LaserDynamics.  So pointing to some other questions
```

 1  in the survey to try and confuse the Court is not going

 2  to cut it.

 3                    The double counting, Your Honor.

 4                    Go to slide 16.

 5                    I was accused of bold-face lying by

 6  putting up this aggregation of charts.  These are the

 7  same respondents answering the question, motivation, for

 8  different features.  Yes, I stand behind that.  I

 9  double-checked after I heard that with my team.  I guess

10  I -- I just have to be called a liar on that.

11                    MR. CASSADY:  Next slide, Your Honor, not

12  this one.

13                    MR. VERHOEVEN:  Let's keep going.  Oh, so

14  this one I guess they admit that the same respondents,

15  then, answered motivation questions on different

16  functionality the same.  So I guess that's not disputed

17  then, Your Honor.  It's an undisputed fact.

18                    As a matter of logic, they could not have

19  interpreted that -- those questions to mean sole

20  motivation.  And we can say that.  They have no

21  pretests.  And I want to get to next, the pretest.  They

22  didn't do any testing to verify.

23                    They're standing up here saying to you

24  that they did all these -- or that these -- Trust us,

25  these respondents interpreted this as sole motivation,

1  but they didn't do anything to test it, Your Honor.

2                Bear with me as I work through my slides.

3                If we go to slide 26.

4                The only test that was done by Dr. Wecker

5  was one of four surveys, Your Honor.  It's undisputed

6  that Dr. Wecker did not pretest any of the motivation

7  questions, period, full stop.  There's no -- and no

8  pretesting was done with these respondents to say, Do

9  you interpret this to mean sole or multiple?  So, they

10 can say that to you, but they didn't pretest.  We have

11 in our brief every authority says you're supposed to

12 pretest.

13               Mr. -- Dr. Wecker says it's recommended

14 to pretest.  He actually did pretest and made

15 adjustments on the one -- the one survey that didn't

16 have the questions.  You've been told repeatedly --

17               If we could go to slide -- just one

18 second, Your Honor.

19               Slide 35.

20               In the brief, the statement is made over

21 20 times, in the opposition brief, that this all goes to

22 the weight.  It doesn't go to admissibility.  But this

23 isn't true in this case.  This is a test propounded by

24 the Federal Circuit.

25               If you take a survey to meet that test

```
1   that doesn't match the holding, and it's clearly -- as
2   we can see from the results -- not consistent with the
3   holding, that is going to be found to be reversible
4   error.
5            The Federal Circuit is all over damages
6   now days, and we got to follow these tests they put out.
7   And there's no question under LaserDynamics that if
8   you're going to rely on LaserDynamics, it's sole
9   motivation.  It's undisputed.  Single feature motivates.
10           Bear with me, Your Honor.
11           There were a number of arguments that
12  were made, Your Honor, concerning Mr. Mills and it
13  overlaps with Mr. Mills' analysis.  I'm not going to
14  address the Mr. Mills' arguments because our motion
15  right now is Dr. Wecker, so I won't address that in the
16  interest of time.
17           And if I could just confer with counsel
18  to see if I've left anything out.
19           With that, Your Honor, I'll sit down.
20           THE COURT:  Thank you.
21           MR. CASSADY:  Can I get 60 seconds?
22           THE COURT:  Yes.
23           MR. CASSADY:  Can I get slide 16 of yours
24  Mr. Verhoeven, please.  Of yours, please.  Sorry, their
25  slides.  Thank you.  I know I've been difficult to you,
```

1   I apologize.  Their slides.  Sorry.  There we go.  Okay.

2             So, Your Honor, with regard to slide 16,

3   this is the issue of the percentages they're showing and

4   the individual lines there relate to the super similar

5   functionality.  So movie rental, movie purchase.  That's

6   what this was right here.  This is not the one that was

7   not true.  This one, these numbers are there.

8             What we're saying is that what the

9   analysis they're taking of this is illogical, that based

10  on the way the survey is asked and who was asked it, it

11  makes sense that the features are so similar that they

12  would answer this way.  It doesn't -- it's not

13  inconsistent with our understanding.

14            Next slide, 17, please.

15            This is the lie.

16            MR. VERHOEVEN:  Your Honor, I object.

17            THE COURT:  Okay.  We're not objecting.

18  So -- Mr. Verhoeven, Mr. Verhoeven, we're not objecting.

19  It's his turn to talk.  I'm going to let him talk.

20            MR. CASSADY:  This is not the same

21  people.  None of these are the same people.  Sixteen

22  percent said rent and download did not answer the

23  question for purchase and download books.  But they make

24  it sound like those are the same persons saying that so

25  they get to say, see, they got to a hundred percent of

1  the people.  That's just patently false.

2              And then also, Your Honor, we didn't rely

3  on all the numbers.  We took the single survey and

4  relied on the single survey based on the time frame that

5  the inventor was in.

6              And then with regard to LaserDynamics,

7  the reason I went into it, and I think I told Your

8  Honor, LaserDynamics is irrelevant to Wecker.  He ran a

9  survey.  It's -- it is polished and fine.  He's done it

10 in all the normal practices.  He's got experience in the

11 world of doing surveys.  They're relevant.  They should

12 come in.  The question mark is Mills.  I had no choice

13 but to walk into Mills because that's the attack they

14 keep making is LaserDynamics.

15             And then finally, with regards to the

16 motivated question, even if they're right and motivation

17 doesn't solely go to the single feature, it doesn't

18 matter because Mr. Mills' analysis took into account

19 only the people who said after motivation, they would

20 have walked away from the product line.  He mixed those

21 two things together in order to come to his number.  So

22 he took every factor in LaserDynamics and put it into

23 his analysis.  And Dr. Wecker simply ran a survey to

24 help them facilitate that.

25             And with that, that's all I've got, Your

```
 1   Honor.  Thank you.
 2                    THE COURT:  All right.  We're going to
 3   take our afternoon break.  We'll be in recess for 15
 4   minutes.
 5                    (Recess.)
 6                    THE COURT:  Please be seated.
 7                    All right.  What's next?
 8                    MR. VERHOEVEN:  Good afternoon, Your
 9   Honor.  I just want to give you an update before we get
10   to the next motion, which is Mills.  As I said before,
11   the parties agree to try to use equal time.  By our
12   calculation, defendants have used 41 minutes and
13   Smartflash 73.  I spoke to them over the break.  They
14   still say they're going to try to keep it with equal
15   time, so we'll see how it goes.
16                    THE COURT:  Okay.
17                    MR. BATCHELDER:  Good afternoon, Your
18   Honor.  James Batchelder again for Apple.  The next
19   motion up is the Daubert, moving to strike Mills who is
20   their -- Smartflash's damages expert.
21                    Counsel said that the attack on Mills --
22   I believe he said it was a death by a thousand cuts.
23   And what I wanted to do was start out by showing you the
24   math that Mr. Mills uses to show that it's actually
25   really a couple of just fundamental problems with his
```

Jill E. McFadden, CSR

1  calculation and his approach that renders what he's

2  doing fundamentally unreliable.

3           So, let's start out with his royalty

4  base.  On the left you have the motivate percentage.

5  That's the answer to the motivate question.  And there's

6  this formula, total units times total revenue over total

7  units, but, of course, total units cancels out, and so

8  the royalty base simply becomes motivate question times

9  total revenue.  That is the royalty base that Mr. Mills

10 uses.  And so the fundamental question is, does that

11 motivate question that he uses, is he using it to

12 measure what he really does measure.

13           And as you will see in a moment, as Mr.

14 Verhoeven has touched on, what he's using it to measure

15 is did X feature alone motivate the purchase of this

16 product.  And that's not what he asked.

17           What was asked was, Does X feature

18 motivate you?  And, of course, multiple things can

19 motivate.  And so, his reliance on that, that's the only

20 thing that he uses to apportion the royalty base.  And

21 it's fundamentally broken as a result of his reliance on

22 a question that doesn't ask what he relies on it to

23 measure.

24           And moving on to the royalty rate.  This

25 is a much fancier formula, but again, many things cancel

1  out.  So those two total units cancel out.  These total

2  revenues cancel out, these total units cancel out, and

3  so what you're left with on the royalty rate is, again,

4  a survey question that, the would not buy question

5  multiplied times contribution margin, which is simply in

6  Apple's case just profits.

7              And so the entire royalty calculation

8  comes down to base times rate, total revenue and

9  contribution margin multiplied by each other are total

10  profits.  So you just have total profits multiplied by

11  two survey question outcomes.  And that's just how

12  important these survey questions are to the Mills'

13  calculation.

14              Again, the motivate question is the only

15  thing that it uses to apportion the base and that's

16  fundamentally broken.  And the would-not-buy question is

17  the only thing that uses the apportionment rate, and

18  that's broken as well for reasons I'll get into in a

19  moment.

20              But let's start with the motivate-to-buy.

21              Can we see 17, please, Mr. Pierce?

22              So there's the question.  It's did X

23  feature motivate you to buy the device.

24              He didn't say was X feature the only

25  feature that motivated you to buy, didn't say, did X

