**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **SMARTFLASH LLC, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CASE NO. 6:13-CV-447-JRG-KNM** |
| | § | |
| **APPLE, INC., et al.,** | § | |
| | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| | § | |
| **SMARTFLASH LLC, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CASE NO. 6:13-CV-448-JRG-KNM** |
| | § | |
| **SAMSUNG ELECTRONICS CO. LTD,** | § | |
| **et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## REPORT AND RECOMMENDATION

Defendants filed Motions for Summary Judgment of Invalidity Pursuant to 35 U.S.C. § 101 (6:13CV447, Doc. No. 266; 6:13CV448, Doc. No. 320).  For the reasons set forth below, the Court recommends that the Motions be **DENIED**.

## BACKGROUND

Plaintiffs Smartflash LLC and Smartflash Technologies Limited (collectively "Smartflash") filed these actions against Apple, Inc. ("Apple"), Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC (collectively "Samsung"), HTC Corporation, HTC America, Inc., and Exedea, Inc. (collectively "HTC") (collectively "Defendants") alleging infringement of the following patents: U.S. Patent No.

7,334,720 ("the '720 Patent"); U.S. Patent No. 7,942,317 ("the '317 Patent"); U.S. Patent No. 8,033,458 ("the '458 Patent"); U.S. Patent No. 8,061,598 ("the '598 Patent"); U.S. Patent No. 8,118,221 ("the '221 Patent"); and U.S. Patent No. 8,336,772 ("the '772 Patent").

The patented technology relates generally to data storage and access systems for paying for and downloading digital content such as audio, video, text, software, games and other types of data.  The asserted patents share a common specification.  The '720 patent issued from a continuation of U.S. Patent Application No. 10/111716.  The '317 Patent issued from a continuation of the application that led to the '720 Patent.  The '458 Patent, the '598 Patent, and the '221 Patent all issued from continuations of the application that led to the '317 Patent.  The '772 Patent issued from a continuation of U.S. Application No. 12/943,872, which was also a continuation of the application that led to the '317 Patent.

Across both cases, Smartflash asserts the following claims: Claims 1, 13, 14, and 15 of the '720 Patent; Claim 18 of the '317 Patent; Claims 8, 10, and 11 of the '458 Patent; Claims 2, 7, 15, and 31 of the '598 Patent; Claims 2, 11, and 32 of the '221 Patent; and Claims 5, 10, 14, 22, 26, 32 of the '772 Patent.

Asserted Claim 26 of the '772 Patent depends on Claim 25.  As one example, Claim 25 recites:

> 25. A handheld multimedia terminal for retrieving and accessing protected multimedia content, comprising:
>
> a wireless interface configured to interface with a wireless network for communicating with a data supplier;
>
> non-volatile memory configured to store multimedia content, wherein said multimedia content comprises one or more of music data, video data and computer game data;
>
> a program store storing processor control code;

a processor coupled to said non-volatile memory, said program store, said wireless interface and

a user interface to allow a user to select and play said multimedia content;

a display for displaying one or both of said played multimedia content and data relating to said played multimedia content;

wherein the processor control code comprises:

code to request identifier data identifying one or more items of multimedia content available for retrieving via said wireless interface;

code to receive said identifier data via said wireless interface, said identifier data identifying said one or more items of multimedia content available for retrieving via said wireless interface;

code to request content information via said wireless interface, wherein said content information comprises one or more of description data and cost data pertaining to at least one of said one or more items of multimedia content identified by said identifier data;

code to receive said content information via said wireless interface;

code to present said content information pertaining to said identified one or more items of multimedia content available for retrieving to a user on said display;

code to receive a first user selection selecting at least one of said one or more items of multimedia content available for retrieving;

code responsive to said first user selection of said selected at least one item of multimedia content to transmit payment data relating to payment for said selected at least one item of multimedia content via said wireless interface for validation by a payment validation system;

