<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                          TYLER DIVISION

 3
     SMARTFLASH LLC and           )
 4   SMARTFLASH TECHNOLOGIES           DOCKET NO. 6:13cv447
     LIMITED
 5
          -vs-                    )
 6
                                       Tyler, Texas
 7                               )     9:06 a.m.
     APPLE, INC.                       January 26, 2015
 8

 9
                  TRANSCRIPT OF PRETRIAL CONFERENCE,
10           BEFORE THE HONORABLE K. NICOLE MITCHELL,
                 UNITED STATES MAGISTRATE JUDGE
11

12
                      A P P E A R A N C E S
13

14
     FOR THE PLAINTIFFS:
15

16   MR. BRADLEY CALDWELL
     MR. JASON CASSADY
17   MR. DANIEL PEARSON
     MR. CHRISTOPHER STEWART
18   MR. JOHN SUMMERS
     CALDWELL CASSADY & CURRY
19   2101 Cedar Springs Rd., Ste. 1000
     Dallas, Texas  75201
20

21
     MR. T. JOHN WARD, JR.
22   MS. CLAIRE A. HENRY
     WARD & SMITH LAW FIRM
23   P.O. Box 1231
     1127 Judson Rd., Ste. 220
24   Longview, Texas  75606

25
</pre>

```
 1   FOR THE DEFENDANTS:

 2
     MS. CHING-LEE FUKUDA
 3   MR. KEVIN J. POST
     MR. JOSEF B. SCHENKER
 4   ROPES & GRAY LLP
     1211 Avenue of the Americas
 5   New York, New York 10036-8704

 6

 7   MR. JAMES R. BATCHELDER
     ROPES & GRAY LLP
 8   1900 University Ave., 6th Floor
     East Palo Alto, California  94303-2284
 9

10
     MR. ERIC ALBRITTON
11   ALBRITTON LAW FIRM
     P. O. Box 2649
12   Longview, Texas 75601

13

14

15

16
     COURT REPORTER:          MS. SHEA SLOAN, CSR, RPR
17                            OFFICIAL COURT REPORTER
                              211 W. Ferguson
18                            Tyler, Texas  75702
                              shea_sloan@txed.uscourts.gov
19

20

21

22

23

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25
```

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Good morning.

 3              Please be seated.

 4              Ms. Hardwick, if you will call the case.

 5              THE CLERK:  Yes, Your Honor.

 6              Court calls Civil Action 6:13cv447, Smartflash LLC

 7   v. Apple Inc.

 8              THE COURT:  Announcements.

 9              MR. CALDWELL:  Good morning, Your Honor.  Brad

10   Caldwell on behalf of Smartflash.  And today you are going to

11   hear from Jason Cassady, John Summers, Daniel Pearson, Chris

12   Stewart; less likely you may hear from Claire Henry or Johnny

13   Ward when he shows up.

14              Plaintiff is ready to proceed, Your Honor.

15              THE COURT:  All right.  Good morning.

16              MR. POST:  Good morning, Your Honor, how are you?

17   Eric Albritton for Apple.  Jim Batchelder, Kevin Post, Josef

18   Schenker, Ching-Lee Fukuda.  And then from Apple we have got

19   Cyndi Wheeler and David Melaugh.

20              THE COURT:  Good morning.

21              MR. ALBRITTON:  And we are ready to proceed, Your

22   Honor.

23              THE COURT:  All right.  Well, welcome to our final

24   pretrial conference together.  I still expect that Judge

25   Gilstrap will also set you for a final, final pretrial
```

1    conference so that you can get some time to interact with him

2    before your trial in front of him.  So I just want to talk

3    about what I hope to accomplish today, and that is primarily

4    to preadmit the exhibits.

5           Judge Gilstrap prefers that they all be preadmitted

6    and ready to go before trial, and it is my intention to get

7    through them.

8           I know that we have some other pending motions, and

9    I would like to hear argument on those as well, but we are

10   going to do exhibits first.  So if we can get through those

11   in a timely fashion, I think we will have time this afternoon

12   to hear argument on some of the other pending motions.

13          I do have some criminal matters that I have got to

14   take up at lunch today, so my expectation is that we will go

15   until about 11:15 or so today, and then I have got criminal

16   matters starting at 11:30 that I think will carry me through

17   lunch.  And we will resume about 1:00 o'clock, provided that

18   those are finished; and then I have a clear afternoon for

19   you-all, so...

20          With that, let's get started on the exhibits.  I

21   know that you-all have been meeting and conferring trying to

22   narrow the disputes down; and so, hopefully, you have got

23   something to report on that.

24          MR. PEARSON:  Yes.  Good morning, Your Honor.

25   Daniel Pearson on behalf of the plaintiff.

1          The parties have come to many agreements.  I have

2     the list here.  Unfortunately, I did not print multiple

3     copies, and I apologize.  I do have a list here of both

4     exhibit numbers that do not have objections outstanding so

5     that the parties agree on each side are preadmitted.

6          And I also have -- simultaneously with that list is

7     a corresponding list of documents that we agree will not be

8     preadmitted this morning because they are either covered by a

9     motion in limine or the parties have agreed to withdraw them

10     or might be used only for impeachment or whatever.

11          I would like to say that I believe the parties are

12     on the same page here.  With respect to the not-preadmitted

13     list -- I am sorry.  With respect to the preadmitted list,

14     the parties agree that even if things are being preadmitted,

15     they are still generally covered by the motions in limine

16     such that if there is something in one of the documents that

17     someone missed that is covered by a motion in limine or

18     pending your ruling later today if something comes up that is

19     preadmitted but also has a motion in limine, the parties

20     agree that we are not going to be using those preadmitted

21     documents to violate motions in limine, and motions in limine

22     generally apply to what has been preadmitted.

23          THE COURT:  Okay.  Is that the agreement as you

24     understand it?

25          MR. POST:  We agree with that.  Yes.

```
 1              THE COURT:  Very good.

 2              MR. PEARSON:  Now, with respect -- I am happy to

 3    pass that list up if you would like or I can -- it will take

 4    a while to read it into the record.  I am happy to do that as

 5    well.

 6              THE COURT:  No.  What I am going to have you do at

 7    the end of the day -- not today but within the next couple of

 8    days, is resubmit a joint agreed exhibit list reflecting the

 9    Court's rulings so you can just include that as part of the

10    list, if that makes sense, what you have already agreed on

11    that is preadmitted.

12              MR. PEARSON:  Do we need to combine the PX's and

13    the DX's into a single separate file or just keep our

14    separate lists?

15              THE COURT:  You can keep your separate lists.

16              MR. PEARSON:  Okay.  Thank you.

17              And then with respect to what remains that is still

18    disputed, the parties have endeavored to categorize each of

19    the -- each of the documents into buckets such that Your

20    Honor can rule on each of the buckets; and whatever is in the

21    bucket can either be in or out.  That is -- you know, at

22    times something to go in multiple buckets, we just did our

23    best to put it with respect to the most important objection.

24    That is what I am saying earlier about the motions in limine

25    applying generally.
```

```
 1              THE COURT:  Okay.  How many of those are there?

 2              MR. PEARSON:  I don't have an exact count.

 3   Probably 10-ish per side.

 4              THE COURT:  Okay.  What I was -- the reason I asked

 5   is I am trying to get a feel for -- I want to make sure that

 6   I give both sides equal time to be heard on their objections,

 7   and so what I would like to do is maybe -- unless you-all

 8   have agreed to another way -- maybe ping-pong and, you know,

 9   let plaintiffs take a bucket that you feel like is one you

10   want to start with and then let the defendants do one.  And

11   that way I can as we go through the morning evenly take up

12   both sides' objections?

13              Okay?

14              MR. PEARSON:  That will be fine.

15              THE COURT:  All right.  Then we will me start with

16   plaintiffs'.

17              I will say, at the end of the day -- and you-all

18   help me save a little time for this -- I know -- I have got

19   some just -- some thoughts from Judge Gilstrap about

20   particular things with regard to his trials, and I want to go

21   over those with you.  I know that he will probably answer

22   questions when he sets his pretrial conference with you, but

23   these are things I think would be useful for you to know now.

24   So don't let me forget those.

25              THE COURT:  All right.
```

```
 1              MR. CASSADY:   Jason Cassady for the plaintiff, Your

 2   Honor.

 3              There are a number of the buckets today I think,

 4   Your Honor, that are related to outstanding motions in

 5   limine.   The Court carried, I think it was five or six with

 6   regard to the parties here today with regard to Apple and

 7   Smartflash.   So I will start with one of those, and I think

 8   that probably crystallizes it pretty quickly.

 9              It starts with Apple's exhibits that are

10   the -- their own patents.   They have got about 20 patents on

11   the exhibit list related to various things.   But the point

12   is, that we still believe that their patents are prejudicial

13   because the jury just didn't seem to really -- don't

14   understand that you can have a patent on something and still

15   infringe someone else's patents.

16              And these 20 patents are generally related to the --

17   you know, to the overall accused feature.   They are not

18   saying we have a patent on FaceTime and that is something you

19   didn't take into account.   They are saying we have a patent

20   on something called method for a network-based purchase and

21   distribution of media.

22              Now, that is clearly intended to tell the jury we

23   have our own patent on exactly the space or area that we are

24   talking about; and so, therefore, they shouldn't -- you know,

25   we don't infringe.
```

1            And it is really telling because the only reason

2    that I understand they are trying to bring it in is for

3    damages, but their own damages expert didn't take these

4    patents into account other than just to say that they exist.

5            So Georgia-Pacific analysis requires two things,

6    which is to take into account the unpatented features, that

7    is one.  And, two, is to take into account the contributions

8    by the producer or the infringer to the product.

9            Well, those things can all be done without ever

10   referring to a patent and without ever complicating the issue

11   of trying to explain to the jury this issue of the patent

12   does not give you the right to practice.  It gives you the

13   right to keep others from practicing.

14           And so that fundamental issue, Your Honor, I don't

15   think I have ever had a case in East Texas that I have tried,

16   whether on defendant or plaintiff, where patents came in from

17   a defendant.  That just hasn't happened.

18           There have been situations where they are allowed

19   to say I am Apple and I have patents.  Or, you know, we have

20   very, very successful patents.  We are very innovative.

21   Those things are fine.  That is exactly what they are trying

22   to get at is they have contributions, but I can just show it

23   to you.

24           If you can pull up PX 51, please.

25           And this one is a perfect example.

 1                    (Discussion between Mr. Cassady and the

 2              Technician.)

 3                    MR. CASSADY:   DX 51, I apologize.   And so zoom in

 4    on the top left.   That's great.

 5                    So like I said here, Your Honor, this has no

 6    purpose other than to say here is an Apple witness, Max

 7    Muller, who works in the space of the accused features; and

 8    look at the title of his patent:   method and system for

 9    network-based purchase and distribution of media.

10                    Your Honor, nobody went through that patent and

11    said what it applied to.   Nobody said the value of that

12    patent with regards to comparison to the value of the

13    Smartflash patent.   Nobody did any of that.   This is skunk in

14    the box, show this various title and say, see, Apple has its

15    own patent.

16                    And we have done, you know, hundreds of jury tests

17    in cases; and over and over again we have found there is no

18    way, no way to get a jury to understand this specific issue.

19    They will always, always misinterpret this issue.   And so

20    that is one reason why I think most of the courts, Judge

21    Davis, I know that Judge Clark, even the other judges I have

22    been in front of, they just don't let this in.

23                    And so they will let people like Apple say they

24    have patents, they have patents on other features.   But there

25    is no reason for the specific patents to come in or the scope

1    of those patents to come in.  So that is why in line with the

2    motion in limine I thought a patent example of what they are

3    trying to do is a good example as to why that is not

4    appropriate.

5              So that is one bucket -- or one subset of the

6    bucket, which is the patent numbers.  I will let them go

7    ahead and respond to that, and I will deal with the other

8    side issue to that.

9              THE COURT:  All right.  Response.

10             MR. ALBRITTON:  Just briefly, Your Honor.

11   Mr. Batchelder is going to speak to it, but I have just had

12   different experience than Mr. Cassady.  I have certainly been

13   in cases, where -- especially when there is a charge of

14   willfulness, these come in.  I can think of a case.  It is

15   slightly different, but it is similar.  It is a case tried in

16   front of Judge Ward.  It was the Saffron case where there was

17   a license to a prior art patent that was not used -- or a

18   license to a patent.  It was not used for prior art purposes.

19   He let that patent in.

20             So I would just say that my experience has been

21   different; and a categorical statement that no Judges in this

22   district ever do that, is not my experience.

23             THE COURT:  Okay.

24             MR. BATCHELDER:  And I would just add, Your

25   Honor -- good morning.

 1           I would just add your Daubert ruling commented that

 2   Mr. Mills admitted that he did not apportion between the

 3   contribution of the patents and other complementary assets in

 4   the accused devices.

 5           You know, as Mr. Albritton is pointing out, it is

 6   quite common in cases that when you are establishing your

 7   complementary assets, you can establish that they are

 8   inventive.  And in this case, as we discussed last time, I

 9   think the Court was satisfied last time, we are never going

10   to argue that we don't infringe because we have our own

11   patents.  Any possible confusion about that could also be

12   dispelled with a clear jury instruction.

13           But for damages, we do need to be able to say we

14   make our own contributions.  They are inventive

15   contributions.  That has to be taken into account.

16           And as you may recall last time, I stood at the

17   podium and I read to you maybe a dozen of examples of Dr.

18   Becker, our damages expert, where he talks about Apple's

19   patents.

20           So I do think it is a fair thing to do.  And,

21   frankly, depriving us of the opportunity to explain some of

22   those patent contributions, would make it hard for us to

23   explain to the jury in any sort of full detail to help them

24   really appreciate what those complementary assets are.

25           THE COURT:  Response?

1          MR. CASSADY:  Candidly, Your Honor, the instruction

2    won't work.  I mean this is -- I mean it is pure skunk in the

3    box.  The license issue is a separate issue that we will talk

4    about in a second.  I am talking about bringing in your

5    patents because they are just your patents.  And that is what

6    this is right here.  This is not a patent that is part of a

7    license.  We will get to that in a second.

8          This is, I have got patents on the features that

9    you are accusing, and I'm going to tell the jury about them.

10   There is no other purpose of that other than to tell a jury

11   you should find non-infringement because I have my own

12   patents.

13         THE COURT:  What about this argument that the

14   defendant's expert relies on that in part of its, you know,

15   other inventive concepts analysis?

16         MR. CASSADY:  Their expert has footnotes that cites

17   to the patents.  He doesn't explain them.  He doesn't walk

18   through them.  When asked about them in his deposition, he

19   said I didn't value them.  I didn't compare them to the

20   patents in this case.  I didn't figure out what this case's

21   patent was worth versus that patent, which means he is wholly

22   irrelevant.  He didn't do anything what they are saying.

23         He cited them, yes; but he did not prepare them.

24   He did not walk through them.  He simply had some sentences

25   in the report that make a statement or that make reference to

 1    these patents, the fact that Apple has them; and the fact

 2    that Apple is innovative.

 3         That is it.  So there is no reason to go into those

 4    patents.  Nobody here is going to contest that Apple gave

 5    things to this product that Smartflash didn't.  So that is

 6    the issue.  If they are going to get up and say you are not

 7    the screen, you are not FaceTime, you are not the case, you

 8    are not other pieces of software, if they are going to do

 9    that, that is normal, that is routine, and that is what their

10    expert really goes into, and really kind of involves in.

11         And this is just simply an attempt to try and get

12    what they know is just pure skunk in the box in front of the

13    jury.

14         I am saying, Your Honor, my old colleague Doug

15    Cawley -- as in older as in old ago, not that he is old, not

16    old Doug Cawley -- he got in front of the Court -- he got in

17    front of the Court all the time and I did, too, and this

18    issue was pretty passionate for the two of us because we have

19    seen too many jury studies and we just know that instructions

20    won't work.

21         We have even gone in and tried to do corrections

22    where we are representing the, quote, third party who is

23    running the test; and going in and say:  Do you understand

24    that their patent is meaningless because it can't mean that

25    they don't infringe?  And the juries just don't care.  They

1    don't get this issue.  And I wish they did.

2         But, again, given the slight relevance that is

3    coming in here, it just cannot overcome the just

4    over-insurmountable issue of these patents in front of the

5    jury.

6         THE COURT:  Okay.  Final word, Mr. Batchelder.

7         MR. BATCHELDER:  I would just say, Your Honor, that

8    again, as I read to you last time from the podium; and,

9    again, I think the Court was satisfied.  This was not just

10   passing footnotes from Dr. Becker.  He cited these patents in

11   connection with his Georgia-Pacific factors again and again

12   and again.  There may be a dozen references to these

13   patents.

14        And our witnesses should be able to say, yeah, we

15   made this inventive contribution to the very features that

16   they are accusing of infringement so that when it comes time

17   to our crossing Mills on this, their damages expert, we just

18   feel like it is absolutely fair for us to be able to point

19   that out.

20        MR. CASSADY:  Your Honor, you didn't rule on his

21   motion in limine last time.  You carried it.  What they are

22   saying is you have already ruled on this.  That is not what

23   happened.  You carried the motion.  You didn't rule on it.

24   That is why we are bringing these exhibits up because like I

25   said these are 20 exhibits that -- it is not a FaceTime

1    patent.  It is a patent where they are trying to say the

2    accused feature is their patent.  That is what it is.  So I

3    gave you one example, but there is 20 of them.

4         THE COURT:  All right.  I'm going to exclude those

5    exhibits.

6         What is next?

7         MR. CASSADY:  Thank you, Your Honor.

8         The next issue is Apple policies.  So there is a

9    number of Apple policies sitting on the exhibit list

10   regarding their treatment of intellectual property.  Many of

11   them relate to how Apple goes about getting their own

12   patents, but some of them relate to Apple's generic

13   statements about how it respects intellectual property.

14        And I believe this was argued at the last hearing,

15   but I wasn't here, Your Honor, so I will do my best to get

16   through this.

17        The issue is if their witnesses are going to get up

18   and start talking about their policy, then the entire

19   privilege MIL becomes a very large issue for us because we

20   tried to kind of get behind this policy.  We got probative

21   objections, which was, well, see this license here that you

22   signed, do you practice these patents?  Privilege.  I'm not

23   even going to talk about that.

24        So having circumstances where they may have taken a

25   license after a lawsuit that they actually believe they

 1   infringed, would show that their policy is not necessarily

 2   that they never infringed those patents or that they don't

 3   ever say they don't infringe it and then later sign licenses.

 4          But the problem is I wasn't able to get into that

 5   because they were objecting to privilege on this issue.

 6          So this is kind of tied up with both this and the

 7   prior art licenses; but the issue is if I can't test your

 8   policy, then you shouldn't be able to get up and say, well,

 9   hey, we have a policy about respecting intellectual

10   property.

11          So what is going to happen is the jury is going to

12   hear we have a policy and there is not going to be any cross

13   from us because our hands are tied behind our backs because

14   they objected to privilege to all of the issues related to

15   how well this policy is followed, what the policy is, what is

16   behind it, what they do; those things.

17          So I just don't see how there is any reason for

18   them to be able to say this issue to a jury or to submit

19   these exhibits of this written policy that we weren't able to

20   test.

21          THE COURT:  Okay.  Tell me again how you wanted to

22   test it and you were stopped.  They have the policy that says

23   we respect the intellectual property rights of others.  Is

24   that it?

25          MR. CASSADY:  That is the generics of it, yes.

1          THE COURT:  And you wanted to ask what about that?

2          MR. CASSADY:  Okay.  So with regards to, for

3     instance, Mr. Risher's testimony, when I asked him about the

4     specific licenses they entered into, I said:  Well, did you

5     infringe those patents?  Objection.  Privilege.  They won't

6     answer whether they even infringe any of the patents they

7     assign licenses to.

8          The reason that is relevant is they ultimately

9     said -- they ultimately got sued on those patents, and they

10    went through a lawsuit, and they told a judge they didn't

11    infringe them.  And they said we have all these great

12    defenses, and then they sign a license.

13         And what they are going to do is get in front of

14    the jury and say, well, yeah, there is another piece of

15    litigation, we ended up signing a license, we don't think we

16    infringe, we followed our policy, but; you know, we wanted to

17    go ahead and resolve the issue so it goes away.

18         But the reality is at least some of those licenses

19    are licenses where they believed they infringed after the

20    license was signed, and they decided to sign a license.  So

21    that would be directly counter to their policy.  If they

22    spent two years running some inventor around in a trial and

23    then sign a license they knew on a patent they infringe, that

24    is exactly the thing with cross to show their policy is not

25    what they say it is; that they just have this God-like

 1   respect for intellectual property, and they will sign a

 2   license for anybody they think they infringe.

 3          So we have no way to cross-examine that because

 4   they object to privilege every time we try to get near those

 5   issues.

 6          THE COURT:  Response.

 7          MR. CALDWELL:  Your Honor, if I might supplement

 8   that.  Mr. Cassady and I sometimes see slightly different

 9   perspectives on -- I agree with him as to what happened but

10   he saw it from the damages perspective.

11          Your Honor, I argued this in the context of the

12   motion in limine last time.  But what I see is, for example,

13   with an engineer like Mr. Faruggia, virtually any question I

14   asked him about our patents was responded with an instruction

15   not to answer and/or him saying, oh, it is with lawyers, it

16   is privilege.  Including he would say something like I

17   believe we don't infringe.  Okay.  Why?  I can't tell you.

18   It is privileged.

19          Well, have you read any part of the patent?  Yes.

20   What have you read?  Can't even tell you what I have read.

21   It is privileged.

22          So I saw it from a slightly different perspective

23   than Mr. Cassady did, but really we both got it from the same

24   angles because what is happening here is it seems like just

25   as a personal anecdote vis-a-vis Apple, what we have seen is

an evolution where Apple now just systematically in multiple

cases, it has become basically their mantra to just have

their witnesses say, no, no.  We have got a policy, and I

gave it to our lawyers.  And I feel good.  We don't infringe.

But if you are going to use that offensively and

then also have the MIL that says you can't ask anything that

might elicit a privilege instruction, it puts us in an unfair

position because it is sort of suggesting that there was some

sort of a good throw result that concluded in

non-infringement.  It is like you are implying the existence

of an opinion of counsel without disclosing one or the

attendant waiver or allowing any investigation into it.

So I guess really our point is -- and I think what

we agreed last time with Counsel for defendants, is we are

still allowed to prove, for example, willful blindness.  And

so what we agreed is, I am the one who has my hands tied; but

I am still allowed to ask the witness:  Can you tell us any

reason you believe you don't infringe?  And things like that?

So our hands are tied.  I can't go into a lot of the

questions.

What parts did you even read necessarily depending

how they answer?  It is kind of in a weird way sort of a

sword/shield thing.  You can't put out there, trust us, our

lawyers are telling us this is okay, but not allow the things

that come with that.  That is really what is bugging us.

1                    THE COURT:  Okay.  Response?

2                    MR. POST:  Good morning, Your Honor.  Kevin Post

3       for Apple.

4                    I think this issue spans both exhibits and some

5       deposition designations, so at face the Apple policies that

6       are being discussed are -- they don't go quite as far as I

7       think Mr. Caldwell is suggesting.

8                    For example, one of them is a business conduct

9       policy, a section on third-party intellectual property, and

10      includes the following statement:  If you were told or

11      suspect that Apple may be infringing intellectual property

12      rights between patents, copyrights, trademarks, or trade

13      secrets owned by a third party, you should contact the legal

14      department.

15                   We think this is particularly relevant in light of

16      some of the questions that engineers were asked about,

17      whether they had read the patents, whether they had done

18      these searches.  And our objections to some of the deposition

19      designations specifically relate to the fact that what has

20      been designated is not just that question but also a

21      cautionary instruction or reminding the witness that they

22      can't disclose privilege communications, but they can

23      disclose the fact that -- and this document was produced that

24      talked about the fact that this policy exists.

25                       And we think it is absolutely relevant to testimony

1    of engineers when they are asked or suggested they didn't

2    read the patents and they have done something wrong by not

3    doing that.

4         First of all, we think it misstates the law of

5    willfulness and what they are required to do and duty to

6    search is not the law, not required to do that.  But at face,

7    as I said, they have a policy in place that makes clear that

8    is not their role.  That it is someone else's role.

9         Now, I don't think that puts Smartflash in a

10   position where they can't explore further.  It is simply an

11   explanation as to what the engineers did and why they did or

12   didn't do anything, and nothing more.  It isn't a blanket

13   protection to them that they couldn't possibly have infringed

14   because there is this policy.  It protects everybody.  It is

15   this umbrella coverage.

16        It doesn't have that.  It is simply an explanation

17   so the jurors aren't left with a misimpression that the

18   engineers did something wrong by not searching the patents.

19        So we think that the policies are relevant and

20   should be preadmitted.  We think they are relevant in a

21   rebuttal context if Smartflash elects to question engineers

22   on their own search practices.

23        And we think as to the deposition designations, we

24   can go into more detail about those, this particular bucket

25   if you like when we get to that phase.  But we think that the

1    designation of privilege instructions has the very potential

2    of misleading and prejudicing the jury against the engineers.

3    We think that the -- you know, the policies are relevant for

4    that.

5                   THE COURT:  Okay.  Tell me a little bit more about

6    the policies and how many of them are there, and I see the

7    one that you highlighted, but are there -- tell me about the

8    other ones.

9                   MR. POST:  So there really are -- there are really

10   two categories, so DX-APL 305 is this business conduct policy

11   that I mentioned.

12                  THE COURT:  Uh-huh.

13                  MR. POST:  This one talks about that statement that

14   I made about what the engineers should do, what employees

15   should do if they become aware.  And that is the legal

16   department, that is their role.

17                  There are, I believe, six other exhibits that

18   relate to specific witnesses, so there are offer letters and

19   certain things that witnesses need to attest to when they

20   join Apple, and I think that those are -- those relate to

21   specifically what Apple's policy is about third-party IP and

22   what people joining Apple should do to protect -- anything

23   they learned in their prior lives, essentially, should not be

24   used in Apple.

25                  So I think that one is more related to the copying

```
 1     allegations.  I think it is still an open question as to

 2     whether or not that is even going to be part of the case.  If

 3     it is not, then I don't know that is nearly as relevant.  But

 4     if copying is, and for at least Mr. Faruggia, we think that

 5     policy would be relevant.

 6                MR. CALDWELL:  Your Honor, let me see if I can --

 7                MR. ALBRITTON:  Can I just briefly --

 8                MR. CALDWELL:  Sure.

 9                MR. ALBRITTON:  -- since they are tag-teaming over

10     there, I would like to tag-team for a second.

11                THE COURT:  No problem.

12                MR. ALBRITTON:  You were certainly there during the

13     VirnetX trial as were these folks and me, and I am sure Your

14     Honor remembers those snippets of those depos that they

15     played where they put together:  Did you read this?  Did you

16     read this?  Did you read this?

17                The clear impression of what they are trying to do

18     is trying to imply that because these engineers did not

19     specifically study the patents and aren't opining about

20     non-infringement, that they did something wrong.  And this

21     goes to show that they are specifically instructed as part of

22     their job that this policy predates this case, that they are

23     not allowed to do that.  So it leaves a horrible

24     misimpression.

25                Nobody is going to get up -- these engineers are
```

```
 1    not going to get up and say, I believe we don't infringe

 2    these patents.  Okay?  That implicates these privilege

 3    issues.

 4              So this privilege point is sort of separate.  It is

 5    just sort of a key fundamental fairness issue that they can't

 6    get up there and say you did something and it is wrong you

 7    did nothing when, in fact, there is an explanation for why

 8    they did nothing.

 9              MR. CASSADY:  Your Honor, I think I can

10    short-circuit this.

11              THE COURT:  Okay.

12              MR. CASSADY:  We don't have any issue with --

13    unless someone over here freaks out on me -- we don't have

14    any issue with Apple saying to a jury that they have a policy

15    that they let legal know about any intellectual property

16    issues.  We don't have anything about that.  They don't have

17    a policy that says engineers aren't allowed to look at

18    patents.  I am not sure what policy that is he is referring

19    to.

20              But we are fine with saying:  We talked to legal.

21    The problem is when they go beyond that, which is that is not

22    we respect intellectual property.  That is we have a process

23    we do when someone thinks we infringe intellectual property.

24              And what has really been -- from these documents

25    people have been summarizing documents saying we have a
```

1    policy with respect to intellectual property.  That is the

2    line that is the problem.  We weren't allowed to get behind

3    that.

4          And so they can say to protect their engineers -- I

5    understand their argument.  I disagree.  But I understand

6    their argument that they can say, look, Your Honor, and the

7    jury, our engineers were told to tell legal about any issues;

8    and so that -- that is fine.  I understand that response.  We

9    are fine with that.

10          Beyond that, I think the copying issue probably

11    deals with it.  I don't know why copies of the policy need to

12    come in that --

13          THE COURT:  About this business policy, what is

14    your specific objection to the actual policy?

15          MR. CASSADY:  Well, really, it is the motion in

16    limine that is kind of outstanding about the policy.  It can

17    go on the list, and then we can fight about motions in

18    limine.  But part of my understanding was that Gilstrap

19    didn't want us to have that kind of fight in front of him.

20          THE COURT:  He doesn't.

21          MR. CASSADY:  Exactly.  So that is why we are

22    bringing this up.

23          I guess what I would say is some of these policies

24    may be totally irrelevant if copying doesn't end up being

25    part of the case.

1          THE COURT:  Right.

2          MR. CASSADY:  But specifically I think the one that

3     we should talk about is the business conduct one.

4          We have no problem with them saying that the policy

5     that they tell legal about any issues they are aware of.

6          THE COURT:  But what is your problem with them

7     showing the jury the policy?  What about this policy is

8     objectionable?

9          MR. CASSADY:  I think that specific policy that is

10    all that one says, so I think that one is probably fine.  So

11    that is 305, right?

12         MR. POST:  Yes, 305.

13         MR. CASSADY:  So DX 305, I think that is fine they

14    have it, as long as we have an understanding about that line

15    being drawn where they are not saying, well, I have this

16    policy, so I don't infringe.

17         THE COURT:  I think if they do that, you can stand

18    up and show the jury the policy, and say the policy doesn't

19    say that, does it?  It says X.  Right?

20         MR. CASSADY:  Right.  But I guess the problem is

21    that is still their belief -- they can still say we have a

22    policy of that, and now -- I can't get behind -- that is the

23    problem.  It is the line.  I can't get behind that policy

24    because of the privilege objection.  It gets into the other

25    MIL issue, which is -- so I think we have agreement that they

 1    are not going to say they don't infringe because of this is

 2    policy.

 3              THE COURT:  I heard that, too, and is that true?

 4              MR. ALBRITTON:  No engineer is going to get up

 5    and affirmatively offer testimony that I analyzed this, and

 6    we do not infringe this patent.  That is why we have experts.

 7              And that is sort of the interesting thing about all

 8    this argument, Your Honor.  I mean, they act as if -- you

 9    know, they say they are unable to test this Apple's general

10    belief that it doesn't infringe; but yet they have got

11    experts running out of their ears, we have got experts

12    running out of our ears.  They have questioned all of them.

13    We have questioned all of them.

14              You know, what an in-house lawyer thinks or doesn't

15    think is sort of beside the point here now, okay, because

16    in-house lawyers hire outside lawyers, us, and they hire

17    experts; and it is, you know, well explained why Apple thinks

18    the patents are invalid and not infringed.

19              THE COURT:  All right.  I am going to preadmit this

20    business policy.  It is admitted.

21              And I just want to note for the record it looks

22    like we have agreement that there will be no Apple engineer

23    standing up saying we don't infringe.

24              And tell me about that motion in limine.  It has

25    been a few weeks.  What exactly were you requesting?

1          MR. CALDWELL:  Well, I think the motion in limine,

2     unless I am getting them confused, was actually one of their

3     motions in limine saying that we couldn't do anything to

4     elicit a privilege instruction.  And that's why I feel like I

5     am stuck walking on egg shells.

6          And I will just give you an example because while

7     these guys were debating here for a second I pulled up

8     Mr. Faruggia's deposition, and I asked him:  Are you aware of

9     any changes Apple plans to make through FairPlay in response

10    to or in connection with this lawsuit?  So I asked him about

11    changes.

12         His answer was:  Like I said, my understanding of

13    that is through my counsel, and I don't think FairPlay would

14    need to change in this case because I don't think we do any

15    unlawful stuff.

16         And then I asked him:  I said any what?  I didn't

17    understand the word.  He goes:  Unlawful.

18         I asked him, I said:  Okay.  You mentioned not

19    doing anything unlawful.  Does that mean -- are you saying

20    you do not believe Apple is infringing?  Instruction not to

21    the answer.

22         Nevertheless, the witness says, despite the

23    instruction not to answer:  Based on the conversation and my

24    understanding with Counsel, I don't think the implementation

25    of Fairway has something to do with my understanding of the

1    patent.

2         Okay.  Despite the instruction that I just said:

3         Mr. Batchelder:  I think that is a waiver.  I think

4    he needs to say I don't know, you guys have privilege or else

5    I need to be able to test it.  And there was a debate between

6    us, and he continues to instruct him not to answer.

7         I asked him:  Why is it you believe that Apple does

8    not infringe?  I will instruct you that the reasons come from

9    Counsel.  Don't answer.  He goes:  I don't have any other

10   reason.

11        Then I try to ask him just personally:

12        Okay.  Mr. Farrugia, have you made any effort

13   whatsoever to determine whether or not Apple was infringing.

14   Everything is from communications with the lawyer.  Okay.

15        If you set aside what your lawyers told you, have

16   you made any effort whatsoever to determine whether Apple is

17   infringing any of Smartflash's patents, if you set aside what

18   the lawyers told you?

19        Okay.  I will repeat what I said.  The only

20   understanding I have is through counsel -- is through my

21   conversations with counsel.

22        And I said:  Okay.  Mr. Farrugia, I need you to

23   listen very carefully.  I'm trying to carve out what you

24   talked about with your lawyers.  If you set aside what your

25   lawyers told you, have you made any effort whatsoever to

1   determine whether Apple was infringing any of Smartflash's

2   patents?

3           And I repeat what I said, my knowledge is based on

4   conversations I had with counsel, which we cannot have an

5   opinion.

6           This is the way -- this is the way the depositions

7   go.  Even if I am trying to respect the privilege -- I mean,

8   I am not trying to cast somebody in a bad light, but I don't

9   know of a better word than it is like the guy is sort of

10  conditioned to say as to everything, lawyers, lawyers,

11  lawyers, lawyers.

12          And so the motion in limine last time, what I was

13  trying very much to respect the instruction of privilege and

14  we have each had instructions of privilege where appropriate

15  I think, for the most part, in this case.

16          But there has got to be some range of fair

17  exploration of an engineer, that is not going to elicit a

18  privilege claim; and that is what we discussed last time

19  about, you know, I'm certainly going to try to phrase the

20  questions that don't elicit:  What did your lawyer tell you

21  about non-infringement?  Beyond that, I think the guy is kind

22  of conditioned to run there.  I don't know what to do about

23  it.  That was the motion in limine we talked about last time.

24          MR. ALBRITTON:  Your Honor, just a few sort of

25  things in clarification.  Certainly, none of our witnesses,

1    non-experts are going to offer opinions about

2    non-infringement.  Okay?  But when they are up there beating

3    these guys up -- and we will get to this second question --

4    and I don't mean that pejoratively; but when they are

5    cross-examining these witnesses, you don't have any personal

6    opinion, you don't have any personal opinion, I certainly

7    think it is fair game for them to say, you know, Apple has

8    got -- we are in the middle of a trial, Apple has experts,

9    Apple has lawyers that are explaining why they say, you know,

10   Apple doesn't infringe or these patents are invalid.

11            I certainly think that is fair game, and that is

12   different than offering any testimony which would, frankly,

13   be expert testimony anyways from an expert that says it is my

14   belief that Apple does not infringe.  That is point number

15   one.

16            But, really, point number two, Your Honor, and it

17   is really sort of the elephant in the room because it

18   underpins all of what is going on.  Why in the world are we

19   even getting into Mr. Faruggia or Ms. Sloan you work for the

20   Court or Mr. Schenker you work for Apple, why is it that you

21   don't think you infringe?  Why are we getting into that?

22            We have got any -- I would, respectfully, submit

23   there is no probative value of that.  But to the extent that

24   it is, it certainly -- any prejudice unduly outweighs that,

25   the source of confusion.

1          They have got experts, we have got experts.  Last

2   time we heard in spades that this case should be about the

3   technical merits of the case.  I agree.  We all have

4   technical experts that are going to talk about the technical

5   merits of the case.

6          And asking individual engineers to elicit testimony

7   that says I don't know, okay, is entirely improper and ought

8   to be excluded under both 402 and 403 because it is not

9   probative to the issues in the case in light of the

10  respective roles of the engineers and the experts, et cetera.

11         THE COURT:  I couldn't help but ask that same

12  question in my head, and maybe -- I just thought I was

13  missing the point of the greater context; but why are you

14  eliciting that type of testimony from Apple's engineers?

15         There may be just a very obvious reason, and I am

16  missing it.

17         MR. CALDWELL:  I think, one -- I think actually the

18  most obvious reason is that patents are written for a person

19  of ordinary skill in the art.  And Mr. Faruggia is personally

20  named in our complaint.  He is the gentleman who had been at

21  Gemplus that was Mr. Racz's business partner.  I mean, these

22  are guys who work in the space.

23         To my knowledge -- maybe I'm missing something, but

24  to my knowledge, it would be an entirely new standard in this

25  district if we are saying the technical folks who work in the

1   field of the art of the patent, you can't ask them questions

2   about whether they understand things, if that is the way it

3   works and whatnot.  It is the ordinary course of things.

4       We could probably all think of so many different

5   examples.  But one I can think of is a great example just to

6   look back at a past case with Mr. Albritton.

7       In that VirnetX/Apple case, there was the gentlemen

8   Christophe Allie who worked at Apple who had actually filed

9   his own patent application almost identical -- and that was

10  the deposition -- it wasn't Mr. Albritton, but the other

11  counsel for Apple actually walked out.  It led to sanctions

12  and things like that.

13      But there was no doubt that it was appropriate to

14  take a patent claim and ask the guy about whether elements

15  are met or not.  He is a person of skill in the art who

16  understands also how their product works.  I can't imagine --

17  I mean you have all these people that are paid and there are

18  arguments of bias and all this.

19      I can't imagine actually it not being viewed as

20  probative to take somebody who in their job knows the accused

21  product as anyone possibly could and they are of skill in the

22  art and to kind of ask them how those things relate.  If it

23  is going to be their strategy to say I don't know, I

24  understand it is the lawyers, and walk away, okay; but if

25  they have taken that route, I think at least we ought to be

1    able to establish that fact.

2              Go ahead.

3              MR. ALBRITTON:  Okay.  I'm sorry.  I didn't mean to

4    stand up, Mr. Caldwell.

5              MR. CALDWELL:  Oh, no.  You are good.

6              MR. ALBRITTON:  A couple of things.  I mean, first

7    of all, Your Honor remembers all of this very well, I am

8    certain.  We all suffered through it.  But the interesting

9    thing is there was an order of sanctions about instructions

10   not to answer.  But if the Court will remember, there was no

11   testimony about this at trial.

12             The issue of discoverability and the issue of

13   admissibility, of course, are different inquiries, right?

14   And the Court never ruled on the issue of admissibility.  In

15   fact, they never put in, as my recollection -- I could be

16   corrected if I am wrong.  You would probably remember better

17   than I. -- but they never even put in that information, as I

18   recall the case.

19             But sort of more fundamentally to the point here is

20   it goes back to what Your Honor asked and what I asked.

21   Okay?  You know, if these people had -- you know, he said one

22   of ordinary skill in the art, et cetera.  The point is he

23   knows that these people only have opinions based on

24   privileged information.  Okay?

25             So by asking the question, all you are doing is

1    either forcing somebody to invoke the privilege or leaving a

2    false impression.

3         So, again, to the extent there is any probative

4    value, it is substantially outweighed and should be excluded

5    under Rule 403, Your Honor.

6         MR. CALDWELL:   I don't want to elicit the privilege

7    instruction or invoke the privilege, and it is not leaving a

8    false impression to leave the true impression that that

9    engineer can't come in and identify it or that that engineer

10   didn't take 45 minutes to sit down and read it.

11        As to the Allie claim, it is ironic he would

12   mention that.  There was a specific agreement not to bring

13   that in.  Because of the same issue Mr. Cassady has already

14   talked about earlier, we weren't going to talk about Apple's

15   specific patents.  So that same prejudicial reason is the

16   reason that didn't come in.

17        But if Mr. Albritton is trying to make the point

18   that nobody went into this with engineers, that is obviously

19   not true because we still did it with the other engineers,

20   whether it was Patrick Gates, who is the guy that got called

21   adverse and testified at trial, or the other depositions that

22   we talked about.  So it absolutely was something we went into

23   with engineers.

24        It is just that the -- Christophe Allie, the

25   example I picked, what ended up happening is because of the

1    recognition of this issue of prejudice and confusion about

2    applying for your own patents and whatnot, that was actually

3    horse-traded away; and I think that may have happened in

4    front of Judge Davis in a hearing rather than on the side.

5              THE COURT:  All right.

6              MR. CASSADY:  Your Honor, I am not going to argue

7    any more.

8              THE COURT:  Okay.

9              MR. CASSADY:  I think I am going to try and chop

10   this up.

11             It sounds to me like we have agreement that no one

12   is going to say we don't infringe because we have a legal

13   department.  That is one of our issues.  I think they have a

14   hundred times said they are not going to do that.  They are

15   going to say we have a policy of giving it to legal, but they

16   are not going to say we don't infringe because we give it to

17   legal.  The engineers aren't going to say that.

18             Are they going to say that?

19             MR. ALBRITTON:  I, literally, don't even understand

20   what that means.  I mean, certainly nobody is going to say we

21   don't infringe because we gave it to legal.

22             What we will say is, okay, I am not offering --

23   they are not going to offer any opinions as to whether or not

24   there is infringement.  Okay?  They will separately testify

25   that they refer these issues to the legal department.  Okay?

1          And, if pressed, they will say that I understand we

2   are here in Tyler, Texas at trial; that Apple disputes it

3   infringes and their experts have testified there is no

4   infringement and invalidity.  But they will not be offering

5   specific opinions that they do not infringe.

6          THE COURT:  Okay.

7          MR. CASSADY:  That is one.  So then with the policy

8   issue that gets mixed up in this, they are not going to get

9   up and say:  I know we don't infringe because we have a

10  policy, we have a policy of not infringing or we have a

11  policy of respecting intellectual policy.

12         MR. ALBRITTON:  Of course, we are not going to say

13  that.

14         MR. CASSADY:  Okay.

15         THE COURT:  Great.

16         MR. CASSADY:  Then I think the next step is to just

17  make sure that, you know, we can ask their engineers on the

18  stand -- and this is separate from the depositions -- we can

19  ask those witnesses:  You are not here to tell a jury your

20  own personal reasons why you don't infringe the patents?  And

21  they should just say:  No, I am not.  Right?

22         MR. ALBRITTON:  That is fair as long as they can

23  say, you know, there were other people who are doing that.

24         THE COURT:  Yes.

25         MR. CASSADY:  Of course, they can, and that is

```
 1    fine, yes.  Yeah, that is fine.

