```
1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF TEXAS

3                          TYLER DIVISION

4   SMARTFLASH LLC, ET AL.        )(

5                                 )(     CIVIL DOCKET NO.

6                                 )(     6:13-CV-447-JRG-KNM

7   VS.                           )(     MARSHALL, TEXAS

8                                 )(

9   APPLE INC., ET AL.            )(     FEBRUARY 4, 2014

10                                )(     1:05 P.M.

11                        PRE-TRIAL HEARING

12           BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13                  UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFFS: (See sign-in sheets docketed in
                          minutes of this hearing.)
17

18   FOR THE DEFENDANTS: (See sign-in sheets docketed in
                          minutes of this hearing.)
19

20   COURT REPORTER:      Shelly Holmes, CSR-TCRR
                          Official Reporter
21                        United States District Court
                          Eastern District of Texas
22                        Marshall Division
                          100 E. Houston Street
23                        Marshall, Texas  75670
                          (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

1                        I N D E X

2

3    February 4, 2015

4                                              Page

5         Appearances                            1

6         Hearing                                3

7         Court Reporter's Certificate          42

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  This is the time for pre-trial hearing in

 4   the Smartflash versus Apple matter.  This is Civil Action

 5   6:13-CV-447.

 6              Let me call for announcements.  What says the

 7   Plaintiff Smartflash?

 8              MR. CALDWELL:  Good afternoon, Your Honor.  Brad

 9   Caldwell on behalf of Smartflash.  Would it help the Court if I

10   did just a few brief introductions --

11              THE COURT:  I was going to ask you if you didn't

12   volunteer, so please go ahead.

13              MR. CALDWELL:  Perfect, perfect, Your Honor.

14              Mr. Johnny Ward will be trying the case with us,

15   Mr. Jason Cassady and Mr. Austin Curry.  And if I could also

16   introduce Mr. Patrick Racz, who is the inventor and will be our

17   corporate rep, and then seated next to him is Mr. Dennis Daily,

18   who is an English barrister that works for the Plaintiffs.  And

19   the Plaintiff is ready, Your Honor.

20              THE COURT:  And are you going to be presenting the

21   argument today?

22              MR. CALDWELL:  To the extent that we're talking about

23   trial procedures, probably.  To the extent it's about the --

24   the Daubert that's pending, Mr. Cassady will be presenting that

25   argument.
```

```
 1            THE COURT:  Okay.  Thank you.

 2            What says the Defendant?

 3            MR. ALBRITTON:  Thank you, Your Honor.  Is it okay if

 4  I stand here?

 5            THE COURT:  You can announce from there,

 6  Mr. Albritton.

 7            MR. ALBRITTON:  Thank you, Your Honor.  Eric Albritton

 8  on behalf of Apple.  With me is Jim Batchelder and Ching-Lee

 9  Fukuda, also on behalf of Apple, and then David Melaugh is the

10  director of patent litigation, and Cyndi Wheeler who is also

11  here on behalf at Apple.  And we're here and ready to proceed.

12  And Mr. Batchelder will be addressing the issues related to the

13  Daubert motion, Your Honor.

14            THE COURT:  Okay.  Thank you.

15            Well, counsel, a large part of today's hearing, and

16  certainly we'll get to the Daubert motion, but a large part of

17  today's hearing is so that I get a chance to see you, and you

18  get a chance to see me, and we have an opportunity to make sure

19  that as many questions that can be asked and answered before we

20  select the jury are taken up and dealt with by the Court so

21  there's as little confusion as possible.

22            As you're aware, we're set for jury selection here at

23  9:00 a.m. on Monday, February the 16th.  We'll begin trial the

24  same day.  However, you should know that the Court has a

25  conflict on Friday, the 20th, so we will not be holding trial
```

1   that day.  And I'll let the jury panel know that when we do the

2   jury selection.  That should be the only day where we'll have

3   a -- a skip in consistent trial days.  We will continue

4   following that Friday, the 20th, on Monday, the 23rd.

5           As to jury selection, each side will be permitted 30

6   minutes per side to examine the panel.  My practice is you may

7   use up to three minutes of your 30 minutes to give a very high

8   level non-argumentative overview of your contentions and

9   position in the case.  That's a hard limit on three minutes.

10  Don't go over it, or you'll hear from me from the bench.  And

11  it's a hard designation on it being non-argumentative.  You're

12  not to argue your case in voir dire.

13          From there, you should proceed to more generic

14  questions and examination of the panel.  I intend to seat eight

15  jurors in this case, and each side will be afforded four

16  peremptory challenges.

17          As you know, the case was originally scheduled for 12

18  hours per side to put on the evidence.  I've since agreed to

19  increase that to 15 hours per side.  I know the Defendant asked

20  for 18.  15 is not going to change, so you don't need to urge

21  that again.

22          Each side will be given 20 minutes per side for

23  opening statements, and each side will be given 30 minutes per

24  side for closing statements.  The Plaintiff may split their

25  closing between co-counsel, if you choose to.  You're not

1    required to.  I do require, though, that you must use at least

2    50 percent of your time in your first closing argument.  You

3    can't get up there and give one minute and then reserve 29

4    minutes until after the Defendant is finished.  You've got to

5    use at least 15 minutes in your first closing argument.

6           If you want, whether it's opening, closing, or any

7    other matter where you're at the podium and you've got a fixed

8    amount of time, if you want a warning on your time from me, ask

9    me when you go to the podium.  I'm happy to give you a

10   five-minute, two-minute, one-minute, whatever warning you want,

11   but you'll need to ask me for that.

12          The Court will be keeping the time through the trial,

13   and periodically I'll be advising you either directly from the

14   bench or through my law clerks about your remaining time.

15   During recesses, don't hesitate to ask if you need an update

16   and haven't gotten one.

