1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
2                         TYLER DIVISION

3

SMARTFLASH LLC and          )
4  SMARTFLASH TECHNOLOGIES         DOCKET NO. 6:13cv447
   LIMITED
5

        -vs-                  )
6

                                    Tyler, Texas
7                              )     1:16 p.m.
   APPLE INC.                       February 16, 2015
8

9

                      TRANSCRIPT OF TRIAL
10                     AFTERNOON SESSION
          BEFORE THE HONORABLE RODNEY GILSTRAP,
11            UNITED STATES DISTRICT JUDGE

12

13                  A P P E A R A N C E S

14

15  FOR THE PLAINTIFFS:

16

   MR. BRADLEY W. CALDWELL
17  MR. JASON D. CASSADY
   MR. JOHN AUSTIN CURRY
18  CALDWELL CASSADY & CURRY
   2101 Cedar Springs Rd., Ste. 1000
19  Dallas, Texas  75201

20

21  MR. T. JOHN WARD, JR.
   WARD & SMITH LAW FIRM
22  P.O. Box 1231
   Longview, Texas  75606

23

24

25

```
 1    FOR THE DEFENDANTS:

 2
      MR. JAMES R. BATCHELDER
 3    ROPES & GRAY LLP
      1900 University Ave., 6th Floor
 4    East Palo Alto, California  94303-2284

 5
      MS. CHING-LEE FUKUDA
 6    MR. KEVIN J. POST
      ROPES & GRAY LLP
 7    1211 Avenue of the Americas
      New York, New York 10036-8704
 8

 9
      MR. ERIC ALBRITTON
10    ALBRITTON LAW FIRM
      P. O. Box 2649
11    Longview, Texas 75606

12

13

14

15
      COURT REPORTERS:        MS. SHELLY HOLMES, CSR, TCRR
16                            OFFICIAL COURT REPORTER
                              shelly_holmes@txed.uscourts.gov
17
                              MS. SHEA SLOAN, CSR, RPR
18                            OFFICIAL COURT REPORTER
                              shea_sloan@txed.uscourts.gov
19

20

21

22

23

24    Proceedings taken by Machine Stenotype; transcript was
      produced by a Computer.
25
```

1                    P R O C E E D I N G S

2              (Jury out.)

3              COURT SECURITY OFFICER:  All rise.

4              THE COURT:  Be seated, please.

5              All right.  Let's bring -- let's bring in the jury,

6    please.

7              COURT SECURITY OFFICER:  All rise for the jury.

8              (Jury in.)

9              THE COURT:  Please be seated.

10             Ladies and Gentlemen of the Jury:  You've now been

11   sworn as the jury in this case.  As the jury, you will decide

12   the disputed questions of fact.

13             As the Judge, I will decide the questions of law

14   and procedure.  And from time to time during the trial and at

15   the end of the trial, I'll instruct you on the rules of law

16   that you must follow in making your decisions.

17             Soon, the lawyers for each side will make what is

18   called an opening statement.  Opening statements are intended

19   to assist you in understanding the evidence.  However, what

20   the lawyers say during opening statements is not evidence.

21   It's only what they expect the evidence will show.

22             What you should base your decision on is the

23   evidence that you will hear, which comes from the sworn

24   testimony from the witness stand, from depositions that are

25   shown to you, and from exhibits that I admit into evidence.

1          This is the evidence that you should rely on in

2     making your decisions as to the verdict in this case.

3          The -- the party who brings the lawsuit is called

4     the Plaintiff.  The Plaintiffs in this case are Smartflash

5     LLC and Smartflash Technologies Limited, who I will refer to

6     simply as the Plaintiff or Smartflash.

7          The party against whom the -- the suit is brought

8     is called the Defendant.  In this action, the Defendant is

9     Apple Inc., who will be referred to, likewise, as either the

10    Defendant or simply just Apple.

11         As I told you during the voir dire this morning,

12    this is a case of alleged patent infringement.  After opening

13    statements, Smartflash, the -- the Plaintiff, will call

14    witnesses and present their evidence.  Then the Defendant,

15    Apple, will have an opportunity to call witnesses and present

16    its evidence.

17         After the parties' case-in-chief has been

18    presented, then the Plaintiff, Smartflash, may be permitted

19    to call additional witnesses for what we call a rebuttal case

20    or rebuttal evidence.

21         Then after all the evidence is in, I will instruct

22    you upon the applicable law to apply in this case.  I will

23    give you detailed instructions both orally, as I am doing

24    now, and after I give you your final instructions, after all

25    the evidence is in, then you will hear closing arguments from

1    the attorneys.

2         And after you have heard their closing arguments,

3    then and only then will I instruct you to retire to the jury

4    room and to discuss the case among yourselves in an attempt

5    to reach a verdict.

6         Only when you retire to the jury room after all the

7    evidence is in, are you permitted to discuss the case among

8    yourselves; but at that time, you are required to discuss the

9    case among yourselves.

10        During the presentation of the evidence and

11   throughout the case, I want you to keep an open mind.  Don't

12   decide any fact until you heard all the evidence, then until

13   you've heard the closing arguments, and finally after you've

14   heard my final instructions to you.  Pay close attention to

15   the evidence and the testimony from the witnesses.

16        If you elect to take notes during the trial, you

17   may do so.  We have some juror notebooks that I'm going to

18   ask the security -- excuse me -- the Court Security Officer

19   to pass out at this time.  There's one juror notebook for

20   each member of the jury.

21        (Pause in proceedings.)

22        THE COURT:  Now that you have your notebooks, if

23   you'll open those up, in those notebooks, you're going to

24   find copies of the patents-in-suit.

25        You're also going to find a list of the terms that

1      the Court has given you specific definitions to follow.

2              You're going to find a page for each witness in the

3      case that has a picture of the witness at the top of each

4      page with blank spaces below the picture in which you can

5      make notes.

6              And you'll also find a legal pad in there, together

7      with a pen, which you can also make additional notes, if you

8      choose to.

9              You'll have lots of time to look through that

10     notebook as the trial goes on, so if you'll close those now

11     and let me complete my instructions to you.

12             If you decide to take notes in this case, be

13     careful not to get so involved in your note-taking that you

14     become distracted and miss part of the testimony.  You don't

15     need to write down everything that happens, but take such

16     notes as you feel are appropriate and will be helpful to you.

17             Your notes are to be used as an aid to your

18     memories only, and if your memory should differ from your

19     notes, then you should rely on your memory and not your

20     notes.

21             Don't be unduly influenced by the notes of another

22     juror.  A juror's notes are not entitled to any greater

23     weight than the recollection of each juror concerning the

24     testimony and evidence.

25             For example, just because someone has written

1    something down does not necessarily mean that they heard it

2    right or they wrote it down correctly.  The fact that it's

3    written into the notes does not mean that it's to be given

4    any greater weight than just what your memory would be.  It's

5    there to help you and for no other purpose.

6            Even though Ms. Holmes, the Court Reporter seated

7    in front of me, is here to take down everything that's said

8    during the trial, the written transcript of everything that's

9    said will not be available for you to use in time for you to

10   deliberate at end of the trial.

11           The purpose of the transcript is in case there's an

12   appeal after this trial is over, but it's not for your use as

13   a part of your jury deliberations.  So you'll have to rely on

14   your memories of the evidence as you deliberate after the

15   trial is complete.

16           As I mentioned to you this morning, it's very

17   important that until the trial is over and I've released you

18   from your service as jurors, that you are not to discuss this

19   case with anyone, and do not permit anyone -- anyone to

20   discuss the case with you in your presence, including family

21   or friends.

22           When you take recesses during the trial, when you

23   are on lunch during the trial as you come and go, those are

24   times you might overhear something about the case.  Be

25   mindful not to listen.  Be mindful not to pay attention.  Do

1   not engage in hearing about anything, as well as talking

2   about anything.

3           Again, it is critical that your decision-making

4   process be limited solely and only to the evidence that comes

5   in under oath from the witness stand and the exhibits that

6   are produced during -- and admitted by the Court during the

7   trial.

8           That's part of why you each have a badge that says

9   "juror" on it, so that when people are talking about this

10  trial and they see you coming, they'll know that they're

11  supposed to stop talking so you don't overhear what they say.

12  Be sure that you keep that juror badge clearly visible on the

13  outside of your clothing throughout your trial process.

14          You're to hold yourself apart from the rest of the

15  people here in the courthouse and elsewhere as you discharge

16  your duties as jurors.

17          I mentioned to you before lunch, and I will say it

18  again, you're not to do any research regarding this case from

19  any source whatsoever.  You're not to attempt to communicate

20  through social media by posting anything on the Internet or

21  any type of communication whatsoever.

22          During the trial, it may be necessary from time to

23  time for the Court to confer with the lawyers here at the

24  bench and outside of your hearing.  I will handle those

25  matters as quickly and as conveniently and briefly as I can,

1   but you should remember that that may be necessary during

2   part of the trial.

3           You're not to speculate about what the Court may

4   discuss with the lawyers outside of your hearing.  There may

5   be times that I address the lawyers when you are not in the

6   courtroom, and that also is outside your hearing.

7           You should not attempt to speculate or guess about

8   any communications that the Court might have with counsel

9   outside of your hearing, either when you're out of the

10  courtroom or when I call them to the bench.

11          Let me give a brief overview of the nature of the

12  case.  This is a patent case.  It involves three patents

13  identified by their numbers.  They are United States Patent

14  No. 7,334,720, which all patents are commonly known by their

15  last three digits.  So that one will be commonly called the

16  '720 patent.

17          Then the second patent is U.S. Patent 8,118,221 or

18  the '221 patent, and United States Patent No. 8,336,772 or

19  the '772 patent.

20          These patents may be referred to at various times

21  as the patents-in-suit or the asserted patents.  These

22  patents generally -- generally relate to data storage and

23  access systems for paying for downloading and controlling

24  access to data, such as audio and video data, text, software,

25  games, and other types of data.

1          As I mentioned earlier, you'll have a copy -- a

2    complete copy of each of these three patents-in-suit in your

3    juror notebooks.

4          The Plaintiff in this case, Smartflash, contends

5    that the Defendant, Apple, is directly and indirectly

6    infringing certain claims of the patents-in-suit by

7    importing, making, and selling products that include the

8    patented technology.

9          Smartflash also contends that Apple's infringement

10    is willful.  Smartflash contends that it is entitled to

11    damages as a result of Apple's infringement.

12          Apple denies that it is infringing and contends

13    that the patents-in-suit are invalid as being either

14    anticipated by or obvious in light of what is called prior

15    art.

16          Apple further contends that certain claims of the

17    patent are invalid because the patent specification does not

18    have an adequate written description.

19          Apple further contends that Smartflash is not

20    entitled to any damages.

21          That may not be completely clear to you at this

22    time.  I know there are new words and new concepts that have

23    been thrown at you.  I'm going to define a lot of those words

24    and concepts for you as we go through the instructions.

25          The attorneys are going to discuss them in their

1    opening statements.  The witnesses are also going to help you

2    through their testimony understand those words.  So do not

3    feel overwhelmed at this stage.  It will come together as we

4    go through the trial, I assure you.

5         Let me visit with you briefly about United States

6    patents and our United States patent system in general.  You

7    saw some of this on the patent video that was shown to you by

8    the clerk this morning before jury selection.

9         Patents are issued by the United States Patent and

10   Trademark Office, which is an agency of the United States

11   Government, and will often simply be referred to, for

12   shorthand purposes, as the PTO, Patent and Trademark Office.

13        The United States Government is empowered by our

14   Constitution to enact patent laws and issue patents to

15   protect inventions.  Inventions that are protected by patents

16   may be products, compositions, or methods for doing something

17   or for using or making a product or a composition.

18        The purpose of the patent system is to help advance

19   science and technology.  A patent is granted for a set,

20   specific period of time for which the patents involved in

21   this case have not yet expired.

22        Once a patent expires, the patent owner may not

23   exclude anyone from making or using the claimed invention in

24   the patent.  The invention then becomes part of what we call

25   the public domain, which means that it's free for anyone to

1    use.

2          During the term of the patent, however, if another

3    person, without the patent owner's permission, makes, uses,

4    sells, or offers to sell or imports into the United States

5    something that is covered by the claims of the patent, then

6    the person is said to infringe the patent.

7          The patent owner may enforce a patent against

8    persons or companies believed to be infringers in a lawsuit

9    in federal court, such as we have in this case.  The law does

10   not require that the patent owner give advanced notice to a

11   defendant that the patent -- that the plaintiff intends to

12   file suit.

13         To be entitled to patent protection, an invention

14   must be new, useful, and non-obvious.  As I noted, a patent

15   gives the owner the right to exclude other people from

16   making, using, selling, or offering for sell or importing

17   what is covered by the claims of the patent.

18         Everyone, however, has the right to use existing

19   knowledge and principles.  A patent cannot remove from the

20   public the ability to use what was known or obvious before

21   the invention was made or patent protection was sought.

22         Let me visit with you briefly about the parts of a

23   patent.

24         A patent includes two basic parts:  A written

25   description of the invention and the patent claims.  The

1  written description, which may include drawings, is often

2  referred to as the patent specification.

3      If you'll open your notebooks and find the '772

4  patent, I'll identify these different sections.

5      The cover page of the '772 patent provides

6  identifying information, including the date the patent was

7  issued, the patent number along the top, as well as the

8  inventors' names, and the filing date, and the name of the

9  assignee, which is Smartflash, the Plaintiff in this case.

10      It also includes a list of certain prior art

11  publications on the first through the third pages, which were

12  considered by the Patent Office when it decided to issue the

13  patent.

14      The specification of the '772 patent begins with an

15  abstract found on the cover page.  The abstract is a brief

16  statement about the subject matter of the invention.

17      You'll see it starts with the first sentence:  Data

18  storage and access systems enable downloading and paying for

19  data, such as audio and video data, text, software, games,

20  and other types of data.

21      Next are the drawings which appear as Figures 1

22  through 13 on the next 17 pages.  The -- the drawings depict

23  the various aspects or features of the invention.  They're

24  described in words later in the patent specification.

25      The written description of the invention appears

next.   In this portion of the patent, each page is divided

into two columns, which are numbered at the top.   The lines

on each page are also numbered going down the middle of the

column, as you'll see.

The written description of the '772 patent begins

at Column 1, Line 1.   So when you see a reference during the

trial to a column and the line number, you can go to that

part of the patent and locate that.

The written description of the '772, as I've said,

begins at Column 1, Line 1, and continues to Column 25, Line

62.   It includes a background section, a summary of the

invention, and a detailed description of the invention,

including some specific examples.

The specification ends with the numbered paragraphs

called claims.   The claims may be divided into a number of

parts referred to as claim limitations.

In the '772 patent, the claims begin at Column 25,

Line 64, where it says what is claimed -- or "what is claimed

is" and continue to the end of the patent at Column 32, Line

56.   Not all of those claims are being asserted in this case,

just certain ones.

Now, let me talk to you a minute about the

significance of the patent claims.   The claims of a patent

are the main focus of a patent case, because it is the claims

that define the patent owner's rights under the law.   The

1    claims define what the patent owner may exclude others from

2    doing during the term of the patent.

3         The claims of a patent serve two important

4    purposes.  First, they set the boundaries of the invention

5    covered by the patent; and second, they provide notice to the

6    public of those boundaries.  Thus, when a product or a method

7    is -- is accused of infringing a patent, the patent claims

8    are compared to the accused product or method to determine

9    whether there is infringement.

10        The claims of a patent must be analyzed to act --

11   to assess infringement because the claims define what the

12   invention is.  The claims are also at issue when the validity

13   of the patent is challenged.  In reaching your determinations

14   with respect to infringement and validity, you must consider

15   each claim separately.

16        Also in your notebooks, you'll find the Court's

17   construction of the meanings of certain terms in the asserted

18   claims of the patents-in-suit.  You must use those

19   definitions or meanings that I give to you when you decide

20   the issues of infringement and invalidity.  Those terms are

21   in a separate tab in your notebooks.

22        As I say, you must use those meanings that I give

23   to you when you decide the issues of infringement and

24   invalidity.

25        There are certain words within the claims -- there

1    are certain words that at a pretrial proceeding, the

2    attorneys had differing arguments over as to what a

3    particular word meant.  They asked the Court to construe it,

4    and I've done that.  And those are the definitions, my

5    constructions, that I've supplied you with in your notebooks.

6              It's kind of like if you were reading a book and

7    you came to a particular passage where a word was used that

8    you didn't understand.  There was a dictionary for you to

9    look it up in.  That list of claim -- of terms that I've

10   construed, those definitions are your dictionary to look up

11   at -- during your analysis.

12             Let me visit with you about how a patent is

13   obtained.  Let's talk about how someone obtains a United

14   States patent.

15             As I said, the United States Patent and Trademark

16   Office is an agency of our Federal Government that initially

17   examines patent applications and issues patents.

18             When an applicant for a patent files a patent

19   application with the PTO, or the Patent and Trademark Office,

20   the application is assigned to a Patent Examiner.

21             The Patent Examiner examines the application to

22   determine whether the invention described in the patent meets

23   the requirements of the patent laws for patentable

24   inventions.

25             In examining the patent application, the Patent

1    Examiner makes a search in the Patent Office records for

2    prior art pertinent to the claims of the patent application.

3        If an applicant believes that a claimed invention

4    is disclosed in an earlier patent application, the applicant

5    may claim priority back to that earlier application.  This

6    earlier application is called a priority application.

7        The Patent Office records may or may not contain

8    all of the prior art pertinent to the claims of a patent

9    application.  The prior art is defined by statute, and I will

10   give you specific instructions at the close of the evidence

11   as to what constitutes prior art.

12       But, generally, it's the technical information and

13   knowledge that was known to the public either before the

14   invention by the applicant or more than one year before the

15   effective date of the application.  Prior art is not limited

16   to patents and may also include publications and products.

17       During this process, the Patent Examiner advises

18   the applicants of his or her findings in a communication

19   which is called an Office Action.

20       The Examiner may reject the claims, if he or she

21   believes that they do not meet the requirements for

22   patentable inventions.  The applicant may then respond to the

23   application -- to the rejection with arguments to support the

24   claims and may sometimes make changes or amendments to the

25   claims or submit new claims.

1               If the Examiner concludes that the legal

2   requirements for the patent have all been satisfied, then the

3   Patent Examiner is said to allow the claims, and the

4   application then issues as a United States patent.

5               This process, from the filing of the patent

6   application to the issuance of the patent, is called patent

7   prosecution.  And that's what I just described to you that

8   goes on between the applicant and the Patent Office, which

9   includes the back-and-forth process that I've mentioned.

10              The record of papers relating to the patent

11  prosecution is referred to as the prosecution history or the

12  file history.

13              In other words, it documents -- its documents,

14  rather, relate to what is transpired between the applicant

15  and the Examiner at the PTO so that generally -- that

16  generally is how the patent process works.

17              I'll now give you some information about the issues

18  to be presented to you at this trial, as well as a short

19  overview of the applicable law.

20              At the close of the trial, you'll be given more

21  specific instructions that you must follow in reaching your

22  verdict.

23              You'll also be given a verdict form and the

24  questions you must answer which will constitute your verdict.

25              And that will result in the end of the case, the

1    returning of your verdict after all the evidence.

2         Let me give you some instructions that you'll be

3    following in deciding this case.  Let me talk to you again

4    about the burden of proof required in this case.

5         In any legal action, facts must be proved by a

6    required standard of evidence known as the burden of proof.

7         You may have heard this referred to in a criminal

8    case as beyond a reasonable doubt.

9         In a civil case, it is proof by a preponderance of

10   the evidence or proof by clear and convincing evidence.

11        These are the two different burdens used in a

12   patent case such as this.

13        The first, as I mentioned, is a preponderance of

14   the evidence standard.  The second is the clear and

15   convincing evidence standard.  Beyond a reasonable doubt is

16   the burden of proof or standard used in a criminal case, and

17   it has no application in a civil case such as this.

18        In this case, the Plaintiff, Smartflash, must prove

19   its claims of patent infringement and damages by a

20   preponderance of the evidence; that is, when a party has the

21   burden by a preponderance of the evidence, it means that you

22   must be persuaded that what the parties seeks to prove is

23   more probably true than not true.  I'll say that again.  More

24   probably true than not true.

25        Apple has the burden of proving its invalidity

1    defenses by a heavier burden called clear and convincing

2    evidence.   When a party has a burden of proof by clear and

3    convincing evidence, it means that the evidence must produce

4    in your minds a firm belief or conviction as to the matters

5    sought to be established.

6            It is a higher standard, a greater burden than a

7    preponderance of the evidence, but it is less than beyond a

8    reasonable doubt, which, as I say, does not apply in this

9    case at all.

10           Let me next visit with you about infringement.

11   Smartflash contends that Apple is infringing the

12   patents-in-suit, by making, using, selling, offering for

13   sale, and importing into the United States certain accused

14   products.

15           Smartflash also contends that Apple infringes

16   indirectly by inducing the direct infringement of others.

17           Smartflash contends that Apple infringes the

18   following patent claims.   And you may mark these in your

19   notebooks, if you choose to.

20           These are Claim 13 of the '720 patent; Claim 32 of

21   the '221 patent; and Claims 26 and 32 of the '772 patent.

22           I'll say that again.   Claim 13 of the '720 patent;

23   Claim 32 of the '221 patent; and Claims 26 and 32 of the '772

24   patent.

25           Let me first talk to you about direct infringement,

1    and then I will instruct you on indirect infringement.

2         Smartflash seeks to prove direct infringement of

3    the patents by literal infringement.  To prove literal

4    infringement of a particular patent claim, the Plaintiff, in

5    this case, Smartflash, must prove by a preponderance of the

6    evidence that the accused products or accused manner of use

7    of the accused products include each and every limitation of

8    a particular claim.

9         A person or a company can directly infringe a

10   patent without knowing that what it is doing is infringement.

11   It may directly infringe, even though it believes in good

12   faith that what it is doing is not infringement of any patent

13   and even if it did not know the patent.

14        Smartflash also alleges that Apple has indirectly

15   infringed the asserted claims by inducing another's direct

16   infringement.

17        To prove that Apple induced someone else to

18   infringe, Smartflash must prove by a preponderance of the

19   evidence that Apple encouraged or instructed customers or

20   other persons to make or use the patented products and that

21   Apple knew or was willfully blind to the fact that the

22   encouragement or instructions would result in the customer

23   acting in a way that infringed the patent.

24        Apple denies that it has either directly or

25   indirectly infringed any of the claims of the

1    patents-in-suit.

2              I'll explain in more detail at the end of the case

3    how you will decide the allegations of infringement.

4              Now, with regard to the defense of invalidity,

5    Apple contends that the asserted claims of the

6    patents-in-suit are invalid.

7              Invalidity is a defense to patent infringement.  A

8    person accused of infringement has the right to assert that

9    the claimed invention in a patent did not meet the

10   requirements for patentability and, therefore, that the

11   issued patent claim is invalid.

12             Let me briefly explain the legal requirements for

13   each of the grounds on which Apple relies to contend that the

14   asserted patent claims are invalid, and I'll give you more

15   specific details on each ground in my final instructions at

16   the end of the case.

17             The first ground is called anticipation.  Apple

18   contends that the inventions covered by the asserted claims

19   of the patents-in-suit are not new.  An invention that is not

20   new is said to be anticipated by the prior art.  To prove

21   that a claim is anticipated by prior art, Apple must prove by

22   clear and convincing evidence that each and every limitation

23   of the claim was present in a single item of prior art -- in

24   one single item of prior art.

25             Next is obviousness.  Apple also contends that the

1    asserted claims of the patents-in-suit are invalid for

2    obviousness.  To prove invalidity of a patent based on

3    obviousness, Apple must prove by clear and convincing

4    evidence that the invention defined by the claim would have

5    been obvious to a hypothetical person of ordinary skill in

6    the art at the time the invention was made.

7         So we've discussed two ways that a patent can be

8    found to be invalid; anticipation and/or obviousness.

9         Next as a grounds for invalidity is written

10   description.  Apple also contends that certain asserted

11   claims of the '772 patent are invalid because the description

12   of the invention in the specification does not meet certain

13   requirements.

14        A patent claim is invalid if the specification of

15   the patent does not contain an adequate written description

16   of the claimed invention.  That's referred to as the written

17   description requirement.

18        To succeed, Apple must prove by clear and

19   convincing evidence that the specification fails to meet the

20   law's written description requirements for an invention.

21        That will conclude my instructions regarding

22   infringement and regarding invalidity at this time.

23        As I say, you will get further instructions from

24   the Court at the end of the case.

25        Now, let me visit with you briefly about the issue

1    of damages.  Smartflash claims that it is entitled to damages

2    as a result of Apple's infringement in the form of a

3    reasonable royalty for each of Apple's accused products.

