1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                 TYLER DIVISION

3

   SMARTFLASH LLC and          )
4  SMARTFLASH TECHNOLOGIES          DOCKET NO. 6:13cv447
   LIMITED
5
        -vs-                   )
6
                                    Tyler, Texas
7                              )    12:58 p.m.
   APPLE INC.                       February 17, 2015
8

9

                    TRANSCRIPT OF TRIAL
10                  AFTERNOON SESSION
          BEFORE THE HONORABLE RODNEY GILSTRAP,
11             UNITED STATES DISTRICT JUDGE

12

13              A P P E A R A N C E S

14

15  FOR THE PLAINTIFFS:

16
    MR. BRADLEY W. CALDWELL
17  MR. JASON D. CASSADY
    MR. JOHN AUSTIN CURRY
18  CALDWELL CASSADY & CURRY
    2101 Cedar Springs Rd., Ste. 1000
19  Dallas, Texas  75201

20

21  MR. T. JOHN WARD, JR.
    WARD & SMITH LAW FIRM
22  P.O. Box 1231
    Longview, Texas  75606
23

24

25

```
1   FOR THE DEFENDANTS:

2
    MR. JAMES R. BATCHELDER
3   ROPES & GRAY LLP
    1900 University Ave., 6th Floor
4   East Palo Alto, California  94303-2284

5

6   MS. CHING-LEE FUKUDA
    MR. KEVIN J. POST
7   ROPES & GRAY LLP
    1211 Avenue of the Americas
8   New York, New York 10036-8704

9

10  MR. ERIC ALBRITTON
    ALBRITTON LAW FIRM
11  P. O. Box 2649
    Longview, Texas 75606
12

13

14

15
    COURT REPORTERS:       MS. SHELLY HOLMES, CSR, TCRR
16                         OFFICIAL COURT REPORTER
                           shelly_holmes@txed.uscourts.gov
17
                           MS. SHEA SLOAN, CSR, RPR
18                         OFFICIAL COURT REPORTER
                           shea_sloan@txed.uscourts.gov
19

20

21

22

23

24  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
25
```

```
 1                   P R O C E E D I N G S
 2              (Jury out.)
 3              COURT SECURITY OFFICER:  All rise.
 4              THE COURT:  Be seated, please.
 5              Ms. Mayes, if you'll bring in the jury, please.
 6              COURT SECURITY OFFICER:  All rise for the jury.
 7              THE COURT:  Counsel, you may return to the podium.
 8              MS. FUKUDA:  Thank you, Your Honor.
 9              (Jury in.)
10              THE COURT:  Please be seated.
11              Welcome back from lunch, Ladies and Gentlemen.
12    We'll continue with the cross-examination of the witness by
13    the Defendant.
14              You may proceed, Counsel.
15              MS. FUKUDA:  Thank you, Your Honor.
16       DR. MARK JONES, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN
17                   CROSS-EXAMINATION CONTINUED
18    BY MS. FUKUDA:
19    Q.   (By Ms. Fukuda) Good afternoon, Dr. Jones.
20    A.   Good afternoon.
21    Q.   Before we broke for lunch, do you recall the series of
22    questions you were being asked about Apple and Akamai?
23    A.   Yes.
24    Q.   And now, you had testified that you agreed that Apple --
25    Apple and Akamai are different companies, correct?
```

1   A.   Yes.

2   Q.   Earlier, during your direct, when Mr. Curry was asking

3   you questions, I believe that in doing your analysis for

4   Claim 13 of the '720 patent and Claim 32 of the '221 patent,

5   you had lumped Apple and Akamai together as the data

6   supplier; is that correct?

7   A.   Yes.

8   Q.   Now, Dr. Jones, you're not an expert in law?

9   A.   That's correct.

10  Q.   And you're not an expert at interpreting contracts?

11  A.   That's correct.

12  Q.   And did you review the contract between Apple and Akamai

13  in providing your analysis?

14  A.   I believe I did, as well as other evidence provided by

15  Akamai.

16  Q.   Do you recall that in that contract, it expressly stated

17  that the relationship of Akamai and Apple under the agreement

18  is that of independent contracting parties?

19  A.   I don't recall the specific language, but that could be

20  there.

21         MS. FUKUDA:  Could we pull up DX-APL 126 at Page 1,

22  please?

23  Q.   (By Ms. Fukuda)  Oh, I'm sorry, let's take a look at the

24  Page 1 first.

25         You see here that this is the contract between Apple and

1    Akamai.  Did you review this?

2    A.   At least a version of this, yes.

3              MS. FUKUDA:  Okay.  Let's turn to Page 54.  And if

4    we could scroll down towards the bottom.  Just one second.

5    Q.   (By Ms. Fukuda)  All right.  If we take a look at the

6    right column in the middle, and you'll see here right there

7    the relationship of Akamai and Apple under the agreement is

8    that of independent contracting parties.  You see that?

9    A.   I do.

10   Q.   And if you keep reading, it says:  And nothing contained

11   in the agreement shall be construed to give either party the

12   power to direct and control the day-to-day activities of the

13   other.

14        You see that?

15   A.   I do.

16   Q.   Okay.  Or, (ii), or deem the parties to be acting as

17   partners, joint venturers, co-owners, or otherwise as

18   participants in a joint undertaking.

19        Do you see that?

20   A.   I do.

21   Q.   Or, (iii), allow other party to create or assume any

22   obligation on behalf of the other party for any purpose

23   whatsoever.

24        Do you remember reviewing that language when you saw

25   this contract?

```
 1   A.    I don't remember one way or the other on that language.

 2   Q.    Okay.  And you are not here to interpret for the rest of

 3   us what the contractual obligations are between Apple and

 4   Akamai, are you?

 5   A.    No, and that wouldn't have any bearing on my

 6   infringement analysis with respect to identifying these as

 7   the data supplier.

 8   Q.    And -- and you can't offer expert opinion on what

 9   exactly Apple's role in terms of interacting with Akamai is

10   from a contractual basis, can you?

11   A.    No.

12   Q.    Dr. Jones, I have a couple of follow-up questions for

13   you.  Do you remember we discussed access rules a little bit

14   earlier?

15   A.    Yes.

16   Q.    And I just want to clarify that your opinion regarding

17   Apple's infringement with respect to Claim 13 of the '720

18   patent and Claim 32 of the '221 patent is limited to the

19   functionality of movie purchases and rentals; is that right?

20   A.    Yes.

21   Q.    And, Dr. Jones, you also recall that we walked through

22   some steps of what happens when a user punches in the

23   password for the Apple ID, and then the DSID, GUID, and MID

24   is sent.  Remember that?

25   A.    Yes.
```

```
 1   Q.    And you testified this morning that when you send your
 2   DSID, GUID, and MID to the Apple server, you're not paying
 3   Apple; is that right?
 4   A.    I don't believe so, no.
 5   Q.    You did not testify to that?
 6   A.    I -- I don't recall saying that, no.
 7   Q.    So is it your opinion that Apple has been paid when its
 8   server receives the DSID, GUID, and MID from a user?
 9   A.    Yes.  If the payment is validated, the user has paid
10   Apple.  There are still back-end transactions to be done,
11   just like with any other purchase.
12   Q.    Again, Dr. Jones, the question is, is it your opinion
13   that when the user sends the DSID, GUID, and MID, to the
14   Apple server, at that moment Apple has been paid?
15            MR. CURRY:  Your Honor, this is exactly what we
16   talked about right before lunch.
17            THE COURT:  You're going to have to speak up,
18   counsel.  I can't hear you.
19            MR. CURRY:  Sorry.  My objection is that this line
20   of questioning goes right to the topic we discussed right
21   before lunch.  May we approach?
22            THE COURT:  Approach the bench.
23            (Bench conference.)
24            MS. FUKUDA:  Your Honor, he had --
25            THE COURT:  Go ahead.
```

1          MS. FUKUDA:  He had given some testimony about when

2     Apple has or hasn't been paid.  I'm just clearing up where,

3     technically speaking, the payment has been made.

4          THE COURT:  What's your objection, Mr. Curry?

5          MR. CURRY:  My -- my objection is this is further

6     continuation of attacking the propriety of the claim

7     construction because the implication of this entire line of

8     questioning is that the Court's construction for payment data

9     requires that -- is something other than how the Court

10    construed it.  The question that she asked is do the things

11    that you identified as payment data, is that paying Apple?

12         MS. FUKUDA:  Your -- Your Honor, if I may, that's

13    not the point I'm making.  It's because the witness had

14    testified and had led to -- created a certain impression that

15    Apple has already been paid when it receives those three IDs.

16    I just want to establish that either he believes that's true

17    or that it isn't true.

18         MR. CURRY:  My -- my -- this is exactly my point.

19    If we follow Your Honor's claim construction, this question

20    has no relevance.  It's entirely prejudicial for Ms. Fukuda

21    to suggest that something is required other than the express

22    construction that the Court gave.

23         THE COURT:  It seems to me that this has been asked

24    and answered already.  Did we not already cover this ground?

25         MS. FUKUDA:  Not the clarifying question.  And,

```
 1    Your Honor, the reason is that in the term -- in the claims,

 2    there's a requirement not just for payment data, but also for

 3    payment.  So it is important to draw a distinction between

 4    payment data and payment.  And I merely wanted to clarify

 5    that his -- when he says payment, that he's not lumping it

 6    together with payment data.

 7                 THE COURT:  All right.  I'm going to overrule the

 8    objection.  But I remind you of my instructions in chambers.

 9                 MR. CURRY:  Thank you, Your Honor.

10                 MS. FUKUDA:  Thank you.

11                 THE COURT:  To the extent this has been covered, we

12    need to move on.

13                 MS. FUKUDA:  Thank you.

14                 MR. CURRY:  Thank you, Your Honor.

15                 THE COURT:  All right.

16                 (Bench conference concluded.)

17                 THE COURT:  All right.  Objection is overruled.

18                 Let's continue.

19    Q.   (By Ms. Fukuda)  Dr. Jones, is it your opinion that

20    Apple has been paid when its server -- at the moment that its

21    server receives the DSID, the GUID, and the MID from the

22    user?

23    A.   Not right at that moment, no.

24    Q.   Thank you.

25         Dr. Jones, at the very end of your examination by Mr.
```

1    Curry, you gave a series of opinions regarding what's called

2    non-infringing alternatives.  You recall that?

3    A.    Yes.

4    Q.    And you testified that it was your understanding that

5    the non-infringing alternatives that you came up with are

6    relevant for damages calculation, correct?

7    A.    Yes.  Specifically for the survey that was conducted.

8    Q.    Okay.  And you understand that Apple did not supply

9    separate so-called non-infringing alternatives, correct?

10   A.    Yes.

11   Q.    And you do understand that just because Apple didn't

12   supply what's called non-infringing alternatives for damages

13   purposes, that has nothing to do whether -- with whether

14   Apple is conceding that there's infringement or no

15   infringement, correct?

16   A.    I'm not sure I understood exactly what you were asking

17   me.

18   Q.    Let me put it this way:  The fact that Apple did not put

19   forward non-infringing alternatives for damages purposes does

20   not mean that Apple hasn't said, no, we don't infringe in

21   this case?

22   A.    That's correct.

23   Q.    And, in fact, it is your understanding that Apple --

24   Apple's position is that it does not infringe?

25   A.    That's correct.

```
1   Q.   And, in fact, there will be other experts who will be
2   testifying here that would not agree with your conclusion.
3        You understand that?
4   A.   That's my understanding.
5   Q.   Okay.  Thank you.
6        So you do understand that this non-infringing
7   alternative is really your opinion; that your opinion -- even
8   under your opinion, if Apple did these things, you would
9   conclude there's no infringement.
10  A.   With respect to the alternatives identified, yes, I
11  think I identified the non-infringing alternative for the
12  '720.  It does not avoid infringement of the '772.
13  Q.   And you came up with different alternatives for the '772
14  that even, in your opinion, you would say that's not
15  infringing, right?
16  A.   That's correct.
17  Q.   Okay.  Now, you characterized these alternatives to be
18  Apple's best alternatives for its current design, correct?
19  A.   Yes.
20  Q.   So you agree that there may be multiple alternatives for
21  each of the asserted claims?
22  A.   Yes.  In fact, I identified multiple alternatives.
23  Q.   What I mean is, for any particular asserted claim, you
24  agree that there could be multiple alternatives that even, in
25  your opinion, is not covered by that claim, right?
```

1   A.   Yes.

2   Q.   And you identified one of them as what you called the

3   best.

4   A.   I believe I identified two in some cases.

5   Q.   Oh, okay.  That would cover any one single claim,

6   correct?

7   A.   I believe so, yes.

8   Q.   Okay.  And by best, would you agree that you believe

9   that your alternative is one that would provide Apple and its

10  customers with as much benefit as possible?

11  A.   That's certainly my intention, yes.

12  Q.   And you also agree that, generally, the fewer steps

13  that's required by the alternative, the more seamless the

14  transaction would be and the most desirable to the user?

15  A.   At a high level, yes.  It would depend on the particular

16  alternative.  I would have to examine that.  But as a general

17  principle, yes, but it's not always true.

18  Q.   Okay.  Now, you provided what you thought were Apple's

19  best alternatives to -- you testified -- Dr. Wecker and Mr.

20  Mills?

21  A.   Yes.

22  Q.   And Dr. Wecker and Mr. Mills are also experts hired by

23  Smartflash to analyze Smartflash's damages?

24  A.   Yes.

25  Q.   And that's under the assumption that there is

1    infringement found and that the patents are found to be

2    valid, right?

3    A.    Yes.

4    Q.    And that's just an assumption.

5    A.    Well, it's my opinion.   It's an assumption that all the

6    damages experts make.

7    Q.    But Apple disagrees, and they will have a chance to put

8    up their testimony -- their evidence later, correct?

9    A.    Yes, they will.

10   Q.    Okay.   Now, you understand that Dr. Wecker and Mr. Mills

11   will be relying on your alternatives when they come up with

12   the damages numbers in this case.

13   A.    Yes.

14   Q.    And you understood that Dr. Wecker would be running

15   consumer surveys based on your alternatives, correct?

16   A.    Yes.

17   Q.    And you understand that Mr. Mills will be relying on Dr.

18   Wecker's surveys that are based on your alternatives, to

19   generate Smartflash's damages number for this case, correct?

20   A.    At least in part, that's my understanding.

21   Q.    Now, you agree -- would you agree that if you didn't

22   select the best alternative, then Dr. Wecker's and Mr. Mills'

23   reliance on your alternatives would also be faulty?

24   A.    It could be the case.   I would have to look at it, but

25   I'm not aware of any situation which that's the case.

1  Q.    Because you believe you've identified the best

2  alternative?

3  A.    Yes.

4  Q.    Now, you're not an expert in consumer surveys, correct?

5  A.    That's correct.

6  Q.    And you're not an expert in drafting survey questions?

7  A.    No.   I've done it, but I'm not an expert in it.

8  Q.    And you're not an expert in drafting questions for a

9  survey-taker to decide whether or not they're motivated to

10 buy something?

11 A.    That's correct.

12 Q.    In fact, this was the first instance where you were

13 working on a survey in a litigation context?

14 A.    It may have been, yes.

15 Q.    And this was the first survey in which you were dealing

16 with specific consumer products?

17 A.    That may be the case, yes.

18 Q.    Now, Dr. Jones, you agree that all four of the asserted

19 claims have this following code element, code responsive to

20 the payment validation data to retrieve data from the data

21 supplier.

22        MS. FUKUDA:   And to make it easier on you -- it's

23 not a memory test -- I will have Mr. Lee pull up a slide that

24 puts them next to each other.

25        There we go.

1   Q.   (By Ms. Fukuda) We've blown up that particular code

2   element that I had asked about.

3        Do you see them?

4   A.   I do.

5   Q.   And you agree that these four code elements, each

6   existing in the respective asserted claims, require code

7   responsive to payment validation data to retrieve data from

8   the data supplier, correct?

9   A.   Yes.

10  Q.   And you understand that the payment validation data is

11  only obtained after payment data is sent, right?

12  A.   That's correct.

13  Q.   And you would agree that in a system in which payment is

14  occurring after a user already downloaded the content from

15  the supplier, that system would not infringe these claims?

16  A.   I would have to know more about the situation to

17  understand it better before I would say it wouldn't infringe

18  it.

19  Q.   Well, in the -- in the example of purchasing an app from

20  the App Store, for example, if a user downloads the app first

21  and then sends the DSID, GUID, and MID, which you call

22  payment data, in that particular situation, there would not

23  be infringement, would you agree?

24  A.   If there's no payment data that was sent according to

25  the claims, then I would agree there's no infringement.

1    Q.    Okay.  Now, this particular claim element here requires

2    that in order -- before you can get that content from the

3    data supplier, whether it be an app or a movie or a song,

4    that you -- the -- your user device must have code -- must

5    first receive pay --

6        Let me rephrase that question.

7        By this element, in all four of these claims, you would

8    agree that before the user can retrieve content from the data

9    supplier, including apps, that they would first have to send

10   payment data and then receive payment validation data back,

11   agreed?

12   A.    Yes.  I believe that's what the claims require.

13   Q.    Okay.  And in your analysis of infringement, you claim

14   that the DSID, the MID, and the GUID is the payment data,

15   correct?

16   A.    Yes.

17   Q.    And you say that that's the payment data that's sent to

18   Apple's server, and in response, you -- your opinion is that

19   payment validation data is sent back to the user, correct?

20   A.    Yes.

21   Q.    And then at that point, the user can retrieve the

22   content?

23   A.    Well, the system can retrieve the content.

24   Q.    The system can retrieve the content.

25       So what about in this scenario?  I'm the user.  I have

1   an iPhone.  I browse for content, and I select something I

2   want to buy.  Let's say it's an app or a movie or a song, and

3   I select it.

4        That content is immediately downloaded to my phone

5   without me require -- without requiring me to punch in my

6   Apple ID, my password, or anything of the kind.  It just

7   downloads to my phone.

8        Are you with me so far?

9   A.   Yes.

10  Q.   Okay.  But before I use that content, before I play it,

11  before I access it, I'm prompted to enter my password for my

12  Apple ID, just the way you demonstrated it before.  Remember

13  when you purchased that movie, you had downloaded it -- I'm

14  sorry.  You had punched in your Apple ID password, and then

15  you got the content?

16  A.   Yes.

17  Q.   Except now I'm reversing it.  Now you select the

18  content.  It comes down to your phone.  And when I want to

19  access it, now I'm prompted to punch in my Apple ID password.

20       In that system, is that practice -- is that practicing

21  any of the four asserted claims?

22  A.   As long as no payment data was sent prior to this code

23  responsive to the payment validation data, then it wouldn't

24  meet the claim.

25  Q.   Okay.  And in that -- that is exactly my example.  When

```
 1    I download the content, I'm -- I'm not required to put

 2    anything into the system.  It's only after the content has

 3    downloaded to my device.

 4            THE COURT:  Counsel, you need to ask questions.

 5    You're making a speech to the witness.  Break this up into

 6    questions, please.

 7            MS. FUKUDA:  Okay.  Sure, Your Honor.

 8    Q.   (By Ms. Fukuda) In the example -- would you agree that

 9    this particular example is not covered where I download the

10    content first to my phone, and then now that I've got it on

11    my phone, before I play or use it, I supply the password for

12    my Apple ID?

13         Would you agree that that falls outside the scope of all

14    four of these claims?

15    A.   When did you provide payment data?  If you didn't

16    provide any payment data, then it wouldn't meet it.

17    Q.   Right.  I've never provided my password for my Apple ID

18    before I downloaded the content.  It was only after I

19    downloaded the content that I'm prompted to enter my ID, just

20    like I otherwise would.  All I'm doing is taking that step

21    that you showed to the jury and moved it further back in time

22    after download.

23    A.   The -- entering the password in your ID isn't the --

24    isn't the way that payment data is met, so I don't think

25    that -- I think I would have to know what the payment data is
```

1    sent.

2    Q.    Sure.  Now, you understand that in a -- let's say in a

3    typical purchase, that when you enter your password for the

4    Apple ID, it is your testimony that at that point, a series

5    of DSID, GUID, and MID is sent to the Apple server, correct?

6    A.    Yes, it's sent in a buy product re -- request.

7    Q.    And in your opinion, is that -- it's those three things

8    taken together that's the payment data, correct?

9    A.    Yes.

10   Q.    Okay.  So in my example, what I'm asking you, Dr. Jones,

11   is that I haven't done that yet.  I haven't sent any of that

12   information yet.  Instead, I get the content downloaded first

13   to my phone; and then before I get to use that content, now

14   I'm asked to put in my password, which results in sending the

15   DSID, GUID, and MID to Apple.

16        In that example, is that -- isn't it true that that's

17   not covered by any of these four claims?

18   A.    That's correct.

19   Q.    And just for the sake of clarity, let's just call this

20   the alternative download before entering Apple ID.  Are you

21   okay with that?

22   A.    No.  I think we need to refer to it by the payment data.

23   Q.    Okay.  Let -- let's call it download before payment

24   data -- before entering payment data.  How's that?

25   A.    Okay.

1    Q.    Okay.  So in this example, you would agree that that

2    would not infringe the claims for any kind of content, right,

3    including apps, movies for purchase, movies for rental,

4    songs, ebooks?

5    A.    As long as the payment data isn't sent until after the

6    movie -- until after this step of retrieving the data from

7    the data supplier, then it wouldn't infringe.

8    Q.    Okay.  Now, you didn't provide this particular

9    alternative to either Dr. Wecker or Mr. Mills, did you?

10   A.    I believe for apps, that is quite similar to the

11   alternative identified.  I would have to look back.

12   Q.    Well, let's take a look at the alternative that you

13   supplied for the apps, if we could.

14          MS. FUKUDA:  Maybe the best way to do this here is

15   let's pull up the slide that Mr. Curry had walked through

16   with you.  It's Smartflash's Slide Deck 157.

