```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3
     SMARTFLASH LLC and          )
 4   SMARTFLASH TECHNOLOGIES          DOCKET NO. 6:13cv447
     LIMITED
 5
         -vs-                    )
 6
                                          Tyler, Texas
 7                               )  8:44 a.m.
     APPLE INC.                     February 18, 2015
 8

 9
                        TRANSCRIPT OF TRIAL
10                        MORNING SESSION
              BEFORE THE HONORABLE RODNEY GILSTRAP,
11                UNITED STATES DISTRICT JUDGE

12

13                    A P P E A R A N C E S

14

15   FOR THE PLAINTIFFS:

16
     MR. BRADLEY W. CALDWELL
17   MR. JASON D. CASSADY
     MR. JOHN AUSTIN CURRY
18   CALDWELL CASSADY & CURRY
     2101 Cedar Springs Rd., Ste. 1000
19   Dallas, Texas  75201

20

21   MR. T. JOHN WARD, JR.
     WARD & SMITH LAW FIRM
22   P.O. Box 1231
     Longview, Texas  75606
23

24

25
```

```
 1   FOR THE DEFENDANTS:

 2
     MR. JAMES R. BATCHELDER
 3   ROPES & GRAY LLP
     1900 University Ave., 6th Floor
 4   East Palo Alto, California  94303-2284

 5

 6   MS. CHING-LEE FUKUDA
     MR. KEVIN J. POST
 7   ROPES & GRAY LLP
     1211 Avenue of the Americas
 8   New York, New York 10036-8704

 9

10   MR. ERIC ALBRITTON
     ALBRITTON LAW FIRM
11   P. O. Box 2649
     Longview, Texas 75606
12

13

14

15
     COURT REPORTERS:        MS. SHELLY HOLMES, CSR, TCRR
16                           OFFICIAL COURT REPORTER
                             shelly_holmes@txed.uscourts.gov
17
                             MS. SHEA SLOAN, CSR, RPR
18                           OFFICIAL COURT REPORTER
                             shea_sloan@txed.uscourts.gov
19

20

21

22

23

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25
```

```
 1                     P R O C E E D I N G S

 2              (Jury out.)

 3              COURT SECURITY OFFICER:  All rise.

 4              THE COURT:  Be seated, please.

 5              Counsel, I understand there may be an agreement

 6   that you want to announce into the record.  If so, please

 7   proceed.

 8              MR. CASSADY:  Thank you, Your Honor.

 9              Your Honor, in this case, a number of products came

10   out after discovery and basically during the expert discovery

11   time period in late October, November.  The parties agreed

12   that we shouldn't open up discovery and -- and reopen the

13   learning about those products.

14              So the parties have agreed that the iPhone 6, the

15   iPad Mini 3, and the iPad Air 2, which are products that were

16   released at that time, are not part of this trial and not

17   part of this case at this time.

18              THE COURT:  Do Defendants concur in that

19   stipulation?

20              MR. CASSADY:  And, Your Honor, one more, the

21   iPhone 6 Plus as well.  I apologize.

22              MR. POST:  And with that, Your Honor, yes,

23   Defendants agree.

24              THE COURT:  All right.  The Court will accept that

25   agreement and stipulation of the parties.
```

1              Mr. Batchelder?

2              MR. BATCHELDER:   Two things, Your Honor.

3              One is, as we discussed this morning, if we could

4    just have read into the record Your Honor's preference to

5    have the JMOL issues handled at the end without waiver.

6              THE COURT:   Well, it is the Court's preference that

7    motions under Rule 50(a) be presented by the parties after

8    the close of all the evidence.

9              The rule is clear to the Court on its face that as

10   long as they're presented before the case is submitted to the

11   jury, they're timely.   The Court will consider them presented

12   at that time -- at that time to be timely, and there will not

13   be any waiver by either party in the mind of the Court.

14             MR. BATCHELDER:   Thank you, sir.

15             The other issue is, we're concerned that the jury

16   may be somewhat confused by Plaintiffs calling Apple's

17   witnesses in their case, and we would request just an

18   explanatory instruction to the jury that when they rest, the

19   jury be told that Apple has already begun its case by

20   presenting some of its own evidence through those witnesses.

21             We just don't want the jury to be under the

22   impression that our case doesn't include Mr. Muller and Mr.

23   Farrugia.

24             THE COURT:   I don't think there's any risk of

25   confusion there.   I thought your reference in opening about

1    how you were graciously going to allow them to call your

2    witnesses was pretty swift myself.

3         But I think you've already had the benefit of that.

4    And I don't think there's any need for further explanation.

5    They're clearly going to be your witnesses, and I don't

6    anticipate any confusion.  So I don't think an appropriate --

7    I don't think an instruction is appropriate.

8         MR. BATCHELDER:  All right.  Thank you, sir.

9         THE COURT:  All right.

10        All right.  With regard to the two issues that we

11   took up in chambers this morning, the Court's given this

12   considerable thought; and with regard to the two issues

13   presented this morning, the Court's ruling is as follows:

14        With regard to the video played from Apple's CEO

15   Tim Cook yesterday and his reference to one-click purchasing

16   of apps, the Court does not view that that opens the door to

17   admission of the Amazon one-click license; and that request

18   by the Defendant is overruled.

19        The Court has considered the effect of that video

20   in light of the likely effect of the one-click license and

21   believes that the prejudicial effect would far outweigh any

22   probative value, and the Court does not believe the door has

23   been opened.

24        With regard to the incorporation of the Wiser

25   patent by reference and the Ansell patent and the

 1    preservation or non-preservation of Wiser as a surviving

 2    prior art reference, at the end of the day, the Court is

 3    convinced that despite the adoption of it by reference, in

 4    that they're charting by the Defendant, that when the parties

 5    made a final election of surviving prior art references, they

 6    did not specifically include Wiser as a part of their Ansell

 7    reference; they did not disclose Ansell in combination with

 8    Wiser, although they did disclose Ansell in combination with

 9    other prior art references.

10         I think the Defendant could have removed all doubt

11    by simply disclosing in the surviving references Ansell in

12    combination with Wiser.

13         The Court has real concerns about allowing one

14    reference to incorporate what may be named by reference

15    within it and what may be named by reference within what was

16    named by reference and how far down that process it goes, and

17    to do otherwise, I think makes the election process somewhat

18    meaningless.

19         Therefore, after much consideration, I'm going to

20    conclude and order that the election of the Ansell prior art

21    reference by the Defendants in their election of surviving

22    final prior art references does not include Wiser and that

23    Mr. Ansell will be limited to testify as to the Ansell patent

24    and its four corners, and the proposed slides and argument

25    from the Defendants that come directly from Wiser are not

```
 1    permitted.
 2            All right.  As I understand, we recessed yesterday
 3    with Mr. Mills on the stand, and the Defendant was ready to
 4    begin cross-examination.  Does that meet with everybody
 5    else's recollection?
 6            MR. BATCHELDER:  Yes, sir.
 7            THE COURT:  All right.  Mr. Mills, return to the
 8    witness stand, please.
 9            And, Mr. Batchelder, you may return to the podium.
10            And during the interim, we'll bring in the jury.
11            Oh, just a minute, Ms. Mayes.  Before you bring in
12    the jury, we did not read into the record the exhibits that
13    were used from the list of pre-admitted exhibits during
14    yesterday's portion of the trial.
15            Counsel, let's do that as quickly as possible.
16            MR. CALDWELL:  Your Honor, while they're doing
17    that, may I talk to one of my colleagues about the rulings we
18    just discussed?
19            THE COURT:  Yes.
20            (Pause in proceedings.)
21            MR. CASSADY:  May it please the Court.
22            THE COURT:  Proceed.
23            MR. CASSADY:  The list of exhibits is long, and I
24    apologize.  It's PX 11; PX 18.001 to PX 18.012, and
25    that's through -- that's 1 through 12; PX 18.014 through PX
```

1    18.032; PX 20.001 through PX 20.011; PX 22.003; PX 28.006;

2    PX 28.023; PX 28.034; PX 34.001; PX 36.001; PX 36.002;

3    PX 37.009; PX 50; PX 51.002; PX 51.003; PX 51.004; PX 53;

4    PX 54.001 through PX 54.006; PX 57.005; PX 57.009; PX 59;

5    PX 94; PX 96; PX 100; PX 102.001; PX 103.002; PX 103.003;

6    PX 103.026; PX 103.027; PX 103.028; PX 103.039; PX 103.040;

7    PX 103.041; PX 103.044; PX 105.013; PX 108; PX 203.001

8    through PX 203.006; PX 204; PX 205.001 through PX 205.005;

9    PX 211; PX 212; PX 223; PX 224; PX 225; PX 226; PX 227; and

10   PX 228.

11            And with that, we'd offer those, Your Honor.

12            THE COURT:  Any objection from the Defendant?

13            MR. POST:  No objection, Your Honor.

14            THE COURT:  All right.  Do you have a similar

15   rendition to read into the record?

16            MR. POST:  Yes, Your Honor.

17            THE COURT:  Please proceed.

18            MR. POST:  Defendants seek admission of DX 126; DX

19   302; PX 34.001; PX 054.002; PX 205.002; and PX 205.003.

20            THE COURT:  Any objection from the Plaintiff?

21            MR. CASSADY:  No, Your Honor.

22            THE COURT:  All right.

23            MR. POST:  And, Your Honor, very briefly, we spoke

24   with -- with Plaintiffs' counsel.  Yesterday one exhibit was

25   inadvertently included in the list that wasn't used with any

1    witness, and that was PX 154.  Neither party believes that

2    that should be admitted into evidence.  It was pre-admitted,

3    but shouldn't be included, Your Honor.

4              THE COURT:  Do you agree, Mr. Cassady?

5              MR. CASSADY:  No objection, Your Honor.

6              THE COURT:  All right.  Then those items from the

7    list of pre-admitted exhibits, as identified and as agreed

8    to, are considered a part of the record in this case.

9              All right.  Now let's bring in the jury.

10             COURT SECURITY OFFICER:  All rise for the jury.

11             (Jury in.)

12             THE COURT:  Welcome back, Ladies and Gentlemen.

13             Please be seated.

14             We concluded yesterday and recessed for the evening

15    with the Plaintiff having passed its witness, Robert Mills,

16    who's now on the witness stand.  We'll proceed with

17    cross-examination of Mr. Mills by the Defendant.

18             Mr. Batchelder, you may proceed.

19             MR. BATCHELDER:  Thank you, Your Honor.

20        ROBERT MILLS, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

21                       CROSS-EXAMINATION

22    BY MR. BATCHELDER:

23    Q.   Mr. Mills, good morning.

24    A.   Good morning, Mr. Batchelder.

25    Q.   The consulting firm that you work for is charging $495

1    an hour for your work in this case, correct?

2    A.    Yes, sir.

3    Q.    And you received your assignment in this case, not from

4    Smartflash itself, but from its lawyers; is that right?

5    A.    Yes, sir.

6    Q.    And Smartflash's lawyers asked you to assume that all of

7    the asserted patents are infringed and that --

8    A.    Right.

9    Q.    -- all of the asserted claims are valid, correct?

10   A.    That is correct, yes.

11            MR. BATCHELDER:  Could we show Mr. Mills'

12   transcript from yesterday starting at Page 128, Lines 2

13   through 4?

14   Q.    (By Mr. Batchelder) This was the third question that Mr.

15   Cassady asked you.

16        And why are you here today?

17        And you said:  I'm here to testify about damages due to

18   the infringement.

19        Do you see that, sir?

20   A.    Yes, sir.

21   Q.    And what you're referring to there is infringement that

22   Smartflash's lawyers asked you to assume had occurred,

23   correct?

24   A.    Yes, sir.

25   Q.    You're not here today providing any opinions whatsoever

11

```
 1   that Apple infringes these patents, correct?

 2   A.   That's correct.

 3   Q.   That's outside of your expertise.

 4   A.   It is, yes.

 5   Q.   So you don't know whether they infringe or not.

 6   A.   That's correct.

 7   Q.   And you're not here providing any opinions whatsoever

 8   that these four patents are valid, correct?

 9   A.   That is correct also.

10   Q.   Also outside of your expertise.

11   A.   It is, yes.

12   Q.   You were here for Dr. Wecker's testimony yesterday,

13   correct?

14   A.   I was, yes.

15           MR. BATCHELDER:  Can we put up the transcript, Page

16   120, Lines 9 through 13?

17   Q.   (By Mr. Batchelder) He was asked:  And were you aware

18   that the parties filed a joint stipulation in this case that

19   Apple has not identified any design-around, non-infringing

20   alternatives, and opinions of counsel?

21           Do you see that?

22   A.   Yes, sir.

23   Q.   And there was some discussion about that.

24   A.   I do recall that, yes.

25   Q.   All right.  Now, in your under --
```

| | |
|---|---|
| 1 | MR. BATCHELDER:  Can we leave that up, please? |
| 2 | Q.    (By Mr. Batchelder) In your understanding, a |
| 3 | design-around, non-infringing alternative would be a change |
| 4 | that someone would make to its own product to render it |
| 5 | non-infringing, correct? |
| 6 | A.    Yes. |
| 7 | Q.    Now, if an accused product already does not infringe, |
| 8 | there's no need to change it to make it non-infringing, |
| 9 | right? |
| 10 | A.    I would agree with that, right. |
| 11 | Q.    By definition, if a product doesn't infringe, then you |
| 12 | don't need to change it to avoid infringement, right? |
| 13 | A.    Correct.  Yes. |
| 14 | Q.    If it ain't broke, no need to fix it, right, sir? |
| 15 | A.    I agree. |
| 16 | Q.    You talked yesterday about a hypothetical negotiation, |
| 17 | right? |
| 18 | A.    I did, yes. |
| 19 | Q.    And you said the date of it would be June 2009, right? |
| 20 | A.    Yes. |
| 21 | Q.    Let me ask you to consider the time period just before |
| 22 | that, say May 2009.  All right, sir? |
| 23 | A.    Yes, sir. |
| 24 | Q.    The iPhone had been on the market for two years, |
| 25 | correct? |

1   A.    Yes.

2   Q.    A fabulously successful product, correct?

3   A.    Yes, sir.

4   Q.    Arguably, the most successful product in the history of

5   consumer electronics.

6   A.    I'm not certain that I can attest to that, but it

7   certainly is a successful product, yes.

8   Q.    And even under the assumption that Smartflash's lawyers

9   asked you to make, nothing about the iPhone was infringing

10  any of the patent claims asserted in this case in May of

11  2009, correct?

12  A.    As far as I know, that's correct, yes.

13  Q.    What changed in June 2009, according to the assumption

14  that Smartflash's lawyers have asked you to make, was that

15  the iTunes Store offered movie rentals, correct?

16  A.    Yes, sir.

17  Q.    Now, you were here Monday when I cross-examined

18  Mr. Racz, correct?

19  A.    I was, yes.

20  Q.    And you know that he did not invent online sale of

21  movies, correct?

22  A.    I do, yes.

23  Q.    And you know he didn't invent the online rental of

24  movies, correct?

25  A.    Yes, sir.

1    Q.    And you know he didn't invent charging different prices

2    for online rental versus online purchases, correct?

3    A.    Yes, sir.

4    Q.    But the iTunes Store offered movie rentals in 2009, and

5    Smartflash's lawyers have asked you to assume that that

6    feature infringes a valid patent claim, correct?

7    A.    Yes, sir.

8    Q.    Now, what changed in June 2009, again -- again,

9    according to the assumption that Smartflash's lawyers have

10   asked you to make, was something about the store, right,

11   the -- the iTunes Store?

12   A.    Yes, sir.

13   Q.    But your damages base here for that time period is not

14   revenues from rentals of movies or sales of movies on the

15   store, is it?

16   A.    No.  As I testified, I've excluded those sales from my

17   analysis.

18   Q.    So your damages model is based on revenue from the

19   iPhone itself, right?

20   A.    For a subset of the iPhones, yes.

21   Q.    Even though nothing in the iPhone changed in June 2009,

22   the change is at the store, right?

23   A.    Yes, sir.

24   Q.    Your damages calculation multiplies a royalty base times

25   a royalty rate, correct?

1   A.   It does, yes.

2   Q.   And you rely on a survey number to play a critical role

3   in your calculation of a royalty base, correct?

4   A.   Yes, I would agree with that.

5   Q.   You also rely on a survey number to play a critical role

6   in your calculation of a royalty rate, correct?

7   A.   I do rely on the survey data from Dr. Wecker for that,

8   yes.

9   Q.   Okay.  You're not a survey expert.

10   A.   I am not.

11   Q.   And you have no specific training in survey design,

12   correct?

13   A.   I do not.  That's correct.

14   Q.   You understand that each party has retained a survey

15   expert in this case, correct?

16   A.   Yes, sir.

17   Q.   Smartflash retained Dr. Wecker, who we saw yesterday,

18   correct?

19   A.   Yes, sir.

20   Q.   And Apple has retained Dr. Dhar, who you understand will

21   testify for Apple in this case, correct?

22   A.   I believe that to be true, yes.

23   Q.   Now, you spoke with Dr. Wecker only one time before

24   signing your opening expert report in this case, correct?

25   A.   I think that's correct, yes, before the opening report.

1   Q.   And during that conversation, it wasn't just Dr. Wecker

2   on the phone, Smartflash's lawyers also participated, right?

3   A.   They did, yes.

4   Q.   Independent of Dr. Wecker, you have no opinion on the

5   reliability of the surveys you used to calculate your royalty

6   rate or royalty base, because that's not your expertise,

7   right?

8   A.   Correct.  I'm relying on Dr. Wecker for that.

9   Q.   But you understand that Dr. Wecker and Dr. Dhar disagree

10  about whether their respective surveys are reliable, correct?

11  A.   Yes, that's true.

12  Q.   Okay.  And you don't have the survey expertise to pick

13  sides in that battle, correct?

