```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3
    SMARTFLASH LLC and           )
 4  SMARTFLASH TECHNOLOGIES            DOCKET NO. 6:13cv447
    LIMITED
 5
          -vs-                   )
 6
                                      Tyler, Texas
 7                              )     8:30 a.m.
    APPLE INC.                         February 19, 2015
 8

 9
                      TRANSCRIPT OF TRIAL
10                       MORNING SESSION
             BEFORE THE HONORABLE RODNEY GILSTRAP,
11               UNITED STATES DISTRICT JUDGE

12

13                      A P P E A R A N C E S

14

15  FOR THE PLAINTIFFS:

16
    MR. BRADLEY W. CALDWELL
17  MR. JASON D. CASSADY
    MR. JOHN AUSTIN CURRY
18  CALDWELL CASSADY & CURRY
    2101 Cedar Springs Rd., Ste. 1000
19  Dallas, Texas  75201

20

21  MR. T. JOHN WARD, JR.
    WARD & SMITH LAW FIRM
22  P.O. Box 1231
    Longview, Texas  75606
23

24

25
```

1    FOR THE DEFENDANTS:

2
     MR. JAMES R. BATCHELDER
3    ROPES & GRAY LLP
     1900 University Ave., 6th Floor
4    East Palo Alto, California  94303-2284

5

6    MS. CHING-LEE FUKUDA
     MR. KEVIN J. POST
7    ROPES & GRAY LLP
     1211 Avenue of the Americas
8    New York, New York 10036-8704

9

10   MR. ERIC ALBRITTON
     ALBRITTON LAW FIRM
11   P. O. Box 2649
     Longview, Texas 75606
12

13

14

15
     COURT REPORTERS:        MS. SHELLY HOLMES, CSR, TCRR
16                           OFFICIAL COURT REPORTER
                             shelly_holmes@txed.uscourts.gov
17
                             MS. SHEA SLOAN, CSR, RPR
18                           OFFICIAL COURT REPORTER
                             shea_sloan@txed.uscourts.gov
19

20

21

22

23

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25

1            P R O C E E D I N G S

2            (Jury out.)

3            COURT SECURITY OFFICER:  All rise.

4            THE COURT:  Be seated, please.

5            All right.  Is the Plaintiff ready to read into the

6    record any items from the list of pre-admitted exhibits used

7    during yesterday's portion of the trial that have not

8    otherwise been read into the record?

9            MR. CASSADY:  Yes, Your Honor.

10            THE COURT:  Please proceed.

11            MR. CASSADY:  The Plaintiffs admit from yesterday

12    PX 753 and PX 754 and PX 755.

13            And that's all, Your Honor.

14            THE COURT:  Any objection from the Defendant to

15    that rendition?

16            MR. POST:  No objection, Your Honor.

17            THE COURT:  All right.  Do the Defendants have a

18    similar rendition to offer into the record?

19            MR. POST:  Yes, Your Honor.

20            THE COURT:  Proceed.

21            MR. POST:  Defendants request admission of the

22    following exhibits:  PX 205.002, PX 203.003, PX 54.001, DX

23    65, DX 68, DX 59, DX 100, DX 93, DX 67, DX 70, DX 101, DX 65,

24    DX 68, PX 9, PX 11, PX 100, PX 103.028, DX 305, and DX 21.

25            THE COURT:  Any objection from the Plaintiff?

1          MR. CASSADY:  No, Your Honor.

2          THE COURT:  All right.  The witness is back on the

3    witness stand.

4          Ms. Fukuda, you may return to the podium.

5          Ms. Mayes, please bring in the jury.

6          COURT SECURITY OFFICER:  All rise for the jury.

7          (Jury in.)

8          THE COURT:  Welcome back, Ladies and Gentlemen.

9          Please be seated.

10          All right.  We'll continue with the direct

11    examination of the witness.

12          You may proceed, Ms. Fukuda.

13          MS. FUKUDA:  Thank you, Your Honor.

14        GEORGE LIGLER, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

15              DIRECT EXAMINATION (CONTINUED)

16    BY MS. FUKUDA:

17    Q.   Good morning, Dr. Ligler.

18    A.   Good morning.

19    Q.   Now, yesterday -- at the end of yesterday, you were

20    recognized by the Court as an expert in computer systems

21    engineering and the areas pertinent to this case?

22    A.   I believe so.

23    Q.   Is there a difference between an expert witness and a

24    fact witness?

25    A.   Yes, there is.

1   Q.    And what is the difference?

2   A.    Well, a fact witness testifies about facts to which that

3   witness has personal knowledge.

4        An expert witness connects the dots, if you will,

5   putting together facts and forming opinions.

6   Q.    Were you in the courtroom when Apple's engineers

7   testified in this case?

8   A.    Yes, I was.

9   Q.    Are those Apple engineers who testified, expert or fact

10  witnesses?

11  A.    My understanding is that they were fact witnesses.

12  Q.    And were you in the courtroom when Smartflash's lawyers

13  asked whether there was anyone here to testify regarding why

14  Apple does not infringe?

15  A.    Yes, I was.

16  Q.    Are you here to give your opinions regarding whether

17  Apple infringes the Smartflash patents?

18  A.    Yes.

19  Q.    What is your conclusion?

20  A.    My conclusion is that, for reasons that I'm going to be

21  going through, that Dr. Jones and Smartflash have not shown

22  that the accused products infringe the asserted claims.

23  Q.    Dr. Ligler, what information did you review to form your

24  opinions that you'll be presenting today?

25  A.    Well, a great deal.  I reviewed the patents.  I reviewed

1    selected portions of the prosecution or file histories of

2    those patents.  I reviewed the asserted claims, of course,

3    which are part of the patents.

4        I reviewed the computer source code that Apple has

5    produced in this case, the source code representing the

6    software within the accused products.

7        I reviewed documentation -- various documents that Apple

8    has produced about the products.

9        I reviewed the Court's claim construction in terms of

10   the construing of particular terms used in the asserted

11   claims.

12       I reviewed the deposition testimony of Apple's

13   engineers, particularly their corporate witnesses; in other

14   words, witnesses who are speaking on behalf or testifying on

15   behalf of the corporation.

16       I additionally reviewed the expert report of Dr. Jones

17   and the claim charts which accompanied or were part of his

18   expert report.

19       I also experimented and -- and -- with the products

20   themselves -- the accused products themselves and did some

21   experimentation with those products.

22   Q.   Thank you.

23       Dr. Ligler, can you tell the jury just a very -- give

24   them just a very quick refresher about the patents that

25   you're going to discuss today?

1          And let me pull up your slides for you.

2    A.    Sure.

3          Well, we've already heard overviews of the -- of the

4    patents, and I'd simply like to focus on Figure 4A of the

5    patent.

6          What I've done is put in red letters discussions of --

7    within -- from the specification of what the various boxes in

8    the figures are.  And there are two basic portions of this

9    figure in terms of my testimony.

10         The first is in the bottom right-hand portion of the

11   figure.  And this is about data or content being supplied

12   through or using the -- under the auspices of a data supply

13   service provider S.P., Box 60, to a data access terminal, Box

14   40, and a data carrier, Box 30, is depicted within the

15   figure, within this embodiment, that a carrier plugs into the

16   data terminal.

17         I'm going to be talking about this portion of the

18   figure, in terms of the delivery of content and use rules,

19   use status data, and access rules that are discussed in the

20   patent related to that delivery and then subsequent use of

21   the content.

22         In the upper left-hand corner is a payment validation

23   authority, and P.V.A., Box 70, and this has to do with

24   payment data, payment validation terms within the asserted

25   claims.  And I will not be testifying about that portion of

1    the figure.

2    Q.    And what are we seeing here in this next slide?  Does

3    this relate to what you just testified about?

4    A.    Yes.   It's sort of a cliff note summary of what I just

5    said.   The access/use rule-related issues are what I will be

6    testifying about with regard to content, delivery, and use.

7          And the payment-related issues, I understand will be

8    discussed by Mr. Wechselberger later today.

9    Q.    Dr. Ligler, could you provide us with an overview of

10   Apple's FairPlay to put your opinions into context?   And

11   would you mind doing that with what Mr. Farrugia had

12   presented so that the jury can see where you -- how to plug

13   your opinions into what they've already seen on the screen?

14   A.    Okay.   Well, to link up with what Mr. Farrugia presented

15   yesterday, this is a chart from his presentation.

16         And as he testified, there is a process within Apple's

17   FairPlay system that based upon a request, which is

18   enumerated as -- as 1 to the Apple iTunes server, strong

19   protection, No. 2 -- and we'll go into in a little more

20   detail in just a few minutes as to what that strong

21   protection is -- comes to the user device.

22         You'll notice that there's a key highlighted in yellow.

23   That is an account key.  We'll talk about that a little

24   later.  There's several keys involved, as Mr. Farrugia

25   testified, keys to protect the keys.

1          And then using the information that is downloaded to the

2     device from No. 2 and No. 3, a uniform resource -- resource

3     locator, or URL, is used to obtain the content from a

4     third-party content delivery network, and the protected

5     content, protected by a key other than the account key, is

6     sent to the user device.

7          At the user device, there is a keybag, which contains

8     the account key, and the protected content is also there.

9     And, again, we'll go into this in a little more detail.

10    Q.   Focusing on the user device and the keys that you talked

11    about, could you explain us -- explain to us how the keys

12    relate to each other?

13    A.   Well, yes.  There -- there is within an -- and the

14    example we're taking here is music.  It's an audio file.  So

15    for this type of content, within the audio file on the user

16    device, the -- the iPad or the -- or the iPhone or the iPod

17    Touch, is firstly the protected content within the file, and

18    then the security information or Sinf that Mr. Farrugia

19    mentioned yesterday.

20         Dr. Jones has also mentioned the Sinf.  And the Sinf has

21    a public part and a private part.  The public part is open

22    for access.  The private part is encrypted.  In the keybag,

23    there is the account key, and various other identifiers, such

24    that with the account key -- thank you -- with the account

25    key, the private part of the Sinf can be unlocked to get the

1    content key.  And the content key is the yellow key that's

2    protecting the content.

3         So, again, as Mr. Farrugia testified, we have keys

4    protecting keys.  So once the account key is retrieved from

5    the keybag, it can be used to unlock, descramble, decrypt the

6    private part of the Sinf to get the content key.  The content

7    key is then used to decrypt the content, and the content can

8    then be played.

9    Q.   Thank you.  Going back to Mr. Farrugia's system diagram,

10   could you show us where the Sinf is found in that series of

11   transactions?

12   A.   Sure.  It's found in No. 2, which is the -- labeled the

13   strong protection.  The Sinf is sent along with the account

14   key and the URL to the user device.

15   Q.   And does the Sinf contain any information other than the

16   content key?

17   A.   Oh, yes, it does.  If we put up a figure from one of the

18   Apple product documents --

19        MS. FUKUDA:  Your Honor, we will request that the

20   courtroom be sealed for showing this highly-confidential

21   figure from Apple's technical documents.

22        THE COURT:  Is there objection?

23        MR. CALDWELL:  No objection, Your Honor.

24        THE COURT:  Counsel, is it for this -- do you have

25   any anticipation as to the length of the necessary sealing?

1          MS. FUKUDA:  There is this one upcoming slide, and

2  then there are four others a little bit later, and that's the

3  extent of the sealing.

4          THE COURT:  All right.  Then when you've gotten

5  through that material, please advise me so that we can unseal

6  the courtroom then.

7          MS. FUKUDA:   Thank you, Your Honor.

8          THE COURT:  At counsel's request and without

9  objection, the Court will order the courtroom sealed.

10         If you're present and not subject to the existing

11  protective order in this case, you should excuse yourselves

12  from the courtroom and remain outside until the courtroom is

13  unsealed.

14         (Courtroom sealed.)

15         (This portion of the transcript is Sealed and filed

16         as Sealed Portion No. 4 under separate cover.)

17         (Courtroom unsealed.)

18         THE COURT:  All right.  Let's proceed.

19  Q.   (By Ms. Fukuda) Dr. Ligler, looking at Slide 27 here --

20  A.   Uh-huh.

21  Q.   -- have you addressed all of the use rules that

22  Dr. Jones had identified?

23  A.   I believe so, yes.

24  Q.   And what is your conclusion?

25  A.   Well -- okay.  On Claim 26 of the '772 patent, I've

1  highlighted two claim elements, each of which recite use

2  rules.  And Dr. Jones, in my view, not having identified the

3  use rules of the claim, I have drawn the conclusion that

4  these two claim elements are not in the accused products.

5  Q.    Do you have any other opinions as to whether Dr. Jones'

6  use rules are applicable to these claims?

7  A.    Well, yes.  With regard to Claim 32, the -- I've

8  highlighted the two elements that the -- whoops --

9  Q.    Sorry.

10  A.    With regard to Claim 32, the other asserted claim with

11  use rules, I've done a similar thing to what I did for Claim

12  36, and the final two elements, I find are not -- have not

13  been shown to be in the accused products.

14  Q.    And what is your other opinion?

15  A.    Well, for the modality of iOS parental controls, for

16  that functionality within the accused products, an additional

17  reason to what I've already said that the claimed use rules

18  have not been shown to be in the Apple products is that the

19  claims require steps in an order.

20      The user makes a selection of content and then reads --

21  the device reads the use rules and use status data pertaining

22  to that -- that selected content item, and then the device

23  evaluates whether access should be permitted for the

24  requested content item.

25      And as I discussed earlier, though, the parental control

1   or the restrictions settings are a little different than the

2   earlier chart, you can't select content that's been

3   restricted.

4   Q.   And which asserted claims does this opinion relate to?

5   A.   Well, again, Claims 26 and 32.  Here, I've asked for

6   the -- just focused on the flow of -- of selection and

7   evaluation of use rules to see whether access is permitted.

8        And so these are additional reasons to those I've

9   already presented, that Claims 26 and 32 of the '772 patent

10  have not been shown to be in the accused products.

11  Q.   Dr. Ligler, I apologize.  Let's go back to Figure 6 of

12  the patent.

13       MS. FUKUDA:  Could we pull that up again?

14  Q.   (By Ms. Fukuda) And, again, I asked you earlier

15  regarding those elements on the bottom.  And in particular,

16  there's an Item 134?

17  A.   Oh, yes.

18       MS. FUKUDA:  Let's go to the respective description

19  in the specification.  I understand that it should be

20  Column 15.  Scroll down to about Line 38.

21       There we go.  Lines 38 to 47.  Thank you.

22  Q.   (By Ms. Fukuda) How does the patent describe Figure 6 in

23  the context of content and access rules?

24  A.   Well, the patent describes that it is the CRM and

25  payment distribution code 134a, which is found in Figure 6 in

1   processor 134, that both downloads the data item and provides

2   the content use rules.

3        So that one processor performs both of the functions

4   discussed in the asserted claims in terms of what the data

5   supplier does.

6   Q.   Would you just read through that first -- I believe

7   that's just one sentence.  Could you read that and show us

8   where it talks about how content use rules and the content

9   relate to each other?

10  A.   Okay.  Again, this paragraph is talking about the

11  software within one of the four processors depicted across

12  the bottom row of Figure 6.

13       And in Line 40, one of the functions of the code 134a is

14  indicated to download a data item from the content provider

15  system to a content access terminal.

16       And then right after that, the patent indicates that it

17  is the software 134a that also provides the content use rules

18  with the data item.

19  Q.   And when Dr. Jones was asked about Figure 6, did he

20  identify this passage to the jury?

21  A.   This passage was not discussed.

22            MS. FUKUDA:  Switch back to the slides.

23            Thank you.

24  Q.   (By Ms. Fukuda) Dr. Ligler, what is the final topic that

25  you'll be addressing today?

1    A.    Well, for apps and purchase content, an additional

2    reason to those I've articulated already for the asserted

3    claims not being found -- or several of the asserted claims

4    not being found within the -- within the accused modalities

5    of apps and purchase content, is that the use status data

6    that has been identified by Smartflash and Dr. Jones is -- is

7    not the use status data of the claims.

8    Q.    And which claims recite use status data?

9    A.    Claims 26 and 32 of the '772 patent, the same claims

10   that we've just discussed with regard to use rules.

11   Q.    Looking at Claim 26 of the '772 patent, what has Dr.

12   Jones identified as the claimed use status data?

13   A.    Well, information in the Sinf, Dr. Jones drew some

14   charts about the Sinf and showed several fields -- several of

15   the fields that are within the Sinf, or security information,

16   and identified those as use status data and then the content

17   rating for a particular piece of content.

