1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                  TYLER DIVISION

3

SMARTFLASH LLC and              )
4    SMARTFLASH TECHNOLOGIES          DOCKET NO. 6:13cv447
     LIMITED
5
          -vs-                       )
6
                                           Tyler, Texas
7                                )          12:50 p.m.
     APPLE INC.                             February 19, 2015
8

9

                         TRANSCRIPT OF TRIAL
10                        AFTERNOON SESSION
              BEFORE THE HONORABLE RODNEY GILSTRAP,
11               UNITED STATES DISTRICT JUDGE

12

13                  A P P E A R A N C E S

14

15   FOR THE PLAINTIFFS:

16
     MR. BRADLEY W. CALDWELL
17   MR. JASON D. CASSADY
     MR. JOHN AUSTIN CURRY
18   CALDWELL CASSADY & CURRY
     2101 Cedar Springs Rd., Ste. 1000
19   Dallas, Texas  75201

20

21   MR. T. JOHN WARD, JR.
     WARD & SMITH LAW FIRM
22   P.O. Box 1231
     Longview, Texas  75606
23

24

25

```
1    FOR THE DEFENDANTS:

2
     MR. JAMES R. BATCHELDER
3    ROPES & GRAY LLP
     1900 University Ave., 6th Floor
4    East Palo Alto, California  94303-2284

5

6    MS. CHING-LEE FUKUDA
     MR. KEVIN J. POST
7    ROPES & GRAY LLP
     1211 Avenue of the Americas
8    New York, New York 10036-8704

9

10   MR. ERIC ALBRITTON
     ALBRITTON LAW FIRM
11   P. O. Box 2649
     Longview, Texas 75606
12

13

14

15
     COURT REPORTERS:        MS. SHELLY HOLMES, CSR, TCRR
16                           OFFICIAL COURT REPORTER
                             shelly_holmes@txed.uscourts.gov
17
                             MS. SHEA SLOAN, CSR, RPR
18                           OFFICIAL COURT REPORTER
                             shea_sloan@txed.uscourts.gov
19

20

21

22

23

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25
```

$$P \ R \ O \ C \ E \ E \ D \ I \ N \ G \ S$$

1          P R O C E E D I N G S

2          (Jury out.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Be seated, please.

5          MR. BATCHELDER:  Your Honor, if I may?

6          THE COURT:  Yes.

7          MR. BATCHELDER:  Following up on your last

8  instruction, I want to be sensitive to the Court.  We've got

9  a Gruse/IBM patent and an IBM system; and I just wanted Your

10  Honor to be aware, when I refer to the IBM system, I'm

11  abiding by your order.

12          THE COURT:  I understand that.  If you'll abide by

13  my order on the IBM/Gruse patent --

14          MR. BATCHELDER:  I absolutely will.

15          THE COURT:  -- and the InterTrust and all the other

16  ones.

17          MR. BATCHELDER:  Absolutely, Your Honor.

18          THE COURT:  I'm aware of the IBM system.

19          MR. BATCHELDER:  Thank you, sir.

20          THE COURT:  That was a part of that lengthy

21  discussion I referenced earlier.

22          All right.  Anything else before we bring in the

23  jury?

24          Bring in the jury, please.

25          COURT SECURITY OFFICER:  All rise for the jury.

1          (Jury in.)

2          THE COURT:  Please be seated.

3          All right, Mr. Batchelder.  You may continue with

4   your examination.

5          MR. BATCHELDER:  Thank you, Your Honor.

6          ANTHONY WECHSELBERGER, DEFENDANT'S WITNESS,

7                    PREVIOUSLY SWORN

8                    DIRECT EXAMINATION

9   BY MR. BATCHELDER:

10  Q.   Mr. Wechselberger, I believe we left off on Slide 75

11  talking about the Ginter/InterTrust patent.  What are we

12  looking at here on Slide 75, sir?

13  A.   We're -- excuse me -- we're looking at Figure 3 from the

14  patent.  And could you repeat the question that got us here,

15  please?

16  Q.   Sure.  I was just asking, what we're looking at here

17  on -- an example of how rules and controls work in the

18  Ginter/InterTrust patent.

19  A.   Right.  So this figure is supplied in the patent, and

20  it's a flowchart.  You can see little arrows from the top to

21  the bottom, and I've highlighted and blown up the entry

22  point, which says "request."

23       So this is what's referred to as a process flowchart

24  that has certain functions that take place as the information

25  goes through the various stages.

1          So content -- this is a content request.  Enters at the

2    top.  The first thing the request hits is a go/no go symbol

3    by a stoplight.

4          If it's a flat no go, it's the end of the transaction.

5    The customer or consumer does not have access to the content.

6          If it is a go, the process continues, and there are a

7    number of other steps then that come into play to control the

8    access to content.

9          And the patent tells us at Column 58, Lines 25 through

10   30, beginning at the bottom, that the budget -- what they

11   call a budget process, limits how much content usage is

12   permitted.

13         It has an example.  A limit by the number of times the

14   content may be accessed, for example, or copied; limit the

15   number of pages or other amount of content that can be used.

16   So that is a condition.

17         And it also tells us then at Column 58, Lines 11 through

18   13, that the meter process keeps tracks of events.

19         So in this patent, the content access is called an

20   event.  And if it's throttled, for example, in a rental

21   situation by number of accesses, then you need to keep track

22   of the number of accesses.

23         And so the number is symbolized by the budget, and where

24   you are in that is tracked by the meter.  And so that's the

25   philosophical picture that the patent gives us for how that

1    takes place.

2    Q.    Sir, did Mr. Racz invent the idea of selling apps on an

3    electronic app store?

4    A.    No, absolutely not.

5    Q.    And what is the Ginter/InterTrust patent?   What light

6    does it shed on that?

7    A.    This patent, the Ginter/InterTrust patent, is quite rich

8    in its teachings of various types of content.   And included

9    in that -- those types are not only the types of content that

10   we're thinking about in terms of songs and books, but it also

11   describes a process called delivery of load modules.

12       By itself, that's hard to understand; but when you read

13   the patent, you understand a load module is an executable.

14   It's a small miniature program, if you will.

15       And by teaching ways of circulating load modules

16   throughout that process flow in Figure 2 -- I showed at the

17   opening where you have the content highway and so forth --

18   they can distribute load modules, as well as content through

19   that process.

20       So a load module can be an executable, and that

21   translates into an applet or an application.   So as of the

22   application date of this patent, it accommodates not only the

23   circulation and control over management but also executable

24   programs or software.

25   Q.    And app is short for what, sir?

1    A.    App has become short for what we used to call an

2    application, which is a program.

3    Q.    Okay.  And is a load module a software application?

4    A.    A load module carries information about applications

5    throughout the system, yes.

6    Q.    Turning to Slide 76, sir, you've got what on the left?

7    A.    This is Figure 1 from the Ginter/InterTrust patent.  And

8    this is the wrap-up slide that I prepared for discussion

9    about this patent.

10        And I've also color coded it to match previous color

11   codings that we've seen.  And shown on this slide is a video

12   production studio in purple.  That's a content supplier.

13        Consumer is in this little house here in red.  There's

14   an office environment, is another type of content consumer.

15        In the middle, the system manager, as I've called it,

16   sometimes operates as a storefront.  And finally, in green,

17   it says intimate -- independent financial provider.

18        So in comparison to Smartflash, similar colors, similar

19   functions can be accommodated through the teachings of this

20   patent.

21   Q.    Same components?

22   A.    They can be implemented to implement -- they can be

23   implemented to derive the same functions as the Smartflash

24   claims.

25   Q.    Did the Patent Office consider the Ginter/InterTrust

1  patent when Smartflash was prosecuting its patents?

2  A.    No, they didn't.

3  Q.    And was there a different Ginter patent considered by

4  the Patent Office in connection with the '221 and '772?

5  A.    Yes, sir.  There is another patent authored by the same

6  Mr. Ginter, but it's not the one that I have been discussing.

7  Q.    Let's turn back to your timeline, sir.  And which

8  reference would you like to focus on next?

9  A.    So next is the one on the far right.  It's still ahead

10  of Smartflash in terms of priority, and it's the

11  Ansell/Liquid Audio patent.

12  Q.    And this is the Mr. Ansell that -- who we saw testify

13  yesterday?

14  A.    Yes.  As a matter of fact, Mr. Ansell was here in the

15  court yesterday.

16  Q.    All right.  And we've now got up Defendant's Exhibit 21.

17  And what does this show, sir?

18  A.    This is the cover page to the patent, and it's titled,

19  Copy Security for Portable Music Players.

20        The first named inventor is Mr. Steven Ansell, who we

21  met yesterday.  The assignee is Liquid Audio.  And the filing

22  date is March 26th, 1999.

23  Q.    And how does that filing date compare to Mr. Racz's

24  priority date?

25  A.    It's still ahead of Smartflash.

```
1    Q.   Let's take a look at Page 79.
2         What does the Ansell/Liquid Audio patent describe as the
3    set of challenges it was confronting?
4    A.   So from Column 1 of this patent, Lines 23 through 26 and
5    28 through 33, we are -- it is explained that M3 -- MP3
6    players provide essentially no protection whatsoever against
7    unauthorized copying of copyrighted works.  That's piracy.
8    And unlimited identical digital copies of the music signal to
9    friends with no compensation whatsoever to the copyright
10   holder.  So the focus here is content management control, and
11   in particular, a piracy problem.
12   Q.   Okay.  And what are you showing here in Slide 80 on the
13   left and on the right?
14   A.   On the left is -- has become my usual approach to this.
15   The citations from the prior reference patent compared
16   against what Smartflash is directed to, and by now, we
17   recognize that it's the Internet and piracy, unauthorized
18   access to content.  So a need to find a way to address the
19   problem of data piracy.
20   Q.   Okay.  So as between these two, who recognized this
21   challenge first?
22   A.   Ansell -- Mr. Ansell and Liquid Audio recognized it
23   first.
24   Q.   And did the Patent Office consider the Ansell/Liquid
25   Audio patent when it decided to issue Mr. Racz's patents?
```

1  A.    No, it didn't.

2  Q.    If we could turn next to Slide 81.  You've got a couple

3  new references here in blue.  What are they?

4  A.    So these are two references, which I'll be using in

5  combination with the other references that I've already

6  covered.  And I'd like to give a brief introduction of these.

7  Q.    All right.  Should we start Poggio/Sun?

8  A.    Sure.

9  Q.    And we've got Defendant's Exhibit 35, and what is this,

10  sir?

11  A.    This is the cover page of a patent application which

12  means it wasn't the formally issued patent, but it was

13  publicly available information.  And it's entitled Virtual

14  Vending System and Method For Managing the Distribution,

15  Licensing and Rental of Electronic Data.

16       The date of publication -- this is a European

17  publication -- is November 26th, 1997.  The assignee was Sun

18  Microsystems, Inc., and the inventor -- the first named

19  inventor is Mr. Andrew Poggio.

20  Q.    And how does this date compare to the Smartflash

21  priority date?

22  A.    We are still well ahead of Smartflash at November 1997

23  versus October 1999.

24  Q.    Have you analyzed this application, sir?

25  A.    I have.

1    Q.    What are you depicting here on Slide 83?

2    A.    So this is Figure 1 from the Poggio/Sun Microsystems

3    patent.  It provides an overview of the system architecture,

4    and it explains in Column 2, Lines 32 through 36, and

5    Column -- and Lines 29 through 31, that this is a mechanism

6    to market, to distribute, and to receive payment for the

7    vendors of electronic data.

8         In this system, the vendor is shown at the top, that

9    it's a data supplier or a content supplier.

10   Q.    Before we move on to the second quote, sir, can I ask

11   you to -- the first few words at the top quote, the virtual

12   vending machine.  What is a virtual vending machine?

13   A.    In yellow is the box virtual vending machine, and it is

14   a central management device.  That's why it's in yellow,

15   manages the system.  And it resides between the content

16   suppliers as -- called the vendors in this patent and the

17   content consumers down here at the bottom.  That's shown as a

18   bunch of client computers.  And so off to the side, we also

19   have an electronic banking network.

20        And, generally speaking, the data flow in this

21   architecture is for the virtual vending machine to manage on

22   behalf of the content suppliers the delivery of their content

23   in a secure way and paid for to consumers down here at the

24   bottom.  So the process flow goes content, through the

25   vending machine, to consumers once payment has been made.

1   Q.    What does the Poggio/Sun Microsystems application say

2   about rental options?

3   A.    The second citation that I've highlighted describes

4   various license options are available which can include

5   procuring a license for a permanent time period or a

6   time-limited or rental basis.  And in this patent, to get

7   access to a piece of content, they manage that access through

8   what's called a license.  So if you get a license, you get a

9   license permanently or you might get a license for a rental

10  period.

11  Q.    Turning up Slide 84, does this elaborate on the rental

12  option?

13  A.    It elaborates on two things, yes, the rental option, as

14  well as the consumer experience in deciding how they want to

15  go about accessing content.

16        And at Column 7, Lines 13 through 16, it explains that

17  the user selects the license option; i.e., to purchase a

18  permanent option or by selecting the menu appropriately.  And

19  the user could alternatively select the rent option.

20        And what it's talking about is in the figure here,

21  Figure 6, that -- if you can imagine yourself sitting around

22  looking at a -- a website similar to what you might find when

23  you're shopping at Amazon, there are a number of selections

24  to be made.

25        Shown here is the purchase option or a rent option; and

1    if you choose rent, then you decide how long you want to rent

2    it for.  And as you fill in the spaces, the price that you

3    will have to pay comes up on this page accordingly.  And

4    before you're done, you have to click yes or no.

5    Q.   Sir, in the bottom box, if I can invite your attention,

6    in the first line to the -- it's not highlighted, but the

7    phrase license fee schedules.  Do you see that?

8    A.   Yes.

9    Q.   What's a license fee schedule?

10   A.   So a license fee schedule basically is the process that

11   I've just explained, and this is Column 25 -- I'm sorry,

12   patent application at 25 through 29.  And so the schedule

13   process is what pops out of the -- the consumer buying

14   selection process.

15        When you're done, and assuming your payment has been

16   processed and approved, you'll end up with a piece of content

17   and the license at your player device.  And the player device

18   will then manage the use of content accordingly to the

19   license.

20   Q.   All right.  Let's turn to Slide 85, and let me ask you,

21   how does a user purchase -- make a purchase in the Poggio/Sun

22   Microsystems application?

23   A.   Once again, it's easiest to look at this as a series of

24   steps that will be numbered.  This is -- so we can look at

25   Step 1.  I've already color coded these.  You can see the

1    user location as the client computer, making a request for

2    identified content -- content that they would like to

3    purchase.  This is explained in Column 9, Lines 45 through

4    48.

5         And Step 2 follows.

6    Q.   What is Step 2?

7    A.   Step 2 is explained at Column 10, Lines 1 through 4.

8         The -- what's called an invoice comes down to the

9    computer, and you can see the consumer is shopping on this

10   web page that shows up on their PC.

11        So this is a confirmation of what the consumer has

12   chosen, and about -- and the consumer has to click yes and

13   enter the payment information for that.  Going back up then

14   to the virtual vending machine is credit information or

15   similarly to pay for some -- for the content, along with the

16   invoice which identifies the content.

17   Q.   All right.  Would you explain Step 3, please?

18   A.   Step 3 is explained Columns 10 -- Column 10, Lines 11

19   through 14.  Once the virtual vending machine receives the

20   request, it then turns to the electronic banking network with

21   the information about the content and the consumer's

22   financial information, shown as the credit card.  It

23   validates that the process will -- is approved and returns

24   the approval to the virtual vending machine.

25   Q.   And after the payment is confirmed, what does the

1  vending machine do?

2  A.    As we saw, that was content going from the vending

3  machine down to the client computer.  Sometimes content may

4  be stored at the web server itself.

5       What I've shown here is in the event the consumer has

6  elected something that's not stored actually on the web

7  server, it can go out, all the way back to the vendor itself

8  where there's a library of products.  It can be brought into

9  the web server, virtual vending machine, and downloaded to

10  the consumer.

11       Now, at Column 10, Lines 24 through 30, it is explained

12  that in a rental situation, preferably, rental products are

13  formatted to include a time bomb or other disabling device.

14       And that's in the license.  And this is figuratively

15  saying you have access to the content until the time bomb

16  goes off and at that point your rental period is over.

17  Q.    And you're also citing to Figure 7 of the Poggio/Sun

18  Microsystems application?

19  A.    Yes.  Yes, that's correct.

20  Q.    Okay.  And how do the components of this Poggio/Sun

21  Microsystems application compare to those disclosed by

22  Smartflash?

23  A.    They're similar.  Click forward.  Color coding is now

24  complete.  We see the vendors' source of content and the

25  management machine store front and the client computers and

1    banking and financial institutions mapping over onto the like

2    functions in the Smartflash patent.

3    Q.    Same components?

4    A.    Yes, sir.

5    Q.    Let's turn now to the next item on your timeline.  What

6    is that?

7    A.    This is the Puhl/Motorola patent, the last one.

8    Q.    All right.  And we're looking now at Defendant's Exhibit

9    42?

10   A.    Yes.

11   Q.    And this is the Puhl/Motorola patent.  And would you

12   walk us through what's on this slide, sir?

13   A.    Yes.  We're looking at the cover page to the patent.

14         The title is:  Secure wireless electronic commerce

15   system with digital product certificates and digital license

16   certificates.

17         The assignee is Motorola.  The inventor is Mr. Larry

18   Puhl.  It has a filing date of March 26th, 1999.

19   Q.    And how does that date compare to the Smartflash

20   priority date?

21   A.    We are -- this is prior art, so we are still ahead of

22   Smartflash.

23   Q.    And what are you highlighting there from the abstract of

24   this Puhl/Motorola reference?

25   A.    So the abstract is this box right on the front of the

1  cover page, and it's -- gives you a short description of what

2  the patent is about.

3       And the point that I wanted to make with this is we are

4  dealing now with a wireless network specifically, and there

5  are a number of server or servers, which are coupleable or

6  connected to the wireless gateway onto the consumer products.

7       And so I have a picture of what it actually is talking

8  about on the next slide.

9  Q.   Let me just pause and ask you, sir, are the accused

10  Apple products here wireless products?

11  A.   Yes, sir, they are.

12  Q.   Slide 93, you've got Figure 4 here?

13  A.   That is correct.

14       And I chose this out of the figures in the patent

15  because it speaks directly to the summary I picked out of the

16  abstract.  And what you'll find here are a number of -- these

17  are the servers.

18       There's the wireless gateway, which simply means that's

19  the entry and exit point through the -- through the --

20  through that air, if you will, the wireless network.  And the

21  user device is shown as Item 450 at the bottom, basically a

22  cell phone.

23  Q.   All right.  What are you pointing to with your red arrow

24  at the bottom, sir?

25  A.   So this patent includes a device, a module, called a

1   SIM, subscriber identity module, and that is a memory

2   component, which has an identity included into it.   Most

3   phones have a SIM module.   Some are embedded.   Some you can

4   move around or change.   But if you'll click, we'll find that

5   that is inserted into the consumer unit.

6        So now the unit has an identity.   And one more click,

7   we're going to see the system in action very simply and

8   quickly.

9        What we're looking at are three different storefronts,

10  if you will.   Think of this as a virtual shopping mall.   You

11  can buy books, buy games, buy music.

12       And if we click one more time, through the wireless

13  gateway, the consumer is able to shop.   Here, they went to

14  the game store, provided credit card information, the game

15  store responded by downloading a game, and it went into the

16  cell phone.

17       So we have a selection, payment, and delivery process

18  through a wireless infrastructure to a -- to a mobile device.

19  Q.   All right, sir.   Now, can prior art be combined in an

20  analysis of invalidity in your understanding?

21  A.   Yes.   You can study prior art references and look at a

22  single reference and find everything in the asserted claims.

23  And that's called anticipation.

24       Or if you don't find everything in a single -- single

25  claim, you are welcome to seek an alternate or an additional

1   reference and use these together.  And they should complement

2   each other.  There should be a reason to put them together.

3        And when those aspects are met, you can use those in

4   combination to invalidate the claim.

5   Q.   And have you identified any specific combinations that

6   you relied on here?

7   A.   Yes, I have.  These are the combinations that I'll talk

8   about.  I've introduced all of these individually in the

9   materials that I've presented so far.

10        And what I'll show are the Gruse/IBM patent, it's said

11  to be in combination with Puhl/Motorola; Stefik/Xerox in

12  combination with Poggio/Sun and so forth.

13        And in one case, I actually have three combinations:

14  Ansell/Liquid Audio in combination with Poggio/Sun in

15  combination with Puhl/Motorola.

16  Q.   All right.  We're now looking at Slide 101, and you've

17  got Gruse/IBM plus Puhl/Motorola?

18  A.   That's correct.

19  Q.   All right.  And would you explain what's depicted here?

20  A.   So in validating a reason to put two references together

21  in combination, one needs to identify a reason to do that.

22        And at a high level, based on what we've all looked at

23  so far on these references, it's recognizable, I hope, that

24  these are similar systems for controlling delivery and

25  consumption of protected content in an electronic

1  distribution environment.

2      You may recall from the Gruse patent, they had a

3  thing -- Gruse/IBM patent, they had a device -- a vehicle

4  called a license.  In the Puhl/Motorola -- Motorola patent,

5  they used content certificates.

6      These are control mechanisms based on cryptograph --

7  cryptographic principles.  We don't need to worry about it,

8  but it shows that they already have some things in common,

9  and so that's caused a motivation to combine.

10  Q.   And why did you consider this specific combination, sir?

11  A.   Once I have a motivation, then there needs -- then they

12  will look for a reason to bring Puhl and Motorola together

13  with Gruse/IBM.

14      And what we learn is -- or what I found is that the

15  Gruse/IBM patent has a variety of devices and used over a

16  variety of different networks, for example, satellite and

17  wireless.  And Puhl/Motorola has a wireless for its

18  infrastructure.

19      So it's clear that these can be complementary and work

20  together.

21  Q.   All right.  Let's turn to Slide 103, and here you've got

22  what combination, sir?

23  A.   A combination of Stefik/Xerox and Poggio/Sun

24  Microsystems.

25      And at a high level, you'll notice in purple, I've

1   provided a little summary of what I'm talking about.  At a

2   high level, these are both similar systems, again, for

3   controlling delivery and consumption of protected content,

4   electronic distribution.

5        Stefik/Xerox includes the notion of fees being

6   associated with access to content.  And, of course,

7   Poggio/Sun, as we just looked at, has licenses for license

8   periods.  Once again, we have -- we see that these two

9   references can complement each other.

10  Q.   And what would the Poggio/Sun Microsystems application

11  add to the Stefik/Xerox patent?

12             MR. BATCHELDER:  Turn to Slide 104.

13  A.   Okay.  Sorry.  I think I got ahead of myself.

14       Can I go back one, please?

15  Q.   (By Mr. Batchelder) Sure.

16  A.   All right.  Yeah, I did go ahead of myself.

17             THE WITNESS:  Go one forward.

18  A.   So the answer to your question is shown on this slide.

19  And I mentioned the notion of fees associated with the

20  exercise of a right.

21       Stefik/Xerox talks in terms of rights and tells them the

22  duration over on the Poggio/Sun Microsystems license fees and

23  rental periods.  That was my reference about these two

24  complementing each other.

25  Q.   (By Mr. Batchelder) Thank you.

1    Let's move on to the next slide, 105.  What's the

2    combination you're depicting here, sir?

3    A.    So this is the combination with Ginter/InterTrust with

4    Poggio/Sun.  Again, at the first entry level, high level,

5    similar systems for controlling delivery and consumption and

6    protected content in an electronic distribution networks.

7         Electronic highway is the way Mr. Ginter and InterTrust

8    like to talk about it.  And the Poggio system we saw the --

9    excuse me -- virtual vending machine.

10             THE WITNESS:  Next slide.

11   Q.    (By Mr. Batchelder) Okay.  And what would Poggio/Sun add

12   to the Ginter/InterTrust patent?

13   A.    Poggio/Sun talks about the receipt -- to receive the

14   product upon receipt of a corresponding electronic payment.

15        And in purple, I've talked about the -- the marriage of

16   these two.

17        There's various content distribution and transaction

18   methods taught in the Ginter/InterTrust patent.  Among these

19   transactions are electronic -- I'm sorry -- various

20   participants in electronic commerce.

