```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3
      SMARTFLASH LLC and          )
 4    SMARTFLASH TECHNOLOGIES           DOCKET NO. 6:13cv447
      LIMITED
 5
          -vs-                    )
 6
                                         Tyler, Texas
 7                               )       9:26 a.m.
      APPLE INC.                         February 23, 2015
 8

 9
                      TRANSCRIPT OF TRIAL
10                       MORNING SESSION
              BEFORE THE HONORABLE RODNEY GILSTRAP,
11               UNITED STATES DISTRICT JUDGE

12

13                   A P P E A R A N C E S

14

15    FOR THE PLAINTIFFS:

16
      MR. BRADLEY W. CALDWELL
17    MR. JASON D. CASSADY
      MR. JOHN AUSTIN CURRY
18    CALDWELL CASSADY & CURRY
      2101 Cedar Springs Rd., Ste. 1000
19    Dallas, Texas  75201

20

21    MR. T. JOHN WARD, JR.
      WARD & SMITH LAW FIRM
22    P.O. Box 1231
      Longview, Texas  75606
23

24

25
```

```
 1    FOR THE DEFENDANTS:

 2
      MR. JAMES R. BATCHELDER
 3    ROPES & GRAY LLP
      1900 University Ave., 6th Floor
 4    East Palo Alto, California  94303-2284

 5
      MS. CHING-LEE FUKUDA
 6    MR. KEVIN J. POST
 7    ROPES & GRAY LLP
      1211 Avenue of the Americas
 8    New York, New York 10036-8704

 9
      MR. ERIC ALBRITTON
10    ALBRITTON LAW FIRM
      P. O. Box 2649
11    Longview, Texas 75606

12

13

14

15
      COURT REPORTERS:        MS. SHELLY HOLMES, CSR, TCRR
16                            OFFICIAL COURT REPORTER
                              shelly_holmes@txed.uscourts.gov
17
                              MS. SHEA SLOAN, CSR, RPR
18                            OFFICIAL COURT REPORTER
                              shea_sloan@txed.uscourts.gov
19

20

21

22

23

24    Proceedings taken by Machine Stenotype; transcript was
      produced by a Computer.
25
```

1                    P R O C E E D I N G S

2              (Jury out.)

3              COURT SECURITY OFFICER:  All rise.

4              THE COURT:  Be seated, please.

5              All right.  Are the parties ready to read into the

6    record those items from the list of pre-admitted exhibits

7    that were used during Thursday's portion of the trial?

8              MR. CASSADY:  Yes, Your Honor.  And I only have one

9    exhibit, so I --

10             THE COURT:  You can read it in from there.

11             MR. CASSADY:  Okay.  Your Honor, the Plaintiffs

12   admit PX 756.

13             THE COURT:  Any objection?

14             MR. POST:  No objection, Your Honor.

15             THE COURT:  Do Defendants have a similar rendition?

16             MR. POST:  Yes, we do, Your Honor.

17             Defendant's request admission of the following

18   exhibits:  DX 10, DX 23, DX 26, DX 27, DX 28, DX 29, DX 31,

19   DX 33, DX 35, DX 39, DX 40, DX 42, DX 44, DX 45, DX 81,

20   DX 240, DX 303, DX 304, DX 347, DX 348, DX 447, DX 448, and

21   DX 449, Your Honor.

22             THE COURT:  Is there objection from the Plaintiff?

23             MR. CASSADY:  No, Your Honor.

24             THE COURT:  All right.  Dr. Dhar, are you present

25   and ready to return to the witness stand, please?

1           And, Plaintiff, whoever is going to cross-examine

2    Dr. Dhar, go to the podium.

3           And please bring in the jury.

4           COURT SECURITY OFFICER:  All rise for the jury.

5           (Jury in.)

6           THE COURT:  Please be seated.

7           All right.  When we recessed Thursday, Defendants

8    had rested with regard to the witness, and we'll now proceed

9    with Defendant's cross-examination of the witness.

10          MR. WARD:  May I proceed?

11          THE COURT:  You may.

12          RAVI DHAR, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

13                     CROSS-EXAMINATION

14   BY MR. WARD:

15   Q.   Good morning, Dr. Dhar.

16   A.   Good morning.

17   Q.   My name is Johnny Ward; and you and I have not met prior

18   to today, have we, sir?

19   A.   That's true, sir.

20   Q.   When you finished testifying on Thursday, you'd gone

21   through your opinions with respect to Dr. Wecker's survey,

22   correct?

23   A.   Broadly speaking, yes.

24   Q.   Broadly speaking.

25          And remind me your hourly rate?

1   A.   $750 per hour.

2   Q.   You're not here to provide the jury with your own survey

3   results that could somehow be utilized by either Mr. Mills or

4   Dr. Becker to assist the jury in calculating damages, are

5   you?

6   A.   That's correct.

7   Q.   That's not what you were asked to do.

8   A.   That's correct.  I was not asked to do that.

9           MR. WARD:  Can we look at the transcript from

10  February 18th, Page 16, Line 17?

11  Q.   (By Mr. Ward) Were you here when Mr. Batchelder was

12  asking questions of Mr. Mills?

13  A.   Yes, I was.

14  Q.   And do you recall when Mr. Batchelder was asking Mr.

15  Mills these questions starting at Page 16, Line 17:  You've

16  chosen to disregard Dr. Dhar's surveys because Dr. Wecker

17  said they're flawed, right?

18      And then you remember Mr. Mills giving this answer:  Not

19  entirely, sir; that's not the entire reason.

20  A.   That's -- that's what it says.  I don't remember the

21  details, yes.

22  Q.   You've chosen not to rely on them, correct?

23      And he said:  Well, he doesn't -- and there's some back

24  and forth in there on -- going to Page 17, Line 1:  He isn't

25  offering that opinion.

1          That's Mr. Mills speaking of you.  You understand that?

2    A.    Sorry.  Where is -- where should I be reading?

3    Q.    Down here to -- right there, Page 17, Line 1.

4    A.    Yes, I see that.

5    Q.    You're not offering an opinion.

6    A.    On the value of the feature, correct.

7    Q.    Right.

8    A.    I'm not.

9    Q.    And so then we go down here, there's some back and

10   forth, and we go down to Line 7.

11         Dr. Dhar didn't do a survey that determines value, so

12   there was not a survey I could rely on from Dr. Dhar.

13   That's accurate, isn't it?

14   A.    Yes.  I agree with Mr. Mills on that.

15   Q.    And then Mr. Batchelder says:  Dr. Dhar has conducted

16   two surveys in this case, correct?

17         Answer:  Yes, sir.  As far as I know, that's correct.

18         And then Mr. Batchelder asked him:  And you've chosen

19   not to rely on either one of them, correct?

20         And his answer is:  Well, they're not the kind of survey

21   that I could rely on for damage -- for a damages opinion.

22         And you agree with that answer from Mr. Mills, don't

23   you?

24   A.    Well, my statement would be that my surveys speak to the

25   reliability of Dr. Wecker's calculations.  So he can rely on

1    that in that regard.  But I don't -- I don't have a survey

2    that provides an alternative value.

3    Q.   Right.  So he could -- if he wanted to, he could rely

4    upon your opinion that says, disregard Dr. Wecker; is what

5    you're telling the jury?

6    A.   Correct.

7    Q.   So disregard Dr. Wecker and then leave Mr. Mills there

8    saying:  Well, I don't have a survey to rely upon.  That's

9    the extent to which he could rely on your surveys.

10   A.   That is correct.

11           MR. WARD:  All right.  You can take that down,

12   Mr. Mortensen.

13   Q.   (By Mr. Ward) Would you agree with me that your opinions

14   as an expert witness can only be as good as the information

15   that you're provided in order to formulate your opinions.

16   A.   Not just provided, but information that I gather.

17       Broadly speaking, that is correct.

18   Q.   And so the information that you review --

19   A.   And I -- I also conducted surveys, so it's not just

20   relying on information.

21   Q.   And I would -- I didn't mean to exclude your surveys.

22   And the work that you did -- the information that you're

23   provided and the work that you do, that's what you rely upon,

24   correct?

25   A.   Correct.

1    Q.   But your work can only be as good as the -- the inputs,

2    the information that you're given, right?

3    A.   Or collected, yes.  I broadly agree.  Collected or

4    given, yes.

5    Q.   And you've got reports that span, with attachments and

6    all their surveys, hundreds of pages, don't you?

7    A.   You mean my personal reports?

8    Q.   Yes, sir.

9    A.   Yes, sir.

10   Q.   You did a lot of work in this case.

11   A.   Yes.

12   Q.   And you cited all the material that you reviewed in

13   formulating your reports, didn't you?

14   A.   Yes, sir.

15   Q.   You're required to do that, right?  You have to give us

16   a list of everything that you reviewed or that you relied

17   upon in formulating your opinions.

18   A.   That's correct, sir.

19   Q.   And isn't it true that prior to writing your opening

20   report, that Apple did not provide you with a single survey

21   that it had conducted?

22   A.   That is correct.

23   Q.   It was only after you saw Mr. Mills' deposition where he

24   was referencing Apple's surveys that you thought maybe you

25   ought to look at them, right?

1   A.   That is correct.

2   Q.   So up until reviewing Mr. Mills' deposition, you didn't

3   even know that Apple had surveys, did you, sir?

4   A.   Not specifically to this case matter, that's correct.

5   Q.   You subsequently discovered, after Mr. Mills gave his

6   deposition, that there were, in fact, surveys, right?

7   A.   That's correct.

8   Q.   And you're not here to give the jury any opinion as to

9   whether or not Apple's own surveys or -- are reliable or not

10  reliable?

11  A.   It's not in my report, so that's, I assume, what you

12  mean, that I cannot give my opinion on that?

13  Q.   Right.

14  A.   Okay.

15  Q.   You haven't given us a written report that says, I'm

16  critical of Apple's surveys, have you?

17  A.   That is correct.

18  Q.   Would you have liked to have seen those surveys before

19  you started writing your reports, Dr. Dhar?

20  A.   It wasn't relevant to my opinion.  As you recall, my

21  opinion was on Dr. Wecker's surveys, and Dr. Wecker had not

22  seen it, so my -- whenever I do my report, I like to see

23  everything Dr. Wecker had referred to in his document, and he

24  had not referred to any Apple surveys.

25  Q.   So you didn't care what the company that you were

1    working for had with respect to surveys that measured

2    consumers' appetite for the features that are accused of

3    infringement here?

4    A.    It wasn't relevant to my task, which was to see whether

5    Dr. Wecker's surveys were scientifically done.

6    Q.    It wasn't relevant to your task because you weren't

7    asked to measure in any way whether or not these features

8    drove demand for these products, were you?

9    A.    I was not asked to do that.

10   Q.    You certainly never spoke to anyone at Apple about their

11   market research prior to writing your report.

12   A.    That's correct.

13   Q.    You think Apple knows how to conduct surveys?

14   A.    I think so.  Like every large company, they have surveys

15   that they do.

16   Q.    Would you agree with me that all things being equal,

17   that you would have preferred that Apple had at least

18   provided you with survey information that goes to whether or

19   not folks are buying their products as a result of the

20   functionality that we accuse of infringement?

21   A.    Again, it wasn't relevant to my task, which was to see

22   whether Dr. Wecker's surveys were reliably done.

23   Q.    Do you think full access to information is important in

24   lawsuits?

25   A.    I -- sure.  I think more information in general cannot

1   hurt.  I don't have any concern with that.

2   Q.   If you're shielded from information, that can make your

3   job more difficult, generally speaking.

4   A.   Well, it's very generally speaking.  As I said, more

5   information could be better, yes.

6   Q.   Whether it's surveys or shielding fact witnesses, access

7   is important, isn't it?

8   A.   Again, I don't know the legal -- I can just speak as a

9   judgment and decision-making expert.  More information cannot

10  be -- a disclosure is not a concern, as I see.  It's good.

11  Q.   What's an event study, Dr. Dhar?

12  A.   Sorry.  I didn't hear you.

13  Q.   An event study.

14  A.   Oh, sure.

15       An event study is a statistical study to show what

16  happens -- to understand if a certain event has an effect.

17       So, for example, if you split a stock, the same stock

18  goes from $50 to, let's say two for one, $25, and you want to

19  understand, does that change how people -- are they more

20  willing to buy and so forth.  So that would be an example of

21  an event study.

22  Q.   And would you agree with me that if you had the

23  information such that you could look at a device, let's say

24  an iPhone, at a point in time, and then you have an event

25  occur, and you look at sales after that event occurred, then

1    you might be able to draw some conclusion about whether or

2    not that event had an impact upon the sale of an iPhone.

3    A.    Broadly speaking, that's correct.   It depends on the

4    event, how broad it is and what's changing in that event,

5    yeah.

6    Q.    You've -- you've been involved in event studies, haven't

7    you?

8    A.    For my academic work, not for my consulting.   But yes.

9    Q.    Did you review any documents, when you were taking a

10   look at Dr. Wecker's surveys, to evaluate whether or not

11   there was an event with sales before and after it, that might

12   either support or undermine Dr. Wecker's opinions?

13   A.    I did not.   It was not the purpose of my report.

14   Q.    You weren't able to see documents that were produced by

15   Samsung, were you?

16   A.    Did you -- documents produced by Samsung, no, I did not.

17   Q.    All right.   I've got an excerpt from PX 96, and it's a

18   confidential document, but I've excised all the confidential

19   information.

20         Have you ever seen this document before?

21   A.    It doesn't look familiar to me.

22   Q.    You see there where -- I'll represent to you that this

23   comes from Samsung.   It says:  The App Store launch in 2008

24   had a direct contribution of 42 percent unit share lift to

25   Apple.

1    Then it talks about stickiness, and then it talks about

2    the importance of apps.   55 percent of mobile phone users say

3    that apps impact their purchase decision.

4    Do you see those things?

5    A.   Yes.

6    Q.   Looking at the upper left-hand corner about the App

7    Store launch in 2008 had a direct contribution of 42 percent

8    unit share lift to Apple, is that not an event that you could

9    look at and determine the value of the patented technology in

10   this case?

11   A.   No.   It's much more complicated than that, because the

12   event needs to be isolated.   So, for example, any new launch

13   is accompanied with a lot more advertising.   A new launch

14   might be at the time of Christmas season when there's a lot

15   of sales.

16   So one would have to do a very detailed study to see

17   what it is.   But the data is much more granular than what

18   you're presenting to me to make that judgment.

19   Q.   Of course, you'd never seen this document, I guess,

20   prior to right now?

21   A.   Correct.

22   Q.   Did Apple give you any information about what impact

23   launching an impact -- launching the App Store had upon its

24   sales of iPhones?

25   A.   They did not.   That was not the purpose of my report.

1    Q.   Your purpose was not to figure out the value of this

2    technology, was it?

3    A.   Correct.  It was not, no.

4             MR. WARD:  All right.  You can take that down.

5    Q.   (By Mr. Ward) And even though it wasn't your job to

6    perform surveys and try and get to the heart of the issue in

7    this case, you do have the expertise to do that, don't you,

8    Dr. Dhar?

9    A.   Generally speaking, yes.

10   Q.   But you don't have an opinion as to whether or not you

11   could do it in this case, right?

12   A.   That's right, because of the timing I mentioned.  It was

13   2009.  We're talking 2014 and '15.  And I understand that Dr.

14   Becker, who the jury will hear from next, has done some

15   analysis of the value of the feature.

16   Q.   Do you know whether or not Apple has surveys that go

17   back to 2009?

18   A.   I would -- yes, I think they do.  I saw some surveys

19   from 2009.

20   Q.   But, again, since Apple didn't ask you to do anything to

21   assist the jury in determining the value of this technology,

22   that's not something you asked for or that you thought would

23   be appropriate in presenting your opinions here.  Would that

24   be fair to say?

25   A.   That was -- that's right.  I did not look at it before

1   writing my report, correct.

2   Q.    Apple didn't ask you to perform any survey for

3   Dr. Becker, right?

4   A.    I didn't hear the question.

5   Q.    Apple did not request that you perform a survey that Dr.

6   Becker could rely upon?

7   A.    Oh, correct.  No, they did not.

8   Q.    You did perform a couple of surveys, though, right?

9   A.    Yes.

10  Q.    At a cost of $150,000 per survey.

11  A.    That was my approximate guess.  I don't know how much I

12  charged.  But based on my past experience, I think it costs

13  that much.