```
 1  feature alone motivate you to buy.  Could have but
 2  didn't.
 3           And Mills' excuse for relying on the
 4  survey for doing it this way, as Mr. Verhoeven's already
 5  pointed out, is, well, that word motivated appears in
 6  the LaserDynamics opinion.  That was his reason.
 7           So, what does LaserDynamics say?  It says
 8  did the feature alone motivate.  The fact that the word
 9  motivate shows up in the opinion doesn't justify relying
10  on a survey that just says did X feature motivate, when
11  the opinion says it has to be that feature alone.
12  Again, that could have been asked but it wasn't.  It was
13  designed not to capture that information.
14           And here's what Mr. Mills says about it.
15           I'm sorry.  Can we have 22, please?
16           Thank you.
17           So again, the question is on the left,
18  The Motivate Question.  And on the right are the
19  questions that I asked him.  And the bottom one was, In
20  conducting that apportionment -- because he admitted
21  that was the only thing he used to apportion -- are you
22  assuming that the Question 4 App Store functionality is
23  the only functionality that motivated the respondents to
24  buy the device if they answered yes?
25           His answer is, Yes.
```

1    So he assumes that motivated by this
2  feature means motivated only by that feature even though
3  no one asked the question.
4         And I reworded the question.
5         Can we see 30, please?
6         I reworded the question for him.  So you
7  see on the right I said, The reworded version is:  For
8  each device listed below, was the capability to purchase
9  apps from Apple's app store, Google Play store, et
10  cetera, the only functionality that motivated you to buy
11  the device?  That's the reworded question.
12         And, My question now is, does that
13  reworded question in your mind mean the same thing?
14         His answer:  I think there is a slight
15  difference in meaning.
16         And I asked him why, and he said:  The
17  way that you phrased question seems to foreclose any
18  possibility that there is another feature that had input
19  in the purchase decision.
20         So he admits that if it had been reworded
21  to ask what he relied on to measure, it would have meant
22  something different.  That breaks his apportionment of
23  the base.
24         So I tested it further.  On slide 31, I
25  asked him to consider a hypothetical.

 1              Say a given respondent answered yes to

 2    Question 4 but was also motivated by, say, three other

 3    features to purchase the reference device.

 4              Are you with me so far?

 5              Answer:  Yes.

 6              Question:  For such a respondent, a

 7    reasonable royalty calculation would need to apportion

 8    as between the motivating feature attributable to the

 9    patents-in-suit and those motivating features not

10    attributable to the patents-in-suit, correct?

11              Answer:  I would need to consider that,

12    yes.

13              So, if the question asked what he had

14    relied on to mean that people actually -- were actually

15    motivated by other features -- because the question

16    leaves room for that as he acknowledged -- he would have

17    to redo his calculation.  He would need to consider

18    that.

19              And we know -- apart from the fact -- I

20    mean, I'll just say this, Your Honor.  Let's go back to

21    the question.  Again, the question is, Did X feature

22    motivate you to buy?

23              If I order a mushroom and pepperoni

24    pizza, and someone asked me, Do mushrooms motivate you

25    to buy that pizza, I'd say sure.

1          If they asked me did pepperoni motivate

2   you to buy that pizza, I'd say sure.  Truthful answer to

3   each of those questions is yes.  And there are probably

4   some other things like, I happen to like the crust at

5   that restaurant and the spice level of the sauce.

6          But if you ask did X feature motivate

7   you, and that's all you ask, you can't exclude the

8   possibility that other things are motivating you.  In

9   fact, it would be an illogical assumption, and yet

10  that's the only assumption that drives the entirety of

11  his apportionment of the base.

12         Can we see 26, please?

13         Now, here are a couple of examples where

14  the same respondents were asked did X feature motivate

15  you and did Y feature motivate you.  And if the survey

16  question meant what Mills said it does, what he relies

17  on it to mean, no one would ever say yes to both because

18  they're different features.

19         And here we have, for example, one of the

20  questions, the top question, number 5 is about

21  capability to purchase and download books.  That's X

22  feature.  Number 6 is -- it's about books and parental

23  controls.  Those are not the same feature.  They're not

24  even highly overlapping features.

25         And yet many of the respondents across

1  the devices, 28 for the iPhone, 19 for iPad, 12 for the

2  iPod Touch, many answered yes to both, and that shows

3  you the respondents in this survey did not interpret

4  motivate to mean what Mills relied on it to mean.  His

5  only apportionment of the base is broken and their own

6  survey proves it.  It's not reliable.  It can't be used.

7              33, please.

8              Royalty rate.  Would not buy percentage

9  times contribution margin.  We looked at that at the

10  outset.

11              36, please.

12              I asked him, Do you agree with the idea

13  that some portion of what you've called at-risk profits

14  is attributable to Apple rather than to the claimed

15  invention?

16              Answer:  There are certain complementary

17  assets that create that value.

18              So he agrees Apple's adding some value to

19  this stuff.  But the law says you have to apportion for

20  it.

21              37, I asked him a follow-up question.

22              You began your answer by saying that

23  there are certain complementary assets that create

24  value.  My question is, Does your analysis do anything

25  to apportion as between, on the one hand, those

1  complementary assets and, on the other hand, on the

2  contribution of the patents-in-suit?

3             His answer was, No.

4             And he goes on to say, I tried to do

5  something different.  I didn't apportion.  I tried

6  divide between infringement and non-infringing

7  alternatives.

8             The problem with that, though, is --

9             38, please.

10            Dr. Jones -- these guys were deposed on

11  the same day, Dr. Jones and Dr. Mills, and it was the

12  scenarios of Dr. Jones that Mills was relying upon to

13  apportion the rate by dividing between infringement, on

14  the one hand, and non-infringing alternatives on the

15  other.

16            Dr. Jones, when he was deposed, he was

17  asked, Well, is this alternative that you provided in

18  your scenario?  Is it really non-infringing under your

19  infringement theory?

20            And he said, Well, no.  No, it really

21  isn't.  There are some claims that are still infringed.

22            But Mill didn't understand that.  In

23  fact, he understood exactly the opposite.  I asked him

24  what his understanding was of Dr. Jones' opinions on

25  that subject that he was relying upon, and he says, My

1  understanding is that the alternatives are

2  non-infringing.

3           So, the entire logic of his so-called

4  apportionment on the rate is based on this false

5  distinction between scenarios and alternatives being

6  infringing and non-infringing.

7           Dr. Jones, a guy who came up with this

8  stuff, and rendered the infringement theory and the

9  alternative theory, he said, Well, actually those

10  alternatives are still infringing.  It's fundamentally

11  broken, both the base and the rate.

12           And again, these are the only two things

13  that he's relying on to apportion anything in this -- in

14  this damages calculation.

15           A couple more quick points.

16           Slide -- I got it.  Slide 40.

17           The LaserDynamics opinion makes one other

18  very important point, and that is, you shouldn't be

19  admitting, you shouldn't be putting in front of the jury

20  the entire market value, basically, the -- the full set

21  of revenues and profits of defendant because it can only

22  prejudice.

23           The admission of overall revenues, which

24  have no demonstrated correlation to the value of the

25  patented feature alone, only serve to make a patentee's

1  proffered damages amount appear modest by comparison.

2            And in VirnetX, the same thing was said,

3  It cannot help but skew the damages horizon for the

4  jury.

5            And again, in their formula, it's total

6  revenue, total profits of Apple.  They want to throw

7  around hundreds of billions of dollar numbers and say,

8  Oh, we're just asking for something very modest.

9            One last point before I sit down, because

10  I know time is short.  But it comes down to the universe

11  of the survey.  And it's one thing in their papers when

12  we pointed out this -- that the wrong universe was used

13  for the purpose that Mills wanted to put it to.

14            They said, Well, Apple surveys regular

15  users.  Why can't we do that?

16            Of course, it's fine for a company that

17  survey regular users if you want to measure the views of

18  regular users.  But what Mills relies on this survey to

19  do is to measure the buying patterns and the motivations

20  of all purchasers, and yet the only thing that was

21  surveyed was regular users.

22            So I asked him:  Don't you think it's

23  likely that people who use iPhones regularly, on

24  average, are going to buy and use applications more

25  often than people who use iPhones only occasionally?

1    He says:  That's possible.  I haven't

2  seen any evidence.

3    Question:  Doesn't common sense suggest

4  it to you, sir?

5    Answer:  It certainly seems like it's a

6  possibility.

7    So, he's relying on this survey that

8  talked only to regular users to measure all purchasers.

9  There's no justification for that and he had none.

10    And when we asked Smartflash about it,

11  what do they say in their brief?  Sampled individuals

12  who are likely to be using the accused functionality.

13    That's what they said Dr. Wecker did.

14  Sampled individuals who are likely to be using the

15  accused functionality.  You can't do that.  That's bias

16  by definition.  You can't steer your survey to people

17  who you think infringe and then say, Oh, people who

18  infringe tend to like this feature, therefore it should

19  be valuable, and -- and ratchet up the damages

20  calculation.  You just can't do that.

21    And I should add that a fundamental

22  failure like this to survey the right population, that's

23  not something that just goes to weight.  It goes to

24  admissibility.

25    And there are a few cases that we've