code to receive payment validation data via said wireless interface defining if said payment validation system has validated payment for said selected at least one item of multimedia content; and

code responsive to said payment validation data to retrieve said selected at least one item of multimedia content via said wireless interface from a data supplier and to write said retrieved at least one item of multimedia content into said non-volatile memory, code to receive a second user selection selecting one or more of said items of retrieved multimedia content to access;

code to read use status data and use rules from said non-volatile memory pertaining to said second selected one or more items of retrieved multimedia content; and

code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more items of retrieved multimedia content,

wherein said user interface is operable to enable a user to make said first user selection of said selected at least one item of multimedia content available for retrieving,

wherein said user interface is operable to enable a user to make said second user selection of said one or more items of retrieved multimedia content available for accessing, and

wherein said user interface is operable to enable a user to access said second user selection of said one or more item of retrieved multimedia content responsive to said code to control access permitting access to said second selected one or more items of retrieved multimedia content.

'772 Patent, Claim 25.

Asserted Claim 13 of the '720 Patent depends on Claim 3.  As another example, Claim 3 recites:

3. A data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising:

a first interface for communicating with the data supplier;

a data carrier interface for interfacing with the data carrier;

a program store storing code; and

a processor coupled to the first interface, the data carrier interface, and the program store for implementing the stored code, the code comprising:

code to read payment data from the data carrier and to forward the payment data to a payment validation system;

code to receive payment validation data from the payment validation system;

code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier; and

code responsive to the payment validation data to receive at least one access rule from the data supplier and to write the at least one access rule into the data carrier, the at

least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system.

'720 Patent, Claim 3.

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(a) provides for summary judgment when "there is no genuine dispute as to any material fact." A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the summary judgment movants demonstrate the absence of a genuine dispute over any material fact, the burden shifts to the non-movant to show there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). A court must draw all reasonable inferences in favor of the non-moving party. *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007).

### *Patentable Subject Matter*

Section 101 of the Patent Act defines patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "Congress took this permissive approach to patent eligibility to ensure that ingenuity should receive liberal encouragement." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (internal quotations omitted). Supreme Court precedent carves out three specific exceptions to § 101's broad patentability principles: laws of nature, physical phenomena, and abstract ideas. *Id.* These exceptions represent "the basic tools of scientific and

technological work." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354, (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). "'Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Id.* (quoting *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289, 1303 (2012).  Accordingly, courts must distinguish between patents that claim the "building blocks of human ingenuity and those that integrate the building blocks into something more." *Id.* (quoting *Mayo*, 132 S. Ct. at1303).

The Supreme Court set forth a two part test for patent eligibility. *Id.* at 2355.  First, the court determines whether the claims at issue are directed towards one of the patent-ineligible concepts. *Id.*  If so, then the court asks "what else is there in the claims before us?" *Id.* (quoting *Mayo*, 132 S. Ct. at 1296–97).  To answer the question, the court considers "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.*  (internal quotations omitted).  The Court has described the second step as a search for an "inventive concept"—"an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1298).

## DISCUSSION

The Supreme Court's most recent and relevant guidance comes from its *Alice* decision. Although the Court extended the test it set forth in *Mayo*, *Alice* dealt with computer implemented inventions as does the present case.

*Alice*

In *Alice*, the asserted patent claimed a computer-implemented means of mitigating settlement risk by using a third-party intermediary.  *Id.* at 2351–52.  The Supreme Court affirmed a divided Federal Circuit holding that the asserted method, system, and computer-readable media claims were not directed toward eligible subject matter under § 101.  *Id.* at 2352.  The Court held that the claims at issue were drawn to an abstract idea, and implementing the idea on a computer failed to "transform that abstract idea into a patent-eligible invention."  *Id.*  The Court determined that the two-step test from *Mayo* governed eligibility questions.  *Id.* at 2355.  The Court explained that the second step cannot be satisfied by implementing an abstract idea on a computer.  *Id.* at 2358 ("[M]ere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention".)  Further, the Court clarified that restating method claims as apparatus claims similarly fails to cure eligibility problems when the apparatus includes only generic computer components.  *Id.* at 2360 (citing *CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1290 (Fed. Cir. 2013) (Lourie, J., concurring) ("[N]one of the hardware recited by the system claims 'offers a meaningful limitation beyond generally linking the use of the [method] to a particular technological environment that is, implementation via computers.'") (internal quotations omitted)).  However, the Court confirmed that "many computer-implemented claims are formally addressed to patent-eligible subject matter" and left open the possibility that claims which "improve the functioning of the computer itself" or "any other technology" are patent eligible.  *Id.* at 2359.