 2              MR. ALBRITTON:  But the dispute, the elephant that

 3    we are ignoring, is the other question; and that is:  You

 4    don't have any personal opinions.  You didn't read these

 5    patents.  You didn't form any opinions.  That is what they

 6    want to do, and that is what is inadmissible.  That is the

 7    hard question for Your Honor.

 8              MR. CASSADY:  Your Honor, this is the witness that

 9    is going to be on the stand.  He is the person that is

10    representing Apple right now.  And, yes, he can say I'm not

11    the one that did it.  The other people did it.  And that is

12    fine.  But at the end of the day the person of ordinary skill

13    in the art on the witness stand who works at Apple didn't

14    review the patents or didn't take the time to come up with

15    the opinion as to why they don't infringe the patent or --

16    those things are critical to willful blindness.

17              THE COURT:  Right.  I know that.  I can see where

18    that will go to willful blindness.  But I will tell you when

19    you get into that, then I think that their answers are fair

20    game.  Their answers -- I think you are dancing on this line

21    of, yeah, because, you know, the company policy is to hand

22    this over to legal and let them make those -- you know,

23    whatever your response is.  I'm just saying the further you

24    wade into that, the more I think you crack that door of

25    letting them respond with whatever they can respond with.
```

1          MR. CALDWELL:  So long as -- I think so long as

2    they are not going to say per Mr. Albritton's

3    representations, well, here is what my lawyers told me, here

4    is our non-infringement -- I mean, if he is going to say --

5    if he is going to say, you are right, I don't because what I

6    do is I hand that over to the lawyers, which is what I

7    understand Mr. Albritton is saying, I think that is fine.  I

8    think that is a fine exchange right there.

9          THE COURT:  I cannot imagine that this witness is

10   going to say something on the stand that he asserted a claim

11   of privilege to in a deposition.

12         MR. CALDWELL:  I would hope not, but I --

13         THE COURT:  Right.

14         MR. ALBRITTON:  That's correct, Your Honor.  But I

15   think that -- you know, very skilled lawyer on the other

16   side; but it is still, Your Honor, I would like to step back

17   one second and just get to the sort of threshold question and

18   talk about the probative value of those questions and the

19   unduly prejudicial nature of it.

20         I understand we can do this response; but, Your

21   Honor, this notion that you ought to be knowing that all of

22   the witness's information is based on privilege, okay,

23   knowing that there is a policy that requires engineers to

24   send these on to Counsel, it is just not probative to say,

25   well, you didn't form any individual opinions, you didn't

1    read this.  That is not their job, Your Honor.

2             THE COURT:  But plaintiff has to prove willful

3    blindness, and that is part of their -- isn't that probative

4    of willful blindness?

5             MR. ALBRITTON:  I would, respectfully, suggest no

6    because willful blindness, Your Honor, does not have to do

7    with -- decisions are not made that lead to -- these

8    individual engineers are not in the control group.  These are

9    not people that can make, for instance, admissions on behalf

10   of the company.  Okay?  Therefore, their individual actions

11   when they are following company policy is not probative --

12            THE COURT:  But that is it, right, they are

13   following company policy?  And isn't it -- aren't they

14   attacking the company's policy is probative of a willful

15   blindness theme?

16            MR. ALBRITTON:  I understand.  The point, though,

17   is they say the company is willfully blind.  And an

18   individual engineer that says I did not read these patents.

19   I sent these on to the company's lawyers and the company is

20   doing all of this.  We are having a big trial about it.  What

21   those individual engineers do, that is not probative.  And to

22   the extent it is marginally probative, it is substantially

23   outweighed because it is not their job.  It is not their

24   position.  It is not their -- it is not -- you know, some

25   engineer Payam -- I can't pronounce his last name.

1          MR. CASSADY:  Mirrashidi.

2          MR. ALBRITTON:  Yeah.  You know, the question is

3    not whether he was willfully blind; and whether or not he

4    read these patents and formed opinions individually, does not

5    give evidence toward this ultimate question.  It is the

6    company's knowledge.  It is not --

7          THE COURT:  Who could speak on the company about

8    that -- from the company about that if not this guy?

9          MR. ALBRITTON:  Well, I mean -- well -- I mean,

10   they have got experts that are going to try to offer opinions

11   as to this.  It is subject to argument.  You know, it is a

12   good question.  I don't know who specifically could speak to

13   that.

14         THE COURT:  What concerns me is that it is the

15   lawyers who would assert privilege.  I mean, I'm trying to

16   get to how else they should be proving this if not through

17   these guys.

18         MR. ALBRITTON:  It's -- you know -- certainly, it

19   is a great question, Your Honor.  And I don't have a great

20   answer other than I can tell you that an individual engineer

21   who has got no position where he can make or she can make

22   admissions on behalf of the company that they are in the

23   control group and these people are just merely following

24   instructions of the law department, okay, that is not

25   substantially -- I mean, I think that to the extent it is

1    probative, it is outweighed.  And I think they can make their

2    case otherwise without asking these individual engineers:

3    Did you read these patents and form any opinions about them?

4         THE COURT:  Response?

5         MR. CASSADY:  Your Honor, they can tell the jury

6    they brought experts and they brought other witnesses to talk

7    about those issues.  And this witness can say Apple has hired

8    these other people, that is fine.  But at the end of the day,

9    that guy that works at Apple isn't doing that.  And the

10   person who is on the stand isn't saying I submitting this to

11   legal.

12        He didn't submit it to legal.  He is the guy who is

13   here testifying on behalf of Apple, and he has no opinion

14   about it, so for willful blindness Dr. Jones isn't allowed to

15   say I believe they have willful blindness, the intent of it.

16   I think that was Your Honor's ruling.  He is going to put the

17   evidence out there.  We should be able to put the evidence

18   out there and let the jury decide willful blindness.

19        And I think we are -- we are on that line, I agree,

20   Your Honor.  We are happy to come to that line and stop.  We

21   just want that line to be defined, so we are not going to get

22   in big fights in front of Judge Gilstrap.

23        THE COURT:  Okay.  I am going to let them go there

24   and ask those questions, and I'm going to let the business

25   practices policy in.  And there was some talk about six other

```
 1    policies, and they all relate to copying -- is that true that
 2    they all relate to copying and, therefore, they rise or fall
 3    with whether plaintiff is going to continue with its copying
 4    case.
 5            MR. POST:  I think, yes, that is correct.  So I
 6    think there may be some that even can drop out without
 7    copying, that route.  But, certainly, as to Mr. Faruggia, who
 8    was the one who was personally named, the documents that
 9    relate to him and his hiring would rise or fall with that.
10            MR. CASSADY:  There are nine of them, I believe,
11    Your Honor.  And we will short-circuit this.  If we go
12    forward with the copying, we are not going to fight about
13    these documents.
14            THE COURT:  They're in.  Okay.
15            MR. CASSADY:  If we don't go forward with copying,
16    clearly they shouldn't come in.
17            THE COURT:  Is that agreeable?
18            MR. POST:  That's fine.
19            THE COURT:  Good.
20            MR. CASSADY:  Thank you, Your Honor.
21            THE COURT:  All right.  We are going to let
22    defendants go now.  And we are going to see if we can take
23    care of one of your objections -- or buckets.
24            MR. SCHENKER:  Thank you, Your Honor.  Josef
25    Schenker for Apple.  I guess one thing I want to start with
```

1    is getting the Court's guidance, and it's, I guess, sort of

2    awkward to start with their motion; but I think there is an

3    outstanding motion with respect to the number of exhibits on

4    Smartflash's list.

5            THE COURT:  Yeah.  I have given that a lot of

6    thought.  And refresh my recollection.  As I was thinking

7    about this over the weekend, you-all had initially jointly

8    filed a motion to get up to 400 exhibits; is that right?

9            MR. SCHENKER:  That's correct.

10           THE COURT:  Okay.  And now plaintiffs are asking to

11   get up to 750-ish; is that right?

12           MR. CASSADY:  Yes, Your Honor, 750.

13           THE COURT:  So the real issue that I am struggling

14   with is that Apple has abided by that 400 limit, and they

15   have worked very hard to get their number down below that.

16   So I am concerned that if I give you all the way up to 750

17   they are going to say we have got 300 other exhibits we would

18   sure like in here, but we abided by the Court's order.

19           So help me work that out.

20           MR. CASSADY:  I think the understanding of how that

21   came about is probably a better way to do it.  Actually -- I

22   guess jointly -- we may not have moved jointly.  We may have

23   submitted unopposed to the motion to go to 400.

24           But the point is we weren't there -- under our

25   understanding of the way that our exhibits were, we were not

there.  They needed 400, and they came to us and said we want
to go to 400.

And I said Your Honor -- I didn't say Your Honor.
I said:  Apple, that is fine.  Just understand that, look, we
may have later debates if you guys -- if we have issues about
our list.  But if you guys want to go to 400, fine, we can go
to 400.

It wasn't, let's all agree to go to 400.  It was
them trying to go up to that number.

And then -- I mean, I hate -- I don't want to get
back into all of it; but I would just say, Your Honor, we
have been through tens of thousands of dollars of redoing
exhibits over and over again over the last bunch of months,
all at iterative objections of the way that exhibits are
done.

We don't like it to be in by iPhone.  We want it to
be by a specific functionality.  We don't like it being by
iPod Touch, by something else.  They kept reorganizing it,
which is fine.  We just kept working through it because we
wanted to limit the issues in front of the Court.

And, Your Honor, right now we have 750 exhibits --
or we don't have 750.  We have 720, I think.  But there is
only 100 or so that are objected to.  And those make up like
ten buckets or nine buckets of objections.

And that really was the Court -- that was my

1   understanding of the Court's sensitivity in the last hearing,

2   and we reduced it down significantly, and we are down to

3   these objections.

4         My understanding is they don't have any additional

5   exhibits.  I could be wrong about that.  But my understanding

6   is they said they have got this number, they might be willing

7   to go up to 500, but they couldn't go beyond that.

8         I guess what I would say here, Your Honor, is we

9   have been through a lot of expense on this.  If they have

10   more exhibits I imagine they would have taken the chance to

11   add 50 more and say we will go to 550 or whatnot.

12         I mean, we are kind of at the point where we have

13   spent a lot of money with this iterative process; and if this

14   was going to be an issue, then it should have been an issue

15   originally, which is we are just going to object period.

16   That has never been their position.  Their position has been,

17   let's continue to work through it.  And now we are here on

18   this.

19         THE COURT:  All right.

20         MR. ALBRITTON:  Thank you, Your Honor.

21         Well, this is -- this is actually fairly near and

22   dear to my heart, and I think it is sort of ironic.  You

23   know, and I hate to pull, you know, this, how it always goes.

24   But I have certainly never seen anybody stick, you know, 300

25   disparate documents into a single exhibit and call it one

1    exhibit.  I mean, that seems to be, at least, respectfully,

2    very contrary to the Rules.

3         We are now sort of being punished for trying to

4    work it out because I will -- without waiving privilege --

5    there were folks who thought, well, we are just going to

6    object that they are over the limit.  And I worked very hard

7    to try to avoid this dispute.  And that is why we engaged

8    them early on and said, look, these compilations are clearly

9    not appropriate.  Okay?  You need to break them up.  Let's

10   work on this.  It would have been quite easy for us to go,

11   you know, we just object.

12        But how would that have been for Your Honor, right?

13   That wouldn't have been easy for the Court.  We are trying to

14   make things better for the Court.

15        So we in very good faith worked hard to address

16   these.  This thing about expense, I mean, look, there is

17   expense on both sides.  They invited us to this party.  We

18   didn't invite them to this party.  Okay?  I can assure you

19   that we are paying as much money as those folks are paying.

20        And talk about the burden of having to go through

21   an exhibit that is 3,000 pages long and try to deal with the

22   objections.  That is the reason from the very beginning when

23   they first served this list before objections were due, we

24   said:  Whoa, whoa, wait a minute, guys.  This isn't right.

25   They said:  Oh, oh, yeah, this is right.  We always do it

1    this way.  Okay?

2            We said, well, we think this is really not in the

3    spirit of the Rules.  Let's try to work through it.  So it

4    has been an iterative process in an attempt to work it out.

5            We did absolutely work to comply with the 400

6    rules.  I was actively involved in that.  I told our people

7    that -- you know, I was even skeptical the Court would want

8    400 exhibits.

9            So we worked very hard.  We made hard decisions to

10   get it down to 400, and they should abide by it.

11           And this last point -- and I think the Court will

12   sort of see this today, we have worked extremely hard to

13   withdraw objections, okay, because I didn't want this to

14   last -- for selfish reasons -- eight hours today.  I didn't

15   want it to last eight hours for Your Honor.  So we have been

16   withdrawing objections.

17           Now they are saying:  Well, since you, Apple and

18   Albritton, have been reasonable and started withdrawing

19   objections, therefore, it is no big deal.  We ought to be

20   able to have 750.

21           So I would, respectfully, suggest, Your Honor, that

22   they should not be permitted.

23           I told Mr. Cassady on the phone -- we met and

24   conferred about this recently -- if there is some -- I am not

25   myopically focused on there have to be 400 and 400 only.  I

1   told Mr. Pearson and I told Mr. Cassady, look, if there are a

2   few extras that you need, okay, up to -- I think I said 450,

3   as they said, I will work with you.  And all they kept coming

4   back with was 750.

5           And one final point on this.  Of the 725 or

6   whatever, there are still compilations, okay, still things

7   that are not proper under the Rules.  What we have done is we

8   have said, look, we can live with these compilations.  They

9   are sufficiently similar that it is not unduly burdensome for

10  us to deal with them in this manner.

11          So I would, respectfully, suggest that the Court

12  not allow them 750, we go back to 400, and they just have to

13  cull their list.

14          You know and I know they are not using 700 exhibits

15  at trial, okay, and we ought not all have to suffer through

16  this and have all this uncertainly about, you know, what we

17  are going to see the night before as an exhibit that is going

18  to be used.  That is one of the reasons we have got this Rule

19  there is going to be a procedure for identifying exhibits.

20          You know, they have only got a universe of 400 they

21  have to worry about.  We now have a universe of, you know,

22  almost double that that we have to worry about.  And that is

23  not fair, Your Honor, and that should -- the motion should be

24  denied.

25          MR. CASSADY:  Your Honor, the size of the companies

1     is so disparate, it is not even funny.  So the idea that our

2     numbers being even close to one another considering the

3     gargantuan size of documents we are dealing with versus the

4     much more limited size of documents they are dealing with, it

5     is just not a fair comparison.

6          We have got lots of iteration of products.  They

7     refused to agree to representative products even though they

8     work the same across everything.

9          Even though their rogs don't identify a single

10    difference on these products but they still won't agree to a

11    representative product, so we have to put all 105 user guides

12    that show each of these devices have a screen, each of these

13    devices have software, each of these devices have various

14    things.

15         And so the issue is -- and they set up a

16    meet-and-confer, we are putting you to it.  We are putting

17    you to it to prove it.  Well just give me the extra hundred

18    so that we can go through it and put them into the record and

19    have a JMOL evidence about that issue.

20         Same thing with the surveys, there is a lot of

21    surveys on the exhibit list because one of their objections

22    to our surveys is that through time -- you can't use this

23    survey to prove through time that the feature was driven

24    alone by our -- this feature or the product was driven.

25         Well, we have got their own surveys that show that

1    the thing stays pretty constant or actually moves up as far

2    as drive.   So, therefore, our survey now is relatively

3    similar to surveys in the past that you guys have run.

4         So that is why you need all of the surveys because,

5    again, they won't agree to representative products so you

6    have to put the iterations of those products going through

7    time on the surveys.   And that takes a lot of documents.

8         And that can very easily be talked about in front

9    of a jury, a large number of documents very easily talked

10   about in front of a jury using examples.   But the point is,

11   without that JMOL evidence, we are in trouble.   And that is

12   exactly what they are trying to cause is like a choke point

13   on the exhibits coming in so that they have a JMOL position

14   to say we never agreed to representative products, you tried

15   using a representative product and didn't get the rest of the

16   evidence in the record, therefore, JMOL.   That is what we are

17   dealing with.

18         MR. ALBRITTON:   Your Honor, at the time we agreed

19   to this 400 limit, they knew there were no representative

20   products.   Again, this is their party.   They invited us to

21   it.   They knew all of this at the time.   They just thought

22   wrongly that they could lump a bunch of things together,

23   okay -- and his comment about JMOL is exactly right.   I mean,

24   let's call a spade, a spade.

25         The reason they want to lump all these things

1    together is because they want to stick them in and think they

2    are all going to be there for record purposes.  But as Your

3    Honor advised us last time, just like Judge Davis's rule and

4    Judge Gilstrap's rule is the same, they have got to talk

5    about them, okay, so they knew all of this at the time.

6              So, you know, Your Honor, it is just -- it is just

7    not fair.  It continues -- not only has it been a burden to

8    this point, but it continues to be a burden.  And they ought

9    to whittle it down to what they need.

10             MR. SCHENKER:  If I can respond, Your Honor, to the

11   point about representative products as well.  At least three

12   of the exhibits on their list are the user guides that

13   Mr. Cassady said we need to show product by product.  Those

14   are the compilations, actually, that we have agreed to.  So

15   these hundreds of user guides that they think they need,

16   those are three exhibits on their list.  You know, I don't

17   understand what the other 750 exhibits need to be from that

18   perspective.

19             MR. PEARSON:  Your Honor, Mr. Albritton is talking

20   about fairness, and I think that is a really good point to

21   look at.  What -- we are really being subject to a gotcha

22   here.  They want to talk about all of our surveys being one

23   compilation.  There is 300 documents all in one exhibit, can

24   you believe it?  That just shocks the conscience.

25             Well, Mr. Post sent us an email and he said:  We

1    think those surveys should be broken up by product.  Here is

2    the eight ways to break it up.  So what we considered a

3    single exhibit, they considered eight.

4              And then at that point, you know, we agreed to 400.

5    And then we had the hearing on the 6th, and then the Court

6    gave the guidance about the compilations, which is perfectly

7    fine, and then so we are going to have to break it up more,

8    which is fine.  We are happy to do that.  And now there is

9    like, oh, 400, gotcha.

10             That -- just -- we really have been doing the best

11   we can to remove exhibits to reorganize our list however they

12   want at every step whenever they have sent us their next set

13   of now we think it should be organized this way.  We are

14   really doing the best we can.

15             And if it was going to be just a hard 400

16   individual documents, if that was the agreement that we

17   didn't know we were making, we wish we could have had this

18   fight earlier when we actually had time to deal with these

19   issues as opposed to wasting time on the eve of trial with a

20   gotcha situation.

21             MR. SCHENKER:  If I may, Mr. Pearson has his

22   timeline a little confused.  The motion for -- the joint

23   motion for 400 exhibits was filed I think the day of or the

24   day after each party exchanged and filed their exhibit lists,

25   which means we had no idea that they had compilations on

1    their list when that motion for 400 came through.

2           And, I mean, during the meet-and-confer beforehand

3    when we were talking about how much is reasonable to go up;

4    and, frankly, Your Honor's standing rule starts with 250.  We

5    talked to them.  Should we go to 300, 350?  And we were told,

6    we don't think there will be anywhere near that amount.

7           Well, that is because when you group together all

8    these documents, sure, you don't need anywhere near that

9    amount.  If you are going to put -- more than 1200 documents,

10   I think in their motion is what they have acknowledged at

11   this point in that first list, you need to bucket that down

12   to 180 exhibits.

13          You know, it is not ambushing them.  From day one

14   we said we think that, you know, you shouldn't have

15   compilations.  And their response was, well, some

16   compilations surely can be fine.

17          We went through and we identified what are the

18   issues with some of these compilations.  We weren't saying

19   you have to break down your compilation into this group of

20   this product and that product and then it is perfect.  The

21   issue is you had a compilation that dealt with eight

22   different authors on four different products on, you know --

23   I think it was an eight-year timeline.

24          And we said:  How can that possibly be a single

25   exhibit?  That doesn't mean that if they break it down into

1    four sub-exhibits it suddenly becomes reasonable.  It is an

2    example of why that is so unreasonable to begin with.

3              MR. PEARSON:  That is fine, Your Honor.  You are

4    hearing that they have definitely reserved their right to

5    change their minds and object to new things.  I mean, they

6    give us guidance on what they want, and we try to follow it.

7    And it is like, oh, well, just because we said that is how we

8    would like to organize it, that didn't mean that was our

9    final position.  We are doing the best we can.  That is all I

10   am saying.

11             MR. ALBRITTON:  We didn't change our minds, Your

12   Honor.  I mean, the point is we expected that people would

13   comply with the Rule.  Anybody knows that documents from

14   eight different people over an eight-year span that are from

15   four different products, anybody ought to know that that is

16   not a proper exhibit, Your Honor.

17             So this is not -- it is a -- if anybody is at

18   fault, it is me.  The buck stops here on this one because

19   they keep saying to us, well, tell us what you think is

20   proper.  So we have gone through and we have said, look, we

21   think this one is fine, this one is fine.

22             But, candidly, they should have just issued a list

23   with 400 individual exhibits in the beginning.  So this

24   suggestion that this is somehow a problem of our making, I

25   think is not well-founded.

1          THE COURT:  I just want to know how you intend to

2   use 750 exhibits at trial?

3          MR. CASSADY:  Your Honor, I think it is a very

4   simple thing.  It is a situation where you point to a

5   specific example of a document.  You say throughout time this

6   exact piece of information shows up over and over and over

7   again on the following exhibits.  That is very easy.

8          In the VirnetX/Apple case I think we put 500

9   admitted exhibits that went to the Federal Circuit from one

10  side.  It was significant.  And in that same VirnetX/Apple

11  case we had compilations.  Mr. Albritton is acting like this

12  never happens.  We had compilations in that case.  It

13  happened in that case.

14         So that is why I am confused by this.  It is a

15  scenario where I agree that they tried to identify problems.

16  The problem is we asked them to identify all of the problems

17  so we could deal with them or we would come to you on them.

18  Instead of doing that, they identified some of the problems.

19         And we fixed it.  Then they identified more

20  problems.  And we fixed it.  They identified more problems.

21         I don't think there is anything -- there is no

22  complaint here other than the general size of the list.  That

23  is the only complaint, Your Honor.

24         THE COURT:  I also heard -- I hear, though, that,

25  yes, we also made difficult decisions about our own exhibits;

1  and there are some more that we would have put on our list

2  had we not tried to comply with the Rule.

3        So how do I cure that prejudice?

4        MR. PEARSON:  Well, I don't think we object to them

5  having an opportunity to add more exhibits to their list if

6  that is what they would like to do.  I think we will

7  obviously be reasonable in our objections and try to limit

8  them as much as possible.

9        And I also would like to point out that this

10 argument about, well, how could you possibly use all of these

11 exhibits, kind of gets to the point that there is really no

12 prejudice.  If there are exhibits on our list that we don't

13 get around to using and don't come into the record for

14 everyone's understanding, what is the harm?  We have 10

15 buckets --

16        THE COURT:  The harm is --

17        MR. PEARSON:  Well, we have 10 buckets --

18        THE COURT:  Huh-uh, stop.  The harm is that every

19 night before trial that have got a list of 750 that they are

20 waiting on you to disclose which ones you are going to use

21 for the next day, right, or however you-all have agreed to

22 let them know about their exhibits.

23        I am saying their universe is bigger than yours.

24 That is the harm.

25        MR. CASSADY:  Your Honor, we only have a couple of

```
 1    witnesses.  They have 20.  The universe is bigger.  That is
 2    just how it works.
 3              THE COURT:  All right.  Well, first, let me say
 4    that I commend both sides for trying to work on your
 5    exhibits.  I appreciate that.  And I am going to -- we are
 6    going to take a break in a minute, and I am going to ask you
 7    to continue to do that while I handle these criminal matters.
 8    No, no, no.  It is only 10:15.  It feels like it has been
 9    longer.
10              MR. ALBRITTON:  It just feels like it's 5:15, Your
11    Honor.
12              THE COURT:  It feels like it has been longer.  We
13    are going to stick right to this.
14              Okay.  I am going to move forward with dealing with
15    the merits of the objections to your current exhibit list.
16              I am also going to give Apple time and opportunity
17    to add exhibits if they need to, which is greatly
18    discouraging to me because what I want to do is deal with all
19    of the exhibit issues now.
20              So over the lunch period I would like for you to
21    have a meaningful meet-and-confer about what the new exhibit
22    might look like and what disputes might be on that list.  But
23    we are going to move forward with the groups, as y'all have
24    discussed.  And there is, from what I understand, ten buckets
25    of 100 disputes on the plaintiffs' exhibit list, and I am
```

1    going to deal with those.

2            And so, Mr. Schenker, tell me about your actual

3    exhibit now that we have talked about the motion for leave to

4    have more exhibits.

5            MR. SCHENKER:   Thank you.   One bucket that I think

6    we want to talk about is Exhibits No. 136.007, .008 and .009

7    on their list.   And those are documents that relate to an

8    asset acquisition agreement between Smartflash Techs Limited

9    and Smartflash LLC.

10           These documents basically put out the purchase

11   price that the LLC -- one of the plaintiffs bought the

12   product from the second plaintiff for 2.25 billion dollars,

13   and we think these should be excluded.   They are highly

14   prejudicial.

15           You know, we have deposition testimony from the

16   witnesses -- oh, we have got deposition testimony from the

17   witnesses that no money exchanged hands between the parties;

18   that their interests were aligned during this; that, in fact,

19   one witness said there was no negotiation.

20           And we think that these are highly prejudicial

21   numbers that -- you know, to put in front of a jury it is

22   just inappropriate.

23           THE COURT:   Remind me about, wasn't there argument

24   on the flip side of this about some evidence that Mr. Racz

25   offered to recoup his return on investment at a very minimal