17          During closing arguments, after both sides have

18   rested, I want you to be aware that I consider closing

19   arguments in a jury trial to be the pinnacle of seriousness and

20   focused, and, therefore, I want you to refrain from moving

21   around the courtroom.  I want you to instruct your support

22   staff, your observers that you have communications with,

23   anybody that's under your control, I don't want people getting

24   up, moving around, the door opening and closing, or anything

25   that would distract the jury from the full attention focused on

```
 1    counsel's final arguments.  I consider that -- of course, at
 2    all times during the trial, you should work to minimize any
 3    disruptions, but those efforts should be redoubled, if not
 4    tripled, during closing argument.
 5           Also, it's my practice, and I know Mr. Ward and
 6    Mr. Albritton know this, having tried various cases before me
 7    before, and I will say both -- both sides have exceptionally
 8    qualified local counsel.  I hope you will use them to the
 9    fullest extent they're available to you.  But both local
10    counsel know it is my long-standing practice to direct that
11    witnesses and counsel will not refer to individuals by first
12    name only during the trial.  Call the person that's being
13    talked about John Smith or Mr. Smith, but don't call him John.
14           And I will direct that counsel instruct their
15    witnesses in this regard, and if the witnesses violate the
16    rule, I'll hold you accountable, because I'll determine that
17    you haven't instructed them as I've told you to.  So that's --
18    that's a matter that I think comports with the level of decorum
19    that's expected in a United States District Court.  It also
20    protects the record from any confusion, given the likelihood
21    that there may be more than one person with the same first name
22    that's going to be referred to through the trial.
23           I don't see an easel in this courtroom.  Counsel, I
24    know that you all are coordinating and providing some of the
25    electronics and other things for use in the courtroom.  Do we
```

1  anticipate there being an easel with markers in the courtroom?

2         MR. WARD:  We'll make sure there is one.  We'll want

3  one, so I'm sure we can coordinate and get that taken care of.

4         THE COURT:  All right.  Well, let's do this.  Probably

5  the best place to put it is somewhere against the wall past the

6  jury box over there, and that will be the most convenient.  And

7  if you're going to use it and set it up, then just ask leave of

8  the Court to do it.  And then probably somewhere between the

9  podium and the corner of the jury box is the best place.

10        I do want to remind you that my practice with not only

11 charts like that or -- but with any other demonstratives is

12 when you've finished your cross-examination, you need to turn

13 the page if it's a chart, or if it's a demonstrative, place it

14 so that it's not continually visible by the jury.

15        And also, opposing counsel will have free use of

16 demonstratives that you put up and vice versa.  Once you've

17 used it, it's -- it's fair game for the other side if they want

18 to use it.

19        All right.

20        MR. WARD:  Your Honor, is there a microphone that

21 we'll have when we're over at the -- an easel?

22        THE COURT:  There is a handheld microphone, and we can

23 make that available, if need be.  I'm sure we'll end up using

24 it through the voir dire process to some extent.

25        MR. WARD:  All right.  Thank you.

1            THE COURT:  It's my intention to be in chambers by

2    7:30 each morning.  And I will do my best to abide by that

3    aspiration.  And it's also my intent to bring in the jury and

4    begin evidence during each day of trial at 8:30.  That

5    intervening hour, counsel, is for your benefit.  You have a

6    fixed amount of time to put on your case.  One of the ways that

7    we try to maximize the benefit of that fixed amount of time for

8    you is that I make that hour available each morning so if there

9    are late-breaking problems or disputes that have developed over

10   night, I can take them up and deal with them during that hour,

11   and it doesn't cost you any of your fixed time for trial.

12           So that hour's there for your benefit and use.  If you

13   need it, let me know.  I will be in chambers by 7:30, but I'm

14   not going to come out and poll counsel every morning.  If

15   something's come up, you need to let me know.  If I don't hear

16   from you, I'll assume there aren't any issues I need to take up

17   with you before we bring the jury in.

18           And I'm not -- I'm not asking you to manufacture

19   disputes for me to deal with during that hour, but it -- it's

20   there for you use if those come up, and I can give some

21   direction and some rulings that will streamline the trial of

22   the case during the time that the jury's in the box.

23           I also will attempt to conclude each day's evidence

24   somewhere around 5:30 to 6:00 o'clock.  The Tyler Division is a

25   large division geographically.  We may well have jurors that

1   have 50, 60 miles to drive each night.  I don't know that we'll

2   have any terribly inclement winter -- winter weather.  I

3   haven't seen a long-term forecast that indicates that.  But I

4   don't intend to go later than 6:00 o'clock, if necessary.

5          My practice is not to let the clock dictate when we

6   stop, but if -- to look for a logical place in the trial of the

7   case, whether it's when you pass a witness or you move on from

8   a major topic to another major topic.  I'll look for a natural

9   break.  So it's not going to be exactly 5:30 or 6:00 -- 6:00

10  o'clock or 5:45.  It will be where we have a logical place

11  that's not disjointed to break that day.  But in a general

12  sense, my target is to conclude each day's evidence between

13  5:30 and 6:00.

14         Also, unless something changes, my typical practice is

15  that I will probably have one recess during the morning, and

16  typically two recesses in the afternoon.  And those are

17  generally spaced out hour and a half to two hours, depending on

18  how things are flowing in the trial.  And I certainly reserve

19  the right to alter that if the circumstances warrant it, but

20  that's my general target as far as recesses.

21         Also, given that this is a patent trial, I want to

22  address with you the Court's practice with regard to

23  confidentiality.  If you have something of a confidential

24  nature that is going to be brought up during the trial and you

25  do not want it to end up in the transcript, then you need to

1   ask me to seal the courtroom.  The redaction practice is only

2   for Social Security numbers, driver's license numbers, those

3   things that are particular to an individual's identity.  It is

4   not a broad brush we can fix everything that came up during the

5   trial through redaction.  That's not my practice, and I'm not

6   going to allow wholesale redactions of the transcript after the

7   evidence is complete.

8        But if I seal the courtroom at counsel's request, then

9   clearly that seals that portion of the transcript.  So if

10  you've got confidential information that may come out in the

11  trial, you need to -- you need to ask me to seal the courtroom.

12       Also, I'd like to have some warning about that.  I'd

13  like to know that's coming.  If -- if we get to Wednesday and

14  you're pretty sure that may come up in Wednesday's portion of

15  the trial, you need to tell me between 7:30 and 8:30 so I'll

16  have some idea.  I don't like surprises.  So anything you can

17  do to prevent me being surprised will work to your benefit, I

18  assure you.