4         Damages cannot be speculative.  Smartflash must

5    prove damages by a preponderance of the evidence.

6         The fact that I am instructing you about damages

7    does not mean that Smartflash is or is not entitled to

8    recover damages.  I'll explain to you further at the end of

9    the trial how reasonable royalties are determined.

10        After the completion of the evidence and at the end

11   of the trial, I will give you a written charge that will have

12   all of these and other instructions in much greater detail

13   than I'm giving you now.  At that time, I will also give to

14   the jury a written verdict form that will ask you to answer

15   certain questions that deal with infringement, invalidity,

16   and damages.

17        The jury's answers to those questions, the answers

18   of which will constitute your verdict in this case, must be

19   unanimous.

20        Now, with regard to construction of the claims, I

21   will instruct you now and at the end of the case about the

22   meaning of some of the claim language.  You must use the

23   meanings that I give you when you decide the issues of

24   infringement and invalidity.

25        In deciding whether or not an accused product or

1   method infringes a patent, the first step is to understand

2   the meaning of the words used in the patent claims.  It's my

3   job as the Judge to determine what the patent claims mean and

4   to instruct you about that meaning.  You must accept the

5   meanings that I give you and use them when you decide whether

6   or not a patent claim is infringed and whether or not a

7   patent claim is invalid.

8         Patent claims may exist in two forms, referred to

9   as independent claims and dependent claims.

10         An independent claim does not refer to any other

11  claim in the patent.  It is independent.  It is not necessary

12  to look at any other claim to determine what an independent

13  claim covers.

14         A dependent claim refers to at least one other

15  claim in the patent.  A dependent claim includes each of the

16  limitations of that other claim or claims to which it refers,

17  as well as the additional limitations recited within the

18  dependent claim itself.

19         Therefore, to determine what a dependent claim

20  covers, it's necessary to look at both the dependent claim

21  itself and the independent claim or claims from which it

22  refers or depends.

23         The claims of the patents-in-suit use the words

24  comprises and comprising.  Comprising means including or

25  containing.  A claim that includes the word comprising or

1   comprises is not limited to methods or devices having only

2   the elements that are recited in the claim but also covers

3   methods or devices that add additional elements.

4        Take, for example, a claim that covers a table.  If

5   the claim recites a table comprising a tabletop, legs, and

6   glue, the claim will cover any table that contains these

7   structures, even if the table also contains other structures,

8   such as a leaf or wheels on the legs.

9        That's a very simple example using the word

10  comprising and what it means.  In other words, it can have

11  other features in addition to those that are covered by the

12  patent.

13       I've instructed you on the two different types of

14  claims at issue in this case.

15       I'll next define the meaning of the words used in

16  the patent claims at issue.  As I say, you must use the

17  definitions that I provide to you in considering the issues

18  of infringement and invalidity.

19       Now, if you'll find in your notebooks the patent

20  claims chart.  It should be easy to locate.  I'm not going to

21  read all of those terms and the definitions to you.  You have

22  those.

23       These are the constructions that I have determined,

24  and it is the construction that you will have to apply in

25  trying this case.  They are there for your reference.  You

1    will hear about them during the process of the trial, and you

2    will see the various words that have been defined and

3    construed by the Court with regard to the claims.

4          This chart, along with everything else that's in

5    your juror notebooks, will go with you into the jury room

6    during your deliberations.

7          Again, if you're feeling a little overwhelmed, let

8    me assure you, this will become clearer as we go through the

9    evidence and the trial takes form and shape.

10         You're going to hear a lot of evidence through

11   witnesses in this trial, Ladies and Gentlemen.  I want you to

12   pay careful attention to the testimony of all the witnesses,

13   and I want you to keep an open mind and not decide any issues

14   until you've heard all the evidence from all of the

15   witnesses.

16         Some of the witnesses that will testify in this

17   case will be designated as expert witnesses.  When persons

18   with special training and experience in the field of

19   technology at issue in the patents can offer testimony in the

20   form of opinions to assist the jury, they are called expert

21   witnesses.

22         It is up to you to determine whether to believe and

23   accept the opinions of the expert witnesses, just like it is

24   up to you to decide whether to accept any of the testimony of

25   any of the witnesses in this case.

1          You are not only the sole judges of the facts, you

2    are the sole judges of the believability and the credibility

3    of each and every of the witnesses.  It will be up to you the

4    jury to decide what weight, if any, you want to give to all

5    of the evidence in this case, including all of the testimony

6    of all of the witnesses.

7          Your duty in this case is to decide the facts from

8    the evidence in this case.  That's your job and your job

9    alone.

10         Your second job is to apply the law as I give it to

11   you to those facts.  You must follow these instructions from

12   the Court, even if you personally would disagree with them.

13   Each of the instructions is important, and you must follow

14   them all.

15         You must perform your duty as jurors fairly and

16   impartially.  Do not allow sympathy, prejudice, fear, or

17   public opinion to influence you.

18         Nothing I say now and nothing I will say or do

19   during the trial is meant to indicate any opinion on my part

20   about what the facts are or what your verdict should be.  You

21   the jury, again, Ladies and Gentlemen, are the sole judges of

22   the facts in this case.

23         Now, as I mentioned, we're going to have opening

24   statements from the attorneys in just a few minutes, but

25   before we do that, I want to give you a brief roadmap of how

 1    the trial is going to be structured before we get on to the

 2    opening statements.

 3         After the opening statements from both sides, the

 4    Plaintiff, Smartflash, will present its evidence to support

 5    its contentions that some of the claims of the

 6    patents-in-suit have been and continue to be infringed by the

 7    Defendant, Apple.

 8         To prove infringement of any claim, Smartflash must

 9    persuade you that it is more likely true than not true that

10    Apple has infringed that claim by a preponderance of the

11    evidence.

12         After Smartflash has presented all of its evidence,

13    it will rest its case.  Then Apple will present its evidence

14    that the asserted claims of the patents-in-suit are invalid.

15         To prove invalidity of any claim, Apple must

16    persuade you by clear and convincing evidence that the claim

17    is invalid.

18         In addition to presenting evidence of invalidity,

19    Apple in its case will put on evidence regarding Smartflash's

20    proof of infringement and damages.

21         Apple will then rest.

22         After Apple, the Defendant, has rested, then the

23    Plaintiff Smartflash will have the opportunity to respond to

24    Apple's evidence by putting on what are called rebuttal

25    witnesses or rebuttal evidence as to infringement and

1    damages.   That's referred to as the rebuttal case.

2         After Smartflash has put on its rebuttal case, if

3    it chooses to do so -- it is their option -- then both sides

4    will close, subject to final instructions from the Court and

5    closing arguments.

6         At that point, you will have heard all the evidence

7    in the case.   I will then proceed to give you additional

8    final instructions which you must follow, and you will hear

9    closing arguments from both sides in the case.

10        After the lawyers present their closing arguments,

11   then I will direct that you retire to the jury room,

12   deliberate, and answer the questions in the verdict form.

13        Those answers to those questions in the verdict

14   form will constitute your verdict in this case.   And as I

15   say, the answers to those questions must be unanimous.

16        This concludes my opening instructions to you.   At

17   this time, we will now hear opening statements for counsel

18   for each of the parties.

19        Plaintiff Smartflash may proceed to offer its

20   opening statement.

21             MR. CALDWELL:   Thank you, Your Honor.

22             THE COURT:   Would you like a warning on your time,

23   counsel?

24             MR. CALDWELL:   Yes, Your Honor.   I would like a

25   five-minute warning.

1          THE COURT:  All right.  You may proceed.

2          MR. CALDWELL:  May it please the Court.

3          Ladies and Gentlemen, shortly you will more

4  formally meet Mr. Patrick Racz.  He's a man who has a

5  beautiful and creative mind, and to date, he has refused to

6  let others dictate his fate.

7          I am Brad Caldwell, and I'm proud to represent

8  Mr. Racz and Smartflash.

9          What the evidence will show is an extraordinary

10  story of innovation, risk, struggle, a lot of challenges

11  along the way that brings us to this courtroom where Mr. Racz

12  has a chance for redemption.

13          THE COURT:  Counsel, either speak up or pull the

14  microphone closer, please.

15          MR. CALDWELL:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. CALDWELL:  Now, Mr. Racz took a very unlikely

18  path to this courtroom.  He grew up on a farm in the Island

19  of Jersey, which is a small island south of England in the

20  English Channel.

21          He actually left high school around what we would

22  call eighth grade and worked studying commercial horticulture

23  and leather working.

24          But not long thereafter, he moved over to London,

25  got involved in early PCs, and was a guy who was also looking

1   for the problem to be solved or great market opportunities.

2           Early on, Mr. Racz saw a market opportunity,

3   believe it or not, for water filters.  He'll explain all that

4   later; but in that process, he saw a problem with water

5   filters, invented a new design of a faucet that actually

6   revolutionized faucets.  And he got his first patent for

7   that.

8           After the examiner studied it, he got patents all

9   around the world.  And he learned a lot from that because it

10  was of enormous commercial significance to his business.

11          But shortly thereafter, I guess maybe about 10

12  years thereafter, Mr. Racz saw a new market opportunity, one

13  that was worldwide.  He started studying on the Internet, but

14  it wasn't just the Internet.

15          In a moment of true serendipity, Mr. Racz became

16  very close friends with two extremely high-up executives in

17  the music industry.  He'll explain all about that when he

18  takes the stand.  But just through a random act of kindness,

19  he got introduced to a different circle of people that would

20  really change his life.

21          Now, let's cast our minds back to 1999.  Remember

22  when phones looked like this?  And they were really good, but

23  pretty much at one thing, and that was making phone calls.

24          Technologically, a lot of us were concerned about

25  things, but the big thing we were concerned about that year

1    was the Y2K bug, bank accounts going to zero and the traffic

2    lights stop working.

3         Mr. Racz was interested in solving problems on the

4    Internet, and particularly problems that involve music.  And

5    he saw something.  What's one of the world's first MP3

6    players?  A music player where you didn't have to have a CD

7    or a cassette to carry it with you.  And it was really cool

8    and people liked it, but it was hard to use and it came with

9    a real big problem that Mr. Racz saw.

10        The problem was it was just too easy to kind of

11   steal the digital data that it used, and he saw that this was

12   going to be a big problem.

13        Now, I'm not going to stand here and say Mr. Racz

14   was the only person who saw that problem.  Several others,

15   smart folks around the world, saw the problems, too.  And

16   different people set off working on the problem.  Other

17   people had solutions.  They were complicated, and they didn't

18   really solve the true problem.

19        Mr. Racz saw the issue differently.  It wasn't just

20   about making it harder to steal content.  It was about making

21   it easier to be honest so that people who were willing to

22   pay, would.  And this created market opportunities.  With

23   that insight, Mr. Racz had his invention.

24        Now, first, Mr. Racz realized that you'd have

25   content -- digital content.  It could be a game.  It could be

1   a computer program.  It could be music or movies, but you

2   needed to secure that content with rules.  And you would keep

3   that content that's secured by rules on a device.  But also,

4   you needed payment data to make it easy for people to legally

5   buy their content.

6          And instead of complicated forms and filling out

7   credit card information and detailed billing information,

8   Mr. Racz realized you could have a simple proxy for that,

9   something that's linked back to more complicated billing

10  information so that it would be easier, when combined on one

11  device, for people to legally purchase content.  In other

12  words, a way to keep honest people honest because you gave

13  them an alternative that's as easy as it was just to go

14  steal.

15         And I'm not trying to oversimplify the invention.

16  Judge Gilstrap told you that there are the claims of the

17  patent, and they have a variety of elements, and we're going

18  to go through these in this case.  You'll get your fill of

19  it.  I'm not trying to oversimplify.  I just want you to

20  understand, the evidence will show that this insight was

21  huge.

22         Now, Mr. Racz thought back to his patent

23  experiences and how that had been so critical to his

24  business, and he went to the patent lawyer he was buddies

25  with and submitted the following in 1999.  That drawing right

1    there, he will tell you, is a hand sketch he did before he

2    went down to his patent examiner -- or his patent attorney,

3    excuse me.

4            Understand that this was in 1999, years before

5    Apple had even the first iPod that was submitted to the

6    United Kingdom's Patent Office, which is in a cooperative

7    treatise with the United States.

8            Mr. Racz didn't stop at starting -- he did not stop

9    at just filing his patent.  He started a business, and he

10   hired other technical help, including a gentleman named

11   Hermen Hulst.  Mr. Hulst and Mr. Racz contributed more ideas,

12   and they went back to their patent lawyers and submitted even

13   more information to the Patent Office.

14           They retained a design firm to help them design

15   what their product would look like.  They retained a

16   technology partner that would help them build it.  And they

17   began developing their product and pouring everything they

18   had in it, all their money, including, frankly, quite a lot

19   of money Mr. Racz had made off of his faucet invention, and

20   all their time.  They poured all that into the company.

21           They were getting recognition and press around the

22   world; and, in fact, they even had sponsorship and marketing

23   deals with Disney, Paramount for the Star Trek brand, and

24   Britney Spears.  This isn't the -- this year -- I mean, in

25   2001, they got a sponsorship deal with Britney Spears.

1    Mr. Racz will tell you about all that.  It seemed

2  like the world was their oyster, but the good fortune was

3  short-lived.

4    Mr. Racz caught his business partner in the

5  engineering firm passing off his invention as their own.

6  They would make presentations and show it to other people and

7  act like it was theirs.  And he's a trusting guy, and he

8  forgave them at first, but it just happened again.

9    And then eventually, even though he'd like to say

10  enough is enough, he really didn't have a choice because he

11  put in all the money that he had earned.  He didn't have his

12  money anymore; but in reliance on his partner, he put in all

13  his money.

14    And then eventually just -- the relationship just

15  got to where it couldn't continue.  They pulled out, cut the

16  cord, and left Mr. Racz -- Mr. Racz in the lurch.

17    But fortunately, you know, he -- he thought he

18  still had products he could go sell, but the problem was

19  there are some other events that he's going to tell you about

20  that really just changed the course of his business and he

21  started a descent.

22    His company eventually went bankrupt.  He

23  personally had a mountain of debt from paying the salaries of

24  his employees and other things that he was footing on his

25  own.

1          And, frankly, the once millionaire was broke and

2    facing depression.  But that's not where the story ends.

3    Mr. Racz always remained committed.  He remained determined.

4          Even though he faced his own demons in this own

5    process and through the help of friends and just, honestly,

6    his own relent -- relentlessness, you will hear that about

7    eight years after he filed it, the United States Patent and

8    Trademark Office awarded him the first patent, the '720

9    patent.

10          And the seal on the front cover of the '720 patent

11    means that the United States Patent Office and its examiners

12    have studied this patent, scrutinized it to make sure it

13    meets the requirements of patentability and determined that

14    he should be awarded a patent.  That gave Mr. Racz a new

15    lease on life.

16          But he still wasn't out of the woods in terms of

17    his finances, the stability of his family, and other people

18    recognized this.  In fact, a variety of people tried to take

19    advantage of him now that he had this property right in hand.

20    But he had learned a lot about choosing partners.

21          Mr. Racz will explain to you that he eventually, a

22    few years later in 2010, finally met a partner he believed in

23    and could trust, a man by the name of Monty Koppel.  And Mr.

24    Koppel is a wealthy, older businessman who referred Mr. Racz

25    to his family's investment company and then became his angel

1    investor, gave him some funds to continue working on the

2    patent, got him and his family stable.

3            Mr. Racz always believed he had contributed more

4    inventions than just those covered by the first patent,

5    including handheld multi-media terminals with wireless

6    features and the ability to download applications and games

7    and music and movies.  And he was right.

8            It took until 2012, but the United States Patent

9    and Trademark Office awarded Mr. Racz these two patents in

10   2012.

11           Now, over the course of all those years, the

12   landscape had changed.  His business partner wasn't doing

13   that, and what had happened was into the void where he should

14   have been with his business partner, Apple had stepped into

15   that void by 2012.  And they were doing exactly what he had

16   disclosed and claimed in his patents with a product that was

17   secure, easy, and elegant, just like he described.

18           Apple infringes with the iPhone, the iPad, and the

19   iPod Touch.  What the evidence will show in this case is not

20   only do they infringe, but they build those products and

21   import them.  They mark them up with a huge profit, sell them

22   at a high price, and they sell a boatload of them.

23           In fact, you'll hear that of infringing products,

24   Apple has sold -- I'm talking about devices.  Not money.

25   Devices.  They've sold about 365 million of them.  Just when

```
 1    you look at money that's come in because of people who bought
 2    it for the invention, it's tens of billions of dollars.
 3            A United States patent is an important U.S.
 4    property right.  To boil it down, Apple was trespassing on
 5    the property and won't pay.
 6            And it's ironic that we're here on President's Day.
 7    I agree with His Honor that you're engaging in the second
 8    highest form of service to the country.  But it's ironic that
 9    it's President's Day because one of the last things that
10    President Lincoln did before swearing in and taking the oath
11    of office was to represent a patent owner in a patent case in
12    his law practice.
13            Now, part of being an attorney on a case like this
14    is we will help you see the evidence and help present it.
15    And we're going to prove to you that Apple infringes, and
16    you're not going to have to take my word for it.  To prove to
17    you that Apple infringes, I'm going to present Dr. Mark
18    Jones.
19            Dr. Jones, please stand.  Thank you.
20            Dr. Jones is a long-time electrical and computer
21    engineering professor at Virginia Tech.
22            Now, Dr. Jones has been able to see all of Apple's
23    secret programming code that they keep back at headquarters
24    and their technical documents and the sworn testimony of
25    their engineers.  And he studied it for a long time and he
```

1    wrote a report.  And he's going to go through and explain his

2    methodology for you, explain the evidence, and he's going to

3    explain to you how Apple infringes, going through those

4    claims that Judge Gilstrap said are the centerpiece of a

5    patent trial.

6         After his presentation, if you believe that Apple

7    infringes, as Judge Gilstrap mentioned, the jury will be

8    asked to award a reasonable royalty.  And that's not

9    necessarily a term that all of us are familiar with, but

10   you're going to hear a lot about it in this case.

11        What's shown on the screen is the law from the

12   United States Code regarding a reasonable royalty.  And what

13   it says is the Court shall award the claimant damages

14   adequate to compensate for the infringement, but in no event

15   less than a reasonable royalty for the use made of the

16   invention by the infringer.

17        And you may wonder how do you go about assessing

18   that?  Well, you will also hear from another person,

19   Dr. William Wecker.

20        Dr. Wecker, if you would, would you stand up and

21   move forward a little just so that you're not obstructed

22   there?  Thank you, sir.  Thank you, sir.

23        And you will also hear from another gentleman,

24   Mr. Robert Mills.  Thank you.

25        Dr. Wecker has a Ph.D. in applied mathematics

1    focusing on statistics.  Mr. Mills has about two decades of

2    experience in economics valuing property like this.

3            Dr. Wecker will explain to you that he has

4    performed a survey to analyze certain values that are

5    applicable to this case.  And the first thing you have to

6    figure out is what's the use made of the invention by the

7    infringer?

8            THE COURT:  Five minutes remaining, counsel.

9            MR. CALDWELL:  Thank you, Your Honor.

10           Now, what Dr. Wecker will show you is that 23

11   percent of the folks that bought the accused products bought

12   them for the accused features.  Mr. Mills, the economist, has

13   had access to Apple's secret financial documents, their

14   profit margins.  He has access to the money that they bring

15   in and their own surveys, and he will explain to you that

16   Apple has brought in about 43.4 billion from the 23 percent

17   of people who bought the device for the infringing features.

18           Dr. Wecker found out some other information, too,

19   including that if Apple were to try and change the way their

20   software worked a little bit so that it didn't infringe,

21   people would just walk away in droves.  The profits they

22   would lose -- even if it's mostly the same device that they

23   take away some of these features, the profits they would lose

24   are in the billions -- profits.

25           Now, using that information and other information

1    that Mr. Mills will explain to you, he was able to determine

2    that a reasonable royalty in this case is a little less than

3    2 percent, and he'll go through his methodology.

4         But when you focus just on the money that came into

5    Apple from people who bought for this feature, and you look

6    at a reasonable royalty, because you have to award, if you

7    find infringement, an amount no less than a reasonable

8    royalty.  That's in the law.  That amount is where 852

9    million comes in.  Mr. Mims and Dr. Wecker will explain all

10   this.

11        Now, I suspect that you will hear a variety of

12   arguments from Apple.  They'll say, well, we don't practice

13   the patents.  And, respectfully, we'll disagree, and

14   Dr. Jones will explain why they do.  And, remember, it's our

15   burden to show you, it's more likely than not that they

16   infringe, and we will.

17        Apple will then say if you don't buy that, we don't

18   infringe.  That's okay because other people that were out

19   there before did the same thing that's in your patent.  Even

20   though your patent was issued, other people did the same

21   thing.  And you should take the patents away.  And they're

22   supposed to prove that to you by a clear and convincing

23   evidence.  And Dr. Jones will explain in our rebuttal case

24   why they've not done so.

25        The truth is that the prior art, what the others

1    were doing, was bad, was complicated, and it's not Mr. Racz's

2    invention.   Apple chose to use a different system, and that

3    system that they've chosen to use, meets the claims of

4    Mr. Racz's patent.   Remember, for direct infringement, it

5    does not matter whether Apple realized they were infringing

6    when they started.   Do they meet the claims?   That's the

7    question for direct infringement.

8            But if at the end you don't buy that Apple doesn't

9    infringe and you don't buy that the patents are invalid,

10   Apple will say, that's okay.   These features are not

11   valuable, and they will probably suggest to you a knee-jerk

12   reaction because the number is big.   And it's true that most

13   of us don't -- outside Apple don't deal with numbers that

14   large on a day-to-day basis.

15           But, remember, you've been instructed you will hear

16   the evidence and decide on that.   And the evidence will show

17   that that amount is actually a tiny fraction of the money

18   that was associated to it.

19           You know, on behalf of Mr. Racz and Smartflash, I

20   thank you very much for your service.   You really do have an

21   important job, and fate has brought us here this day.   We

22   look forward to presenting you the evidence.   Thank you.

23           THE COURT:   All right.   The Defendant may now

24   present its opening statement.

25           MR. BATCHELDER:   Thank you, Your Honor.   I'd like a

1    five-minute warning.

2              THE COURT:  All right.

3              MR. BATCHELDER:  Thank you, sir.

4              THE COURT:  You may proceed, counsel.

5              MR. BATCHELDER:  Thank you, Your Honor.

6              Ladies and Gentlemen, good afternoon.  My name is

7    Jim Batchelder, and I represent Apple in these proceedings.

8    And it's now time for me to share Apple's perspective on this

9    case.

10             And let me just be clear at the outset, Apple sees

11   this case very differently than the view that you just heard.

12             The four claims -- patent claims in this case are

13   basically about one way to pay for protected content, like

14   music or movies that are sold over the Internet.

15             Well, Apple invented its own two systems and built

16   them from scratch that protect content and then arrange for

17   that content to be paid for so that the artists, like

18   musicians can get their fair share.

19             You may want to jot down in your notebooks the

20   names of those two systems because they'll be very important

21   here.  The first one is called FairPlay, and the second is

22   called the iTunes Store.  And those systems are very

23   important, because as you'll see in those systems, content

24   gets protected and then paid for in a way that's not just

25   different but better than the way that these patents say to

1   do it.

2          The name of the man who leads the engineering team

3   for the FairPlay system that I mentioned is Augustin

4   Farrugia, and we'll put his picture up here.  And Apple's

5   bringing him to Tyler so you can hear from him directly.

6   He's run this team for more than a decade.

7          Apple's also bringing to Tyler two other engineers

8   who have run the iTunes Store essentially since it began.

9   One of them is here, Mr. Max Muller.

10          If you'll stand, please, sir?

11          And Mr. Muller will be with us throughout the

12   trial.  And he was Engineer No. 1 on the iTunes Store,

13   building it from scratch with a great team of engineering

14   colleagues.

15          You'll also hear from Payam Mirrashidi who also was

16   working shoulder-to-shoulder with Mr. Muller from the start

17   in building the iTunes Store.

18          We've even said to the Plaintiffs here that they

19   can call these witnesses in their case, Mr. Muller,

20   Mr. Farrugia.  We want these folks to speak to you as soon as

21   possible, because what they're going to tell you is they're

22   going to describe the incredibly hard work that went into

23   building the iTunes Store and the FairPlay system.  They're

24   going to talk about how the products work.

25          And, again, what you'll learn at the end of the day

1   is these things pay for protected content in a way that's not

2   just different, but better than the way the patents say to do

3   it.  And that will be very clear.