17   Q.    (By Ms. Fukuda)  And I'll direct your attention to the

18   second paragraph.  You see that?

19   A.    I do.

20   Q.    Okay.  And that's the scenario you're talking about

21   right now, correct?

22   A.    Yes.

23   Q.    So the alternative you provided to Dr. Wecker and Mr.

24   Mills is that instead of purchasing apps the way a user on an

25   Apple system would do right now, instead, you would allow

1  users to browse for and install apps but require users to

2  complete each purchase by separately visiting a website and

3  entering payment information to unlock the app.  That -- that

4  was your alternative, correct?

5  A.   Yes.

6  Q.   Okay.  Now, the example -- the alternative I gave you

7  does not require a user to separately visit a website and

8  enter payment information; isn't that right?

9  A.   That's correct.

10  Q.   Wouldn't you agree that separately visiting a website

11  and entering payment information would require additional

12  effort by the users?

13  A.   No.

14  Q.   Wouldn't you agree that if -- if a user had to -- if

15  they download the app on their phone, then they have to go

16  pull up another browser, enter in their payment information

17  there, in order to come back and be able to use their app.

18       Wouldn't that be additional steps?

19  A.   If you did it that way, but I don't think that's how you

20  have to visit a website.

21  Q.   Well, you -- in your alternative, you didn't tell the

22  survey takers that they could -- instead of visiting a

23  separate website to enter payment information, that they

24  could instead do exactly what they're doing now to purchase

25  an app, except they don't do it at the moment they try to

```
 1    down -- they don't do it before download, they just do it
 2    after download.  You didn't present that option?
 3    A.    That is effectively what I presented here.
 4    Q.    You think that separately visiting a website and
 5    entering payment information is, in your opinion, the same
 6    thing as punching in a password for your Apple ID the way
 7    users purchase -- the way the users enter information now?
 8    A.    I think they're very similar, yes.
 9    Q.    Do you have any understanding that as -- well, let me
10    ask it this way:  You agree that separately visiting a
11    website and entering payment information may be understood as
12    opening up Internet Explorer or Safari, navigating to a URL,
13    go to the payment page, and enter credit card information,
14    right?
15    A.    That seems like the longest possible way to do it, so
16    I'm not sure that people would understand it in that way.
17    Q.    But do you remember you had given deposition testimony
18    in this case, Dr. Jones?
19    A.    Yes.
20          MS. FUKUDA:  Could we pull up your September 25th,
21    2014 deposition transcript, Page 112, starting Line 16,
22    please?
23    Q.    (By Ms. Fukuda)  You see here that you were asked a
24    question:  Well, the scenario I just described wouldn't
25    require the user to separately visit a website, correct?
```

1      And your answer:  Separately visiting a website can be

2    as simple as putting up a pop-up of the simple website and

3    entering that information.

4          Next question:  Or it could require a user to open up

5    Internet Explorer or Safari, navigate to a URL, go to the

6    payment page, enter credit card information, right?

7          And your answer on the next page was:  You could do

8    that, yes.

9          Did you give that testimony at your September 25th, 2014

10   dep -- deposition?

11   A.    Yes, and it's exactly what I just said.

12   Q.    You still agree with that?

13   A.    Yes.

14   Q.    Now, when your scenario is presented to the survey

15   takers, you don't know how the survey takers understood your

16   sentence:  Separately visiting a website and entering your

17   payment information, correct?

18   A.    I can't know what -- what any person understands when

19   they read a survey.  That -- that's not my area.

20   Q.    It's possible that the survey takers thought that it

21   required them to go over to Internet Explorer or Safari, open

22   up a URL, and then -- and then entering the credit card

23   information, isn't it?

24   A.    I don't know.

25   Q.    Let's take a look at another one of your scenarios.

1            MS. FUKUDA:   Back to Slide 157 of your presentation

2    under Video Purchase.

3    Q.   (By Ms. Fukuda)   You see that scenario?

4    A.   I do.

5    Q.   And your opinion was that the Apple's best

6    non-infringing alternative was to allow users to purchase and

7    stream the desired content.   You see that?

8    A.   Yes.

9    Q.   Let's now take a look at your alternative to video

10   purchase and rental alternative.

11           MS. FUKUDA:   And that's on Slide 154.

12   Q.   (By Ms. Fukuda)   Now, the best scenario -- the best

13   alternative that you presented was that instead of Apple

14   being able to offer their users the ability to both buy

15   movies and rent movies, now you're only going to allow users

16   to purchase that -- the movie.   You can't rent it at all.

17       Wasn't that your best scenario?

18   A.   For that one, yes.

19   Q.   Well, isn't it true that what you could have

20   presented -- you could have also presented the alternative

21   that you can still purchase and rent movies, except that when

22   you do, you'd be streaming the content instead of downloading

23   it.   Couldn't you have presented that?

24   A.   I could have, yes.

25   Q.   And -- but you never gave the users or the survey takers

1    the option to be able to stream rental content, did you?

2    A.    No.

3    Q.    And, Dr. Jones, I'm going to wrap up here, but I just

4    wanted to direct your attention to one more slide from your

5    presentation, and that's Slide 46.

6              MS. FUKUDA:  Let's try Slide 40.

7    Q.    (By Ms. Fukuda) All right.  Well, these are not the

8    slides I had in mind.  There's a mismatch between our deck.

9    I apologize.

10        Do you remember there was a slide that was directed

11   to -- there was a picture of an iPhone, and there were

12   multiple features that were point -- identified surrounding

13   the iPhone?

14   A.    Yes.

15   Q.    Okay.  And there were things like, you know, touchscreen

16   and, you know, all the different content that's available.

17        If you can picture that in your head, I will -- that's

18   what I wanted.

19              MS. FUKUDA:  Oh, thank you.

20              All right.  That should be -- here we go.  Slide

21   40.

22   Q.    (By Ms. Fukuda) All right.  That is Slide 40 from your

23   presentation, correct?

24   A.    I believe so, yes.

25   Q.    Okay.  Thank you.

1          Now, in this particular slide, you see here the list is:

2     FaceTime camera, receiver from microphone, ring -- ring

3     silent switch, volume buttons, app icons, multi-touch

4     display, bottom microphone, headset -- oh, I'm sorry --

5     headset jack, status bar, iSight camera, rear microphone, SIM

6     card tray, home button, touch ID sensor, lightning connector,

7     speaker.  I think I missed a couple.  Sleep/wake button, LED

8     flash.

9          You see all that?  Those are -- and those are just a few

10    of the features of the iPhone, correct?

11    A.    Yes.

12    Q.    Now, you're not testifying here that any of those things

13    are Mr. Racz's invention, right?

14    A.    That's correct.

15    Q.    And, in fact, the iPhone and all of these features that

16    were depicted here were, in fact, created, designed, built,

17    and made by Apple; isn't that right?

18    A.    At least to a certain extent, yes.

19    Q.    Well, those features exist on the iPhone, correct?

20    A.    Yes.

21    Q.    Apple made them?  Apple made this device?

22    A.    They did make this device.

23    Q.    Okay.  And Apple designed this device?

24    A.    They did.

25    Q.    Thank you very much.

1            MS. FUKUDA:  Pass the witness, Your Honor.

2            THE COURT:  Redirect by the Plaintiff?

3            MR. CURRY:  Thank you, Your Honor.

4            May I put the big foam board with the Court's

5    constructions, on the easel?

6            THE COURT:  You may.

7            MR. CURRY:  Thank you.

8            May I inquire if the jury can see the entirety of

9    the board?

10           Thank you.

11           THE COURT:  All right.  Let's proceed.

12                       REDIRECT EXAMINATION

13   BY MR. CURRY:

14   Q.   Dr. Jones, did you apply the Court's constructions in

15   your analysis?

16   A.   Yes, I did.

17   Q.   Including for payment data?

18   A.   Yes, sir.

19   Q.   Will you please explain why DSID, GO -- GUID, and MID

20   are payment data under the Court's claim construction?

21   A.   Yes.  The GUID, MID, and DSID are data that are used to

22   make payment for content, and that's done when a user -- a

23   user's device sends a buy product request to get -- to pay

24   for the content that they would like to pay for, for example,

25   a movie or an app.

1    Q.   Now, do you remember being asked some questions about

2    Visa and Mastercard and the point at which Apple would post

3    transactions to credit card companies?

4    A.   Yes, I do.

5    Q.   Does that matter for your analysis under the Court's

6    claim construction?

7    A.   No.   I certainly analyzed how the system operated, but

8    the time at which that transaction is posted is -- does not

9    affect my analysis under the Court's claim construction.

10   Q.   Now, the Court's claim construction for payment data is

11   data that can be used to make payment for content.   Who is

12   selling content?

13   A.   It's Apple.

14   Q.   Is Visa selling content?

15   A.   No.

16   Q.   Is Mastercard selling content?

17   A.   No.

18   Q.   And I think that you were asked some questions regarding

19   how a DSID can be used for other things as well.

20        Does the fact that a DSID or a GUID or MID, for that --

21   for that matter, does the fact that those pieces of data can

22   be used for other purposes somehow negate whether or not they

23   meet the Court's construction?

24   A.   No, sir.   I just compared them to the Court's

25   construction.   Other uses, that's not something that's

1   covered in the -- the claims or the Court's construction.

2   Q.   And in Apple's system, is the DSID linked to card

3   information?

4   A.   Yes, it is, just as I explained.

5   Q.   And you were actually asked some questions about the --

6   the setting up of an Apple ID to link credit card information

7   or -- or gift card information with an Apple ID.

8        Do you remember that?

9   A.   Yes.

10  Q.   What's the point of doing that?

11  A.   The point of doing that is to allow the DSID, GUID, and

12  MID to be used to make payment for content.

13  Q.   And does the DSID itself have value tied to it?

14  A.   Yes, it does.  That can be the gift card balance that

15  resides at the servers at Apple.

16  Q.   I want to be very clear on this.  Even if someone hasn't

17  even set up a credit card to be linked to an Apple ID, does a

18  DSID have value associated with it?

19  A.   Yes, it does.  It could be a zero balance if you haven't

20  gotten a gift card; but if you do put a gift card, then you

21  have a balance that's associated with that DSID.

22  Q.   And when MZ Buy receives a buy product request, does it

23  check that value?

24  A.   It does.  If the -- if the product -- if it's not a

25  request for a free product, then it will check that value

1    first.

2    Q.   And is that just one of the ways that MZ Buy validates

3    payment data?

4    A.   Yes, it is.

5    Q.   And you were asked questions about downloading free apps

6    by Ms. Fukuda.

7         Do you remember that?

8    A.   Yes.

9    Q.   Does an Apple product get payment validation data when

10   getting a free app?

11   A.   No, because you haven't made payment.

12   Q.   Is the payment validation -- I'm sorry.

13        Is the payment validation data that's received when

14   someone actually does buy an app, differ from the response

15   received from the Apple servers from MZ Buy when someone gets

16   a free app?

17   A.   Yes, it does.  When you pay for the app, there -- and --

18   what comes back in the response is the price.  When you get

19   the app for free, what comes back is indication that you paid

20   zero dollars.

21   Q.   And do you remember Ms. Fukuda asking you about

22   scenarios in which someone's DSID would get stolen?

23   A.   Yes.

24   Q.   Okay.  Does Apple protect the communications between its

25   Apple devices and its servers?

1    A.   Yes, they do.   They do that by encrypting the

2    communications.

3    Q.   And when you were performing your network captures, was

4    the level of protection for those communications different at

5    the point at which you would actually make a purchase?

6    A.   Yes.   Those communications were -- were further

7    certified, and we were not able to analyze those

8    communications because of the increased security.

9    Q.   Now, you were asked a question about use rules being

10   numbers.

11        Do you remember this?

12   A.   Yes, I do.

13   Q.   A series of questions, right?

14   A.   Yes.

15   Q.   Can you please explain to the jury why a number -- a use

16   rule can be represented in a computer as a number?

17   A.   Well, first of all, computers represent everything as

18   some type of a number.   But, additionally, computers

19   traditionally represent things like permissions, rights, and

20   rules as numbers.

21        If we look at computer file systems, they represent

22   the -- the rights that a user has for access as individual

23   bits and fields, which are just numbers.

24   Q.   Thank you, Dr. Jones.

25        And you were asked questions about the point at which

1    Apple gets paid.

2        Do you remember that?

3    A.    Yes.

4    Q.    Does anything in Smartflash's claim language, the

5    claims, or the Court's construction require that Apple be

6    paid the minute it receives payment data?

7    A.    No, it doesn't.

8    Q.    Do you remember being asked questions about Akamai?

9    A.    Yes, I do.

10   Q.    And who is Akamai again?

11   A.    Akamai is the company with which Apple contracts to

12   perform -- or to be their content delivery network.

13   Q.    Now, do you have a home?

14   A.    Yes, sir.

15   Q.    Have you ever hired an independent contractor?

16   A.    Yes, sir.

17   Q.    For what?

18   A.    Performing work on the -- the house, to, for example,

19   put in a new bathroom.

20   Q.    Did he do what you told him to do?

21   A.    Yes.

22   Q.    And you were shown the contract between Apple and

23   Akamai, and a lot of emphasis was put on independent

24   contractor.  Do you remember that?

25   A.    I do.

1  Q.   Apple and Akamai are different companies, correct?

2  A.   Yes.

3  Q.   Okay.  That contract explicitly -- let me -- let me ask

4  a question.  Sorry.

5       Did that contract permit Apple to control Akamai's

6  business?

7            MS. FUKUDA:  Objection, Your Honor.  Witness is not

8  qualified to testify as to contracts.

9            MR. CURRY:  Your Honor, he was cross-examined on

10  this.

11           THE COURT:  I'll allow it.  Overruled.

12  A.   I don't believe it allowed them to control Akamai's

13  business.

14  Q.   (By Mr. Curry)  But in that same contract, did that

15  contract allow Apple to lease servers that are owned by

16  Akamai and for it delivering content to user for Apple's

17  systems?

18  A.   Yes.  What -- what the contract is establishing -- that

19  is, Apple is paying Akamai to run a particular content

20  delivery network for them.

21  Q.   Does a data supplier have to be implemented on a single

22  server?

23  A.   No.  There's nothing in the claim language that

24  indicates that a data supplier can only be a single server.

25  Q.   Can a data supplier be a computer system with multiple

1    servers?

2    A.    Yes.   There's nothing that would limit that.

3    Q.    Does the patent even give an example of that?

4    A.    It does.

5          MR. CURRY:   Mr. Mortensen, please pull up Figure 6

6    of the '720 patent.

7    Q.    (By Mr. Curry)  Dr. Jones, what is Figure 6 showing?

8    A.    It's showing a -- a data supply system -- in -- in

9    particular, the system 120, and that's composed of multiple

10   processors and functionalities that we can see across the

11   bottom.

12   Q.    How do you know that that is the data supply system as

13   depicted in the patent?

14   A.    The description of this figure in the specification --

15   in the portion with all the words in it.

16         MR. CURRY:   Mr. Mortensen, go -- please go to

17   Column 11.  All right.  There at the top.  Thank you, sir.

18   Q.    (By Mr. Curry)  How does the patent describe Figure 6?

19   A.    Figure 6 shows a data supply computer system.

20         MR. CURRY:   And, Mr. Mortensen, can we go back to

21   Figure 6 and leave that on the screen?

22   Q.    (By Mr. Curry) Dr. Jones, what is Box 134?

23   A.    That's the content distribution processor on the far

24   right side.  It provides the content.

25   Q.    And now back to the written description.  Sorry.

1          MR. CURRY:  Mr. Mortensen, can you go to Column 14,

2     Lines 34 through 50?

3     Q.   (By Mr. Curry)  What does the patent teach about

4     different ways to implement a data supplier, Dr. Jones?

5     A.   It's indicating that the four elements along the bottom,

6     128, 132, 130, and 134, could be separate programs or a

7     single computer system.  They might operate on a single,

8     physical computer, or they may operate on separate computers

9     and -- well, over separate computers.

10         MR. CURRY:  And specifically, Mr. Mortensen, could

11    you highlight the last two -- Lines 49 and 50?

12    Q.   (By Mr. Curry) Could you read that sentence, Dr. Jones,

13    starting with however?

14    A.   However, in other embodiments one or more of the

15    processors may be coupled to web server 124 via Internet --

16    Internet 142 and owned and operated by a separate entity,

17    such as a financial institution.

18    Q.   Thank you.

19         MR. CURRY:  You can blackout that screen, Mr.

20    Mortensen.

21    Q.   (By Mr. Curry)  Dr. Jones, you were asked a series of

22    questions about selecting content when parental controls are

23    enabled.  Can you please explain how a user is able to select

24    content as required by the claim language?

25    A.   Yes.  For example, the user can select the movies

1   category or TV's category -- TV season category in the video

2   app is one example of being able to select one or more

3   content items as required by the claims.

4   Q.    And when -- if an Apple product has a piece of content

5   grayed out, does the Apple device still know and receive the

6   user selection, even on a grayed-out piece of content?

7   A.    Well, that'd be the case, for example, in an iTunes app

8   or in the App Store app.  In that situation, Apple will still

9   receive the user's touch, but it won't process it as a

10  selection.

11  Q.    Have you ever -- you were asked a number of questions

12  about alternatives to infringement.

13  A.    Yes.

14  Q.    How many alternatives to infringement did Apple identify

15  in this case?

16  A.    None.

17  Q.    Are you qualified to identify a non-infringing

18  alternative of patent claims?

19  A.    Yes.

20  Q.    Are you confident that you identified the best

21  non-infringing alternatives in this case?

22  A.    Yes.

23  Q.    Do you remember being asked about the download before

24  entering payment data alternative?

25  A.    Yes, I do.

1  Q.   Is that effectively what you had identified in your

2  opinion?

3  A.   Yes, just as I explained.

4  Q.   Does that alternative -- let me ask a different

5  question.

6       Can that alternative be implemented in a number of ways?

7  A.   Yes, it can.

8  Q.   Does that alternative require all the steps that

9  Ms. Fukuda laid out, such as going to a web browser, entering

10 a URL, going to a website, et cetera?

11 A.   No.

12 Q.   Please explain to the jury one way the alternative could

13 work, and from an ease of use perspective, exactly the way --

14 exactly as easy as the competing alternative that she was

15 cross-examining you on?

16 A.   That could be, for example, popping up a -- a view that

17 would -- in the same application that would take you to a

18 website where you could enter your payment information or

19 payment data.

20 Q.   Dr. Jones, did you request to be compensated at twice

21 your hourly rate for this case?

22 A.   No, sir, at my usual rate.

23 Q.   To be an expert witness, does it require you just to

24 testify from memory of facts that have already happened, like

25 a fact witness?

1    A.   No, sir.

2    Q.   Finally, did Ms. Fukuda challenge you on how you said

3    the source code works, your network captures, or how you say

4    Apple's products work?

5    A.   No, sir, I don't recall her doing so.

6              MR. CURRY:  Pass the witness.

7              THE COURT:  Further cross-examination.

8              MS. FUKUDA:  No further questions, Your Honor.

9              THE COURT:  You may step down, Dr. Jones.

10             All right.  Plaintiff, call your next witness.

11             MR. WARD:  Plaintiff calls Dr. William Wecker.

12             THE COURT:  All right.  Dr. Wecker, if you'll come

13   forward and be sworn.

14             MR. WARD:  Your Honor.

15             THE COURT:  Yes.

16             If you'll come around, please sir.

17             (Witness sworn.)

18             THE COURT:  Please have a seat on the witness

19   stand.

20             All right.  Mr. Ward, you may proceed.

21         DR. WILLIAM WECKER, PLAINTIFFS' WITNESS, SWORN

22                      DIRECT EXAMINATION

23   BY MR. WARD:

24   Q.   Good afternoon, Dr. Wecker.

25   A.   Good afternoon.

1   Q.   Would you introduce yourself to the jury, please, sir?

2   A.   My name is William E. Wecker.

3   Q.   And what do you do for a living, Dr. Wecker?

4   A.   I'm a statistician.

5   Q.   And where are you employed?

6   A.   I now have a small consulting firm.  I'm retired from

7   university, but I still do some of this sometimes.

8   Q.   And what were you asked to do in this case?

9   A.   I was asked to determine the importance of the

10  Smartflash technology to Apple and to consumers by means of

11  several surveys that I conducted.

12  Q.   And we're going to discuss those surveys here in a

13  little while, correct?

14  A.   Yes.

15  Q.   All right.  Before we do that, let's look at your CV.

16  And I'm showing you what's been marked as Plaintiffs' Exhibit

17  53.  And can you tell us what that is?

18  A.   That's my -- at least the first page of my CV or resume,

19  describing my background and experience.

20  Q.   And will you tell us a little bit about your educational

21  background?

22  A.   I received a Bachelor of science degree in 1963 from the

23  United States Air Force Academy.  And then I was in service

24  with the Air Force for a number of years, but after some

25  years, I returned as a civilian to the University of Michigan

1   where I received a Master of science, and then the Ph.D.

2   degree in statistics and applied mathematics.

3   Q.   And what did you do while you were in the Air Force?

4   A.   Well, in the Air Force -- well, first, I went to pilot

5   training in Laredo, Texas.  And importantly, got married

6   while I was there.  But then it was flying Air Force

7   fighter-type aircraft at all sorts of places around the

8   world; England, North Africa, Germany, Philippines, many

9   other places.

10  Q.   Did that include Vietnam?

11  A.   And Vietnam.

12  Q.   And did you receive the Distinguished Flying Cross for

13  Heroism for Combat over in Northern Vietnam?

14  A.   Yes.  That's a long time ago.

15  Q.   Now, what did you do after receiving your Ph.D. degree?

16  A.   After receiving the Ph.D., I accepted an offer to be a

17  professor at the University of Chicago, and we moved to

18  Chicago.

19  Q.   And what were you teaching at the University of Chicago?

20  A.   Statistics and applied mathematics to graduate students.

21  Q.   And have you taught at any other universities besides

22  the University of Chicago?