14  A.   That's correct, yes.

15  Q.   And yet you have chosen sides, haven't you?

16  A.   I wouldn't put it that way, no, sir.

17  Q.   You've chosen to disregard Dr. Dhar's surveys, because

18  Dr. Wecker says they're flawed, right?

19  A.   Not entirely, sir.  That's not the entire reason.

20  Q.   You've chosen not to rely on them, correct?

21  A.   Well, he doesn't --

22  Q.   Sir --

23  A.   -- he doesn't have a survey about value that I could

24  rely on.

25  Q.   Sir, have you --

1   A.   He isn't offering that opinion.

2   Q.   -- have you chosen not to rely on Dr. Dhar's survey?

3            THE COURT:  Counsel, let him finish his answer.

4            MR. BATCHELDER:  Thank you, Your Honor.

5            THE COURT:  Finish your answer, Mr. Mills.

6            THE WITNESS:  Thank you, Your Honor.

7   A.   Dr. Dhar didn't do a survey that determines value, so

8   there was not a survey I could rely on from Dr. Dhar.

9   Q.   (By Mr. Batchelder) Dr. Dhar has conducted two surveys

10  in this case, correct?

11  A.   Yes, sir.  As far as I know, that's correct.

12  Q.   And you've chosen not to rely on either one of them,

13  correct?

14  A.   Well, they're not the kind of survey that I could rely

15  on for a damages opinion.  They don't get to the issues that

16  I'm trying to address with my model.

17  Q.   Dr. Dhar's surveys test the reliability of the

18  Dr. Wecker survey questions that you rely on in your damages

19  calculation, correct?

20  A.   I understand that that's Dr. Dhar's position, yes.

21  Q.   And you don't rely on those Dr. Dhar surveys, correct?

22  A.   No, I don't.  They don't provide the kind of information

23  that I need for my model.

24  Q.   When Dr. Dhar opines that a given Dr. Wecker survey

25  question suffers from a flawed design, you're not here to

1    opine as an expert in survey design whether Dr. Dhar's view

2    on that subject is correct or incorrect.  Fair?

3    A.    That's true, yes.

4    Q.    Now, Dr. Wecker has not performed any royalty

5    calculation in this case, has he?

6    A.    He has not.

7    Q.    You've done that.

8    A.    I have, yes.

9    Q.    Okay.  And so it's you, not Dr. Wecker, who's plugging

10   survey numbers into a damages calculation, correct?

11   A.    Yes.  Dr. Wecker has performed the surveys, and I'm

12   relying upon those surveys for my damages calculations.

13   Q.    And because it's your damages calculation, you're the

14   one who needs to take responsibility for ensuring that the

15   survey numbers that you're using in your calculation are

16   reliable to measure what you're relying on them to measure.

17   Fair?

18   A.    Yes, that's fair.

19              MR. BATCHELDER:  Can we pull up, please, PX 205.002

20   Page 19?

21              I'd like to show Question 4A.

22   Q.    (By Mr. Batchelder) So this is the survey number that

23   you used to calculate your royalty base, correct, sir?

24   A.    This is one of the questions that I used, yes.

25   Q.    All right.  And the question is:  For each device listed

1  below, consider the capability to purchase apps from Apple's

2  App Store.  Did this capability alone motivate you to buy the

3  device?

4       That's the question, correct?

5  A.   It is, yes.

6  Q.   Now, it's your understanding that the functionality of

7  Question 4A is broader than the invention claimed in any of

8  the four patent claims asserted in this case, correct, sir?

9  A.   I really can't speak to how broad the claims are.  It's

10  my understanding that this is the accused feature with

11  respect to the App Store functionality.

12  Q.   Sir, is it your testimony that you don't know one way or

13  the other whether the capability referenced in Question 4A is

14  broader in scope than any of the four patent claims asserted

15  in this case?

16  A.   I really can't speak to how broad the scope of the

17  claims are.  It's my understanding that this is the feature

18  that has been accused of infringement with respect to the

19  apps, anyway.

20  Q.   Did Mr. Racz and Mr. Hulst invent patent applications,

21  sir?

22  A.   Patent applications?

23  Q.   Did they invent the idea -- I'm sorry.

24       Did they invent the idea of software applications?

25  A.   Oh, no.  No, sir.  As far as I know, they did not.

1  Q.   Did they invent the idea of selling software

2  applications on an electronic store?

3  A.   No, sir.

4  Q.   Did they invent the idea of online sale of any kind of

5  digital content?

6  A.   I don't believe so, no.

7  Q.   Online payment of digital content, they didn't invent

8  that either, did they, sir?

9  A.   As far as I know, they did not.

10  Q.   And they did not invent downloading secure content over

11  the Internet, did they?

12  A.   I don't believe so, no.

13  Q.   Including apps, right?

14  A.   Correct.

15  Q.   Apps are just software applications, right?

16  A.   Yes, sir.

17  Q.   Sir, to calculate a reasonable royalty for a feature

18  accused of infringing, you need to apportion as between, on

19  the one hand, the contribution to that feature made by the

20  patents-in-suit, and on the other hand, the contributions

21  made to that feature by the Defendant and others, correct?

22  A.   That's certainly the aim, yes.

23  Q.   Okay.  So even under the assumed infringement theory,

24  Apple adds value not added by the patents-in-suit to the

25  process of purchasing apps from Apple's App Store, correct?

1    A.    Yes.

2    Q.    What value?

3    A.    I'm not sure I understand the question.  Are you looking

4    for a quantification or types of value?

5    Q.    Types of value.

6    A.    Well, Apple has provided the software that is the App

7    Store functionality.  It provides a place for app

8    distributors to provide their apps.  It handles some of the

9    payment transactions.  It also provides the interface for

10   purchase of apps.  Those are some of the items that it

11   provides.

12   Q.    This question, Question 4A that's up on the screen, it

13   uses the word "motivate," doesn't it?

14   A.    It does, yes.

15   Q.    How many royalty calculations have you done in your

16   career, sir?

17   A.    I don't have a precise number for you, but dozens.

18   Q.    And before this case, you've never once relied on, in

19   connection with a royalty calculation, a survey that used

20   that word "motivate," true?

21   A.    I -- I think that's correct, yes.

22   Q.    Now, there are multiple models of iPad accused in this

23   case, correct?  Those are the tablets.  There are multiple

24   models of them?

25   A.    There are, yes.

1  Q.   One of them is an iPad Mini?

2  A.   Yes, sir.

3  Q.   And then there's a more fully featured iPad called the

4  iPad Air, correct?

5  A.   I don't know that I would call it a more fully featured,

6  but it's a larger footprint.

7  Q.   Well, the iPad Air has some features that the iPad Mini

8  does not have, correct, sir?

9  A.   That may be true, depending on the models.

10  Q.   You said it may be true.  Is it true?

11  A.   Well, there are different models of the iPad Mini, so I

12  think we'd have to compare the precise model that you're

13  talking about.

14  Q.   The iPad Air has something called retina display,

15  correct?

16  A.   It does, yes.

17  Q.   And that's -- that's a better display, a higher quality

18  display, right?

19  A.   It's a higher resolution display, yes.

20  Q.   Higher resolution display than the one on the iPad Mini,

21  correct?

22  A.   That's correct, yes.

23  Q.   The iPad Air has a more powerful processor than the iPad

24  Mini, correct?

25  A.   I can't attest to that, but that would not surprise me.

1    Q.   The iPad Air has a higher capability camera than the

2    iPad Mini, correct?

3    A.   I don't recall the precise specification of the camera,

4    so I can't -- I can't tell you that.

5    Q.   Well, the iPad Air has a camera that allows panorama and

6    zoom functionality that the camera on the Mini does not,

7    correct?

8    A.   I'm not certain.

9    Q.   The iPad Air, when released, cost more than the iPad

10   Mini when it was released, right?

11   A.   Yes, sir.

12   Q.   Sir, if the capability to purchase apps from Apple's App

13   Store is available -- well, let me just ask you this:  That

14   capability to purchase apps from Apple's App Store, that's

15   the capability in Question 4A, correct?

16   A.   It is, yes.

17   Q.   And that capability is available on both the iPad Mini

18   and the iPad Air, correct, sir?

19   A.   It is, yes.

20   Q.   Now, if that capability was the only capability that

21   motivated a purchase, no one would ever buy the iPad Air,

22   because they could just get that capability on the Mini,

23   right?

24   A.   I disagree.

25   Q.   Why is that, sir?

1 A.    Well, because there are other -- there are other

2 features, like the screen size, for example, that may be

3 decisions that a consumer that's motivated to purchase based

4 on apps will ultimately consider in the decision between an

5 iPad and an iPad Mini, but the motivation can still be the

6 apps for the purchase.

7 Q.    Okay.  So it's your position that a given product can

8 have features that are necessary for the purchase decision

9 but not motivate the purchase decision?

10 A.    Certainly, yes.

11 Q.    Now, if -- if the jury rejects that idea, if it rejects

12 the idea that a product like the iPhone can have features

13 that are necessary to the purchase decision, but somehow

14 don't motivate the purchase decision, then they should reject

15 your use of this Question 4A in your damages calculation, the

16 way you've used it, correct, sir?

17 A.    Well, I wouldn't say that they should reject it, but

18 they may -- if they disagree with my interpretation, they may

19 use their own interpretation.

20 Q.    You admit, sir, that for a given customer, a given

21 device could have dozens of must have features, correct?

22 A.    Yes, that's possible.

23 Q.    A given customer could be unwilling to purchase a

24 device, even at a discount, if it lacks any one of dozens of

25 features, correct?

1    A.    That's possible, depending on the customer, yes.

2              MR. BATCHELDER:   Can we put up PX 203.003, Page 3?

3    Could we blow up the table, please?

4    Q.    (By Mr. Batchelder) All right.   So the Row No. 3, that

5    refers to the App Store, correct, at the end there?

6    A.    Yes, sir.

7    Q.    And under the iPhone column, we've got 26.9 percent,

8    right?

9    A.    Yes, sir.

10   Q.    And you used this number for a two-year period, correct?

11   A.    Approximately, yes.

12   Q.    Okay.  And you're asking this jury to believe that more

13   than 25 percent of the people who bought iPhones during that

14   two-year period were motivated only by this one feature, the

15   ability to buy apps from the App Store.  That was it.  The

16   only feature of the phone.  That's what you're asking them to

17   believe?

18   A.    The feature that motivated the purchase, yes.  That

19   doesn't mean that there aren't other features that might be

20   features that a customer would need to have to make the

21   purchase, but that's the feature that motivated the purchase.

22   Q.    You're asking them to believe that of those more than 25

23   percent of the customers, more than one-fourth of them, they

24   weren't motivated at all by the ability to make a phone call,

25   send an email, browse the Internet, send a text message, take

1   a photo, right, sir?

2   A.   Those may be criteria that a customer will need in order

3   to make a purchase; but according to Dr. Wecker's survey,

4   it's the App Store functionality that motivated the purchase

5   for approximately a quarter of the people that made the

6   purchase.

7   Q.   If people had answered yes to that Question 4a that we

8   just looked at, if they were motivated by other features in

9   addition to the App Store feature, then the way you used this

10  response to this survey question would be unreliable,

11  correct, sir?

12  A.   Well, people that said they -- they were alone motivated

13  to purchase based on the App Store functionality were, in

14  fact, not alone motivated, then I -- I would agree that an

15  adjustment to the base under that model might be necessary,

16  but I also have the alternative model with the valuation.

17           MR. BATCHELDER:   Can we put up PX 205.002, at Page

18  20, please?  Let's blow up Question 4b, please.

19  Q.   (By Mr. Batchelder) This is that value question you were

20  just referring to, sir; is that right?

21  A.   Yes, sir.

22  Q.   And you understand that Dr. Dhar did a survey to test

23  the reliability of that question, correct?

24  A.   I understand that he purports to have done a survey to

25  test that reliability, yes.

1   Q.   And you understand that he concluded that it does not

2   measure what you rely on it to measure, correct?

3   A.   I understand that that's what he claims, yes.

4   Q.   Let's talk about your royalty rates, sir.  For each

5   asserted patent claim, the logical premise underlying your

6   royalty rate calculation is that you're using a dividing line

7   of conduct that on the one hand you assume infringes and on

8   the other hand the next best alternative, correct?

9   A.   Yes, sir.

10  Q.   And to you that next best non-infringing alternative is

11  one that would provide Apple and its customers as much

12  benefit as possible, correct?

13  A.   I think that would be the goal if Apple were to try to

14  implement a non-infringing alternative, if it had one

15  available to it.

16          MR. BATCHELDER:  Can we put up PX 54.001, Page 50?

17  Q.   (By Mr. Batchelder)  All right.  If we could look at

18  Question 7.  At the beginning here it says:  Suppose that no

19  devices, including the devices that you have purchased,

20  allowed you to rent and download movies and TV shows from

21  iTunes or Google Play.

22      Right?  Do you see that, sir?

23  A.   I do, yes.

24  Q.   And then it says:  Instead, you could purchase movies

25  and TV shows at a price around three times what the rental

1  price would have been.

2      Do you see that?

3  A.   I do, yes.

4  Q.   Okay.  So you can't rent.  All you can do is buy.

5  That's the alternative, right, sir?

6  A.   Yes, sir.

7  Q.   And you relied upon that as the next best non-infringing

8  alternative, correct, sir?

9  A.   Yes, sir.

10  Q.   But you understand from Dr. Jones that streaming also

11  would be an alternative, correct?

12  A.   I did hear testimony to that effect, yes.

13  Q.   Okay.  That's a better alternative to be able to rent

14  streamed content than having to buy it, isn't it?

15  A.   It's possible for some consumers that might be better,

16  but streaming has a lot of limitations.  You can't stream

17  when you're on an airplane, for example, when a lot of people

18  would like to watch a movie on their iPad.  When you don't

19  have connectivity to the Internet, you're not able to stream.

20  So that's a disadvantage, I think, for many consumers.

21  Q.   Sir, if I'm sitting on my living room couch where I

22  watch movies, it would be an advantage to me be -- to be able

23  to stream a rented movie instead of having to buy it, right?

24  I'd pay less?

25  A.   It might be.  Depends on the consumer.  But overall, I

1  think that the ability to download and view movies is

2  important for many consumers.

3  Q.   Okay.  So you didn't rely on an alternative that -- that

4  would have allowed people to rent movies by streaming them?

5  A.   No, I relied on Dr. Jones's next best alternative.

6          MR. BATCHELDER:  Can we -- hold on one moment.

7  Q.   (By Mr. Batchelder)  You were in the courtroom for Dr.

8  Jones's testimony, correct?

9  A.   Yes, sir.

10  Q.   And did you see him do a live demonstration using an

11  iPod Touch to purchase an app on the Apple App Store?

12  A.   I did, yes.

13          MR. BATCHELDER:  And can we put up the App Store

14  slide?

15  Q.   (By Mr. Batchelder)  You understand that the steps that

16  he demonstrated started with you open your App Store,

17  correct?  That was his first step?

18  A.   Yes, sir.

19  Q.   And then you click buy, correct?

20  A.   Yes.

21  Q.   Then you enter your password, correct?  And that sends

22  those three IDs?

23  A.   Well, I can't speak to the technical aspects, but that's

24  my understanding based on the testimony, yes.

25  Q.   Okay.  And then you download the app, correct?  That's

1    Step 4?

2    A.    I think that's next, yes.

3    Q.    And then you launch the app, correct?

4    A.    Yes, sir.

5    Q.    Those are the five steps that he demonstrated yesterday,

6    correct?

7    A.    That's my recollection, yes.

8    Q.    Now, in your damages calculation, you relied on Dr.

9    Jones's non-infringing alternative scenarios, right?

10   A.    I did, yes.

11   Q.    These alternatives were featured in Dr. Wecker's

12   surveys, right?

13   A.    They were, yes.

14   Q.    And Dr. Jones yesterday discussed with my colleague,

15   Ms. Fukuda, alternatives to this, correct?

16   A.    Alternatives to the infringement?

17   Q.    Alternatives to this five-step process?

18   A.    Yes, I believe that they did discuss that.

19   Q.    All right.

20         MR. BATCHELDER:  Why don't we put up, if we could,

21   from yesterday's transcript at Pages 21 and 22, starting at

22   Line 21?

23   Q.    (By Mr. Batchelder)  So Ms. Fukuda asked yesterday of

24   Dr. Jones:  Well, you in your alternative, you didn't tell

25   the survey takers that they could -- instead of visiting a

1  separate website to enter payment information; that they

2  could instead do exactly what they're doing now to purchase

3  an app, except they don't do it at the moment they try --

4  they try to down -- they don't do it before download, they

5  just do it after download.  You didn't present that option?

6       And his answer was:  That is effectively what I

7  presented here.

8       Do you recall that testimony, sir?

9  A.   Yes, sir.

10  Q.   Okay.  So this was a discussion about an alternative,

11  applicable to all the asserted claims -- all four of them,

12  right?

13  A.   I believe that's correct, yes.

14  Q.   And so what Dr. Jones proposes here in his testimony and

15  in his report as an alternative to that five-step process we

16  just looked at, is transmitting what Smartflash claims is

17  payment data, those three identifiers, after the download of

18  content instead of before the download of content, correct?

19  A.   I think that's correct, but I can't really speak to the

20  technical aspects because I'm not an expert in the technology

21  here.

22  Q.   But your understanding, that's what Dr. Jones proposed

23  yesterday on the stand to this jury, correct?

24  A.   I don't recall him proposing that, but I do recall the

25  discussion, yes.

1    Q.    All right.  Well, let -- let's take a look at a

2    side-by-side comparison.

3         So the alternative was open the App Store, correct?

4    A.    I believe so, yes.

5    Q.    Next step, click buy, correct?

6    A.    As far as I know, yes.

7    Q.    Next step, download the app, correct?

8    A.    Yes.

9    Q.    Next step, enter the password, correct?

10   A.    I think that's what they discussed, yes.

11   Q.    Next step, launch the app, correct?

12   A.    Yes, I believe that's correct.

13   Q.    Okay.  So that's the five-step process that Dr. Jones

14   said even under the assumptions of Smartflash's lawyers about

15   what assume -- what's assumed to infringe, that that would be

16   non-infringing, correct?