18   Q.    And do you have an opinion as to whether these elements

19   are the claimed use status data?

20   A.    Yes, I do.  They're not.  If we go to a -- the next

21   chart, I'll articulate more about why.

22   Q.    Would you be able to do that without the next chart, Dr.

23   Ligler?

24   A.    I sure would.

25   Q.    Okay.  Go ahead.

```
 1  A.    The information identified in -- in the Sinf really does
 2  not pertain to use status.  It's a question of what is data
 3  that pertains to use status.
 4       The content rating, as testified to by Mr. Mirrashidi
 5  yesterday -- and I -- I certainly have the same view --
 6  doesn't tell -- doesn't tell you anything about whether the
 7  product has ever been used or that content has ever been
 8  viewed or whether it's going to be viewed, and, therefore,
 9  it's not the claim use status data.
10  Q.    And what about content rating?
11  A.    I just discussed content rating.
12  Q.    My apologies.
13       What does this mean for Claim 26 of the '772 patent?
14  A.    Well, I've highlighted one of the two elements that I
15  highlighted earlier in Claim 26 because it is the element
16  that talks about evaluating use status data and use rules to
17  determine whether access is permitted.
18       Again, it's very important, when looking at the claim
19  elements, to look at all the words of -- of the element.
20  It's not just that it is use status data; it also needs to be
21  evaluated, that data, along with use rules to determine
22  whether access is permitted.
23       So all of those conditions must be met for data to be
24  the claimed use status data.
25  Q.    And what is your conclusion with respect to Claim 26?
```

1   A.   Well, that here is an additional reason for apps and

2   purchase content, that Dr. Jones and -- and Smartflash have

3   not shown infringement of this claim by the accused products

4   with regard to apps and purchase content.

5   Q.   And what is your opinion regarding Claim 32 of the '772

6   patent?

7   A.   Very similar.  The final claim element of Claim 32 --

8   well, the final claim element of Claim 30, I guess, also has

9   the same recitations about evaluating use status data to

10  determine whether access is permitted.

11       Therefore, for Claim 32 as well, there's an additional

12  reason to the reason I already gave that had to do with use

13  rules, that the accused products don't use the claim.

14  Q.   And, Dr. Ligler, have we covered all three topics you'll

15  be testifying?

16  A.   Yes, I have.

17  Q.   Can you summarize for the jury your conclusions?

18  A.   Sure.

19       I've highlighted here the particular claim elements of

20  the four asserted claims, which I have not found within the

21  accused products to be -- to have been shown to be there by

22  Dr. Jones.

23       And, again, they have to do with access rules, use

24  rules, and for apps and purchase content, use status data.

25  Q.   Finally, Dr. Ligler, are you aware of any additional

1    reasons why Dr. Jones has failed to show infringement of the

2    asserted claims?

3    A.   Well, my understanding is that Mr. Wechselberger will be

4    talking about additional reasons later today.

5    Q.   Thank you, Dr. Ligler.

6                MS. FUKUDA:  We pass the witness.

7                THE COURT:  Thank you.

8                Cross-examination by the Plaintiff.

9                MR. CALDWELL:  Thank you, Your Honor.

10               May I approach the witness with binders?

11               THE COURT:  You may.

12               MR. CALDWELL:  Thank you.

13               THE WITNESS:  Good morning.

14                          CROSS-EXAMINATION

15   BY MR. CALDWELL:

16   Q.   Good morning, Dr. Ligler.

17   A.   Good morning.

18   Q.   It's good to see you again.  I met you at your

19   deposition, correct?

20   A.   Yes.  It's good to see you, too.

21   Q.   And just so there's no confusion of this, you don't

22   endorse any of the opinions of Dr. Wechselberger, correct?

23   A.   I don't know precisely what they are, so the answer

24   would be:  Correct, yes, sir.

25   Q.   Now, you explained earlier that fact witnesses talk

1    about personal knowledge, and that's not what you're here to

2    do, correct?

3    A.    Correct, sir.

4    Q.    You're a compensated expert witness?

5    A.    I am.

6    Q.    What is your hourly rate, sir?

7    A.    My hourly rate for this type of work is $600 an hour.

8    Q.    Dr. Ligler, what are the different sets of use status

9    data and use rules that Dr. Jones pointed to for the '772?

10   A.    Well, I had them on some charts.  They are values that

11   are found in the keybag.  I enumerated them.  We could put

12   the charts back up.

13   Q.    Well, I want to know if you remember what they are, the

14   different sets of use status data and use rules that Dr.

15   Jones pointed to.

16   A.    Well, with regard to use rules, the keybag and the

17   rental keybag, rental duration, playback duration, the

18   account key.  I might have missed one or two, but that's most

19   of them.

20   Q.    Every one of those things you just said in use of an

21   Apple device is read, correct?

22   A.    Read by code within the device, sir?

23   Q.    Yes, sir.

24   A.    Yes.

25   Q.    And every one of those things you just pointed to is

```
 1   evaluated; isn't that correct, sir?
 2   A.   Evaluated in one way or another, yes.
 3   Q.   In the case of the '720 and the '221 patent, what is the
 4   access rule that Dr. Jones points to?
 5   A.   He pointed to, I believe, five fields.  Again, they
 6   were -- let's see, "rentalDuration," "playbackStartTime,"
 7   "rentalStartTime," play -- play -- "playbackStartTime," and
 8   "Account Key."
 9   Q.   And every one of those is read and evaluated, correct?
10   A.   Read, yes.  Evaluated in some way, yes.
11   Q.   Looking at some of the points that you made -- well, I'm
12   going to go through your points in just a minute.  Let me --
13   let me go somewhere else first.  I'm sorry.
14        Do you believe patents are important, Dr. Ligler?
15   A.   Yes, sir, I do.
16   Q.   And why is that?
17   A.   Because they permit an inventor to disclose what the
18   inventor has invented; and presuming that the claims are
19   granted by the United States Patent Office, to exclude others
20   from practicing the claims for a specific period of time.
21        There's a trade involved.  The user gets a monopoly,
22   effectively an ability to exclude within the United States
23   for a United States patent.  But the tradeoff is that the
24   details of the invention are presented to the public; and at
25   the end of the pendency of the term of the patent, anyone can
```

1   use them.  And there's full disclosure of what the invention

2   is.

3   Q.   So, for example, the formula for Coke, Coca-Cola, that's

4   not in a patent, correct?

5   A.   I don't think it is, but I don't know for sure.

6   Q.   Well, nobody's been able -- nobody besides Coca-Cola has

7   been able to use that formula, correct?

8   A.   That's my understanding.

9   Q.   And that is because they chose to keep it as a trade

10   secret as opposed to publishing it, putting it in a patent

11   where other people can learn, fair?

12   A.   Fair.

13   Q.   Now, you agree that what Mr. Racz and his co-inventor

14   did is they took their invention and they put it down in

15   patent applications filed in 1999 and 2000, correct?

16   A.   Yes, sir.

17   Q.   And the disclosures they put in their patent haven't

18   changed since then, have they?

19   A.   No, they haven't.

20   Q.   The United States Patent and Trademark Office -- in

21   exchange for Mr. Racz and Mr. Hulst putting that in a patent

22   application and advancing the state of the art, the United

23   States Patent and Trademark Office has granted them property

24   rights, correct?

25   A.   Correct, sir.

1   Q.    How many claims need to be infringed for there to be

2   patent infringement?

3   A.    One, sir.

4   Q.    Just one claim for each patent, correct?

5   A.    Yes, sir.

6   Q.    What are the asserted claims in this case?

7   A.    Well, there are four asserted claims.

8   Q.    Okay.

9   A.    One from the '720 patent.

10   Q.    Which one from the '720 patent?

11   A.    Claim 13, sir.

12   Q.    Okay.

13   A.    And then a claim from the '221 patent, and then two

14   claims from the '772 patent.

15   Q.    Which claim from the '221?

16   A.    I believe it's 32, sir.

17   Q.    And which claims from the '772?

18   A.    I believe it's 26 and 32, sir.

19   Q.    And if the jury finds that any one claim is infringed,

20   there's patent infringement in this case, correct?

21   A.    That is correct, sir.

22   Q.    Do you understand that in exchange for Mr. Racz and Mr.

23   Hulst taking their invention and disclosing it, they only

24   have a limited time to enforce their patents?

25   A.    That's true, sir.

```
 1    Q.    And that time is calculated from when they put all that

 2    subject matter in patent applications about 15 years ago,

 3    correct?

 4    A.    Yes.

 5    Q.    And that information they submitted 15 years ago is the

 6    support for the claims that we have in this case, correct?

 7    A.    Yes, sir.

 8    Q.    Did you hear Dr. Jones explain that patents are written

 9    for a person of ordinary skill in the art?

10    A.    I read his testimony, yes, sir.

11    Q.    Were you here when he testified?

12    A.    Not for the first hour.

13    Q.    Dr. Ligler, do you agree that patents are written for a

14    person of ordinary skill in the art?

15    A.    Yes, sir, I do.

16    Q.    You figure Apple has some persons of ordinary skill in

17    the art that pertains to these patents?

18    A.    Yes, sir.

19    Q.    How many would you guess?

20    A.    I'd be speculating.  Quite a few, I would assume.

21    Q.    Probably thousands?

22    A.    With regard to this particular field of art, possibly.

23    That's a little higher than I would put the number.

24    Q.    Sir, when you prepared your report, did you do any

25    network captures?
```

1  A.    No, I didn't.

2  Q.    You didn't use Wireshark or Fiddler, those programs that

3  Dr. Jones described?

4  A.    No, sir, I did not.

5  Q.    And if we review your materials considered, did you look

6  at Dr. Jones's network captures?

7  A.    Specifically, no.

8  Q.    Early on in your presentation, you showed us a slide

9  with just sort of two things on it, and -- and one related to

10  access rules or use rules, and the other related to payment,

11  correct?

12  A.    Related to what, sir?  I'm sorry?

13  Q.    Payment?

14  A.    Yes, yes.

15  Q.    And what you were saying was you were not going to

16  testify about payment -- the payment data parts, correct?

17  A.    That's correct, sir.

18  Q.    But you looked at some of the code for payment data in

19  your preparation, right?

20  A.    That's true, sir.

21  Q.    And you will not be offering any opinion that the

22  payment data, payment validation system, or payment

23  validation data elements are not met, correct?

24  A.    I'm not offering any opinions of that nature, correct,

25  sir.

1   Q.   There may not be an ideal spot, but can you at least

2   kind of see the chart, Dr. Ligler?

3   A.   I'll do my best.

4              MR. CALDWELL:  Your Honor, may I use the -- the

5   chart throughout the presentation?

6              THE COURT:  You may.

7              MR. CALDWELL:  Thank you.

8   Q.   (By Mr. Caldwell)  All right.  Dr. Ligler, you agreed

9   with me that you did review some of the -- the payment code,

10  correct?

11  A.   Yes.

12  Q.   Were you asked to form an opinion as to whether the

13  payment data elements were met?

14  A.   No, sir, I was not.

15  Q.   And you haven't reached a conclusion one way or another

16  whether the payment elements are met in the claims, correct?

17  A.   That is correct, sir.

18  Q.   Now, with regard to your expert report, who wrote it?

19  A.   I wrote -- personally typed, if you will, about 80

20  percent of it, as I recall.  The remainder, a draft, was

21  supplied of particular subsections, which I edited heavily,

22  but I didn't create the original draft.

23  Q.   And, sir, I don't know if you can see it.  What I've

24  written is:  Report mostly written by witness.  And I'll put

25  a check there.

1    Even though you wrote your report, you will agree with

2    me that you did not initially come up with most of your --

3    the opinions that are in your report, correct?

4    A.    No, I wouldn't agree with that.  Some of the opinions I

5    did not initially -- some of what became my opinions or the

6    positions that became my opinions were initially put forward

7    for my consideration by others.  The majority of the opinions

8    I formed myself without someone else having made the first

9    suggestion.

10   Q.    Were you here during the testimony of Mr. Mirrashidi

11   yesterday?

12   A.    Yes, sir, I was.

13   Q.    Did you hear him describe that the truth is in the code?

14   A.    Sure did.

15   Q.    Do you agree with that?

16   A.    I sure do.

17   Q.    Why do you agree with that?

18   A.    The reason I agree with that is because I've got 39

19   years of experience in -- in computer systems.  And while

20   documentation for products is generally accurate and

21   engineers' recollections about products are even more

22   generally accurate, I found through experience that to know

23   really what the product does, one needs to -- one needs to

24   look at the code.

25        One example that I testified about in my deposition was

1   that -- was dealing with a very good design engineer, and he

2   honestly thought that something was in the product.  When we

3   checked the code, it wasn't.

4   Q.    It happens, correct?

5   A.    It happens, yes.

6   Q.    And you would have had access to Apple's engineers if

7   you had wanted to talk to them, correct?

8   A.    Yes, sir, that's correct.

9   Q.    But you didn't talk to Apple's engineers --

10  A.    No, I didn't.

11  Q.    -- in preparing your report?

12  A.    I'm sorry.  No, I didn't.

13  Q.    Okay.  And one of the reasons is because you thought you

14  could go back and verify things in the code, correct?

15  A.    That was one of the reasons, yes, sir.

16  Q.    Nevertheless, you only looked at some of the code cited

17  by Dr. Jones, correct?

18  A.    That's correct.

19  Q.    Either way, it's true, isn't it, that you would not want

20  to give an infringement report or non-infringement report

21  without looking at the code that pertains to the issues?

22  A.    That is correct, sir.

23  Q.    And one of the reasons is source code provides at least

24  the same, if not a higher level of detail than verbal

25  testimony of engineers, correct?

```
 1   A.    Correct, sir.

 2   Q.    Would you agree that it was the attorneys on the

 3   Smartflash side that took the depositions of Apple's

 4   engineers in this case?

 5   A.    The ones I read, yes, sir.

 6   Q.    And so it was Smartflash's attorneys, in view of what

 7   they had seen in the code or the technical documents, that

 8   got to decide what they would ask of the engineers, fair?

 9   A.    Fair.

10   Q.    Did you ever put out any questions that you wanted

11   answered that should be answered by the engineers at Apple?

12   A.    Yes.

13   Q.    Were your questions asked of Apple's engineers in

14   depositions?

15   A.    No.

16   Q.    Prior to putting out the non-infringement reports in

17   this case, you never spoke to Dr. Wechselberger that we'll

18   hear -- or Mr. Wechselberger that we'll hear from later,

19   correct?

20   A.    That is correct, sir.

21   Q.    And you never -- you weren't Skyping with him or

22   emailing with him or anything like that, correct?

23   A.    That is correct, sir.

24   Q.    You never spent any time whatsoever explaining technical

25   documents to him or the operation of a code to him, correct?
```

1    A.    Correct.

2    Q.    When you were picking testimony to review, even leading

3    up to the time of your deposition, you had not read the

4    deposition of Dr. Jones where he explained and answered

5    questions that were posed to him about his infringement

6    analysis, right?

7    A.    That's correct, sir.

8    Q.    By the time you gave your report, how many items of

9    content was it that you'd bought of the pertinent types of

10   content on the accused products?  Was it three or four?

11   A.    Yes.

12   Q.    What kind of content -- what kind of things was it that

13   you bought in the three or four items that you bought before

14   putting out your non-infringement report?

15   A.    Oh, there was a movie, there was a -- I believe a TV

16   show, there was an in-app purchase, and I think an app.

17   Q.    Did you ever buy any music as part of that testing?

18   A.    Might have.  Might have.  I don't recall specifically.

19   Q.    Did you ever get around to buying a whole album?

20   A.    No, sir.

21   Q.    Is the operation of FairPlay important to your opinions

22   in this case?

23   A.    Yes.

24   Q.    Nevertheless, when I took your deposition, you had what

25   you characterized as a general understanding of what FairPlay

1   does?

2   A.    That's correct.

3   Q.    And you based that on the deposition testimony of

4   Mr. Augustin Farrugia, correct?

5   A.    Largely.  I'd also looked at some of the code.

6   Q.    Before you put out a report saying Apple doesn't

7   infringe, I think you said you'd spent half a day to a day

8   studying FairPlay; is that right?

9   A.    That sounds about right.  I believe I testified I spent

10  a couple of days with the code.  A portion of that would have

11  been looking at FairPlay, yes.