21        So when you read about electronic commerce, commerce

22   means merchandising.  That means buying products for a fee.

23        And so we have that common denominator between the

24   Ginter/InterTrust and the Poggio/Sun Microsystems.

25   Q.    Turning now to the Ansell/Liquid Audio patent, why would

```
 1    a person of ordinary skill combine Ansell/Liquid Audio with

 2    the Poggio/Sun reference?

 3    A.   Without sounding like too much of a broken record, all

 4    these systems are associated or directed towards similar

 5    systems for controlling delivery and consumption of protected

 6    content.  So it's electronic distribution and electronic

 7    commerce systems at the high level.

 8    Q.   All right.  And turning to 108, what would have been

 9    added through this combination?

10    A.   Poggio/Sun Microsystems talks about receiving the

11    product upon receipt of a corresponding payment.  And this is

12    download following receipt.

13         And over on the Ansell/Liquid Audio, a mechanism for

14    preventing the unauthorized copying of signals discouraged to

15    protect intellectual property rights of artists.

16         And so from the standpoint of distributing and playing

17    digitized audio/visual signals, the -- similar digital

18    distribution functions are found in Poggio/Microsystems.

19    Q.   All right, sir.  And now turning to Slide 109, what are

20    you depicting here with your purple language on the bottom?

21    A.   This is the example where I indicated I would be

22    combining three references.  So we have the two I just

23    finished discussing, and now we'll look to Puhl/Motorola.

24         These are electronic systems for merchandising, and so

25    is Puhl/Motorola.  In particular, you'll recall this is a
```

wireless distribution network using a mobile phone for

consumer applications.

Q.    Turn to Slide 110.  What are you describing here?  On

the bottom you've got variety of devices, networks plus

mobile phones, wireless.  What's that a reference to?

A.    So this is the -- the -- the second part of the three

references, variety of devices.  The present invention is not

limited, it says here, to the use of the Internet, as other

types of communication -- communications connections can be

used.  And as an example of other types of communications

connections, I'm showing the wireless gateway that's

described in the Puhl/Motorola patent.

Q.    All right, sir.  In Slide 111, why are you showing the

IBM system in your discussion of these other systems and

combinations?

A.    The IBM system, if you'll recall when we went through

that item, was not a single patent or a single reference.  It

was, in fact, a collection of references, and I've repeated

those bullets that I presented earlier.  It included the

public proof-of-concept trial, the technical information,

press releases, public demonstrations, the cooperation

between IBM and the music labels, and the IBM -- and the

Gruse/IBM patent itself.

     And so when you combine various disclosures like this

and look at it as a single reference, that is also called a

1    combination.

2    Q.    Okay.  And, again, why would a person of ordinary skill

3    combine these references in connection with the IBM system?

4    A.    In this case, all those references point toward the same

5    system.  And so if you wanted -- if you were one of ordinary

6    skill in the art and you wanted to know about it, they all

7    would complete your overall understanding of what that system

8    is.

9    Q.    Sir, have you considered whether the prior art that

10   you've explained discloses or renders obvious the asserted

11   claims -- the four asserted claims here?

12   A.    I have.

13   Q.    And what was your conclusion?

14   A.    My conclusion is, based on these prior art references,

15   that all four of the asserted claims are invalid.

16   Q.    Are these those four claims?

17   A.    Yes, sir.

18   Q.    Would you just read them off for the record?

19   A.    Yes.  '720 patent, Claim 13.  '221 patent, Claim 32.

20   And the '772 patent, Claims 26 and 32.

21   Q.    All right.  And what prior art references have you

22   considered in connection with the first of those -- that is,

23   the '720 patent, Claim 13?

24   A.    So I'm going to use a -- a repeating pattern as I go

25   through my invalidation analysis with -- with the Court and

1    the jury.  And I will show the patent claim -- excuse me,

2    I'll show the patent claim, the asserted claim, and color

3    code certain of the elements so it's easier to keep track as

4    we go through.

5         And one at a time, I will analyze the prior art

6    reference against each of the elements of the claim.

7         And so on this opening one, we find that I'm going to

8    talk about Gruse/IBM as an invalidating reference.

9         And when I'm done, I'm going to cover the IBM system.

10   I'm actually going to cover the IBM system as I go through

11   the IBM patent because that makes it go faster for us.

12        Then I'll talk about the Stefik/Xerox in combination

13   with Poggio/Sun, and finally Ginter/InterTrust in combination

14   with Poggio/Sun.

15   Q.   All right, sir.  In Slide 114 you've grayed out

16   everything but the preamble.  Why have you done that?

17   A.   So in the process of going through this, I'll highlight

18   one claim element or preamble at a time so that it sticks out

19   for us.  And then we'll address it one at a time.

20   Q.   Okay.  What are you depicting there on Slide 114?

21   A.   So beginning with the preamble, which describes a data

22   access terminal for retrieving data from a data supplier and

23   providing the retrieved data to a data carrier.  And

24   beginning with IBM/Gruse -- I'm sorry, Gruse/IBM, Figure 6

25   that we've seen before, here is the end-user device.

1        And you'll recall the content hosting site.  And so the

2   user -- end-user device, as described at Column 14, Lines 34

3   through 37, ingests or accepts information coming from a data

4   supplier.  And inside the user device there is a data

5   carrier.

6   Q.   And what is a data carrier in con -- in the context of

7   this case?

8   A.   Inside the user device, there is a memory in that red

9   box.  It's a small computer with a memory.

10  Q.   Okay.  And we've seen before, the Court's claim

11  construction was data carrier is a medium capable of storing

12  information; is that right?

13  A.   That is correct.

14  Q.   And how does that apply to what you're showing us here?

15  A.   It directly applies.  The device that accepts the

16  content from the data supplier goes on to a data carrier

17  inside the end-user device.  In fact, I repeat -- I call

18  attention to that in the following slide.

19       I've highlighted the need for a data carrier, as

20  described in the preamble, reminding us of the Court's

21  construction, a medium capable of storing information.

22       In Figure 1D and also at Column 89, Lines 38 through 52

23  of the patent, the figure describes what's inside an end user

24  device.  And in there is a DC library collection.  That is a

25  memory storage location for content.

1   Q.   So does the Gruse/IBM patent disclose this preamble of

2   '720 patent, Claim 13?

3   A.   Yes.

4   Q.   And does the IBM system also do so?

5   A.   Yes, sir.  That's the next slide.

6   Q.   Walk us through this, would you, please?

7   A.   So with the IBM system, we have our end-user device,

8   which you'll recall is this Sony Walkman.  And we also --

9   we're -- found out that the IBM system had the similar types

10  of processing components as that were described in the

11  Gruse/IBM patent.  I've highlighted the content preparation

12  and hosting site, and the client software, which was

13  disclosed as going inside the end-user devices.  So the --

14  this IBM system also meets the requirements of the preamble.

15  Q.   And does the -- the device in front of you, that Walkman

16  device, does it have memory?

17  A.   Yes, sir.  That is the MagicGate memory device that we

18  saw in the picture earlier inside there.

19  Q.   Okay.  So does -- does it meet -- meet the Court's claim

20  construction of data carrier?

21  A.   Yes.

22  Q.   All right.  We're now moving on to the second element;

23  is that right?

24  A.   Yes.

25  Q.   Okay.

```
 1   A.   And the second element asks for a first interface for
 2   communicating with the data supplier.  So the end-user device
 3   has an input/output capability so that it can interface with
 4   the data supplier.  And in the next slide --
 5   Q.   If I could just ask you, sir, what -- what passage are
 6   you citing from Defendant's Exhibit 23?
 7   A.   Thank you.  This is Gruse/IBM patent, Figure 6.
 8   Q.   All right.  And what are you showing here on Slide 118?
 9   A.   This is the next element, a data carrier interface for
10   interfacing with the data carrier.  And the box in the
11   middle, which was the data carrier previously, now we're
12   looking at how you get information into and out of that data
13   carrier.  And I've highlighted the arrows associated with
14   that.  That's Figure 1D, and it's supported by Column --
15   information at Column 81, Lines 56 through 59.
16   Q.   And was there such an interface also in the IBM system?
17   A.   Yes.  Next slide shows a picture of the Walkman device I
18   mentioned, how the bottom comes off of it, and the memory
19   stick goes in.  At the edge of that MagicGate are some little
20   pins, and that is literally a physical interface.
21   Q.   All right.  Moving on to Slide 120, there's a program
22   store and a processor that are required here?
23   A.   Yes.  I'm going to cover the next two elements in the
24   same picture.  There's a program store and a processor.
25   Q.   All right.  What are you showing here, sir?
```

```
 1   A.    Back to the same Figure 1D, with information supporting

 2   that at Column 9, Lines 33 through 34.   So we've moved

 3   outward a little bit to look at the -- some of the rest of

 4   the components of the end-user device.

 5         End-user device is a software driven machine which means

 6   it has a processor, it has code, it has memory that execute,

 7   just like any little computer.   And we're given examples of a

 8   web browser, watermarking, decryption functions.   There's

 9   applications.   So I've highlighted those functions in purple.

10   Q.    All right.   What -- what element comes next, sir, in the

11   claim?

12   A.    Code to read payment data from the data carrier --

13   excuse me -- and forward the payment data to a payment

14   validation system.

15   Q.    All right.   And what are you showing here from this

16   patent?

17   A.    Recalling Figure 6, which showed us the overall system

18   and remembering the clearinghouse there, the end-user devices

19   forwards payment data to the clearinghouse.   This is

20   supported by the information in Column 77, Lines 31 through

21   42.   So the payment data requirement is satisfied.

22   Q.    All right.   What are you showing here, sir?

23   A.    And, likewise, for the IBM system, since it was based on

24   the Gruse/IBM patent, Figure 6, we can point to the same

25   function and recognize that we were told right here in
```

1    Defendant's Exhibit 33 that the clearinghouse function was

2    implemented in the IBM system.

3    Q.   All right.   Turning to the next element, the code to

4    receive element, is that disclosed in the Gruse/IBM patent?

5    A.   Yes.

6    Q.   Please explain.

7    A.   Code to receive payment validation from the payment

8    validation system.   So we have sent payment data, and now

9    this is the next step of receiving validation data back.

10   It's explained at Columns 26, Line -- Column 26, Line 39

11   through 42, Column 84, Lines 34 through 35.

12       If the verifications are successful, the clearinghouse

13   builds and transfers the license secure container to the

14   end-user device.

15       So returned from the clearinghouse, following this path

16   to the end-user device, is -- on approval of the payment, is

17   information that goes back to the user device -- that is,

18   payment validation data.

19   Q.   Okay.   And you're referring to Figure 6, and what other

20   lines and passages?

21   A.   Column 26, Lines 39 through 42, and 80 -- Column 84,

22   Lines 34 through 35.

23   Q.   Okay.   And then what have you added to the bottom?

24   A.   So to complete the -- the description and provide

25   additional support, this slide shows the actual secure

1    container that's returned to the user device that I've just

2    mentioned.   It is supported by the same citation I just gave,

3    and with an additional citation at Column 84, Lines 45

4    through 46.

5        So se -- secure container goes back to the user device

6    as a transaction ID, and it's provided by the electronic

7    digital content store.

8    Q.   All right.   And what are you showing here with the

9    clearinghouse?

10   A.   So this brings into the discussion, again, the IBM

11   system and the fact that the same clearinghouse has been

12   identified as part of that system.

13       And I've cited to Defendant's Exhibit 33, which said

14   the -- remember, they've referred to their system as EMMS,

15   electronic manage -- electronic music management system, so

16   we know we're talking about IBM system there, and they talked

17   about reporting of royalties and financial clearing.

18   Q.   All right.   Let's move on to the next element.   This is

19   code responsive to payment validation data.   What does the

20   IBM/Gruse -- excuse me, Gruse/IBM patent say about this?

21   A.   So I've highlighted two -- I've highlighted a -- a part

22   of this, code responsive to the payment validation data to

23   retrieve data from the data supplier.   So after all the

24   payment stuff is taken care and subject to the payment

25   process, then the device is allowed to go out and get the

1   data.

2        So citing from the patent at Column 26, Lines 53 through

3   57, it says:  After receiving the license secure container --

4   that was what we just saw coming from the clearinghouse.  So

5   that satisfied the code responsive to.  Then the -- the user

6   device will request the content secure container from a

7   content hosting site.

8        Let me complete the citations for the record.  Also

9   included Column 26, Lines 39 through 42, Column 26, Lines 53

10  through 57.

11  Q.   All right, sir.  Moving to the next element, what are

12  you showing here from the Gruse/IBM patent?

13  A.   The next claim element says code responsive to the

14  payment validation data, again, to receive at least one

15  access rule from the data supplier.  So it's been a two-step

16  process to get us here -- payment, retrieve the content.  Now

17  we're going to retrieve an access rule.  Code responsive.

18       After receiving the license smart card and after

19  receiving the content secure container, then at the player

20  device, when an end user device receives the content that was

21  purchased, the store usage conditions are encoded into that

22  content.

23       So this is a process that happens at the end-user device

24  to put the usage condition into memory, that data carrier at

25  the usage -- at the user device.

```
1    Q.    And so the record is clear, the SC in these codes stands

2    for secure container?

3    A.    Yes.   I've been saying it out loud because sometimes SC

4    is sometimes confused with smart card.   It's not smart --

5    it's a -- a secure container.

6    Q.    Okay.

7    A.    And for the record, I've been citing from Column 26,

8    Lines 53 through 57, Column 84, Lines 34 through 36, and

9    Column 28, Lines 32 through 35 -- 35.

10   Q.    All right, sir.   Let's move to the next limitation, and

11   what are you depicting here in connection with that?

12   A.    So this claim element requires that the access rule that

13   was just written into the data carrier should specify a

14   condition for accessing the content, and that condition

15   should be dependent upon the amount of payment used.

16        And this time I am referencing the Gruse/IBM patent at

17   Column 62, Rows 47 through 62, which is where the usage

18   condition table is located.   I'm also going to cite to Column

19   28, Lines 39 through 42.

20        Examples of store usage conditions for music, for

21   example, is that the song can be played, for example, n

22   number of times.   Looking up at the table, we find a row of

23   usage -- for usage condition that talks about a rental.   Keep

24   in mind we can do purchase, we can do rental as shown at the

25   top.
```

1          And, in particular, for different usage condition 1, 2,

2   and 3, it shows you can have Price 1, Price 2, or Price 3.

3          And so the access conditions, based upon the amount of

4   payment, is clearly disclosed.

5   Q.    Turning to the final limitation added by Claim 13, it

6   lists some devices, correct, sir?

7   A.    Yes.

8   Q.    And at the end of that list, there's an and/or.  Do you

9   see that?

10  A.    Yes.

11  Q.    What does that mean?

12  A.    The final claim limitation, which now brings us to the

13  Dependent Claim 13, talks about the kind of device this might

14  be, mobile communication device, a personal computer,

15  et cetera.  And it says and/or a satellite television

16  interface device, point being any one of these devices

17  satisfies this claim element.

18  Q.    And is that -- are any of those then disclosed in the

19  Gruse/IBM reference?

20  A.    Yes, sir, Column 9, 33 through 36, and 23, 12 through

21  14, discloses PCs, set-top boxes, Internet appliances, IBM

22  Think Pad, laptop computer.  So it's a final requirement.

23  Q.    Just to be clear, you mentioned PCs.  What does that

24  stand for?

25  A.    The text -- formal text in the disclosure says PCS.

1    That either means personal communication system or it's a

2    typo, and it should be PC small S, personal computers.  So

3    either way it's satisfied.

4    Q.   Okay.  And the bottom one ends with laptop computer in

5    the bottom right?

6    A.   Yes.

7    Q.   And is that a personal computer?

8    A.   Sure is.

9    Q.   All right.  Let's turn to Slide 129.  And you're talking

10   here about the IBM system?

11   A.   Yes.

12   Q.   And how does that relate to the -- this final claim

13   element?

14   A.   This shows different kinds of user devices.  We have

15   seen the Sony Walkman, which we have a physical copy of up

16   front.

17       I mentioned the mobile phone network disclosure that was

18   described as being compatible with the IBM system.  So we

19   have a mobile -- excuse me -- a mobile device, as well as a

20   cell phone audio player combination.  So the IBM system meets

21   this claim element.

22   Q.   Have we now stepped through every single element of

23   Claim 13 of the '720 patent?

24   A.   Yes, sir.

25   Q.   And is it or is it not disclosed by the Gruse/IBM patent

1    and IBM system?

2    A.    All the claim requirements and claim elements are fully

3    disclosed by the Gruse/IBM patent and the IBM system

4    patent -- IBM system.  Excuse me.  It's not a patent.

5          And so we can checkmark the top two boxes for Gruse/IBM

6    and IBM system.

7    Q.    All right.  Let's move next to the Stefik/Xerox patent.

8          And let me just ask you, in the upper right, you've done

9    some highlighting of the various references.  Can you just

10   explain to the jury what you mean by that?

11   A.    Yes.  Thanks.  I wanted to mention that.

12         To kind of keep track of where we are as I have to go

13   through this process, we just did the Gruse/IBM and IBM

14   system.  Now we'll move on to Stefik in combination with

15   Poggio.

16         So you can look up there and track progress as we go.

17   So the next series of checkoffs will be related to the

18   elements as disclosed by Stefik/Xerox and Poggio/Sun.

19   Q.    Thank you, sir.

20         All right.  So what are you showing here with the pulls

21   from the Stefik/Xerox patent?

22   A.    Back to the preamble:  A data access terminal for

23   retrieving data from a data supplier.

24         This is Figure 12 from the Stefik/Xerox patent.  I'll

25   remind everybody, this was what they called the repository,

1    which is an end-user device.  And it has an external

2    interface shown, and that is the interface to the outside

3    world.

4        And so the data retrieved from a data supplier would

5    come in through this interface 1206.

6    Q.    Okay.  And what are you showing on the bottom?

7    A.    I'm citing to Column 7, Lines 44 through 49.  When in

8    the requester mode, the repository will be initiating

9    requests to receive -- requests to access digital works.

10       So there's the support for getting digital works or

11   receiving digital works from a data supplier for that

12   element.

13   Q.    All right.  Let's move to -- what did you add here in

14   yellow, sir?

15   A.    The data carrier is a requirement of this preamble.

16   There has to be a data carrier storage element inside.

17       Figure 12 shows us a memory storage for content and a

18   memory storage for what's called descriptor.

19       Descriptor is the memory storage locations for usage

20   controls or access rules in this -- in this patent.

21       So the claim element has been satisfied, and we move to

22   the first interface for communicating with the data supplier.

23       And I mentioned a moment ago the external interface now

24   highlighted in blue.  So that's satisfied.  That is explained

25   in Figure 12.

1        And just to remind us from the animation, repository 2

2   is the end user, and it made a request for content, which was

3   then delivered from the content supplier.

4   Q.   And what are the passages from the Stefik/Xerox patent

5   that you're relying on?

6   A.   Column 7, 16 through 22.

7   Q.   Let's move to the next claim element.   What does the

8   Stefik/Xerox patent say about this?

9   A.   A data carrier interface for interfacing with the data

10  carrier.

11       And I just described the data carrier down here in 1207.

12  Those are arrows for interfacing with the data carrier, and

13  that's in Figure 12.

14  Q.   So is that element met?

15  A.   Yes, sir.

16  Q.   What are the next two?

17  A.   Program for -- a program store storing code, memory

18  storage for code, and a processor coupled to the first

19  interface.

20       So back to Figure 12 again -- we make lots of use of

21  this figure -- there is a processing element and a memory for

22  the processor shown as elements 1201 and 1202.  So these two

23  claim elements are satisfied.

24  Q.   Let's go to the next limitation, sir.  What is this?

25  A.   Code to read payment data from the data carrier and

1   forward the data -- payment data to a payment validation

2   system.

3   Q.   All right.  And what have you shown from this reference?

4   A.   So this is where I bring in the Poggio/Sun combination

5   reference.  So we'll see a combination for the first time and

6   how that happens.

7        And I've drawn from the animation that we saw earlier

8   for the Poggio/Sun application and Figure 7, and I find

9   further support there in the Poggio/Sun Microsystems patent

10  application at Column 10, Lines 1 through 4.

11       And we don't have to run through the animation again;

12  but I'll just remind everybody that we saw payment data going

13  from the user location, which is where the data carrier is,

14  up to the virtual vending machine where it subsequently --

15  you may remember it was delivered to a payment validation

16  system.

17       So this element is satisfied by the combination of

18  Stefik/Xerox and Poggio/Sun.

19  Q.   All right, sir.  Next limitation, what are we seeing

20  here?

21  A.   Code to validate -- code to receive payment validation

22  from the payment validation system.

23       So this is the next piece of the animation from the

24  Poggio/Sun Microsystems and recalling the approval of the

25  payment process that took place as supported in Poggio/Sun at

1   Column 10, Lines 11 through 14.

2        We see there:  Signifying successful completion of the

3   payment transaction.  So this claim element is satisfied.

4   Q.   All right.  Let's move to the next one.  What are you

5   showing here?

6   A.   This is the element that has:  Code responsive to the

7   payment validation data to go get the content.

8        And I'm citing to the Poggio/Sun Microsystems

9   application at 10/24 through 30 and Figure 7.  The method

10  then proceeds to format the purchased product for

11  transmission to the user.

12       So this is the code responsive part; and subsequent to

13  that, the content is sent from the virtual vending machine

14  down to the user device, and that --

15  Q.   What have you added to the top there?

16  A.   Thank you.  I'd forgotten I had the follow-on slide.

17       We see now the content coming from the code responsive

18  part to -- I'm sorry -- the -- yes -- the content coming from

19  the virtual vending machine down to the client computer.

20  Q.   All right, sir.  And what are you citing there?

21  A.   Same citation, Figure 7 and -- from Poggio/Sun

22  Microsystems and Column 10, Lines 24 through 30.

23  Q.   All right.  Let's move to the next limitation.  What are

24  you showing here?

25  A.   The second part of the code responsive to the payment

1    validation requirement is to go out and then receive the

2    access rule, citing to Figure 7 of Poggio/Sun, and once

3    again, back to the animation, as well as citing from Column

4    10, Lines 24 through 30 and Figure 7, remembering that

5    Poggio/Sun explains that in conjunction with, for example, a

6    rental situation.

7         The rental products are formatted to include a time

8    bomb.  So that declares the rental period over, and so that's

9    clearly a use rule, an access rule.  That happens after

10   payment validation has taken place.

11   Q.   So is that element satisfied?

12   A.   Yes.

13   Q.   All right.  Moving to the next one, sir, what are you

14   showing here?

15   A.   This is the claim element that talks about the use

16   condition and access rule condition being dependent upon the

17   amount of payment associated with the transaction.

18        Continuing to use the combination of Stefik/Xerox and

19   Poggio/Sun, go to Figure 6 where we learned earlier that in

20   the process of purchasing a component, that the consumer,

21   depending upon their purchase and their rental time period,

22   gets a different requirement for price.  And so that's

23   dependent upon the amount of payment.

24        I'm also looking at support from Stefik/Xerox, Column

25   18, Lines 13 through 16.  Talks about five copies for $10,

1    unlimited copies for a hundred dollars.  So it -- depending

2    upon payment.

3        And additional support in Sun Microsystems -- Poggio/Sun

4    at Column 7, Lines 13 through 16.  So this element is

5    satisfied.

6    Q.   All right.  Then moving to the final element, sir, what

7    are you depicting here?

8    A.   This element, you recall we talked about a moment ago,

9    first time we saw it, a personal computer, an audio/video

10   player, and/or cable satellite television, any one of those

11   devices.

12       In the Stefik/Xerox patent at Column 13, Lines 48

13   through 50, they describe what in this invention is called a

14   rendering repository.  That's a play-out device.

15       And in the same patent, Columns 51, Line -- Column 51,

16   Lines 33 through 37, they add additional detail saying that

17   that type of a rendering device or play-out device could be a

18   general purpose computer or video systems or audio systems.

19       And so the claim element is satisfied.

20   Q.   Have we now been through all of the claim limitations in

21   connection with the Stefik/Xerox and Poggio/Sun combination?

22   A.   Yes, we have.

23   Q.   And what is your opinion, sir?

24   A.   We need to put a check on the third box.

25   Q.   Why?

1    A.    Because these -- the combination of Stefik/Xerox -- let

2    me start over.