14  Q.    So for two surveys, we're talking $300,000?

15  A.    Correct.

16  Q.    Not to determine value but to determine that

17  Dr. Wecker's surveys were no good.

18  A.    Correct.

19  Q.    During your direct examination by Mr. Albritton, do you

20  recall some questions about whether or not you or someone

21  working directly for you drafted each and every one of the

22  questions that you use in your surveys?

23  A.    Yes, I do.

24  Q.    And I think it was your testimony that you draft them

25  all.

1   A.   Yes.

2   Q.   Or someone at your direction.

3   A.   Correct.

4   Q.   You then were asked whether you had ever conducted a

5   survey where somebody just merely gave you a description to

6   use in your survey question.

7        Do you remember that?

8   A.   Yes, I do.

9   Q.   You weren't intending to suggest that Dr. Wecker had

10  just been given questions to ask, and he stuck them in his

11  survey and asked them, were you?

12  A.   Well, I wasn't suggesting anything at that point, but

13  there was -- you know, the lawyers talking.  My -- but my

14  recollection of what Dr. Wecker said in his deposition was

15  that there was some questions that he was given by Dr. Jones

16  and counsel.

17  Q.   Let's -- let's look at what you were asked, because that

18  was lawyer talking, asking you questions, right?

19  A.   Sure.

20       MR. WARD:  Let's look at the transcript from the

21  19th, Page 136, Lines 1 through 18.

22  Q.   (By Mr. Ward) And so this is Mr. Albritton last Thursday

23  asking you questions, right?

24  A.   Yes.

25  Q.   And so if you -- if you get down to Line 10,

1  Mr. Albritton asked:  Dr. Dhar, have you ever conducted a

2  survey where somebody just merely gave you a description to

3  use in a survey question?

4       And you answered:  I have not.

5       Now, I think you answered this.  You said that was

6  lawyer talking, not your answer, right?

7  A.   No.  I thought you were referring to his question.

8  That's my answer.  I have not, yeah.

9  Q.   Right.  I understand that's your -- your answer, but did

10  you mean to imply or were you trying to leave the impression

11  with the jury that Dr. Wecker had simply been given questions

12  that he didn't have any input on, and he just stuck them in

13  his survey because he was told to?

14  A.   Maybe I misread what Dr. Wecker's testimony was, whether

15  he was -- in his deposition, I got the same -- that some of

16  the questions, he did precisely what you are suggesting.

17  Q.   Would it be helpful to look at what his testimony was

18  here in the courtroom?

19  A.   No.  I said from his deposition.  I think it was a

20  little different than his courtroom testimony here.

21  Q.   All right.  Well, let's look at what he said in the

22  courtroom.

23  A.   Okay.

24  Q.   You understand that that's the reason you have a

25  deposition so that if you think someone gives inconsistent

1   testimony in the courtroom, you get to confront them and

2   challenge their answer.

3           You understand that, right?

4   A.    I do now.

5   Q.    Okay.  Let's look at the testimony that Mr. Wecker --

6   Dr. Wecker gave on the 17th.

7              MR. WARD:   Page 62, Line 5 to 18.

8   Q.    (By Mr. Ward) And he was asked -- he's talking about the

9   preamble to one of his questions.

10          Dr. Jones assisted you with coming up with that

11  preamble?

12          He said:  Exactly.

13          And then who assigned (sic) you with coming up with the

14  question that you've got highlighted?

15          He said:  Well, I wrote that.

16          Did Mr. Mills have any hand in that?

17          And then do you see his answer where he says:  This was

18  a collaborative effort.  There'd be conference calls, and I'd

19  listen to them, and they'd listen to me; but eventually,

20  because I'm doing the survey, I get the last word.  So when

21  it comes down to finalizing this, that's me.

22          That's what he testified to here in court, correct?

23  A.    Yes, he did.

24  Q.    Do we need to keep going to see if he was confronted

25  with the deposition where he did something inconsistent or

1    said something inconsistent?

2    A.    No.   I think that's okay.   I think I agree with you that

3    here he says he had a hand in it.

4    Q.    Okay.   Now, you're not critical of him talking to Dr.

5    Jones and Mr. Mills in assistance in formulating these

6    questions, are you?

7    A.    Not at all.

8    Q.    And you yourself had to talk to Mr. Wechselberger about

9    some of these questions, as to whether or not they captured

10   more than what was simply accused -- or what was caught by

11   the claim, right?

12   A.    That's correct.

13   Q.    Because these are complex claims, correct?

14   A.    That's correct.   I'm not a technical expert.

15          MR. WARD:   Let's look at PX 205.002-6.

16   Q.    (By Mr. Ward) You recognize this question from

17   Dr. Wecker's survey, don't you?

18   A.    Yes, I do.

19   Q.    You asked the same question in your survey?

20   A.    Yes.

21   Q.    I believe you told us that Mr. Wechselberger told you

22   that this question captured more than what's covered by the

23   claims in the lawsuit; is that right?

24   A.    That's correct, yes.

25   Q.    That's what he told you.

1    A.    I relied on him, yes.

2    Q.    And is that the same Mr. Wechselberger who didn't know

3    what the burden of proof is for proving invalidity in this

4    case?

5    A.    I wasn't here for his entire testimony, but if you

6    say -- represent that, I'll take it.

7    Q.    I'll represent to you that he did not know what the

8    burden of proof was for invalidity.

9    A.    Okay.

10   Q.    Does that cause you to question whether or not you

11   should be relying upon this gentleman as an expert in patents

12   if he doesn't know what the burden of proof is for

13   invalidity?

14   A.    No.  That's very standard to rely on that.  Obviously,

15   if he's incorrect, then the jury can take that into account.

16   But I don't have any independent opinion on that.  I have to

17   rely on the Defendant's plaintiff -- technical expert.

18   Q.    You don't get to choose them, do you?

19   A.    I don't get to choose them.

20   Q.    They're kind of given to you, and you're stuck with what

21   you've been given, right?

22   A.    That's correct.

23   Q.    Kind of like those Apple surveys, right?  You either get

24   them, or you don't get them.  It's not up to you.

25   A.    It is up to me -- if Dr. Wecker had referred to it in

1    his report.  He did not.  So I asked for all the documents

2    that are referred to in Dr. Wecker's report.

3    Q.    Well, you've testified that Mr. Wechselberger told you

4    that this question was too broad, and it captured things

5    outside of the claim, right?

6    A.    Broadly speaking, yes.

7    Q.    All right.  Tell us what's captured that's outside of

8    the claims.

9    A.    So, again, I'm not a technical expert, but my

10   understanding is that the claim is something around the

11   manner of payment and downloading; whereas, this leads --

12   this is generally about the capability to purchase apps, and

13   you can purchase apps in other potential ways that may be

14   non-infringing.

15   Q.    You understand that Apple hasn't identified any

16   non-infringing alternative to the way that's described in the

17   patents in this case.

18        Do you know that?

19   A.    Well, that's correct.

20   Q.    So what is the non-infringing manner of downloading apps

21   that you're aware of?

22   A.    The one is that -- that I think your expert -- you know,

23   Dr. Jones mentioned.  So that would be one way to purchase

24   apps without infringing the patent.

25   Q.    So that's the only one you're aware of, the one that Dr.

1    Jones came up with?

2    A.   And there was some discussion in the courtroom around,

3    you know, first downloading and then paying for it would

4    be -- I think Dr. Jones said would also be non-infringing.  I

5    don't know if it's different from what he did or it's

6    slightly similar, but that would be another one I heard.

7    Q.   Well, I think we'll hear from Dr. Jones, and we can ask

8    him that.  Do you agree he might be the best person to ask?

9    A.   I agree.

10   Q.   Would you agree with me that when a product, like a

11   smartphone, has dozens of features -- or I think you said

12   hundreds of features the other day -- that the consumer

13   doesn't consider all those many, many features when they're

14   making a decision to purchase the device, do they?

15   A.   That's correct, yeah.

16   Q.   They consider a -- a few of those features when making

17   that decision, don't they?

18   A.   Largely speaking, correct, yes.

19   Q.   And you've now seen Apple surveys, I believe, that show

20   that Apple also knows the main reasons why people are buying

21   their devices, haven't you?

22   A.   They have identified several main reasons, yes.

23   Q.   And, again, you hadn't seen those when you offered your

24   first criticism of Dr. Wecker?

25   A.   Correct.

```
 1              MR. WARD:  Let's look at Plaintiffs'
 2   Exhibit 103.28-1242.
 3              We'll blow up that top left.
 4   Q.   (By Mr. Ward) You've seen this document during trial,
 5   haven't you?
 6   A.   Yes, I have.
 7   Q.   And so Apple is saying:  What are the main reasons,
 8   consumers, that you purchase your iPhones?  And these are the
 9   responses they're getting.
10   A.   Yes, that's correct.
11   Q.   Regardless of what you think of Dr. Wecker's surveys,
12   would you agree with me that his survey results are much more
13   in line with Apple's surveys than anything that you've
14   provided to the jury?
15   A.   Don't know what you mean by "in line," because that's a
16   very different question.  Wanted to use apps is not what is
17   the infringing feature here.  It just means he wanted to use
18   apps.
19        And my understanding is Dr. Wecker is trying to
20   understand the value of the infringing feature, which is
21   around a method of payment for purchasing apps, which is, to
22   my understanding, much more narrower than wanting to use
23   apps.
24   Q.   You don't think that the claims in this case cover
25   selecting an app and downloading it to your phone?
```

1   A.    I think they do.

2   Q.    Okay.  And the first category there, that also

3   encompasses downloading games and -- and you know what comes

4   after "and" is "apps," don't you?

5   A.    Yes, I think so.  You're right, yes.

6   Q.    All right.  So --

7   A.    Oh, is there a question?  I didn't --

8   Q.    I'm coming.  I'm a little slow.

9        Two of the top three here that Apple is asking questions

10  about deal with purchasing and downloading games and apps,

11  correct?

12  A.    Correct in the sense -- using apps and combining

13  features, correct.

14  Q.    And, again, since Apple never provided you with any of

15  their surveys, you've never given us a report on them, have

16  you?

17  A.    That's correct.

18  Q.    And you're not here to provide any criticism to the jury

19  of Apple's surveys, are you?

20  A.    Not specifically.  I don't know if I'm asked a question,

21  but not otherwise.

22  Q.    Would you agree with me that no survey is perfect?

23  A.    Yes, that's true.

24  Q.    And because no survey is perfect, criticism can be

25  offered about every survey.

1   A.   That's true, too, but there are bad surveys, just to

2   clarify.   Just because there's no perfect survey doesn't mean

3   that there are not bad surveys.

4   Q.   Those are your words, aren't they?   No survey is

5   perfect.   Criticism can be offered about every survey.

6   A.   Yes, that -- that's correct.

7   Q.   One of your criticisms of Dr. Wecker's surveys is his

8   use of the direct elicitation method, correct?

9   A.   Yes.

10  Q.   And that means direct questioning.

11  A.   Correct.

12  Q.   Would you agree with this statement, quote:   It is

13  fundamental to good survey design to ask respondents a

14  precise question that is relevant to a question of interest,

15  closed quote.

16  A.   I would agree with that.

17  Q.   That's your statement, isn't it?

18  A.   Yes, it is.

19  Q.   From the USA v. H&R Block case?

20  A.   If you say so.   I don't remember, but that's a

21  perfectly -- yeah, I agree with that statement, yeah.

22  Q.   And despite your criticism of Dr. Wecker's method of

23  propounding questions, you used the exact same method when

24  you conducted your survey, didn't you?

25  A.   I wouldn't say the same method, because it depends on

1    the same case, but I have direct questions, if that's what

2    you mean by saying that.

3    Q.   Word-for-word for Question 4A, for example, when you

4    asked word-for-word the same question that Dr. Wecker asked,

5    didn't you?

6    A.   Oh, excuse me.  You mentioned my survey.  Yes, that's

7    correct.

8    Q.   You didn't propound a different question that would, as

9    you say, capture what was actually claimed in the patents,

10   right?

11   A.   I did not.

12   Q.   Or what you claim is claimed in the patents?

13   A.   That's correct, my understanding of it.

14   Q.   You didn't propound a different -- a different question

15   that would describe some non-infringing alternative that the

16   survey respondent then would read and respond to?

17   A.   That's correct.

18   Q.   Same non-infringing alternative that Dr. Wecker

19   presented in his surveys.

20   A.   That's correct.

21   Q.   Okay.  You're not here to tell us how to do it; you're

22   here to tell us how not to do it essentially, right?

23   A.   Or the way it was done, why it's not reliable, correct.

24   Q.   You also criticize Dr. Wecker -- or initially, you

25   criticized Dr. Wecker's use of regular users versus all

```
 1   buyers, correct?
 2   A.    Yes, that's correct.
 3   Q.    Would it be fair to say that you've backed off that
 4   criticism, and you don't have any further criticism of his
 5   use of regular users versus purchases?
 6   A.    That's correct.  In subsequent surveys, he used both.
 7   Q.    And there wasn't much different, was there?
 8   A.    There was not much difference is correct.
 9         MR. WARD:  In fact, let's look at Slide 16 from Dr.
10   Wecker.
11   Q.    (By Mr. Ward) You backed off of that criticism, because
12   if he had used recent purchasers instead of regular users,
13   the damage number would have gone up, right?
14   A.    Based on this number, that's correct.
15   Q.    Is that why you backed off of the criticism of his use
16   of using the percent of regular users, because it was -- that
17   was going to be worse for Apple if he followed your criticism
18   and used purchasers?
19   A.    No.  I don't care if it was Apple.  I did because (A) he
20   hadn't done it first, so it's good he did it, and (B) the
21   numbers are very similar.  So I didn't -- it was not a strong
22   point.
23         MR. WARD:  You can take that down.
24   Q.    (By Mr. Ward) Another criticism that you had of
25   Dr. Wecker was his use of the word motivate in the first
```

```
 1   survey that he conducted, right?

 2   A.   The first survey, the original survey, correct.

 3   Q.   And you said that using motivate could mean that a

 4   respondent wouldn't know whether they were responding they

 5   were a little motivated, somewhat motivated, very motivated,

 6   or extremely motivated, right?

 7   A.   Right, whether it was a major motivation or not.  And he

 8   was also using it differently in the first survey.

 9              MR. WARD:  Mr. Lee, could you give me the camera?

10              Thank you.  There we go.

11   Q.   (By Mr. Ward) So we've got the word motivate here.  I'm

12   going to put over on the left:  A little motivated, somewhat,

13   very motivated.

14        Can you read that?

15   A.   Yes, I can.

16   Q.   And then extremely motivated.

17        And I'll refer to that as our motivate continuum.

18        Does that make sense?

19   A.   Sure.

20   Q.   Do you agree with me, as we get out here further to the

21   right, we're getting out to the only reason that motivates

22   you?

23        Would that be fair?

24   A.   That would not be fair, because there can be many

25   extremely motivating reasons.
```

1  Q.   And I'm moving out further out than extremely.  So it's
2  further out the continuum.  It's to the end.  It's the only
3  reason.
4  A.   If it's the only reason, by definition, I agree with
5  you.
6  Q.   All right.  We'll call that the end.
7  A.   Okay.
8  Q.   I'll move my arrow there.  Is that more accurate?
9  A.   Yes.
10  Q.   Now, originally, you had some criticism of Dr. Wecker's
11  use of the word motivate, right?
12  A.   Yes.
13  Q.   Because they might understand it as one reason as
14  opposed to the only reason or even a major reason.
15  A.   That's correct.  In fact, my opinion is that they would
16  not understand it to mean the only reason, but it
17  most like -- most people would understand it to mean a
18  reason.  But I gave him the benefit of the doubt.
19  Q.   And what is the -- where does major reason fall on
20  the -- the continuum I've got here?
21  A.   So in your continuum, it would be -- major reason
22  means -- again, I want to be careful.  One of the major
23  reasons would be anywhere around -- after "very" could be a
24  major reason.
25  Q.   Okay.  So maybe from "very" on up to "only," right?