```
 1   cited to, there's the 1-800 Contacts case, the J&J Snack
 2   Foods case, and the Oracle Google case.  All of those
 3   cases struck the survey because of fundamental problems
 4   like surveying the wrong population and asking a
 5   fundamentally broken question like motivated by X when
 6   you're really trying to ask motivated only by X but
 7   don't bother to ask that question.
 8                Those surveys get -- get struck exactly
 9   for those kind of reasons in this survey, and the
10   reliance on it by Mills to formulate a damages
11   calculation need to be stricken for the same reason.
12                Thank you.
13                THE COURT:  Response.
14                MR. CASSADY:  Can I stick with your
15   slides, please?  And can you go to slide -- go to slide
16   1, please.
17                Your Honor, I'll just try to briefly deal
18   with some of those things, and then obviously I think is
19   usual in a Daubert motion, I will open it for the Court
20   to ask me any questions the Court may have.
21                With regards to this issue here, I
22   already dealt with this.  Their argument is
23   multiplication is associative.  So, if there's
24   multiplication and division, then we can delineate down
25   in the model, say anything we want to, and try and call
```

```
 1   what it is -- or call what it's not.
 2               And so the situation here is he's showing
 3   you the royalty base.  The calculation he's showing you
 4   looks like a normal damages analysis in its -- in its
 5   total.  That's not what that is.  This is simply just
 6   calculating the royalty base, and it's using multiple
 7   things.
 8               And more importantly, Your Honor, we do
 9   not intend to, and never will, go in front of the jury
10   unless, of course, some opening of the door happens, and
11   saying $182 billion, that's -- that's the royalty base.
12   That is not what's going to happen.
13               What's going to happen is, based on the
14   calculation that's done here, so that we don't have to
15   show the jury 181 [sic] billion, we can say, here's a
16   percentage of motivated units, here's the revenue
17   related to those motivated people, that's the royalty
18   base, and the jury won't ever know the remainder of the
19   base.  And that's what that is.  So that's the situation
20   and so that's the royalty base.
21               You go to the royalty rate, we -- can you
22   go two slides forward, please.  That's still the base.
23               Okay.  When you go to royalty rate,
24   it's -- there we go.  Thank you -- there's a whole
25   lot -- a whole lot more variables that go into the
```

1 royalty rate like the -- the profit margin, the

2 percentage that would not buy it without the feature no

3 matter what prices actually got done.  And that royalty

4 rate is applied against that portion and reduced royalty

5 base.  And it's what I told you before, Your Honor,

6 that -- that 83 percent of the people in some of these

7 situations are zero royalty for.

8                    Then another larger percentage of the

9 17 percent left over, zero royalty for.  Only a subset

10 of a subset of a subset are getting applied -- are

11 profits that are getting allocated to Smartflash in one

12 way or another.

13                    But I'll back up and I'll say -- Your

14 Honor, with regards to the motivate question, as I said

15 with regards to the Wecker analysis, we're not at the

16 entire market rule just to start with.  That's not where

17 we are.  We -- we apportion down the base and we did an

18 analysis related to the apportion base.

19                    If the Court and if the defendants

20 believe that we are in the entire market value real

21 world, we've provided that evidence amply for those

22 things.  And so, the point is that question doesn't have

23 to mean solely or alone the way the defendants say in

24 order for us to have a damage model.  Only in the world

25 where this is the entire market value rule we're talking

1  about for this 17 percent of people does that question

2  have to go down that road.  And in that situation, we

3  think we've provided ample evidence for that.

4             And so, let me just go to some of -- some

5  of their slides and point out the things for that.

6             So, can you go to slide 26, please?

7             Back to this one.  So, books and parental

8  controls is -- that's a new example we're using here.

9  Books and parental controls.  Again, it is -- it is

10 obtaining and controlling content.  That's the

11 functionality we're talking about in this case.

12            And so it should be no shock to anyone

13 that people that care and are motivated by the obtaining

14 of specific types of content and controlling of that

15 content care about various versions of that.  And so it

16 should be no shock to anybody.  That's not a negation of

17 our motivated-to-buy question being solely for a

18 feature.  It just isn't.

19            Now, like I said before, Your Honor,

20 they're not asking the same people.  Here, these guys

21 got asked -- I'm not saying this -- this one didn't.

22 But all across all features, they did not get asked the

23 same question.  And it's not a hundred percent plus

24 people saying yes to all those things.

25            With regards to slide 28, please.  Or,

1  sorry, 38.  I apologize.

2             Your Honor, with regards to the

3  non-infringing alternatives that might still infringe,

4  and Mr. Mills assumes that they are not infringing, this

5  is a pretty peculiar argument by the defendants.  What

6  they're saying is Mr. Mills' assumption that some of the

7  accused functionality doesn't infringe means he should

8  get Dauberted.

9             What he did was he gave them the benefit

10  of the doubt related to those non-infringing

11  alternatives.  So Jones said, You know what, I think

12  there's still an infringement reading on some of these

13  non-infringing alternatives.  But Mr. Mills says, You

14  know what, I'm going to assume you get all the benefit

15  of that whether it's infringing or not.

16             And they're saying that's a criticism of

17  the way he did his analysis?  And we dealt with this

18  issue.  I'll put it right here in front of the Court.

19             Could I get the document camera, please?

20             This is from the brief on this issue with

21  Jones.  And we say, The fact that some alternatives

22  might still infringe some claims says nothing about

23  Dr. Jones' methodology, rather it means that the

24  defendants were freely credited with the benefits of

25  that infringement.

```
 1              I mean, Your Honor, we bent over
 2   backwards to throw benefits over the fence for them.
 3   You know, you get all the people that use it, get all
 4   the people that would still buy it with a discount.  You
 5   get it all -- you get everything.  It's still all there.
 6   We only took the very specific people that we were
 7   allocated with regards to LaserDynamics.
 8              Okay.  Then if we go to slide 42, please.
 9   I apologize.  Their slide 42.
10              Okay.  The regular users.  I apologize,
11   Your Honor.  So with regards to this, now they're saying
12   we have a fundamental survey flaw, that we have -- we
13   have gone after regular users.  And again, this one kind
14   of surprises me that this one got -- got put up in front
15   of us for two reasons, Your Honor.
16              Number one, when Dr. Wecker was asked
17   about this in his deposition, he said, I went back and
18   looked at the data and the data -- the purchasers versus
19   the users -- was insignificantly different.
20              Done.  That issue's dead.  There's
21   nothing there.  And they bring this up.
22              Even worse, Your Honor, their own survey
23   expert, their own survey expert testified and used users
24   in his survey.  I mean, I just don't know what we're on.
25   And I can show you the testimony, Your Honor, but in --
```

1   in saving time, I won't flip the camera and do that.

2              But Dr. Reibstein said he used users in

3   his survey.  So, I don't know what we're talking about

4   here about methodological flaws when we're just doing

5   the same thing they did.  Now, apparently, we all did it

6   in a blind test where we traded it over the fence to

7   each other, but that doesn't make ours methodologically

8   flawed and theirs fine.

9              So that's what I have, Your Honor.

10              THE COURT:  Response.

11              MR. BATCHELDER:  Your Honor, I made three

12   high level points, and I just want to come back to each

13   of them because I don't think that they were adequately

14   addressed.  On the apportionment of base and the only

15   methodology for doing that is the motivate question.

16   Motivate, motivated by acts does not mean motivated only

17   by acts.

18              And there was no rejoinder to that

19   argument.  The only rejoinder was to say, well, maybe we

20   don't really need it to mean that.  But Mr. Mills relied

21   on it to mean that in his survey.

22              Slide 22, please.

23              Not in his survey but his damages

24   calculation he says so himself.  That's the only thing

25   he used to apportion the base and he says so here.