**Recent Federal Circuit Precedent**

Since filing these Motions, both Smartflash and Defendants filed notices of supplemental authority and submitted supplemental briefing, drawing the Court's attention to the following

Federal Circuit decisions made in light of *Alice*: *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) ("*Ultramercial II*"); *DDR Holdings, LLC v. Hotels.com, L.P.*, No. 2013-1505, 2014 WL 6845152 (Fed. Cir. Dec. 5, 2014); and *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, No. 2013-1112, 2014 WL 7272219 (Fed. Cir. Dec. 23, 2014).

    1.   *Ultramercial II*

    In *Ultramercial II*, the asserted patent claimed a "method for distributing copyrighted media products over the Internet where the consumer receives a copyrighted media product at no cost in exchange for viewing an advertisement, and the advertiser pays for the copyrighted content." 772 F.3d at 712.[1]  The Federal Circuit held that the claims were drawn to the abstract

---

[1] Claim 1 of the asserted patent was representative and read as follows:

    1.   A method for distribution of products over the Internet via a facilitator, said method comprising the steps of:

        a first step of receiving, from a content provider, media products that are covered by intellectual property rights protection and are available for purchase, wherein each said media product being comprised of at least one of text data, music data, and video data;

        a second step of selecting a sponsor message to be associated with the media product, said sponsor message being selected from a plurality of sponsor messages, said second step including accessing an activity log to verify that the total number of times which the sponsor message has been previously presented is less than the number of transaction cycles contracted by the sponsor of the sponsor message;

        a third step of providing the media product for sale at an Internet website;

        a fourth step of restricting general public access to said media product;

        a fifth step of offering to a consumer access to the media product without charge to the consumer on the precondition that the consumer views the sponsor message;

        a sixth step of receiving from the consumer a request to view the sponsor message, wherein the consumer submits said request in response to being offered access to the media product;

        a seventh step of, in response to receiving the request from the consumer, facilitating the display of a sponsor message to the consumer;
        an eighth step of, if the sponsor message is not an interactive message, allowing said consumer access to said media product after said step of facilitating the display of said sponsor message;

        a ninth step of, if the sponsor message is an interactive message, presenting at least one query to the consumer and allowing said consumer access to said media product after receiving a response to said at least one query;

idea of using "an advertisement as an exchange or currency" and the claim limitations did not transform the abstract idea into patent eligible subject matter.  *Id.* at 714–15.  The court noted that adding "routine additional steps" to the abstract idea did not transform it into patentable subject matter, including "updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet."  *Id.* at 716.  Moreover, the court explained that because of the "prevalence of the Internet, implementation of an abstract idea on the Internet . . . is not sufficient to provide any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1297).  Finally, the court determined that the claimed method also failed both prongs of the machine-or-transformation test, which can provide a "useful clue" in the second step of the *Alice* framework.  *Id.* 716–17.  The Internet "is a ubiquitous information-transmitting medium, not a novel machine.  And adding a computer to otherwise conventional steps does not make an invention patent-eligible."  *Id.*  The claims also failed the transformation prong because manipulations of "public or private legal obligations or relationships, business risks, or other such abstractions cannot meet the test because they are not physical objects or substances, and they are not representative of physical objects or substances."  *Id.* (quoting *Bilski*, 545 F.3d at 963).