```
 1    amount of money?  I am just seeing the other side -- I mean,
 2    I'm trying to remember what happened with that.  Does that
 3    make sense?  It was weeks ago.  Did I carry that motion?  Did
 4    I let that in?
 5              MR. CALDWELL:  My recollection is that that was
 6    carried.
 7              Is that correct, Kevin, or no?
 8              I don't know what I am interpreting --
 9              THE COURT:  Because here is what I am saying.  You
10    know, here you want this 2.2 billion number out, but you want
11    in the 200,000 number.
12              MR. CALDWELL:  I think it came up in the context of
13    a motion in limine that was related to unaccepted offers.
14    And some of these were even like third parties being like,
15    hey, man, will you take X?  That kind of thing.  And I want
16    to say that motion in limine was carried.
17              MR. BATCHELDER:  It was denied.
18              MR. POST:  That was denied.
19              THE COURT:  It was denied.  Okay.
20              MR. CALDWELL:  That motion was denied, so then
21    there you go.
22              THE COURT:  So it is coming in, this information is
23    coming in.
24              MR. POST:  Right.  And I think one other useful
25    point is that their expert didn't rely on the
```

1    2.25-billion-dollar transaction.  At any point if there

2    wasn't it was an admitted not arm's length deal.  And there

3    was not an actual transaction.  I believe it was sort of a

4    promissory note that there would be -- that this was an

5    acknowledged amount.

6            As between two companies that are affiliated, you

7    can come up with any number, pluck it out of thin air and say

8    these patents are worth whatever you want and come up with a

9    new number.

10           And the fact that no one has relied upon it as a

11   valid value to the patents, I think is indicative of the fact

12   that it has little to no probative value.  But as such a

13   massive number, is it highly prejudicial as both an exhibit

14   document and also this goes to another -- we have objections

15   to some of the deposition testimony that has been designated

16   that relates to this agreement, so...

17           THE COURT:  Okay.

18           MR. CALDWELL:  I would just say in response to

19   Mr. Post's argument, everything he just said applied to

20   unaccepted offers from third parties as well.

21           If you have somebody who just comes and says here

22   is a number, that is no different.  Their damages guy isn't

23   relying on that as part of his calculation for the number he

24   proposes, so I mean it is like goose/gander sort of --

25           THE COURT:  I think that is my concern, Mr. Post,

1  is if I am letting in this really low number, why shouldn't I

2  let in this really high number?  Maybe none of it should come

3  in.

4          MR. POST:  Well, I think there is a big difference

5  between those two.  In one case with a high number, those are

6  two affiliated companies.  Those are -- the agreement may

7  have been signed by the same person on behalf of both

8  entities, you know, as opposed to somebody making -- and they

9  are free to say:  Mr. Racz, you didn't accept that offer, did

10  you?  No.

11          So they have the ability to characterize that in a

12  different way than this, which I think it is completely

13  unfair to even call it a transaction.  It has no tie.  There

14  is no value that anyone can, has, or will say relates to

15  these patents.  And that is why I think there is a big

16  difference between that and the unaccepted offers.

17          Those are -- those were two -- that would be me and

18  Mr. Caldwell negotiating or something.  We are not aligned;

19  we don't have the same interests.  But if me and Schenker

20  are -- let's talk about I will you -- you give me your

21  notebook, I will give you $5,000.  That is not indicative of

22  the fact that has any value at all.  I do think there is a

23  pretty significant difference between those two buckets.

24          THE COURT:  All right.  Tell me how you are going

25  to use this and why it is relevant.

1          MR. SUMMERS:   Thank you, Your Honor.

2          John Summers for Smartflash.   There are actually

3   two or three issues with this document on our exhibit list

4   that relate to other documents that they are seeking to

5   preadmit today.

6          And there are a lot of documents and a lot of

7   deposition designations that are about our corporate

8   structure, how they want to put before the jury that we are a

9   fake company; that all of these financial documents are for,

10  you know, tax ramifications, for weird -- there are weird

11  numbers.   There is a one-dollar figure next to the '720

12  patent on an exhibit.   And they want to put all of that into

13  evidence.

14         But then this exhibit, which is sort of -- of the

15  same ilk, sort of arising from the same sorts of tax-related

16  transactions, they say, oh, that is too prejudicial.

17         So, Your Honor, we would think that, putting the

18  offers to purchase sort of as an aside, none of this is

19  really relevant.   None of that corporate structure stuff is

20  really relevant.   None of our tax records and our finance

21  records and all of that stuff which comes into this amended

22  asset acquisition agreement and this 2.25 billion number, we

23  just think all of that should be out, it is all irrelevant,

24  it is all outside the merits.

25         So if they would agree to drop all of those

1   designations and drop all of those exhibits, we would be fine

2   with not preadmitting this amended asset acquisition

3   agreement.

4          But if they are going to come forward and they are

5   going to put forward all these financial documents and they

6   are going to put forward all of their designations about how

7   nobody works in Tyler.  We don't have any employees, we don't

8   do anything like that, I think if that is going to come in,

9   this should come in.

10          But, respectfully, Your Honor, I think none of it

11  should come in.  None of that has to do with infringement, it

12  doesn't have to do with validity.  It doesn't have to do with

13  damages.  It is sort of an irrelevant point.

14          So that is what I would say as the main thing about

15  the amended acquisition agreement.

16          But if that stuff is going to come in, I think that

17  Your Honor's point earlier about the unaccepted offer is

18  in -- the low offers and the high offers should all be in

19  there together.

20          THE COURT:  Okay.  Response?  And let me hear a

21  response about this corporate structure line of questioning,

22  evidence, whatever.  I mean, are you-all going to get into

23  that?

24          MR. POST:  So I was just going to say I don't think

25  that the -- to the extent there are disputes about corporate

1    structure, chain of title, ownership of the patents, there

2    are documents that relate to that actual chain that you have

3    seen now that don't require that this particular document

4    with this number to be used.  There is an assignment

5    document --

6          THE COURT:  I'm not talking about -- I'm not

7    talking about chain of title issues.  I am talking about this

8    notion of, you know, here is Smartflash, and they are a

9    fictitious company and here is all these -- that line of

10   questioning, which I thought we had a MIL about.

11         MR. POST:  Right.  We do.  And I think we have no

12   intention of eliciting testimony or suggesting that

13   Smartflash is a shell company or a patent troll.  We dealt

14   with those in the MILs.

15         I think that there are -- let me pull up the

16   language that we had.  So it was agreed MIL 6:  There will be

17   no argument, evidence, testimony, or reference to Smartflash

18   having engaged in forum shopping or litigation abuse or that

19   the Eastern District of Texas is the wrong venue for this

20   litigation.

21         This motion is not -- I'm sorry.  There is the

22   shell one -- this is also I think related, though, because it

23   has the following sentence:  This motion does not exclude

24   reference to underlying facts related to when Smartflash

25   opened its Tyler office, how much work is done in the

1    Smartflash Tyler office; and when Smartflash sued in Tyler

2    and/or decided to sue.

3            I think there are some facts, some basic underlying

4    facts that we do think are relevant and kind of akin to --

5            THE COURT:  Like what?  I mean, just get -- let me

6    just hear the meat of what --

7            MR. POST:  So I think we would like to have

8    testimony that says that Smartflash opened its Tyler office

9    after it decided to sue; that it opened its Tyler office in

10   April of 2013; it filed suit in May of 2013.

11           I think the fact that there is no employee in the

12   Tyler office might qualify as one of those facts.  Not

13   calling Smarflash a shell company; but as to its relationship

14   to Tyler, I think those facts are relevant.

15           MR. ALBRITTON:  I'm sorry, Your Honor.

16           THE COURT:  No, you're fine.

17           MR. ALBRITTON:  Just setting aside when the office

18   was opened, there are some other important things.  There is

19   this gentleman named Unterhalter -- maybe I mispronounced

20   that again.  But he does not have -- the company is managed

21   by sort of an asset management firm.  It is owned by a series

22   of trusts that are in one way or another related to Patrick

23   Racz and/or family members.  He is the hypothetical

24   negotiator in this.  I think both parties agree on that.

25           This Unterhalter fellow has no -- you know, he was

1    not involved -- he owns a lion safari park in Florida.   Okay?

2    He has got no background in patent acquisition, licensing, et

3    cetera, so -- just that those sorts of facts relate to the

4    hypothetical negotiation and the like.

5              And just the motion in limine he read shows you

6    that it was certainly agreed by the parties and contemplated

7    that some of this stuff could get in.

8              We are cognizant of the Court's out-loud wondering

9    last time about if we get into opening, you know, when an

10   office was opened, et cetera.  We understand that could open

11   the door.

12             But the underlying facts about the corporate

13   structure are relevant to damages, Your Honor; and that the

14   president has got no history involved in patent licensing.

15   He is not an inventor.  He doesn't even own a stake in the

16   company, and he happens to be the guy that they put up as the

17   corporate rep on behalf of the company.

18             So the fact that their corporate representative,

19   the person who spoke on behalf of the company, has got, you

20   know, no involvement with the development of this technology,

21   has got no experience whatsoever with respect to patents, the

22   fact that, you know, he owns a lion park and that is what he

23   does for a living, those sorts of -- and that these are owned

24   by these various trusts.

25             We are not going to get up and say -- you know, I

1    was around in Marshall when it happened.  Nobody is going

2    to -- in the O2Micro days.

3         Nobody is going to get up and say this is a tax

4    dodge or that they are trying to hide money.  We are not

5    going to do that.  But just the underlying facts relate to

6    understanding who the parties are, relates to the

7    hypothetical negotiation and the like.

8         MR. SCHENKER:  If I may continue, please, on that.

9         With respect to the corporate structure also, there

10   has been deposition testimony on this by some witnesses,

11   including the corporate directors, that Smartflash has plans

12   to commercialize these inventions and Smartflash wants to

13   expand in the U.S. market.

14        And I think the fact that there are no employees

15   here in the U.S. market and what the corporate structure is

16   and what they actually have in place versus prospective

17   testimony -- again, we have got business plans about

18   commercializing these inventions ourselves, I think, you

19   know, that becomes highly relevant to cross-examine and to

20   deal with and responding to them saying, yeah, we have plans

21   to business size this.  It is not just about licenses.  It is

22   not just about patents, it is about building a business.

23   Well, where are the employees?  What is the business?

24        MR. CALDWELL:  We might need to back up just a tiny

25   little bit there.  Mr. Albritton read to you an agreed motion

in limine from before the last hearing.  In the hearing --

see, what happened was we tried to find disputes where there

was agreement to take those off the table and we argued

things where there were disputes.

What Mr. Albritton did not read to you was our

Motion in Limine E -- I'm sorry.  Mr. Post did not read to

you was our Motion in Limine E which was argued and which was

granted at the hearing.

And so that is -- it is important because he is

talking about there is the carveout as to the agreement, and

then we argued about parts that were in dispute.  That motion

in limine that was granted was any argument, evidence,

testimony, or reference that Smartflash or any of its

investors is a shell company, shell corporation, or trust or

any insinuation that any trust or any other aspect of

Smartflash's corporate structure are suspicious or improper

or any argument, evidence, testimony, or references to

Apple's job creation in the United States.

That was the motion in limine that was argued as to

all this portion about anything about shell corporation,

shell company, and trust.  I was arguing about the talk of a

BBI trust, any insinuation that that is improper.

So focusing on the part that was agreed as sort of

the common ground is really missing the boat.  We came and

argued about the rest, and you are right there was a motion

1    in limine on it.

2            I don't know that this is the sort of thing that

3    you care too much about.  Mr. Albritton was very much

4    misstating Mr. Unterhalter.  Mr. Unterhalter is a gentleman

5    in his 80's.  He has been a director on the board of

6    directors of lots of big companies, including a cable company

7    that he negotiated huge deals for, et cetera, et cetera.

8            What he does now at this stage of his life, he does

9    not own a lion park.  One of his friends does.  And what he

10   does is he manages it in his basic retirement in Palm Beach

11   in Florida.  I don't think any of that matters.

12           But trying to come up here and disparage him and,

13   hey, guess what, we want to come embarrass this guy, it

14   doesn't make any sense.  I mean, we are just embellishing

15   facts that try and make it sound egregious.  For some reason

16   we need to get into it.  But I think you have addressed this

17   through the motion in limine.

18           And one of the things that I have as a concern is

19   they get up and they say what they want to talk about and

20   what they don't want to talk about.  Well, last night I was

21   listening in on the document phone call and chiming in on

22   certain issues, and I took up with a couple of the folks from

23   the Ropes team last time that they want to go into you are a

24   company with zero employees and you are just formed for some

25   sort of legal purpose here right before the suit and things

1    like that.

2            Well, part of the reasons we have motions in limine

3    on it is because we are trying to keep it tried on the merits

4    because it is well-known -- I mean, there have been

5    Congressional Reports on Apple is notorious for having these

6    shell companies in Ireland, and they run money through them

7    to save hundreds of millions or billions and billions of

8    dollars in tax money.

9            And I think a large portion of why there are

10   motions in limine on this is because the trial can't be about

11   one side having a company with no employees but not the

12   other, and it really doesn't need to be about either.  It

13   ought to be about the questions that are for the jury because

14   nothing about that, nothing about it goes to infringement,

15   validity, or damages.

16           And as to Mr. Albritton's point, he also gets up

17   and says everybody agrees hypothetical negotiation will be

18   with Patrick Racz, so we need to talk about this other guy

19   who got involved later who runs a lion park.  That is a

20   complete non-sequitur.  They want to complain about certain

21   things they find to be distasteful, but that is the point of

22   a motion in limine, so we are not both doing that throughout

23   the trial.

24           THE COURT:  Okay.  Let's get back to the document,

25   which was, I believe, this interchange of the

1   2.2-billion-dollar amount.  And what I heard, I think, from

2   Mr. Summers is, look, if they are not getting into this shell

3   company, full of trusts, kind of line of questioning about

4   Smartflash, then we are good at excluding this document.

5           And what I am remembering now is I think I even

6   granted a motion in limine to that effect.

7           And so I am going to sustain the objection.  I'm

8   going to exclude that document under the same -- I am going

9   to exclude it for now; but just know that if we get into that

10  covered context of the motion in limine, that notion of the

11  trust -- and I'll put this in the order for Judge Gilstrap to

12  have in front of him -- but if you go there, if we get into

13  this notion of they are just a bunch of trusts and whatever,

14  then I think the document is fair game.

15          So I am keeping it out because I think you ought to

16  just walk away from that issue.  But if you tread in there,

17  then I think that my ruling would be different.

18          MR. POST:  Understood.  We have no intention of

19  going against the MIL.  I truly agree with Mr. Caldwell, we

20  did agree during the hearing not to refer to shell companies

21  or make the suggestions that trusts are in any way improper

22          But I think when you look wholistically at the

23  MILs there are -- in the agreed-to MILs, there are certain

24  basic facts that talk about Apple employment.  Some of those

25  equivalent facts I think would fall into the agreed terms

1    without going anywhere near the shell company issue or any

2    suggestion that that is somehow an improper structure.

3            MR. CALDWELL:  So what I -- I would like a clear

4    answer because I want to know where we are on this door

5    opening; and it is unfair, obviously, for Judge Gilstrap to

6    try to pick it out of a long transcript on the fly.

7            As to the motion in limine, they are not making

8    reference to the trust.  That is in the express motion in

9    limine that was granted.  I don't think they are disputing

10   that.

11           MR. POST:  No.

12           MR. CALDWELL:  Okay.  So my question is what

13   about -- what about saying you are a company with no

14   employees that was formed a couple of weeks before the

15   lawsuit?  Where does that fall on the spectrum and does that

16   open the door?  Because I think that is kind of the elephant

17   that is walking around in the room right now.  I think they

18   are sort of dancing around their position.

19           MR. POST:  That was my point of reading that second

20   sentence of the agreed MIL 6.  I think that is exactly what

21   that says.

22           MR. CALDWELL:  And we argued the disputed one

23   thereafter which was granted, so --

24           MR. POST:  So I think those two actually fit

25   together and don't -- and that having a -- exploring those

1    basic facts without a suggestion that -- that is your

2    choice -- if Smartflash doesn't want to have employees here,

3    that is fine.  I'm not suggesting it is bad or the fact that

4    they -- that our trusts are somehow improper, so I don't

5    think those two things are inconsistent.

6              THE COURT:  So why are you asking them about them?

7    Why are you putting on evidence of that?

8              MR. POST:  Well, I think it -- it is important,

9    relevant to the level of context if they are going to have

10   testimony about Tyler presence or Texas presence.

11             THE COURT:  So what I am hearing is you want to say

12   we are in Tyler and we have a business here in Tyler.  And

13   they want to say, well, you actually don't have any employees

14   here in Tyler, and --

15             MR. CALDWELL:  See, the last thing I want to do is

16   do some sort of pandering on this.  What I would envision --

17   and I am really glad we are actually just talking this out --

18             THE COURT:  Yeah.

19             MR. CALDWELL:  -- maybe we will get it resolved.

20             What I would envision -- the truth is that Mr. Racz

21   studied patent litigation for a while because this is new to

22   him.  He is not even American -- he studied the judicial

23   system.  He actually watched a trial.  Okay.  He watched

24   VirnetX/Apple.  He sat through and watched it.  And it is no

25   secret that is how he and I became more acquainted.

1          I don't intend to even drag that out.  We are not

2    talking about other litigation.  His point is that -- his

3    point is that he tried to research United States patent law,

4    saw that the Judges here had experience, and thought that

5    this would be a fair place to file.

6          And I am happy not touching it at all.  What I

7    can't do is I can't put him up for direct and then have him

8    beat up on cross.  It is like, oh, you didn't even tell the

9    jury you have got this nonsense zero employee company that

10   you set up to sue or anything like that.  I just want it to

11   be fair.

12         What I would envision that I think is fair is just

13   simply saying, you had your company, it had the patents, and

14   what did you do?  We put them in a Tyler company before we

15   brought the lawsuit.  That is it.  I intend not to do

16   anything to pander.

17         If that opens the door, I am happy not saying that.

18   I just don't want -- I just don't want to not say something

19   to the jury and have it look like we are afraid of a fact or

20   hiding any sort of a fact, and then they come back and take

21   it out on cross.

22         MR. POST:  I think if that were the direct

23   testimony, the cross, consistent with the agreed MIL, would

24   be when was that office opened?  How many people are there?

25   And when you decided to sue.  I don't think we need anything

1   more than that.

2          MR. CALDWELL:  How does the "how many people" part

3   matter?  I mean, if that happens then we need to point out

4   that as a matter of legal construct -- which jurors are not

5   familiar with -- Apple themselves sets up zero employee

6   companies.

7          I don't know why we have to get into that.  I am

8   happy to say --

9          THE COURT:  Are you getting into at all the fact --

10  the notion that Smartflash is eventually going to -- or is in

11  the process of --

12         MR. POST:  Commercializing.

13         THE COURT:  I'm at a loss.  Commercializing its

14  inventions.

15         MR. CALDWELL:  No, I actually don't intend to do

16  that.  The only thing is I have seen their depositions of

17  him.  And, of course, everybody likes to play this game, oh,

18  you don't even have a product, to play on some emotion with

19  the jury.

20         Now, I am happy saying:  You guys aren't currently

21  making a product.  I think it is fair to say:  Why are you

22  not?  I believe that there is infringement we have to deal

23  with first.

24         But I don't even care to talk about we intend to go

25  commercialize, and we are going to set up a factory here or

1   something like that.  I have no intention of doing any of

2   that.

3         Again, my issue is simply I don't want my guy to

4   look dishonest because we didn't cover something on direct

5   and then come back and cross them with the implication that

6   trial lawyers make that, oh, you didn't want the jury to know

7   X.  That's why I really want to know exactly where the lines

8   are.

9         I think it would be fair for him to say -- he is

10  not ashamed of this at all to say we formed the company in

11  Tyler, and we can say the date we brought the suit, which is

12  what Mr. Post is saying he wants to say.

13        If we are going to start talking about zero

14  employees, there is no purpose of that other than to suggest

15  to a jury, wait a minute, what is this all about company?

16  You have got a company with zero employees.

17        And then showing that that is part of the normal

18  fabric of corporate structures, becomes relevant.  I don't

19  think either of us need to go there.  But I am happy to just

20  put in the facts about when the company was formed in Tyler

21  relative to when the suit was filed.  And I think we could

22  all just be comfortable with that.

23        MR. POST:  I think to the extent there is a

24  suggestion that there are plans or things in motion to

25  commercialize, I think it would be relevant to say:  And

1   there is nothing that actually has been done in Tyler to do

2   that?  If that doesn't go there and that door is not opened,

3   then we do not need that, and we would fine with just the

4   basic facts; the when and why.

5          THE COURT:  Okay.  I think that this is just one of

6   those -- this may be just one of those scenarios where we are

7   going to have to see what happens on direct.

8          But I think you are right, you know, that if you

9   don't wade into we are working toward commercializing our

10  product or, you know -- or on that side of things, I think as

11  Mr. Post said, they are not going to wade into but you don't

12  really have any employees and you don't really make anything

13  and that sort of thing.

14         Whichever one of you opens that door first, I think

15  the other one is fair game to get into it.

16         MR. CALDWELL:  My fear is actually what is going to

17  happen is Apple is going to go there with some sort of

18  cross-examination kind of thing.  But I actually -- I don't

19  want to hide any facts about this.  I just want to be open

20  with the facts, so I actually want to say here is when you

21  formed the Tyler company, here is when you filed the lawsuit,

22  and what are you doing?  Well, right now we are dealing with

23  this infringement suit.

24         I am not going to say anything about we are ramping

25  up to release a product out of here or anything like that, so

1    I don't think anything there would open the hypothetical door

2    we are talking about.

3              MR. POST:   I think Mr. Albritton was saying, it is

4    relevant that they don't make products.   That is relevant to

5    the Georgia-Pacific analysis.   And I think to the extent that

6    they make the argument that first we have got to take care of

7    all these bad folks and then we can go ahead and move forward

8    with our business, there are no steps that have been taken.

9    I think that would open the door to the fact that there are

10   no -- there is nothing happening in Tyler.   There is nothing

11   happening in the U.S.   You haven't taken those steps.

12             THE COURT:   Response?

13             MR. CALDWELL:   If I open the door, I open the door.

14   I mean, what I am trying to say is that I envision that I

15   don't open the door because I am happy to acknowledge when

16   they came to Tyler, happy to acknowledge when the lawsuit was

17   filed, and then I will say what is happening is that they are

18   dealing with infringement in this lawsuit.

19             And if I want to go say, guess what, we are going

20   to get into product development and go down that path, then,

21   sure, I am opening up the door on what questions of what

22   steps have you taken towards commercialization.   I agree with

23   that.   I just -- I intend to do the former and not the latter

24   unless, I guess, there is something that necessitates a

25   change.   But I understand that the latter comes with the door

```
 1   opening.
 2              THE COURT:  Okay.  All right  I feel like y'all are
 3   close.  We already had a quasi-agreed and a ruled-on MIL, but
 4   it sounds like we have opened the door -- for lack of a
 5   better pun -- to new issues that may be -- but you are close,
 6   and I feel like you can work on an agreement.  We have been
 7   going about an hour and 40 minutes, so we are going to take a
 8   15-minute break.
 9              I want to see if y'all can reach some sort of
10   agreement on what you are and are not going to go into, and
11   we will take it up when we resume.
12              We will be in recess.
13              (Recess was taken at this time.)
14              THE COURT:  Please be seated.
15              So we are going to press on for about 20 minutes,
16   and then we will break for lunch so I can take up the
17   criminal matters.
18              Let's hear a good report.
19              MR. POST:  All right.  So we did talk further about
20   this over the break and weren't able to reach complete
21   agreement, so here is where we are.
22              I think we both agree that the fact of when the
23   Tyler office was open and when Smartflash elected to bring
24   suit, are fine.
25              We think we should also be able to elicit the fact
```

1  that there are no products that are being made and are

2  comfortable leaving it at those three facts.

3      I think Smartflash's position is that last fact

4  would open the door to them eliciting testimony that the

5  reason Smartflash isn't commercializing anything is that it

6  has to deal with this infringement first.

7      And our position is that, well, if that is the

8  response, then we should be able to respond that there are no

9  employees at Smartflash.

10      I think we are going to say -- not tie it to Tyler

11  in any way, just that there is no -- Smartflash has no

12  employees period.

13      And I think Mr. Caldwell's position is if that is

14  the fact, then the next fact is that Apple has entities

15  somewhere that have zero employees.

16      We don't think that that last fact is a door that

17  is opened.  I don't know that any specific entity has even

18  been pointed to.  I know there is repeated mention about

19  Ireland.  The Irish entities have employees.  There is over

20  3,000 of them right now.

21      And Apple as a company has tens of thousands of

22  employees.  That doesn't seem to be related to at all the

23  fact thatSmartflash has none.  And that is, we think, a

24  relevant fact for the jury to consider.  They can then

25  evaluate is the reason Smartflash has no products because of

1    the infringement or because they have no employees.

2    　　　　　THE COURT:  Why is that relevant?

3    　　　　　MR. POST:  We think that is relevant to -- if they

4    are going to say that they have to first deal with this

5    infringement, these bad actors before they can do anything,

6    we just think it is relevant that there have been no steps

7    taken and leave it at that.

8    　　　　　The jury can decide whether that is the reason why

9    there is no products or whether that is the alleged

10   infringement.

11   　　　　　THE COURT:  But that is in response to your option

12   to wade into this notion that they don't make any products,

13   right?

14   　　　　　MR. POST:  Well, I think that the commercial

15   relationship between Smartflash and Apple is relevant to

16   damages.

17   　　　　　MR. ALBRITTON:  It is a specific factor under

18   Georgia-Pacific.

19   　　　　　MR. POST:  So that is why that fact is different

20   than the panoply of other facts that seem to be falling out

21   of doors that are opening.  We would be comfortable with

22   those three.  We think that those --

23   　　　　　THE COURT:  I am going to extend it to the fourth,

24   and then we are not going to ask about zero employees.  That

25   is where the line is.  Okay?

1             All right.

2             MR. ALBRITTON:  One last thing, Your Honor.

3             THE COURT:  Yes.

4             MR. ALBRITTON:  You talked to us about those

5    exhibits.

6             THE COURT:  Yes.  Which ones?

7             MR. ALBRITTON:  Well, you had said -- yeah, a

8    fairly ambiguous question there, right -- or statement, about

9    the extension of exhibits.

10            THE COURT:  Yeah.

11            MR. ALBRITTON:  A couple of things on that.  You

12   asked if we could figure out what we needed.  We can't do

13   that right now.

14            THE COURT:  I understand that, and that makes

15   sense.  I know you are going to need some time.

16            MR. ALBRITTON:  Good.

17            And just so you know, they represented that there

18   were umpteen-jillion exhibits in VirnetX.  Actually, Apple

19   only admitted 120 exhibits -- 121 exhibits in that case.  And

20   the plaintiff only 412.

21            And so, you know, just this -- as I tried over the

22   break to kind of figure out what we need to add, I mean, we

23   are two weeks from trial, Your Honor.  It is going to be very

24   distracting and difficult for us to go through and do all

25   this because, you know, we weren't keeping track of had to

```
 1    leave this one off the list to get to 400, had to leave that
 2    one.
 3            So I would at least ask the Court to give them some
 4    extension but not to 750 for the reasons we talked about
 5    before.  Maybe 500.  But it really -- just the exercise of
 6    trying to go back and relooking at our exhibits in all of
 7    this, is going to be terribly prejudicial, Your Honor.
 8            THE COURT:  I toyed with that, asking you to come
 9    down to something under 750.  And let me just get from you,
10    what could you come down to, Mr. Cassady?
11            MR. CASSADY:  Your Honor, I could guarantee we can
12    get this thing down to 600.  I would say that 400 admitted
13    exhibits pretty much tells you I am not playing games.  This
14    is a set of exhibits we intend to admit, and we intend to put
15    into trial.
16            So if I was at 600, you are talking about, what is
17    that -- I don't have the number in my head right now.  But
18    you are talking about 60 to 70 percent of the listed exhibits
19    being admitted, and that is significant.
20            THE COURT:  All right.  Get it down to 550.
21            MR. CASSADY:  Okay.  Thank you, Your Honor.
22            THE COURT:  All right.  I feel like we can
23    accomplish one more bucket before the break.
24            MR. CASSADY:  Is it our turn?
25            THE COURT:  I think it is your turn.
```

1          MR. CASSADY:  Our turn.  Go ahead.

2          MR. SUMMERS:  I think as far as the exhibits, based

3   on the discrete disagreement as to the number of employees

4   and Your Honor's ruling, there are a bunch of -- a number of

5   exhibits that we can go ahead and agree to not preadmit.

6          There is six exhibits related to the Smartflash LLC

7   formation and incorporation documents and --

8          THE COURT:  Why don't y'all meet and confer about

9   those over the lunch break and confirm that you can agree not

10  to preadmit them unless you have already talked about it.

11  But since I just ruled on that, why don't you deal with that

12  over lunch.

13         MR. SUMMERS:  We can absolutely do that, Your

14  Honor.

15         So the next thing and this might, you know, be

16  opening a big door as one of the -- our objections to a large

17  chunk of these documents are the ownership-related documents.

18  And that is -- you know, it depends on Your Honor's ruling as

19  to whether it is going to be tried to the jury or not and

20  whether Your Honor is going to resolve it now or not.

21         And even beyond that, I think it seems from the

22  supplemental expert report of Dr. Becker that even if Your

23  Honor doesn't let standing go to the jury and even if Your

24  Honor agrees that it is not appropriate for that to be before

25  the jury, there is still a bunch of Internet-Plc-related

1  valuation documents that Dr. Becker threw in in his

2  supplemental expert report claiming to rebut Mr. Mills'

3  report, but we don't agree that it is proper rebuttal.

4         But in any event we think those documents should be

5  excluded, this 40,000-pound Internet Plc valuation.  It is

6  just highly prejudicial.  It is unclear, you know, who came

7  up with that number.  It is five years before any patent was

8  ever granted.  And we just think any probative value,

9  depending on what Your Honor does with the ownership issue,

10  it is going to blow the door wide open as to speculating what

11  this number means and how they should address it.

12         So we think any of those -- any of those types of

13  documents and the documents related to that standing issue

14  should not be admitted.

15         THE COURT:  Okay.  I understand this is kind of a

16  difficult one to argue because some of these documents may

17  just rise or fall with the Court's ruling, and we are working

18  on it.  So -- but, anyway, to the extent maybe we can flesh

19  that out and say, yes, these are the documents that if the

20  Court, you know, decides that we have standing and it is not

21  going to the jury, then they are out and if the Court decides

22  it is a jury issue, then they are in, then I think that would

23  be helpful if there is a group of documents that we decide

24  rise or fall with the Court's ruling.

25         MR. BATCHELDER:  Your Honor, it may not be that

1   simple.  I don't want to make it unduly complicated.  But

2   standing is ultimately a determination if the plaintiffs now

3   own the patent rights.

4         The question here is when Internet Plc was

5   evaluating the intellectual property rights, and it said --

6   you know, it placed price tags on the value of its IP, and it

7   really came in a couple of different contexts.

8         One is that there is Internet Plc's -- I think his

9   title was managing director.  His name was Melvin Simpson.

10  He submitted these documents to the bankruptcy proceeding

11  putting that 40,000-pound price tag on the intellectual

12  property.

13        And then there were also communications from

14  Mr. Racz directly to the liquidators associated with the

15  bankruptcy making relative statements about the patents

16  versus the trademarks and that kind of thing.

17        And we believe that the jury could conclude fairly

18  that at that time Internet Plc owned the patent rights.  That

19  may be a different question from what is true today, or it

20  may not be.  But we do think that that is a fact question

21  that the jury should be able to resolve because it is related

22  to damages.  They are going to have to make the damages call.

23  At the end of the day that is a fact question.  So we think

24  those documents should be preadmitted.

25        And, again, it may or may not rise or fall with the

 1   Court's standing ruling; but I don't think it does because,

 2   again, it is a damages question; and we think the jury should

 3   be entitled to conclude from the documents surrounding what

 4   was going on at the time, that Internet Plc owned the patents

 5   at the time.

 6          THE COURT:  And, therefore, what?  How does that go

 7   to damages?  And, therefore, they valued them, and that

 8   should be taken into account.

 9          MR. BATCHELDER:  Well, and, therefore, when

10   Internet Plc was placing price tags on the value of

11   intellectual property, that price tag would be relevant to

12   the value of the patents.

13          THE COURT:  Response?

14          MR. CALDWELL:  Your Honor, I just want to -- I'm

15   not going to take Mr. Summer's argument away from him.  You

16   were asking like, basically how does this fit in or relate to

17   a category of documents.  I think a couple of sentences out

18   of Apple's standing brief actually help explain it.

19          If I could paraphrase and then I will read you

20   their sentences.  If I can paraphrase Apple's argument --

21   first of all, there is standing, which the Court can clearly

22   resolve and the Court can make factual findings and should.

23          What Apple's argument is, is essentially that if

24   you conclude that you don't even have standing, then they can

25   make an argument about damages using the Internet Plc stuff,

```
 1    and they say as much in their brief.

 2              They say:  As discussed further below, if Internet

 3    Plc did, in fact, own the patents-in-suit, it did not

 4    transfer them to Smartflash, and Smartflash has no standing

 5    to bring suit.

 6              Then after a sentence here, it says:  If, as Apple

 7    maintains, the patents-in-suit were transferred to Internet

 8    Plc, then statements about the valuation of those patents

 9    during Internet Plc's insolvency proceedings are highly

10    relevant to damages.

11              So, effectively, you would have to conclude that

12    you don't have standing in the first place for them to be

13    relevant.  And if they were relevant, that is where you get

14    to the extraordinary 403 situation even if they were relevant

15    because what you have is, again, five years before any patent

16    issued, before the patents here were even pending, that is,

17    predecessors to predecessors, a lay liquidator who wasn't

18    even certain he had title -- it turns out he didn't -- puts a

19    value on it.

20              So -- anyway, basically we think the Court should

21    resolve the threshold issue for standing, and it seems to me

22    that maybe Mr. Batchelder is trying to kind of evolve what

23    their position is now as to, well, it is still going to come

24    in no matter what.

25              But the truth is -- I mean, throw the case out if
```

 1   there is no standing.  But the Internet Plc valuation

 2   documents aren't even relevant even by their own admission

 3   unless you decide that you need to throw it out.

 4            THE COURT:  Obviously, I saw that point raised in

 5   the response and I haven't -- there is not a reply coming in,

 6   so I would love to hear a response to that argument that you

 7   only get to the Internet Plc's valuation if, in fact,

 8   Smartflash didn't have standing because the stuff was

 9   transferred to Internet Plc.

10            MR. BATCHELDER:  I think I understand Your Honor's

11   question.

12            THE COURT:  I'm not doing a very good job.

13            MR. BATCHELDER:  But correct if not.  The reason I

14   said that it may or may not rise or fall is that Smartflash

15   has never quite come out and said that, you know, if Apple is

16   right if at the time Internet Plc owned the patents, then

17   Apple would be right that there is no ownership here and

18   there is no standing and the case should go away.  They have

19   never admitted that.  And that is why I say intellectually

20   there are two different questions.

21            One is whether plaintiffs now have the patent

22   rights and can sue on them.  The question for damages at the

23   time when those valuations were made, did Internet Plc own

24   the patent rights?

25            It is conceivable, I suppose, that the answers

1    could be different.  But our belief is that if Internet Plc

2    owned the rights at the time, the chain is title is broken

3    and they don't have standing now.

4            THE COURT:  All right.  And if they don't have

5    standing, then it doesn't really matter how Internet Plc

6    valued the patents for this case because they don't have

7    standing.

8            MR. BATCHELDER:  I understand.  That is Apple's

9    belief.  They have never admitted that.  And so it just comes

10   down to, I think, ultimately, you know, for this question

11   about damages, the jury could decide conceivably if you find

12   that there is standing, it is still possible under their

13   theory, perhaps, that the jury could still decide that

14   Internet Plc at the time owned the patents, and so that

15   valuation could still be relevant.  That is my only point.

16           THE COURT:  Are you saying that?

17           MR. CALDWELL:  We have never taken the position

18   that if Internet Plc owned the patents at that time, we would

19   have standing.  So I guess the whole matter of things are in

20   theory conceivable.  We are not aware of any fact that would

21   connect those dots.

22           In fact, that is why we made the point in our

23   response that it is essentially a predicate that you need to

24   find you don't have standing before this damages thing gets

25   to -- gets to be relevant.

1          THE COURT:  Okay.  It sounds to me like then these

2   documents will rise or fall with the Court's ruling on

3   standing, and I am hopeful that this afternoon maybe we will

4   have -- I have been through all of the briefing but because

5   of the lateness with which this was teed up, I would like to

6   hear some argument on it and let you-all have a chance to

7   reply to the response, et cetera.

8          So, anyway, so all of that to say I'm not going to

9   rule on those exhibits because I'm going to rule that they

10  will rise or fall with the Court's rule on standing.

11         MR. CALDWELL:  Yes, Your Honor.

12         THE COURT:  It is 11:15.  I don't know that we can

13  really properly wade into another one of these before I need

14  to break for my criminal matters.

15         So what we are going to do is break for lunch until

16  1:00 o'clock.  I think I will be well done with the criminal

17  by then.  And I would just encourage the parties to, please,

18  while you are eating find the time to meet and confer in

19  light of the rulings that we have been through and see if

20  there is not anything else you can reach agreement on in the

21  interim.  And, otherwise, we will pick back up after lunch.

22         We will be adjourned -- recessed.

23         Oh, I'm sorry.  If you-all would kind of clear out.

24  I'm going to have criminal attorneys that need to use counsel

25  tables.  I need you to stack things.  I'm sorry to ask you to

1    do that.  They are going to have to get in here.

2              MR. BATCHELDER:  No problem.

3              (Recess was taken at this time.)

4              THE COURT:  Hello.  Please be seated.

5              All right.  Welcome back.  Okay.  Let's continue.

6              Let me just get an idea of what all we have left.

7    How many groups of objections do we have left?

8              (Pause in proceedings.)

9              THE COURT:  Not everybody at once.

10             MR. ALBRITTON:  About five on our side.

11             THE COURT:  Okay.  Five over here.

12             MR. PEARSON:  We have got about five groups --

13   depending on how you count it, we have around five groups for

14   trial exhibits.

15             THE COURT:  All right.  Well, let's get started.

16             MR. ALBRITTON:  Is it our turn?

17             THE COURT:  It's your turn.

18             MR. CASSADY:  Your Honor, I don't think we finished

19   the ownership issue.

20             THE COURT:  Oh, are we still on that?

21             MR. SUMMERS:  Well, we discussed it a little bit

22   and there is a little bit of disagreement on what is and what

23   is not rising and falling with the Court's ruling on

24   standing.

25             THE COURT:  Okay.

1          MR. SUMMERS:  So there is -- Your Honor, there is

2   one sub-bucket of documents, if you will, that is related to

3   the Internet Plc liquidation.  And these are the exact

4   documents that I was talking about when we were talking about

5   the ownership issue and this 40,000-pound issue and these

6   liquidator documents and series of emails that is cited all

7   up and down the standing briefs.

8          And, apparently, we are at a disagreement as to

9   whether those documents, those liquidation documents and that

10  40,000-pound figure rises or falls with the ownership issue.

11         THE COURT:  Okay.  So why else might they also be

12  relevant?

13         Defendants?

14         MR. SCHENKER:  Your Honor, some of these

15  documents -- I mean, the liquidation and the facts of

16  liquidation also go to Internet Plc, which is the

17  predecessor-in-suit or predecessor entity related to the

18  predecessor entity of the plaintiffs, their efforts to

19  commercialize the inventions and their efforts to -- and

20  their failure at commercialization of these inventions and

21  the relevance for those purposes as well.

22         THE COURT:  All right.

23         MR. BATCHELDER:  If I could add to that, Your

24  Honor.  Excuse me.  Just to be clear, there are also some --

25  some of those documents -- I assume they fall in this bucket,

1    but I am not dead certain, where Mr. Racz himself is talking

2    about the patent rights in suit, so he is explicitly saying

3    as to these patents I think they have this value.  One time

4    he says they have no realizable value.  Another time he says

5    they are less value than the trade name, so that kind of

6    thing.

7            That has nothing to do with standing.  That is his

8    direct commentary on the value of the patents.  That, I

9    think, is clearly relevant to damages as cited in our damages

10   report.  That has to come in, so I just want to be clear

11   about that.

12           THE COURT:  Relied on by your expert.  When were

13   these emails?  Are they around the time of the hypothetical

14   negotiation?

15           MR. BATCHELDER:  They were even before it actually.

16   They are 2003-ish.

17           MR. SUMMERS:  June of 2003, Your Honor.  It is

18   right as this liquidation is going on, right when all of

19   these 40,000-pound emails are going on, right when the emails

20   about patents held by Smartflash Limited.  There is no way

21   that this stuff can come up without just blowing the

22   ownership door right open.

23           And the fact about Dr. Becker relying on them, I

24   believe it is correct that they have already agreed that that

25   extra portion of Becker's report rises and falls with

 1    ownership where these documents are cited.  So I don't

 2    understand what the disagreement is here.

 3         And they can correct me if that understanding is

 4    incorrect, but these documents are six years before the

 5    hypothetical negotiation.  There is no patent.  It is just a

 6    patent application.  We don't know -- it is impossible to

 7    sort of sort out what all these documents mean, and they are

 8    highly prejudicial.

 9         MR. BATCHELDER:  On the last point, the application

10    existed to which all of the patents-in-suit claim priority,

11    so every claimed invention that is now claimed in the claims

12    of the patent-in-suit was disclosed in this priority

13    application.  And the named inventor Mr. Racz was commenting

14    on the value of that application and all of the disclosed

15    inventions.  It is clearly relevant to damages.  There can be

16    no doubt about that fact.

17         MR. CALDWELL:  Your Honor, if we want to talk about

18    the relevance of those, as Mr. Summers says, they were six

19    years before the hypothetical negotiation, five years before

20    a patent issued.

21         And what Mr. Racz was talking about is he is saying

22    things in emails like if these stay in Smartflash Limited

23    when that company is stricken from the record, I have zero

24    doubt that the receiver is going to keep alive the

25    applications and do what he needs to do.

 1          And if somebody else were to buy them, and I don't

 2    know who this person is and they were disassociated, and they

 3    would have no realizable value without -- and it all relates

 4    to standing.  It has literally nothing to do with what kind

 5    of claims might issue and ultimately did issue five years

 6    later, what might infringe.  It has no bearing on the

 7    hypothetical negotiation whatsoever.

 8          MR. BATCHELDER:  My last word on this, Your Honor.

 9    When Mr. Racz says, for example, the trade name Internet Plc

10    is more valuable than the patent rights, he is talking about

11    these patent rights explicitly.  There is no issue about

12    standing or whether these are owned by some entity or not.

13    He is talking about these patent rights.

14          They want to criticize the fact that subsequent

15    patents hadn't yet issued; and that he is only talking here

16    about the priority application that discloses all of these

17    inventions.  That goes to the weight and not admissibility.

18          MR. CALDWELL:  No patents had issued.  He was

19    saying there was a great chance no patents will issue if the

20    thing goes to a receiver and nobody even keeps it alive.

21          Again, I think Your Honor's question hit the nail

22    on the head.  It literally has no bearing on the hypothetical

23    negotiation, in which case he possesses a patent, he has

24    claims, you know what the claims cover, and you are having

25    the hypothetical negotiation on the value at that point.

 1              THE COURT:  All right.  I am going to hold those,

 2    to the extent they would be admissible, they rise or fall

 3    with my ruling on standing.  They are not going to be

 4    admissible on this other issue of damages apart from that.

 5              So -- and I apologize that we haven't been able to

 6    get you a ruling on that earlier.  I know that would flesh

 7    out some of these issues, but we are paddling as fast as we

 8    can, so...

 9              MR. SUMMERS:  I completely understand that, Your

10    Honor.  So we have got a couple of other things that we

11    thought may have been agreed as a result of the ownership

12    rising and falling that apparently aren't.

13              There are some -- four exhibits about -- actually,

14    I take that back, Your Honor.  I thought -- these would be

15    agreed as it relates to Your Honor's ruling as to, you know,

16    the four facts that could be said and all of the other

17    corporate structure trust stuff being out.

18              There are four documents about a royalty interest

19    agreement, which is an agreement between the BBI company and

20    Smartflash LLC, and it talks about, you know, infringers and

21    other litigation; and so we think that would fall under a

22    whole bunch of MILs, and we object to that.

23              THE COURT:  Let me see the document.  Let me hear

24    the arguments on it.  We are at the point where I need to

25    make some rulings on some actual exhibits, so --

1          MR. SUMMERS:  Thank you, Your Honor.  It is

2     Defendant's Exhibit 181.

3          If you'd zoom in a little bit.

4          And, Your Honor, this is just one of the several

5     agreements between Smartflash Technologies and Smartflash LLC

6     that arose prior to the lawsuit being filed.  It was signed

7     at the exact same time as the agreements we talked about

8     earlier with that 2.25-billion figure.  So if Your Honor is

9     going to exclude that 2.25-billion figure, I don't understand

10    why this agreement would also be in.

11         Again, we don't think it is relevant to anything,

12    and it just goes into the relationship between the two

13    companies and whether the structure is incorrect or nefarious

14    in any way.

15         So that is document 181, and there are three

16    more -- they are not agreements but they are Smartflash

17    Technology, Smartflash LLC financial statements.  And that is

18    exhibits -- Defendant's 191.

19         Could you scroll down, please?

20         This is just a financial statement of, I believe,

21    Smartflash LLC.  And, again, Your Honor, I don't really

22    understand what this goes to.  It is just -- I don't believe

23    Dr. Becker relied on it.  It is cited in his materials

24    considered, but it is just a bunch of financial information

25    about Smartflash LLC.  I don't see how that is relevant.