19       All right.  I understand both sides have filed a list

20  of pre-admitted exhibits and that there aren't any remaining

21  disputes as to designated deposition clips.  I have been told

22  that there seems to be some continuing discussion about the

23  issue of door opening and what can come up in if and when the

24  door is opened.  I would expect there to be final lists of

25  pre-admitted exhibits before we begin jury selection.

1          From that list of pre-admitted exhibits, counsel are

2    free to use and display those items before the jury without a

3    predicate.  They've been pre-admitted for that express purpose.

4    That, too, is another way the Court maximizes the use of the

5    designated and fixed amount of trial time for each side.  That

6    avoids the waste of time for objections and predicates and so

7    forth and so on.  You can simply use, as you wish, any item

8    from the list of pre-admitted exhibits that you choose to.

9          However, you need to understand -- and, again, I know

10   local counsel is familiar with this, but for those of you that

11   are not familiar with it, the fact that an exhibit is on the

12   list of pre-admitted exhibits doesn't make it a part of the

13   record in this trial.  Only if it's used for the jury from the

14   list of pre-admitted exhibits does it become a part of the

15   record.

16         To keep account of this so there's no confusion, my

17   practice is beginning on the second day of trial, which in this

18   case we will get some evidence in on Monday afternoon, so

19   probably Tuesday morning, before 8:30, I will come into the

20   courtroom, and I will ask each side to go to the podium and

21   read into the record the designations and exhibit numbers from

22   any exhibits from the list of pre-admitted exhibits that they

23   used during the preceding day's portion of the trial.  And then

24   I'll ask the other side if you agree with opposing side's

25   rendition of those exhibit numbers.  And we will do that on a

1  rolling basis each morning so that we won't have to keep lists

2  and then do it all at one time afterward.  But those exhibit

3  numbers that are read into the record as having been used from

4  the list of pre-admitted exhibits before the jury and during

5  the trial, they are a part of the record in the case.  The

6  pre-admitted exhibits not so used and not identified in the

7  record in that manner are not a part of the record in the case.

8        So someone on each side's trial team needs to be

9  keeping up with that on a daily basis and be prepared each

10  morning to go to the podium and read those exhibit numbers into

11  the record for each side.  But that's the practice I'll follow

12  through the trial.

13        All right.  Let me pause at this point and ask each

14  side if there are any questions before we get to any remaining

15  live disputes on the docket as far as procedure and practice

16  and Court's custom.  Are there anything that you'd like to ask

17  me about that I haven't touched on?

18        MR. CALDWELL:  Yes, sir, Your Honor.  Thank you, and

19  thank you for the background.

20        One question just to clarify about pre-admitted

21  exhibits, and I think the -- the guidance from the Court is

22  super helpful.  But the parties have, to this point, I think,

23  proceeded understanding that we had resolved certain objections

24  if a door got up and a motion in limine no longer kept

25  something out.

1          As I understand the Court's guidance now, if something

2    is on the list as pre-admitted but still subject -- still

3    excluded due to a motion in limine, we need to pull that off of

4    the -- the pre-admitted list?

5          THE COURT:  I don't think that's necessary, but the

6    general rule still applies.  And that is, if there's anything

7    that's potentially subject to an order in limine from the

8    Court, before it's used under any circumstance, you need to

9    approach the bench and get leave from the Court to do so.

10         MR. CALDWELL:  Very well.

11         THE COURT:  So if you think the Defendants have opened

12   the door and you attempt to, based on that, offer something

13   that you believe might possibly be subject to an order in

14   limine, then before you walk through that doorway with that in

15   hand, you need to approach the bench, and we'll take it up, and

16   I'll give you guidance from the bench, and we'll go forward.

17         MR. CALDWELL:  Absolutely.  And we would certainly

18   intend to do that.  I just -- I just wanted to make sure that

19   it being on the pre-admitted list didn't trump the motion in

20   limine thing, and we will --

21         THE COURT:  No.

22         MR. CALDWELL:  I think both parties agree we'll

23   absolutely approach, Your Honor.

24         THE COURT:  And that's consistent with the fact that

25   if it's on the pre-admitted exhibit list and it's not used and

1   read into the record, it's not a part of the record.  It goes

2   away after the trial.

3           MR. CALDWELL:  Perfect.  Thank you, Your Honor.

4           THE COURT:  Any other questions?

5           MR. CALDWELL:  Yes, sir.  Another -- another question

6   I have is for opening.  Do you -- do you prefer that the

7   parties open here at the lectern or in the well nearby, just in

8   terms of Your Honor's procedure --

9           THE COURT:  Well --

10           MR. CALDWELL:  -- and not wanting to get --

11           THE COURT:  -- I have a general rule -- and, again,

12   this is the first time I've tried a jury trial in this

13   courtroom.  So we'll see how things go, and I'll reserve the

14   right to adjust as we go, given that this is a different

15   setting.  But my general rule is what's commonly called the

16   arm's length rule.  If you're within an arm's length of the

17   podium, you're okay.  If you're beyond an arm's length, then

18   you're not okay unless you've asked leave of me to be at that

19   position, and I've given it to you.

20           MR. CALDWELL:  Yes, Your Honor.  Thank you.

21           And then my final question, and I believe Mr. Ward

22   had -- has some, too.  I understand that Your Honor is breaking

23   in a new courtroom for you.  Have -- has Your Honor got an idea

24   of where you want to organize the jurors for voir dire just in

25   terms of if we want to kind of map out roughly where people

1   would be sitting.  Are you envisioning the -- for example, the

2   jury box and then the first few rows on this side or --

3            THE COURT:  That's my plan.  My plan is to seat the

4   panel, the first 12 in the jury box, and then beginning on the

5   first pew where the gentlemen you introduced as being an

6   English barrister is sitting, from there and go back on that

7   side.  Leave the other side of the courtroom available for

8   paralegals, support staff, any other people outside of the

9   panel.

10            MR. CALDWELL:  Thank you, Your Honor.  And I think

11   Mr. Ward may have a question or two.

12            THE COURT:  Okay.

13            MR. WARD:  Just a couple, Your Honor.

14            On the -- where the panel will be seated for jury

15   selection, will the Court provide a chart, or do we need to

16   have our own chart prepared?