4           His Honor instructed you just now that to infringe

5   a patent claim -- I'm just going to read his words.  I wrote

6   them down as he was speaking -- the -- the accused product

7   must include each and every limitation of a particular claim.

8           So if a given patent claim, for example, has 10

9   limitations or requirements and you practice 1 through 9 but

10  not 10, you do not infringe.  Period.  End of story.

11          I'll give you one example now of something that's

12  required by these patent claims that isn't done by the

13  accused products.  The patent claims say that the device --

14  that the end user has to have something called payment data

15  stored on it.  And they say that, for example, if you want to

16  buy something, like a song, you need to send that payment

17  data, like a credit card number, you just send it to the

18  seller and the seller doesn't give you content until it looks

19  at that credit card number, validates it, and then it will

20  send your song.

21          Well, Apple's system works better and differently.

22  Under Apple's system, the iPhone, you don't store people's

23  credit card numbers on the iPhone.  When someone logs in and

24  sets up an iTunes's account, they provide their credit card

25  one time and then that number is stored at Apple on a very

1    secure server to protect it, not on this device.

2         And then when you want to buy a song after you've

3    created that account, you don't send your credit card number

4    over the Internet every time, you just send your log-in

5    information.

6         Now, why does Apple do it that way?  Well, if a

7    credit card number were stored on this device and someone

8    stole it, they could hack your credit card number.  And if

9    every time you wanted to buy a song off of iTunes you had to

10   send your credit card number over the Internet, they could

11   hack it there, too.

12        Apple's system protects that credit card number on

13   a very secure server, and it does so to protect its customer

14   from identity theft and credit card theft.  Apple's system is

15   better, and it's certainly different.  It doesn't practice

16   what the claims here require.

17        That brings us to a theme that you'll see over and

18   over again -- that is, Plaintiffs in this case ignoring their

19   own documents that were created before this lawsuit was

20   planned -- that is, before they were motivated to write

21   things down that would help them sue someone.

22        You'll see, for example, some documents in 2009

23   reflecting that Mr. Racz and others that he reached out to in

24   the industry, experts even, they understood that Apple didn't

25   infringe.  They're going to set aside those documents now and

1   ask you to -- to ignore them, but those documents speak the

2   truth.  So that -- that's Hole No. 1 in -- in Plaintiff's

3   case.

4        The accused Apple products, the iPhone, the iPad,

5   they are different, different than what these patent claims

6   require.  They pay for protected content in a different and

7   better way.

8        Hole No. 2 in Plaintiff's case is that Mr. Racz

9   told the United States Patent and Trademark Office that he

10  was the first to think of this one way of paying for

11  protected content, but he just plain wasn't.

12       To help understand that, that is, how that came to

13  be, it's important to remember what was happening in this

14  industry.  I'll call it the content distribution industry.

15  It's a mouthful.  I know.

16       But, you remember back in the '70s -- many of you

17  will remember -- that music was sold on records.  And records

18  weren't particularly easy to copy, so piracy in those days

19  was not so commonplace.

20       Well, some things started to happen around the

21  mid-1990s that were improvements in the industry so they

22  created some opportunities; but at the same time, they

23  created some real challenges.

24       So for one thing, music went digital.  Instead of

25  being on records, it was on CDs, and more and more American

1    households had CD players.  Well, that was neat and good.  It

2    also meant that with one touch of a button, someone could

3    burn a copy of a CD and basically steal the artist's music.

4           Another advancement in the industry is that music

5    could easily and quickly be sent over the Internet by the

6    mid-1990s.  Before that time, it took a long time, often

7    hours or more, to download a single album off of the

8    Internet.  But by mid-1990s, you could do it very quickly.

9           And then also the memories, the -- the stuff in

10   these devices that store data got better and better and

11   cheaper and cheaper.  So you could, on a single device, store

12   a lot of content, even perhaps someone's entire music

13   library.

14          So that was all happening in the mid-1990s.  And as

15   you can imagine, given that that was happening, engineers

16   everywhere were thinking about, writing about, talking about,

17   how do we set up a system where content like music or movies

18   can be sold over the Internet, because it can be sent so

19   quickly now, but protected from being pirated?

20          And what we'll show you is that this was a very

21   crowded field.  Again, engineers all over the consumer

22   electronics industry from -- from the world's top companies

23   were thinking about this; they were writing about it; they

24   were publishing about it.

25          One of them built a system about it.  They actually

did it.  Some submitted patent applications that described ways to do it.  And what we'll show you, as this case unfolds, is that those really smart people and motivated people thought of a lot of different ways to do this, and one of them was the very way that Mr. Racz came along later and told the U.S. Patent Office he invented when he just hadn't.

Now, you must be wondering, why would Mr. Racz have done that?  Why would he have told the U.S. Patent Office that he invented this thing first when these other engineers were writing about it and publishing documents to show that this idea had already been thought of?

Well, answer is simple.  He didn't know.  He didn't know, because he was not an expert in this space.  He did not have background in this space.  He didn't work in this field. The other folks we've been talking about, these other engineers, I mean, because they're engineers in computers and electronics, they devoted their lives in both school and career to studying these fields so they could add value.

They had expertise.  Mr. Racz simply hadn't done that.

So, again, we come back to that idea of Plaintiffs ignoring their own documents.  There's a very good example from 2008 where Mr. Racz reached out to a company called Intertrust.  And that's another name you may want to jot down in your notebooks.  It turns out to be particularly important

1    in this case.

2           Intertrust was an expert in this space, in

3    protecting content and arranging for it to be sold over the

4    Internet.  And Mr. Racz reached out to them, and in so many

5    words, he said:  You know, I've got this neat thing, this new

6    idea, I think, and I want you to take a look at my patent and

7    tell me what you think.  I want you to invest.

8           And the way that Intertrust responded was very

9    telling.

10          Can we see that, please?

11          As you can see, they said:  Our guys were pretty

12   thorough in their investigation.  Their feeling was that the

13   claims were broad but that there was generally little that

14   gave highly significant or distinctive advances over any

15   prior art.

16          Well, what is prior art?  His Honor described it,

17   but that term "prior" is a good clue.  It means what came

18   before.  What came before Mr. Racz came and claimed to have

19   invented something?

20          Intertrust was the expert.  He reached out to them,

21   and they said:  There doesn't seem to be much here.  The

22   prior art really covered it.

23          And what prior art are we talking about?  We're

24   talking about some of the top engineering firms in the

25   industry.  And we'll show it through expert testimony.

1   IBM, Sun Microsystems, Intertrust itself described how to do

2   this; Sony, Xerox.

3          Again, some of the top companies in the engineering

4   space in the U.S. and in the world had already done what

5   Mr. Racz came along later and told the U.S. Patent Office

6   that he had invented first.

7          Given that background, it won't surprise you to

8   learn then what happened when Mr. Racz decided to start his

9   own company to commercialize what he said he had invented.

10  And that company was called Internet Plc.

11         And they chose to embody Mr. Racz's so-called

12  invention through something called a smart card.  It looked

13  something like this.  It was a credit card size piece of

14  plastic that had a computer chip on it.  He said it was an

15  embodiment of what he had invented.

16         And the evidence will show that the reason Mr. Racz

17  decided to commercialize what he said he'd invented using a

18  card and not a smartphone, for example, was that he thought

19  it would be easier.

20         Well, he was right about that much.  It's a lot

21  easier to make a card than to make a world-class family of

22  products like iPhones and iPads that just pack a wallop of

23  value for customers that use them.  It's a lot easier.

24         But, you know, we teach our children that there are

25  no shortcuts in life, and this case is no exception.  Yeah,

1    it was easier to make a card, but even though he paid big

2    names in the U.S., like Britney Spears, Disney, Star Trek for

3    the right to use their names to market these cards, and even

4    though he had a background in marketing, it just -- it just

5    doesn't take off.  Customers just weren't interested.  And

6    it's not surprising.

7            So that brings us to Hole No. 3 in Plaintiff's

8    case.  And, again, it's a good example of Plaintiffs ignoring

9    their own documents.

10            Here we have a lot of documents where Mr. Racz, his

11   colleagues in the industry, because he reached out to a lot

12   of people, and these documents speak to what the value of

13   these patents would have been if they had been valid.

14            And they went on the low end of about maybe $50,000

15   to a high end being generous reading them to about

16   $4-and-a-half million.  Again and again, Mr. Racz, his

17   colleague, the industry all speaking about this, saying the

18   value of these patents, if they're valid, would be

19   $4-and-a-half million.

20            And now we have Mr. Racz here doing an about-face.

21   Now he goes from 4-and-a-half million to saying:  Give me

22   $850 million.  $850 million?  That's almost a billion

23   dollars.  That a staggering leap from 4-and-a-half to

24   $800 million.

25            It tells you, on the one hand, who can be trusted

1    here and who wants you to get to the right answer.  It tells

2    you, on the other hand, he was looking for an easy payday

3    that he hasn't earned.

4            If we could quickly put up the graphics that

5    Smartflash's lawyer used --

6            THE COURT:  Five minutes remaining, Counsel.

7            MR. BATCHELDER:  I'm sorry, Your Honor?

8            THE COURT:  Five minutes remaining.

9            MR. BATCHELDER:  Thank you.  Appreciate that.

10           If we could look at what he calls Figure 1A on the

11   right, that's described in the patent, and it's described as

12   an MP3 player.  Well, Mr. Racz is going to admit, when I get

13   a chance to question him, I hope this afternoon, he didn't

14   invent MP3 players.

15           And if we could look at the next demonstrative,

16   this is not a picture from his patent.  That's one they

17   created for this trial to make that thing look more like a

18   smartphone.  He didn't invent the smartphone.  He's going to

19   admit that too.

20           And if you look up at the top at things that they

21   claim he invented, content -- did he invent content?  Content

22   is just music and movies.  Mr. Racz sure didn't invent those.

23           What about rules?  He's going to admit he didn't

24   invent rules in connection with online transactions either.

25   Didn't invent access rules, didn't invent use rules in

1    connection with selling stuff online.

2           Well, what about payment data?  Did he invent that?

3    Again, he will admit, when I have a chance to question him,

4    the answer is no.  He didn't admit payment data and online

5    transactions either.

6           All of this was in the prior art.  It had already

7    been thought of.  It had already been talked about.  It had

8    been published.  There had been a system built to do it.  He

9    didn't invent this idea.

10          So, Ladies and Gentlemen, Plaintiffs simply cannot

11   overcome the three holes in their case that we've just talked

12   about.

13          Again, the way that Apple's FairPlay and iTunes

14   systems protect content and arrange for it to be paid, it's

15   different, and it's better.  It protects artists, and it also

16   protects consumers from credit card theft and identity theft.

17   It's a smarter way of doing things that looks out for

18   everyday people.

19          Number two, this one idea, this one way of paying

20   for that protected content that Mr. Racz told the Patent

21   Office he invented first, again, others before him already

22   had; and he didn't know about it because he just didn't have

23   a background in this.

24          But we'll prove it to you loud and clear in

25   black-and-white documents that predate what Mr. Racz calls

1   his eureka moment.

2           And then, third, again, if these patents are valid

3   and if they're infringed, which they certainly aren't here,

4   but if they were, their own documents show that $4-and-a-half

5   million is a cap in the value of these patents.  It's one

6   idea, one way to pay for data.

7           Let me end, Ladies and Gentlemen, by thanking you

8   for your service in this case.  We very much appreciate your

9   consideration of your evidence, and we look forward to your

10  feedback at the end.

11          Thank you.

12          THE COURT:  Thank you, Counsel.

13          Ladies and Gentlemen, before the Plaintiff calls

14  their first witness, we're going to take a short recess.

15          You may leave your notebooks in your chairs, if you

16  don't want to carry them back into the jury room with you.

17          Don't discuss the case among yourselves while we're

18  on recess.  Use this opportunity to get a drink of water and

19  stretch your legs.

20          We'll be back in here shortly, and the Plaintiff

21  will call their first witness at that time.

22          But you're excused for recess at this time.

23          COURT SECURITY OFFICER:  All rise for the jury.

24          (Jury out.)

25          THE COURT:  All right.  The Court stands in recess.

```
 1                    (Recess.)

 2                    (Jury out.)

 3                    COURT SECURITY OFFICER:  All rise.

 4                    THE COURT:  Be seated, please.

 5                    All right.  Let's bring in the jury, please.

 6                    COURT SECURITY OFFICER:  All rise for the jury.

 7                    (Jury in.)

 8                    THE COURT:  Please be seated.

 9                    Before the Plaintiff calls their first witness,

10    does either party wish to invoke the Rule?

11                    MR. WARD:  The Plaintiff does, Your Honor.

12                    THE COURT:  Including or excluding experts,

13    Mr. Ward?

14                    MR. WARD:  Excluding experts.

15                    THE COURT:  All right.  The Rule has been invoked.

16                    Therefore, unless you are a corporate

17    representative or an expert witness designated in this case,

18    if you are not either of those but simply a third-party fact

19    witness or a fact witness of any kind, then you should excuse

20    yourself from the courtroom and remain outside the courtroom

21    until you're brought in to testify.  Only corporate

22    representatives and designated expert witnesses should

23    remain.

24                    (Excluded witnesses leave the courtroom.)

25                    THE COURT:  All right.  Plaintiff, you may call
```

```
 1    your first witness.

 2              MR. CALDWELL:  Thank you, Your Honor.

 3              The Plaintiff calls Mr. Patrick Racz.  And while

 4    Mr. Racz is walking to the witness stand, may I --

 5              THE COURT:  Before he walks to the witness stand,

 6    he needs to be sworn in.

 7              MR. CALDWELL:  Perfect.

 8              THE COURT:  Or what do you have, Counsel?

 9              MR. CALDWELL:  I was just going to ask permission

10    to pass a notebook to opposing counsel and take some

11    materials to the witness stand.

12              THE COURT:  You have leave to circulate that while

13    the witness is sworn.

14              MR. CALDWELL:  Thank you, Your Honor.

15              (Witness sworn.)

16              THE COURT:  Now if you'll have a seat on the

17    witness stand, please.

18              All right.  Counsel, you may proceed.

19              MR. CALDWELL:  Thank you, Your Honor.

20              Would the Court like or the Court Reporter or

21    anyone like a copy of the witness's witness binder?

22              THE COURT:  If you want to pass it up, that's

23    perfectly fine.  If you don't, it's your call.

24              MR. CALDWELL:  I'm certainly willing to, just in

25    case it helps with spellings or anything like that.
```

1          May I approach, Your Honor?

2          THE COURT:  You may.

3          MR. CALDWELL:  May it please the Court.

4          THE COURT:  Proceed.

5          PATRICK RACZ, PLAINTIFFS' WITNESS, SWORN

6                  DIRECT EXAMINATION

7  BY MR. CALDWELL:

8  Q.   Would you please introduce yourself to the jury?

9  A.   Yes.  My name is Patrick Racz.

10  Q.   Why are you here, Mr. Racz?

11  A.   I'm one of the inventors of the patents-in-suit.

12  Q.   What did you invent that is at issue in this case?

13  A.   I invented particular devices and methods for combining

14  payment functionality, secure downloading, storage, and rules

15  for the use of content on one portable device that you would

16  carry with you.

17  Q.   Could that be a phone or an MP3 player?

18  A.   It would include those, sir, yes.

19  Q.   Who benefits from your invention, Mr. Racz?

20  A.   Content developers, publishers, artists, songwriters,

21  device manufacturers, and users.

22  Q.   We will go through your invention in detail momentarily,

23  but I'd like to introduce you to the jury.

24       How old a man are you?

25  A.   I'm 54 years old.

1    Q.    Married?

2    A.    I am, sir, yes.  Married to Carol.  I have two children:

3    Jake, who is 19, and Luke, who is 14.

4    Q.    Where did you grow up, Mr. Racz?

5    A.    I grew up on the island of Jersey, which is a small

6    island in the English channel.  I'm not from there

7    originally.  My parents moved there when I was about three

8    years old to buy a farm, settle down and bring up their

9    children.

10   Q.    Tell me about your educational background.  Do you have

11   a high school or college education?

12   A.    No, I don't, sir, no.

13   Q.    Why not?

14   A.    I actually left home and school at a very early age.  It

15   would be the equivalent of 8th grade here in the United

16   States.

17   Q.    What did you do when you left home?

18   A.    I went to live on a neighboring island of Guernsey.  I

19   worked in a commercial greenhouse learning about propagation

20   and growing plants, a greenhouse nursery.

21   Q.    Did you eventually get some college education?

22   A.    I did sir, yes.  When I returned to Jersey, I attended

23   Highlands College for horticulture, advanced education.  I

24   learned about commercial horticulture.

25   Q.    How were you able to pay for your education, sir?

1    A.    I was working part time in my family business.  I've

2    always been interested in making things and building things.

3    I was working making leather belts, bags, picture frames, and

4    even growing strawberries.

5    Q.    Did you complete your studies at Highlands College?

6    A.    I did, sir, yes.  I graduated with several certificates

7    in commercial horticulture.  They were HNDs, but here they

8    would be the equivalent of, I guess, trade certifications.

9    Q.    What did you do after finishing at Highlands?

10   A.    I went back to work in the family business for a while.

11   Q.    Did you eventually move over to the big city?

12   A.    I did, yes, sir.  In 1994, I moved to London.  I got a

13   job in a thriving business that was involved with early

14   personal computers.

15   Q.    How long were you at that job?

16   A.    Approximately two years.

17   Q.    Have you ever set up your own business, Mr. Racz?

18   A.    I have, yes, several, the first of which was in 1986.

19   It was a company called General Ecology UK Limited.

20   Q.    What kind of company was General Ecology UK Limited?

21   A.    We were involved in the importation of high-end water

22   filtration systems for General Ecology, Inc., here in the

23   United States.

24   Q.    What got you thinking about starting a water filtration

25   company?

1    A.    Well, I'd seen some articles in the press that had

2    dispelled the common myth that London tap water was the

3    purest in the world.   They were explaining that actually --

4    in actual fact, London tap water was quite heavily polluted

5    and had been recycled several times, and it was very poor

6    quality.

7         And I saw that there was going to be a growing market

8    for water filters.   I decided to get into the industry.

9    Q.    What was the distribution territory of your company?

10   A.    Initially, in the UK, we did very well.   We quickly

11   expanded and went into Europe and then the Middle East and

12   Africa.

13   Q.    Did you turn your business, your experiences at General

14   Ecology, to a different kind of filter business?

15   A.    Yes, I did.

16   Q.    Explain that to us, sir.

17   A.    I spent quite a bit of time analyzing, you know,

18   whether -- whether -- what the best prospects were for

19   selling filters, and it seemed to be kitchens, the kitchen

20   being the most likely place that someone would install a new

21   water filter.

22        I spent about six months talking to kitchen designers,

23   installers about what they didn't -- did like and didn't like

24   about existing filtration systems.   Most of them were quite

25   critical of the existing TouchFlo carafe faucets that were

1    available at the time, the separate spigot faucets, and I

2    came up with an inventive way of solving that.

3    Q.    Will you teach us what that was?

4    A.    Yes.  I did it, taking a conventional faucet design, and

5    then instead of having just hot and cold water, I came up

6    with a method, a concept of introducing a third waterway and

7    control mechanism, so you could have hot, cold, and filtered

8    water through a single fitting, but in such a way that the

9    filtered water couldn't be cross-contaminated from the hot

10   and cold supplies.

11   Q.    Was your invention successful in terms of being a

12   business?

13   A.    Yes, sir, it was hugely successful.  And we are working

14   with a lot of major kitchen distributors, appliance

15   distributors, and even the world's largest sink manufacturer,

16   Franke, who's sold it into 45 countries.

17   Q.    Did you apply for a patent on that invention, sir?

18   A.    Yes, I did, sir.  We applied for patents in the UK,

19   Europe, and the United States of America.

20   Q.    How did you find patent lawyers to help you with that?

21   A.    Well, back then, I didn't know much about patents at

22   all.  It was 1989.  A good business partner of mine, he knew

23   a little bit more about it.  He hunted around, and he found

24   Marks & Clerk, who he believed were the right people to go

25   with, and we went with them.

```
 1    Q.    After the Patent Offices looked at your patent
 2    application, were you awarded any patents for the Tri-Flow?
 3    A.    We were, sir, yes.  And we received patents from the UK,
 4    Europe, and the United States of America.
 5    Q.    Did you build a good relationship with those patent
 6    lawyers in the process?
 7    A.    I built a very good relationship with them, yes, sir.
 8    Q.    Did having the patents influence the success of your
 9    business?
10    A.    I would say it was essential.
11    Q.    Why?
12    A.    Well, speaking with companies like Franke, who we were
13    working with, they said, if we didn't have patents, then the
14    other companies within the industry would have taken that
15    same idea and used it themselves.  It would have been
16    difficult for them to have invested and worked with a startup
17    company of our size.
18    Q.    Thank you, sir.
19          Did you eventually end up leaving the Tri-Flow Company
20    even despite the success?
21    A.    I did.  I was there for about 10 years.  We built it up
22    into a very successful business.  The problem was I was
23    traveling all the time and probably around 45 countries in
24    total.  I was home for two to three weeks out of four.  I was
25    missing my -- my family a lot.
```

1        My younger son, Jake, was a toddler, and Carol, I think,

2   was struggling with me -- without me there, and I decided it

3   was time to move on and go into something different.

4   Q.   What did you decide to pursue when you left Tri-Flow?

5   A.   I decided to get into the Internet space.

6   Q.   Did you see the Internet as another big opportunity?

7   A.   I did, sir, yes.  I saw it as a new frontier.  I thought

8   it was going to be enormous in the same way as I looked to

9   getting in on the ground floor with the filtration business.

10  Q.   Was there something in particular about the Internet

11  that stuck out to you?

12  A.   Yes, there was, sir.  Content, music in particular, and

13  MP3.

14  Q.   What is an MP3?

15  A.   An MP3 is a music file where you can take a rip from a

16  CD, a very small size, and you could then play it on a

17  portable device, a PC, and you could also send it over the

18  Internet to other people.

19  Q.   How did you first learn about MP3s?

20  A.   I saw one of the world's first MP3 players.  Shortly

21  after that, I purchased one of these devices, a Rio PMP300,

22  which was a popular device at the time.

23  Q.   Did you see any problems with that device?

24  A.   I did, sir, yes.

25  Q.   What were those?

1    A.    Well, I saw that it was far easier to steal content than

2    it was to pay for it.

3    Q.    Now, how did you get from first selling filters, then

4    designing faucets, to working in the music industry or having

5    connections in the music industry?

6    A.    Yeah.  So a bit of a funny story, actually, sir, all to

7    do with squatters.

8    Q.    What are squatters?

9    A.    Well, squatters, at that time in England -- it was a

10   curious law, but if you left your window open or your door

11   ajar and the house was unlocked and unoccupied, there was no

12   one living there, then squatters could just move in and take

13   up habitation, which sometimes would take two or three years

14   to evict them.  It was a real problem at the time.

15   Q.    So how did squatters have anything to do with you

16   getting an insight into the music business?

17   A.    Well, my wife -- that came out of my -- my wife and I

18   bought an apartment in central London.  I came out of it one

19   day, and I saw that there was a notice on the empty apartment

20   door next to us that the people hadn't moved in yet.  I knew

21   it was someone claiming squatters rights.

22        So I knocked on the door, and there was no reply.  I

23   went out to the front of the building, looked through the

24   window, and no one there.  So I walked out -- I had gone out

25   to get new locks, and I waited for them to come back, and I

1    wouldn't let them into the building.  My wife called the

2    police, and they helped send them on their way.

3    Q.    Did you ever meet the true owners of that apartment?

4    A.    I did, sir, yes.

5    Q.    And who were they?

6    A.    They were Mike and Joanne McCormack, who were two senior

7    executives in the music industry, very high up and very well

8    connected.  Mike was the head of A&R, BMG, which was later

9    bought by Sony.  Jo was high up in Virgin Music and signed a

10   lot of very large bands.

11         We became very close friends.  My wife and I are

12   actually godparents to one of their children.  And they

13   introduced me to a lot of senior people in the music

14   industry.

15   Q.    So what were the fundamental problems you mentioned

16   earlier with the MP3 player and files?

17   A.    Well, it was the fact that it was easier to steal music

18   than it was to pay for it.

19   Q.    Why is that?

20   A.    Well, I put it down to accountability, security, and

21   payment.

22   Q.    What do you mean by accountability and security?

23   A.    Well, accountability and security in the -- it was very

24   easy to take music files, to rip them off CDs, and to

25   distribute them over the Internet, share them with friends

1    where no one was accountable.

2        And security, because there was no effective method for

3    securing those files onto CDs, which made it very, very

4    simple for that to take place.

5    Q.   Mr. Racz, what was the problem with payment that you

6    saw?