23  A.   Yes.  I taught at University of California Davis and

24  Stanford and one year at -- in Czechoslovakia at the Prague

25  Technological University.

1    Q.   Are you still teaching at the university level, or is it

2    mostly consulting work?

3    A.   I'm retired now as a professor, although occasionally,

4    by invitation, I'll give lectures.  But I've moved to

5    Wyoming, and I'm -- I'm no longer active in university work.

6    Q.   One of the items on your resume is the Journal of the

7    American Statistical Association.  What is that?

8    A.   That's the -- two parts to the answer really.  The

9    first -- the Journal of the American Statistical Association

10   is an academic journal that professors typically publish

11   their research in.  It's the -- really the premier journal

12   for academic publications and statistical theory and methods,

13   both in the United States and probably around the world.  I

14   think you'd get general agreement on that.

15       Then the second part is, what's -- what's an editor do?

16   And they run something called the peer review process, which

17   is to say they decide what gets published and what doesn't

18   get published.  I did that job for that journal and others

19   for more than 20 years, and it's a very responsible position,

20   because young professors' careers depend on whether they're

21   published or not.  So I spent a lot of time and was quite

22   careful in that work.

23   Q.   As an editor?

24   A.   As an editor, yeah.

25   Q.   And was that a paid position?

1   A.   No, it's not a paid position.  It's what's called

2   service to the profession.  It's just something you do along

3   with your regular work at the university.

4   Q.   And does Plaintiffs' Exhibit 53, your resume, list other

5   various publications that appeared in that journal, as well,

6   if the jury wanted to look at them?

7   A.   Yes.  Not on this page, but on several pages that

8   follow, I have publications that are in that journal and

9   other journals.

10  Q.   Now, among the subjects that you taught at the

11  university, did you teach statistical sampling and sample

12  surveys?

13  A.   Yes, in virtually every introductory course I would

14  start with that topic because it's so fundamental.

15  Q.   And did -- besides teaching, did you actually conduct

16  surveys, as well?

17  A.   Over the years, I've conducted many surveys, yes.

18  Q.   And did you provide us with a list of those, or at least

19  an example of some of the surveys that you performed?

20  A.   Yes.  At the bottom of this chart that I made, until I

21  ran out of room, I listed a few.

22  Q.   Let's talk about one of them, briefly, the first one

23  there.  Let's start there.  The General Motors vehicle

24  owners.  Can you tell us what that survey was about?

25  A.   Yes.  That's easy to describe.  General Motors wanted to

```
 1   know what their customers' experience was and what their
 2   reaction was to certain of their vehicles.
 3        And, of course, they didn't want to talk to a hundred
 4   percent of them, so they got a statistician to design the
 5   right kind of samples so they could talk to a smaller number
 6   and then be confident that was representative of all of them.
 7   And I did that work for them.
 8   Q.   What was the purpose of your surveys in this case?
 9   A.   The purpose, as I wrote on this chart here, is to
10   determine the importance of features enabled by the
11   Smartflash technology to consumers and to Apple.
12   Q.   Now, before we --
13            MR. WARD:  Your Honor, Plaintiff offers Dr. Wecker
14   as an expert in statistical sampling, including individual
15   surveys.
16            THE COURT:  Is there objection?
17            MR. POST:  No objection, Your Honor.
18            THE COURT:  The Court will recognize him as an
19   expert in that field.
20            Proceed.
21   Q.   (By Mr. Ward) Before you took the stand, did you have an
22   opportunity to review a number of exhibits that we're going
23   to be discussing today?
24   A.   Yes, we did that this morning.
25   Q.   We're not going to discuss all -- every page of those
```

1   exhibits, are we?

2   A.   Well, I hope not.

3   Q.   We're going to discuss selected pages, correct?

4   A.   Yes.

5   Q.   But the exhibits that we are going to discuss come from

6   Plaintiffs' Exhibit 54.001, 54.002, 54.003, 54.004, 54.005,

7   and 54.006, which are Attachments D through Y to your surveys

8   from August the 14th?

9   A.   Yes, I can confirm that from this morning.

10  Q.   And also, did you review Plaintiffs' Exhibits 204,

11  205.001, 205.0022, 205.003, 205.004, and 205.005?

12  A.   I did.

13  Q.   And those are the attachments, A through P, to your

14  January 2015 supplemental report?

15  A.   Yes, that's correct.

16  Q.   Is this just a subset of all the paper that was

17  generated from your surveys?

18  A.   It's actually quite a small subset.  There's more than

19  8,000 pages of work that was produced and made available to

20  all parties in this matter, but the particular attachments

21  that you have called attention to are the -- what I would

22  call the results pages where certain estimates are made.

23  There's about a 150 pages of results there.

24  Q.   And how many different surveys did you do in this case?

25  A.   Seven.

1   Q.    Can you tell us a little bit about the surveys you

2   conducted?

3   A.    Well, I can tell you about this first one here first,

4   and the others are going to be quite similar, so after

5   struggling through one of these, the rest should go easier.

6        Notice at the top of this chart, I had to have a name,

7   because there's seven different surveys.  This is a chart

8   about the App Store.  So I'm surveying and asking questions

9   of people about the App Store.

10       And I've titled it in the subtitle:  The Importance of

11   the Smartflash Technology to Consumers, just to distinguish

12   it from the next survey.  So I have two names.

13       The design of my survey here is what's called an

14   Internet survey.  Now, Internet surveys have become quite

15   popular and normal in the last several years as the Internet

16   has grown and as more and more people have access to the

17   Internet.

18       And so what that means is that the people answering the

19   questions I'm going to be asking are answering on their

20   computers from wherever they are.  And they're receiving the

21   questions on the computer, and then they're clicking with

22   their mouse or typing, and the answers then are coming back

23   to a central computer location and processed by me.

24       The sample size of this first survey was approximately

25   2,000.  That's a good-sized sample for statisticians.

```
 1          And the important thing about it is it's a
 2   representative sample, and the easy -- so that when you
 3   finish looking at the answers for 2,000 people, you can make
 4   estimates for the entire United States based on that.
 5          We've all seen, say, the CNN or other news programs
 6   where they have surveys.  So this is very much like that.
 7               THE WITNESS:  Oh, thank you.
 8   A.    My vendor here was ORC, who, in fact, does the surveys
 9   for CNN, and they're very large, compared to me, at least.
10          And they have a panel of more than 1.7 million people
11   that they have organized and ready to receive questions.
12          And so I work with ORC.  I do all the questions.  I do
13   all the designs.  All they do is provide me the access to
14   these people.
15          And so I go out and get a random sample of their 2.7
16   million panelists, and those are the people I'm going to ask
17   questions of.
18          So we can put this away and go back to the design chart.
19   Q.    (By Mr. Ward) Have you used ORC prior to this survey?
20   A.    Yes.  I like their work.  They've been very effective
21   for me many times.
22          So I want to explain about what a representative sample
23   is maybe just a bit more.  Think of it this way:  When you
24   look at my sample, it's going to have about 51 percent female
25   and about 49 percent male because it turns out, in the United
```

```
 1    States adult population, that there's 41 percent male and --
 2    51 percent female and 49 percent male approximately.
 3         And then there's education levels and whether people are
 4    employed and whether they own their home and whether they
 5    live in the north or the south or the east or the west and a
 6    whole bunch of other factors, so that when I'm done, my
 7    sample is a really good match to the U.S. population.
 8         And, therefore, I have a good basis for reaching
 9    conclusions about the entire United States having looked at
10    only 2,000 people.
11         The -- the last line on this chart --
12              THE WITNESS:  Oh, I'm sorry.  Go ahead.
13              MR. POST:  Object to being nonresponsive to the
14    question, Your Honor.
15              THE COURT:  I'll sustain that.
16              We need to break these in smaller questions,
17    Counsel.
18              MR. WARD:  Certainly, Your Honor.
19    Q.   (By Mr. Ward) Did you conduct a direct elicitation
20    survey?
21    A.   Yes.
22    Q.   And can you tell us what direct elicitation is?
23    A.   Yes.
24    Q.   Will you do that?
25    A.   Yes.
```

1          Direct elicitation is just a term that statisticians

2     use.  It means nothing other than direct questions.  There

3     are other ways to do surveys, more complicated, but this is

4     the most common.  And even Apple does it, I've seen in their

5     documents.

6          So this is just a direct question method, and you'll

7     see, when I show the questions, what that means.

8     Q.   What type of questions did you ask?

9     A.   Well, the first set of questions I asked are -- were

10    demographic questions, such as are you -- what is your

11    gender, where do you live, the -- the items I mentioned a

12    moment ago.

13    Q.   Why -- why did you do that?

14    A.   Because I wanted to confirm that my sample design was

15    really working as I intended and was really good at giving me

16    estimates of the whole United States.

17         And I can confirm that by asking each and every

18    individual what their demographic information is and then

19    using my sample information to project the entire United

20    States.

21         And then I go to the United States Census information,

22    which is public data that you can download, and I find what

23    the full United States' answer to those questions are and I

24    can compare; and if my sample is not coming up with the right

25    answers, then something has gone wrong, and I can try to

1    figure it out.

2         But as it turned out, things were not going wrong.  All

3    was well.

4    Q.   And did you prepare an example of one of your validation

5    questions?

6    A.   Yes.  This is titled Question No. 6.  It's one of

7    several questions, and it asks if you own or if you rent the

8    dwelling where you live, and you -- the respondent checks one

9    of those.

10   Q.   And did you compare the answers that you received from

11   your survey respondents to census information?

12   A.   Yes.

13   Q.   And what were your results?

14   A.   As you can see on this chart, the -- my survey estimate

15   is 66.7 percent own their home, and the census benchmark is

16   66.8.  And that's a good confirmation that, on that score, my

17   sample is faithfully representative of the United States.

18   Q.   Were you checking things besides home ownership?

19   A.   Yes.  In my report, I indicate 13 different factors

20   where I checked this, some of them having subfactors to them.

21   Q.   And what are we looking at here?  Is this Attachment P

22   to your report?

23   A.   Yes.  The -- may I explain?

24   Q.   Sure.

25   A.   The charts that I made for that that have the blue

1   backgrounds are large and suitable for viewing in a

2   courtroom, and -- but the chart we're looking at now is what

3   was actually published in my report.  So it's small and hard

4   to see.

5        But the numbers that I've highlighted here, they're the

6   very same numbers that I showed in the larger format.

7   Q.   And so all these validation responses, all the responses

8   we're talking about are contained in the information that you

9   produced in your report and provided to everybody?

10  A.   Yes.

11  Q.   Some numbers are highlighted and others are not.  Will

12  we see that throughout our presentation today?

13  A.   Yes.  I'll have some highlighted and some not.

14  Q.   And what is this question that we're looking at here

15  now?

16  A.   Having dispensed with the validation checks with the

17  demographics, I then began with what I call Question 1.  This

18  is the first substantive question.  I wanted to find out

19  which people in my sample regularly use, say, in -- the first

20  on that list -- an Apple iPhone.

21       Throughout today, I think I won't take the time to read

22  these entire lists, and I'll use iPhone as an example, but

23  you can see I'm asking the same questions for iPad and iPod

24  Touch.  But I'll just shorten it by saying -- finding out who

25  regularly uses an Apple iPhone.

1   Q.   And are we looking at the results of the responses to

2   that first question?

3   A.   Yes, sir.  That's what it is.  Then you see 36.6 percent

4   of U.S. adults, which is something I estimate for my sample

5   results, are users -- regular users of the iPhone and other

6   percentages for the other devices.

7   Q.   And what is the confidence interval that you reference

8   on the right side of that slide?

9   A.   The -- on the right of this chart is -- I labeled it a

10  95 percent confidence interval.  It's -- it's the normal

11  thing that statisticians create whenever they make estimates

12  to show how accurate is the estimate.  Anyone can make an

13  estimate, but only the statistician knows how to calculate

14  how accurate the estimate is.

15       And it's exactly the same as you see on the news

16  broadcast where they talk about a margin of error of plus or

17  minus 3 percent.  It's exactly the same concept.  And I just

18  express it as a range from this case, 34 to 38 percent,

19  approximately, showing the accuracy of my estimates.

20  Q.   And did this confidence interval apply to all of the

21  estimates that you prepared?

22  A.   Yes.  Whenever I make an estimate, I calculate the

23  accuracy of it.

24  Q.   What'd you do next?

25  A.   Well, I'm jumping over to Question 2 because it's too

```
1   simple.  There I just asked in Question 2:  Did you also
2   purchase the iPhone if you are a regular user?
3        And in Question 3, I'm asking -- the important one is
4   the second line down -- have you purchased one or more apps
5   from the App Store, so that now I can find in my sample that
6   the people who regularly use an iPhone, who purchased that
7   iPhone, who have also purchased an app from the App Store,
8   and it's those people I want to get an opinion from as to the
9   importance of that, because they're the ones that are going
10  to know.
11  Q.   These are the responses you got to that last question?
12  A.   Yes, sir.  It shows regular users and purchasers of the
13  iPhone and also who purchased an app.  That's 59 percent of
14  the regular users of the iPhone.
15  Q.   And what was your next question?
16  A.   This next question asked that for each device listed
17  below, and one of those is the iPhone -- it invites the
18  respondent to consider the capability to purchase apps from
19  Apple's App Store.
20       And then the actual question in yellow:  Did this
21  capability alone motivate you to buy the device?  And then
22  they get to check yes or no or they don't know.
23  Q.   Did you formulate this question by yourself?
24  A.   I had a hand in ever question here, because I'm the --
25  designing the survey, and I know -- know how to do that.  But
```

1   this particular question was requested of me, and I think it

2   was Mr. Mills who was most interested in this particular

3   question.

4   Q.   And you understand that Mr. Mills is going to be

5   testifying after you?

6   A.   Yes, I understand that.

7   Q.   And have you worked with Mr. Mills before?

8   A.   Yes, several times.

9   Q.   And have you worked with his company Microeconomics?

10  A.   Yes, I have.

11  Q.   And we heard -- you weren't here for Dr. Jones's

12  testimony, or were you?

13  A.   No, I was not.  Just the last few minutes.

14  Q.   And I'll tell you that he said that he gave you some

15  questions to formulate -- or assisted you in formulating some

16  questions; is that correct?

17  A.   That's correct.

18  Q.   And will we see some of those examples today as well?

19  A.   Yes.  They're coming up.

20  Q.   Is this next slide the results of the responses that you

21  got to the last question?

22  A.   Yes.

23  Q.   And can you tell us what the results were?

24  A.   Yes.  Picking on the iPhone again, 30 percent of the

25  regular users answered that they were alone motivated to buy

1   their iPhone because of its ability to purchase and download

2   apps.

3   Q.    And tell us about this slide.  You've got regular users

4   and percent of purchasers.  Why did you do that?

5   A.    In the course of the activities that precede where we

6   are today, there are depositions, and the lawyers argue and

7   that sort of thing.

8       And I received some criticism that I hadn't calculated

9   this same result for purchasers who -- whether or not they

10  were regular users.

11      And I didn't think that was necessarily the best thing

12  to do, but because I have in mind somebody who purchased the

13  iPhone, handed it to their daughter and never used it, and

14  now I'm going to be asking them questions about something

15  they really don't know anything about.

16      I was not in favor of this, but it was an easy thing for

17  me to do it anyway.  And so I calculated for purchasers, and

18  the numbers are about the same, a little higher, but not

19  importantly different, in my view.

20      And I won't be saying much more about purchasers.  I'll

21  just go back to regular users.

22  Q.    Did the results concern you at all about the way that

23  you were conducting the survey?

24  A.    Not at all, no.  Most -- most regular users are

25  purchasers, so there's a huge overlap between the two.

```
 1   Q.    And what are we looking at here?
 2   A.    This is the -- the next question.  And it takes a little
 3   concentration to follow this one.
 4         We just asked if they -- if -- just think of one person
 5   at a time.  We just asked a Mr. Smith if he was alone
 6   motivated to buy the iPhone because of the ability to
 7   purchase and download apps.
 8         Some -- he might have said yes; he might have said no.
 9   But if he said no, he's not alone motivated, then I asked
10   this question.  And the question is:  What -- it amounts to
11   this, and then I'll read the question.
12         Even though it didn't have enough importance to you to
13   alone motivate you to buy your iPhone, it still might have
14   had some importance to you, and I'd like to learn what that
15   is.
16         So I'd phrase it this way:  What portion, if any, of the
17   value do you attribute to the capability to purchase apps
18   from the App Store?  And then they would write in the number,
19   and then here's the result.
20   Q.    And tell us what those results were.
21   A.    The -- for the iPhone, just -- you can read the other
22   numbers for yourselves, but for the iPhone, it was a percent
23   value of approximately 29 percent.
24         And you need to bear in mind, this is only for this
25   small group -- smaller group that said no to the
```

1    alone-motivate question.

2    Q.    And are -- are we looking at value numbers that are

3    averages for all regular users here?

4    A.    No.   This is this group that was a regular user,

5    purchaser of the iPhone, purchased the app, and was not --

6    did not find the App Store so important that it alone

7    motivated them to purchase.   It's -- it's a much smaller

8    group.

9    Q.    And for all these results that we've been talking about,

10   are they summarized here on -- or in part on Plaintiffs'

11   Exhibit 205.0029, Attachment F, from your January 2015

12   report?

13   A.    Yes.   And I've highlighted in yellow the ones we've

14   displayed, and I understand those are also the ones that Mr.

15   Mills is going to be using.

16   Q.    Are there other -- or there clearly is information

17   that's not highlighted -- highlighted, right?

18   A.    Yes, sir.

19   Q.    And why is that?

20   A.    Because those are just other estimates I've made.

21   There's -- as I mentioned, there's 150 pages here, and Mr.

22   Mills is not using them all.   And I'm sure you're thankful,

23   I'm not going to be showing or talking about all of them.

24   But they are in my report.

25   Q.    Now, you did seven surveys.   We're going to look at a

1  second survey now?

2  A.   Yes.

3  Q.   And tell us the difference from this survey to the one

4  we just talked about?

5  A.   This is still a survey about the App Store, but it's

6  going to be asking different questions.  And for this second

7  survey, I -- I went and got another random sample, this time

8  of 3,000 adults.

9      And everything else about the design is the same, so --

10 but this is a fresh new group of 3,000 people who are

11 answering my question.

12 Q.   And what were you getting at with this survey?

13 A.   This survey is going to get at what I call lost sales.

14 If Apple did not incorporate the Smartflash technology and

15 had a less capable iPhone, how many people would simply have

16 not bought that iPhone at the price it was offered?

17     And that -- those that did not, they're potential lost

18 sales to Apple.  And that's why I call it at the top:

19 Importance to Apple.

20 Q.   And did you validate your survey sample like we did in

21 the last survey?

22 A.   Yes, sir, exactly the same.  Went through all the

23 demographics, and everything is fine.

24 Q.   And we're not going to go through those questions again,

25 right?

1    A.    Going to be just like it was before.

2    Q.    So what are we looking at with this question?

3    A.    Well, now I am going to be repetitive, because this is a

4    new -- new group of people, so I have to, again, figure out

5    which ones are regular users of iPhones and go through all

6    that preliminary stuff to get down to the group I want to

7    ask.

8         So I ask my same first question:  Have you regularly

9    used an Apple iPhone?

10   Q.    And what are we looking at here?

11   A.    This is the answers from this second group of 3,000

12   people.  A little over 36 percent are regular users of

13   iPhones.

14        No surprise, because I knew that before.  But I have to;

15   but I'm not just trying to learn it's 36 percent; I'm trying

16   to learn which people in my sample are -- are those people.

17   So I have to go through this.

18   Q.    And did you compare this to the results of the regular

19   users from your first survey?

20   A.    Yes, I did.

21   Q.    And is that what we're -- the results that we're looking

22   at here?

23   A.    Yes.

24   Q.    And what did this tell you?

25   A.    Well, it's a -- it's a form of checking.  Replication is

1    an important thing in the world of statistics; and if I ask

2    the same question to two different representative samples,

3    I'm expecting to get the same answer.

4         There's -- there's other footnotes.  You have to ask the

5    same question to the same kind of people and do it in the

6    same order.  But in this case, I did all that.  And so I'd

7    expect these to be close, and 36.6 is very close to 36.52.

8    Q.   And so was that further validation of your technique?

9    A.   Yes.  That's further validation that my design is

10   working as I intended.

11   Q.   And this -- this survey is entitled:  The Importance of

12   Smartflash Technology to Apple.  Correct?

13   A.   Yes, sir.

14   Q.   And so how did you go about testing that?

15   A.   This question is the beginning of that investigation,

16   and the long preliminary material in blue on Question 5 is,

17   in fact, information that I got primarily from Dr. Jones.

18        And I'll describe in general terms what it is, and then

19   I'll read it maybe with a little paraphrasing, but I'll try

20   to read it through.

21        The idea here, as I understand it -- it's easy to

22   understand really -- is that this is a hypothetical question.

23        And it asks the respondent to consider an iPhone that is

24   not really the same as the iPhone they bought but is less

25   capable.  It's been disabled to some degree.  And the extent

1   of this disablement is what Dr. Jones -- and I was here for

2   this -- described as a non-infringing alternative.

3       I'm not a patent expert, so I'm not going to say any

4   more about that, but I heard -- I heard him say that.

5   Q.   You're describing it as disablement, but it's really an

6   alternative is what you understand?

7   A.   Yes.  As -- as a non-patent person, it seems to me a

8   good way to think of it is just a slightly less capable

9   telephone, iPhone, because it doesn't have as good of

10  features as the one you bought.

11      So let me read this now so that we've all got this.

12  Q.   Sure.

13  A.   It says:  Suppose -- and that word is the clue that this

14  is a hypothetical -- suppose that the features of the App

15  Store application that allows you to browse for, purchase,

16  install apps offered for sale, including games, were disabled

17  on all handheld devices, including those that you purchased.