17   A.    Well, I can't really speak to -- to precisely what Dr.

18   Jones had in mind because I'm not a technical expert, but my

19   recollection is that he said that you could implement the

20   method or the -- the steps that he identified as the next

21   best alternative without infringing.

22   Q.    All right.  Let's look at them side-by-side.  The first

23   step is the same, open the App Store, correct?

24   A.    Yes, sir.

25   Q.    The second step is the same, correct?

1   A.   As far as I know, that's correct, yes.

2   Q.   The last step is the same, launch the app, correct?

3   A.   Yes, sir.

4   Q.   And so the only difference is that you flip three and

5   four, right?  What was Step 3 in the App Store process

6   becomes Step 4 in the Dr. Jones non-infringing alternative,

7   right?

8   A.   Well, I can't speak to whether that's all that's

9   involved in -- in rendering the system non-infringing.  Dr.

10   Jones is the one that can speak to that.

11   Q.   All right, sir.  Are you asking this jury to conclude

12   that Apple would have paid $852 million to avoid making that

13   change, flipping that one step?

14   A.   Well, I'm not certain that flipping that one step is the

15   one change that needs to be made.

16   Q.   That's exactly what Dr. Jones said yesterday, isn't it?

17   A.   Well, I can't speak for Dr. Jones.  That doesn't -- I

18   don't think he said exactly that.  He said that he had

19   identified the next best non-infringing alternative, and

20   that's what we tested in the survey.

21   Q.   Making that switch of that one step would not infringe

22   any of the claims, right?

23   A.   I -- I can't speak to that.

24   Q.   Sir, in your opening report -- it should be in a binder

25   in front of you.  Could you turn to that, please?  I don't

1    want to put it up, but it's PX 050.

2         You have a summary of materials considered, correct?

3    A.    I do, yes.

4    Q.    And first of all, are those actually materials that

5    you've laid your eyes on?

6    A.    Many of them, I have.  But my staff also helped me.

7    Q.    Are those materials that every one of which either you

8    or your staff has actually read?

9    A.    No, sir, I don't believe that's correct, because we also

10   had access to databases of all of the documents that had been

11   produced in the case.  That's my recollection.  And so some

12   of these documents we may have searched through to look for

13   information that we thought was relevant to the analysis, and

14   so we've included them for completeness.  But maybe we

15   haven't read every single page or every single word in those

16   documents.

17   Q.    But there may be some documents in their entirety in

18   what you call "materials considered" that neither you nor

19   your staff ever read, correct?

20   A.    I can't rule out that possibility, no.

21   Q.    Now, that set of materials considered is 50 pages long,

22   correct?

23   A.    Yes, sir.

24   Q.    There are thousands and thousands of pages of documents

25   that you and your staff had access to and searched in this

1    case before you signed your report, correct?

2    A.    Yes, sir, that's correct.

3    Q.    And when you signed your report, you had not read any

4    publications, any newspaper or magazine articles, any

5    industry reports that discuss these patents in any way by

6    name or number, correct?

7    A.    I think that's correct, yes.

8    Q.    When you signed your report, you also had not seen any

9    TV programs, radio reports discussing these patents in any

10   way by name or number, correct?

11   A.    Correct, yes.

12   Q.    When you signed your report, you did not know of any

13   awards that had been given to these patents or to Mr. Racz,

14   in connection with these patents, correct?

15   A.    Yes, sir.

16   Q.    Now, in contrast, the accused Apple products have

17   received a wide variety of industry awards, correct?

18   A.    They have, yes.

19          MR. BATCHELDER:   Can we put up Defendant's Exhibit

20   65, please?

21   Q.   (By Mr. Batchelder)   This is an award from the Press

22   Association.   Apple wins Best Gadget Award for the iPad,

23   correct?

24   A.    It appears to be, yes.

25   Q.    And the second sentence says it beat out the Amazon

1    Kindle, right?   The iPad beat the Amazon Kindle in competing

2    for this award?

3              MR. BATCHELDER:   Next paragraph.

4    A.   Yes, sir, I see that.

5    Q.   (By Mr. Batchelder) Now, the Amazon Kindle, that's a

6    product that Smartflash says practice these patents, correct?

7    A.   I'm not certain.

8    Q.   You don't know that?

9    A.   I don't.

10   Q.   If both Amazon and Apple, under Plaintiffs' assumptions,

11   practice these patents but Apple won this award over Amazon,

12   the jury could conclude that the success of Apple's products

13   is due to value that Apple contributed, correct?

14   A.   Well, I won't -- I won't fuss with that if -- if you

15   mean part of the -- the value, yes, certainly.

16             MR. BATCHELDER:   Your Honor, may I approach the

17   easel?

18             THE COURT:   You may.

19             MR. BATCHELDER:   Thank you.

20   Q.   (By Mr. Batchelder)   I'm going to ask you to consider a

21   hypothetical, sir.   I'm just going to call this Company A and

22   Product 1 -- I'll call it P 1, all right?   And over here I'm

23   going to say Company B, and they sell Product 2.

24        Step out of the way for the jury.

25        So Company A sells Product 1, Company B sells Product 2;

1    is that clear?

2    A.    Well, I'm having sort of a hard time reading it.

3    Q.    Switch it around a little bit.

4    A.    That -- that's much better.  Thank you.

5    Q.    Does that give you room?  Is this clear to you?

6    A.    It is, except the monitor is cutting off the bottom

7    half, so if you're going to write much more, then I won't be

8    able to see.

9    Q.    I think that's all I can -- I need to do, sir.  Thank

10   you.

11   A.    Thank you, sir.

12   Q.    Now, if Product A from Company 1 has been highly

13   successful, Product B -- or excuse me, if Product 1 from

14   Company A is highly successful, Product 2 from Company B has

15   been less successful, but both are said to practice the same

16   patents, that could indicate that the -- the success of

17   Product A is attributable to the value that that company has

18   brought to that product, correct, sir?

19   A.    That's certainly possible, yes.

20   Q.    And that would be relevant in determining fair value in

21   a hypothetical negotiation, correct?

22   A.    I would agree, yes.

23   Q.    But you have not taken into account in this case the

24   extent to which the Apple accused products were more

25   successful than other products that Smartflash says also

1  practice the patents-in-suit, correct?

2  A.  Yes.  I focused on the value that Apple realizes from

3  its infringement.

4  Q.  So your answer to my question is yes?

5  A.  Yes, sir.

6  Q.  And in this case, you have not taken into account

7  whether Apple's relative success, as compared to other

8  companies that Smartflash says practice these same patents,

9  may indicate that the success of Apple's products results

10  from value that Apple brings to its products, rather than the

11  value that the asserted patents have brought to Apple's

12  products under your assumed infringement theory, correct?

13  A.  Yes, sir, I focused on the value that Apple realizes

14  from its infringement.

15  Q.  Again, your answer to my question is yes?

16  A.  It is, yes.

17       MR. BATCHELDER:  Could we see Defendant's Exhibit

18  68, please?

19  Q.  (By Mr. Batchelder) At the top there it says Apple's

20  iPhone 4 wins Best Mobile Device Award, correct, sir?

21  A.  Yes, I see that.

22  Q.  And you've seen this award before, correct?

23  A.  I'm not certain that I've seen this particular award,

24  but I'm certainly aware that -- that Apple has won awards for

25  the iPhone 4.

1  Q.    The first sentence says:  A host of hot new Android

2  phones from Samsung, LG Electronics, HTC, Sony Ericsson made

3  their debut at this Mobile World Congress 2011, correct?

4  A.    Yes, sir.

5  Q.    Then it goes on to say:  But it was the relatively

6  venerable iPhone 4 from Apple that was named the show's best

7  mobile device, correct?

8  A.    Yes, I see that.

9  Q.    Now, Smartflash says Samsung's Android phones practice

10  the patents-in-suit, correct?

11  A.    Yes, sir.

12  Q.    Those are mentioned here, correct?

13  A.    They are, yes.

14  Q.    Smartflash says HTC's Android phones practice the

15  patents-in-suit, correct?

16  A.    Yes, sir.

17  Q.    But Apple's iPhone 4, which Smartflash also says

18  practices the patents-in-suit, beat Samsung's phones and

19  HTC's phones to win this Best Mobile Device Award, correct,

20  sir?

21  A.    Yes, sir.

22  Q.    One of the products that Smartflash says practice the

23  patents-in-suit that's not an Apple product but a Samsung

24  product, is the Samsung Media Hub, correct?

25  A.    Yes, sir.

1  Q.   It was an electronic store selling digital content,

2  right?

3  A.   Yes, sir.

4  Q.   Including movies and TV shows for rental and purchase,

5  right?

6  A.   That's my recollection, yes.

7  Q.   The Samsung Media Hub failed to generate a profit,

8  right?

9  A.   That's my recollection, yes.

10  Q.   It was such a failure that Samsung ultimately dropped it

11  as an offering, right?

12  A.   Well, I believe Samsung still offers the app

13  functionality, but it did drop part of the functionality,

14  yes.

15  Q.   Overall, up through the filing of the complaint in this

16  case, Samsung's content platforms have not been profitable,

17  correct?

18  A.   That's correct, yes.

19  Q.   Whereas, Apple's has.

20  A.   Yes, sir.

21  Q.   And Smartflash says Apple's platforms practice the

22  patents-in-suit.  That's the assumption you've been asked to

23  make, right?

24  A.   Yes, sir.

25  Q.   And Smartflash says that Samsung's content offerings

1   practice the patents-in-suit, correct?

2   A.   Yes, sir.

3   Q.   Apple's have succeeded; Samsung's has not, correct?

4   A.   That's true.

5   Q.   Another of the products that Smartflash says practice

6   the patents-in-suit, again, not an Apple product, this time

7   an HTC product, is called HTC Watch, correct?

8   A.   Yes, sir.

9   Q.   It was an electronic store selling digital content,

10   correct?

11   A.   Video content, yes.

12   Q.   Including movies, TV shows for rental and purchase,

13   right?

14   A.   Yes, sir.

15   Q.   It was a content store, correct?

16   A.   Yes.

17   Q.   Not profitable, correct?

18   A.   That's true.

19   Q.   Closed down earlier this year, correct?

20   A.   I -- I believe it closed down even earlier than this

21   year, yes.

22   Q.   HTC lost millions of dollars on HTC Watch, correct?

23   A.   It did, yes.

24   Q.   Yet Smartflash says that HTC Watch practiced the

25   patents-in-suit, right?

1  A.    Yes.

2  Q.    Just like it says Apple practiced the patents-in-suit,

3  right?

4  A.    Correct.

5  Q.    Apple's content stores have succeeded, correct?

6  A.    They have, yes.

7  Q.    HTC Watch failed, correct?

8  A.    It did, yes.

9  Q.    You mentioned yesterday the Georgia-Pacific analysis,

10  correct?

11  A.    Yes, sir.

12  Q.    Factor 1 in Georgia-Pacific are the royalties received

13  by the patentee for the licensing of the patents-in-suit,

14  correct?

15  A.    Yes, sir.

16  Q.    By the time of the hypothetical negotiation in 2009, the

17  royalties received by the patentee for the licensing of the

18  patents-in-suit were zero dollars, right, sir?

19  A.    Yes, but two of the patents-in-suit hadn't issued.

20  That's an important consideration as well.

21  Q.    Zero dollars for the ones that had, right?

22  A.    For the one that had, yes.

23  Q.    And the same is true as of the filing of this lawsuit,

24  correct?  The royalties received by the patentee for the

25  licensing of all four of the patents-in-suit -- or excuse

1    me -- all four of the claims associated with the three, are

2    zero dollars, right?

3    A.    Yes, sir.  No one had taken a license at that time.

4    Q.    Smartflash has never licensed any of the patents-in-suit

5    to a company that makes smartphones, correct?

6    A.    That's correct.

7    Q.    Or tablets, correct?

8    A.    Yes, sir.

9    Q.    Or music players, correct?

10   A.    Yes, sir.

11   Q.    You mentioned Chalfont yesterday, right?

12   A.    I did, yes.

13   Q.    Chalfont was an entity that was set up to license

14   certain Smartflash technology, correct?

15   A.    Yes, sir.

16   Q.    And it entered into zero licenses, correct?

17   A.    Correct.  With respect to patent licenses, that's

18   correct.  I'm not -- I can't speak to other kinds of

19   licenses.

20   Q.    Zero patent licenses, right?

21   A.    That's correct.  It predated the patent's issuance.

22   Q.    Zero licenses to patent rights under the application

23   that existed at the time, right?

24   A.    That's right.

25   Q.    You mentioned that Chalfont had a plan that it would

1    seek royalty payments of $4 per device and 10 cents per card,

2    right?

3    A.    Yes, sir.

4    Q.    You cited that in your August 25th opening report,

5    right?

6    A.    I did, yes.

7    Q.    And I took your deposition a month later in September,

8    correct?

9    A.    Yes, sir.

10   Q.    And you had no opinion as to whether $4 for a licensed

11   player device would have been a reasonable royalty at the

12   time, correct?

13   A.    Yes.  As I told you, I hadn't done that analysis.

14   Q.    In terms of money generated from that model of Chalfont,

15   the grand total was zero dollars, correct?

16   A.    Yes.  It predated the patent's issuance.

17   Q.    Now, sir, if -- if the jury in this case rejects as

18   unreliable the way that you've apportioned the royalty base,

19   then the jury should reject your damages calculation,

20   correct?

21   A.    Well, my royalty calculation involves a rate and a base,

22   so if -- if one were to conclude that the rate -- or that the

23   base, rather, is -- is overstated, for example, then I would

24   agree that an adjustment should be made.

25   Q.    And same on the rate.  If the jury rejects as unreliable

1   the way you've apportioned the rate, the jury should reject

2   your damages calculation, correct?

3   A.   Well, I think it depends on -- depends on what they

4   think.  There might be an adjustment that might be necessary

5   if they think that it's unreliable.  I believe it to be

6   reliable, though.

7   Q.   All right, sir.  Let's come back to Mr. Racz's testimony

8   that you watched here on Monday.

9        You heard him describe a 2009 negotiation with a company

10  called Saranite, correct?

11  A.   Yes, sir.

12  Q.   And 2009 was the year in which the hypothetical

13  negotiation that you've talked about would have taken place,

14  right?

15  A.   Yes, June of 2009.

16  Q.   And the deal that was under consideration between Mr.

17  Racz and Saranite is that he would sell 80 percent of the

18  patent rights for $350,000, correct?

19  A.   That sounds right, but I haven't committed all the

20  specific terms to memory.  But that sounds right.

21  Q.   Okay.  And -- and that included all the continuations to

22  the '720 patent, correct?

23  A.   I would need to see the document to be certain on that.

24  Q.   Okay.  Will you accept my representation that it did,

25  sir?

1   A.    Certainly, yes.

2   Q.    Thank you.

3         And by the way, Mr. Racz was willing to enter into this

4   deal, right?

5   A.    My recollection is that -- that the deal had progressed

6   to a certain point, and then there was an attempt to

7   renegotiate, and so the deal ultimately wasn't consummated.

8   Q.    Now, Mr. Racz was willing to enter into it, but it was

9   actually Saranite who decided it was paying too much and

10  wanted to pay a lower price, correct?

11  A.    I can't speak to what Saranite believed.  We haven't

12  heard anything about what Saranite believed, so I don't know.

13  Q.    But it told Mr. Racz it thought it was paying too much,

14  and it asked to pay fewer dollars, correct?

15  A.    I can't tell you what it told Mr. Racz.  I don't think

16  we've heard that.

17  Q.    Okay.  All right.  Well, let me just come back to the

18  flip chart.

19        So we have 80 percent, $350,000.  I'm going to call that

20  350K, all right?  80 percent and 350K, right?

21  A.    Yes, sir.

22  Q.    Sir, do you have a calculator with you?

23  A.    I do.

24  Q.    I'd like to ask you to help me with some math.  I'm

25  going to come down here and ask you, what number would you

```
 1    need to multiply times 80 percent to get to a hundred
 2    percent?
 3    A.    1.25.
 4    Q.    1.25, did you say?
 5    A.    Yes, sir.
 6    Q.    And would you calculate, please, sir, what $350,000 is
 7    times 1.25?
 8    A.    It is $437,500.
 9    Q.    $437,500.  Did I hear you right?
10    A.    That's the math, yes.
11    Q.    $437,500, you would agree with me, sir, that's quite a
12    bit lower than $852 million, isn't it?
13    A.    Certainly, yes.
14              MR. BATCHELDER:   Your Honor, I pass the witness.
15              THE COURT:  Redirect.
16              MR. CASSADY:  Your Honor, may we briefly approach?
17              THE COURT:  You may.
18              (Bench conference.)
19              MR. CASSADY:  Your Honor, I would never want to
20    presume that I could talk about this in front of the jury,
21    and that's why I wanted to ask you.  Mr. Batchelder
22    insinuated that Mr. Mills was assuming infringement and
23    assuming validity because we told him to.
24              I assume Your Honor is going to tell them that he
25    had to assume that, at the end of the case.  And so I want to
```

1    be able to redirect him on the fact that the law requires him

2    to assume validity and assume infringement.  I probably would

3    have let it go if it happened once, but he went through it

4    five or six times.  And I think it's necessary, given the

5    confusion that's been put in.

6              MR. BATCHELDER:  I have no objection to that, Your

7    Honor.

8              THE COURT:  All right.  Then proceed.

9              MR. CASSADY:  Okay.

10             THE COURT:  Anything else?

11             MR. CASSADY:  No, Your Honor.

12             THE COURT:  Okay.

13             MR. CASSADY:  Thank you.

14             (Bench conference concluded.)

15             THE COURT:  All right.  Let's proceed with

16   redirect.

17                       REDIRECT EXAMINATION

18   BY MR. CASSADY:

19   Q.   Good morning, Mr. Mills.

20   A.   Good morning.

21   Q.   You were asked some questions about assumptions that

22   apparently I gave you, or at least Mr. Batchelder believed I

23   gave you; is that fair?