12  Q.    Well, my -- my specific question was, how much time did

13  you spend developing your understanding of FairPlay, and I

14  believe you testified it was half a day to a day, correct?

15  A.    Sure.

16  Q.    At a high level, what is claimed in Claim 26 of the

17  '772 -- just at a very high level?

18  A.    A handheld multi-media terminal.

19  Q.    And what's claimed in Claim 32?

20  A.    A data access terminal.

21  Q.    And in those claimed handheld multi-media terminals and

22  data access terminals, you -- you have a terminal that can

23  download content and rules, correct?

24  A.    Yes.

25  Q.    And it can play content, correct?

1    A.    Yes.

2    Q.    Do you have an understanding from reading the patent how

3    those would operate?

4    A.    I believe so, yes.

5    Q.    Okay.  They're described in the patent, correct?

6    A.    I obtained an understanding sufficient for what I was

7    asked to look at from the patent, yes.

8    Q.    You're not here telling the jury they're not described

9    in the patent, are you?

10   A.    I've given no such opinion.

11   Q.    We talked a little bit about use rules and use rule

12   data.  You believe in your analysis that use rules and use

13   rule data, those terms are synonymous, correct?

14   A.    In my analysis -- I believe that Dr. Jones in his

15   analysis equated those two terms.  As I testified at my

16   deposition, I do not believe that use rules and use rule data

17   are the same thing.

18   Q.    So you testified in your deposition that your analysis

19   was done under the assumption that the terms were synonymous,

20   correct?

21   A.    Under -- using the same assumption, as did Dr. Jones,

22   that they were synonymous, correct.

23   Q.    Dr. Ligler, your analysis was done under the assumption

24   that use rules and use rule data were synonymous, correct?

25   A.    Correct.

```
 1   Q.    And use rule data can be values in a table, can't it?

 2   A.    Use rule data can be valued in a table, yes.

 3   Q.    When you went through your example earlier, do you

 4   recall talking about the 30-days number?

 5   A.    Yes, I do.

 6             MR. CALDWELL:  Mr. Mortensen, do we have Dr.

 7   Ligler's slides?  Would you mind putting up the slide that is

 8   DD5.16?

 9             Apple's in-house attorneys -- I'm not sure what's

10   going on.

11             Are you wanting to seal the courtroom?

12             THE COURT:  Approach the bench, Counsel.

13             (Bench conference.)

14             THE COURT:  You want to use a slide that Ms. Fukuda

15   used on direct; is that right?

16             MR. CALDWELL:  Yes, Your Honor.

17             THE COURT:  Was it used during the time the

18   courtroom was sealed?

19             MR. CALDWELL:  I -- probably so.  I honestly don't

20   know.

21             MS. FUKUDA:  Is this the slide you wanted to show?

22             MR. CALDWELL:  This is the one I wanted to show.

23             MS. FUKUDA:  You don't need to seal for this slide.

24             MR. CALDWELL:  I wasn't thinking --

25             THE COURT:  Tell them to pull it up.  Tell your
```

1    people to pull it up, Ms. Fukuda.

2              MS. FUKUDA:   Okay.

3              (Bench conference concluded.)

4    Q.   (By Mr. Caldwell)  Do you recall using this slide on

5    your direct, sir?

6    A.   Yes.

7    Q.   And I think what you're saying is the patents require

8    what's on the left and Apple does what's on the right, at a

9    general level; is that about right?

10   A.   That's about right.

11   Q.   Okay.  What computer language is the box on the left?

12   User has only 30-days to access the content.  What computer

13   language is that written in?

14   A.   It could -- it's not written as recited in the patent in

15   any particular language.  It could be written in any one of a

16   number of programming languages.

17   Q.   Well, what I'm asking is, those words, even if we use

18   the exact example you showed the jury --

19   A.   Uh-huh.

20   Q.   -- user has only 30 days to access the content, are you

21   aware of any computer languages that could read that?

22   A.   Just like that?

23   Q.   Yes, sir.

24   A.   Unless it's in the syntax of a programming language for

25   which a compiler was -- was programmed, the answer would be

1  no.

2  Q.   I'm asking about your opinion, Dr. Ligler?

3  A.   Sure.

4  Q.   Are you aware of any computer language that that would

5  apply to, that language that's in your box right there on

6  your slide?

7  A.   No.  I'm aware of a number of programming languages in

8  which that rule could be expressed.

9  Q.   Dr. Ligler --

10            MR. CALDWELL:   Thank you very much.  I appreciate

11  it.

12  Q.   (By Mr. Caldwell)  Dr. Ligler, I believe you said in

13  your direct, you -- you gave an analogy of like a rule that

14  your mom might tell you about your bedtime or something along

15  those lines?

16  A.   I certainly had those, yes.

17  Q.   But then right after that, didn't you testify that what

18  you need to look at is what a number in a computer

19  represents?

20  A.   I did testify that one needs to look at what a number in

21  a computer represents, yes.

22  Q.   Dr. Ligler, what does the 30 represent in the context of

23  a movie rental?

24  A.   In the accused products, it represents the maximum

25  length of time of the rental when that number is accessed and

1    evaluated within the accused products.

2    Q.    When you rent a movie from the iTunes Store, you get

3    usage rights or usage rules, correct?

4    A.    The usage rules of the claim?  I just think I've

5    testified no.

6    Q.    Sir, when you rent a movie in the iTunes Store, you get

7    usage rights or usage rules, correct?

8    A.    You certainly get usage rights, and there are rules, but

9    I don't think they're the rules of the claim.

10   Q.    Apple refers to those usage rights you get

11   interchangeably with usage rules, doesn't it?

12   A.    I don't know.

13          MR. CALDWELL:  Go to the iTunes Store support page.

14   Q.    (By Mr. Caldwell) Dr. Ligler, this is a website off of

15   Apple's own support page.  And do you see there at the very

16   top, it just says:  iTunes Store, Rental Usage Rights --

17          MR. CALDWELL:  Even the big headline right under

18   that, Mr. Mortensen.

19   Q.    (By Mr. Caldwell) -- Movie Rental Usage Rights, and then

20   at the subheading below, Apple refers to those as the iTunes

21   Store Movie Rental Usage Rules.

22      Do you see that?

23   A.    Sure do.

24   Q.    You understand that rights and rules can be used

25   interchangeably, correct?

1  A.    Some people might use them interchangeably.  Within the

2  context of a patent claim, one needs to look at the entire

3  limitation, but yes.

4         MR. CALDWELL:   Thank you, Mr. Mortensen.

5  Q.    (By Mr. Caldwell) So if I understand your opinion

6  correctly, you're looking for the source code to say

7  something like, check to make sure current time is within the

8  window -- rental window?

9  A.    That would be an example.  That was not identified by

10 Dr. Jones.

11 Q.    Or you're looking for the code to say something like the

12 current time should be somewhere inside of the window, things

13 like that, correct?

14 A.    That would be another portion of what one would be

15 looking for; again, not identified by Dr. Jones.

16 Q.    Dr. Ligler, when we go through your report, I think we

17 find three code files that you mentioned in your report,

18 correct?

19 A.    I might have mentioned more, but today I showed, I

20 think, three, yes.

21 Q.    And, sir, Apple's counsel, the way we do things here in

22 the procedure, they -- they hand us a binder with the

23 exhibits that you're going to use, correct?

24        Is that your understanding?

25 A.    Yes.

```
1    Q.    And there's a big section -- well, I don't know --
2    56 pages that's your report, and then there's the resume in
3    part.  But there's -- this section right here is the source
4    code section that Apple included in your -- your binder for
5    court, right?
6    A.    I'll take your word for it, sure.
7    Q.    Well, you have a copy of the binder sitting up there.
8    Maybe to the left?
9    A.    Sorry.
10   Q.    Maybe the binder to your left there.  I'm not -- I'm not
11   sure.
12   A.    Yes.
13   Q.    You didn't cite anywhere near all the code that
14   Dr. Jones cited just on the reading use rules element and the
15   evaluating use rule element, did you?
16   A.    No, I didn't.  Didn't need to.
17   Q.    Remember how I asked you if you'd want to see in the
18   code something like, check to make sure current time is
19   within the rental window?
20   A.    Yes, I do.
21   Q.    Dr. Ligler, did you even look at the piece of code that
22   Dr. Jones tacked to the foam board for the evaluate rules
23   element?
24   A.    As I testified in my deposition, I looked at some code
25   with regard to rental duration, yes.
```

1    Q.   Dr. Ligler, did you even look at the piece of code that

2    Dr. Jones tacked to the foam board on the evaluate use rules

3    element?

4    A.   I probably did before my deposition.

5    Q.   Okay.   Which file was that?

6    A.   I'm -- I'm not sure.   If you show it to me, we can -- we

7    can take a look.

8    Q.   What files did you cite in your report, Dr. Ligler?

9    A.   In my report, I filed -- I -- I cited specifically

10   several header files, sir, that had to do with the definition

11   of program variance.

12   Q.   What is a .H file?

13   A.   It's a header file.   It provides definitions that are

14   used in the computer source code.   It defines variables and

15   data structures and -- and procedures.

16   Q.   What is a .C file?

17   A.   A .C file is a file that uses the definitions from the

18   header file and contains executable code.

19   Q.   That actually performs steps, correct?

20   A.   Yes.

21              MR. CALDWELL:   Can I have the document camera?

22              Mr. Ward, do you remember how to do this thing?

23              Your Honor, I'm going to show a piece of source

24   code.   I guess we have to seal the courtroom.

25              THE COURT:   All right.   What's your anticipated

1    length of time to cover anything that might be confidential?

2              MR. CALDWELL:  That's a very fair question.  I hope

3    just a couple of minutes.  Obviously, I don't know how

4    certain questions will be answered, but I hope it's just a

5    couple of minutes.

6              And then what I'll try to do after that, is maybe

7    just hold something up in a binder or -- or Redweld or

8    something so I don't have to --

9              THE COURT:  The last time I asked I was told

10   5 minutes and it was 20.  I'm just trying to get a realistic

11   idea.

12             MR. CALDWELL:  I sincerely hope it's a couple of

13   minutes.  I mean, I just don't know where I'll have the need

14   to impeach.

15             THE COURT:  All right.  Is there objection from the

16   Defendant?

17             MS. FUKUDA:  No objection.

18             THE COURT:  All right.

19             MR. CALDWELL:  Mr. Racz needs to leave.

20             THE COURT:  All right.  I'll order the courtroom

21   sealed.  Those of you present, not subject to the protective

22   order in this case should exit the courtroom at this time and

23   remain outside until you're invited to return.

24             (Courtroom sealed.)

25             (This portion of the transcript is Sealed and filed

1          as Sealed Portion No. 5 under separate cover.)

2          (Courtroom unsealed.)

3          MR. CALDWELL:  Your Honor, may counsel and I

4    approach while folks are getting situated?

5          THE COURT:  Approach the bench.

6          MR. CALDWELL:  Thank you.

7          (Bench conference.)

8          MR. CALDWELL:  In Dr. Jones' presentation, backing

9    up, we had a motion in limine that all we were going to talk

10   about about compensation for experts was basically their

11   hourly rate.

12          In Dr. Jones' presentation, when being

13   cross-examined, Ms. Fukuda went further and said something

14   like:  80 percent of your income comes from...

15          I don't really think that was -- that was

16   permitted.  But Part A, I would assume I can at least do the

17   same thing with -- with Dr. Ligler as to what she did with

18   Dr. Jones with that question.

19          And my second part is, it's also true that roughly

20   two-thirds of that comes from working for their firm.

21          MS. FUKUDA:  I'm sorry.  I didn't catch that

22   two-thirds.

23          MR. CALDWELL:  Of -- of his consulting work is

24   working for your firm.

25          And we had tried to agree on this issue by saying

1    that all we would do is talk about rates, and she just went

2    there on cross-examination of Dr. Jones.

3            MS. FUKUDA:  Your Honor, the motion in limine said

4    that we would not talk about total compensation for the case

5    or prior work that the expert did for either the party or the

6    law firm.

7            It does not exclude generally what percentage of

8    their work was for a particular category, like patent

9    litigation cases and so forth.  We don't have an objection to

10   him asking about what percentage of time Dr. Ligler spends on

11   patent litigation cases, but we will object if it touches

12   upon what he does for a party or the counsel in this case.

13           MR. CALDWELL:  I feel she just charged right

14   through that door, and we thought we should have approached

15   beforehand.  By getting into 80 percent of his income and not

16   to get --

17           THE COURT:  You can ask Dr. Ligler what percentage

18   of his income comes from consulting work like this.  I don't

19   recall Dr. Jones being asked how much of his income came from

20   your --

21           MR. CALDWELL:  He wasn't.

22           THE COURT:  -- firm or Smartflash, so we'll stop at

23   that point.

24           MS. FUKUDA:  Thank you, Your Honor.

25           (Bench conference concluded.)

1          THE COURT:  All right.  Let's proceed.

2          MR. CALDWELL:  Thank you, Your Honor.

3    Q.   (By Mr. Caldwell) Dr. Ligler, I'd like to talk to you

4    about your -- the statements you made about Akamai.

5    A.   Very good, sir.

6    Q.   Were you here during the testimony of Mr. Farrugia and

7    Mr. Mirrashidi yesterday?

8    A.   Yes, sir, I was.

9    Q.   Now, is the point of your Akamai argument that the rules

10   Dr. Jones points to are supplied by Apple, but the content is

11   supplied by someone else?

12   A.   In part, yes.

13   Q.   The -- is your point that the claim requires both the

14   rules and the content to come from the, quote, data supplier?

15   A.   That's one of them, yes, sir.

16   Q.   Now, which claims have that requirement?

17   A.   I believe the access rule claims, sir.  Claim 13 of the

18   '720 patent, sir, and Claim 32 of the '221 patent.

19   Q.   So that rule -- I'm sorry, excuse me, that argument

20   doesn't even apply to the '772 claims that are at issue in

21   this case, correct?

22   A.   Correct.

23   Q.   And that argument is premised on the basis that what Dr.

24   Jones points to as access rules come from Apple, but the

25   content does not, correct?

1    A.    That's one of the premises, yes, sir.

2    Q.    Now, Dr. Ligler, do you agree that Apple does supply the

3    content users receive?

4    A.    It supplies it to Akamai, yes.

5    Q.    Apple supplies that content to the user, correct?

6    A.    Akamai supplies the content to the user.  The content is

7    supplied to Akamai by Apple.

8    Q.    Do you agree with the statement that Apple supplies that

9    data to the user?

10   A.    In a sense, I do.  But the way the system works is that

11   Apple supplies the content to Akamai, and Akamai supplies the

12   content to the user.

13   Q.    All right.  Dr. Ligler, do you agree with the following

14   statement, and I'll quote:  Apple then takes the encrypted

15   file and supplies that data to the user via Akamai?

16   A.    Yes.

17   Q.    You told me earlier that you've not bought an album.

18   A.    That's right.

19   Q.    Can you get parental controls on an album, Dr. Ligler?

20   A.    I don't know.  I presume so.

21   Q.    If you buy an album that has 12 songs, one or two of

22   them are explicit, and they come with an explicit song tag,

23   is that a -- is that a possibility or would they all be

24   tagged the same way?

25   A.    I don't know.

1   Q.   And, Dr. Ligler, let's say you bought an album with

2   explicit lyrics on one or two songs, you didn't want your

3   kids to hear those, okay?  You with me so far?

4   A.   Yes.

5   Q.   And you turned on the parental controls.  Are you with

6   me so far?

7   A.   I am.

8   Q.   When you go and select that album --

9   A.   All right.

10  Q.   -- does your phone look to see what the controls are for

11  those songs that are part of that album?

12  A.   I don't know.

13  Q.   You didn't consider that, did you?

14  A.   No, I didn't.

15          THE COURT:  All right.  Ladies and Gentlemen, it's

16  10:00 o'clock.  We're going to take a short recess.  We'll

17  continue with cross-examination of the witness when we

18  return.  You may leave your juror notebooks in your chairs.

19       Don't discuss anything about the case, and we'll

20  have you back in here.  This is going to be approximately a

21  10- or 12-minute recess.  You're excused at this time.

22          COURT SECURITY OFFICER:  All rise for the jury.

23          (Jury out.)