3         The Stefik/Xerox patent, in combination with the

4    Poggio/Sun patent application satisfied all the requirements

5    of Claim 13, and, therefore, Claim 13 is invalid.

6    Q.    Sir, you've got that list on the right.  To be clear,

7    how many blue checkmarks do we need to demonstrate that this

8    claim is invalid?

9    A.    Any prior art reference or prior art reference

10   combination that satisfies all those immediately makes that

11   claim invalid, so you only need one.

12   Q.    And so far you've got?

13   A.    Three.

14   Q.    Let's move on to your last.  This is the

15   Ginter/InterTrust patent combined with Poggio/Sun reference?

16   A.    Yes.

17   Q.    All right.  First limitation, what are you showing here?

18   A.    Okay.  Back we go again to the preamble.  We'll start

19   up, and now we're talking, as you can see in the illuminated

20   items up there, Ginter/InterTrust, Poggio/Sun, combination,

21   citing from the former Ginter/InterTrust, Column 209, Lines

22   64 through 66.

23        I described the content objects earlier as the container

24   that moves content around in the Ginter/InterTrust patent.

25   It explains that objects may be received by retrieval from an

1    object repository over a network.

2        So what's being described there is the data supplier

3    providing content to a data retriever or a data carrier in

4    the end user device.

5    Q.    So is that preamble met?

6    A.    Yes.

7    Q.    And what are you adding here?

8    A.    Additional support.  This is Figure 8 from the

9    Ginter/InterTrust patent, and it's described at Column 62,

10   Lines 64 through 67.  Highlighted the data carrier

11   requirement in the preamble.

12       And we have -- Figure 8 is a block diagram of the Ginter

13   consumer appliance or electronic appliance.  And there's a

14   box called secondary storage.  And you probably can't see it,

15   but there's a thing there called VDE objects.  That's where

16   those objects go.  So we have a data carrier.

17   Q.    VDE objects.  VDE?  Is that what you said?

18   A.    Yes.

19   Q.    Okay.

20   A.    I've tried to avoid being too technical in this patent.

21   Everything is VDE.  It stands for virtual distribution

22   environment.  So that's the -- that's where the objects go,

23   content object.

24   Q.    Okay.  So is the preamble satisfied by this

25   Ginter/InterTrust patent, sir?

A.   Yes, it is.

Q.   Let's move on to the next limitation.  What are you

showing from the Ginter/InterTrust patent?

A.   This limitation asks for the interface for communicating

with the data supplier.  We can use the same Figure 8 block

diagram of the electronic appliance.

     There is a box called communications controller

connected to a little cloud there that's the network.  Out in

that network is the data supplier.  So this is the portal

into which data content -- data -- content data comes.

     It is supported by disclosure in the specification at

Column 62, Lines 30 through 33.  The electronic appliance --

that's this diagram -- can communicate with other electronic

appliances via the network.  And it's those other electronic

appliances, of course, that have the content.

Q.   So is this claim element satisfied by the

Ginter/InterTrust patent, sir?

A.   Yes.

Q.   Next claim limitation, what are you showing here?

A.   Data carrier interface for interfacing with a data

carrier.  This is inside the appliance and there's a

communications arrow shown between the communications

controller and the memory location.

     So that's the interface for communicating with the data

carrier.  This is supported in the Ginter/InterTrust patent

1   at Column 62, Lines 37 through 40.

2   Q.   Move on to the next limitations, the program store and

3   the processor limitations.

4   A.   Okay.

5   Q.   What are you showing here from Ginter/InterTrust?

6   A.   Once again, I'll address those two limitations together.

7   Program store, storing code, that's memory where code goes.

8   And a processor to execute the code, that's nicely revealed

9   in this same Figure 8 as the CPU and the associated memory

10  658.

11      Additional support was provided in the patent at Column

12  75, Lines 35 through 37, and Column 288, 61 through 68.

13  Q.   So the record is clear, sir, what is a CPU?  What is

14  that acronym?

15  A.   It stands for central processing unit.  And

16  Mr. Mirrashidi, I believe yesterday, described it in the

17  Apple products, for example, as the brain of the consumer

18  unit.

19  Q.   The P in CPU is the processor?

20  A.   Yes, sir.

21  Q.   Okay.  And that matches up to the processor in the --

22  Mr. Racz's claim?

23  A.   Exactly.

24  Q.   Okay.  Let's move on to the next element, sir.  What is

25  that element, and what are you disclosing here?

1   A.   Code to read payment data from the data carrier and to

2   forward the payment data to a payment validation system.

3        Again, this is a combination invalidation argument that

4   I'm presenting, and for the payment processes, I'm going to

5   present exactly the same support that I just provided when we

6   looked at the Stefik/Xerox patent.

7        So you'll see the similar animation, citations, and

8   hopefully, we can speed that up a little bit because it's

9   exactly the same arguments for the same claim elements, this

10  time around in combination with Ginter/InterTrust.

11       Additional support in the Poggio/Sun patent is at Column

12  10, Lines 1 through 4.  So this is entering payment data that

13  goes -- payment data -- excuse me -- going out of the data

14  carrier as payment data.

15  Q.   So is this element satisfied, sir?

16  A.   Yeah.  Yes.

17  Q.   Moving on to the next limitation, what is it, and what

18  are you depicting here?

19  A.   This is the code to receive payment validation data from

20  the payment validation system.  This is disclosed in the

21  Poggio/Sun Microsystems patent using the animation I provided

22  in Column 10, Lines 11 through 14.  This is satisfied.

23  Q.   Moving on to the next limitation, the code responsive to

24  payment validation data, the first of those, what are you

25  depicting here, sir?

1   A.   Once again citing from the Poggio/Sun patent

2   application, Column 10, Lines 24 through 30:  The method then

3   proceeds to format the purchase product for the transmission

4   to the user.

5       The method then satisfies the "code responsive to"

6   portion.  So the data doesn't come back until after the

7   content approval payment process has taken place.  So this

8   element is satisfied.

9   Q.   Moving to the next code responsive element, what are you

10  depicting here, sir?

11  A.   This is the element that requires now the downloading of

12  the usage condition.  Same citation, Column -- Column 10, 24

13  through 30, in Poggio/Sun.  The method then proceeds to

14  format the purchased product transmission.  Preferably the

15  rental products are formatted to include a time bomb.  Time

16  bomb includes the license termination process, so that's the

17  usage control conditions.

18      Also, in Ginter/InterTrust at Column 57, Lines 17

19  through 23, it's described that the budgets process was in

20  that usage control Figure 3 that I showed earlier that may

21  specify, among other things, limitations on usage of

22  information content.  So we find this satisfied both in

23  Ginter/InterTrust, as well as Poggio/Sun.  This element is

24  satisfied.

25  Q.   Let's move on to the next one, sir.  What is that

1    requirement, and what are you depicting here from the

2    Poggio/Sun Microsystems application?

3    A.    That the rule that has just been imported and put into

4    the data carrier needs to include a condition, depending upon

5    the amount of payment.  So I'll cite back to the Poggio/Sun

6    Microsystems, Figure 6, that I showed earlier.  Recall, when

7    the user decides to purchase, rent.  And if it's rent, they

8    can select a rental period which buries the purchase price.

9        So it's depending upon -- the amount of payment is how

10   long they get to use the -- the product.  There's additional

11   support on that subject, Column 7, Lines 13 through 16 in

12   Poggio/Sun.  This is satisfied.

13   Q.    Moving on to this final requirement, sir, again, remind

14   us what it is and whether it's satisfied in the

15   Ginter/InterTrust patent?

16   A.    It is -- it requires that the player device integrated

17   with the mobile communication device, a personal computer, an

18   audio/video player, any one of these that's found in the

19   prior art reference will satisfy this limitation.

20       In the Ginter/InterTrust patent at Column 60, Lines 52

21   through 30 -- 55 -- 52 through 55, they talk about the

22   appliance -- that's the consumer appliance -- personal

23   computer.  The element is satisfied.

24   Q.    Have we now stepped through each requirement of this

25   claim?

1   A.    Yes.

2   Q.    What should we do in that final box, sir?

3   A.    I've shown that Claim 13 is invalid in light of

4   Ginter/InterTrust and Poggio/Sun combination.   That claim is

5   invalid.   We should check that box.

6   Q.    Is that another independent reason to invalidate this

7   claim?

8   A.    It is.

9   Q.    All right.   Let's move on to the next claim, which is

10  Claim 32 of the '221 patent.   What references are you

11  considering here?

12  A.    These are exactly the same references that I just went

13  through element-by-element for Claim 13.   This time we are in

14  a different patent, '221, Claim 32.   And the interesting news

15  is that most of these claim elements are exactly the same as

16  the one that we just looked at.

17       And so if we can step forward one, I can explain the

18  implications of that.

19  Q.    What are you showing on the left versus the right here?

20  A.    This on the right is '720, Claim 13, the claim we just

21  went through and invalidated, all but the last claim element

22  about integrated with a mobile communications device.   So

23  basically all the major moving parts, all the limitations of

24  Claim 3 are color coded -- recall them.

25       And over in Claim 32 of the '221 patent, you'll see a

1   mapping -- a direct mapping of the color coding, all the way

2   down to the last requirement.

3       And, in fact, when I analyzed the comparison between

4   these two claims, it was my conclusion that all of the color

5   codings you see in Claim 32 map directly to the similar

6   colors in Claim 13.  In other words, they have the same

7   requirements.

8       And if we could step forward, please.

9   Q.  And why have you added checkmarks?

10  A.  So the result of the claim elements -- the preamble and

11  claim element requirements of Claim 32 being the same as

12  those in '720, Claim 13, every element I found in Claim 13 of

13  the '720 patent that compares to the similar element of Claim

14  32 makes every one of these elements in 32 invalid, and I've

15  checked them all off accordingly.

16  Q.  So you're relying on the same corresponding prior art

17  that you just taught us?

18  A.  That is correct.

19  Q.  All right.  Can we turn to this last claim requirement

20  then?

21  A.  Yeah -- yes.

22  Q.  And you've highlighted that at the bottom?

23  A.  Yes.  Right.

24  Q.  And what are you depicting here, sir?

25  A.  So there was one claim element that was different than

1   the previous Claim 13 of the '720 patent.  And I'll just read

2   it.  This is code to retrieve from the data supplier an

3   output to a user-stored data identifier data and associated

4   value data and use rule data.  The simple translation of that

5   is present to a user what the content item is -- that's an

6   identifier -- value data -- what it costs -- and use rule

7   data -- what are the conditions for access?  It's that

8   simple.

9        And so the first comparison that I'm showing is with the

10  Gruse/IBM patent.  And we're -- again, we're looking for

11  identifier, cost, constraint.

12       And citing from Column 28, 19 through 26, of the

13  Gruse/IBM patent.  The end-user devices request authorization

14  for the content based on store usage condition.

15       So the content will be identified that the consumer is

16  going to request.

17       And in this patent at Column 62, Lines 47 through 32 --

18  62, excuse me, we find the familiar usage rule table.  So I

19  have a -- content identified, we're going to be looking for

20  cost information.  That exists in the price row at the

21  bottom.  Price 1, Price 2, Price 3.  And use rule data --

22  this entire table is full of usage conditions, according to

23  Use Condition 1, 2, and 3.

24       So we find all the requirements of this claim element

25  met in the Gruse/IBM patent.

1  Q.   So you put a check for Gruse/IBM because, why, sir, just

2  to be clear?

3  A.   Yes.

4  Q.   And you put that there why?

5  A.   Because the additional citations that I just cited to in

6  the Gruse/IBM patent satisfied the one remaining claim

7  requirement that was not previously invalidated when we

8  looked at the '720 patent, Claim 13, patent.

9  Q.   Well, let's move on.  And why have you checked the IBM

10 System?

11 A.   Because the IBM system, when I went through the '720

12 patent, Claim 13, patent, you'll recall that I also addressed

13 that.  The same citations that I just provided for the

14 Gruse/IBM patent satisfy the IBM system patent because the

15 IBM System patent includes the Gruse/IBM patent.

16 Q.   What are you showing here, sir?

17 A.   The next invalidating reference is the Stefik/Xerox

18 patent.  Again, we're looking for an identifier, a value, the

19 cost, and a user rule.  Stefik/Xerox explains at Column 18,

20 Lines 33 through 38, the specifications components 1452 are

21 used to specify conditions which must be satisfied prior to

22 the right being exercised or to designate various

23 transaction-related parameters.

24     In the currently preferred embodiment, these

25 specifications include copy count, fees, and incentives,

```
1    time, access and security, and control.  So -- I'm sorry,
2    these -- these are use rule conditions or usage conditions
3    for the types of content that the Stefik/Xerox patent
4    provides controls over, and it's in Figure 14 that it's
5    referring to.
6    Q.   Thank you, sir.  So what should we do for the
7    combination of Stefik/Xerox and Poggio/Sun?
8    A.   We should check that off.
9    Q.   Because?
10   A.   Because that claim element is satisfied, therefor
11   invalidating Claim 32 in light of Stefik/Xerox and
12   Poggio/Sun.
13   Q.   Let's move on to the next combination which is
14   Ginter/InterTrust combined with Poggio/Sun.  Again, focusing
15   on that final limitation, what do you show here, sir?
16   A.   Citation from the Ginter/InterTrust patent, Figure 72 D,
17   pretty simple this time around.  Property is the
18   identification of the content.  Cost per unit is the price.
19   And the type is the usage control element.
20   Q.   So is this limitation satisfied?
21   A.   Yes.
22   Q.   What would you like to do for that Ginter/InterTrust
23   plus Poggio/Sun box?
24   A.   Put a check there, please.
25   Q.   All right.  And then finally, we have Ansell/Liquid
```

1  Audio combined with Poggio/Sun?

2  A.   Yes.

3  Q.   What are you showing here?

4  A.   So this time we need to go through, once again, Claim 32

5  because the particular combination didn't meet all of the --

6  or didn't map directly with this with reference to the '720

7  Claim 13.  So, once again, we'll do the walk-through.

8  Q.   Okay.  So for the preamble, what are you depicting?

9  A.   We're, once again, of course, dealing with the data

10  access terminal for retrieving data.  And the Ansell/Liquid

11  Audio patent at Column 4, 19 through 23, discloses that

12  memory 104 can include any type of computer memory.  And

13  there's different kinds of memory described, fixed and

14  removable storage devices.

15      So this the memory in the consumer unit which stores

16  content, and there's actually a figure that should go on this

17  page which appears in the next element.  So I'll be able to

18  close the loop on this.

19  Q.   Okay.  Is that first element satisfied, though, that

20  preamble?

21  A.   It will be satisfied as soon as I point out the next

22  slide.  Right -- thank you.  Right there is memory 104 that

23  the preamble was talking about, so that preamble is now

24  satisfied.

25  Q.   And now moving on to the second limitation, the first

1    interface, is that satisfied?

2    A.    Yes.  So what we're looking at is Figure 1 from the

3    Ansell/Liquid Audio patent.  The network access circuitry is

4    the interface for communicating with the data supplier.  Also

5    adding support from Column 4, Lines 62 through 67.

6    Q.    All right.  Moving on to the next limitation, is that

7    satisfied?

8    A.    Yes, it is.  Figure 2 from the patent, in connection

9    with disclosure at Column 2, Lines 6 through 10, describes --

10   you can see the term SPT interface 114.  You may remember

11   from Mr. Ansell's description yesterday, his invention, that

12   he talked about something called an SPT, that stands for the

13   secure files that his system manages, so this is the

14   interface that loads the data carrier in his design.

15   Q.    Moving to the next two limitations, the program store

16   and the processor, are those limitations satisfied?

17   A.    Yes, they are.  I'm showing Figure 1 and Figure 5 from

18   the Ansell/Liquid Audio patent, two examples of program store

19   and processors -- player logic in Figure 5, and the processor

20   from Figure 1.  That's satisfied.

21   Q.    Next requirement, is that satisfied?

22   A.    Code to read payment data from the data carrier and to

23   forward the payment data to a payment validation system.

24        Now, I'm bringing in the combination from Poggio/Sun and

25   at -- citing from Figure 1 and Line 2 -- Column 2, excuse me,

1    Lines 32 through 36, as well as Lines 29 through 31.

2        The virtual vending machine provides vendors with a

3    mechanism to market, distribute, and receive payment for the

4    vendors' electronic data.  It also discloses that various

5    license options permit time period -- or time limited rental

6    basis.  And so this system, you recall that the information

7    regarding payment is forwarded to the electronic banking

8    network as payment data.

9    Q.   Is that limitation satisfied, sir?

10   A.   Yes, it is.

11   Q.   Move on to the next two, code to receive payment, code

12   responsive to the payment validation data.  Are those

13   disclosed?

14   A.   So I'm citing from Poggio/Sun, Column 10, Lines 41

15   through 54, and it has the same citation for the second one.

16       Code to receive payment validation from the payment

17   validation system and then code responsive to that.  So this

18   is the -- the receipt of confirmation that payment took

19   place, and then to respond -- to receive the data

20   accordingly.

21       So in the Poggio/Sun application, the user would pay the

22   specific funds to a virtual vending machine.  That vending

23   machine will -- will then re -- get in touch with the banking

24   financial institution, the electronic banking network, and

25   then would transmit the electronic data back to the client

```
 1   computer after confirmation of payment data.
 2   Q.   And the quote below, you highlight, to receive the
 3   product upon receipt of a corresponding electronic payment.
 4   Why is that language important?
 5   A.   Well, that's the second blue element shown here, code
 6   responsive to the payment validation data to retrieve the
 7   data from the data supplier.  And so this indicates that upon
 8   receipt of a corresponding electronic payment, the end-user
 9   device would respond to that by downloading data of the
10   content.
11   Q.   All right.  Let's move to the next limitation --
12               THE COURT:  Let's take a --
13   Q.   (By Mr. Batchelder)  What are you showing here?
14               THE COURT:   -- let's take a pause here before we
15   move to the next limitation.  It's a good opportunity to take
16   a recess.
17               Ladies and Gentlemen of the Jury:  I'm going to
18   excuse you for a brief recess.  You may leave your notebooks
19   in your chairs.  Don't discuss the case, and follow my other
20   instructions.  We'll have you back in here 10 or 12 minutes
21   and continue.  But you're excused for recess at this time.
22               COURT SECURITY OFFICER:  All rise for the jury.
23               (Jury out.)
24               THE COURT:  All right.  Counsel, we stand in
25   recess.
```

1          (Recess.)

2          (Jury out.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Be seated, please.

5          All right.  Let's bring in the jury, please.

6          COURT SECURITY OFFICER:  All rise for the jury.

7          (Jury in.)

8          THE COURT:  Please be seated.

9          All right.  Counsel, you may continue.

10          MR. BATCHELDER:  Thank you, Your Honor.

11   Q.   (By Mr. Batchelder) Mr. Wechselberger, we left off at

12   Slide 169 here talking about the combination of Ancell/Liquid

13   Audio, on the one hand, and Poggio/Sun Microsystems on the

14   other; and we're on the second to last limitation, Claim 32

15   of the '221 patent.

16          And would you show what's depicted here, please, or

17   explain what's depicted here.

18   A.   This element has to do with code that's responsive to

19   the payment validation data to receive the access rule from

20   the data supplier and to write that in the data carrier with

21   conditions.

22          I'm citing to the Liquid Audio/Ansell patent, Figures 9

23   and 5.  And also to Column 11, Lines 11 through 17 for

24   support of this.

25          The patent indicates in Figure 5 that player logic

1    interprets usage rules and use conditions.

2        There are three different types, Type 904, 906, and 908,

3    as examples, defines what those are and talks about

4    restrictions in this patent -- usually controls are called

5    restrictions -- at the citation for Figure 9.

6        And these conditions are stored in the memory 104 unit

7    that I showed earlier with the preamble.  So this item is

8    satisfied.

9    Q.    This element is met?

10   A.    Yes.

11   Q.    All right.  And why is there dependency on the amount of

12   payment?

13   A.    Dependent amount of payment.  Support at Column 11,

14   Lines 16 through 18.  The header can include a number of

15   different restrictions -- those are those numbers I just

16   mentioned -- each of which includes a restriction type field,

17   restriction data field and a state 908.

18   Q.    All right.  And you referred here to a specified amount

19   of funds.

20   A.    Yes.

21   Q.    That's at Column 10, Lines 41 through 54?

22   A.    Yes.  Additional support, for instance, the virtual

23   vending machine could request that the requesting user pay at

24   a specified payment of funds.  Further support for dependent

25   amount of payment.

1    Q.   Let's move to the final limitation.  What are you

2    disclosing here, sir?

3    A.   Code to receive from the data supplier.  This is the

4    data identifier, value, and use rule.  Poggio/Sun, Column 10,

5    Lines 41 through 54.

6         Pay at a specified amount of funds upon receipt of

7    confirmation and transmit the electronic data to the client

8    computer.

9    Q.   Have we been through all the limitations, sir?

10   A.   Yes, sir.

11   Q.   Are they all met?

12   A.   Yes.

13   Q.   Should we add another checkmark?

14   A.   Yes.

15   Q.   How many do you have?

16   A.   Five.

17   Q.   How many do you need to invalidate?

18   A.   One.

19   Q.   Let's move to the next claim, Claim 26 of the '772

20   patent.  Why do you start with gray checkmarks on the left?

21   A.   The elements with gray checkmarks are code -- or excuse

22   me -- are elements we've already looked at and invalidated

23   through the testimony that I've provided up to this point.

24        So we can check those off and don't need to deal with

25   them further.

1  Q.   All right.  And what have you inserted in the upper

2  right-hand corner here, sir?

3  A.   So there's a lot of parts to this claim.  You'll see

4  I've color coded them red, pink, green, et cetera.  And

5  they're categorized in categories of hardware, browsing, and

6  shopping, payment for content -- we've already checked off;

7  those are those gray checkmarks -- enforcing use rules, use

8  status data, and user selection and playback.

9       So from a logical approach, I'll follow that -- those

10 categories as we go forward and invalidate each claim

11 element.

12 Q.   All right.  So let's start with the hardware, shall we?

13 A.   Yes.

14 Q.   All right.  What are you showing here for the hardware?

15 A.   The preamble is:  A handheld multimedia terminal for

16 retrieving and accessing protected content.

17      The first invalidating reference is Gruse/IBM in

18 conjunction with Puhl/Motorola.  Citing from the Gruse/IBM

19 patent, Figure 6, and Column 5, Lines 47 through 51, we have

20 the end-user devices from Figure 6 -- we've used that several

21 times -- and customized players of a variety of devices, such

22 as handheld devices.

23      This element is satisfied.

24 Q.   All right.  What are you showing here?

25 A.   This is from the Puhl/Motorola patent.  Recall, that's a

1    cell phone implementation with a wireless network.  It's from

2    Figure 4.  Support, Line -- Column 8, Lines 30 through 34.

3    This is satisfied.

4    Q.   All right.  And what are you showing here for the IBM

5    system?

6    A.   One additional element -- or one additional reference is

7    the IBM system.  And now we've seen the portable handheld

8    Sony Walkman device, as well as the disclosure of the cell

9    phone audio player from Defendant's Exhibit 31.  And a

10   Walkman, of course, is Defendant's Exhibit 44.

11   Q.   All right.  And what you are showing here, sir?

12   A.   Wireless interface configured to interface with a

13   wireless network is the next element.  Citing from Gruse/IBM,

14   Column 9, Lines 40 to 43, talks about a wireless

15   communication network.

16       Figure 4 from Puhl/Motorola talks about a wireless

17   gateway.  And additional support in Puhl/Motorola, Column 8,

18   Lines 30 to 34.

19       This element is satisfied.

20   Q.   Move on to the next one.  What are you showing here?

21   A.   This is non-volatile memory to store multimedia content.

22   Citing to Gruse/IBM, Figure 1D; also support of Column 9,

23   Lines 38 to 52.  There's that data carrier that I pointed out

24   earlier inside the end user appliance of Gruse/IBM.

25   Q.   Okay.  The next limitations, what are you showing here?

1  A.   So we're down now to the user interface and a display.

2  Gruse/IBM disclosure at Column 92, 1 through 25 talks about

3  various buttons that exist for the end user interface on the

4  appliance.

5      Also from that patent, Column 60, Lines 24 through 29,

6  it discloses that content types could be those that require

7  video or movies.  So that would meet the display requirement

8  of this element, the last -- the second element.

9  Q.   Okay.  And what is this device from this IBM system?

10 How does it play in?

11 A.   The Sony Walkman device that I'm holding has buttons on

12 its side -- on the side for user interface and control.