1    Would that be fair?

2    A.    That would be fair, I think.

3    Q.    Would you agree that major reason might be synonymous

4    with main reason?

5    A.    Yes.   Sorry.   Did you say would be they synonymous?

6    Yes, I think so.

7    Q.    Okay.   So we can say major or main?

8    A.    Yes.

9    Q.    And when you criticized Dr. Wecker's use of the word

10   motivate, he ran some more surveys, didn't he?

11   A.    That's correct.

12   Q.    And he added the word alone.

13   A.    Correct.

14   Q.    So he -- instead of just using motivate, he added alone

15   motivate to try and capture "only reason."   Would you agree

16   with that?

17   A.    That's what he tried to do, but he did it incorrectly,

18   yes.   But that's what he was trying to do.

19   Q.    He was responding to that criticism in part, right?

20   A.    Yes, he would.   But I have a survey to show that that's

21   not how people interpret it.

22   Q.    So previously in your first criticism, you said motivate

23   wouldn't be understood by someone taking the survey as to

24   whether it was a reason or the only reason, right?

25   A.    I -- I think I said it would be closer to a reason, and

1    it would not be taken as the only reason.

2    Q.    It wasn't criticism of the word motivate in the first

3    criticism you offered?

4    A.    That's -- that's correct, yeah.

5    Q.    But then when he added the word alone motivate, you then

6    criticized him for using the word motivate, right?

7    A.    Well, I said it would be ambiguous in terms of the way

8    people took it to mean.  I think people use the word motivate

9    as a reason, basically, is the way I look at it, broadly

10   speaking.

11          MR. WARD:  Let's look at what you said in your

12   report on -- from January 21st, 2015, Page 11 --

13   Paragraph 24.

14   Q.   (By Mr. Ward) And you can just read along with me here,

15   Dr. Dhar.

16      Dr. Wecker states that the purpose of the alone motivate

17   to buy question is to provide additional survey evidence that

18   the patented features alone motivated survey respondents to

19   purchase the accused devices.

20      However, the word motivate is not a word commonly used

21   in surveys.  In fact, in over 250 surveys that I have

22   conducted or supervised and more than a thousand surveys that

23   I have reviewed, I have never previously encountered a survey

24   that uses the word motivate to elicit responses about

25   purchase decisions.

1      Is that what you wrote in your report?

2   A.   Yes.

3   Q.   So you'd never use that word motivate, would you?

4   A.   Yes.   I prefer to use the word reason, basically.

5   Q.   You think it's silly to use a question in a survey that

6   says are you motivated for a reason to buy something?

7   A.   Are you motivated -- I think of motivation as a reason,

8   so I would -- I said what are the reasons he would buy

9   something?

10  Q.   And you were critical of Dr. Wecker using the word --

11  when you criticized him the second time, you said he

12  shouldn't be using that word motivate because you've never

13  used it and you've never seen it used, right?

14  A.   Well, again, I was going back to the first report where

15  it could be different degrees of motivation.

16  Q.   Of course, you were going back to that report before

17  you'd seen Apple's survey that the jury has now seen where

18  they use the word motivate, right?

19  A.   Correct.

20  Q.   When you wrote that, you hadn't seen Apple's surveys

21  using the word motivate, had you?

22  A.   That's -- that's correct.

23          MR. WARD:   Let's look at that, at Plaintiffs'

24  Exhibit 756, Page 16.

25  Q.   (By Mr. Ward)  Did you see this document for the first

1  time when you were in Court?

2  A.   That's correct.

3  Q.   And you see Apple using the question, what motivated you

4  to purchase an iTunes gift card for yourself?

5  A.   I do.

6  Q.   Would you have preferred to have seen that document

7  before you wrote your report and said how you should never

8  use the word motivate?

9  A.   No.  As I said, people interpreting as reasons to do --

10  what reasons to do purchase.  I prefer to use the word

11  reasons because motivation in psychology has a very specific

12  meaning, so I prefer to use reasons, but that's how the

13  surveys are using it.

14  Q.   And so did I understand your answer correctly to be, no,

15  I didn't want to see that document before I committed myself

16  in the report saying that you should never use the word

17  motivate?  Do I understand your answer correctly?

18  A.   I said I have never used it, and I had not seen surveys

19  that used it.

20       MR. WARD:  Objection, nonresponsive.

21       THE COURT:  Sustained.

22  A.   Sorry, please repeat the question.

23  Q.   (By Mr. Ward)  Right.  Is your answer to my question

24  that it did not matter to you that Apple had not shown you

25  this document, that you didn't need to see it before you

1    issued your report?

2    A.    That's right, did not affect my opinion.

3    Q.    And that you wouldn't have preferred to have seen it

4    before you issued your report?

5    A.    It wasn't relevant to my task.

6    Q.    Now, another criticism that you have of Dr. Wecker was

7    that he didn't ask questions about a large number of other

8    features that could have motivated someone to buy an iPhone

9    or an iPod Touch or an iPad, right?

10    A.    When he asked the alone motivation question, correct,

11    yeah.

12    Q.    But didn't we just agree earlier that there's just a few

13    features that drive someone's decision to purchase a product

14    with hundreds of features?

15    A.    But that doesn't mean there are few motivations.  What I

16    mean is when you buy between two phones, there are few

17    features of which you decide.

18         So, for example, if I buy an iPhone 6, I will decide

19    based on a few features, how big is the screen or something

20    else, but the phone still has other features like making

21    calls that would be motivations.

22         So people decide between products between -- with a

23    subset of the features; but when you buy a category, you have

24    other features you can consider.

25    Q.    So when you go buy a phone, are you motivated to buy the

1    phone -- a smartphone because it makes phone calls?

2    A.    Yes.    That's the way that Dr. Wecker asked the question

3    because I asked him if people said yes to it and --

4    Q.    And that was one of the things that you included in --

5    in your criticism of Dr. Wecker is that these folks might

6    have been motivated to buy a phone to make phone calls and

7    not just motivated to buy the phone because they could

8    download and purchase apps, right?

9    A.    That's correct, yeah.

10    Q.    That was shocking to you that someone might be motivated

11    to buy a phone call to make phone calls?

12    A.    No, not at all.    I expected that -- that people, when

13    you test it, they would say these are also reasons to also

14    buy the phone.

15    Q.    You don't think that the ability to make a phone call on

16    a phone is something that's expected and factored into every

17    phone when you go to the store, and it's not something that

18    motivates you?

19    A.    It's factored as much as purchasing apps is because most

20    phones have that, as well now.

21    Q.    Most phones have the ability to download and purchase

22    apps?

23    A.    Correct, yeah.

24    Q.    Does that mean that they don't infringe these patents?

25    A.    No, I'm not -- I'm just saying to the point that people

```
 1    consider both unique and common features when buying in the
 2    category, but people focus only on unique features when
 3    buying between brands between products.
 4    Q.   Their decision is made by looking at one of just a few
 5    features, right?
 6    A.   Subset.  I -- I don't know how many.  It could be, you
 7    know, half a dozen at best, yeah.
 8    Q.   Half a dozen?
 9    A.   Yes.
10         MR. WARD:  All right.  Let's look at Plaintiffs'
11    Exhibit 103.28 at Page 1166.
12    Q.   (By Mr. Ward)  Have you seen this page from the Apple
13    survey before you came to Court?
14    A.   I don't remember specifically.  I've seen some --
15    several of these surveys.
16    Q.   But you understand that Apple is saying that while many
17    features are important in the purchase decision, web
18    capabilities, ease of use, and apps are rated highest?
19    A.   That's what it says, yes.
20    Q.   You did not limit your survey where you went and asked
21    questions beyond the alone motivate to just a few features,
22    right?
23    A.   That's correct, because different people will have
24    different subsets, sir.
25         MR. WARD:  All right.  Let's go back to Plaintiffs'
```

1    Exhibit 103.28, Page 1242, and focus in on that left

2    column -- I'm sorry -- with the percentages.

3    Q.   (By Mr. Ward)  So we know Apple is asking questions of

4    its buyers about what the main reason for purchase is, right?

5    A.   Correct.

6    Q.   And you agreed with me earlier that main is out here on

7    our continuum --

8              MR. WARD:  Let me switch to the document camera,

9    Mr. Lee.  Thank you.

10   Q.   (By Mr. Ward)  Main, which Apple is surveying, is moving

11   out here to the upper end of our motivation continuum, isn't

12   it?

13   A.   So one of the main reasons, that's correct, yeah.

14   Q.   Did Apple tell you --

15             MR. WARD:  And I'm through with the document

16   camera.  We can go back to 1242, and I'm almost finished.

17             And let's just look at the entire document.

18   Q.   (By Mr. Ward)  Before you issued your report, did Apple

19   tell you about the fact that they run surveys all around the

20   world in all these different countries?

21   A.   Not specific -- before my opening report, I think you're

22   referring to.  No, I -- we did not have a discussion of that.

23   Q.   Did they tell you whether or not they tried to figure

24   out what value of this -- this technology might have by

25   running their open internal survey, whether it was in the

1   U.S. or in another country?

2   A.   They did not.

3   Q.   Do they have the expertise to do that, Dr. Dhar?

4   A.   I don't know the answer to that.

5   Q.   But you do, right, you've got the expertise?

6   A.   Generally speaking, yes.

7   Q.   You just weren't asked to do it, right?

8   A.   That is correct.

9   Q.   Have you ever heard the saying that it takes a carpenter

10   to build a barn?

11   A.   I can figure it out, but I hadn't heard that.

12   Q.   Have you ever had to build a barn or a structure or

13   anything like that?

14   A.   Sorry?

15   Q.   Have you ever built a barn or any type of structure

16   where you got to get out there and pour a foundation, set

17   poles, make sure everything is level, put a roof on it, walls

18   on it?

19   A.   Not a big construction guy, but I've done small things,

20   yeah.

21   Q.   All right.   That can be hard work, can't it?

22   A.   Yes.

23   Q.   Doesn't take any skill to tear it down, though, does it?

24   A.   I would -- I would disagree with that.

25            MR. WARD:   Pass the witness.

```
 1              THE COURT:  Redirect?

 2              MR. ALBRITTON:  Thank you.  May it please the

 3   Court.

 4              THE COURT:  Proceed.

 5                    REDIRECT EXAMINATION

 6   BY MR. ALBRITTON:

 7   Q.   Dr. Dhar, we just heard questions about building a barn

 8   and that takes no skill to tear it down.  Do you remember

 9   those questions?

10   A.   Yes.

11   Q.   Was there skill involved in the surveys that you ran

12   that exposed the flaws and the biases in Dr. Wecker's survey?

13   A.    In my opinion, yes, sir.

14              MR. ALBRITTON:  If you would, Mr. Lee, let's bring

15   up Apple's -- Plaintiffs' Exhibit 103.028-1242?

16   Q.   (By Mr. Albritton)  And while you're bringing that up,

17   Dr. Dhar, do you believe that you've used and relied on your

18   skills in offering these opinions to assist this jury?

19   A.   Yes.

20   Q.   All right.  Dr. Dhar, Mr. Ward asked you about this,

21   okay?  And I want to ask you a -- a question.  Does this show

22   that people are alone motivated or that it is the only

23   reason -- that apps are the only reason that they buy

24   iPhones?

25   A.   It does not.
```

1    Q.    What does it show?

2    A.    Well, the question asked for up to three reasons, and it

3    shows that people have multiple reasons to buy an iPhone.

4    Q.    So, in your opinion, does this support the notion that

5    people buy iPhones solely for the capability to purchase

6    apps?

7    A.    It does not.

8    Q.    Do you have data that shows -- scientific data that

9    shows people do not buy iPhones solely --

10             MR. WARD:  I'm going to object to leading.

11             THE COURT:  Sustained as to leading.

12             MR. ALBRITTON:  Okay.

13   Q.    (By Mr. Albritton)  What does your data show, Dr. Dhar?

14   A.    Well, I discussed the survey that I did on Thursday

15   which showed that people had many more reasons that they said

16   they were motivated to purchase the different devices.

17             MR. ALBRITTON:  Mr. Lee, can we bring up

18   Plaintiffs' Exhibit -- it's the one Mr. Ward showed.  It's

19   756-16 -- 750 -- Plaintiffs' Exhibit 756 at 16 -- or maybe

20   it's at Page 10.  It's the one that Mr.  Ward just showed.

21             Okay.  Can I get -- can I get you to bring that up

22   for me, please, sir?

23   Q.    (By Mr. Albritton)  All right.  Can you see that, Dr.

24   Dhar?

25   A.    Yes, I can.

1   Q.   This is a survey Apple did that talks about what

2   motivated you to purchase an iTunes gift card for yourself.

3   A.   Yes, sir.

4   Q.   Does that have anything to do with the purchasing of

5   apps?

6           THE COURT:   Speak up, Mr. Albritton.

7   Q.   (By Mr. Albritton)   Does that survey, as you look at it,

8   does it have anything to do with the capability of purchasing

9   apps?

10  A.   It does not.

11  Q.   Does anything in that survey ask about what is the only

12  or sole reason for purchasing a gift card?

13  A.   I don't have all the details how it was done.   The

14  question says -- I don't know that they had -- oh, it says

15  main and secondary reasons, so it asked them for different

16  reasons then.

17          MR. ALBRITTON:   Yeah, if you would, please, sir,

18  highlight there on the left -- I'm sorry, the left where it

19  says I like to control my spending, it was convenient, that

20  column.   Can you pull that out, please, sir?   Thank you.

21  Q.   (By Mr. Albritton)   Now, Dr. Dhar, what does that tell

22  you about whether this survey was asking about the only

23  reason for purchasing a gift card?

24  A.   I think it was -- the survey was asking about different

25  reasons for purchasing a gift card or different motivations,

1   if you like.

2   Q.    The -- the -- does it ask about the only motivation?

3   A.    Not the way I read it.

4   Q.    Okay.  Dr. Dhar, there was some discussion -- Mr. Ward

5   asked you about a bad survey.  Is there any empirical data in

6   this case that shows that the survey questions relied upon by

7   the Plaintiffs in this case were bad questions and that the

8   results are bad?

9   A.    So I don't know what bad means, but my sort of two

10  surveys that I did shows that they're not reliable in terms

11  of the measures of value to Apple from the features.

12  Q.    Mr. Ward asked you if you used one of the exact

13  questions from Dr. Wecker's survey -- I believe it was

14  Question 4a?

15  A.    Yes.

16  Q.    Why did you replicate Dr. Wecker's survey questions?

17  A.    Well, there was a purpose, as I mentioned, Thursday,

18  setting aside all the flaws, I think in the methodology, I

19  wanted to show that the question itself, if you isolate the

20  problem with the question, the wording of the question, so I

21  didn't want to change anything because if I did, then they

22  would tell me, hey, you changed all these things and you

23  actually...

24  Q.    Why did you ask direct questions in your surveys in this

25  case, Dr. Dhar?

1    A.    Because I was trying to do what Dr. Wecker did, yeah.

2              MR. ALBRITTON:  Pass the witness, Your Honor.

3              THE COURT:  Further cross-examination.

4                        RECROSS-EXAMINATION

5    BY MR. WARD:

6    Q.    Dr. Dhar, you understand the reason we are looking at

7    the survey relating to the iTunes gift card was not because

8    it had anything to do with apps but because it used the word

9    motivate for measuring consumer's purchase decisions,

10   correct?

11   A.    That's the questions you asked me.

12   Q.    Right.  And that was what you were critical of Dr.

13   Wecker about doing was using the word motivate in his

14   surveys, right?

15   A.    Correct.

16   Q.    And you understand I was showing you that document to

17   show that Apple uses that same terminology?

18   A.    Correct.

19   Q.    Despite the fact that you say no one should ever use it

20   and you haven't seen it in thousands of surveys, right?

21   A.    I have not used it, and I have not seen it, correct.

22   Q.    Now, the question here is in this case -- that Dr.

23   Wecker addressed is, is the only reason you're purchasing

24   this phone is because of its ability to download and purchase

25   the app from the App Store.  That's what he was getting at,

1  right?