```
 1                    In conducting that apportionment, are you
 2   assuming that the Question 4 App Store functionality is
 3   the only functionality that motivated the respondent to
 4   buy?
 5                    Answer:  Yes.
 6                    He relies upon it and that's his only
 7   base apportionment.
 8                    As to rate, again, he needed to
 9   apportion.  He admitted that apportion was necessary for
10   the rate.  And when I asked him:  Well, doesn't Apple
11   add value to these things?
12                    He said:  Yeah, it does.  There are
13   complementary assets.
14                    Did you do anything to apportion for the
15   rate for those complementary assets that Apple is adding
16   to the equation?
17                    He said:  No.  No, because I'm trying
18   something else.  I'm using the infringement versus
19   non-infringement line.
20                    And now admitted in open court, and as we
21   saw from Dr. Jones, that line is broken.  Jones says now
22   it actually still infringes.  So the fundamental logic
23   of his entire apportionment of the rate goes out the
24   window.  He could have tried to apportion but he just
25   ignored Apple's contributions.  And you just can't do
```

1   that.   So, both his apportionment of the base and of the

2   rate ultimately falls apart.

3                  And as to the regular users question,

4   the regular users in Mr. Wecker's survey, they drop

5   out of the survey.   It was like the second question

6   asked.   And if someone said, no, they were not a

7   regular user, they didn't get asked any questions.

8   There's nothing used to compare their outcomes.   That

9   introduced fundamental bias and there's no

10  justification for it.   You haven't heard any.   Thank

11  you.

12                  THE COURT:   Okay.

13                  MR. CASSADY:   Just two quick points.   I

14  won't even go to the podium.   With regards to the

15  response regarding whether our survey actually got to

16  the only motivation issue, I spent 30 minutes before our

17  last break going through the Apple surveys that showed

18  that their numbers were drastically higher than ours

19  when it was asking the question about multiple

20  motivating features.   That alone is a fact issue for a

21  jury to decide if there is an issue on only versus not

22  only.

23                  And with regards to the issue just

24  brought up at the tail end about -- about the

25  infringement again, we're back to we studied a more

1    narrow aspect of infringement and got the value of that,
2    and he's saying that's a methodological flaw because we
3    didn't get a bigger amount of infringement in there.
4    The damages would have been larger if we'd done the
5    larger amount of infringement.
6                    We tested a much more narrowed,
7    non-infringing alternative partly because none were
8    identified to us and, part two, because we were trying
9    to be fair in the survey rather than making kind of
10   Draconian decisions about the non-infringing
11   alternative.
12                   And now Jones is being attacked and Mills
13   is being attacked for being conservative.  It's just --
14   it's illogical.
15                   THE COURT:  Okay.  All right.  Mr. Curry,
16   do you have a comment on this motion?
17                   MR. CURRY:  Very quickly, because this
18   is -- this is a criticism that they had of Jones'
19   methodology that Mr. Verhoeven declined to bring it up,
20   but the issue of some alternatives still infringe some
21   claims.
22                   So, this is how it plays out and it's
23   real easy to understand.  Imagine that there are some
24   claims that are infringed only by movie rentals.
25   Dr. Jones' theory of the best non-infringing alternative

1  for those claims is movie purchase.

2              And so what he's saying is, because it's

3  the best alternative for those claims, it doesn't mean

4  that it's -- that movie purchases are a non-infringing

5  alternative for all claims.  It's that simple and

6  pedestrian, Your Honor.  That's all.

7              THE COURT:  All right.  What's next?

8              MR. CALDWELL:  Your Honor, I think we're

9  down four to two on motions at this point, so it's our

10 opportunity to catch up.  And what he'd like to take up

11 with Your Honor's indulgence is actually the newest

12 motion that's on your docket, I think anyway, which is

13 Docket 317, at least in the Apple case, which is

14 Plaintiffs' Motion to Enforce Compliance with O2 Micro,

15 or Resolve Claim Construction Disputes.

16             And this motion was filed 10 or 12 days

17 ago and the responses came in yesterday at noon.  I

18 don't know -- I understand that that's not necessarily

19 fair to the Court in terms of -- in terms of

20 preparation, but what's happened is we've seen -- we've

21 seen something occurring over the last month or so and

22 it seems to get worse, and what it's setting up for is

23 just an absolute disaster in front of the jury, just a

24 complete zoo.

25             And I guess it's an issue that's very

```
 1  near and dear to my heart because the last time we tried
 2  a case, and -- and you were there, we were down the
 3  hall.   It -- that trial turned into an absolute zoo with
 4  so many bench conferences.
 5                   And I've heard Judge Davis refer to it
 6  at a bench bar in another context as basically one of
 7  the hardest cases he's ever had to try.  And it was
 8  terrible because we were trying to follow the rule of
 9  you don't reargue claim construction in front of the
10  jury, while the other side was saying things
11  inconsistent with what they had argued.
12                   And I think what's about to happen is
13  something that's just perhaps at least equally as bad
14  in this case.
15                   MR. GARDNER:  Your Honor, if he's talking
16  about the trial that we were in, we won.  I respectfully
17  disagree with that.
18                   THE COURT:  Okay.  We are -- I appreciate
19  that, Mr. Gardner.
20                   Listen, you-guys, we are down to no time,
21  so get to the merits, let me hear your argument, and
22  let's move on.
23                   MR. CALDWELL:  We -- in the claim
24  construction -- in the claim construction dispute, there
25  was a series of terms that had sort of a common issue,
```

1    and it was this issue of whether prosecution history

2    disclaimer in the oldest of the patents required

3    separate memories.

4                    And what happened was you had a variety

5    of different terms like data carrier, and they'd say

6    they'd have to be two memories and they were physically

7    separate; and then they'd say memories and they'd have

8    to be physically separate.  Or they would say, okay, now

9    you have use rules and those have to be stored

10   separately, and didn't really say physically separate.

11                   But we went through -- we had a very

12   lengthy argument on this and the Court addressed it.

13   And what the court did was find that basically our

14   construction for data carrier was correct.  There was no

15   limitation that read it to be something else.

16                   And then as to the other terms, they were

17   given the plain meaning.  Well, what has happened is now

18   the defendants' experts at least, presumably the counsel

19   behind us, are just seeking to recapture precisely what

20   they did not obtain through claim construction and do it

21   saying it's plain meaning.  What we'll do is we'll read

22   in the disclaimer as plain meaning.  And this is just --

23   it's getting worse just every time we talk on -- talk

24   with them about something.

25                   And just to be clear, so what's happening

```
 1   is, okay, okay, the judge said there's not a requirement
 2   of physically separate memories, but I still read what
 3   you said in the file history, and in my mind, that
 4   disclaimed scope down to logically separate.  And then
 5   we start having arguments about what does that mean.
 6                   And they say, Well, I infer that it means
 7   this and this and this.  It is absolutely devolving into
 8   a complete claim construction file history disclaimer
 9   argument before the jury.
10                   It just -- what's kind of telling, I
11   think, is in the briefs that got filed yesterday --
12   totally understanding Your Honor may not have had a
13   chance to look at them -- what you actually see is it's
14   such an unjustifiable position that Apple and Samsung
15   are saying the exact opposite.
16                   Samsung and Apple, although they've
17   reached the same conclusion, Samsung's coming in saying,
18   Hey, our guy's just going to get that through plain
19   meaning.  He's not going to look at the file history.
20                   Apple's like, Oh, man, our guy's looking
21   at the file history.  He's going to go find that you did
22   the disclaimer.  And -- but when we look at actually
23   what happened in the depositions, they all say that.
24                   I mean, Apple's first expert says, In
25   light of the Hiroya -- in light of the ground the
```

1 patentee gave in distancing itself from Hiroya --

2 Hiroya, yes -- there still has to be this logical

3 separation between these, but the Court says it's not

4 physical.  He's going back to this Hiroya argument.

5                    Very clear question.  Are you saying as

6 the primary basis for your contention primarily based on

7 your understanding of the prosecution history

8 specifically respect -- with respect to the arguments

9 made to overcome Hiroya?

10                    I would agree with that.

11                    Apple's next guy, George Ligler.  I'm

12 sorry for the long quotes, I really am.  I know we're

13 short on time.  But skipping to the bottom past the

14 little dash there, the definition of separately, you

15 know, separately stored from associated content in the

16 discussion of Hiroya in the file history is the one I'm

17 trying to use.  So, I'm going back to the -- to the file

18 history.

19                    And although Samsung is now saying, well,

20 our guy will not talk about Hiroya or the file history,

21 it's definitely not what he did in his deposition.

22                    So any opinion relying on the concept or

23 construction that memories need to be physically

24 separate would no longer be applicable or relevant?

25                    This was his deposition right after --

 1   right after their claim construction opinion came out.

 2                 He says, Under the court's recommended

 3   construction, that's right.  I do not believe, however,

 4   that the court has weighed in on whether the content and

 5   non-content data must be stored separately within the

 6   same physical memory.  And as my report refers to, the

 7   patentee did in prosecution talk about separately

 8   stored, and the court decided that didn't mean

 9   physically stored in physically separate memories.

10                 He continues and says, It's my reading of

11   the patent specification and intrinsic evidence.

12                 So, because of the timing in this case,

13   we had expert reports and then we got the claim

14   construction right around the time we were doing the

15   deposition.

16                 This was literally happening in many

17   instances on the fly in the deposition or the day

18   before, and it's easy to see where it's going.  And in

19   one deposition, just as -- this is what I'm really

20   afraid of in front of the jury.

21                 We have Apple's expert, Dr. Ligler.  He

22   says, I've got a new opinion to tell you about.  I came

23   up with it yesterday.  It's not in any of my reports.

24                 Okay.  And then, you know -- so at the

25   risk of having the Court tell me, Well, you should have