## 2.  *DDR Holdings*

In *DDR Holdings,* the asserted patents claimed a system and method of generating a composite web page that combined certain visual elements of a "host" website with content of a

---

a tenth step of recording the transaction event to the activity log, said tenth step including updating the total number of times the sponsor message has been presented; and

an eleventh step of receiving payment from the sponsor of the sponsor message displayed.

*Id.* (internal citation omitted)

third-party merchant.   2014 WL 6845152 at *1.[2]   The Federal Circuit held that the asserted

claims "clear[ed] the § 101 hurdle." *Id.* at *8.  The court noted that the claims did not recite a

mathematical algorithm or a fundamental economic practice.  *Id.* at *10 ("Although the claims

address a business challenge (retaining website visitors), it is a challenge particular to the

Internet.").  The court determined that even though the asserted claims might be characterized as

an allegedly abstract idea, the "claims satisf[ied] *Mayo/Alice* step two." *Id.*  Even though the

claims involved both the Internet and a computer, they stood "apart because they [did] not

merely recite the performance of some business practice known from the pre-Internet world

---

[2] Claim 19 of the asserted patent at issue was representative and read as follows:

19.  A system useful in an outsource provider serving web pages offering commercial opportunities, the system comprising:

(a) a computer store containing data, for each of a plurality of first web pages, defining a plurality of visually perceptible elements, which visually perceptible elements correspond to the plurality of first web pages;

(i) wherein each of the first web pages belongs to one of a plurality of web page owners;

(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

(iii) wherein the selected merchant, the out-source provider, and the owner of the first web page displaying the associated link are each third parties with respect to one other;

(b) a computer server at the outsource provider, which computer server is coupled to the computer store and programmed to:

(i) receive from the web browser of a computer user a signal indicating activation of one of the links displayed by one of the first web pages;

(ii) automatically identify as the source page the one of the first web pages on which the link has been activated;

(iii) in response to identification of the source page, automatically retrieve the stored data corresponding to the source page; and

(iv) using the data retrieved, automatically generate and transmit to the web browser a second web page that displays: (A) information associated with the commerce object associated with the link that has been activated, and (B) the plurality of visually perceptible elements visually corresponding to the source page.

*Id.* at 2–3.

along with the requirement to perform it on the Internet.  Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.*  The claims called for an "outsource provider" that directed a website visitor to a hybrid web-page that combined the "look and feel" elements of the host website and information from a third-party advertiser's website.  *Id.* at *11.  When the visitor clicked the third party's advertisement, the hybrid page kept the visitor from leaving the host site.  *Id.*  There is no "brick and mortar" "analog of what ordinarily occurs in 'cyberspace' after the simple click of a hyperlink" where a customer could be completely transported outside of a store and relocated to a separate physical venue.  *Id.*  The claims addressed "the challenge of retaining control over the attention of the customer in the context of the Internet . . . ." *Id.*  The claims were distinguishable from those in *Ultramercial II* because they did not "broadly and generically claim 'use of the Internet' to perform an abstract business practice" when the limitations were taken together as an ordered combination.  *Id.* at *12.  Further, the claims did not preempt every application of an idea, but instead recited a specific way of solving a problem faced by websites on the Internet.  *Id.*

    3.  *Content Extraction*

In *Content Extraction*, the four asserted patents claimed a method of extracting and digitizing data from hard copy documents, recognizing specific information in the data, and storing that information in memory.[3]  2014 WL 7272219 at *1.  The Federal Circuit held that the

---

[3] Claim 1 of the first of the four asserted patents recited:

    1.  A method of processing information from a diversity of types of hard copy documents, said method comprising the steps of:

        (a) receiving output representing a diversity of types of hard copy documents from an automated digitizing unit and storing information from said diversity of types of hard copy documents into a memory, said information not fixed from one document to the next, said receiving step not preceded by scanning, via said automated digitizing unit, of a separate document containing format requirements;

asserted claims were drawn to patent-ineligible subject matter. *Id.* at *5.  As an example of one embodiment, automated teller machines that accept and scan checks for deposit practice the claimed method. *Id.* at *1.  Applying step one of *Mayo/Alice*, the court found that the asserted patents claimed the well-known and long-practiced abstract idea of collecting data, recognizing certain data with the collected set, and storing that data in memory. *Id.* at *3.  The court rejected the plaintiff's argument that the claims were not abstract because they required a scanner and human minds cannot process the stream of bits output by a scanner. *Id.* The court likened the claims to similar requirements in *Alice*. *Id.*  Applying step two, the court found no limitations that transformed the claims into a patent-eligible application, individually or as an ordered combination. *Id.*  The court noted that the plaintiff conceded that using a scanner or other device to extract data from documents and using computers to transform shapes on a page into typeface characters were well-known practices. *Id.* at *4.  Therefore, the court determined these were routine, conventional activities insufficient to "save a claim in this context." *Id.*  Further, the court stated that addressing each asserted claim was unnecessary where the district court identified two as representative and the plaintiff never identified claims that were not fairly represented. *Id.*

### *The Parties' Positions*

Defendants argue that the claims at issue are directed towards an abstract idea. 6:13CV447, Doc. No. 266 at 2.  According to Defendants, patent claims for "long-familiar commercial transactions" and relationships, no matter how narrow, are directed to abstract ideas as a matter of law. *Id.* at 3. (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353–55 (Fed.

---

(b) recognizing portions of said hard copy documents corresponding to a first data field; and

(c) storing information from said portions of said hard copy documents corresponding to said first data field into memory locations for said first data field.

*Id.*

12

Cir. 2014)).   Defendants assert that the two concepts at the heart of the asserted claims are payment and controlling access.   *Id.* at 3–4.   Further, Defendants assert that these are age-old concepts and the combination of the two—exchanging payment for access—is a building block of the modern economy.   *Id.* at 4.   Accordingly, Defendants assert that the claims recite an abstract idea under the first step of the *Mayo/Alice* test.   *Id.* at 5.

For step two of *Mayo/Alice*, Defendants argue the asserted claims do not disclose an "inventive concept" that is "significantly more" than the abstract idea.   *Id.*   Defendants assert that limits on the claims to the ideas of payment for data and controlling access to data are field of use limitations that do no transform abstract ideas into patent eligible inventions. *Id.* at 5–6 (citing *Bilski*, 130 S.Ct. at 3230–31; *Parker v. Flook*, 98 S.Ct. 2522, 2528–29 (1978); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, No. 2:13-CV-655, 2014 WL 4364848, at *5 (E.D. Tex. Sept. 3, 2014) (Bryson, J.)).   Defendants further assert that the method steps and "code to" limitations simply instruct that abstract ideas of payment for data and controlling access should be implemented on a generic computer in software code that does not transform the abstract ideas into patent eligible inventions.   *Id.* at 6–7.   (citing *Alice*, 134 S.Ct. at 2358 ("[R]ecitation of a generic computer cannot transform a patent ineligible abstract idea into a patent eligible invention."); *buySAFE*, 765 F.3d at 1355 (finding that "sending" and "receiving" data over a network is "not even arguably inventive"); *Loyalty*, 2014 WL 4354848, at *10 (finding that "data recording, storage, and calculation" are "conventional functions that can be performed by a generic computer")).   Moreover, Defendants contend that the hardware recited in the asserted claims is purely functional and generic because nearly every computer will include "a medium capable of storing information, a processor, a user interface, a display, wireless capabilities, internal and external facing interfaces." *Id.* at 8.  Defendants argue the claims disproportionately

foreclose future innovation (preemption) because the "code to" functional claims do not provide a significant description of the particular means by which the various recited functions are performed. *Id.* at 11. Defendants' expert opined that the claims compare to "calling someone up and buying a DVD" in a different context. *Id.* at 13. Further, Defendants assert that the claims also fail the machine-or-transformation test. *Id.* at 14.