```
1              And 218 and 219 are similar except they are

2   Smartflash Technologies' financial statements.

3              Then there is Defendant's Exhibit 234.

4              Which if we could pull that up.

5              That is just an email -- as soon as it gets here.

6              An email about an investment in Smartflash

7   Technologies and a potential investor.  I believe we have an

8   agreed MIL about ownership interest in Smartflash

9   Technologies and Smartflash LLC, so we don't really

10  understand why this document would not be under that

11  agreement.

12             THE COURT:  Okay.  Response?

13             MR. SCHENKER:  Your Honor, these --

14             THE COURT:  If you would take the podium, that

15  would be great.

16             MR. SCHENKER:  I'm sorry.

17             THE COURT:  All right.  Mr. Schenker, go ahead.

18             MR. SCHENKER:  As we said, these documents were

19  cited by our expert in his damages report.  You know, they

20  went to his conclusions ultimately as to what his damages

21  numbers -- what the appropriate damages numbers, what they

22  should be and why.

23             THE COURT:  He called them out, he talked about

24  them and how they impact his valuation of the patents?

25             MR. SCHENKER:  To be honest with you I can't tell
```

1   you on the spot how and where they were cited in the report.

2   I don't have the specifics on these.  And I don't know that

3   report as clearly.

4             THE COURT:  Tell me why -- just tell me why you

5   need them then.

6             MR. SCHENKER:  I mean, I would say we need these.

7   Basically, they support in terms of the valuation of what

8   these patents should be, the valuation of what the companies

9   believe these patents were at.

10            THE COURT:  How are these different than the

11  2.2-billion-dollar agreement that you said was really not

12  probative of the interaction between these two companies?

13  They can put whatever number down.  But it seems like these

14  numbers are better for you, and so you would like to have

15  them in.

16            MR. SCHENKER:  Because the other numbers when it

17  relates to a sell of the patent, again, some of that is based

18  on the deposition testimony of Smartflash's own witnesses

19  that the -- that there was no hypothetical negotiation.

20  There was no negotiation at all between the Smartflash Tech

21  and Smartflash LLC in signing that promissory notice and

22  putting that out.  When the questions were asked where did

23  that number come from, advice was taken, advice was taken by

24  counsel, advice was taken from, you know, firms.  And a lot

25  of road blocks were put up there.

1          Basically, what we were told is, yeah, we came

2    up -- we needed a number and we put together a number, and it

3    is a really big number, and it makes it look really good.

4          These, on the other hand, are financial statements

5    by the entities talking about presumably the actual value of

6    their finances as they go.

7          THE COURT:  All right.  I am going to exclude

8    those.

9          But, defendants, you are up, so -- on your next

10   bucket.

11         MR. ALBRITTON:  Hi, Your Honor.

12         THE COURT:  Hi.

13         MR. ALBRITTON:  Very small disagreement here.

14   Mr. Cassady and I at the last hearing told you that the

15   defendants would only be talking about the apportioned base;

16   that they would not be talking about total revenue.

17         So we have had some followup discussions with

18   regard to that, and we agree that they can talk about the

19   number of units.  We agree that they can talk about the base

20   as they had it apportioned.  We agree that they can talk

21   about the sales price of the devices.  We agree that they can

22   talk about the profit margin.

23         Okay.  We also agree they can't use any of those

24   constituent parts to calculate or suggest the overall revenue

25   base.

1          The additional agreement we have is they can

2     say -- they can describe their methodology to have come up

3     with the apportioned base.  So they can say we took some

4     revenue numbers, we took these answers to these questions,

5     and this is how we came up with this apportioned base.

6          The only problem is -- the only dispute is they

7     want to be able to say that they apportioned that -- that

8     that base is 25 percent of the total revenue.  And, of

9     course, if you tell the jury that that base is 25 percent of

10    the total revenue, then you are telling them --

11          THE COURT:  You are telling them the total

12    revenue.

13          MR. ALBRITTON:   -- the total revenue is four times

14    that.  So that is our only dispute.

15          One other thing that we agree about that we should

16    just be clear on the record is that they won't make any

17    arguments or suggestions that come up with an effective rate.

18          So, like, for instance, they can't say, you know,

19    since we are using this apportioned base, instead of asking

20    for one percent of the price of the phones -- or of the base,

21    we are effectively only asking for a quarter of a percent or

22    we are only asking for, you know, this minute portion of the

23    overall revenue; things of that nature.

24          So it is just that very one discrete problem where

25    they want to effectively tell the jury what the overall

1   revenue is.

2           THE COURT:  Okay.  Response?

3           MR. CASSADY:  Your Honor, part one of the

4   agreements are right.  Mr. Albritton and I -- we worked it

5   out, and we kept going back and forth to try to get this

6   right, and we agreed that we can talk about the price of each

7   product and the total number of units and the other various

8   issues that he went through.

9           And I agree that I am not going to -- and we all

10  know it probably will be me -- I will not be going into

11  comparing the damages award as a percentage against the total

12  revenue.  I am not going to do that.  It is just in direct

13  violation of Uniloc and I agree.

14          The issue of what Mr. Albritton said, which is

15  basically they have agreed that we can tell the jury that our

16  apportionment is a percentage of the base, but that is it.

17  We can't tell them anything else.

18          The problem with that is this entire damages case

19  is going to be about them saying we didn't apportion the

20  base; and that our questions don't properly apportion the

21  base from the survey.  And for us to not be able to tell the

22  jury the percentage that we actually use to apportion the

23  base, is kind of nonsensical.  We are not allowed to show our

24  work.

25          I understand that a juror may decide to go back

1    there and run the numbers.  A juror may decide to go back

2    there and Google the numbers.  But at the end of the day, you

3    are talking about moving steps away from Uniloc.

4         Uniloc was don't say the overall damages figure and

5    compare it to the total revenue and compare it to your

6    damages asked.  We are not going to do that.  We are going to

7    say we apportioned the base -- here is the total revenue and

8    we apportioned it to this, which is 25 percent.  I'm not

9    going to say that total number.

10        The revenue figure that I will say is the

11   apportioned revenue figure.  But I don't see how we are going

12   to have a case about apportionment and about the question of

13   apportionment where I can't tell the jury this is the

14   percentage I used because, I mean, Mr. Albritton is going to

15   get up -- he is a smart lawyer -- he is going to get up and

16   he is going to say they have got touch screens, they have got

17   cameras, they have got -- and he is going to list hundreds

18   and hundreds of features out; and I am going to be

19   debilitated because all I can say is, well, we took a

20   percentage of the whole.

21        And the jury is going to be like, well, what

22   percentage did you use?  And Your Honor knows, I mean, the

23   Daubert in this case was about the very percentage, the very

24   question of motivation.  And that is the question we are

25   dealing with here.

1          So I understand that a studious juror could go and

2     do those things.  But that is not the prejudice issue of

3     Uniloc.  Uniloc is about expressing those large numbers in

4     comparison to a damages asked, and basically that comparison

5     and that continual comparison is unable to correct.  You

6     can't correct it.  The jury starts believing otherwise.

7          So my issue here is that I can't show my work if I

8     can't say that percentage.  And they are not going to agree

9     not to cross my witness on that percentage, and so then I

10    am -- I don't even know how to say it.

11         For instance, Your Honor, in your order you noted

12    that we said 80 percent.  80 percent is not even in there.

13    80 percent of the devices are not even in there.  Under what

14    he is saying, I can't say that.  I can't tell the jury that.

15         I mean, that just kind of shocks the conscience.  I

16    can't tell the jury that 80 percent of the devices are gone,

17    and the revenue you are looking at from the 20 percent of the

18    devices left over.  That is a critical issue, Your Honor.

19         If we can't tell them, we can't show the homework,

20    then basically we can't do our analysis, so that is what is

21    happening there.

22         MR. ALBRITTON:  Your Honor, the fight is over the

23    methodology and what the survey showed and how it did it.  It

24    has nothing to do with the percentages.  We are not going to

25    cross their expert about the percentages.  We are going to

1    cross them about the methodology and if it is proper to

2    apportion based on the results that they got.

3            So there is no reason to get into the specific

4    percentage.  All it does is, you know, tell the jury

5    everything -- put up to the jury everything that the Fed

6    Circuit says you shouldn't do, the things that they say are

7    overly prejudicial.  It is just the back-door way, whether

8    intended or not, into the overall revenue figure.

9            Therefore, there can be ample cross with respect to

10   what they can do -- address, all of the cross-examination

11   with respect to the methodology; and if for some reason we

12   are dumb enough to get into the percentages, they can

13   approach, the door will be opened, and it will be our own

14   fault.

15           But there is no necessity of them to talk about the

16   percentages, Your Honor.

17           THE COURT:  Doesn't that methodology require them

18   to show how they got their numbers?

19           MR. ALBRITTON:  It does not require them to show

20   the percentages.  All they have to do is say that we asked

21   these questions, we got these results; and based on these

22   results, we took a percentage of the revenue.  There is no

23   necessity of showing that.

24           We further, Your Honor, we don't quibble with their

25   math on that.  We quibble with the methodology, but we are

1    not going to attack anybody.  In fact, we will stipulate that

2    their math was appropriate -- or not flawed.

3         THE COURT:  You know, Mr. Cassady raised that line

4    of questioning that you are going to get up and say, yeah,

5    but you didn't -- you know, the phone has a screen and the

6    phone has this and the phone has that; and their response is,

7    yeah, we took that into account in our apportionment.  And

8    that is why they want to be able to say with what

9    apportionment is, so how do we get around that?

10        MR. ALBRITTON:  Well, the surveys discuss a variety

11   of issues.  And all of that is going to come in without

12   getting into what the specific percentage is.  He is

13   certainly right, under Factor 13 everybody agrees -- they

14   even agree -- that these other issues are irrelevant to

15   apportionment.  But none of those things required them to say

16   what the actual percentage of apportionment is.

17        THE COURT:  Response.

18        MR. CASSADY:  Your Honor, Uniloc doesn't say you

19   can't give a jury any concept that allows them to ever figure

20   out anything about total revenue.  It says you can't go in

21   front of the jury and give them the total revenue figure and

22   compare it to your damages asked.  That is what that holding

23   is.  That is the extent of that holding.

24        And we are agreeing that we are not going to go

25   into those two issues.  We are not going to tell them the

```
 1    total revenue, and we are not going to compare it to our

 2    damages asked.  We are not going to do that.

 3            So what is happening here is the implication will

 4    be given the royalty base we are going to have, the

 5    implication is it has got to be everything.  That has got to

 6    be everything regarding some high percentage of everything

 7    because the jury is going to hear we didn't take into account

 8    a whole lot of issues.

 9            And then Mr. Mills is going to say, no, but I took

10    a percentage of this as my apportioned base.  And the jury

11    is -- there is no way a jury is going to understand that

12    40-billion dollars is not all of their revenue.  That is just

13    not going to happen, so that is what is trying to be built

14    here is the reverse of Uniloc.  It is the insinuation that we

15    are using all of it or some large portion of it.  So what is

16    happening is we can't explain to the jury our

17    apportionment.

18            I don't understand kind of the parts of what the

19    trial would be about here about the issue for damages if we

20    can't tell them it is 15 percent for movies, it is 25 percent

21    for apps, it is 8 percent for books.  If we can't tell them

22    that, I don't understand how -- every cross they have, I am

23    debilitated and I can't respond to it.

24            And I am not going to say the total revenue.  I am

25    not going to say those things.  I get it.  But, I mean, at
```

1    the end of the day Uniloc does not stand for the position

2    that you have to put the jurors in the dark on any issue that

3    they move within two steps of total revenue.

4          And that is what is being asked here.  They are

5    trying to extend Uniloc a lot further than it goes.

6          THE COURT:  What kind of exhibits are we talking

7    about here?  I mean, I see the general testimony; but what

8    are the exhibits at issue in this bucket, what kinds of

9    things?

10         MR. CASSADY:  I'm not sure -- well, Your Honor, I

11   think we have all agreed we are taking Mills' summary

12   exhibits, and we are going to redact out the total revenue

13   portions that he is using to calculate.  Then that will be

14   removed and now the rest of the steps will be there.

15         So he'd say "alone motivated" was 26 percent of

16   devices.  That number would stay there.  And that way you

17   could tell the jury 74 percent of the devices aren't in

18   here.  So the revenue you are seeing is related to 26 percent

19   of the devices or 25 percent of the devices.

20         So it is not in the context of -- so, yes, somebody

21   that is astute could look at it and try to figure out the

22   calculation; but, Your Honor, I tell you, I don't know that

23   there is any case where some juror couldn't, after hearing

24   the number of units that is out there and the price -- and

25   that is the more telling part, Your Honor.  They have agreed

```
 1    to price, and they have agreed to units, so the jury can
 2    figure that out, too.  They can take the number of units
 3    times the price, and they can figure it out just as easily as
 4    they can this percentage.
 5            So what is really happening is they are trying to
 6    lock me down on a very important issue to them as far as
 7    crossing my witness on apportionment, and make it where I
 8    can't defend myself.  But they are happy for the jury to talk
 9    about the number of units times the price.  That is not
10    really their issue.  They are trying to extend Uniloc so they
11    can cross my witness without him being able to respond.
12            THE COURT:  Response?
13            MR. ALBRITTON:  Briefly, Your Honor.
14            This is not just a Uniloc issue, Your Honor.  If
15    you recall Lucent, there is a whole series of cases that
16    caution against giving this sort of information to juries and
17    the effect of it.  And there have been cases reversed based
18    on this very point.  So it is not merely a Uniloc issue.
19            Secondly, we are not going to insinuate that this
20    is only -- Mr. Cassady seems to have some concern that we are
21    going to insinuate that this is close to all of the revenue
22    or all of the revenue.  Again, that is certainly not our
23    intention.  If we do that, we have opened the door to that.
24            The last thing, it makes it hard to really try to
25    work out deals here because they come back and use it against
```

1    you.  In an attempt to get this narrowed down for the Court,

2    I agreed last night to revenue -- I am sorry.  I agreed to

3    the units and the sales price.

4          And now they are saying, well, look, he has agreed

5    to this.  They can do all this complicated math.  You know, a

6    jury or jurors going out and figuring out all these big unit

7    numbers times the various prices of the devices is

8    fundamentally different than telling somebody 40 billion

9    dollars is a quarter of the whole base.

10         And so, you know, that is where we are, Your Honor.

11             THE COURT:  Okay.  Final word.

12             MR. CASSADY:  Your Honor, I don't know how to tell

13   a jury that the units in the base or the devices that were

14   alone motivated and have them have any perspective on what is

15   being left on the table.

16         It is in your order, Your Honor, about the 80

17   percent.  I can't tell the jury about the 80 percent?

18             THE COURT:  I mean, is that it, you can't tell the

19   jury you left 80 percent?  I mean, I'm having a hard time

20   getting my head around the concrete evidentiary issues that

21   are coming in.  I mean, I hear big global arguments.  What

22   are the exhibits?

23             MR. CASSADY:  What I am hearing is I can't tell the

24   jury Wecker's -- Dr. Wecker, our survey expert's percentage.

25   I can't tell the jury the percentage from the "alone

motivate" question is what I am hearing.  I can't tell the

jury what that percentage is and have it understood that when

Mills takes that percentage for "alone motivate" that his

revenue base, his apportioned base is just the revenue

related to that.  He is saying I can't do that.

MR. ALBRITTON:  We don't mind saying that Dr.

Wecker came up with 20 percent.  It is the further step of

connecting the dots, Your Honor.

MR. CASSADY:  But they are going to cross Dr.

Wecker on that 20 percent, and they are going to cross Dr.

Wecker on that survey question and say it is inappropriate

and do all those things like that.  And when Mr. Mills gets

up, he can't -- he can't connect the dots that he is

excluding this 80 percent, and he can't connect the dots.

They have no case that says this.  They have cases

that say I can't tell them the total revenue.  They don't

have cases that say you can't have information in a record

that allows a jury to figure it out.  It is just not there.

MR. ALBRITTON:  We are not going to fuss with Dr.

Wecker about whether 20 percent of the responses or 30

percent -- there is going to be no fuss about the math, Your

Honor.  It is about the fundamental methodology of trying to

apportion the base and the flaws with the question.  It is

has nothing to do with the math.

MR. CASSADY:  Your Honor, then why did they Daubert

1    Mills if it is a flaw in the methodology of the survey?  They

2    tried to Daubert both of them on that exact issue.  And Your

3    Honor found that Wecker's survey was fine, and that Mills had

4    issue -- you know, we, respectfully, disagree -- but Mills

5    had issues with his question.

6         And so how -- what they are saying is Mills can't

7    say I relied on that 20 percent to identify the apportioned

8    base.  They are saying he can't do that.  That is what they

9    are saying.  And that is ultimately the calculation.

10        So, I mean, it is really shocking to me that we

11   might be in a scenario where Mr. Mills gets up and literally

12   can't show his work.  He is not going to show the total

13   revenue, but he can't show his work, and this entire case is

14   going to turn into cross-examination about that percentage.

15   That is exactly what this case is about.

16        THE COURT:  All right.  I'm going to overrule that

17   objection.  I wish I had some context for the kinds of

18   exhibits that this is letting in though.  I would love to see

19   what kind of things are in this bucket.

20        MR. CASSADY:  Your Honor, I'm not sure the

21   exhibits -- I'm not sure the exhibits really are what is

22   controlling this.  I think this really is testimony.

23        THE COURT:  Okay.

24        MR. CASSADY:  I think there are exhibits that

25   have -- but we already agreed we are going to redact out

```
 1   those numbers, and then the percentages may stay around in

 2   those exhibits, but -- yeah.

 3              THE COURT:  Okay.

 4              MR. CASSADY:  Thank you, Your Honor.

 5              THE COURT:  All right.  What is next?

 6              MR. CASSADY:  Is it our turn?  Okay.

 7              Your Honor, I just wanted to complete one other

 8   subissue that is related to Apple licenses that also relates

 9   to Apple policies and Apple patents.  This one should be, I

10   believe relatively quick, Your Honor.

11              With regards to the prior art -- or sorry, with

12   regards to the patents, Your Honor, said the patents are out.

13   I assume does that mean Your Honor, the MIL was that those

14   patents won't be discussed even though the exhibits are not

15   in?

16              THE COURT:  Right.  I mean, is there -- refresh my

17   memory.  Is there also a pending MIL that I carried --

18              MR. CASSADY:  Yes, we filed a MIL, Your Honor,

19   about their discussion about patents.  So I guess what I

20   would tell Your Honor is we are fine with them saying we are

21   Apple, we have patents, we are innovative.  Even their guys

22   that get on the stand can say we have got patents.  That's

23   fine.  But just not patents in this field, not patents about

24   the accused feature, not patents in the space.  That is what

25   our big issue is.
```

```
 1            THE COURT:  Okay.  Response?

 2            MR. BATCHELDER:  Thank you, Your Honor.  So for a

 3   given witness, Mr. Cassady just said -- excuse my voice -- a

 4   given engineer could say I have got patents in my name.  We

 5   do think it is appropriate for a given witness to say, my

 6   group worked on this particular area iTunes and our group has

 7   X number of patents emanating from that work.  I understand

 8   Your Honor said we can't get into the specific patents and we

 9   can't introduce those exhibits.  That's what I understand the

10   ground rules are.

11            THE COURT:  That's right.

12            Does that -- Mr. Cassady, that is where I

13   understand my own ruling is as well.

14            MR. CASSADY:  Your Honor, that is fine, as long as

15   it is about the group, not about we have this -- iTunes is a

16   general, overall concept -- to say movie purchases on iTunes.

17   You see what I am saying?  That is where this case is.  So if

18   it is their group, I think we are fine there.

19            THE COURT:  All right.

20            MR. CASSADY:  So, Your Honor, on that same thing,

21   is the motion in limine -- that same motion in limine was

22   also a motion in limine regarding the use of licenses that

23   Apple had that they contend was to prior art or was to prior

24   art that they have in this case.  There is long argument in

25   the last hearing -- Mr. Curry and my colleague argued it --
```

1    we didn't get a ruling from the Court on that one.  I can

2    walk back through it.

3           What it is, Your Honor, is that there are some

4    prior art references they have that they have a license to.

5    In the context of the depositions of their licensing witness,

6    this is the one where their licensing witness claimed

7    privilege if we asked them whether or not they practiced that

8    patent.

9           So now they get to have the best of both worlds.

10   They can come in and tell the jury we have a license to that

11   prior art patent; but now the jury doesn't get to hear all of

12   the background of whether they practiced it, whether they

13   though it is invalid, whether they said it wasn't infringed,

14   whether after some time they changed their mind and signed a

15   license because they believed it was infringed.  All of that

16   stuff is kind of gone because the prior art -- or because of

17   the privilege objections.

18          So we have no way to cross-examine on that.  They

19   didn't produce any of the information related to these

20   licenses from those lawsuits that those licenses came from or

21   any contentions they had about those things, and that is

22   where you get into the satellite litigation issue.  We are

23   going to talk about -- we have to talk about all those

24   things, and we are unarmed.  We don't have any discovery

25   about any of that stuff.

1            And we don't have -- we have got privilege

2   objections as to, for instance, Intertrust.  I asked straight

3   up:  Do you guys practice that patent?  And Risher, Jeff

4   Risher, the licensing witness, said privileged when answering

5   the question.

6            Then they will get up here in front of the jury and

7   say we have a license to that patent in Intertrust, but then

8   they are not going to tell the jury whether they practice it

9   or not or they are going to claim privilege as to whether

10  they practice it or not.

11           Obviously, if you have a license, it is only

12  relevant to the extent that you practiced it, and you

13  believed it was valid and infringed.  But we don't have any

14  of that.  I imagine what would happen is you find out they

15  said it was invalid and you find out that they said they

16  didn't practice it, and you find out that either they --

17  after two years of litigation decided to say, yes, maybe we

18  do infringe or they decided to pay up and get out just

19  because it was easy.

20           So the problem is we don't have any of that

21  information, Your Honor, and it is prejudicial in the same

22  way that the patents, their other patents are.  In fact, it

23  is worse because they are going to get up and say this is

24  prior art.  So if we have a license to prior art, how can we

25  possibly be infringing your patent?  It goes back to that

1    same toxic argument about the patent, which a jury doesn't

2    understand is that you can practice somebody else's patents

3    but your patent doesn't make it where you can exclude -- if

4    your patent only excludes, it doesn't allow you to have the

5    right.

6         So with those two things, we think this one is

7    worse than Apple's patents themselves given the privileged

8    objection and issues like that.

9         THE COURT:  Okay.  Response?

10        MR. BATCHELDER:  Your Honor, I think that the

11   guidelines that we just talked about cover this one too.

12   That is, for a given end licensed patent from a third party,

13   we don't have to put the patent in front of a jury, but I do

14   think that Apple should be able to say in the aggregate we

15   end licensed a bunch of technology and even specified keeping

16   entities from moving on the end licensed technology.  Don't

17   have to put patents in front of the jury.  Of course --

18        THE COURT:  Well, did you stonewall the plaintiff

19   from getting discovery about those licenses?

20        MR. BATCHELDER:  The answer to that is no.  We

21   produced licenses, and we put up a 30(b)(6) witness to talk

22   about the licenses.  To the extent that there was any

23   question asked about infringement analysis, that was objected

24   to as privilege for some licenses on a license-by-license

25   basis.  Those questions were asked.  And, obviously, you

1  can't use privilege as a sword and a shield, so you can't go

2  back on that at trial.  But I think we are constrained by

3  that general principle.

4       MR. CASSADY:  Your Honor, we are back exactly where

5  we were with regards to the Apple patents.  They can tell a

6  jury that they take licenses.  They can tell a jury that they

7  end license technology all the time.

8       What they are really trying to do here is say we

9  took in technology from the prior art that we want to present

10 to the jury, and it has no relevance that that was an issue

11 other than to confuse the jury.

12      So, like I said, we are happy for them to say we

13 take end licenses.  We are happy for them to say we have

14 licensed portfolios.  But when they start saying we licensed

15 this piece of prior art that we are putting in front of you

16 right now, that specific issue has no relevance other than to

17 confuse the jury.

18      And it is more important -- what is important about

19 that is that even when we asked this question about these

20 licenses, that is exactly the issue it goes to is the

21 infringement, and they wouldn't answer the question.  So I

22 can't cross-examine that license, and then they moved to

23 exclude how much the license was and all kinds of issues with

24 the license because they said it is not comparable.

25      So you see what I am saying, there is no damages

```
 1    issues.  There is no analysis.  It is simply just skunk in
 2    the box, get in there.
 3              THE COURT:  All right.  My ruling is -- with regard
 4    to these is going to be consistent with regard to Apple's
 5    patents.  I think you can generally say that you license
 6    other technology in the aggregate, but we are not going to
 7    get into the specifics of these particular licenses.
 8              MR. CASSADY:  Thank you, Your Honor.
 9              THE COURT:  What's next?  I think it is defendant's
10    turn.
11              MR. SCHENKER:  Can we get the screen?
12              Your Honor, this is Plaintiffs' Exhibit 100.  And
13    as you see it is a licensing discussion between Samsung and
14    Apple taken from another litigation, subject to, you know,
15    previous MILs and agreements with respect to other
16    litigations.  That is one issue with it.
17              Additionally, there is definite content in here
18    that we would consider prejudicial.  There is talk of royalty
19    rates paid -- negotiated between Samsung and Apple, which are
20    not relied on as the royalty rates by Smartflash's experts
21    and would be highly prejudicial in this case.  This entire
22    document should be left out.
23              THE COURT:  Okay.  Response?
24              MR. PEARSON:  Thank you, Your Honor.  We have no
25    problem leaving most of this document out.  We have no
```

1    problem working out deals on redactions.  We were not able to

2    do that before the hearing today.  What we really need is the

3    beginning of this document -- something from this first page

4    sufficient to show that it is a document from Apple.  Then we

5    need what is on Pages 3 through 8.

6              If we could skip ahead.  See -- if you could skip

7    one page forward.

8              It talks about what makes a mobile computer or an

9    iPhone an iPhone.  Whenever you are ready, Your Honor, we can

10   skip ahead again.

11             THE COURT:  Okay.

12             MR. PEARSON:  Next page, please.

13             The general history of Apple products.

14             If we could skip ahead again.

15             Here we have a slide about mobile computers relied

16   upon several key technologies principally developed in the

17   computing industry.  We see things that are relevant to the

18   accused products in this case such as apps, music, video,

19   gaming.

20             This is an Apple presentation, and we think it is

21   relevant to show the general importance that Apple believes

22   some of the accused features in this case possess with

23   respect to other features on their phone and considering, as

24   we discussed, there is going to be some likely talk of, well,

25   most of the value is on our phone, you know, the screen or

1    the battery life or some of the hardware-type features.

2              I think this document tends to undermine that and

3    shows the importance of software in the Apple system.

4              Past this there are some slides about how much

5    Apple was seeking from Samsung in its licensing discussion;

6    and we have no problem removing those pages from this

7    exhibit.

8              THE COURT:  So you want to use this portion of the

9    exhibit to show what?  To show that Apple considered these

10   features important features?

11             MR. PEARSON:  Yes, as a general counter-argument to

12   the trial theme we think Apple may present about most of the

13   value of the accused devices being in the hardware.

14             THE COURT:  All right.  Mr. Schenker, let me get

15   your responses as to these -- you know, not indicating that

16   this is any kind of licensing agreement but as to these few

17   pages that discuss some of the background of Apple's

18   technology.

19             MR. SCHENKER:  Well, again, Your Honor, I'm not

20   sure how completely we can divorce these three pages even

21   from the fact that this is a 408 discussion between Samsung

22   and Apple in the context of other patent litigation and in

23   the context of determining licenses between the parties and,

24   you know, respective to two competitors and what two

25   competitors would value with respect to each other's

 1   portfolios and with respect to each other's patents and how

 2   to deal with that.

 3        It is sort of hard to take individual statements

 4   from this entire presentation, which is, again, in its entire

 5   context, which I think they would agree generally shouldn't

 6   be as part of the case and say, well, we are just going to

 7   divorce those statements from everything else and try to get

 8   those in the record as relevant of what Apple believed in

 9   general.

10        THE COURT:  I think certainly, generally, documents

11   that reference to and are part of other litigation, we can

12   agree are not going to be part of this case.

13        But, I mean, if I am just looking at Page 7, for

14   example, I don't have any context this is part of a licensing

15   analysis or that it is even between two competitors.  To me

16   it looks like an Apple document talking about some of its own

17   technology.  It seems to be fairly easily divorceable.

18        MR. SCHENKER:  So I think we can agree that if we

19   redact the cover page, the 408's on these -- any additional

20   filing basically showing --

21        THE COURT:  Yes.

22        MR. SCHENKER:  -- where this is coming from, we can

23   probably agree to the content on those three slides could be

24   admissible.

25        THE COURT:  Yeah, I mean, I feel like this is one

```
 1    we can work out.  Is there any need to keep these filing --
 2              MR. PEARSON:  No, no, absolutely not, Your Honor.
 3    I am obviously happy to redact that.  I just didn't see that
 4    before.
 5              THE COURT:  So what pages are you talking about?
 6    Is that 4 through 7; 4, 5, 6, 7.  Let me look at them.
 7              MR. PEARSON:  My notes say Pages 3 through 8.
 8              THE COURT:  Let's go back to 3.
 9              MR. PEARSON:  I might have should have said 2.
10              THE COURT:  Okay.
11              MR. PEARSON:  There is one more before that.
12              THE COURT:  All right.  So here you have a basic
13    phone.  I would say this is a Samsung phone.  So tell me why
14    we need this as far as discussion of Apple and its products?
15              MR. PEARSON:  That's fine.  We can start at Page 3.
16              THE COURT:  The same thing, same question.  It is
17    also a Samsung.  What has changed?  What makes the Galaxy S
18    relevant?
19              MR. PEARSON:  I apologize, Your Honor, if we could
20    start at Page 4.
21              THE COURT:  We are narrowing it down.  I like it.
22              All right.  So Page 4.  Looks to be about the
23    iPhone, and I think we can remove all litigation/Samsung
24    related, you know, parts of this page; and then it would be
25    largely unobjectionable.
```

 1              Is that right, Mr. Schenker?

 2              Mine says 5 of 19.  Is that Page 5 that we are on?

 3              MR. PEARSON:  Yes.  I'm sorry.  I was looking at

 4   the 4 in the bottom corner --

 5              THE COURT:  I see where you are.

 6              MR. PEARSON:  I'm sorry.  Page 5 of 19.

 7              THE COURT:  Got it.  5 of 19, let's look at this.

 8              Same thing, this appears to be all Apple for the

 9   most part.

10              MR. SCHENKER:  That's fine.

11              THE COURT:  What about the next page?  Same thing

12   here?  What is next?  That is it, right?

13              MR. PEARSON:  I think this one is also okay.

14              THE COURT:  It is okay.  So there we go 5 through 8

15   of 19 that is the pages I am looking at.  Remove all

16   reference to the filing numbers, that it is produced for

17   business settlement.  This note down here.  Redact out any

18   evidence that it is part of any kind of other litigation

19   document.

20              MR. PEARSON:  Yes, Your Honor.

21              THE COURT:  Okay.

22              MR. SCHENKER:  Thank you, Your Honor.

23              THE COURT:  As discussed, that will be admitted.

24              What is next?

25              MR. PEARSON:  Next, Your Honor, we have a few

 1    buckets from Smartflash that are all essentially the same

 2    issue.

 3            Mr. Schenker, for your record-keeping purposes,

 4    what we exchanged via email would be Smartflash's hearsay

 5    bucket 5 and 6; and what was about ownership, sub-bucket

 6    number 2.

 7            These are generally the unaccepted offers to

 8    purchase documents that contain hearsay.  I know there has

 9    been discussion earlier about high numbers and low numbers.

10            And just to reset the stage, we want all of these

11    numbers out.  We don't want this 2.25-billion-dollar number

12    in.  It doesn't go to anything but, you know, corporate

13    structure was coming in and we reserved our right to have all

14    of the facts in.  But still, we think all of this should be

15    out.

16            With respect to the unaccepted offers to purchase,

17    we have emails that -- if I could draw -- and I am happy to

18    pull up as many as you would like to see, Your Honor,  it is

19    about 10 documents.  They are emails that are not cited in

20    the damages report that are literally a random person

21    emailing Patrick Racz saying things along the lines of:

22    Thanks for the conversation.  Here is how much I would like

23    to buy your patent for just as we discussed.

24            And Patrick -- Mr. Racz emails back and says no,

25    no, no, that is not what we discussed.  So it would be, you

```
 1   know, Mr. Albritton emailing me this evening and saying you
 2   did such a great job with the hearing, I'd like to buy your
 3   house; and I would like to buy it for five dollars.
 4          And then I email him back and say, well, you know,
 5   I appreciate you thought I did a great job; but my house is
 6   worth more than five dollars.  And that email is not going to
 7   be -- has nothing to do with whether my house is in actuality
 8   worth five dollars.
 9          I thinks these are just -- there is no
10   investigation into any of these offers.  They didn't seek out
11   these third parties.  We don't have details about here are
12   all of the things we looked at.  Here is my process, and here
13   is why I am right that your patent is invalid or your patent
14   is worth $100,000.  It is just a bunch of things that got
15   floated out in emails --
16          THE COURT:  Okay.  Let me see one.
17          MR. PEARSON:  Sure.  Can I please have DX 215?
18          Can we -- oh, man, I need glasses.  Can we scroll
19   down to the bottom.  Further down, please, the next email
20   down.
21          Okay.  Can we scroll up just a little bit, a little
22   bit higher.  You see the email again.
23          THE COURT:  It was good to catch up.
24          MR. PEARSON:  Here we have Vicky begin:  Dear
25   Patrick.
```

1          Okay.  If we could scroll down.

2          Good to talk to you.  There is some mentions of a

3    brief conversation.  You know, we have to establish a basic

4    agreement.  We scroll down some more, and he sets forth in

5    simple terms he is seeking such as an equity percentage.

6          Scroll down a little bit more.

7          0.9, the 150,000 pounds.

8          Then we are going to scroll all the way to the

9    top.

10         Mr. Racz responds to someone now named Collin.

11   Thanks for the call yesterday.  And goes through some reasons

12   why they don't, in fact, have an agreement.

13         If we could scroll down just a little bit more.

14         Here he says the 150,000-pound figure is a

15   non-negotiable down payment.  You know, I mean, just -- not

16   valuing the IP in Smartflash at 150,000 pounds.

17         So there is a good sentence at the top that

18   Mr. Cassady can read that I can't because of my poor

19   eyesight.  I need a raise so I can afford glasses.

20         Please scroll up a little bit more.

21         He hasn't had an opportunity to discuss his

22   proposal with his business partner.

23         So this is just -- they are all kind of complicated

24   like this.  We could go through more.

25         There is another email from a man named Mr. Juan

```
 1   Gisone who offers to buy the '720 patent for 50 -- $250,000.

 2   They exchange a few emails about can you talk at 3:00

 3   tomorrow?

 4           They additionally have another email where Mr.

 5   Gisone says:  Well, thanks for the call.  Looks like our

 6   expectations don't overlap.

 7           Well, you know, what does that go to show?

 8   Nothing.

 9           THE COURT:  Okay.  Response?

10           MR. BATCHELDER:  Your Honor, we have already had

11   exactly this argument.  This was exactly their MIL H, and you

12   have already denied it.  I feel like we are reliving Ground

13   Hog Day.  We just don't have time for this.

14           These are unaccepted offers, as we talked about at

15   some length last time around.  They book-end the hypothetical

16   negotiation.  And there were many of them where the market is

17   speaking to the market's valuation of these patents.  And

18   they are pretty consistent.  They range basically from about

19   50K at the low end to about 350K at the high end.