17            THE COURT:  Well, what we will do as a part of the

18   introductory process before counsel are allowed to question

19   the panel at all is I will have each member of the panel --

20   they'll all be given a number once they're seated.  And it's

21   entirely likely that the front row of the jury box, the seat

22   closest to the bench will be where Panel Member No. 1 ends

23   up --

24            MR. WARD:  Okay.

25            THE COURT:  -- and then 6 and then 7 through 12 will

1  be on the back row, and then we'll start with 13 on -- from my

2  angle, the left side of the gallery.  And they will, as you're

3  used to, go through and answer a list of predetermined

4  questions.  And you'll have plenty of time to write their names

5  down, so --

6          MR. WARD:  Okay.

7          THE COURT:  -- bring your own grid with boxes in, but

8  you'll have to fill it in.  We won't do that for you.

9          MR. WARD:  All right.  Thank you.

10         And then on the juror questionnaires and the jury

11 list, I know -- I understand the Court's practice is to give

12 that to us on Thursday before jury selection on Monday.  Do I

13 understand that correct?

14         THE COURT:  That's -- that's the practice we followed

15 in Marshall.  I'm not aware of a different practice in Tyler.

16 However, I'm going to defer to the clerk's office here.  I

17 don't want to reinvent the wheel if they're used to doing

18 something else.  So in that regard, I'm going to direct that

19 you be guided by whatever the clerk's office tells you.

20         I will -- I will continue my rule that those

21 questionnaires must be turned back in before the end of the day

22 or at the end of the day on the day of jury selection, and you

23 are not permitted to scan, copy, or keep information in any

24 form from those jury questionnaires.  I'd like to be able to

25 assure the members of the panel that that's the Court's

```
1   practice so they'll feel as free as they can to give full and

2   complete answers when they answer those.  So that rule is still

3   going to apply.

4           MR. WARD:  And I guess I didn't understand what the

5   logistics were.  Assuming we do get those on the Thursday

6   before, do we get them here at the clerk's office, and the

7   reason --

8           THE COURT:  I'm sure you will.

9           MR. WARD:  Okay.

10          THE COURT:  They're not going to bring them to me in

11  Marshall.

12          MR. WARD:  Okay.  Very well.

13          And then lunch break, how long -- I know we're going

14  to be providing lunch for the jurors.  How long will the

15  attorneys have for a lunch break?

16          THE COURT:  Well, that's a practice that is

17  established in Tyler that's different than what I'm used to in

18  Marshall.  I'm told that where that practice is followed,

19  typically the lunch break is somewhere around 40 or 45 minutes.

20          MR. WARD:  Okay.

21          THE COURT:  And we will -- we will try -- if that

22  doesn't work, we'll either shorten it, or we'll extend it, but

23  that's probably what we'll start out trying.

24          MR. WARD:  All right.  Thank you.

25          THE COURT:  Mr. Albritton, you don't have to hobble up
```

```
 1   to the podium if you want to stand there and ask questions.
 2        MR. ALBRITTON:  Thank you very much, Your Honor.  I
 3   have a couple of brief follow-up questions.
 4        THE COURT:  And I'm not meaning to comment on your use
 5   of your crutches.
 6        MR. ALBRITTON:  I'm not terribly good with them.  I
 7   will so stipulate, Your Honor.
 8        A couple of minor things.  It has been the typical
 9   practice in Tyler that counsel will be provided rooms where
10   they can have lunch with the lawyers and their witnesses and
11   the like.  I wanted to see if there was any hesitancy on the
12   Court's part with -- with that practice, or if we would be
13   permitted to have rooms -- we can coordinate it, of course,
14   through the CSOs, but just wanted for planning purposes to see
15   if that was --
16        THE COURT:  Well, as I understand it -- and, again,
17   these are new facilities to me.  I've been here many times, but
18   not on the bench before.
19        As I understand it, the original jury assembly area,
20   when this was the only courthouse, is available outside this
21   courtroom and that that space, which is pretty ample, is
22   usually used during the trial by one side or the other, both
23   for dealing with witnesses, marshaling documents and hard
24   copies and other tangible things, and I assume eating lunch.
25        During the week that we're going to be in trial here,
```

1    I'm told that Judge Davis will not be in trial, and there is

2    something comparable available adjacent to his courtroom

3    facilities which are just down the hall and around the corner.

4           So it's my -- it's my plan that those two areas will

5    be available to each side.  I want this to be as equal as

6    possible.  I don't want somebody to have an advantage over the

7    other.  I'm not completely sure how we're going to assign

8    space.  We may flip a coin, or we'll do something.  I don't

9    want it to be the first one to plant the flag gets to keep it

10   there.

11          MR. ALBRITTON:  Yes, sir.

12          THE COURT:  I'm working on that, and we'll talk about

13   that probably in more detail on the morning of jury selection.

14   I intend that space and the other space, assuming my

15   information is correct, and it's available, will be those two

16   locations.  But if something changes or if I get more

17   information, be prepared to discuss about -- that further on

18   the morning of the 16th.

19          MR. ALBRITTON:  Thank you very much, Your Honor.

20          Another question, and I believe this is the

21   appropriate time, and if not, I apologize in advance.

22   Mr. Cassady and I have worked out a procedure and a protocol

23   for clearing slides and exhibits and things of that nature

24   during trial.  And we -- we reached agreement on it yesterday,

25   and we're great.  There's -- there is just one -- and I really

1  hate to characterize it as a dispute, but there's one issue

2  that we need the Court's guidance on.

3         As -- as you well know, for years, the appendix to the

4  local rule required impeachment -- exhibits used for

5  impeachment only to be listed on the exhibit lists.  As -- as,

6  of course, the Court is aware, that has been amended.  So in

7  this case, there are materials that potentially the parties

8  will want to use for impeachment purposes, whether it be a

9  document that has been produced in the case that has not been

10  listed on an exhibit list or be it a transcript from another

11  matter where a witness had previously given related testimony

12  or learned treatise.

13         What we've been in discussions about, Your Honor, is

14  whether there should be some procedure for clearing those

15  things before they're brought out in front of the jury where

16  there may be objections to them.  We would respectfully suggest

17  and have suggested to Mr. Cassady that before any such material

18  is used, any material that's not on an exhibit list is used

19  with a witness for impeachment purposes, that that material,

20  but nothing else be disclosed the night before.