7    A.   Well, the problem with payment was there was no easy way

8    for paying for content at that time.  No good way for paying

9    for content over the Internet at that time in a secure way,

10   and the record companies weren't getting paid.

11       So if the record companies weren't getting paid, the

12   artists, the publishers, and the songwriters weren't getting

13   paid.  And that was going to affect the people that I knew

14   and good friends in the industry, and that's when I started

15   coming up with the idea.

16   Q.   For time context, when was it that you had this

17   realization of a problem?

18   A.   It was the spring of 1999.

19   Q.   Did you ever tell anyone around that time about the

20   problems that you were foreseeing?

21   A.   No.  I -- well, I told -- I told the music industry

22   executives I knew, about the problem they were facing, yes,

23   sir.

24   Q.   Now, Mr. Racz, what was their reaction?

25   A.   I would say it was -- it was mixed.  There was three

1    different types of reactions.

2        The first one was that some of them didn't even know

3    what an MP3 was at the time, surprisingly enough.

4    Others thought it was just a fad.  It wouldn't catch on.  And

5    if it did, they would end up controlling it.

6        And a third group were adamant that they would have

7    nothing to do with the Internet.  The senior A&R people

8    executives couldn't even talk to Internet companies.  They

9    wanted to band the use of music on the Internet.

10   Q.   Despite the reactions from those executives, did you

11   continue thinking about this problem?

12   A.   I did, sir, yes.

13   Q.   Did the music industry ever make its own attempts at

14   dealing with the problem?

15   A.   Yes, they did.  There was a couple of noted attempts

16   with Press Play and Music.net, but they were abject failures.

17   They didn't work.

18   Q.   Is there a particular moment you can remember when you

19   saw a solution?

20   A.   Yes.  I would describe that and have described that as

21   my eureka moment.

22   Q.   Please tell us about your eureka moment.

23   A.   Well, I was sitting down at the table I was working

24   from.  I had my StarTAC cell phone in front of me, and that

25   was one of the very early flip phones.  And I realized that

1    that had identification data on it that linked you to the

2    service provider.

3        I also had one of the first credit cards in Europe that

4    had a chip on it, and I realized that that had authentication

5    data for payment functionality.

6        I had my Rio PMP300 player at the time also, and I

7    recognized that that had more memory than the phone, but it

8    was really dumb memory.  It didn't do anything.  There was no

9    security, and it was the root of the problem.

10        And I just figured out that, well, if I took that device

11    or a device like it, I increased the memory and made it

12    smart, and I added the functionality that I had identified on

13    the cell phone of authenticating you to a network and also

14    combined that with payment functionality, then I would have

15    the solution for the music industry.

16    Q.   If you combined all that, what would it give you?

17    A.   That would give you your -- effectively, the

18    downloading, the ability to download content, store content,

19    rules, use data -- use data status, payment functionality,

20    everything in one place on one portable device you can carry

21    with you.

22    Q.   Did you feel like you were on to something with that

23    idea, Mr. Racz?

24    A.   I very much did, sir, yes.

25    Q.   We've talked a lot about music, but would it work for

1    other types of content?

2    A.    Absolutely.  Digital content could be in the form of

3    music, movies, games, apps, that sort of -- would also apply

4    in exactly the same way.

5    Q.    Can you show us what one of these devices might look

6    like?

7    A.    Yes, sir, I can.

8    Q.    What do we -- I'm sorry, sir.

9          What are we --

10   A.    No.

11   Q.    What are we seeing here that's on Slide 3?

12   A.    Well, this is -- Figure 1A is from -- based on a drawing

13   from my 1999 GP application of a reader player device.

14   Q.    And is this Figure 1 of the patent, the '720 patent

15   that's at issue in this lawsuit?

16   A.    That's correct.

17   Q.    And what were you just explaining about the 1999

18   application?

19   A.    I was explaining that that drawing was based from the

20   original drawing from my 1999 application.

21   Q.    Was that drawn before or after Apple had the very first

22   iPod?

23   A.    It was long before, sir.  It was about two years before.

24   Q.    Was it before or after Apple had the iTunes Store where

25   you could buy content?

1  A.   That came out in 2003, sir.  It was four years before

2  that.

3  Q.   Was it before or after when the iPhone came out?

4  A.   The iPhone was 2007, sir.  It was eight years before

5  that.

6  Q.   Mr. Racz, in this particular drawing, where is the

7  memory that might store content?

8  A.   Well, in this particular embodiment, the memory is

9  actually stored on a smart card where the card is the data

10  carrier.  And you can see that depicted here on this diagram

11  on Figure 2.

12  Q.   Will you explain to us what we're looking at here as

13  Figure 2?

14  A.   Yes.  Figure 2 is a smart card, which has increased

15  memory, has payment functionality, use rules, and status

16  data.  And that would be inserted into a device such as the

17  one you saw in Figure 1A.

18       MR. CALDWELL:  And for the record, this '720 patent

19  is Plaintiffs' Exhibit 1.

20  Q.   (By Mr. Caldwell) Now, Mr. Racz, how would you download

21  content onto the card in this particular embodiment?

22  A.   Well, in this particular embodiment, you would take the

23  card, and if you look at the bottom of Figure 3, under Figure

24  3 where you have A, so Figure 3A, you'll see there that

25  there's actually a card reader that's connected to the

1  terminal via USB interface.

2      What you would do is you would take that card; you would

3  slide it into the reader; you would use the terminal to

4  access the content data that you wanted to download; that

5  would be downloaded onto the card; and the card could then be

6  taken out and used in other devices.

7  Q.   Can you play content from the data terminal?

8  A.   In some cases, but not always.  You could have used a

9  reader player device as the card reader and the access to the

10  terminal, but in other cases, it would just be a

11  Smartflash-enabled reader device.

12  Q.   Would it be all integrated into one?

13  A.   Yes, it could be.

14  Q.   So does your invention have to use removable cards, Mr.

15  Racz?

16  A.   Absolutely not, sir.

17  Q.   Now, because that came up, what does your patent say

18  about integrating memory into the device?

19  A.   Well, my '720 patent states -- oh, you want to -- sorry.

20  I can run through this one.

21  Q.   And that's my fault.  Let me -- I think I skipped over

22  something, so let's just ask about this.  Will you explain to

23  us how the card embodiment would work?

24  A.   Yes.  In this particular embodiment, what you would do

25  is you would slide the card into the device, and you would go

1   into the menu, select your content that you wanted to play.

2   Q.   And it was my fault for not doing that.

3   A.   That's okay.

4        THE COURT:  Let's don't talk about -- let's don't

5   talk about fault.  Let's just ask questions.

6        MR. CALDWELL:  Yes, Your Honor.  Thank you.

7   Q.   (By Mr. Caldwell) Mr. Racz, will you show us what your

8   patent tells us about whether memory can be integrated all

9   into one device?

10  A.   If you go into the '720 patent, and you'll see there in

11  the '720 patent, Column 4, Lines 42 to 43, the data carrier

12  may also be integrated into other apparatus, such as a mobile

13  communications device.

14       And, again, in the '720 patent, Column 16, Lines 9 to

15  10, in some embodiments, the data carrier may be integral

16  with the terminal.

17  Q.   Now, how would an integrated device look any different

18  than a device that used a removable card?

19  A.   It could look exactly the same as that device from the

20  outside, except you wouldn't have the slot for the smart

21  card.

22  Q.   So where would the memory be in that instance?

23  A.   The memory would be integrated, hard wired into the

24  device itself.

25  Q.   Mr. Racz, from a user perspective, what does it look

```
 1   like as an example of buying content using a device?
 2   A.   Well, we can show you that in the next slide.  You would
 3   take your -- your handheld device.  You would select a
 4   content item.  Let's go to games here.  If you select games,
 5   it would then give you a subselection menu.  We would buy
 6   Zoombots.
 7        If you select buy on there, once you press buy, the
 8   device would send payment data to the data supplier payment
 9   validation system.  On validation of that data --
10   Q.   Well, let me interrupt you, if I can.  I'm sorry for
11   that.  But I want to focus on that question.  So sorry for
12   interrupting you.
13   A.   Sure.
14   Q.   Now, does payment data have to be a credit card number?
15   A.   Absolutely not, sir, no.
16   Q.   What does your patent say about what payment data might
17   be if it's not a credit card number?
18   A.   Payment data can be user authentication data or
19   identification data, linking a user to a device onto a card
20   or a cardholder.
21             MR. BATCHELDER:  I'm sorry to interrupt, but I need
22   to object.  This is a construed term by the -- the Court,
23   payment data.
24             THE COURT:  Do you have a response to that
25   objection?
```

1            MR. CALDWELL:  That sentence was critical to the

2    outcome.  It was the basis for the construction.

3            THE COURT:  Well, to the extent we have previously

4    construed terms, we're going to use those definitions, and

5    we're not going to go behind them and talk about how those

6    constructions came about.  We're simply going to use the

7    constructions as the Court has adopted.

8            MR. CALDWELL:  Yes, Your Honor.

9            THE COURT:  Okay.

10            MR. CALDWELL:  And, Your Honor, if we might -- and

11    I really hate to interrupt, but may we approach on this

12    issue?

13            THE COURT:  Approach the bench.

14            (Bench conference.)

15            THE COURT:  So you're saying he's trying to discuss

16    what led up to the construction?

17            MR. BATCHELDER:  Yeah.  The payment data is a

18    construed term.  For him to talk about what it means -- if we

19    put up the Court's construction, if we're going to talk about

20    what it means.

21            THE COURT:  Let me hear a response.

22            MR. CALDWELL:  I absolutely love the construction.

23    The problem is they tried to win this credit card or

24    something that could be authorized.  They tried to win that

25    in Markman and lost.

1          We even put data in our construction precisely

2    because of that, and now --

3              THE REPORTER:  Judge?

4              THE COURT:  You need to speak up.

5              MR. CALDWELL:  Okay.  And now, even with precisely

6    our construction -- and theirs required extra stuff, like

7    authentication and all sorts of other things, was actually

8    rejected, and now their expert pretends that that's -- this

9    is inconsistent with the patent, and he's arguing the thing

10   he lost at construction.

11             THE COURT:  Well, we're not going to argue claim

12   construction.  The constructions adopted are the

13   constructions we're going to use, and we're not going to go

14   behind them.

15             If he was trying to mischaracterize an earlier

16   argument, you know, we're not going to open the door and go

17   back behind the constructions.  They are what they are.

18   How we got there, what -- who argued what to get there, who

19   now is adopting somebody else's argument and trying to make

20   it their own, none of that is coming in.  We're just going to

21   use the constructions that are adopted, okay?

22             MR. CALDWELL:  Okay.

23             MR. BATCHELDER:  Thank you, Your Honor.

24             THE COURT:  Thank you.

25             (Bench conference concluded.)

```
 1              THE COURT:  All right.  Let's proceed.

 2              MR. CALDWELL:   Thank you, Your Honor.

 3    Q.   (By Mr. Caldwell) Now, what happens after payment data

 4    is validated, Mr. Racz?

 5    A.   Well, on receipt -- once the payment data has been

 6    validated, then the data supplier will then send the content

 7    use rules to the device.

 8    Q.   Are there other steps that would go on behind the scenes

 9    that are not visible on the face to the user?

10    A.   Absolutely, sir, yes.  There are various steps, but it's

11    transparent.  The user doesn't see them.

12    Q.   Now, if the game is downloaded, what happens if the user

13    picks that game to play?

14    A.   Well, when you select play, the device will evaluate the

15    use rules and the status data to check whether your access is

16    permitted; and if it is, it will then give you access to that

17    content.

18    Q.   Mr. Racz, can rules be used to prevent things like

19    piracy; in other words, prevent someone else from copying and

20    using?

21    A.   Yes.  Yes, sir.  Yes, they can.

22    Q.   How would that work?

23    A.   Well, it could work, for instance, on a rental of a

24    movie.

25    Q.   Well, before we go there, I want to ask you about copy
```

1    protection.

2    A.    Sure.

3    Q.    How can rules be used to implement copy protection if

4    someone were to copy the content to a different device?

5    A.    Well, the rules would prevent another device from using

6    that and would stop copying or piracy from taking place.

7    Q.    So if the -- if the game were copied to a different

8    device, what would happen?

9    A.    Well, then the other device would evaluate the use rules

10   and status data, would see that it wasn't authorized, and

11   then access would be denied.

12   Q.    Are there other features besides copy protection that

13   can be implemented using rules?

14   A.    Yes, sir.

15   Q.    Give us an example, please, sir.

16   A.    The one I was giving you earlier would be another

17   example of, say, renting a movie, and you could rent it for a

18   specific amount of time or for a specific period of time once

19   the rental had started.

20   Q.    How would a rental work, Mr. Racz?

21   A.    It would work in very much the same way that you would

22   send your payment data to the data supplier.  And here we're

23   selecting the understudy, a movie, and we could select rent

24   on that.

25   Q.    Okay.  And what happens if we choose to rent a movie,

1    Mr. Racz?

2    A.    Well, then you would have access to that content for a

3    predetermined time, according to the rules set by the

4    provider.

5    Q.    All right.  And if the user attempts to access that

6    content -- for example, the movie -- within the allowed time

7    period, what happens?

8    A.    Well, then, again, the device would evaluate using the

9    use rules and status data, if access was permitted; and if it

10   was, play would commence.

11   Q.    And in this example it shows 24 hours.  So what happens

12   if 25 hours had elapsed?

13   A.    Well, in that case, then, when the device evaluates the

14   use rules and status data, would show that you had gone over

15   the 24-hour limit and rental would have expired, access would

16   be denied.

17   Q.    Thank you, Mr. Racz.

18         Is this purchase and use process simple for users?

19   A.    Yes, it's very simple.

20   Q.    Is that important?

21   A.    Yes, it is, sir.

22   Q.    Why is it important?

23   A.    Well, it's important --

24   Q.    -- to be easy?

25   A.    It's important because it -- it gives honest people a

1    simple and easy way to access content and remain honest.

2    Q.   Are you able to apply -- to take Apple's information,

3    their code, and apply it to your patent claims?

4    A.   I'm not allowed to look at Apple's secret code and

5    their -- and confidential information.  I can only look at

6    their devices and available information.

7    Q.   Will Dr. Jones be going through that in his

8    presentation?

9    A.   I -- I believe he will, sir, yes.

10   Q.   Mr. Racz, did your invention in your mind solve the

11   problem you had recognized about digital content being easier

12   to steal than it was to acquire honestly?

13   A.   Yes, sir.

14   Q.   Did you feel like it would help the digital content

15   industry grow?

16   A.   I -- I felt it would -- it allowed the industry to grow

17   at a very rapid pace, sir, yes.

18   Q.   Why?

19   A.   Well, because record companies would have a system that

20   would able -- allow them to release content in a protected

21   way with assurance that they were going to get paid.

22        The artists, developers, song writers would also embrace

23   it because they would know that they were going to get paid

24   because their content was secure and more people would have

25   access to it.

1    Device manufacturers would embrace it because if there

2   was more content and more people buying it, you would sell

3   more devices, and end users/consumers would benefit because

4   they would have access to far more content than was

5   previously available but without stealing it.

6   Q.    Referring back to the conversation you had with music

7   executives, did those fears of piracy come true?

8   A.    Yes, sir, they did.

9   Q.    Can you give us an example of how?

10  A.    Well, shortly after I came up with the idea, a lot of

11  people started selling -- started distributing music through

12  a peer-to-peer network which appeared in June of '99 called

13  Napster.

14  Q.    Did you take your idea to those patent lawyers that you

15  knew?

16  A.    I did, sir, yes.

17  Q.    Mr. Racz, what are we looking at here as Plaintiffs'

18  Exhibit 198?

19  A.    You're looking here at the GB, the original GB

20  application that I filed in the UK.

21  Q.    Did the Great Britain and -- cooperate with the United

22  States Patent Office?

23  A.    Yeah.  That's a global treaty.  It's called a PCT or

24  patent cooperation treaty which operates through the world of

25  intellectual property office and you have priority from a GB

1    date in other countries and -- just as you would from the USA

2    to Europe.

3    Q.    Mr. Racz, did you form a company to start developing or

4    building the idea?

5    A.    I did, sir -- actually two companies.

6    Q.    What were those two companies?

7    A.    The first was Smartflash Limited, which is to hold the

8    intellectual property, the patents.  And the other company

9    was Internet Plc, which was to develop, manufacture, and

10   commercialize the invention.

11   Q.    In the '99 and early 2000 time frame, approximately how

12   many employees did you have at Internet Plc and Smartflash?

13   A.    Very few.  I would say 10 to 20 employees at that time.

14   Q.    Are you personally a computer programmer?

15   A.    No, I'm not, sir.

16   Q.    Did you hire any additional technical help?

17   A.    Yes, I did, sir.

18   Q.    Who did you hire?

19   A.    One of the first people we hired was a gentleman by the

20   name of Hermen Hulst.  He was previously at Philips

21   Semiconductors, and he had a good understanding and knowledge

22   on encryption and e-commerce and I felt that he would be a

23   valuable addition to the team.

24   Q.    Is he also named as an inventor on the patents?

25   A.    Yes, Mr. Hulst assisted in the development of several

1    new ideas and improvements on the existing ones, and he's

2    named as a co-inventor on the other patents.

3    Q.    Are you and Mr. Hulst still friends?

4    A.    Yes, sir, we are.

5                THE COURT:   Counsel, approach the bench, please.

6                (Bench conference.)

7                THE COURT:   I've been thinking about our last

8    exchange.  I want to clarify something.  We're not going to

9    reargue claim construction.  We're not going to raise the

10   prior arguments.  We're not going to go behind the

11   construction of the terms.

12               But that said, your witnesses are allowed to take

13   the Court's constructions and testify as to how they would

14   apply them.  So I don't want you to be confused that you

15   can't touch on the terms at all, but we're going forward,

16   we're not going backward.  But my instruction that we're not

17   going to reopen claim construction or go behind the

18   construction adopted, does not preclude you from applying

19   those through your witnesses.  Is that clear?

20               MR. BATCHELDER:  Appreciate that, Your Honor.

21   Understood.

22               MR. CALDWELL:   And for -- for the sake of clarity

23   since we're here, I think that's exactly what we're trying to

24   do because the Court's construction of that term is data that

25   can be used for payment or to make a payment.  And the issue

1    is Apple's already argued in opening that it has to be the

2    actual credit card number that was rejected in Markman.  And

3    what I was actually showing is how you use it is, is because

4    you can set up something with an ID that's actually linked to

5    the card back at the server.

6           THE COURT:   Well, I don't expect either of you to

7    present the same arguments you present -- presented in your

8    claim construction, but I don't expect both witnesses for

9    both sides to take those construed terms and probably tell

10   two different stories about how they're implemented and

11   applied.

12          MR. BATCHELDER:   To be clear, though, what -- what

13   he can't do is go back to the specification and say, what --

14   what light it sheds on the meaning of payment data.  That's

15   already been construed.

16          THE COURT:   We're going to talk about application.

17   We're not going to reopen meaning.

18          MR. BATCHELDER:   Exactly.  Thank you.

19          MR. CALDWELL:   Certainly.  I just want to make sure

20   that what we can do is -- and I think this is what you said

21   is okay.  I want to make sure what we can do is say:  What is

22   one example in which it may be used to make a payment?

23          THE COURT:   The witnesses can testify as to how

24   they would apply the constructions adopted, but we're not

25   going to reopen the arguments as to how those constructions

```
 1    were arrived at.

 2              MR. CALDWELL:  Right.

 3              MR. BATCHELDER:  And I'm just telling you --

 4              THE COURT:  So we're -- we're prospective.  We're

 5    not going to be retrospective.

 6              MR. CALDWELL:  Okay.

 7              THE COURT:  I just want to make sure y'all are all

 8    clear on that because after your last trip to the bench, it

 9    did not seem to me we were completely clear.  So I looked for

10    an opportunity to bring you back up here and give you some

11    more guidance.

12              MR. BATCHELDER:  Thank you, sir.

13              (Bench conference concluded.)

14              THE COURT:  Let's continue.

15              MR. CALDWELL:  Thank you, Your Honor.

16    Q.   (By Mr. Caldwell)  Let's pick up right where we were.

17         Are you and Mr. Hulst still friends?

18    A.   Yes, we are, sir.  And he's been really supportive over

19    the last few years.

20    Q.   Mr. Racz, will your co-inventor, Mr. Hulst, be

21    testifying at this trial?

22    A.   Unfortunately not, sir, no.

23    Q.   Why not?

24    A.   He works for Sony in Amsterdam.  He's very senior high

25    up in the games division, and he won't able to be here, sir.
```

1   Q.   Mr. Racz, do you believe that you have to actually build

2   your invention in order to get a patent on it?

3   A.   No, sir.

4   Q.   Did you or the others at Internet Plc have experience

5   with physically building the kind of devices that you've

6   talked about?

7   A.   No, I had 10 years manufacturing experience.  We'd

8   actually built up a very large plant.  We'd expanded into

9   bathrooms and other areas, but I didn't have any

10  manufacturing experience in consumer electronics.  I realized

11  that we'd need a -- an EDE, an electronic design engineering

12  partner, and so we -- we went out and looked for one.

13  Q.   Were you able to find any partners?

14  A.   I would say, yes, we found two -- two main partners.

15  One was an electronic design engineering firm based here in

16  the United States, which is Cadence or Tality, as they were

17  later renamed.  And the other one was a French company called

18  Gemplus.  They were in the hardware/software side.

19  Q.   Did you get the sense that your project was important to

20  Tality and Gemplus?

21  A.   Very much so, yes, sir.

22  Q.   Who were some of the folks you worked with at Gemplus?

23  A.   We were working with all the senior management, a lot of

24  directors, all the way up to the chairman, founder, and major

25  shareholder of the company.

1    Q.    Did anyone at Gemplus communicate to you that they

2    believed your idea was important to them?

3    A.    Frequently, sir, yes.

4    Q.    Mr. Racz, I put up Plaintiffs' Exhibit 194.   What is

5    this document?

6    A.    This is a letter from Stephen Landau who was put in

7    charge of evaluating initially with us and then working with

8    us on the project.   And he was telling me about meetings and

9    conversations he'd been having with Mark Lassus, who was the

10   chairman and founder of Gemplus.

11   Q.    And what --

12   A.    And --

13   Q.    I'm sorry.   I was just going to -- what was he

14   explaining about?

15   A.    He -- he was explaining that he wanted to join the board

16   and also wanted to invest in Smartflash and Internet Plc.

17   Q.    The chairman of Gemplus did?

18   A.    Yes, sir.

19   Q.    What about these other folks listed in the middle

20   paragraph?

21   A.    Those were other founders of Gemplus.   One of them, I

22   think, had actually left Gemplus at that time, Gilles

23   Lisimaque.   Another one was Jean-Pierre Gloton, who was

24   another founder.   They were interested in joining the board

25   as technical advisors and also investing funds in the

1   business.

2   Q.   Now, the author of the letter, is that the one -- is

3   that Steven Landau?

4   A.   Yes, sir.   Yes.

5   Q.   Was Mr. Landau interested in your ideas?

6   A.   He actually came and joined our company later, sir, and

7   came to work for Internet Plc.   He left Gemplus.

8   Q.   Did you actually go out then and design players?

9   A.   Yes, we did, sir.

10  Q.   Mr. Racz, I put up some pages from Plaintiffs' Exhibit

11  141.02.   What are we looking at?

12  A.   This is one of the reader player designs that we

13  developed with Tality after they were renamed from Cadence.

14  This is one of three designs named Sidney, and this

15  particular one was using a smart card as the data carrier.

16  Q.   And, Mr. Racz, what does this -- this drawing represent?

17  A.   This is a more advanced version.   It was Pablo, and this

18  had a touch screen interface.

19  Q.   Did you ever make models of some of your players beyond

20  just conceptual drawings?

21  A.   Yes.   Yes, we did so.   Yes, we -- we developed phone

22  models, which designed to get the form and function, the feel

23  of the product, an indication of what it would look like in

24  real life.   That's a precursor to prototypes.

25  Q.   Mr. Racz, did you ever show these models or those

1    presentations to Gemplus?

2    A.   Yes, we shared them with Gemplus.

3    Q.   Who was -- you had -- did you tell us there were two

4    partners that you had?

5    A.   Yes, yes.

6    Q.   Partner companies?  Which was the partner company that

7    helped you design those drawings?

8    A.   That was Cadence who later became known as Tality.

9    Q.   And did you and Cadence or Tality take the drawings to

10   Gemplus?

11   A.   Yes, we did, sir.

12   Q.   The devices you showed us, did they use swappable memory

13   cards?

14   A.   Yes, they did.

15   Q.   Why did your company start designing things it would use

16   as swappable memory card?