18  Instead, you could browse for and install apps offered for

19  sale, but before using those apps, you would need to complete

20  each purchase by separately visiting a website and entering

21  your payment information to unlock the app.  So that's what

22  the survey respondent is asked to think.

23      And then the question in yellow is:  In that scenario,

24  would you still have purchased your device with your iPhone

25  for the price you actually paid?  And some say yes, some say

1    no, and some say they don't know.

2    Q.    Now, did you see any type of question that Apple

3    provided where it laid out what its non-infringing

4    alternative was that you should be asking about?

5    A.    I'm not aware of that.

6    Q.    Is this next slide the results of the responses to that

7    question we just looked at?

8    A.    Yes.

9    Q.    And will you tell us what the results were?

10   A.    This is the percentages that said, no, they would not

11   have purchased their iPhone.  This is what I called a moment

12   ago the lost sales.  19 percent and a little more of the

13   regular users of an iPhone said in response to my question

14   that they would not have purchased their iPhone at the same

15   price.  And, therefore, unless Apple would do something like

16   lowering the price, they're going to lose 19 percent of these

17   sales.

18   Q.    What was the next question that you asked?

19   A.    The important part of this is the line at the top

20   because it says who's being asked this question.  And it's

21   for those who would not have purchased, the 19 percent that I

22   just described.  The question says -- with the same

23   preliminary, so I have to read it again.

24        It says:  Could you -- in that scenario would you have

25   purchased, if you could have purchased at a price less than

```
 1   the price actually paid?  In other words, you wouldn't have
 2   purchased at the price you paid but maybe you'd purchase it
 3   if we lowered the price.  And some say yes, and some say no,
 4   and some don't know.
 5   Q.   And so the preamble is the same from the last question?
 6   A.   Yes.
 7   Q.   And that was provided to you -- or Dr. Jones assisted
 8   you with coming up with that preamble?
 9   A.   Exactly.
10   Q.   And then who assisted you with coming up with the
11   question that you've got highlighted?
12   A.   Well, I wrote that.
13   Q.   Did Mr. Mills have any hand in that?
14   A.   It's hard to say.  There was -- this is a collaborative
15   effort.  There'd be conference calls, and I'd listen to them
16   and they'd listen to me, and -- but eventually, because I'm
17   doing the survey, I get the last word.  So when it comes down
18   to finalizing this, that's me.
19   Q.   Is the next slide showing the results to that last
20   question we just looked at?
21   A.   Yes, sir, that's what it does.
22   Q.   And can you explain what we're looking at on the slide?
23   A.   Okay.  This is the breakdown from the last question, and
24   it says that the -- as you read at the top, would not have
25   purchased one or more of their Apple devices at the price
```

1    they paid if it did not include the Smartflash technology.

2         So they wouldn't purchase at the price they paid.  But

3    they -- some say they would purchase at a discount.  And then

4    I go on to ask them how much of a discount.  That's the other

5    question.  And some say they wouldn't do it even at a

6    discount.  That's on the right-hand side.

7         And so that's how I learned how Apple could possibly

8    recover some of these lost sales by a discount.

9    Q.   And is the information on this slide summarizing the

10   information that we see on the next slide from Plaintiffs'

11   Exhibit 205.001?

12   A.   Yes, sir, that's my -- that's an attachment to my report

13   that shows the numbers.  They're smaller and harder to read,

14   but I put them in yellow, and they correspond exactly to the

15   number I just put on the larger format for us all to see

16   today.

17   Q.   And were there other numbers that you didn't highlight

18   here?

19   A.   150 pages of them.

20   Q.   And anything -- you don't know how those were used, I

21   take it?

22   A.   Well, they're there for anybody to use.  I calculate

23   lots of different things, like calculated the -- the extra

24   amount that iPhone users would be willing to pay to add the

25   Smartflash technology if it wasn't already there.  And

```
 1    hundreds of other things.  And I -- I don't know what use

 2    other people would necessarily make of those.  They're just

 3    there for others to use.

 4    Q.   Did you conduct a third survey?

 5    A.   Yes, sir.

 6              THE COURT:  Before we get into that third survey,

 7    we're going to take a recess at this point.

 8              Ladies and Gentlemen of the Jury:  You may leave

 9    your notebooks in your chairs.  We're going to make this

10    about a 10-minute recess.  Use this as an opportunity to

11    stretch your legs, get a drink of water.

12              Don't discuss the case among yourselves.  And we'll

13    have you back in here shortly and continue.  You're excused

14    for recess at this time.

15              COURT SECURITY OFFICER:  All rise for the jury.

16              (Jury out.)

17              THE COURT:  All right.  The Court -- the Court

18    stands in recess for 10 minutes.

19              (Recess.)

20              (Jury out.)

21              COURT SECURITY OFFICER:  All rise.

22              THE COURT:  Be seated, please.

23              Let's bring in the jury, please.

24              COURT SECURITY OFFICER:  All rise for the jury.

25              (Jury in.)
```

```
 1                    THE COURT:   Please be seated.

 2                    All right.   Counsel, you may continue.

 3    Q.   (By Mr. Ward) Dr. Wecker, before we broke, we had

 4    covered the first two App Store surveys; is that right?

 5    A.    That's correct.

 6    Q.   And we're about to look at the third survey; is that

 7    correct?

 8    A.    Correct.

 9    Q.   And is that what we're looking at here?

10    A.    Yes, sir, that's the third survey.  This is on the

11    movies subject.

12    Q.   And what was the feature that you were looking at with

13    this -- this survey?

14    A.    The ability to download and -- movies and TV shows.

15    Q.   Same kind of background that you did on the other two

16    surveys?

17    A.    Yes, everything is parallel here, except I've now

18    recruited a whole new set of 2,000 people, so I have to go

19    through all those preliminaries again, which I won't torture

20    you with, but that all happened.

21    Q.   We're jumping to Question 4a.  Is that because we're

22    not -- not going through the validation questions?

23    A.    I did them, but we're not going to have to talk about

24    them.  We're going to jump into the substance here, if you

25    don't mind.
```

1   Q.    Will you tell us what we're looking at on that slide?

2   A.    Well, this is the Question 4a for regular users of --

3   I'll say iPhone again to be concrete -- who purchased that

4   iPhone, and also who rented or purchased movies or TV shows

5   to download from iTunes.  So now I've got the group that I'm

6   confident has the experience to be able to answer this next

7   question.  And so it's only them that I'm going to ask this

8   of.

9        And then I -- for those, I say for your iPhone, did this

10  capability to rent or purchase movies and TV shows from

11  iTunes, did this capability alone motivate you to buy your

12  iPhone?  Some said yes, some no, some didn't know.

13  Q.    Are these the results?  Are we looking at the results?

14  A.    Yes, sir, these are the results.

15  Q.    And explain those to us, if you could.

16  A.    For the iPhone, it's 22 percent and a little more for

17  regular users, so this is not as important as an App Store

18  capability, but it's still of noticeable importance.  22

19  percent said that this alone motivated them to buy their

20  iPhone.

21  Q.    The numbers from the previous survey were indicating

22  that the ability to download and purchase apps was more

23  important than this feature?

24  A.    Yes, sir.

25  Q.    But this feature still had importance?

1  A.    Yes, sir, that's right.

2  Q.    And what's the next question that we are looking at?

3  A.    Okay.  For the ones who said they were not -- it was not

4  so important to them as to rise to the high level to alone

5  motivate them to purchase their iPhone, I asked of them --

6  well, in the vernacular -- well, it may -- it still have had

7  value, so I asked what portion, if any of its value, would

8  you attribute to the capability to rent and purchase movies,

9  TV shows, to download from iTunes?  And then they could fill

10  in the box whatever they -- number they like.

11  Q.    Is the next slide showing the results for that question?

12  A.    Yes, it does.

13  Q.    And would you tell us what the results were?

14  A.    For the iPhone here, it's 20 percent and a little more.

15  20 percent of the value from this select group where I asked

16  this question.  And, again, it's not as high a number as for

17  the App Store, but it still shows substantial value to the

18  consumers.

19  Q.    And is this a summary of the results?

20  A.    Yes.  This is taken as a page from my report, and -- and

21  instead of the slides that I made to show in the courtroom,

22  it's the same numbers, but they're so small you can't read

23  them, and I put yellow on them to indicate that.  And I

24  believe the yellow ones are also numbers that Mr. Mills is

25  going to use in his further work.

1          MR. WARD:   And for the record, we're referencing PX

2    205.003.

3    Q.   (By Mr. Ward)   And that's -- what's on the bottom chart,

4    G1.1 from Attachment G; is that correct?

5    A.   Yes, sir, that's the -- the chart number and the

6    attachment number in my -- my report.

7    Q.   And, again, the highlighted numbers are what Mr. Mills

8    relies upon?

9    A.   That's my understanding.

10   Q.   And then there were a lot of other numbers that folks

11   could look at if they wanted to?

12   A.   Anyone who wants to that's involved in this matter has

13   my reports.   They can use them for any purpose.

14   Q.   Now, is this the fourth survey?

15   A.   Yes, sir.

16   Q.   And what was the fourth survey?

17   A.   This is still on movies, and in parallel to what I did

18   with the app survey, this is the lost sales piece.   So I

19   title it to distinguish it, the importance to Apple, but it's

20   easier to keep in mind for me that it's going to be a

21   lost-sales-type calculation.

22        I go out and recruit another fresh sample here, and so I

23   have to go through all those preliminaries again.   And then

24   I'll get into the substance right away and skip talking about

25   that.

1  Q.    What are we looking at on this slide?

2  A.    This is Question 7, and it's got -- it's a hypothetical

3  again.   It says:  Suppose that no devices, including the

4  device you purchased, like the iPhone, allowed you to rent

5  and download movies and TV shows from iTunes, and instead you

6  could purchase movies and TV shows at a price around three

7  times what the rental price would have been.

8       That's a hypothetical and was supplied to me by Dr.

9  Jones and I wrote it in there.   And then I asked:  In that

10 scenario, would you still have purchased the price at the

11 price you actually paid?  Some will say yes, some will say

12 no.

13 Q.    The next slide, is that looking at the results?

14 A.    Yes, that's the results page.

15 Q.    And tell us what those results were.

16 A.    Four-and-a-half percent of the iPhone regular users said

17 they would have not have purchased their iPhone if it did not

18 include the capability that was referenced on the previous

19 page, so that's a smaller percentage than in the app stores

20 because it turns out my survey's teaching us that -- teaching

21 me, at least, that the movie capability is not as

22 important -- as important as app capability.

23 Q.    And this is Question 8?

24 A.    Yes.   This is going to be:  If you would not have

25 purchased at the price you paid, perhaps you'd purchase at a

1    discount.  I explained that in the earlier survey, so this

2    should be easy because it's the same idea.  So if you would

3    not have purchased at the price you paid, the part in yellow

4    says, perhaps you'd purchase at a price less than the price

5    you paid.  Some will say yes, some will say no.  And I have

6    the results on the next page.

7    Q.   And these are the results we're looking at on Slide 39?

8    A.   Yes, they are.

9    Q.   And will you tell us the results?

10   A.   Just a little more than 2 percent said they would

11   purchase at a discount, and around 3 percent said they would

12   not purchase even at a discount.

13   Q.   And the results of this survey, are they contained in

14   Plaintiffs' Exhibit 54.001?

15   A.   Yes, sir.  That's where they are in my report.

16   Q.   Same deal here, as far as what's highlighted?  That's

17   what Mr. Mills relied on?

18   A.   Yes.

19   Q.   And then other numbers that are available for anyone to

20   look at?

21   A.   Yes, sir, that's correct.

22   Q.   So have we discussed Surveys 1, 2, 3, and 4?

23   A.   Yes, sir.  The two app store surveys and the two movie

24   surveys.

25   Q.   There were three other surveys that you conducted?

1   A.   Yes, sir.

2   Q.   We're not going to go through those like we did the

3   other surveys, are we?

4   A.   We are not.

5   Q.   However, they are part of the record as Plaintiffs'

6   Exhibit 54.003, Attachments F, J, N, and X, and 54.004, G, K,

7   O, and Y.

8        And would they be the similar type questions with

9   summaries provided that we've been through with the other

10  surveys, Dr. Wecker?

11  A.   They're very similar.  Of course, there are differences

12  because it's a different topic.

13             MR. WARD:  Pass the witness.

14             THE COURT:  Cross-examination by the Defendant.

15             MR. POST:  Kevin Post on behalf of Apple, Your

16  Honor.

17             May it please the Court.

18             THE COURT:  You may proceed.

19             MR. POST:  Your Honor, may we have leave to pass

20  out some materials to the witness and the Court?

21             THE COURT:  Yes.

22                       CROSS-EXAMINATION

23  BY MR. POST:

24  Q.   Good afternoon, Dr. Wecker.

25  A.   Good afternoon.

1    Q.   I don't believe we've had the chance to meet, have we?

2    A.   I don't recall it.

3    Q.   Okay.  Well, it's good to meet you, sir.  My name is

4    Kevin Post.  I'm going to ask you some questions on behalf of

5    Apple today.

6        You've been handed a binder with some materials in it.

7    You should also have two bound copies of deposition

8    transcripts.  So I just want you to know what you have and

9    where it is, sir.

10       Now, Dr. Wecker, you're -- you're not offering technical

11   opinions regarding infringement in this case, correct?

12   A.   That's correct.

13   Q.   Okay.  And you're not offering technical opinions

14   regarding invalidity of the asserted patents; is that right?

15   A.   That's also correct.

16   Q.   Okay.  You're not offering any opinions regarding

17   damages or a reasonable royalty in this case?

18   A.   That's correct.

19   Q.   Now, you're a statistician and an applied mathematician,

20   right?

21   A.   Yes, sir.

22   Q.   You're not an expert in consumer behavior?

23   A.   I'm not.

24   Q.   You have no knowledge of the content of consumer

25   behavior theory; is that correct?

1  A.   Well, zero is a little small, but I'm not an expert at

2  it.

3  Q.   Do you recall being asked a question about whether

4  you've heard of the order effect in consumer behavior theory

5  during your deposition?

6  A.   I don't recall it, but if it's an order effect in

7  surveys, I know all of that.

8            MR. POST:  Okay.  Can we pull up Page 55, Line 20

9  through 56, Line 2?

10  Q.   (By Mr. Post) So starting there at Line 20, you were

11  asked the question:  Have you heard of the order effect in

12  consumer behavior theory?

13       Answer:  I'm not an expert on consumer behavior theory,

14  and I have no knowledge of that particular content of that

15  theory.

16       Were you asked that question, and did you give that

17  answer, sir?

18  A.   Yes, sir.

19  Q.   Okay.  Thank you.

20       Now, you agree that surveys are not always reliable,

21  right?

22  A.   If you don't do them right, they're not reliable.

23  Q.   You understand this is a patent case, correct?

24  A.   I do.

25  Q.   But you have no understanding of what aspects of the

1   patents the Apple App Store or the iTunes Store relate to,

2   correct?

3           THE COURT:  Mr. Post, if you would slow down just a

4   little bit.

5           MR. POST:  Sure.

6           THE COURT:  Go ahead, Dr. Wecker.  You can answer

7   the question.

8   A.   I'm busy digesting the question, Your Honor.

9           THE COURT:  Well, when you're through digesting it,

10  answer it.

11          THE WITNESS:  Yes, sir.

12  A.   I think I have some knowledge because I've been in court

13  for a few days.  I heard opening statements.  But I'm not

14  claiming to be an expert in that area.

15  Q.   (By Mr. Post) The slides that you walked us through

16  today had the phrase Smartflash technology on them.

17       Do you recall that?

18  A.   Yes.

19  Q.   Okay.  Do you have any knowledge about what that

20  technology is, sir?

21  A.   I have this knowledge, so I have some, and that is, I

22  have an understanding of the functions that it enables in the

23  case of, say, the App Store, downloading movies and other

24  things.  That's the knowledge I have.

25  Q.   And the slides that you presented equated the Smartflash

1   technology with the capability, for example, to purchase

2   apps, correct?

3   A.    I don't think I would say equate, but it is the

4   Smartflash technology that enables that capability as I

5   understand it.

6   Q.    You don't have any opinion regarding whether the concept

7   of purchasing apps is broader than what is claimed in

8   Smartflash's patents, do you, sir?

9   A.    No, I have no opinion on that.

10  Q.    Now, you had some slides that showed a -- questions

11  regarding something called "alone motivate."

12        Do you recall those?

13  A.    Yes, sir.

14  Q.    Okay.  And they were asking questions like, does a

15  certain capability alone motivate you to buy a device; is

16  that -- did I phrase that right?

17  A.    Yes.

18  Q.    Okay.

19              MR. POST:  Mr. Lee, could we pull up Dr. Wecker's

20  Slide 13?

21  Q.    (By Mr. Post) And this is an example, sir, of one of

22  those questions, right?

23  A.    Yes, it is.

24  Q.    Okay.  So highlighted in the yellow:  Did this

25  capability alone motivate you to buy the device?  That's one

1   of the questions you were asking the survey participants,

2   correct?

3   A.   Yes, it is.

4   Q.   Okay.  You agree that apps are an example of digital

5   data, sir?

6   A.   That seems reasonable.  I did teach computer science for

7   a while, so I have some knowledge of the area, but it's not

8   the sort of thing that a survey expert normally is expert in.

9   But I think I'll say yes to that as long as you don't get too

10  technical.

11  Q.   Were you in court yesterday when Mr. Racz was

12  testifying, sir?

13  A.   No.

14         MR. POST:  Can we pull up the transcript from

15  yesterday afternoon, Page 125, 9 through 15?

16  Q.   (By Mr. Post) So I'll -- I'll represent to you,

17  Dr. Wecker, that this portion of the transcript was coming

18  during Mr. Racz's testimony.

19  A.   Very good.

20  Q.   And if I could direct your attention, sir, to Lines 9

21  through 15.  Mr. Racz was asked the following questions and

22  gave the following answers:

23       Question:  You did not invent online sale of content,

24  correct?

25       Answer:  We didn't, sir.

```
 1          Question:  Or online payment for content, correct?
 2          Answer:  We didn't, sir.
 3          Last question:  You didn't come up with the first way to
 4  source and buy digital content over the Internet, right?
 5          Answer:  We didn't, sir.
 6          Do you understand that testimony from Mr. Racz?
 7  A.   I can understand what was asked and what was answered.
 8  Q.   Okay.  And as you said before, you have no specific
 9  opinion about what -- about the scope of the Smartflash
10  technology, correct?  Particularly in light of Mr. Racz's
11  testimony.
12  A.   No.  I think I do have an opinion on what -- when I
13  explained that my understanding is that Smartflash technology
14  enables certain capabilities.  That much I think I
15  understand.
16  Q.   Is it the capability to purchase apps, sir?
17  A.   From the App Store.
18  Q.   From the App Store.  Okay.
19          Now, you have no opinion about what may or may not be a
20  non-infringing alternative to the asserted claims in this
21  case, correct?
22  A.   I have no separate opinion.  I have received information
23  from Mr. Jones that I understand to be a non-infringing
24  alternative, and I've read it, and it makes sense to me.  But
25  it's -- it's not my opinion; it's his.  It's not -- that's
```

1    his portion of the question.

2    Q.    So you have no independent opinion beyond what Dr. Jones

3    has told you, correct?

4    A.    Right.   I have no expertise to design non-infringing

5    alternatives.

6    Q.    And those -- those scenarios were provided by Dr. Jones?

7    Is that what you said?

8    A.    Yes.

9    Q.    And just so we're all clear, you're not offering an

10   opinion regarding whether those scenarios that Dr. Jones

11   provided you represent the patented functionality, right?

12   A.    My understanding would be that they don't.   That's the

13   point of them.   They're non-infringing, so they wouldn't be

14   representing the patent.

15   Q.    I'll -- I'll ask the question a different way.

16        You're not offering an opinion that the scenarios

17   provided to you by Dr. Jones are the best non-infringing

18   alternatives to the patent claims that are asserted in this

19   case, correct?

20   A.    You're correct.   I have no independent opinion of that.

21   Q.    Okay.   Dr. Wecker, you're -- you're being compensated

22   for your time spent working in this case, correct?

23   A.    Correct.

24   Q.    I think you -- you had indicated in your expert report

25   that your hourly rate is around $700 an hour; is that

1   correct?

2   A.   Correct.

3   Q.   Okay.  And you're the owner of William E. Wecker

4   Associates, Incorporated, in Jackson, Wyoming, right, sir?

5   A.   Yes, sir.

6   Q.   And you have some employees -- people who work with you

7   at your company who helped you on the work you performed in

8   this case --

9   A.   Yes.

10   Q.   -- correct?

11   A.   Correct.

12   Q.   And their average hourly rate, I think you testified,

13   was somewhere between 300 and $550 an hour; is that correct?

14   A.   Sounds about right.

15   Q.   Okay.  And you agree that it's reasonable for you and

16   your team to be compensated for the time you spent doing some

17   of the work described in those surveys, right?

18   A.   Yes, sir.

19   Q.   Now, you walked us through -- I think three surveys in

20   your direct testimony.  One of the -- you mentioned four, but

21   I think that one may -- may have been an earlier survey.  But

22   you did not walk us through all seven surveys you performed;

23   is that correct?