24   A.   I think so, yes.

25   Q.   Specifically, you were given a cross insinuating that I

```
 1  told you to assume infringement and I told you to assume
 2  validity.  Does that sound fair?
 3           MR. BATCHELDER:  Objection, argumentative.
 4           THE COURT:  Overruled.
 5  A.    Yes.
 6  Q.    (By Mr. Cassady) Okay.  Is the Court in this case and
 7  the law -- is the Court going to instruct this Court and this
 8  jury that you were supposed to assume validity and
 9  infringement in doing your analysis?
10  A.    Well, I'm not sure what the Court will instruct.  I
11  mean, that -- that's certainly up to the Court.  But my
12  experience has been that that's often the instruction that
13  will be given, yes.
14  Q.    Right.  Your understanding is that's the law, right?
15  A.    Yes, that is my understanding for purposes of damages.
16  Q.    You would agree it's improper to insinuate that you were
17  just doing what the lawyers told you to, right?
18  A.    I would -- I would agree it's -- as -- as somebody that
19  calculates damages in cases like this, that's an assumption
20  that I'm always asked to make.  It's -- it's necessary for a
21  damages analysis.
22  Q.    And the Defendant's damages expert, he makes that same
23  assumption, doesn't he?
24  A.    Yes, he does.
25  Q.    And damages experts in every case make that assumption,
```

1    don't they?

2    A.    They have to, yes.

3    Q.    Okay.  You were asked some questions about

4    non-infringing alternatives.  Do you remember that?

5    A.    Yes, sir.

6    Q.    Okay.  Is it your understanding that Apple didn't

7    disclose any non-infringing alternatives in this case?

8    A.    That's my understanding, yes.

9    Q.    Okay.  And where does that understanding come from?

10   A.    From a stipulation between the parties.

11   Q.    So Apple agreed that they had no non-infringing

12   alternatives?

13   A.    Yes, sir.

14   Q.    Have you ever had a party agree to something like that

15   in a case before?

16   A.    I -- I don't recall ever seeing a stipulation like that.

17   Q.    It's pretty rare, isn't it?

18   A.    In my experience, yes.

19   Q.    Now, Mr. Mills, you were asked some questions about

20   alternatives that Dr. Jones proposed, fair?

21   A.    Yes.

22   Q.    Isn't it true that Dr. Jones testified you couldn't just

23   flip Steps 3 and 4?  Didn't he say that just yesterday?

24   A.    I don't recall precisely what he said, so I'm hesitant

25   to attest to that; but my recollection is there was some

1   discourse about what it would take to avoid the infringement.

2   Q.   Let me ask you a different question then.  If Apple

3   could have flipped Steps 3 and 4, do you think they would

4   have done it by now?

5   A.   If it were that easy, I would expect that they would,

6   yes.

7   Q.   Okay.  If designing around the infringement in this case

8   were as easy as just flipping Steps 3 and 4, do you think

9   there would be a stipulation from Apple that they had no

10  non-infringing alternatives?

11  A.   I would find that surprising.

12  Q.   You were asked some questions about the retina display

13  and processor speed and camera quality and a few other

14  features.  Do you remember that?

15  A.   I do, yes.

16  Q.   Okay.  Now, Dr. Wecker -- Wecker asked a question in his

17  analysis about the non-infringing alternatives, right?

18  A.   Yes, sir.

19  Q.   Okay.  So if a company --

20          MR. CASSADY:  Well, strike that.

21  Q.   (By Mr. Cassady) Could Apple keep all of those

22  features, the retina display, the processor speed, the

23  camera, in the non-infringing alternative proposed to the

24  jury -- or, sorry, to the iPhone users?

25  A.   Yes.  The -- the survey question was designed in a way,

1   as I understand it, to -- to keep all of those other features

2   in tact, so there's no -- no difference between the actual

3   scenario and the hypothetical that the survey respondents

4   were asked to consider.

5   Q.   And if you were to compare the differences between

6   Apple's products as they are currently designed and how

7   they'd be designed if the non-infringing alternative was put

8   into place, do the retina displays, processor speeds, and

9   camera quality, do they just go away?

10  A.   No, there'd be no change to those features at all.

11  Q.   Okay.  And does the value of those features, the retina

12  display, the camera, the processor speed, other various

13  aspects, are those included in your damages calculations?

14  A.   Yes, those values are taken into account.

15  Q.   Okay.  And who's getting the credit for those values in

16  your analysis?

17  A.   Apple is.

18  Q.   Okay.  Is Smartflash getting that credit?

19  A.   No, sir.

20  Q.   You were asked questions about the reason for using the

21  word motivate in the surveys.  Do you remember that?

22  A.   Yes, sir.

23  Q.   I think the insinuation was that you had never used it

24  before, or you couldn't remember ever using that word before;

25  is that fair?

1    A.    It is, yes.

2    Q.    Okay.  Mr. Mills, what is your understanding as to the

3    source of the word motivate?  Where did that come from?

4    A.    My understanding is that it comes from the law.

5    Q.    Now, in this case, Mr. Mills, you relied on a survey to

6    calculate damages, correct?

7    A.    Several surveys, yes.

8    Q.    Is that the first time you've used a survey to calculate

9    damages before?

10   A.    No, sir.

11   Q.    Okay.  Is this the first time Apple's been in a case

12   regarding surveys and damages?

13   A.    No, sir.

14   Q.    Okay.  Has Apple ever used a survey to try and calculate

15   damages for patent infringement of its competitors?

16   A.    Yes.  Apple has used surveys in -- in lawsuits that it's

17   been involved with against its competitors.

18   Q.    Now, Mr. Mills, you were asked questions about Company A

19   and Company B on the flip chart.  Do you remember that?

20   A.    I do, yes.

21   Q.    Okay.  And I think the insinuation was that a company

22   with a feature competing with another company with a feature,

23   that could never be the distinction between the companies; is

24   that fair?

25   A.    I think so, yes.

Q. Could you please tell the jury reasons that Company A having the feature and Company B also having the feature could have nothing to do with why the product -- one product failed versus the other?

Let me ask it a different way.

Could you please explain to the jury why Company A's success with a feature could still indicate value even though Company B has the feature?

A. Certainly. Let me give you a concrete example. We talked about HTC Watch and how that service ultimately wasn't successful. But the thing that's important to keep in mind is that HTC Watch was competing directly with Google Play, which is the largest source of -- of content for the Android ecosystem, and -- and Apple doesn't have that kind of competition. Apple has a closed system where it -- it is the only provider of apps for its devices, and so it's not facing that same competition that HTC is.

Q. Okay. And in this case, with regards to Company A and Company B, what does timing have to do with the success of introduction of a feature?

A. Well, timing can play an important role. If you're first -- first to market with a feature, for example, that might give you an advantage over competitors.

Q. Okay. And do we have evidence in this case that that, in fact, happened, that one competitor put this feature in

```
 1   first and that that feature is what ended up increasing
 2   market share?
 3   A.    Yes.  I'm thinking back to the Samsung document that we
 4   presented yesterday towards the end of the day, and that
 5   showed that when the App Store was introduced, there was a
 6   significant increase in -- in sales of the iPhone.
 7   Q.    Mr. Mills, you were asked questions about the offer that
 8   Mr. Racz ultimately didn't enter into with, I think,
 9   Saranite.  Is that the company?
10   A.    That's my recollection, yes.
11   Q.    Okay.  Is it appropriate to make that calculation to
12   determine what the overall value of that agreement was?
13   A.    It's certainly not appropriate to make that calculation
14   to determine the value of the patents that are at issue here.
15   Q.    And do they -- did Mr. Racz and Saranite actually enter
16   into this agreement?
17   A.    No, they did not.
18   Q.    Okay.  At the time of that negotiation, was the '772 and
19   the '221 patent, were they issued?
20   A.    No, they had not issued.
21   Q.    And were you here when Mr. Racz testified regarding his
22   partner that got involved and helped him with his prosecution
23   of his patents?
24   A.    Yes, sir.
25   Q.    Okay.  Do you remember how much money Mr. Racz said that
```

1   that investor and partner had to put in to help prosecute the

2   patents at the Patent Office?

3   A.    I don't recall a specific figure, but I think it was in

4   the millions of dollars.

5   Q.    So there was significant investment in continuing to

6   prosecute these patents after this, right?

7   A.    Absolutely, yes.

8   Q.    And the two patents in this case -- or two of the

9   patents in this case, the '221 and the '772, were the result

10  of that, right?

11  A.    That's my understanding, yes.

12  Q.    Okay.  Mr. Mills, can you please, again, tell the jury

13  your conclusion for the structure and the size of the

14  infringement -- or the damages for the infringement in this

15  case?

16  A.    Well, I've -- I've calculated damages based on a running

17  royalty structure.  I think that's reasonable here.  And I've

18  concluded that damages are $852 million for the infringement.

19  Q.    When you did that 852 million analysis, did you just

20  take the highest numbers you could?

21  A.    No.  In fact, there were many instances where I took,

22  like as I testified yesterday, the lower bound of the

23  confidence intervals in Dr. Wecker's survey, so I actually

24  used numbers that were lower than the point estimates.

25  Q.    Okay.  And if you had used the mean that Dr. Wecker

1  calculated, rather than the lower bound confidence interval,

2  what would your analysis come out to?

3  A.   Well, if I had used Dr. Wecker's point estimates or the

4  means rather than the lower bound, the damages would be about

5  a hundred -- about $1.19 billion, using the same model that I

6  presented.

7  Q.   Thank you, Mr. Mills.

8        MR. CASSADY:  I pass the witness, Your Honor.

9        THE COURT:  Additional cross-examination?

10       MR. BATCHELDER:  Thank you.

11       THE COURT:  Proceed.

12                   RECROSS-EXAMINATION

13  BY MR. BATCHELDER:

14  Q.   Sir, when you watched and heard Dr. Wecker's testimony

15  yesterday, you didn't hear any mention of Dr. Dhar, did you?

16  A.   I don't recall him being asked about Dr. Dhar.

17  Q.   Dr. Wecker, Smartflash's survey expert, didn't mention

18  Dr. Dhar or criticize or critique his work in any way,

19  correct?

20  A.   I don't recall him being asked about that.

21  Q.   Sir, if the jury here finds there's no infringement

22  because Apple's systems work differently, better than the way

23  these patents say to do what they say, the damages they

24  should award would be zero, correct?

25  A.   Well, if there's no finding of infringement, then I

1    think damages are zero, yes.

2    Q.   And if the jury finds that the asserted patent claims

3    here are invalid, Mr. Racz didn't invent what those claims

4    say, again, the jury should award zero dollars in damages,

5    correct?

6    A.   I would agree, yes.

7              MR. BATCHELDER:   Your Honor, I pass the witness.

8              THE COURT:   Further redirect?

9              MR. CASSADY:   Your Honor, I'll be brief.

10             THE COURT:   That's fine, Counsel.

11                    FURTHER REDIRECT EXAMINATION

12   BY MR. CASSADY:

13   Q.   Mr. Mills, if Apple took the 350,000-dollar deal and the

14   Saranite deal for the 20 percent royalty and $350,000 up

15   front -- I don't want you to calculate it -- but would that

16   be higher or lower than your damages analysis in the case, as

17   applied to total revenue?

18   A.   Are you asking me to assume that Apple would have paid

19   20 percent?

20   Q.   If Apple got the deal that it just proposed up here,

21   that it pays $350,000 for these patents and then 20 percent

22   on all infringing units, would it be higher or lower than the

23   number you've calculated here?

24   A.   Well, it would be significantly higher.

25   Q.   Now, Mr. Mills, I just want to step through a couple of

1    things here very quickly.

2         In this analysis --

3              MR. CASSADY:  And, Your Honor, may I approach the

4    easel?

5              THE COURT:  You may.

6    Q.   (By Mr. Cassady)  In this analysis that you did, what

7    was the percentage of infringing products that Apple got 100

8    percent of the credit for?

9    A.   77 percent of the products were excluded from the

10   royalty base.

11   Q.   Smartflash doesn't get a penny from the revenue for

12   those units, right?

13   A.   That's correct, under the model that I presented.

14   Q.   And how much revenue from content sales does Smartflash

15   get?

16   A.   I haven't applied any royalty to those sales, so it

17   would be zero.

18   Q.   Okay.  So Apple gets free and clear the content revenue?

19   A.   Yes, sir.

20   Q.   Now, in this analysis you did, you only used movies and

21   the App Store surveys to calculate damages, right?

22   A.   Yes, sir.

23   Q.   But there are other content types that are infringed by

24   Mr. Racz's patents, right?

25   A.   Yes, there are books and -- and music.

1   Q.    What revenue does Smartflash get from books and music to

2   the extent they motivate people to buy products?

3   A.    I haven't calculated a royalty on that at all, so it

4   would be zero.  Apple gets all of that.  I'm sorry, but I

5   can't see the -- the board, so if I'll need to see it, then

6   it will have to be moved a little bit.

7   Q.    I wrote in music and books motivation.

8   A.    Okay.  Thank you.

9   Q.    Is that fair?

10  A.    It is.

11  Q.    Okay.  And then what we discussed at the very end of

12  your last -- last few questions, you used the lower bound of

13  the 95 percent confidence interval, right?

14  A.    I did, yes.

15  Q.    So they get the difference between the lower bound and

16  the mean in this case, right?

17  A.    Yes.

18  Q.    Okay.  And what was that -- what was the difference in

19  millions between the point estimate and the mean -- and the

20  lower bound?

21  A.    Well, the difference is about $350 million.

22  Q.    Okay.  Is it fair if I say, 350 million conservative

23  assumption of surveys?

24  A.    Yes.

25  Q.    And, finally, Mr. Mills, Dr. Wecker's surveys are not

1    the only surveys in this case, are they?

2    A.   No.   Apple has produced a large number of surveys

3    itself.

4    Q.   And Apple did not create a single survey for this case,

5    either through Dr. Dhar or at their business unit.  They gave

6    you the value estimates you were looking for in this case.

7    Right?

8    A.   That's correct.

9    Q.   Okay.

10           MR. CASSADY:  I pass the witness, Your Honor.

11           THE COURT:  Further cross-examination?

12           MR. BATCHELDER:  Nothing further, Your Honor.

13           Thank you.

14           THE COURT:  All right.  You may step down, Mr.

15   Mills.

16           THE WITNESS:  Thank you, Your Honor.

17           THE COURT:  Ladies and Gentlemen, we're going to

18   take a brief recess at this point.  You may leave your

19   notebooks -- your juror notebooks in your chairs.

20           Don't discuss the case among yourselves.  Follow my

21   other instructions.

22           We'll be back in about 10 minutes to continue with

23   the next witness.  You're excused for recess at this time.

24           COURT SECURITY OFFICER:  All rise for the jury.

25           (Jury out.)

1          THE COURT:  The Court stands in recess for

2    approximately 10 minutes.

3          (Recess.)

4          (Jury out.)

5          COURT SECURITY OFFICER:  All rise.

6          THE COURT:  Be seated, please.

7          All right.  Is the Plaintiff prepared to call the

8    next witness?

9          MR. CASSADY:  Your Honor, the next few witnesses

10   will be by deposition.

11         THE COURT:  All right.  Let's bring the jury in,

12   and we'll proceed.

13         COURT SECURITY OFFICER:  All rise for the jury.

14         (Jury in.)

15         THE COURT:  Please be seated.

16         Plaintiffs call your next witness.

17         MR. CASSADY:  Your Honor, the Plaintiffs have a few

18   depositions we would like to play as our next witnesses, the

19   first of which, if Your Honor would please, is Mr. Alan Ward

20   from Apple.

21         THE COURT:  How long do you anticipate that video

22   clip to be, Counsel?

23         MR. CASSADY:  I've got the total number, Your

24   Honor, of the six depositions.  It's 16-and-a-half minutes

25   for Smartflash, and it's 6-and-a-half minutes for Apple.

1          THE COURT:  And there are six witnesses by

2   deposition?

3          MR. CASSADY:  Yes, Your Honor.

4          THE COURT:  All right.  Well, let's proceed with

5   the first one; and if you like, between them, you can

6   introduce and identify the next one before it starts.

7          MR. CASSADY:  I appreciate it, Your Honor.

8          THE COURT:  All right.  Let's proceed.

9          (Video clip playing.)

10          QUESTION:  Will you please state your full name for

11   the record?

12          ANSWER:  My name is Alan Ward.

13          QUESTION:  Where do you work, Mr. Ward?

14          ANSWER:  I work at Apple.

15          QUESTION:  How long have you worked at Apple?

16          ANSWER:  12 years.

17          QUESTION:  What is your current job title?

18          ANSWER:  Engineering manager.

19          QUESTION:  What's the purpose of MZ Buy looking up

20   account information in the Oracle database?

21          ANSWER:  To verify that the account exists and that

22   it's in good standing.

23          QUESTION:  From MZ Buy's perspective, what does it

24   mean for an account to be in good standing?

25          ANSWER:  It means that you do not have any

1    transactions for which you receive goods but did not settle

2    payment.

3              QUESTION:  What's the relation between a DSID and

4    an Apple ID?

5              ANSWER:  It's one-to-one.

6              QUESTION:  What does one-to-one mean?

7              ANSWER:  Each Apple ID has a DSID.  The DSID is

8    immutable.  The Apple ID, the name on the account is mutable.

9              QUESTION:  What's the point of having DSIDs given

10   that Apple has Apple IDs?

11             ANSWER:  What most people consider to be the Apple

12   ID is really the user name or the email address or whatever

13   they're typing in; whereas the DSID is an immutable number

14   associated with the account that will remain the same even

15   when the email address changes.

16             QUESTION:  Do you have any actual knowledge

17   yourself that the legal department at Apple actually reviews

18   other companies' patents when Apple develops new features?

19             ANSWER:  I don't have any knowledge specifically

20   myself of that.

21             QUESTION:  Did you read through Smartflash's

22   patents?

23             ANSWER:  I briefly skimmed them.

24             QUESTION:  What were your thoughts about

25   Smartflash's patents after your brief skim of them?

1          ANSWER:  Thought I'm not a patent attorney, and I'm

2   not qualified to judge these.