24          THE COURT:  All right.  Be seated, please.

25          I want to make one thing clear, each party's

1    slides, once they have been shown, are available to the other

2    side on cross-examination.  And if there's an objection to

3    the use by one party of another party's slides, such as

4    whether it contains information that would require the Court

5    to be sealed, those objections are to be made by trial

6    counsel at the counsel table.  People behind the bar are not

7    going to interfere with the process or lodge objections.

8              Am I understood?

9              All right.  We stand in recess for 10 to 12

10   minutes.

11             MR. CALDWELL:  Your Honor, very quick question.  If

12   the witness is in the middle of cross-examination, is he off

13   limits for --

14             THE COURT:  His lawyers can talk to him, and your

15   co-counsel can talk to you.

16             MR. CALDWELL:  Thank you.

17             THE COURT:  We're in recess.

18             COURT SECURITY OFFICER:  All rise.

19             (Recess.)

20             (Jury out.)

21             COURT SECURITY OFFICER:  All rise.

22             THE COURT:  Be seated, please.

23             All right.  Before we bring the jury back in, this

24   morning before we begin today's portion of the trial, I met

25   with counsel in chambers and reviewed objections raised

overnight to various issues, most of which were disposed of

before coming into the courtroom this morning.

However, there was a lengthy group of slides to

which the parties had varying disputes and objections.

Counsel, this is the group referred to at the

bottom of Page 2 and the top of Page 3 of your email chain

from last evening.  It's also the group which is categorized

roughly as being Slides 141 and below, and Slides 159 and

higher.

It's the group you gave me that begins with the

earliest numbered slide being 82 and the latest -- or largest

numbered slide being 218.  I believe these are D 82 and 218.

For the record, having reviewed the same, they're

demonstrative in nature.  They're subject to

cross-examination.  And having weighed all the various

objections, I don't find that any of them should be

precluded.  So objections to all this group are denied.

All right.  Let's bring in the jury, please.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury in.)

THE COURT:  Please be seated.

You may continue, Mr. Caldwell.

MR. CALDWELL:  Thank you, Your Honor.

Q.   (By Mr. Caldwell) Dr. Ligler, there's a memory access

interface in all the accused devices, correct?

1    A.   Yes, sir.

2    Q.   And that pulls up the code that implements functions

3    like DRM, parental controls, and rentals, fair?

4    A.   I wouldn't say it that way, sir.

5    Q.   Well, the memory interface is an interface over which

6    all that information related to digital rights management,

7    parental controls, and rules in the phone is carried around

8    the device -- for example, from the memory to the processor,

9    correct?

10   A.   Yes.

11   Q.   Now, does Apple refer to mere numbers as rights or

12   rights data?

13   A.   I don't know.

14            MR. CALDWELL:   Your Honor, I'm going to ask the

15   witness about code, but I don't think I'm going to show it on

16   the screen.  He has it in his binder, and I think counsel has

17   it in -- in her binder, so I don't actually think I'll need

18   to seal for that.

19            THE COURT:   Then let's proceed.

20            MR. CALDWELL:   Thank you.

21   Q.   (By Mr. Caldwell) Now, Dr. Ligler, do you have the

22   cross-examination binder in front of you?

23   A.   Yes, sir, I do.

24   Q.   Will you flip to the code file at Tab 3?

25   A.   I'm there, sir.

1    Q.    What's the name of that file?

2    A.    DRMFileFormat.h.

3    Q.    Have you ever reviewed this file before?

4    A.    I don't believe so, no.

5    Q.    Sir, will you flip to the page of the code file that's

6    Page 14 of 20?

7    A.    I'm there, sir.

8    Q.    Do you see starting on Line 689, a long list of numbers

9    that Apple's code refers to as sent for Sinf rights data?

10   A.    Yes, sir, I do.

11   Q.    Was that in a file that Dr. Jones cited, but you did not

12   review?

13   A.    I don't know whether -- I don't recall whether Dr. Jones

14   recited it.  I did not review it.

15   Q.    Dr. Ligler, do you agree that about two-thirds of your

16   income comes from working on patent matters?

17   A.    No.  Working on intellectual property matters in their

18   entirety, yes.

19   Q.    Now, in your direct, you showed us something from the

20   patent.  It was towards the end.  You showed an -- an excerpt

21   out of the patent, and I believe the colloquy was that Dr.

22   Jones hadn't shown that.  Do you remember that?

23   A.    I remember saying that that passage had not been

24   discussed, yes.

25   Q.    Were you suggesting that he had hidden something from

1    the jury?

2    A.    No, sir.  I simply said it had not been discussed.

3    Q.    And was that text from the claims or the claim

4    construction that the jury has to evaluate?

5    A.    No.  It was from the specification, sir.

6    Q.    Am I correct that you don't dispute for a minute that

7    Dr. Jones is qualified to offer the technical infringement

8    opinions that he's offered in this case?

9    A.    He is qualified, as I testified at my deposition.

10            MR. CALDWELL:  I will pass the witness, Your Honor.

11            THE COURT:  Redirect?

12                    REDIRECT EXAMINATION

13   BY MS. FUKUDA:

14   Q.    Dr. Ligler, there was some testimony -- you were asked

15   questions about you didn't cite in your report all of the

16   code that was cited in Dr. Jones's report.  Do you remember

17   that?

18   A.    Yes, I do.

19   Q.    Why did you not cite all of the code that Dr. Jones had

20   cited in your report?

21   A.    Because I cited the code -- only the code that I needed

22   to rebut Dr. Jones's opinions.

23   Q.    And was the code that you had cited in your report

24   sufficient to form your opinions?

25   A.    Yes.

1   Q.   Do you remember a line of questions from Mr. Caldwell

2   about whether you had formed questions that you had wanted

3   answered from Apple's engineers?

4   A.   Yes.

5   Q.   Did you receive answers to those questions from the

6   Apple engineers?

7   A.   Indirectly, yes.

8   Q.   And did you rely on those -- those responses in forming

9   your opinions today?

10  A.   Yes.

11  Q.   Thank you.  Dr. Ligler, there was also a line of

12  questions about use rules and use rule data.  You recall

13  that?

14  A.   I do.

15  Q.   Is the term use rule data in any of the asserted claims?

16  A.   Yes.  Actually, it's in the final clause of Claim 32 of

17  the '221 patent, I believe.

18  Q.   How did -- when you had reviewed Dr. Jones's report,

19  what meaning did Dr. Jones attribute to the term use rule

20  data?

21  A.   Well, as I've testified, he treated it synonymously with

22  a use rule.

23  Q.   And did he further explain what meaning use rule data

24  ought to have?

25  A.   Those things that he identified as use rules, he also

1    identified as use rule data.  I believe in his deposition, he

2    indicated that a use rule was a rule or regulation of some

3    sort.

4    Q.    And in his deposition, what did Dr. Jones identify the

5    meaning of use rule data to be?

6    A.    In his deposition?

7    Q.    Yes.

8    A.    I'm not sure.  In his report, he identified it as

9    synonymous.

10   Q.    Okay.  And why did you apply Dr. Jones's meaning to use

11   rule data in forming your opinions?

12   A.    Because I was rebutting Dr. Jones's opinions.

13   Q.    Whose burden is it in a patent infringement case to show

14   infringement?

15   A.    The patent owner's.  In this case, Smartflash's.

16   Q.    And if the Defendants demonstrate that the patent owner

17   has not demonstrated infringement, then what happens?

18   A.    Well, then the patents are found not to be infringed.

19   Q.    Turning to Mr. Caldwell's chart over here, do you

20   remember -- do you remember these checkmarks that Mr.

21   Caldwell put up on the board?

22   A.    Yes, I do.

23   Q.    So there's a column under Dr. Ligler, and there's a

24   first row that says reviewed payment code.

25   A.    Yes.

1    Q.   Dr. Ligler, did you review all of the Apple code that

2    relates to Apple's payment process?

3    A.   No, ma'am, I did not.

4    Q.   Why did you not review all of the payment code?

5    A.   Because I had not been asked to look at the questions

6    of -- related to payment data and payment validation data.

7    That was not an area I was asked to look at and to form

8    opinions about.

9    Q.   Will someone else be offering opinions about that?

10   A.   My understanding is that Mr. Wechselberger will be doing

11   that.

12   Q.   Now, you testified that you did review some code related

13   to payment, earlier?

14   A.   Oh, yes.

15   Q.   And why -- in what context did you come across some of

16   that code?

17   A.   Well, when I begin to look at a code base, as very early

18   on in my analysis, I tend to look throughout the code base,

19   looking at samples of code to get the look and feel, if you

20   will, of -- of what the code is about.  And in doing that, I

21   go through various portions of the code that I might not need

22   to look at in detail later; but I'm, again, just trying to

23   get a feel for the code base.  That's my standard operating

24   practice.  And while doing that, I look through some of the

25   code that would be related to payment.

1    Q.    Did you review enough of the code related to payment to

2    form an opinion about the payment-related aspects of these

3    claims?

4    A.    No, ma'am, I did not.

5    Q.    So Mr. Caldwell's checkmark under Column 1, reviewed

6    payment code, that's not really true, is it?

7    A.    In the sense of reviewing it enough to form opinions,

8    it's not really true.

9    Q.    Thank you, Dr. Ligler.

10            MS. FUKUDA:  Pass the witness.

11            THE COURT:  Further cross-examination.

12            MR. CALDWELL:  Yes, Your Honor.

13                        RECROSS-EXAMINATION

14   BY MR. CALDWELL:

15   Q.    So, Dr. Ligler, who did review all the payment code

16   before putting out a report?

17   A.    I have no idea, sir.

18   Q.    Dr. Jones did, right?

19   A.    Oh, I'm sorry.  I thought you were talking about Apple's

20   experts.  Beg your pardon.

21   Q.    You agree Dr. Jones did, correct?

22   A.    He reviewed a good portion of payment code, yes.

23   Q.    Who on the Apple side reviewed that code?

24   A.    I don't know, sir.

25   Q.    Would you like me to take the check off by your name?

```
 1  A.   If the check implies that I reviewed it enough to form
 2  opinions about it, yes, please.
 3  Q.   Now, we were talking about code that you looked at.  You
 4  said you -- I think you said something like you reviewed all
 5  you felt you needed to review, something along those lines?
 6  A.   To rebut Dr. Jones's opinions, yes.
 7  Q.   And, Dr. Ligler, you had not reviewed or cited that Sinf
 8  rights code I showed you, correct?
 9  A.   That's right.
10  Q.   You had not reviewed or cited the rental.C code that we
11  put on the overhead, correct?
12  A.   That's correct.
13  Q.   Dr. Ligler, this is the code that's in your witness
14  exhibit binder, correct?
15  A.   In my binder, yes.
16  Q.   Dr. Ligler, do you dispute that this is the code Dr.
17  Jones cited for reading use rules and use status?
18  A.   I don't know, so --
19  Q.   Would you like to check it?
20  A.   If you'd like me to.
21          MR. CALDWELL:  May I approach the witness, Your
22  Honor?
23          THE COURT:  You may.
24  Q.   (By Mr. Caldwell)  Dr. Ligler, do you dispute that in
25  the first Redweld I gave you is the code Dr. Jones cited for
```

1  reading use rules and use status for '772, Claims 26 and 32?

2  A.   I find this code rather hard to read.  I'll take your

3  word for it, sir.

4  Q.   Do you dispute that in the second Redweld I gave you is

5  a code Dr. Jones reviewed and cited for evaluating use rules

6  and use status in the '772 claims?

7  A.   And when I say hard to read, I meant literally hard to

8  read.

9         THE COURT:  That -- that wasn't the question, Dr.

10  Ligler.  Limit your responses to the questions that are

11  asked.  Okay, sir?

12         THE WITNESS:  Yes, sir.

13  A.   Do I dispute this?  No.

14  Q.   (By Mr. Caldwell) And, Dr. Ligler, do you dispute that

15  the third Redweld is the code Dr. Jones cited for the access

16  rule element in '720, Claim 13, and '221, Claim 32?

17  A.   No, sir, I do not dispute it.

18  Q.   You were redirected on the issue of the definition of

19  use rule relative to use rule data.

20       Do you recall that?

21  A.   Yes.

22  Q.   And did you explain that Dr. Jones used those

23  synonymously?

24  A.   Yes.

25  Q.   And in your report, you used them synonymously, too,

1   correct?

2   A.   Adopting his assumption, correct.

3   Q.   And you had an opportunity in that report to challenge

4   and dispute that assumption, correct?

5   A.   Correct.

6   Q.   You applied them synonymously, right?

7   A.   Yes.

8            MR. CALDWELL:  I pass the witness, Your Honor.

9            THE COURT:  Further direct?

10                  REDIRECT EXAMINATION

11  BY MS. FUKUDA:

12  Q.   Dr. Ligler, for your opinions, when you applied use

13  rules and use rules data synonymously for your analysis, what

14  meaning did you apply to both of those terms?

15           MR. CALDWELL:  Your Honor, I object.  He's admitted

16  he's not applying them in his opinions, and it's outside his

17  report.

18           MS. FUKUDA:  I believe that was the same question

19  that Mr. Caldwell asked.

20           THE COURT:  I'll allow him to answer the question.

21  Q.   (By Ms. Fukuda) When you formed your opinions in your

22  report and you -- you applied Dr. Jones' synonymous meaning

23  for use rules and use rules data, what meaning did -- was --

24  did you apply for both of those terms?

25  A.   For both of them, they needed to be a rule or

1    regulation.

2              MS. FUKUDA:   May I have those three tabs?

3    Q.   (By Ms. Fukuda) Dr. Ligler, Mr. Caldwell waved around a

4    couple of times the three tabs, and he said that these were

5    what you had cited in your opinions in your report.

6         Do you recall that?

7    A.   I do.

8    Q.   Does this constitute all of the source code that you

9    have reviewed?

10   A.   By no means.

11   Q.   Why did you include this portion of the code that you

12   had reviewed?

13   A.   Because that portion contained the header files and data

14   definitions for things that Dr. Jones had identified as use

15   rules and access rules.

16   Q.   And was what you had cited here sufficient to form your

17   opinions of non-infringement --

18   A.   Yes.

19   Q.   -- with respect to those terms?

20   A.   Yes.

21   Q.   Thank you, Dr. Ligler.

22             THE COURT:   Further cross-examination?

23             MR. CALDWELL:   No, sir, Your Honor.

24             THE COURT:   All right.  You may step down,

25             Dr. Ligler.

```
 1              THE WITNESS:  Thank you, sir.

 2              THE COURT:  Defendants, call your next witness.

 3              MR. BATCHELDER:   Apple calls Dr. Anthony

 4  Wechselberger.

 5              THE COURT:  All right.

 6              MS. FUKUDA:  Your Honor, I apologize.  Could we

 7  have permission to release Dr. Ligler?

 8              THE COURT:  Is there objection from the Plaintiff?

 9              MR. CALDWELL:  No objection, Your Honor.

10              THE COURT:  All right.  You're released,

11              Dr. Ligler.

12              The new witness will come forward and be sworn by

13  the Courtroom Deputy.

14              (Witness sworn.)

15              THE COURT:  Please have a seat on the witness

16  stand.

17        ANTHONY WECHSELBERGER, DEFENDANT'S WITNESS, SWORN

18                      DIRECT EXAMINATION

19  BY MR. BATCHELDER:

20  Q.   Good morning, sir.

21  A.   Good morning.

22  Q.   Would you please introduce yourself to the jury?

23  A.   Good morning.  My name is Anthony Wechselberger.

24  Q.   And what do you do for a living, sir?

25  A.   I'm a technology consultant, and I provide system and
```

```
 1  engineering services to the industry, and I assist in

 2  legal -- the legal community as I'm doing today.

 3       Most of my work -- technical work revolves around

 4  systems and equipment that distributes multimedia

 5  information, and I've been doing this kind of work for about

 6  35 years.

 7  Q.   What do you do when you're not working?

 8  A.   Well, I'm married.  And between my wife and myself, we

 9  have 6 kids and 12 grandkids; and that keeps us pretty busy.

10       We live in Southern California.  We like the outdoors.

11  Nancy and I spend a lot of time in the deserts and mountains

12  out there.

13  Q.   Why are you here today, sir?

14  A.   I've been asked to provide opinions on the issues of

15  infringement; that is, whether or not the accused products

16  infringe the Smartflash patents.

17       I've also been asked to provide my opinions on the

18  validity of the asserted patent.

19  Q.   What did you study in school?

20  A.   I have a Bachelor of Science degree in electrical

21  engineering from the University of Arizona.  That's 1974.

22  I have a Master's degree in electrical engineering conferred

23  by the San Diego State University, 1979.

24       I'm also a graduate of the executive program for

25  scientists and engineers.  That's conferred from the
```

1  University of California at San Diego.  That was 1984.

2  Q.   And even outside of school, what work have you done

3  related to the technologies involved in this case?