13     There's also a screen, which is a little display.

14 So it meets both of these claim elements.

15 Q.   All right.  What are you depicting here, sir?  You've

16 checked the hardware off?

17 A.   Checked -- I'm sorry.  Yes, upper left side.  And that

18 was the hardware part of these claim elements.  Checked that

19 off, and next we'll talk about the browsing and shopping

20 claim requirements.

21 Q.   All right.  Those are color coded in purple?

22 A.   Purple with some highlights.  Code to request identifier

23 data; code to receive identifier data.

24     Support, Gruse/IBM patent, Column 73, Lines 50 through

25 54, and Column 28, 19 through 26.  These claim elements

1    basically say to the data supplier, show me what you have,

2    and it -- the unit receives what you have.

3         This is satisfied.

4    Q.   Move on to the next ones.  What are you showing here?

5    A.   Code to request content information; code to receive

6    content information.

7         Once the device shows you what you have, the user can

8    then say, tell me more information about an item, a

9    particular content item, and then they'll receive that.

10        This is supported by the IBM/Gruse patent -- Gruse/IBM

11   patent at Column 62, Lines 47 through 62.  That's the table.

12   Also Column 28, 19 through 26.

13        This is satisfied.

14   Q.   All right.  Should we move on to the enforcing use rules

15   and use status data?

16   A.   Yes.

17   Q.   All right.  What are you showing here, sir?

18   A.   So we have three elements here.  This thing talks

19   about -- this patent talks about a second user selection.

20   That assumes now that the content has been downloaded.

21        And then the elements talk about accessing content

22   according to the retrieved multimedia content, whether access

23   is permitted.  Citation satisfying these requirements are

24   from Gruse/IBM at Column 10, Lines 43 through 50, and Column

25   23, Lines 33 -- 39 through 41.

```
 1   Q.   All right.  We just checked off all the enforcing

 2   elements?

 3   A.   That's right.

 4   Q.   Should we move on to user selection and playback?

 5   A.   Yes.

 6   Q.   All right.  What are you depicting here, sir?

 7   A.   User interface is the way you interface with the end

 8   user device to be able to select a content available for

 9   retrieving and then to make a second selection to select it

10   once you've retrieved it.

11       The Gruse/IBM patent discloses these requirements using

12   the control panel shown in Figure 15A, and accompanying

13   support at Column 88, Lines 42 through 46.

14   Q.   And --

15   A.   Also -- excuse me --

16   Q.   Please.

17   A.   Also, the IBM system patent, these are the figures we

18   saw earlier from Figure 14, downloading content from the

19   Internet, and then once the content is in the player device,

20   the selection and playback from a playlist as depicted in

21   Figure 16.  So the IBM system satisfies this.

22   Q.   And what are you depicting here, sir?

23   A.   So the last two claim elements:  To enable user to

24   access the selection and present it to the -- to the user is

25   supported in Gruse/IBM at -- by Figure 15, the control panel,
```

Column 10, Lines 43 through 50, and Column 60, Lines 24 through 29.

These claim elements are satisfied.

Q.    All right.  Have you now checked through each of the claim limitations in connection with Claim 26 of the '772?

A.    Yes, I have.

And so these two citations going to the right-hand column shows that I have invalidated this claim in light of the combination of Gruse/IBM and Puhl/Motorola and the IBM system.

Q.    All right.  Should we move on to the combination of Stefik/Xerox and Poggio/Sun Microsystems?

A.    Yes.

Using the same color-coding approach, we start out with the handheld multimedia terminal.

Stefik/Xerox patent at Column 15, Lines 25 through 28 talks about handheld repositories.  Again, in the Stefik/Xerox patent, the repositories are also handheld -- are also end-user consumer devices.

Q.    And what are you depicting here, sir?

A.    So for the wireless network, interface configuration requirement, Stefik/Xerox patent at Column 1, 24 through 28. It tells us the transmission of digital works over networks is commonplace, a general statement.

In Poggio/Sun, Column 4, 15 through 20:  The present

1    invention is not limited to the use of the Internet as other

2    types of communications connections can be used.  And

3    wireless was well-known as an Internet medium.

4    Q.    Staying with hardware, what comes next?

5    A.    Non-volatile memory to store multimedia content.  We've

6    seen Figure 12 of Stefik/Xerox, and in particular, in the

7    data storage element 1207 is content storage 1204.

8         That satisfies that claim element.

9         Additional support in Stefik/Xerox is shown at Column

10   14, Lines 28 through 32.

11        This item is met.

12   Q.    And moving on to the final hardware limitations, what do

13   you show here?

14   A.    These are user interface to allow a user to select in a

15   display for showing it to the user, the content.  Support,

16   Column 16, Lines 42 through 46, Figure 4B.

17        This is the Stefik/Xerox patent.  Figure 4B shows the

18   display engine.  That's a display device.  And final support

19   is in Stefik/Xerox at Column 8, 63 through 67.

20   This satisfies -- these citations satisfy these claim

21   elements.

22   Q.    All right.  Are all the hardware requirements satisfied?

23   A.    Yes, sir.

24   Q.    Shall we move on to browsing and shopping?

25   A.    Yes.

1    Q.   Please do.

2    A.   These two claim elements:  Code to request identifier

3    data; code to receive identifier data.  It's supported by the

4    Stefik/Xerox patent at Column 38, Lines 65 through 67, which

5    describes a request for information about digital works.

6    Q.   Are they satisfied?

7    A.   Yes.

8    Q.   What's this?

9    A.   Content information, request content information via

10   wireless interface and to receive content information.

11        This is satisfied in Stefik/Xerox at Column 38, Lines 65

12   through 67; also 39, 5 through 11.  Descriptions of the works

13   and different choices of billing.

14   Q.   All right.  And the final browsing and shopping

15   requirement?

16   A.   Code to present the information to the user is satisfied

17   by Stefik/Xerox at Column 8, 65 through 67, and 39, Lines 5

18   to 11.

19   Q.   All right.  Have we now satisfied all the requirements

20   for browsing and shopping?

21   A.   Yes.

22   Q.   Should we move on to enforcing use rules and use status

23   data?

24   A.   Yes.

25   Q.   What do you show here?

1   A.   Three elements for receiving a second user selection.

2   Code to read status data, use status data, and then code to

3   evaluate that.

4       This brings in -- oh, I'm still -- sorry -- still in the

5   Stefik patent itself, reflecting on the animation where the

6   usage rights were checked in the picture above with the

7   support for these claim elements given at Column 30, Lines 44

8   through 47, and Column 7, 24 through 30 -- through 26.

9   Q.   And that's in the Stefik/Xerox patent?

10  A.   Yes, sir.

11  Q.   All right.  Have we now met the requirements of the

12  enforcing use rules and use status data?

13  A.   Yes.

14  Q.   Should we move on to user selection and playback?

15  A.   Yes, sir.

16  Q.   All right.  What do you show here, sir?

17  A.   These two first claim elements, content available for

18  retrieving and then a second selection for information

19  operable to enable a user to make a second user selection.

20      This is supported in the Stefik/Xerox patent at Column

21  16, Lines 42 through 46, talks about the repository user

22  interface to invoke transactions to gain access to a digital

23  work.

24      This is satisfied.

25  Q.   What comes next?

1  A.    Again, dealing with the user interface to access the

2  selection and to present the information to the user is

3  supported in the Stefik/Xerox patent at Column 16, Lines 61

4  through 65, and Column 19, Lines 51 through 55.

5  Q.    All right.  Have you now stepped through every category

6  of requirements for Claim 26 of the '772 patent?

7  A.    Yes, I have.

8  Q.    And what should we do?

9  A.    Put a check in the third box down indicating that the

10  evidence I have provided invalidates the asserted claim in

11  light of the combination of Stefik/Xerox and Poggio/Sun.

12  Q.    All right.  Let's move on to the combination of

13  Ginter/InterTrust, on the one hand, and Poggio/Sun

14  Microsystems on the other.

15      What are you showing here, sir?

16  A.    Okay.  Continuing the examination, back up to the top,

17  the preamble, and the first requirement for a wireless

18  interface is disclosed in the Ginter/InterTrust patent at

19  Column 34, Lines 1 through 6, and also by the support

20  provided in Column 233, Lines 53 through 57.

21  Q.    How about that next hardware requirement?

22  A.    Non-volatile memory in the user device, secondary

23  storage, as shown in Figure 8 of the Ginter/InterTrust

24  patent, as described at Column 62 through -- Line 63 through

25  67, disclosed the non-volatile memory.

1          So that one's there.

2     Q.    And the next hardware requirement?

3     A.    The user interface to select and play and a display for

4     showing.   In Figure 8, I've highlighted the keyboard to allow

5     the selection, and it has a display element.

6          So these elements are satisfied.

7     Q.    The final two?

8     A.    Yes.

9     Q.    All right.   You've satisfied the hardware requirements?

10    A.    Yes, sir.

11    Q.    Move on to browsing and shopping?

12    A.    Yes.

13    Q.    What are you showing here?

14    A.    Okay.   These elements are all associated with getting

15    identifier data for content out for retrieving to receive it,

16    to get information about that content item, and to -- and to

17    present -- to receive the information and to present the

18    information.   Sounds like a lot of steps, but they're really

19    quite trivial and readily found in the Ginter/InterTrust

20    patent at Figure 72D.   So these are all satisfied.

21    Q.    So you've satisfied browsing and shopping?

22    A.    Yes, sir.

23    Q.    Can we move on to enforcing use rules and use status

24    data?

25    A.    Yes.

1    Q.    What do you show?

2    A.    Three more items in the use rules:  Use status data

3    area; user selection, selecting one or more content of items;

4    then usage rules pertaining to that item and then whether

5    access is permitted.  This is Figure 3 from the

6    Ginter/InterTrust patent where I went through the usage

7    control functions, the go/not go metering, and that is

8    supported in the Ginter patent -- Ginter/InterTrust patent at

9    Column 56, Lines 25 through 36.

10   Q.    Have you covered all the requirements of Claim 26 for

11   enforcing use rules and use status data?

12   A.    Yes.

13   Q.    Let's move on to the final set, which is user selection

14   and playback.

15   A.    Okay.

16   Q.    What do you show here, sir?

17   A.    User interfaces.  Again, operable to enable a user to

18   make selections of content and then select a content for

19   play.  The similar table from the Ginter/InterTrust patent is

20   shown with support at Column 238, Lines 50 through 55.

21   Q.    Are those requirements met?

22   A.    Yes.

23   Q.    And what else are you using as support?

24   A.    In additional support, Ginter patent, Column 238, Lines

25   50 through 55.

1   Q.   All right.  What comes next under user selection and

2   playback?

3   A.   Enable a user to access said user selection, so the

4   content is in the unit.  You want to be able to select it and

5   play it.

6        The Ginter/InterTrust patent discloses that can be done

7   at Column 58, Lines 33 through 34.  Content may be supplied

8   to the user, and Figure 3 tells us the conditions for

9   accessing that content.  This is satisfied.

10  Q.   And the final user selection and playback requirement?

11  A.   This simply says once you select it, display it.

12  Q.   Is that met?

13  A.   Excuse me?

14  Q.   Is that met here?

15  A.   That is met here.  Ginter/InterTrust patent, Column 58,

16  Lines 33 through 34, and 58, 57 through 62.

17  Q.   All right, sir.  Have you now stepped through every

18  category of requirements for Claim 26 of the '772 patent in

19  connection with the combination of the Ginter/InterTrust

20  patent and the Poggio/Sun reference?

21  A.   Yes.

22  Q.   And what should we do?

23  A.   Put a check on the fourth box.

24  Q.   All right.  Let's move on to the final one, the

25  combination of the Ansell/Liquid Audio, the Poggio/Sun

1   Microsystems, and the Puhl/Motorola.

2   A.   Yes.

3   Q.   What are you showing here for the hardware?

4   A.   Preamble, a handheld multimedia terminal.  Ansell/Liquid

5   Audio, Figure 1 shows the computer system.  There's a little

6   portable device in the lower right-hand corner 150.  From

7   Puhl/Motorola, Figure 4, the mobile phone operating in a

8   wireless network.  So we can move on, check that one off.

9   Q.   That satisfied?

10  A.   Yes.

11  Q.   What's the next hardware requirement?

12  A.   For the -- for there to be a wireless interface

13  configured with the wireless network, the same pictures that

14  I just talked about for the preamble, this time highlighting

15  in Figure 1 of Ansell/Liquid the access to the outside world,

16  the -- the network access circuitry box, 160, I believe it

17  is.  And then Figure 4 from Puhl/Motorola showing the

18  wireless interface highlighted in red.

19  Q.   So you've got Ansell/Liquid Audio on the top and the

20  Puhl/Motorola, Figure 4, on the bottom?

21  A.   Yes.

22  Q.   All right.  What about the next hardware requirement?

23  A.   This simply speaks to the non-volatile memory in the

24  handheld multimedia unit, and that is satisfied by the red

25  box storage media in Ansell/Liquid Audio, Figure 5.

1   Q.    What about the final two hardware requirements?

2   A.    A user interface to select something to play and a

3   display for showing it is readily apparent in Ansell/Liquid

4   Audio, Figure 1.

5   Q.    That's met, both of those?

6   A.    Yes.

7   Q.    All right.  Browsing and shopping, should we move on to

8   that?

9   A.    Yes.

10  Q.    What are you showing here?

11  A.    Okay.  Browsing, shopping, the same five pink items.

12  Select an item, get information about it.  Select content,

13  get information.  Select a specific content, get information.

14       So with the Ansell/Liquid Audio patent, Figure 1, we

15  have the computer subsystem that runs all the code to perform

16  the indicated requests and reception.

17       Move on, please.  See if there's -- oh, back up.

18       So just to complete that, the code that runs on the

19  processor, together with the memory associated with that,

20  satisfies these claim elements because the -- they're

21  basically asking for information about data to -- to

22  retrieve, getting the information, selecting more information

23  to -- to choose a specific song, and then receiving that

24  information.

25  Q.    All right.  Should we move on to enforcing use rules and

1   use status data?

2   A.   Yes.

3   Q.   What are you showing here, sir?

4   A.   So the triplet -- these three claim elements -- second

5   user selection, selecting the -- the item retrieved, getting

6   information about whether the access rules allow you to re --

7   to review that content or see that content -- satisfied by

8   Ansell/Liquid Audio at Column 13, Lines 11 through 15, as

9   well as the information disclosed by that patent, Figure 9

10  and Figure -- Figure 5.

11  Q.   Have you satisfied all the enforcing use rules and use

12  status data requirements of Claim 26 for the

13  Ginter/InterTrust -- I'm sorry for the Ansell/Liquid Audio

14  reference?

15  A.   Yes.

16  Q.   All right.  Should we move on to the user selection and

17  playback?

18  A.   Yes.

19  Q.   What are you showing here?

20  A.   These are the user control functions.  There is

21  Ansell/Liquid Audio with the keyboard and the display.  So

22  the user interface requirements are satisfied.

23  Q.   What's next?

24  A.   Same functions for this claim element are satisfied by

25  the computer and display -- computer keyboard and display.

1    Q.    And the last two user selection and playback

2    requirements?

3    A.    Likewise, these are satisfied by the same two components

4    of Figure 1.

5    Q.    All of these are met?

6    A.    Yes.

7    Q.    All right.  Can we now check that box for Ansell/Liquid

8    Audio?

9    A.    That's correct.

10   Q.    All right.  Let's move on.  And what are you showing

11   here, sir?

12   A.    This is the last of the asserted claims, '772 patent,

13   Claim 32.  It is about data access terminals.  And you'll see

14   a number of gray checks all the way down the left-hand side.

15        The color coding that I'm showing here is the same as

16   the groupings that I just went through for the previous Claim

17   26.  These claim elements and requirements are the same as

18   what we just looked at in all respects, excepting for the

19   last claim element of Dependent Claim 32, so I've already

20   checked them off as being shown to be invalid.

21   Q.    What have you added to the right column?

22   A.    The identification of each of the color codings for

23   hardware, browsing and shopping, payment for content,

24   enforcing use rules/status data, and mobile communications

25   device, just to remind us what those categories are for.

1   Q.   All right.  And what are you depicting here in Slide

2   235?

3   A.   Since all of Claim 32 is -- all the claim elements have

4   already been shown to be invalid, with the exception of one,

5   that is the -- the last limitation of Claim 32, we have to --

6   I have to show that that is also met in the prior art.  That

7   claim requirement is:  Wherein said data access terminal is

8   integrated with a mobile communication device and an

9   audio/video player.

10  Q.   So is that disclosed?

11  A.   That is disclosed, starting with the Gruse/IBM patent

12  in connect -- conjunction with the Puhl/Motorola patent.  The

13  Gruse/IBM patent says -- at Column 5, Lines 47 through 51,

14  talks about customized devices in a variety of devices, such

15  as handheld devices.

16       So that, in combination with what is disclosed in

17  Figure 4 of Puhl/Motorola, where we find a handheld cellular

18  phone.  This element is satisfied.

19  Q.   And what are you depicting here in Slide 236?

20  A.   This brings in that the IBM system also satisfies this

21  last claim -- claim element because we have the disclosure by

22  NTT DoCoMo Company about the mobile phone/audio player which

23  they've described as a cell phone and audio player.  So that

24  satisfies this claim element.  That's Defense Exhibit 31.

25  Q.   All right.  What should we do next?

1  A.   We check off the top two boxes and then --

2  Q.   If I could ask you, sir, is it then your opinion that

3  Claim 32 of the '772 patent is rendered invalid by the

4  combination of Gruse/IBM and Puhl/Motorola?

5  A.   Yes, it's invalid by either one and both of those.

6  Q.   And by the IBM System?

7  A.   And by the IBM system.

8  Q.   All right.

9  A.   I'm sorry, just to be clear, by the combination of

10  Gruse/IBM and Motorola, as well as invalidated by the IBM

11  system.

12  Q.   Let's move on to that final combination.  It's the

13  combination of the Ansell/Liquid Audio reference, Poggio/Sun

14  Microsystems reference, and the Puhl/Motorola reference.

15      What are you showing here, sir?

16  A.   Puhl/Motorola reference, Citation, Column 8, Lines 30 to

17  34, talks about a server coupleable to the wireless gateway,

18  delivering content to the wireless device, shown in Figure 4

19  of that Puhl/Motorola patent.

20      So we have already satisfied that claim element, and

21  that box can be checked.

22  Q.   All the requirements are met by that final combination?

23  A.   Yes, sir.

24  Q.   All right, sir.  What should I do next?

25  A.   We should check off the second line.  I have

1   demonstrated that all of the asserted claims are invalid in

2   lieu of the prior art.

3   Q.   All right, sir.  Secondary considerations.  They're up

4   here on this slide.  What -- what is this a reference to?

5   A.   So when making conclusions and opinions about whether

6   patent claims are obvious or not, there is a category -- a --

7   a collection of categories called secondary considerations.

8        And these are extra things to look at besides just the

9   prior art.  And I've listed five of those -- commercial

10  success, long-felt need, and failure of others, copying,

11  industry praise, and acceptance, or unexpected results.  And

12  so --

13  Q.   Sir, let me -- let me just ask you.  Have you analyzed

14  these secondary considerations?

15  A.   Yes, sir.

16  Q.   In detail?

17  A.   Yes.

18  Q.   And do any of them support a conclusion of

19  non-obviousness, in your opinion?

20  A.   In my opinion, none of these factors would support a

21  conclusion of non-obviousness.

22           MR. BATCHELDER:  Can we pull up Slide 260, please?

23  Q.   (By Mr. Batchelder) You refer here to a lack of written

24  description?

25  A.   Yes.  I also have an opinion that Claim 26 of the '772

```
 1   patent is invalid for lack of a written description.  This is
 2   a different category than secondary considerations.
 3   Q.   All right.  And what do you refer to here on this next
 4   Slide 261?
 5   A.   Well, the patent statute gives us an understanding of
 6   what lack of written description is, and it says that a
 7   patent specification shall contain a written description of
 8   the invention; and it should be full, clear, concise, and
 9   exact.  And also that the full scope of the claimed
10   invention, as finally claimed and that the inventor actually
11   had possession of the full scope by the filing date of the
12   original application.  So in simple words, the patent
13   specification should describe the claim.
14   Q.   And what are you showing here on Slide 262 in connection
15   with that lack of written description?
16   A.   Well, we just looked at '772, Claim 6, a moment ago.
17   Q.   Claim 26?
18   A.   Claim 26.
19   Q.   Thank you.
20   A.   I'm sorry.  And that claim requires a handheld
21   multimedia terminal for retrieving and accessing protected
22   content, and then it goes on to have additional elements
23   which we've already looked at, to enable the user to access
24   and present information to the user.
25        And the issue -- the problem is -- in the next slide --
```

1    that the Smartflash specification doesn't disclose a terminal

2    that plays content.  Earlier, I showed Figure 4 several times

3    in the patent, and Figure 1.  Figure 1 is the data access

4    device.  That is the player in the Smartflash architecture.

5         The overall system architecture I spent a lot of time

6    talking about.  And terminal is this T unit, Item No. 40.  In

7    all instances, the function of a terminal in the Smartflash

8    system is to receive data from a data provider or a data

9    supplier and write it into the data carrier in 30 -- Item 30.

10        This is the only function that's ever disclosed in this

11   patent about what the function of a terminal is.  When it

12   comes time to play content, there's another device that has

13   been explicitly described, and it's called a data access

14   device.

15        Nowhere in the specification does the Smartflash

16   specification indicate that a terminal has any other function

17   than writing data to a data carrier.

18        And after many efforts on my part to justify claim --

19   the claim of the '772 patent where it talks about a terminal

20   playing content, was I able to find over disclosure of that

21   function.  And so that is a -- my conclusion that there's no

22   written description of a terminal in this patent that plays

23   content.

24             MR. BATCHELDER:  Can we see Slide 265, please?

25   Q.   (By Mr. Batchelder)  Would you please provide now, sir,

1    a summary of your opinions?

2    A.    The summary of my opinions in total are that all the

3    asserted claims are not infringed by the accused products,

4    that none of the asserted claims are valid, in light of the

5    prior art, and that Claim 26 of the '772 patent is also

6    invalid because it fails the written description requirement.

7    Q.    Thank you, Mr. Wechselberger.

8              MR. BATCHELDER:   Your Honor, I pass the witness.

9              THE COURT:   Cross-examination of the witness by the

10   Plaintiff.

11             MR. CALDWELL:   Your Honor, may I take a minute to

12   get some foam boards organized and things like that?

13             THE COURT:   Proceed.

14             (Pause in proceedings.)

15             THE COURT:   Are you ready, Counsel?

16             MR. CALDWELL:   Yes.   Thank you.

17             THE COURT:   Proceed.

18                          CROSS-EXAMINATION

19   BY MR. CALDWELL:

20   Q.    Mr. Wechselberger, you understand that it is Apple's

21   burden to prove invalidity of all claims by clear and

22   convincing evidence?

23   A.    Yes, sir.

24   Q.    And you were asked a question earlier about how many

25   checks do I -- how many blue checks do I need on the screen

1  in order to do -- in order to invalidate a claim.  Do you

2  recall that?

3  A.   Well, I had a number of checks, yes.

4  Q.   I'm asking, do you recall the question about how many

5  checks -- how many blue checks you needed on the screen to

6  invalidate a claim?

7  A.   Okay.  The blue checks, yes.  One.

8  Q.   And that's because that blue check, you're lumping

9  together an entire claim, correct?

10  A.   Yes.

11  Q.   You have to find every element from the claim, either in

12  a single reference or in an elected combination of

13  references, in order to invalidate the claim, correct?

14  A.   Yes.

15  Q.   Do you believe that the pile of references, one system,

16  six or so different patents, all those combinations that you

17  presented rises to the level of clear and convincing evidence

18  necessary to invalidate these patents?

19  A.   Yeah, absolutely.

20  Q.   Sir, have you ever heard the expression, "hit me with

21  your best shot"?

22  A.   Say again, please?

23  Q.   Have you ever heard the expression, "hit me with your

24  best shot"?

25  A.   Yes.

1   Q.   What would you say is the best one of those references?

2   A.   They each bring different qualities and different

3   degrees of complexity.  Some are better than others,

4   depending upon the audience.