2  A.    In that question, generally speaking, yes, sir.

3  Q.    You understand that's the issue that Mr. Mills was

4  looking at for -- for performing his damages calculation,

5  right?

6  A.    Correct.  The -- the answer to that question, yes.

7  Q.    Right.  And you agree that you could have gone about

8  getting an answer to that question if you'd been given the

9  opportunity to conduct your own surveys, right?

10  A.    Yes.

11  Q.    If Apple had asked you to do that, right?

12  A.    Correct.

13  Q.    Instead, they asked you to spend $300,000 on surveys

14  saying why Dr. Wecker's surveys weren't right, right?

15  A.    And I believe, as you'll hear from Dr. Becker, he's

16  going to testify on the value, but my focus was on

17  reliability of Dr. Wecker's surveys, correct.

18  Q.    Wouldn't you agree with me that if you really wanted to

19  show why these surveys were no good, you could conduct your

20  own survey to show exactly what Apple says the value

21  attributable to these patented features are?

22  A.    No.  You would have to do a different survey for that.

23  Q.    But you could do a different survey and do that, right?

24  A.    I said I wasn't asked to do that.

25  Q.    I understand.  But you're saying you could do that with

1    a different type survey formulated by you with your

2    expertise, you could get at the heart of this question,

3    couldn't you?

4    A.    I said earlier generally speaking, because you have to

5    keep in mind it's 2009.  We're in 2014.

6    Q.    I understand.  So you're saying it's impossible?

7    A.    I would have to think about it, to what the value was

8    in -- five years ago.

9    Q.    Does it make you think that maybe Apple doesn't want to

10   know what the answer is to that question?

11   A.    I don't know what Apple wants to know.

12   Q.    We've only got one survey to rely upon that goes to that

13   question, and it's Dr. Wecker, right?

14   A.    Only one survey that has a value; but as I said, there

15   are other ways to value a feature, and the jury will soon

16   hear from that person.

17             MR. WARD:  Pass the witness.

18             THE COURT:  Redirect?

19                      REDIRECT EXAMINATION

20   BY MR. ALBRITTON:

21   Q.    Dr. Dhar, do you believe, in your expert opinion, that

22   the data obtained from the surveys conducted by Dr. Wecker

23   suggest that the sole reason for buying the iPhone is the

24   capability of purchasing and downloading apps?

25   A.    I do not.

1    Q.    And do you have data that supports your opinion?

2    A.    That's correct.

3              MR. ALBRITTON:  Pass the witness.

4              MR. WARD:  Nothing further.

5              THE COURT:  Nothing further.

6              You may step down, Dr. Dhar.

7              THE WITNESS:  Thank you, sir.

8              MR. ALBRITTON:   Your Honor, may Dr. Dhar be

9    finally excused?

10              THE COURT:  Is there objection?

11              MR. WARD:  No objection.

12              THE COURT:  Dr. Dhar, you are excused from your

13   attendance at Court.  You're free to stay.  You're also free

14   to leave.

15              THE WITNESS:  Thank you, Your Honor.

16              THE COURT:  It's your decision.  Thank you.

17              All right.  Defendants, call your next witness.

18              MR. ALBRITTON:  Thank you, Your Honor.  We call Dr.

19   Becker.

20              THE COURT:  All right.  Dr. Becker, if you'll come

21   forward and be sworn.

22              (Witness sworn.)

23              THE COURT:  Please have a seat on the witness

24   stand.

25              MR. ALBRITTON:   May it please the Court.

```
 1            THE COURT:  You may proceed, Counsel.

 2            MR. ALBRITTON:  Thank you very much, Your Honor.

 3         STEPHEN BECKER, DEFENDANT'S WITNESS, SWORN

 4                      DIRECT EXAMINATION

 5   BY MR. ALBRITTON:

 6   Q.   Good morning.

 7   A.   Good morning.

 8   Q.   Please introduce yourself to the jury, please sir?

 9   A.   My name is Stephen Becker.

10   Q.   Dr. Becker, have you created some demonstratives to use

11   with your testimony today?

12   A.   I have.

13   Q.   All right.  Let's -- we'll bring those up.  Do you have

14   the clicker so you can click, yourself?

15   A.   I do.

16   Q.   Great.  Thank you, Dr. Becker.

17        If you would, introduce yourself to the members of the

18   jury, please, sir.

19   A.   Yes.  As I said, my name is Stephen Becker.  I live in

20   Austin, and I'm the founder and director of a firm called

21   Applied Economics Consulting Group.  We're a firm that does

22   economic analysis in a variety of industries, including

23   valuing intellectual property like I'm doing here today.

24   Q.   Dr. Becker, tell us about your family situation.

25   A.   Well, I'm married, been married 21 -- almost 22 years.
```

```
 1    I've got a 19-year-old son who's a sophomore in college, and
 2    proud to say he's just recently been admitted into the Marine
 3    Corps Officer Candidate School, so he'll be going off to the
 4    Marines as soon as he graduates from college.  And then my
 5    daughter is 18 -- just turned 18 a couple of weeks ago, and
 6    she's a senior in high school.
 7    Q.   All right.  Has she been recently admitted to college?
 8    A.   She has.  She luckily got into her first choice, so it
 9    took a big pressure off of us.
10    Q.   And you're married?
11    A.   I am.
12    Q.   And what does your wife do for a living?
13    A.   My wife is the mental health medical director for
14    Medicaid in Texas, so she's responsible for the medical
15    aspects of all the Medicaid services that are offered in
16    Texas.
17    Q.   Is she a doctor?
18    A.   She is.
19    Q.   Dr. Becker, if you would, tell us a little bit about
20    your educational background, please, sir?
21    A.   All right.  I've got a slide on that.  I started out
22    first as getting an engineering degree.  I went to the
23    University of Pennsylvania and received a Bachelor's of
24    Science in computer science and electrical engineering from
25    Penn.
```

 1          Then after working for a number of years, I had gotten

 2    myself back to my hometown, Austin, and went and got an MBA

 3    in finance from UT Austin.

 4          Then went off and worked for a while again, and the pull

 5    of getting back to my hometown was pretty strong, so I ended

 6    up back in Austin yet again to get a Ph.D. from the LBJ

 7    School in Public Policy.

 8    Q.    Dr. Becker, what was the focus of your public policy

 9    degree?

10    A.    I was -- my research was in a field called econometrics

11    and was looking at the ways that the tools that economists

12    were using to study questions of basically funding public

13    education, whether those tools were actually telling them how

14    to better improve public education.

15    Q.    Dr. Becker, as part of your higher education, did you

16    receive any awards or honors?

17    A.    I did.  In my engineering curriculum in both my junior

18    and senior years, I was given an award by the faculty of the

19    engineering school that they give to the student that they

20    vote as the sort of top engineering student in the department

21    each year.

22          I received that award in my junior year and, again, in

23    my senior year of the program at Penn.  And then at the

24    University of Texas in my Master's program, I graduated with

25    what's called the Dean's Award for academic excellence and

1   something called a Sword Scholar which is given to the top

2   few people in the class.

3   Q.   Tell us a bit about your work history, if you would, Dr.

4   Becker.

5   A.   Well, after getting my engineering degree, I went to

6   work for an oilfield services company called Schlumberger.  I

7   was in their research labs in Houston, doing computer systems

8   research.  I then left that job to form my own computer

9   systems company called The Solutions Group.

10       We -- I primarily did systems design for this sort of

11  newfangled thing that was out at the time.  I'm dating

12  myself.  But it was this thing called the personal computer.

13  Nobody had ever seen one, and we were all trying to figure

14  out how to use it.

15       And then I went to work for -- after my Master's degree,

16  for a firm called Booz Allen & Hamilton as a management

17  consultant.

18  Q.   Now, tell us, what does a management consultant do?

19  A.   It encompasses a pretty broad array of things that

20  management consulting firms do.  I primarily was focused on

21  questions that pretty large companies, mostly Fortune 500

22  companies in the U.S., Canada, and Mexico had as to -- sort

23  of how they either get into a business, how to make the

24  business they had more profitable, and in some ways how to

25  get -- how to get out of businesses.  We did some projects

```
 1   like for a big steel company that was realizing that being

 2   in -- milling steel was not going to be a good thing to be in

 3   and they needed to figure out how to get out of that

 4   business, so we helped them do that.

 5   Q.   Okay.  After you left Booz Allen where you were working

 6   as a management consultant, what did you do?

 7   A.   That's when I decided to move back to Austin and get a

 8   Ph.D. at the University of Texas and essentially settle down

 9   and do what I'm doing now.

10   Q.   Okay.  And you've described a bit, but tell us a little

11   bit more about your current employment.

12   A.   Well, Applied Economics is a firm that I started really

13   when I moved back to Austin and started the Ph.D. program at

14   the University of Texas.  I -- just through working, I ended

15   up meeting the person that is my current business partner.

16        We liked working together, so we decided to hang out a

17   shingle and see if we could make a go of it.  That was almost

18   20 years ago that we first started working together.  And

19   just bit by bit over the years, we've built the firm into --

20   I think there are 25 people now, and we have people in

21   Austin, Houston, Washington, D.C., and Boulder, Colorado.

22   Q.   Dr. Becker, are you a member of any professional

23   organizations?

24   A.   Yes.  I'm a member of the American Economic Association,

25   the American Finance Association, and something called the
```

```
1    Licensing Executive Society.

2    Q.    What does that Licensing Executive Society have to do

3    with?

4    A.    It's -- it's a professional organization focused on

5    licensing of intellectual property, and so the members of

6    that come from academic fields and professional fields that

7    all deal with questions of valuing and licensing of patents

8    and other forms of intellectual property.

9    Q.    Dr. Becker, have you ever served as an expert witness

10   concerning the issue of patent infringement damages benefit?

11   A.    I have.

12   Q.    About how many times?

13   A.    I think at last count, I've been a testifying expert in

14   over 50 patent cases.

15   Q.    Okay.  Now, if you would, describe the types of

16   companies that you work for.  Do you work for both accused --

17   Plaintiffs, like Smartflash, and also accused infringers like

18   Apple?

19   A.    Yes, over the years, probably half and half have worked

20   for patentholders who are claiming infringement and for

21   Defendants who are responding to those claims.

22   Q.    Dr. Becker, you told us about your -- your background in

23   engineering and computer science.  Are you here to offer

24   technical opinions in this case?

25   A.    I'm not.
```

1    Q.    Are you here to test about -- testify about infringement

2    or validity?

3    A.    No, I'm not.

4    Q.    Do you think that background is relevant, though?

5    A.    I do find over the years I do a lot of work in the

6    telecommunications and networking and computer industries,

7    the types of patent cases that I've done; and more often than

8    not, having that engineering degree, at least it helps me

9    understand some of the documents I'm reading and some of the

10   issues in sort of where does the technology fall within the

11   overall scope of some of these products that I've had to

12   analyze.

13   Q.    So how does this help with your economic analysis?

14   A.    Well, we'll see a little bit later that the -- one of

15   the fundamental questions in any patent case is separating

16   what value should be ascribed to the invention itself as

17   apart from things that are not part of the invention and that

18   were brought to the table by, for example, the company that

19   made the product and was selling it.  And having some

20   engineering understanding of how those products are made,

21   helps with that economic analysis.

22   Q.    Dr. Becker, what do you understand that the patents in

23   this case relate to?

24   A.    It's my understanding that the claims here relate to a

25   particular way to pay for protected content that includes

1    things like movies, apps, TV shows.

2    Q.   Is it your understanding that they describe or these --

3    these patents relate to the mere capability to download apps?

4    A.   No.  It's my understanding they don't, and I've heard,

5    you know, this week or last week testimony to that effect.

6    Q.   Is Applied Economics being compensated for your time and

7    your work in this case?

8    A.   They are.

9    Q.   And what is your current hourly rate?

10   A.   My firm's billing rate for my time is $595 per hour.

11   Q.   Now, is that the standard rate you charge in your cases,

12   Dr. Becker?

13   A.   Yes.

14   Q.   And does your compensation depend on your opinions or

15   the outcome of this case in any way?

16   A.   No, not in any way.

17           MR. ALBRITTON:  Your Honor, I would tender Dr.

18   Becker as an expert on patent valuation and patent

19   infringement damages.

20           THE COURT:  Is there objection?

21           MR. CASSADY:  No objection, Your Honor.

22           THE COURT:  The Court will recognize the witness as

23   an expert in those fields.

24           MR. ALBRITTON:  Thank you.  Thank you, Your Honor.

25           THE COURT:  Proceed.

1   Q.   (By Mr. Albritton)   Dr. Becker, can you tell the jury

2   about your assignment in this case?

3   A.   Yes.   As indicated on the slide here, I had basically

4   two assignments.   The first was to review and comment on the

5   opinions offered by Smartflash's damages expert, Mr. Mills.

6        And, second, to independently sort of set his opinion

7   aside and come up with what I thought was a reasonable

8   royalty for a license to the patents-in-suit.

9   Q.   Dr. Becker, what evidence did you consider in this case?

10  A.   Well, there's -- this case is no different than a lot of

11  cases that I've worked on where we have literally mountains

12  of -- of documents, some produced by Apple, some produced by

13  Smartflash, financial documents.

14       We've seen some of those in the last week.   There are a

15  lot of Court documents, expert reports filed by both sides.

16       Those experts give depositions, so that testimony I

17  consider.

18       I have had discussions with some Apple personnel to gain

19  a better understanding of certain issues.   And then I've

20  looked at deposition testimony and exhibits from fact

21  witnesses.   And my team and I have also done research on

22  publicly available information.

23  Q.   Now, Dr. Becker, in addition to this information that

24  the jury's looking at on the screen that you studied before

25  trial, have you been here during trial and heard the

1    testimony of Dr. Wecker, Mr. Mills, Mr. Racz, Dr. Jones, and

2    Dr. Dhar?

3    A.    Yes.

4    Q.    Before we get into the specifics, the nitty-gritty, if

5    you would, please provide the jury with a summary of your

6    opinions.

7    A.    I've reached three primary conclusions.

8         First, if the patents-in-suit are valid and infringed,

9    it's my opinion that the appropriate measure of damages is a

10   reasonable royalty.  We'll get to the specifics of that in a

11   bit.

12        Second, Mr. Mills's opinions are unreliable, and I think

13   vastly overstate the value of the patents and the damages.

14        Third, it's my opinion that that reasonable royalty that

15   would come out of a negotiation between Smartflash and Apple

16   is a fully-paid-up, lump-sum payment of 4-and-a-half-million

17   dollars.

18   Q.    Dr. Becker, do you have any opinion as to how Mr. Mills

19   could get to a royalty in this case that's almost 200 times

20   greater than the royalty you reached?

21   A.    I do.  I've studied his work, and I think I have an

22   understanding of where it got off the rails.

23   Q.    Dr. Becker, you've studied Mr. Mills's opinion in this

24   case?

25   A.    I have.

1    Q.   And after doing so, what did you conclude?

2    A.   Well, if -- if you look at all the -- the sort of

3    schedules that he uses to come up with his opinion and the --

4    the formula that comes up with -- his primary number, I

5    think, is 852 million, that formula reduces down to -- it's

6    really actually pretty simple.   There's only like four or

7    five components to the whole thing.

8    Q.   Well, did you create a graphic that shows that?

9    A.   I did.

10   Q.   If you would, put that up, Dr. Becker.

11        If you would, explain to the jury what we're looking at

12   here.

13   A.   Well, I was here when Mr. Mills testified, and I think

14   he -- he explained that he has something called a royalty

15   base and a royalty rate.   And in a lot of patent cases,

16   the -- the royalties -- the damages are simply multiplying

17   the royalty base times the royalty rate.   And Mr. Mills has a

18   model that follows that -- that -- that approach.

19        When I look at what drives his royalty base, it really

20   reduces down to just three things.   He's got the -- and I'll

21   use the iPhone as an example here, but this is -- the same

22   formula applies to iPads and to iPod Touches.

23   Q.   Okay.

24   A.   And I'm only talking about the time period that's at

25   issue in this case.   But setting that aside, the equation is

1   really the number of units of iPhones, so all the units of

2   iPhones that are sold in that time period.

3   Q.    Sold in the United States?

4   A.    Sold in the United States times Dr. Wecker's alone

5   motivated percentage times the average selling price of each

6   iPhone, so the average revenue per unit.  So that's the base.