```
 1  asked him, you were there, so -- I spent a lot of time
 2  trying to figure out what it is and -- and nail this
 3  thing down.  And he says, though, there's this new
 4  logically separate.
 5              Trying to figure out what he means by
 6  that I'm asking, Are two different files on a hard drive
 7  logically separate?
 8              In my view, yes.
 9              That was in the morning.  By afternoon --
10  by afternoon it had evolved:  Are two distinct files
11  logically separate if one file references or links to
12  the other file?
13              Well, see, now even though there's still
14  two distinct files.
15              In the sense we've been discussing in a
16  logically separate fashion, the answer to that would
17  generally be no.
18              But it gets worse.
19              The next question:
20              Okay.
21              If I have an html page or file running on
22  my computer and it links to an html page on Bank of
23  America's server, are those two not logically separate?
24              No, they're not.
25              So, now what's happened is although
```

Jill E. McFadden, CSR

1   they've lost the physically separate, even two files

2   that are physically separated across the United States

3   or what have you are not meeting where they come out on

4   this claim construction.

5           I mean, I'm imagining this happening in

6   front of -- in front of the jury.  It's just not the

7   jury's job to resolve that sort of a claim construction

8   issue, an issue that we believe has already been

9   resolved favorably for us.

10          In the interest of time, I want to kind

11  of get past this.  But in the briefs that were filed

12  yesterday, the defendants are trying to loop this back

13  to something that you said in your -- in your opinion.

14  Three times in the briefs they say, basically, that the

15  report rejected the memories in the asserted patents

16  require physically separate but recognize the disclosed

17  memories are nonetheless distinct memory structures.

18  They say that a few times.

19          But if you look at what you actually said

20  about distinct memory structures, what Your Honor said

21  is that the specification discloses distinct memory

22  structures.  Okay.  That's your mention of distinct

23  memory structures is the specification discloses it.

24          And besides the -- the trivial fact that

25  that's a comment on the specification, it's important to

1  understand we're looking at something they argue as a

2  disclaimer from the first of six patents.

3              Then claims have been written with

4  increasing detail covering different items and different

5  structures, different kinds of memory, different numbers

6  of memories, all sorts of different things that they're

7  trying to carry forward by just generically saying this

8  patent is all about distinct memory structures.

9              Some claims recite only one memory.

10 Okay.  Then actually some claims even specify that the

11 use rules and the content must be in the same memory,

12 which they're now contradicting.

13             And that's down in those implementation

14 details that -- that kind of -- I think there's five in

15 the 101 motion as we were trying to look at the -- how

16 the specifics of each things are implemented.

17             And just -- I've picked on '772, and John

18 Summers has picked on '772, Claim 26 because I think

19 it's one where just glossing over it's hardware and

20 generic stuff doesn't work.  It's got lots of

21 limitations.

22             In that instance, you have one

23 non-volatile memory and everything goes in it, the

24 content and the rules and the status.  Totally different

25 than -- than what these experts doing.

1          And finally, several asserted claims

2    don't mention memory.  They have reading and writing to

3    a data carrier, which you previously denied their

4    attempt to say it had these two memories.  So, it's --

5    it's all really something that's been -- that's been

6    addressed.

7          Also, although sometimes distinct

8    recitations mean distinct things, one structure in the

9    accused product can meet multiple elements.  Just as

10   a -- as side point, but I don't know that for this issue

11   that the Court has to really get there.

12          The fact is that rather than track the

13   particulars of the various claims, at least Apple and at

14   least Samsung's expert, they expand this read-in

15   limitation about distinct memory structures to almost

16   all asserted claims even -- regardless of whether they

17   have two memories, one memory, one memory with

18   everything, or just the data carrier, which you

19   construed.

20          And in fact, the sentence that's on slide

21   12, I think from Apple's brief is pretty instructive.

22   With the Court's indulgence, I'd request if -- if the

23   Court could try to read this sentence, because like the

24   first four times or something, it meant something

25   different to me where it originally looks like they're

1  saying, okay, if they're separate memories, those might

2  have different content.

3            But as Dr. Ligler explained, his

4  conclusions regarding logically separate is limited --

5  as though that's going to happen -- is limited to claims

6  where the express language identified stored content and

7  memories that store particular types of non-content

8  data, and claims that recite use status data and stored

9  content or data.

10            So, now at this point, it actually

11  doesn't even matter if they require memory storing

12  certain kinds of data.  If it merely gets to having use

13  status data or stored content, he's now got his

14  logically separate -- logically separate requirement.

15            There's lots of claims he -- he put out a

16  supplement about 10 days after his deposition, lots of

17  claims says this applies to.  I just picked one for an

18  example, understanding the time sensitivity.  I'll go

19  back again to '772, Claim 26, which he says this applies

20  to.

21            '772, Claim 26, says you write the

22  multimedia content into said non-volatile memory, and

23  then when it's time to check the use status data, you're

24  reading the use status data and use rules from said

25  non-volatile memory.  In other words, that claim can

1  only be met where you find those two things are read, or

2  stored in, written to the same non-volatile memory.

3            But what he's doing is saying that

4  something about Hiroya, which never rose to the level of

5  disclaimer, now makes that requirement logically

6  separate.  It just -- it's completely illogical.

7            I don't want to go -- I don't want to go

8  into the Markman argument itself because, one, we

9  requested two kinds of relief; one of which was just --

10  I mean, it's -- it's bizarre.  I don't really know how

11  to even phrase an issue like this, but what we phrased

12  it as was Enforce Compliance with O2 Micro that claim

13  construction is not an issue for the jury.  And if not,

14  we don't want the trial zoo, nor do we think it's

15  appropriate.  It would error to have that.

16            So, if -- I mean, I doubt the Court

17  really wants to reopen Markman on it, but if there's

18  some dispute here that hasn't been resolved, let's just

19  knock it out the proper way because I'm confident that

20  we'll win it just as we won it the first go-round, even

21  with their fallback position.  But we can't waste trial

22  time saying, aha-ha, here's your disclaimer.

23            And just as example, not to even read all

24  this kind of stuff, but we had to show the Court how

25  back in the Markman phase, in order to get their

267 of 292 PageID #: 23488

constructions, they changed what lots of the arguments
were.  I mean, they changed a sentence -- or moved a
comma, made it a period; remove these sentences and all
the other explanations.  Those explanations are the ones
that talked about how Hiroya has electronic ticket
information that itself includes ticket invalidity data.

Ultimately, it doesn't have the use data.
And in fact, I think the last sentence on -- on the
current slide, 17, is super helpful.  One of the
arguments in Hiroya was even that there would be no
motivation to include use data with the device of
Hiroya.  So not only did it not have use data, there's
not even a motivation to -- to include it.

Based on that argument, we have what the
Court concluded in the Markman.  The applicant
contrasted the invention with the electronic ticket
information of Hiroya which was validated by an
electronic signature, not use rules, and then goes on to
say this doesn't rise to level of definitive statements
or a clear and unmistakable disclaimer warranting
inputting their limitations.

Well, to now -- it didn't even -- Hiroya
didn't even have use status.  To now say because of
something that was in it we can impute that anything
that mentions use status must have this new logically

Jill E. McFadden, CSR