Smartflash responds that the claims are not directed to an abstract idea. *Id.* at 4. According to Smartflash, the claims are directed to particular devices with payment capabilities for digital content, access control capabilities for stored digital content, and, in some claims, to particular control access capabilities based on particular payment. *Id.* at 4–5 (citing *Ultramercial Inc. v. Hulu LLC*, 772 F.3d 1335, 1344 (Fed. Cir. 2013) ("*Ultramercial II*"), *cert. granted, judgment vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014) ("The Court has long-recognized that any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. A court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims."). Smartflash points to Claim 26 (dependent on Claim 25) of the '772 Patent and Claim 13 (dependent on Claim 3) of the '720 Patent and asserts that neither is drawn to the abstract ideas of payment for or controlling access to something. *Id.* at 5–6. Smartflash further asserts that other claims are directed toward data retrieval only after payment validation data has been received, which is useful to protect distributors from users who cannot pay for purchased content and an advancement over prior art. *Id.* at 7. Smartflash argues that claims for computer-implemented inventions may be somewhat generic because of the nature of the person having ordinary skill in the art ("PHOSTIA"). *Id.* at 8. (citing *TQP Development, Inc. v. Intuit Inc.*,

2014 WL 651935, at *1, *7 (E.D. Tex. Feb. 9, 2014) (Bryson, J.) (noting the generic nature of the claim language and determining it did not "involve a method of doing business that happens to be implemented on a computer; instead, it involves a method for changing data in a way that will affect the communication system itself, by making it more secure.").

Moreover, Smartflash contends that the asserted claims do not give rise to preemption concerns because both Smartflash and Defendants identified numerous non-infringing alternatives, such as those employed by Netflix and Spotify. *Id.* at 9. As to the machine-or-transformation test, Smartflash contends that its claims are tied to a particular machine and that the invention transforms data. *Id.* at 12. Smartflash argues that even though generic computers have storage mediums and store data, the asserted claims use the storage in a particular way that ties the invention to a particular machine. *Id.* On step two of *Mayo/Alice*, Smartflash maintains that Defendants fail to discharge their burden to show that all the limitations of the asserted claims are simply generic computer or field of use limitations. *Id.* at 3, 13. Smartflash asserts that instead, Defendants overly generalize the patents-in-suit as claiming too much without showing how the patents would preempt basic tools of technological work. *Id.* at 4.

### Supplemental Briefing

After the Federal Circuit decided *Ultramercial II*, the Court granted the parties leave to file supplemental briefing. In their supplemental briefing, Defendants assert that Smartflash relied on *Ultramercial I* and pointed out that the Federal Circuit held *Ultramercial I* is inconsistent with the Supreme Court's *Alice* decision. 6:13CV447, Doc. No. 329 at 1. Defendants compare the invalidated patents in *Ultramercial II* to the patents-in-suit, asserting that the patents in *Ultramercial II* recited the similar capability of permitting access to content after a user views advertising. *Id.* According to Defendants, *Ultramercial II* rejected

Smartflash's argument that the claims are valid because they are directed toward computer-specific problems and improving the function of the computer itself.  Defendants further assert that *Ultramercial II* stands for the proposition that even where claims were directed toward a particular transaction structure, the patent claims may impermissibly preempt that particular business method and be invalid.  *Id.* at 3.