20           They can criticize them, they can cross on them.

21   Their arguments go to weight; not admissibility.  That is why

22   Your Honor denied the MIL the first time around.

23           MR. PEARSON:  Your Honor, I apologize I wasn't able

24   to attend the hearing last time.  My team is whispering to me

25   that last time you didn't necessarily say unaccepted offers
```

1    of purchase were definitely coming in, but that you would

2    take it up on an exhibit-by-exhibit basis.  I'm not sure if

3    that's true.  I haven't had a chance to review that part of

4    the transcript.

5           But I don't think that these emails show the market

6    value of these patents.  Just because Mr. Albritton has the

7    capacity to email me and offer me $5 for my house, that

8    doesn't have anything to do with the market value.  They have

9    done nothing to subpoena these people or prove they were

10   experts or prove they had some sort of special insight into

11   the market's appreciation for these documents.

12          Not to mention -- I am just going to read into the

13   record, if you would permit me, DX 204, 215, 225, 322, 323,

14   324, at least, are not even in the damages expert report.

15          THE COURT:  Okay.  Let me get a response about

16   that.

17          Mr. Batchelder, I mean, how are these relied on by

18   your damages expert report, if at all?

19          MR. BATCHELDER:  The one that we -- the one that we

20   just went through is relied.  I don't have these other

21   document numbers memorized, so I would have to see them to

22   see --

23          THE COURT:  So what does he do, he looks at it and

24   he incorporates that in his valuation of the patents.

25          MR. BATCHELDER:  Yeah.  Well, what he does is he

1    comes up with a calculation, and then he cites a lot of

2    offers to basically show they are corroborative; that the

3    market is -- in fact, a lot of these were responsive to

4    actually reaching out to people and soliciting offers.  He is

5    negotiating.  He sends out a ton of emails to various players

6    in the market saying I am interested in investing in a patent

7    portfolio.  And he gets responses back.

8           So the market collaboratively is speaking on what

9    the market thinks about -- or at least making these offers.

10   All of the arguments that were just made as to how they could

11   be distinguished or belittled or whatever, again, goes to

12   weight and not admissibility.  That is what you already ruled

13   on.

14          MR. PEARSON:  And I appreciate that he brought that

15   up.  I failed to mention that.  There are a lot of emails, as

16   he mentioned, where Mr. Racz is just floating things out

17   there in the market, and we didn't object to those, and those

18   are all on their exhibit list and will be coming in.

19          These are a specific category of hearsay statements

20   from third parties that are not proved up.  I don't want to

21   be making ticky-tacky hearsay arguments, but I think it is

22   important in this case because these statements really are

23   clearly prejudicial.

24          Now, to the extent that Mr. Racz is saying

25   something, sure, we have to live with it.  I understand.

```
 1                 THE COURT:  Okay.  How do you get over the hearsay
 2    objection?
 3                 MR. BATCHELDER:  I'm sorry?
 4                 THE COURT:  How do you get over the hearsay, the
 5    objection that these objections are full of hearsay?
 6                 MR. BATCHELDER:  Your Honor, these are documents
 7    from a given entity saying what would you think about selling
 8    me your patents for X dollars.  I don't think that is
 9    hearsay.
10                 THE COURT:  Right.  That part is not.  But what
11    about the responses?
12                 MR. BATCHELDER:  Responses from --
13                 THE COURT:  From third parties.
14                 MR. BATCHELDER:  What I am saying is these are
15    documents from third parties.  They are saying we would like
16    to pay X dollars for your patent rights.
17                 So -- Your Honor, can I suggest this?  You have
18    ruled on this in a MIL.  I think the one we just saw up on
19    the board is covered by the MIL explicitly because, again,
20    this is an entity saying we are willing to pay you this many
21    dollars for your patent rights.
22                 If they have other documents -- and he just threw
23    our some document numbers and didn't put them up on the
24    board; but given the guidance that, generally, Your Honor's
25    ruling on MIL H stands that if we have some other specific
```

1  documents you want to talk about, we can have this more

2  granular conversation to try and reach agreement.

3       THE COURT:  The MIL is one thing, but now we are

4  pointing to a specific objection and -- I mean, exhibit and

5  saying within this exhibit there is hearsay, out-of-court

6  statement offered by a non-party to prove the truth of the

7  matter asserted.  And these responses to Racz, those are

8  hearsay and tell me the exception to hearsay that gets them

9  into an admissible form.

10       MR. BATCHELDER:  Your Honor, if Mr. Racz reaches

11  out to me and says I am interested -- even he doesn't try --

12  he reaches out and says I'm interested in investments, and I

13  respond by saying I am willing to pay you X dollars, I don't

14  see that is hearsay; and if it were, it would be arguably, at

15  least, an offer of contract, which is a legal document.  It

16  is legally operative conduct.

17       In any event, this is a document that, as I just

18  said, that Dr. Becker does rely on.  As an expert who is

19  saying this is corroborative with my damages calculation, he

20  can point to that in an expert report.

21       And, by the way, that point also came up in the MIL

22  argument.

23       MR. PEARSON:  I'm certainly not trying to cast

24  doubt on what he saying, but I really did check last night

25  and the Vicky/Collin email that we just read is not cited in

 1  Dr. Becker's report; at least not by Bates label.  I couldn't

 2  find it.

 3          I think there is a fundamental difference in

 4  Mr. Racz saying would you like to buy my patents for $500,000

 5  and somebody responding versus just somebody floating in an

 6  email to him with respect to what we just saw like the Vicky/

 7  Collin email.

 8          I'm not just trying to read a bunch of emails in

 9  the record that they didn't know about.  We have been

10  emailing about this for days.  I am happy to go through each

11  of the documents one by one if the Court feels that is

12  necessary.  You know, we can look at PX -- or DX 204, the

13  Mr. Gisone email that I described as fundamentally the same

14  that is not in Dr. Becker's report.

15          I really -- I want to assure the Court I really did

16  try to limit my objections in this bucket to really just the

17  precise thing that I have described, not where Patrick is

18  affirmatively trying -- Mr. Racz is affirmatively trying to

19  sell something.

20          MR. BATCHELDER:  If I could, Your Honor?

21          THE COURT:  Sure.

22          MR. BATCHELDER:  I do think that, again, if an

23  industry player is saying I am willing to pay X dollars for

24  your patent, they can criticize it, they can cross it; but

25  that is relevant evidence that an expert can rely upon in

1    valuation or as confirmatory.  And that document should come

2    in, and all of their criticisms can go away.

3          THE COURT:  All right.  Here is my ruling:  The

4    documents that are explicitly referred to and relied on by

5    the expert in his report can come in.  If they are not, they

6    are out.

7          What is next?

8          MR. PEARSON:  Thank you, Your Honor.

9          MR. CASSADY:  Your Honor, I assume when you say

10   reliance, we are not saying part of the documents considered.

11   We are talking about it is actually in the report in some

12   way, shape, or form.  It is not the billions of documents

13   considered.  It is in the report somehow.

14         THE COURT:  I mean, what I have heard from

15   Mr. Batchelder is that he looked at this and used it as

16   corroborative of the valuation in his report.  To the extent

17   he did that, then, yes, it is coming in.

18         MR. CASSADY:  Right.  Right.

19         THE COURT:  I see what you are saying, if it is in

20   the blanket of tens of thousands of documents he considered?

21         MR. CASSADY:  Yeah, many experts just point to the

22   production and say I considered it.  It is not that.  It is

23   the latter or former -- it is the one where they actually did

24   it.

25         THE COURT:  That's right.

```
 1              Now, that bucket, that was one document; but were

 2   there others in that particular bucket?

 3              MR. CASSADY:  Exhibit numbers for that bucket?

 4              THE COURT:  I mean, not with regard to this notion

 5   of unaccepted offers.  Is there another category of documents

 6   that is in that same bucket before we move on to the next

 7   one?  More hearsay?

 8              MR. BATCHELDER:  While he is looking for that, Your

 9   Honor --

10              THE COURT:  Sure.

11              MR. BATCHELDER:  -- I just want to be clear, if I

12   think that Mr. Racz has said something that opens the door to

13   cross with these documents, I take it you are not ruling that

14   out for now.

15              THE COURT:  I am not.  I am trying to think if I

16   need to just get you to approach before you get into that.  I

17   would think so.  In light of this ruling, before you just

18   walk through that door that you think has been opened, take

19   it up with Judge Gilstrap and make sure.  All right?

20              MR. PEARSON:  Then just to correct the record, I

21   have some highlighting on my paper, and I reversed it.  The

22   Vicky/Collin email is, in fact, cited in Dr. Becker's report.

23   So my apologies.

24              THE COURT:  Is cited.  Okay.

25              All right.  We have been going about an hour and
```

1     some change, so we are going to take a break, and then we

2     will take up the remainder of the buckets and, hopefully,

3     resolve those and move on to some other pending issues.

4           We will be in recess for 15 minutes.

5           (Recess was taken at this time.)

6           THE COURT:  Please be seated.

7           All right.  What is next?

8           MR. SCHENKER:  So, Your Honor, I think for the next

9     bucket we will sort of be in the vein of hearsay.  These are

10     letters or emails from Steven Landau starting with Exhibit

11     113, 141.001 --

12           (Reporter requests the number to be repeated.)

13           MR. SCHENKER:  Certainly.  113, 141.001, 162, 194,

14     and 200.

15           We would ask that all of these be excluded as

16     hearsay.

17           THE COURT:  And tell me who this is.

18           MR. SCHENKER:  This is Steven Landau who at one

19     point who was a VP at Gemplus and at another point was the

20     president, I believe, at Internet Plc.

21           Now, with respect to this one, it is still sort

22     of -- I mean, it gets even more confusing in terms of, you

23     know, of which shoe he is speaking of here because Patrick --

24     and my eyes are just as bad -- would you be so kind as to

25     forward -- summarize this email.  I was getting Gemplus.com

1    email server problems as usual.

2          So beyond whether he is trying to send this as a

3    Gemplus representative and, therefore, it is not an Internet

4    Plc statement, you know, that raises the question.

5          And then beyond that, the entire agreement talks

6    about -- summarizes his meetings with other people and

7    summarizes what those people have said to him, which includes

8    quotes from those meetings; and, you know, we would say that

9    at the very least it includes hearsay within hearsay with

10   respect to all of that.

11         THE COURT:  Okay.  Response?

12         MR. SUMMERS:  Thank you, Your Honor.  John Summers

13   for Smartflash.

14         This will be pretty easy, I think.  We are not

15   looking to use these emails for the truth of the matter

16   asserted.  We are not trying to prove up that these

17   agreements happened or that, you know, Steven Landau said

18   this and someone told Steven Landau that.

19         These exhibits are really just on the exhibit list

20   to corroborate Mr. Racz's story of, you know, Internet Plc

21   and Gemplus days and the potential agreement there and that

22   whole story that goes into Gemplus's ultimate passing off of

23   Mr. Racz's idea.

24         So the Steven Landau emails are not for the truth

25   in the emails.  They are just Mr. Racz's impression, the

```
 1   favorable feedback he was getting from Gemplus and then the
 2   favorable, you know, statements from Mr. Landau after he
 3   became president of Internet Plc.
 4         THE COURT:  What do the emails say?  I mean, this
 5   is three pages single-spaced full of all kinds of stuff.
 6   What does it say generally?
 7         MR. SUMMERS:  Just generally it is about a -- this
 8   particular email is about a meeting that Mr. Landau had with
 9   a particular business person talking about various investment
10   potential and people, you know, thinking that the Internet
11   Plc idea is a good one and just that this business that
12   Mr. Racz was involved in, he was hearing from other parties
13   that he was in a legitimate enterprise that was going to do
14   well, which ultimately did not.
15         THE COURT:  Tell me why do you need them in
16   addition to his testimony to that effect.
17         MR. SUMMERS:  Well, Your Honor, it would just be
18   corroboration to the extent that any part of his relationship
19   with Gemplus and the business discussions related to that are
20   at any point not -- or impeached or anything like that.
21         MR. CALDWELL:  I can give you, perhaps, a more
22   concrete example, if you would like.
23         Throughout the case the defendants have attacked
24   Mr. Racz saying that his business failed and -- I mean, you
25   have heard about the arguments related to that.  That somehow
```

1   relates to value.

2          The truth of the matter is that he was very

3   successful before the Smartflash invention and had a lot of

4   money that he had made off of other ideas and businesses that

5   he had put together, and he basically spent every penny of

6   that trying to build something and working with Gemplus.

7          And these documents are part of actually his story

8   of what ended up happening.  He basically put in every bit

9   that he had, was completely, essentially, wed to a partner

10  who eventually, due to a variety of different circumstances

11  including change of management -- and in a sort of weird,

12  convoluted way just something fell apart September 11th with

13  the business deal that they had; and believe it not because

14  Britney Spears wouldn't fly on a plane to do a European tour.

15         What ended up happening is that business

16  relationship crumbled, and at that point he had -- is why he

17  was eagerly throwing every penny he had into this deal

18  because he thought he had a business partner who was running

19  lockstep with him.  And that is what he was representing and

20  the impression he had.

21         And at the end when they pulled out, he is

22  essentially left with nothing.

23         And this sort of theme of failure has been a theme

24  of the defendants from the beginning.  It is what he was

25  hearing, what he was feeling, why he was putting his money in

 1   it, why he had cause for optimism.  And all that just really

 2   goes to the story of his business.

 3          THE COURT:  Well, the initial argument that I heard

 4   is that these emails are not hearsay because they are not

 5   offered for the truth of the matter.

 6          Aren't they offered for exactly the truth of the

 7   matter to show that the idea had some pull to it?

 8          MR. CALDWELL:  I don't think so.  Certainly that is

 9   some anecdotal aspect of it.  I'm not going to deny that it

10   is.  I think the point is, though, what matters is what was

11   Mr. Racz's hearing and why was he sticking with this business

12   partner, who is, honestly -- it was kind of a rocky road a

13   couple of times.

14          In fact, he goes to a trade show and sees that the

15   things they had worked on together, they are just pitching as

16   their own.

17          One time he is in a meeting he finds that they had

18   taken one of his PowerPoints and scrubbed out all mentions of

19   his company and them their own company.  Why do you keep

20   working with them?

21          And what has happened is that it is all part of his

22   story as to why once he got locked in and spent all his

23   money, why he did a full investment with his business partner

24   and let everything hang out there, because everything seemed

25   on the up and up at the beginning and they were supportive.

 1   But he basically spent everything he had.

 2          So it is not so much we have the burden of proving

 3   that Gemplus liked him.  Right?  That is not the point.  The

 4   point is why did you make these people your business partner

 5   and go hand in hand with them through this rocky time period.

 6          THE COURT:  Okay.  Response?

 7          MR. SCHENKER:  I mean, I think Your Honor hit the

 8   nail directly on the head that if this is being used to

 9   corroborate Mr. Racz's testimony, that this is being used for

10   the truth of the matter asserted.

11          Mr. Caldwell hasn't denied that.  He said you

12   know -- it is true, but he explained that because there is

13   a -- you know, Mr. Racz has this sympathetic story, so the

14   truth of the matter should be allowed in these hearsay

15   documents, and it just doesn't get around the fact that these

16   documents are hearsay.

17          If they want to show -- or talk about third-party

18   conduct and what happened, they can bring evidence that it is

19   third-party conduct, that doesn't allow these hearsay

20   statements into the record, and it doesn't allow this to get

21   in.

22          The question is:  Mr. Racz, why did you keep

23   working with these people?  I don't see why you need hearsay

24   talking about all of the problems in order to say why did you

25   keep working with these people.  That is his testimony.  The

1  corroboration is hearsay, and it is being offered for the

2  truth of the matter.

3       MR. CASSADY:  Your Honor, just a real crystal

4  description of this.  We don't care that he said -- that

5  Landau said that he was happy about the project and happy to

6  work with Patrick.  We don't care about the truth about

7  whether the project was actually really good to Gemplus or

8  not.  Nobody cares about that.  We don't care about that.

9       What we care about is he made that statement.  He

10  made the statement so that Patrick was relying on a

11  statement.

12       Whether it is true or not, doesn't matter.  We are

13  not trying to tell a jury that Mr. Landau said that our

14  project was great and awesome.  That is not the purpose of

15  this document for us.  The purpose is for Mr. Racz to say is

16  he was told that Landau's company thought it was great and

17  awesome.  And that is the difference.

18       THE COURT:  And he acted on that?

19       MR. CASSADY:  And he acted on it, and that is the

20  difference.

21       THE COURT:  Okay.  All right.  I am going to

22  overrule the objection and admit those documents.

23       What is next?

24       MR. CASSADY:  Okay.  Your Honor, the next one is a

25  couple of sub-groups; but I think these will go relatively

```
 1    quickly.  Other litigation motion in limine.

 2            My understanding is, basically, the Court and the

 3    parties in the last hearing -- I don't remember whether it

 4    was your order or whether it was agreement, but we are not

 5    going to talk about other litigation in the case.  So this --

 6    these sub-groups here are mainly about that.

 7            So the first one, real quick, is DX 306.  And I

 8    actually have glasses, so I will go ahead and put them on.

 9            So -- although I don't know that will help.

10            THE COURT:  We just need to get a monitor at the

11    lectern.

12            MR. CASSADY:  Right.

13            THE COURT:  That is just a little, minor technology

14    upgrade.

15            MR. CASSADY:  So, Your Honor, these are two --

16    these are two or three Apple employees talking about this

17    very lawsuit, and they are kind of joking with each other

18    about the fact that Mr. Farrugia was named in the actual

19    complaint.

20            So here they are saying:  According to the lawsuit

21    you're just using patented technology divulged to you before

22    you joined Apple.  Of course, there are lawsuits that

23    implicate all of us doing that the same.  The difference is

24    we don't all get named in the press.

25            I mean, I don't what this goes to.  I have no idea
```

1    what it goes to.  But, clearly, it is insinuating Apple gets

2    sued all time.  You should have sympathy for Apple because

3    they get patent lawsuits, and everybody in there gets sued.

4              So, clearly, to me it insinuates that, and I think

5    it should be gone.

6              THE COURT:  All right.  Response?

7              MR. BATCHELDER:  Your Honor, I would say that for

8    the -- can we put it back up again?

9              THE COURT:  Yeah, can you put it back up there for

10   me, please.  Thank you.

11             MR. BATCHELDER:  I believe that Mr. Faruggia

12   received his notice of the lawsuit from this email exchange.

13   We are happy to redact that document in the reference to

14   other lawsuits, et cetera.

15             But I do think that he needs to be able to say that

16   he learned of the lawsuit from his colleague if he is

17   questioned and accused of willful blindness and not caring,

18   et cetera.  Somehow we need him to be able to testify about

19   that fact.

20             But, frankly, I don't think this statement about

21   other lawsuits and Apple being accused in another setting, I

22   don't think that belongs in this case.

23             THE COURT:  All right.  Agreed?  Well --

24             MR. BATCHELDER:  If you would like, Mr. Melaugh has

25   suggested we don't need the document for him to do this.  If

1  he can just testify to that, we are okay with that

2  solution.

3          THE COURT:  What do you think about Mr. Faruggia

4  testifying that he found out via an email from a colleague

5  that he was in this lawsuit?

6          MR. CASSADY:  Yeah, this is their exhibit, so if

7  they are going to pull it and that is the testimony is what

8  they are going to say, that is fine.

9          MR. BATCHELDER:  That is fine.  If Mr. Faruggia can

10  respond to this.  So if those emails are out, and he can just

11  testify how he learned about the lawsuit, that is fine.

12          MR. CASSADY:  That is fine, Your Honor.

13          THE COURT:  Good.  Easiest decision I made.

14          MR. CASSADY:  See I was right.  Like Mr. Albritton

15  did, see how quick that was.

16          So the next one I hope is just as quick.  There are

17  a number of exhibits from Apple regarding their awards they

18  have received on the patented features or features around the

19  patented features, and they want to bring those in.

20          I think we are okay, but we have a little issue, a

21  little, tiny distinction between the parties.  Your Honor may

22  remember they wanted to be able to say some form of:

23  Smartflash, you know, basically contends that these other

24  people, Samsung and HTC, infringe the patents.

25          Okay.  So, Your Honor, asked us to meet and confer

1    about that issue.  We did.  We did narrow it down to exactly

2    that.  Apple now wants to say that here are these awards we

3    won, and these awards we won were over the people you say

4    contend -- or you contend also infringe these patents.

5           What we are saying is that is going to insinuate

6    the other litigation.  We are happy to say that you can say

7    these other people have the feature.  You can say Samsung has

8    this feature, HTC has this feature, and we won these awards

9    over them.  And you won't hear a peep from me or maybe on my

10   side that we contest that issue that that feature is there

11   and that it exists in other products.

12          We just think using the word "contend" is

13   insinuating we have another lawsuit out there.  That is a

14   skunk-in-the-box issue for the jury.  And I don't see what

15   they are gaining by using the word "contend" versus they have

16   the feature and we don't contest it.

17          THE COURT:  Okay.

18          MR. BATCHELDER:  We did talk about this last time,

19   and I think Your Honor carried it so that we could see how

20   this actually came up in the expert depositions.  And here is

21   what I want to be able to do, and I will be happy to read you

22   an excerpt from the Mills' transcript from just last Friday

23   about it.

24          But what I want to be able to do is not bring up

25   other lawsuits but to say, generally, you say that Apple

1   practices your patents.  You say that another entity,

2   Samsung, for example, practices your patents.  And here is an

3   industry award that an Apple device that is accused won over

4   a device from Samsung that you say practices your patents.

5   And, Mr. Expert, isn't that relevant?  Doesn't that reflect

6   the success of the Apple product, that award?  Doesn't that

7   reflect that it is succeeding in the marketplace because of

8   the value that Apple is bringing to the table on the patents?

9   Because they have, according to Smartflash, those patents in

10  common.

11          So I asked Mr. Mills about this.  I'll just read,

12  you, with your permission, a couple Q and A's.

13          THE COURT:  Sure.

14          MR. BATCHELDER:  QUESTION:  If product A from

15  company 1 and product B from company 2 were both accused of

16  practicing the same patents, and product A has been highly

17  successful and product B has been less successful, could that

18  indicate that the success of product A is attributable to the

19  value that company 1 has brought to that product?

20          ANSWER:  That is theoretically possible, yes.

21          And then I asked him more in the concrete.

22          QUESTION:  In your opinion as you sit here, is it

23  relevant to extent to which Apple's accused products have

24  done better or worse in the industry than the accused

25  products of other entities accused of infringement by

1    Smartflash?

2          ANSWER:  Yes, I think it is relevant.

3          So it is relevant to damages.  Their own expert

4    admits that it is.  I would just like to be able to cross him

5    on that.

6          Again, I wouldn't bring up other lawsuits.  I would

7    just say these are products that Smartflash says practice the

8    patents-in-suit.  And I don't think that tells the jury

9    anything else about other litigation.

10          MR. CASSADY:  Your Honor, we are playing word

11   games, but they are important word games.  Saying it is an

12   accused product or saying we accused it or we contend it

13   infringes, insinuates the litigation.  It just does.

14          So I don't understand why he can't cross Mr. Mills,

15   my expert, on the issue of the product with the feature at

16   one company versus the product with the feature at another

17   company.  That is the way he should have been asking the

18   question.  He knew this was an issue when he took the

19   deposition.

20          This was a deposition 48 hours ago.  This isn't the

21   deposition months ago we didn't know this was an issue.

22          But I am happy to work with them and Mr. Mills to

23   say, look, when you get asked this question, this was your

24   answer from the testimony, and he is going to ask about this

25   product has a feature and Samsung's products have the

1    feature.  And we are not going to talk about contentions, and

2    we are not going to talk about accused products.

3           And so if they want to -- we want to work that out,

4    that is the way to deal with that because at the end of the

5    day to a certain degree we are creating an artificial world

6    to keep the jury from understanding that fact.  And this

7    pierces that veil and makes it where they are going to

8    starting asking themselves about that, and they are going to

9    say what about -- the lawsuit.

10          I think even us saying that they have the feature

11   is going to beg the question.  But at that point the question

12   won't be lawsuits, which is what accused products or accused

13   feature, that's what it sounds like.

14          MR. BATCHELDER:  So I hope it is clear.  But the

15   reason I asked this question in the deposition is precisely

16   because we talked about this last time, and I wanted to

17   establish the relevance, and their expert has now conceded

18   the relevance, and I think it just makes common sense.

19          But to say that Samsung has the feature, doesn't

20   get to the point.  The point is that Smartflash is saying

21   that these two different products have the patents in common,

22   and we want to be able to say that if that is true and this

23   one has been more successful, it is because of the value that

24   Apple has brought to that product.

25          THE COURT:  Why can't you say it just like that?

1    If the Apple products and the Samsung products have these

2    patents in common; and if Apple has been more successful,

3    then wouldn't you say that is because of the things that

4    Apple brings to the --

5            MR. BATCHELDER:  That is exactly what I want to do,

6    Your Honor.  So when you said they had the patents in common,

7    I just want to be able to say that Smartflash says practice

8    these patents.  That is all I want to be able to do.  I don't

9    want to say litigation.  I don't want to say suit.  I just

10   want to say Smartflash says these two products, company A,

11   company B, Apple, Samsung practice these patents.

12           And so according to them they have that in common.

13   So the success of this one must be attributable to the value

14   that Apple brings to the table.

15           MR. CASSADY:  Again, why aren't we just saying they

16   have the same patented feature?  The word "patent" is not

17   what bothers me.  I mean, they can say -- but it is the

18   insinuation that comes along with it that they want to do it

19   where it is Smartflash contends that they have this.

20           Well, there is no purpose in that.  Just say, for

21   the purpose of this litigation we are going to say they have

22   the patented feature.

23           THE COURT:  Right.  That is the thing is I don't

24   know why we need to say Smartflash says they have them.  Why

25   can't everyone in the room just at that point in that line of

```
 1   questioning agree that these phones have the patents in

 2   common?  I mean, Smartflash isn't going to object to that

 3   because the response would be, well, then I need to get into

 4   why we are saying that, right?  Which we don't want to do.

 5   So can't we do it in a way that is a little bit higher level?

 6           MR. BATCHELDER:  Well, my only concern about that

 7   is there will be no evidence in this trial about Samsung

 8   practicing the patents.  So I am afraid that would be

 9   confusing.  I think we need to be able to say that Smartflash

10   has said that.

11           THE COURT:  I understand that concern.  I mean, how

12   can we alleviate that?

13           MR. CASSADY:  Well -- what is the evidence that is

14   going to be put in now?  Just him saying we contend

15   something?  We are not contesting it.  We are basically all

16   agreeing to it, so that seems a lot more powerful evidence

17   than just we contend it.  That is what I am saying.  I just

18   don't see how this doesn't blow up in all litigation

19   issues.

20           MR. BATCHELDER:  I just want to be able to have my

21   expert say and be able to cross their expert on the notion

22   that Smartflash has said that these two products both

23   practice the patents-in-suit.

24           THE COURT:  Well, I think you can just start with

25   these two products both practice the patents-in-suit, and no
```

1    one is going to object to that from this side; and so it is

2    going to be a generally-accepted idea as a baseline to start

3    with.

4            Yes?  I mean, what am I missing?

5            MR. BATCHELDER:  Your Honor, that would be an

6    admission of infringement, if I may, if I put it that way.  I

7    can't say that.  It really has to be based on their

8    contention.

9            MR. CASSADY:  Well, no, your part has to be based

10   on our contention because you don't want to agree that you

11   infringe our patents.  You are not admitting anything for

12   Samsung, I mean, so you can say --

13           THE COURT:  Poorly worded question by the Judge.  I

14   would never want you to say we practice the patent --

15           MR. CASSADY:  Your Honor, if he wants to say yes,

16   that's fine.  But I am saying, you know, the point is it is

17   with regards to them that it actually matters --

18           THE COURT:  All right.  Listen, you guys keep

19   working on it.  You are close.  I think the line of

20   questioning is fair.  And I think there is a way to do it

21   without implicating other litigation.

22           MR. CASSADY:  I agree with the line of questioning,

23   Your Honor.  I totally agree.  That is not the argument.

24   Yeah, we will keep working on it.

25           MR. BATCHELDER:  Thank you.

```
 1              THE COURT:  All right.  What is next?  How many
 2    more buckets do we have?  Let's have a bucket update.
 3              MR. PEARSON:  Two more relating to trial exhibits
 4    from Smartflash, Your Honor.
 5              MR. SCHENKER:  Your Honor, two more coming from
 6    Apple.
 7              MR. CALDWELL:  And 75 deposition buckets.
 8              THE COURT:  What?  What?
 9              MR. CASSADY:  It's a joke.  Just ignore it.
10              MR. BATCHELDER:  Your Honor, if I could -- I'm
11    sorry to interrupt.  For timing purposes and planning
12    purposes in the afternoon, I know Your Honor wanted some
13    brief commentary on standing.  We are happy to do that.
14              I also want to make sure that I am carving out 15
15    minutes to address, Your Honor, the emergency motion we filed
16    Friday about the late-disclosed Mills' calculation that we
17    got on Thursday night.
18              THE COURT:  Okay.
19              MR. BATCHELDER:  It is just really important to us,
20    and we want to get that resolved.
21              THE COURT:  Okay.  Then we will save some time for
22    that.
23              MR. BATCHELDER:  Thank you.  I appreciate that.
24              THE COURT:  And, really -- I mean, I have the
25    briefing on the standing issue.  I have been through all of
```

1   it, so it is really just to give you an opportunity to reply

2   to the response.

3          MR. BATCHELDER:   Thank you.

4          THE COURT:   And just because we haven't had an

5   opportunity, so...

6          MR. SCHENKER:   Okay.   So the second to last on our

7   bucket list, we have got Exhibits 102.001 and 102.002 are

8   videos -- they are described as videos of Tim Cook Intro at

9   WWDC.   That is the Worldwide Developer Conference.

10         These are two videos of Tim Cook, the CEO of Apple,

11  and other people putting a presentation at a convention.   One

12  of them is over an hour-and-a-half long.

13         I guess we are objecting to these on the grounds of

14  relevance.   We are objecting to them also -- on the first one

15  of two videos, for example, talks about worldwide numbers in

16  terms of number of apps downloaded worldwide and amounts of

17  money paid to developers worldwide, which we think, given

18  some of the issues that have already been hashed out today,

19  would be prejudicial and wouldn't be there.

20         The larger issue is we don't really see how these

21  videos can be relevant at all, especially not one that is an

22  hour-and-a-half long and how it is planned to be used.

23         It wasn't relied on by their infringement experts

24  in terms of identifying how the accused features worked.   I

25  don't believe it was relied on by their damages experts in

1    terms of apportioning damages.

2          So the fact that Apple participates in a Worldwide

3    Developer Conference that has videos on it, just seems really

4    highly prejudicial to put out there, and without any

5    probative value.

6          THE COURT:  Okay.  Let's talk about the videos.

7          MR. STEWART:  Your Honor, Chris Stewart for

8    Smartflash.  I don't think we need to play the videos,

9    especially not the hour-and-a-half one.

10         THE COURT:  Not the hour-and-a-half one.

11         MR. STEWART:  However, my colleague, Mr. Cassady,

12   just pointed out to me that in a previous case that he had, I

13   think Opti versus Apple, these same videos were attempted to

14   be entered only in part, a piece of them; and there was

15   actually objection from Apple about incompleteness, and I

16   think they entered the entire video.

17         That is the reason for the entire video being in

18   because to the extent there are relevant portions which --

19   which we think Apple should agree the entire video should

20   come in.

21         As to the relevance, of course, these are, you

22   know, speeches by Apple's CEO and CF -- and other high

23   executives about the accused features.

24         THE COURT:  So what parts do you want to play and

25   why?

1          MR. STEWART:  So there are going to be a smattering

2     of clips throughout the videos that go to the accused

3     features, the App Store, the various features on the devices

4     related to the App Store and the other infringing technology,

5     videos and music.

6          So it is going to be kind of smattered throughout.

7     These are conferences and features given to app developers,

8     so there is going to be the discussion throughout about the

9     importance of the app development -- app developer community

10    to Apple and to Apple's products.

11         So to the extent, you know, we needed to sort of do

12    a splicing, it wouldn't, in our opinion, be very efficient.

13         THE COURT:  Okay.  So you are not going to be

14    relying on any worldwide app developing numbers or anything

15    else that was just listed as objectionable.

16         MR. STEWART:  Certainly, you know, we already

17    discussed earlier, Your Honor, that to the extent these are

18    preadmitted they obviously still would be -- you know, would

19    be subject to the motions in limine.

20         THE COURT:  Would it give Apple some comfort if I

21    ordered them to narrow down to what they think they will

22    be -- the snippets they will be using, and then let you see

23    those under the grounds you won't make an incompleteness

24    objection because, obviously, I have ordered them to narrow

25    it down.  So maybe we could resolve this dispute, in other

1   words, by getting them to whittle it down to what they really

2   need in that presentation.

3           MR. BATCHELDER:  That is exactly what we propose,

4   Your Honor.  Thank you.

5           THE COURT:  Okay.  Let's do that.

6           MR. CASSADY:  Your Honor, I will just say one thing

7   just to put this out there, so we don't have to come back

8   here.

9           THE COURT:  Sure.

10          MR. CASSADY:  There are a couple of snippets in

11  that video that I am aware of where Tim Cook is making

12  statements about the overall units of downloads that have

13  occurred.  Like, we have allowed a billion app downloads.  He

14  is telling the app developers that.  And he is telling the

15  app developers how important they are to Apple.

16          Those kind of generic statements, I'm assuming

17  nobody is objecting to those.  I mean, there is no reason not

18  to bring it up now in case there is going to be an issue.  I

19  don't see what issue there would be with that, but you tell

20  me.

21          MR. ALBRITTON:  Well, I mean, those are worldwide

22  downloads, Your Honor.  Those are not -- I mean, we have no

23  objection to it if it is U.S.-only downloads but not

24  worldwide downloads.  We would object to that.

25          MR. CASSADY:  Well, they don't talk in United-

1    States-only downloads.  And this is our only way to show Tim

2    Cook telling them how important the stuff is.  I mean, this

3    is what it is.

4         And so he is saying worldwide downloads of apps as

5    a billion, I'm not sure that -- I mean, we are not using it

6    as a royalty calculation.  We are not talking about dollars.

7    We are talking about units.  You know, so I am not sure what

8    the issue is.

9         That is why I brought it up because I thought this

10   might be what it is.

11        THE COURT:  What is this used in response to --

12   this notion -- I'm trying to see if it is in response to what

13   you think is an overarching theme is that, you know, there is

14   not a lot of that going on.  I mean, is there anyone

15   disputing that there are a lot of app downloads?

16        MR. CASSADY:  No.  And -- actually -- my point is

17   to show the jury how important it is.  I think sometimes

18   juries lose sight of the witness testimony that is in front

19   of them, but why don't you hear from the CEO.  No, we didn't

20   ask them to bring the CEO to a deposition so we can get his

21   testimony about it.  But that doesn't matter because this is

22   an admission against a party opponent.

23        So we think it is important to play those videos to

24   the jury in the position of the market and what they are

25   looking at with this player instead of just the now

1    litigation based statements of the witnesses.  So I have done

2    this in a couple of Apple cases, and we have played videos

3    like this --

4                 THE COURT:  Okay.

5                 MR. POST:  The issue is that they are, in fact,

6    worldwide numbers.  They are not limited to U.S. conduct.  We

7    have produced to Smartflash large spreadsheets, all kinds of

8    ways.  They know exactly how many downloads have taken place

9    in the United States and United States customers.  So those

10   numbers are there.  They just are not in a video form.

11               The problem is the video form is worldwide numbers.

12   That is the issue.  That is prejudicial.

13               MR. CASSADY:  Your Honor, what is going to

14   happen -- so, yes, I have U.S. app downloads on a piece of

15   paper, and I'm going to get up and show that to the jury.

16   The jury is going to have no context when Tim Cook gets up

17   and talks for an hour.  He talks for 30 minutes about apps.

18   You know, they are not going to have that context.

19               I'm trying to give them context for here is them

20   talking to the world and here is what they say.  And he wants

21   me to take their internal document that says this is how many

22   app downloads.

23               So they are going to criticize by saying it is

24   battery life, it is screen size, it is this, it is that.  I

25   think it is fair that there is like a ten-minute window in

1    there where he is just talking about the app developer market

2    and how critical it is to Apple and how an iPad or an iPhone

3    wouldn't be an iPad or an iPhone if it wasn't for the app

4    developers.  I mean, I can't get that from a piece of paper,

5    and that is what is critical there.

6              MR. ALBRITTON:  And all of the things he just

7    described they can get without getting into the specific

8    number of worldwide downloads.

9              THE COURT:  That was my next question.

10             MR. CASSADY:  He sits there with it behind him on

11   the screen the whole time.  It said a billion apps

12   downloaded, and he talks about the app market and the app

13   environment and he goes through it, and I just don't see why

14   a number -- I don't see what is prejudicial about that

15   number.

16             And I'm not sure about this case, but I mean, I

17   think their downloads come from a United States server

18   anyway, so I'm not sure that that is even -- the

19   extraterritorial thing is even covered through app downloads.

20             THE COURT:  Okay.  Okay.  Well, y'all please keep

21   working on this.  If he is sitting back there with it behind

22   him on a screen the whole time, I'm not going to cut out that

23   whole stuff because he -- just because it is behind him on a

24   screen.

25             I would like you to work on maybe not using that

1    one sentence about the billion app downloads.  See if you can

2    find some middle ground on that.  So leave that one out, but

3    maybe he can say some of the other things that he spends a

4    great deal of time talking about app downloads.

5         MR. CASSADY:  Thank you, Your Honor.  That is what

6    I need.  That is the guidance I needed.  Thank you very much.

7         THE COURT:  All right.

8         Okay.  What is next?

9         MR. CALDWELL:  Your Honor, Brad Caldwell.  Looks

10   like I have one of these now, and I think this bucket

11   consists of one drop.  So it is Defendant's Exhibit 208.

12        If we could, could we pull that one up?

13        Your Honor has seen this document probably in a

14   more legible size -- there we go -- a few different times.

15        What this document is, in 2009, late 2009 when

16   Mr. Racz was talking with one of the companies he considered

17   doing a deal with, what happened was I think that they

18   basically agreed to an agreement in principle.

19        Then the other side comes back to them and says,

20   well, here is a little prior art patent I want you to look

21   at.  And this is where he writes back and says:  I don't

22   think that has anything to do with mine.  It doesn't fit in

23   with mobile phone infringements.  It doesn't have the paying

24   for invalidated content wirelessly to a mobile phone, for

25   example.  It is different.  I don't see how it is the same.

1   It is different.

2        But then he says on the next page, from our

3   perspective it is simply a prior publication.  It is not what

4   we are doing.  In the event you disagree, we can see some

5   other options, but the options to follow would depend on U.S.

6   litigation tactics.

7        Mr. Batchelder really likes number one.  I mean, he

8   has read this to you on three or four times in the past.

9        But what happened was in this bullet number 1 as

10  his first alternative to his actual belief, Mr. Racz says:

11  Well, one thing we could argue is that a data carrier is an

12  intermediate device.

13       We could argue that for '720, Claim 1.  I don't

14  know that this applies to other claims because we think

15  Claim 3 is broader, for example.  Then he goes on to do other

16  things.

17       And at the top of the next page.

18       If you would.

19       At the top of the next page he says:  Look, it is

20  good that we are identifying prior art now.  That helps us

21  assess everything.  But have your company run this issue past

22  a skilled U.S. litigator to look at and deal with.  We could

23  expect some positive suggestions there.

24       What was happening was and the thing that

25  Mr. Batchelder likes to say, oh, Mr. Racz and his lawyer

1    drafted this.

2         What happened was when he was considering doing

3    this deal is --

4         If we go back to the top of Page 1, if you don't

5    mind.  I'm sorry.

6         There is a little intro nugget at the top of Page

7    1.  Very top.  Right there.  It says Erik, please note the

8    following comments...Patrick.

9         And then, essentially, he pastes in something that

10   is drafted by his UK lawyer, and that's how he testified in

11   his deposition.  And the UK lawyers don't understand the

12   American claim construction law.  That's why they also come

13   back and say talk to the U.S. -- the skilled U.S. lawyer

14   about this thing.

15        My point is simply that maybe there are just

16   redactions that could handle that, but I don't know that we

17   have to have a big fight over this.  But every time this

18   document has come up in the case it has been with

19   Mr. Batchelder saying you have to read in this intermediate

20   device, removable card thing on data carrier based on this.

21   And this is that same piece of extrinsic evidence that we

22   have talked about few times that you have kept out.

23        And I understand their position.  I have done

24   nothing but take them at their word that they are not going

25   to argue claim construction to the jury, but I think that is

1   literally the only thing we have ever heard about that

2   portion of this document, so at least that should be redacted

3   or the document should just be excluded under the

4   already-granted Motion in Limine No. 1 from Smartflash on

5   claim construction.

6            THE COURT:  Okay.  Response?

7            MR. BATCHELDER:  Your Honor, this conversation

8   starts with a third party saying to Mr. Racz, we are

9   concerned -- you have asked us to invest money in your

10  patents.  We are concerned that your patent is invalid in

11  light of a given prior art reference.

12           Mr. Racz responds by saying, no, actually our

13  claims are distinguishable.  That is relevant to several

14  things, including willfulness here; that third parties in the

15  industry are reading these patents and concluding they are

16  invalid.

17           So we do like this document.  We think it is

18  relevant to a variety of issues, but that is at least one of

19  them, and we think there is no basis to exclude it for that

20  purpose.

21           But, as I say, if Mr. Caldwell has redactions to

22  propose, I am happy to consider them so he can continue to

23  work on that if Your Honor would like.

24           THE COURT:  Yeah, I mean, have y'all not -- have

25  y'all not talked about possible redactions to this document?

1          MR. CALDWELL:  My proposal is very concrete, and it

2    just relates to this bullet point 1 that Mr. Batchelder

3    always cites on claim construction.  You know, I think this

4    is one of the instances -- like I say, we have tried to

5    tailor down our objections, and this is one of the ones where

6    my understanding is we weren't objecting to this chain

7    because what originally happened was Mr. Racz agreed to a

8    deal in principle, and then they came back and tried to

9    rework the deal; and when he saw that, he said, look, I think

10   what you are saying is nonsense on this prior art; but he

11   also just walked away from it.

12          My proposal on redaction is that simple.  We always

13   point to this number 1 and say, oh, a data carrier, we could

14   argue that is an intermediate device.

15          THE COURT:  What about redacting that bullet point

16   number 1?

17          MR. BATCHELDER:  Your Honor, honestly, this is the

18   first time I have heard that proposed.  Could I ask to

19   consider that overnight and confer with Mr. Caldwell?

20          THE COURT:  Oh, overnight, yes.  I really was

21   hoping to resolve all of these.  I'm worried that you are not

22   going to resolve it, and I'm going to have another dispute.

23          MR. CALDWELL:  That's my fear, too.  I think it is

24   a very discrete issue.  I mean, how about if maybe --

25          THE COURT:  At the next break.