21         So a concrete example would be if Mr. Cassady

22  anticipated -- reasonably anticipated using a -- a produced

23  document on -- on the cross-examination of my witnesses

24  without -- and it not being on the list, that the night before

25  when we exchange our other -- and have our meet and confers on

1    the other matters, that those matters likewise -- likewise be

2    disclosed so that if there are problems, they can be raised

3    with Your Honor in that hour the following morning.

4            THE COURT:  Mr. Ward?

5            MR. WARD:  Yes, Your Honor.  I've seen parties reach

6    that type of agreement by agreement.  Of course, parties

7    typically reach agreement about the exchange of exhibits that

8    will be used during a direct.  But impeachment by its very

9    nature, if we exchange -- here are the exhibits that we think

10   we might us to impeach your witness, it's telegraphing where we

11   think the -- the areas of cross are.  And that's why we're

12   opposed to disclosing those.

13           We expect that the witness will testify consistent

14   with documents and transcripts of the prior sworn testimony.

15   And we think it's not appropriate to lob that kind of stuff

16   over the fence the night before to let that witness get ready

17   on potential areas of cross.

18           MR. ALBRITTON:  To make it clear, Your Honor, I'm

19   not -- I apologize.  And I think that Mr. Cassady and I talked

20   about this, but we're not suggesting that all impeachment

21   exhibits be exchanged the night before.  I -- I'm a trial

22   lawyer also, just like Mr. Ward, and love the idea of

23   sneaking -- sneaking up on somebody.

24           THE COURT:  Tell me what you are suggesting.

25           MR. ALBRITTON:  Yes, sir.  Anything that has not been

1    on an exhibit list that you reasonably anticipate using the

2    following day with a witness be disclosed the night before no

3    later than 8:00 o'clock.

4          THE COURT:  Well, the exhibit list are -- are or

5    should be finalized now.  And we're not going to leave that

6    door open to add things to the list of pre-admitted exhibits.

7    And if this is not already agreed to and understood, then

8    there's clearly the likelihood that one side or the other or

9    both have things that may well be intended to be used for

10   impeachment that they didn't put on the witness list and can't

11   put on the witness list now.

12          So if both sides reach an agreement that otherwise

13   would alter what I'm about to tell you, I'm certainly open to

14   it.  But it's going to need to be mutual.  Failing a mutual

15   agreement to the contrary, you're directed to disclose exhibits

16   you intend to use during your direct examination by 7:00

17   o'clock the night before.  And if there are objections to it,

18   those should be filed by 9:00 o'clock that night.  Then I'll

19   know by 7:30 what I've got to deal with the next morning, but I

20   don't have a requirement that you disclose sources of

21   impeachment in advance.

22          Now, if you can work out something you both agree to,

23   fine.  But to say if it's on the list of pre-admitted exhibits,

24   you don't have to tell them you might use it for impeachment,

25   but if it's not, then you've got to tell them the night before

1    does, in fact, telegraph that.  And that list is closed and

2    that door is shut, and I don't want to reopen it.

3            So had this come up earlier in the case before we

4    finalized the list of pre-admitted exhibits, I might feel

5    differently about it.  But at this juncture, we're -- we're --

6    barring some agreement from both sides that's different, that's

7    what we're going to need to do.

8            MR. ALBRITTON:  Okay.  So I think I understand.  May I

9    ask one follow-up question?

10           THE COURT:  All right.

11           MR. ALBRITTON:  What I understand from the Court's

12   ruling is that if it's not on an exhibit list, it -- it can't

13   be used as an exhibit.  And, therefore, there's no reason to

14   disclose them the night before, or am I misunderstanding

15   because I believe both sides did not include expressly

16   impeachment exhibits on their list as a result of a change in

17   the local rules.

18           THE COURT:  Well, if it's going to be used solely for

19   purposes of impeachment, I'm not going to disclose -- I'm not

20   going to require early disclosure of it, given the posture we

21   find ourselves in now.

22           MR. ALBRITTON:  Yes, sir.  Thank you very much.

23           THE COURT:  Have there been discussions among counsel

24   with regard to disclosing intended demonstratives, in addition

25   to exhibits you intend to use?

1          MR. ALBRITTON:  We have a complete agreement on that,

2  Your Honor.

3          THE COURT:  Tell me what that is so I'll know what it

4  is.

5          MR. ALBRITTON:  I don't remember the exact times.

6          MR. CASSADY:  I think I do.

7          MR. ALBRITTON:  Okay.  I'll defer to Mr. Cassady.

8          MR. CASSADY:  Your Honor, it's Jason Cassady for the

9  Plaintiff Smartflash.

10         Right now, the agreement, I believe, is at 7:00

11  o'clock, the offering party will disclose the demonstratives to

12  the opposing side.  I believe by 8:00 o'clock, the opposing

13  side will object to those demonstratives.  And I believe we had

14  a set 9:00 o'clock meet and confer.  I was going to bring that

15  up to Your Honor because you -- I think you just said you

16  wanted us to file our motion with you by 9:00 o'clock the night

17  before about our objections.