17   A.   Because that was the fastest and easiest route to

18   market, sir.

19   Q.   Is it costly to engage in a design process like what

20   you've described?

21   A.   Extremely costly, yes, sir.

22   Q.   Mr. Racz, how did you have the money to begin developing

23   those products?

24   A.   I made quite a bit of money from Tri-Flow from my

25   previous venture.  I'd invested myself, and I also got a lot

1    of other investors, including people we mentioned earlier

2    to -- to come on board, as well.

3    Q.    Mr. Racz, how much of your own personal money would you

4    estimate that you invested?

5    A.    Nearly 3 million.

6    Q.    Were there other folks that wanted to invest?

7    A.    Yes, sir.

8    Q.    Approximately how many people invested?

9    A.    Well, aside from the founders of Gemplus, I would say

10   around 20 to 25 individuals and companies.

11   Q.    Did the companies prepare any formal paperwork to

12   present the investment opportunity to potential investors?

13   A.    Yes, we did, sir.

14   Q.    Mr. Racz, I've put up Plaintiffs' Exhibit 108.  What is

15   this document?

16   A.    This is a copy of Chalfont Holdings offering memorandum

17   which was prepared in association with Werbel-Roth, a

18   financial securities company in New York.

19   Q.    Who is Chalfont Holdings?

20   A.    Chalfont was the company that owned Internet Plc and

21   Smartflash, so the reason it was done in that way is that

22   funds would be invested into Chalfont and then be distributed

23   to the two companies in accordance with the budgetary

24   requirements.

25   Q.    Did you envision any alternative ways of bringing your

1    invention to the market other than building the devices

2    yourself?

3    A.   Absolutely we did, sir, yes.

4    Q.   And what were those?

5    A.   Licensing the technology, sir.

6    Q.   What is a license, Mr. Racz?

7    A.   A license is where you give a manufacturer or a user the

8    ability to make your product under license for a royalty

9    payment.

10   Q.   And still in Plaintiffs' Exhibit 108, what do we see on

11   Page 22 of Plaintiffs' Exhibit 108?

12   A.   That's an extract from the offering memorandum, which is

13   outlining our strategy for licensing the technology that we

14   were developing.

15   Q.   What did your companies determine would be a fair rate

16   for licensing your invention for a player device?

17   A.   We determined a fair rate would be $4, sir.

18   Q.   What kind of devices might be Smartflash-enabled

19   players?

20   A.   MP3 players, mobile phones, PDAs, other such devices.

21   Q.   Was Apple in the cell phone or mobile phone business at

22   that time?

23   A.   No.  That was six years before they were, sir.

24   Q.   And how would this licensing work for a company like

25   Apple?

1  A.   Well, they would take a license, and they would pay a

2  royalty for each device that they manufactured and sold using

3  that technology.

4  Q.   Mr. Racz, how were things going with Gemplus around this

5  time in mid-2001?

6  A.   Well, we -- we actually ran into a -- a bit of an issue.

7  They were going very well, and then we stumbled across a bit

8  of a problem.

9  Q.   Remind us what this presentation was.  It's 141.002.

10  A.   That's a presentation that was developed by Tality for

11  Internet Plc or in conjunction with Internet Plc for the

12  reader player devices that they designed.

13  Q.   What was the problem you mentioned that you ran into

14  with Gemplus?

15  A.   I was at a meeting in Steven Landau's office.  I noticed

16  on his desk that he had some drawings that looked very

17  familiar and similar to our own.  And when I looked closer, I

18  picked up the presentation.  I was quite shocked.

19  Q.   So what presentation are we looking at now, Mr. Racz, as

20  Plaintiffs' Exhibit 127?

21  A.   This is a Gemplus presentation.

22  Q.   Were they referring to a device as a Smartflash device?

23  A.   No, they weren't, sir.

24  Q.   What were they doing?

25  A.   What they'd actually done is they'd taken the drawings

1    and they put them into their own presentation.  They deleted

2    the Internet Plc and Tality trademarks and company names and

3    taken off any references to our own trademarks and replaced

4    them with this -- I suppose a similar -- similar product and

5    their own logos and company name.

6    Q.    Did it seem to you that Gemplus was trying to claim your

7    idea as theirs?

8    A.    That's exactly what it looked like, sir, yes.

9    Q.    Mr. Racz, did you confront Gemplus?

10   A.    I did, sir, yes.

11   Q.    Tell us about that.

12   A.    I -- I confronted Steven Landau about it.  I asked him

13   about it.  He insisted that it was -- it wasn't him.  I

14   wanted to believe him.  I didn't think Mr. Landau would take

15   my ideas as his own.  He said that he was instructed to

16   prepare the presentation by Gilles Michel.

17   Q.    Were you willing to forgive Gemplus at that time?

18   A.    I did so, yes.

19   Q.    Mr. Racz -- well, also from the Gemplus presentation at

20   Plaintiffs' Exhibit 127, what was Gemplus saying also in that

21   presentation, Mr. Racz?

22   A.    They'd taken some words that I used for their

23   presentation verbatim and put it into there as their own

24   words.  Instead of Smartflash, they put SUMO as the preferred

25   carrier for music and entertainment and thereafter as the

1    preferred carrier solution for all digital content.

2    Q.    Did Gemplus ever come to you and reaffirm their

3    commitment to work with your company?

4    A.    Yes, sir, they did.

5    Q.    What are we seeing at Plaintiffs' Exhibit 162, Mr. Racz?

6    A.    That's the reaffirmation -- the confirmation from

7    Gemplus, and there they've used the correct words.  They've

8    taken the opportunity to affirm that commitment.  And here

9    they use the words to help draft Smartflash as the preferred

10   carrier for digital media.

11   Q.    Thank you, sir.

12         Alongside development, did Smartflash look for ways to

13   market its products?

14   A.    Yes, we did, sir.  Yes.

15   Q.    Okay.  Tell us who you partnered with to market.

16   A.    Well, the first -- first branded partner we were

17   actually associated with was Britney Spears.

18   Q.    Can you show us that, sir, the reader that you have?

19   A.    Yes, sir.  Yes.  This is -- this is the reader player

20   device and product that we developed in association with

21   Britney Spears, yes.

22   Q.    Thank you, Mr. Racz.

23         How are y'all able to get an audience with Britney

24   Spears in order to cut a deal?

25   A.    One of my friends knew her manager quite well, and he

1    got me through the door and got the wheels in motion.

2    Q.    What was Ms. Spears' status in the music industry at

3    that time?

4    A.    She was huge.   She was -- at that time, we're going back

5    to 2001.   She had just released her second album.   She was, I

6    believe, the highest selling or the biggest selling artist in

7    the world at that time, certainly one of them.   She was

8    enormous, yeah.

9    Q.    Besides putting her name on a product, did she do

10   anything else to help you market?

11   A.    Yes, she did, sir.   Yes.

12   Q.    What was that?

13   A.    Well, we were linked into her world tour.   We were doing

14   the European promotional leg of her world tour.   When she was

15   in London, I think it was around July of that year; and she

16   did a commercial for us in a London taxi promoting

17   Smartflash, and that was going to be shown at all the

18   concerts she did.

19   Q.    Do you still have that commercial today?

20   A.    Yes, we can play it now, sir.

21          MR. CALDWELL:   Your Honor, may I play that

22   commercial?   We'll have audio, just so you know.

23          THE COURT:   Proceed.

24          (Videoclip played.)

25   Q.    (By Mr. Caldwell)   When you saw that, did you think

1   things were going pretty well?

2   A.   Yes, sir.

3   Q.   Were you getting recognition in the press?

4   A.   We were, yes.  We were getting a lot of attention from

5   the press online, even doing interviews with the Wall Street

6   Journal.

7   Q.   Mr. Racz, what happened next?

8   A.   Well, unfortunately, the tragic events of 9-11 took

9   place.

10  Q.   Making no light whatsoever of those tragic events, it

11  doesn't equal that, but how did that connect to your

12  business?

13  A.   Well, we were linked into Britney Spears' European tour

14  as part of her world tour.  And quite understandably, she was

15  worried about flying at the time, and she took the decision

16  to not fly and to cancel the European tour.

17  Q.   Did she keep other concert dates in another part of the

18  world?

19  A.   Yes, she did.  She still kept her North American tour;

20  and that was good for her other partners, so brands like

21  Pepsi and Kellogg sketches that we were working with, they

22  were still able to benefit and work with her.  But we were

23  pretty much restricted in the European side.  And it really

24  hurt our -- our small company at the time.

25  Q.   After the European tour was canceled, did you still try

1  to do some work with Ms. Spears?

2  A.   We did, sir, yes.  We -- we -- we continued working with

3  her.

4  Q.   Was that part successful?

5  A.   Well, I'd say it was -- it was successful in terms of it

6  was a fantastic association to have, and it opened a lot of

7  other doors and validated a lot of what we were doing.  So in

8  that sense, yes, it was; but we didn't have the content, so

9  we didn't have the content from the tours and we didn't have

10  the sale from the tours, so it wasn't the success that we

11  envisioned at the time.

12  Q.   But did you still have your partnership with Gemplus to

13  continue developing the hardware you envisioned?

14  A.   Well, un -- unfortunately, we -- we hit a roadblock at

15  that point, sir.

16  Q.   Explain that to us, Mr. Racz.

17  A.   Well, shortly after Britney had canceled her tour, I was

18  in Paris -- would have been October 23rd to the 25th.  I was

19  visiting a trade event called CARTES 2001.  Gemplus had a

20  very large presence there and very large booth in the center

21  of the hall.  I walked out of the booth and was really

22  shocked to see that they were back to promoting my product as

23  this SUMO device again.

24     And I -- well, I went up and I confronted the man who

25  was doing the demonstrations and showing the press and the

1    people that were there.  I introduced myself.  He knew who I

2    was immediately.  He apologized profusely, said it was all a

3    misunderstanding, and it would all get resolved.

4    Q.   Did you break things off with Gemplus after the second

5    time?

6              THE COURT:  Mr. Caldwell, you're going to need to

7    speak up so everybody can hear you.

8              MR. CALDWELL:  Thank you.  Thank you, Your Honor.

9              THE COURT:   All right.  Let's proceed.

10   Q.   (By Mr. Caldwell)  Did you break things off with Gemplus

11   at that point, Mr. Racz?

12   A.   No, I -- I couldn't really.

13   Q.   Why not?

14   A.   Well, as much as I felt betrayed, I wasn't in a position

15   to.  They -- you know, we'd spent a very large amount of our

16   shareholders' funds at that point.  We were developing

17   additional products.  They were our technology partner, and

18   we were -- thought we were close to the -- you know, the

19   senior people there.  We -- couple of the directors were

20   working closely with us.  I thought I'd be able to turn

21   things around.

22   Q.   Did you still try to work on some additional products

23   with Gemplus?

24   A.   Yes, we do.  We continued developing them.  We were very

25   close to launch, and these are two of the products here.

1    Q.    Thank you.

2    A.    The first one here, this is a product that we developed

3    with Disney -- the first product we developed with Disney,

4    which was Treasure Planet reader and card.  And the other one

5    here, this was in association with Paramount Studios with the

6    launch of their movie Star Trek Nemesis.

7    Q.    The products that you've shown us today, do those

8    products practice the specific patent claim that are at issue

9    in this case?

10   A.    No, they don't, sir.  No.

11   Q.    Did you have a plan as to how you were going to build up

12   to other products?

13   A.    Yes, sir, we did.

14   Q.    Explain that to us.

15   A.    Well, we had a phase launch plan in several stages.  The

16   first one we termed Smartflash promo.  That was the

17   production of promotional cards that were given away or what

18   would be given away in serial packets, multi-packs of Pepsi

19   in Target stores and the music CDs.  The second one we termed

20   Smartflash Light, Smartflash Fan, and that product had a bit

21   more functionality to it.

22        Similar to the products I've shown you, you could also

23   have some digital rights management and payment functionality

24   involved buying content with the memberships and so on.

25        And the third one was Smartflash Media, and this was far

```
 1    more complete offering.  This was including digital rights
 2    management, so you would have rules, storage of content, use
 3    data, and all the functionality we spoke about earlier, on
 4    one integrated device.
 5    Q.   Mr. Racz, did you describe those phases in a business
 6    plan?
 7    A.   We did so, yes.
 8    Q.   What's on the screen is marked Plaintiffs' Exhibit 114.
 9    A.   This is -- this is from our 606 business plan, final
10    version, Smartflash Media, unique combination of
11    authentication, storage, digital rights management, customer
12    relationship management, and loyalty applications, payment
13    and Internet/channel access.  Smartflash Media permits the
14    distribution of digital products over the Internet on a
15    worldwide scale.
16    Q.   You said 606.  Are you meaning 2006?
17    A.   No, Version 606.
18    Q.   Approximately when is this dated?
19    A.   This would have been in 2002.
20    Q.   Did you ever get a chance to complete all those phases
21    of production?
22    A.   No, we -- no, we didn't, sir.
23    Q.   What happened to your relationship with Gemplus?
24    A.   Well, I would -- they pulled the -- pulled the plug on
25    us, sir.
```

```
1   Q.   How did you find out that Gemplus was pulling the plug
2   on your project?
3   A.   I found out from Mark Lassus, from the chairman.
4   Q.   Explain that to us.
5   A.   Mark Lassus called me one evening from Miami.  He had
6   been at a board meeting, and there was a lot of problem he
7   was having internally.  There were some new shareholders
8   who -- involved in the company wanted to move the firm and
9   some of the management and directors that Gemplus had sided
10  with them against him.  He called me after the board meeting,
11  and he said that he'd been fired from the board.  In addition
12  to that, that they'd called in a loan in connection with his
13  shares for over a hundred million Euros, similar to, I guess,
14  the dollar, sir.  That he was effectively out.
15  Q.   What did you say to him?
16  A.   I -- I told him I was shocked.  I was really sorry to
17  hear that.  I asked if there was anything I could do to help,
18  and -- and then he said be careful, you watch your own back
19  because they're going to come for you.  And I -- I asked him
20  what he meant, and I'll never forget what he said.  He
21  switched it to his native French and he said (speaking
22  French) and then translated in English, they are very
23  jealous, they want your technology, but they want you out of
24  the way.  And the implication was that they didn't want me
25  around because of my association with him.
```

```
 1   Q.   Did they cut you off?
 2              MR. BATCHELDER:   Your Honor, I object to the
 3   hearsay.
 4              THE COURT:  Restate your question, counsel.
 5              MR. CALDWELL:  I'm happy to move on to --
 6              THE COURT:  Let's move on then.
 7   Q.   (By Mr. Caldwell)  Mr. Racz, did Gemplus cut off the
 8   relationship?
 9   A.   Yes.  I got a call a couple hours afterwards from Gilles
10   Michel to say that they were unable to continue with the
11   strategic development agreement with the investment program
12   and they were no longer able to work with us, but he wouldn't
13   give a reason why.
14   Q.   Did you have any issued patents at that time?
15   A.   No, sir.
16   Q.   Approximately when did you get that call from Gemplus?
17   A.   This would have been around October of 2002.
18   Q.   How did it affect your business to not yet have the
19   patents?
20   A.   It was a disaster to us.
21   Q.   Mr. Racz, how did you feel when all that happened?
22   A.   I'm pretty -- pretty shocked, devastated.
23   Q.   What happened with your company after Gemplus broke off
24   the deal?
25   A.   Well, we -- we had to scale back and reduce our plans.
```

We couldn't continue with the launch plans that we had on the new devices and products.  We -- we couldn't afford to buy stock for Target, Best Buy, stores in the states that we were partnering with.

And we were treading water desperately trying to find a new technology partner and raise money to keep going.  I -- I sold my remaining investments and shares that I had and put any funds I had just to pay salaries and keep it going.

Q.   Did you have to look into bankruptcy as a company?

A.   Yes, sir, we did.

Q.   Were there any of your friends that could pitch in to help the company?

A.   Yes, sir, there were, yeah.  One in particular was one of our shareholders in the United States, Mike Flint, and I remember he -- he called me in the office one evening.  It was around midnight, 1:00 a.m.

I was working late.  I had no reason to go home at that point.  We had some urgent bills to pay that week, or we would have to shut the business, and he told me to go home, get some sleep, said he was going to -- he was going to wire the money in the morning.  He said we won't let this fail for want of --

Q.   Did he get you some more money?

A.   He did, sir.  He wired the funds in the morning, and we were able to keep going a bit longer.

1    Q.    Ultimately, was it enough to keep the company alive?

2    A.    No.   No, sir.   No.

3    Q.    Mr. Racz, did you ever get a chance to build your

4    Smartflash-enabled integrated player?

5    A.    No.   No, I didn't, sir.

6    Q.    Does that mean you didn't invent it?

7    A.    No, sir.

8    Q.    Did shutting down the company affect your personal life?

9    A.    Yes, sir.

10   Q.    How?

11   A.    I -- I lost everything.   I had nothing left.   Pretty --

12   pretty devastating.

13   Q.    What was the lowest point for you, Mr. Racz?

14   A.    I -- I would say I hit rock bottom in mid- to late 2003,

15   April 2004.   And I was pretty depressed.   If I'm completely

16   open about it, I was drinking heavily.

17   Q.    Did it impact your family and --

18   A.    Yes.

19   Q.    -- the expense of your family?

20   A.    Yes, sir.

21   Q.    How?

22   A.    We -- we had the school calling us, telling us that if

23   we didn't pay the tuition fees, we'd have to come collect the

24   children.   And my wife was pretty devastated as well.

25   Q.    Mr. Racz, did you personally go bankrupt?

1  A.    No, sir.  No.  No, I didn't.

2  Q.    Over time were you able to get your head back above

3  water?

4  A.    Slowly.  Never fully recovered, but, yes, slowly, we

5  were.  And my -- a good friend of mine, Marcus Watson, he

6  loaned me the money to pay all of the school fees, and he

7  also introduced me to some people who were starting up --

8  well, they had a spring in Iceland.  They wanted to start up

9  a water company.  Because of my experience in water and

10  manufacturing, I was able to help them build the company.

11  Q.    What was the name of that company, sir?

12  A.    It was Icelandic Water Holdings, and the brand was

13  Icelandic Glacial.

14  Q.    Was it a successful business?

15  A.    It was a huge success, yes.  Still is, sir.  We linked

16  up with Anheuser-Busch here in America.  We had a

17  20-million-dollar equity investment to build a new plant in

18  Iceland, and we were working on distribution through the

19  United States with them using their network.

20  Q.    Mr. Racz, looking at the first patent, the '720, on its

21  face, it says it issued February 26th, 2008.  Did you get

22  some notification on that day?

23  A.    No, I didn't, sir.  No.  There was a bit of a

24  miscommunication between Marks & Clerk, who are our UK patent

25  attorneys, and the firm in the U.S. that was handling the

1   prosecution here.

2       And so I didn't find out about it straight away.  I

3   found out a little time after.  Then once Mr. Luckhurst, who

4   was at Marks & Clerk realized, he gave me a call and told me.

5   Q.   How did you feel when you received the call and heard

6   your patent had finally been granted?

7   A.   Ecstatic; over the moon; really, really happy.

8   Q.   Did you make a career change once your patent had

9   issued?

10  A.   Yes, I did, sir.  I was saving up the money so I would

11  be able to do it, and fortunately, my wife had some

12  consulting work she was doing.  She was able to support for

13  me to be able to transition away from what I was working on

14  and focus on my invention once again.

15  Q.   How were you able to keep your patent applications alive

16  from when the company shut down to when the patent issued?

17  A.   Well, I think, fortunately, I built up a good

18  relationship with partners at Marks & Clerk, and they were

19  really supportive.  I think they also really believed in the

20  applications.

21      But they would, from time to time, not invoice me on

22  time, and other times they would, you know, delay chase --

23  delay chasing up on them.  Gave me some -- some fresh air and

24  space to breathe.  And we -- you know, they -- they helped.

25      And we had to drop a lot of applications, though.  I

1    couldn't keep my European and Canadian applications.   I

2    couldn't afford to do that.

3    Q.   How did you decide which patent applications to keep

4    alive?

5    A.   I determined that the -- the jury system and the patent

6    system here in the United States is extremely fair.   I

7    decided that if I was going to keep one alive, it would be

8    the American one.

9    Q.   After your patent issued, or even before, did you ever

10   have to take a look at maybe selling an interest or selling

11   off some sort of interest in your patent?

12   A.   Yes.  Yes, I did, sir.  Yes.

13   Q.   Why is that?

14   A.   Because I had no -- no money for start, and I needed

15   to -- I wanted to try and develop the portfolio.  I knew that

16   I could get new claims issued on the handheld multimedia

17   claims.  I didn't have the funds to continue with the work on

18   it, so I needed to get a partner in for that.

19   Q.   Did you ever come close to reaching a deal with

20   somebody?

21   A.   I did, sir, yes.

22   Q.   And what was that deal?

23   A.   November 2009 with a company called Saronite.

24   Q.   And what -- roughly, what would the terms of the deal

25   have been?

```
 1   A.   It was -- they would -- they were going to give me
 2   $350,000 as an upfront payment and in return for buying the
 3   patents, and I would be left with a 20 percent interest in
 4   any licensing revenues that they received thereafter.
 5   Q.   Was the 20 percent interest important to you?
 6   A.   Essentially, yes, or -- I wouldn't have considered a
 7   deal without it.
 8   Q.   Why?
 9   A.   Because I wanted to maintain an interest involvement and
10   not a financial interest moving toward.
11   Q.   Did that deal ever get fully consummated?
12   A.   Well, almost, but they tried to renegotiate it at a
13   final change.  We both agreed to walk away.
14   Q.   Separate from that kind of deal, were you willing to
15   still do licenses to folks that wanted to use your
16   technology?
17   A.   Absolutely, sir.  I've always been willing to license
18   the technology to a company that had the means to
19   commercialize it and sell it, market it.
20   Q.   Did you want to be fairly compensated if somebody
21   licensed?
22   A.   Yes, sir.
23   Q.   Do you feel that way now?
24   A.   Yes, sir.
25   Q.   Mr. Racz, what do you think would be fair compensation
```

1   given the investment that you made?

2   A.    I believe fair compensation would be in the form of a

3   royalty, the same as I envisioned back in 2001.

4   Q.    And why is that?

5   A.    Because that's the fair and correct way of doing it, and

6   I'm entitled to a royalty for the use of my technology.

7   Q.    Where did you learn about royalties, Mr. Racz?

8   A.    Self-taught, I guess.  I learned about it myself just

9   from studying and learning about it.  But, you know, I also

10  just have a belief -- a firm belief in it.  An ROI, or return

11  on investment, in a situation like this should be in the form

12  of royalty.

13       Same as from working in the music industry.  If you're

14  an artist, a songwriter, a publisher, every time a record is

15  sold, you take a royalty for the sale of that record.

16  Q.    And -- and in your mind, what would be the fair way if

17  Apple wanted to license?

18  A.    For them to take a license to the technology in return

19  for a royalty payment.

20  Q.    Do you still believe in the 4-dollar-per-device rate you

21  mentioned earlier?

22  A.    Absolutely.  I do, sir.

23  Q.    If Apple offered you a few hundred thousand or up to

24  4-and-a-half million, as we heard about in opening, in your

25  mind, would that reflect fair value?

1   A.   No, sir.  No.

2   Q.   Mr. Racz, were you ever introduced to somebody that you

3   felt like you wanted to partner with?

4   A.   Yes, I was, sir.  Yes.

5   Q.   Who was that?

6   A.   Mr. Monty Koppel.

7   Q.   When did you meet with Mr. Koppel?

8   A.   Late January of 2010.  I was introduced to him by a very

9   good friend of mine.

10  Q.   And who is Mr. Koppel?

11  A.   Mr. Koppel is a -- he's an 86-year-old gentleman.  He's

12  been extremely successful in business.  And he's -- every now

13  and then, he takes up a cause he believes in.  And if he can

14  help people along the way, he does.  He's a real gem, and

15  he's become a good friend.

16  Q.   Did he introduce you to a company that would be able to

17  help?

18  A.   Yes.  He's like my angel investor.  He didn't personally

19  invest.  He introduced me to the people that run his family

20  investment firm, Latitude, and they -- he recommended that

21  they take a look at the invention.  They did, and they

22  invested accordingly.

23  Q.   Mr. Racz, before there was ever a lawsuit, did Latitude

24  put in money into the patents?

25  A.   Yes, they did, sir, yes, millions of dollars.

1    Q.    Tell us about that.

2    A.    Well, first of all, they -- before we'd even signed a

3    deal, they advanced me some funds to enable me to pay off

4    some urgent bills, some overdue bills, pay off some bills to

5    Marks & Clerk and also some school fees that had built up,

6    and then they -- they invested additional money in developing

7    the patent portfolio to where it is now.