24   A.   I'll answer the last part because I was a little

25   confused about the first part.

```
 1        I didn't go in detail in all seven.  That's -- that part

 2   is correct.  And the first part, I didn't fully understand.

 3   Q.   Do you recall being asked some questions in your

 4   deposition about a Wave 1 set of surveys as compared to a

 5   Wave 2?

 6   A.   I don't remember the questions, but I certainly know

 7   what that means because I've used those terms myself, Wave 1

 8   and Wave 2.

 9   Q.   So you had a set of surveys, and they're described in

10   the last page of your -- of your slides that were performed

11   and described in an August expert report; is that correct?

12   A.   I don't think that's quite right.  Would you like me to

13   explain?

14           MR. POST:  Can we -- we actually pull up the last

15   slide of Dr. Wecker's demonstratives?

16   Q.   (By Mr. Post) I'll point you right to them, sir.

17   A.   Thank you.

18   Q.   So here you have seven enumerated surveys, and those are

19   the seven surveys you -- you conducted; is that correct, sir?

20   A.   Yes.

21   Q.   And if we look below them, I believe Surveys 4, 5, 6,

22   and 7 all appear to be attachments to your August 25th, 2014

23   expert report; is that correct?

24   A.   Yes.

25   Q.   Okay.  And that's different than the first three surveys
```

1    which were attachments to your second supplemental expert

2    report served in January of 2015, right?

3    A.    It's different than -- in that the work was performed at

4    different times and recorded in different reports, but it's

5    not substantially different in what the nature of the work

6    was.

7    Q.    But -- but as to the timing, you agree there was a Wave

8    1 that was described in that earlier period and a Wave 2 that

9    was -- was in the January report; is that fair?

10   A.    No.  It's true in a detail that is going to be

11   confusing.  The actual work that I did with Wave 1 and Wave 2

12   combined Wave 1 and Wave 2 into a single group.  But if that

13   doesn't help, I'll just go on and answer the next question.

14   Q.    We'll see -- we may -- we may get to that detail, sir.

15   There were some -- some additional surveys that you conducted

16   in what we've been calling Wave 1 that was performed, I

17   think, in July and August.  You performed a survey about

18   movies and TV shows.  Does that sound right?

19   A.    Yes.

20   Q.    And a -- a survey about the App Store?

21   A.    Yes.

22   Q.    A survey about books and parental controls?

23   A.    Yes.

24   Q.    And a survey about music?

25   A.    I think that's right.

1  Q.   Okay.  Now, you described that there was a -- a

2  difference that might get confusing between the two sets of

3  surveys.  Your -- your first expert report describes surveys

4  that asked whether features motivated purchasers to buy a

5  product.  Do you recall that?

6  A.   Yes.

7  Q.   Okay.  And that's different than the questions we saw in

8  your presentation, which asked whether certain functionality

9  alone motivated purchases, right?

10 A.   That's correct.

11 Q.   Okay.  Is that the difference you were referring to that

12 might get confusing?

13 A.   No.

14 Q.   Okay.  There's a different one?

15 A.   Yes.  But I don't think the difference is all that

16 important.  It's just I'm trying to be precise.  So I'm -- we

17 shouldn't worry about it, I think.  Let's just get on.

18 Q.   Well, I'd -- I'd appreciate the clarification, sir.

19 Let's -- let's talk a little bit about those motivate

20 questions.  The -- the questions you asked in those surveys

21 were provided to you by Smartflash's counsel, correct?

22 Smartflash's lawyers?

23 A.   No, there -- that's not true at all.  There was -- there

24 was conference calls and lawyers, and Mr. Mills and Mr. Jones

25 and I were on the conference calls and discussing the

1    surveys.  But it would be wrong to think that the lawyers

2    provided the questions for these surveys.

3    Q.    The motivate questions that you asked in your first

4    round of surveys, did you write that language?

5    A.    No, not that question.  I misunderstood you perhaps.  I

6    thought you were talking about all the questions.  But for

7    that question, I believe it's Mr. Mills who was the primary

8    person who suggested that, if I -- I hope I'm remembering

9    right.

10   Q.    It wasn't you, though, right, sir?

11   A.    Right, it wasn't me.  I implemented that question with

12   the recommendation of Mr. Mills.

13   Q.    Okay.

14          MR. POST:  Mr. Lee, can you pull up Plaintiffs'

15   Exhibit 54.002 at Page 52?  I think this may be the page.

16   It's a little bit different.  Try Page 50.  It'd be Question

17   4 at the top.  Would you mind blowing that up?

18   Q.    (By Mr. Post) So, Dr. Wecker, what we have on the screen

19   here is -- is Question 4 of your App Store survey that's an

20   Attachment M to your first expert report.  Do you recognize

21   that question, sir?

22   A.    Yes.

23   Q.    Okay.  And so here you're asking respondents whether the

24   capability to purchase apps from the Apple's App Store,

25   Google Play Store, Android Market, or Samsung Apps, motivate

1    you to buy the device?

2          Did I read that right?

3    A.    Correct.

4    Q.    And that's different than the alone motivate question

5    that you -- you showed in your slides; is that right?

6    A.    That's correct.

7    Q.    And you -- you created some -- some tables summarizing

8    the result of your survey; is that correct?

9    A.    For all the surveys, I had tables, yes.

10   Q.    Okay.  Well, let's look at the one for this one.

11          MR. POST:  Mr. Lee, can you pull up Plaintiffs'

12   Exhibit 54.002 at Page 2?  And if you could go down to the

13   bottom to the Section A-Q4?

14   Q.    (By Mr. Post)  So, Dr. Wecker, this is a summary of some

15   of the results from -- from your survey.  And if you see in

16   the second column, there's the number 99.  Do you see that?

17   A.    Yes.

18   Q.    So that's the number of respondents who said yes to the

19   question of whether they were motivated to buy -- to buy

20   their device, here the iPhone, based on the capability to

21   purchase apps from the App Store; is that correct?

22   A.    I think that's right.  You've cut off the top part that

23   is -- where all the definitions are given, so it's a little

24   hard to figure this out.  There, that's a help.  Thank you.

25   So you're right, that's what the 99 is.

1    Q.   Okay.  So for those 99 people, it's your opinion that

2    they were not motivated to buy their Apple iPhone because of

3    its call capabilities, correct?

4    A.   Let me read it.  Just a second, please.

5    Q.   Sure.

6    A.   Why would you say not, because I think these are the

7    yeses.

8             MR. POST:  Can you pull up Page 85, Lines 17

9    through 22, of Dr. Wecker's deposition, please?

10   Q.   (By Mr. Post) So from Line 17 to 22, question:  The 99

11   out of 214 (sic) people, and it is your position that they

12   were not motivated to buy the Apple iPhone because of its

13   call capabilities?

14            Answer:  That's the way I would answer this, yes.

15            Were you asked that question?  Did you give that

16   answer, sir?

17   A.   Evidently I did, if they recorded it right.  But when I

18   look at that table, it looks like it's the other way around.

19   Q.   That was a yes, right, sir?

20   A.   Go ahead, please.

21   Q.   Okay.

22            THE COURT:  All right.  He's answered the question.

23            THE WITNESS:  Yes, sir.  Thank you, Your Honor.

24            THE COURT:  But the witness is not going to direct

25   counsel to move along or let's go to the next thing.  That's

1    inappropriate, Dr. Wecker.

2              THE WITNESS:  Well, thank you, Your Honor.  I -- I

3    won't do that.

4              THE COURT:  All right.  Let's move along, Counsel.

5              MR. POST:  Certainly, Your Honor.

6    Q.   (By Mr. Post) So for an iPhone purchaser in the context

7    of apps, the question about motivate to purchase, your

8    understanding is that that would be the only feature that

9    caused them to buy the device; is that correct?

10   A.   That's not the way I would phrase it.  If I have your

11   permission to say how I would phrase it?

12   Q.   Let me ask you a different question.  Can you speak

13   authoritatively as to what's in the mind of a survey

14   respondent who views that motivate to buy that question?

15   A.   Well, I think no one can be authoritative about what's

16   in someone else's mind, no.

17   Q.   And you can't speak authoritatively about what's in the

18   mind of these specific survey respondents because you didn't

19   interview them; is that right?

20   A.   Even if you interview them, you don't know what's in

21   their mind.

22   Q.   But at the very least, you did not interview them; is

23   that correct?

24   A.   That's correct.

25   Q.   Now, you never asked a survey respondent whether the

```
 1    capability to place a phone call on an iPhone motivated their

 2    purchase, did you, sir?

 3    A.    I didn't ask that question.

 4    Q.    You didn't ask whether screen size or resolution

 5    motivated their purchase to buy an iPhone, did you, sir?

 6    A.    Correct.

 7    Q.    You yourself have an iPhone that you purchased because

 8    of the large screen; is that right?

 9    A.    That's right.

10    Q.    So your first set of surveys, those were the -- the

11    motivate question surveys; is that right?

12          You asked some other questions, but you did ask

13    questions about motivate to purchase, right?

14    A.    Thank you.  Thank you.

15          That's correct.

16    Q.    And then you performed a second wave of surveys.  Those

17    were the ones that you walked us through today that asked

18    about alone motivate; is that correct?

19    A.    That's correct.

20    Q.    And they also asked about something that we've referred

21    to as percent value.

22          Do you recall that?

23    A.    Yes.

24    Q.    Okay.  And that's where you asked survey respondents to

25    say what they -- how much they valued certain features; is
```

1    that correct?

2    A.    Correct.

3    Q.    Okay.  So if I refer to percent value, I'm referring to

4    that entry of numbers for value; is that fair?

5    A.    Understood.  Thank you.

6    Q.    Okay.  Now, you were asked to perform those second

7    surveys by Smartflash's lawyers, correct?

8    A.    Yes.

9    Q.    Okay.  And this was because they wanted you to both

10   increase the accuracy of your population estimates made from

11   your original App Store survey scenario and also to provide

12   some additional survey evidence that the patented features

13   alone motivated the survey respondents to purchase the

14   accused devices.

15        Do you recall that --

16   A.    Yes.

17   Q.    -- in your next report?

18   A.    I agree with that.

19   Q.    Okay.  So for Wave 2, rather than ask whether questions

20   motivated the purchase, now we're going to ask whether the

21   features alone motivated the purchase, correct?

22   A.    That's so.  I can explain if you like.

23   Q.    Well, you agree with me that other than the insertion of

24   the word "alone," those questions about motivation are

25   otherwise the same, correct, sir?

```
 1   A.    For those surveys that -- where that's an appropriate

 2   thought, yes.

 3   Q.    Okay.  And just so we're clear, you did not do an alone

 4   motivate survey for music, correct, sir?

 5   A.    Correct.

 6   Q.    And you didn't do an alone motivate survey about books,

 7   right?

 8   A.    Correct.

 9   Q.    And you didn't do an alone motivate survey on parental

10   controls?

11   A.    Correct.

12   Q.    Okay.  And just like Wave 1, you didn't draft the alone

13   motivate question that you asked in Wave 2, correct?

14   A.    That's a misunderstanding, I'm afraid.

15   Q.    Those questions were provided to you by Smartflash's

16   lawyers, correct?

17   A.    That's also not true.

18   Q.    All right.

19              MR. POST:  Can we pull up Page 296, Line 25 -- or

20   Page 297, Line 20?

21   Q.    (By Mr. Post) So we -- if you go up to the top, the

22   original question starting at Line 25, the prior page, the

23   question was:  Did counsel tell you what questions to ask in

24   your new surveys?

25        Okay.  Okay.  So now we have it up.  Starting at Line
```

```
 1   25, you were asked --

 2              MR. WARD:  Your Honor, I'm going to object.

 3              Can we approach the bench and take that down?

 4              THE COURT:  Approach the bench.

 5              (Bench conference.)

 6              MR. WARD:  He's displaying on the screen my

 7   objection, and I'm cautioning the witness about privilege and

 8   what he can answer, and it's inappropriate for him to put

 9   that type of instruction from counsel up unless he contends

10   that my instruction was somehow improper.  It's not proper to

11   show the jury.  It violates the MILs.

12              MR. POST:  I'm not saying his instruction was

13   improper in any way.  I'll be happy to direct him to the

14   paper version of the transcript to refresh his recollection,

15   if that would be the Court's preference, and that way I don't

16   need to display Mr. Ward's cautionary instruction.  That will

17   be fine.

18              MR. WARD:  I shouldn't have to object to remind

19   that he's not supposed to be displaying privileged objections

20   in front of the jury, Your Honor, is my point.

21              THE COURT:  That's well put.  You're responsible

22   for your technical person.  If they're going to put that up,

23   then you're responsible for it.

24              MR. POST:  Okay.  Understood, Your Honor.

25              THE COURT:  All right.  It's down now.
```

```
 1              To be honest with you, I think an instruction from
 2   me just calls more attention to it than anything else, but
 3   it's not going to happen again.
 4              MR. WARD:  If you could note that the objection is
 5   sustained, it would be appreciated.
 6              THE COURT:  I'll sustain the objection for the
 7   record.
 8              MR. WARD:  Thank you.
 9              MR. POST:  Thank you, Your Honor.
10              (Bench conference concluded.)
11              THE COURT:  All right.  That objection is
12   sustained.
13              Let's move on.
14              MR. POST:  Mr. Lee, would you mind, please, pulling
15   up Plaintiffs' Exhibit 205.002 at Page 19, specifically
16   Question 4A?
17   Q.   (By Mr. Post) And, Dr. Wecker, do you recognize this as
18   one of your alone motivate questions from Attachment J of
19   your App Store motivation survey?
20   A.   I recognize it as one of my alone motivate questions.  I
21   couldn't swear it's what the attachment number is.
22   Q.   Okay.  Well, I'll represent to you, sir, that it is from
23   Attachment J from the App Store survey.
24   A.   Thank you.
25   Q.   Now, this was a question -- now, this was the -- the
```

```
 1   fourth question in a series of questions that survey
 2   respondents were asked about App Store functionality; is that
 3   correct?
 4   A.   I'll just say yes.  It's -- not all the earlier
 5   questions were about App Store functionality, but it's the
 6   general idea, I guess.
 7   Q.   So there were some initial screening questions in some
 8   of the validation questions you ascribed?
 9   A.   Yes, that's correct.  That's why it wasn't quite right.
10   Q.   Okay.  Thank you.
11        So before respondents got to this question, they were
12   given some introduction about the specific functionality you
13   were asking about; is that correct?
14   A.   Let me think, because you're not showing me the whole
15   thing.  I've got to think from memory what was above it.
16   Q.   Well, we can go --
17             MR. POST:  Mr. Lee, can you pull up Page 17 of this
18   exhibit?
19   Q.   (By Mr. Post) Dr. Wecker, do you recognize this as being
20   some of the information that survey respondents reviewed
21   before getting to Question 4A?
22   A.   Yes.
23   Q.   Okay.  So this is some screenshots that they're provided
24   along with a description about the scenario they're going to
25   be asked about; is that correct?
```

1    A.    That's correct.

2    Q.    And you have a yellow box that's drawn around what

3    appears to be Google's Play Store; is that correct?

4    A.    Yes.

5    Q.    Now, looking at the screenshot on the left, it appears

6    that there's some other applications on the screen.  Do you

7    see those, sir, things like Gmail?

8    A.    Yes, I see it.

9    Q.    And there's also an app called WhatsApp for messaging.

10         Do you see that?

11   A.    Yes.

12   Q.    And there's also an app for a camera?

13   A.    Yes.

14   Q.    Now, you didn't ask whether -- of the survey respondents

15   about whether they were alone motivated to buy a device based

16   on, for example, a camera functionality, correct?

17   A.    Correct.

18   Q.    You didn't ask them if they were alone motivated to

19   buy -- my apologies -- based on email capability?

20   A.    Correct.

21   Q.    Or messaging?

22   A.    Correct.

23   Q.    So after being shown these two screenshots, survey

24   respondents would eventually get to that -- that Question 4A

25   about whether they were alone motivated to purchase based on

1   apps, correct?

2   A.   Correct.

3   Q.   And your understanding of what it means for someone to

4   be alone motivated is that that feature is the thing that

5   caused them to buy the device, correct?

6   A.   Yes.

7   Q.   So under your understanding of the term alone motivate,

8   imagine if a survey respondent were asked two questions in a

9   row about alone motivate.

10       So Question 1:  Were you alone motivated by the

11  capability of purchasing apps?  And they could answer yes,

12  no, or I don't know, okay?  That's Question 1.

13       And that same respondent then for Question 2 would be

14  asked the question:  Were you alone motivated by the

15  capability to place a phone call?  Yes, no, I don't know as

16  being the options, okay?

17       Can you keep that in your mind for me, sir?

18  A.   Yes.

19  Q.   So is it your belief that a respondent who answered yes

20  to that first question, that they were alone motivated to buy

21  based on the capability to purchase apps, would have to

22  answer no or I don't know to the second question about

23  whether they were alone motivated to buy based on the

24  capability to place a phone call?

25  A.   I don't -- I think what happened is they just -- first,

1   I don't know what they would answer.  But I think they would

2   be confused, because the capability of an iPhone, for

3   example, to place phone calls is so basic that it just is not

4   in the same category as an app-downloading feature.

5       And so these basic features, like whether it has a

6   battery or whether it can place phone calls, are just

7   fundamental characteristics of all phones.  And so I just

8   don't think they're in the same category at all.

9   Q.   But you didn't ask that question of any survey

10  respondent, correct?

11  A.   I didn't ask, and I wouldn't ask.  I think it would

12  create confusion.

13  Q.   And you also didn't ask any survey respondent an alone

14  motivate question about any features other than the

15  capability to purchase apps and the capability to make movie

16  and rental purchases, correct?

17  A.   Yes.

18  Q.   And you didn't ask respondents about their motivations

19  to purchase in any specific time period, correct?

20  A.   That's correct.

21  Q.   So you didn't ask people whether they regularly used a

22  product or purchased a product in 2008, correct?

23  A.   Correct.  No dates.

24  Q.   So we don't know with whether they purchased in 2009 or

25  2010, correct?

```
1   A.   That's right.

2   Q.   Or even 2014.

3   A.   That's right.

4   Q.   Dr. Wecker, I want to ask you some questions about the

5   percent value portion of your surveys.

6       So these were questions that were asked in addition to

7   whether certain features alone motivated purchase of

8   products, correct?

9   A.   Correct.

10          MR. POST:  Mr. Lee, can you pull up Plaintiffs'

11  Exhibit 205.002 at Page 20?

12          And if you could blow up Question Q4b?

13  Q.   (By Mr. Post) Dr. Wecker, is this an example of one of

14  those percent value questions that you asked?

15  A.   Yes, it is.

16  Q.   Okay.  Is it your belief that Smartflash's patent claims

17  cover all ways of purchasing apps?

18  A.   I have no opinion on that.  That's a patent expert's

19  area.

20  Q.   You're not offering that opinion?

21  A.   I have -- I have no opinion.

22  Q.   So this percent value question, that's not a question

23  that was drafted by you, correct?

24  A.   Just a moment.

25      I did draft that question, but the request to have a
```

1   question like this was suggested by, I think, Mr. Mills.

2   Q.   Someone asked you to ask it, correct?

3   A.   Right.  But I wrote the question.

4   Q.   Looking at that -- at that question, sir, if that

5   description of Smartflash's technology is too broad, your

6   survey generates an invalid response, correct?

7   A.   I couldn't say.  If it's too broad, someone would have

8   to explain to me what was too broad about it and why it would

9   be invalid.  It's just not a topic that I could be definitive

10  about.

11  Q.   Okay.  So this percent value question, like the alone

12  motivate question, isn't asked about the value a survey

13  participant places on a particular capability at any

14  particular time, correct?

15  A.   The particular capability, I think, is a yes, but the

16  particular time is a no.

17  Q.   Okay.  And these survey respondents are answering after

18  having answered questions that they already purchased and

19  owned a device, correct?

20  A.   They purchased and regularly used the device.

21  Q.   Okay.  So as an example, someone would need to be a

22  regular user and a purchaser of an iPhone to get to this

23  question in your survey, correct?

24  A.   They might still be screened out, but they have to be at

25  least that and some other things, too.

```
1    Q.    Okay.  So at the very least, they have to be that.

2    A.    At the least, they have to be that.

3    Q.    And they would be answering this question after having

4    used -- regularly used the App Store, correct?

5    A.    No.  That's not -- that's not the way it's phrased.  I

6    can help you, if you like.

7    Q.    They would need to be regular users of the iPhone; is

8    that correct?

9    A.    Yes.

10   Q.    And they would need to have purchased the iPhone and

11   downloaded at least one app, correct?

12   A.    Exactly right.

13   Q.    Okay.  Thank you.

14          So they may have spent some money on that application,

15   correct?  May have paid 99 cents for it?

16   A.    They would have had to have purchased -- not a free one.

17   They would have had to have purchased an app.

18   Q.    And they could have purchased many apps?

19   A.    They could have purchased any number, yes.

20   Q.    And just so we're clear, your percent value question

21   doesn't tell you how they would have valued the capability to

22   purchase an app before they actually went forward and did

23   that purchase, correct?

24   A.    Let me think for a moment.

25          No, it doesn't tell them to answer this based on the
```

1  knowledge they had prior to ever downloading an app.

2  Q.   Okay.

3  A.   No, sir.

4  Q.   Now, you agree with me that the percent value is not a

5  measure of value based on the purchase price of the device,

6  correct?

7  A.   I agree with that.

8  Q.   And your analysis did not address whether a percent

9  value of perhaps 10 percent relates in any way to the price

10  the survey participant actually paid for the device, correct?

11  A.   Let me think.

12      I think there is a relationship, but it's not -- it's

13  not clearcut what it is.

14  Q.   You didn't try to relate the percent value to the price

15  in any way, correct?

16  A.   Well, I can now.  I can see that it would have to be

17  something at or above that price or they wouldn't have bought

18  it in the first place.

19  Q.   But you didn't do that as part of the analysis you

20  performed in this case, correct?

21  A.   No.  It's just obvious.  I can see.

22  Q.   You would agree with me that percent value may not be a

23  mathematically precise concept, correct?

24  A.   Yes, I agree with that.

25  Q.   You asked some questions about percent value in the

1    context of movies.

2         Do you recall those questions?

3    A.   Not -- I can't by memory, but, in general, I do.

4    Q.   Okay.  Now, for your -- for those questions, your

5    percent value questions do not tell you what a participant --

6    what value a participant places on movie rentals alone,

7    correct?