3          QUESTION:  How much time did you spend reading

4   Smartflash's patents?

5          ANSWER:  As I said, I didn't read them through

6   because I'm not qualified to read patent documents.

7          QUESTION:  How much time did you spend skimming

8   Smartflash's patents?

9          ANSWER:  Maybe 15, 20 minutes.

10          QUESTION:  How did you receive Smartflash's

11   patents?

12          ANSWER:  They were sent to me yesterday.

13          QUESTION:  By whom?

14          ANSWER:  By counsel.

15          QUESTION:  Apple's lawyers?

16          ANSWER:  And outside.

17          QUESTION:  Apple's inside and outside counsel?

18          ANSWER:  I would say specifically Apple's outside

19   counsel.

20          QUESTION:  And was Apple's outside counsel there

21   with you when you were skimming Smartflash's patents for 15

22   or 20 minutes?

23          ANSWER:  Yes.

24          QUESTION:  Has there ever been a scenario at Apple

25   where a patent attorney or Apple's in-house counsel told you

1    to do something or not do something based on another

2    company's patent?

3               ANSWER:  I can't think of a specific occasion where

4    I've been told to do something differently, no.

5               QUESTION:  When you looked at Smartflash's patents,

6    how much time did you spend looking at them?

7               ANSWER:  I think 15 to 20 minutes.

8               QUESTION:  And did you understand the technology

9    that was being described in Smartflash's patents?

10              ANSWER:  I wasn't trying to understand the patents.

11              QUESTION:  Why not?

12              ANSWER:  Because I'm not a patent attorney.

13              (End of video clip.)

14              MR. CASSADY:  May it please the Court.

15              THE COURT:  Proceed.

16              MR. CASSADY:  Your Honor, the Plaintiffs call by

17   deposition Augustin Farrugia.  He's a senior director for

18   digital rights management technology at Apple.

19              THE COURT:  Proceed.

20              (Video clip playing.)

21              QUESTION:  Will you please introduce yourself on

22   the video record?

23              ANSWER:  I'm Augustin Farrugia.

24              QUESTION:  What is your title today?

25              ANSWER:  Senior director, DRM Technologies.

 1                    QUESTION:  Mr. Farrugia, how many people report to

 2    you today?

 3                    ANSWER:  Let me count.  If I've got to give you a

 4    number, roughly, around 30.

 5                    QUESTION:  Is the content itself, once encrypted,

 6    different because one is a rental and one is a purchase?

 7                    ANSWER:  Nope.  Identical.

 8                    (End of video clip.)

 9                    MR. CASSADY:  May it please the Court.

10                    Your Honor, the next witness that the Plaintiff

11    calls is Christopher Bell.  Mr. Bell is the senior director

12    related to iTunes marketing at Apple.

13                    THE COURT:  Proceed.

14                    (Video clip playing.)

15                    QUESTION:  Please state your name for the record.

16                    ANSWER:  My name is Chris Bell.

17                    QUESTION:  Who are you currently employed by?

18                    ANSWER:  Apple, Inc.

19                    QUESTION:  How long have you worked for Apple,

20    Inc.?

21                    ANSWER:  11-and-a-half years.

22                    QUESTION:  Would you say your career has been more

23    on the marketing side or the technical side or a mix?

24                    ANSWER:  On the marketing side.

25                    QUESTION:  So after you became the director of

1   iTunes marketing -- is that the position you're in today?

2           ANSWER:  I'm currently senior director of iTunes

3   marketing.

4           QUESTION:  Well, the first time you heard about

5   this lawsuit, was it this year or last year?

6           ANSWER:  This year.

7           QUESTION:  Okay.  So other than sitting down with

8   counsel and walking through the patents, did you review them

9   on your own?

10          ANSWER:  No, I didn't.

11          (End of video clip.)

12          MR. CASSADY:  Your Honor, the Plaintiffs call

13  Mr. Payam Mirrashidi by deposition.  And he is an engineering

14  director at Apple working on iTunes.

15          THE COURT:  Proceed.

16          (Video clip playing.)

17          QUESTION:  Good morning, sir.

18          Can you please state your name and address for the

19  record?

20          ANSWER:  My name is Payam Mirrashidi.

21          QUESTION:  How long have you been at Apple?

22          ANSWER:  I've been at Apple since 2002.

23          QUESTION:  And how long were you a director of

24  engineering?

25          ANSWER:  I've been a director of engineering for

 1   about five to six years now.

 2         QUESTION:   How many people do you manage now?

 3         ANSWER:   About 200.

 4         QUESTION:   So what does MZ Buy or MZ Finance do

 5   with the information that it gets back from its search

 6   against the pod database or the DS database?

 7         ANSWER:   When the information is looked up using

 8   the DSID, we get back -- we create in Java code and memory an

 9   object called MZ Account, which is the object that

10   encapsulates some of the information of the account.

11         We use that to go through a series of validation

12   tests to make sure that that customer's account is in good

13   standing and in a position to purchase an item using either

14   their gift card credit or credit card information if a new

15   session is created.

16         QUESTION:   Can you think of any other examples of

17   validation tests?

18         ANSWER:   One of the things we check is whether the

19   customer has any xCard credit.

20         (End of video clip.)

21         THE COURT:   Counsel, before you play the next

22   video, do we have tech people here for either of the parties

23   that can mute the television sets so we don't get the

24   feedback and muffled sound between the speakers and the

25   television sets themselves?

1          Is there simply a mute button somebody can push?

2          MR. CASSADY:  Your Honor, can you give me one

3    moment to confer?

4          THE COURT:  Yes.

5          (Counsel confer.)

6          THE COURT:  If we can, fine.  If we can't, I won't

7    drag this out, but -- and I don't know if it is affecting the

8    jury's ability to hear it very clearly.

9          MR. CASSADY:  Your Honor, apparently, if we mute

10   the televisions, it will mute all the sound.

11         THE COURT:  Then let's go like we were.

12         MR. CASSADY:  I apologize, Your Honor.

13         THE COURT:  Not a problem.  We're all making the

14   best with what we have to work with.

15         Let's proceed.

16         MR. CASSADY:  Your Honor, the next witness we call

17   is Mr. Sean Kelly.  Mr. Kelly works at Apple with iTunes and

18   the iOS operating system.

19         MR. CALDWELL:  I'm sorry.  I was trying to push the

20   volume button.

21         (Video clip playing.)

22         QUESTION:  Good morning.

23         Can you please state your name and address for the

24   record?

25         ANSWER:  My name is Sean Kelly.

1         QUESTION:  Sir, how long have you worked at Apple?

2         ANSWER:  I started as an intern in 2005, and then I

3    started full time in 2006.

4         QUESTION:  What's your current title?

5         ANSWER:  Individual Contributor Level 5.

6         QUESTION:  Okay.  Going back to the question about

7    DRM impacting local content, how does DRM impact whether you

8    can play local content?

9         ANSWER:  When the media system on iOS tries to do

10   playback with DRM, it has to call in to FairPlay in order to

11   actually be able to play back the content.

12        So if the device doesn't have the rights to play

13   the content, then the playback will fail.

14        QUESTION:  What application on the iOS device is

15   making the call with the core media to determine whether it

16   can play back content?

17        ANSWER:  I don't think the apps make a call to

18   determine if they can play the content.  They just attempt to

19   play it, and the playback fails.

20        QUESTION:  And what apps would those be?

21        ANSWER:  The music and the videos apps.  Also the

22   iBooks app in the case of DRM books.

23        QUESTION:  But the user doesn't press a button that

24   says FairPlay, check if I can play this; is that right?

25        ANSWER:  Correct.  There is no user interface to

1    trigger a FairPlay check.

2           QUESTION:  And would the product page also include

3    descriptive information about the movie?

4           ANSWER:  Yes.

5           QUESTION:  What's included in the successful

6    purchase response?

7           ANSWER:  The response would include any -- any

8    updates to the FairPlay keybag that are required to play the

9    assets.  And then it would include a series of

10   representations of the assets.

11          So in the case of a movie, there would be only one.

12   But if you bought an album, for example, you would get all of

13   the tracks from the album.  For each asset, it includes two

14   URLs -- at least two URLs to download the assets.

15          So it would include a URL for high-quality artwork.

16   It would include a URL for the actual media asset itself.

17   And then it would include any other FairPlay information

18   that's needed to deprotect that asset or play the asset such

19   as the Sinf or the Pinf that we mentioned before.

20          And, finally, it would include the metadata for the

21   item.  So things like the title, the artist, the director of

22   movies, things like that.

23          QUESTION:  Do you know why Apple offers the option

24   to rent a movie?

25          ANSWER:  I mean, it was a business decision.  I

 1    don't know the background behind it.

 2                QUESTION:  What's your understanding of why Apple

 3    offered the option to rent a movie?

 4                ANSWER:  I think a lot of people only watch movies

 5    once, so they may want to rent something for less money than

 6    buying it to keep forever.

 7                QUESTION:  In the case where a user has

 8    authenticated a device and selects an item to purchase, you

 9    described that the client sends a purchase request to the

10    iTunes server; is that correct?

11                ANSWER:  Yes.

12                QUESTION:  And in that request, the iTunes client

13    includes the DSID; is that correct?

14                ANSWER:  Yes.

15                QUESTION:  When the iTunes client is retrieving the

16    DSID to put into that request, is it reading it from the

17    iTunes Store D key value store database?

18                ANSWER:  The first time that iTunes Store D needs

19    to access information about the account, it loads it from

20    that database into its memory.  And then the account

21    information would be cached in memory.  So most of the time

22    it's getting DSID out of memory.

23                QUESTION:  What other pieces or parts of this

24    mechanism would enforce these restrictions?

25                ANSWER:  So we've discussed enforcement in the

1    stores.  So then there's also enforcement in the libraries

2    themselves.  So there's enforcement in the music and video

3    apps, and SpringBoard on the home screen, and then in iBooks

4    on the bookshelf.

5              QUESTION:  Can you describe the enforcement in each

6    of those applications?

7              ANSWER:  So starting with SpringBoard for

8    applications, SpringBoard queries the launch services

9    database via the API that the launch services team provides

10   to get the applications that are installed on the system.

11             Part of the information that launch services

12   provide is the content rating for the application which we

13   received when the user downloaded the application as part of

14   the purchase response.

15             SpringBoard compares that to the current

16   restriction setting and then hides the application if the

17   application is restricted.

18             QUESTION:  And would SpringBoard read the current

19   setting the same way as the iTunes Store application via a

20   call to manage configuration?

21             ANSWER:  Yes.

22             QUESTION:  Can you describe the process for the

23   music app, please?

24             ANSWER:  The music app reads -- it loads the items

25   for display from its media library database, so that's a

1    SQLite database.  When it is doing that querying, it loads

2    the current restriction values from the manage configuration

3    at API.

4         It uses those values to add predicates on to the

5    queries it makes against the database to filter out items

6    that are restricted so that they do not appear in the user

7    interface.  They're just completely gone.

8         QUESTION:  Can you explain what you mean by adding

9    predicates to the queries?

10        ANSWER:  When -- when the music app wants to

11   display a list of items to the user, it creates a query

12   against the database where it has certain rules.  You know,

13   it might be songs by The Beatles, if you're looking at The

14   Beatles page in the application.

15        So, in addition to saying, you know, load songs

16   from The Beatles, it would add predicates saying load songs

17   from The Beatles with a restriction value less than this.

18        QUESTION:  So when the user selects the music

19   application, it does the check and then either displays or

20   doesn't display items based on the comparison of the rating

21   of the items themselves and the current settings; is that

22   accurate?

23        ANSWER:  When the SQLite engine is evaluating the

24   query, it's comparing the value from a manage configuration

25   API with the value of the content restriction that's in the

1  database for that entry that's in that item.  The music app

2  only then ever sees the items that met that restriction.

3       QUESTION:  Okay.  So the distinction that you're

4  drawing is that it's not the music application itself

5  directly that's doing the comparison, but then it's the

6  SQLite engine that's doing this evaluation?

7       ANSWER:  Yes.

8       QUESTION:  So when the user selects a music

9  application, the music application can only display or

10  present items where the content rating of the item satisfies

11  the current setting as determined by the SQLite engine?

12       ANSWER:  Correct.

13       QUESTION:  Can you describe how the video app

14  enforces these restrictions?

15       ANSWER:  The video app uses the same technique as

16  the music app.  So it's also querying the media library

17  database, and it adds predicates to the query to filter out

18  restricted items.

19       QUESTION:  Just to be clear, if a restricted item

20  is filtered out, the user can't access it from somewhere else

21  on the device?

22       ANSWER:  Correct.  The asset is still physically

23  present on the device.  It does not appear in the user

24  interface.  It is not accessible.

25       QUESTION:  Can you describe how this process works

1    for items on the iBooks bookshelf?

2            ANSWER:  iBooks stores the content rating for the

3    items in its database, and it compares that against the value

4    that it gets from manage configuration and filters the books

5    from the shelf.

6            QUESTION:  Is its database also a SQLite database?

7            ANSWER:  I don't know.

8            QUESTION:  Is it your understanding that it's a

9    SQLite database?

10           ANSWER:  I believe it is, yes.

11           QUESTION:  Other than reading the content ratings

12   from its separate database, would the technique be similar to

13   that of the music app and the video app?

14           ANSWER:  As far as I know, yes.

15           QUESTION:  Do you know if there's a policy or

16   handbook at Apple that requires engineers to cooperate with

17   Apple regarding the intellectual property?

18           ANSWER:  Apple does have a business conduct policy.

19           QUESTION:  Do you know the general provisions that

20   the business conduct policy contains regarding intellectual

21   property?

22           ANSWER:  If questions come up, that we should

23   consult with Apple legal.

24           QUESTION:  Do you have a direct contact in Apple

25   legal?

1          ANSWER:  What do you mean by a direct contact?

2          QUESTION:  Is there a specific person that your

3    team reports to or communicates with at Apple legal?

4          ANSWER:  Not that I'm aware of.

5          QUESTION:  Have you reviewed Smartflash's patents

6    in this case?

7          ANSWER:  Yes, briefly.

8          QUESTION:  About how much time did you spend

9    reading them?

10          ANSWER:  15 or 20 minutes.

11          QUESTION:  And the 15 or 20 minutes that you spent

12    reviewing Smartflash's patents were when?

13          ANSWER:  Yesterday.

14          QUESTION:  In your role at Apple, do you do

15    anything to make sure that Apple's products are not

16    infringing other companies' patent rights?

17          ANSWER:  If I had questions about it, I would

18    consult with Apple legal, but it's not part of my day-to-day

19    responsibilities.

20          QUESTION:  So in your day-to-day responsibilities,

21    do you consider or take into account other companies' patents

22    when you're developing products?

23          ANSWER:  We trust that Apple legal will be

24    monitoring that.  So engineering in general, me specifically,

25    we do not.

1    QUESTION:  So you wouldn't run any patent searches

2    before you started developing a product or a feature?

3    ANSWER:  Correct.  We would leave that to Apple

4    legal.

5    QUESTION:  Do you do anything to make sure that

6    Apple legal has all the proper information to determine

7    whether other companies' patent rights need to be considered

8    before the implementation or development of a feature of a

9    product?

10    ANSWER:  I know that Apple legal is looped in on

11    new feature development.  I personally am not involved in

12    that communication.

13    QUESTION:  And earlier in the day, do you recall

14    being asked some questions about something called the iTunes

15    Store D key value store?

16    ANSWER:  Yes.

17    QUESTION:  And I believe you testified that there

18    was account information that was stored in that database.

19    Did I get that right?

20    ANSWER:  Yes.

21    QUESTION:  Can you tell me what type of account

22    information is stored on that database?

23    ANSWER:  iTunes Store D would store the Apple ID

24    for the account, the user's full name, the account ID -- also

25    known as the DSID -- the type of the account, whether it's an

1    AOL account or regular Apple account, some flags on the

2    account, such as whether it's enabled for redownload and

3    iTunes match.  And that may be about it.

4           QUESTION:  Okay.  Do you know whether any billing

5    information is stored in the iTunes Store D key value store

6    database?

7           ANSWER:  We do not store billing information, no.

8           QUESTION:  Would the user use either Apple ID or

9    DSID to make a purchase in the iTunes Store?

10          ANSWER:  The DSID is required on the purchase

11   request.  The purchase request also requires the X token or

12   the strong token that we discussed earlier.  In order to get

13   a strong token, you need to have entered your Apple ID and

14   password.

15          (End of video clip.)

16          MR. CASSADY:  Finally, by deposition, Your Honor,

17   last deposition, Mr. Mark Buckley.  And Mr. Buckley is a

18   finance manager at Apple.  That's our last deposition, Your

19   Honor.

20          THE COURT:  Proceed with the witness by deposition.

21          (Video clip playing.)

22          QUESTION:  Good morning.

23          Could you please state your full name for the

24   record?

25          ANSWER:  Mark Buckley.

1          QUESTION:  And who do you work for?

2          ANSWER:  Apple, Inc.

3          QUESTION:  What is your job title?

4          ANSWER:  Finance manager.

5          QUESTION:  And are you aware this is a case about

6    patent infringement?

7          ANSWER:  I'm aware this is a patent infringement

8    case.

9          QUESTION:  Have you ever read Smartflash's patents?

10         ANSWER:  No.

11         QUESTION:  Why not?

12         ANSWER:  My understanding are the patents are very

13   technical documents, and I don't read them.

14         (End of video clip.)

15         MR. WARD:  That's the end of the deposition, Your

16   Honor.

17         THE COURT:  All right.  Plaintiffs, call your next

18   witness.

19         MR. WARD:  Plaintiff calls Apple through its

20   corporate rep -- corporate representative, Max Muller.

21         THE COURT:  All right.  Mr. Muller, if you'll come

22   forward and be sworn.

23         (Witness sworn.)

24         THE COURT:  Please have a seat on the witness

25   stand.