4  A.   For virtually all of my professional career, I've been

5  involved in communications systems.  Through the decade of

6  the '80s and '90s, I was executive vice president and chief

7  technology officer at a couple of companies that produced

8  systems and equipment for television broadcasting

9  applications, cable TV, and satellite broadcasting

10  applications.

11      When I started my consulting company in 1999 and worked

12  for myself, I continued in that area and expanding into areas

13  of all kinds of multimedia distribution, including newer

14  technologies, such as those use in the Internet and wireless

15  spaces.

16  Q.   All right, sir.  And have you given talks and

17  presentations in this space, publications?

18  A.   Yes.  Many panel presentations.  I've authored magazine

19  articles, approximately 30 over the years.

20  Q.   Do you have any patents in this area?

21  A.   Yes.  I'm the named inventor on two patents, both of

22  which have to do with the control and management of

23  information and communications systems, mostly entertainment

24  types of information.

25  Q.   And what types of engineering work do you do?

1   A.   In the industry, I -- most of my clients are clients

2   that are involved in distributing content.  Those clients

3   would be rights owners or content owners, such as networks or

4   studios.

5       And those networks typically would tend to connect

6   content providers with content consumers, such as people or

7   industrial applications.

8       For example, for the past -- more than a decade, I've

9   been involved with the six Hollywood studios, the six

10  Hollywood studios.  I'm under contract to them currently,

11  still am, as their chief securities systems architect for

12  their digital cinema initiative.

13      And this is the transition from 35-millimeter film to

14  digital files for theatrical distribution.  In that capacity,

15  I'm responsible for their DRM or security infrastructure in

16  that system, and I represent them at the -- at the SMPTE,

17  Society of Motion Picture and Television Engineers, where I

18  am the -- I guess you could call it the chief evangelist for

19  global system specification for digital cinema.

20  Q.   And so by content, you're referring to stuff like

21  movies, music, that sort of thing?

22  A.   Yes.  Virtually any kind of information that can be

23  represented digitally:  Songs, books, movies, television

24  shows.

25  Q.   And what kind of legal consulting do you do?

1   A.   That falls into two buckets.

2        One bucket would be providing expert witness services,

3   such as I'm doing here today.

4        The other bucket has me come in as a technologist and

5   basically a teacher to help folks understand the technology

6   of a patent or whatever is at issue.

7   Q.   And have you served before as an expert witness in the

8   areas of content distribution and protection?

9   A.   Yes.  I've given oral testimony approximately a dozen

10  times in depositions or at trial.  And in terms of formal

11  submitted expert reports, about twice that many.

12            MR. BATCHELDER:  Your Honor, I'd like to offer

13  Mr. Wechselberger as an expert in the area of digital content

14  distribution and protection.

15            THE COURT:  Is there objection?

16            MR. CALDWELL:  No, Your Honor.

17            THE COURT:  Mr. Wechselberger will be acknowledged

18  by the Court as an expert in those fields.

19            Proceed.

20  Q.   (By Mr. Batchelder) Have you prepared slides explaining

21  your analysis and conclusions, sir?

22  A.   Yes, I have.

23  Q.   All right.  Can you summarize your opinions in this

24  case, please?

25  A.   Yes.

1    Q.   And what's your first opinion?

2    A.   My first opinion is that all of the asserted Smartflash

3    claims are not infringed by the accused Apple products.

4    Q.   And your next opinion?

5    A.   My next opinion is on the issue of validity, and I've

6    concluded that all of the asserted claims are invalid in

7    light of what's called prior art.

8    Q.   And your third opinion?

9    A.   Third opinion has to do with Patent No. '772, Claim 26,

10   where I've concluded that claim is invalid for lack of a

11   proper written description.

12   Q.   And in your understanding, sir, what are the differences

13   between a non-infringement analysis and an invalidity

14   analysis?

15   A.   Sure.  In an infringement analysis, the question of

16   infringement, the accused products have to be examined for

17   the way they operate and their features and compared against

18   the asserted claims.  If every one of the claim requirements

19   is not found in the accused product, there is no

20   infringement.

21   Q.   And what did you do to evaluate whether Apple's products

22   practice Smartflash's claims?

23   A.   I studied -- excuse me, I studied the accused products

24   and I learned how they work and all their features.  I did

25   this by reviewing documentation that was provided to me.

1        The deposition transcript -- transcripts of the Apple

2   witnesses was very helpful, including all the exhibits

3   associated with that.  Of course, I studied the claims and

4   the patents that were being asserted.  I took into account

5   the Court's claim construction rulings because that's

6   important to understand claim meaning.  And I also read the

7   expert report from Smartflash's expert.

8   Q.   That's Dr. Jones?

9   A.   Yes.

10  Q.   And did you review the testimony of any of the Apple

11  engineers who testified here:  Mr. Mirrashidi, Mr. Muller,

12  Mr. Farrugia?

13  A.   Yes, all of them.

14  Q.   Were you here in court when those Apple engineers

15  testified?

16  A.   Yes, I was.

17  Q.   They say anything that was inconsistent with your

18  understanding coming in?

19  A.   No, they did not.

20  Q.   What did you do to evaluate whether the asserted patent

21  claims are invalid?

22  A.   So there again, I, of course, examined the Smartflash

23  patents, the claims, and the Court's construction which help

24  us to understand the meaning and scope of the claims.

25       I reviewed what are -- what's called the prosecution

1    history of those files, Dr. Jones's expert report, and the

2    prior art, of course, which I'll be talking about today which

3    invalidates those patent -- those claims.

4    Q.   Are you being paid for your time spent working on this

5    matter?

6    A.   Yes.  My standard consulting rate currently is $325 an

7    hour, and that's what I'm charging here.

8    Q.   How did you approach preparing your expert report and

9    other materials in this case?

10   A.   My standard technique, which is the same one I applied

11   here, is to do my investigation.  And when it came time to

12   document my findings, I documented my report, my findings,

13   and I documented the basis of those findings.

14        And in terms of the rigors of putting together the

15   formal report, I solicited both my typewriter and the help of

16   the -- the lawyers -- the lawyers at Ropes & Gray to help

17   with the typing.

18   Q.   Why didn't you do all the typing yourself?

19   A.   The reports -- more than one that was submitted,

20   hundreds of pages in all.  I'm not the best or fastest

21   typer -- typist or the most accurate.  And the important

22   thing is that the opinions and the basis of those are mine,

23   and that's mine in the report.  I own that.

24   Q.   Earlier were you in the courtroom when Dr. Ligler

25   testified about non-infringement this morning?

1    A.    Yes, sir, I was.

2    Q.    And yesterday, too?

3    A.    Yes.

4    Q.    And how do your opinions compare to his?

5    A.    I am going to provide opinions on the same asserted

6    claims.  As you heard, he -- Dr. Ligler was focusing on the

7    access rules and use rules parameters in the claims.  I

8    looked at the same claims with respect to the requirements

9    for payment information.

10   Q.    All right.  Were -- were you in the courtroom when Dr.

11   Jones testified about these payment elements?

12   A.    Yes, sir, I was.

13   Q.    And do you agree with Dr. Jones?

14   A.    I do not agree with Dr. Jones.

15   Q.    All right.  Can you summarize for the jury your opinions

16   in that regard?

17   A.    I indicated I was going to make opinions about payment

18   information, and the two specific types of payment

19   information that are important are shown here.

20        In my opinion, Dr. Jones has not identified payment data

21   or payment validation data in the accused products in the way

22   that they are required in the claims under the Court's

23   construction.

24   Q.    All right.  Let's look at Slide 3.  Can you remind us

25   all what Dr. Jones identified as payment data?

1   A.    Sure.   In the upper left-hand corner of this slide are

2   the three identifiers that we've now seen several times, the

3   DSID, GUID -- I heard it called the GUID yesterday -- and a

4   machine ID.

5   Q.    And those all end in ID?

6   A.    Yes, sir.

7   Q.    That stands for?

8   A.    Identifier.

9   Q.    Okay.   And so Dr. Jones identified that as payment data,

10  those identifiers?

11  A.    Yes, he did.

12  Q.    And what has the Court told us that payment data must

13  be?

14  A.    On the right-hand side in blue is the Court's

15  construction.   The Court has instructed that payment data is

16  data that can be used to make payment for content.

17  Q.    And what's that red symbol you've got in the middle

18  there?

19  A.    That's an equal sign with a slash through it.   That's a

20  way of saying that what Dr. Jones says is payment data is not

21  payment data.

22  Q.    You were here to see Mr. Mirrashidi testify yesterday?

23  A.    Yes, sir, I was.

24  Q.    Can you remind us what Mr. Mirrashidi said about what

25  happens when a user buys content in iTunes?

1   A.   Sure.   In the next slide, I have a diagram of that.   And

2   this is a --

3   Q.   What does this reflect?

4   A.   This is a picture.   Shows the Apple terminal at the

5   lower bottom.   That's a user device.   And you see the circle

6   with information package.   That is called a buy request.   And

7   the parameters across the top is the information that was

8   within the information package when a buy request is

9   initiated by a consumer wishing to download content.

10   Q.   All right.   And which of these does Dr. Jones say are

11   payment data?

12   A.   So with a click --

13            THE WITNESS:   Thank you.

14   A.   -- I've drawn a red box around those three identifiers,

15   DSID, GUID, and MID, and that is what Dr. Jones is pointing

16   to among the parameters in that information package as

17   representing payment data.

18   Q.   (By Mr. Batchelder)   All right.   And, sir, are those

19   identifiers payment data?

20   A.   They are not.

21   Q.   What do they do?

22   A.   Next slide, please?

23   Q.   What -- what do they do, sir?

24   A.   They -- they -- they identify particular pieces of

25   information that transit between the user device -- the Apple

1   user device and the Apple servers.

2   Q.   All right.  Let's go to this next slide.  What do the

3   Smartflash claims require about payment data?

4   A.   So on the left part of this slide, I have a picture of

5   the Smartflash claim requirements; and as it says at the top

6   under the red words:   Payment data must be read from the user

7   device and sent to a payment validation system.  So the

8   Smartflash user device is shown down here at the bottom.

9        They call that a data access terminal or a -- with a

10  data carrier or also a data access device.  But that --

11  there's a Smartflash user terminal.  You see payment data

12  then coming from that terminal up to the payment validation

13  system as required by the claim.

14  Q.   All right.  And does that ever happen in Apple's

15  products?

16  A.   This does not -- Apple's products do not function this

17  way.  No, it does not happen.

18  Q.   And what happens -- what happens in Apple's products?

19  A.   I can show that on the right-hand side of this slide.

20  Q.   And what are you showing here, sir?

21  A.   We have the Apple user device in the bottom.  We see the

22  information package, which I identified in the previous slide

23  with the three identifiers in it, DSID, GUID, MID.  And that

24  information package then goes to the Apple server at the

25  beginning of a purchase request for content to be downloaded.

1    Q.    All right.   And then what happens next in Apple's

2    system?

3    A.    We see what happens as a result of that.   I've added the

4    animation that shows if there is a payment process to take

5    place, that information associated with the user's account up

6    at the Apple server then transits over to a financial

7    institution that can take charge of the financial process

8    that's associated when something has to be purchased.

9    Q.    Now, that credit card number that you've depicted at the

10   top on the Apple side, that is payment data?

11   A.    Yes, sir, that is payment data at that point.

12   Q.    Okay.   And where does that get stored?

13   A.    That is stored up here at the Apple server.   You see the

14   user account information there at the Apple server, so that's

15   where it exists.

16   Q.    All right.   Is there an advantage to storing that

17   payment data on the server, as opposed to storing it down

18   lower on the user's device?

19   A.    You bet.   Payment data, obviously, would be sensitive

20   information.   Consumers' financial information would be

21   sensitive.   And by putting that payment data up in the Apple

22   server area, it's been removed from the high-threat

23   environment associated with where the user owns and controls

24   their user device.

25        And so what you avoid in this design is sensitive

information, such as payment data, going back and forth

through the communications infrastructure.  It never happens.

And so the system is fundamentally more secure by

putting that up where the information is safe at the Apple

servers.

Q.    Now, let me ask you, sir, do you and Dr. Jones --

focusing on the information package down in the lower right

there, do you and Dr. Jones have any dispute about whether

those three IDs get sent to the Apple server?

A.    No dispute whatsoever.

Q.    Do Apple engineers say that happens?

A.    Yes, sir.

Q.    Dr. Jones says it happens?

A.    Yes.

Q.    Do you need to read source code to figure out whether

that happens?

A.    I do not.  I -- my review of the deposition testimony

and now the court testimony, there's no disagreement here at

all about whether or not those three parameters exist and

that they go from the Apple user device up to the Apple

server.

Q.    Okay.  And what does Dr. Jones say is the data carrier

in Apple's devices?

A.    Dr. Jones points to the memory inside the user device as

being the Smartflash data carrier.

1  Q.   And does payment data come from memory in the user

2  device on the Apple side?

3  A.   No, sir.  There's no payment data in the Apple user

4  device.

5  Q.   And why isn't the information sent from Apple's devices,

6  payment data?

7  A.   Well, as we can see, it's up at the Apple server where

8  it exists, but I also have an additional slide that helps us

9  visualize that.

10  Q.   Okay.  And what does this show?

11  A.   This shows two use cases for when a consumer would

12  attempt to download -- request and download content.

13       On the left is the use case where the Apple user would

14  be requesting content with no associated price.  And on the

15  right, a use case where the Apple consumer would be

16  requesting content that does have a price and --

17  Q.   And -- and how does what gets sent to the server from

18  the Apple's user device, how does that compare across those

19  two scenarios?

20  A.   Well, as you can see visually, on the left, the same

21  three identifier parameters are shown in the information

22  package as is on the right.

23  And this being two use cases, one for content with no price,

24  the other content with a price, virtually, identical

25  information is sent in both cases.

1   Q.    All right.  And so is that information package payment

2   data?

3   A.    I'm sorry.  I couldn't hear you.

4   Q.    Is that information package payment data, sir?

5   A.    Absolutely not.

6   Q.    Now, what was the second reason you disagreed with Dr.

7   Jones?

8   A.    Second reason --

9            THE WITNESS:  Thank you.

10  A.    -- is shown on the lower part of this slide.  He accuses

11  payment validation data requirement of the asserted claims as

12  being this collection of five parameters.

13  Q.    (By Mr. Batchelder) Can you just read them into the

14  record so we're clear?

15  A.    Yes.  The Sinf, the Pinf, dpInfo, download URL, and

16  download key.

17  Q.    All right.  And what did the Court tell us about payment

18  validation data and what it means?

19  A.    With the Court's construction order, he instructed us to

20  apply the plain meaning.

21  Q.    And what is that plain meaning in your understanding?

22  A.    Plain meaning in my understanding would be data that can

23  validate that payment has been made.

24  Q.    So why do you disagree with Dr. Jones about what he

25  accuses as payment validation data?

```
 1   A.    Because under that meaning, the plain meaning I just

 2   provided, none of these -- singularly or collectively, none

 3   of this information that comes down from the active server

 4   has anything to do with payment validation.

 5   Q.    All right.  What are you showing on this next Slide 8,

 6   sir?

 7   A.    So this slide takes us now to the second half of a

 8   download tran -- transaction.  Again, we have the Apple user

 9   device at the bottom and the Apple server in the middle, at

10   the top.  Same two use cases:  Content being requested with

11   no price; content being requested with a price.

12   And we see in the dotted bubbles on both sides the five

13   parameters that I just identified.  And this is essentially

14   the mirror image of the upload information that we just

15   looked at, but now we're looking at the information coming

16   back down from the Apple server, which, to meet the claim

17   requirements, has to be payment validation data.

18   None of the parameters shown for either use case is related

19   to payment, payment validation, or even, as you can see,

20   whether content is free or not.

21   Q.    And is -- is it the same information that comes down or

22   different?

23   A.    It's identical information under both use cases.

24   Q.    And to be clear, on the left side, when you talk about

25   Apple user requesting content with no price, has any payment
```

1   been made there?