5        For example, the Ginter/InterTrust and IBM/Stefiks are

6   particularly complex.  I believe they're both equally

7   invalidating with the proper combination references, so I

8   don't know that at this point in the overall examination that

9   I provided that there's any one better than the other.  And I

10  think I indicated during my deposition that it kind of

11  depends on your audience.

12  Q.   For this jury trial, do you have a personal favorite

13  reference or combination?

14  A.   No, sir.

15  Q.   I'm going to use the foam board, with the Court's

16  permission; and will you then -- when I approach the foam

17  board with the marker, tell me which anticipation references

18  you've raised for each one of these patents?

19            MR. CALDWELL:  May I approach, Your Honor?

20            THE COURT:   You may.

21  Q.   (By Mr. Caldwell) Sir, what anticipation references did

22  you have for the '720 patent?

23  A.   Gruse/IBM, I believe.

24            THE COURT:  Counsel, given the acoustics in this

25  courtroom, I'm going to ask you to use that handheld

1    microphone to make sure when you're away from the podium,

2    there's no question with the jury hearing you.

3              MR. CALDWELL:  Yes, sir.  Thank you.

4    Q.   (By Mr. Caldwell) Is that the only anticipation

5    reference you had?

6    A.   Yes, sir.

7    Q.   Mr. Wechselberger --

8    A.   I can't see that poster, by the way, excuse me.

9    Q.   Is that better?

10   A.   Yes, thank you.

11   Q.   Mr. Wechselberger, what obviousness combinations did you

12   have for the '720 patent?  Do you know them off the top of

13   your head?

14   A.   No.  I'd be happy to see the slides, or they can -- or

15   they can recall the slides.

16   Q.   However you have to --

17   A.   I'm ready.

18   Q.   Okay.  Sir, please tell me what obviousness combinations

19   have you had for the '720 patent.

20   A.   IBM system.

21   Q.   Yes, sir.

22   A.   Stefik/Xerox in combination with Poggio/Sun.

23   Q.   Is Stefik, S-t-e-f-i-k?

24   A.   Yes.

25   Q.   In combination with Poggio?

1    A.    Poggio/Sun.

2    Q.    In your report, you call it Poggio, not Poggio/Sun,

3    correct?

4    A.    We have instructions from the Court as to how to refer

5    to these.  I don't remember what I had in my report.

6    Q.    I think we -- it's fair for us to refer to it by the

7    name of the -- the patent name Poggio, correct?

8    A.    His Honor has instructed otherwise today.

9              THE COURT:  Refer to them by the name of the

10   inventor and the assignee.

11             MR. CALDWELL:  Yes, sir.

12   Q.    (By Mr. Caldwell)  And, Mr. Wechselberger, what other

13   obviousness combinations do you have for the '720 patent?

14   A.    The combination of Ginter/InterTrust and Poggio/Sun.

15             MR. CALDWELL:  Your Honor, do I need to write the

16   company names on here --

17             THE COURT:  Counsel, you can abbreviate any way

18   you want to --

19             MR. CALDWELL:   Thank you.

20             THE COURT:  -- but for the record, I'm trying to

21   keep everything straight.

22             MR. CALDWELL:  Yes, sir, I -- I appreciate that.

23             THE COURT:  I -- I assume you understand our

24   previous discussion of all this?

25             MR. CALDWELL:  I certainly do.

1          THE COURT:  Okay.  Let's do it that way.

2    Q.   (By Mr. Caldwell)  And the one you just mentioned,

3    Mr. Wechselberger, after Stefik and -- and Poggio was --

4    A.   Was Ginter/InterTrust in combination with Poggio/Sun.

5    Q.   Any other obviousness combinations for the '720, sir?

6    A.   No.

7    Q.   Mr. Wechselberger, what anticipation references do you

8    have for the '221 patent?

9    A.   I have no other anticipating references for '221 or

10   '772.

11   Q.   You mean no other anticipating references or no

12   anticipating references?

13   A.   No anticipating references.

14   Q.   I can write none in those boxes, correct?

15   A.   Yes.  The top row is anticipation?  Yes.

16   Q.   Yes, sir.

17   A.   I stand corrected, excuse me.  I just found the right

18   category of my slides.  And for Claim (sic) '221, Claim 32,

19   Gruse/IBM is an anticipating reference.

20   Q.   Okay.  While I've got the red marker, do you have any

21   anticipation references on the '772 claim, sir?

22   A.   I'll need to find the associated page for that.  For

23   '772, Claim 26, the answer is no, and that will be the case

24   also for Claim 32.

25   Q.   So I can write none in the box for the '772

1    anticipation, correct?

2    A.    Yes.

3    Q.    Mr. Wechselberger, what obviousness combinations do you

4    have for at '221 patent?

5    A.    IBM system.

6    Q.    Yes, sir.

7    A.    Stefik/Xerox, in combination with Poggio/Sun.  The next

8    one is Ginter/InterTrust, in combination with Poggio/Sun.

9    Q.    Yes, sir.

10   A.    And the last one is Ansell/Liquid Audio in combination

11   with Poggio/Sun.

12   Q.    Is that it, sir?

13   A.    Yes.

14   Q.    And what obviousness combinations did you identify for

15   the '772, sir?

16   A.    Claim 26 is Gruse/IBM, in combination with

17   Puhl/Motorola.

18   Q.    Yes, sir.

19   A.    And the IBM system.

20   Q.    Yes, sir.

21   A.    And Stefik/Xerox -- Stefik/Xerox with -- in combination

22   with Poggio/Sun.

23   Q.    Yes, sir.

24   A.    Ginter/InterTrust, in combination with Poggio/Sun.

25   Q.    Any others?

1   A.   Yes.  The last combination is Ansell/Liquid Audio, in

2   combination with Poggio/Sun and Puhl/Motorola.

3   Q.   You combined two with Ansell on that one?

4   A.   That's correct, Poggio/Sun and Puhl/Motorola.

5   Q.   Did you select these combinations yourself, sir?

6   A.   Yes.

7           MR. CALDWELL:  Ms. Mayes, I don't know how to turn

8   this off.

9   A.   Well, I didn't do -- I did, but I did not do it in

10  isolation, of course.

11  Q.   (By Mr. Caldwell) Can we talk about the IBM system for a

12  little bit?

13  A.   Sure.

14  Q.   You referred also to the Gruse patent, correct?

15  A.   Yes.

16  Q.   And you looked at the Gruse patent to get a lot of your

17  information on how you believe the IBM system would work,

18  correct?

19  A.   For that portion of the IBM system, which relies upon

20  the disclosure of the -- of the Gruse/IBM patent.

21  Q.   And you talked about a public trial that was called

22  Album Direct as part of Project Madison.

23           Do you remember that?

24  A.   Yes.

25  Q.   Did that system even secure content once it was

1   downloaded?

2   A.   Did it encrypt content?

3   Q.   Was the content -- was there a digital rights management

4   on the content once it was downloaded?

5   A.   The disclosures about it indicated that content was --

6   was downloaded and implemented the EMMS aspects, which were

7   lifted from the Gruse/IBM patent, and those things include

8   usage conditions.

9   Q.   And you identified watermarks as a usage condition

10  earlier, correct?

11  A.   I don't believe watermarks was included.

12  Q.   Mr. Wechselberger, in the IBM Album Direct trial, was

13  content protected by DRM when it was downloaded?

14  A.   In the proof-of-concept trial?

15  Q.   In the IBM Album Direct trial.

16  A.   I just testified I don't believe that watermarking was

17  actually implemented in that trial.  It's disclosed in the

18  patent, but I don't think that was one of the things that was

19  done in the proof-of-concept system.

20  Q.   I see.  I misunderstood your testimony.  My apologies.

21  I want to know, was any digital rights management implemented

22  in the IBM Album Direct trial, sir?

23  A.   Well, certainly to the extent that a permanent purchase

24  is allowed, that is a -- that is a part of DRM controls, yes.

25  Q.   Because the purchase was permanent?

1    A.    Yes, sir.

2    Q.    Even if -- if I purchase a compact disk, that's a

3    permanent purchase, correct?

4    A.    Yes.

5    Q.    Does that mean the music on it has digital rights

6    management on it?

7    A.    No.  It means, if you're in a system which implements

8    DRM, one of the options is a permanent purchase.

9    Q.    Do you know who Jeffrey Lotspiech is?

10   A.    No.

11   Q.    Do you remember relying on Mr. Lotspiech's information

12   in your report?

13   A.    I don't remember the name.  I'm sorry.

14   Q.    Did you remember relying on anyone to describe the IBM

15   system in your report, sir?

16   A.    I gave the evidence that I primarily relied upon today

17   in my testimony.

18   Q.    Mr. Wechselberger, I'm asking, do you remember relying

19   on anybody for evidence of the IBM system when you prepared

20   your report?

21   A.    I don't remember today all of the names, with respect to

22   that, that are in my report.

23   Q.    Mr. Wechselberger, Apple's lawyers wrote 50 to

24   70 percent of your invalidity report, didn't they?

25   A.    I testified to that earlier today, that I documented

```
 1   my -- my opinions, and they helped me with the typing.  That
 2   percentage probably is correct.
 3   Q.    That's what you told us in your deposition, isn't it?
 4   A.    I don't remember; but as I sit here today, I agree with
 5   you.
 6   Q.    Same for your infringement report -- your
 7   non-infringement report, correct?
 8   A.    Probably.
 9   Q.    So why did you rely on Mr. Jeffrey Lotspiech's
10   information in your -- in your report?
11   A.    I could answer that question if you'd like -- if -- if
12   you would like me to reference the report so I can remember
13   what I said about him.  As I -- like I told you, I don't
14   remember that name today.
15   Q.    Does it ring a bell if I explain that Mr. Lotspiech is
16   one of the engineers who was at IBM that worked on the EMMS
17   system?
18   A.    If you assert that to me, I'm willing to go forward.
19   Q.    Did you know that he's another fact witness that Apple
20   has hired up in this matter?
21   A.    No, sir.
22   Q.    Have you ever had a chance to talk to him and figure out
23   how the system works, sir?
24   A.    I have not talked to that person.
25   Q.    Do you believe that Sony player that's sitting right in
```

1    front of you is part of the IBM system?

2    A.    Yes.

3    Q.    Did IBM ever configure the system to where you could put

4    songs from the EMMS system on the Sony player?

5    A.    I don't believe so.   That's immaterial.

6    Q.    Earlier, you also showed some -- some slides suggesting

7    that that player would be the end-user device in the IBM EMMS

8    system, didn't you?

9    A.    I did not attempt to represent that this player worked

10   in the system.   My representation was that it was announced

11   and disclosed for what it would be, in conjunction with the

12   overall information disclosed within the IBM system.

13   Q.    Do you recall that in the IBM -- the -- I'll just start

14   over.

15        You recall that in the Gruse patent, there was a variety

16   of boxes, and one of them is called the end-user device,

17   correct?

18   A.    Yes.   I remember, in the Gruse/IBM patent, that's

19   disclosed.

20   Q.    And would that player be the end-user device if it was

21   in the Gruse system?

22   A.    This player?

23   Q.    Yes, sir.

24   A.    Yes.   Yes, it would be.

25   Q.    Mr. Wechselberger, do you recognize Gruse patent Figure

1    6?

2    A.    Yes, sir.

3    Q.    And you used that to describe the IBM EMMS system,

4    correct?

5    A.    I -- I described that, yes, to reference the -- the

6    component that is matched that Figure 6, because they were

7    disclosed as part of the IBM system documentation, and that

8    IBM system -- you're right, that was called -- they -- they

9    referred to that as the EMMS system.  So, yes, I referenced

10   Figure 6 from the patent.

11   Q.    Sir, in your testimony today, what did you point to on

12   this figure as the place where the end-user device went to

13   process a payment?

14   A.    Well, I can't see it from here, but it's in the lower

15   right-hand corner.

16   Q.    Remember what it's called?

17   A.    No.

18   Q.    The clearinghouse?

19   A.    Yes.  That -- the -- yes, that's what it's called.

20   Q.    Is that what you said in your report, sir?

21   A.    Yes, it certainly is.

22   Q.    Do you have a copy of your cross-exam binder?

23   A.    Uh-huh.

24          THE COURT:  Again, Mr. Wechselberger,

25   non-verbalized responses are not acceptable.

1          THE WITNESS:  I'm sorry, Your Honor.

2          THE COURT:  Say yes or no.  Don't say uh-huh.

3    A.    Yes, I have it.  This is what you just gave me?

4    Q.    (By Mr. Caldwell) Yes, sir.

5    A.    Okay.

6    Q.    Mr. Wechselberger, in your invalidity report, can you

7    find Paragraph 151?

8          And while you're doing that, sir, I'm going to circle

9    the clearinghouse and identify that that's what you pointed

10   to today, okay?

11   A.    Sure.

12   Q.    Have you found Paragraph 151, sir?

13   A.    Yes.

14   Q.    In Paragraph 1, you say, and I quote:  Upon a selection,

15   the consumer's end-user device interacts with the store,

16   correct, which interacts with the credit card clearing

17   organization?

18   A.    That's correct.

19   Q.    Now, is this clearinghouse that you've pointed to, sir,

20   is that the store, sir?

21   A.    No.

22   Q.    Sir?

23   A.    No.

24   Q.    So in your report, you weren't pointing to the

25   clearinghouse; you were pointing to the electronic digital

1    content store as the store, correct?

2    A.    That's right.

3    Q.    Was it your decision to change and point now to the

4    clearinghouse?

5    A.    What you have pointed out in Paragraph 151 is it starts

6    off by saying the Gruse functions generally -- functions,

7    generally as follows:  This is a high-level summary to

8    introduce the reader to Figure 6.  What you find in the

9    detail of the Gruse -- IBM/Gruse -- of the Gruse/IBM patent

10   are further disclosures that the -- the connection between

11   the user and the store house is the beginning of a

12   transaction that ultimately ends up with financial

13   finalization being the responsibility of the -- of the

14   clearinghouse.

15   Q.    In your --

16   A.    That approval takes place on that item you circled, up

17   in the lower -- if you circle that item at the lower

18   right-hand corner.

19   Q.    Sir, in your report you said, the user -- end-user

20   device interacts with the store which interacts with a credit

21   card clearing organization, correct?

22   A.    That's correct.

23   Q.    And you weren't pointing to the clearinghouse when you

24   said that, were you, sir?

25   A.    What is not written there, because I just testified that

1    this is a high-level description, I have very detailed

2    invalidity charts that accompany this report.  And also in

3    the IBM/Gruse patent it describes the -- in full detail that

4    the transaction smart card that goes to the user device

5    contains information that when it turns to the clearinghouse,

6    completes the financial validation.  Those underlying details

7    are not included in this high-level summary.  They weren't

8    intended to.

9    Q.   Because when you summarized how Gruse works, rather than

10   the simple transaction with the clearinghouse, you actually

11   went through the sequence of steps that are described, right?

12   A.   I don't understand the question.

13   Q.   Well, do you understand, sir, that when an end-user

14   device -- when there's a selection of content, that a message

15   goes from the end-user device over to the electronic digital

16   content store first?

17   A.   Yes, that kicks it off.

18   Q.   And then in response, the store sends a message back to

19   the user device, correct?

20   A.   Yes.

21   Q.   What's that message called?

22   A.   It's called a transaction SC.

23   Q.   That's written right there in your report that you're

24   looking at, correct?

25   A.   Transaction secure containers, yes.

```
1   Q.   At that point, does the user get the content?

2   A.   No, sir.

3   Q.   Because then you have another set of messages where the

4   end-user device contacts the clearinghouse, correct?

5   A.   That's right.

6   Q.   What gets sent to the clearinghouse?

7   A.   That's the order which contains the transaction

8   information for the clearinghouse to do the final validation

9   of the transaction.

10  Q.   And then in response, does the clearinghouse send the

11  content?

12  A.   No, the clearinghouse does not.

13  Q.   What does the clearinghouse send?

14  A.   The clearinghouse sends payment validation data back to

15  the end user, if it's approved.

16  Q.   It doesn't say that in the patent that it sends payment

17  validation data, does it?

18  A.   In the context of the Smartflash patents, that's the

19  elements I pointed to.  The information in that is the result

20  of approval of the payment process in this system.  It does

21  not have those literal words, I would agree with you on that,

22  if that was your issue.

23  Q.   The answer to my question was that it -- no, it does not

24  send back -- it does not say it sends payment validation

25  data?
```

```
 1    A.    Correct.

 2    Q.    It sends what's called a license SC, correct?

 3    A.    That's literally what it sends, yes.

 4    Q.    And the user still doesn't have the content right now,

 5    correct?

 6    A.    Correct.

 7    Q.    The user actually goes where to get the content?

 8    A.    To the content hosting site.

 9    Q.    Do you know what the user sends to the content hosting

10    site?

11    A.    I'd have to look to confirm, but I believe it's the box

12    in the upper right-hand corner, the detail, the offer S --

13    secure container detail that goes over -- all the

14    communications in this system are with what are called SCs,

15    secure containers.

16    Q.    You believe that the end user sends the offer SC up to

17    the content hosting site?

18    A.    No, I take that back.  There's an arrow missing from

19    that box that doesn't define where it came from.  There is

20    another secure container that goes to the content hosting

21    site to prove to that site that content should be downloaded.

22    Q.    Okay.  We just don't know the name of it, correct?

23    A.    Correct.

24    Q.    Now, finally, after the end-user device has contacted

25    the content hosting site, does a user finally get the
```

1    content?

2    A.    Yes, it's returned to the user.

3    Q.    What's that called?

4    A.    There's a secure container called content.

5    Q.    Is it your position that that Sony device that you

6    identified as the end-user device can send one -- even one of

7    those messages?

8    A.    I think my testimony was that this Sony device wasn't

9    actually operable within the IBM system.  The answer is no.

10   Q.    Did you identify a different end-user device for us

11   today?

12   A.    A physical device?  I identified the end-user device in

13   Figure 6.  I identified also the end-user device that was

14   disclosed by the DoCoMo announcement about a mobile phone

15   with an audio player in it.

16   Q.    Did that ever get built, the NTT DoCoMo mobile phone

17   thing you're referring to?

18   A.    I don't really know.

19   Q.    How many days before Mr. Racz filed his patent

20   application was that publication you referenced?

21   A.    I believe it was early -- earlier in the month of

22   October.  I don't remember the exact date.  It was about a

23   month, approximately.

24   Q.    Had they done it?  Had they built a mobile phone that

25   could do any of this, or were they talking about that they

1    might think about doing it in the future?

2    A.    They announced it.  They had not built it.

3    Q.    They hadn't even designed it.  You have no evidence that

4    they designed it, do you?

5    A.    No.  No, sir.

6    Q.    Are you aware of any of the prior art that's asserted

7    here in this case that describes particular devices or

8    methods for combining payment functionality, secure

9    downloading, storage and rules for the use of content on one

10   portable device you carry with you?

11   A.    I observed the prior art through the lens of the

12   asserted claims.  To the extent that that -- what you just

13   asked me is echoed specifically in a claim, then my answer

14   would be yes.  But outside the -- the lens of the claim,

15   which is what I've analyzed, that generally describes what

16   these patents are about.

17   Q.    You used the claim to help you go back and pick through

18   the prior art, sir?

19   A.    No, it's the opposite.  I have to find disclosure in the

20   prior art of what the claim requires.

21   Q.    Do you know if there are any other of these prior art

22   fact witnesses that Apple is paying?

23   A.    Other than who?

24   Q.    The one I mentioned earlier?  Do you remember his name?

25   A.    Oh, no.

```
 1   Q.   Mr. Lotspiech, who was at IBM.  That was the one I
 2   mentioned earlier, correct?
 3   A.   And I testified I don't remember that name, and I didn't
 4   know anything about any relationship between him and Apple.
 5   Q.   Mr. Wechselberger, will you turn to Tab 5 in the
 6   cross-examination binder?
 7   A.   I'm there.
 8   Q.   What's at Tab 5 in your cross-examination binder?
 9   A.   This is a letter, appears to be from Ropes & Gray, to a
10   Mr. Jeffrey Lotspiech, dated December 14th, 2014.
11            MR. CALDWELL:  I'm sorry.  Does Apple counsel not
12   have a copy of the binder?
13   Q.   (By Mr. Caldwell) It's a retention agreement with Mr.
14   Lotspiech, formerly of IBM, between him and Apple's law firm,
15   correct?
16   A.   I've never seen this document.  I don't know what it is.
17   Q.   Do you accept my representation that it's an agreement
18   between Apple's law firm and Mr. Lotspiech, sir?
19   A.   I'm not sure I know how to answer that; but given that
20   I've never seen the document, I -- I suppose to go forward,
21   if you represent that's what it is, I'll accept that.  But
22   with the understanding that I've not read it and I've never
23   seen it.
24   Q.   Okay.  We can clarify it on redirect, if -- if
25   necessary, but that -- I'll represent that to you, sir.
```

1    A.    Okay.

2    Q.    Did you know that Mr. Lotspiech was deposed in this

3    case?

4    A.    No.

5    Q.    He gave sworn testimony about how what's in the Gruse

6    patent and how the IBM EMMS and Project Madison system

7    worked.  Did you know that?

8    A.    No.

9    Q.    Would you have wanted to know that before you took the

10   stand and asked the jury to invalidate Smartflash's patent

11   claims based on Gruse or the IBM patents?

12   A.    Without knowing what he had to say, I don't know.

13   Q.    What's behind the next tab of your binder, sir?  Who's

14   that agreement with?

15   A.    Tab 6?

16   Q.    Yes, sir.

17   A.    I have it.

18   Q.    Who are the parties to that agreement, sir?

19   A.    Similar letter from Ropes & Gray.  This is dated

20   September 15th of last year to a Mr. Larry Puhl.

21   Q.    That's the same Puhl that you mentioned at least

22   once -- twice on the chart, correct?

23   A.    I have not seen this document before, so I don't know.

24   Q.    Okay.  Do you mind if I circle the references that are

25   affected by these agreements, sir?

1   A.   With the understanding that I've never seen them and

2   don't know what they say, so I'm subject to your

3   representation.

4   Q.   Yes, sir.  Mr. Wechselberger, what's behind the next tab

5   of the binder?

6   A.   Another letter.

7   Q.   Between Ropes & Gray and whom?

8   A.   It says Andrew A. Poggio.

9   Q.   What's behind the next tab, sir?

10  A.   I'm looking at Tab 8, and I find another letter to a

11  person named Leo -- the last name is H-e-j-z-a.

12  Q.   Do you know who that is?

13  A.   No.

14  Q.   He's one of the named inventors on one of those prior

15  art patents you serted -- you asserted.

16  A.   Okay.  I don't recognize the name.  I only paid

17  attention to the first named inventors.

18  Q.   I believe he's the second named inventor on Poggio.

19       Does that sound familiar or surprise you?

20  A.   If you represent to me that's the case, I'll accept it.

21  Q.   When I went and took Mr. Lotspiech's deposition about

22  how the IBM EMMS system worked, he explained that his EMMS

23  system wasn't even combined with the Memory Stick in the Sony

24  device until 2001.  Does that surprise you, sir?

25  A.   No.

1    MR. CALDWELL:  Mr. Mortensen, will you pull up Mr.

2  Lotspiech, at Page 217, Line 20 through 218, Line 1?

3  Q.   (By Mr. Caldwell) Do you see, starting at Line 20 from

4  Mr. Lotspiech's sworn testimony:

5    All right.  Now, did the IBM EMMS system allow for

6  transferring content onto Flash memory onto a Memory Stick to

7  be used on a portable media device?

8    Yes.

9    And when was that first implemented for EMMS?

10    Probably -- implemented was probably 2001 or 2002.

11    Do you see that, sir?

12  A.   I do.

13  Q.   Now, if he's telling the truth in his sworn testimony,

14  that means it didn't even happen in the prior art period, did

15  it?

16  A.   I'm -- I'm not rep -- it did not, and I'm not

17  representing, and never have, that it did.

18  Q.   While I've got the red marker out, is there someone else

19  on the chart that we know is a fact witness who was hired by

20  Apple's lawyers or retained by Apple's lawyers?

21  A.   That question is addressed to me?

22  Q.   Yes, sir.

23  A.   I -- I have no knowledge of any such activities or

24  relationships.

25  Q.   Well, you were here when Mr. Ansell testified the other

1   day, right?

2   A.   I'm unaware of his -- other than what he shared in his

3   testimony, I'm unaware of any other facts behind the scenes.