7        It's just iPhones, the price that they sold for, and the

8   Wecker alone motivated percent.  That's the base.

9        Then over on the rate side, there's only two components,

10  the iPhone U.S. profit margin, so that's a percentage, what

11  percent profit do they earn on iPhones in the U.S., times

12  the -- what I call the Wecker scenario percentage.  That's

13  the percentage of people responding to that scenario that Dr.

14  Jones provided to Dr. Wecker.

15  Q.    That was a scenario that Dr. Jones said would be

16  non-infringing?

17  A.    It is.

18  Q.    Okay.  Do you have an additional slide that explains

19  anything further about this?

20  A.    Well, if I sort of say those are the -- I guess five

21  components, if you look and see, three of those five are

22  just -- that's just data that comes from Apple.  This is just

23  financial data from Apple on the number of units, the average

24  revenue per unit, and the profit margin on those units.  So

25  that's just coming right off the financial schedules.

1    So you set that aside, really the only thing that's

2    driving this that's not coming from these just direct

3    financial records of -- of the hundred percent of the iPhones

4    that were sold are the Wecker alone motivated percent

5    question and the Wecker scenario percent question.

6    Q.   Does Mr. Mills present an alternative model, Dr. Becker?

7    A.   He did.   I -- he has the other model that I think

8    generates 800 million, give or take.

9    And as I indicated, if you -- see, the only thing that

10   changes is that alone motivate question, he substitutes the

11   answer, sort of the percentage responses to the Wecker

12   percent value question.

13   Q.   But all other elements stay the same?

14   A.   Yes.   So you can see that even in this alternate model,

15   the -- you've got the three inputs that relate to the -- just

16   the -- what are the units that were accused of the devices,

17   the price of those units, and the profit margin on them, and

18   the rest is just -- in the alternate, it's the Wecker percent

19   value and the Wecker scenario percent.

20   Q.   Dr. Becker, do you have an opinion about whether either

21   of these models is reasonable for Mr. Mills to use to compute

22   damages in this case?

23   A.   I do have an opinion on that.

24   Q.   Can you explain the reason to us, please, sir?

25   A.   Well, I -- I think the -- using this model is not

1  appropriate in this case and leads to a dramatic

2  overstatement of the damages and a dramatic overstatement of

3  the value of this claimed invention.

4  Q.   Do you have a summary slide that lets -- sets out those

5  reasons?

6  A.   Yes.   There are really three basic reasons that -- you

7  know, if you -- once you realize that what's driving all the

8  damages is just that simple equation.   First, basing a

9  royalty on the sales of the iPhones, the devices themselves,

10  I think, is unreasonable.   Given what's claimed to be the

11  inventive thing here.

12     Second, Mr. Mills consistently assumes -- by what he

13  sticks into his model, he's consistently assuming an overly

14  broad scope of the invention.

15     And, third, the survey questions that he relies on for

16  his two key inputs, they themselves are overly broad.   And we

17  heard from Dr. Dhar that there's some technical issues with

18  those that render them unreliable.

19  Q.   Can you explain your first point?

20  A.   Well, on this first point, the iPhone itself is a device

21  that does many, many things.   Imagine, it's like a car.   You

22  can drive it around.   You can go to the store, you can go to

23  the movies, you can go to the lake, you can go pick up the

24  kids, you can do a lot of things with it.

25     And the claimed invention here is one part of one thing

1   that can be done with that device, and so I think as just a

2   threshold matter, when you come up to it, it seems you're

3   going to have a real task to get down to just the invention

4   and the value of the invention in that device.  But also

5   the -- the -- the sort of types of transactions that are at

6   issue in this case.

7       Renting a movie, that's happening in the -- in the

8   store.  I mean, I think we heard the iPhone was a big success

9   before Apple is even accused of infringing.  And then

10  something changed at the iTunes Store when they offered --

11  started renting movies.  And that is the thing that triggers

12  Smartflash saying now you infringe.

13      So those things are happening at a store.  They're not

14  sort of in the -- in the device that's getting you to the

15  store.

16  Q.   Dr. Becker, you were here when Mr. Mills was asked some

17  questions by Mr. Batchelder?

18  A.   Yes.

19            MR. ALBRITTON:  Mr. Lee, if you would put up Page

20  12, Line 16 through Page 13, Line 16?

21  Q.   (By Mr. Albritton)  If you would, read that to the

22  members of the jury.

23  A.   Yes.  So it -- it says:  You talked yesterday about a

24  hypothetical negotiation, right?

25      And the answer was:  I did, yes.

1    And you said:  The date of it would be June 2009, right?

2    Answer:  Yes.

3    Let me ask you to consider the time period just before

4    that, say, May 2009, all right, sir?

5    Answer:  Yes, sir.

6    The iPhone had been on the market for two years,

7    correct?

8    Answer:  Yes.

9    A fabulously successful product, correct?

10   Answer:  Yes, sir.

11   Arguably, the most successful product in the history of

12   consumer electronics?

13   Answer:  I'm not certain that I can attest to that, but

14   it certainly is a successful product, yes.

15   And even under the assumption that Smartflash's lawyers

16   asked you to make, nothing about the iPhone was infringing

17   any of the patent claims asserted in this case in May of

18   2009, correct?

19   As far as I know, that's correct, yes.

20   What changed in 2009, according to the assumption that

21   Smartflash's lawyers have asked you to make was that the

22   iTunes Store offered movie rentals, correct?

23   Answer:  Yes, sir.

24   Q.   Now, Dr. Becker, why is this testimony important to you?

25   A.   Well, this is precisely the point I was just making

```
 1   which is that the device itself is -- shouldn't be the focus

 2   of the -- the sort of royalty equation here.  If you were

 3   going to have a -- something focused on what is generating

 4   the value, these devices, before they're even accused of

 5   infringing, were fabulously successful.  And what changed was

 6   something at the store, not in the car that's driving you to

 7   the store.

 8              THE COURT:  Let me interrupt just a minute.

 9              Ladies and Gentlemen, we're going to take a short

10   recess.  I'm going to allow you to leave your notebooks in

11   your chairs.  Don't discuss the case among yourselves.

12              We're going to try to make this about 10 minutes, so

13   please take this opportunity to stretch your legs and get a

14   drink water, and we'll be back in here shortly to continue

15   with the direct examination of Dr. Becker.  But you're

16   excused for recess at this time.

17              COURT SECURITY OFFICER:  All rise for the jury.

18              (Jury out.)

19              THE COURT:  All right.  We stand in recess.

20              Let me see one lead and one local counsel from each

21   side in chambers, please.

22              (Recess.)

23              (Jury out.)

24              COURT SECURITY OFFICER:  All rise.

25              THE COURT:  Be seated, please.
```

1          Ms. Mayes, please bring in the jury.

2          (Jury in.)

3          THE COURT:  Please be seated.

4          Before we continue with the direct examination of

5     the witness, I want the Ladies and Gentlemen of the Jury to

6     know a couple of things.  I know you're concerned about the

7     weather outside.  The Court's concerned about the weather,

8     too.

9          Part of the reason why we just took a recess was so

10    I could consult with counsel for both sides.  I don't see any

11    realistic possibility that we will go later than midafternoon

12    at the latest.

13         It will -- it will be extremely helpful to the

14    Court and to the staff if we could get the evidence finished

15    today.  And I think we can do that by early to midafternoon.

16         I've made arrangements with the Clerk of the Court

17    that at whatever time I release you for the day, they're

18    going to take you downstairs and load you in a van in a

19    covered area and drive you to where you are parked around the

20    Square, so you won't have to walk across the Square or

21    whatever to get to your vehicles, and you can drive out from

22    there.

23         I don't think that any of this will create a

24    serious threat or chance of harm, but we're trying to take

25    every reasonable precaution that we can and still get the

1    evidence finished, if at all possible, today.  You're not

2    going to be here at 5:30 tonight.  I'll be surprised if

3    you're here at 3:30.

4          I'm going to shorten the lunch hour.  We'll have

5    lunch brought in.  We'll only take 30 minutes for our lunch

6    to try to keep things moving.  We'll keep our recesses as

7    short as we can, all with an eye toward getting you out of

8    here as soon as possible today.

9          So we're all aware of the situation.  I just wanted

10   you to know that the Court's aware of it, and within the

11   restrictions of trying to give these parties their full time

12   to present their evidence, we're trying to work with that, as

13   well as with the weather.

14         So I'll keep you posted.  I just want you to be

15   aware that the Court has those thoughts and will keep those

16   things in mind as well.

17         All right.  You may continue, Mr. Albritton.

18         MR. ALBRITTON:  Thank you, Your Honor.

19   Q.   (By Mr. Albritton) Dr. Becker, let's go back to Slide

20   No. 13, please, sir.

21       So tell us, again, if you would, what are the two --

22   what are the things being used by Dr. Becker -- I'm sorry --

23   by Mr. Mills to arrive at this 800-plus million dollars he

24   says Apple should pay Smartflash?

25   A.   He's using, as we talked about, the devices themselves

1    and the sales and profit margins of those devices, and then

2    the only sort of non-Apple information that's coming in is

3    the Wecker alone motivated percent question and the Wecker

4    scenario question.

5    Q.   Were you here when Mr. Mills said that he had performed

6    a Georgia-Pacific analysis?

7    A.   I was.

8    Q.   And is Factor 13 one of the factors he said that he

9    considered?

10   A.   Yes.

11   Q.   If you would, Dr. Becker, tell us about Georgia-Pacific

12   Factor 13.

13   A.   I think I've got a slide on it.

14       Okay.  So Factor 13, Mr. Mills described that there are

15   these list of factors that are sort of a checklist that his

16   damages experts were supposed to consider.  And Factor 13 is

17   an important one, particularly in a case like this, and I'll

18   just read it.

19       It says:  The portion of the realizable profit that

20   should be credited to the invention as distinguished from

21   non-patented elements, the manufacturing process, business

22   risks, or significant features or improvements added by the

23   infringer.

24       So we've got sort of two elements.  The one on the

25   left-hand side is the portion of the realizable profit that

1   should be credited to the invention, and the other side is

2   anything that is distinguished from the invention.

3        So it's the non-patented elements, the manufacturing

4   process, the business risks, anything that the accused

5   infringer, in this case Apple, brings to the table.

6   Q.   So if the invention is one way to pay for things, like

7   movies or apps, where are all the other things related to the

8   iPhone and the iPad and the iPod Touch and even the iTunes

9   Store, where are they supposed to go?

10  A.   Well, they're supposed to be on Apple's side of the

11  table, this stuff that's distinguished from the invention

12  that are credited to the Apple side of the equation.  And

13  those are the non-patented elements.

14       So, certainly, the parts of the iPhone, the screen,

15  the -- the -- the user interface, those things, I think, are

16  obvious; but even within the App Store or in the iTunes

17  Store, there's lots of things that are not the invention,

18  which is the way to pay.  There are the other things that

19  Apple brings to the table in the App Store.

20  Q.   So do you have an issue -- do you have other issues, in

21  addition to using the sales of those devices as the royalty

22  base?

23  A.   I do.  I do.

24  Q.   Okay.  Tell us about that.

25  A.   So that's -- set that aside.

1     The -- even if you set aside the fact that, I think,

2  using the iPhones and the devices themselves is necessarily

3  sort of -- no matter how good you get on the question, you're

4  going to be in the wrong place with respect to what you're

5  building your royalty base out of.  It's just the wrong set

6  of bricks.

7     The question -- this alone motivate question is overly

8  broad.  It's just -- broadens the scope of the patent in ways

9  that pushes things on to the Smartflash side of the

10  negotiating table that shouldn't be there, according to what

11  the -- this sort of Georgia-Pacific factor analysis, and in

12  particular, Factor 13 tells us we have to do.

13  Q.   So if you would remind the members of the jury the

14  questions that he uses.

15  A.   I'm not sure I'll get the exact wording, but it was --

16  Q.   I think you have a slide, Dr. Becker.

17         MR. ALBRITTON:   If you would go to Slide 15.

18  Maybe not.  I apologize.

19  A.   No, we don't have one.

20  Q.   (By Mr. Albritton) Okay.

21  A.   It's -- the question was something to the effect of were

22  you alone motivated by the capability to purchase apps?

23     And that is certainly more than -- there's a lot that

24  goes into the apps and the App Store, and just the capability

25  of purchasing them strikes me as, on its face, more than the

1  particular way to pay for when you check out of the App

2  Store.

3  Q.   Okay.  And what's the alternative question that

4  Dr. Becker uses -- I'm sorry -- Mr. Mills uses for his

5  alternative royalty base calculation?

6  A.   It's the -- what percent value did you ascribe.  But,

7  again, it's to the exact, same sort of formulation of the

8  question, which is what percent of value do you attribute to

9  the capability of purchasing apps?

10      So, again, it's just this sort of broad -- everything to

11  do with apps, not the invention -- or the claimed invention,

12  which is the way to check out of the store.

13  Q.   And do you have the same opinion regarding the

14  capability to purchase and rent movies and TV shows?

15  A.   Yes.

16  Q.   Dr. Becker, what about the third question, just on a

17  high level, that Dr. -- Mr. Mills uses for this royalty rate?

18  A.   Well, the -- the scenario -- the Jones scenario -- I

19  think if we go here, you can see on -- over on the right, on

20  the royalty rate, the Wecker scenario percent question.

21      I understand that that is also flawed in the sense that

22  Dr. Dhar's opinion is that the way that was presented with

23  the sort of very negative connotation that we're going to

24  disable everything, we're going to disable the capability to

25  purchase apps, and then we're going to put something else in

1    place.

2        Well, when you're disabling the capability, you're

3    turning everything in the App Store off, everything that --

4    you know, and the same with the movies rental.

5    Q.    Absolutely.

6        So let's talk about his first damage model that yields

7    this $252 million.  Do you have an opinion as to whether it's

8    reasonable to base his damages on these survey results?

9    A.    I do.  It's not reasonable to use these two isolated

10   questions given how broad they are and also the -- from Dr.

11   Dhar's analysis, we know that they're -- they're not

12   producing the results that Mr. Mills assumed they were.

13   Q.    Yeah.  What do you understand about and how did you

14   utilize in your opinions Dr. Dhar's testimony and his survey

15   results?

16   A.    Well, we heard him explain the results; but on that

17   alone motivated percent, as you'd expect, if a particular

18   feature was the sole and exclusive reason that they bought

19   it, they would answer no if you asked them about something

20   else.

21       And Dr. Dhar asked the people who took this same survey

22   about 10, 12 -- I think it was 12 other features, and a

23   hundred percent of them said:  Oh, yeah, that other feature

24   motivated -- was a motivator as well.

25       And a very large percentage of them answered that most

1    of those 12 features were motivating their purchase.

2        So it can't be the case that people understood and were

3    responding in the way that Mr. Mills necessarily assumes they

4    were for this model to -- to be a sound basis for a damage

5    claim.

6    Q.   Now, you were here when Mr. Mills was asked questions

7    about this topic?

8    A.   Yes.

9        MR. ALBRITTON:  If you would, let's bring up Page

10   24, Line 7 through 10.

11   Q.   (By Mr. Albritton) What is that testimony there, and why

12   does it matter to you, Dr. Becker?

13   A.   Well, he was asked:  So it's your position that a given

14   product can have features that are necessary for the purchase

15   decision but not motivate the purchase decision?

16       Yes.  Certainly, yes.

17       So -- and he answered this in a couple of ways as well,

18   that I understand his position to be that notwithstanding

19   that he asked the question and assumed that when people said

20   this was the sole motivator, his -- the math of his equation

21   depends on that being the only reason.

22       He is acknowledging that there's a lot of other features

23   in the phone that they wouldn't buy it if it wasn't there.

24       And so back to that Factor 13.  We've got to keep those

25   things on Apple's side of the table.  And if you treat the

1    question the way Mr. Mills does, you scrape all that value

2    over to Smartflash's side of the table.

3    Q.    In the course of your work in this case, did you review

4    some internal surveys performed by Apple?

5    A.    I did.

6    Q.    Are they consistent with your conclusion that many

7    different features drive demand for the accused Apple

8    devices?