```
 1  separate -- that for some experts means a separate
 2  partition, others means a separate file, others means
 3  separate files that don't point to each other, it
 4  just -- it can't be.  It can't be something that's
 5  argued before the Court -- I'm sorry -- before the jury.
 6              So, ultimately, at the end of the day, I
 7  think these questions basically expose the problems of
 8  what the defendants are trying to do.
 9              Does a logically separate limitation
10  apply to claims that recite only one memory?
11              Does it apply to claims that specifically
12  require the rules, the status data, and the content are
13  all in the some non-volatile memory?
14              And does the new logically separate
15  limitation apply to claims that don't mention any memory
16  and, instead, reference the single data carrier for any
17  rules and content, which Your Honor has already
18  construed against their disclaimer.
19              I'm really sorry for taking the Court's
20  time but...
21              THE COURT:  All right.  Response.
22              MS. FUKUDA:  Your Honor, I only have
23  about nine slides, so this should be relatively quick.
24              So, Your Honor, I do want to address a
25  number of questions that Mr. Caldwell did raise here.
```

1  We fully recognize that Your Honor did go through claim

2  construction and found plain meaning for a number of

3  memory terms as well as for use status data and use

4  rules.  We also recognize, Your Honor, that in your

5  report and recommendation, there was that citation to

6  the Becton Dickinson case.  And I believe this shows up

7  on slide 10 of Mr. Caldwell's presentation.

8              Could we just look at that quickly?

9              No, this would be slide 10 of

10  Smartflash's.  Here we go.

11              So --

12              THE COURT:  Even the technology's tired.

13              COURTROOM DEPUTY:  Which side are they

14  on?

15              THE COURT:  Plaintiff's side.

16              MS. FUKUDA:  So right before the sentence

17  that's been highlighted by Smartflash, you'll see that

18  the beginning of that paragraph says, Distinctly recited

19  limitations are usually interpreted as distinct

20  structures.  And there's a cite to the Becton case, 616

21  F.3d at 1254.

22              Where a claim lists elements separately,

23  the clear implication of the claim language is that

24  those elements are distinct components of the patented

25  invention.  Then Your Honor moves on to talk about how

1  the specification also discloses distinct memory

2  structures.

3          And so as we're applying the plain

4  meaning of these terms, both to memory and to use status

5  data and use rules, we went to our expert and said, In

6  view of the Court's construction, what does that mean?

7          Let's take the opinion as a whole.  So a

8  couple of questions have popped up.  One is under your

9  court's interpretation of plain meaning, can a person

10  refer to intrinsic evidence at all?  So that was one

11  that -- and we looked at Federal Circuit precedents and

12  we came to the conclusion that the precedential opinions

13  all say that, yes, you can.  You can look at the

14  intrinsic evidence.

15          Second question was -- given that Your

16  Honor has said -- has not found clear and unmistakable

17  disavowal -- can we still use the prosecution history to

18  inform what plain meaning is?  And the question that --

19  and the answer we derived from Federal Circuit precedent

20  is also, yes, you can look at that.

21          So, let's turn back to our slides, and

22  I'd just like to quickly walk through a couple of those

23  cases.

24          THE COURT:  But, I mean, not in a way

25  that conflicts with my construction, right?  I mean,

1  what I've said is it doesn't have to be physically

2  separate.  Is that what you're trying to argue?

3            MS. FUKUDA:  No, we are not, Your Honor.

4  In fact, the one clarification that Your Honor -- report

5  and recommendation makes clear is that it cannot -- the

6  plain meaning cannot be physically separate memory.  And

7  we are not arguing physically separate memory.  In fact,

8  that -- that addresses some of Mr. Caldwell's questions.

9            He said, Look, you know, there are some

10  claims that refer to that one non-volatile memory that

11  stores both the use status data and the content.  And

12  what we're saying is, yes, it can be one physical

13  memory, but within that one physical memory there needs

14  to be logical separations.  Because of the very fact

15  that when Smartflash went to get the patent from the

16  Patent Office, they could have distinguished Hiroya on

17  other grounds, and he pointed to one ground under which

18  they distinguish Hiroya, but they chose to say that we

19  don't separately store -- I'm sorry -- that Hiroya does

20  not disclose separate storage of use status data from

21  content.

22            That was a distinction they made, and

23  that statement can't just be viciated by plain meaning.

24  Once you tell the Patent Office that there's a

25  distinction of your invention over prior art, that

1  sticks.

2           Now, it may not be clear and unmistakable

3  disavowal but it still informs claim construction.  And

4  that's the shier Developments case that just came out of

5  the Federal Circuit earlier this year.

6           THE COURT:  And so what is your expert

7  opining is the distinction?

8           MS. FUKUDA:  The distinction is that

9  we're no longer looking at whether it has to be two

10 separate chips or two separate -- actually physically

11 separate memories whether in a device or across two

12 different devices.

13          What the expert is saying is that

14 separate storage, when you read it in the context of the

15 intrinsic evidence here has to at least mean that

16 there's some logical separation.  It is -- for example,

17 you could have one memory, one physical memory, and the

18 files are -- and content data is stored in one file and

19 use status data and use rules are stored in a separate

20 file.  And those two files, you can access them

21 independently.  They're not kind of merged together so

22 that in order to get to one file, you have to go through

23 the other one.

24          If they are logically separate from each

25 other, even if they're stored in the same physical

1    memory, that would meet the -- the statements that -- at

2    least that would be consistent with the statements that

3    were made to the Patent Office to distinguish over

4    Hiroya.  And that's simply what we're trying to do here.

5                         So, just so Your Honor understands, this

6    impacts from Apple's perspective nine out of the

7    asserted claims.  So that -- just so we all know that

8    we're not wasting our time kind of chasing around some

9    esoteric argument.

10                        So, can we quickly switch over...  Thank

11   you very much.

12                        So just very quickly, a couple of cases

13   just -- you know, again, we did struggle with this

14   concept, what is plain meaning, and the Seminole

15   Phillips case on claim construction says that you can't

16   just look at the ordinary meaning of the term in a

17   vacuum.  You have to look at ordinary meaning in the

18   context of the written description and the prosecution

19   history.

20                        Again, that concept has recently been

21   reiterated by the Federal Circuit in the Cardsoftt

22   versus Verifone case.  Ordinary and customary meaning

23   must be evaluated in the context of the entire patent,

24   including the specification and the prosecution history.

25                        And, you know, this is a motion that was

1   brought under O2 Micro.  O2 Micro itself says that

2   ordinary and customary meaning are determined after

3   reviewing the intrinsic record.  And why is that?

4   Because the public has access to prosecution history, to

5   the intrinsic record.  They're entitled to rely on what

6   the public record says about what the claims cover and

7   what the claims don't cover whether or not they're under

8   a plain meaning interpretation.

9             So let's jump right -- this is a very

10  important case, Your Honor.  We spent a bit of time in

11  our response that we filed on an expedited basis

12  yesterday.  The Shire Development versus Watson

13  Pharmaceuticals case, 746 F.3d 1326, ironically has some

14  similarities beyond what we pointed out in our brief,

15  also dealt with the '720 patent and it dealt with the

16  issue of statements made during prosecution about two

17  things being separate.

18            The court in that case -- the district

19  court found that there was no clear disavowal.  They

20  looked at the prosecution history and said it's not

21  clear and unmistakable, no disavowal.  Went up to the

22  Federal Circuit and the Federal circuit says, We agree.

23  No clear disavowal.  However, you are still entitled to

24  look at the prosecution history to inform your claim

25  construction.  And in view of that prosecution history

1 | statement about these two matrices being separate from
2 | each other, the Federal Circuit said your claim
3 | construction must reflect that these two matrices are
4 | separate.
5 | So a couple of highlighted sentences that
6 | are key here in the first paragraph, Although the
7 | prosecution history statements do not rise to the level
8 | of unmistakable disavowal, they do inform the claim
9 | construction.
10 | And, Your Honor, that is our situation
11 | over here.  Here's a -- I believe you've seen this in
12 | Smartflash's slides.  We have it here as well.  During
13 | the prosecution of the '720 patent, not only did the
14 | applicant make statements to distinguish over the Hiroya
15 | prior art reference -- and that's on the bottom -- it
16 | says, use status data stored on the non-volatile memory,
17 | and then it says, to determine whether access to
18 | separately-stored requested content.
19 | All right.  And then later on another
20 | sentence, Hiroya does not disclose use status data
21 | stored separately from associated content data.  Not
22 | only did they make that distinction in the Patent
23 | Office, they also amended their claims.  You'll see that
24 | the original claims refer to data memory, and that was
25 | amended to specify that it's non-volatile data memory

1  storing content memory.

2           And then the non-volatile parameter

3  memory was further defined later on in the elements to

4  distinguish the fact that in one you only -- you

5  store -- so there are two distinct memories right there,

6  a data memory for storing content, and then second part

7  is the parameter memory for storing use status data and

8  use rules.

9           So, these are two distinct elements of a

10 claim.  Distinct elements in the claims are -- under

11 even Your Honor's report are supposed to be distinct

12 structures.  And this is virtually identical to the

13 situation in Shire Development.

14          So, what we have on the left is our claim

15 at issue here, Smartflash's claim at issue here with the

16 statements that were made distinguishing Hiroya, and on

17 the right is the claim at issue in Shire Development

18 where the claim talks about an inner lipophilic matrix

19 and an outer hydrophilic matrix, and a claim

20 construction was provided by the district court that

21 didn't require them to be separate.

22          No disclaimer was found, and the Federal

23 Circuit pointed to the prosecution history that says --

24 I think it's Sanghvi was the prior art that was being

25 distinguished in that case.  What the applicants there

1  told the Patent Office was that Sanghvi fails to

2  disclose a system containing two separate matrices.

3            And the court had found that because it

4  characterized the invention in terms of what the prior

5  art had failed to disclose and then didn't follow up

6  with a clear statement saying that we, on the other

7  hand, you know, we -- we do have these two separate

8  matrices.  The court said there's no clear and

9  unmistakable disavowal; however, for this particular

10 purpose of claim construction, you have to be held to

11 your statement.  That doesn't disappear into thin air.

12 That needs to be reflected in the claim construction,

13 and it was remanded back to the district court for that

14 to be reflected.

15            And so, Your Honor, the same exact thing

16 would happen here if Smartflash is not held to their

17 statements to the prosecution -- to the Patent Office.

18 What they would effectively be doing is to be allowed to

19 cross out claim language.

20            And, you know, on slide 7, we just drew

21 an illustration.  That's what they would want the claim

22 to read, but it's not how the claims read.

23            Just very quickly, I believe that

24 Mr. Caldwell mentioned that there is an evolving set of

25 opinions from our experts.  And to a certain extent it

1  was true, Dr. Ligler's deposition was taken, I believe,

2  within a week or two of Your Honor's report and

3  recommendation, and he had told Smartflash at the

4  beginning of his deposition that he was still

5  formulating and thinking through the impact of the

6  report and recommendation how that would affect his

7  opinions regarding the various memories and use status

8  data and use rules, but he was happy to share that with

9  Smartflash.

10               And in fact, Smartflash spent about two

11  hours asking him about it.  So he gave those opinions at

12  the state that they were in at that point to give them

13  notice, and then also implied that, you know, when it's

14  all consolidated, that we will serve a supplemental

15  expert report that would put all his opinions together.

16  And we -- Your Honor, we in fact have done that.

17               Smartflash has not moved to strike that

18  particular report, instead we are here to discuss the

19  parameters of the claim construction meaning.  So, you

20  know -- but the last thing to point out here is that

21  there's some insinuation that Dr. Ligler had changed an

22  important aspect of this -- this logically separate

23  opinions, and that's not true here.

24               The upper portion deals with his morning

25  testimony where he clearly said in response to a

1  question that if there are two different data base files

2  that don't intersect, they would be logically separate.

3  So there's no -- you don't have to -- you don't go

4  through one or the other.  They're not linked together.

5  They can be separately accessed.  They are logically

6  separate.

7             And in the afternoon, he gave the same

8  answer to the question, Are two distinct files logically

9  separate if one file references or links to the other?

10  And Dr. Ligler's answer was no.

11             All right.  So two separate files, even

12  in the same memory, logically separate if they don't

13  intersect.  If they do intersect, then they're not

14  logically separate.

15             And those are all the slides I have.

16  Does Your Honor have any further questions?

17             THE COURT:  No.

18             Response.

19             MR. CALDWELL:  I have a question and I

20  think it's a rhetorical one.  How is that not claim

21  construction?  We -- we just went through here's what

22  happened in Hiroya and all the distinctions.  That was

23  not a distinct -- that was not a discussion of here's

24  how Apple's system operates; does this meet the word

25  that's in the claim.  That was a claim construction

 1   argument.  That's not for the jury.

 2                   And I understand how late in the day it

 3   is, I mean, but what's trying to -- what's happening is

 4   I think the defendants are trying to win by basically

 5   fatiguing you or us and something will slip through, or

 6   there will be jury confusion.  And we've seen it played

 7   out and it's just terrible.

 8                   But Ms. -- Ms. Fukuda admitted, she says,

 9   okay, it may not be clear and unmistakable disclaimer

10   what happened there.  And what happened thereafter is

11   she says, well, so we went and looked for a case to say

12   that this is okay, what we want to do.

13                   I saw the Shire case when they sent it to

14   us yesterday.  I definitely encourage the court clerks

15   to read it, as if you don't have enough to read.  The

16   Shire case, it's crystal clear.  What it's saying --

17   even the sentence she likes, Although the prosecution

18   history statements do not rise to the level of

19   unmistakable disavowal, they do inform claim

20   construction.

21                   It's not that your expert gets to come in

22   and just sort of waffle around about what the plain

23   meaning is.  And what's interesting about Shires --

24   Shires, it says Shires is a lot like our case.

25                   If I might trouble you for the document

1   camera, I would appreciate it.

2               Right after -- this is the sentence

3   that -- that Ms. Fukuda likes, and I think she pointed a

4   part of this next paragraph.  She's making it sound

5   like, Oh, because of what they did in the file history

6   that did not rise to the level of disclaimer, the court

7   still said we have to go read this in as a limitation.

8               What the court actually says that in this

9   instance, you had the prosecution history, the structure

10  of the claim itself, the ordinary meaning of the claim

11  terms, including Markush group limitations that were

12  added in prosecution, and the patent's description of

13  the invention compel a claim construction which requires

14  the inner lipophilic matrix is separate from the outer

15  hydrophilic matrix.  It goes on to say the patentee

16  admitted that those two require two separate matrices.

17              The logical reading of them requires

18  separation because they have mutually exclusive spatial

19  characteristics.  One's inner, one's outer.  They have

20  mutually exclusive compositional characteristics, one is

21  hydrophilic and one is lipophilic.  And under the

22  ordinary and customary meanings of those

23  characteristics, it cannot be both the inner and outer,

24  nor can it be both hydrophilic and lipophilic.  Plus,

25  was the prosecution important?  You bet.