Smartflash responds that the data-storage limitations are not generic computer limitations because they equip a generic computer with specific capabilities to ensure proprietary digital content is appropriately distinguished from other generic data.  6:13CV447, Doc. No. 339 at 1–4 (comparing *Diamond v. Diehr*, 450 U.S. 175, 188–89 (1981)).  According to Smartflash, the combination and implementation of three generic or abstract steps—data storage, retrieving and transmitting data, and access rules—results in patent eligible claims when analyzed as a whole like in *Diehr.  Id.*  Smartflash contends that the claims in *Ultramercial II* did not purport to solve a computer or technological problem, but simply an economic one with no use of any particular hardware.  *Id.* at 5.  In contrast, Smartflash argues that the claimed inventions solve a computer-specific problem: "storing use and access rules with the proprietary digital content such that content providers could protect their otherwise generic data from the copying effects of digital networks, while still allowing consumers of digital content the ability to store the digital content permanently."  *Id.* at 2.  Smartflash asserts that, under *Alice*, once insignificant pre- and post-solution activity and generic implementation—"token activit[ies]"—are ignored, "nothing less than complete preemption of the 'abstract idea' is required."  *Id.* at 7.  Smartflash distinguishes the asserted patents from those in *Alice*, *Bilski*, and *Loyalty*, arguing that the claims solve a computer-specific problem rather than simply implementing a business method on a computer.  *Id.* at 9–10.

16

***Applying Mayo/Alice Step One***

The asserted claims recite abstract ideas.  "The Supreme Court has not 'delimited the precise contours of the abstract idea category."  *Content Extraction*, 2014 WL 7272219, at *3 (quoting *Bilski*, 561 U.S. at 606, 608) (internal citation omitted).  Although there is no categorical exception for business methods, "claims directed to the mere formation and manipulation of economic relations may involve an abstract idea."  *Id.*

The court must first determine the purposes of the claimed inventions.  Applying the Supreme Court's guidance, the Federal Circuit has identified claims directed toward certain financial transactions as claiming abstract ideas.  *Id.* (citing *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed.Cir.2014) ("creating a transaction performance guaranty for a commercial transaction on computer networks such as the Internet"); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336, 1338 (Fed.Cir.2013) ("generating rule-based tasks for processing an insurance claim"); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.),* 687 F.3d 1266, 1278 (Fed.Cir.2012) ("managing a stable value protected life insurance policy"); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 ("processing loan information through a clearinghouse")).  Here, the asserted claims recite methods and systems for controlling access to content data, such as various types of multimedia files, and receiving and validating payment data.  Although not each and every asserted claim explicitly recites a process or system related to payment, the patents' common specification makes it clear that one of the purposes of the claimed invention is to reduce the risk of unauthorized access to content data.  *See e.g.*, '720 Patent, Abstract.  Payment is one of the primary ways a user becomes authorized, and the patents are directed toward validating payment data, which affects the "use rules" that determine whether access is permitted.

Therefore, the general purpose of the claims—conditioning and controlling access to data based on payment—is abstract and a fundamental building block of the economy in the digital age.  Although these patents claim specific methods and systems of applying this purpose, the Court follows the examples in *Mayo* and *Alice* and only looks at the general purpose at step one. The Court considers specific limitations at step two.

***Applying Mayo/Alice Step Two***

The asserted claims contain meaningful limitations that transform the abstract idea of the general purpose of the claims into a patent-eligible invention.  Defendants attempt to boil down the claims to simply "payment for something" and "controlling access to something" with generic implementation.  While discussing the patents-in-suit broadly, Defendants never assert that any claim or claims are representative of the asserted claims.  Although exchanging access to something for payment for something is unquestionably a long-standing economic practice, the asserted claims recite more than Defendants' over-generalized characterizations.  Defendants highlight Claim 11 of the '458 Patent (which depends on Claim 6), but asserted Claim 1 of the '720 Patent recites more specific limitations.  For example, the claim recites reading "status data" and evaluating such data according to stored "use rules" that determine whether access to previously stored content is permitted.  '720 Patent Claim 1.  The claims also recites "parameter memory" and "content memory."  Even Claim 11 of the '458 Patent recites specific types of information and how it should be used in a particular way in the claimed system.

In *Ultramercial II*, the court characterized the limitations as merely distributing media over the Internet with the condition of viewing an advertisement and recording events in an activity log.  In *Content Extraction*, the claims simply recited the long-practiced abstract idea of collecting data, recognizing certain data, and storing that data with already well-known methods.