```
 1              MR. CALDWELL:  After the next break --

 2              MR. BATCHELDER:  I will look at it over the break,

 3    that's perfectly fine.

 4              THE COURT:  Okay.

 5              MR. BATCHELDER:  Do you have a hard copy?

 6              Okay.  We have got it.  Thank you.

 7              THE COURT:  Okay.  Then what is next?

 8              MR. SCHENKER:  So, Your Honor, I think the last

 9    bucket on our list at this point are some of the agreements

10    that we have come to in rulings today is a group of documents

11    that were produced by Samsung and HTC in the other

12    litigation.  They weren't produced in this litigation, and

13    they are documents that come from a different litigation

14    altogether; and, you know, we don't see kind of how or why

15    they should be introduced as evidence in this litigation,

16    what they are probative of with respect to the damages model

17    against Apple since it is a different damages case against

18    Apple, and they are using it against Samsung and HTC, as far

19    as I understand.

20              You know, we have generally had an agreement just

21    keep separate and apart and stay away from the other

22    litigations in general, so I am not really sure why the

23    documents produced in that litigation really should be

24    brought into this litigation altogether.

25              THE COURT:  What kind of documents are they?
```

```
 1              MR. SCHENKER:  They are marketing documents, I
 2    think survey documents.  I think we can pull up some
 3    examples.
 4              MR. CASSADY:  What number?
 5              MR. SCHENKER:  96 is the first one.
 6              I mean, in some of these categories there is a
 7    large number of documents.  I don't know if you want to go
 8    through all of them.
 9              THE COURT:  Okay.  Well, we don't need to go
10    through the specifics just yet.  I was trying to get a feel
11    for -- your general categories are helpful.  Marketing
12    documents.
13              Is this one right here PX 96?
14              MR. SCHENKER:  Yeah.
15              THE COURT:  All right.  Well, let me get a response
16    on that then.
17              Mr. Stewart.
18              MR. STEWART:  Your Honor, Chris Stewart for
19    Smartflash.  This issue may sound familiar to Your Honor
20    because Your Honor has taken it up I think three separate
21    times in the reverse order with Samsung and defendants in the
22    Samsung case arguing about Apple documents being exchanged
23    over there.
24              It is basically the exact same argument.  They have
25    exchanged these documents.  They saw them before expert
```

1   reports.  Mr. Mills relied on these documents in his expert

2   report.

3           If we could go back to Page 2 of this document, you

4   would note that it talks about beating Apple as a primary

5   goal of Samsung; and it talks about the competitiveness of --

6           THE COURT:  Why is that relevant in the Smartflash

7   v. Apple case?

8           MR. STEWART:  Because the perception of Apple's

9   competitors about the importance -- or the success of Apple

10  and the importance of the accused features to Apple's success

11  and to their competitive advantage, just goes to show that

12  these accused features are valuable and are essential to

13  Apple's products.

14          And, Your Honor, I didn't actually note that

15  comparison earlier when Mr. Batchelder was talking about

16  Apple's awards.  Now, there are two products that are

17  competitors both that Smartflash contends infringe.  They

18  want to show why their products are better because of other

19  features, and we want to show that, in fact, their products

20  in their competitor's minds are better because of the accused

21  features.

22          THE COURT:  All right.  Well, let's just take a

23  couple of these head on then.

24          Explain to me about this one, for example, why this

25  Samsung document, and particularly this page, is relevant to

1  you in the Apple case.

2          MR. STEWART:  So, sure, Your Honor, this page is

3  one page of several in this document that talk about beating

4  Apple, talk about that being the sole focus of Samsung in

5  their endeavors over the next course -- over the next few

6  years.

7          THE COURT:  And I get it.  I mean, they are

8  competitors, right?  Wouldn't everyone assume that is

9  Samsung's goal and it is probably Apple's goal?  I mean, what

10  is the tie --

11          MR. STEWART:  Right.  I hesitate because I am not

12  sure I can point you to a specific slide, although Mr.

13  Cassady can help me out.

14          THE COURT:  Anyone can jump in.

15          MR. PEARSON:  I believe we are looking for the

16  slide, Your Honor, but this particular document talks

17  about -- it is specifically relied on and discussed at length

18  or at least in paragraph form, more than just a bare citation

19  by Mr. Mills, for the premise that at least Samsung believed

20  when it made this document that when one of the accused

21  features was released by Apple -- I believe it was the App

22  Store, and we can find the page -- Apple's sales jumped by 42

23  percent.

24          And we think that is very good and strong evidence

25  of the value and the importance of these features -- or at

1   least that was Mr. Mills' interpretation when he was citing

2   about it.

3           THE COURT:  That he relied on this exhibit and in

4   some detail talked about the page you are currently looking

5   for.

6           MR. PEARSON:  Definitely.  And I can also, I think

7   fairly represent to the Court that there are some documents,

8   such as this one, that legitimately were discussed in

9   paragraph form and quoted and whatnot.  There are some other

10  ones that might have just been cited in footnotes that,

11  obviously, we think contain valuable information.

12          But I am going to be honest, there are probably --

13  some of those are on the chopping block now that we have to

14  reduce our exhibit numbers.

15          MR. STEWART:  And, Your Honor, I just would point

16  out, too, that these documents work in tandem to the extent

17  that some of them discussed the importance of the accused

18  futures to Apple's success and others maybe do just touch

19  generally on the competitiveness of those competitors with

20  Apple.

21          It is those two concepts in combination that

22  actually lead to the conclusion that these features are

23  important.

24          THE COURT:  All right.  Mr. Schenker, while they

25  are looking for that piece of this document, give me your

1    response.

2            MR. SCHENKER:  Well, so I guess two responses

3    initially.  I understand that they are saying Your Honor has

4    kind of approached these documents a number of times before.

5    But my understanding is that each time this was dealt with

6    was in the aspect of discoverability of these documents,

7    which really doesn't get to the admissibility of these at

8    all.

9            I don't think Your Honor has at this point at all

10   ruled that these documents should just be admissible just

11   simply because they are discoverable.

12           THE COURT:  All right.

13           MR. SCHENKER:  In terms of the last point that if

14   there are some documents that might have been subsequently

15   talked about, there are other documents that maybe were -- we

16   think they kind of go hand in hand.  It sort of undercuts

17   this entire thing that there are a lot of documents that

18   don't really have a relevance, that haven't really been

19   discussed; and we have got, instead, this large bucket of

20   documents that were never produced in our case, entirely for

21   another litigation, and haven't been through the same kind of

22   discovery --

23           THE COURT:  Let me just generally give you a ruling

24   or some guidance on these.  If there are documents like this

25   ones you are telling about where Mills has at length or at

1    some length opined or used them, relied on them, talked about

2    this 40-percent jump in sales, I see the relevance of that.

3    It can come in.

4            But if there are kind of a set of documents that

5    are more generally or really minorly relied on, I think those

6    are not going to come in.

7            Does that make sense?

8            MR. CALDWELL:  And that applies to both parties --

9            THE COURT:  Yeah, and I think I have sort of ruled

10   consistently that way on several issues today.  I mean, if

11   you have got an expert and he is really talking about this

12   document and he is showing why that jump in sales is

13   relevant, okay.

14           But if it is just 20 documents that were produced

15   in the Samsung case and you think it shows that they are

16   competitors and Apple wants to beat them, well, okay, we got

17   that.  That is not coming in.

18           MR. CASSADY:  Your Honor, just to tie the knot on

19   this one.

20           Can you switch over to our doc camera now?

21           Okay.  Zoom on this bottom left piece.

22           This is a Samsung document, and here is a good

23   example.  The App Store launch in 2008 had a direct

24   contribution of 42 percent unit share lift to Apple.

25           I mean, that is your competitor saying we think

1   your lift of sales is directly related to an accused feature.

2   It is what Mr. Pearson was describing.  And I think you

3   already ruled on it.  I just want to show it to you because

4   that is what we are talking about.

5           These kind of documents Mr. Mills goes in detail

6   about throughout his report.  Other ones, I will agree, there

7   are occasions where he cites five documents, and he doesn't

8   go into some of those details.

9           THE COURT:  So we are about to take a break, and

10  what I want you do is -- with regard to this category of

11  documents -- see if you-all can agree which ones are

12  significantly talked about by Mills and would under this

13  ruling be admissible and which ones are not.  So what we

14  don't have is you later not having an agreement about my

15  ruling.

16          MR. CASSADY:  Okay.

17          THE COURT:  Mr. Schenker, what are you --

18          MR. SCHENKER:  If I may respond.  I mean, I

19  guess --

20          MR. PEARSON:  I have a proposal that would be kind

21  of easy, I think --

22          THE COURT:  I like it.  I like easy.

23          MR. PEARSON:  -- clear cut.  That if Mr. Mills

24  quoted something in a paragraph or includes excerpts of

25  quotes in a footnote where there is like actual text from a

```
 1   document that made it into his thing, not just bare
 2   citations, maybe that is a clear line we can agree on.
 3            THE COURT:  I think that is good.  We are going to
 4   talk about it at the break.
 5            Mr. Post.
 6            MR. POST:  We will talk about it over the break.  I
 7   am not sure we can -- we will talk about it.
 8            THE COURT:  All right.  This is my guidance:  If
 9   Mills is generally relying on it and he is using it in part
10   of his analysis, it is going to come in.
11            And also, Mr. Batchelder, you were going to look at
12   the possible redaction of that one email over the break.
13            MR. BATCHELDER:  I will.
14            THE COURT:  All right.  We are going to take
15   another break, 15 minutes.
16            (Recess was taken at this time.)
17            THE COURT:  Please be seated.
18            All right.  Hi.
19            MR. BATCHELDER:  Your Honor, I am at the podium
20   because I am delighted to report not one, but two
21   agreements.
22            THE COURT:  Yes.
23            MR. BATCHELDER:  The first is, as to the opposed
24   proposed redaction by Mr. Caldwell on the Racz/Gregg email,
25   that is DX-APL 208.  He had proposed redacting paragraph
```

1    number 1.  I pointed out to him that paragraph number 4 also

2    deals with claim language and claim interpretation, and if 1

3    is going to come out, we think 4 should, too.  And he agreed.

4           So what we agreed is that we would take out

5    paragraphs 1 and 4, and then also to avoid to the Judge and

6    Jury that there are holes in the documents; that actually the

7    numbers of those paragraphs 1, 2, 3, 4, 5, they can also come

8    out.  So just the remaining text can be there.

9           THE COURT:  Very good.

10          MR. BATCHELDER:  So that is agreement number 1.

11          And now agreement number 2, Mr. Cassady will

12   correct me if I misstate this, but I think we agreed on

13   wording on the comparative language, so I think we agreed

14   that we can get in the notion that Smartflash says that this

15   Apple product and that competitor product, like that Samsung

16   product, practice the patents-in-suit and could say that this

17   Apple product and that Samsung product practice the

18   patents-in-suit with the same feature, with those kinds of --

19          MR. CASSADY:  "Says" is the word, that is fine.  We

20   are okay with "says."

21          THE COURT:  Good.

22          MR. BATCHELDER:  Okay.

23          THE COURT:  Good job.  Thank you.

24          MR. BATCHELDER:  Thank you.

25          THE COURT:  All right.  Am I right we have one more

```
 1    bucket left?
 2              MR. STEWART:  Well, Your Honor, actually we had one
 3    more thing we were supposed to discuss over the break --
 4              THE COURT:  Yeah.
 5              MR. STEWART:  And I'm actually going to be the
 6    bearer of bad news.
 7              THE COURT:  No.
 8              MR. STEWART:  And say we didn't quite resolve that
 9    issue.
10              THE COURT:  All right, Mr. Stewart.
11              MR. STEWART:  There was the issue of these Samsung
12    and HTC documents that Mr. Mills actually relied on.
13    Apparently we couldn't come to an agreement as to a
14    bright-line rule.  We think to the extent it is other
15    documents that are either quoted or there is a substantive
16    discussion of documents, followed by a citation to one of
17    these Samsung or HTC documents, that should be the
18    substantive discussion that satisfies Your Honor's ruling.
19    And, as we understand it, Apple disagrees with that.
20              THE COURT:  All right.  Mr. Post.
21              MR. POST:  Very briefly.  I think we have two
22    issues with these types of documents.  I don't think there
23    are very many, frankly, in Mr. Mills' report at this point.
24              But they are -- as far as this litigation
25    is concerned, they are third-party documents.  That
```

1  particular one that you saw, I don't want to put them back up

2  on the screen because they do contain Samsung

3  highly-confidential information, I understand.

4        We do have Apple folks here today with us, which is

5  another issue I think how they are going to be used at trial.

6  I don't know that we can shepherd the confidentiality of

7  third-party documents.  But they are -- that particular one

8  was an embedded hearsay document.

9        We have produced 6-million-plus pages of

10  documentation in our case.  We have produced, as the exhibit

11  lists demonstrate, multiple surveys, marketing studies.  If

12  there is information from Apple's own documents that they

13  want to use and cite, they have done that.  We don't see the

14  need of using these third-party documents essentially in

15  place of Apple information.  We don't have discovery from

16  them, and we have these hearsay and confidentiality issues.

17        So that is our issue.  I don't think it is a

18  tremendous number of documents at this point given what they

19  have narrowed down to, but we do think that those still ought

20  not be showed.

21        THE COURT:  Okay.  What are the documents, and let

22  me see them.  If we are not going to put them up on the

23  screen, let me see a physical copy.

24        (Pause in proceedings.)

25        MR. POST:  If it is easier, we can have our two

1  folks step out so we can put them up on the screen.

2          THE COURT:  Okay.  Thank you.

3          Now, okay, before we get into this, my wise Court

4  Reporter is telling me, is this something that needs to be

5  sealed or are we talking about --

6          MR. POST:  Well, let's see if we can put it up on

7  the screen and talk about it without saying the actual

8  specifics.

9          THE COURT:  Okay.

10          (Mr. David Melaugh and Ms. Cyndi Wheeler left the

11          courtroom.)

12          MR. STEWART:  So, Your Honor, has already seen

13  Exhibit 96.

14          Can we pull up 104.001?

15          Oh, right, so, Your Honor, can we actually have a

16  ruling on 96?  You have already seen that one.

17          THE COURT:  Okay.  Well, let's look at 96.  96 was

18  a how-many-page document, and we looked at that one page of

19  that document and talked about one snippet of that page, so

20  let me see it.

21          So 96, Mr. Mortensen.

22          So is this the end?

23          TECHNICIAN:  No, that was the page --

24          MR. STEWART:  Okay.  So that was -- a page on the

25  end you have already seen, the beginning at Page 1 about

```
 1    competitiveness --
 2             THE COURT:  All right.  I see the indication that
 3    says PX 96-1.  Then the page shows PX 96-89.  So are you
 4    telling me -- am I -- can I assume that I was looking at the
 5    89th page in that one exhibit just now?
 6             MR. STEWART:  Yes.
 7             THE COURT:  So it is a more-than-89-page document?
 8             MR. STEWART:  That's right.
 9             THE COURT:  Tell me why the whole thing is
10    relevant.
11             MR. STEWART:  Your Honor, to the extent that the
12    competitive nature of the Samsung and Apple relationship is
13    continued to be discussed in interim pages prior to that 89th
14    page talking about the specific feature or the specific
15    aspect of those products, that creates that competitive
16    disadvantage.
17             THE COURT:  What I am going to need you to do,
18    though, is tee up for me the relevant portion of this
19    document that you need and -- because it is replete with
20    hearsay and all kinds of potential issues.  I have no idea.
21    I can't look at it.  It is 89-pages-long-plus.
22             So what part of the document do you need and why?
23             MR. STEWART:  Your Honor, I apologize.
24             THE COURT:  That's okay.
25             MR. STEWART:  I'm simply unable to do that.
```

  1          THE COURT:  Mr. Cassady.

  2          MR. CASSADY:  Your Honor, I mean, there are many

  3  pages that have this kind of beat Apple, here is how Apple is

  4  beating us tone.  I don't have the ten or so of those

  5  memorized, and we can get the expert report out and show the

  6  citations.

  7          They know which ones they are.  It is the same

  8  thing we have been citing the whole time.  It is the 42

  9  percent of the market -- of Apple's market is because we let

 10  them beat us to this specific feature, various aspects of

 11  that.

 12          The hearsay objection, though, this isn't for the

 13  truth of the matter asserted.  This is for your competitors

 14  believe that this is the advantage you got from this feature.

 15  Whether it is true or not, that is irrelevant.  It is the

 16  fact that your competitors in the space thought this and that

 17  is why -- that is what we are looking for here.

 18          So Apple is going to -- just like what we just

 19  talked about and agreed to, they want to talk about how,

 20  well, if they have got the feature, then how can we have

 21  motivated anybody?  This goes to before they had the feature.

 22          And they admit that they think that the other

 23  people were motivated to buy Apple because they didn't have

 24  the feature.  So there are pages like that.  We can go to

 25  that last -- I mean, that page that has the 42 percent, that

1  page is a very specific example.  That 42 percent shows up

2  two or three other times in this document and has different

3  import when it shows up.

4         But, I mean, a perfect example is this one here.

5  Focus on the building.  I can't remember what CNS is right

6  now, but I think it is software offerings and broadening the

7  ecosystem preference and showing market competition.  I don't

8  see anything objectionable on here.

9         And then we have the App Store launch in 2008 had a

10  direct contribution of 42-percent unit share lift to Apple,

11  and so --

12         MR. STEWART:  Your Honor, if I could add just one

13  more thing -- just, obviously, Your Honor's wishes with

14  respect to looking at the individual documents trumps

15  whatever our agreements were.  But I do want to point out

16  that when we agreed to bucketize these objections, the idea

17  was there was an agreement between the parties that these

18  buckets all rose and fell based on the same general

19  principles.

20         They objected to the prejudicial nature of these

21  because they were cross-produced.  I understood Your Honor to

22  sort of resolve that objection, so that is why we didn't

23  necessarily prepare to talk about every single page.

24         THE COURT:  I understand that.  That's a fair

25  point, Mr. Stewart.  I guess what I am trying to do is I -- I

 1   would admit this document, this page of this document.  What

 2   I am worried about is what else is in this document that I am

 3   letting in?  Is there something else?

 4          Maybe that is just for Apple to tell me, there is

 5   something else in this document that is hugely prejudicial,

 6   and that is the part we want redacted.

 7          MR. CASSADY:  Yeah, if there is something else,

 8   Your Honor, we are happy to redact, just like we are with

 9   most of these other documents.  That is the thing they know I

10   want.  There may be other ones that are very similar to that.

11   Those are the statements I want out of this document.

12          If there is something prejudicial, I am not aware

13   of it.  And we are happy to redact and make it a less

14   burdensome document.

15          But, I mean, objection to 89 pages is not exactly

16   something to deal with --

17          THE COURT:  Yes.

18          Mr. Post.

19          MR. POST:  I think this one is about 140.  And I

20   think -- so we -- is it Your Honor's position that the

21   embedded hearsay example of this little thing in the corner

22   is going to be overruled.

23          THE COURT:  In the same fashion, if Mr. Mills has

24   relied on it and opined on it and talked about it, I am going

25   to let it in just like I did in overruling their hearsay

 1   objection to some of the things that your experts relied on,

 2   in the same fashion.

 3           MR. POST:  So I think, you know, for documents like

 4   this where they are substantial and there are lots of issues,

 5   whether they be prejudice, hearsay, that aren't relied upon

 6   by any expert, we would ask that those be redacted.  And it

 7   may be -- especially for the ones that aren't even ours.  We

 8   still have the confidentiality issue that we may have to work

 9   through.  I'm hoping we can do that.

10           What I have done in other cases is if a document

11   like that that is confidential, if a particular slide is

12   used, then it is left in unredacted form.  But everything

13   else that is not used with the witness gets redacted.  And I

14   think that for these particular materials, that may be what

15   we request.

16           Not just so much just -- you know, if Mr. Mills

17   cited to six pages, maybe that is a starting point.  But if

18   all six of those aren't used with him as a witness, we would

19   ask that those -- that they then be redacted.  Just left to

20   what was shown to him, what he testified about during the

21   actual trial.

22           THE COURT:  Given the nature of these documents

23   that they were produced in another litigation and they are

24   subject to other confidentiality issues, I think that is

25   probably a fair request.

1          MR. CASSADY:  Your Honor, I think the line -- just

2    so it is clear, I think the line is going to be, you know,

3    Mr. Mills says these documents supports his position.  He is

4    talking about this page and shows this page and a couple

5    before this and talking about details that are related to

6    this and how and why.  At that point I think that evidence

7    should be in the record.

8          I agree, I am happy to redact, you know, other

9    things he is not at least mentioning or saying examples to

10   the jury.  It is just that line of how far we have to go for

11   it to be there, but I agree.  The vast majority is going to

12   get redacted; and Samsung, I'm sure, will be watching our

13   trial with bated breath, and they will be there to help

14   protect their own confidential information, so...

15         THE COURT:  All right.

16         All right.  Is there another specific document that

17   I should look at and give you some guidance on in this group?

18         MR. CASSADY:  I mean, I would think with this

19   instruction we would go back, and I think we would be pretty

20   quick to get through the ones that he cites.

21         But unless they have got some specific issue that I

22   am not aware of about these documents now that we are on the

23   ones that are just literally talked about in his report.

24         THE COURT:  Okay.

25         MR. CASSADY:  Candidly, Your Honor, this is where a

```
 1   lot of the candidates, I think -- given Your Honor's order we
 2   have to go down to 550.  These is where a lot of the
 3   candidates are going to be; that we are going to isolate this
 4   to the six or seven or eight of them that he talks about in
 5   detail, and that is what we will do.
 6                 THE COURT:  Okay.  All right.
 7                 Then what is next?  Now -- I was all excited a
 8   minute ago to say:  Are we on the last bucket?  Now are we on
 9   the last bucket?
10                 COURT SECURITY OFFICER:  Can the other couple come
11   back in?
12                 THE COURT:  Yes, thank you.
13                 (Mr. David Melaugh and Ms. Cyndi Wheeler return to
14                 the courtroom.)
15                 MR. PEARSON:  Your Honor, I am pleased to report
16   that we are on Smartflash's last bucket.
17                 THE COURT:  You are the bearer of really good news.
18                 MR. PEARSON:  I am also pleased to report that
19   there are two minor parts to this bucket.
20                 May I please have the ELMO?
21                 THE COURT:  Yeah, you have got to turn it on over
22   at the -- there you go.
23                 MR. PEARSON:  So what we are looking at there, Your
24   Honor, is defendant's -- well, I am trying to -- sorry.
25   There is a lot.  That is the point.
```

1          Your Honor, we have defendant's final prior art

2    elections, which are currently 20 references spread across

3    the asserted patents, eight references per patent.

4          With the exception of one of these documents, which

5    I am going to discuss in a second, we have no objection to

6    the references that are actually used at trial being

7    admitted.

8          However, we are requesting that today these

9    documents not be preadmitted because we believe there is a,

10   perhaps, strong -- at least a likelihood that this case will

11   be streamlined more before we actually get to the trial.  I

12   think there is a very decent chance that not all of these 20

13   references will be discussed in detail with their invalidity

14   expert.

15         And in accordance with the Court's guidance from

16   the previous hearing about state of the art, whatever is on

17   this list now and that is not ultimately mapped claim by

18   claim, we would say falls in state of the art and should not

19   be in front of a jury.

20         I know they are not on the clock today to have

21   elected precisely what is going in front of the jury, and

22   that is fine.  I'm not trying to stand in the way of them

23   presenting their case.  We just are concerned about a

24   situation where in opening if all of these documents were to

25   be preadmitted Mr. Albritton or Mr. Batchelder gives a very

1    good opening statement discussing 20 references and why they

2    all invalidate the patents.

3           And then on the back end when it is

4    Mr. Wechselberger's turn, you know, through no malice or

5    whatever, there is only time for two references; and if they

6    all got talked about in front of the jury, we would be

7    severally prejudiced.

8           So we would just ask for the simple solution of not

9    preadmitting them today, with the understanding that we do

10   not intend to object to their actual use at trial.

11          THE COURT:  So whenever they go forward on prior

12   art, reference-wise, at trial, you will not object to their

13   admissibility?

14          MR. PEARSON:  Correct.  That is currently on their

15   list of final references with the exception of DX 31, which I

16   would like to discuss in just a second.

17          Okay.  So response as to just that part?

18          MR. SCHENKER:  Your Honor, I guess I am not quite

19   sure, you know, how this sort of comports with the rest of

20   the preadmission process that we have been doing, the whole

21   purpose of the preadmission process, which is to get things

22   that should be into evidence preadmitted and admitted so they

23   can be dealt with.

24          It doesn't change Judge Gilstrap's practices and

25   the way Your Honor feels about Judge Gilstrap's practices, or

1     by only moving into evidence things that have been

2     substantively talked about, it doesn't -- you know, change

3     that.  It doesn't all of a sudden let something in that

4     shouldn't be otherwise in evidence.

5              But what we have got here are elected references

6     that are under, you know, Apple's current elections which we

7     can estimate we made the elections to be the appropriate

8     number.  This is exactly what is supposed to be preadmitted

9     and exactly what the entire purpose of today's hearing is

10    about.

11             I would note that Smartflash has already raised the

12    prospect of, you know, we don't know exactly what we are

13    going to present at trial in terms of infringement, and we

14    don't know exactly what this case is going to be limited to.

15    But we haven't gotten up and said you have got to not

16    preadmit any of the technical documents because some of those

17    technical documents might be about features or functions or

18    products that they don't ultimately accuse.

19             And Mr. Caldwell or Mr. Cassady or whomever from

20    their end, you know, Mr. Ward, can stand up in opening also

21    and they would have the same prejudice of saying, look at all

22    of these accused products and accused infringing features;

23    and these are all there and their expert Dr. Jones might just

24    get up and give evidence of one or two things.

25             I don't see how it is at all -- there is any equity

1    in this to allow that to happen.

2           THE COURT:  So what about kind of a ruling in

3    reverse that I preadmit the exhibit; but to the extent that

4    defendant's further narrow their prior art references, we

5    have an understanding that those exhibits would be pulled

6    just as if you narrow your claims or asserted products,

7    exhibits related to those would be pulled out of your exhibit

8    list?  Is there some way we can get to that in reverse?

9           MR. CALDWELL:  I think that is fine with us.  I

10   think as further color on the argument from Mr. Pearson,

11   another thing that would also be a problem is if it is

12   preadmitted and it is in the record, and really the only time

13   we hear argument about how it matches up to the claims is in

14   closing, for example.  I mean, that would seem to be

15   inappropriate.

16          I think we are actually trying to do what Apple is

17   saying we are not trying to do.  We are actually here telling

18   you you don't have to resolve something about hearsay and

19   authenticity and that sort of thing.  That is stuff we can

20   assume is good.  We just want to reserve the "does it go back

21   to the jury" part for if there is a further reduction.

22          So I think the way you are approaching it is

23   perfectly fine as long as -- we are saying we are just not

24   going to use this as a back-door into that whole

25   state-of-the-art unelected references kind of thing that we

1   have talked about before.

2           MR. BATCHELDER:  Your proposal is fine.

3           THE COURT:  Okay.  We will do it that way then.  We

4   will preadmit these exhibits that are unobjected to, but then

5   if at some point Apple reduces the number of prior art

6   references, we will pull any of those that are pulled from

7   the exhibit list.  Okay?

8           All right.  So let me hear about that one.

9           MR. PEARSON:  Thank you, Your Honor.

10          May I please have DX 31?

11          One of the elected references, Your Honor, is a

12  system, IBM plus Sony.  This is an article about this system,

13  and the article is from October 8th, 1999, I believe.  And

14  the situation here is we are objecting to the admission of

15  this document because this document does not corroborate how

16  the IBM plus Sony system worked at the relative time; i.e.,

17  before our priority date.

18          If you look at the text of this article -- which,

19  again, I apologize I can't read very well -- it talks about

20  plan changes that are going to be made the following year by

21  this Japanese company.

22          Those glasses are not going to help me.

23          I appreciate your patience, Your Honor.  The fact

24  is, there is a lot of "wills" and this is going to happen and

25  that will happen and here are some statements about the

1   future.  And all those future-looking statements do not

2   corroborate how this system is working at the time of the

3   article being written.

4         And I'm not trying to stop them from having Sony

5   plus IBM as a reference.  They have other articles that are

6   about it that are also, you know, stuff off the Internet that

7   is hearsay and unauthentic that I am not even bothering with.

8   With respect to this one, we don't believe these statements

9   actually corroborate the system at the appropriate time

10  period.

11        THE COURT:  Okay.  Response.

12        MR. SCHENKER:  Well, Your Honor, this exhibit talks

13  specifically about the fact that Sony had released this

14  memory stick.  It talked specifically about the IBM EMS

15  system which is the entire thrust of the IBM plus Sony

16  election that has been made.

17        It has been cited in -- it has been cited Dr. --

18  Mr. Wechselberger's expert report in terms of supporting his

19  contentions there.

20        Additionally, it goes to the obviousness, or at the

21  very least there is an obviousness argument that these things

22  that both were in existence before this point and were around

23  prior to the priority date, they would know how to modify it.

24        But more specifically it talks about the fact that

25  the two systems could be used together and may have been used

 1   together.  And to the extent they got an issue of how does

 2   this actually support Mr. Wechselberger's position, it really

 3   is going to get to the credibility, and that is going to get

 4   to cross-examination as opposed to the admissibility of this

 5   reference.

 6        Sorry.  Also one other point.  The document also

 7   notes that the agreement is between two companies that had

 8   been signed in the past in terms of putting these

 9   functionalities together.

10        MR. PEARSON:  And it certainly says that the

11   functionalities may be put together in the future, but it

12   doesn't say the functionalities were put together before our

13   priority date.  It doesn't say that they had been.

14        To the extent it shows what is obvious to combine,

15   this document could have been a separate reference; but by

16   the terms of this document, it just doesn't describe what has

17   happened and is being corroborated that exists at the time of

18   this document.

19        THE COURT:  Okay.

20        Any response?  Mr. Schenker?  Anyone who wants to

21   jump in, jump in.  Let me hear a final word on this.

22        MR. SCHENKER:  I mean, I guess, again, it

23   doesn't -- I don't think there is any claim that it doesn't

24   talk about the fact that these functionalities -- that these

25   functionalities were known at the time that it was known to

1   combine; that our expert has already opined on this

2   combination and cited it directly in his reports.

3          I think it has been cited -- someone flagged it and

4   it has been cited on Page 1 of his charts even.  So it

5   something that he has already contemplated to the extent he

6   is relying on it and he establishes that, again, if they have

7   a problem with how well he supported his theories and his

8   ideas, I think that goes to cross-examination as opposed to

9   admissibility.

10          THE COURT:  All right.

11          MR. PEARSON:  I am certainly not contesting that we

12   talked about this document.  I understand that.  But I'm just

13   saying the document doesn't purport to -- even on its face it

14   just doesn't corroborate the system that existed during the

15   pertinent time period.

16          THE COURT:  Your objection is overruled.  That will

17   be preadmitted, subject to this agreement regarding further

18   narrowing of elected prior art references, which we are going

19   to talk about in just a minute.

20          But before we get off the subject of exhibits, have

21   I been through all of the buckets?  I don't want to think

22   about buckets any more today.

23          You guys did a good job.  I appreciate you trying

24   to compartmentalize these documents and help the Court work

25   through a large number of exhibits, and I appreciate y'all's

1    continued attempts to work and come to agreements on these so

2    that we can get this case ready for trial.

3         So with that, though, what I need you to do now is

4    get together and by next Monday I need -- in light of these

5    rulings -- a plaintiffs' exhibit of what has been preadmitted

6    and a defendant's exhibit list of what has been preadmitted.

7    Okay?  Narrowing your exhibits to the numbers that we have

8    talked about and in light of the Court's rulings.

9         Okay.  And so before we get into the few motions

10   that we need to talk about, I want to talk to you about one

11   of the other motions, which is this motion to have more trial

12   time.  And I am going to talk to Judge Gilstrap about that,

13   but that was his ruling initially was the 12 hours, though it

14   came from me.  So I will certainly put those motions before

15   him.

16        But I want to talk to both of you about getting

17   this case ready for trial because we are going forward

18   currently on somewhat like 19 asserted claims across six

19   patents, a lot of prior art references.

20        I have heard talk that maybe there have been some

21   attempts to meet and confer and further narrow that; and I

22   just want a report on how that is going, if it is going at

23   all.

24        MR. CALDWELL:  I think, candidly, the

25   meet-and-confer process on narrowing isn't going.  I mean,

what happened was, when it was time for the pretrial

disclosures, what we saw is -- we were requesting 14 hours,

which is in the ballpark of what you tend to see, certainly

in Tyler with Judge Davis and whatnot.

We know that Judge Gilstrap -- I think he just got

through trying a case in nine hours a side two weeks ago, so

I mean, we understand his preferences and are planning

accordingly.

But, anyway, when we had 14 and they were at 24 or

25 -- or we had 15 and they were are 25 -- whatever it was --

on a call with Counsel for Apple -- I think it was Ms.

Fukuda -- I just reached out and said, hey, listen, you know

you are probably not getting that in the Eastern District.

Is there some way we can converge on something we can

propose?

And their response was that not with that many

claims and the prior art.  And I was, like, okay, well, get

us this proposal for reduction.  And, ultimately, they

weren't able to get us the proposal because they wanted us to

do a unilateral drop.

I think the thing is you can't just be -- you have

to drop, and then after that we will see if we need to drop

too.  I mean, if we want to agree to something where

everybody agrees to streamline it down, I think that is okay.

And also Your Honor snuck in an order on us over