18         THE COURT:  I just want to be put on notice so that

19  I'll know what to expect the next morning.

20         MR. CASSADY:  Would it -- would it be okay with Your

21  Honor if we had our meet and confer at 9:00 o'clock -- those

22  meet and confers generally last 30 minutes, and then after

23  that, we make our filings with the Court, you know, 30 minutes,

24  an hour later.  It will be late for Your Honor, but --

25         THE COURT:  Well --

```
 1              MR. CASSADY:  Or an email to the clerk, Your Honor.  I
 2    mean, whatever you prefer.
 3              THE COURT:  Let's say notice no later than 10:00 p.m.
 4              MR. CASSADY:  Okay.  Thank you, Your Honor.  That will
 5    work.
 6              THE COURT:  And there's no reason to have one rule for
 7    exhibits and one rule for demonstratives, so we'll make 10:00
 8    p.m. the cutoff for both exhibits and demonstratives that are
 9    going to be disclosed the night before.
10              MR. CASSADY:  And depositions, I would assume, too,
11    Your Honor?
12              THE COURT:  Yes.
13              MR. CASSADY:  Okay.  And right now I think that --
14    that will work with the timing we have, and then we'll do our
15    best to -- to follow everything the Court says clearly.
16              THE COURT:  All right.  Is that clear with you,
17    Mr. Albritton?
18              MR. ALBRITTON:  Yes, sir, very much.  Thank you, Your
19    Honor.
20              THE COURT:  Okay.
21              MR. CASSADY:  If -- if Your Honor would like,
22    Mr. Albritton and I have actually reached our agreement.  We
23    just couldn't get it papered formally to file with Your Honor.
24    We could file our trial procedures with Your Honor so you're
25    aware of those in more detail.
```

```
1              THE COURT:  That's all right.  We've got it in the

2    record.  And if a train comes off the track, we'll consult the

3    record.

4              MR. CASSADY:  No problem.  Thank you, Your Honor.

5              THE COURT:  Other questions, counsel, before we move

6    on?

7              MR. ALBRITTON:  I thought I had three, but now the

8    last one is escaping me.

9              MR. CALDWELL:  I'm happy to give you a minute to

10   think.

11             MR. ALBRITTON:  Rooms.  Impeachment material, that --

12   it must not have been terribly important, Your Honor.

13             THE COURT:  All right.

14             MR. ALBRITTON:  We have nothing further.

15             THE COURT:  Mr. Caldwell?

16             MR. CALDWELL:  Very simple question, Your Honor.  In

17   terms of notifying you at 10:00, I think this -- I remember in

18   Judge Clark's court, he wanted us to email his -- his clerk,

19   for example.  Do you want a notice on file?  Do you want a

20   motion on file?  Do you want it -- would we email, for example,

21   Mr. DeArman?  How does Your Honor like to be notified that

22   here's the --

23             THE COURT:  I -- I think the most efficient way is an

24   email to my law clerks.

25             MR. CALDWELL:  Thank you, Your Honor.
```

1          THE COURT:  All right.  Is there any question I need

2    to take up with you -- with counsel regarding Judge Mitchell's

3    previous rulings on Stephen Ansel and Jeffrey Lot -- Lotspiech?

4    Are we straight on that, or do we need to nail that down one

5    more time because I'm told it seems to pop up periodically.

6          MR. ALBRITTON:  We're -- we're very clear on it, Your

7    Honor.

8          MR. CALDWELL:  And Plaintiff doesn't want to --

9    Plaintiff objects to Mr. -- Mr. Ansel, but I don't want to

10   reargue and replow old ground, so...

11         THE COURT:  Well, I'm going to follow Judge Mitchell's

12   orders, and I think they speak for themselves.

13         MR. CALDWELL:  Understood.

14         THE COURT:  Okay.  I understand that we have pending

15   objections to the report and recommendation on Plaintiffs'

16   objections to Judge Mitchell's ruling regarding her granting in

17   part of the Defendants' motion to exclude opinions from Robert

18   Mills.  That prior order, I think, is Document 374.

19         I understand there's still a live Daubert motion.  I'm

20   not talking about that.  I'm talking about the objections to

21   the original R and R.  Those are denied, for the record.  We'll

22   get that cleared up right now.

23         We do have the remaining live Daubert motion to

24   exclude opinion from Robert Mills under Rules 403 and 702,

25   which is Document 434.  And I'll hear brief argument from both

1   sides on that, and we'll take that up.  And I'll hear from the

2   movant first.  I would hope we don't need more than about 10

3   minutes a side.

4          MR. BATCHELDER:  Thank you, Your Honor.  James

5   Batchelder, Ropes & Gray, on behalf of Apple.  May it please

6   the Court.

7          The -- and -- and I can handle this, I think, in less

8   than 10 minutes to -- to summarize what I -- I see as -- as the

9   two main defects of this Mills opinion.

10         To give Your Honor a bit of background.  Mr. Mills'

11  original report was the subject of the first Daubert, how the

12  royalty base calculation that essentially involved two data

13  points -- he took total revenue, and he multiplied it times a

14  percentage of survey respondents who answered yes to a

15  question.  And that question for a given feature -- for

16  example, the feature that he identified was the ability to

17  download -- or buy apps from the App Store.  So he took the

18  percentage of people who answered yes to that question, and he

19  multiplied that times total revenue, and that was his royalty

20  base.

21         And the Daubert that Judge Mitchell granted on -- on

22  that was essentially based on the notion that that royalty base

23  calculation employed an entire market value rule approach, and

24  that the question that had been asked, did X feature motivate

25  you to buy, did not appropriately establish that for those

1    answering yes, it was the only feature that motivated the

2    purchase.  And the Court made clear that that would have been

3    necessary in order to rely on the entire market value rule that

4    had been done.  So that's the background.

5         Then the way that -- that Mr. Mills responded was to

6    rely on a survey that took that same feature and said, did --

7    does this ability -- in other words, the ability to download

8    apps from the App Store -- does this ability alone motivate you

9    to buy the phone?  And -- and he relied on that as establishing

10   predicate for the entire market value rule.  In other words, he

11   interpreted that as measuring whether that feature was the only

12   thing that motivated someone to buy something like an iPhone,

13   again, an iPhone having thousands of features.

14        We established through counter surveys that replicated

15   that question.  So we asked the same question of respondents,

16   and then for people who said, yes, to that question, we asked

17   them about additional features because the -- the Wecker survey

18   that Mills relied on asked only about that one feature.  And

19   100 percent of the respondents who had answered, yes, to the --

20   yes, that ability alone motivated my purchase, 100 percent of

21   those respondents answered yes to being motivated by other

22   features, as well.

23        And so we believe that the record is irrefutable that

24   that question and the way that Mills relied upon it still does

25   not justify invocation of the entire market value rule, which

1    is what he relies upon it to do.  So that's -- that's the main

2    argument that we make.

3           And then the second one is simply that the -- the

4    feature they identify, the ability to download apps from the

5    App Store and buy apps from the App Store, that's too broad a

6    feature, that -- that Mr. Racz himself does not contend that he

7    invented the ability to -- to buy apps from the App Store and

8    there has to be a coterminous relationship between an N --

9    EMVR-type issue and -- and the -- and the patented feature, and

10   the -- for those two reasons, we think Mr. Mills' continued

11   reliance on that alone motivate question is improper.

12          THE COURT:  All right.  Thank you, counsel.  Let me

13   hear a response from the Plaintiff.