8    Q.    Did you set up a company to continue the patent

9    application work?

10   A.    We did so, yes.  We set up a new company, which was

11   Smartflash Technologies Limited.

12   Q.    Mr. Racz, after the '720 patent issued in 2008, did you

13   still think you might get more patents issued from the Patent

14   and Trademark Office?

15   A.    Yes, I did, sir.

16   Q.    On what?

17   A.    On the handheld multimedia claims in particular.

18   Q.    Were you correct?

19   A.    I was, sir, yes.

20   Q.    Can you show the patents to the jury, sir?

21   A.    This is the -- that's the '221 patent that issued in

22   February 2012 and the '772 patent that issued on Christmas

23   Day 2012.

24   Q.    When they issued, did you believe Apple was infringing?

25   A.    Yes, I did, sir.

1    Q.   After they issued, did you set up an additional company?

2    A.   Yes, we did, sir.

3    Q.   What company was that?

4    A.   Smartflash LLC.

5    Q.   Why did you set up Smartflash LLC?

6    A.   Well, we -- we wanted to have a presence here in the

7    United States.  If you want to enforce your patent rights in

8    the United States, you have to go to court here in the U.S.,

9    and we set up that company accordingly.

10   Q.   Mr. Racz, do you have any formal legal training?

11   A.   None, sir.

12   Q.   Did you study how to enforce your patent rights?

13   A.   Yes, I did, sir.

14   Q.   What did you learn?

15   A.   I learned that the Judges here in the Eastern District

16   of Texas and the Courts are very experienced with patent

17   cases; and I also learned, and based on my own experience,

18   that the juries here are very fair.

19   Q.   Does Smartflash LLC currently make a product, Mr. Racz?

20   A.   No, sir, we don't.

21   Q.   Why not?

22   A.   Well, it wouldn't be possible for us to enter the

23   market, sir; that infringement is such a roadblock, we

24   wouldn't able to do that.

25   Q.   In case there's any doubt, do you receive money if the

1    jury reaches a verdict in your favor?

2    A.   Yes.  My family still owns approximately 40 percent of

3    the shares in the company, and my family will benefit from

4    it, and I would accordingly, yes.

5    Q.   What about the other people that helped you along the

6    way, Mr. Racz?

7    A.   I've arranged to pay all of them back and some.

8    Q.   Do you think $4-and-a-half million is reasonable damages

9    for infringement of your patents, Mr. Racz?

10   A.   No, sir, I don't think that's at all reasonable.  In

11   fact, I think it's insulting.

12   Q.   Why?

13   A.   Because, like I said, a reasonable royalty is a fair way

14   of paying it.  $4-and-a-half million wouldn't even be enough

15   to get Internet Plc back on its feet.  It's probably not even

16   as much as Latitude Investments have invested in developing

17   the patent portfolio.  It's -- it's a very small number next

18   to everything that's gone into this project.

19   Q.   Mr. Racz, how does it make you feel when you hear there

20   are hundreds of millions of iPhones, iPads, and iPod Touch

21   devices you believe are using your invention?

22   A.   On one hand, it makes me immensely proud to see how

23   successful my invention has been in the market.  And on the

24   other hand, I feel that it's right and fair and in accordance

25   with the law that I should receive a reasonable royalty.

1    Certainly correct.

2              MR. CALDWELL:  We'll pass the witness, Your Honor.

3              THE COURT:  Cross-examination by the Defendant.

4              MR. BATCHELDER:  If I could have a moment to set

5    up, Your Honor?

6              THE COURT:  Take a moment.

7              MR. BATCHELDER:  Your Honor, could my associate

8    have leave to pass out the binders?

9              THE COURT:  Yes.

10             MR. BATCHELDER:  And may I set up a board?

11             THE COURT:  Yes.

12             And, Counsel, you're welcome to use that easel with

13   that board; but given our tight quarters in here, when you

14   pass the witness, take it down, please.

15             MR. BATCHELDER:  I will, sir.  Thank you.

16             THE COURT:  All right.  You may proceed when you're

17   ready.

18                     CROSS-EXAMINATION

19   BY MR. BATCHELDER:

20   Q.   Mr. Racz, good afternoon.

21   A.   Good afternoon.

22   Q.   In your direct examination, you testified about a

23   company called Internet Plc, correct?

24   A.   Yes, sir.

25   Q.   Okay.  And that's a company you started, right?

1    A.    Yes, sir.

2    Q.    You were the chairman and principal founder?

3    A.    I was the chairman of Chalfont Holdings Limited which

4    was the parent company, and at times, I believe I was a

5    director, a chairman of Internet Plc.

6    Q.    And I believe you said in your direct examination that

7    you founded Internet Plc to develop, manufacture, and

8    commercialize the invention?

9    A.    That's correct.

10   Q.    Did I get that right?

11         Yes?

12   A.    Yes.

13   Q.    All right.  And when you started Internet Plc, I think

14   you mentioned you had done some work in the field of water

15   faucets, correct?

16   A.    Water filtration and faucets, yes, sir.

17   Q.    And just to be clear, the iPhone device, the iPad, the

18   accused Apple products, you're not saying that your work in

19   the water faucet field had anything to do with Apple's

20   technology, are you, sir?

21   A.    No, sir.

22   Q.    Okay.  And also you said, I think, you explored some --

23   some -- something in the horticulture field?  Did I

24   understand that correct?

25   A.    I worked in commercial horticulture, sir, yes.

```
 1    Q.    Okay.  And that has to do with the growing of plants?

 2    A.    Propagation and growing of plants, yes.  Yes, sir.

 3    Q.    And that work doesn't have anything to do with Apple's

 4    technology, correct?

 5    A.    Nothing whatsoever, sir.

 6    Q.    Okay.  All right.  And when you started Internet Plc,

 7    you were not an engineer in electronics or electronic

 8    engineering, correct?

 9    A.    No, sir.

10    Q.    And you were not an engineer in field of computer

11    science?

12    A.    No, sir.

13    Q.    And you had no engineering degree at all, right?

14    A.    No, sir.

15    Q.    At that time, could you write computer code?

16    A.    No, sir.

17    Q.    Can you now?

18    A.    No, sir.

19    Q.    Could you have programmed a smart card to do anything?

20    A.    No.

21    Q.    You were not a person of even ordinary skill in the

22    field of the claimed invention for your patents?

23    A.    Not as has been explained to me, no, sir.

24    Q.    You started Internet Plc knowing that you had not

25    invented mobile devices, correct?
```

1    A.    Yes, sir.

2    Q.    And -- and this is a mobile phone, right?

3    A.    Yes, sir.

4    Q.    It's also a smartphone?

5    A.    Yes, sir.

6    Q.    And you and Mr. Hulst did not invent mobile phones,

7    right?

8    A.    No, we didn't, sir.

9    Q.    You didn't invent smartphones, correct?

10   A.    No, sir.

11   Q.    Just to be clear, when I said, you didn't invent,

12   correct, and you said, no, sir, were you agreeing with me?

13   A.    I'm agreeing you that I didn't invent them, sir.

14   Q.    Thank you.

15         Before smartphones, there were MP3 players, correct?

16   A.    Correct, sir.

17   Q.    All right.  And those were mobile devices used to store

18   and play music?

19   A.    Correct, sir.

20   Q.    You and Mr. Hulst did not invent MP3 players, correct?

21   A.    Correct, sir.

22   Q.    All right.  And I think, as you mentioned, in the prior

23   art time period, you actually purchased one, right?

24   A.    Yes, sir.

25   Q.    And that was from someone else?

1    A.    Correct, sir.

2    Q.    And someone else invented that.

3    A.    Yes, sir.

4    Q.    The accused iPhones, iPads, iPod Touches, they all have

5    a touchscreen interface; is that correct?

6    A.    Yes, sir.

7    Q.    And a screen for displaying visual content, correct?

8    A.    I believe so, yes, sir.

9    Q.    All right.  And you and Mr. Hulst did not invent the

10   touchscreen interface, correct?

11   A.    Correct, sir.

12   Q.    And you have not invented any sort of screen technology,

13   correct?

14   A.    Correct, sir.

15   Q.    All right.  So I've put up a board of the Court's claim

16   constructions.  And I can just represent, if Your Honor will

17   allow, that the parties have agreed on this board reflecting

18   the Court's claim constructions.

19        And if I could call your attention, sir, to the bottom

20   one, it's -- it's data carrier.  You know that term, right?

21   A.    I do, sir.

22        Would it be okay if I move the screen, because I can't

23   see the board here.

24   Q.    Oh, I'm sorry.

25   A.    Or I can lean back and then answer questions by moving

1    forward.

2    Q.    That will be fine.  Are you able to --

3    A.    I can do that, sir, yes.

4    Q.    Would you, please?  Thank you, sir.

5          Can you see it now?

6    A.    I can, sir, yes.

7    Q.    Okay.  So data carrier is in that bottom row of the

8    Court's claim constructions, correct?

9    A.    Correct, sir.

10   Q.    And in this case, you understand that Smartflash accuses

11   these Apple devices, like the iPhone here, of containing

12   something called a data carrier, correct?

13   A.    Yes, sir.

14   Q.    You and Mr. Hulst did not invent data carriers, did you,

15   sir?

16   A.    We didn't, sir, no.

17   Q.    In fact, that Rio that you bought in the prior art time

18   period, that MP3 player, it had a data carrier, right?

19   A.    Yes, it did, yes.

20   Q.    And memory is what the Court has said a data carrier is,

21   medium capable of storing information, correct?

22   A.    That's correct, sir.

23   Q.    Okay.  And you and Mr. Hulst did not invent memory in

24   electronics devices, did you?

25   A.    No, sir.

1    Q.    You didn't invent Flash memory, right?

2    A.    No, sir.

3    Q.    You didn't invent adding more memory to a previously

4    existing electronic device or form factor, correct?

5    A.    No, we didn't, sir.

6    Q.    You did not invent adding Flash memory to a previously

7    existing electronic device or form factor, correct?

8    A.    No, we didn't, sir.

9    Q.    You had mentioned I believe --

10            MR. BATCHELDER:  Can we put up the slides that were

11   used for Mr. Racz's presentation?  I just want to see Slide

12   4.  Is that possible to get that on the screen?  Let's look

13   at 5.  I've got the wrong number.

14            Your Honor, can I grab my binder?  I'm sorry.  I

15   got the wrong number.

16            THE COURT:  You may.

17            MR. BATCHELDER:  Thank you, sir.  My apologies.

18            Let's have Slide 3, I'm sorry.  This is out of

19   sync.

20            Well, I tell you what, let's just turn -- can we

21   put up the '720 patent?  That's PX 001.  And can we turn to

22   Figure 1, which I believe is on Page 4?

23   Q.    (By Mr. Batchelder)  That's your Figure 1 A, correct,

24   sir?

25   A.    That's correct, sir, yes.

1              MR. BATCHELDER:  Can we actually have the whole

2    figure?  Thank you.

3    Q.   (By Mr. Batchelder)  And so in your Figure 1 A at the

4    top there, that's an MP3 player example, correct?

5    A.   That could be an MP3 player, yes, sir.

6    Q.   Okay.  And B in the middle there, that shows the bottom

7    of the device?

8    A.   That's correct, sir.

9    Q.   And it has a slot for a smart card; is that right?

10   A.   That's correct, sir.

11   Q.   Okay.  And then your Figure 2 --

12             MR. BATCHELDER:  If we could turn to that, please,

13   on the next page.

14   Q.   (By Mr. Batchelder)  I believe you showed the jury

15   earlier, that's the smart card, right --

16   A.   Yes, sir.

17   Q.   -- in your embodiment, correct?

18   A.   Correct, sir.

19   Q.   All right.  And just to be clear, you and Mr. Hulst did

20   not invent smart cards, did you?

21   A.   No, we didn't, sir.

22   Q.   All right.  You didn't invent using smart cards for

23   security and authentication, did you?

24   A.   No, sir.

25   Q.   You did not invent smart cards that offer a high level

1    of security, ensuring that no one can hack the value off a

2    card or otherwise put unauthorized -- unauthorized

3    information on the card?

4    A.    No, we didn't, sir.

5    Q.    Others before you had done that?

6    A.    Absolutely they had, sir.

7    Q.    You did not invent smart cards with memory?

8    A.    No, sir.

9    Q.    You did not invent smart cards with Flash memory,

10   correct?

11   A.    No, sir.

12   Q.    All right.  One of the components mentioned in your

13   patent is an interface for communicating with a data

14   supplier, correct?

15   A.    Correct, sir.

16   Q.    And WiFi connection over the Internet is such an

17   interface, correct?

18   A.    Yes, sir.

19   Q.    All right.  You and Mr. Hulst, first of all, you didn't

20   invent the Internet, correct?

21   A.    No, that -- that was Tim Berners-Lee, I believe, sir.

22   Q.    And you did not invent receiving or press for content,

23   correct?

24   A.    No, we didn't, sir.

25   Q.    You did not invent transmitting digital content,

1   correct?

2   A.   No, sir.

3   Q.   You did not?

4   A.   I'm saying we didn't.

5   Q.   Thank you.

6        You did not invent downloading content over the

7   Internet, correct?

8   A.   No, we didn't, sir.

9   Q.   You did not invent downloading secure content over the

10  Internet, correct?

11  A.   No, we didn't, sir.

12  Q.   And all the accused Apple devices have WiFi, correct?

13  A.   I believe so, yes.

14  Q.   But you and Mr. Hulst did not invent WiFi, correct?

15  A.   No, sir, we didn't.

16  Q.   All right.   Turning back to the claim construction chart

17  here, you see the top row is payment data.   You see that?

18  A.   Yes, I see that, sir.

19  Q.   Are -- and you and Mr. Hulst did not invent payment data

20  either, did you?

21  A.   No, we didn't, sir.

22  Q.   You didn't invent using payment data in connection with

23  the online sale of content, did you, sir?

24  A.   No, sir.

25  Q.   You did not invent payment authorization in connection

1   with the online sale of content, did you?

2   A.   No, sir.

3   Q.   You did not invent receiving requests for payment data

4   for downloading content, did you?

5   A.   No, sir.

6   Q.   You didn't invent paying royalties for Internet download

7   of content, correct?

8   A.   No, sir.  We didn't, correct.

9   Q.   You did not invent online sale of content, correct?

10  A.   We didn't, sir.

11  Q.   Or online payment for content, correct?

12  A.   We didn't, sir.

13  Q.   You didn't come up with a first way to source and buy

14  digital content over the Internet, right?

15  A.   We didn't, sir.

16  Q.   Payment validation data is the last remaining row on

17  that claim construction chart.  An example of payment

18  validation data is a receipt which confirms the payment has

19  been made, correct?

20  A.   That's correct, sir.

21  Q.   All right.  And there is payment validation --

22  validation data in the prior art, correct?

23  A.   I believe probably, yes, sir.

24  Q.   And you and Mr. Hulst did not invent that, right?

25  A.   No, sir.

1          MR. BATCHELDER:  Let's try again with Mr. Racz's

2    demonstrative deck to pull up Slide 20.  We're showing Slide

3    18.  Oh, okay.  You don't have it.  Okay.  Yeah, would it be

4    possible to bring that up?  Is that being pulled up?  There

5    it is.  Thank you so much.

6    Q.   (By Mr. Batchelder)  So at the top there you have --

7    this is one of your slides, correct, sir?

8    A.   Yes, sir.

9    Q.   And you have movie rental at the top, correct?

10   A.   Yes, sir.

11   Q.   All right.  And you and Mr. Hulst, you did not invent

12   the online rental of content like movies, did you?

13   A.   I don't believe so, no, sir.

14   Q.   Okay.  You didn't invent charging different prices for

15   online rental versus online purchase, did you?

16   A.   No, sir.

17   Q.   And you didn't invent an online system ending access to

18   rented content when the rental time period ends, did you?

19   A.   I don't believe we did.  I'm not a hundred percent.  I

20   don't think so, sir.

21   Q.   I'm sorry, I couldn't hear you.

22   A.   I don't remember seeing -- I don't remember saying --

23   no, we didn't, sir.  Correct, sir.

24   Q.   Okay.  Correct you did not invent that?

25   A.   Correct.

1          MR. BATCHELDER:   If we could come back to the '720

2    patent to Column 1, Lines 15 through 19, and this is

3    Plaintiffs' Exhibit 1, Line 15 through 19, please?   Thank

4    you.

5    Q.    (By Mr. Batchelder)  So it says there:   One problem

6    associated with the increasingly wide use of the Internet is

7    the growing prevalence of so-called data pirates.   Such

8    pirates obtain data either by unauthorized or legitimate

9    means and then make this data available essentially worldwide

10   over the Internet without authorization.

11         Have I read that correctly, sir?

12   A.    Yes, sir, you have.

13   Q.    You and Mr. Hulst were not the first to recognize this

14   problem of data piracy on the Internet, were you?

15   A.    No, sir.

16   Q.    And you and Mr. Hulst did not invent secure online

17   payment for content, did you?

18   A.    No, sir.  No, we didn't.

19   Q.    You were the not the first to invent -- excuse me, you

20   did not invent securely paying for and downloading content

21   wirelessly, did you, sir?

22   A.    No, sir.

23   Q.    You did not invent securely paying for and downloading

24   content wirelessly even to a mobile phone, did you?

25   A.    I don't believe we did, sir, no.

1    Q.   Now, some companies address piracy through something

2    called Digital Rights Management, or DRM, correct?

3    A.   Correct, sir.

4    Q.   And that, generally, has to do with protection of rights

5    for digital content, correct?

6    A.   Correct, sir.

7    Q.   And you and Mr. Hulst did not invent DRM, did you?

8    A.   No, we didn't, sir.

9    Q.   You didn't invent DRM in connection with the online sale

10   of content, did you?

11   A.   No, we didn't, sir.

12   Q.   You didn't invent DRM that managed royalty payments and

13   prevented the unauthorized distribution and copying of music

14   files, correct?

15   A.   No, we didn't, sir.

16   Q.   You mentioned rules earlier --

17   A.   Yes, sir.

18   Q.   -- correct?  Some of the asserted claims of your

19   patents -- some of these four claims require access rules,

20   correct?

21   A.   Yes, sir.

22   Q.   And some require use rules, correct?

23   A.   Yes, sir.

24   Q.   Now, access rules are rules restricting access to

25   content, correct?

1   A.   Correct, sir.

2   Q.   User rules are rules restricting the use of content?

3   A.   Yes, sir.

4   Q.   You and Mr. Hulst did not invent use rules, did you?

5   A.   No, we didn't, sir.

6   Q.   You didn't invent use rules in connection with the

7   online sale of content, did you?

8   A.   No, sir, we didn't.

9   Q.   You also didn't invent access rules, did you?

10   A.   No, sir.

11   Q.   No, you didn't, correct?

12   A.   That's correct, sir.

13   Q.   And you also did not invent access rules in connection

14   with the online sale of content, did you?

15   A.   Correct, sir.

16   Q.   You also did not invent displaying to the user whether

17   access to a given piece of content is permitted, did you?

18   A.   That's correct, sir.

19   Q.   Now, at Internet Plc, all of your commercialization

20   involved smart cards, correct?

21   A.   At the time, yes, sir.

22   Q.   Internet Plc sold products with a brand name Smartflash,

23   correct?

24   A.   We did, sir, yes.

25   Q.   And all commercially available Smartflash products

1   involved smart cards, correct?

2   A.   At that time, yes, sir.

3   Q.   Well, ever, right?

4   A.   Well, yes, we had to close, yes, sir.

5   Q.   So --

6   A.   Correct.

7   Q.   Let me repeat my question and make sure we have a clean

8   record.  All commercially available Smartflash products

9   involve smart cards, correct?

10  A.   Correct, sir.

11           THE COURT:  Let's make sure one's finished

12  answering before the next question is asked and the question

13  is asked before the answer is given.  Okay.  Continue.

14           MR. BATCHELDER:  Thank you, Your Honor.

15  Q.   (By Mr. Batchelder)  I was taking notes during your

16  direct, and I just wanted to to make sure I got this right --

17  that is, when -- when you decided to commercialize your

18  invention using smart cards, one of the reasons is because

19  you thought that was the easiest way?

20  A.   Correct, sir.

21  Q.   And you thought doing it on devices like a phone would

22  be harder?

23  A.   It would be harder to get the technology deployed in

24  that way and much easier to start with smart cards, so, yes.

25  Q.   And during this time frame in the early 2000s, smart

1  cards were more popular in Europe than in the U.S., correct?

2  A.   I would say that's correct, sir, yes.

3  Q.   Okay.  And that's where you're from, right?

4  A.   Well, from -- I'm from Jersey, which is not part of

5  Europe, but it's considered to be associated to it through

6  the UK.

7  Q.   Okay.  It's not part of the European union, but it's

8  part of the continent of Europe?

9  A.   Geographically, yes, Europe, so, yes.

10  Q.   Okay.  The only cards -- smart cards --

11        MR. BATCHELDER:  Strike that, please.

12  Q.   (By Mr. Batchelder) The only Smartflash cards sold by

13  Internet Plc were the Britney Spears card, the Star Trek

14  card, and the Disney card, correct?

15  A.   That's correct, sir.

16  Q.   And Internet Plc paid each of those artists and

17  entities -- that is, Britney Spears, the Star Trek folks, the

18  Disney company -- significant sums of money for the right to

19  use their names to market those smart cards, correct?

20  A.   Yes, sir.  We had to pay royalties, yes.

21  Q.   The money that Internet Plc agreed to pay Britney Spears

22  included a lump sum of 1.5 million, correct?

23  A.   I believe that was correct, if certain targets were

24  achieved.

25  Q.   And a 250,000-dollar upfront payment, correct?

```
 1    A.    That's correct, sir.

 2    Q.    And by late October 2001, you were planning to move

 3    ahead with the Britney Spears project, correct?

 4    A.    We were, sir, yes.

 5    Q.    It was your view even then that Internet Plc's business

 6    was in promotional marketing, not technology, correct?

 7    A.    I -- I've seen it described in that way, but I would

 8    typically describe it as a technology company.

 9    Q.    Sir, you said you've seen it described that way.  You

10    yourself described it that way, didn't you?

11    A.    I -- I think I may have done so, yes.

12    Q.    Why don't we take a look?

13            MR. BATCHELDER:  Can we see Defendant's Exhibit

14    154?

15    Q.    (By Mr. Batchelder)  This is a document you created

16    correct, sir?

17    A.    I believe it probably is, yes.

18    Q.    Your name --

19    A.    My name's on it, yes, sir.

20    Q.    And there's a from line at the top, and it's got your

21    name, correct?

22    A.    Yes, sir.

23    Q.    And can we look at the very last line on this page, you

24    say:  Our business is in promotional marketing, not

25    technology.
```

```
 1        Correct?

 2   A.   Poor choice of words, yes, sir.

 3   Q.   They were your words, right?

 4   A.   They were my words, sir.

 5   Q.   As to the smart cards that Internet Plc did sell, the

 6   smart card came in something that Internet Plc called a

 7   Smartflash kit, correct?

 8   A.   Yes, sir.

 9   Q.   The kit contained a smart card and something called a

10   reader, right?

11   A.   And a CD, as well, sir.

12   Q.   And the reader was something you plugged into your

13   computer, correct?

14   A.   Correct, sir.  Typically, yes.

15   Q.   And the kit costs just -- just about 30 bucks?

16   A.   Depending on the product, it would be around the 29.99,

17   some of them I believe were 34, depending on what came with

18   it, sir.

19   Q.   All right.  So right around $30?

20   A.   I'd agree with that, yes.

21   Q.   Okay.  So let's take a Britney Spears kit as an example.

22   If you bought a card and a reader, you were buying membership

23   to a fan club, correct?

24   A.   Correct, sir.

25   Q.   And access to content?
```

1    A.   Yes, sir.

2    Q.   And to use it, you connected the reader to a computer,

3    right?

4    A.   You -- firstly, you would download some software from

5    the CD that came with it, so the client software.

6    Q.   Would you -- would you connect the reader to a computer,

7    sir?

8    A.   Yes, sir.

9    Q.   All right.  And when you slid the card into the slot in

10   the reader, then you could access a website, correct?

11   A.   Yes.  Yes, sir.

12   Q.   Okay.  And the card was registered to you, the user,

13   once you bought it, correct?

14   A.   Correct, sir.

15   Q.   And would have a user ID associated with it, correct?

16   A.   Yes, it would, sir.

17   Q.   All right.  And to be clear, you and Mr. Hulst did not

18   invent that idea either -- that is, the idea of associating

19   users with devices, correct?

20   A.   Yes, that's correct, sir.  Yes.

21   Q.   Okay.  Internet Plc's Britney Spears cards used that

22   concept from the prior art, correct, associating a user with

23   a device?