8    A.   That's right.

9    Q.   And your percent value questions were asked only of

10   those participants who answered that they were not alone

11   motivated to buy based on a particular feature, correct?

12   A.   Correct.

13   Q.   In fact, it was your testimony that if someone answers

14   yes to the alone motivate question, you can't tell what

15   specific percent value they place on that feature, correct?

16   A.   That's correct.

17   Q.   And you didn't test the percent value that participants

18   placed on other features of a device like GPS, screen size,

19   or the ability to make calls, correct?

20   A.   Correct.

21         MR. POST:  Mr. Lee, can you pull up -- I believe it

22   was Slide 30 of Dr. Wecker's demonstratives?

23   Q.   (By Mr. Post) Do you recognize this slide, sir?

24   A.   Yes, sir.

25   Q.   Okay.  So I want to ask you a question about the 20.22

1    percent value number for iPhone.

2        So it's your opinion here that iPhone users who were not

3    alone -- alone motivated by the capability to rent and

4    purchase movies and TV shows has a percent value of 20.22

5    percent, correct?

6    A.   Yes.

7    Q.   So you would agree with me, then, that all other

8    features that the individuals who were not alone motivated by

9    this feature alone would be a hundred percent minus 22 --

10   20.22 percent or 79.78 percent; is that correct?

11   A.   Only if they're independent features.  If they're

12   interconnected or overlapping, then you would get more than a

13   hundred percent.

14   Q.   So for independent features, though, you would agree

15   with me it would add up to --

16   A.   Right.

17   Q.   -- a hundred percent.

18       Dr. Wecker, would you agree with me that the way

19   questions are worded or -- in a survey can impact how they're

20   understood by survey participants?

21   A.   Yes.

22   Q.   Okay.  So if -- if a question was asked about a percent

23   for meat that's 75 percent lean --

24   A.   I didn't understand you.

25   Q.   Sure.  I'll start over.

```
 1        Have you ever -- are you familiar with any academic

 2   research about phrasing questions in a -- in a negative

 3   manner and whether that can impact survey results?

 4   A.    Yes.  I'm familiar with the general topic of phrasing

 5   questions, including that.

 6   Q.    And did you consider that academic research when you

 7   assembled the surveys that you conducted in this case?

 8   A.    It's part of my background and experience, yes.

 9   Q.    Okay.

10            MR. POST:  Mr. Lee, can you pull up Plaintiffs'

11   Exhibit 201.001 at Page 56?

12            201.001 at Page 56.

13   Q.    (By Mr. Post) Okay.  Dr. Wecker, do you recall placing

14   bold -- or blue highlighting on certain words in your

15   surveys?

16   A.    Yes.

17   Q.    And one of those words was "disabled," correct?

18   A.    Yes.

19   Q.    And you -- it was your choice to put the word "disabled"

20   in blue text, correct?

21   A.    Yes.

22   Q.    And disabled is a -- has a negative connotation, doesn't

23   it, sir?

24   A.    Yes.  It's intended to.

25   Q.    It's intentional.
```

1   A.   Yes.

2   Q.   Okay.   Thank you.

3        You showed a slide about ORC and a -- the size of some

4   panels that they have.

5        Do you recall that?

6   A.   Yes.

7   Q.   I think the number was 1.7 million?

8   A.   Correct.

9   Q.   And just to be clear, you didn't ask any of your survey

10  questions to over 1.7 million people, did you?

11  A.   I think I was clear I did not do that.

12  Q.   Okay.   Good.

13              MR. POST:   Mr. Lee, can you pull up Plaintiffs'

14  Exhibit 205.002 at Page 9?

15  Q.   (By Mr. Post) And this was one of the tables that you

16  showed us with some highlighting on the -- on the right-hand

17  side.

18       Do you recall that?

19  A.   Yes.

20  Q.   Okay.   I want to ask you about some other numbers that

21  you didn't highlight.

22       And this is an app motivation survey; is that correct?

23  A.   Correct.

24  Q.   Okay.   So -- so I make sure we all understand, for your

25  Wave -- for this app motivation survey, you started out with

1   2,009 potential iPhone respondents, correct?

2   A.   Correct.

3   Q.   Okay.  And -- and actually, it was 2,009 potential

4   respondents total, right, for all those devices?

5   A.   I don't understand the difference.  Is that a different

6   question?

7   Q.   So for this survey, you started with 2 -- 2,009

8   respondents, correct?

9   A.   That's correct.

10  Q.   Okay.  And of those 2,009 respondents, 707 were regular

11  users and purchasers of an iPhone.

12       Do you see that --

13  A.   That's correct.

14  Q.   -- highlighted there?

15       Okay.  And so of those 707 iPhone purchasers who were

16  regular users, 457 of them had purchased one or more apps

17  from the App Store; is that right?

18  A.   Correct.

19  Q.   Okay.  And then of those 457 participants, just 230 of

20  them stated that they were alone motivated to purchase their

21  iPhone based on the capability to purchase apps, correct?

22  A.   Correct.

23  Q.   And you didn't highlight that number in your direct

24  testimony, did you?

25  A.   Correct.  I didn't highlight any of the counts of

1    individuals.

2    Q.    Okay.  So 230 respondents who met that criteria, that's

3    about an average of 4.6 respondents per state, right, if you

4    divide by 50?

5    A.    Yes.

6    Q.    Now, you're aware, sir, that Mr. Mills has identified

7    more than 206 million accused sales of iPhones in the United

8    States?

9    A.    I don't know anything about that.

10   Q.    Okay.  Well, I'll represent to you that he has

11   identified that number.

12       So here we have 230 iPhone respondents in that segment

13   out of the more than 206 million iPhone users that Mr. Mills

14   identified in his report; is that right?

15   A.    I don't know what his number is, but I doubt that it's

16   the same construction as mine.  But in any event, there's a

17   lot more iPhone users in the whole United States than 230,

18   that's for sure.

19   Q.    Okay.  So I wanted to do just a little bit of quick

20   division.

21            MR. POST:  Your Honor, may I approach the witness

22   with a calculator just to --

23            THE COURT:  You may.

24   Q.    (By Mr. Post) All right.  Dr. Wecker, I'd like you to --

25   ask you to do some quick division for me.

1       Can you divide 230 into 206 million and tell me what the

2  result of that is as a percentage?

3  A.   Well, if I've used your calculator correctly, it's a --

4  it's a very tiny portion of 1 percent.  Is that good enough?

5  Q.   So I think -- I tried to do it, and you can tell me if I

6  did it wrong, but I got .00011165 percent.

7  A.   That's what I got.

8  Q.   Okay.  I'm just going to write that right here.

9       Now, for your percent value segment, we can see those

10  numbers right below this; is that right?

11           MR. POST:  So if you could scroll down, Mr. Lee.

12  Q.   (By Mr. Post) Here we see 227 participants who were not

13  alone motivated but had a percent value estimate that they

14  provided, correct?

15  A.   Yes.

16  Q.   Okay.  So I'll ask you this time to divide 227 into 226

17  million.  I expect you'll get a similar number.

18  A.   I will agree immediately, it's going to be a similar

19  number.

20  Q.   So I will -- I will tell you that I got the following

21  number, okay?  And that number is 0.00011019 percent, right?

22  A.   I'll agree with that.

23  Q.   And so we're -- so we're clear these results are for

24  apps, right, sir?

25  A.   Yes.

1    Q.    The App Store motivation survey?

2    A.    Right.

3    Q.    Okay.  And you did -- you have some similar tables for

4    movie and TV purchases, correct?

5    A.    Correct.

6              MR. POST:  So, Mr. Lee, if you could pull up

7    Plaintiffs' Exhibit 205.003 at Page 9.

8    Q.    (By Mr. Post) Okay.  And do you recognize this, sir, as

9    Chart G1.1, your Movies Motivation Survey results?

10   A.    Yes, sir, I do.

11   Q.    Okay.  Great.

12         So we're going to do a similar process, but just to make

13   sure I'm in the right spot, for this survey, you started with

14   a segment of 2,021 respondents, correct?

15   A.    Correct.

16   Q.    Okay.  And of those, 702 had purchased and regularly

17   used an iPhone; is that correct?

18   A.    Correct.

19   Q.    And then of those, 303 had rented or purchased a movie

20   using their iPhone, correct?

21   A.    Correct.

22   Q.    And we don't actually know what iPhone they used to --

23   to make that rental or purchase, right?

24   A.    You mean model number?

25   Q.    Correct.

1    A.    Don't know the model, no.

2    Q.    It could be an iPhone 3G with a small screen or an

3    iPhone 6 Plus with a large one?

4    A.    Correct.

5    Q.    Okay.  So of those 303 iPhone users, 165 responded that

6    they were alone motivated by the capability to rent and

7    purchase movies, correct?

8    A.    Correct.

9    Q.    Okay.  So if you could do me a favor and divide 165 into

10   206 million, and tell me what that number is as a -- as a

11   percentage, sir.

12   A.    Your calculator quit.

13   Q.    I actually have a backup, if you want one, sir.

14   A.    Well, it's blank.  But I can approximate this quickly.

15   It's going to be not very far off from where we are.

16   Q.    Okay.  So I got, when I did the math on my iPhone, a

17   0.0000801 percentage.  Does that sound --

18   A.    That's -- it's going to be approximately that, yes.

19   Q.    And then you also have some results for percent value

20   for this survey as well, correct?

21   A.    Correct.

22   Q.    So if we scroll down to the table below, we see a

23   segment with 138 participants, correct?

24   A.    Correct.

25   Q.    And I'll represent to you, since our calculator quit on

1   you --

2   A.    Your calculator.

3   Q.    My calculator, exactly.   Thank you.

4         That 138 divided into 206 million is 0.00006699.

5   A.    That sounds about right.

6   Q.    Okay.   I'll write that one down, too.

7         Sir, do you consider the capability to buy an app to be

8   an independent feature from, say, rental and purchase of

9   movies and TV shows?

10  A.    I think so.   That may take some discussion; but the

11  overlap would occur if you were also thinking about, say, a

12  battery, which would influence both.   But I think the one

13  part -- I'd want to talk to another expert on this, but I

14  don't think the one influences the other.   It's really not my

15  professional area.

16  Q.    Okay.   And do you have an opinion about whether the

17  capability to purchase apps is an independent feature from

18  screen size?

19  A.    Probably not.

20  Q.    How about battery life?

21  A.    Right, not battery life either.

22  Q.    But build quality of a phone?

23  A.    That -- that would require even a definition of what it

24  is.

25              MR. POST:   I pass the witness.

1          THE COURT:  Redirect?

2          MR. WARD:  May we approach, Your Honor?

3          THE COURT:  You may.

4          (Bench conference.)

5          MR. WARD:  Your Honor, I tried to stay away from

6    the previous survey where we had this question where it was

7    motivate, and then we moved to alone motivate.

8          He got into one survey -- one question one way with

9    motivate without the word "alone," and the second survey he

10   added it.  He added it because they criticized him.  The

11   damages report was struck.  And so he had to do new surveys.

12         I'm entitled to ask him:  Did you add that word

13   because of the criticism you received from Apple's lawyers?

14         And I don't think that gets into our damages expert

15   getting struck.  Otherwise, I'm fighting with one hand behind

16   my back.

17         MR. POST:  Your Honor --

18         THE COURT:  What's the response?

19         MR. POST:  Your Honor, we made no reference to the

20   Daubert motion.  The Daubert motion on -- on Dr. Wecker was

21   denied.

22         So the Daubert was granted on Mr. Mills, based on

23   his interpretation and reliance on those -- that data a

24   certain way.  But, you know, Mr. Ward took the --

25         THE COURT:  As I understand it, the grant on Mr.

1    Mills was based on the surveys not being limited to that

2    being the alone motivating factor.

3              MR. POST:  Right.  Based on the way Mr. Mills

4    applied that --

5              THE COURT:  So you attacked Mr. Mills' testimony,

6    but you attacked it based on the underlying survey data from

7    the original survey; is that correct?

8              MR. POST:  On his interpretation of that data,

9    that's right, on what it meant.

10             Additionally, Your Honor, the -- there are certain

11   surveys as part of that Wave 1 that Dr. Wecker has used to

12   increase his sample size.

13             So those surveys are certainly relevant.  They were

14   on Mr. Ward's demonstratives.  He wanted -- they've --

15   they've asked to pre-admit them, and I assume they're going

16   to say they're admitted.

17             So, you know, I think it's -- it was fair to

18   explore.  We didn't go anywhere near suggesting that he was

19   Dauberted in any way.  He wasn't.  So I stayed away from

20   that.

21             THE COURT:  I'm not going to let you ask him a

22   leading question about did you change the surveys based on

23   criticism from Apple.  I think you can ask him, did he alter

24   his surveys and why.  But I don't think you can ask that as a

25   leading question.

 1             MR. WARD:  And I'm worried about asking him, that

 2   he's not going to know this line that we're walking --

 3             THE COURT:  If he doesn't have personal knowledge

 4   of it, he can't testify --

 5             MR. CALDWELL:  He knows, but he's trying to respect

 6   your -- your motions in limine is the problem.

 7             THE COURT:  Are we all mind-readers?  Do we all

 8   know what --

 9             MR. CALDWELL:  We've tried to make sure he

10   understands all the rulings in limine, so --

11             THE COURT:  I'm not going to let you ask it as a

12   leading question.  If you choose to go there, you can ask it

13   as a non-leading question about his reason for changing or

14   amending the surveys.

15             MR. WARD:  May I remind the witness that he's

16   instructed not to reference the Daubert motion or the

17   striking of Mr. Mills' report?  Because --

18             THE COURT:  Yes.

19             All right.  Hang on a minute.  Tell me why we took

20   numbers from 2,000 people, and then you divided it into 200

21   million.

22             MR. POST:  Why did we do that?

23             THE COURT:  Just to make little tiny zeros like

24   that?

25             MR. POST:  And the perfect point is that they're

1  asking for $850 million from Apple based on results from 200

2  (sic) people.  So that's a point that we think is -- is

3  important.

4           THE COURT:  Well, I don't understand why you asked

5  him to divide it into 200 million -- 200 plus million people

6  when the survey itself never touched more than a couple

7  thousand people to begin with.

8           MR. POST:  So Mr. -- so Mr. Mills, in his --

9           THE COURT:  There was no objection to irrelevance,

10  but it seems like to me it was an intentional attempt to

11  confuse the jury, and I'm not going to sanction the

12  intentional attempt to confuse the jury.

13          MR. POST:  Okay.  This certainly was not, Your

14  Honor.  I think in the next witness you'll see where that 206

15  million number comes from.  But I would never

16  intentionally --

17          MR. WARD:  Your Honor, I didn't object because I

18  don't have Dr. Dhar's report memorized.  He's their survey

19  expert.  But I'll be anxious tonight and I will go back and

20  look and see if there was criticism about the sample size

21  that he surveyed.  I don't recall that being a criticism, but

22  I'll look.

23          THE COURT:  And the Court will take a very dim view

24  of any attorney before it, that attempts to intentionally

25  confuse the jury.

1              All right.  Let's go forward.

2              MR. CALDWELL:  Thank you, Your Honor.

3              MR. WARD:  And, Your Honor, just to be clear, am I

4    permitted to instruct the witness -- remind him about the

5    limine, that he cannot refer to the Daubert motion, Mr.

6    Mills' prior report being struck, or did I misunderstand you?

7              THE COURT:  You can instruct him about -- I think

8    it should be more generic.  I think you should instruct him

9    not to infer that anything happened during the pretrial

10   process.

11             MR. WARD:  Okay.

12             THE COURT:  I think he'll understand that.

13             MR. WARD:  I'll do that.

14             (Bench conference concluded.)

15             THE COURT:  Let's proceed, Gentlemen.

16                      REDIRECT EXAMINATION

17   BY MR. WARD:

18   Q.   Dr. Wecker, do you remember the questions about long

19   division and the tiny fractions that resulted as a result of

20   that division?

21   A.   Yes, I remember all that.

22   Q.   Has there been any criticism of the sample size or the

23   methodology in which you conducted these surveys prior to

24   today?

25   A.   The -- no, there haven't, and this is not criticism of

1    it either.

2    Q.    Does this have anything to do with the reliability of

3    your survey?

4    A.    Absolutely nothing.  It's a common statistical fallacy

5    to believe that fractions like this indicate accuracy when

6    they absolutely do not.  Accuracy is the confidence intervals

7    I calculated.

8    Q.    Is that confidence interval something that you were

9    always looking at to confirm your sample size and the

10   accuracy of that sample size?

11   A.    To confirm the accuracy; and if I thought it was

12   insufficient, I would increase the sample size.

13   Q.    Did you think your sample size was insufficient in this

14   case?

15   A.    It was not insufficient.  It was adequate and

16   sufficient.

17   Q.    Have you ever seen a survey that attempted to go out and

18   survey 206 million adults in the United States?

19   A.    Yes, the U.S. Census.

20   Q.    Besides the U.S. Census?

21   A.    No.

22   Q.    That's a rather expensive census that's done every 10

23   years?

24   A.    Yes.

25   Q.    Did Apple produce a survey that you could look at where

1    they went and surveyed their 206 million iPhone users?

2    A.    No.

3    Q.    Do you know if Apple has a survey department?

4    A.    I believe they do.

5    Q.    And have you actually seen some of the survey results

6    from Apple's surveys?

7    A.    I have.

8                  MR. WARD:  Can we pull up Dr. Wecker's Slide 15,

9    Mr. Mortensen?

10   Q.    (By Mr. Ward)  Remind us what we're looking at there,

11   and let's reference the iPhone in the top left-hand corner

12   with respect to this survey question.

13   A.    Yes, sir.  This is the App Store survey, and this is 30

14   percent of iPhone regular users were alone motivated to buy

15   their device -- to buy their iPhone because of its ability to

16   purchase and download apps from the App Store.

17                 MR. WARD:  And, Mr. Mortensen, could we look at PX

18   103.028, Slide 10?

19                 MR. POST:   Your Honor, object.  This goes beyond

20   the scope of the -- the witness's expert report.

21                 THE COURT:  You're going to have to speak louder,

22   Mr. Post, if you want me to hear you.

23                 MR. POST:  Sorry.  I got too far away from the mic,

24   Your Honor.

25                 I object to this question to the extent Dr. Wecker

1  had no opinions about Apple surveys in his expert report,

2  didn't rely on any.

3     THE COURT:  Overruled.  You've opened the door.

4  I'm going to allow the Plaintiff to proceed with this line of

5  questioning.

6  Q.  (By Mr. Ward)  All right.  Are we looking at a survey

7  from -- that Apple conducted, Dr. Wecker?

8  A.  Yes.

9  Q.  And across the top there it says reasons for purchase

10  center around the benefits of owning a smartphone -- a

11  notable percentage mentioned being a -- and then on the left

12  side --

13     MR. WARD:  Can we blow up that first column that's

14  U.S. and main reason for -- main reason for purchase?

15  Q.  (By Mr. Ward)  All right.  So would you read what it

16  says on the left side of those percentages?

17  A.  Main reason for a purchase.

18  Q.  And then over on the right, we're got a color code,

19  correct?

20  A.  Yes.

21  Q.  And what does purple correspond to?

22  A.  It corresponds to wanted to use apps.

23  Q.  And what percentage from Apple's own survey does it say

24  is the main reason for purchasing 24 percent?

25  A.  Well, you just read it.  It's the 24 percent wanted to

1  use apps.

2  Q.   And then what about 40 percent, main reason for

3  purchase?

4  A.   Wanted phone that combine music, email, web games, apps.

5  Q.   And I don't think you need a calculator, but will you

6  add up -- if you do, I'll give it to you -- will you add up

7  those numbers, just ballpark, the percentages?

8  A.   The total of them?

9  Q.   Yes, sir.

10  A.   Around 160, maybe.

11  Q.   And you testified that there could be more than one

12  reason that a purchase -- a person might purchase an iPhone,

13  correct?

14  A.   Yes.

15  Q.   Yet Apple's own survey, when they checked main reasons,

16  it shows various percentages that add up well above a hundred

17  percent, right?

18  A.   That's true.

19  Q.   And is that 24 percent from Apple's own survey within 6

20  percentage points of your survey?

21  A.   Yes.

22       MR. WARD:   Mr. Mortensen, if we could look at PX

23  103.028, Page 1242?   And blow up the top left-hand corner,

24  just first three rows.   Top three rows, there you go.

25  Q.   (By Mr. Ward)   And, again, are we looking at another

1  survey from Apple?

2  A.    Yes.

3  Q.    And according to this survey from Apple --

4         MR. WARD:   Strike that.

5  Q.    (By Mr. Ward) What is n equals 1184?

6  A.    That'd be a sample size.

7  Q.    Is that smaller than your sample size?

8  A.    Usually smaller.  I had 2 or 3,000.

9  Q.    So it was apparently good enough for Apple for this

10  survey?

11  A.    Yeah, I have no criticism of a thousand.  That's usually

12  adequate.

13  Q.    And what do they say about the main reason for purchase?

14  What's the percent who purchased because they wanted to use

15  apps?

16  A.    The 29 percent, and I think the arrow means an

17  increasing of -- had a main reason because they wanted to use

18  apps.

19  Q.    That's within 1 percent of your 30 percent, is it not?

20  A.    Yes, it is.

21         MR. WARD:   And one more, Mr. Mortensen, PX

22  103.028-1345?

23  Q.    (By Mr. Ward)  And could you just read that?

24  A.    Web capabilities, ease of use, and apps are a key -- are

25  key features in the decision to purchase an iPhone.

1          MR. WARD:   Thank you, Mr. Mortensen.   You can take

2     that down.

3     Q.   (By Mr. Ward)   Do you know what the meaning of stipulate

4     is?