1        MAX MULLER, PLAINTIFFS' WITNESS, SWORN

2                  DIRECT EXAMINATION

3    BY MR. WARD:

4    Q.   Good morning, sir.

5    A.   Good morning.

6    Q.   My name is Johnny Ward, and you and I have not met

7    before today, have we?

8    A.   No, sir, we have not.

9    Q.   And would you please introduce yourself to the jury?

10   A.   Sure.  I'm Max Muller.

11   Q.   And you've been selected by Apple to be its corporate

12   representative during this trial; is that correct?

13   A.   Yes, sir, correct.

14   Q.   And you had your deposition taken back in August of

15   last -- last year, 2014?

16   A.   That -- that sounds about right, yes.

17   Q.   And at that time, you were the senior engineering

18   director at Apple.  Are you still in that position?

19   A.   Yes, I'm still senior engineering director at Apple.

20   Q.   And are you able to read computer code?

21   A.   Yes.  Yes, I am.

22   Q.   And would you characterize your position as senior --

23   senior engineering director as being in the upper band of

24   management at Apple?

25   A.   Yes, I would.

1   Q.   And you understand that because Smartflash has sued

2   Apple -- these are both companies, and they're only able to

3   speak through representatives, right?

4   A.   That's my understanding, yes.

5   Q.   Companies are made up of people; and when they get to

6   trial, sometimes they have to select a person to speak on

7   their behalf.  And you're that person for Apple, correct?

8   A.   Correct.

9   Q.   Is Apple an innovative company?

10   A.   Yes, I would -- I would characterize Apple as -- as an

11   innovative company.

12   Q.   We've heard a little bit about that during the trial,

13   haven't we?

14   A.   Yes, yes.

15   Q.   Is it easy to get a job at Apple, or is it something

16   that's kind of difficult to do?

17   A.   It's -- it's challenging, yes.

18   Q.   Does Apple try to hire the best and brightest when it

19   makes its hires?

20   A.   Oh, absolutely.

21   Q.   Does it have talented employees?

22   A.   Very talented, sir.

23   Q.   Smart employees?

24   A.   Very smart employees, yes.

25   Q.   Does it write its own computer code?

1    A.    Yes, yes, yes, we do.

2    Q.    Would you agree with me that there's probably no one who

3    knows Apple's computer code better than the folks at Apple

4    who write it?

5    A.    Yes, I would agree with that.

6    Q.    So as far as telling the jury who would be in a better

7    position to tell us exactly how Apple's products and computer

8    code works, folks within Apple would be in a better position

9    than folks outside Apple, generally speaking.  Would you

10   agree with that?

11   A.    Yes, I would.  That's why I'm here.

12   Q.    How many software engineers does Apple employ?

13   A.    I don't know the specifics on the software engineers,

14   but in -- I would estimate in the tens of thousands.

15   Q.    Tens of thousands?

16   A.    Probably around that.

17   Q.    That know how to read computer code?

18   A.    Probably around that, yes.

19   Q.    Did you see this chart that was prepared by Dr. Jones

20   when he testified?

21   A.    Yes, I saw it yesterday.

22   Q.    Where he went through and he examined various pieces of

23   evidence, including Apple's computer code, correct?

24   A.    Correct.

25   Q.    You're not here to dispute a single element that Dr.

1    Jones told this jury was met by Apple's computer code, are

2    you, sir?

3    A.    That's correct.  I'm here to explain about Apple and its

4    products.

5    Q.    And nor will there be one of these tens of thousands of

6    software engineers that will take the stand on Apple's behalf

7    and dispute anything that Dr. Jones told this jury about how

8    Apple's computer code works, will there?

9    A.    That's correct.  We've asked experts here to -- to make

10   that determination.

11   Q.    Do you know anything about mineral interests?

12   A.    A little bit.

13   Q.    All right.  You understand in East Texas, there are

14   quite a few oil and gas fields?

15   A.    I grew up in Oklahoma, so, yes, I'm well aware.

16   Q.    All right.  And Oklahoma, as well, aren't there?

17   A.    Oh, yes.

18   Q.    And I might own a piece of property -- and I've outlined

19   it here.  Let's assume that that's a 250-acre tract, okay?

20   Are you with me?

21   A.    I'm following you.

22   Q.    And I've got a deed to that property; and it says I own

23   the minerals, 100 percent of them under that piece of

24   property.  Are you with me?

25   A.    Sure.

1  Q.   You understand that's what a mineral deed does for the

2  individual who possesses it?

3  A.   Again, I'm not an expert, but I'll take your word for

4  it.

5  Q.   Growing up in Oklahoma, do you have a sense that it

6  might take a lot of money to drill an oil well or drill a gas

7  well if you wanted to undertake that expense?

8  A.   Sure, yes.

9  Q.   If you wanted to drill an oil well in East Texas, hire a

10  rig, hire a crew, come out and finish it, you're talking

11  about millions of dollars, aren't you?

12  A.   Yes, sir.

13  Q.   Yet just because if I own that -- that piece of property

14  and I've got a deed and I own the minerals under it, yet I

15  don't have enough money to hire my own drilling company and

16  come out and complete a well, doesn't mean that an oil and

17  gas company can show up, drill a well, and take my minerals,

18  does it?

19  A.   No, sir, it does not.

20  Q.   If they drill a well on my property, they've got to pay

21  me a royalty, don't they?

22  A.   If you'd entered into an agreement for that, then, yes,

23  they would.

24  Q.   They can't avoid paying a royalty by saying that they

25  didn't know that they were on my property when they drilled

```
 1   their well, can they?

 2   A.    I don't believe so, sir.

 3   Q.    Just saying:  Oh, I didn't know about your deed, sorry.

 4   We've got one of the greatest wells of all time; but we

 5   didn't know about your deed, so we're not going to pay you.

 6   That wouldn't be a defense, would it?

 7   A.    No, sir, it would not.

 8   Q.    Same is true for patents, isn't it, Mr. Muller?

 9   A.    That's my understanding.

10   Q.    So if Smartflash has a patent and it covers a piece of

11   intellectual property, Apple doesn't get to show up, use the

12   property, and then say, oh, we didn't know about it, we're

13   not going to pay you anything for using your property.

14        That's not a defense to patent infringement.  You

15   understand that, don't you?

16   A.    Yes, I understand.

17   Q.    And you'd agree with me that if the jury disagrees with

18   Apple and determines that Apple infringes and that these

19   patents are valid, that it owes a reasonable royalty.  Would

20   you agree with that?

21   A.    Yes.

22   Q.    Now, one of Apple's defenses in this case is that it

23   doesn't infringe, right?

24   A.    Yes, that's my understanding.

25   Q.    And does it believe strongly in that defense, Mr.
```

1    Muller?

2    A.    Yes, I believe it does.

3    Q.    You believe so?

4    A.    I believe so, yes.

5    Q.    So if we look at Smartflash's property, Apple says we're

6    not on Smartflash's property, doesn't it?

7    A.    Yes, sir.

8    Q.    And, in fact, did you hear Mr. Batchelder during his

9    cross-examine of -- cross-examination of Mr. Mills talking

10   about the stipulation and asking Mr. Mills that you don't

11   have to come up with a non-infringing alternative if you

12   don't infringe?  Do you remember that line of questions?

13   A.    Yes, sir, I do.

14   Q.    And so that's why Apple entered into a stipulation that

15   it doesn't infringe because --

16         MR. WARD:  Or, I'm sorry.  Strike that.

17   Q.    (By Mr. Ward) It entered into a stipulation that there's

18   no non-infringing alternative because it doesn't infringe;

19   is -- is that right?

20   A.    I don't -- I don't know the particulars of the

21   stipulation.

22   Q.    I'll show it to you.  Can you read that?

23   A.    Yes, I can, sir.

24   Q.    And you agree with me a stipulation is an agreement,

25   right?

1   A.   Yes, sir.

2   Q.   So up until today, at least, this has been Apple's

3   agreement that it does not -- it has not identified any

4   design-around, non-infringing alternative in opinion of

5   counsel, right?

6   A.   Correct.

7   Q.   And when you had your deposition taken back in August,

8   prior to that deposition, you spent about 30 minutes prior to

9   the deposition looking at Smartflash's patents; is that

10  right?

11  A.   Yes, sir, about -- yeah, 30 minutes would be correct.

12  Q.   And that was the day before your deposition was taken,

13  correct?

14  A.   Yes, sir.

15  Q.   And you understand this lawsuit has been on file since

16  May of 2013?

17  A.   Yes, sir.

18  Q.   So between May of 2013 and August of 2014, prior to the

19  day of your deposition, you'd not looked at the patents,

20  correct?

21  A.   That's correct, sir.

22  Q.   Another defense that Apple has is invalidity.  Do you

23  understand that?

24  A.   Yes, sir.

25  Q.   So if the jury disagrees with Apple's position and it

1    decides that Apple is actually on the property, Apple says

2    that the deed that Smartflash has, its patent is no good,

3    right?

4    A.    That's my understanding of -- of invalidity, yes.

5    Q.    And you understand that when you ask a jury to

6    invalidate a patent like these, that that's permanent?  You

7    understand that, right?

8    A.    I'm -- I'm not aware of the specifics, but sounds

9    correct.

10   Q.    Let me show you a statement that was made by Mr.

11   Albritton during voir dire.

12            MR. WARD:   Page 56.  I'm sorry, can we switch?  Mr.

13   Mortensen, Page 56?

14   Q.    (By Mr. Ward)  And you were here during voir dire,

15   weren't you, Mr. Muller?

16   A.    Excuse me, I'm sorry, which -- which part?

17   Q.    Were you here during voir dire when we stood up and we

18   each had just a few minutes to briefly describe what we

19   thought the case was about and then Apple got a chance to

20   describe what they thought the case was about?  You recall

21   that?

22   A.    Oh, yes, sir, sorry.

23   Q.    All right.  And you can read along with me.

24        This is Mr. Albritton:  What you're going to hear in

25   this case is from this gentleman here to my left, Max

1    Muller --

2           That's you, correct?

3    A.    That is me, yes.

4    Q.    -- who was Employee No. 1 who worked on the iTunes

5    Store.  And Max Muller and two very other senior engineers

6    from Apple are going to come here to Tyler.  They're going to

7    sit right there in that witness stand and they're going to

8    explain to you about all the hard work and how they developed

9    the App Store, how they developed the --

10          THE COURT:   Slow down a little bit, Counsel.

11   You're reading awfully fast.

12   Q.    (By Mr. Ward)  The iTunes Store and how they developed

13   the way to pay for that protected content.  So Mr. Ward is

14   right, and he -- he's right.  He and I have known each --

15   each other for years and years, and there's definitely a

16   fundamental disagreement.  It's Apple's hard work, the hard

17   work of Max Muller that resulted in these products, not the

18   patents of Mr. Racz.

19          Did I read that correctly?

20   A.    Yes, sir, you did.

21   Q.    So in a little while we're going to hear about the hard

22   work that you and these other engineers put into iTunes and

23   the App Store; is that right?

24   A.    I hope so.

25   Q.    If that drilling company is out there on my property and

1   they've hit this motherload of an oil well and it took them a

2   lot of -- lot of hard work, they worked really hard, they

3   broke off several strings, it took them months and months,

4   they spent lots of money and worked really hard and had this

5   great oil well, is that a defense to paying me if they're on

6   my property?

7   A.   If they're on your property, no.

8   Q.   So if the jury determines that you did work really hard

9   and Apple worked really hard to develop these products -- and

10  I don't dispute that you did -- that has nothing to do with

11  whether or not Apple infringes on Smartflash's patents, does

12  it?

13  A.   No, sir, it doesn't.

14  Q.   Hard work's not a defense to patent infringement, is it?

15  A.   No, sir, it's not.

16  Q.   Similarly, the invalidity defenses that Apple asserts in

17  this case, none of those defenses are based upon a product

18  manufactured by Apple that somehow predates Smartflash's

19  patents and somehow invalidates them, is it?

20  A.   I'm -- I'm not the expert on invalidity.  We'll have

21  that up later.

22  Q.   Okay.  And I'll represent to you that Apple has not

23  indicated that there's any product that either you developed

24  or anybody else at Apple developed that inva -- invalidates

25  Smartflash's patents, okay?  You with me?

```
 1   A.    Yes.

 2   Q.    I'll make that representation to you.  If that's

 3   correct, then all the hard work, however admirable it is that

 4   you and other engineers did, that won't be relevant to

 5   invalidity, will it?

 6   A.    I don't believe so, no.

 7   Q.    And I think we heard some testimony earlier, in fact

 8   when Mr. Racz was being cross-examined, about a problem that

 9   was well-known in the industry back in 1999 of piracy of

10   digital content, do you recall that?

11   A.    Yes, sir, I -- I do recall.

12   Q.    And at the time that iTunes was finally unveiled where

13   it had digital rights management features to it, where it was

14   protecting that content, that was around, what, 2003, 2004?

15   A.    The iTunes Store launched in April of 2003.

16   Q.    And so whatever protections were on there for -- to

17   protect digital content, it was four or five years earlier

18   that Mr. Racz filed his patent to address this known problem

19   of data piracy, correct?

20   A.    Yes, that's correct.

21   Q.    Years ahead of the iTunes launch, correct?

22   A.    Yes, sir.

23   Q.    And the App Store and the iTunes Store have been huge

24   successes, haven't they?

25   A.    Very much so.
```

```
 1  Q.    They were -- the success of the App Store -- were you

 2  here during the video where Mr. Cook was speaking?

 3  A.    Yes, I was actually sitting in the audience there, as

 4  well, so...

 5  Q.    You were in the audience?

 6  A.    Yes, sir, I was.

 7  Q.    And did you hear him say that it was astounding?

 8  A.    Yes, yes, I did.

 9  Q.    Mind-boggling?

10  A.    Yes.

11  Q.    And unthinkable, right?

12  A.    Yes, sir.

13  Q.    And that was in 2012, right?

14  A.    That was in 2012, WWC.

15  Q.    The success of this technology was unthinkable in his

16  words, correct?

17  A.    Yes, sir.

18  Q.    Now, under invalidity, there's a couple of different

19  ways to invalidate a patent.  You know that generally?

20  A.    Again, I'm -- I'm not -- I'm not on our patent legal

21  team.  I'm -- I'm not an expert in these matters, so I -- but

22  if you'd like to represent and I can see if I agree, then

23  sure.

24  Q.    You understand that our jury, they're not patent experts

25  either, right?
```

1   A.   No, I understand that.

2   Q.   You -- you -- they were here -- you were here during

3   voir dire, and we didn't have any patent experts on the

4   panel, did we?

5   A.   No, sir, we didn't.

6   Q.   So to the extent these are new concepts for you, you'd

7   agree with me that they were new concepts to the jury,

8   correct?

9   A.   Correct.

10   Q.   And one of the invalidity defenses that you have is

11   something called anticipation; is that right?

12   A.   That's -- that's my understanding.

13   Q.   And then another one is obviousness; is that right?

14   A.   I -- I believe so.

15   Q.   And then the third one is the lack of a written

16   description; is that right?

17   A.   I -- I -- I don't know about the third one for sure.

18   Q.   You understand that when Smartflash filed its patent

19   applications, there were Examiners at the Patent and

20   Trademark Office who were charged with examining Smartflash's

21   applications and determining whether or not that they thought

22   the inventions claimed in the patent applications were new,

23   novel, and unique, right?

24   A.   That's my understanding of what the Patent Office does,

25   yes.

1  Q.    And the Examiners in the Patent Office are trained to

2  look at the prior art, right?

3  A.    Yes, I believe so.

4  Q.    And they are trained to look and see if they think

5  there's another reference that invalidates the inventions

6  that are claimed in the patents, correct?

7  A.    I -- I believe so.

8  Q.    And they're trained to look and determine whether or not

9  there can be a combination of references to render claims

10  invalid because they're obvious.  You understand they're

11  trained to do that?

12  A.    Again, I'm not -- I'm not an expert on the -- on the

13  U.S. Patent Office, but, I mean, that sounds reasonable.

14  Q.    And do you think they might be trained to look at the

15  specification and the claims and determine whether or not

16  there's adequate written description in the patents?

17  A.    That seems reasonable.

18  Q.    Seems reasonable to you?

19  A.    Seems reasonable, yes.

20  Q.    And you understand that these patents were filed -- the

21  original was -- goes back to the application in Great Britain

22  that was filed in 1999, correct?

23  A.    Yes, sir.

24  Q.    And the '720 patent was actually filed in 2006.

25        Do you see there?

1    A.    January 19th, 2006.

2    Q.    And it gets to relate to the Great Britain application.

3    You understand that?

4    A.    Yes, sir.

5    Q.    And you see the -- the Examiner there to the right,

6    Steven --

7    A.    Steven -- Steven S. Park; is that right?

8    Q.    I think it's Paik, P-I-A-K (sic)?

9    A.    Sorry.  It looks like an R from here.

10   Q.    I agree.  It's hard to read.

11   A.    Okay.  Paik.

12   Q.    So that one's in 2006, correct?

13   A.    Correct.

14   Q.    Now we're looking at the '221 patent.  See in the top

15   right-hand corner?

16   A.    Yes, sir, I see that.

17   Q.    And that one's November 10, 2010 for the filing date,

18   correct?

19   A.    Correct.

20   Q.    And it's got a different Examiner, Thien M. Le.

21   A.    Yes.  Yes, I see that.

22   Q.    And then the last patent that we're talking about is the

23   '772 patent filed August 2011, and, again, Thien M. Le is the

24   Examiner, right?

25   A.    Yes, sir, he is.

1  Q.   So from 2006 through 2011, you've got these three

2  patents being filed by Smartflash at the Patent Office with

3  the trained Examiners, right?

4  A.   Correct.

5  Q.   Two different ones, correct?

6  A.   Yes, sir.

7  Q.   And during the time that those two Examiners were

8  examining these patents and looking at the prior art, they

9  made the same mistakes is what Apple is telling the jury,

10  right?

11  A.   I -- I -- I'm -- I'm not trying to represent that the --

12  the patent -- yeah -- I mean, what mistakes are you referring

13  to?