2   A.   With no price, no payment.

3   Q.   And why is that important?

4   A.   It's important because Dr. Jones has pointed to these

5   five parameters and said that's payment validation data, and

6   it's illogical to -- to accept his opinion when we're dealing

7   with content that has no price.

8   Q.   All right.  Mr. Mirrashidi -- Mr. Mirrashidi explained

9   something about sessions within Apple's system, correct?

10   A.   Yes.

11   Q.   What does this slide show, sir?

12   A.   So it helps us to understand the notion of a session,

13   session being a period of time across which certain

14   transactions are allowed to take place.

15   Session has an opening and a closing, and it's represented

16   here as a -- as hours.  A session will automatically close

17   after 84 hours.

18   So we have here an open session that -- within which then

19   consumers can make content selections for download, and we

20   can -- this will be animated in a moment, and we can see some

21   things that happen.

22   Q.   Okay.  Should I click?

23   A.   Yes, please.

24   Q.   All right.  What have you done there?

25   A.   So we're at the opening -- or the beginning of the

1    session, and the consumer in this -- this picture has --

2    excuse me -- requested a download of the song Heartbreak

3    Hotel.  That song costs $1.29.

4    We see a line going up vertically and terminates in what's

5    called a buy request.  That's what they call the transaction

6    message that takes that information that goes up to the Apple

7    server.

8    And once that information in that dotted blue box has been

9    processed by the Apple server, a download response is

10   generated, and that contains those five other parameters that

11   we looked at.  In response, along comes the content down to

12   the consumer.  So this is a single song request, download

13   transaction.

14   Q.   All right.  And, sir, let me pause and just ask, the buy

15   request that goes up and the download response that goes

16   down, as you're indicating there, is there any dispute

17   between you and Dr. Jones about whether that happens?

18   A.   No.  It happens just -- just as I've shown.  And from

19   what I have read and understand about his opinion, we are in

20   agreement that far.

21   Q.   And the Apple engineers, what do they say about that?

22   A.   Their testimony is the basis of my opinions here.

23   That's what they say happens.

24   Q.   Okay, sir.  Everybody agrees on the facts?

25   A.   Yes, sir.

1   Q.   All right.  So should I click to see what happens next?

2   A.   Just a quick point to the cash register over here at the

3   $1.29 on the left, that started out at zero, and we've just

4   purchased a song, so that's now going to say $1.29.  And as

5   we continue with the purchase, we'll see that accumulate.

6   There's a series of purchases now happening.  I think the

7   total is eight or nine songs, some twice at the same time.

8   And we now see the cash register has a total of $10.41.

9   We also may have noticed that the session, red bar, came in

10  from 84 to about 60 hours.  And the reason that happened is

11  that the total went over $9.90, and the Apple session rules

12  or processes, if you will, have been established so that the

13  session closes when the accumulated cost goes over $9.90.

14  Q.   Okay.  So let's come back to that -- the first purple

15  circle on the left that has the apple with the music notation

16  in it.  When the user receives that content, has payment

17  happened?

18  A.   Not at all.

19  Q.   And there's a blue box over that called download

20  response, correct?

21  A.   Yes.

22  Q.   All right.  And that yellow arrow, you're indicating

23  what there?

24  A.   On both of those yellow arrows, accused of being payment

25  data, accused of being payment validation data, those are the

1    information packages that Dr. Jones is pointing to for those

2    claim requirements.

3    Q.    So for that first Apple song, is the information in that

4    blue box payment validation data?

5    A.    No.   There's been no payment whatsoever at this point.

6    Q.    And what about all the way at the end of the session?

7    Ultimately, there may be payment, correct?

8    A.    Ultimately, yes.   Nobody's saying that the Apple system

9    doesn't charge for content.   There will be payment.

10   Q.    And so what about the -- the next blue box after that?

11   Would that be payment validation data?

12   A.    The one after the red bar at the close?

13   Q.    Right.

14   A.    No, none of the down -- none of those download blue

15   responses are payment validation data.

16   Q.    How does the download response information to the far

17   right compare with the download response information to the

18   far left?

19   A.    The information is all identical.

20   Q.    And does any of it reflect that payment has been made?

21   A.    No, sir.   And the important -- an important takeaway

22   from the slide is that each of these download responses is

23   coming back down to the Apple user device in all situations,

24   but there's no information in that box related to payment

25   being made or payment being validated.

1    Q.   All right.  Sir, let's move to your next slide.  How

2    does all this relate to the claims?

3    A.   So this slide shows '720, Claim 13, and I've highlighted

4    and underlined those terms in the claim elements that require

5    payment data.  And if you'll click one, we can get a better

6    view of those.

7    Q.   Before I do that, sir, could I just ask you what those

8    gray Xs are?

9    A.   Sure.  Prior to my testimony today, we heard from Dr.

10   Ligler, and he provided testimony as to why certain claim

11   elements don't infringe the access rules or use rules

12   information.  And he earlier today checked off these two

13   claim elements as being non-infringed.

14   Q.   Okay.  So that's what those gray Xs are?

15   A.   Yes.

16   Q.   All right.  And then you focused on the ones that we've

17   just highlighted, the -- the ones that have payment data or

18   payment validation data?

19   A.   That's correct.  There are five claim elements with

20   payment data and payment validation data.

21   Q.   And what should we do as to those yellow elements?

22   A.   Well, as it says in the upper left portion of this

23   slide, the accused features are not payment data.  They are

24   not payment validation data.  So we should put a red X over

25   those five boxes next to the yellow highlighted elements.

1   Q.   Does Apple infringe this claim, sir?

2   A.   No, sir.

3   Q.   How many Xs would you need not to infringe?

4   A.   You only need one.

5   Q.   How many you got?

6   A.   I have five -- excuse me.  Dr. Ligler offers two more

7   for a total of seven reasons why this claim does not

8   infringe.

9   Q.   Now, let's take a look at the next one, '221 patent,

10   Claim 32.  How does all this relate to this claim?

11   A.   Similar situation here.  You see the X -- the gray X

12   from Dr. Ligler's earlier testimony, and I will highlight the

13   payment data and payment validation data elements.  And we

14   have four of them on this particular claim.  And for the same

15   reasons, these claim elements are not infringed.  They should

16   get red Xs, as well.

17   Q.   Like that?

18   A.   Yes, sir.

19   Q.   All right.  Should we move on to the next claim, sir?

20   A.   Uh-huh, yes.

21          THE COURT:  You need --

22   Q.   (By Mr. Batchelder)  What are we looking at here?

23          THE COURT:  -- you need to -- excuse me, you'll

24   need to answer verbally.

25          THE WITNESS:  Yes, Your Honor.

```
 1              THE COURT:  "Uh-huh" won't work.
 2              THE WITNESS:  Sorry.
 3              THE COURT:  All right.  Let's proceed.
 4   Q.   (By Mr. Batchelder)  What are we looking at here, sir,
 5   which claim?
 6   A.   This is '772, Claim 26.  And since there's so many
 7   elements and they're difficult to read, I've arranged to blow
 8   up the elements so we can see them.
 9   Q.   Okay.  And you've got gray Xs at the bottom.  What are
10   those?
11   A.   Those are two claim elements that Dr. Ligler -- Ligler
12   testified to that are not infringed because of the parameters
13   he looked at.
14   Q.   And you're focused on what?
15   A.   Payment data and payment validation data.
16   Q.   Okay.  So you've highlighted those elements?
17   A.   Yes, highlighted those.  They don't exist in the
18   claim -- I'm sorry, they don't exist in the Apple system as
19   required in the claim.  So three more Xs.
20   Q.   Like that?
21   A.   Yes, sir.
22   Q.   Does Apple infringe this claim, sir?
23   A.   No.
24   Q.   Again, how many Xs do you show here, sir?
25   A.   Three.
```

1   Q.   How many do you need to show you don't infringe?

2   A.   Only one.

3   Q.   Let's move to the next one.  This is which claim, sir?

4   A.   '772, Claim 32.

5   Q.   And you've got two more gray Xs.  Those reflect what?

6   A.   Those are from Dr. Ligler's testimony.

7   Q.   And you're going to focus on which ones?

8   A.   Three claim elements shown in yellow.  Again, the same

9   underlined payment data, payment validation terms, and same

10  conclusion, three red Xs.

11  Q.   Like that?

12  A.   Yeah.

13  Q.   Does Apple infringe this claim, sir?

14  A.   No, sir.

15  Q.   Have we now been through all four asserted claims?

16  A.   Yes.

17  Q.   In sum, what is your opinion of whether Apple infringes

18  the asserted claims in this case?

19  A.   There are four asserted claims in this case.  The Apple

20  products do not infringe any of them.

21  Q.   What did you indicate with that blue checkmark, sir?

22  A.   We've satisfied the question of infringement.  There is

23  no infringement.

24  Q.   All right.  Remind us of your second opinion.

25  A.   This is the issue of validity of the asserted patents,

1    whether they're valid in light of the prior art.

2    Q.   And what is prior art?

3    A.   Prior art is information that exists prior to the

4    priority date of a patent.  In this case, the Smartflash

5    priority date is -- is October 25th, 1999.  And so prior art

6    that would be ahead of that date and time and available to

7    people of ordinary skill.

8         Examples would be patents, textbooks, magazine articles.

9    Any kinds of information that's available to the person of

10   ordinary skill and can be combined with the knowledge of that

11   person of ordinary skill, can be used to show that a claim is

12   not valid.

13   Q.   And what is meant by a person of ordinary skill in the

14   art?

15   A.   I have a slide that speaks to that.  And this is -- is a

16   result of my investigation and work on -- on this project.

17        What I concluded would be a person of ordinary skill,

18   and that is a person of or -- of ordinary skill in the art

19   would be -- I'm sorry, would have at least a Bachelor of

20   Science degree in electrical engineering, computer science,

21   or a telecommunications-related field, so that's academics.

22        And in terms of industry experience, at least three

23   years of industry experience that included client-server

24   data/information distribution and management architectures.

25   Q.   And did you have the qualifications of a person of

```
 1   ordinary skill as of the Smartflash priority date?
 2   A.   I did.
 3   Q.   Let's move to Slide 16.  How would you describe the
 4   technology covered by the asserted claims in this case, sir?
 5   A.   I thought it would be helpful, before we dive into some
 6   of the details of the prior art, to help people understand
 7   what these patents in the field of art is all about and how
 8   it could be considered in a simple way to think about it.
 9        And in my opinion, they would be -- these patents are
10   about paying for access to protected content in an electronic
11   distribution system.
12   Q.   All right.  And in an electronic distribution system,
13   what types of components would you like to discuss?
14             THE WITNESS:  Next slide, please?
15   A.   So systems that we'll be looking at have ways of moving
16   information around, and they have processing elements that
17   manage and -- and work with this information.  And what I'm
18   calling components on this slide are representations of the
19   kinds of physical devices that would do this processing or --
20   and then architecture.
21        And starting -- excuse me, I'll just go clockwise
22   around.
23        Smart cards.  Smart cards have been around since the
24   very early 1980s.  If you have one of the newer credit cards
25   that has a chip on it, I think we call those chip cards,
```

```
 1   that's a smart card.  But they -- they are small devices that

 2   have memory and a little bit of processing capability, but

 3   they're not new.

 4   Q.    And what's the next one?

 5   A.    The next one, general purpose computers, standard

 6   desktop computer, nothing special, just a PC.

 7   Q.    Next?

 8   A.    Next, the communications interfaces and wireless

 9   communications.  As I mentioned, these systems will move data

10   around to the various components, and that takes interfaces

11   to move data in and out of components and communications.  In

12   particular, wireless communication is a characteristic of

13   some of the asserted claims is the point here, so there's

14   nothing new about wireless.

15   Q.    And the next one?

16   A.    Keeping going, mobile devices, think laptop or a cell

17   phone, something portable and like -- small like that.

18   Q.    And the next one?

19   A.    Last one, memory is a characteristic of the claims we'll

20   be looking at.  And I've shown here a small memory component.

21   You might think of a card that you insert into a digital

22   camera, for example.

23   Q.    All right.  Let's take a look at Slide 18.  What are you

24   comparing here?

25   A.    So on the left are the prior art components that I'm
```

1    just giving a quick review of.  And on the right, the same

2    components in the Smartflash patent architecture exist.  The

3    statement is that there's nothing special about the

4    implementation of the Smartflash system.  It's all based upon

5    well-known standard components that were available in the

6    industry at the time.

7    Q.   Why did you put the prior art components on the left,

8    sir?

9    A.   To emphasize that prior art comes ahead of the

10   Smartflash patent.  It was there already.

11   Q.   All right.  Were you here in the courtroom when Mr. Racz

12   testified?

13   A.   Yes, I was.

14   Q.   And what did Mr. Racz say about these components?

15   A.   He had several things to say when asked about those.

16   And I've got some citations.

17   Q.   All right.  In Slide 19, what did he say?

18   A.   He said, when asked about smart cards, that he did not

19   invent smart cards.  He said he did not invent memory.  He

20   did not invent general purpose computers.  He did not invent

21   mobile devices.  He did not invent communication interfaces

22   or wireless communication.

23   Q.   All right.  Let's look at Slide 20.  What are you

24   depicting here from what you call the Smartflash system?

25   A.   This is Figure 4A from the Smartflash patent, and also

1    in the box on the lower left is Figure 1A from the same

2    Smartflash patent.  And this is an overview of the main

3    components in the Smartflash architecture, and it shows some

4    of the communications paths between these components.

5    Q.   All right.  What does Box 80 do that is colored purple?

6    A.   So I'm going to describe the boxes in this, and I'm

7    going to color code them as we go so we can keep track of

8    that.

9         The specification calls D.S. a data supplier.  That's a

10   data provider, a sort of content.

11   Q.   And the items you've just colored red, the T and the

12   Figure 1?

13   A.   Yes.  Elements associated with the user location, I'm

14   going to color code red.  There are three components in the

15   Smartflash architecture associated with a consumer's

16   location.

17        T is a terminal device.  30, the small box, is a data

18   carrier.  It's a memory device.  And the consumer player

19   device or rendering device is called a data access device in

20   this system, and that's shown in Figure 1A.

21   Q.   All right.  And what is Box 60 that you've just colored

22   yellow, S.P.?

23   A.   Okay.  The S.P. is called a service provider, and you

24   can think about -- you can see that it's sort of in the

25   middle of the -- of the arrangement connecting to all the

1   other boxes.

2        It has different functions depending upon different --

3   on different ways, different embodiments in -- in the system.

4        But you can think about that as a system manager or the

5   central authority or perhaps a storefront.

6   Q.   All right.  And then finally what is the green box, 70,

7   P.V.A.?

8   A.   P.V.A. stands for payment validation authority.  And so

9   it's green for money, and a lot of what we'll be talking

10  about has to do with making payment for content, and that

11  function is responsible for doing that.

12  Q.   All right.  And do these same two figures, Figure 4 and

13  Figure 1A, do they appear in all of the asserted Smartflash

14  patents?

15  A.   That's correct.  The Smartflash drawings are the same

16  across all of the asserted patents.

17  Q.   All right.  And what does Mr. Racz say about whether he

18  invented the functions depicted here?

19            THE WITNESS:  Next slide, please.

20  A.   He said he did not invent transmitting digital content

21  or downloading content over the Internet.

22  Q.   (By Mr. Batchelder) Okay.  And what did he say about

23  online-related information?

24  A.   He said he did not invent online sale of content, online

25  payment for content, payment validation data, or use rules in

1    connection with the online sale of content.

2    Q.    And what did he say about DRM?

3    A.    He said he did not invite (sic) digital rights

4    management, DRM, or DRM in connection with online sales of

5    content.

6    Q.    He did not invent that?

7    A.    He did not.

8    Q.    And what did he say about display?

9    A.    He said he did not invent displaying to the user whether

10   access is permitted.

11   Q.    MP3 player?

12   A.    Said he didn't invent that.

13   Q.    Online rental?

14   A.    Said he did not invent online rental of content or

15   charging different prices for online rental versus online

16   purchases.

17   Q.    All right, sir.  And what are you depicting here in

18   Slide 27?

19   A.    So wrapping up that introduction to components and

20   processes and functions, these fundamental components and

21   concepts are all in the prior art.

22   Q.    And do you have some examples from the prior art that

23   you'd like to show the jury?

24   A.    Yes.

25   Q.    What are you depicting on this timeline?

1    A.    So the timeline goes from 1994 out to 1999; and,

2    importantly, is the Smartflash priority date shown in October

3    25th of 1999.