4   Q.   But he acknowledged he's been retained as a fact witness

5   and is being compensated as a fact witness by Apple's

6   lawyers, correct?

7   A.   I heard him indicate he was being paid.  I did not hear

8   him indicate he was retained.

9   Q.   Are you aware of any of your anticipation or

10  obviousness -- excuse me, are you aware of any of your

11  anticipation or obviousness references that are unaffected by

12  some fact witness that Apple's lawyers are paying?

13  A.   I don't understand the question.

14  Q.   Are Apple's lawyers paying a fact witness connected to

15  every single one of your anticipation and obviousness

16  combinations, sir?

17  A.   I have no knowledge of that.  I don't know.

18  Q.   Do you think customers would even like using that purple

19  gadget that you have there?

20  A.   I don't have an opinion on that either.  I -- I haven't

21  ever used it or tried to make it work.  I don't know how --

22  actually how it functions.

23  Q.   Sir, there's literally no way to buy content on that

24  device, correct?  Even in 2002, if we fast forward a few

25  years?

```
 1   A.    I know what was disclosed about that in the references

 2   in the critical time period before the priority date.  As far

 3   as the details of what's inside the function, I don't know.

 4   Q.    What was disclosed prior to Mr. Racz's patent was never

 5   that you could buy something from the Sony device, correct?

 6   A.    You said Mr. Ansell?

 7   Q.    I -- I may have, and I'll just rephrase it in case I

 8   have the Thursday afternoon blues.  I'm sorry.

 9              THE COURT:  Wait a minute now.  Counsel, we're not

10   going to have sidebar comments about --

11              MR. CALDWELL:  My apologies.

12              THE COURT:    -- whether or not you have the

13   Thursday afternoon blues.

14              MR. CALDWELL:  My -- my apologies, Your Honor.

15              THE COURT:  And, Mr. Wechselberger, if you don't

16   know, say you don't know.  Don't give us a 15-minute

17   gobbledegook answer that doesn't say I don't -- I don't know.

18              If you know, answer it.  If you don't, don't do

19   what you've been doing.  All right?

20              THE WITNESS:  All right.

21              THE COURT:  And, Mr. Albritton, you know not to

22   parade into the middle of the courtroom when an examination

23   is going on.  Your own co-counsel, Ms. Fukuda had the good

24   manners to sit behind the bar when she came in.  Don't do

25   that again.
```

1          MR. ALBRITTON:  Yes, sir, I apologize.

2          THE COURT:  All right.  Let's proceed.

3  Q.   (By Mr. Caldwell)  Mr. Wechselberger, in order to do all

4  these steps that are in the Gruse patent, the end-user device

5  has to have some sort of communication means, correct?

6  A.   Yes.

7  Q.   That device has no communication means, correct?

8  A.   I don't know.

9  Q.   It has no WiFi, no cellular, no Ethernet network, no

10  phone modem, right?

11  A.   It's designed for a hard-wired connection to another

12  device.

13          MR. CALDWELL:  Objection, nonresponsive.

14          THE COURT:  Sustained.

15  Q.   (By Mr. Caldwell) It has -- okay.  You look like you're

16  about to answer.

17  A.   I was going to ask for the question repeated.  I -- I

18  didn't mean to be non -- nonresponsive.

19          THE COURT:  Gentlemen, we don't need a

20  conversation.  We need questions and answers.  We don't need

21  guesses about what you're going to do next.  And we don't

22  need unsolicited apologies.  We just need questions and

23  answers.

24          MR. CALDWELL:  I was trying not to talk over him

25  because I thought he was about to speak.  My -- my fault.

1    I'm sorry.

2    Q.    (By Mr. Caldwell) Mr. Wechselberger, there's no

3    communication means for communicating with a clearinghouse,

4    an electronic digital content store, or a content hosting

5    system on that device, correct?

6    A.    I don't know.

7    Q.    Would you agree that that device is meant for a user to

8    buy something on a totally separate computer and maybe carry

9    a card over to the device?

10    A.    I believe so, yes.

11    Q.    Do you believe that the Gruse patent accurately

12    describes watermarks in the EMMS system?

13    A.    No.

14            THE COURT:  Counsel, approach the bench.

15            (Bench conference.)

16            THE COURT:  How much longer do you have on this

17    cross?

18            MR. CALDWELL:  Probably --

19            THE COURT:  I'm not going to hold you to it.  I

20    just want to know.

21            MR. CALDWELL:  I'm guessing 35 to 40 minutes or so.

22            THE COURT:  And I'm sure you'll have redirect?

23            MR. BATCHELDER:  I may, but I'll try to keep it

24    short.

25            THE COURT:  We're going to take a recess now.

113

1    Everybody get a breath of air.

2            (Bench conference concluded.)

3            THE COURT:  All right.  Ladies and Gentlemen, we're

4    going to take this opportunity to have a short recess.

5            Members of the Jury:  Please leave your notebooks

6    in the chairs.  Don't discuss anything about the case.  We'll

7    make this about 10 to 15 minutes, somewhere in that range.

8            And then we'll be back to continue with the

9    cross-examination of the witness.  You're excused for recess

10   at this time.

11           COURT SECURITY OFFICER:  All rise for the jury.

12           (Jury out.)

13           THE COURT:  All right.  Counsel, we stand in

14   recess.

15           (Recess.)

16           (Jury out.)

17           COURT SECURITY OFFICER:  All rise.

18           THE COURT:  Be seated.

19           Are we ready to proceed, Counsel?

20           MR. CALDWELL:  I am, Your Honor.

21           THE COURT:  Let's bring in the jury, please.

22           COURT SECURITY OFFICER:  All rise for the jury.

23           (Jury in.)

24           THE COURT:  Please be seated.

25           All right.  We'll continue with cross-examination

1    of the witness by the Plaintiff.

2              Proceed, Mr. Caldwell.

3              MR. CALDWELL:  Thank you, Your Honor.

4    Q.   (By Mr. Caldwell) Mr. Wechselberger, did you rely on Mr.

5    Lotspiech in your report?

6    A.   I don't remember.

7              MR. CALDWELL:  Can we see Page 99 of

8    Mr. Wechselberger's invalidity report?

9              If we can look at the top paragraph there.

10   Q.   (By Mr. Caldwell) Did you write in your report:   I

11   further understand that Mr. Lotspiech explained that some

12   aspects of the technology of Downs and Gruse were used in

13   Project Madison?

14   A.   I see that.

15   Q.   Did you write that, sir?

16   A.   This is from my report, yes, I did.

17             MR. CALDWELL:  Mr. Mortensen, do you have

18   Mr. Wechselberger's slides?  Would you mind putting up Slide

19   42, please.

20   Q.   (By Mr. Caldwell) Mr. Wechselberger, I'm putting this

21   one up as an exhibit of one of your slides.  Do you recognize

22   this generally?

23   A.   Yes.

24   Q.   Up in the upper left-hand, you have a comment of

25   Gruse/IBM versus Smartflash.

1        Do you see that?

2    A.    Yes.

3    Q.    To your knowledge, IBM and any of the other companies,

4    none of them are contending that Smartflash's patents are

5    invalid, correct?

6    A.    I don't understand the question.

7    Q.    There were a handful of your slides that presented a

8    company versus Smartflash.

9        Do you see that?

10   A.    I see the title in the upper left corner of the slide.

11   Q.    I merely wish to clarify, IBM, Motorola, Sun, Xerox,

12   they're not contending Smartflash's patents are invalid, are

13   they?

14   A.    The companies themselves are not.  This is simply my way

15   of referencing the reference.

16   Q.    The prior art that you cited, other than a few press

17   articles about IBM, was all of the other prior art you cited

18   basically either a U.S. patent or a European patent?

19   A.    You said IBM.  I presume -- I will answer that assuming

20   you meant to say IBM system.

21   Q.    Well, I meant --

22   A.    I don't -- I don't understand the question.

23   Q.    I meant, if we set aside the press articles that you

24   showed us, the rest of the references that you cited are

25   patents, correct?

A.    Yes, sir.

Q.    Is it your position that the Patent Examiners at the Patent Office did not have access to those references or the ability to find them in searches?

A.    They wouldn't -- I don't understand the question.

Q.    Mr. Wechselberger, in your direct, didn't you mention a couple of times that the references you were looking at were not considered by the Examiner during prosecution?

A.    Yes.

Q.    The truth is you don't know that, correct?

A.    I know what is recited on the title pages of the patents, and that's what I relied upon.

Q.    But the truth is you don't know whether or not the Examiner considered them, correct?

A.    Yes, I suppose that's correct.

Q.    Do you understand that Examiners are only charged with citing what they perceive to be the best references?

A.    I'm unfamiliar with the instruction by which the USPTO operates.

Q.    Sir, in order to invalidate Smartflash's claims, am I correct that you have to prove invalidity by a higher burden than the burden of proof on Smartflash when proving infringement?

A.    I don't know.

Q.    Sir, invalidity has to be proven by clear and convincing

1    evidence.

2        Does that sound familiar?

3    A.    Yes, I understand that.

4    Q.    Mr. Wechselberger, is there something fundamentally

5    different about the Stefik and Ginter references than some of

6    the others?

7    A.    I don't -- I don't understand the question.  It was

8    rather broad.

9    Q.    The Stefik and Ginter references are metered billing

10   references, correct?

11   A.    They can perform that function.  I wouldn't describe

12   them that way.

13   Q.    When we look at Figure 1 of the Stefik patent, does it

14   show how you would send payment data and get back payment

15   validation data before you get content?

16   A.    Figure 1 does not, no.

17   Q.    In fact, Figure 1 shows that you transmit the digital

18   work out to the recipient before you deal with billing,

19   correct?

20   A.    I would agree with respect to Figure 1.

21   Q.    That is metered billing, correct?

22   A.    No.

23   Q.    Does Ginter -- the preferred embodiment of Ginter work

24   in a very similar manner?

25   A.    Similar to what?

1   Q.   Stefik.

2   A.   I would answer that by saying they both have teachings

3   that overlap, but I would not consider them architecturally

4   or structurally the same.

5   Q.   Well, when describing one of them -- and perhaps you can

6   help me remember which one -- when describing one of them

7   today, you pointed to a sentence, just one sentence, and

8   said:  Or you can debit with a debit card or something like

9   that.

10       Do you recall that?

11  A.   Yes, sir.

12  Q.   Do you remember which reference that was?

13  A.   Yes.  That was Stefik/Xerox.

14  Q.   Sir, in the Stefik/Xerox reference, is there any other

15  description of how debit operates besides the sentence you

16  showed?

17  A.   I don't recall.  That was clear and short and crisp, so

18  I rather liked that one.

19  Q.   Mr. Wechselberger, I believe you also said in your

20  direct that the way the debit card works is, it's like you

21  pay for your gas before you get it.

22       Do you remember that?

23  A.   Yes, sir.

24  Q.   How do you pay for your gas before you get it?

25  A.   A debit transaction is a realtime process.  The money is

1   immediately extracted from your bank account.

2   Q.   Well, how much money is extracted before I pump gas into

3   the tank of my truck?

4   A.   It happens as part of the transaction.  Whatever gas you

5   are done with, it's paid on the spot.

6   Q.   After, correct?

7   A.   I would call it a realtime transaction.

8   Q.   But not before, correct?

9   A.   The bank can't know how much gas you're putting in.

10  Q.   At the beginning of your testimony, you spent a few

11  minutes talking about non-infringement, correct?

12  A.   Yes.

13  Q.   Were you suggesting that the Apple system does not meet

14  the payment elements of the claims?

15  A.   Absolutely.

16  Q.   What is the Court's construction for payment data?

17  A.   Data that can be used to make payment.

18  Q.   Is a DSID, a GUID, and an MID used when you buy content

19  from the iTunes Store?

20  A.   Yes, sir.

21  Q.   In your view, is credit card information payment data?

22  A.   In the context of how credit card information is used in

23  the accused system or generally speaking?  I don't understand

24  the question.

25  Q.   Does credit card information meet the construction of

1    payment data?

2    A.    If it is used to make payment for content, it is.

3    Q.    And when buying an asset through the iTunes Store or the

4    App Store, the user's computer sends a DSID, GUID, and MID to

5    Apple's system, correct?

6    A.    Yes.

7    Q.    Those are used in order to purchase the content,

8    correct?

9    A.    I would disagree with that.

10   Q.    Are they validated when they're received?

11   A.    They are validated by the Apple server at the -- upon

12   reception, yes.

13   Q.    Mr. Wechselberger, did you look at any code in preparing

14   your report?

15   A.    No.

16   Q.    Mr. Wechselberger, were you asked to form an opinion

17   about the payment terms?

18   A.    Yes.

19   Q.    Mr. Wechselberger, without reviewing the code, did you

20   reach a conclusion about the payment elements?

21   A.    I don't understand the question.

22   Q.    Mr. Wechselberger, did you reach a conclusion about

23   whether the payment elements of the claim are met in Apple's

24   system?

25   A.    Yes, I did.

1   Q.   Mr. Wechselberger, you would agree that your report --

2   your non-infringement report was written mostly by the

3   lawyers, correct?

4   A.   No, I don't agree with that.  Well, I agreed earlier to

5   80 -- 70 or 80 percent, whatever I testified to.  So if

6   that's what you mean by most, then, yes, I agree.

7   Q.   Mr. Wechselberger, did you also opine on the payment

8   validation data terms?

9   A.   Yes.

10   Q.   What is Fiddler?

11   A.   I don't understand the question.

12   Q.   In the context of computers and networks, what is

13   Fiddler?

14   A.   I don't know.

15   Q.   What is Wireshark?

16   A.   I think -- well, I -- now that I think I understand your

17   question, they're analysis tools.

18   Q.   Would you agree that what payment validation data is, is

19   information that's returned from a payment validation system

20   based upon an attempt to validate payment data?

21   A.   Yes, sir.

22   Q.   And the Apple system validates the DSID, the GUID, and

23   the MID that Dr. Jones pointed to, correct?

24   A.   Yes.

25   Q.   Do you understand that Dr. Jones also, as part of his

1    payment validation data, provided Fiddler and Wireshark

2    reports showing information that Apple sends back when it's

3    validated the payment data?

4    A.    I understand that he testified that he used those tools

5    to analyze what was going on, that he concluded that it was

6    payment validation data.

7    Q.    You got copies of his reports and exhibits and all that,

8    correct?

9    A.    Yes, sir.

10   Q.    You've never seen his Fiddler --

11   A.    No.

12   Q.    -- Wireshark results?

13   A.    No, sir.

14   Q.    You got them, though, didn't you?

15   A.    If they were part of his report, yes.

16            MR. CALDWELL:  I'll pass the witness, Your Honor.

17            THE COURT:  Redirect?

18            MR. BATCHELDER:  Thank you, Your Honor.

19                    REDIRECT EXAMINATION

20   BY MR. BATCHELDER:

21   Q.    Mr. Wechselberger, when you said -- you were just asked

22   what percentage of your report you wrote.

23            You recall those questions?

24   A.    Yes.

25   Q.    Were you talking about how much you typed?

```
 1   A.    Yes.

 2   Q.    And, again, you didn't type more because why?

 3   A.    It was not very efficient for me to attempt to do all

 4   the typing.  I'm not very fast and not as accurate as

 5   alternatives.

 6   Q.    The opinions set forth in your report, sir, are they

 7   yours or somebody else's?

 8   A.    My opinions are mine.

 9   Q.    Do you own those reports?

10   A.    I own those reports.

11   Q.    You stand behind them?

12   A.    Yes, sir.

13   Q.    Let me just come back quickly to --

14         MR. BATCHELDER:  If we could look at

15   Mr. Wechselberger's Slide 5.

16   Q.    (By Mr. Batchelder) Coming back to Mr. Caldwell's

17   question about whether you looked at code.

18         MR. BATCHELDER:  Can we go to the next slide,

19   please?

20   Q.    (By Mr. Batchelder)  On the right, the DSID, GUID, MID,

21   is there any dispute about whether that information packet

22   gets sent?

23   A.    There's no dispute between the parties.

24   Q.    You and Dr. Jones agree on the facts, right?

25   A.    Yes, sir, we do.
```

1          MR. BATCHELDER:  Can we pull up Slide 9, please?

2          Can we click -- click again?

3   Q.   (By Mr. Batchelder)  Is there any dispute between you

4   and Dr. Jones about whether a buy request gets sent or a

5   download response gets sent down?

6   A.   No dispute whatsoever.

7   Q.   Was there any need for you to look at code, given that

8   you agree on the facts?

9   A.   Not at all.

10  Q.   In analyzing whether the four patent claims here are

11  valid, I'm just going to read some reference names:

12  Gruse/IBM, Ansell/Liquid Audio, Poggio/Sun Microsystems,

13  Puhl/Motorola.  Do you have those in mind?

14  A.   Okay.  Yes.

15  Q.   What disclosure are you relying on to show invalidity,

16  the patent document or something else?

17  A.   The patent.

18  Q.   Do you need to talk to anybody else when you're looking

19  at the patent?

20  A.   No.  The patent is the embodiment of the prior art.  It

21  is what discloses, for purposes of invalidity analysis, and

22  any other such communication doesn't matter.

23  Q.   And when the prior art teaches a given system, does

24  someone need to build it first before it counts as prior art?

25  A.   No, sir, they do not.

1    Q.   Now, Mr. Caldwell asked you about Paragraph 151 of your

2    expert report.  Do you recall that?

3    A.   Yes.

4              MR. BATCHELDER:   And could you please put up, Mr.

5    Lee, in Mr. Wechselberger's opening report, I want to see

6    Exhibit D and Page 10?

7    Q.   (By Mr. Batchelder)  While that's being pulled up, sir,

8    he was asking you about the payment validation system,

9    correct?

10   A.   Yes.

11   Q.   And in Paragraph 151, he asked why didn't you say that

12   the clearinghouse was that payment validation system?  Do you

13   remember those questions?

14   A.   Yes.

15   Q.   All right.  Now, turning to Page 10 of the Exhibit D to

16   your expert report -- first of all, would you tell the jury

17   what Exhibit D is?

18   A.   This is called an invalidity chart.  And as part of my

19   work on the project, this is a way of rigorously examining

20   whether the prior art disclosures revealed what is claimed.

21        And so the claim elements are down the left, and the

22   evidence that supports that it is disclosed in the art is in

23   the paragraphs on the right-hand side of the chart.

24   Q.   All right.  Now, if you look in your table on the line

25   that correlates with that payment validation system that Mr.

1   Caldwell asked you about, if you look in the third paragraph

2   and the third line down -- third line down, it says --

3   begins:  The clearinghouses 105 -- and then you put paren --

4   payment validation system, right?

5   A.    Yes, sir.

6   Q.    And that's exactly what you testified on direct?

7   A.    Just today, I did.

8   Q.    And Mr. Caldwell didn't show you that when he was

9   cross-examining you about this?

10   A.    He did not.

11             MR. BATCHELDER:  Pass the witness, Your Honor.

12             THE COURT:  Further cross-examination.

13             MR. CALDWELL:  Thank you, Your Honor.

14                       RECROSS-EXAMINATION

15   BY MR. CALDWELL:

16   Q.    Mr. Wechselberger, if you didn't need to talk to those

17   prior art witnesses or if no one would need to talk to them,

18   do you know why it was Apple retained them and bound them

19   contractually not to talk to Smartflash?

20   A.    No, sir.

21   Q.    Did you figure out if you had an anticipation theory on

22   the '221 patent -- and if you told me already, maybe I just

23   failed to write it down.  But do you have one?

24   A.    I can't see what you're pointing at.  You're in front of

25   the chart.

1    Q.   Yes, sir.  I just wish to know if you have an

2    anticipation theory on the '221?

3    A.   Yes, I indicated it was Gruse/IBM -- '221, yes.  Yes,

4    that's what I said.

5    Q.   Mr. Wechselberger, Gruse does not describe purchasing or

6    downloading from a portable device, does it?

7    A.   I'm confused about the question because I thought you

8    were talking about Claim 32.  Was it a different question?

9    Q.   Yes.  I'm just asking, Gruse does not describe

10   purchasing and downloading to a portable device, correct?

11   A.   I would agree with that.

12            MR. CALDWELL:  Pass the witness.

13            THE COURT:  Further direct?

14            MR. BATCHELDER:  No further questions, Your Honor.

15            THE COURT:  All right.  You may step down,

16   Mr. Wechselberger.

17            MR. BATCHELDER:  Your Honor, we request that

18   Mr. Wechselberger be released?

19            THE COURT:  Is there objection?

20            MR. CALDWELL:  There is none, Your Honor.

21            THE COURT:  All right.  Mr. Wechselberger, you are

22   not only able to step down, but you're excused.  You may stay

23   or you may leave.  It is up to you.

24            All right.  Defendant, call -- call your next

25   witness.

```
 1              MR. ALBRITTON:  Thank you, Your Honor.  We call
 2    Dr. -- Dr. Ravi Dhar.
 3              THE COURT:  All right.  The witness will be sworn.
 4              (Witness sworn.)
 5              THE COURT:  Please have a seat, sir.
 6              THE WITNESS:  Thank you, sir, Your Honor.
 7              MR. ALBRITTON:  Go ahead and pass everything out,
 8    please.
 9              THE COURT:  All right.  Mr. Albritton, you may
10    proceed.
11              MR. ALBRITTON:  May it please the Court.  Eric
12    Albritton on behalf of Apple.
13                 DR. RAVI DHAR, DEFENDANT'S WITNESS, SWORN
14                         DIRECT EXAMINATION
15    BY MR. ALBRITTON:
16    Q.   Good afternoon.
17    A.   Good afternoon.
18    Q.   If you would, please, sir, introduce yourself to the
19    jury?
20    A.   Sure.  My name is Ravi Dhar.
21    Q.   Now, Dr. Dhar, I'm going to ask you some questions, and
22    I'm going to ask you to please speak slowly and speak clearly
23    in the microphone.  Can you try to do that for us?
24    A.   Sure.
25    Q.   Where do you live, Dr. Dhar?
```

1    A.    I live in New Haven, Connecticut.

2    Q.    Dr. Dhar, have you prepared any demonstratives to assist

3    us in this case today?

4    A.    I have.

5            MR. ALBRITTON:   Mr. Lee, if you would, please bring

6    up Defendant's Exhibit No. 347?

7    Q.    (By Mr. Albritton) Dr. Dhar, what is Defendant's Exhibit

8    No. 347?

9    A.    This is the first page of my resume.

10           MR. ALBRITTON:   Mr. Lee, if you would, pull out the

11   education section.

12   Q.    (By Mr. Albritton) Dr. Dhar, if you would, tell the

13   Ladies and Gentlemen of the Jury about your educational

14   background?

15   A.    Sure.  My undergraduate degree was from India in

16   engineering, Indian Institute of Technology.  Subsequently, I

17   went and did a Master's degree in business, also in India.

18           In 1987, I graduated.  And then I came to the U.S. in

19   1988 to get a Ph.D.  I graduated -- I finished my Ph.D., in

20   1992 from University of California at Berkeley.

21   Q.    And what is your Ph.D. from the University of California

22   at Berkeley in?

23   A.    So it's broadly in the area of business administration,

24   and my focus is on marketing.

25   Q.    Thank you.

1        MR. ALBRITTON:  If you would back that out, Mr.

2   Lee.

3   Q.   (By Mr. Albritton) Now let's talk about your education.

4        After you left Berkeley, California, what job did you

5   first take?

6   A.   I took a research and teaching job at Yale University at

7   the School of Management.

8   Q.   And do you still work at Yale University?

9   A.   I do.

10  Q.   If you would, tell the Ladies and Gentlemen of the Jury

11  about the positions you currently hold at Yale?

12  A.   Sure.  I have -- I have what's called a chaired

13  professorship, George Rogers Clark professor of management.

14       In addition, I have a secondary appointment at the

15  School of Psychology or Department of Psychology as a

16  professor.

17  Q.   Okay.  And let's just slow down just a hair.

18       We also see here, Dr. Dhar, that since 2004, you've been

19  the director of the Yale Center for Consumer Insights.  If

20  you would, tell the Ladies and Gentlemen of the Jury what is

21  the Yale Center For Consumer Insights.

22  A.   So most universities have research centers, and this is

23  one of them.  And the idea behind that was around 10 years

24  ago --

25            THE COURT:  Dr. Dhar, please slow down.

1        THE WITNESS:  Yes, Your Honor.

2        THE COURT:  Okay.  Let's continue.

3  A.    And so around 10 years ago, we decided that academic

4  research is known for being rigorous but not necessarily

5  relevant, so the idea was how best to do relevant research

6  but to work collaboratively with companies.  And that's what

7  the research center does, works on the questions around

8  frontiers of consumer behavior.