9    A.    They are.

10          MR. ALBRITTON:  If you would, Mr. Lee, let's bring

11   up Plaintiffs' Exhibit 103.028 at 10.

12   Q.    (By Mr. Albritton) Can you see that good, Dr. Becker?

13   A.    I do see that.  That's -- that's great.

14   Q.    Okay.  And have you seen that before?

15   A.    I have.

16   Q.    Does this document, this Apple survey, support the

17   assumption by Mr. Mills that 28 percent of Apple's company --

18   I mean, Apple's customers solely bought the iPhone because of

19   the capability to download and purchase apps?

20   A.    No, not at all.  In fact, it demonstrates quite the

21   opposite.

22   Q.    Now, why is that?

23   A.    Well, I think this slide maybe was used with Dr. Wecker

24   as well, and one of the questions that's asked here is --

25          THE WITNESS:  Over there on the purple bar, if you

1    can blow up the whole U.S. bar.

2              On the left.

3              MR. ALBRITTON:  Yes, sir.

4              THE WITNESS:  There you go.

5    A.   Okay.  That 24 percent purple slice, about five down

6    from the top, corresponds to wanted to use apps.  And this

7    sort of makes two points.

8         One is, if it's the sole and exclusive motivator, you

9    wouldn't have this stack of reasons adding up to more than a

10   hundred percent.  And it adds up to quite a bit more than a

11   hundred percent.

12        And this -- these people were only asked to provide up

13   to three reasons.  So there may have been others.  They were

14   limited to three reasons, and we see that they're crediting

15   or checking more than one box as the -- as the -- the main

16   reason.

17        The second point is that "wanted to use apps," I mean,

18   I -- I think the testimony has been pretty clear that Mr.

19   Racz and these patents are not claiming that they invented

20   apps.  So wanting to use apps is far too broad a

21   characterization.

22        And that 24 percent, I think Dr. Wecker said:  Yeah,

23   that's about what I found in my survey.  But this is the

24   broad just wanted to use apps, and it's one of a number of

25   reasons that this survey is showing.

1    Q.   (By Mr. Albritton) Were you here when Mr. Racz said that

2    he didn't invent apps?

3    A.    Yes.

4    Q.    Were you here when he testified that he didn't invent

5    the ability to purchase content --

6    A.    Yes.

7    Q.    -- on the Internet?

8    A.    Yes.

9          MR. ALBRITTON:   If you would, Mr. Lee, let's bring

10   up Plaintiffs' Exhibit 103.028 at 230.

11   Q.   (By Mr. Albritton) Dr. Becker, have you seen this

12   document before?

13   A.    Yes.

14   Q.    And what is it?

15   A.    This is a summary of the results from another form of

16   survey that Apple ran very similar to the one we were looking

17   at, although this question --

18          THE WITNESS:   If you can highlight the question

19   down at the bottom --

20   A.    Here people were given the opportunity -- not limited to

21   three reasons.  They were given the opportunity to rate -- I

22   think there's 12 things on this slide.

23        And what we find is that a very high percentage of

24   people rate a lot of these features, in fact, most of these

25   features, as very important in their purchase decision.

1   Q.   (By Mr. Albritton) So let's just look at the first one.

2        What's the highest percentage?

3   A.   Well, 94 percent of these respondents said that easy to

4   use was very important -- or important in their purchase

5   decision for the iPhone.

6   Q.   Does that suggest to you that 23 percent of the people

7   that bought iPhones bought them solely and exclusively for

8   the ability or the capability to purchase apps?

9   A.   No.  In fact, it demonstrates that that can't possibly

10  be the case.

11  Q.   Let's look at the second one and the third one.

12  A.   So battery life, trust the Apple brand, value, these are

13  all things that are back to that Factor 13, should be

14  credited to things that Apple brings to the table.

15       Making it a trusted brand, providing good value for the

16  price, these are all important motivating factors or

17  important factors -- attributes in the decision to purchase

18  the iPhone for a very high percent of the people.

19  Q.   Now, under Smartflash's theory, do they say these

20  patents have anything to do with battery life or the Apple

21  brand or the value of the price paid?

22  A.   No.

23  Q.   Now I'd like to draw your attention down to the

24  questions about apps right there under services and support.

25            MR. ALBRITTON:  Right there.

1   Q.   (By Mr. Albritton) What is that question, or what does

2   that indicate to you, Dr. Becker?

3   A.   This is the quality of the apps available.  We could see

4   that 83 percent of the people rated that as an important --

5   very important or important feature in their decision to

6   purchase the iPhone.

7        And a little ways down, we have a similar one, the

8   quantity of the apps.

9   Q.   Now, even under Smartflash's theory in this case, do

10  they have anything to do with the quality of the apps that

11  are available?

12  A.   No.

13  Q.   What about the quantity of the apps that are available?

14  A.   No, nothing.

15  Q.   Does this survey support Smartflash's position in any

16  way, Dr. Becker?

17  A.   No.  In fact, it -- it offers some -- an interesting

18  insight into that 24 percent we saw on the last slide, which

19  were -- people were saying wanted to use apps.

20       Well, now that we're drilling down to a level below

21  that, what is it about the apps that people find to be

22  important to their purchase decision, and at least this

23  survey says over -- you know, quality of the apps and the

24  quantity of the apps.

25  Q.   Now, on this list, does it say anything about the ease

1    of purchase or the manner of purchase of apps in the App

2    Store?

3    A.    No, nothing at all.

4    Q.    All right.  Dr. Becker, if you would --

5             MR. ALBRITTON:  You can take that down, Mr. Lee.

6    Q.    (By Mr. Albritton) Dr. Becker, I think you have an iPad

7    there at the podium with you.

8    A.    I do.

9             MR. ALBRITTON:  Mr. Lee, would you make sure that

10   that gets on the screen?

11            Thank you very much, sir.

12   Q.    (By Mr. Albritton) Now, were you here when Dr. Jones did

13   a live demonstration?  I think he was actually using an iPod

14   Touch.

15   A.    He was.  And my eyes aren't that good, so I'm going to

16   use an iPad, if I could.

17   Q.    Okay.  So was his demonstration relevant in any way to

18   the opinions you have in this case?

19   A.    It was.

20   Q.    Tell us how so.

21   A.    Well, as he was going through that, I found it

22   interesting that he was sort of navigating through the

23   process of clicking on the App Store and getting in and

24   getting to the point where he could, I think, demonstrate to

25   the jury sort of where the claimed invention resided in

1    these -- in the system.

2    Q.   Now, let me ask you, was that when he went to push the

3    button to purchase, push the button that had the price, push

4    the button again, and then it downloads?  That's what he said

5    was the invention?

6    A.   Yes.

7    Q.   Okay.  Well, if you would, run us through what you think

8    are other important factors to consider under Georgia-Pacific

9    No. 13 as it relates to the App Store.

10   A.   Okay.  So the point I want to make here is that, you

11   know, there's been, I think, a lot of testimony about what

12   was the capability?  Were the apps motivating?  Big debate.

13       Were the apps the only motivator, or do people like to

14   send email?  Do people like to do other things here?

15   Q.   Let me just ask you this:  You own an iPad yourself?

16   A.   I do.

17   Q.   What do you primarily use your iPad for, Dr. Becker?

18   A.   I'd say 90 percent of it is checking email and going on

19   the Internet and then using the mapping function to keep from

20   getting lost in all the different cities I go through.

21   Q.   All right.  So if you would walk us through the App

22   Store that are there, Dr. Becker.

23   A.   Okay.  So the App Store here, we go to the App Store,

24   one of the things that we see is that Apple has provided a

25   best new apps, best new games.  It animates.

1    It's pretty interesting here that this is -- you can

2  kind of go around and see things they have -- top charts, so

3  kind of like the old Casey Kasem Top 40, you can see the top

4  charts to apps.

5    And that's an interesting functionality.  That's part of

6  the process of browsing for and purchasing an app.  They --

7  you can see they provide -- they provide a wish list.  You

8  can create a wish list of apps, if you don't find what you

9  want.

10    And they provide categories, so if you're looking in

11  particular for something for -- let's say for your kids, you

12  can click on kids and go see something for kids.

13    All of this is functionality that is part of down -- you

14  know, purchasing the capability to go on to the App Store and

15  purchase apps.

16    And I'll keep going.  I'll search here.  I'll say

17  weather clocks.  So they provided -- somebody had to build

18  this functionality to be able to search through the millions

19  of apps that are out here.

20  Q.   You were here when you heard Payam Mirrashidi and Mr.

21  Muller sit here -- Muller -- excuse me -- sitting here to

22  testify?

23  A.   I wasn't in the courtroom then, but I have -- I've read

24  that transcript, and I understand they're engineers that

25  helped build this functionality.

1   Q.    So Apple is responsible for this functionality, not

2   Smartflash.

3   A.    Absolutely.

4   Q.    Okay.  If you would, continue.

5   A.    So if we keep anything here, you can see now just --

6   I've searched, so that search functionality is -- is part of

7   the process.  I can click on -- I thought weather would be

8   appropriate today, given what's going on outside.

9        So there's an app called clock and weather that -- and

10  even here, you can see that they've provided the ability to

11  get some information about the app.  You can see screenshots

12  of what's -- what the app is going to look like before you

13  buy it.

14       You can click and see reviews.  You know, people can

15  write a glowing description of the app, but maybe people who

16  bought it before you said:  Ah, it's not so good.  So you can

17  read the reviews before you spend any money.

18       And then when you're ready to buy, you can -- you can

19  click on that button.

20  Q.    So you click that button once?

21  A.    You click that button once, and then you say buy, and

22  then it asks you for your -- for your password.

23       And, hopefully, if I did this right, it will start

24  downloading.  But the -- the point that I had is that -- I

25  mean, everything up to this point, the graphics, the ability

1    to search -- well, it's going to make --

2    Q.    You don't have to put in your personal credit card

3    information in front of everybody.

4    A.    I'm not going to do that.  I think we've seen somebody

5    buy the app, so...

6    Q.    So of everything that you've shown, up until the very

7    end, is that stuff that even Smartflash admits has nothing do

8    with their patent?

9    A.    Yes.

10   Q.    And how does this affect your opinions in this case?

11   A.    Well, it -- even if the debate weren't about, you know,

12   the -- the survey questions and the sole motivator, you still

13   have to recognize that within the fence, within the boundary

14   of what we would call apps and the ability to use apps and

15   purchase apps, there's -- I cannot imagine the amount of

16   functionality and capabilities that somebody had to build,

17   Apple had to build, to bring to the table.

18        And we saw that the quantity of the apps and the quality

19   of the apps that are available in this store are, according

20   to the surveys, significant reasons why people purchased

21   their devices.

22   Q.    Thank you, Dr. Becker.

23        Now, if you would, let's go back and look at your

24   formula again, the formula that Dr. -- or that Mr. Mills

25   uses.

1      MR. ALBRITTON:  Back to the slides, please, Mr.

2  Lee.

3  Q.   (By Mr. Albritton) All right.  If you would, we've

4  talked about the left box, the royalty base; is that right?

5  A.   Yes.

6  Q.   Now, let's talk to the jury, if you would, please, sir,

7  about the box on the right.

8  A.   Well, that royalty rate, again, consists of just two

9  components, Apple's iPhone U.S. profit margin, that's

10  expressed as a percent margin.  So what percent profit did

11  they earn on the device times Dr. Wecker's scenario percent.

12  That's the Jones non-infringing alternatives scenario.

13  Q.   Dr. Becker, do you have any opinions about Mr. Mills's

14  basing his royalty calculation on this question?

15  A.   I think that generates a flawed and inflated rate as

16  well.

17  Q.   Why is that?

18  A.   Well, the scenario question as it was posed, I

19  understand from Dr. Dhar, was posed in a way that generates

20  scientifically unreliable results.  It was -- there was a lot

21  of negative framing of the -- of the question.

22      And I think they used the description that said:

23  Imagine that all your capability to do this has been

24  disabled.  Well, everything we just went through in that

25  demonstration, you're going to disable all that, take that

1    away from me?

2        I think that's what Dr. Dhar was getting at, that the

3    negative framing of that could cause people to go:  Well, no,

4    I don't want that.  As opposed to saying, what if at the end

5    of the purchase process, everything is going to be the same?

6    Q.   Excuse me.  Okay.  Great.  I'm sorry.  I didn't mean to

7    interrupt you.  My -- my mind went on me there for a second.

8    I apologize.  Okay.

9            THE COURT:  Let's just proceed.

10           MR. ALBRITTON:  Thank you, Your Honor.

11   Q.   (By Mr. Albritton) So do you have an opinion on the

12   overall effect of this question, the use of this question and

13   its results on your opinions in this case, Dr. Becker?

14   A.   Yes.  This -- this question and given the fact that

15   it's -- you know, it and the alone motivated percent question

16   drive the damages.  I mean, they're the only thing that's in

17   here.  They do not produce a reliable measure of damages and

18   are not valuing the claimed invention here.  They're not

19   valuing these asserted patents.

20   Q.   Now, we talked about there -- you put up two different

21   formulas, because Dr. -- or Mr. Mills has two different

22   theories; is that right?

23   A.   He does.

24   Q.   Are your opinions the same with respect to each of them?

25   A.   Yes.  They're -- it's -- all the same issues apply to

1    both.

2    Q.    What is wrong with using this percent of value question?

3    A.    Well, it -- similar to the -- the alone motivate,

4    there's two problems.

5         One are the technical issues that Dr. Dhar addressed

6    that -- you know, asking somebody about a feature in

7    isolation, what value do they place on it, without giving

8    them the opportunity to have all the other features to sort

9    of divvy the value up.

10        I understand that produces highly biased and unreliable

11   results, but also -- set those issues aside, what was asked,

12   what they were asked to value was sort of the totality of

13   apps, the ability to use apps or download movies.  It wasn't

14   focused on the method of checking out of the store.

15   Q.    Okay.  So in sum, can you tell us your opinion about Dr.

16   Mills' two theories of damages in this case?

17   A.    They are not reliable, and they don't generate a --

18   anything like a reasonable valuation of the damages or the

19   patented value in this case.

20   Q.    Dr. Becker, what was your other assignment in this case?

21   A.    Well, my second assignment was to set all that aside and

22   independently determine a reasonable royalty for a license to

23   this -- to these patents.

24   Q.    And have you done that?

25   A.    I have.

```
 1   Q.   Now, if you would, please remind the members of the jury
 2   what your opinion is in this regard.
 3   A.   My opinion is that the royalty would be a
 4   4.5-million-dollar lump-sum payment.
 5   Q.   Now, are damages only appropriate if the patents are
 6   found -- or the patent claims are found valid and infringed?
 7   A.   Yes.
 8   Q.   If they're found either invalid or not infringed, how
 9   much would the damages be?
10   A.   There would be no damages.
11   Q.   Let's talk about lump-sum payment.  What is that?
12   A.   Well --
13   Q.   Lump-sum royalty.
14   A.   -- when you're licensing technology, people and
15   companies tend to do it in one of two broad ways.  There's a
16   lot of sort of flavors, but, typically, things break down
17   into either making a one-time payment, sort of buying the
18   rights outright, or doing what's called a running royalty
19   where you pay as you go.
20        And they're used in different circumstances.  Neither
21   one is sort of the best in all circumstances.  It depends on
22   the particular situation.
23   Q.   Now, what -- what is Mr. Mills putting forth in this
24   case?
25   A.   He's putting forth a running royalty.
```

1   Q.   And what is your opinion?

2   A.   I think, given the circumstances of this case, the

3   evidence indicates a lump-sum royalty is the most appropriate

4   structure.

5   Q.   Now, tell us, Dr. Becker, how you went about making that

6   determination.

7   A.   Well, I considered the specific facts of this case, a

8   couple of factors more on that.

9        One is the nature of this technology.  You've got

10  products that have hundreds, if not thousands, of pieces of

11  technology that go into them that you have to take into

12  account.

13       And in those circumstances, the way companies tend to

14  pay for one little slice of technology that's out of the

15  whole big package is to just make a lump-sum payment, because

16  trying to keep straight how much of a running royalty is

17  appropriate for just that one piece that may be used by

18  different people different ways is not something that people

19  tend to do as the way they would form the royalty in that --

20  in that circumstance.