```
 1                 In prosecution, they added Markush groups
 2   to the terms to say, you know that inner lipophilic one,
 3   the inner lipophilic matrix is limited by a Markush
 4   group consisting of unsaturated and/or hydrogenated
 5   fatty acids, salts, esters thereof, fatty acid,
 6   monoditriglycerides [sic], waxes, ceramides, cholesterol
 7   derivatives, melting points below 90 degrees Celsius
 8   whereas the outer hydrophilic matrix is similarly
 9   limited by Markush group of stuff that hydrophilic.  The
10   lack of overlap in these components supports the
11   requirement that they must be separate.
12                 It is nothing like what we have here, not
13   to mention the fact that they just want to have their
14   expert come in and say, I've concluded there is a
15   disclaimer, makes it separate.  I've concluded it has to
16   be logically separate.
17                 In some instances, the guy Wechselberger
18   says, By the way, it can't be logically separated if the
19   things are not on separate partitions.  In other words,
20   he basically says you have to take a block of your
21   memory of your hard drive and permanently reserve it,
22   permanently, for content -- or -- or for use rules.
23                 And this is just stuff that's coming out
24   of nowhere.  It has nothing to do with what happened
25   in -- in the Hiroya.  But if it did, Ms. Fukuda's
```

1   argument made the point, it is claim construction.  And

2   that can't be done in front of the jury.

3               You know with that I'll --

4               THE COURT:  I agree with that, actually.

5   I mean, what I'm hearing is what I hear all the time as

6   we get close to trial, and it's a claim construction

7   issue that gets teed up as we get the case focused and

8   realize that there are some terms that got construed

9   initially and now we've got problems with that.

10              I just looked back over the claim

11  construction opinion where the focus -- it seems the

12  entirety of the argument from everyone was this

13  distinction of must it be physically separate or not.

14  We dealt with that.

15              But now what I'm hearing is a new

16  argument about whether it needs to be somehow separate,

17  and I haven't addressed.  We haven't briefed it up.  And

18  I think that you're right.  I think that that's probably

19  a claim construction issue for the court, so I'm going

20  to give you an opportunity to brief it.

21              MR. CALDWELL:  Unfortunately for the

22  Court, I'm sorry you have to take more briefing on it.

23  But what would the Court like in terms of -- in terms of

24  briefing on this?  What would suit you?

25              THE COURT:  Short would be great.

```
 1              MR. CALDWELL:  Zero, zero pages.

 2              THE COURT:  No pages.  I -- I do want you

 3   to brief it so that I can make an informed ruling on

 4   claim construction and do it quickly because you-all are

 5   now far along in the case.  So my hope is that in the

 6   next couple of weeks we can have the totality of the

 7   briefing in.

 8              Mr. -- do you-all have some thoughts on

 9   that?  I mean, it seems like everyone has kind of now

10   crystalized the issue, and I don't know that it should

11   be that hard to brief, but you give me your feedback on

12   that.