By contrast, the asserted claims here recite specific ways of using distinct memories, data types, and use rules that amount to significantly more than the underlying abstract idea. Although in some claims the language is functional and somewhat generic, the claims contain significant limitations on the scope of the inventions.

Additionally, the court's reasoning for upholding the patent-at-issue in *DDR Holdings*—where the representative claim recited less-specific limitations and largely functional language—applies here. As in *DDR Holdings*, the patents here do not simply apply a known business practice from the pre-Internet world to computers or the Internet. "The claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *See DDR Holdings*, 2014 WL 6845152, at *10. Digital Rights Management is a technology that was developed after widespread use of the Internet. Entry into the Internet Era presented new and unique problems for digital content providers in combatting unauthorized use and reproduction of protected media content. Digital content became easy to reproduce for anyone with access to a computer. Piracy of digital content became widespread through means unknown to the pre-Internet world. The patents claim methods and systems designed to prevent such easy and unauthorized reproduction and access while allowing the access to be nearly instantaneous and the storage to be permanent.

The patents also address the unique problem of controlling a user's access to data that the user already possesses by tracking use data and restricting access according to use rules. This sort of access control was also unknown in the pre-Internet era, even though Defendants' expert opined that the patents can be likened to ordering a DVD over the telephone. Extending the illustration, once a DVD is shipped to and in the possession of the user, the user has unlimited access to the data on the DVD. However, in addition to allowing instant access to content, the

asserted patents claim technology that allows a user to download content data that may come with certain access restrictions, such as the number of times a user may watch a movie, the length of time the user has access to it, and restrictions on reproducing it.  For example, Claim 1 of '720 Patent—one of the most basic and general of the asserted claims—recites a method of: (1) receiving access requests for stored content data in non-volatile memory; (2) reading use status data and use rules from parameter memory; (3) evaluating the use status data according to the use rules to determine if access is permitted; and (4) displaying whether access to the content data is permitted.  This sort of access control would not be possible with a DVD already in possession of the user.  Thus, the patents do not "broadly and generically claim use of the Internet to perform an abstract business practice."  Instead the claims solve problems faced by digital content providers in the Internet Era and "improve the functioning of the computer itself" by providing protection for proprietary digital content.

Further, the claims do not risk preempting all future inventions related to exchanging access to data for payment on the Internet.  Instead, when taken as ordered combinations, the claims recite specific ways of combining system components and method steps beyond the routine use of the Internet.  The claims address specific ways of managing access to digital content data based on payment validation through storage and retrieval of use status data and use rules in distinct memory types and evaluating the use data according to the use rules.  The patents' claims include meaningful limitations that "ensure the claims are more than a drafting effort designed to monopolize the abstract idea."  *DDR Holdings*, 2014 WL 6845152, at *12.  As in *DDR Holdings*, the claims recite an inventive concept for resolving a particular "Internet-centric problem."  *Id.*

The asserted claims are unlike the claims in *Alice*, *Ultramerical II*, and *Content*

*Extraction* that claimed little more than abstract concepts. The claims do not "recite a commonplace business method aimed at processing business information, applying a known business process to the technological environment of the Internet," or collecting, recognizing, and storing data on a generic computer as did the claims in those cases. *See id.* Thus, the claimed methods and systems are patent-eligible under § 101.

## CONCLUSION

Defendants failed to show that the asserted patents claim ineligible subject matter. Accordingly, the Court recommends that Defendants' Motions for Summary Judgment of Invalidity Pursuant to 35 U.S.C. § 101 (6:13CV447, Doc. No. 266, 6:13CV448, Doc. No. 320) be **DENIED**.

Within fourteen days after receipt of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the Magistrate Judge. 28 U.S.C. § 636(b).

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this Report within fourteen days after service shall bar that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations, and except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Services Auto. Assn.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*; 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 21st day of January, 2015.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

21