```
 1   lunch on the O2Micro, which certainly helps -- I mean, just
 2   to be -- to be completely honest that helps because it helps
 3   us shape what we would like to present at trial.
 4         We are willing, in view of the O2Micro and I go
 5   back and I talk to Mr. Curry and other folks that are smarter
 6   than me, I am confident we are able to reduce; but it needs
 7   to be -- you know, it needs to be sort of a dance with two
 8   people, right?  And if we can do that, I think we can work on
 9   a reduction.
10         There is another issue -- are you just wanting to
11   talk about -- you are just talking about claim reductions?
12         THE COURT:  I am and prior art reductions --
13         MR. CALDWELL:  And plaintiffs' prior art witnesses.
14         THE COURT:  -- and I am talking about narrowing
15   this case for trial.  I mean, because I don't know that in 12
16   hours you are going to be able to meaningfully go forward on
17   19 asserted claims and I don't know that you are going to be
18   able to meaningfully -- and maybe you can.  You guys are
19   smart, good lawyers; but I want to know if you are working
20   toward reducing this.
21         MR. CALDWELL:  Well, I can tell you here, we are
22   absolutely working towards and able to go try it in 12 hours.
23         THE COURT:  Okay.
24         MR. CALDWELL:  Okay.  We understand we were
25   assigned Judge Gilstrap.  We understand Judge Gilstrap has
```

1   been doing this quite a lot in the last three years, and I

2   think 12 is basically kind of where he is usually.  And then,

3   as I say, I know he did one in nine hours.

4          I talked to those folks about it, and, you know, it

5   really wasn't that big of a deal.  You just have to get

6   cracking and not waste time.  They picked a jury on a Tuesday

7   morning, picked to go, and they had a verdict on Friday.

8   They just worked at it hard.  We have 33 percent more time

9   than that, so I know we can do it, and that is what we will

10  be working on.

11         Now, as to the complexity issues, it is interesting

12  Apple says we have some claims with 22 elements.  Well, we

13  do.  I mean, a lot of it is sort of trivial.  It is like you

14  have a display.  But there are several elements.

15         But the fact is, when you prove one of those claims

16  basically, one of the lengthy claims, each of those elements

17  is just reused in the other ones.  That is essentially what

18  they did in that nine-hour trial is they proved up certain

19  things and showed the applicability to others.  And we think

20  both sides can do that.  So I actually do think it can be

21  tried in that amount of time.

22         And I have another issue with -- with respect to

23  the Court not wanting to hear us on discovery fights.  There

24  is another issue I would like to bring up, and I can wait or

25  do it now.  But it relates to Apple's insistence that they

1    need all these witnesses.

2           Apple puts in their motion they have 10 people they

3    simply must call.  There are five people on their "will call"

4    list that they filed with the Court.  And I have a real issue

5    with one of them.  I don't want to derail your afternoon, but

6    I feel like I need to tell you, because at the end of the

7    last hearing, which was January 6th, I was arguing to

8    preclude this witness, Mr. Ansell, who is this prior art

9    witness on which they have only elected the four corners of

10   the patent.

11          What we found out after the hearing, like a week

12   after the hearing -- and I have got all this prepared to show

13   you.  It is entirely up to you -- what we heard in the

14   hearing was they disclosed him at the close of discovery,

15   five days left, we heard nothing from Smartflash.

16          What actually happened was we wrote them five times

17   asking them about this guy.  Then they say we put him on our

18   witness list on September 16th.  We heard nothing from

19   Smartflash.

20          What we actually got was an email from them that

21   says we will let you know if we have any subsequent

22   discussions with these guys.  We started pinging them

23   periodically.  Don't find out anything.

24          Way back in December -- so three months passed.  In

25   December we find out, oh, they represent Mr. Ansell.  After

1    the hearing -- so mind you, the quotes are, we did nothing.

2    They put him on witnesses.  We did nothing, and we sat on our

3    hands.  And that was the ruling where Your Honor said at the

4    very end it was a close call.

5           Six days after that hearing, Apple produces to us

6    that they had hired this guy back in October.  They paid him

7    $400 an hour as a fact witness.  They have flown across the

8    country to meet with him, talk about his book, sit down, have

9    all sorts of preparations.

10          The next day they produced to us at our request the

11   privilege log withholding about 12 or 15 communications with

12   him.  Substantive communications were on the privilege log

13   that said we are talking to him about trial.

14          They have been doing that October, November,

15   December, this whole time; and we come in where we were under

16   a representation from Apple that they will let us know if

17   they have any substantive discussions.

18          And we come into court, and I am told -- or you

19   were told that I did nothing, even though I can show you the,

20   I don't know, 15 emails we sent them about these guys; 15 or

21   so, seriously, asking them.  And asking them are they

22   represented?  Did you have contact with them?  No answers, no

23   answers, no answers.

24          We find out later after that hearing they had this

25   guy in their hip pocket talking to him about trial, the whole

1  time.

2          Remember that back at the close of discovery with

3  five days left, he was disclosed in a list of 32 prior art

4  guys with five days left.

5          Then September 16th, cut down to a list of 11

6  people on the "may call" list.  Then they sign him up.

7          So two things I think are relevant:  Honestly, I

8  think under Rule 37 the appropriate result -- I think the

9  appropriate result before was that he shouldn't be coming

10  because anything he would say outside the four corners of his

11  patent is improper under the Court's rulings.

12          Under Rule 37 in failures to disclose, that is an

13  additional reason he should not be coming.  He is definitely

14  not necessary to Apple.  And I don't want to use the "S" word

15  and say we have got to have sanctions; but I think as to the

16  way we were characterized, all of that can be dealt with

17  post-trial.

18          As for trial planning, there is no reason that that

19  guy -- he was on the margins of reason to call him anyway --

20  under these circumstances should be brought to trial.

21          THE COURT:  All right.  Response, Ms. Fukuda.

22          MS. FUKUDA:  So, Your Honor, I don't want to

23  retread old ground.  We have already talked about the

24  relevance of Mr. Ansell's testimony.  Your Honor has ruled on

25  it.

1          Since then, Smartflash has had the opportunity to

2    take Mr. Ansell's deposition for an entire day, so they have

3    explored everything within his patent.  And even though Your

4    Honor said he can't go outside the four corners and he can't

5    talk about the commercial Liquid Audio system, they have

6    asked him many, many questions about the Liquid Audio system.

7          So, honestly, they had a full opportunity; and now

8    that they have heard what Mr. Ansell has to say about his

9    prior art, they don't want him to testify.

10          Now, I would like to address Mr. Caldwell's

11    accusations about us hiding the ball.  As explained to Your

12    Honor, there were many, many prior art inventors on our

13    elected references, more than 30.  And it took time to try to

14    see who we can reach, who we can realistically put together.

15          And we have produced all that information to them,

16    all of the written communications.  So it is more than just

17    Mr. Ansell.  It is Mr. Lotspiech.  We had a handful of other

18    witnesses.  We have produced all of our written

19    communications of those witnesses to them.

20          So, obviously, this is not a case of us taking one

21    witness and burying him.

22          We worked through -- since August, September,

23    October, November trying to reach out to who we can get in

24    touch with, who is willing to come testify, who can spare the

25    time, and how many, realistically, can we actually put on the

1    stand at trial.  And as we have reduced that process down to

2    fewer and fewer witnesses, we reduced our list as well.

3            And, Your Honor, they mentioned an exhibit -- or a

4    witness list.  We do intend to file an amended witness list.

5    This is all information that we provided to Smartflash in

6    terms of who we are actually going to be calling.  So there

7    should be no surprise that we want to formalize it in an

8    official list to see exactly who we have on the slate right

9    now.

10           So in terms of -- so we have had all of the

11   communications that we have had with any prior art witness.

12   The handful of communications that we withheld going back and

13   forth with Mr. Ansell merely relates to our trial preparation

14   materials.  We are so close to trial that we started working

15   on how to refine the testimony, what to hone in on.  And we

16   thought what we as Counsel, and Apple's Counsel, selected to

17   focus on at trial was really our mental impressions and our

18   trial strategy, that they are not entitled to.

19           Other things, we produced it all to them, produced

20   all of the back-and-forth with Mr. Ansell.  That is where we

21   stand.

22           MR. CALDWELL:  Your Honor, that "all that we

23   produced" was after this hearing.  I won't walk you through

24   this.

25           But can you put up this PowerPoint?

1           I am not going to walk you through this.  But I

2     just -- I -- visually I think is super helpful.  Let me show

3     you just the part about the hearing, and then I won't go

4     through the time sensitive part.

5           If you see on the far left, that is when they

6     picked the Ansell patent as a prior art.  That is way back in

7     January.  Then you see right at the close of discovery they

8     add them with these 32 people.

9           I'm just going to focus on the hearing, and then I

10    will just skip all the way to the end, just got to the end.

11    At the hearing:  What we did is we disclosed him within the

12    discovery period with five minutes left.  That was on August

13    6th.

14          Okay.  We heard nothing from Smartflash.  In fact,

15    then again on September 16th, Apple added him to the "may

16    call" list.  Again, we hear nothing from Smartflash.

17          At that point we're thinking it is a little late to

18    be sitting on your hands.  This is referring to when we

19    talked to him in November as though we had just skipped to

20    November.

21          And then they were the ones -- we decided to wait.

22    I don't think we should suffer from the fact that they

23    delayed the request.  Then the Court ruled that it is a close

24    call in light of the ruling on the motion in limine.

25          Now, the blue communications are us writing them

1   about these guys in this time frame, the time frame we

2   allegedly sat on our hands.  And I can go through all of it

3   if you want.  There is a couple that I put at the top just so

4   you can see.

5          During this time we allegedly sat on our hands,

6   after we had wrote them, I think, five times, we finally got

7   this response that says:  If we have any substantive

8   discussions with any of the prior art inventors, we will

9   notify you.

10          Okay.  So then we get to the hearing.  And you have

11  just been told:  We gave them all of these communications.

12  You gave us the communications -- you gave us the

13  communications on January 12th and 13th after the hearing, so

14  that is when we got it.  Like the night before Mr. Ansell's

15  deposition is when we get all this.

16          Here is what it shows in terms of Apple working

17  with Mr. Ansell.  Each of the black communications are ones

18  that we have that we have been able to see.  Each of the

19  white ones are the ones that they have withheld as privileged

20  relating to preparing the guy for trial.

21          And Your Honor was told that we sat on our hands

22  when you can see how many times we wrote them.  Like I say, I

23  will go through all of them if you want, submit it, whatever

24  you want.  Most of these are us asking them questions like:

25  Have you been talking to the guys?  Are they represented by

1    anybody?

2          Write them back like a few days later:  Guys, what

3    is your response?

4          Write them back a week later:  Guys, what is your

5    response?

6          One time I wrote them back 24 hours after Mr. Hamad

7    had written them, and said:  Guys, I'm sorry to bug you after

8    only one day, but we asked you this three times in two weeks

9    with no answer.

10          And finally they respond the next day, so that was

11   that call.  That is the call we have talked about previously

12   with Mr. Albritton.  We had a nice call.  No mention of

13   Mr. Ansell.  No mention of retention.

14          And so when we then argued this last week, I thought

15   the guy was completely inappropriate because all they can do

16   is talk about the four corners of his patent.

17          I mean, you can see what has happened here.  They

18   disclosed these 32 guys with a few days left in discovery,

19   tell us it is our fault for not deposing these 32 guys with a

20   few days left in discovery.

21          Then the truth is, of the 32, there is about five

22   of them, five or six, that they went out and signed up.  They

23   didn't give us any of that.  We got all of that on -- we got

24   all of the stuff from Mr. Ansell on January 12th and 13th,

25   and we got the stuff from these other guys later, maybe

1    January 15th, all of it after the hearing.  Never kept up on

2    those duties of disclosure.

3                    THE COURT:  Okay.

4                    Leave it up.

5                    Ms. Fukuda, let's talk about it.

6                    MS. FUKUDA:  Sure.  Your Honor, they have known

7    about our list of prior art witnesses.  They could have

8    reached out to any of those guys at any given time.  And that

9    is the point of providing them notice because these are

10   third-party notices -- these are third parties.  And they

11   know about them.  They could call them.

12                   In our correspondence what they didn't tell you is

13   they didn't pick up the phone to try to reach any of those

14   guys for months and months.  What they want to do is to find

15   out exactly what Apple is doing in terms of trial strategy

16   and figure out who are the witnesses over time that we are

17   trying to focus in on, why we want them.  And we don't think

18   they are entitled to our trial strategy.

19                   Now, as of the moment right now, they have had

20   access to all of our documents with these prior art

21   witnesses, again, with the exception of a handful of

22   documents that relate to trial-preparation-type material.

23                   So I do not understand the prejudice here.  They

24   have had full access to Mr. Ansell.  We have already been

25   through this motion about the relevance of his testimony.

1    I'm not exactly sure what is missing here.

2         THE COURT:  Is it true, though, that they were

3    requesting reports of any conversations that you were having

4    with these folks, you know, on all of these little blue dots;

5    and that you were saying we'll get back to you except right

6    here you weren't saying.  Then they got all of that after our

7    last pretrial hearing in January.  Is that a true statement?

8         MS. FUKUDA:  We made the production after the

9    hearing because they finally knew that Mr. Ansell was -- they

10   had not asked for a deposition up until then.  We asked them

11   to serve a subpoena.  They didn't serve a subpoena until

12   after the hearing and after Your Honor had ruled that he

13   could testify.  So at that point we turned over everything

14   that we had with Mr. Ansell.

15        Now, in terms of our agreements beforehand, I know

16   that there was an agreement between Mr. Albritton and

17   Smartflash regarding the identity of these witnesses; and

18   that they would not move to exclude any of the witnesses if

19   we give them a deposition.  And we had agreed to that.

20        And, Your Honor, I believe this came up at the last

21   pretrial conference where that agreement was in place.  And,

22   as a result, we skipped over this argument back and forth

23   about whether there was delay or not delay.

24        THE COURT:  Mr. Caldwell.

25        MR. CALDWELL:  I don't want to derail where you are

 1    headed.  As to the conversation, the person we were talking

 2    about was another guy Jeff Lotspiech.  That is the guy we

 3    talked about.  Now -- you know, we tried to reach something

 4    for similarly situated people.

 5           But the thing about Mr. Lotspiech is, the Quinn

 6    folks had talked to him, too, a long time ago.  And they -- I

 7    think the Quinn folks have produced to us their

 8    communications with him.  And in those communications, there

 9    was some reference that he had also heard from someone at

10    Apple; and we were able to figure out Lotspiech because that

11    guy is arguably relevant because he is one of the guys on the

12    IBM system that they have elected, as opposed to Ansell who

13    is on the four corners of a patent.  So it is very different.

14           And, I mean, obviously, sincerely, I will either

15    give you the PowerPoint, I'll give you the documents,

16    whatever you want to do.  My point is that when they

17    disclosed this to us at the eleventh hour of discovery, we

18    did write them in this time period where we heard nothing

19    from Smartflash, and specifically said:  Guys, this is late.

20    What are you trying to do?  What is going on here?  Have you

21    talked to these people?  Are they represented by counsel?  I

22    mean, that is the point of this.

23           And, honestly, what you will notice is -- what you

24    will notice is at September -- September 11th is basically

25    the last red one in September.  You see that?  Then there is

```
 1    actually a lull there because we were pestering them

 2    non-stop.  On September 11th they write us back and say:

 3    Listen, to the extent that there are any substantive

 4    discussions with any of these prior art inventors, we will

 5    notify you.  And that is why we chilled out for a couple of

 6    weeks and went back -- I think the next one is Mr. Cassady

 7    saying:  Look, you have still got these people on a "may

 8    call" list, what is going on?

 9            I mean, it doesn't just happen you have a trial and

10    a prior art guy who is not affiliated with any of the parties

11    just shows up and says:  Hey, I am here to take the oath and

12    start talking.

13            That is why we knew -- a list of 32, I mean, that

14    is not in good faith.  And then when you start cutting it

15    down, somebody has got to be talking to somebody if you are

16    actually going to bring them in.  And when they tell us we

17    will let you know --

18            THE COURT:  Okay.  So let me ask this:  Ultimately,

19    you have not deposed him.  I have limited his testimony

20    substantially to nothing beyond the four corners of the

21    patent, so what -- tell me about the prejudice and why I need

22    to still exclude him.

23            MR. CALDWELL:  Well -- okay.  So I think there is a

24    couple of points.  I mean, one, we took his deposition under

25    pretty non-ideal circumstances.  Right?
```

1          I went and I took the deposition of Jeff Lotspiech,

2     who is the person that Mr. Albritton and I agreed to in

3     specific.

4          My colleague, Justin, went and I think he did a

5     find job getting ready for Mr. Ansell; but we did that a few

6     days after the hearing while we are trying to go to trial in

7     the middle of briefing all these other things that are coming

8     up, in the middle of trying to repair our damages thing from

9     the Daubert situation.  So all of that came in a situation

10    where we had limited ability -- limited ability to prepare,

11    limited ability to research him.  And there is no reason it

12    had to be that way, so there was prejudice in preparation for

13    him.

14         Plus my other point is and the way we actually got

15    into this is, Apple is alleging he is one of the people they

16    simply must have and one of the reasons they need 18 to 24

17    hours for this trial.

18         It is just hard to buy that, I mean, that this guy

19    is a "must have" witness, so...

20         THE COURT:  Well, my ruling remains that he can

21    testify.  He can testify on the very narrow issue of the four

22    corners of the patent in that very limited sense, and that's

23    it.  We are moving on.

24         Now --

25         MR. CALDWELL:  Your Honor?

```
 1                    THE COURT:  Yes.

 2               MR. CALDWELL:  Can I have a clarification of

 3    another motion in limine that relates to it?

 4               THE COURT:  Tell me about that.

 5               MR. CALDWELL:  So I know that we have got this

 6    motion in limine on a privilege, just --

 7               THE COURT:  Not getting into something that would

 8    elicit a privilege --

 9               MR. CALDWELL:  Right.  Right.  Now, to be fair, I

10    don't think that can -- I understand for an Apple engineer

11    who goes to their lawyers in-house and says, hey, look, you

12    know, I've got to show you the patent, to be fair, if Apple

13    goes out and hires up these fact witnesses on prior art, I

14    don't think the motion in limine can apply to that.

15               The notions of willfulness and opinions of counsel

16    and a lot of the reasoning in that other line of privilege

17    can't apply to, you go and start paying a guy, Apple pays the

18    bills, pays Ropes & Gray.  Ropes & Gray says you are

19    retaining us, but don't worry, you don't have a bill.  In

20    fact, we will pay you, all of our talks are going to be

21    secret, you can't tell anyone else.

22               We have to be able to make that point at trial that

23    they have done that with the fact witnesses.  And I don't

24    want to be accused of violating the motion in limine, but

25    obviously, when we worked that out last time, it was in the
```

1   context of Apple engineers who go and talk to their in-house

2   department.  It is not about, you know, these fact witnesses

3   they have gone out to --

4          THE COURT:  So let me just get this straight.  I

5   mean, there are fact witnesses and you have -- they have got

6   Counsel retained, and it is Apple's Counsel, and there are

7   some privileged -- I mean, give me the factual context for

8   how this is going to come up at trial.

9          MR. CALDWELL:  Well, what has happened is, for

10  example, one of the first few questions in Mr. Lotspiech's

11  depo is just basically like:  Have you looked at Smartflash's

12  patents?  Okay.  What did you look at?  What did you read?

13  Instruction not to answer -- I instruct you not to answer.

14  It comes up in that context.

15          It comes up in the context of did -- were you

16  directed to focus on any particular parts of your own patent

17  in preparation for this deposition; or directed to certain

18  things that were particularly applicable to Smartflash's

19  patent in the invalidity case; and things like that.

20  Instruction not to answer.  Instruction not to answer.

21          And as to -- I mean, someone that Apple has their

22  lawyers go out and seek out this person and say:  Here is the

23  agreement by which we will be paying you.  Oh, by the way, it

24  creates a privilege -- I mean, Mr. Lotspiech even referred to

25  this agreement wherein he gets represented by Apple's Counsel

```
 1    as I think the word was "silly" -- I mean, someone will
 2    correct me if I am wrong.  He is like:  I'm not sure it even
 3    works on privilege.  I think it is kind of silly myself.  Or
 4    something along those lines.
 5              But as to -- I'm fine with it as to their
 6    engineers.  That makes some sense.
 7              THE COURT:  I mean, are you asserting privilege as
 8    to communications with third-party fact witnesses?
 9              MS. FUKUDA:  Let me address a big portion of that
10    and then Mr. Post can supplement as needed.  But my
11    understanding is that the primary issue here is work product.
12    We are this close to trial, and a lot of what is happening
13    would give a window into what our privilege is, so --
14              THE COURT:  Well, but you walked that line in a
15    fine way because this has all come to a head this close to
16    trial.  I mean, we can't fall back on that.
17              MS. FUKUDA:  Understood.  And so where we have
18    drawn the line is they were free to ask any of the fact
19    witnesses what the facts were.  Tell us about your patent.
20    We want to ask you about this particular passage or that
21    particular passage, which they have done.
22              Where we drew the line was:  Well, tell us what
23    Apple's attorney told you to focus on.  Was there anything
24    there you are particularly interested in?  Essentially, can
25    we get into what it is that they are going to ask, you know,
```

```
 1    what kind of questions are they going to ask you at trial?

 2             They are not entitled to that because that is our

 3    work product.  They can ask him any questions they would like

 4    to ask.

 5             THE COURT:  Okay.

 6             MR. CALDWELL:  I mean, I, frankly, think that all

 7    of that is actually fair game because each of these guys

 8    could have just been subpoenaed and we could have gone and

 9    taken their fact discovery, or we could have said:  Would you

10    be willing to come testify at trial?

11             What happened is Apple said you want some money for

12    your time, here is the deal, you get it, here is this

13    contract; and what it says is we can talk secretly, and you

14    can't talk to them at all.  And, I mean, if we can't make

15    that cross point, that is just wholly, wholly unfair.  To

16    take these people that are presented as some third party and

17    not be able to make that point, would be just wholly unfair,

18    that they are trying to protect --

19             THE COURT:  Okay.  Well, this is just sort of one

20    of those that really needs to be decided, I think, in the

21    context of trial and their testimony, so I am going to leave

22    the MIL as it stands; and before you get into that with this

23    particular witness, bring it up to Judge Gilstrap because I'm

24    having a hard time wrapping my head around that you-all have

25    this kind of an agreement with a third-party fact witness.
```

1   But if you do, that it might be relevant in something that

2   you are going to get into.

3          So anyway, the MIL stands.  We are not going to get

4   into discussions that elicit privileged responses unless we

5   first bring them up to the Bench, so you just may have to

6   take it up in the context of their testimony.

7          MR. CALDWELL:  All right.  So maybe just the scope

8   of all of the allowable testimony, what would open the door,

9   we should approach Judge Gilstrap maybe at the pretrial for

10  him and take that up?  Is that -- I mean, I'm not trying to

11  defer it, but it affects us for cross preparation.  I mean,

12  and we are the ones that are -- we are the ones who tried to

13  do this.

14         We are told -- we were told through silence in the

15  face of an obligation to tell us there is nothing going on,

16  and here we are dealing with it at the last minute.  So, I

17  mean, it strikes me as just wholly unfair that you could go

18  and do that with these third parties; and that we can't -- I

19  mean, getting into the privilege is one -- obviously, we can

20  get into the compensation and all that.  I mean, I think that

21  is -- that should be beyond dispute.

22         But the fact that they can have secret

23  conversations and the guy is contractually prohibited from

24  even talking to us, I mean, not being able to explore that

25  just seems wholly, wholly unfair.  It wasn't our choice to

1    enter that agreement.

2         THE COURT:  Okay.  Response?  Anyone?

3         MS. FUKUDA:  Your Honor, I don't want to rehash the

4    same arguments over and over again.  We are happy to stand by

5    the rulings you have already issued.

6         THE COURT:  I'm actually probably -- with regard to

7    these third-party fact witnesses, I'm going to carry this.  I

8    just want to think it through.  I, frankly, have not ever had

9    the scenario in front of me that I can recall where

10   third-party witnesses have been retained and then we have got

11   privilege issues with them.  And maybe it happens all the

12   time and I just haven't seen it yet, so...

13        Mr. Post.

14        MR. POST:  Just one relevant fact for

15   Mr. Lotspiech.  He actually is in another unrelated

16   litigation and happened to be retained as an expert witness

17   by Apple.  So there was one aspect of his representation is

18   to make sure those privileged communications were protected.

19        He is not retained -- has no contractual

20   relationship, I believe, or privilege relationship, at least,

21   with Samsung.  And has had discussions with Samsung.  He was

22   welcome and testified for hours about communications like

23   that.

24        So the specific instructions not to answer

25   questions in Mr. Lotspiech's case were in relationship to

1  trial prep -- deposition preparation, trial preparation

2  issues like Mr. Ansell, as well as protecting his privileged

3  relationship.  But anything else as far as facts about the

4  references, facts about the prior art system, was all fair

5  game and he testified to that.

6          MS. FUKUDA:  Your Honor, can I -- if you are going

7  to carry the motion, let me just put in a couple of thoughts

8  here.

9          One is that with respect to the retention, I know

10  Mr. Caldwell has characterized it a number of ways but in the

11  way he would like you to see it.  I have kept silent on that

12  issue; but now since you are carrying the motion, I do want

13  to put it out there that when we reached out on behalf of

14  Apple to try and get in touch with these third-party

15  witnesses, we did not go out and say:  Hey, can we pay you?

16  You know, we want you to testify.  Can we pay you?  Never.

17  We just said:  Do you have relevant information?  And, if so,

18  what have you got?  Would you be willing to come and testify?

19          Many -- almost all of the witnesses say this is

20  going to cause me to miss time from work.  I am going to lose

21  money.  I can't get that back.  I know that preparing for

22  trial takes a lot of work and time.  I'd like to give

23  whatever I can for the purposes of this case, but I would

24  like to be compensated for my lost time.

25          And in situations where we felt that, you know, it

1  really isn't fair to let these witnesses to lose 20 or 30

2  hours of time from work and get no compensation, we have

3  agreed to just compensate them for their lost time.

4       They are not being paid for any time spent actually

5  testifying, which they would be obligated to do.  This is

6  purely for preparation time to compensate for loss.

7       Second, Your Honor, regarding this whole privilege

8  issue, I will make an offer to cut through all of this, there

9  is nothing -- again, there is a handful of emails that we

10 have redacted because we really think it gets into sort of

11 the legal aspects of the trial preparation materials, but if

12 it would help to resolve the issues, we can have that

13 produced to them if Smartflash agrees that producing that is

14 not some sort of general waiver into our trial preparation --

15      THE COURT:  Response?

16      MR. CALDWELL:  I don't think that that addresses

17 the problem because I think Ms. Fukuda flew across the

18 country to meet with him or maybe in -- maybe Palo Alto to

19 meet with Mr. Ansell all day, and they sat down and talked

20 all day.  So I think that that is maybe a small part of the

21 privilege part, but it is certainly not all of it.

22      If Your Honor is going to go back and think about

23 this -- which I think makes perfect sense -- I would like to

24 just ask that Your Honor -- I know you have already said you

25 have ruled on it -- I would like you to think about the issue

1    of preclusion of Mr. Ansell.  And the reason I say that is if

2    under these facts that doesn't justify precluding him and the

3    remedy was that we happened to have deposed him because they

4    hid this stuff until later, what does that say about how we

5    are supposed to disclose witnesses in other cases in the

6    future?  I mean, I am really worried about the endorsement of

7    that.

8              And as to Mr. Ansell, I think one other point that

9    Your Honor should consider -- I am glad -- I, honestly, just

10   forgot.  I'm glad Ms. Fukuda reminded me -- Mr. Ansell is

11   signed up to make $400 an hour when he testifies.  The most

12   he has ever made as a billing rate, which is what his company

13   billed him for, was $200 an hour.

14             When you annualize his salary and break it down,

15   even if you take the highest average salary he makes and the

16   lowest average hours a week he works, it comes out to like

17   $156.  If you take the middle range, it is like $125 an hour.

18   The guy is getting paid two, three, four times more than what

19   his rate is.

20             There are cases who have granted -- where judges

21   have granted a mistrial on that purpose -- on that basis.

22             I, honestly, can't remember if Your Honor was with

23   us in 2010 for the VirnetX/Microsoft case in Judge Davis's

24   Court; but in the post-trial briefings -- in fact, it got

25   settled right out from under this -- but in the post-trial

```
 1    briefings there was a big issue there where Weil and
 2    Microsoft had compensated a witness Sami Saydjari, and I
 3    think it was more than what his rate was.
 4          That is -- there are all sorts of ethical opinions
 5    that are saying that basically you can compensate the guy for
 6    the lost time that he is out, but paying a guy more than
 7    twice the peak of what his company has ever billed him for,
 8    that alone, I think, could be grounds for a mistrial, and
 9    that is still on this guy who was disclosed way, way late;
10    all of the privilege stuff was held until late, et cetera.
11    So I just would ask that Your Honor keep that in mind.
12          MR. ALBRITTON:  I hate to do this, but we have got
13    to make -- we have to make one thing clear.  I don't know
14    about all this.  Okay?  But one thing I know for sure is that
15    the phone call Brad Caldwell and I had was not limited to
16    that one expert -- I mean, I'm sorry, to that one witness.
17    We were clearly talking about these 32 witness that they say
18    we disclosed late.
19          It is nonsensical and just not accurate to say that
20    we talked about one witness and our agreement was limited to
21    one witness.
22          The deal we made was if we let them have
23    depositions, they would not move to strike any of those
24    witnesses.  I am sorry to get into this he said/she said, but
25    I was going to let it stop until we had to hear this again,
```