14          MR. CASSADY:  Your Honor, I have some binders, but I

15   think I can make the argument without handing up the documents,

16   but if we get to a moment where I believe Your Honor may want

17   to see some of the surveys, I'm happy to give those up to Your

18   Honor.  In fact, why don't I just go ahead and do that?

19          THE COURT:  Don't ask me to tell you when.  If you

20   want me to ask for leave --

21          MR. CASSADY:  So may I approach, Your Honor?

22          THE COURT:  You may.  And when you have something to

23   hand up, hand them all to the courtroom deputy.

24          All right.  Proceed.

25          MR. CASSADY:  Thank you, Your Honor.

```
 1              So I'll focus on the two defects that -- the alleged
 2   defects that Apple claimed here.  With regards to the situation
 3   at hand, there's a little bit of history here, and I know Your
 4   Honor's aware of -- of Judge Mitchell's orders.
 5              In this case, it's common for -- for our side --
 6   for -- for our firm to ask questions like how would you, Apple,
 7   evaluate the value of a certain feature?  And in this case, we
 8   did that, as we do in lots of our cases.  And in this case, we
 9   got an answer that was, basically, we don't measure that.  We
10   can't measure that.  We're not going to measure that.  That's
11   your job.
12              And so we -- we sought out to analyze and value the
13   patented feature here by running a survey.
14              Now, with regards to Judge Mitchell's order, Judge
15   Mitchell found that because we did not include the word "alone"
16   in our questions, at the behest of counsel for Apple that the
17   word "alone" must be included in the question, we went out and
18   re-ran the surveys, adding the word "alone."  And that's what
19   we did, again, at the behest of counsel and at the behest of
20   the Court.  And we were happy to do it for two reasons, Your
21   Honor.  One, if the Court believes that we were trying to slide
22   one past the jury by not adding the word "alone," we wanted to
23   prove to -- to Your Honor and -- and to -- and to her, to Judge
24   Mitchell, that we were right in asking our questions the way we
25   did, and we asked -- we added the word "alone."
```

1          Now, Your Honor, what happened when we did that, we

2    got very, very similar results.  A very, very similar set of

3    people percentage wise said they were alone motivated by the

4    feature in this case, just like they did in the prior question

5    that did not include the word "alone."  And so at the behest of

6    counsel, we did it, and we presented that to the Court, and --

7    and that's what's in front of Your Honor right now is the

8    damages opinion that's based on that.

9          Now, with regards to -- so we -- we did exactly what

10   LaserDynamics requires, we added the word "alone," and we asked

11   the question, are you alone motivated by the feature in this

12   case?  And that's the way we asked it, clear as day, language

13   directly from Federal Circuit law.  That's the way we asked the

14   question.

15         Now, even though counsel for Apple said we should add

16   the word "alone," once we did that, a new host of complaints

17   came up about asking the question with the alone motivated word

18   in there.  And those questions and those issues all go to

19   weight is what I would tell Your Honor.  The situation is they

20   have a survey that they claim proves that our survey can't mean

21   alone.  We have a survey, and we have experts that believe our

22   question means alone motivated under the Federal Circuit law.

23   That's a fact issue that should be presented to the jury.  It's

24   a weight issue.

25         But more importantly, just to go directly to their

1  evidence, Your Honor, what they did was they had a counter

2  survey, as -- as counsel recalls it where they first asked the

3  question the way that we did.  And they said, are you alone

4  motivated by the accused feature in this case?  And then they

5  followed it up by questions that removed the word "alone."  And

6  so what happened was any survey taker, either a person with a

7  Ph.D. or a person with a high school degree, Your Honor, would

8  see that those two questions must mean something different

9  because the word "alone" is missing.

10         And so what's happening now is counsel is saying since

11 the new survey questions that they added got yes answers from

12 people who said alone motivated, that must mean they weren't

13 alone motivated.  Well, that doesn't follow.  What it means is

14 the people who may have been motivated by some subset of the

15 question later, that may be a feature that in the context of

16 that survey they may require the product to have.  And a lot of

17 times that's referred to as table stakes.  That'd be like the

18 wheels for a car, Your Honor.

19         I may be driven to drive -- or to buy a sports car

20 because it's fast, has a very large engine, lots of horsepower,

21 but it doesn't mean I would buy a car that doesn't have wheels.

22 Of course, I would be -- I'd require wheels on that car.

23         And -- and so what's happened, Your Honor, is we

24 were -- we've kind of changed over.  In the first survey that

25 was motivated to buy, counsel for Apple said all we proved was

1  that the Apple's App Store was a requirement of people buying

2  the device.  That's what they -- that's what they said.

3       Now that we've asked alone motivated, they said, well,

4  it can't be alone motivated because lots of things are required

5  for someone to buy a product like this.  And so what they're

6  doing, Your Honor, is with regard to LaserDynamics, it makes it

7  very clear -- in LaserDynamics, products can be alone motivated

8  and still have other features that may be required in order to

9  purchase it, or even may make the product commercially

10 unviable, but the reality is what alone motivated someone to

11 buy that product is what matters.

12      And so we've asked that question.  We surveyed exactly

13 what the LaserDynamics's requirements is, and we have that

14 evidence.  And they have a survey that they believe is counter

15 evidence, and -- and we're going to have those issues of fact

16 with regards to their survey in front of a jury.

17      Now, Your Honor, if you would, please, would you

18 point -- would you turn to Page -- I apologize, Your Honor.  If

19 you turn to Page 21 of the slide deck that I put in front of

20 you, it's behind Tab 1.  If you could turn to Slide 21, please,

21 Your Honor.

22      THE COURT:  All right.

23      MR. CASSADY:  Now, Your Honor, the reason that we

24 contend that our alone motivated question is actually getting

25 to the people who are solely or alone motivated by the accused

1    feature is because if you look here in the survey on Page 21,

2    as an example, use apps from the App Store gets close to 57 or

3    40 -- or 54 percent for users of -- of the device.  Whereas as

4    our survey, Your Honor, with the alone motivated question, we

5    got 25 percent.

6         And so what they're talking about is people require

7    this.  This would be -- at least 57 percent of people use apps.

8    But in our survey, there's a subset of people who required it,

9    and it was the reason that they went and bought the device.