24   A.   Yes.

25   Q.   And when you slid the card into the reader, it would

 1   check your user ID to make sure you were authenticated,

 2   right?

 3   A.   Yes.  It was direct URL application on the chip -- an

 4   applet on the chip.

 5   Q.   Okay.  Your understanding is that because you had paid

 6   for the Smartflash kit, that user ID was payment data, even

 7   though providing that user ID did not confer payment,

 8   correct?

 9   A.   No, that's not payment data.

10           MR. BATCHELDER:  Can we pull up -- Your Honor, can

11   I approach the witness with his deposition transcript,

12   please?

13           THE COURT:  Yes.  But, counsel, approach the bench

14   first.

15           (Bench conference.)

16           THE COURT:  I'm going to have to let this jury have

17   one more short recess.  How much more cross do you think you

18   have?  Best guess?

19           MR. BATCHELDER:  It's fairly substantial.  I'd say

20   another maybe 45 or 50 minutes.

21           THE COURT:  I assume you're going to attempt to

22   impeach him at this point?

23           MR. BATCHELDER:   I am.  Can I finish this and --

24           THE COURT:  We'll do that and then we'll recess.

25           MR. BATCHELDER:  Thank you.

1          MR. CALDWELL:  Your Honor, while we're up here, I'd

2     like to point out that after he called me out and brought us

3     up here on payment data, he's trying to go and talk about the

4     inventor's definition of payment data.  It's the thing that I

5     wasn't -- I mean, I was pointing to the intrinsic record, and

6     what he's trying to do is now ask the inventor about payment

7     data via impeachment.  And it's really the issue.  I was

8     actually trying to honor the Court's claim construction

9     because they had previewed in opening they were going through

10    this path.

11         MR. BATCHELDER:  I'm -- I'm going to direct him to

12    the Court's claim construction which is exactly what Your

13    Honor asked us to do.

14         THE COURT:   Well, I think I've been real clear on

15    that.  If I'm convinced that somebody is ignoring my

16    instruction, I won't be happy.  All right.  Let's proceed.

17              (Bench conference concluded.)

18         THE COURT:  All right.  Counsel, you may proceed.

19         MR. BATCHELDER:  Thank you, Your Honor.

20         THE COURT:  You have leave to approach the witness.

21         MR. BATCHELDER:  Thank you, sir.

22         THE WITNESS:  Do you mind if I get my glasses?  I

23    can't see --

24         THE COURT:  Stay where you are.  Someone will bring

25    them to you.

```
1              MR. CASSADY:  May I approach, Your Honor?

2              THE COURT:  You may.

3              MR. CASSADY:  Thank you.

4              MR. BATCHELDER:  Your Honor, may I remind the

5   witness of the question pending?

6              THE COURT:  Proceed.

7   Q.   (By Mr. Batchelder)  The question was:  Your

8   understanding is that because you had paid for the Smartflash

9   kit, that user ID was payment data, even though providing

10  that user ID could not confer payment, correct?

11  A.   Yes, I misunderstood the construction -- the Court's

12  construction at the time, sir.

13  Q.   I see.

14             MR. CALDWELL:  Your Honor, we -- we object.  The

15  deposition is before there was a Court's claim construction.

16  It's being used in a misleading way.  That's the objection,

17  Your Honor.

18             THE COURT:  Do you still wish to proceed with the

19  deposition, counsel?

20             MR. BATCHELDER:  I do.

21             THE COURT:  Understanding that the deposition was

22  taken before the Court's claim construction was issued?

23             MR. BATCHELDER:  I'm asking about the witness's

24  understanding of the term in this patent, Your Honor, based

25  on this Court's claim construction, to see if -- if that is
```

```
 1    what his understanding was.
 2              THE COURT:  And you're using his deposition which
 3    was taken before the claim construction order was issued?
 4              MR. BATCHELDER:  I'm going to ask him, Your Honor,
 5    if I may, if he understood it to be -- to have this meaning.
 6              THE COURT:  I'm going to sustain that objection.
 7              MR. BATCHELDER:  All right, sir.  And, Your Honor,
 8    you mentioned that you may want to have a break.  This may be
 9    a good time to do that.
10              THE COURT:  All right.  Ladies and Gentlemen, we're
11    going to take one more short recess today.  It's going to
12    have to be short.  But you may leave your notebooks in your
13    chairs.  Don't discuss anything about the case with each
14    other.  And we'll have you back in here shortly and continue.
15    You're excused for recess at this time.
16              COURT SECURITY OFFICER:  All rise for the jury.
17              (Jury out.)
18              THE COURT:  All right.  The Court stands in recess
19    for the next 10 minutes.
20              (Recess.)
21              COURT SECURITY OFFICER:  All rise.
22              THE COURT:  Be seated, please.
23              Let's bring in the jury, please.
24              COURT SECURITY OFFICER:  All rise for the jury.
25              (Jury in.)
```

```
 1              THE COURT:  Please be seated.

 2              All right.  Counsel for Defendants may continue

 3  with your cross-examination of the witness.

 4              MR. BATCHELDER:  Thank you, Your Honor.

 5              Can we see Defendant's Exhibit 189, please.

 6  Q.   (By Mr. Batchelder) Do you recognize this document, Mr.

 7  Racz?

 8  A.   I do, sir, yes.

 9  Q.   This was created by an entity called Eco Capital; is

10  that right?

11  A.   That's correct, sir, yes.

12  Q.   And Eco Capital was introduced to Internet Plc as a

13  financial specialist who could help raise funding?

14  A.   That's correct, sir.

15  Q.   And you regarded Eco Capital as an advisor to Internet

16  Plc, correct?

17  A.   Yes, sir.

18  Q.   It also audited your books, correct?

19  A.   They did, sir.

20  Q.   Eco Capital, your auditor and advisor, concluded that it

21  was a mistake to have issued these Britney Spears cards

22  because the market potential for sales of such cards was too

23  small, correct?

24  A.   That's correct.  That's what they wrote.

25              MR. BATCHELDER:  Can we take a look at Page 15?
```

1    Q.   (By Mr. Batchelder) About two thirds of the way down the

2    page, right at the bottom of the paragraph beginning with the

3    decision to issue, they said:  The decision to issue

4    Smartflash cards providing access to a website containing

5    exclusive information -- info about tours and live concerts

6    of Britney Spears was a commercial mistake because the market

7    potential for sales of such cards was too small, correct?

8    A.   That was their opinion.

9    Q.   And they reported that to you, right?

10   A.   They did, sir.

11   Q.   In their capacity as your advisor, correct?

12   A.   Yes.  Okay.  I'll agree to that, yes.

13           MR. BATCHELDER:  And can we see the next paragraph

14   as well, please?

15   Q.   (By Mr. Batchelder) It says:  Eco Capital does not

16   consider the mistakes of IG at the initial stage of

17   development would prevent it from being a commercial success

18   in the future subject to the proper financial management

19   being in place.

20       Do you see that, sir?

21   A.   I see that written there, yes.

22   Q.   And IG was the Internet Plc group?

23   A.   That's what they named it in this document, yes, sir.

24   Q.   Okay.  And, again, you were chairman of Internet Plc,

25   right?

1   A.    I was chairman of Internet Pl -- well, chairman of

2   Chalfont Holdings, which is where they were referring to the

3   IG group, sir.

4   Q.    The mistakes that they're referring to are the mistakes

5   of you and your colleagues in running Internet Plc?

6   A.    That was their opinion, sir.

7   Q.    My question, sir, was the mistakes that they're

8   referring to are the mistakes of you and your colleagues,

9   correct?

10  A.    I don't know, sir.  I didn't write it.  They did.

11  Q.    You got some feedback from customers that this website

12  experience, in connection with the Britney Spears kit, was

13  not worth the $30 you were charging, correct?

14  A.    I remember mixed feedback.  Some people really liked it,

15  and others didn't enjoy the experience as much.  It was

16  mixed.

17          MR. BATCHELDER:  Let's take a look at Defendant's

18  Exhibit 175.

19          So can we go to the very top, please?

20  Q.    (By Mr. Batchelder) There's a reference to eBritney.

21      Can you see that, sir?

22  A.    I can see that, yes.

23  Q.    And that was a Britney Fan Club site, correct?

24  A.    I think it was, yes, sir.

25  Q.    Okay.  And then just a little ways down, there's

```
 1    something that's a reference to a mother's gift.

 2         Do you see that?

 3    A.   Yes, I can see that.

 4    Q.   And then -- so it begins by saying:  By now, you have

 5    heard that Britney has written a novel with her mother,

 6    Lynne, back in 2001.  Well, did it stink, or was it great?

 7    And it says:  I'm happy to say that after reading that novel

 8    in just hours, it was fantastic.

 9         Do you see that?

10    A.   I can see that's what it says, sir.

11    Q.   Okay.  And then a little ways down, it refers to your

12    Smartflash kit, doesn't it?

13         Do you see that?

14    A.   Yes, it does, yes.

15         MR. BATCHELDER:  And can we take a look at the

16    bottom?

17    Q.   (By Mr. Batchelder) It says --

18         MR. BATCHELDER:  Yeah.  In that paragraph beginning

19    with "if."

20    Q.   (By Mr. Batchelder) If you happen to win this program

21    for free at a Britney show, go ahead and give it a try.  If

22    you decide to be stupid like me and pay 30 bucks to buy it at

23    one of her shows, you can spend your hard-earned money on

24    something more exciting.

25         Do you see that?
```

1    A.    I can see that, yes.

2    Q.    And a couple of paragraphs up, it ends by saying:  Nope,

3    nothing fancy.  It's not a cool computer program, but just a

4    cheap little website.

5         Do you see that?

6    A.    I can see that's what it says, sir.

7    Q.    Now, in the case of Internet Plc's Britney Spears

8    project, and in the case of its Star Trek project, for each

9    of those projects, there was a net revenue loss of around

10   half a million dollars, correct?

11   A.    That's not the way -- not the way that I looked at it.

12   We discussed this at my deposition.

13   Q.    My question, sir, is:  Was there a net revenue loss of

14   around half a million dollars?

15   A.    No.  There was an investment of around half a million

16   dollars, sir.

17   Q.    Let's take a look at your deposition, Page 335, Line 20.

18   And in the case of Britney Spears and in the case of Star

19   Trek, for each of those projects, you're saying there was a

20   net revenue loss of roughly half a million dollars, correct?

21   A.    That's correct.

22   Q.    And I need to keep going.

23        And then answer:  I'm saying that's probably -- I didn't

24   say approximately half a million dollars.  I said around.

25             MR. BATCHELDER:  And let's go over to the next page

```
 1    through Line 4.

 2    Q.   (By Mr. Batchelder) It could have been a lot more.   I'm

 3    saying the estimate right now, without looking at the figures

 4    and data, I would say at least half a million dollars in each

 5    project.

 6         Have I read that correctly, sir?

 7    A.   You read that correctly from that section, yes, sir.

 8    Q.   Thank you.

 9              THE COURT:   Counsel, if you're going to read like

10    that, please slow down just a little bit.

11              MR. BATCHELDER:   Thank you, Your Honor.   Appreciate

12    that.

13    Q.   (By Mr. Batchelder) There were indisputably net --

14    negative net revenues associated with those projects,

15    correct?

16    A.   I -- I believe that we had investments.   We didn't term

17    it as net negative revenue, sir.

18    Q.   You suffered losses in connection with the Disney card

19    project also, correct?

20    A.   We -- we put a lot of investment money into it, sir.

21    Q.   Did you make money?

22    A.   No.   The company was shut down, sir.

23    Q.   Did you make money with those three projects?

24    A.   No, we didn't, sir.

25    Q.   Thank you.
```

```
 1              MR. BATCHELDER:  Let's take a look at Defendant's

 2   Exhibit 140.

 3   Q.   (By Mr. Batchelder) Do you recognize this document?

 4   A.   I do, sir, yes.

 5   Q.   This is another document from your auditor and financial

 6   advisor Eco Capital, correct?

 7   A.   It is, sir, yes.

 8   Q.   And you were chairman at Internet Plc at the time this

 9   document was created and used, correct?

10   A.   I was chairman of Chalfont Holdings, sir.

11              MR. BATCHELDER:  Can we pull up in your deposition,

12   please, Page 344, Lines 6 through 8?

13   Q.   (By Mr. Batchelder) Question:  But you were chairman of

14   Internet Plc at the time this document was created and used,

15   correct?

16        Answer:  It would appear so, yes.

17        Have I read that correctly, sir?

18   A.   Yes, you have.

19   Q.   Coming back to Defendant's Exhibit 140, you had a chance

20   to review this document and comment on it before it went out,

21   correct?

22   A.   I did.

23              MR. BATCHELDER:  Can we take a look at Page 26,

24   please, at the bottom?

25   Q.   (By Mr. Batchelder) It says:  On the negative side, the
```

```
 1    group has spent approximately $500,000 on the Britney Spears

 2    card project that generated virtually no revenue for IG.

 3         Initial estimates of Britney Spears card sales, which

 4    were overly optimistic, were undermined by a lack of

 5    high-quality content originally envisaged would be provided

 6    to the group.

 7         Do you see that?

 8    A.   That was their opinion, yes, sir.

 9    Q.   And that was the opinion that they gave to you, correct?

10    A.   I disagreed with it at the time, yes, sir.

11    Q.   All right.  So this document was generated as an

12    investment vehicle for Internet Plc, correct?

13    A.   It was a rescue project for Internet Plc, sir.

14    Q.   To raise money, correct?

15    A.   Yes.

16    Q.   So are you saying, sir, that it had a statement in it

17    that you regarded as false, you had a chance to review it as

18    chairman, but you let it go out to raise money anyway?

19    A.   I disagreed with it, and I disagreed with several things

20    in there with Alex Shadrin, who wrote it, but it still went

21    out.  That was my personal opinion.

22    Q.   Could you have told them not to send it?

23    A.   I wasn't in a position to, sir.

24    Q.   You were chairman of the company?

25    A.   I was chairman of the holding company, but we weren't in
```

1    a position -- we were desperate for funds, and they were our

2    last-ditch attempt at survival, sir.

3    Q.   So you're okay with a document going out with a

4    statement you felt was false?

5    A.   I wasn't happy with it, sir.

6            MR. BATCHELDER:  Can we take a look at Defendant's

7    Exhibit 139?

8    Q.   (By Mr. Batchelder) That's another document written by

9    Eco3 Capital, correct?

10   A.   Correct, sir.

11   Q.   And it explains why investors approached by Eco had

12   decided not to invest in Internet Plc, correct?

13   A.   That's what it says, sir.

14   Q.   And you don't remember responding to this document, do

15   you?

16   A.   I don't believe I did.  I might have done, but I don't

17   recall responding to it.  I think we might have had a

18   conversation.  I can't be a hundred percent sure, sir.

19   Q.   All right.  The very first numbered paragraph in the

20   three says:  Internet Plc does not generate revenues --

21           THE COURT:  Slow down, Counsel.

22           MR. BATCHELDER:  I'm sorry, Your Honor.

23   Q.   (By Mr. Batchelder) Internet Plc does not generate any

24   revenues after two years of operations.

25       That's how it begins, correct?

```
 1   A.    That's correct.  We just started launching product at

 2   the time we had the rug pulled from under our feet, so yes.

 3   Q.    And the second numbered paragraph --

 4              MR. BATCHELDER:  If you'd go to that, please.

 5   Q.    (By Mr. Batchelder) Internet Plc has no contracts with

 6   any party that commits itself to pay Internet Plc for its

 7   products.

 8              You see that?

 9   A.    That was the result of what happened, sir, yes.

10              MR. BATCHELDER:  And if we can go to the next page.

11   Q.    (By Mr. Batchelder) There's actually your -- something

12   on the back.  It says:  Typical.  We have already fallen.

13              Do you see that?

14   A.    Yes, sir.

15   Q.    You wrote that, didn't you?

16   A.    I did, sir.

17   Q.    You wrote that, because Internet Plc was already

18   spiraling into failure, correct?

19   A.    I wrote that because I was saying it was typical of how

20   I felt about Alex Shadrin.  I felt let down by him, sir.

21              MR. BATCHELDER:  All right.  Can we go back to the

22   first page?

23   Q.    (By Mr. Batchelder) It describes the Britney Spears

24   project as not successful, doesn't it, at the end of that

25   Paragraph 2?
```

1   A.   Yes, it does.  That was the opinion they stated, sir.

2   Q.   All right.  Now, you mentioned in your direct

3   examination, in connection with Chalfont Holdings, that you

4   had come up with a licensing model of $4 per device, correct?

5   A.   That's correct, sir, yes.

6   Q.   And would you tell the jury, how much money did Chalfont

7   make using that licensing model?

8   A.   We didn't have any money from it.  We hadn't had a

9   patent granted, so we couldn't license it at that stage, sir.

10  Q.   Okay.  So the answer is $0?

11  A.   Absolutely, yes, sir.

12  Q.   Internet Plc shut down in early 2003, correct?

13  A.   Yes, sir.

14  Q.   And ultimately filed for bankruptcy?

15  A.   Yes, sir.

16  Q.   Now, many of Internet Plc's investors were your friends

17  and business associates, correct?

18  A.   Yes, sir.

19  Q.   People you had encouraged to invest?

20  A.   Yes, sir.

21  Q.   To the tune of about $6 million?

22  A.   Thereabouts, sir.

23  Q.   And you were contacted by liquidators in that timeframe,

24  correct?

25  A.   Yes, sir.

1    Q.   And these were folks whose job it was to monetize as

2    many of Internet Plc's assets as possible to pay as much

3    money back as possible to those investors, right?

4    A.   Yes.   Including myself, sir, yes.

5    Q.   And you had spoken to a man named Richard Birch whose

6    job was to help with that project, right?

7    A.   I did, sir.

8    Q.   And you told him you were going to take care of some

9    things in connection with the liquidation, right?

10   A.   I did, sir, yes.

11   Q.   But you didn't do what you agreed to do, right?

12   A.   We never finalized what we discussed, sir, no.

13   Q.   So the record is clear, so you didn't do what you had

14   agreed to do, correct?

15   A.   Okay.   Yes.

16   Q.   You received a letter from the liquidators asking you to

17   follow through on your agreements, but you didn't open it,

18   right?

19   A.   Not for a while after, sir, no.

20   Q.   And you left town, right?

21   A.   Yes, sir.

22   Q.   Not for a week or two, but for a few months, maybe more,

23   correct?

24   A.   I was backwards and forwards, sir.

25   Q.   Sir, can I have an answer to my question?

```
 1              THE COURT:  Counsel, if you don't think the witness
 2   is responsive, direct it to the Court.
 3              MR. BATCHELDER:  Thank you, Your Honor.
 4   Your Honor, I object to that answer as nonresponsive.
 5              THE COURT:  I'll sustain the objection.
 6   A.    I was suffering from depression, sir.  I was going
 7   backwards and forwards to Jersey and to see my mother in
 8   Scotland and to see my family.  I was not in a good space,
 9   sir.
10   Q.   (By Mr. Batchelder) Sir, as of your deposition last
11   August, you -- you acknowledge that you'd gone away for a few
12   months, maybe more, but you couldn't remember where you went,
13   right?
14   A.    Some of the time I didn't actually know where I was at
15   the time, sir.
16   Q.   Sir, I'm asking, as of this past August when I took your
17   sworn deposition, you said you had left town for months but
18   couldn't remember where you went, right?
19   A.    Yeah.  That's what I meant, sir, yes.
20   Q.    All right.
21              MR. BATCHELDER:  Can we pull up Defendant's Exhibit
22   160, please?
23              Oh, I'm sorry.  Put it down.  My mistake.
24   Q.   (By Mr. Batchelder) You mentioned in your direct
25   examination a company called Cadence, also known as Tality?
```

1   A.    Yes, sir.

2   Q.    When it was still in business, Internet Plc hired the

3   services of that company, correct?

4   A.    Yes, sir.

5   Q.    To do what?

6   A.    To be our electronic design engineering partner to

7   develop the products that we wanted to produce and to work

8   with us on that side of things.

9   Q.    And they did work for you, right?

10   A.    Yes, they did, sir.

11   Q.    You promised to pay them money, right?

12   A.    Yes, sir.

13   Q.    And when Internet Plc went out of business, it still

14   owed Cadence or Tality a large sum of money, maybe 3- or

15   $400,000, correct?

16   A.    That's correct, sir.

17   Q.    All right.  And to this day, neither you nor the company

18   you chaired, Internet Plc, ever paid that debt, correct?

19   A.    No, sir.

20   Q.    Am I correct?

21   A.    That's correct, sir.

22   Q.    In connection with the debts from the Internet Plc days,

23   you, Patrick Racz, defaulted on a loan from the Royal Bank of

24   Scotland, correct?

25   A.    Yes, sir.

1  Q.   That default led to a court judgment against you,

2  correct?

3  A.   Yes, sir.

4  Q.   Now, Internet Plc closed its doors in 2003?

5  A.   Yes, sir.

6  Q.   All right.  And when this lawsuit was filed against

7  Apple a decade later in May 2013, that default taken out

8  against you by the Royal Bank of Scotland, that was still

9  outstanding, right?

10  A.   Sir, I've actually paid back about 300,000 pounds to the

11  Royal Bank of Scotland, and there's a small amount remaining,

12  sir, by comparison to it.

13        MR. BATCHELDER:  Your Honor, again, I object to the

14  nonresponsiveness of the answer.

15        THE COURT:  Well, you asked if it was still

16  outstanding, so he -- he indicated what he had paid.  I'll

17  overrule the objection.

18        MR. BATCHELDER:  Thank you, sir.

19  Q.   (By Mr. Batchelder) When the lawsuit was filed against

20  Apple, you hadn't paid any of it off, correct?

21  A.   When you say I hadn't paid any of the money I owed to

22  Royal Bank?

23  Q.   Yes.

24  A.   I paid them back a small fortune over the years, sir.

25  Q.   I see.  Okay.  Thank you.

```
 1   A.    I made an arrangement -- they made an arrangement with

 2   me.   They offered for me to settle the debt for one-third of

 3   what I owed them, and I made the decision I wanted to repay

 4   them in full, sir, and I made arrangements for that to

 5   happen, sir.

 6   Q.    Thank you.

 7   A.    You're welcome.

 8   Q.    You have purchased many of the accused Apple products,

 9   correct?

10   A.    I'm sorry.  I didn't hear, sir.

11   Q.    You have purchased many of the accused Apple products,

12   correct?

13   A.    I have, sir.

14   Q.    You've purchased a couple of iPod Touches, right?

15   A.    Yes.

16   Q.    And an iPad, right?

17   A.    Yes, sir.

18   Q.    And your family members have also purchased iPhones,

19   correct?

20   A.    Yes, sir.

21   Q.    At some point around 2000, you were introduced to

22   someone at Intertrust named Oliver Mills, correct?

23   A.    I believe I met Oliver Mills in 1999 -- I'm sorry.  You

24   were saying the first time I met or -- please could you

25   repeat the question?  I'm sorry.
```

1   Q.   At some point around the year 2000, you were introduced

2   to someone at Intertrust named Oliver Mills.

3   A.   I think I met him around that timeframe, around '99,

4   2000.  Oliver Mills and Dean West, yes, sir.

5   Q.   And you were introduced by someone named Shane Dodson?

6   A.   I believe so, yes, sir.

7   Q.   And roughly eight years later, in October 2008, you

8   reached back out to Intertrust's Oliver Mills, correct?

9   A.   That's correct.

10          MR. BATCHELDER:  Let's look at Defendant's Exhibit

11   198, please.

12   Q.   (By Mr. Batchelder) So there at the top, this is an

13   email from you to Mr. Mills, correct?

14   A.   That's correct, sir.

15   Q.   And the subject line is something of significant benefit

16   to Intertrust, correct?

17   A.   That's correct, sir.

18   Q.   And essentially, what you were asking is that Intertrust

19   would consider entering into some kind of joint venture with

20   you or perhaps investing with you, correct?

21   A.   That's correct, sir.

22   Q.   Intertrust was looking at the '720 patent, correct?

23   A.   That's correct, sir.

24   Q.   And the continuation application?

25   A.   I believe they were also looking at that also, yes, sir.

1   Q.   Now, in the -- in the top third of that email, third

2   paragraph, you say:  In addition to the above, I have

3   retained all relevant documentation and records going back to

4   the date of invention in 1998, correct?

5   A.   Yes, sir.

6   Q.   Was your invention in 1998?

7   A.   No.  I think I said at the depo, when you asked me the

8   same question, it was a typo, sir, and I've never ever said

9   '98 before.  It was just a mistake.

10  Q.   You would prefer it if your invention had been in 1998,

11  correct?