5     A.   I think so.

6     Q.   What do you understand stipulate to -- to mean?

7     A.   I think in the legal setting, it means parties have

8     agreed to something.

9     Q.   And were you aware that the parties filed a joint

10    stipulation in this case that Apple has not identified any

11    design-around non-infringing alternatives and opinions of

12    counsel?

13    A.   I was not aware of that.

14    Q.   That was read to the jury earlier today, and I'll

15    represent to you that that's a stipulation the parties

16    have -- have entered into, okay?

17    A.   Yes.

18    Q.   Mr. Post asked you some questions about whether you were

19    representing that the non-infringing alternative that

20    Mr. Jones had provided to you, whether you were representing

21    that that was the best non-infringing alternative.   Do you

22    recall that question?

23    A.   Yes.

24    Q.   That was the only non-infringing alternative, wasn't it,

25    Dr. Wecker?

```
 1   A.    It's the only one I knew of.

 2   Q.    Certainly none has been provided to you by Apple, has

 3   it?

 4   A.    Correct, none has been.

 5              MR. WARD:  Pass the witness.

 6              THE COURT:  Additional cross?

 7              MR. POST:  Very brief, Your Honor.

 8              THE COURT:  All right.  Proceed.

 9              MR. POST:  Mr. Lee, would you mind pulling up

10   Plaintiffs' Exhibit 103.028, Page 10, I believe?

11                     RECROSS-EXAMINATION

12   BY MR. POST:

13   Q.    And, Dr. Wecker, you were just asked some questions

14   about this slide.  Do you recall those?

15   A.    Yes.

16   Q.    Okay.  So at the bottom, do you see at the end of that

17   sentence it says:  Base, iPhone buyers; up to three reasons

18   could be selected?

19   A.    Yes.

20   Q.    So you understand that to mean that a survey respondent

21   could select three different main reasons for purchase,

22   correct?

23   A.    That's what it appears to mean.  I don't know the

24   details here.

25   Q.    So would you agree with me that this survey is not
```

1   asking about the only reason for purchase?

2   A.   Let me think.  I think I agree.  It's -- the main reason

3   for purchase, and apparently they're allowed to list up to

4   three.

5   Q.   And if you look on the right-hand side of that legend

6   that you talked about, there was a -- a purple for wanted to

7   use apps.  Do you see that?

8   A.   Yes.

9   Q.   Now, it's not your understanding that the use of apps is

10  the Smartflash technology, is it, sir?

11  A.   I -- I believe you're correct.  It's the ability to

12  purchase and download apps from the App Store is my

13  understanding.

14  Q.   Another question for you.  You answered a question that

15  n, I believe on one of the surveys, was smaller than your

16  sample size.  Do you recall that?

17  A.   Yeah, it was about 1100, and mine varied because I did

18  many different ones, but generally, 1100 is smaller, but I

19  had no criticism of it.  1100 is usually adequate.

20  Q.   Okay.  So for this -- this slide, if you look underneath

21  U.S., the end is 1387, right?

22  A.   Yes.

23  Q.   Isn't that the number of people answering this question,

24  sir?

25  A.   I don't know.  I don't know enough to -- to know what it

1    is.  I just thought it was a sample size, which is what it

2    usually is.

3    Q.   But you don't know for sure?

4    A.   No, I don't know the details of this survey.

5    Q.   Haven't studied it?

6    A.   I'm sorry, was that a question?

7    Q.   You have not studied it, correct?

8    A.   I know nothing more than this chart, which I'm looking

9    at here.

10   Q.   Okay.  Same is true of the other three surveys you were

11   shown by Mr. Ward?

12   A.   Yes, I don't know the details of those surveys.

13           MR. POST:  No further questions, Your Honor.

14           THE COURT:  Redirect?

15           MR. WARD:  Very briefly.

16                   FURTHER REDIRECT EXAMINATION

17   BY MR. WARD:

18   Q.   So as we just saw, Apple knows how to run a survey that

19   says select three reasons -- up to three reasons, correct?

20   A.   Apparently, that's what they did.

21   Q.   Anything that would stop them from running a survey that

22   said select one reason?

23   A.   Nothing.

24           MR. WARD:  Nothing further.

25           THE COURT:  Further cross?

```
 1              MR. POST:  No further cross, Your Honor.
 2              THE COURT:  All right.  You may step down, Dr.
 3  Wecker.
 4              THE WITNESS:  Thank you, Your Honor.
 5              THE COURT:  Ladies and Gentlemen, before we proceed
 6  with the Plaintiffs' next witness, we're going to take
 7  another short recess.  You may leave your notebooks in your
 8  chairs.  This, too, will be about 10 minutes.
 9              Don't discuss the case among yourselves, follow my
10  other instructions, and we'll be back in here shortly to
11  continue with the next witness.  You're excused for recess at
12  this time.
13              COURT SECURITY OFFICER:  All rise.
14              (Jury out.)
15              THE COURT:  The Court stands in recess for
16  approximately 10 minutes.
17              (Recess.)
18              (Jury out.)
19              COURT SECURITY OFFICER:  All rise.
20              THE COURT:  Be seated, please.
21              MR. CASSADY:  Your Honor, if I may.  We have a
22  small thing to bring up before the jury comes in, if you
23  would please allow.
24              THE COURT:  What have you got, Counsel?
25              MR. CASSADY:  Your Honor --
```

```
 1              THE COURT:  Let's go from the podium.
 2              MR. CASSADY:  Your Honor, my understanding is, with
 3   regards to the criticism of Dr. Wecker running a survey for
 4   motivate and then running a survey for alone motivate, that
 5   the door had been opened to ask the following question:  And
 6   I heard Apple's counsel criticize just now Dr. Wecker for
 7   running a survey with motivate and alone motivate and say --
 8   and Dr. Mills will say -- I imagine he'd say yes.
 9              And then I'd say:  Do you know why he did that?
10              And I imagine Mr. Mills would say:  Because counsel
11   for Apple criticized our use of that survey, and so that's
12   why we ran it.
13              That's it.  Nothing more.
14              THE COURT:  My understanding was that question was
15   going to be posed to Dr. Wecker.  That was my understanding
16   from the bench conference.
17              Mr. Ward?
18              MR. WARD:  I was going to, but I was fearful that
19   he might get into the issues of how --
20              THE COURT:  And that's why you went to him at the
21   witness stand, and I assume you two huddled up with him,
22   which I didn't expect to happen at the witness stand; I
23   expected it to happen from the podium.
24              MR. WARD:  Well, I wanted to --
25              THE COURT:  So I assumed, once you had talked to
```

```
 1    him at the witness stand, you decided not to go there.
 2              MR. WARD:  He said he wanted an example, and
 3    that's --
 4              THE COURT:  Well, Dr. Wecker's off the stand now.
 5              MR. WARD:  Right.
 6              THE COURT:  And I didn't give consent to talk to
 7    Dr. Mills -- Mr. Mills about it.
 8              MR. WARD:  Okay.
 9              THE COURT:  I'll carry your request if and when you
10    put on a rebuttal case, and we'll talk about it before then,
11    but we're going to move forward now.  All right?
12              MR. CASSADY:  Thank you, Your Honor.  I just wanted
13    to ask for that very reason.  I appreciate it.
14              THE COURT:  All right.  Let's bring in the jury.
15              COURT SECURITY OFFICER:  All rise for the jury.
16              (Jury in.)
17              THE COURT:  Please be seated.
18              All right.  Plaintiff, call your next witness.
19              MR. CASSADY:  Your Honor, the Plaintiffs call
20    Mr. Robert Mills.
21              THE COURT:  All right.  Mr. Mills, if you'll come
22    forward and be sworn.
23              MR. CASSADY:  Your Honor, while he's doing that,
24    can I go ahead and pass the binders for his testimony?
25              THE COURT:  Yes.  You have leave to distribute your
```

1    binders.

2              MR. CASSADY:  Thank you, Your Honor.

3              (Witness sworn.)

4              THE COURT:  And, Mr. Mills, before we start the

5    questioning, if for any reason I should send the jury out or

6    you otherwise are asked to stand for the Court, be mindful of

7    the microphone.  The last several times there's been a loud

8    boom every time everybody stood up because the witness has

9    bumped the microphone.

10             THE WITNESS:  Yes, Your Honor.

11             THE COURT:  Just be mindful of its placement.

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  Thank you.

14             All right.  Counsel, you may proceed.

15             MR. CASSADY:  Thank you, Your Honor.

16             ROBERT MILLS, PLAINTIFFS' WITNESS, SWORN

17                      DIRECT EXAMINATION

18   BY MR. CASSADY:

19   Q.   Sir, can you please introduce yourself to the jury?

20   A.   Hello.  My name is Robert Mills.

21   Q.   And can you please tell the jury a little bit about

22   yourself.

23   A.   Yes.  I'm an economist.  I grew up in the Pacific

24   Northwest, just west of Portland, Oregon.  I now reside in

25   the Los Angeles area with my wife and two children.  I work

1   for a firm called Micronomics in Los Angeles.

2   Q.   And why are you here today?

3   A.   I'm here to testify about damages due to the

4   infringement.

5   Q.   And were you here yesterday during Mr. Racz's testimony?

6   A.   Yes, sir.

7   Q.   Okay.  I believe there was a Mr. Mills referred to in

8   various number of documents yesterday.  Are you related to

9   that Mr. Mills at all?

10  A.   No, sir.

11  Q.   Okay.  Now, have you actually reached an opinion

12  regarding the damages in this case?

13  A.   I have, yes.

14  Q.   Okay.  So before we get into the details of that, I just

15  want to ask this question:  Can you please tell the jury how

16  much you determined that Apple owes Smartflash due to its

17  infringement of the patents in this case?

18  A.   Well, I've concluded that Smartflash should receive no

19  less than a reasonable royalty, and I calculate that royalty

20  at $852.2 million.

21  Q.   Mr. Mills, what is it that enables you to come up with a

22  figure like that?

23  A.   Well, as I mentioned, I'm an economist.  I'm trained as

24  an economist.  I've been involved in economic research and

25  consulting for more than 18 years now, and that includes the

1    valuation of intellectual property and the calculation of

2    economic damages.

3    Q.    And did you help prepare slides or did you prepare

4    slides to help the jury with your testimony today?

5    A.    Yes, sir.

6    Q.    Okay.  And this is an example of one of those slides?

7    A.    It is, yes.

8    Q.    Okay.  So with this slide up, could you help me and the

9    jury with your educational background.

10   A.    Yes.

11         So as I mentioned, I -- I grew up in the Pacific

12   Northwest, the Portland, Oregon, area.  And I went to -- to

13   college at Portland State University, where I obtained a

14   Bachelor's degree in economics and history, and then

15   continued on there and received a Master's of Science degree

16   in Applied Economics.

17         And then after leaving Portland State University, I went

18   to the University of California in Santa Barbara where I

19   obtained a Master's of Arts degree in economic.

20   Q.    And what did you do after graduating?

21   A.    After graduating, I joined a firm in Portland, Oregon,

22   for a couple of years and then ultimately moved to Los

23   Angeles and joined Micronomics.

24   Q.    I was looking at your slide when you were answering the

25   question, and I noticed that you have two economic degrees.

1    Is that true?

2    A.    It is, yes.

3    Q.    Why do you have two master's degrees in economics?

4    A.    Well, the first degree is an applied degree, and that's

5    a program that's at Portland State University, where it deals

6    more with real-world problems, the application of economics

7    to real-world problems.

8        The second degree is more of a theory degree.

9    Q.    Okay.  And you currently work at Micronomics?

10   A.    Correct.

11   Q.    What do you do at Micronomics?

12   A.    Well, I consult with clients on matters related to

13   economics.  Much of that is in the area of patents.

14   Q.    And what do you do with regards to patents?

15   A.    Well, I assist clients in understanding the value of

16   patents.  Sometimes that involves looking at portfolios or

17   groups of patents and then trying to determine the value of

18   those patents or which patents in that portfolio have value.

19       At other times, I'm asked to help with licensing

20   negotiations, how much somebody should pay for a license or

21   how much they should receive for a license.  And then

22   sometimes I'm asked to come into court and testify about

23   damages in cases like this.

24   Q.    Do you always work for the owner of the patents, like

25   Smartflash, or do you sometimes work for accused infringers

1    or infringers like Apple?

2    A.    It's a mix.

3    Q.    Could you please identify maybe a few example companies

4    you've worked for, maybe ones the jury would know?

5    A.    Certainly.

6        So I've done work in the intellectual property area for

7    companies like Ericsson and Hyundai and Boeing.  And I've

8    also worked for Regal Theaters and the estate of Marilyn

9    Monroe.

10   Q.    Did you say Marilyn Monroe?

11   A.    I did, yes.

12   Q.    Okay.  We'll come back to that.

13       Could you -- could you tell the jury whether you have

14   previously testified in cases like this about patent damages?

15   A.    I have, yes.  I've testified in deposition or trial more

16   than 30 times in a patent case.

17   Q.    Okay.  And are you being paid or compensated for the

18   work you've done in this case?

19   A.    Micronomics, the firm that I work for, charges for my

20   time and the time of my staff, yes.

21   Q.    Okay.  And you've been here today during the testimony

22   of Dr. Jones and Dr. Wecker, right?

23   A.    Yes, sir.

24   Q.    Okay.  And you heard some of the insinuations about

25   being paid for their time that Apple's counsel made of those

```
1    experts.

2         Do you remember that?

3    A.    I remember questions about them being paid, yes.

4    Q.    Okay.  It's routine for expert witnesses to be

5    compensated for their time, right?

6    A.    Absolutely, yes.

7    Q.    Okay.  And expert witnesses are different than fact

8    witnesses, right?

9    A.    Yes, they are.

10   Q.    Okay.  Now, back to Marilyn Monroe.  Tell me about that.

11   A.    Well, the estate of Marilyn Monroe was involved in a

12   dispute with a number of photographers that had photographed

13   her, Ms. Monroe, when she was alive; and they were using her

14   name and likeness and her image to market various products.

15   And so the estate was involved in a dispute with those

16   photographers, and I was asked to help assess the value of

17   her name and likeness.

18            MR. CASSADY:  Your Honor, Smartflash offers Mr.

19   Mills as an expert in economic analysis, intellectual

20   property analysis, and patent damages analysis.

21            THE COURT:  Is there objection?

22            MR. BATCHELDER:  No objection, Your Honor.

23            THE COURT:  The Court will accept him as an expert

24   in those fields.

25            Let's proceed.
```

1              MR. CASSADY:   Thank you, Your Honor.

2     Q.   (By Mr. Cassady) Mr. Mills, can you please describe the

3     work you did for this case?

4     A.   Yes.  My staff and -- and myself, we reviewed a large

5     number of documents.  And I think I prepared a slide that

6     shows some examples, but we reviewed tens of thousands of

7     pages of documents that were provided by Apple and by

8     Smartflash.

9          And this would include things like surveys -- we've seen

10    some examples of that -- financial documents, business

11    records, emails, those kinds of documents.

12         And then I also reviewed the sworn testimony of more

13    than a dozen witnesses.

14         And then also we obtained our own independent research,

15    books and articles, trade press, analyst reports, items like

16    that.  And we've reviewed all that information.

17    Q.   Okay.  And I see on the list that you had some

18    conversations or interviews with some individuals; is that

19    right?

20    A.   It is, yes.

21    Q.   And who did you have interviews with?

22    A.   Well, in addition to reviewing the sworn testimony, I --

23    I spoke with Mr. Racz, and I spoke with Dr. Wecker and Dr.

24    Jones.

25    Q.   The -- the Dr. Wecker and Dr. Jones that have testified

1   in this case?

2   A.   Correct, yes.

3   Q.   And Mr. Racz, the inventor?

4   A.   Yes, sir.

5   Q.   Okay.  Mr. Mills, how do you go about determining what

6   constitutes or -- or what makes up damages in a case like

7   this?

8   A.   Well, I start with the -- the patent statute that

9   addresses damages for patent infringement cases.  It's called

10  Section 284.

11  Q.   And is this that statute?

12  A.   It is.  This is -- this is a part of the statute, yes.

13  Q.   Okay.  And how do you go about determining what

14  compensates -- fair compensation?

15  A.   Well, according to the statute -- and I think we heard

16  this earlier in the instructions, but according to the

17  statute, upon finding for the claimant, the Court shall award

18  the claimant damages adequate to compensate for the

19  infringement, but in no event less than a reasonable royalty

20  for the use made of the invention by the infringer.

21  Q.   Okay.  And in this situation, who would be the

22  infringer?

23  A.   Apple is the one that is alleged to infringe here, yes.

24  Q.   Okay.  And when you calculate a reasonable royalty for

25  patent infringement, what are you trying to determine?

```
 1   A.    Well, we're trying to determine what a license would
 2   look like between the parties if they had a license.
 3   Q.    And -- and what is a license?
 4   A.    A license is an agreement to let somebody else use your
 5   property rights.
 6   Q.    Can you give me some examples?
 7   A.    Yes.  So common examples would be licenses in the oil
 8   and gas industry, so licenses to oil and gas rights, licenses
 9   to music rights, and then licenses to patent rights.  Those
10   are very common as well.
11   Q.    And, Mr. Mills, could you explain why licenses are
12   necessary in the first place?
13   A.    Well, in the -- in the context of patents, a patent
14   owner has the right to exclude others from using its
15   property.  And it also has the option to -- to grant rights
16   to others to use its property.
17        And so a license is -- is a means of providing those
18   rights.  The patent owner can set a price for its technology
19   and offer licenses to third parties.
20   Q.    And so I heard you say price.  Does that mean that
21   licenses include payment terms?
22   A.    Generally, they include payment -- payment terms that
23   are called royalties, yes.
24   Q.    Okay.  And how do royalties work?
25   A.    Well, there can be many different forms of royalties.
```

```
 1   There can be a one-time payment, for example.  There can be
 2   payments that are made over time, like installments.
 3        And also commonly, there are what are called running
 4   royalties, which are royalties that are paid based on use.
 5        And use can be metered either by the number of sales
 6   that are made or the amount of revenue that's generated.  But
 7   they would be tied somehow to -- somehow to the amount of use
 8   that's made of the technology.
 9   Q.   And how do licenses come into existence?
10   A.   Parties negotiate them.
11   Q.   And a license between Smartflash and Apple doesn't exist
12   in this case, right?
13   A.   It does not.
14   Q.   Okay.  So what do we do?
15   A.   So when a license doesn't exist, I use something called
16   the hypothetical negotiation framework.
17   Q.   And can you tell me about that?  What's that?
18   A.   Yeah.  The hypothetical negotiation framework asks us to
19   imagine what would happen if the parties in dispute had
20   actually negotiated a license at the time that the
21   infringement began, rather than infringing.
22   Q.   And in this case, when would that negotiation have taken
23   place?
24   A.   It would have taken place in about June of 2009, because
25   that's when the infringement here is -- began.
```

1    Q.    And who would have been involved in that negotiation?

2    A.    Well, Apple would be on one side of the negotiating

3    table, and Mr. Racz, acting on behalf of Smartflash would be

4    on the other.

5    Q.    Are there certain assumptions made in this negotiation?

6    A.    There are, yes.  There are some key assumptions.

7    Q.    And what are those assumptions?

8    A.    Well, the first two have to do with validity and

9    infringement.  And at the hypothetical negotiation, we're

10   asked to assume that -- that Apple would admit that it

11   infringes the patents and would admit that the patents are

12   valid, even though we've heard that that's being denied here.

13   For the hypothetical negotiation framework, we're asked to

14   assume that they would admit that.  And that's different from

15   a real-world negotiation, because it resolves all that

16   uncertainty in favor of the patent owner, which would improve

17   its bargaining position.

18   Q.    Okay.  Are there -- are there other assumptions in the

19   negotiation?

20   A.    Yes.  The third bullet point here is that the parties

21   are willing to negotiate.  And what this means is that --

22   that both Apple -- we presume that both Apple and Smartflash

23   would be willing to actually negotiate a license, sit down

24   and negotiate until they reach an agreement.

25   Q.    Okay.  And then what's the final assumption you have

```
 1   here on the slide?
 2   A.    So the final assumption is that the parties have access
 3   to all of the relevant information.  And this can include
 4   information that may not have even been known at the time of
 5   the negotiation, so it could be subsequent information.
 6        But, basically, it means that the cards are dealt face
 7   up.  And this is very different from a real-world negotiation
 8   where parties typically wouldn't share confidential
 9   information with their counterpart, wouldn't pass that across
10   the table.
11        But in the hypothetical negotiation framework, we assume
12   that both parties would have access to all of the relevant
13   information.
14   Q.    Okay.  So in a negotiation that you're reviewing here,
15   Apple doesn't get to say the patents are invalid, right?
16   A.    That's correct.
17   Q.    And unlike in this litigation, Apple doesn't get to say
18   the patents aren't infringed.
19   A.    That's correct.
20   Q.    Apple can't just walk away from the table and say they
21   don't want to negotiate.
22   A.    Correct.
23   Q.    And -- and Apple and Smartflash both have, you know,
24   cards up.  They all see each other's cards, right?
25   A.    Also correct, yes.
```

```
 1    Q.    Okay.  So they can both tell maybe what the other person

 2    may be willing to pay or willing to sell or other various

 3    pieces of information?

 4    A.    Yeah.  Any relevant information would be known.

 5    Q.    Okay.  What products are covered in -- in this case by

 6    this negotiation?

 7    A.    Well, as we heard Dr. Jones testify earlier, this

 8    involves the iPhone, the iPad, and the iPod Touch.

 9          And it's my understanding that this case involves the

10    iPhone up through the 5S model, the iPad up through the iPad

11    Air and the iPad Mini 2 models, and then all of the models of

12    the iPod Touch.

13          And then the relevant period for purposes of damages is

14    June 2009 when the infringement began up through -- through

15    the time of trial.

16    Q.    What about the devices that were sold by Apple prior to

17    June 2009?

18    A.    Well, it's my understanding that those devices can be

19    upgraded and are often upgraded to be used with the

20    infringing features, but they have not been included in my

21    damages calculations.

22    Q.    Okay.  So to be clear, the upgrade in 2009, would those

23    products be infringing?

24    A.    That's my understanding, yes, if they're using the

25    functionality.
```

1   Q.   Okay.  But you haven't included those here in your

2   analysis in this case?