14  Q.   Well, you're telling this jury that all these patents

15  are invalid for the same reasons, that they're anticipated,

16  they're obvious, and they fail for lack of written

17  description.

18  A.   Yes, sir.  Yes.

19  Q.   Apple retained a damages expert in this case, Stephen

20  Becker, correct?

21  A.   Yes.  Dr. -- Dr. Becker.

22  Q.   Dr. Becker.

23      And it also retained a survey expert, Dr. Dhar.

24  A.   Yes, correct.

25  Q.   We've heard -- heard both of their names, and we'll hear

1   from them during Apple's case --

2   A.   That's --

3   Q.   -- presumably, correct?

4   A.   That's my understanding, yes.

5   Q.   Does Apple have its own survey department?

6   A.   I'm sorry.   Survey department?

7   Q.   Yes, sir.   Is there some type of department -- I don't

8   know what it's named -- within Apple that conducts surveys to

9   measure what consumers think about its products?

10  A.   I'm -- I'm on the engineering side within the marketing

11  group.   It would seem like a reasonable function to have

12  within the marketing group, but I can't speak to -- I don't

13  know that particular group specifically.

14  Q.   So were you not in the courtroom yesterday when

15  Mr. Cassady stacked up a stack of surveys and referred to

16  them as the Apple surveys?   Did you miss that?

17  A.   No.   I saw those, yes.

18  Q.   So there's somebody at Apple who knows how to perform

19  surveys, correct?

20  A.   I would -- I would assume so, yes.

21  Q.   Kind of like you've got experts who know how to read

22  code, do you think Apple hires the best and the brightest to

23  go out and conduct surveys to determine what consumers think

24  about their products?

25  A.   Sure.

1    Q.   Yet in this case, Apple claims that it has no idea how

2    to value an individual feature of an Apple product; isn't

3    that correct?

4    A.   That's correct.  The surveys that are typically done are

5    around the -- the functionality, new enhancements, how people

6    like to review systems.  Those are the type of -- would they

7    like a bigger screen.  It's those types of attributes --

8    Q.   So you do --

9    A.   -- of their products --

10   Q.   I'm sorry.

11   A.   It's those types of attributes that that -- you know,

12   for the ones that I've seen.

13   Q.   So you do know about some surveys within Apple where

14   they survey the functionality that consumers are looking for

15   in their products?

16   A.   I -- I mean, I can't speak to specifics.  I have seen it

17   in, you know, presentations that have been given.

18   Q.   In this case, Apple takes the position that surveys

19   can't be used to determine why a purchaser buys a device; is

20   that right?

21   A.   That's correct.

22   Q.   And, in fact, it conducted no survey, it didn't ask Dr.

23   Dhar to conduct a survey to value the features that

24   Smartflash has accused in this case, did it?

25   A.   I'm not on the legal team, but -- so I couldn't speak

1    to -- I couldn't speak to that.

2    Q.   You can't tell the jury whether or not Apple conducted

3    its own survey, whether in-house or through Dr. Dhar, to

4    determine a value of these features?

5    A.   I can tell you that I've never seen any surveys inside

6    Apple that tried to estimate value of features.  You know,

7    we -- our -- our products are made up of thousands of

8    features, and they all basically contribute in -- you know,

9    for the whole experience.  It's not an individual one that we

10   try to, you know, parcel off as, you know, being worth a

11   certain amount.

12   Q.   And you didn't do it in this case either, did you, sir?

13   A.   Again, I'm here to speak about Apple and its products.

14   I'm not part of, basically, the legal defense team on this.

15   Q.   Did you hear Mr. Batchelder in his opening talk about

16   holes, the holes in Smartflash's case?  I think he listed

17   three holes.

18   A.   Yes, sir.

19   Q.   I mean, that's what Dr. Dhar was hired to do, right?

20   A.   I -- I don't know the specifics of...

21   Q.   You know that he wasn't hired to conduct a survey to

22   attempt to determine the value of the features that

23   Smartflash accuses in this case.

24        Do you know that, or do you not know that?

25   A.   I -- I don't know that.

```
 1    Q.    Did you hear Mr. Batchelder ask Mr. Mills if he'd ever

 2    seen a survey that used the word "motivate" in it?

 3    A.    I -- I heard that, yes.

 4    Q.    And Mr. Mills said, not that he could think of?

 5    A.    Yes, that's my -- my recollection.

 6    Q.    I'll represent to you that this comes from Apple's

 7    documents, Bates labeled APPSF347-911, documents entitled

 8    iTunes Store Gift Cards, 12 of 2008.  And that's Page 17 of

 9    the document.

10         Are you with me, Mr. Muller?

11    A.    Yes, I see this.

12    Q.    And you see there, it says:  Controlling spending and

13    convenience are main drivers for personal use purchases.

14    A.    Yes.  Yes, I read that in the top.

15    Q.    And then down there, it says:  Motivations for self,

16    right?

17         Can you read that?

18    A.    Yes, sir.

19    Q.    And then it actually asks the question that was asked.

20    A.    I'm sorry.  I can't quite read that.

21         What motivated you to purchase an iTunes gift card?  Is

22    that my --

23              MR. WARD:  I tell you what, Your Honor.  May I

24    approach the witness with a copy?

25              THE COURT:  You may.
```

```
 1              THE WITNESS:   Thank you.

 2   Q.   (By Mr. Ward) It is hard to see there, isn't it?

 3        Will you read the question that Apple was asking in its

 4   own surveys?

 5   A.   What motivated you to purchase an iTunes gift card for

 6   yourself?

 7   Q.   So Apple itself has asked survey questions of

 8   respondents to see what motivates them to make purchases,

 9   correct?

10   A.   Correct, sir.

11   Q.   And you see the size of that sample?  Purchase gift card

12   for self:  n equals 363?

13   A.   Yes, I see that.

14   Q.   Any idea what that n equals 363 means?

15   A.   I would assume it's the number of respondents.

16   Q.   Good enough for Apple.

17   A.   I -- I can't speak to the gift card -- the gift card

18   group or what they were -- what they were looking for.

19   Q.   Were you present during the cross-examination of Dr.

20   Wecker?

21   A.   Yes, sir, I was.

22   Q.   Do you remember these numbers that he wrote?

23   A.   Yes, sir.

24   Q.   And these were actually written by Mr. Post, correct?

25   A.   Yes, Mr. Post wrote those.
```

```
 1    Q.    And he performed some calculations where he divided the

 2    folks that were alone motivated into over 200 million.

 3          You recall that?

 4    A.    I -- I do recall that, yes.

 5    Q.    Do you understand that the things Mr. Post writes, the

 6    things that I write, they're not evidence, right?

 7    A.    I -- I believe that, yes.

 8    Q.    And you understand that you do have a survey expert

 9    who's named Dr. Dhar, right?

10    A.    Correct, sir.  That's my understanding.

11    Q.    And you understand that experts in cases have to provide

12    reports.  Our experts have to take reports and disclose all

13    their opinions and pass them over to Apple.

14          Do you know that?

15    A.    Yes, sir.

16    Q.    And Apple's experts have to take their reports and pass

17    them over to Smartflash and disclose all their opinions that

18    they're going to give at trial, right?

19    A.    Yes, sir.

20    Q.    And that's so lawyers have a chance to go and they get

21    to test what the experts are telling them, because they're

22    the experts in the field, right?

23    A.    That's -- that's -- that's my understanding, yes.

24    Q.    And so we get to study those reports and talk to our own

25    experts and figure out what's right.
```

1        You understand?  That makes sense to you?

2    A.   Makes sense, yes.

3    Q.   Do you know if Dr. Dhar -- any -- did any of these

4    calculations in his expert report?

5    A.   I -- I -- I don't know.

6    Q.   If I represented to you that he did no calculations like

7    this whatsoever to criticize that -- anything that Dr. Wecker

8    did, would it surprise you that Apple's counsel got up and

9    did these types of calculations?

10   A.   Again, I -- I -- I don't know what was -- what was asked

11   of Dr. Dhar.

12   Q.   We'll have to let Dr. Dhar tell us what relevance these

13   calculations have to this case, right?

14   A.   Yes, sir.

15   Q.   You've been present during the trial, and you heard the

16   cross-examination of Mr. Racz, right?

17   A.   Yes, sir, I did hear that.

18   Q.   And did you hear Mr. Batchelder go through the list of

19   things that Mr. Racz did not invent?

20   A.   Yes, I remember that.

21   Q.   Did anything that Mr. Racz say about, I agree, I didn't

22   invent -- invent that, did any of that surprise you in any

23   way whatsoever?

24   A.   No, sir, it did not.

25   Q.   Because when you had your deposition taken, you were

1    asked about things that Apple did not invent, right?

2    A.    Yes, sir, that's correct.

3    Q.    Apple didn't invent the smartphone.

4    A.    No, sir, we did not invent the smartphone.

5    Q.    The web browser?

6    A.    No, sir.

7    Q.    Camera?

8    A.    No, sir, we didn't invent the camera.

9    Q.    Touchscreens?

10   A.    No, we didn't invent the touchscreen.

11   Q.    Apple was not the first company to sell digital content?

12   A.    Correct, sir.  That's been going on since the mid-'90s.

13   Q.    Apple did not invent selling digital content, did it?

14   A.    No, sir, it did not.

15   Q.    It didn't invent selling digital content online?

16   A.    No, sir.

17   Q.    Didn't invent the Internet?

18   A.    No.

19   Q.    Digital certificates?

20   A.    No, sir, we didn't.

21   Q.    And I'll run through this list; and if I name something

22   you invented, we'll come back to it.  All right?

23        Digital licenses, encryption, encryption keys, parental

24   controls, computer memory, Flash memory, non-volatile memory,

25   or an MP3 player.  Apple doesn't claim to have invented any

1  of those things, does it?

2  A.   No, sir, we do not.

3  Q.   And you'd agree with me that in the art of electronic

4  devices, that all inventions are essentially a compilation of

5  known elements and new and unique ways, right?

6  A.   As long as it's inventive, yes.

7  Q.   As long as it's inventive.  It's not like someone's

8  coming up for the first time with:  Hey, I just invented a

9  microprocessor.  Now I'm going to put it in a phone.  That's

10  not how it works, is it?

11  A.   Typically, no.

12  Q.   You take these known elements, and you combine them in

13  new and unique ways, right?

14  A.   Yes, sir.

15  Q.   And what might be obvious in 2014 to us now might not

16  have been so obvious back in 1999, correct?

17  A.   I would agree with that.

18  Q.   Might not have been that obvious in 1999 what you saw in

19  2004 either, correct?

20  A.   Correct.

21  Q.   You ever witness an auto accident, Mr. Muller?

22  A.   Yes, sir, unfortunately.

23  Q.   They can be bad things so I don't want to go back and

24  relive bad memories.  So you know what a witness to an auto

25  accident is, right?

1    A.    Yes, sir, I do, and have been one.

2    Q.    That's an intersection, okay?

3    A.    I follow you.

4    Q.    I'm going to put a stop sign right there.  Are you with

5    me?

6    A.    I'm following you, yes.

7    Q.    I'm going to put Mr. Muller right here on this corner,

8    okay?

9    A.    Fair enough.  Yeah, close enough resemblance.

10   Q.    You got a big rig coming through, and it hits a car

11   going the other way, and you've got a good view of it.

12         Are you with me?

13   A.    Yes, sir, I am.

14   Q.    All right.  So assume with me that that big rig going

15   through -- we'll put a well-known name on it.  Let's call it

16   the Exxon -- Exxon rig.

17         Are you with me?

18   A.    Yes, sir, I'm with you.

19   Q.    So you're an independent witness to that, right?  You

20   don't know anyone in either one of the vehicles.

21         Are you with me?

22   A.    I'm with you.

23   Q.    Assume with me that the lawyers for Exxon show up on

24   your front doorstep.

25         Are you with me?

```
 1   A.   Yes, sir.

 2   Q.   And folks can't agree on who caused this accident.

 3        You got the Plaintiff in this car, and you've got the

 4   Defendant Exxon.

 5        Are you with me?

 6   A.   Sure.  Yes.

 7   Q.   Exxon's lawyers show up at your doorstep, and they say:

 8   Mr. Muller, you might get subpoenaed, asking for documents or

 9   to give a deposition, and we want to pay to be your lawyers.

10        Are you with me?

11   A.   Okay.

12   Q.   A little unusual to you?

13   A.   Sure.

14   Q.   It sounds a little unusual, doesn't it?

15   A.   It does sound -- yes.  Yes, sir.

16   Q.   And then they tell you:  For the time that you spend

17   telling us about this accident, we want to pay you for your

18   time, okay?

19        Are you with me?

20   A.   Yes, sir.

21   Q.   And they ask you what your standard hourly rate is, and

22   you tell them:  I make between $135 to $200 an hour.

23        Are you with me?

24   A.   Yes.  Yes, I am, sir.

25   Q.   But you tell them:  You know what, to get involved in
```

1   this case and to tell you the truth, it's going to cost you

2   double that, $400, $400 an hour to tell you what I saw.

3       Are you with me?

4   A.   Yes, sir.  I follow you.

5   Q.   If you're on the outside looking in, is that a little

6   strange to you?

7   A.   It sounds -- it sounds strange, yes.

8   Q.   Sounds strange that a witness would say:  I'll show up

9   and tell you the truth, but it's going to cost you double to

10  show up and tell you the truth.  Right?

11  A.   Yes, sir.

12  Q.   But Exxon says:  You know what, sounds like a good idea;

13  we're going to pay you double, and we want you to sign an

14  engagement letter with us.

15      Are you with me?

16  A.   Okay.

17  Q.   They sign this engagement letter that says:  Don't worry

18  about your legal fees; Exxon is going to pay those.  Okay?

19  A.   So my legal fees for testifying?  Is that correct?

20  Q.   Yeah.  Anything that happens.  If the Plaintiff's

21  lawyers show up and they want to talk to you, you're

22  instructed not to talk to the Plaintiff's lawyers by Exxon's

23  lawyers.

24      Are you with me?

25  A.   Okay.

```
 1   Q.   That's in the agreement.  The agreement says:  This
 2   stuff is secret.  Even though you're a fact witness, don't
 3   talk to the Plaintiff's lawyers.
 4        Are you with me?
 5   A.   Yes, sir.
 6   Q.   Even though you're this independent fact witness, who's
 7   charging double for your time, don't talk to the other side.
 8        Does that all sound strange to you?
 9   A.   In this particular case, yes, sounds -- sounds -- yeah,
10   sure.
11   Q.   This scenario sounds familiar, though, doesn't it,
12   Mr. Muller?
13   A.   What do you mean?
14   Q.   Well, that's what Apple did in this case, isn't it, sir,
15   with Mr. Ansell?
16   A.   I don't know any of the specifics on that.
17   Q.   Well, let's talk about the specifics and see if any of
18   this refreshes your recollection, okay?
19   A.   Okay.
20   Q.   Do you know who Mr. Ansell is?
21   A.   No, sir, I don't.
22   Q.   So it's -- would be news to you if I told you that
23   Apple's lawyers identified him as a witness with respect to
24   prior art, approached him and offered to represent him for
25   free, and that Mr. Ansell demanded double his hourly rate to
```

1    testify for Apple?  You don't know any of those facts?

2    A.   No, sir, I don't.  I'm here to tell you about Apple and

3    our products.

4    Q.   You don't know that Mr. Ansell is on the "will call"

5    witness list for Apple to come testify about his patent that

6    Apple claims invalidates Smartflash's patents?  This is all

7    news to you?

8    A.   Yes, sir.

9         MR. WARD:  Can we look at Plaintiffs' Exhibit 753?

10   Q.   (By Mr. Ward) See there it says:  By email --

11        MR. WARD:  If you would, Mr. Mortensen, zoom in on

12   the -- there you go.

13   Q.   (By Mr. Ward) By email to Steven T. Ansell, October 9,

14   2014.

15        Do you see that?

16   A.   Yes, sir.

17   Q.   And it's got Ms. Fukuda's -- Ms. Fukuda's name on the

18   letter, correct?

19   A.   Yes, sir.

20   Q.   And she cross-examined Dr. Jones.  You know that name,

21   right?

22   A.   Yes.  Yes.

23   Q.   She's one of the lawyers for Apple in this case,

24   correct?

25   A.   Yes, sir, she is.

1   Q.   And so she writes this letter to Mr. Ansell, and there

2   in the first sentence of the second paragraph, she writes and

3   says:  We understand that you may have knowledge relevant to

4   the action.

5       You see that?

6   A.   Yes, sir.

7   Q.   And in the next sentence, she says:  We would appreciate

8   the opportunity to visit with you further.

9       Right?

10  A.   Yes, sir.  I'm following you.

11  Q.   And then she says:  It is possible you may receive a

12  subpoena seeking documents and/or testimony in connection

13  with the action.  We have, therefore, agreed to represent you

14  personally in connection with the action.

15      You see that?

16  A.   Yes, sir, I do.

17          MR. WARD:  Let's scroll down to the bottom

18  paragraph:  Fees and Expenses.

19  Q.   (By Mr. Ward) Then she writes:  Apple will pay Ropes &

20  Gray's fees and expenses incurred in representing you in the

21  action.

22      Did I read that right?

23  A.   Yes.

24  Q.   Of course, the fact that Apple has agreed to pay such

25  fees and expenses will not interfere with Ropes & Gray's

1    independence or professional judgment or with Ropes & Gray's

2    client-lawyer relationship with you.

3        Did I read that right?

4    A.   Yes, sir.

5            MR. WARD:  Let's go to the second page, first

6    sentence, top paragraph.

7    Q.   (By Mr. Ward) Further, to compensate you for your time,

8    Apple will pay you at the rate of $400 per hour and reimburse

9    you for any necessary and reasonable travel and other

10   expenses incurred on its behalf.

11   A.   Yes, sir.  It seems low in comparison to some of the

12   other experts that are testifying.

13   Q.   You understand that Mr. Ansell says he's a fact witness

14   in this case.

15   A.   Okay.

16   Q.   You ever heard of paying a fact witness double what they

17   claim their hourly rate is just to get them to show up and

18   tell the truth?