4         And the prior art references that I'll be discussing are

5    all in front of the Smartflash date and time.  And the one in

6    bold there, says Gruse/IBM, is the first one I'd like to talk

7    about.

8    Q.    Okay.  What are you depicting here on Slide 29, sir?

9    A.    This is Defendant's Exhibit 23, and it's the title page

10   of a United States patent.  The title is:  System for

11   tracking end-user electronic content usage.  It's assigned to

12   IBM or International Business Machines.

13        The inventors -- first named inventor is Mr. George

14   Gruse, and it has a priority date of October 22, 1998.

15   Q.    And how does that date compare to the Smartflash

16   priority date?

17   A.    This is one year -- more than a year ahead of

18   Smartflash.

19   Q.    Have you analyzed this IBM patent?

20   A.    I did.

21   Q.    And what challenges did this IBM patent from Mr. Gruse

22   seek to address?

23   A.    So on the next slide, I've gone to the opening of the

24   IBM/Gruse patent, and most patents will have a brief

25   discussion or introduction to what they're all about.

1        And citing from Column 1, Line 65 through Column 2, Line

2   5, the Gruse patent explains that one reason that owners are

3   afraid of unauthorized copying or pirating of digital

4   content.

5        And another citation comes from the same patent, Column

6   2, Lines 23 through 31 where it's explained that the Internet

7   makes it relatively easy to pirate and distribute

8   unauthorized copies.

9        And, therefore, a need exists to ensure protection and

10  security of digital assets dis -- distributed electronically.

11  Q.   All right.  How does that compare to the challenges that

12  Smartflash later said it was addressing?

13  A.   We can look at the opening of the Smartflash patent on

14  the next slide.

15  Q.   What do you have on the left, sir?

16  A.   What I have on the left are the citations that I just

17  provided about the IBM patent.  And on the right, I have

18  citations from the Smartflash patent.

19       At the top of the '720 patent, Lines 1 -- or Column 1,

20  Lines 15 through 19, the Smartflash patent explains that

21  there is an increasingly wide use of the Internet as a

22  growing prevalence -- to be responsible for a growing

23  prevalence of so-called data pirates.  I'm paraphrasing.

24       Also indicates that content is being accessed without

25  authorization through unauthorized websites.

1        I've now moved to the second box, Column 1, Line 23

2   through 31, and finalizing by saying:  There's an urgent need

3   to find a way to address the problem of data piracy.

4   Q.    So as between these two patents, the IBM patent that

5   came earlier and the Smartflash patent that came later, who

6   recognized this problem first?

7   A.    Obviously, IBM and Mr. Gruse at IBM were onto this a

8   year ahead of Smartflash.

9   Q.    All right.  In the IBM patent, what was the role of

10  usage conditions in addressing these challenges?

11  A.    Sure.

12       On the next -- excuse me -- on the next slide, the

13  IBM/Gruse patent developed a process for managing control

14  over content through what they call use conditions.

15       And at Column 28, Lines 39 through 42 at the top we --

16  our -- we are given examples of store usage conditions.  When

17  it says "store," they're talking about an electronic store

18  where you might go to purchase electronic content.

19       An example would be getting a song that could be played

20  a defined number of times.

21       The table in the middle is an example of the kinds of

22  usage conditions that the IBM/Gruse patent provides or

23  discloses, and you can see here there's -- talks about

24  purchasing content in the line in the middle or renting

25  content.

1    It also talks about various prices that one can pay for

2    content -- or have to pay for content.  It allows for the

3    definition of a rental term.  Here, the example is 14 days

4    for a rental.

5    Q.   Sir, did Mr. Racz invent the idea of rental of digital

6    content?

7    A.   Well, we're finding a rich assortment of

8    rental approach -- approaches to rental in this table.

9        No, he did not.

10   Q.   How would the device disclosed in this IBM patent

11   enforce a rental period?

12   A.   The last citation drawn from Columns -- Column 10, Lines

13   43 through 50, explains that if the requested use of the

14   content does not comply with the usage conditions -- for

15   example, the number of copies has been exhausted -- then the

16   end-user device will not perform the request.

17   Q.   All right.  And how does the system described in this

18   patent, how is it described to operate?

19   A.   They have a diagram that we can reference.  This is

20   Figure 6 from the patent.

21   Q.   All right.  And what would you like to do to illustrate

22   how this works?  That's a lot of figures.

23   A.   Yeah, this is -- this is -- we can use this and draw

24   forth from this the key components that provide an

25   explanation of how this all works together.

```
 1        You can see a lot of arrows and so forth.  So I've
 2   developed an animation that simplifies this, and we can watch
 3   the process as it unfolds, beginning with the next slide.
 4   Q.   Okay.  What have you just done there?
 5   A.   So four components of the previous slide do most of the
 6   work in this diagram, and they're color-coded, and we'll --
 7   we'll revisit that.
 8        What I'd like to go through is a transaction, and it
 9   comes out in a number of steps, 1, 2, 3, 4, and so forth, so
10   we can break it down and see how that functions.
11   Q.   And are those steps described in the patent?
12   A.   Yes, sir, they are.
13   Q.   All right.  What are you showing as Step No. 1, sir?
14   A.   So Step No. 1, as described in the patent at Column 25,
15   Lines 14 through 18, the user is shown in the upper right
16   corner.  A store front.  And it even -- it calls it an
17   electronic digital content store -- in yellow on the lower
18   left -- is where the consumer has browsed for content and
19   made a content selection and indicates that decision by
20   sending a message with a content request and money
21   information, signified by a credit card.
22   Q.   All right.  Should we look at Step 2?
23   A.   Please.
24   Q.   What is Step 2?
25   A.   Step 2 then is the response from the content store
```

1  explained from Column 25, Lines 63 through 67.  In return, to

2  the content request, a transaction information package is

3  sent back to the user device.  It contains the rules for

4  access to that content.

5  Q.   All right.  What is Step 3?

6  A.   Step 3 then has the user device turning to the

7  clearinghouse in green, sending that house the order.  The

8  receipt identifies the requested content and an indication of

9  the rules.  So this is the payment process that's about to

10  take place.

11  Q.   And Step 4, what is that?

12  A.   Step 4 completes payment validation, assuming it's

13  approved, and we find information going back to the user

14  device from the clearinghouse.  The information then, which

15  we'll see in a moment, allows the user device to go get the

16  requested content.

17  Q.   And what happens if the transaction is not validated?

18  A.   If the clearinghouse does not perform payment

19  validation, then the transaction will be terminated and the

20  content will be refused.  That's shown by the X.

21  Q.   And what happens if it is validated?

22  A.   If it is validated, then the payment validation process

23  has been approved.  Steps 5 and 6 are allowed.  As explained

24  at Column 23, Lines 23 through 63, Step 5 has the end-user

25  device going to the content hosting site.  This is where the

```
 1   digital files for the movie or the book, whatever it is, are
 2   stored.  So the request goes there.  And in the return for
 3   the request, we see, in this case, the content is a song, and
 4   it's returned to the end-user device.
 5   Q.   Okay.  So at this point you've got content and usage
 6   conditions on the user's device?
 7   A.   That's correct.  A user device has the usage control
 8   conditions, and it has the content.
 9   Q.   And what happens next?
10   A.   Well, with a successful transaction, we've just seen the
11   user can now enjoy that content.  And with each use of the
12   content, the access rules will be looked at by the machine to
13   confirm access is allowed.
14       So if you can think of rental condition, for example,
15   that may have a limit of, you know, 10 days, the rules check
16   will confirm that 10 days has not elapsed yet.  If it has,
17   the consumer will have lost access to it.  But if it's okay,
18   it's still in the -- within the period, then they'll get the
19   content.
20   Q.   And this --
21   A.   I'm sorry, this is explained at Column 10, Lines 44
22   through 50 and 24, 5 through 8.
23   Q.   How does the device then store the usage conditions?
24   A.   This is explained at Column 28, Lines 32 through 35.
25   The usage conditions must stay with the content in order for
```

1    those to be continually analyzed throughout the duration of

2    that content's life cycle in the device.

3         And so the patent explains that the two -- two ways to

4    store that information.  It can be stored as a watermark

5    embedding information into the content, or it can be stored

6    in memory in the unit.

7    Q.   All right, sir.  And -- and so in your opinion, how does

8    the -- the Gruse technology compare to the technology

9    disclosed in the Smartflash specification?

10   A.   I've just explained the -- what I've called a

11   transaction for the Gruse patent, and we described -- or I

12   described an electronic store in yellow.  Smartflash calls

13   that a service provider.

14        I talked about an end-user device.  Smartflash calls

15   that a terminal or a data access device.

16        I explained there's a content hosting site.  Smartflash

17   calls that a data supplier.

18        And I've described the function of a financial

19   clearinghouse, which Smartflash calls a payment validation

20   authority.

21   Q.   Same components or different?

22   A.   Functionally and through the requirements of the claims,

23   they're the same.

24   Q.   Sir, when the U.S. Patent Office issued these patents to

25   Mr. Racz, had it considered this Gruse IBM patent?

A.    The patent -- U.S. Patent Office did not consider the

Gruse patent.

Q.    And how do you know that?

A.    I know that because the cover of the Smartflash patents

associated with the title information, the Patent Office

lists all the prior art references that it examined, and this

is not listed there.

Q.    Now, did IBM ever implement the technology that's

described in this Gruse IBM patent?

A.    Yes, they did, as a matter of fact.

Q.    All right.  And what are you depicting here in Slide 43?

A.    So I've highlighted in yellow a sentence that's drawn

from the document you see in the background.  And it might be

easiest to start this discussion by just reading it.

Q.    Before you do, sir, is that Defendant's Exhibit 26?

A.    Yes.

Q.    Okay.  Thank you.  Please proceed.

A.    Okay.  IBM and the big five global music companies --

Universal, EMI, Bertelsmann, Time-Warner, and Sony -- will

today finally pull the wraps of Project Madison, the secret

Big Blue-led development of a piracy protected Internet music

delivery system.  The announcement will also cover the

commencement of the first public trial of the technology due

to begin in the next few months.

        So this is an announcement of a Project Madison, which

```
 1   is a cooperative effort between IBM and five major music

 2   labels.  And the purpose is to download music to real people

 3   using real equipment and real songs.

 4   Q.   And have you studied information about the IBM system?

 5   A.   Yes, I have.

 6   Q.   And what did you look at to understand it?

 7   A.   In the next slide, I listed the collection of

 8   information that was available about this system.

 9        First, the public proof-of-concept trial, which was

10   referred to just a moment ago, public technical information

11   was disclosed.  There were press releases, public

12   demonstrations, the cooperation between IBM and the record

13   labels.  And finally, it's the IBM/Gruse patent itself.

14        So the patent is the basis for the architecture in the

15   system that was put in place to allow people to download

16   songs over the Internet as part of this proof-of-concept

17   trial.

18   Q.   And is it -- is it fair to use this set of information

19   to invalidate patents in this setting?

20   A.   Yes, it is.  One of ordinary skill, at that time,

21   wanting to know about this IBM system would have access to

22   all this information collectively, because it's all about

23   basically the same system.  And so that's fair game for

24   disclosure and represents prior art.

25   Q.   And what was this IBM technology called?
```

1   A.    There were different pieces of it that carried different

2   names.   In the top of this slide from Defendant's Exhibit 29,

3   we find the term electronic music management system, EMS

4   (sic).   So this is the name that the IBM folks called what we

5   saw in the IBM/Gruse patent.

6         Next from Defendant's Exhibit 27, the --

7   Q.    And then underneath that?

8   A.    Underneath Exhibit 27?

9   Q.    No.   I mean, underneath the electronic music management

10  system, there's another reference to Project Madison.   What

11  is that?

12  A.    Excuse me.   Yes.   That's -- that's from Defendant's

13  Exhibit 27.   Project Madison is the name that the

14  collaboration gave -- that's IBM and the music labels -- for

15  their -- their test -- proof of concept -- for their

16  cooperation.

17  Q.    Okay.   And then you referenced Defendant's Exhibit 33

18  and something called Album Direct.   What is that?

19  A.    That is the public facing name of the proof-of-concept

20  trial, the public trial.

21  Q.    Why would a company run a proof-of-concept trial?

22  A.    Trials or the proof-of-concept system is often done by

23  technology companies when they have a new idea or a new piece

24  of equipment or a new system to try out.

25        In this case, it's a system.   Has many components.   It's

1    a way to -- as the name suggests, proof-of-concept, it's a

2    way to test your ideas.  This test included not only

3    technology components but consumers.

4         And to see how well -- excuse me -- to see how well that

5    interplays together, you can put out a limited feature

6    version of it to test to see if consumers like it, fine-tune

7    the technology, what-have-you.

8         So it's often done in -- in systems before a full-blown

9    rollout.

10   Q.   All right.  What are you comparing here in Slide 46?

11        First of all, what's on the left?

12   A.   What's on the left is excerpts from Defendant's Exhibits

13   26 and 29.  And in the first yellow highlight, it's the big

14   blue "led development of piracy protected Internet music

15   system.

16        And then on the lower left, it explains that IBM and

17   Sony enable their -- IBM and Sony aim to enable artists and

18   content providers to more -- take more fully advantage of the

19   enormous growth potential of the market for digitally

20   distributed music content.

21        So these excerpts talk about the -- it's kind of the

22   reasons and the goals of the IBM system.

23   Q.   Including piracy protection?

24   A.   Including, yes, piracy protection.  It says:  While

25   protecting the interest of right-holders.

1   Q.   Okay.  So as -- as between the IBM system and the -- the

2   Smartflash priority patents, which -- which addressed this

3   problem first?

4   A.   So on the right are the summaries from the Smartflash

5   patent, and we see that the IBM system dated April 15 was

6   ahead of Smartflash.

7   Q.   How do you know that Project Madison relates to the

8   Gruse/IBM patent that you've showed us?

9   A.   So this slide shows two figures from the IBM patent, the

10  same one that I looked at a few minutes ago:  Figure 14 and

11  Figure 16.

12       On the left, if I could click forward once, please, I

13  will highlight -- you see the user starts a download,

14  download complete.  So on the left is the process that a user

15  would follow to download a song in the IBM/Gruse patent to a

16  player.

17       Once the song is on the user's device on the right,

18  Figure 16, we see in the user/player device, there's a

19  playlist.  The user can select a song from that and play it.

20       So it's a download process and a playback process that

21  are described in the Gruse patent in Figures 14 and 15.

22  Q.   All right, sir.  We've now got an excerpt up from

23  Defendant's Exhibit 81.  Would you describe this?

24  A.   Yes, including the previous slide, there was a -- if I

25  could have that back, please?

1   Q.    Sure.

2   A.    The punctuation mark on this is that these black bars in

3   these little figures can't see on this; but if you blow those

4   up, what you find in those -- the header of every one of

5   those screenshots, it says:  Madison Music Masterworks.  So

6   in the IBM work is referenced Project Madison.  Thank you.

7   Q.    Turning back to Slide 48 and Defendant's Exhibit 81,

8   would you describe what you're referencing there?

9   A.    Yes.  There was a document dated February 23rd, 1999,

10  which talked about a demonstration that took place at the IBM

11  research labs.  This was a demonstration of the EMM -- EMMS

12  system that is the Gruse patent system.

13       It says:  During the demonstration at the Advanced

14  Technology Labs, Greg Gruse, an IBM employee, who helped

15  develop the system downloaded Dave Matthews songs from an IBM

16  virtual store.

17       This is the same Greg Gruse who's the named inventor of

18  the IBM/Gruse patent.

19  Q.    And why is it significant that Mr. Gruse performed the

20  demonstration?

21  A.    Well, to me, this disclosure, coupled with the

22  information from Figures 14 and 16 of the IBM/Gruse patent,

23  makes it pretty clear that the EMMS system, which was part of

24  the overall IBM project -- IBM system project is based on the

25  Gruse patent.

1    Q.    What are you showing here in Slide 49, sir, referring to

2    Defendant's Exhibit 33?

3    A.    So after the conclusion of the trial, this document

4    describes -- or announces their results, if you will.  They

5    define the purpose, looking back at the trial, was to gather

6    proprietary research about the consumer experience of

7    purchasing and receiving music online.

8    Q.    Just to be clear, sir, what is the trial that's being

9    referenced there?