9  Q.    (By Mr. Albritton)  Now, Dr. Dhar, as a professor of

10 management, do you teach courses at Yale?

11 A.    I do.

12 Q.    And have you been teaching courses over the last 20

13 years?

14 A.    Yes, I have.

15 Q.    To what sorts of students do you teach courses?

16 A.    So typically I teach to graduate students, the MBA

17 program at Yale, and then I also teach Ph.D. courses in which

18 we have both undergraduates and Ph.D. students.

19 Q.    Now, Dr. Dhar, have you taught courses that relate to,

20 among other things, survey design?

21 A.    I have, in the Ph.D. courses.

22 Q.    Do you have a particular expertise within the field of

23 marketing, Dr. Dhar?

24 A.    So I've done research in a lot of different areas in --

25 under marketing.  My basic research is what's called consumer

1    decision-making, consumer behavior, how do people make

2    choices, how do people arrive at judgments.  I have also

3    studied questions around branding and marketing strategy.

4    Q.   Dr. Dhar, let's go back to Defendant's Exhibit No. 347.

5    And let's talk a bit about your academic honors and your

6    fellowships.

7         If you would, please, sir, tell us about one of the more

8    recent awards you've received.

9    A.   Sure.  One of the most recent awards I received in 2012

10   was a Distinguished Scientific Contribution Award.  It's like

11   a lifetime achievement award for consumer psychology.

12   Q.   Now, Dr. Dhar, I see a number of entries that relate to

13   an award called the O'Dell Award.  If you would, please tell

14   the Ladies and Gentlemen of the Jury what the -- what the

15   O'Dell Award is?

16   A.   So O'Dell Award is given for publication in one of the

17   journals, Journal of Marketing Research, and it's given for

18   what's called, I think, long-term contribution.  So it's

19   given once every five years.

20              MR. ALBRITTON:  All right.  Mr. -- if you would

21   back out of that, Mr. Lee.  And if you would, please, sir, go

22   to the next page of that same exhibit.

23   Q.   (By Mr. Albritton)  We heard yesterday or two days ago,

24   I guess, about editorial boards.  Do you serve on the board

25   of any editorial -- do you serve on any editorial boards?

1   A.   I do.

2   Q.   If you would, at a high level, tell the members of the

3   jury about your service on those boards and what you're

4   involved with.

5   A.   Sure.  So I serve as what's called an associate editor

6   or -- or an editorial board member of various marketing

7   journals.  Again, the names will be all -- you know, Journal

8   of Consumer Research, Journal of Consumer Psychology, Journal

9   of Marketing Research, and so forth.

10  Q.   Okay.

11            MR. ALBRITTON:  If you would back out there, Mr.

12  Lee.

13  Q.   (By Mr. Albritton)  Next on your resume or CV, Dr. Dhar,

14  there's a list of publications.  Are those publications and

15  papers you've written in peer-reviewed journals?

16  A.   That -- that's the list, yes.

17  Q.   How many have you authored?

18  A.   Around -- between 50 and 60 -- 55 or so.

19  Q.   Okay.  Now, Dr. Dhar, I see a notation here on Page 2

20  that says approximate number of citations in Google Scholar.

21       If you would, tell the Ladies and Gentlemen of the Jury

22  what that refers to.

23  A.   So Google Scholar is a service provided by Google which

24  every time any -- I guess not any academic, but any work is

25  cited, they count that.  So this is the number of citations

1   to the papers I've written.

2   Q.   So more than 6,000 times your papers have been cited; is

3   that what that means?

4   A.   Correct.

5   Q.   Dr. Dhar, as part of your academic work and your

6   academic research and your academic publishing, have you done

7   consumer surveys?

8   A.   I have.

9   Q.   In these 50 to 60 articles that you've written, did the

10  majority of them involve surveys and experimental research?

11  A.   Yes.  Most of them involve -- I'm an empirical person

12  which means I collect date, and the majority of them had some

13  surveys or experiments in them.

14  Q.   Okay.  Dr. Dhar, there was a recent article about author

15  productivity in the premiere AMA journals.  My first question

16  is, what is an AMA journal?

17  A.   AMA is American Marketing Association.

18  Q.   Okay.  And what did that recent survey indicate about

19  the persons who have published the most articles in those

20  premiere journals over the last four-year period?

21  A.   I was tied for first in that.

22  Q.   Dr. Dhar, have you given --

23        MR. ALBRITTON:  If you would, Mr. Lee, let's go to

24  Page 8, please, sir.

25  Q.   (By Mr. Albritton)  Have you given -- been invited and

1   given presentations at universities around the United States

2   of America?

3   A.    Yes, I have.

4   Q.    And what -- broadly, what do these presentations relate

5   to?  What subject matter?

6   A.    It's broadly based -- you present your research, and in

7   my case it was the work I do on consumer behavior, consumer

8   decision-making.

9   Q.    Have you given presentations at universities here in the

10  State of Texas?

11  A.    Yes, I have.

12  Q.    If you would, give us a few examples.

13  A.    So the few listed here are UT Austin, University of

14  Texas Austin, Texas A&M, and University of Houston, as well.

15  Q.    Dr. Dhar, approximately how many surveys have you worked

16  on over your career?

17  A.    It's well over 250.

18  Q.    And in what various capacities did you work on those

19  surveys?

20  A.    So a lot of work -- as I mentioned earlier, my research

21  is using real experiments and surveys.  I've also done it for

22  consulting and for litigation.

23  Q.    When you say litigation, you mean for purposes of

24  assisting in a lawsuit?

25  A.    That's correct.

1  Q.    Dr. Dhar, of those 250 or so surveys, did either you or

2  someone working directly for you draft each and every one of

3  those questions in those surveys?

4  A.    For the surveys I do, yes, that's correct.

5  Q.    Also, the descriptions that precede the surveys, in each

6  of those instances, Dr. Dhar, did either you personally or

7  somebody working under your direction draft those scenarios

8  to be used in those surveys?

9  A.    For the surveys I conducted, that's correct.

10  Q.    Dr. Dhar, have you ever conducted a survey where

11  somebody just merely gave you a description to use in a

12  survey question?

13  A.    I have not.

14  Q.    Why not, Dr. Dhar?

15  A.    Well, I mean, for my own research, the way you phrase

16  the questions, the wording of a question, that can have a big

17  influence.  So I know that it's important to -- to phrase

18  appropriately the questions that you have.

19  Q.    So, Dr. Dhar, in addition to doing surveys for academic

20  purposes, you mentioned you've done some in a consulting

21  capacity; is that right?

22  A.    Yes.

23  Q.    If you would, explain to the members of the jury some of

24  the companies you've done surveys for in a consulting

25  capacity?

```
1    A.    Sure.   They will be technology companies like IBM or

2    Hewlett-Packard.   I've worked with consumer goods companies

3    like Procter & Gamble, PepsiCo, Visa, as financial services,

4    so there's a range of different companies.

5    Q.    And those have nothing to do with lawsuits.   That's just

6    business consulting; is that right?

7    A.    Correct.

8    Q.    If you would, give the members of the jury an example or

9    two, briefly, of the types of surveys you've done for these

10   companies.

11   A.    So there are a range of marketing questions.

12   Hewlett-Packard was interested in learning about customer

13   satisfaction and customer retention for their products.

14        The survey I did for IBM was interesting.   It was

15   looking at business to business, how do businesses buy very

16   high-tech products and services that IBM sells.

17        The surveys that I did with Procter & Gamble and PepsiCo

18   would be much more consumer products; how do people buy soft

19   drinks; are they willing to pay more when they go to a

20   smaller mom-and-pop chain versus when they go to a, you know,

21   Walmart or a Target and those kinds of things.

22   Q.    Dr. Dhar, have you ever done surveys to be used to

23   assist in a lawsuit such as this?

24   A.    Yes, I have.

25   Q.    Of all the surveys that you've done, what would you
```

1  approximate were the percentage you did for purposes of

2  assisting in a lawsuit?

3  A.   I would say around less than 10 percent.

4  Q.   Of those surveys that you've done in this capacity, have

5  you done them on behalf of companies such as Smartflash, the

6  Plaintiff, and on behalf of companies such as Apple, the

7  Defendant?

8  A.   Yes.

9  Q.   Have you ever testified in court before, Dr. Dhar?

10  A.   I have.

11  Q.   About how many times?

12  A.   About four or five times.

13  Q.   What do you spend the majority of your professional time

14  doing, Dr. Dhar?

15  A.   So I'm an academic, so the majority of my time is on

16  academic research and teaching and also consulting, that we

17  discussed.

18  Q.   Okay.  So about what percentage of the time do you spend

19  assisting with lawsuit matters such as this?

20  A.   I would say approximately one-third.

21  Q.   Are you an expert, Dr. Dhar, in survey design?

22  A.   Yes.

23  Q.   Are you an expert in performing and analyzing consumer

24  surveys?

25  A.   Yes.

```
1    Q.    Are you an expert in consumer behavior?

2    A.    Yes.

3    Q.    Have you written and taught on the subject of consumer

4    behavior?

5    A.    Yes.

6    Q.    Is consumer behavior important to understand and to be

7    able to offer expert opinions concerning consumer surveys?

8    A.    In my opinion, yes.

9    Q.    Dr. Dhar, are you being compensated for your time in

10   this case?

11   A.    Yes.

12   Q.    And what is your standard hourly rate?

13   A.    $750 per hour.

14   Q.    Dr. Dhar, is your compensation contingent on your

15   conclusions in this case or its outcome?

16   A.    It is not.

17           MR. ALBRITTON:  Your Honor, we offer Dr. Ravi Dhar

18   in the expert of field of consumer surveys and consume

19   consumer behavior.

20           THE COURT:  Is there objection?

21           MR. WARD:  No objection.

22           THE COURT:  The Court will recognize the witness as

23   an expert in those fields.

24           Continue, Counsel.

25           MR. ALBRITTON:  Thank you very much, Your Honor.
```

```
 1   Q.   (By Mr. Albritton) Dr. Dahr, what were you asked to do
 2   in this case?
 3   A.   So at a broad level, I was asked to look at
 4   Dr. Wechselberger's surveys and conclusions that he reached
 5   and how Mr. Mills used some of those results and whether
 6   there was a scientifically -- whether his results were
 7   scientifically well done; are there any scientific concerns
 8   with what he did.
 9   Q.   Dr. Dhar, what information did you consider in
10   undertaking this study?
11   A.   So, naturally, I looked at Dr. Wechselberger's surveys
12   and reports and his deposition testimony.  I also reviewed --
13   not as comprehensively, but how Mr. Mills' report and
14   testimony, how he was using it.
15        I conducted my own surveys, and I looked at basically my
16   background and education and research in this area.
17   Q.   Thank you, Dr. Dhar.
18        Were you in the courtroom when Mr. Racz and Dr.
19   Wechselberger and Mr. Mills testified?
20   A.   I was.
21   Q.   Have you also -- were you here for a portion, for
22   instance, today of Dr. Wechselberger -- or
23   Mr. Wechselberger's testimony?
24   A.   I was there briefly in the morning, and then I heard
25   some of it towards the end.
```

1   Q.   When you were here when Dr. Wecker testified, did you

2   hear him criticize what you did in this case in any way?

3   A.   Not specifically.  I don't recall.

4   Q.   Dr. Dhar, are you here to offer opinions about what are

5   the appropriate damages, if, in fact, damages are owed?

6   A.   I'm not a damages expert.

7   Q.   Are you here to offer opinions on infringement or

8   validity?

9   A.   I'm not.

10   Q.   What are you here to do, Dr. Dhar?

11   A.   I'm here just to look at the measures that Dr. Wecker

12   used in his surveys and -- and provide some of the scientific

13   concerns that I found with it.

14   Q.   On a high level, Dr. Dhar, what is your opinion about

15   Dr. Wecker's surveys?

16   A.   So Dr. Wecker had three measures that look at what he

17   called -- and I might be paraphrasing -- what he called the

18   value of the feature to Apple.  And I'm going to look at

19   those three measures, and my overall opinion is that all

20   those three measures are highly unreliable.

21        MR. ALBRITTON:  Mr. Lee, if you would, bring up

22   Slide No. 2, please, sir.

23   Q.   (By Mr. Albritton) What are the three categories of

24   questions that were asked by Dr. Wecker that you analyzed and

25   are here to offer opinions about?

1    A.    So the three measures that he spoke about that talk

2    about the value of the feature to Apple, one of them was

3    alone motivate, the second was percent value of the feature,

4    and the third was the purchase intention of certain

5    descriptions of scenarios.

6    Q.    Now, in each of these three categories, did he ask

7    multiple -- did he ask these as it relates to different

8    features -- I'm sorry -- as to different products, for

9    instance?

10   A.    Yes.  They were asked for different devices, the three

11   devices that are, you know, allegedly infringing here, the

12   tablets, the smartphones, and the iPod Touch, and he also

13   asked them for -- for movies and app scenarios.

14   Q.    Now, for the purposes of simplicity, are we going to

15   focus on just some of those questions?

16   A.    That's correct.

17   Q.    But are -- do your opinions apply and your criticisms

18   apply across the board?

19   A.    Yes.  My report has all of them.

20          MR. ALBRITTON:  Mr. Lee, if you would, please bring

21   up Plaintiffs' Exhibit No. 205.002 at Page 19, and in

22   particular, Question 4A.

23   Q.    (By Mr. Albritton) Dr. Dhar, what is Question 4A on the

24   screen?

25   A.    So this is the first measure that he has, what I call

```
 1   the alone motivate question.  It says:  For each device
 2   listed below, consider the capability to purchase apps from
 3   Apple's App Store.  Did this capability alone motivate you to
 4   buy the device?
 5   Q.   Now, is that Dr. Wecker's survey question?
 6   A.   Correct.
 7        MR. ALBRITTON:  Now, Mr. Lee, if you would go to --
 8   Q.   (By Mr. Albritton) And is that what you refer to as the
 9   alone motivate question?
10   A.   Yes.
11        MR. ALBRITTON:  Now, if you would, Mr. Lee, go to
12   Question 4B.
13   Q.   (By Mr. Albritton) Dr. Dhar, what is Question 4B?
14   A.   So this is what I referred to as the second measure he
15   had for the value of the feature to Apple, which is the
16   percent value question.
17   Q.   Okay.  And that's Dr. Wecker's actual question?
18   A.   Correct.
19        MR. ALBRITTON:  Now, Mr. Lee, if you would, please
20   bring up Plaintiffs' Exhibit 205.001 at Page 54, specifically
21   Question 6.
22   Q.   (By Mr. Albritton) Dr. Dhar, what is that?
23   A.   So this is Dr. Wecker's -- what I call the purchase
24   intent question.  That's the third measure that he has to
25   determine the value of the feature to Apple.
```

1    Q.   Okay.  So these -- we've now seen the three questions --

2    or examples of the three questions that you analyzed and are

3    going to offer opinions about?

4    A.   Yes.  And I'm focusing on them.  His survey had many

5    other questions, but these are the ones that I understand

6    that Mr. Mills is using for damages.

7    Q.   Okay.

8              MR. ALBRITTON:  If you would, Mr. Lee, please bring

9    up Slide No. 3.

10   Q.   (By Mr. Albritton) Dr. Dhar, if you would, on a high

11   level, please summarize for the members of the jury why you

12   believe Dr. Dhar's (sic) survey questions -- or his surveys

13   are flawed and unreliable?

14   A.   I think you meant Dr. Wecker's.

15   Q.   Yes.  I'm sorry.  You're Dr. Dhar.  I apologize.  Yes, I

16   meant Dr. Wecker.

17   A.   Sure.

18        So the first concern I had for the alone motivate

19   question -- so Dr. Wecker and Mr. Mills assumed that the

20   alone motivate question measures are -- the understanding

21   that the people have of the question is that when they answer

22   yes to the question, it means this is the only feature -- why

23   they bought the device.  And I don't think that's correct.

24        The second question was the percent value question,

25   which is -- Dr. Wecker assumes that the percent value

1    question, when somebody tells you what portion of the value

2    is from this feature, the rest -- all the other features that

3    a smartphone has or a tablet has, there is 100 percent minus

4    the number to give for this feature, and I don't think that

5    is reliable either.

6         And, finally, the scenarios that were provided to

7    measure purchase intent were also flawed.

8    Q.   Dr. Dhar, do you believe, in your expert opinion, that

9    Dr. Wecker's surveys should be relied upon in making

10   important decisions?

11   A.   Not in my opinion.

12             MR. ALBRITTON:  Mr. Lee, if you would, please bring

13   up Plaintiffs' Exhibit 205.002, Page 19, Question 4A.

14   Q.   (By Mr. Albritton) Dr. Dhar, we just looked at this.  If

15   you would, please read again Dr. Wecker's question to the

16   jury.

17   A.   The question reads:  For each device listed below,

18   consider the capability to purchase apps from Apple's App

19   Store.  Did this capability alone motivate you to buy the

20   device?

21   Q.   Dr. Wecker -- Dr. Dhar, what does "alone motivate" in

22   that question refer to?

23   A.   It refers to the capability to purchase apps.

24   Q.   Is it your understanding that the Smartflash patents do

25   not cover the mere capability to purchase apps?

1    A.    I'm not a technical expert; but based on what I'm

2    hearing, it's narrower than that.  It's a matter of payment

3    and downloading.  But I'm not a technical expert.

4    Q.    Dr. Dhar, does that question, Question 4A, ask about the

5    manner in which to pay for apps that are purchased?

6    A.    It does not.  It asks about the capability to purchase

7    apps.

8    Q.    Dr. Dhar, is that question in any way targeted to a

9    purchase decision in the year 2009?

10   A.    It is not.

11           MR. ALBRITTON:  If you would, Mr. Lee, bring up

12   Slide 4 for us, please sir.

13   Q.    (By Mr. Albritton) Dr. Dhar, according to Dr. Wecker and

14   Mr. Mills, what is this question, Question 4A that we just

15   looked at, attempting to measure?

16   A.    So according to Dr. Wecker and Mr. Mills, if somebody

17   answers yes to this question, what it's measuring is that

18   means this was the only reason that caused them to make a

19   purchase.

20   Q.    Does it actually do that, Dr. Dhar?

21   A.    Not in my opinion.

22   Q.    Thank you very much.

23           MR. ALBRITTON:  You can take that down.

24   Q.    (By Mr. Albritton) Has Dr. Wecker offered any empirical

25   evidence to show how respondents actually understood the

1    alone motivate question, that question being 4A?

2    A.   He has not.

3    Q.   Is there, in fact, any data that shows that the tested

4    feature was not the only reason to buy the -- the product at

5    issue in the question?

6    A.   I conducted a survey in this matter.

7    Q.   Let's talk about your survey?

8              MR. ALBRITTON:  If you would, Mr. Lee, please bring

9    up Defendant's Exhibit 447 at Page 15, please, sir.

10   Q.   (By Mr. Albritton) What are we looking at?

11   A.   This is the first introduction of my survey.

12   Q.   Dr. Dhar, what did you do in this survey?

13   A.   So I pretty much took Dr. Wecker's questions that he had

14   up, to the alone motivate question, and I re-ran the survey

15   that he had.

16   Q.   Okay.  Now, after -- in your survey, if a respondent

17   answered yes to alone motivate, did you ask them any

18   additional questions?

19   A.   Yes.  I asked them additional questions about other

20   features that a smartphone has, including many of those that

21   were listed by Dr. Wecker in his survey.

22             MR. ALBRITTON:  Let's look, Mr. Lee, at Page 22 of

23   Defendant's Exhibit No. 447.  And if you would, blow up Intro

24   Question 4.

25   Q.   (By Mr. Albritton) Dr. Dhar, what is Intro Question 4?

1   A.   So this is the same introduction that Dr. Wecker had,

2   which listed the handheld devices and what sort of features

3   they might have.

4   Q.   Did you replicate that list of features, or did you use

5   that list of features in your survey?

6   A.   Yes, I just mentioned those.

7   Q.   And did you use the same introduction?

8   A.   Yes.

9        MR. ALBRITTON:   Now, if we could, Mr. Lee, let's go

10  to Page 24 and look at Question 4A.

11  Q.   (By Mr. Albritton) Is that the question from your survey

12  that you asked about alone motivate, Dr. Dhar?

13  A.   Yes, and that's the same as Dr. Wecker's.

14  Q.   So it's precisely the same question?

15  A.   Yes.

16       MR. ALBRITTON:   Now, if you would, Mr. Lee, let's

17  go to Page 25.

18       If you would, just blow up Question No. 1; QF1, for

19  instance.

20  Q.   (By Mr. Albritton) Now, if you would, Dr. Dhar, tell us

21  what we're looking at here.

22  A.   So basically what you're looking at is, after asking Dr.

23  Wecker's question on the alone motivate, I presented them

24  with additional features of a smartphone or a tablet, and I

25  asked them the question:   For each device listed below,

```
 1   consider the capability to browse the web.  Did this
 2   capability motivate you to buy the device?
 3   Q.   Okay.
 4           MR. ALBRITTON:  Now, if you would, let's look at --
 5   Q.   (By Mr. Albritton) So that -- the capability there is to
 6   browse the web; is that right?
 7   A.   Yes.
 8           MR. ALBRITTON:  Now, if you would, let's look at,
 9   Mr. Lee, QF2.  F2, yes.
10   Q.   (By Mr. Albritton) Is that an example of another
11   question that you asked in the same manner, Dr. Dhar?
12   A.   That's correct.
13   Q.   And what does this one ask about?
14   A.   This is about the capability to send emails.
15   Q.   Okay.
16           MR. ALBRITTON:  Mr. Lee, let's look at QF3, please,
17   sir.
18   Q.   (By Mr. Albritton) And what does that ask about, Dr.
19   Dhar?
20   A.   This asks about the capability to capture photos and
21   video.
22   Q.   So we've looked at QF1, -2, and -3.  Are there actually
23   a total of 11 of those questions that ask about a -- ask
24   about different features?
25   A.   There were 11 for smartphone, and there were 10, I
```

```
 1    think, for the other devices.  Keep in mind that -- that
 2    these products have hundreds of features, and I showed them
 3    only 10 here.
 4    Q.   Thank you.
 5         It appears that you approximated or that you used some
 6    of the questions just exactly the way that Dr. Wecker did.
 7         Why did you do that, Dr. Dhar?
 8    A.   So I had concerns -- other concerns with his
 9    methodology, but I wanted to set that aside; and I wanted to
10    show -- isolate the problem with this question that Dr.
11    Wecker used.
12    Q.   So what was the purpose of this study that you
13    undertook?
14    A.   It's very simple.  And the simple answer is that Dr.
15    Wecker says that if you answer yes to the alone motivate
16    question, it means that was the only reason that people were
17    buying this device.
18         All I wanted to do was see if people answer yes to the
19    other features, and that would tell me that there were other
20    reasons why they were buying the device.
21    Q.   Does that have any impact on your opinion as to whether
22    they understood the alone motivate question?
23    A.   Yes.
24    Q.   And what is that?
25    A.   That it's -- my understanding, it is different from Dr.
```

```
 1   Wecker and Mr. Mills, which is that it is not -- when they

 2   answer the alone motivate question, their understanding is

 3   not that this is the only reason that caused them to buy the

 4   device.

 5              MR. ALBRITTON:  Mr. Lee, could we please bring up

 6   Defendant's Exhibit 447 at Page 49?

 7   Q.   (By Mr. Albritton) Dr. Dhar, if you would, please tell

 8   us what we're looking at there.

 9   A.   So what you're looking at here is just the summary

10   tables of regular users and purchasers -- purchasers, and I

11   compare my result here with Dr. Wecker's result for -- for

12   these questions.

13        And you see that in my survey, we find 38 percent say

14   they're regular users of iPhone, and Dr. Wecker finds 38

15   percent.  And if you look at some of the other numbers, like

16   if -- they're roughly very similar.

17   Q.   Now, what's the importance of this, Dr. Dhar?

18   A.   There's not a huge importance other than they're -- they

19   both find similar number of regular users and purchasers.

20              MR. ALBRITTON:  Mr. Lee, if you would, please bring

21   up Exhibit 447 at Page 31.

22   Q.   (By Mr. Albritton) Dr. Dhar, I'd like to talk to you

23   about the results of the survey that we've been talking

24   about.  If you would, explain to the members of the jury,

25   what we're looking at here.
```

A.    Sure.

So in this -- as I said, I approximated Dr. Wecker's survey to Question 4A, which is his alone motivate question. Did the capability to purchase apps from Apple's App Store alone motivate you to buy the device?