21  Q.   Okay.  What other factors did you consider in reaching

22  your opinion that a lump-sum royalty was appropriate?

23  A.   Well, I looked at the evidence of what Mr. Racz, who

24  would be the person sort of negotiating this license for

25  Smartflash in June of 2009 -- looked at whether there was

1  evidence of whether he would have been willing to accept a

2  lump-sum payment for an interest in these patents, and the

3  evidence was that he had been expressing in various ways his

4  willingness to take a lump sum for a -- an interest in the

5  patents.

6  Q.   Okay.  What else did you look at and consider?

7  A.   Well, you look at -- the other side of the table is

8  Apple.  The evidence indicates that Apple's typical practice

9  and certainly its preferred method of licensing technology

10  for devices like this is in a lump-sum payment.

11  Q.   You -- you were here when Mr. Racz testified?

12  A.   Yes.

13  Q.   Did you hear him describe how, in his early business

14  plans back in 2001 or even earlier, he thought he might be

15  able to get a running royalty as a license?

16  A.   Yes.

17  Q.   Now, how does that affect your testimony and your

18  opinions, Dr. Becker?

19  A.   Well, I -- I certainly was aware of that, and the --

20  it's very early in the process for him.  It's a business

21  plan.  I'd love to have had the things that I put in my

22  business plan for my first computer company be something that

23  I could say were absolutely doable.

24      They were an aspiration back in 2001, but the

25  negotiation in this case is in 2009, and you have to take

1  into account what the marketplace and what everybody sort of

2  understood to be the circumstance at that time, not what

3  somebody back at the beginning had maybe aspired to.

4  Q.   And does Dr. Mills agree that the hypothetical

5  negotiation in this case was June of 2009?

6  A.   He does.

7  Q.   How did you go about determining the amount of the

8  reasonable royalty, Dr. Becker?

9  A.   Well, I conducted what's called a hypothetical

10  negotiation.  Mr. Mills described this as well, so we're in

11  agreement on the general sort of framework.

12      In June 2009, we imagine Smartflash and Apple coming

13  together to negotiate, in a business setting, a license to

14  this technology.

15  Q.   And did you make some assumptions about that

16  hypothetical negotiation?

17  A.   Yes, the -- a couple of key assumptions that have to be

18  made.

19      First, that the parties have to assume the patents are

20  valid and infringed.

21      Second, the parties have the same information.  We're

22  sort of at the table with the cards face up instead of

23  keeping things close to your vest.

24      And third, and importantly, the parties have to reach an

25  agreement that's reasonable for both sides.  So it's a --

1    it's a reasonable business solution for both sides.

2    Q.   Now, why is this characterized as hypothetical?

3    A.   Well, it never happened.  So, obviously, we wouldn't be

4    here today if they'd had a negotiation in 2009.  But to put

5    ourselves at the point in time that Apple had a first -- is

6    first accused of using this technology is when the courts

7    have said:  You need to focus the analysis on that point in

8    time.

9        So that's why we sort of have to imagine a negotiation

10   happening in June.

11   Q.   Now, because it's hypothetical, should you ignore or

12   discount the real-world facts?

13   A.   No.   It's one of the things you've got to be careful to

14   do is not -- in sort of picking yourself up and going back to

15   June of 2009, we don't undo things that were really happening

16   at the time.

17   Q.   Are there -- let's talk about what factors you

18   considered in determining the outcome of the hypothetical

19   negotiation in this case, Dr. Becker.

20   A.   Okay.   And I'll, in the interest of time, go through

21   these pretty quickly.

22       Georgia-Pacific factors, Mr. Mills described these.

23   There was a case a long time ago that outlined 15 factors

24   that as a damage expert, you sort of use this as a checklist

25   to go through.

1          You're not going to find them all relevant in every

2     case.   Some cases, different factors turn out to be the ones

3     that are most important or most relevant.   But you do go

4     through and consider them all, and I have done that.

5     Q.   What factors did you determine were the most important

6     in coming up with a reasonable royalty in this case, Dr.

7     Becker?

8     A.   So here are the ones that I concluded were most

9     relevant, are Factors 1, 8, 9, 10, 13, and 15.   And we'll

10    talk about each of those.

11    Q.   Which factor would you like to discuss first, sir?

12    A.   Let's talk about 13.   I think I can hit that pretty

13    quickly.

14    Q.   Is it significant in this case?

15    A.   It is.   It's quite significant.

16    Q.   Why is that?

17    A.   Well, we talked about this earlier.   The -- Factor 13 is

18    the one that says you've got to take the portion of the

19    realizable profit that should be credited to the -- to the

20    invention as distinguished from the things that Apple brings

21    to the table.

22         And this is -- in a case like this where the technology

23    is one of many things that go into making the product do what

24    it does, Factor 13 is very important.

25    Q.   Well, what evidence did you consider on the Apple side

1    of the ledger?

2    A.    Well, we -- so I indicated we've got to figure out

3    things that Apple brought to the table because they don't owe

4    royalties on that.

5    Q.    Mr. -- I apologize.

6    A.    So I looked at -- this is where my staff did some

7    research, and we looked at a lot of different things.

8              MR. ALBRITTON:   Mr. Lee, if you would bring up DX

9    91, please, sir?

10   Q.    (By Mr. Albritton)   What are we looking at here, Dr.

11   Becker?

12   A.    All right.   This is from Fortune Magazine, World's Most

13   Admired Companies in 2010.   And what we see is that Apple was

14   ranked No. 1 in computers.   And in one of those surveys we

15   looked at earlier, we saw that Apple's brand and reputation

16   was a very important reason or factor in people's purchase

17   decision.

18             MR. ALBRITTON:   If you would, let -- Mr. Lee, let's

19   go to DX 102, please, sir?

20   Q.    (By Mr. Albritton)   What are we looking at here, Dr.

21   Becker?

22   A.    This is a study that looks at the value of brands and

23   comes up with the hundred most powerful brands around the

24   world in different categories, and we'll see that Apple is

25   even worldwide in terms of across all product categories

1    ranked as one of the most powerful and most valuable brands

2    in the consumer space.

3              MR. ALBRITTON:  Mr. Lee, if you would, please, go

4    to Page 2 of that document, please sir?  And if you would,

5    bring out the -- that's -- that's right.

6    Q.  (By Mr. Albritton)  What are we looking at there, Dr.

7    Becker?

8    A.   Right.  We can see that Apple on a worldwide basis is

9    ranked No. 7 in terms of the value of its brand.

10             MR. ALBRITTON:  All right.  Mr. Lee, if you would,

11   bring up Defendant's Exhibit No. 93, please, sir?

12   Q.  (By Mr. Albritton)  What are we looking at here, Dr.

13   Becker?

14   A.   This is an article from Time Magazine in November of

15   2007 about the iPhone, and you can see in that very first

16   sentence that it said the iPhone changed the way we think

17   about how mobile media devices should look, feel, and

18   perform.  It goes on to talk about the slick glass, stainless

19   steel case, and the elegant touch display, the two megapixel

20   camera.  These are all things that Apple brings to the table

21   and needs to be kept on their side of the ledger.

22   Q.   If you would what's -- I notice the date -- what's

23   important about the date of this article?

24   A.   Well, this touches on a topic that I -- a point I made

25   earlier, namely that the -- these devices are not accused of

1   infringing until June of 2009 when the App Store started --

2   or the iTunes Store started offering movies for rent.  So the

3   fact that -- I mean, this is already a smashing success of a

4   product.

5          MR. ALBRITTON:  All right.  Mr. Lee, let's look at

6   Defendant's Exhibit No. 101, please, sir?  If you would,

7   scroll down a bit and pull out that on the left?

8   Q.  (By Mr. Albritton)  All right.  Dr. Becker, what are we

9   looking at here?

10  A.  So this is, again, another award that was won is -- by

11  Apple for the iPad, and you can see right in the middle, it

12  says:  Apple is the first company that designed

13  finger-friendly hardware and software from scratch, rather

14  than stuffing a PC into a keyboardless case.

15         And they call those results magical and revolutionary.

16         So this, again, is -- they're not describing the way in

17  which people check out of the App Store or the iTunes Store.

18  These are things that Apple brought to the table.

19  Q.  Did Mr. Mills consider this type of evidence

20  sufficiently, in your opinion?

21  A.  No.

22         MR. ALBRITTON:  If you would back out of that, Mr.

23  Lee, and let's just look at the top right and -- that's

24  right.

25  Q.  (By Mr. Albritton)  So what is this we're looking at,

1    this document -- what's it titled?

2    A.    Well, the -- this -- Time Magazine was looking at 50

3    best inventions of 2010 across sort of everything in the

4    economy, so this is a pretty significant invention.

5                MR. ALBRITTON:  All right.  Let's go back to the

6    slides, if we could, Mr. Lee?  If you would, let's go to

7    Slide No. 23.

8    Q.    (By Mr. Albritton)  So let's talk about the left side of

9    the screen.  What did you consider on this point, Dr. Becker?

10   A.    Well, as this indicates, Factor 13 says that the

11   reasonable royalty has to give Smartflash only royalties on

12   the patented invention and keep all of the other stuff,

13   anything else that's not the patented invention on Apple's

14   side of the table.

15   Q.    All right.  Dr. Becker, what are the next factors that

16   you considered?

17   A.    I looked next at 8 and 10.

18   Q.    What are Factors 8 and 10?

19   A.    Factor 8 looks at the established profitability of the

20   product, its commercial success, the popularity of the

21   product, and then 10 says -- one of the things that 10 asks

22   us to focus on is the character of the commercial embodiment

23   of it as owned and produced by the licensor.

24        So that's the inventor, Mr. Racz.  So we look at the

25   commercial embodiment of this invention in the hands of the

1   inventor, if they did try to commercialize it and gain some

2   evidence from that.

3   Q.   Dr. Becker, what's your understanding about Smartflash's

4   efforts to commercialize the patented technology, or what

5   they say is the patented technology?

6   A.   Well, I understand that -- that efforts were made to

7   commercialize it, products were built, and they tried to roll

8   out a product -- Mr. Racz and his colleagues tried to roll

9   out a product that -- that embodied this invention in the,

10  say, 2001 time -- time frame.

11  Q.   And what's the importance of that to your analysis?

12  A.   Well, it -- it gives us, at least, some indication back

13  to that question of, well, what goes on Apple's side of the

14  table versus what goes on the -- the side of the invention is

15  that here you have the inventor who would know better how to

16  use this, taking the invention and building a product with

17  it, and it's not a commercial success.

18       And later Apple builds its products, and its products

19  are a commercial success.  So it gives, at least me as an

20  economist, some evidence as to what's driving that success,

21  and is it the -- is it reasonably credited to the invention?

22       And this is one piece of information that suggests that

23  maybe the invention by itself is not enough to -- to have a

24  successful product.

25  Q.   What's the next factor you looked at, Dr. Becker?

```
 1    A.    Factor 1 is the royalties received by the patentee for

 2    the licensing of the patent and whether it proves what's

 3    called an established royalty.

 4    Q.    As of June 2009, the date of this hypothetical

 5    negotiation, had smart -- Smartflash received any royalties

 6    for licensing of the patents-in-suit?

 7    A.    No, not to third parties.

 8    Q.    Did you consider any evidence of Smartflash's efforts to

 9    sell or license the patents and the patent application?

10    A.    Yes.

11    Q.    If you would, Dr. Becker, let's look at --

12              MR. ALBRITTON:  If you would, please bring up, Mr.

13    Lee, Defendant's Exhibit 215?  If you would, Mr. Lee, pull

14    out the -- the top?

15    Q.    (By Mr. Albritton) Tell us what we're looking at here,

16    Dr. Becker?

17    A.    So this is an October 2005 email from Mr. Racz to

18    somebody named Shane Dodson, and there are a couple of things

19    that I found important in this document.

20    Q.    Okay.

21              MR. ALBRITTON:  If you would, pull that out and

22    come down about halfway and bring up right there, for the

23    avoidance.

24    Q.    (By Mr. Albritton)  If you would, talk to us about the

25    importance of what Mr. Racz is saying in this email, Dr.
```

```
 1   Becker?
 2   A.    Well, there -- the background on this is there had been
 3   some -- this is part of an effort to raise money and perhaps
 4   sell or license the Smartflash technology.  And I think
 5   Smartflash had received an offer for 150 pounds for an
 6   interest in the technology.  And what I find here is that
 7   he's, one, giving us an idea of the level of investment that
 8   he has at that point in time.  It says:  Personal funds in
 9   excess of $3 million.
10        And then, second, we see his intention is to realize a
11   substantial ROI over the life of any granted patents in
12   excess of my own personal investment.
13   Q.    Now, what does ROI stand for?
14   A.    That stands for return on investment.
15   Q.    All right.
16             MR. ALBRITTON:  Now, let's look at, Mr. Lee, at
17   Defendant's Exhibit No. 214, please, sir?  I'm sorry.
18   Q.    (By Mr. Albritton) All right.  What are we looking at
19   here in 214?
20   A.    This is a document describing what you see in the title
21   there:  A Patent Development and Licensing Opportunity.  This
22   is a briefing document related to that.
23        And as I understand it, this document is outlining a
24   potential deal that Mr. Racz was at least considering where
25   the patent -- and this is the granted '720 patent, and I
```

```
 1   think you can see they say -- and all future continuations,

 2   eventually three patents, so we're talking about the three

 3   patents in this case -- that there's terms of a deal outlined

 4   in this document.

 5   Q.   Okay.

 6             MR. ALBRITTON:  If you would, Mr. Lee, we need to

 7   go down to the -- the -- the financial terms, please, sir?

 8             MR. CASSADY:  Your Honor, can we approach and ask

 9   that that be brought down?

10             THE COURT:  Approach the bench.

11             (Bench conference.)

12             THE COURT:  Yes, Mr. Cassady?

13             MR. CASSADY:  Your Honor, when the document was

14   first brought up, there was a reference to contingency fee

15   lawyers, a document that got brought up on the screen.  I

16   tried to go ahead and ignore it when it was just at the very

17   bottom, but he's starting to scan down.  The document clearly

18   calls for the MIL on -- talking about that kind of aspect of

19   litigation and things like that.

20             MR. ALBRITTON:  I didn't see that, Your Honor, and

21   certainly I didn't ask him any questions about that.  I'm

22   only taking him to the $200,000 for 20 percent.

23             THE COURT:  If you put it back up, is there a way

24   for you to take down and to exclude that portion?

25             MR. ALBRITTON:  Yes, sir.  May I have one moment to
```

1   talk to Mr. Lee?

2            THE COURT:  Just direct him to do that, and then

3   let's proceed.

4            MR. CASSADY:  Thank you, Your Honor.

5            (Bench conference concluded.)

6            THE COURT:  All right.  Let's continue.

7            MR. ALBRITTON:  Thank you, Your Honor.  I think --

8   just go to the page that talks about $200,000.  Right there.

9   Q.   (By Mr. Albritton) If you would, Dr. Becker, talk to us

10  about what is entitled to offer there?

11  A.   Okay.  So what is being offered here is a 20 percent

12  stake in the company that owns -- granted U.S. Patent

13  7,334,720 and all future continuations.  And we saw on the

14  first page that that's talking about the three patents in

15  total eventually.  So this is an investment of $200,000 for a

16  20 percent stake in the company that owns the -- the

17  technology.

18  Q.   Is this important evidence, in your opinion, Dr. Becker?

19  A.   Yes.  This -- I understand this to have been a document

20  from the fall of 2009, and so this gives me an indication of

21  what parties at the time were considering as the total value,

22  or at least what an interest in these -- in this technology

23  would be -- would be worth.

24  Q.   All right, Dr. Becker.

25            MR. ALBRITTON:  Now, let's, Mr. Lee, go to

1    Defendant's Exhibit No. 201, please, sir?  And if you would,

2    bring up the -- who it's from and the date.

3    A.    Okay.  So here we have, again, Mr. Racz.  This is

4    October of 2009, so very relevant to that June 2009 time

5    period.