13              MR. CALDWELL:  Well, from -- from our

14   perspective -- and I'm not going to reargue -- from our

15   perspective, you've basically found that since there is

16   an argument that there weren't use rules in the Hiroya

17   they were distinguishing, that makes it where there

18   can't be a clear and unmistakable disclaimer as to

19   something being separate because one of the arguments

20   was that predicate item wasn't there.

21              I think you've actually already addressed

22   it, I really do, but I'm not asking you to stand on that

23   and say don't -- don't brief it.  But given the

24   situation that we're in, and we're getting ready for

25   trial and I feel like they are doing this improper
```

```
 1   argument at this point, and I think what needs to happen
 2   is if they think there's yet another limitation to read
 3   in, the defendants together should file one brief on it,
 4   I don't know, maybe seven pages or something like that,
 5   and then respond five business days later or something
 6   like that.  I think they should go first in this --
 7                   THE COURT:  Okay.
 8                   MR. CALDWELL:  -- in this instance, and
 9   then we get one response and that ought to be it.
10                   THE COURT:  I agree.  It's going to be
11   short.  And I may very well find that, yes, I've already
12   addressed it, but what I'm hearing is that maybe I
13   haven't addressed it fully enough.
14                   So, Ms. Fukuda, what do you think about
15   that?  How quickly could you have me something?
16                   MS. FUKUDA:  Give me one second.
17                   THE COURT:  Absolutely.
18                   MS. FUKUDA:  Your Honor, we propose that
19   we file our brief in one week, next Tuesday --
20                   THE COURT:  Okay.
21                   MS. FUKUDA:  -- and Smartflash can
22   respond to that a week from then.
23                   THE COURT:  On Tuesday the 16th,
24   Smartflash?
25                   MR. CALDWELL:  Ours would be -- ours
```

```
 1    would be when, the 16th?
 2                    THE COURT:  Tuesday the 16th.  Sounds
 3    pretty reasonable.
 4                    MR. CALDWELL:  Yeah.  I guess there's not
 5    much -- many days that aren't super busy between now and
 6    then, so...
 7                    THE COURT:  That's right.  And then we're
 8    in Christmas.  And who wants to be briefing on
 9    Christmas, right?  No.
10                    MR. GARDNER:  Your Honor, how many pages
11    do we have to write?  How many pages, Your Honor, do you
12    want us to have?  Can we have 10?
13                    THE COURT:  10 pages.  Everyone gets 10
14    pages.  One opening, one response.  That's it, 10 pages.
15                    MR. GARDNER:  Yes, Your Honor.
16                    THE COURT:  All right.  Okay.
17                    MR. CALDWELL:  Thank you, Your Honor.
18                    THE COURT:  Now, we have only, you know,
19    20 minutes or so left and I want to talk about my stuff
20    before we continue, but let me just tell you this.
21    We -- we have not been able and we had a huge, you know,
22    workload to tackle and you-all have done a good job,
23    we've made a big dent in it, but we didn't get to any
24    summary judgment motions except the 101 motion.
25                    So, I want to just throw this out there.
```

1  My schedule is very tight.  I'm sure yours are, too, and

2  I'm sure you have flights and all of that.  But if

3  you're willing and want to, I just want to offer you the

4  afternoon of Thursday of this week to come back and

5  argue some of this.  You don't have to take it.  I can

6  deal with this on the papers if you want.

7              MR. VERHOEVEN:  We would very much

8  appreciate that.  That's very generous of you, Your

9  Honor, and we would definitely be available and want to

10 do that.

11             THE COURT:  Plaintiffs, how you doing?

12 And I understand if you need to consult calendars and

13 whatnot.  I'm just looking -- that's really all I've got

14 availability-wise to give you.

15             MR. CALDWELL:  Can I -- I think that at

16 several points throughout the day the defendants have

17 indicated to us they're willing to take several of them

18 on the papers.

19             So, can we just identify openly which

20 ones we're willing to take on the papers, because maybe

21 then it gets down to two people that need to come out

22 here and it makes it easier to --

23             THE COURT:  Yeah.  I think that's fair.

24             MR. VERHOEVEN:  Well, Your Honor, if

25 you'll give us an opportunity to argue.  We filed these

1  because we thought they were important, and we were

2  dealing with a time frame we had to try and get this.

3          Just for the record I'll point out, Your

4  Honor, Smartflash has used 103 minutes this afternoon

5  and we've used 70.  We have three defendants.  Game

6  Circus didn't get a chance to argue yet on their motion.

7          THE COURT:  Yeah.  That's really one of

8  my concerns is --

9          MR. VERHOEVEN:  Yeah.  And they want to,

10 I just checked with that -- with that party.  So, you

11 know, I don't -- I know Your Honor doesn't like to do

12 clocks and set clocks and stuff, but we're kind of --

13 the disadvantage is because we have multiple defendants

14 and the time frame.  So this would be very helpful to us

15 and it would be helpful to make sure Your Honor

16 understands our arguments, so we really would very much

17 like to take you up on that.

18          MR. CALDWELL:  Well, I guess my point was

19 simply is there a way to streamline who has to come out

20 there.  I understand I -- the time thing, I don't know

21 why we're getting into it.  They dominated the morning,

22 we got more in the afternoon, so be it.  We'll come

23 back.  I was just wondering if it was possible that I

24 could maybe bring fewer than -- than all the folks

25 because I may be done with mine and do I need to take

```
 1  over some.  That's all.
 2                   Are there any that we can take up on the
 3  briefs?
 4                   MR. VERHOEVEN:  Well, we'll meet and
 5  confer --
 6                   THE COURT:  Yeah.  That would be my
 7  suggestion.  What we'll do is we will resume this
 8  hearing on Thursday at 2 o'clock.  And so you'll have
 9  basically from 2 to till 5 if you need it.  Don't feel
10  like you have to take it.  And -- and so y'all meet and
11  confer and see what you can get through in that -- in
12  that time.  Okay?
13                   MR. CALDWELL:  Okay.
14                   MR. VERHOEVEN:  Yes, Your Honor.
15                   THE COURT:  Okay.
16                   MR. VERHOEVEN:  I have a discovery
17  related --
18                   THE COURT:  Well, good.  I know you're
19  going to have to rearrange flights and all of that, so
20  thank you for doing that.
21                   And then let me talk to you, then, about
22  the cases.  So we're getting close, and without full
23  consent, we're going to need to draw a district judge,
24  and so I'm going to do that today.  I'm going to have
25  the clerk's office draw your district judge.
```

```
 1              I know that we have drawn a district

 2   judge throughout this case for different things, for

 3   dispositive motions, that kind of thing, and I think it

 4   has been Judge Schneider each time.  I want you to know

 5   that -- that does not mean it will be Judge Schneider

 6   for your trial judge.

 7              I'm going to draw it, we'll see who we

 8   get, and then I will meet with whoever it is and see

 9   about getting you on his trial calendar.  And so all

10   that to say that's up in the air.  But I'm hopeful to

11   have -- well, you'll at least know which -- which

12   district judge you have by Thursday, and then we can

13   maybe talk about trial plans and all of that fun stuff.

14              I'm in -- I'm in receipt of all of your

15   notices regarding conflicts and all of that, too, which

16   I will put forward to whichever district judge that you

17   draw.

18              Okay.  Are there any questions about

19   that?

20              MR. CALDWELL:  No, Your Honor.

21              MR. VERHOEVEN:  No, Your Honor.  I --

22              MR. CALDWELL:  What time on Thursday?

23   I'm sorry to --

24              THE COURT:  2 o'clock.

25              MR. VERHOEVEN:  I just want to check with
```

```
 1  counsel for Game Circus to make sure if Thursday would
 2  work, too, because --
 3                  THE COURT:  Yeah.  Good idea.
 4                  MR. DUNWOODY:  We're available Thursday.
 5                  MR. VERHOEVEN:  I apologize, Counsel,
 6  that we didn't get to your motion today.
 7                  THE COURT:  All right.  Well, then with
 8  that note that we're going to resume this on Thursday at
 9  2 o'clock, is there anything further that I can help you
10  with between now and then?
11                  MS. BAILY:  No, Your Honor.
12                  MR. CALDWELL:  Not from the plaintiff,
13  Your Honor.
14                  THE COURT:  Okay.  I would encourage
15  you-all to meet and confer and see if you can't
16  streamline some of this, but I will see you-all on
17  Thursday.
18                  (Hearing recessed.)
19
20
21
22
23
24
25
```

```
 1                      CERTIFICATION

 2            I HEREBY CERTIFY that the foregoing is a

 3   true and correct transcript from the stenographic

 4   notes of the proceedings in the above-entitled matter

 5   to the best of my ability.

 6

 7

 8   _____        December 31, 2014
     JILL E. McFADDEN
 9   Deputy Official Reporter
     State of Texas No.:  3392
10   Expiration Date:  12/31/16

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```