```
 1    but that is just absolutely inaccurate, and it doesn't even
 2    make sense.
 3              MR. CALDWELL:  Okay.  I know you hate this sort of
 4    part.  Remember that as of September 11th we were told we
 5    will let you know if there is anyone else.  There was one
 6    person we were aware of, which was Mr. Lotspiech.  That is
 7    the only person.
 8              And I think it was, what, the day before
 9    Thanksgiving, Eric?
10              And that was -- we find out about December 1 -- so
11    it is about six days later is when we find out they are
12    thinking that Mr. Ansell is like one of the guys they are
13    actually likely to bring.  It is another 10 days later,
14    December 11th before we find out they actually had -- they
15    represented him.  And we thought they had just signed him up
16    on December 11th.
17              It isn't until after the hearing, another month
18    passes before we find out they actually had him in the pocket
19    since way back in October.
20              So I understand we didn't talk about this is
21    something that applies to Mr. Lotspiech and can never apply
22    to anyone else.  I agree with Mr. Albritton on that.  I am
23    trying to make a deal that avoids a fight in front of the
24    Court based on what I know and the representations that they
25    are making to me.
```

1          And then when I come back later and find out, okay,

2     there is more to the story, then we have the hearing and I

3     come back and find out there are like chapters and chapters

4     that were written before any of these calls.  That is where I

5     have a real problem.

6          And what does it say about the duties of disclosure

7     Rule 26, keeping things updated, keeping your production

8     updated, in compliance with Rule 37 if you can do all this.

9     I have just never seen anything that is even remotely,

10    remotely like it.

11         THE COURT:  Anyone have anything else to say about

12    this?

13         MR. ALBRITTON:  We were not meeting and conferring

14    about one witness.  They were complaining about all of them.

15    And he just basically backed off exactly what he told you

16    earlier that he and I were talking about one witness.  That

17    is just flatly inaccurate.

18         MR. CALDWELL:  He is the only witness whose name

19    even came up.

20         THE COURT:  Okay.  Ms. Fukuda?

21         MS. FUKUDA:  The last thing, and I will sit down.

22         All of these questions about Mr. Ansell's

23    compensation, they can feel free to go into crossing him with

24    that.  That is typical cross-examination to this line.  In

25    fact, Mr. Ansell had responded to all of those questions.  He

1    explained it, why he charged the rate.  He made it clear that

2    he was the one that asked for that rate.  There was nothing

3    from Apple's side to try to, as they would call it, pay this

4    witness.  This is merely compensation for what the witness

5    said in terms of time.  So they are free to cross-examine

6    him.

7              And in terms of prejudice, I don't really hear any

8    because they talk about having to do his deposition quickly.

9    The fact is they knew about his deposition for weeks and

10   weeks.  They had time to prepare for it, so I just don't see

11   that there is prejudice, given everything we have discussed.

12             Thank you.

13             THE COURT:  All right.  I am going to carry this.

14             And, Mr. Batchelder, I'm going to let you have the

15   floor to argue your motion.

16             MR. BATCHELDER:  Thank you.

17             THE COURT:  This is the motion to exclude the

18   supplemental rebuttal report of Mr. Mills --

19             MR. BATCHELDER:  Exactly.  Thank you, Your Honor.

20             We will put up a slide deck if we could have

21   ours.          All right.  So this is a relatively short

22   deck, Your Honor.  I think this timeline really captures the

23   main points.  But before we dive into the detail here, let me

24   just frame the issue, is that on Thursday night after our

25   responsive expert reports on damages were submitted, we got a

1   brand new royalty rate calculation that, basically, evaded

2   that response.  And it would be highly prejudicial and it

3   would turn the trial date on its head and we would have to do

4   a lot of things if this doesn't get struck.

5            So here is the timeline.  So on August 25th, on the

6   far left entry, that was the Court deadline for burden

7   reports that Your Honor had set.

8            And if we could go back.

9            And Smartflash served its opening Mills and Wecker

10  reports.

11           On December 23rd, that was your Daubert order, and

12  you ordered the amended report from Smartflash to be served

13  in 15 days.  That would be January 7th.

14           On January 6th at the pretrial conference, the day

15  before those supplemental reports were to come in, you told

16  us, look, we need to have all of this aired out.  We need the

17  new reports.  We need them all settled by January 30th.  And

18  the parties agreed based on that guidance on what the

19  schedule would look like.

20           Then the very next day we got their supplemental

21  Mills and Wecker reports, new survey, and Mills had a royalty

22  base calculated base -- you will recall that last time was

23  based on this motivate question.  And this time Wecker asked

24  a new question that was almost identical but had inserted the

25  word "alone," so he calculated royalty base from that "alone

1   motivate" question.

2          We then, pursuant to the schedule, on January 21st

3   we had two weeks to respond just as they had two weeks to

4   respond to your Daubert.  And our folks conducted their own

5   responsive survey.  They tested that "alone motivate"

6   question that Wecker had put forward and that Mills used as

7   the basis for his royalty based calculation to show how

8   people were really interpreting it; and that it doesn't

9   justify reliance on the entire market value rule.  It is

10  wholly broken.

11         Then that was on the 21st night; and then the very

12  next day, the night before Mills' deposition, I fly out to LA

13  to take his deposition.  I arrive at the hotel and log onto a

14  computer and see there is this brand new royalty based

15  calculation based on a different Wecker survey question that

16  Mills had had all along, had thought about doing that

17  calculation before and decided not to.

18         And because it was a different question, it wasn't

19  the question targeted by the surveys that our folks had done.

20  So their response reports were basically side-stepped by this

21  new opinion that falls outside the Court's calendar, and it

22  would be terribly prejudicial to allow that to go forward.

23         So let me just step through a few more slides and

24  show you the context.

25         Next slide, please.

1      You will recall this piece of the slide that I

2  showed you in the Daubert; that this was how Mills calculated

3  his royalty base the first time around.  Motivate question

4  times total units times revenue of total units.

5      Next slide.

6      Everything reduces, so it just really just --

7      Next slide.

8      -- motivate times total revenue becomes his royalty

9  base.  That was true the first time, and that was really true

10  the second time in the January 7th report, the same thing.

11  It is just the motivate became the "alone motivate" question.

12      Next slide, please.

13      All he do was he took the original motivate

14  question and added the word "alone" to it.  And that is what

15  Dr. Dahr testified in his responsive survey.

16      Next slide, please.

17      So Dr. Dahr did a survey to show how people are

18  actually interpreting that.  Samsung's expert did one, too.

19  Both of them really came out with exactly the same results

20  that debunk what they had done.

21      Next slide, please.

22      Then this is what Mr. Mills admitted in his

23  deposition that I took on Friday about this.  So he said he

24  had had a phone call with Mr. Wecker and with Smartflash's

25  Counsel either on the day of your Daubert or the next day, to

1    talk about your Daubert.

2              So I asked him, at the top quote:  In that phone

3    call, did you discuss asking a survey question directed to

4    the subject matter of what is now Question 4B in Exhibit 4?

5              So that is the new one.

6              And he said:  I believe we did.  We had some

7    discussion about the concept, anyway, of this question.

8              So that was in December.

9              Then next question:  Were you thinking at that time

10   that answers to such a question could be used in calculating

11   a reasonable royalty?

12             ANSWER:  I was thinking at the time that the

13   answers could provide insight into a reasonable royalty, yes.

14             Then critically here, last question:  Prior to

15   signing your January 7th, 2015, supplemental report, did it

16   occur to you to do royalty base calculations reflected in

17   your January 22nd exhibits?

18             ANSWER:  I had thought of the concept, yes.

19             So before the January 7th report that Your Honor's

20   Daubert order allowed him to do, he had thought of this idea.

21   He had the data.  He could have done it.  He decided not to.

22   He waited.  Our experts did responsive surveys to deal with

23   what he did decide to do.  And then he does the

24   bait-and-switch, and we get this thing dumped on us over the

25   transom on Thursday night, the night before his deposition.

1          Needless to say, if you don't strike it, we are

2     going to have to do responsive reports, it would throw off

3     the Daubert schedule, it would threaten the trial date, we

4     would have to do another deposition.  That would be an

5     absolute mess.  Frankly, untenable if we are going to keep

6     this trial date.  This really needs to be stricken.

7               THE COURT:  Okay.  Response.

8               MR. CASSADY:  Your Honor, with regards to this

9     specific issue, I think the timeline is pretty critical, so

10    we'll just start back on Christmas Eve Eve.

11         So we got Your Honor's order with regards to the

12    motion on the Dauberts regarding "alone motivate."  And

13    during that time frame of the motion in limine --

14         And could I get the document camera, please?

15         During that time frame of the Daubert, the argument

16    had been the entire time, the entire time, that we needed to

17    add the word "alone" to the motivate question, the entire

18    time.  That was the pivotal thing they kept saying.  That was

19    what Your Honor picked up on in the order was that we didn't

20    ultimately have the word "alone."

21         So we went and looked at it and grabbed a couple of

22    inserts from the Daubert here, says:  Accordingly, for

23    Mr. Mills' apportionment of the base to have been proper, the

24    relied on survey question would have needed to ask whether

25    the patented feature alone motivated.

 1          Verhoeven, Counsel for Samsung/HTC, that argued on

 2     behalf of both parties in the Wecker depo -- or in the Wecker

 3     Daubert:  Well, Your Honor, as you know, when you read the

 4     holding of LaserDynamics, there's a very important word that

 5     exists that was left out of the survey.  And we are not

 6     talking about just the motivation -- sorry.  Just the

 7     motivation.  It has to be the feature alone motivates the

 8     buy.  That's the law.  That's LaserDynamics.  There is no

 9     question about it.

10          Okay.  So Christmas Eve we are sitting here having

11     these conversations -- and, again, I'm not trying to blow my

12     own work product, but we are having these conversations about

13     what to do with Your Honor's order.

14          And, candidly, Your Honor, we said to ourselves,

15     you know what, at a minimum, at a minimum we have to ask the

16     "alone" question because I don't think it is fair to

17     Mr. Mills and I think Mr. Curry said I don't think it is fair

18     to Mr. Cass -- fair to Jason if we just let the Court think

19     that we are trying to pull one on them.  So let's ask the

20     question with the "alone" and let's give that to her.

21          And that is what we did.  We added the word "alone"

22     to it; and then we also added a second question, which is the

23     question we are talking about really here.

24          We added a second question, which is the one

25     highlighted here:  For each device listed below, what

1    portion, if any, of its value do you attribute to the

2    capability to purchase from the App Store?  Please answer

3    your question from 0 to 99.  So self-apportionment basically

4    for the people who didn't say they were "alone motivated."

5            We didn't ask that question -- we didn't ask that

6    question to create a separate royalty base.  We didn't think

7    we needed to create a separate royalty base.  Our assumption

8    was the surveys would come back, that data can be used

9    ancillarily for other things; and given their testimony and

10   their statements from the Court, we just had to add the word

11   "alone."  We didn't believe in a million years we were going

12   to get 90 pages of new criticisms of our "alone motivate"

13   question including a new survey being run and issues like

14   that.

15           And we think those are wholly inappropriate given

16   where everything was and the timing.  If their criticism was

17   that, why didn't they run that survey the first time?  Why

18   wasn't that survey run when they had a month from our last

19   report -- from the first report to the rebuttal reports?

20           And they were laying in wait to tell the Court you

21   are going to add the word "alone" in hopes that we couldn't

22   run a survey over Christmas.

23           So we run our survey over Christmas and we get that

24   "alone" word put in there.

25           And, like I said, Your Honor, we were shocked when

1    we got their surveys, this very, very vast amount of surveys

2    that were rebutting things that they could have rebutted

3    before, and they didn't do.

4            So we worked with them before we got the report.

5    Before we got the report, we worked with their Counsel and

6    said:  How many hours do you need with Mills, given that you

7    guys should have a pretty limited rebuttal?

8            Never did they say, oh, no, we're not going to have

9    a limited rebuttal; we are going to have a lot of

10   rebuttal.  They kept saying:  No -- yeah, we can agree to

11   limit it, and we agree to four-and-a-half hours.

12           But very telling, the limitation of four-and-a-half

13   hours, which was very, very specific by Counsel for Apple,

14   and he said that --

15           Give me the highlighter, please.

16           They said -- I said:  Thank you for chatting with

17   me about the time limits for Mills' deposition.  We don't

18   believe this is very long, but we are willing to present him

19   for four-and-a-half hours with the understanding that all of

20   the expert depositions will be limited to the additional

21   disclosure in the reports we can make -- with that we can

22   make this offer.

23           They respond, and it is very critical to their

24   agreement, we agree that -- we agree that all of the expert

25   depositions will be limited to the additional disclosures in

1   their new reports.  Any difference between the current and

2   previous reports and even more importantly questions about

3   the opposing expert's new report.

4            They specifically wanted this depo to be about

5   that, questions about the report they were about to serve.

6            And the funny thing is, Your Honor, you are talking

7   about the night before the deposition they get this report.

8   We got their report 30 hours before this deposition.  So we

9   were lightning speed, and we got this -- we got this from

10  them, we got his report; and they were served late, I will

11  note.  They were due at midnight.  And we got Dahr's report

12  an hour later, his reports were an hour late, he got the

13  report 10 minutes late.  And given when you are talking about

14  a 30-hour time limit to prepare a witness for a deposition,

15  that is a pretty critical, you know, one hour.

16           I would never complain about an hour on supporting

17  materials being late; but when it is like that, that is

18  pretty critical.

19           So what did we do?  The next morning we are looking

20  at it saying, oh, great.  Like look at all this.  We are

21  going to have to strike all this.  That is what we are saying

22  to ourselves, we are going to have to strike all this because

23  this is clearly meant to rebut something we did before and

24  make us use this time to catch up and throw in a whole bunch

25  of new opinions.

1           And that is what they did.  And Gruse did it, Dahr

2   did it, Becker; all of their experts did it.  They threw in a

3   whole bunch of new material that could easily have been sent

4   before and they didn't do it.

5           So what do we do?  Well, I had a conversation again

6   about this.  We said, look, we could tell them tomorrow in

7   the deposition.  Mr. Mills could get asked questions about

8   this, about how can his model be reasonable given the

9   criticism of the model.  And we can just tell them, well,

10  look, this other question supports my theory just like I said

11  in my report on January 7th of 2015.  You can do just that.

12          Because, look, Megan Raymond is saying that is what

13  she wants, questions about the opposing expert's new report.

14          So instead of hijacking them, we served the report

15  at, I believe it was 10:00 o'clock.  We served it at night.

16  We did the best we could.  We served it at 10:00 o'clock that

17  night, and we give them the report.  They had it.  They go in

18  the deposition and they can asked questions about it.

19          Unlike whenever Mr. Caldwell took Mr. Ligler, their

20  expert's report -- or their expert's depo, he had the Markman

21  opinion for two whole weeks, and he was coming up with new

22  opinions on the fly over lunch about that Markman order.

23  They had two whole weeks to get ready for that.

24          And we are not talking about that.  We are talking

25  about this one here.  But the point is we did the very best

1   we could to let them know exactly where we were on this

2   issue.

3          And, Your Honor, reliance on this question was in

4   his January 7th report.  He points to this question,

5   calculated the people who weren't alone motivated, and said

6   here is how much money was at risk for them because they

7   apportioned the value.

8          So the apportionment was already in there.  It is

9   that if you are going to criticize the "alone" question, he

10   needed to expand that analysis to the people that were alone

11   motivated to the extent that they contend "alone motivate" is

12   an impossible standard that can never be met.  And that is

13   what their new position is; impossible standard that can

14   never be met for a smartphone.  There is no way around it;

15   that is the way it is.

16          And Mr. Mills testified in his deposition he didn't

17   run that calculation before.  He said that we talked about

18   that calculation, and we did because it ended up in his

19   January 7th report.  So it ends up in his report.

20          Now, really telling here, Your Honor.  They have

21   that report.  They spend what they came claim to be too

22   restrictive of a time with Mr. Mills, four-and-a-half hours.

23   They spend some 45 minutes talking to him about the timing of

24   when he could have given them this number, 45 minutes of what

25   they considered to be a very critically important

1    four-and-a-half hours.

2         And then they didn't ask a single question about --

3    not one single question about this new opinion; none; not;

4    what its basis is; not what the variable is; nothing.

5         And when they get at the end of it they go, we

6    believe we need to reserve more time because four-and-a-half

7    hours was never enough in the first place, and now we have

8    this rebuttal.

9         I said to them, Your Honor, I am here, Mr. Mills is

10   here, let's take a break, and let's get to it.  Let's get to

11   it.  I'm not going to cut you off at four-and-a-half hours.

12   I even have a flight I was trying to catch, but I was willing

13   to say in LA for another day to get this done.

14        And they basically took the position now we are

15   just going to hope the Court is going to strike it.  And they

16   said they -- lots of excuses, but they all went away by the

17   wayside; and at the end of the day the only excuse they had

18   was, they can't ask questions in a deposition without talking

19   to their experts.  That was their position.  It is on the

20   record.  It is clear.

21        Mr. Caldwell, was in a deposition with Mr. Ligler

22   and got the position of lunchtime new opinions, and that

23   happened and -- unequivocally.  And Mr. Caldwell didn't just

24   say I'm not going to ask questions and we are going to get

25   this guy later.  He didn't do that.  He asked the questions.

1          So what has happened here, Your Honor, is they have

2     basically baited us into adding the word "alone" to the

3     survey.  They knew all along they had a different intent of a

4     whole bunch of new criticisms they were going to make about

5     the "alone motivate"; and they didn't bring those to Your

6     Honor when they were telling us to add the word.  And then

7     now they act shocked when some 12 hours after getting their

8     report, our expert puts out his slight tweak.

9          And, Your Honor, it is literally one variable

10     difference, and I will show you.  He makes one variable to

11     the survey, to the results they have had the whole time.

12          And so, basically, Your Honor, what happens is --

13     this is his old report where you can see the apportionment or

14     the percentage of units that are entire market value or all

15     "alone motivated."  Those are the percentages on the right,

16     Your Honor.  Okay?

17          What he did was he extrapolated the percentage of

18     apportionment for everybody, which comes out to pretty close

19     to the same numbers of the "alone"; but this wasn't necessary

20     until we realized they were going to criticize the "alone

21     motivate" question in the way they never have before.

22          So that is why we put in the different alternative

23     apportionment based on the other question.

24          Tellingly, Your Honor, Dahr, the survey opinion

25     expert, spends some -- I'm sorry.  Apple's survey expert

1    spends -- of a 30-page report, he spends at least one, two

2    three, four, five, six, seven, eight -- eight pages; almost

3    30 percent of his report talking about the very question they

4    claim they had no idea we were relying on.

5          The survey question that we sent -- that is the

6    thing.  We didn't rely on it, we didn't rely on it in this

7    exact way.  And that addition was because of these criticisms

8    that we had no idea were coming.

9          Now, what I would say, Your Honor, rather than

10   putting this in a scenario of let's argue about striking this

11   little piece of their report and this little piece of this

12   report and let's pull this back and get in these various

13   fights before trial, what I'm saying is, look, let's all put

14   our big-boy pants on and let's all go try this case with what

15   has been disclosed, and let's get this done.

16         They put us in a position of tricking us into this.

17   We gave them the results the best we could as fast as we

18   could based on that trickery.  And at that point I don't know

19   what else to say about it other than they were ready for it.

20   Their own expert responded to this very issue in his report,

21   this very question.

22         And even furthermore Samsung's expert did a whole

23   bunch of analysis as well that goes even further than Dahr's

24   does.  So the point is the idea they had no idea this survey

25   question was important and that is why they had to rely on

1    what they did, it is just not true, one; and then, two, the

2    fact that they ran the surveys to criticize what we were

3    doing with the "alone motivate," the fact that they ran that

4    survey, they shouldn't have been able to run that survey in

5    the first place because those were criticisms they should

6    have had months ago.

7            And they come up with them now, and they have to

8    live with that and we will have to live with that; but at the

9    end of the day if we are all going to live with that, this

10   should come in as responsive testimony to their having to put

11   this report out.

12           THE COURT:  Okay.  Response?

13           MR. BATCHELDER:  Could we have our slides?  Thank

14   you.

15           Your Honor, what Mr. Cassady was just describing as

16   trickery was the arguments that Your Honor accepted in

17   granting the Daubert motion; that is, to establish that what

18   they had done the first time was apply the entire market

19   value rule to a portion of Apple's products when they didn't

20   drive, they were not the only feature driving demand for the

21   products.

22           Your Honor Dauberted it on that basis -- and

23   correctly so -- and then they responded with a royalty base

24   calculation based on this new survey inserting the word

25   "alone."  And we looked at that and we thought the way that

they put it couldn't possibly have actually captured the idea

of, was that the only feature that motivated that purchase?

The way they phrased it, it didn't add up and it

didn't make sense that 60 percent of the people who are

buying a phone with thousands of features would say, yeah,

that one thing drove my purchases, that one thing.

So we responded with a survey to see how people

actually did understand and apply that question.  It was

exactly the right thing to do.

And in that responsive set of surveys, we

established what we had assumed all along, which is people

actually didn't read it that way.  When they answered yes to

that question, the "alone motivate" question, if you asked

them about additional features they said, actually that

motivated my purchase, too, and so did that and so did that

and so did that.

So it debunked that their rephrased question

justifies application of the entire market value rule.

But Mr. Cassady and I have agreed on one thing.  We

were locked in on that question.  That is, that is the

royalty base calculation that they chose in response to Your

Honor's Daubert order.  They could have done that calculation

and an alternative calculation in their expert report on

January 7th.

In fact, as we saw, Mr. Mills considered it, but

1   decided not to do that.  And having not done that, we had one

2   royalty base calculation to respond to.  We responded with

3   responsive surveys.  It took two weeks and thousands of

4   dollars to do.  We did those appropriately.  We got them in

5   on time.  We got Dr. Becker to consider them and apply those

6   in his damages report, on time.

7          And then when I take Mr. Mills' deposition, he

8   said, well, I still stand by that royalty base calculation

9   based on "alone motivate," so I am still going to launch that

10  opinion.  I just dropped this new thing over the transom that

11  your most recent expert reports as of a night ago, they don't

12  speak to because that wasn't my royalty base calculation.

13         It is just improper for this new royalty base

14  calculation to be a part of this case now.  They can talk

15  about the survey question, but they can't rely on this new

16  royalty base calculation because it doesn't meet with the

17  schedule Your Honor contemplated.

18         THE COURT:  What else did your rebuttal expert -- I

19  mean, what about this argument that your responsive -- your

20  new responsive report also dealt with a whole host of new

21  arguments aside from this "alone motivate" issue?

22         MR. BATCHELDER:  Yeah, it does for sure.  I mean,

23  Wecker asked a bunch of new questions, and our guys commented

24  on these questions and to the extent that they share any

25  light -- or shed any light on these issues.  And that is

 1   fine.

 2          But the point here is that it is a new royalty base

 3   calculation.  And Mr. Cassady says we changed one variable.

 4          Can you go to next slide?

 5          Remember, that one variable is the only variable in

 6   the royalty base calculation is the motivate thing.  You

 7   multiply that times total revenue, and that is the whole

 8   thing.  That was the calculation that they relied upon, the

 9   calculation for the royalty.  And so that is what our experts

10   dealt with.  That is what they targeted in their responsive

11   survey and report.  That is the record.

12          Again, Mills is still standing behind this "alone

13   motivate" question.  We are locked in on that issue.  That is

14   a fair issue to try.

15          THE COURT:  How about a response to that, that

16   Mills still stands behind that calculation and their response

17   was a survey response in response to the "alone motivate"

18   survey?

19          MR. CASSADY:  Your Honor, I mean, I will put it in

20   front of the Court again.

21          If we can go back to the document camera, please.

22          I mean, they spent the whole time telling us we had

23   to add the word "alone."  It is not responsive to the word

24   "alone."

25          If this is their criticism that "alone" could never

1    be that, which is what their response is now; that the "alone

2    motivate" can never be for these phones.  Unequivocally, that

3    is their response.  If that was their opinion, that should

4    have been in here.  They should have been saying to Your

5    Honor not only does it not include the word "alone" but it

6    doesn't matter if they include the word "alone" because it is

7    impossible because the Fed Circuit has set an unattainable

8    standard.

9         That is not what they said to Your Honor.  They

10   said add the word "alone."  They didn't have the word

11   "alone."

12        I think they hoped you were going to strike us and

13   not let us do anything after that or not give us the time to

14   do anything after that.  We got it in under the wire over the

15   holidays and got this survey in there.

16        And, Your Honor, I mean, I will get into it.  With

17   regards to the percentages, we always contended the

18   "motivated to buy" question was for "alone motivated to buy."

19   We have always said the way it is written and the way it

20   reads, that is what it is.

21        When we added the word "alone," Your Honor -- and I

22   will show you the app survey examples, here is a percentage

23   that we got in the new surveys, this 26 percent.  Okay?

24        Here is what we got in the old surveys when it said

25   "motivate."

1          I mean, these are laser precise, Your Honor.  I
2    mean, this proves that we were right.  When you ask the word
3    "motivate" in our survey questions, that's the way the
4    survey -- that's the way it got read was as "alone
5    motivated."

6          Now, we have got all kinds of issues with their
7    stuff that they run that we believe confuses the person into
8    thinking otherwise; but the point is when they got asked, the
9    question didn't change percentage-wise when we added the word
10   "alone."  And we don't think there is any other better
11   evidence than saying what we said before is true; that you
12   read the "motivate" question, we believe it said the word
13   "alone."  Our experts did too.

14         Your Honor disagreed with us; and, respectfully, we
15   disagreed with Your Honor's decision on that, but we went
16   forward and added the word "alone" and got the same results.
17   So there is no question that we were at least in the ballpark
18   of what we were talking about.

19         We think that specific aspect of that should get
20   rescinded.  We don't think that should be sitting there given
21   that we have our data showing that is not what it means.

22         Now, they have done their surveys and grabbed a
23   whole bunch of other data that they think means the opposite,
24   they think that it doesn't mean this.  And we are going to
25   have our issues about that.  And it is going to be a big

1   fight in front of the jury about this issue, which is exactly

2   what I was telling you about between Mr. Albritton and

3   myself.  We said how this apportionment is going to work.

4   This is going to be the fight.  It is here.

5       Again, what is happening is we were responding to

6   them saying that it can't be "alone motivated," by showing

7   that a different type of apportionment using the other survey

8   question -- if you are saying it can't be "alone motivate,"

9   which we never thought you would say but now you are, this

10  shows you -- this other analysis shows you that even if it is

11  not alone motivated for 100 percent of the products, if you

12  just took into account the value that those people gave the

13  product, it gets to the same number.  And it does, Your

14  Honor.

15      It is within $30 million between Apple's two

16  numbers.  We are talking about a number that is very high,

17  and I know Your Honor knows this, with a billion dollars.

18  And at a billion dollars, these two analyses are within $30

19  million of one another.

20      So what I am saying is that it is literally one

21  variable.  Their expert responded to this variable.  Their

22  expert went through details of why that question was not

23  right, why it is wrong, why they don't agree with it.

24      And the point is if I had any mind to understand

25  that they were going to come in and say this is an impossible

1   standard to meet, then, yeah, we would have tried to do 10

2   other alternatives over Christmas Eve and over New Year's

3   Eve.

4          But at the end of the day, we did the best we

5   could.  They asked us to be responsive.

6          And I don't know that you and I would even be

7   talking about this, Your Honor, had I taken the path of I

8   will ask for forgiveness rather than permission; and I'll

9   just let my expert blow it out on the deposition.

10          If I had done that, I don't know that we would be

11   talking right now; and that makes me a little offended

12   because I give them what is a couple pages of updated charts

13   showing the difference and let them ask the questions.  And

14   they go in there and say, nope, nope, we are not going to ask

15   any questions about it.  We are going to shut it down and not

16   ask a single question and hope that we get this thing struck.

17          THE COURT:  Okay.

18          All right.  Mr. Batchelder, what I am really

19   struggling with is the notion that the first time we were in

20   here on this issue, it really did seem like the whole

21   argument was they didn't ask the right question.

22          I mean, I think Mr. Verhoeven even said something

23   to that effect, if only they had asked whether it was the

24   "alone motivator" then we wouldn't have this issue, but they

25   didn't.  And now they did, and so that is where I am having

1    trouble.

2         MR. BATCHELDER:  Well, Your Honor, I think for the

3    most part that is right.  And what the test is, as Your Honor

4    recognized in the Daubert is, if you are going to rely on the

5    entire market value rule, the question is, is this feature

6    the only feature that motivated your purchase?  That is what

7    you have to be getting at.

8         And the way they asked it was, does this feature

9    alone motivate?  So I think probably when people said yes to

10   that, what they really meant was this feature alone, that is,

11   considering this feature in isolation, that motivate

12   reference, well, yeah, but then so did these other features.

13   That was the problem.  So we tested that with Dahr.

14        But the bottom line is, again, Mr. Cassady and I

15   agree on this much, that is where the fight is going to be.

16   Right?  They say that does justify -- that question justified

17   if it gives you the entire market value rule.  We say it

18   doesn't, and we can fight about that.

19        But adding this new royalty base calculation --

20        THE COURT:  But see the difference is I think you

21   say that now, but earlier what you said was that question was

22   just asked incorrectly.  It was missing a word.  And so they

23   modified that.

24        I mean, I see their argument where we responded in

25   the way we thought they were raising the Daubert issue and

1    then they responded in a new and different way that was never

2    raised before.  You never raised the issue of even if they

3    hadn't said "alone," it still wouldn't be enough.

4              MR. BATCHELDER:  But the point is they then came

5    back with that "alone" question.  They did an expert survey

6    on it.  They did an expert Mills' report.  They used that as

7    a damages calculation.  That was their response.

8              They said, well, now we have met your -- what we

9    think was your objection in Apple, and now we believe we have

10   justified indication of the entire market value rule.  That

11   is the playing field.

12             So having taken that position, Apple was entitled

13   to respond.  We had two weeks to do it, and we did.  We

14   responded with surveys and reports saying we don't think that

15   is how respondents actually understood the survey because if

16   they did then -- if they ever answered yes to the "alone

17   motivate" questions they would always answer no to everything

18   else.

19             But 100 percent of the people that said yes to the

20   "alone motivate" question answered yes to other features,

21   too.

22             So it just shows that what Mills was relying on in

23   this to measure, it didn't.  But that is going to be the

24   fight.

25             What they can't do is pick a new fight on the eve

1    of his deposition after the responsive expert reports are in,

2    and say:  Let's fight over here about this new royalty base

3    calculation based on the apportion of value question that was

4    lingering out there, was considered by Mills before January

5    7th, he decided not to do a royalty base calculation when he

6    could have.  That new fight can't be in this case.  And that

7    is what is the --

8                THE COURT:  Isn't the new fight really, though,

9    that "alone" is never -- never going to be -- it is not what

10   you are proving?  I mean, isn't the new fight really, you

11   know, this new test of it can never be the "alone motivator"?

12               In other words, didn't you introduce the new fight

13   in response?

14               MR. BATCHELDER:  But that's how it works.  I mean,

15   they take a position for damages.  It is their burden.  And

16   then we respond.  So they are trying to justify the entire

17   market rule value rule indication with this "alone motivate"

18   question, and we think they failed to do that; and so that is

19   where our responsive survey is the responsive report to a

20   burden report.

21               But they can't then do, particularly given what

22   Your Honor's guidance was, that we need to have this all

23   wrapped up by January 30th, they can't then side-step that

24   response by saying actually here is a whole new royalty base

25   based on a whole new survey question that your surveys and

1     responses didn't address.  That is just not fair.

2              MR. CASSADY:  Your Honor, the record is very clear.

3     They always told us, add the word "alone."  They said nothing

4     more than that.  They did not say it is impossible.  They did

5     not say it couldn't happen.  They said add the word "alone,"

6     all of them over and over again.  That is their position

7     until January 22nd of this year, a couple days ago where they

8     come up about a new position, which is it can never happen.

9              And this is clearly responsive to the it can never

10    happen.  This is clearly responsive to saying it can never

11    happen and your "ask" is so ridiculous because, see, it can

12    never happen.

13             And this is responsive to that because it is

14    saying, look, the apportionment these people gave to the

15    value, even assuming that the people who said "alone

16    motivated" actually would have been as negative about the

17    feature as the people who weren't "alone motivated."

18             That is what we did.  We moved it over there.  Even

19    assuming that situation, that would be -- that would still be

20    the same number.

21             And we had no reason to say that because our theory

22    was the "alone motivated," and then these additional people

23    that we are leaving on the table for Apple.  That was what we

24    are talking about was here is the "alone motivated" people we

25    are taking our percentage of.  We are leaving the revenue for

1   Apple of the rest of the people.

2         And look at the value left for Apple.  We

3   calculated that.  They criticized it in their rebuttal.  They

4   had all of the time in the world to criticize that.  They

5   knew it was there.

6         Reibstein, Samsung's expert, went further than Dahr

7   did and criticized it in a whole lot of other ways.  So it is

8   not that it wasn't disclosed.  The person who didn't know

9   that this "alone" issue was coming was us until the very

10  morning of, and we served the report.  They had it that day,

11  they could have asked questions about it the next day.  They

12  didn't do it.

13        Your Honor, I just listened to them say with regard

14  to Ansell, well, we had a day.  We had a day with the stuff

15  they sent us.  And now you are hearing the same story back

16  from them saying we had a day, and that is not enough, Your

17  Honor, for one variable change in a survey to which all their

18  experts criticized.  I just don't know what to say about it.

19        They can file a Daubert today.  They don't have a

20  problem filing a Daubert.  They have got it.  They can file

21  it.  They had no problem filing this emergency motion in one

22  hour after the deposition.

23        So file a Daubert, and let's have a conversation

24  about those Dauberts, but I don't know why we are -- I don't

25  know why we are emergency striking this issue, especially

1    when it wasn't critical enough for them to even ask questions

2    about it on Friday.

3         MR. BATCHELDER:  We have a royalty base calculation

4    and their burden reports in response to your Daubert.  We

5    responded with surveys and a responsive report.  That is the

6    playing field we should be playing on.  That is the playing

7    field we should be taking to trial.  We can't be asked to

8    deal with a new royalty base calculation.  It is just too

9    late.

10        MR. CASSADY:  May I suggest something?  I think the

11   fair way to deal with this is, strike their new criticisms,

12   and we will strike this.  Or let them all in.  But it can't

13   be fair that you change your -- you change boats, you know,

14   on us; and then say, oh, but you can't do that, especially

15   when they were in this courtroom, Your Honor, during the

16   hearing knowing what they were doing when we were saying you

17   are just going to rebut, right?  It is not going to be a

18   whole new blowout here of reports.

19        They were trying to get me to agree to two hours

20   with these witnesses knowing they were about to give me a new

21   survey.  So I am just saying it should be let it all in or

22   kill it all.  That is the way to say it.

23        THE COURT:  The entire initial fight was about this

24   idea about they asked the wrong question; that they only

25   asked whether it was the "alone motivator" then we wouldn't

1    have the issue that we have now.

2            So that is what troubles me about I -- if you want

3    to let in your new stuff, then I think they get to let in

4    their new stuff.

5            MR. BATCHELDER:  Our response is a response to

6    their burden report that reacted to your Daubert though, Your

7    Honor.  Okay?  So they chose what survey question to ask, and

8    they said, we now say that that proves that the one feature

9    that caused people to buy this phone was the ability to buy

10   apps from the App Store.  That is what they said.

11           And our responsive report shows that is not right,

12   at least we think it is.  We think our responsive report on

13   that battlefield takes that fight well, and we can hash it

14   out.

15           But the point is, that is this January 7th royalty

16   base calculation, and that is what they should go forward

17   with.  They can't then side-step that survey with a whole new

18   royalty base calculation.

19           If they were allowed to do that, we would have to

20   be able to, perhaps, do a new survey to respond to that one.

21   But because he didn't use that for his royalty base, we

22   didn't do that.  We wasted two weeks and thousands of dollars

23   on that survey for nothing.

24           So throwing out over the transom at the last minute

25   a new royalty base calculation, it is just unfair.  They

1    decided how to respond to your Daubert.  We decided how to

2    respond to their burden report.  That should be the playing

3    field.

4              MR. CASSADY:  He didn't say anything different,

5    Your Honor.  We are in a bad spot because they threw in new

6    materials.  They got our response in 24 hours, less than 24

7    hours.  I mean, understand that.  They got our response in no

8    time.  They knew what they were doing.  They sat in this

9    courtroom knowing that survey was coming out when they were

10   saying what they were saying to us and talking about limits

11   of depositions.  They knew that.

12             And we did ours over Christmas.  I will just put

13   that out there.  Our two weeks was not the same as their two

14   weeks.  We had Christmas Eve and Christmas and New Year's Eve

15   and people all over the country trying to get them all

16   together for this.

17             We did the best we could.  We threw it together as

18   fast as we could, and we did it in the Court's deadline.  We

19   didn't ask for any more time.

20             They did it in two weeks as well, but they knew the

21   whole time their two weeks were coming up, they were going to

22   run a whole new set of surveys changing the entire playing

23   field of the criticisms of our guy.

24             If I had any idea they would be going and saying

25   this is an unreachable standard, then I wouldn't do this.  We

1    did what you told us to do.  We did what they told us to do.

2    Add the word "alone."  That is what we did.  That is where

3    the criticism should have been, which was when we told you to

4    put the word "alone" in; oh, now you did it; now we are

5    changing; now it is an impossible standard.

6           I just don't -- I mean, it's either all in or all

7    out.  I just don't know how to say it.

8           THE COURT:  Final word.

9           MR. BATCHELDER:  Your Honor, I would just say

10   again, having chosen that playing field, that is, they chose

11   to do a new survey in response to Your Honor's Daubert, their

12   burden report, we responded with our responsive report based

13   on the evidence that we thought was appropriate.  That is the

14   playing field.

15          Then struck a new royalty base calculation that we

16   haven't had a chance to respond to with new expert reports to

17   test that, it is just not fair.  And I think if Your Honor

18   was going to let it in, we would need an opportunity --

19   another two-week opportunity, perhaps, to do a new survey, to

20   respond to new expert reports, you would have to have a

21   Daubert schedule that followed from that.  Frankly, I just

22   don't think that is tenable with the trial date.

23          THE COURT:  What about this notion that your expert

24   already opined as to that?  Didn't I hear something about

25   that?

 1          MR. CASSADY:  Yeah.  Your Honor, yeah, they

 2  criticized this question.  They said why it was wrong.  Why

 3  it didn't say what we said it said.  They went through all

 4  that process.  I'm not saying they can't -- Your Honor, if

 5  they want to respond, I mean, obviously, we may get ourselves

 6  another round of them putting up some brand-new thing on that

 7  too.

 8          I mean, if they want to respond in some minimal

 9  nature quickly and we go take the deposition, fine.  But I

10  don't know why we are throwing this thing two more weeks down

11  the road.  We responded in five minutes.

12          MR. BATCHELDER:  On that apportion of value

13  question, we do have a record on that question.  But what we

14  don't have is a record on its use in a brand-new way as the

15  factor in the royalty base calculation.  That is the problem.

16  They can talk about the apportion of value question if they

17  want and what light they think it sheds.  You can't use it

18  for a new royalty base calculation.  That is what they have

19  done to offend the schedule.  That is what I would strike is

20  that calculation.

21          MR. CASSADY:  Your Honor, we did what they told us

22  to do.  We added the word "alone."  We did what they told us

23  to do.  We did it as quickly as possible.  We did it under

24  Your Honor's schedule.  I don't know what else to say about

25  that other than they added a bunch of new things.

1          If we need to file a motion to strike tonight, we

2     will.  We hoped that wouldn't be necessary, but we will do

3     it.  And that stuff can all go the way of the Dodo with this

4     piece, too.

5          But what they are trying to do is basically put us

6     in a gotcha.  We told you to do it and then we gotcha.  We

7     were ready to do this.  We were ready to run these surveys.

8     We were ready to do this if you added that word.  Gotcha.

9     Woohoo.  And they are hoping that you will hold us to a

10    gotcha.  That is what is happening.

11         MR. BATCHELDER:  It was your Daubert order that

12    told them what they had done the first time was wrong.  Okay?

13    You said you applied the entire market value rule and it was

14    unjustified.  Go do a new reasonable royalty calculation.

15    They chose what to do.

16         They chose to redo the survey typing in the word

17    "alone" in a way that, frankly, was ambiguous because it

18    created this problem.  But they made that bed.  And having

19    done that, they now need to rely on that.

20         And, again, Mr. Mills thought of doing this other

21    calculation the first time.  Chose not to.  He can't now do

22    it to side-step our expert reports.

23         MR. CASSADY:  Not anything new, Your Honor.  We are

24    saying the same thing over and over again.  I don't know what

25    to say about it.  We -- like I said, the reality of the

1    situation is we did what they told us to do.  They made no

2    other criticisms, and they sat here in front of this

3    courtroom and saying we need to add the word "alone."

4           Never did they say the word "alone" needs to be in

5    some specific spot and done in a certain way.  I mean, and

6    then they turn this criticism into a whole different

7    ballgame.

8           THE COURT:  All right.  Given the history with

9    regard to the reports and the arguments and the underlying

10   Daubert motion, I am going to deny the motion to strike.  I

11   am going to allow the rebuttal responsive -- whatever --

12   supplemental report of Mills.

13          All right.  Before I let you go, I need to talk to

14   you guys about some things with regard to trial.

15          MR. BATCHELDER:  Your Honor, I'm sorry.  I just

16   wanted to say, in light of that ruling, we are going to need

17   to submit responsive reports to address that new royalty base

18   calculation.

19          THE COURT:  Okay.

20          MR. BATCHELDER:  And we will have to meet and

21   confer over schedules.

22          THE COURT:  Okay.  Do it.  Do it as quickly as you

23   can.  I know you are doing a thousand other things, but y'all

24   work on that.

25          All right.  I know Judge Gilstrap is going to set

1    you-all for a final pretrial conference with him.  But these

2    are just a few things that we -- he and I discussed with

3    regard to kind of how he does things for trial.

4              So I think I have already told you that exhibits

5    not used with a witness will not come into -- will not be

6    made part of the record.

7              Then separate from that, his practice is that the

8    exhibits do not all go back with the jury.  So if the jury

9    asks for an exhibit, then they can have it.  But just for

10   your own knowledge, he doesn't just routinely send all of the

11   exhibits back with the jury while they are deliberating.

12             I think that we have already covered this, but you

13   do not need to provide food for the Court or the jury.

14             MR. ALBRITTON:  Ms. Rosa asked us to do that.

15             THE COURT:  She did?

16             MR. ALBRITTON:  Yes, she said that -- I just got

17   through talking to her.  She said that originally he was --

18   did not want that, but then --

19             THE COURT:  Now he does.

20             MR. ALBRITTON:  They have asked us, and she sent

21   Johnny and me an email, and we have talked to her.

22             MR. CALDWELL:  It is all getting worked out.

23             MR. ALBRITTON:  We have got better information than

24   you.

25             THE COURT:  You totally do.  Man, I'm always the

1    last to know.

2         All right.  He mentioned that you will get the jury

3    list the Thursday before trial, so that is something that you

4    can have.  And so we have sent out your agreed questionnaire

5    with the changes that Judge Gilstrap had, out with a summons,

6    so you should get those back and completed with the list the

7    Thursday before trial.

8         He seats eight jurors and typically gives four

9    strikes per side.  Each side strikes their list separately.

10        And during voir dire he said he will let you do

11   kind of a two- to three-minute very high-level overview of

12   your case to the panel, but do not argue the case and don't

13   do that or he call you out in front of the panel.  So just a

14   very high level this is what the case is about kind of

15   summary.

16        This is a big one:  Do not call anyone in the

17   courtroom by their first name; not your assistants; no one.

18   We are on a Mr. and Mrs. last-name basis.  Okay?

19        And the last thing I have here note-wise is just

20   with regard to testimony of an expert witness that may be

21   outside the scope of that expert's report.  He just said, you

22   know, you are free to make those objections; but make them in

23   a cautionary manner because he will dive into it, which will

24   require excusing the jury, give me the report, let's get into

25   it.

1           And so if you need to make it, make it.  But know

2   that if you make several of them and it is not outside the

3   scope, you kind of make it at your peril, so it is very

4   disruptive to the trial to have to excuse the jury for those

5   kinds of objections.

6           So I think those are all of the separate notes I

7   had from him.  Are there any questions?  And maybe I can

8   answer them; and if not, maybe I can get you the answers or I

9   can just tell him those are questions that you have for his

10  meeting with you as well.

11          I told you it was going to be tried in Judge

12  Steger's courtroom, right?

13          MR. CALDWELL:  Yes, Your Honor.  And we have worked

14  between, particularly Johnny and Eric -- or Mr. Albritton and

15  Mr. Ward.

16          THE COURT:  There you go.

17          MR. CALDWELL:  Have been working on how much it is

18  going to cost us to outfit it with technology and all that

19  mess.  So we are making pretty good progress on that.

20          THE COURT:  Okay.

21          MR. CALDWELL:  But I don't think there are any

22  other particular questions from the plaintiff.

23          MR. ALBRITTON:  Nothing on our behalf of the

24  defendant, Your Honor.

25          THE COURT:  Okay.  All right.  Well then, thank you

1   for a good, long, hard day.  I am still working on it.  I am

2   going to put out a summary kind of ruling on the MILs, so

3   that you have that and he has that.

4          And I will ask you, again, to submit those exhibit

5   lists to the Court so that he has that.  And I am just going

6   to try and get rulings out on any of the remaining, pending

7   motions and get you ready for trial.

8          MR. ALBRITTON:  I did actually have one question I

9   forgot I was supposed to ask.

10         Do you have any idea when we are likely to hear on

11  this motion about the trial time?

12         THE COURT:  I think relatively soon.  My intention

13  is to go and discuss that with him -- well, probably tomorrow

14  now, but I think you should hear something relatively soon.

15         MR. ALBRITTON:  Great.  Thank you, Your Honor.

16         THE COURT:  Uh-huh.

17         MR. BATCHELDER:  Your Honor, I did want to remind

18  the Court we did have one outstanding MIL that was submitted

19  in writing on Lotspiech.

20         THE COURT:  Yes, on his testimony.  Okay.  Yes.

21  The Court has that, and I will try and include that ruling

22  with my summary.

23         MR. BATCHELDER:  Thank you.

24         THE COURT:  All right.  Thank you all.

25         We will be adjourned.

1                   (Hearing adjourned.)

2

3                         CERTIFICATION

4

5              I HEREBY CERTIFY that the foregoing is a true

6   and correct transcript from the stenographic notes of the

7   proceedings in the above-entitled matter to the best of my

8   ability.

9

10  /s/ Shea Sloan
    SHEA SLOAN, CSR, RPR
11  Official Court Reporter
    State of Texas No.:  3081
12  Expiration Date:  12/31/15

13

14

15

16

17

18

19

20

21

22

23

24

25