10   And so what happens is, Your Honor, there's many -- many people

11   that would go out and buy a vehicle, and they'd say I, really

12   liked the -- the new color on the new Chevy truck.  Other

13   people really like the towing capacity.  Lots of people could

14   have required the towing capacity, but only some subset picked

15   that specific Chevy because of its towing capacity.  And that's

16   what we're trying to get at here in the requirement of

17   LaserDynamics.  And that's what our question goes to.

18        And the surveys that are in front of Your Honor that

19   are Apple surveys that were run by Apple, Pages 21 through 25

20   of the slide deck I put in front of Your Honor, those are all

21   surveys that show much higher percentages from Apple's own

22   evidence of people the required the feature, whereas we asked

23   about alone.

24        THE COURT:  All right.  Mr. Cassady, try and wrap this

25   up for me.

1          MR. CASSADY:  Okay.  Easy enough.

2          Your Honor, if you could turn to Page 26 for me really

3   quickly, or as quickly as Your Honor would like to.  On Page

4   26, Your Honor, this is a study that was done by Apple's

5   largest competitor.  And -- and in order not to seal the Court,

6   Your Honor, I won't list -- I won't say the percentage, but if

7   you look at the percentage in the middle of the page, that's

8   the percentage that Samsung believes Apple got an uplift of

9   devices because they added the accused feature, Your Honor.

10  And so, again, that's much larger than the percentage that we

11  have used in our survey.

12         Now, in addition, Your Honor, we asked another

13  question about value.  And we asked people if you weren't alone

14  motivated, what percentage of the device was this feature?  We

15  asked that.  And we got a number, and it's very similar to our

16  alone motivated number.  And we had a -- a separate damages

17  model based on that.  And it's not subject to any of the issues

18  that Mr. -- I'm sorry, that Apple's counsel just brought up to

19  you.

20         And, finally, Your Honor, with regards to identifying

21  a product that's too broad, okay, a product that -- or sorry,

22  our question being too broad -- the App Store question being

23  too broad.  If you look at the details of the question, Your

24  Honor, we don't say did just buying stuff drive you to buy the

25  Apple iPhone?  We asked the question -- and if Your Honor would

```
 1   like, I can point you to the slide that has the question on it.

 2            THE COURT:  That's fine.  I want you to finish up.

 3            MR. CASSADY:  Okay.  So, Your Honor, the -- the issue

 4   here is they're saying we didn't ask the right question.  We

 5   asked the question in a common language that someone who uses

 6   the App Store would understand.  And in this situation, the

 7   App Store infringes.  So the way it's described is described

 8   in the infringing manner because that's the way the device

 9   works.

10            But fundamentally, Your Honor, our royalty rate is

11   based on a question that is comparing the non-infringing

12   alternative to our royalty rate or -- or, sorry, to our

13   feature, and we say, would you have bought the device if Apple

14   put their best non-infringing alternative in?

15            So the relationship between that question and the

16   motivated to buy question deals with all LaserDynamics issues.

17            And with that, I'll -- I'll leave it to Your Honor.

18            THE COURT:  All right.  Mr. Batchelder, do you have a

19   short response, and I do mean short?

20            MR. BATCHELDER:  Thank you, Your Honor, I do.

21            I just want to call Your Honor's attention -- invite

22   Your Honor's attention to one point that Mr. Cassady made

23   because it's important because Mr. Cassady agrees with

24   Mr. Mills and Dr. Wecker.  Dr. Wecker took the survey.

25   Mr. Mills is their damages expert, and they agree on one point
```

1   and that is that a respondent could accurately and truthfully

2   answer yes to the alone motivated question even if that iPhone

3   had but for features in that respondent's mind.  And that is,

4   even if that iPhone had features that if missing would have

5   caused that respondent not to make the purchase.  And I would

6   submit that that is utterly inconsistent with the Federal

7   Circuit's test for applying the entire market value rule.  That

8   feature has to be the only thing that drives the purchase.

9   There cannot be other but for features.

10          Thank you.

11          THE COURT:  All right.  Thank you, counsel, for your

12   argument.  I've looked at this, I think, fairly

13   comprehensively, and I appreciate the benefit of hearing your

14   argument on it.  The Court's conclusion is that this does not

15   rise to a level that requires me to exercise my gatekeeping

16   function and exclude this.  This seems, to me, appropriate for

17   argument and cross-examination before the jury, and a large --

18   a large part of it falls within the jury's purview to weigh and

19   allocate the evidence as they see fit.

20          I'm going to deny Defendants' motion with regard to

21   this Daubert and Robert Mills.

22          Also, before we conclude this pre-trial today, I

23   understand there was a previous ruling by Judge Mitchell on a

24   summary judgment issue regarding indefiniteness, and there may

25   be some confusion about whether that ultimately disposed of the

```
 1    issue in this case.

 2            My reading of her ruling is that it does, and I don't

 3    expect evidence to be presented of that during the trial.

 4            Anybody have any question about that?

 5            MR. BATCHELDER:  If I could, Your Honor.  I just want

 6    to be sure I'm understanding.  So this is -- this is Judge

 7    Mitchell's denial of Apple's motion for summary judgment of

 8    indefiniteness, and the Court's guidance is that that ruling

 9    should be treated of -- a ruling as a matter of law, that the

10    challenge claims are definite?

11            THE COURT:  That's my understanding of her ruling, and

12    I intend to enforce it that way through the trial.

13            MR. BATCHELDER:  Thank you, Your Honor.  Appreciate

14    that.

15            THE COURT:  All right.  Gentlemen -- excuse me,

16    counsel, I'll be here early on the 16th.  And certainly if

17    issues develop between now and then, though I'll be in trial in

18    Marshall, if they're important, contact me through my clerks,

19    and I will try to get back with you.

20            I will try to let you know prior to the 16th about the

21    allocation and use of ancillary space.  I want to run a few

22    traps down and make sure that both sides are as equally treated

23    in that regard as possible, and I need to see what's available

24    and the length it will be available here in Tyler.

25            But with that, I appreciate your attendance.  That
```

```
 1    concludes this pre-trial hearing today.  Counsel, you're

 2    excused.

 3            COURT SECURITY OFFICER:  All rise.

 4            (Hearing concluded.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            CERTIFICATION

2

3        I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /s/ Shelly Holmes                      2/5/15
     SHELLY HOLMES, CSR-TCRR                 Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25