12  A.   Yes, sir.  And I said that at my depo as well, sir.

13  Q.   This references -- a couple of paragraphs later, it

14  says:  The files also include extensive background records

15  relating to SanDisk and other later entrants, correct?

16  A.   That's correct, sir.

17  Q.   And it doesn't mention Apple, right?

18  A.   No, sir, it doesn't.

19  Q.   Now, as soon as the iPhone hit the market, you knew what

20  it did, right?

21  A.   Absolutely, sir.

22       MR. BATCHELDER:  Let's take a look now at

23  Defendant's Exhibit 225, please.

24  Q.   (By Mr. Batchelder) This is a November 20th, 2008 email

25  from Oliver Mills back to you, correct?

1    A.    That's correct, sir.

2    Q.    And it CC's that Mr. Shane Dodson, who had introduced

3    you, correct?

4    A.    That's correct, sir.

5    Q.    And he says at the top there:  Sorry that this has taken

6    longer than anticipated, but our guys were pretty thorough in

7    their investigations.

8          Do you see that?

9    A.    I do, sir, yes.

10   Q.    And then he goes on to say:  Their feeling was that the

11   claims were broad, but that there was generally little that

12   gave highly significant or distinctive advances over any

13   prior art.

14         Do you see that, sir?

15   A.    That was the opinion he stated then, yes, sir.

16   Q.    And you didn't get back to him, did you?

17   A.    I don't -- I don't remember getting back to him.  I

18   don't recall speaking to him.  Maybe Shane spoke to him.  I

19   don't remember, sir.

20   Q.    You didn't say --

21              THE COURT:  Excuse me just a minute.  I'm going to

22   instruct the witness not to refer to individuals by first

23   name only.  This is not the first time you've done it.

24              THE WITNESS:  I apologize, Your Honor.

25              THE COURT:  I've instructed counsel to advise their

1  witnesses not to refer to individuals by first name only, so

2  I'm assuming you've not been instructed, but I'm instructing

3  you now.

4       THE WITNESS:  I've been instructed.  I'm sorry,

5  sir.  I apologize.

6       THE COURT:  All right.  Let's continue.

7  Q.   (By Mr. Batchelder) So when you got this email from Mr.

8  Mills saying there was generally little that gave highly

9  significant or distinctive advances over any prior art, you

10 didn't call him or write him and say:  Oliver Mills, what are

11 you talking about?  I thought I had a great invention here.

12 A.   No.  I don't remember doing so, sir, no.

13 Q.   You didn't ask him what prior art he was referring to?

14 A.   No, sir.  No, I didn't.

15 Q.   You haven't communicated with him since?

16 A.   I don't believe I have, sir.  I don't recall doing so.

17 Q.   So Mr. Mills goes on to say, referring to his team:

18 They felt that if there is an important product upcoming that

19 looks like it might really succeed in the market, it might be

20 worthwhile re-looking at these patents more carefully in

21 relation to that specific product, but as one example, they

22 considered SanDisk, who are currently trying their best to

23 push a similar concept with little success.

24     Do you see that, sir?

25 A.   I do see that, yes.

1   Q.   So he refers to, if there are -- significant product, it

2   might be worth revisiting, right, an important product?

3   A.   That's what he says, sir.

4   Q.   And you knew at the time that the iPhone was a

5   significant product, right?

6   A.   I believe so, yes, sir.

7   Q.   Okay.  And he wasn't saying he thought the iPhone

8   practiced this patent, did he?

9   A.   He clearly hasn't looked at that, sir.

10  Q.   And you didn't respond by saying:  I think the iPhone

11  practices this patent, Oliver Mills.

12  A.   No.  I didn't respond at all, sir.

13  Q.   Now, less than a year later, SanDisk came up again in

14  your conversation with third parties, correct?

15  A.   Yes, it did, sir.

16  Q.   In 2009, you entered into a discussion with a company

17  called Turtle Bay, correct?

18  A.   Yes, I did, sir.

19  Q.   You invited Turtle Bay to pay money for an equity share

20  of your patents, correct?

21  A.   I did, sir.

22  Q.   And the man you were negotiating with at Turtle Bay was

23  named Jeff Ronaldi, right?

24  A.   That's correct, sir.

25  Q.   You came close to reaching the agreement?

1   A.   We had a number of discussions.  We never drafted a

2   contract or anything, I don't believe, sir, or a terms sheet.

3           MR. BATCHELDER:   Let's take a look at Defendant's

4   Exhibit 200.

5   Q.   (By Mr. Batchelder) So your purpose in writing an

6   email -- I'm sorry.  Let's just frame it.

7       At the top, it's from you, correct?

8   A.   That's correct, sir.

9   Q.   And it's to Mr. Ronaldi, correct?

10  A.   Correct, sir.

11  Q.   And your purpose in writing this email was to convince

12  Mr. Ronaldi to invest in your patents, right?

13  A.   Yes.  I was interested in getting him to do that, sir,

14  yes.

15  Q.   And you say -- in about the middle, you say:   Our

16  claimed priority date of October 1999 predates any related

17  concepts in the field of secure memory cards, and I believe

18  that there is a very strong potential for gaining significant

19  fees for a number of infringing companies in the U.S. market,

20  the largest of which is SanDisk.

21      You see that?

22  A.   I do, sir, yes.

23  Q.   Now, in your negotiations with Mr. Ronaldi, you were not

24  suggesting that you would confine the deal to any industry

25  sector like secure memory cards, were you?

```
 1   A.    No, I wasn't, sir.

 2   Q.    He would have been involved with anything you did with

 3   the patents, right?

 4   A.    Yes, he would, sir.

 5   Q.    And this was two years after the iPhone hit the market,

 6   right?

 7   A.    That's correct, sir.

 8               MR. CALDWELL:  Objection, Your Honor.

 9               May we approach?

10               THE COURT:  Approach the bench.

11               (Bench conference.)

12               THE COURT:  What's your objection, counsel?

13               MR. CALDWELL:  Your Honor, I'm happy to make

14   objections from the table.  I just don't know what you find

15   appropriate, but he's violating a motion in limine --

16               THE COURT:  I'd rather you not go back and forth,

17   but I'll let you do it this time.

18               MR. CALDWELL:  Thank you.  I feel like he's

19   violating a motion in limine.  The hotly contested issue in

20   claim construction is whether the patents are limited to a

21   card -- like a removable card.  We won that.  We won it

22   through additional briefing later.  We won it through our

23   motion in limine where they're not allowed to talk about it.

24               And the whole point of him doing this is saying all

25   you did was talk to people about your patents applying to a
```

```
 1    card and you never told them it applied to something else

 2    like the iPhone.  That's his whole -- whole purpose.

 3            And we have an order from the Court saying it

 4    absolutely is not limited to a card when properly construed.

 5    That was absolutely flatly rejected, and there's a motion in

 6    limine on it.

 7            MR. BATCHELDER:  Your Honor, the point of my

 8    cross-examination, as it's already revealed, is to show that

 9    he was communicating to this other party, pointing to

10    infringers after the iPhone hit the market and he wasn't

11    saying the iPhone infringed.

12            MR. CALDWELL:  He is testifying by saying his

13    memory --

14            THE COURT:  Give me -- give me your limine that you

15    say it infringes.  Bring it to me.

16            How much more do you think you have, Mr.

17    Batchelder?

18            MR. BATCHELDER:  I would say probably half an hour,

19    maybe less.

20            THE COURT:  Wouldn't care to make it 10 minutes,

21    would you?  That's a joke.

22            MR. BATCHELDER:  Okay.

23            MR. CALDWELL:   Your Honor, this is -- it's retyped

24    there for easy access.  The limine covers any arguments

25    inconsistent with the Court's claim construction, including
```

1    any opinions or claims limited to smart flash card, smart

2    card, or any sort of integrated circuit card, for example,

3    based on preferred embodiment, company names, any past --

4            THE COURT:  Just don't touch that.

5            MR. CALDWELL:  Yes, sir.  Any past company names,

6    any commercial embodiments.  Anything.  It's been the

7    centerpiece of this case, Apple constantly arguing you have

8    to have a card.  The patents plainly say it can be

9    integrated, and that construction was -- was rejected.

10   That's my data carrier is -- is a medium for carrying data,

11   as it says on the -- on the board up there.

12           MR. BATCHELDER:  Your Honor, again, the point of my

13   cross is that he was communicating with this third party in

14   2009.

15           THE COURT:  I'm not concerned about your point.

16   I'm concerned about whether you violated the MIL.  It doesn't

17   say if your mental state is such and such, you can ask this.

18   It just says you don't go there.

19           MR. BATCHELDER:  Well, what I'm saying is where I'm

20   going is about the iPhone.  It's not about whether the

21   invention is limited to cards.  My point is you were talking

22   to him about another company and not about Apple.  That's

23   been the whole point in this cross.

24           THE COURT:  I tell you what I'm going to do.  I'm

25   going to carry the objection, and I'm going to see where you

```
1    go.  And if I'm convinced that you're pursuing a path that

2    violates this MIL, then I'll impose some kind of penalty.

3               MR. BATCHELDER:  Understood.

4               MR. CALDWELL:  And, Your Honor, just for additional

5    clarity while you're thinking about it, I understand your

6    ruling certainly.  At the last pre-trial with Judge Mitchell,

7    Apple argued that they should be able to say this, something

8    about his embodiments being a card and things like that, if

9    we were going to pursue an allegation of copying, and

10   she ordered us to let them know, and we gave it up -- and we

11   gave it up and told them we're not going to allege copying --

12              MR. BATCHELDER:  And I'm not arguing his embodiment

13   is a card.  I'm just -- I'm pointing out that he was not

14   accusing Apple of infringing at the time.

15              MR. CALDWELL:  That's leading the jury terribly on

16   this.

17              THE COURT:  All right.  You've heard my ruling.

18   I'll carry this objection.  But I would suggest both sides

19   not tread too closely to crossing over these MILs.  If I'm

20   convinced that you've done that, I'll enter an appropriate

21   finding and an appropriate order.

22              MR. BATCHELDER:  Thank you, sir.

23              (Bench conference concluded.)

24              THE COURT:  All right.  I'll carry the objection,

25   as I've indicated at the bench.  Let's proceed with the
```

1    cross-examination.

2              MR. BATCHELDER:   Thank you, Your Honor.

3    Q.   (By Mr. Batchelder)   So coming back to Defendant's

4    Exhibit 200, you didn't tell Mr. Ronaldi that you believed

5    that Apple infringed your patent claims, did -- did you?

6    A.   I'm not sure if I told Mr. Ronaldi or not.   I told a

7    couple of the people I was talking to around that time

8    period.   But I'm not sure if I actually told him that or not.

9    Q.   All right.   Let's go back to Gemplus.   You --

10             MR. BATCHELDER:   If we can -- is it possible to put

11   up Slide 31 from the slides that Mr. Racz presented?

12   Q.   (By Mr. Batchelder)   While that's being pulled up, sir,

13   let me just clarify, neither you nor the companies that

14   you've been associated with have sued Gemplus, correct?

15   A.   I haven't, sir, no.

16   Q.   None of the patents being asserted here were asserted

17   against Gemplus?

18   A.   No, they're not, sir.

19   Q.   All right.   So I'm looking at your Slide 31, and it

20   refers to a slide deck of Gemplus.   Do I have that right,

21   sir?

22   A.   I believe, yes.   It's -- it was a presentation.   But

23   when I saw it, it was a paper presentation that was stapled

24   together, but I -- it was probably available in a slide show,

25   yes, sir.

1    Q.    Okay.

2    A.    I would imagine.

3    Q.    And if I understood you correctly on -- on your direct

4    examination, you were saying that you thought that this slide

5    deck reflected that Gemplus had somehow stolen an idea of

6    yours; is that right?

7    A.    Yes, that's -- well, I didn't say stolen, but they

8    were -- I think plagiarizing it.  They were using it without

9    my permission and consent, sir.

10   Q.    Now, can we look at the bottom of that page?  The name

11   on it is Steven Landau, correct?

12   A.    That's correct, sir.

13   Q.    Now, after this, you hired Mr. Landau, correct?

14   A.    That's correct, sir.

15   Q.    You made him the president and CEO of Internet Plc,

16   right?

17   A.    No, sir.

18   Q.    What was his position?

19   A.    He was the president and CEO of Internet Plc, Inc.  That

20   was the U.S. company, sir.

21   Q.    I see, okay.  And you hired him from Gemplus, right?

22   A.    Yes, sir.

23   Q.    And Gemplus Management fully cooperated in your hiring

24   Mr. Landau, correct?

25   A.    They recommended that he come work for us, sir.

1   Q.   Thank you.  You mentioned Britney Spears having canceled

2   her world tour in September 2001, correct?

3   A.   Correct, sir.  Yes, just after that.

4   Q.   She went back on tour just the very next spring, right?

5   A.   I don't recall, sir.  She may have done --

6           MR. BATCHELDER:  Can we see Defendant's Exhibit

7   146, please?  And can we just blow up at the top there?

8   Q.   (By Mr. Batchelder)  It's -- you'll see it's dated May

9   6th, 2002, correct?

10  A.   Yes, sir.

11  Q.   And it refers to the Dream Within a Dream tour, correct?

12  A.   Yes, sir.

13  Q.   2002?

14  A.   Correct, sir.

15  Q.   And Smartflash is reaching out to -- to Britney Spears

16  to propose more collaboration, correct?

17  A.   Yes, sir.

18  Q.   Okay.  So after she canceled one tour, she was back on

19  tour.  You were working with her again, right?

20  A.   Not on the tour that we were supposed to be doing, sir,

21  no.

22  Q.   Well, you were proposing that as -- Internet Plc was

23  proposing to work with her on this tour, right?

24  A.   It wasn't the same tour.  It wasn't the European tour,

25  so we didn't have the backstage content and everything that

```
 1   we'd envisioned originally, sir.  It was a different -- it
 2   was a different proposition, a different situation.
 3   Q.   Sir, was Smartflash -- was Internet Plc making a
 4   proposal to work with Britney Spears in connection with this
 5   May 2002 tour?
 6   A.   I don't believe so, sir.  I don't think that's an
 7   Internet Plc presentation, sir, no.
 8   Q.   What company is it?
 9   A.   It's NVU, sir.
10   Q.   I'm sorry?
11   A.   NVU.
12   Q.   You're talking about the Smartflash -- Smartflash seeks.
13        Do you see that in the first line?
14   A.   I -- I need to see the whole -- could I -- would it be
15   possible for me to see the whole document so I could --
16   Q.   We can browse through as much of -- as much as you want.
17             MR. BATCHELDER:  Is there another page?
18             THE COURT:  If the witness doesn't know, he needs
19   to say he doesn't know; but it's not for the witness to ask
20   to go further.  They'll show you what they want to show you.
21   If you can answer it, answer it.
22             Counsel for Plaintiff will have a chance to
23   redirect.
24             THE WITNESS:  Sorry, Your Honor.
25             THE COURT:  All right.  No problem.  Let's go
```

1   forward.

2   Q.   (By Mr. Batchelder)  All right.  So there's a reference

3   to Smartflash seeking to do something here, correct, sir?

4   A.   Yes, that's what it says.

5   Q.   Okay.  And you were associated with an entity called

6   Smartflash Limited at the time?

7   A.   Yes, sir.

8            MR. BATCHELDER:   All right.  Can we put up

9   Defendant's Exhibit 324, please?

10  Q.   (By Mr. Batchelder)  And in that first line there -- I'm

11  sorry, at the top, that's your name, right, Mr. Racz?

12  A.   Yes, sir, that's correct.

13  Q.   And it's to a Mr. Twysden Moore, correct?

14  A.   That's correct, sir.

15  Q.   And who is Mr. Moore?

16  A.   Mr. Moore is someone I know through a friend.  He's a

17  business associate of a friend of mine.  I've known Mr. Moore

18  for several years, but not -- not -- I just know him every

19  now and then.  We bump into each other.

20  Q.   Okay.  And in the first sentence there you refer to my

21  patent at the end there, right?

22  A.   That's correct, sir.

23  Q.   And you're referring to the '720 patent?

24  A.   That's correct, sir.

25  Q.   Okay.

1          MR. BATCHELDER:  Can we now pull up Defendant's

2    Exhibit 249?  Can we go to Page 24?

3    Q.   (By Mr. Batchelder)  And it refers to a negotiation

4    between and you Mr. Moore, correct?

5    A.   Yes, sir -- yes, it does.  It refers to meetings that we

6    had, yes, sir.

7    Q.   And can we look where it refers to a cold offer at about

8    the middle of that paragraph?

9    A.   Yes, sir.

10   Q.   And was this a cold offer that you received from

11   Mr. Moore?

12   A.   I believe it was, sir, yes.  It was through an associate

13   of his, Mr. Holwell, sir.

14   Q.   Okay.  And the offer was for a 200,000-dollar lump-sum

15   payment in return for a 20-percent equity stake in your

16   patents; is that right?

17   A.   That's correct, sir.

18   Q.   And when you say it was a cold offer, do you mean that

19   before receiving that offer, you had not communicated with

20   Mr. Moore about a deal involving a 200,000-dollar lump-sum

21   payment in return for a 20 percent equity stake in the '720

22   patent and its continuations?

23   A.   I don't think I communicated with Bill Holwell at

24   Trilithon Intellectual Property.  I'd had conversations and

25   exchanges with Twysden Moore, sir.

1   Q.   Okay.   Prior to this -- this March 9, 2010 offer that

2   referenced here, had you communicated with Mr. Moore about a

3   deal involving a 200,000-dollar lump-sum payment in return

4   for a 20 percent equity stake in the '720 patent and its

5   continuations?

6   A.   I'd certainly had discussions and negotiations with

7   Twysden Moore.   I don't remember specifically what the

8   amounts were or what the percentages were, but --

9   Q.   Okay.   Are you saying, sir, that you don't know one way

10  or the other whether you'd had that conversation with

11  Mr. Moore before?

12  A.   I had conversations with Mr. Moore.   I can't remember

13  the specifics of it, sir.

14  Q.   So it's possible that those very same terms had come up

15  just a month earlier, $200,000 for a 20 percent stake?

16  A.   I -- I don't recall that, sir.   It's possible, but I

17  don't recall it.

18          MR. BATCHELDER:   Your Honor, may I approach?

19          THE COURT:   You may.

20          MR. BATCHELDER:   Can I invite counsel to join me?

21          THE COURT:   You want to approach the bench or the

22  witness?

23          MR. BATCHELDER:   I'm sorry, the bench.

24          THE COURT:   All right.

25          MR. BATCHELDER:   Thank you.

1                    (Bench conference.)

2                    MR. BATCHELDER:  I have -- I have a document that's

3    not pre-admitted, but it reflects that a month earlier he had

4    that conversation with Mr. Moore.  I just want to clear it

5    with the bench before I use it.

6                    THE COURT:  There's no requirement that you can

7    only use pre-admitted exhibits to impeach.

8                    MR. BATCHELDER:  Okay.  I just wanted to be clear.

9    I didn't want to transgress.

10                    THE COURT:  You have any problem, Mr. Caldwell?

11                    MR. CALDWELL:  I don't know the document.  I mean,

12    in this setting, it's kind of hard to say.  I haven't even

13    seen which one he's referring to.

14                    THE COURT:   Well, it will either work or it won't

15    work.  You never know what a witness is going to say.  If it

16    opens the door to impeachment, therefore, you can't be

17    limited in advance as to what you can use to impeach.

18                    MR. BATCHELDER:  Thank you, sir.

19                    (Bench conference concluded.)

20                    THE COURT:  All right.  Proceed, counsel.

21                    MR. BATCHELDER:  Thank you, Your Honor.

22                    Can we pull up DX 322, please?

23    Q.   (By Mr. Batchelder)  This is from Mr. Moore to you,

24    correct, sir?

25    A.   Yes, it looks to be, sir.

```
 1   Q.    And it was a month earlier, correct?

 2   A.    I don't know what the date was on the previous document,

 3   but --

 4   Q.    That was -- it referred to a March 9, 2010 letter.  Do

 5   you remember that?

 6   A.    Okay.

 7   Q.    And now this is from Mr. Moore to you in February,

 8   correct?

 9   A.    Yes.

10         MR. BATCHELDER:  And if you could scroll down --

11   Q.    (By Mr. Batchelder)  There is a reference below to a

12   200,000 lump-sum payment, correct?

13   A.    Yes.  Could I just read that, please, sir?  And if you

14   could just -- okay.  Thank you.

15   Q.    He -- he refers in the middle of that paragraph to:  I

16   would like to clarify that I'm working on a first refusal

17   assumption for the raising of the U.S. $200,000 for 20

18   percent of the patent ownership vehicle.

19         Do you see that?

20   A.    Could -- yeah, I do see it.  But could I read it from

21   the top, sir?

22   Q.    Sir, right now I'm asking you if you see that.  Do you

23   see that?

24         THE COURT:  The witness needs to answer the

25   question.
```

1          THE WITNESS:  I can see it, sir, yes.

2          THE COURT:  Okay.

3    Q.   (By Mr. Batchelder)  All right.  And so this came a

4    month earlier than the offer for $200,000 for 20 percent of

5    the patent ownership vehicle that you just described earlier

6    as a cold offer, correct, sir?

7    A.   That's correct, sir, yes.

8    Q.   Sir, each of the accused Apple products reflects

9    significant inventive work by Apple, correct?

10   A.   Correct, sir.

11   Q.   Through its iTunes Store, Apple also makes available to

12   consumers a massive collection of songs, apps, movies, books,

13   and other content, correct?

14   A.   I would agree with that, sir, yes.

15   Q.   Apple adds a lot of value to its products by compiling

16   such a great collection of content, correct?

17   A.   I would agree with that, sir, yes.

18   Q.   And for devices like the iPhone content, drives sales,

19   correct?

20   A.   Very much so, yes, sir.

21   Q.   Each of the accused Apple devices performs thousands of

22   functions that you did not invent, correct?

23   A.   I -- I don't know that it performs thousands of

24   functions, but it certainly performs functions I didn't

25   invent, sir.

```
 1    Q.    Each of the accused Apple products has hundreds of

 2    hardware components, correct?

 3    A.    It may well do, sir.

 4    Q.    And you and Mr. Hulst did not invent any of the hardware

 5    in Apple's accused devices, correct?

 6    A.    No, we didn't, sir.

 7              MR. BATCHELDER:   Your Honor, I pass the witness.

 8              THE COURT:   All right.  This is a good juncture,

 9    Ladies and Gentlemen, to recess for the day.

10              I assume the Plaintiff has redirect of this

11    witness?

12              MR. CALDWELL:  Absolutely, Your Honor.

13              THE COURT:   All right.  Well, we'll take that up

14    first thing in the morning.

15              Ladies and Gentlemen, as you exit the courtroom, if

16    you'll leave your juror notebooks on the table in the jury

17    room.

18              Let me remind you again of my earlier instructions.

19    Do not discuss the case with anyone.  And when you get home

20    tonight, that will be one of the most tempting times that you

21    will have.  So feel free to blame it on me.  Just tell

22    whoever asks that you're under strict instructions not to

23    discuss it at all; and that when this case is over and you're

24    released, you'll be happy with -- you'll be happy to talk to

25    them about it at that time, but you cannot talk to them now.
```

1          Don't discuss the case among each other.  Follow

2    all the other instructions I've given you.

3          I would like to ask that you be in the jury room

4    assembled by about 8:20 in the morning, and we will try to

5    start promptly at 8:30.

6          So with those instructions, drive safely, have a

7    good night, and we'll see you in the morning.  You're excused

8    until tomorrow morning.

9          COURT SECURITY OFFICER:  All rise for the jury.

10          (Jury out.)

11          THE COURT:  All right.  Counsel, we stand in recess

12    until tomorrow morning.  I will attempt to be in chambers by

13    7:30.  If there are any developments or disputes that develop

14    overnight that require the Court's time, I should be

15    available during that hour before 8:30.

16          I also remind you before you that bring the jury in

17    in the morning, I'm going to ask each side to read into the

18    record those exhibits from the list of pre-admitted exhibits

19    that were used during today's portion of the trial.  Be

20    prepared to do that.

21          With that, have a good evening.  We stand in recess

22    until tomorrow morning.

23          (Court adjourned.)

24

25

1                          CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of our

6    abilities.

7

8

9

10   /s/_____          February 16, 2015
     SHEA SLOAN, CSR, RPR
11   Official Court Reporter
     State of Texas No.:  3081
12   Expiration Date:  12/31/16

13

14

15

16   /s/_____
     SHELLY HOLMES, CSR, TCRR
17   Deputy Official Court Reporter
     State of Texas No.:  7804
18   Expiration Date  12/31/16

19

20

21

22

23

24

25