3   A.   I have not.

4   Q.   Now, we talked about the assumptions.  Is there anything

5   else that goes into this negotiation?

6   A.   Yes.  There is, yes.

7   Q.   Okay.  And -- and what else do you have to do in

8   analyzing this negotiation?

9   A.   Well, I consider something called the Georgia-Pacific

10  factors.

11  Q.   And are these those factors?

12  A.   Yes, this is a -- sort of a summary of the factors,

13  yeah.  There are 15 factors, and -- and they're summarized

14  here.  They're actually longer if you look at the full text.

15  Q.   Okay.  And -- and I'll start with this slide.  Why is it

16  called Georgia-Pacific, and what is that we're seeing on the

17  far left of your slide?

18  A.   So Georgia-Pacific is a famous patent case, and these

19  factors come from that case.  And the factors on the right --

20  the 15 items on the right are factors that we analyzed to

21  determine what the outcome of this hypothetical negotiation

22  would be.

23  Q.   And did you consider all of these factors in your

24  analysis in this case?

25  A.   Yes, sir, I did.

1  Q.   Okay.   Are all the Georgia-Pacific factors always

2  relevant?

3  A.   Not necessarily.   Depends on the facts of the case.

4  Q.   Okay.   Are you prepared to testify about these factors

5  today?

6  A.   Yes, sir.

7  Q.   Did you prepare some slides kind of organizing how you

8  wanted to approach this analysis?

9  A.   I did, yes.

10  Q.   And where do you want to start this Georgia-Pacific

11  analysis?

12  A.   I think it makes sense to start with -- I've grouped

13  three factors together, Georgia-Pacific 1, 2, and 12.   And

14  these factors relate to licenses that involve the parties and

15  the industry -- industry licenses, as well as the licensing

16  policies of the parties.

17  Q.   Were there any licenses comparable to this negotiation

18  in this case?

19  A.   Well, I've reviewed a number of licenses in this case,

20  but I didn't find any to be directly comparable.

21  Q.   Okay.   Were there any Apple licenses that you reviewed

22  in this case?

23  A.   Yes, I did.

24  Q.   Okay.   Do the Apple licenses provide any contribution to

25  your analysis in this case?

1   A.   Yes.  As I said, I didn't find any directly comparable,

2   but they do tell me that Apple has been willing to enter into

3   licenses with others; and that it's been willing to do so on

4   different terms.  Sometimes it pays lump-sum royalties, and

5   sometimes it pays running royalties.

6   Q.   Okay.  And what else did you consider under the

7   licensing factors you have up here right now?

8   A.   I also considered the Chalfont licensing strategy.

9   Q.   Okay.  And what is Chalfont?

10  A.   Chalfont, as we heard Mr. Racz testify, was a company

11  that was established in 1999.  And it's my understanding that

12  it was established in part to license the technology of

13  Smartflash.

14  Q.   And did Chalfont have a licensing strategy?

15  A.   Yes, sir, it did.

16  Q.   Okay.  Is that the one Mr. Racz talked about yesterday?

17  A.   Yes.

18  Q.   Okay.  And is -- is this that policy?

19  A.   Yeah.  This is a summary of the policy, yes.

20  Q.   Okay.  And -- and what was the policy as shown here on

21  the board?

22  A.   Well, the -- the policy or the strategy, rather, was

23  really to try to license device manufacturers and content

24  providers, and the strategy involved some target royalty

25  rates that were established back in 2001.  And they were $4

1    for player devices and 10 cents per digital content card.

2    Q.   And what did you conclude from -- from this strategy?

3    A.   Well, it tells me something about how Smartflash -- or

4    Smartflash viewed the value of its technology at that point

5    in time, but it also tells me something about the type of

6    license structure that Smartflash would find acceptable; that

7    being a running royalty structure as opposed to a one-time

8    payment.

9    Q.   Now, Mr. Mills, you were here during the

10   cross-examination of Dr. Racz, right?

11   A.   Yes, sir.

12   Q.   Do you remember the documents that were shown to Mr.

13   Racz that made various statements about the value of the

14   investment in Smartflash or various technologies?

15   A.   I remember some of that, yes.

16   Q.   Okay.  Were any of those documents showing values --

17   were any of those made after the '772 patent and the '221

18   patents that are part of this case?

19   A.   I don't believe so, no.  Those patents issued in 2012,

20   and I think all of the documents that we saw were predated

21   that time period.

22   Q.   Okay.  So to your recollection, was Dr. -- sorry, was

23   Mr. Racz ever shown a document that valued the '772 and the

24   '221 patents?

25   A.   Not that I can recall.

1   Q.   Okay.   Thank you.

2        In addition to the Chalfont business plan, what else

3   have you looked at?

4   A.   Well, I looked at -- I mean, it depends on what --

5   what -- for what purpose.   I mean, I've looked at a lot of

6   information.   If we're moving on to -- to the benefits and

7   advantages, then I've looked at a lot of internal Apple

8   documents, for example.

9   Q.   Okay.   And what is benefits and advantages?

10  A.   So these are Georgia-Pacific Factors No. 9 and 10, and

11  they relate to the benefits and advantages of the -- of the

12  patent.

13  Q.   And is the Smartflash invention beneficial to Apple?

14  A.   Yes, sir, it is.

15  Q.   Okay.   Now, Mr. Mills, were you here -- I think you

16  already said yes to this -- to Mr. -- Mr. Batchelder's cross

17  of Mr. Racz regarding the number of features that an Apple

18  device has?

19  A.   Yes, I recall that.

20  Q.   Okay.   So can you help me understand how a device like

21  an iPhone, and I don't have one on me -- how a device like an

22  iPhone that has lots of hardware and other implementation

23  features, just like Mr. Batchelder said, how a feature like

24  Mr. Racz's can be important to that?

25  A.   Yes.   Well, hardware is certainly important, but -- but

1   Apple has long recognized that software creates the largest

2   portion of the value of its products, including applications

3   and content.

4   Q.    Okay.  And is this one of those pieces of evidence

5   you're referring to?

6   A.    Yes.  This is a -- an Apple executive presentation from

7   2010.  And if you look at the first bullet point, it says:

8   Software creates the largest share of product value.

9   Q.    And what does that tell you about the analysis here?

10           MR. CASSADY:  Strike that.

11   Q.    (By Mr. Cassady) Let me ask a different question.

12       So what are the two software functionalities that are

13   discussed in this case so far?

14   A.    Well, we spent quite a bit of time talking about the App

15   Store and the iTunes Store.

16   Q.    Okay.  And -- and are those services or software like

17   described here on this sheet?

18   A.    Yes, sir.

19   Q.    Okay.  Are there particular types of content in those

20   stores that infringe?  I think Dr. Jones listed them, but if

21   you could just one more time.

22   A.    Yes, I heard Dr. Jones earlier today speak about

23   applications from the App Store, video, which would include

24   movies and TV, books, and music.

25   Q.    So we know Apple believes software related features

```
 1    create the largest product value, but how do we know that the

 2    features we're talking about in this case are important?

 3    A.    Well, there are other internal Apple documents that --

 4    that demonstrate that.

 5    Q.    Okay.  Do you have some examples for us?

 6    A.    I do.  I've put together some examples.

 7    Q.    Is this one of them?

 8    A.    It is, yes.  This is an iTunes marketing plan from 2004,

 9    and so this is a pretty early-on document.  And so the goal

10    was to create a profitable online music business for the

11    company, but it also was to drive iPod sales and usage.

12    Q.    Can you please explain -- I mean, what does that mean

13    when it says drive iPod sales and usage?

14    A.    Well, by -- by developing a -- an online music business,

15    the hope was to further the hardware sales.

16    Q.    And this one here is PX 59, correct?

17    A.    Yes, PX 59.

18    Q.    Okay.  And, Mr. Mills, at various times during this

19    case, people have referred to PX or DX numbers, right?

20    A.    Yes.

21    Q.    Okay.  And is it your understanding that the jury, if

22    they wanted to, could ask for those numbers in their

23    deliberations so they could look at those documents?

24    A.    That's my understanding, yes.

25    Q.    Okay.  Do you have any other examples besides PX 59?
```

1  A.   Yes, I do.  So this is a -- an analysis of iTunes'

2  impact on iPod and Mac purchases, and this is from 2007.  And

3  if you look at the -- the call-outs from the document, you'll

4  see that Apple found that the presence of an iTunes Store

5  account made customers significantly more likely to buy an

6  iPod.

7       And the same was true with video iPods.

8  Q.   Okay.  And this is just an excerpt from a larger

9  document, right?

10 A.   It is, yes.

11 Q.   Okay.  Just like the one before it was, correct?

12 A.   Correct.

13 Q.   Okay.  Does Apple run any internal surveys or studies?

14 And I think we know the answer to that already, but go ahead.

15 A.   Yes, sir, it does.

16 Q.   Okay.  So what kind of information does Apple ask

17 about --

18            MR. BATCHELDER:  Your Honor, may we approach?

19            THE COURT:  You may approach.

20            (Bench conference.)

21            MR. BATCHELDER:  I'm concerned we're getting into

22 subject matter that may require the courtroom to be sealed.

23            MR. CASSADY:  You could have just asked that.  Yes,

24 we're about to pull up surveys.  I was about to tell you

25 that.  I didn't know that was the issue.  I apologize.  So

```
 1   we'll seal the courtroom, Your Honor.
 2              THE COURT:  You'll ask me to seal the courtroom.
 3              MR. CASSADY:  I mean, yes, Your Honor, of course.
 4              THE COURT:  Another thing, if you're going to tell
 5   the witness the answer, don't ask the question.  You've done
 6   that three times.
 7              MR. CASSADY:  Okay.
 8              THE COURT:  All right.  Let's just ask from the
 9   podium, and we'll proceed to seal it as soon as you ask.
10              MR. BATCHELDER:   Thank you, sir.
11              (Bench conference concluded.)
12              THE COURT:  All right.  Let's proceed.
13              MR. CASSADY:  I believe counsel for Apple had --
14   counsel for Apple wanted to seal the courtroom?
15              MR. BATCHELDER:  Yes, Your Honor, if we could.
16              THE COURT:  Is there objection?
17              MR. CASSADY:  No objection, Your Honor.  I would
18   just ask -- these are business documents, so I would assume
19   that Mr. Racz could stay for this portion of the testimony,
20   but obviously, that's up to Apple.  I'm just putting the
21   question --
22              THE COURT:  Mr. Batchelder?
23              MR. BATCHELDER:  No objection.
24              THE COURT:  All right.  At counsel's request, the
25   Court will order the courtroom sealed.  All persons present
```

```
 1    not subject to the current protective order in this case,
 2    except Plaintiffs' corporate representative, should excuse
 3    themselves from the courtroom and remain outside until the
 4    courtroom is unsealed.
 5              (Courtroom sealed.)
 6              (This portion of the transcript is Sealed and
 7              filed as Sealed Portion No. 3.)
 8              (Courtroom unsealed.)
 9              THE COURT:  Ms. Mayes, please let those people
10    outside know they may return.
11              COURT SECURITY OFFICER:  Yes, sir.
12              MR. CASSADY:  Your Honor, would you prefer I wait?
13              THE COURT:  Yes, I do.  I'll tell you when to
14    proceed, Counsel.
15              MR. CASSADY:  Thank you, Your Honor.
16              THE COURT:  Approach the bench, please, Counsel.
17              (Bench conference.)
18              THE COURT:  How much longer do you expect your
19    direct to be?
20              MR. CASSADY:  I think I've got about 10 more
21    minutes, if I've got it right.
22              THE COURT:  And I assume you have lengthy cross
23    coming?
24              MR. BATCHELDER:  Yes, I do.
25              THE COURT:  You're going to need to show a little
```

1  more respect for this Court.  I am getting a very strong

2  message that you're off to the races regardless of what I may

3  or may not say.  If I continue to feel that way, you and I

4  are going to have a problem.

5          You understand me, Mr. Cassady?

6          MR. CASSADY:  I understand, Your Honor, and I

7  apologize.

8          THE COURT:  I expect to see a little more deference

9  shown to the Court, like your co-counsel have.

10          MR. CASSADY:  I understand, Your Honor.

11          THE COURT:  All right.  Let's proceed with the

12  remainder of the direct.

13          (Bench conference concluded.)

14          THE COURT:  All right.  Proceed with the remainder

15  of your direct examination.

16          MR. CASSADY:  Thank you, Your Honor.

17  Q.  (By Mr. Cassady)  Now, you've calculated the at-risk

18  profit, correct?

19  A.  Yes, sir.

20  Q.  Okay.  What do we do next in your analysis?

21  A.  Well, I used that calculation to determine a royalty

22  rate -- well, actually I used it to determine royalty rates

23  for each of the devices types.

24  Q.  And how do you do that?

25  A.  Well, this -- this provides a summary of how I do that.

1    This is, again, just a particular period of time.  It's --

2    it's for the iPhone and the App Store from December 25th,

3    2012, through February 20th, 2015.  And the at-risk profit is

4    $309 million, if you look in Column 1.  The total units are

5    49 million during that period.

6    Q.   Now, Mr. Mills, you've got the at-risk profit and the

7    total units.  What do you do with those numbers?

8    A.   So I divide Column -- Column 1, which is actually

9    labeled Column 3, by -- by the second column, and that gives

10   us the at-risk profit per unit, which is $6.24 per unit.  And

11   then I compared that to the revenue per unit, which is $455,

12   and that gives us a royalty rate.  If I divide the at-risk

13   profit by the revenue per unit, that gives us a royalty rate.

14   And in this -- for this particular time period, it's 1.4

15   percent.

16        And I -- I just noticed, I think, that this slide is

17   actually mislabeled.  It should be the iPad App Store

18   scenario, not iPhone.

19   Q.   Oh, thank you, Mr. Mills.  Is the PX number on the

20   bottom left, is that the number for the full analysis you've

21   done under this?

22   A.   Yes, sir, it is.

23   Q.   Okay.  And that's PX 203.002?

24   A.   Yes, sir.

25   Q.   Okay.  So what is the resulting royalty rate for all the

1    products across the time period?

2    A.    For the iPhone, it's 2.5 percent; for the iPad, it's .9

3    percent; and for the iPod Touch, it's 0.4 percent.

4    Q.    Why are the royalty rates different for the products in

5    this case?

6    A.    Well, as I explained, I'm taking profit margins into

7    account, and the profit margins for these products are

8    different.  Also, Dr. Wecker's surveys indicate that these

9    features are -- are more important for certain devices, and

10   so the royalty rates reflect that.

11   Q.    Okay.  So we have a -- a royalty base and a royalty

12   rate.  What do we do with those?

13   A.    So we multiply the royalty rate times the royalty base

14   to determine royalties.

15   Q.    And what's the outcome of that?

16   A.    So if we look at the first row for the iPhone, the

17   royalty base there is 29.7 billion, and the royalty rate is

18   2.5 percent.  And so if you multiply the rate times the base,

19   that is 741.6 million.

20        And I've done the same thing for the iPad and the iPod

21   Touch, and when you add those together, it is $852.2 million.

22   Q.    And is that the damages asked that we were discussing

23   earlier today?

24   A.    That's my estimate of reasonable royalty damages, yes.

25   Q.    And is this the only analysis you did in this case

 1   regarding damages?

 2   A.    No, I did a second analysis, as well.

 3   Q.    And what analysis was that?

 4   A.    It's -- it's similar to the first analysis, but instead

 5   of using Dr. Wecker's survey results about alone motivate, I

 6   used the valuation survey results.

 7   Q.    Okay.  And how did you go about analyzing the value

 8   attributed to the feature?

 9   A.    Well, I -- I looked at Dr. Wecker's survey results and

10   made some estimates of the value -- the percentage of the

11   product value attributable to the features and then used that

12   to determine unapportioned royalty base.

13   Q.    Okay.  And this is -- is this an example of that

14   analysis?

15   A.    Yes.  This shows an estimate of 16.4 percent for the

16   iPhone movie/TV functionality.

17   Q.    Okay.  Now, is -- is this an answer from everybody in

18   the survey?

19   A.    No.  This is an estimate that I prepared based on the

20   answers to the -- that I have from the survey.

21   Q.    And why was an estimate necessary?

22   A.    Because certain participants in the survey weren't asked

23   this question.  So certain par -- participants in the survey

24   don't use the functionality, and so they weren't asked how

25   much they value it.

1        And for those participants, I just assumed they have

2    no -- they place no value on it, so it's a zero for them.

3        And then others that are alone motivated to purchase

4    based on the functionality, they -- they were not asked the

5    question either.  And so I've estimated the value for those

6    individuals by looking at the people that were not alone

7    motivated, and particularly looking at the upper half of

8    those responses and using that average.

9    Q.   And is your an analysis contained in PX 223?

10   A.   It is, yes.

11   Q.   Okay.  What was the resulting royalty base using this

12   analysis?

13   A.   The royalty base using this analysis is lower than the

14   prior one, but it's still significant, $41.1 billion.

15   Q.   Now, you had this royalty base.  How does this analysis

16   differ from your prior analysis beyond this step?

17   A.   Well, beyond this step, it's -- it's the same

18   calculation.  We apply the royalty rate to the royalty base.

19   Q.   And what's the resulting damages using your second

20   analysis?

21   A.   Multiplying the rates times the bases for each of the

22   three devices and then adding them together, yields $802.8

23   million.

24   Q.   Now, have you compared the two damages asked from your

25   two analyses?

1    A.    I've compared the results, yes.

2    Q.    And what have you determined about your analysis based

3    on the comparison between your two?

4    A.    Well, the alternative analysis, based on the valuation

5    questions, it produces a lower damages estimate, but it's on

6    a similar scale as -- as the first estimate.  And what this

7    tells me is that we get similar results whether we look at

8    the motivation question, the alone motivate question, or we

9    look at the valuation question.  They -- they both produce

10   similar results, and that gets me some comfort in the -- the

11   reasonableness of the result.

12   Q.    And is your an analysis contained in PX 203.006 and

13   PX 228?

14   A.    It is, yes.

15   Q.    Okay.  Let me ask you one more question about Mr. Racz's

16   testimony.  He talked about the Chalfont document, and you

17   did too, as well, right?

18   A.    Yes, sir.

19   Q.    Okay.  And they -- what was the royalty rate per unit in

20   that analysis?

21   A.    Well, for devices, it was $4, and for content cards it

22   was 10 cents.

23   Q.    Okay.  And I'm not asking you to run the number right

24   here in your head, but I want to know is the number that

25   Chalfont royalty rate would have asked for in this case

1   higher or lower than the number that you have here on the

2   screen?

3   A.   Well, if we were just strictly applying that -- that

4   strategy -- the target rates to devices, it would be much

5   higher.

6   Q.   Okay.  Now, did you prepare a slide that summarizes the

7   various exhibits that you used during your analysis?

8   A.   Yes, sir.

9   Q.   Okay.  Is this -- is this that slide?

10  A.   It is, yes.

11  Q.   Okay.

12        MR. CASSADY:  Your Honor, rather than reading these

13  numbers into the record, if the Court would permit, I would

14  just note that these are documents that were used with Mr.

15  Mills.

16        THE COURT:  Is there any objection from the

17  Defendant?

18        MR. BATCHELDER:  No, sir.

19        THE COURT:  It's your call, Counsel.  We'll accept

20  that, or you may read them into the record orally.  It's your

21  decision.

22        MR. CASSADY:  Thank you, Your Honor, I appreciate

23  that.  To save the jury some time, we'll go ahead and leave

24  it at that.

25  Q.   (By Mr. Cassady)  So just one more time, Mr. Mills, can

1    you please tell the jury what your analysis of the reasonable

2    royalty is, based on Apple's infringement?

3    A.    Yeah.   My conclusion is that the damages are $852

4    million.

5    Q.    Thank you, Mr. Mills.

6            MR. CASSADY:   Your Honor, I pass the witness.

7            THE COURT:   All right.   Ladies and Gentlemen, this

8    looks like a good juncture to recess for the day.   We will

9    reconvene in the morning and begin with cross-examination of

10   the witness by the Defendant.

11           Please take your notebooks and leave them on the

12   table in the jury room as you leave the courthouse.

13           You know I'm going to say this, but I'm going to

14   say it anyway.   Don't discuss the case with anyone, including

15   yourselves.   Follow all my other instructions.   We will try

16   to keep to the same time table.   We were a little late

17   getting in this morning.   We will do better, I promise you,

18   in the morning.

19           Try to be here assembled by 8:20 so that we can

20   start as close to 8:30 as possible.   Travel safely.   And

21   you're excused for the evening.

22           COURT SECURITY OFFICER:   All rise for the jury.

23           (Jury out.)

24           THE COURT:   Counsel, we stand in recess until

25   tomorrow morning.   I will be in chambers at 7:30, if there's

1    anything that develops overnight that comes -- needs to come

2    to my attention.

3              We stand in recess.

4              (Court adjourned.)

5

6                    CERTIFICATION

7

8              I HEREBY CERTIFY that the foregoing is a true

9    and correct transcript from the stenographic notes of the

10   proceedings in the above-entitled matter to the best of our

11   abilities.

12

13

14   /s/_____
     SHEA SLOAN, CSR, RPR                    February 17, 2015
15   Official Court Reporter
     State of Texas No.:  3081
16   Expiration Date:  12/31/16

17

18

19

20   /s/_____
     SHELLY HOLMES, CSR, TCRR
21   Deputy Official Court Reporter
     State of Texas No.:  7804
22   Expiration Date  12/31/16

23

24

25