19   A.   I'm not on the legal team.

20   Q.   I'm not asking you about as a legal team; I'm asking you

21   about as a human being out in the everyday world.  Have you

22   ever heard of someone saying:  I'm a fact witness, and to

23   show up and tell you the truth, pay me double?

24   A.   If you're asking him to travel here and take time away

25   from his existing job and function and to forego other, you

1    know, income that he's making, I mean, it seems reasonable to

2    compensate the individual for coming here and -- and

3    providing testimony if he's not an Apple employee, right.

4    Q.   And pay him double?

5    A.   I -- I can't speak to the -- the specifics, you know.

6    Q.   Mr. Muller, I'm asking to speak to specifics.  Does that

7    strike you as strange that someone would say I'm going to

8    show up and I'm fine, I agree with you, pay him for

9    compensation for travel, whatever his hourly rate is; but if

10   he says pay me double if you want me to tell the truth about

11   the facts, does that strike you as strange at all, Mr.

12   Muller?

13   A.   I mean, if I were looking at it, it would be, you know,

14   what other things are basically he's having to forego, right?

15   I mean, it's -- you know, if he's in the middle of a

16   three-month engagement and he's got to give that up -- I

17   mean, I -- I can't speak to specifics on -- on the -- on what

18   the arrangement would be.

19   Q.   Because as you just told us, you don't even know

20   anything about Mr. Ansell or what his situation is, do you,

21   sir?

22   A.   No, sir, I don't.

23        MR. WARD:  Let's go to privileged and confidential

24   information there in the next sentence.  And I tell you what,

25   before we do that, the last sentence of that second

1    paragraph.

2    Q.   (By Mr. Ward)   Ropes & Gray and Apple will only ever be

3    interested in your truthful testimony.

4        Right?

5    A.   Yes, sir.

6    Q.   That's what it says, right?

7    A.   Yes, sir.

8    Q.   Do you think Mr. Ansell had to be reminded that that's

9    all they were interested in?

10   A.   No, sir.

11   Q.   All right.   Under privileged and confidential

12   information, Ms. Fukuda writes:  You agree not to waive

13   privilege over these communications or documents and matters

14   that are subject of subpoenas or documents that are otherwise

15   privileged without Apple's agreement, but agree that Apple

16   may waive privilege involving communications between you,

17   Apple, and Ropes & Gray if it determines that it is necessary

18   to do so.

19       Did I read that right?

20   A.   Yes, sir, you did.

21   Q.   So Mr. Ansell is agreeing that he's not going to tell

22   anybody about what he talks about with Apple's lawyers.  You

23   agree with that?

24   A.   That would -- that would be my interpretation of the --

25   of the wording there.

1   Q.   And would it surprise you to know that Mr. Ansell has

2   been sending invoices to Apple's lawyers for his time?

3   A.   No, it wouldn't surprise me.

4           MR. WARD:  Let's look at Plaintiffs' Exhibit 755,

5   and we'll go to the second page.  We'll start from the bottom

6   up.  Can we put the other page and this one together so we

7   can see?

8   Q.   (By Mr. Ward)  And you can see there on December 6th,

9   2014, two months ago, Ms. Fukuda is writing Mr. Ansell:  If

10  anyone from Smartflash or their lawyers, Caldwell Cassady &

11  Curry, calls you, please do not discuss anything with them

12  and ask them to call me directly.  Thanks.

13  A.   Yes, sir.

14  Q.   I read that right, correct?

15  A.   Yes, sir, you did.

16  Q.   So if we turn back to you being the witness to the

17  accident, would it strike you strange if Exxon instructed you

18  don't talk to the other side?  We know you're a fact witness,

19  but don't talk to them.  We're now your lawyers.  Call us if

20  they've got any questions.

21          Does that strike you as strange in that situation?

22  A.   In my reading, you know, the Exxon situation is

23  different than this particular situation, and I don't know

24  the specifics around this particular situation.

25  Q.   Do you know if Mr. Ansell agreed to talk to Mr. Caldwell

1  when he called him?

2  A.   No, sir, I -- I don't.

3  Q.   Let's scroll up into this exhibit.  Mr. Ansell writes to

4  Ms. Fukuda:  Of course, I did receive a call from someplace

5  in Texas yesterday, but I didn't answer it and no message was

6  left.

7       That's what he wrote, right?

8  A.   Yes, sir.

9  Q.   Do you know that Caldwell Cassady & Curry's located in

10 Texas?

11 A.   Yes, sir, I do.

12 Q.   Let's scroll up.  And here he is, telling Ms. Fukuda

13 that it -- indeed, Mr. Caldwell has called, correct?

14 A.   Just a second.  Yes, sir, I see that.

15 Q.   And Mr. Caldwell says today -- that Mr. Caldwell had

16 called him today requesting to introduce himself and saying

17 that he had heard I may be testifying in this case.

18      Right?

19 A.   Yes, sir, I see that.

20 Q.   And this is an important case to Apple, right?

21 A.   Very important.

22 Q.   Very important?

23 A.   Yes, sir.

24 Q.   And apparently, Mr. Ansell is an important enough

25 witness, that Apple decided to approach him and pay his legal

```
 1   fees, sign him up, and tell him not to talk to Smartflash's
 2   lawyers, right?
 3   A.   I  mean, I -- I -- I can read basically the specifics
 4   that you're pointing out here.
 5   Q.   But until you took the stand, you knew nothing about Mr.
 6   Ansell, is what you're telling us.  Right?
 7   A.   That's correct, sir.
 8   Q.   Now, he tells Ms. Fukuda that Mr. Caldwell left his
 9   phone number, but I have not called him back.  If you like, I
10   can return the call and request him to contact you; or if you
11   just want to contact him on my behalf, he left his contact
12   number as, and then he leaves his name and his phone number.
13   Right?  Is that correct?
14   A.   Yes, sir.
15            MR. WARD:  Let's look at Plaintiffs' Exhibit 754.
16            Go to the second page, please -- third page.
17   Q.   (By Mr. Ward)  You see this invoice?
18   A.   Yes, sir, I do.
19   Q.   And it says -- it's got dates, and it says who?
20   A.   Yes, sir, I see that.
21   Q.   It's got Mr. Ansell's name, right?
22   A.   Correct, sir.
23            MR. WARD:  Let's go to the first page, bottom.
24   Q.   (By Mr. Ward)  There's Mr. Ansell, again, December 3,
25   2014, writing Ms. Fukuda, telling her that he's attached his
```

1    invoice.  Please let me know if you have any questions.  If

2    you need to see more details on the tasks.

3    Right?

4         And Ms. Fukuda responds --

5              MR. WARD:   Scroll up.

6    Q.   (By Mr. Ward) Hi, Steve.  We will process right away.

7    Do you mind just deleting the expert witness words and

8    resend?  We're using you as a fact witness for this trial.

9    Thanks.

10        Did I read that right?

11   A.   Yes, sir, you did.

12   Q.   And I told you about the process that we've got to go

13   through if a party determines that it's going to select

14   someone as an expert witness, right?

15   A.   What -- what process?

16   Q.   Of compiling expert reports and sending them to the

17   other side so that they have an opportunity to review all the

18   opinions that that expert might express at trial so that we

19   get a chance to look at it closely and determine whether or

20   not we disagree.  Right?

21   A.   Yes, sorry.  Yes.

22   Q.   And so Mr. Ansell, he's describing himself as an expert,

23   at least in his invoice, right?

24   A.   Yes, sir.

25   Q.   And Ms. Fukuda says:  Delete that, you're a fact

```
 1    witness.

 2          That's what she instructs him to do, right?

 3    A.    Yes, sir.

 4    Q.    And Mr. Ansell, at his double hourly rate, emails right

 5    back and says:  No problem.  I had just given the task list I

 6    work from, that name.

 7          That's what he tells her, right?

 8    A.    Yes, sir.

 9    Q.    And as Apple's corporate representative sitting on the

10    stand, you'd tell us there's just nothing unusual about what

11    we've been through with Mr. Ansell's role in this case on

12    behalf of Apple?

13    A.    I'm not on the legal team, and so I can't represent

14    essentially these -- these documents or -- or this

15    proceeding.  I don't know what is -- what he normally does

16    for an hourly rate.

17    Q.    As far as you know, this is just standard operating

18    procedure at Apple?

19    A.    I -- I can't speak to, you know, how -- how the legal

20    team operates in these matters.

21                MR. WARD:  Pass the witness.

22                THE COURT:  Cross-examination by the Defendant.

23                MR. BATCHELDER:   Thank you, Your Honor.

24                          CROSS-EXAMINATION

25    BY MR. BATCHELDER:
```

```
 1    Q.    Mr. Muller, good morning.

 2    A.    Good morning.

 3    Q.    Who asked you to come to this trial?

 4    A.    Apple did.

 5    Q.    And what is your current title at Apple?

 6    A.    I'm senior engineering director.

 7    Q.    In addition to being an engineer, are you also a lawyer,

 8    sir?

 9    A.    No, sir, I'm not.

10    Q.    And in your understanding, are patents legal documents?

11    A.    Yes, sir, they are.

12    Q.    Is it part of your job responsibility to analyze whether

13    patents are infringed or invalid?

14    A.    No, sir, it's not.  We have a fantastic patent legal

15    group.

16    Q.    So they do those analyses?

17    A.    Yes, sir, they do.

18    Q.    In preparing for your deposition, who did you meet with?

19    A.    I met with -- I met with our -- our legal group.

20    Q.    Why did you meet with them?

21    A.    Because they're the -- you know, they're the experts in

22    this matter.

23    Q.    All right.  And are you here today to talk about whether

24    the patents in this case are infringed or invalid or whether

25    those checkmarks belong?
```

1    A.    No, sir, I'm not.  We've -- Apple's asked experts to

2    basically perform those analyses, and the men and women of

3    the jury will be hearing from them later on today or

4    tomorrow.

5    Q.    So in this trial, who will speak on Apple's behalf as to

6    whether those checkmarks belong, whether the patents are

7    infringed?

8    A.    Apple -- Apple's experts will refer to those.

9    Q.    And in this trial, who will speak on Apple's behalf as

10   to whether these patents are invalid?

11   A.    Apple's experts will.

12   Q.    And who -- in this trial, who will address prior art

13   references?

14   A.    I believe Apple's experts will.

15   Q.    Now, are you trained in valuing patents?

16   A.    No, sir, I'm not trained in valuing patents.

17   Q.    Is a part of your job function at Apple to value

18   patents?

19   A.    No, sir.  I'm an engineer.  Write code.

20   Q.    In this trial, who will speak to the value of the

21   patents on Apple's behalf?

22   A.    I believe Dr. Becker will speak to the value.

23   Q.    From Apple's point of view, why are you here today?

24   A.    I'm -- I'm here to help educate the jury about Apple and

25   its products and services that -- that we've -- we've

1   designed over the years.

2   Q.   Why you?

3   A.   I've been at Apple for -- for 13 years.  I was the first

4   engineer in the iTunes's Store.  I worked on it for over a

5   decade.  I've, you know, been in all -- you know, in all

6   manner of the -- of Apple over the years.

7   Q.   Did I hear you mention you grew up in Oklahoma?

8   A.   I did, yes, about five-and-a-half, six-hours north of

9   here, Edmond, Oklahoma, just up I-35.

10  Q.   Do you have a family, sir?

11  A.   I do.  My wife, who I met in 7th grade, also from

12  Oklahoma.  We have four children -- four young children.

13  Three boys, 11, 9, and 4; and -- and then we have one girl

14  who's 1, so --

15  Q.   Did you go to college?

16  A.   Yes, sir.  I -- my first year I went to Tulane

17  University, and my remaining years I went to Georgetown

18  University in Washington, D.C.

19  Q.   What degree did you graduate with?

20  A.   I graduated with a -- a minor in mathematics, a Bachelor

21  of Science in economics, a Bachelor of Science in computer

22  Science, and a Master of Science in economics.

23  Q.   And how long did all that take you?

24  A.   Four years.

25  Q.   Did you work during college?

1    A.   Yes, I -- I did work at the Cognitive Institute of

2    Georgetown University.

3    Q.   What did you do in that job?

4    A.   Well, it was -- it was actually somewhat menial.  It

5    was, you know, repairing hard drives, pulling networking

6    cables, kind of all the -- all the grunt work that you start

7    out doing when you're learning about how to put together

8    IT -- IT systems.

9    Q.   So you were working on computers?

10   A.   Yes.  Yes, sir, I was.

11   Q.   What year did you graduate college?

12   A.   I graduated in the summer of 1999.

13   Q.   And you started at Apple when?

14   A.   In May of 2002, I started at Apple.

15   Q.   What did you do in between?

16   A.   In between, I worked at several small computer companies

17   in -- in the Bay Area.

18   Q.   And can you summarize for the jury at a high level what

19   kind of work you've done at Apple?

20   A.   Sure.  So I -- I joined Apple to build the -- the iTunes

21   music store; and, you know, so over the years we built the

22   music store, we built the book store, the video store, all --

23   you know, the App Store, and really I was very -- I was one

24   of the -- kind of the chief architects responsible for kind

25   of the overall architecture and all the pieces that went into

1    the design of those -- those systems.

2    Q.    So of all the engineers at Apple, what engineer number

3    were you on the iTunes Store?

4    A.    I was the -- I was the first engineer hired on to the

5    iTunes music store.

6    Q.    No. 1?

7    A.    Yes, sir, that's correct.

8    Q.    What's the relationship between the iTunes Store and the

9    App Store?

10   A.    The -- well, we -- we started out calling it the iTunes

11   Music Store, and -- but as we started to add more content,

12   like video and TV shows, you know, calling it the iTunes

13   Music Store was -- you know, became awkward, so we shortened

14   it to the iTunes Store.  And the App Store is built right in

15   as just another kind of content type, if you will, so it's

16   running through all the back-end infrastructure as the -- as

17   the iTunes Music Store.  It's just -- yeah.

18   Q.    How many Apple engineers do you now oversee?

19   A.    I oversee -- within my group 200 -- about 220 engineers

20   and data scientists.

21   Q.    And how long did you work on that iTunes Store project,

22   sir?

23   A.    Just over 11 -- I think 11-and-a-half years, I -- I ran

24   that group.

25   Q.    So during that 11-plus-year period, what's your best

```
 1   estimate of the number of engineer hours that Apple devoted
 2   to the iTunes Store?
 3   A.    We easily put in, you know, hundreds of thousands of
 4   engineering hours over -- over the years at the iTunes Store.
 5   Q.    That same question as to dollars.  What's your best
 6   estimate of the dollars invested by Apple in the iTunes Store
 7   over that time?
 8   A.    Well -- well north of over a billion dollars we put into
 9   the iTunes Store over the years.
10   Q.    When was the iTunes Store first opened for business?
11   A.    April 28th, 2003.
12   Q.    If that's the case, sir, why did your group continue to
13   invest so many engineer hours and dollars in the iTunes Store
14   even after it opened?
15   A.    Well, when we were first developing the iTunes Store,
16   there were so many more features that we wanted to do.  We
17   wanted to provide different ways that people could discover
18   music.  We wanted to find different ways that people could
19   enjoy, you know, their digital content.  And, you know, just
20   over the years, there's just been so many new things to do
21   and so many new, you know, countries to expand into.  So
22   there's just -- there's always a -- you know, a laundry list
23   10 miles long of -- of new features and ideas that -- that we
24   want to basically do to -- you know, for our customers.
25   Q.    What business is Apple in?
```

1    A.   Apple started out in the computer business in the -- in

2    the '70s.  And since then, it's evolved into the computer --

3    or the kind of consumer electronics business with the phones

4    and tablets and -- and now we're growing into the services

5    business, as well.

6    Q.   Headquartered in the U.S.?

7    A.   Yes, sir, located in Cupertino, California.

8    Q.   About how many employees does Apple have?

9    A.   I actually just checked this last week.  In the United

10   States, we have 65,000 employees.  And internationally,

11   another 40,000 employees.

12   Q.   Do any Apple employees work in Texas?

13   A.   Yes, sir.  We have about 7,000 Apple employees here in

14   Texas.  Our -- a good portion of our finance group is located

15   here, as well as our Apple Care organization.

16   Q.   In your time at Apple, have you come to learn what the

17   company's major project milestones have been?

18   A.   Yes, sir, I have.

19   Q.   All right.

20             MR. BATCHELDER:   Let's put that up.

21             Your Honor, request to approach the witness with a

22   mouse that he can use to indicate?

23             THE WITNESS:  I have one.

24             MR. BATCHELDER:  Oh, you have one?  Okay.

25             THE WITNESS:  Let's see if it works.

1   Q.   (By Mr. Batchelder) Okay.  So you've got a mouse and

2   that little red dot that you can use to circle things?

3   A.   It's working.

4              THE COURT:  I tell you what -- I tell you what

5   we'll do:  Before we get into this, it's noon.  We're going

6   to take this opportunity to break for lunch.  When we come

7   back for lunch, we can continue with this.

8              Ladies and Gentlemen of the Jury:  Please take your

9   notebooks with you.  We're going to try to keep lunch as

10  reasonable as we can so that we can keep making progress.

11             Don't discuss anything about the case, follow all

12  of my other instructions, and we'll be back in here as soon

13  as possible to continue with the evidence this afternoon.

14             But you're excused for lunch at this time.

15             COURT SECURITY OFFICER:  All rise for the jury.

16             (Jury out.)

17             THE COURT:  All right.  Counsel, I anticipate this

18  lunch break being approximately 35 to 45 minutes.

19             With that, we stand in recess for lunch.

20             (Lunch recess.)

21

22

23

24

25

1                           CERTIFICATION

2

3               I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of our

6    abilities.

7

8

9    /s/_____

     SHEA SLOAN, CSR, RPR                    February 18, 2015
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/16

12

13

14

15

16   /s/_____

     SHELLY HOLMES, CSR, TCRR
17   Deputy Official Court Reporter
     State of Texas No.:  7804
18   Expiration Date  12/31/16

19

20

21

22

23

24

25