10   A.    This is the trial where real people downloaded real

11   music, as explained in the middle citation, a thousand

12   households in San Diego and a hundred households in Portland,

13   Maine, were the test consumers; and those participants, it

14   goes on to explain, successfully executed approximately 4,000

15   downloads encompassing some 50,000 music tracks.

16   Q.    And what features were being tested during that trial?

17   A.    This same document goes on to describe some of the

18   technical features that were part of that.  In particular,

19   I've raised to the forefront, so we can see them, the

20   components of the system that were exercised.

21         Listed there are the content preparation component,

22   content hosting proponent -- component, clearinghouse, retail

23   software, and a client software -- client software would go

24   on a user device.

25         And the significance is apparent when we compare those

1   to the similar components to Figure 6 from the Gruse patent.

2        You may recall when I did the initial animation a few

3   moments ago, we talked about the content providers,

4   clearinghouse, electronic digital content store, and end

5   user.

6        And there's a one-to-one mapping between what is

7   described as being part of the IBM system and what we find in

8   the Gruse patent.

9   Q.   So according to the yellow highlighting at the bottom

10  here on Defendant's 33, why were these features selected?

11  A.   It allowed them to achieve their primary research goals,

12  and they indicate the trial validated the security features

13  and the viability of the technology.  It demonstrated high

14  ease of use and overall positive consumer experience.

15  Q.   Was this trial successful?

16  A.   They're announcing their pleasure and that at the

17  conclusion, it was their opinion it was successful.

18  Q.   What are you depicting here Slide 51?  This is

19  Defendant's Exhibit 44, 45, and 240.

20  A.   So this is a picture of a user device that was disclosed

21  in conjunction with the test.  This is a Sony -- what's

22  called a Sony Digital Walkman, and you can see it's been

23  opened up.

24       The little white device in the middle -- you probably

25  can't read it -- but it's called a MagicGate.  It's a

1   memory -- memory card.  And it slips into the bottom of the

2   user device, and then the end cap goes on.  So this is a

3   portable music player.

4            MR. BATCHELDER:   Your Honor, may I approach?

5            THE COURT:  You may.

6   Q.   (By Mr. Batchelder)  Sir, I've handed you what's been

7   marked as Defendant's Exhibit 240.  What is that?

8   A.   This is a physical specimen reflected in that picture.

9   Q.   And what is the relationship between the Memory Stick

10  Walkman and the IBM system?

11  A.   Next slide, please?

12  Q.   We're looking at Defendant's Exhibit 29?

13  A.   Yes.

14  Q.   Would you summarize the importance of this?

15  A.   So this is dated April 15th, 1999, and it announces that

16  Sony -- IBM, excuse me, and Sony Corp., the maker of this

17  device, are in -- to collaborate on copyright management.

18       And it describes in the highlight below:  A player

19  recorder, such as a Memory Stick Walkman to receive content

20  purchased and downloaded over the Internet using EMMS.

21  Q.   How does that date, April 15th, 1999, compare to

22  Smartflash's priority date here?

23  A.   It's in front of or ahead of the Smartflash priority

24  date.

25  Q.   And could other devices have been used with IBM's

1   system?

2   A.    Yes, other devices were also disclosed in conjunction

3   with this same system.   This is document, Defendant's Exhibit

4   31.   It's dated October 8th, 1999, and it describes a company

5   called NTT DoCoMo; and that they will introduce a music

6   distribution system for mobile phone networks.

7       It describes that it will -- that they intend for their

8   player to be compatible or compliant to IBM's EMMS music

9   distribution system or used in combination with that.

10      And the president of the company remarked that

11  there's -- I'll just read his remark:   You can always carry

12  your cell phone with you.   It would be convenient if you

13  could use it to listen to music.

14      So what is disclosed here is the concept of a cell phone

15  as a music player in a wireless environment.

16  Q.    Before Smartflash or after?

17  A.    We're still in front of Smartflash, ahead of it.

18  Q.    In Slide 54, sir, can you summarize what types of

19  devices were disclosed to be used with the IBM system?

20  A.    Yes.   The Sony Walkman and the DoCoMo mobile cell music

21  player were both disclosed in conjunction with this system.

22  Q.    All right.   Does the IBM system disclose the features of

23  Smartflash's claims?

24  A.    Yes, it does.

25  Q.    Did the Patent Office, when it issued the patents

1  asserted here, did it consider the IBM system when it issued

2  the patents?

3  A.    No, it did not.

4  Q.    How do you know?

5  A.    Well, my understanding is the Patent Office, in

6  conjunction with prosecutions, doesn't take into

7  consideration systems.  They look at documents and -- and

8  other such evidence, but not real-world systems.

9  Q.    And nothing like this was on the face sheet of the

10  Smartflash patents, correct?

11  A.    No, sir.

12  Q.    And coming back to your timeline, sir, what would you

13  like to address next?

14  A.    So in bold next, I'd like to discuss the Stefik/Xerox

15  patent.

16  Q.    All right.  What are you depicting here on Slide 56 from

17  Defendant's Exhibit 39?

18  A.    This is the cover page of what I'll be calling the

19  Stefik/Xerox patent.  Its title is System For Controlling the

20  Distribution and Use of Digital Works.  It's assigned to

21  Xerox Company -- Corporation.  The inventor is Mr. Mark

22  Stefik.  The priority date is November 23rd, 1994, which is

23  just about five years ahead of Smartflash.

24  Q.    All right.  What were the challenges that the

25  Stefik/Xerox patent recognized, sir?

```
 1  A.   Once again, soliciting the introductory comments to the
 2  patent, I've excerpted from Column 1, Lines 11 through 14,
 3  and again, Lines 21 through 24, just to see what this patent
 4  explains.
 5       Prevent the unauthorized and unannounced distribution or
 6  use of electronically published materials.  It also explains
 7  that unaccounted for distribution of a work.  In this patent,
 8  a work is a piece of content.  Distribution of a work results
 9  in unpaid royalty.
10       So -- excuse me, go ahead.
11  Q.   And, sir, referring to these concepts, unpaid royalty,
12  unauthorized, and unaccounted distribution usage, is there a
13  name for that?
14  A.   I'm sorry, the question again?
15  Q.   Is there a name for unauthorized and -- and unaccounted
16  distributions?
17  A.   Yes.
18  Q.   What is it?
19  A.   It's commonly called piracy.
20  Q.   All right.  What are you showing here on Slide 58?  What
21  do you have on the left?
22  A.   On the left are the two citations that I just referenced
23  to in the previous slide.  And on the right, once again,
24  comparing that to what Smartflash talks about.
25       Having already introduced that, I'll just remind us that
```

1    they're talking about the Internet as a source of piracy;

2    unauthorized websites, as well, and a need to find a way to

3    address that problem.  Same problem.

4    Q.    Who recognized the problem first as between these two?

5    A.    Xerox/Stefik patent.

6    Q.    All right.  Sir, Slide 59 shows Figure 1 from the

7    patent.  Would you tell us what's important about this?

8    A.    Yes.  This is a -- the way the patent introduces

9    their -- their concept, and I'm going to animate this.  But

10   just a quick introduction to where the animation came from.

11        There's a creator of content, a distributor of content.

12   There's a receiver of content, a user, and there's also a

13   billing transaction built into this process flow.

14   Q.    All right.  Should I click to start the animation?

15   A.    Yes, please.

16   Q.    Okay.  And what have you broken out here?

17   A.    So once again, I think it's easy to -- it's most helpful

18   to look at a series of steps, as before, numbered 1, 2, 3, et

19   cetera, and we'll take a look at what Figure 1 looks like

20   when you put it into action.

21   Q.    All right.  What is Step 1?

22   A.    Step 1 recognizes the content creator, and this is

23   explained at Column 7, Lines 8 through 11.  Content creator

24   generates content.  There's associated usage rights.  Goes to

25   the repository.  That's a data supplier or a content

1    supplier.

2         Next step.

3    Q.    Step 2?

4    A.    So with a content out at the data store, content store,

5    at Column 7, Lines 16 through 22, it is explained that

6    Repository 2, or the end user device, can make a request for

7    a selected piece of content.

8    Q.    And Step 3, what happens there?

9    A.    Step 3, as explained in Column 7, Lines 24 through 26,

10   reminds us that as part of this system, the usage rights

11   attached to the content will be examined before access to the

12   content will be granted.  So this little magnifying glass

13   represents receipt of the request at the store, and the store

14   wants to check a -- whether the rights are allowed.

15   Q.    And what happens if the supplier determines that access

16   should not be allowed?

17   A.    Well, click -- one click.  If the usage rights, in fact,

18   are turned down because the requester, for whatever reason,

19   doesn't have the rights, then the error message will be

20   returned and the transaction terminates.  This is explained

21   at Column 7, Lines 30 through 31.

22   Q.    And what happens if access is allowed?

23   A.    If the transaction is approved -- next click -- Step 3

24   explained in the patent at Column 7, Lines 31 through 33,

25   then the content is delivered to the consumer, along with the

1    usage rights or usage conditions for content access.

2    Q.    And how do fees get paid?

3    A.    So click it one more time.  The billing process.  The

4    patent explains that billing transaction can take place in

5    conjunction with processes associated with both the requester

6    and the supplier.  And that's explained at Column 7, Lines 33

7    through 36.

8

9    Q.    And do fees need to always be processed after content is

10   sent, like we just saw?

11   A.    No.  And we can cite to what the patent tells us about

12   that in the next slide.

13         At Column 17, Lines 30 through 32, it is explained that

14   the credit server, which is the green billing transaction

15   device in the previous slide, can act as a debit card where

16   transactions occur in real-time.

17         And so the way to think about this is go to a gas

18   station, you use your debit card, you pay for that before you

19   get gas, as opposed to using a credit card where you get your

20   gas but you may pay for that at the end of the month with a

21   check.

22         And so this system, recognizing in the real world both

23   kinds of billing processes are used and are effective, allows

24   you to choose which billing process makes sense for your

25   application -- pay before or pay after.

1    Q.   All right.  So how does the Xerox/Stefik disclosure

2    compare to Smartflash?

3    A.   We can do a comparison.  Once again, as we finish up the

4    Xerox discussion, we find a content supplier, a store front,

5    a user device, and a billing processing mechanism which maps

6    to the functions of the Smartflash patent.

7    Q.   Same components?

8    A.   Similar functions that can be read through the

9    requirements of the claims to invalidate the Smartflash

10   patent.

11   Q.   All right.  And when the Patent Office decided to issue

12   these patents to Mr. Racz, did the Patent Office consider

13   this Xerox patent?

14   A.   No, it did not.

15   Q.   How do you know?

16   A.   Because this Xerox patent is not listed as the

17   references the U.S. Patent Office examined before allowing

18   the Smartflash patent.

19   Q.   What's the next prior art reference that you'd like to

20   discuss, sir?

21   A.   This is the Ginter patent from the company called

22   InterTrust Technologies.  And this is the same InterTrust, by

23   the way, that we heard about -- I believe it was on the

24   opening day here -- where there was an email exchange between

25   Smartflash and Mr. Racz who was seeking financial investment

1    from InterTrust.  So they own the following patent that we'll

2    look at.

3    Q.   All right.  We're looking now at Defendant's Exhibit 40?

4    A.   Yes.

5    Q.   And is it -- is this that InterTrust patent?

6    A.   Yes, sir, it is.

7    Q.   And would you describe it, please?

8    A.   It has a title of Systems and Methods For Secure

9    Transaction Management and Electronic Rights Protection.

10        It's assigned to InterTrust Technologies Corp.  Has a

11   filing date of January 8th, 1997.  And the inventor -- the

12   first named inventor is Mr. Karl Ginter.

13   Q.   How does that January 8, 1997 date compare to

14   Smartflash's priority date?

15   A.   This is -- this is prior art to Smartflash.  It's ahead

16   of Smartflash.

17   Q.   What are the industry challenges recognized by the

18   InterTrust patent?

19   A.   So we can, once again, look at the front part of the

20   Ginter/InterTrust patent and draw from citations both in

21   Column 2, Lines 35 through 38 and 59 through 63.

22        It is explained that content providers often need to

23   limit use to authorized activities and amounts.  Authorized

24   limit use of content is what they're talking about.  They

25   also explained that commercial content providers are

1    concerned with ensuring proper compensation for the use of

2    their electronic information.

3        Of course, when you have piracy, there is no

4    compensation.  So same problem that Smartflash is looking at.

5    Q.   Okay.  And what are you depicting on Slide 72?

6    A.   Once again, citations I just provided on the left,

7    compared to the similar citations that we've now seen several

8    times with Smartflash -- piracy, a need to address data

9    piracy?

10   Q.   All right.  And what does InterTrust disclose here to

11   address these challenges?

12   A.   So let's take a look at the architecture of this system.

13       This is Figure 2 from the InterTrust/Ginter patent, and

14   I belive I've prepared color codings right up front for this

15   in the next slide.

16   Q.   What have you color coded here, sir?

17   A.   Content provider is shown at the top, and it generates

18   digital content.  The rights distributor -- you can think of

19   again as the manager or the store front.  In red is the user

20   device, and in green for money is the financial

21   clearinghouse.

22       And this is arranged in a sort of process flow, so we

23   can see how these components interact with each other.  On

24   the left coming out of the content is what's called a content

25   highway.

1    So it's a way to think about how content moves around in

2    a system.  One of the first exit ramps -- ramps goes to the

3    store front where the content can be placed.  And when it's

4    purchased, it can take the highway down to the user

5    component.

6    On the right, the blue arrows -- you probably can't read

7    them, but they say rules and controls.  And so the access

8    rules for the content are generated by the content owner.

9    They're placed out at the store, and eventually they're

10   delivered to the end user device in conjunction with a

11   purchase transaction.

12   Finally, payment is disclosed.  You see the green arrow.

13   It says payments are given to the financial clearinghouse for

14   content that needs to be paid for.

15   Q.   Now, how is information sent in this InterTrust

16   disclosure?

17   A.   So on that content information highway, it is explained

18   that there are objects called content objects with this --

19   which this invention uses to move content around on that

20   highway.  This is called a content container.  There's

21   information about the content, title, author, what have you,

22   and permissions record and budgets.  And these two layers are

23   where the usage conditions reside in the content object.

24   Q.   All right.  Can you give us an example then of how these

25   rules and controls work within the InterTrust disclosure?

1    A.    Yes.   Next slide, please?

2           THE COURT:   Let me interrupt here.   It's 12:00

3    o'clock.   I'm not going to fail to break for lunch.   This

4    apparently has some additional length to go in the

5    examination by the Defendant.

6           Ladies and Gentlemen, we're going to take a lunch

7    break at this time.   Take your notebooks with you, if you

8    will, to the jury room.   Don't discuss the case among

9    yourselves.   Follow all my other instructions, and we'll be

10   back here in approximately 40, 45 minutes to continue.   But

11   you're excused for lunch at this time.

12          COURT SECURITY OFFICER:   All rise.

13          (Jury out.)

14          THE COURT:   Be seated, please.

15          Mr. Batchelder, I want to remind you that we had a

16   very lengthy discussion in chambers about whether these

17   references would be referred to by logos, by names, by name

18   of the current assignee, by name of the inventor; and the

19   Court made it very clear, after hearing heated argument from

20   both sides, that we would refer to them by the name of the

21   inventor, slash, the assignee.

22          Both you and the witness have repeatedly referred

23   to these only by the assignee name.   Sometimes the assignee

24   name, slash, the inventor name when your slide says inventor,

25   slash, assignee.   It's important that you follow a clear,

1    consistent path.

2         And I'm going to direct both counsel and the

3    witness for future references to these prior art references,

4    to follow my instruction accurately and refer to them by both

5    inventor name, slash, assignee.

6         MR. CALDWELL:  Understood, Your Honor.  Thank you.

7         THE COURT:  All right.  We stand in recess for

8    lunch.

9         COURT SECURITY OFFICER:  All rise.

10        (Lunch recess.)

11                        CERTIFICATION

12

13        I HEREBY CERTIFY that the foregoing is a true

14   and correct transcript from the stenographic notes of the

15   proceedings in the above-entitled matter to the best of our

16   abilities.

17

18   /s/_____
     SHEA SLOAN, CSR, RPR                    February 19, 2015
19   Official Court Reporter
     State of Texas No.:  3081
20   Expiration Date:  12/31/16

21

22   /s/_____
     SHELLY HOLMES, CSR, TCRR
23   Deputy Official Court Reporter
     State of Texas No.:  7804
24   Expiration Date  12/31/16

25