161 people said yes.  And to those 161 people, I asked the subsequent questions that are listed on the QF.

Q.    So read that to us.

A.    So respondents who said yes to QF4A were asked whether other features and capabilities motivated them to buy the devices.

Q.    Now, let's go through a few of these.  What does the first line indicate?

A.    It says that 141 out of the 161 people who answered yes to the alone motivate question also answered yes to capability to browse the web.

Q.    And when you say the alone motivate question, you're talking about the alone motivate question from Dr. Wecker's survey?

A.    Yes, sir.

Q.    What about the next line, Dr. Dhar?

A.    That shows, again, to the capability to send emails, 141 people answered yes of the 161 who answered yes in Dr. Wecker's survey.

Q.    And the rest of this table indicates your results as the

1   remainder of the additional features; is that right?

2   A.   Yes, sir.

3   Q.   If you would, let's talk about the bottom entry.

4          MR. ALBRITTON:  If you would, highlight that, Mr.

5   Lee.

6   Q.   (By Mr. Albritton) And explain what that indicates, Dr.

7   Dhar.

8   A.   So all that indicates is that -- all the 161 people who

9   answered yes to the alone motivate question, all of them

10  answered yes to at least one of the features in my survey.

11  Q.   What conclusion do you draw from that, Dr. Dhar?

12  A.   The conclusion I draw is that Dr. Wecker's understanding

13  and Mr. Mills' use of that answer yes to that survey to

14  assume, that means that's the only reason people bought the

15  device, is incorrect.

16  Q.   What does it tell you about the design of the survey

17  done by Mr. -- or Dr. Wecker?

18  A.   It tells me that the alone motivate question is hard to

19  understand and certainly people are not understanding it as

20  meaning the only reason to buy the device.

21  Q.   And you did similar surveys regarding buying and renting

22  TVs and movies, correct?

23  A.   Correct.

24  Q.   And for iPads and iPod Touches?

25  A.   Correct.

1  Q.   Similar results to all?

2  A.   Yes, sir.

3  Q.   Same opinion as to all?

4  A.   Yes, sir.

5  Q.   What is your overall opinion about the results of the

6  alone motivate question?

7  A.   So my opinion is that's one of the measures that Dr.

8  Wecker uses to value the feature to Apple, and that measure

9  is highly unreliable.

10  Q.   Thank you.

11          MR. ALBRITTON:   Mr. Lee, if you would, please, sir,

12  bring up Plaintiffs' Exhibit No. 205.002, Page 20, Question

13  4b?

14  Q.   (By Mr. Albritton)   What are we looking at there, Dr.

15  Dhar?

16  A.   So this is the second measure that Dr. Wecker had to

17  determine the value of the feature to Apple.  I call it the

18  percentage value question.

19  Q.   If you would, tell us, is that Dr. Wecker's actual

20  question from the materials he produced in this case?

21  A.   Yes, I think so.

22  Q.   If you would, please read that to the members of the

23  jury.

24  A.   For each device listed below, what portion, if any, of

25  its value do you attribute to the capability to purchase apps

1    from Apple's App Store.

2    Q.    Dr. Dhar, is that question targeted to the year 2009?

3    A.    It is not.

4    Q.    Is it targeted to any particular time period?

5    A.    It is not.

6    Q.    Dr. Dhar, did the percentage of value question that you

7    just read, that question being Q4B, talk about the manner in

8    which to purchase apps or the manner in which to pay for

9    apps?

10   A.    No, it's about the capability to purchase apps.

11   Q.    And what is your understanding about that issue?

12   A.    So my understanding, listening to some of the testimony,

13   is that it's -- this is broader than what the patents at

14   issue are.

15            MR. ALBRITTON:   Mr. Lee, if you would, bring up

16   Slide No. 5, please, sir?

17   Q.    (By Mr. Albritton)   What does Dr. Wecker assume that

18   this survey question relate to?

19   A.    So what Dr. Wecker assumes if somebody answers

20   10 percent of the question, what portion of the value comes

21   from this feature, he assumes that all the other features of

22   the device are hundred minus that 10 percent, namely 90

23   percent.

24   Q.    Do you agree, Dr. Dhar?

25   A.    I disagree with the methodology.

1  Q.    That he used in -- with this question -- if -- is that

2  right?

3  A.    Yes, sir.

4  Q.    Would you explain to the members of the jury why?

5  A.    So it's interesting.  Whenever you -- whenever you point

6  to one feature and ask what is the portion of the value that

7  comes from this feature, it's considered leading and leads to

8  a highly-inflated response, if it's not in the con -- if it's

9  not in the context of all the features that a product has.

10  Q.    Dr. Dhar, did you do anything to study whether this

11  question could yield or did yield valid results?

12  A.    I did.  I conducted a survey, although it's a well-known

13  finding in the academic literature.

14        MR. ALBRITTON:  If you would, Mr. Lee, bring up

15  Defendant's Exhibit 449, at Page 22, please, sir?

16  Q.    (By Mr. Albritton)  One follow-up question.  Your

17  motivation survey regarding TV/movie rentals is Defendant's

18  Exhibit No. 448; is that right?

19  A.    I don't recall, but I'll take your representation.

20  Q.    Thank you.

21        Dr. Dhar, what are we looking at here on the screen?

22  A.    This is a -- another survey I did in the matter.

23  Q.    Okay.  And what was this survey?  How did you design

24  this survey, and what were you seeking to test?

25  A.    So, broadly speaking, as I said, I was seeking to test

```
 1    if you ask about one feature at a time for a device that has
 2    hundreds of features, what portion of the value comes from
 3    this feature, it's likely to be inflated, very high.  The
 4    numbers are going to be artificially inflated.  That's what I
 5    was trying to show here.
 6              MR. ALBRITTON:  Dr. Dhar, if you would -- I'm
 7    sorry.
 8              Mr. Lee, if you would, bring up Defendant's Exhibit
 9    No. 449 at Page 33, please, sir?  And highlight for us, or
10    bring out Question QM1a and 1b.
11    Q.   (By Mr. Albritton)  Dr. Dhar, if you would, tell us what
12    is Question QM1a?
13    A.   Sure.  So -- maybe let me step back.  Again, I did this
14    for many different features.  There are around 10 different
15    features.  And each group of respondents saw two questions.
16         The first -- the first question said -- which was
17    similar to Dr. Wecker's alone motivate question, which said:
18    For each device listed below, consider the capability to send
19    and receive emails.  Did this capability alone motivate you
20    to buy the device?
21    Q.   Then what did you ask people to do, Dr. Dhar?
22    A.   So regardless of their answers to the first question,
23    yes, no, don't know, they go to the second question, which
24    is:  For each device listed below, what portion, if any, of
25    its value do you attribute to the capability to send and
```

1   receive emails.  This is Dr. Wecker's percentage value

2   question.

3   Q.   Okay.  So for Q1 -- QM1b, is the question phrased the

4   same way as Dr. Wecker's question, except it doesn't ask

5   about the capability to purchase apps?  It asks about other

6   features on the phone?

7   A.   That's correct.

8   Q.   What was the purpose of your study, Dr. Dhar?

9   A.   So the purpose was that each group of respondents got

10   one of these features, and they were asked what's the

11   percentage of the value.  And they did this for 13 features

12   for the smartphone, I think, and 11 features for the tablet

13   and iPod Touch.

14   Q.   Why did you ask the percentage of value question to all

15   regular users?

16   A.   Because I just wanted to see if -- what the answers --

17   they were going to be artificially inflated if you ask one

18   feature at a time.

19   Q.   Now, were each of the respondents asked all of these

20   questions -- that is, questions about each of these

21   additional features?

22   A.   No.  Like Dr. Wecker, each group of respondents would

23   get only one feature at a time.

24   Q.   Okay.  If you would, explain to us, Dr. Dhar, how you

25   can ask about different features to different groups of

1    respondents and get a result that is meaningful?

2    A.    So that's the beauty of representative sampling, as Dr.

3    Wecker was saying.  So what each -- they're different groups.

4    They're essentially -- the groups are similar, so the

5    averages in the groups are the same.  What I'm trying to do

6    is I'm trying to isolate what's the effect of just asking one

7    feature at a time, what responses people give to the portion

8    of value.

9    Q.    Is this a well-accepted manner in which to conduct

10   surveys?

11   A.    Yes.

12          MR. ALBRITTON:  If you would, Mr. Lee, bring up

13   Defendant's Exhibit 449 at Page 47.

14   Q.    (By Mr. Albritton)  If you would --

15          MR. ALBRITTON:  I'm sorry, I don't believe that's

16   the right.  I'm sorry, yes, it is.

17   Q.    (By Mr. Albritton)  If you would, I'd like you to tell

18   on a high level to the jury, what it is we're looking at

19   here, Dr. Dhar?

20   A.    So I think the focus should be maybe on the fourth

21   column.  That will make it easier.  The fourth column gives

22   the average percentage value that respondents gave in the

23   survey when they were asked one feature at a time.

24        So, for example, the group that got to ask about

25   capability to send and receive emails, they said it was 43

1  percent of the value of the device.

2  Q.   What about for the second line, the capability to browse

3  the web?

4  A.   So the group that got that question said it was 49

5  percent of the value of the device.

6  Q.   What about for Question 3?

7  A.   Shoot and -- shoot photos and videos?  That was 40

8  percent.

9  Q.   Okay.  What about for Question 4, what was the

10  capability?

11  A.   It was to view maps and/or navigate using GPS.  That was

12  33 percent.

13  Q.   How about Question No. 12?  Let's skip ahead.  The

14  second in the -- the second to the end, the capability to

15  make and receive phone calls?

16  A.   It was 59 percent.

17  Q.   And how about the last one, which relates to text

18  messaging?

19  A.   That was 48 percent.

20  Q.   Now, Dr. Dhar, if you take the averages of all of these

21  questions, what does it add up to, what percentage?

22  A.   It adds up to 587 percent.

23  Q.   What does that tell you, Dr. Dhar?

24  A.   That tells me that the technique of asking one feature

25  at a time for a device that has hundreds of features, what is

1    the value of this feature, is not a proper technique.  It's

2    highly inflated and artificial.

3    Q.   If you consider a 95 percent confer -- confidence

4    interval, what would be the low percentage and the high

5    percentage?

6    A.   Here it says 577 to 598.

7    Q.   Let me ask you, just as an example, if you just took the

8    questions I asked you about, QM1 through 4, 6, 12, and 13,

9    and you added those up, would those add up to more than a

10   hundred percent?

11   A.   Sorry, you said the first four?

12   Q.   Yeah, let's just take the first four?

13   A.   Yes, that adds up to around 92, 132, 165.

14   Q.   Okay.  And then what about if you add -- so we're at

15   165.  And then what about if you add the result for Question

16   6, Apple brand?

17   A.   165, 172, 232.

18   Q.   232.  What about if you go and add the capability to

19   make and send -- make and receive phone calls?

20   A.   280.

21   Q.   Okay.  And then if you --

22   A.   Sorry, that's -- I added 48, so 232, that would be 291.

23   Q.   And then if you add the capability to send and receive

24   text messages?

25   A.   239.

```
 1    Q.   Now, 239 percent --

 2    A.   339, sorry.

 3    Q.   339, just for those feature alone?

 4    A.   Yes, and the smartphone has hundreds of features.

 5    Q.   And are each of those independent features?

 6    A.   The ones that are highlighted are independent.  Some of

 7    them, as Dr. Wecker said, could be dependent; but these ones

 8    are clearly independent of each other.

 9    Q.   Does this survey result and this survey show you the

10    full extent of the bias of the question that Dr. Wecker

11    asked?

12    A.   No, because I used only 11 features, and the phone has

13    hundreds of features.

14    Q.   And did you ask -- do a similar study with respect to

15    the iPad and the iPod Touch?

16    A.   I did.

17    Q.   And did you get similar results?

18    A.   The total percentages were 3 -- I think in the range of

19    300 something, but they were similar.

20              MR. ALBRITTON:  If you would, Mr. Lee, bring up

21    Plaintiffs' Exhibit No. 205.001 at Page 55, and then draw out

22    for us Question No. 6, please, sir.

23    Q.   (By Mr. Albritton)  Dr. Dhar, what are we looking at on

24    the screen?

25    A.   So this is a third measure of value to Apple for this
```

1    feature that Dr. Wecker had.  I call it the purchase intent

2    question.

3    Q.    And this is actually Dr. Wecker's question; is that

4    correct?

5    A.    Correct.

6    Q.    And that comes from a Plaintiffs' exhibit?

7    A.    Yes, sir.

8    Q.    Are there some things about the text that stick out to

9    you, Dr. Dhar?

10   A.    So, obviously, this is bold and highlighted, the App

11   Store application and disabled, and then I mentioned some

12   other concerns I had with the description of the alternative.

13   Q.    Okay.  If you would, talk to us about the concept of

14   framing, Dr. Dhar.

15   A.    So the concept of framing is when you describe the

16   alternative, you can describe it in a negative way, in a

17   positive way, or in a neutral way.  And so framing refers to

18   when you frame something positively or negatively.

19   Q.    Were you here when Dr. Jones testified in this case?

20   A.    Dr. Jones?  Yes, I was in the room.

21   Q.    And is this the scenario or one of the scenario --

22   scenarios that Dr. Jones testified about?

23   A.    I think so.

24   Q.    Is it your understanding that Dr. Jones drafted this --

25   this scenario used in that question?

1    A.    I think that's what Dr. Wecker testified, but, Counsel,

2    I don't remember all the specific details sitting here.

3    Q.    Okay.  I also -- I won't go over with you specifically,

4    but did you consider Plaintiffs' Exhibit 54.001, Page 50, at

5    Question 8?

6    A.    Yes, I did.

7    Q.    Okay.  And is your testimony about that Question 6

8    relevant also here to this Question 8 that's on the screen?

9    A.    For some of that -- some of the concerns, yes.

10   Q.    Okay.  Now, if you would --

11            MR. ALBRITTON:   Let's go back to Question 6,

12   please, Mr. Lee.

13   Q.    (By Mr. Albritton)  If you would, talk to us -- you've

14   told us about framing.  What is your opinion about how this

15   scenario is framed and how it impacted the result of this

16   survey?

17   A.    So in short, the value of this feature would depend on

18   what the alternative is because it's asking about how much do

19   you value this, compared to something else.  So what framing

20   says -- what is it compared to is seeing -- is framed

21   negatively, that will inflate or that will boost the

22   attractiveness of this feature.

23   Q.    Is there a specific word that's used in that -- in that

24   scenario that causes you an issue with respect to framing?

25   A.    So the one I pointed out in my report was that instead,

1    he could browse for and install apps; but before using the

2    apps, you would need to do something.  So the words like

3    "but," it seems harmless and simple, they create negative

4    frame.

5    Q.    You were here when Dr. Wecker testified; is that right?

6    A.    Yes.

7               MR. ALBRITTON:  If you would, Mr. Lee, bring up the

8    transcript of 2/17 in the afternoon, Page 102, Lines 13

9    through 103, Line 1?

10   Q.   (By Mr. Albritton)  If you would read that to the jury,

11   Mr. -- or Dr. Dhar?

12   A.    Dr. Wecker, do you recall placing bold or blue

13   highlighting on certain words in your surveys?

14        Yes.

15        And one of those words was disabled, correct?

16        Yes.

17        And you -- it was your choice to put the word disabled

18   in blue text, correct?

19        Yes.

20        And disabled is a -- has a negative connotation, doesn't

21   it, sir?

22        Yes, it's intended to.

23        It's intentional?

24        Yes.

25   Q.    Thank you.

1        MR. ALBRITTON:  You can take that down, Mr. Lee.

2   Q.  (By Mr. Albritton)  So your opinions with respect to the

3   question or the inclusion of the word "but," do those -- as

4   it relates to framing, does that have equal applicability to

5   that blue highlighted word, "disabled"?

6   A.   Yes.  Anything that's framed negatively would have an

7   effect on lowering the attractiveness of the alternative.

8   Q.   How does the improper framing of a scenario affect the

9   result of a question?

10  A.   So, as I said, the result of the question really is, how

11  much do you like A compared to B?  B is the alternative here.

12  So if B is described in a negative sense, then A looks more

13  attractive.

14  Q.   Can you give us an every-day example of this phenomenon,

15  Dr. Dhar?

16  A.   Sure.  There's a well-known study on looking at people's

17  evaluation of meat.  It's like 75 percent lean versus 25

18  percent fat; and it's the same meat, but people -- the frames

19  are different and people think 75 percent lean is much more

20  attractive than 25 percent fat.

21  Q.   Is there another problem with how the scenario and

22  questions are written in this case?

23  A.   So I had mentioned in my report the concern with the

24  payment information that was -- that made the alternative

25  seem more burdensome.

1   Q.   Well, explain that to us.

2   A.   Sure.  Is it -- can I see that scenario?

3   Q.   Yes, sir, I apologize.

4           MR. ALBRITTON:  If you would bring back up Question

5   No. 6, and I believe that's in 447.  I'm sorry, it is not.

6   Let me --

7       I apologize, Your Honor.

8       It's Plaintiffs' Exhibit 54.01 -- 001 at Page 50,

9   Question 8.  Actually go to Page 17 if you would, sir -- 17,

10  please, Mr. Lee.

11      I apologize.  That's not it, Mr. Lee.  I apologize.

12  It's -- it's 205.002, Page 17, where it describes the manner

13  in which information is stored -- payment information is

14  stored.

15  Q.   (By Mr. Albritton)  All right.  Dr. Dhar, would you read

16  this to us and tell us the importance of this to your

17  opinions?

18  A.   So this is a preamble in Dr. Wecker's survey, and one of

19  the sentences says -- it's basically describing the App

20  Store.  And one of the sentences says that the App Store

21  saves your payment information for ease of making multiple

22  purchases.

23          MR. ALBRITTON:  Okay.  Now, let's go back to the

24  question.  The question is Question No. 8 on 54.001.

25  Q.   (By Mr. Albritton)  Okay.  So the people who answered

1    this Question No. 8 had done so after having seen that

2    description that we just went through about the storage of

3    payment information; is that right?

4    A.   Yes.

5    Q.   Okay.  So if you would, explain to the members of the

6    jury your concern as -- of this question as it relates to the

7    description of the payment information.

8    A.   So my concern is really that it makes the alternative

9    seem potentially burdensome.  It says:  But before using the

10   app, you would need to complete each purchase by separately

11   visiting the website and entering your payment information.

12       And some people may understand entering your payment

13   information to mean entering your credit card, your address,

14   and other details.  Some people may take it to mean user ID

15   and password, which might be less burdensome.

16       So there could be a range in terms of how people take

17   this payment information to mean.

18   Q.   And how does that affect your opinion about the validity

19   and reliability of the results Dr. Wecker got to that

20   question?

21   A.   Well, to the extent people interpret it to be more

22   burdensome and there are less burdensome ways available, that

23   will make the alternative less attractive and make the

24   feature tested more attractive, because they're comparing

25   always A versus B.

1    Q.   Dr. Dhar, do you have concerns about this question with

2    respect to the manner in which the technology or the feature

3    is described?

4    A.   It's, again, talking about capability to purchase apps.

5    And my understanding is that the patents are, on manner of

6    payment, related to that, not just purchasing apps or renting

7    movies.

8    Q.   Were you here when Mr. Racz testified that he didn't

9    invent the ability to purchase digital content online?

10   A.   Yes.

11   Q.   Did you do a survey in this case, Dr. Dhar, from which

12   damages could be affirmatively calculated?

13   A.   I did not.

14   Q.   Why not?

15   A.   I was not asked to do a survey by Apple in this case;

16   and my understanding is Dr. Becker, who is the damages

17   expert, is going to decide, based on some of the

18   documentation, what was happening at the time, 2009 time

19   period, which is the relevant time period to determine the

20   damages.

21   Q.   And do you have a problem with the -- is there any issue

22   with doing a survey in 2014 and trying to measure things that

23   happened back in 2009 or that would have happened in 2009?

24   A.   I mean, there would certainly be a concern.  You would

25   have to make a lot of heroic assumptions about the value of

```
 1   the features today and compare it to the value in 2009.  The

 2   survey would not be able to ask, in other words, the value in

 3   2009.

 4   Q.   Thank you.

 5        MR. ALBRITTON:  To correct the record, when you and

 6   I spoke earlier about the payment information question, it

 7   was Plaintiffs' Exhibit 205.001 at Page 55.

 8   Q.   (By Mr. Albritton) Dr. Dhar, you were here in the

 9   courtroom when there was discussion concerning Apple's

10   surveys?

11   A.   Some of it.  I was not here all through, but I heard

12   some of it.

13        MR. WARD:  Objection, Your Honor.  This is outside

14   his report.  He's attempting to bolster the witness before I

15   have an opportunity to cross-examine him.

16        MR. ALBRITTON:  I was merely going to ask him if

17   they caused him any concern, and nothing else, Your Honor.

18        THE COURT:  Not permitted to go outside the report.

19        MR. ALBRITTON:  Yes, sir.

20        THE COURT:  I'll sustain the objection.

21        MR. ALBRITTON:  Thank you, Your Honor.

22   Q.   (By Mr. Albritton) Dr. Dhar, in your opinion, are Dr.

23   Wecker's results reliable and -- and invalid?

24   A.   Not in my opinion.

25   Q.   In your opinion, is it appropriate to rely on them to
```

1   make important decisions?

2   A.    Not in my opinion.

3   Q.    Do you view the award of $850 million an important

4   decision?

5   A.    I think all of us would, yes.

6              MR. ALBRITTON:  Pass the witness, Your Honor.

7              THE COURT:  Counsel, approach the bench.

8              (Bench conference.)

9              THE COURT:  All right.  We're going to stop for the

10  day here.  We'll start again Monday morning.

11             MR. WARD:  Yes, Your Honor.

12             MR. ALBRITTON:  Thank you very much, Your Honor.

13             (Bench conference concluded.)

14             THE COURT:  Ladies and Gentlemen, we are going to

15  use this time as a good point to break for the day.

16             In case you had forgotten, which I doubt you had,

17  but let me remind you, we're not going to be in session

18  tomorrow, so you get a three-day weekend.  And I will see you

19  back here Monday morning.

20             I'm going to ask that you be assembled in the jury

21  room by about 8:20.  As we started at 8:30 this morning,

22  we'll do our best to start again Monday morning at 8:30.

23             I remind you, as you would expect, not to discuss

24  the case among yourselves or with anyone.  I ask you to

25  follow all the other instructions and directives that I've

1    given you.

2              Have a safe and enjoyable weekend.  I will see you

3    Monday morning.  You're excused at this time.

4              Please take your jury notebooks to the jury room.

5              COURT SECURITY OFFICER:  All rise.

6              (Jury out.)

7              THE COURT:  All right.  Counsel, please have your

8    exhibits ready to go Monday morning to read into the record

9    that come from the list of pre-admitted exhibits.  I'll be in

10   chambers by 7:30.

11             If there are late-breaking disputes over the

12   weekend -- I am hopeful that there won't be -- but we'll be

13   here if you need us.

14             Is there anything from either party before we

15   recess until Monday morning?

16             Anything from the Plaintiff?

17             MR. CALDWELL:  No, Your Honor.

18             THE COURT:  Anything from the Defendant?

19             MR. BATCHELDER:  No, sir.

20             THE COURT:  We stand in recess.  Have a good

21   weekend.

22             (Court adjourned.)

23

24

25

```
 1                        CERTIFICATION

 2

 3              I HEREBY CERTIFY that the foregoing is a true

 4    and correct transcript from the stenographic notes of the

 5    proceedings in the above-entitled matter to the best of our

 6    abilities.

 7

 8

 9    /s/_____
      SHEA SLOAN, CSR, RPR                    February 19, 2015
10    Official Court Reporter
      State of Texas No.:  3081
11    Expiration Date:  12/31/16

12

13

14

15

16    /s/_____
      SHELLY HOLMES, CSR, TCRR
17    Deputy Official Court Reporter
      State of Texas No.:  7804
18    Expiration Date  12/31/16

19

20

21

22

23

24

25
```