6    Q.  (By Mr. Albritton)  And what is this email about, Dr.

7    Becker?

8    A.    This email is talking about -- again, I find in here

9    some evidence of what Mr. Racz was willing to accept or was

10   looking for in terms of consideration for an interest in his

11   patents.

12   Q.   All right.

13          MR. ALBRITTON:   Mr. Lee, let's go down into the

14   body of the first page there.  And if you would, highlight

15   for us the patent number that's referenced.

16   Q.  (By Mr. Albritton) Dr. Becker, what is that patent

17   number?

18   A.    This is the 7,334,720.  That's the patent -- the first

19   of the patents in this case to issue.

20   Q.   All right.

21          MR. ALBRITTON:   Mr. Lee, if you would go to Page 7

22   of that same document.  And if you would, bring up the

23   highlight and blow up for the Ladies and Gentlemen of the

24   Jury the last entry to the last statement.

25   Q.   (By Mr. Albritton) Dr. Becker, what does that say?

1    A.   So this is -- Mr. Racz is the author of this, so this is

2    Mr. Racz saying:  My intention is to realize a return on the

3    investment I have made over the last 10 years through the

4    sale or the licensing of my patent.  And that's the '720

5    patent.

6    Q.   And why is this relevant to you, Dr. Becker?

7    A.   Again, this gives us on the ground at the time evidence

8    of what Mr. Racz would have -- was looking for in terms of

9    consideration or value for an interest in the patent.

10   Q.   All right.  Dr. Becker --

11            MR. ALBRITTON:  Mr. Lee, excuse me, if you would,

12   please bring up Defendant's Exhibit No. 205, please, sir?

13            And if you would, first, pull up the first entry

14   that starts this intellectual property.

15   Q.   (By Mr. Albritton) Dr. Becker, if you would, walk us

16   through that first clause on this document?

17   A.   So this is a -- a document or a contract -- proposed

18   contract between a company called Saranite Devices, LLC, and

19   Mr. Racz.

20   Q.   Okay.

21   A.   And it's -- it's an intellectual property purchase and

22   sale agreement.  So the subject of this agreement is the

23   buyer is buying or seeking to buy the patent and patent

24   applications, and Mr. Racz is selling them.

25   Q.   Okay.

1          MR. ALBRITTON:  If you would, Mr. Lee, bring up

2    under the -- the first recital.  You need to go up, I'm

3    sorry, Mr. Lee, to the first recital.  Thank you, sir.

4    Q.   (By Mr. Albritton) Now, what does the first recital

5    indicate to you, Dr. Becker?

6    A.   Well, it indicates that the seller is Mr. Racz, so he's

7    saying I -- he owns certain rights and certain patents, and

8    those are the patents that -- and patent applications, so

9    that's what at issue in this case.

10        And he desires to sell to buyer, and buyer desires to

11   purchase those rights.  So this is a contract that's, you

12   know, giving us some visibility into a real negotiation for

13   an interest in these very same patents.

14   Q.   Okay.

15          MR. ALBRITTON:   Mr. Lee, now if you would bring up

16   paragraphs -- Article 1.1 and 1.2?

17   Q.   (By Mr. Albritton) What does 1.1 show, and how does that

18   matter to your analysis, Dr. Becker?

19   A.   Well, this gives us the timing of this document, and we

20   see it's November 19th, 2009.  So just mere months after the

21   hypothetical negotiation we have a real negotiation taking

22   place that is going to give me, as an economist, some

23   evidence into the value that Mr. Racz and a real-live buyer

24   was putting on the patents at the time.

25   Q.   Okay.  And what about Paragraph 1. -- or Article 1.2?

```
 1   A.   Well, it's saying that what the buyer is going to get

 2   are the patents and patent applications and anything that

 3   issues or comes out of those, so the continuations of the

 4   patents, which would include the ones that ultimately issued

 5   in 2012.

 6   Q.   Okay.  Dr. Becker --

 7            MR. ALBRITTON:  Mr. Lee, excuse me.  If you would

 8   go to Article 2.1, please, sir?

 9            All right.  If you would pull that out.

10   Q.   (By Mr. Albritton) Dr. Becker, if you would, talk to us

11   about what's contained in Article 2.1 and its significance,

12   please, sir?

13   A.   Yes.  The purchase price here, so this company was going

14   to buy the patent and the patent applications and pay an

15   initial cash payment of $350,000.  And we see elsewhere that

16   there's additional consideration.

17       Mr. Racz retains an interest in essentially 20 percent

18   of any licensing revenues that are generated by this company

19   that would buy them, if they were to have completed this

20   transaction.

21   Q.   Now, why is this important to your analysis, Dr. Becker?

22   A.   This gives me another data point that informs a

23   real-life negotiation on the ground at the time of a business

24   deal that Mr. Racz was apparently willing to do.

25            MR. ALBRITTON:  If you would, Mr. Lee, let's bring
```

1    up Defendant's Exhibit No. 305, and if you would highlight

2    the first half of the page, please, sir?  It's at Bates No.

3    679.  Okay.  Thank you.

4    Q.   (By Mr. Albritton) If you would, identify who this is to

5    and the date?

6    A.   So this is from Mr. Racz.  It's to a company called

7    Latitude Investments, Limited.  It's dated April 28, 2010.

8    Q.   Okay.

9         MR. ALBRITTON:  Now, Mr. Lee, if you would, pull up

10   the first paragraph under Dear Sirs, and the heading

11   Smartflash Project?

12   Q.   (By Mr. Albritton) What do you -- we see there, Dr.

13   Becker?

14   A.   So what I see here is a description of terms that have

15   been agreed between these parties for a loan and -- and the

16   acquisition of a 50 percent stake in the patent and other

17   intellectual property regarding rights to the Smartflash

18   technology.

19   Q.   Dr. Becker, I think I said Defendant's Exhibit 305.

20   This is actually Defendant's Exhibit 350?

21   A.   Yes.

22   Q.   Okay.

23        MR. ALBRITTON:  Now, if you would, Mr. Lee, go down

24   in the definitions section to where it talks about

25   intellectual property rights?

1   Q.   (By Mr. Albritton) What are we looking at there, Dr.

2   Becker?

3   A.   So this is describing what this party would -- who is

4   acquiring a 50 percent stake in the patent and other

5   intellectual property.

6        So they're getting more than just the patents.  They're

7   getting any software and databases and things that they might

8   have, but included within that are the patent and the patent

9   applications.

10             MR. ALBRITTON:   And if you would, Mr. Lee, go to

11   3.3, please, sir?

12   Q.   (By Mr. Albritton) Is this the provision that relates to

13   the financial terms that you've been talking about, Dr.

14   Becker?

15   A.   Yes.  This provides that the -- that this 50 percent

16   interest in the patents is being sold for $200,000.

17   Q.   And what's the significance of this, Dr. Becker?

18   A.   This gives another on the ground at the time real-world

19   data point that I can consider in coming up with an

20   evaluation of what a negotiation for a non-exclusive license

21   would have reasonably provided in June of 2009.

22   Q.   Is it your opinion -- or is it your -- do you believe

23   that it would be improper to not rely on this type of

24   evidence?

25   A.   Well, I think it would be improper to ignore it.  You

1    have to consider it and give it appropriate weight in terms

2    of the -- you know, when it falls in time, which is very

3    close to the hypothetical negotiation date that we're asked

4    to look at.

5    Q.   Did you consider other evidence in this case?

6    A.   I did.

7    Q.   Tell us about that, if you would.

8    A.   Well, primarily, I looked at the question back to this

9    focusing on Mr. Racz's desire to get a substantial return, he

10   said in 2005, and it would give some weight to that, but also

11   look that in 2009 and early 2010, closer to the hypothetical

12   negotiation, those terms seem to have changed and been more

13   sort of lower numbers, but I have considered what those

14   returns would be.

15   Q.   Okay.  Dr. Becker, let's look at Slide No. 26.  What

16   factor are we looking at there?

17   A.   So Factor 15, this is where the hypothetical negotiation

18   comes together.  You asked the question, what's the amount

19   that the licensor, who's Mr. Racz, and the licensee, Apple,

20   would have agreed upon at the time the alleged infringement

21   began, so June 2009.  Let's consider all these factors,

22   consider the evidence that we have from sort of on the ground

23   at the time, and reach a conclusion about what a reasonable

24   number is.

25   Q.   Well, what did you ultimately conclude would be a

```
1    reasonable -- would be reasonable for a license as of that

2    date of the hypothetical negotiation, June 2009?

3    A.    I ultimately concluded that an amount that gave Mr. Racz

4    a -- a return on the investment that he had in light of the

5    evidence of his willingness to sell the -- an interest in the

6    patents for lump-sum amounts, that that would have been

7    acceptable at the time and would be reasonable for Apple to

8    have agreed to.

9    Q.    What's your understanding of the amount of money Mr.

10   Racz had invested as of that time?

11   A.    It's my understanding that it was approximately $3

12   million.

13   Q.    Now, what's the basis for that understanding?

14   A.    Well, that number appears in a number of documents.  We

15   saw one earlier that -- you know, the total investment in

16   some of the projects may have been higher, but the -- his

17   personal funds invested, and he's the person now in 2009 that

18   owns the patent, I understand his personal investment to have

19   been approximately $3 million over the course of, say, nine

20   years.

21   Q.    Did you do any analysis to determine what would have

22   constituted a return on that investment by Mr. Racz?

23   A.    I did.

24   Q.    Now, what is a rate of return?

25   A.    Well, this is the money you earn on money you invest.
```

1          So if you have your money sitting in a, you know,

2     savings account at the bank and you're earning 3 percent on

3     it these days, maybe 2 percent, that's the rate of return you

4     get on the cash that you have in the bank.

5          If you invest in a company, you expect that at some

6     point that money will come back to you as more money.  That's

7     what we all hope.  And the rate of return is the percentage

8     increase in that nest egg, as it were, every year.

9     Q.   What rates of return did you use in your analysis, Dr.

10    Becker?

11    A.   I considered three rates of return.  First is the bar on

12    the left is 26 percent.  That's a rate of return that I got

13    looking at data kind of relevant to the time period around

14    2009 and going back over the time that Mr. Racz had made his

15    investment.  26 percent was an average -- what's called a

16    venture capital rate of return.

17         Venture capital investments are very risky, a lot of

18    times in high tech.  But because they're risky, they generate

19    high rewards.  High risk, high reward.  And the evidence says

20    that over this time period, a 26 percent annual rate of

21    return.  Every year you get 26 percent on your money is

22    something that would -- was consistent with what venture

23    capitalists were earning at the time.

24    Q.   Okay.  What about the middle bar in that bar graph?

25    A.   So the middle one is the -- is 17.3 percent.  That's --

1   I looked at what the computer industry had earned.  So in

2   around -- sort of as of the end of 2008, looking back 10

3   years, which is the period of time that Mr. Racz had made his

4   investments, what was the computer industry, the industry

5   that Apple was in, what was it earning, and you see an

6   average of 17.3 percent over that time period.

7   Q.   Okay.  And what about on the right side?

8   A.   The right side is more of just sort of a basic safe

9   return.  6.2 percent is the average of the prime rate over

10  this same time period.

11  Q.   Okay.  Dr. Becker, what did you conclude were the

12  amounts as of June 2006 that would have provided Mr. Racz

13  with these various rates of return on his investment in

14  these -- in this technology?

15  A.   Okay.  I think you said June 2006?

16  Q.   2009, I apologize.

17  A.   So as of June 2009, if I take $3 million, invest it 10

18  years before June of 2009, and let that investment earn on

19  the left-hand bar 26 percent every year, and it's

20  compounding, so you're -- you're earning money on the money

21  you've earned, that by the time you get to June of 2009, is

22  $30.2 million.  And if you do that same process with the

23  computer industry rate of return, you get 14.7 million.  And

24  at the prime rate it's 5.5 million.

25  Q.   Okay.  Do these represent the amounts that Apple would

```
 1    have reasonably needed to pay to provide Mr. Racz with these
 2    rates of return?
 3    A.    No.   These are what I'd say sort of the total market
 4    value, not the piece that Apple would be buying.
 5    Q.    Well, what does that mean, and why is that important?
 6    A.    Well, we have to recall that what Mr. Racz would be
 7    granting to Apple and all that they're entitled to get at
 8    that negotiation is what's called a non-exclusive license.
 9    Q.    What does that mean, a non-exclusive license?
10    A.    Sometimes I describe it as, you know, imagine Mr. Racz
11    has his patent.  If he -- if he's giving an exclusive license
12    to somebody, he's going to give them -- hand them the patent
13    and he doesn't have it anymore.
14         A non-exclusive license, you make a Xerox copy of the
15    patent, and you give it to somebody and say you have the
16    right to use this, but, the patent owner, still have it and I
17    can go license it to anyone else that I want to license it
18    to.  So it -- it's not a hundred percent of the value.  It's
19    just the right to use and others can -- he still has the
20    patent.
21    Q.    Well, how did you go about determining the portion of
22    these total amounts that is reasonable for a license to
23    Apple?
24    A.    Well, I looked at the markets that -- based on documents
25    and business plans at the time Mr. Racz had identified as the
```

1  markets that he thought were relevant for the Smartflash

2  technology.

3  Q.   Okay.  Do you have a slide about that, Dr. Becker?

4  A.   I do.  So if we look at the smartphone, MP3 player, and

5  PC markets.  These are three markets that have been

6  identified by Mr. Racz in his documents back at the time, as

7  the markets that were relevant to his technology.

8       So there's people that he thinks he can go license in

9  those industries.

10      I looked at Apple's market share in each of those

11  markets as of June of 2009, and we find that when you combine

12  the three markets together, Apple has 20.9 percent of this

13  relevant market as identified by Mr. Racz.

14 Q.   Well, what did you -- what did you conclude after

15  considering this evidence, Dr. Becker?

16 A.   Well, since Apple is getting a non-exclusive license and

17  Mr. Racz would still have the rest of the market available to

18  him to go out to license, rather than having this sort of

19  30.2-million-dollar or $14.7 million, we have to take Apple's

20  piece of that, which is -- or the 20 percent share of that is

21  6 million for the substantial return, the venture capital

22  rate of return, or 2.9 million for the computer industry rate

23  of return.

24 Q.   Okay.  And what did you ultimately conclude would be,

25  based on your analysis, the reasonable royalty?

1   A.   I concluded the -- we'd saw before, 4-and-a-half-million

2   dollars, and I got that as essentially the midpoint between

3   the computer industry rate of return and a venture capital

4   rate of return, giving him something better than the industry

5   that he's even licensing into, namely the computer industry,

6   so he's going to do better than that industry on his money,

7   but not all the way to a venture capital rate of return,

8   which I thought in light of the fact that the previous

9   efforts to license the -- and commercialize the technology

10  had generated losses, no return at all, I thought that was

11  too extreme to give him the venture capital rate of return.

12        So I concluded that 4-and-a-half-million dollars was

13  the midpoint of those and would be reasonable.

14        MR. ALBRITTON:  Pass the witness, Your Honor.

15        THE COURT:  Ladies and Gentlemen, before the

16  Plaintiff cross-examines Dr. Becker, we're going to break for

17  lunch.

18        Please take your notebooks with you to the jury

19  room.  Don't discuss anything about the case.  Follow my

20  other instructions, if you will.

21        We're going to try to keep this to approximately 30

22  minutes so that we can keep moving forward.  With these

23  instructions, you're now excused for lunch.

24        COURT SECURITY OFFICER:   All rise for the jury.

25        (Jury out.)

1          THE COURT:   All right.   Defendants, you have an

2     hour and 22 minutes remaining.

3          All right.   We stand in recess for lunch.

4          (Lunch recess.)

5                       CERTIFICATION

6

7          I HEREBY CERTIFY that the foregoing is a true

8     and correct transcript from the stenographic notes of the

9     proceedings in the above-entitled matter to the best of our

10    abilities.

11

12

13    /s/_____
      SHEA SLOAN, CSR, RPR                    February 23, 2015
14    Official Court Reporter
      State of Texas No.:   3081
15    Expiration Date:   12/31/16

16

17

18

19

20    /s/_____
      SHELLY HOLMES, CSR, TCRR
21    Deputy Official Court Reporter
      State of Texas No.:   7804
22    Expiration Date  12/31/16

23

24

25