```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                         TYLER DIVISION

 3
     SMARTFLASH LLC and            )
 4   SMARTFLASH TECHNOLOGIES          DOCKET NO. 6:13cv447
     LIMITED
 5
          -vs-                     )
 6
                                          Tyler, Texas
 7                                )       12:43 p.m.
     APPLE INC.                           February 23, 2015
 8

 9
                        TRANSCRIPT OF TRIAL
10                      AFTERNOON SESSION
                 BEFORE THE HONORABLE RODNEY GILSTRAP,
11                 UNITED STATES DISTRICT JUDGE

12

13                    A P P E A R A N C E S

14

15   FOR THE PLAINTIFFS:

16
     MR. BRADLEY W. CALDWELL
17   MR. JASON D. CASSADY
     MR. JOHN AUSTIN CURRY
18   CALDWELL CASSADY & CURRY
     2101 Cedar Springs Rd., Ste. 1000
19   Dallas, Texas  75201

20

21   MR. T. JOHN WARD, JR.
     WARD & SMITH LAW FIRM
22   P.O. Box 1231
     Longview, Texas  75606
23

24

25
```

```
 1   FOR THE DEFENDANTS:

 2
     MR. JAMES R. BATCHELDER
 3   ROPES & GRAY LLP
     1900 University Ave., 6th Floor
 4   East Palo Alto, California  94303-2284

 5

 6   MS. CHING-LEE FUKUDA
     MR. KEVIN J. POST
 7   ROPES & GRAY LLP
     1211 Avenue of the Americas
 8   New York, New York 10036-8704

 9

10   MR. ERIC ALBRITTON
     ALBRITTON LAW FIRM
11   P. O. Box 2649
     Longview, Texas 75606
12

13

14

15
     COURT REPORTERS:        MS. SHELLY HOLMES, CSR, TCRR
16                           OFFICIAL COURT REPORTER
                             shelly_holmes@txed.uscourts.gov
17
                             MS. SHEA SLOAN, CSR, RPR
18                           OFFICIAL COURT REPORTER
                             shea_sloan@txed.uscourts.gov
19

20

21

22

23

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25
```

```
 1                        P R O C E E D I N G S

 2              (Jury out.)

 3              COURT SECURITY OFFICER:  All rise.

 4              THE COURT:  Be seated, please.

 5              All right.  Let's bring in the jury, please.

 6              COURT SECURITY OFFICER:  All rise for the jury.

 7              Your Honor, it will be just a moment.

 8              THE COURT:  All right.

 9              (Jury in.)

10              THE COURT:  Please be seated.

11              All right.  Mr. Cassady, you may proceed with the

12     cross-examination of the witness.

13                        CROSS-EXAMINATION

14     BY MR. CASSADY:

15     Q.   My name is Jason Cassady, and I represent Smartflash.

16          We've met before, haven't we?

17     A.   We have.

18     Q.   Okay.  We met at both of your depositions in this case,

19     correct?

20     A.   Yes.

21     Q.   Now, you're no stranger to litigation, right?

22     A.   Correct.

23     Q.   Okay.  In fact, about 75 percent of your work is in

24     litigation; isn't that true?

25     A.   It is.
```

1    Q.    And today, it's probably a little bit more than that

2    now, right?

3    A.    I think, yes -- I mean, certainly the last couple of

4    months has been higher than that.

5    Q.    Okay.  Now, when I took your deposition, you were being

6    paid $550 an hour, but I think I just heard during your

7    direct you got a raise and now are getting 595?

8    A.    Well, every January 1st, our firm changes their rates,

9    and that happened this January 1st like every year.

10   Q.    Okay.  So it's $595 now?

11   A.    It is.

12   Q.    Okay.  Now, you understand what an interrogatory is,

13   right?

14   A.    Yes.

15   Q.    An interrogatory is a tool for discovery in a case like

16   this where a party like Smartflash could ask a party like

17   Apple a question in writing, right?

18   A.    Yes.

19   Q.    And Apple's required to respond, correct?

20   A.    They are.

21   Q.    Okay.  Now, Dr. Becker, you're not here to provide a

22   technical opinion; isn't that right?

23   A.    Correct.

24   Q.    And you're not here to be the survey expert, right?

25   A.    That's correct.

1    Q.    Now, you're aware that damages in a patent case is

2    covered by statute; isn't that fair?

3    A.    Yes.

4    Q.    And do you know the -- the number of that statute?

5    A.    It's 284.

6    Q.    U.S.C. 284?

7    A.    Yes, U.S.C. 284.

8          MR. CASSADY:   And if you could pull up, please --

9    thank you.

10   Q.    (By Mr. Cassady)   Now, Dr. Becker, is this 35 U.S.C.

11   284?

12   A.    It is.

13   Q.    And the bottom of it, what's in highlighting, is -- it

14   says:   But in no event less than a reasonable royalty for the

15   use made of the invention by the infringer.

16         Did I read that correctly, Dr. Becker?

17   A.    You did.

18   Q.    And in this case, Smartflash actually asked Apple what

19   the answer to that question is.   Did you know that, sir?

20   A.    I'm not aware if they asked this specific question.

21   Q.    In an interrogatory like we just talked about?

22   A.    I understand that there could have been an interrogatory

23   that had something to do with this, but I -- I don't have it

24   committed to memory.

25   Q.    Did you review the interrogatories in this case?

1    A.    I - I read all -- I think all of the interrogatories in

2    this case.   There are quite a few.

3    Q.    You just don't remember this one?

4    A.    I don't remember this one specifically, no.

5         MR. CASSADY:   Okay.   If you could get Slide 5,

6    please, sir?

7    Q.    (By Mr. Cassady)   I'll go ahead and read along, and you

8    make sure that I got it right, okay?

9    A.    All right.

10   Q.    Identify the actual or estimated value of the accused

11   features to Apple's devices and describe the methodology and

12   facts used for each valuation.

13        If Apple does not know the actual value and has not

14   estimated the value of the accused features, describe the

15   methodology and facts that Apple uses to estimate the value

16   of an individual feature.

17        Did I read that right, sir?

18   A.    You did.

19   Q.    Okay.   Do you know what Apple said?

20   A.    I don't know specifically.   My guess is that they would

21   have said that they don't estimate the value of individual

22   features and don't think that they can be estimated, given

23   the nature of their products.

24   Q.    Well, let's look at what they said.

25        MR. CASSADY:   Slide 6, sir?

1   Q.   (By Mr. Cassady)  Apple responds that it does not

2   presently know and has not estimated in the ordinary course

3   of business a dollar value of any of the accused features on

4   its accused products, and does not have a standard

5   methodology used in the ordinary course of business to

6   estimate the value of an individual feature.

7        Did I read that right?

8   A.   You did.

9   Q.   Okay.  So the answer is I don't know, right?  That's

10  what Apple is saying?

11  A.   I think that's a fair characterization that's -- they

12  said more than just I don't know, but that's part of what

13  they said.

14  Q.   Okay.  And you would agree that you yourself have enough

15  expertise to estimate the value of the accused features in

16  this case to Apple; isn't that right, sir?

17  A.   I think I have, yes.

18  Q.   Okay.  But instead, in this case, you believe that the

19  accused features are so intertwined with so many features

20  that one cannot isolate it at a single incremental value;

21  isn't that right, sir?

22  A.   Yes.

23  Q.   And were you here during Dr. Dhar's testimony?

24  A.   Yes.

25  Q.   And you know Dr. Dhar runs surveys, right?

1   A.   He does.

2   Q.   And Dr. Dhar didn't run a survey to determine the

3   incremental value of the infringement to Apple, did he?

4   A.   He did not.

5   Q.   Did you ask him to do that, sir?

6   A.   No.

7   Q.   Did Apple ask him to do that, sir?

8   A.   I'm not aware that they did.

9   Q.   You don't know whether they did or not?

10  A.   I -- it's my understanding that they did not, but I

11  haven't been present in all their conversations with Dr.

12  Dhar, so I can't -- I can't go beyond what I know.

13  Q.   Okay.  Well, let's -- let's look at what he said.

14          MR. CASSADY:  Can we go to Slide 56, please, sir?

15  Q.   (By Mr. Cassady)  And this is Dr. Dhar's deposition:

16       Did Apple ask you to run a survey to determine the

17  incremental value of the patented feature to Apple?

18       And he said:  They did not.

19       Does that clear it up?

20  A.   Yes.

21  Q.   Okay.  Now, you'll agree with me, sir, that patent cases

22  are expensive?

23  A.   Yes.

24  Q.   In fact, an average patent case can cost $6 million;

25  isn't that right?

1  A.   Yes.

2  Q.   And you wouldn't be surprised if Apple spent more than

3  you're telling this jury is the damages in this case on just

4  its lawyers; isn't that fair?

5  A.   On just its what?

6  Q.   Lawyers.

7  A.   I can't say.  That wouldn't surprise me.  Over the

8  course of this entire case, it's -- it's been a very large

9  case.

10  Q.   All right.  So it wouldn't surprise you if Apple spent

11  more on lawyers than the amount of money that you're saying

12  that this patent is worth in this case?

13  A.   That wouldn't surprise me, no.

14  Q.   But, Dr. Becker, you agree that surveys can be used to

15  assess damages; isn't that fair?

16  A.   They can be in certain circumstances.

17  Q.   In fact, you yourself have previously relied on surveys

18  to estimate damages in patent cases, right?

19  A.   I've used them as one of many data points that I've

20  considered, yes.

21  Q.   And we both know Apple agrees that surveys can be used

22  to assess patent damages; isn't that right?

23  A.   Yes.

24  Q.   I mean, Apple has, in fact, used surveys when it was

25  valuing its patents that it said other people infringe; isn't

1    that right?

2    A.    I'm aware of that, yes.

3    Q.    And all that being said, isn't it true that you didn't

4    talk to anyone at Apple from Apple's market research and

5    intelligence group or otherwise kind of known colloquial as a

6    survey group?

7    A.    That's correct, I didn't.

8    Q.    And you agree that Apple has a survey group, right?

9    A.    Oh, sure.  We've seen some of their surveys.

10   Q.    You were here during Mr. Muller's testimony?

11   A.    I was not.

12   Q.    Did you review the transcripts?

13   A.    Yes.

14   Q.    Did you see that there was some question mark about

15   whether Apple actually has a survey group?

16   A.    I don't recall the specifics of that.  I -- maybe they

17   were just over the semantics of survey group, but I

18   understand there are people in marketing at Apple who at

19   least are consumers of surveys and commission them.

20   Q.    Okay.  So we know that they exist?

21   A.    Yes.

22   Q.    Okay.  And you didn't speak to anybody in that

23   department, right?

24   A.    No.

25   Q.    You certainly didn't speak to the head of that

1   department, right?

2   A.   No.

3   Q.   Mr. Art Rangel?

4   A.   Did not.

5   Q.   Do you know where in the chain at Apple he is?

6   A.   No.

7   Q.   Okay.  Do you know who he reports directly to?

8   A.   No.

9   Q.   Didn't ask anybody about that?

10  A.   No.

11  Q.   And it's true, sir, that in this case, you were never

12  denied access by Apple or Apple's counsel to anybody at

13  Apple, right?

14  A.   That's correct.  I feel like I had pretty free access.

15  Q.   So anybody you could have talked to, it sounds like,

16  you -- Apple wouldn't -- would have allowed that.

17          MR. CASSADY:  Strike -- strike that.

18  Q.   (By Mr. Cassady) Let me ask, anybody that you wanted to

19  talk to, Apple would have let you talk to them, right?

20  A.   I -- I can't think of anybody that if I had given a good

21  reason to talk to them, they wouldn't have arranged for that.

22  Q.   Okay.  Now, we've seen some of these surveys, but I want

23  to ask you some questions about some of the surveys you

24  presented, fair?

25          MR. CASSADY:  If we could go to Slide 59, please,

1    sir.

2    Q.    (By Mr. Cassady) I want to make sure everybody

3    understands how these surveys get run.

4         Dr. Becker, you agree that Apple runs these surveys on a

5    quarterly basis across the iPod Touch, the iPhone, and the

6    iPad, right?

7    A.    That appears to be the case from the -- oh, gosh --

8    thousands of pages of these that I've looked at that, but I

9    see them on multiple quarters, and they are focused on

10   different products.

11   Q.    And you agree, sir, that apps are one of the important

12   features that go into the purchase decision of people who buy

13   these devices, right?

14   A.    Sure.  One of many.  But, yes, definitely, apps, broadly

15   defined, yes.

16   Q.    Okay.

17           MR. CASSADY:  If you'd go to Slide 63, please, sir.

18   Q.    (By Mr. Cassady) And here's just an example.

19        Many features are important in the purchase decision;

20   however, web capabilities, ease of use, and apps are rated

21   the highest.

22        Do you see that?

23   A.    I do.

24   Q.    Okay.  And I think during your testimony, if I

25   understood you correctly, you were saying that it's just the

1   use of apps that people are answering in the survey; is that

2   fair?

3   A.   No.  No.  I don't think that's a fair characterization

4   of what I said.

5   Q.   When you presented -- let me see if I can find it for

6   you real fast.

7       And you agree these are all general pages that come from

8   the App Store, right, or the apps --

9          MR. CASSADY:  Strike that.

10   Q.   (By Mr. Cassady) You agree that all the pages -- I'm

11   flipping through here -- are from the surveys Apple runs,

12   right?

13   A.   Yes.

14   Q.   All right.  I think you were asked some questions about

15   a survey that looked very similar to this, and you said it

16   doesn't say "downloaded;" it just says "wanted to use apps,"

17   right?

18   A.   Right.  One of the things that they test is questions

19   like wanted to use apps, but there were -- we saw on some

20   other slides that there were questions asking about different

21   aspects, like the quantity, quality of the apps as well.

22   Q.   But when you were talking about this specific survey to

23   the jury, you said "wanted to use apps," doesn't even say

24   "download," and has nothing to do with download; isn't that

25   fair?

1    A.    I think I said it doesn't have -- it is not specifically

2    about the manner in which the app is purchased.

3    Q.    Okay.

4              MR. CASSADY:   If you could, please go to Slide 83,

5    please, sir.

6    Q.    (By Mr. Cassady) Now, it's a little small on the top

7    left, but you agree with me that this slide says the

8    importance of the ability to download and use apps is very

9    high in most countries.

10             You see that?

11   A.    Oh, sure, yeah.   I mean, if -- they've got to come down

12   onto the device in order to use them, so I would agree with

13   that.

14   Q.    And you agree that 92 percent or 91 percent, depending

15   on the product, consider it very important or at least

16   somewhat important, the ability to download and use apps;

17   isn't that fair?

18   A.    That is fair.

19   Q.    Now, you understand that there have been many surveys

20   produced in this case by Apple, right?

21   A.    Yes.

22   Q.    And those surveys are -- are in exhibits that are

23   entered into this case, such as 103.028; is that fair?

24   A.    Yes.

25   Q.    Have you actually looked through the entire exhibit,

1    which is PX 103.028?  And to refresh your memory, it's the

2    exhibit that relates to the iPhone buying.

3    A.    Right.  I can't say that I've looked at every page.  I

4    think it's over 3,000 pages long, if my recollection serves

5    me correctly.  But I have a good spent some -- a good bit of

6    time with that exhibit.

7    Q.    And you would agree with me that PX 103.028 is a

8    compilation of many surveys run on a quarterly basis by

9    Apple, fair?

10   A.    Yes.

11   Q.    Okay.  Now, Dr. Becker, you testified about Dr. Dhar's

12   surveys that he ran, fair?

13   A.    Yes.

14   Q.    Okay.  And I want to focus you on the survey where Dr.

15   Dhar first asked if someone was alone motivated and then

16   followed that up with asking:  Are you motivated by other

17   features?  Is that fair?

18   A.    Yes.

19   Q.    Do you think it was a little misleading by Dr. Dhar to

20   ask somebody if they were alone motivated only to follow it

21   up by other questions leaving out the word alone and just

22   asking about motivation?

23   A.    No, I didn't find that misleading.  I think that what I

24   found was that the premise that you could ask the alone

25   motivate question the way it was without following it up or

1    doing any kind of testing the way Dr. Wecker did, I thought

2    that was a little strange.  But I didn't find anything

3    misleading about Dr. Dhar's presentation.

4    Q.   Well, you'd agree with me, sir, that Dr. Dhar didn't

5    allow somebody to read the alone motivate question, answer

6    it, and then go to the next question and realize that Dr.

7    Dhar must have been asking something different, because now

8    he's asking about motivation.

9        He didn't let somebody go back and re-answer the alone

10   motivate question, did he?

11   A.   That's correct.  He didn't.  And in the context of what

12   he was trying to demonstrate, or at least test, the

13   hypothesis he was trying to test, I think that was the

14   appropriate construction of that question.

15   Q.   Okay.  Now, Dr. Dhar -- sorry.  Dr. Becker.  I

16   apologize.

17       Dr. Becker, you said during your testimony that

18   infringement began when there was a change in the iTunes

19   Store; is that fair?

20   A.   Yes.

21   Q.   Now, do you know whether or not there was a change on

22   the iPhone, as well, that corresponded with that iTunes Store

23   change?

24   A.   I don't know one way or the other.

25   Q.   You just don't know?

1  A.    I don't know.  That gets into the technical aspect of

2  what had to change on the iPhone, if anything.  But in terms

3  of overall functionality, I'm not aware of anything that

4  changed.

5  Q.    Okay.  And you agree, sir, that the application that all

6  the patents in this case point to was filed in 1999, right?

7  A.    Yes.

8  Q.    Okay.  And that application has to include all of the

9  disclosure of the invention, doesn't it?

10  A.    It does.

11  Q.    Okay.  And so any idea that was in a patent that issued

12  in later years must be disclosed in the specification of that

13  application in 1999, right?

14  A.    I understand that to be the case.

15  Q.    Okay.  Which means if an -- if a patent issues later,

16  that doesn't mean Mr. Racz invented it later; that means he's

17  simply getting the claims from the application he filed in

18  1999, right?

19  A.    I understand that.

20  Q.    Okay.  Well, sir, you insinuated, at least -- at least I

21  thought you did -- to this jury, that Apple made a change,

22  and that's why infringement began; is that fair?

23  A.    As I understand the testimony of -- that I've heard, is

24  that it was -- even though the patent had already issued, the

25  functionality that was added, that is -- the first instance

1    of infringement is when the -- when movies and TV shows were

2    available for rent.

3         So some change or some offering of that service is what

4    triggers the infringement in my understanding.

5    Q.   Okay.  And one of the things you said was that the Apple

6    iPhone had been very successful before these inventions were

7    implemented; isn't that fair?

8    A.   Before the features that are pointed to as the

9    infringing features were added to the system, yes.

10   Q.   Now, Dr. Becker, when the '772 issues in late 2012,

11   you'd agree with me Apple is already infringing that claim --

12   those patents, right?

13   A.   Well, it's my understanding -- one is, I have to assume

14   for the purpose of my analysis that they're infringing.  It's

15   ultimately going to -- somebody else is going to decide that.

16        But if it's the case that those 2012 patents are valid

17   and infringed, I think -- it's my understanding that the

18   functionality that is being pointed to was present in the

19   iPhone and in the stores before that date.

20   Q.   Do you know when the iPhone was released, sir?

21   A.   2007.

22   Q.   Do you know when the App Store was released?

23   A.   Gosh, I -- I used to know exactly that, but it was, I

24   think, in late '08.

25   Q.   Isn't it true, sir, that the functionality that

1   infringes the '772 patent in this case is the very

2   functionality that Apple put in the phone in 2008 in the App

3   Store?

4   A.   Well, again, the specific functionality that is being

5   pointed to as infringing, the nuts and bolts of that, I'd

6   leave that to the technical experts.

7   Q.   So it wouldn't be fair to tell this jury that the time

8   from 2007 to 2012 where the iPhone was successful, without

9   the invention, that wouldn't be a fair statement if the

10  actual infringement feature was implemented in 2008, right?

11  A.   Well, there's no infringement of that patent back in

12  2008.  The -- you know, there are -- there's App

13  Store-related functionality in 2008 when the App Store comes

14  out.  I'm not aware of any evidence that's been put on, that

15  says that that functionality, as of 2008, was infringing or

16  not.  That's the not the focus of that inquiry.

17  Q.   Right.  But we already talked about this, Dr. Becker.

18  In 1999, that's when Dr. Racz put out his application that

19  had all the inventions, right?

20  A.   Well, it -- it has to have described all of the

21  invention as of 1999.

22  Q.   And in 2008, Apple puts out the App Store.  And the only

23  reason that they're not liable for damages is because Mr.

24  Racz was spending money with his partners, millions of

25  dollars, to try and get his patents out of the Patent Office;

1    isn't that fair?

2    A.    Well, I think it's fair that he did not yet have patents

3    on the thing that he described in his application in 1999,

4    and the way the system works is you -- until you have a

5    patent and if somebody is found to infringe it, you don't get

6    to collect any damages.

7    Q.    Right.  So in this situation, Apple gets a free pass on

8    anything that would have been infringing in 2008 to 2012

9    until his claims issue; is that fair?

10   A.    Well, I -- no, I don't think that's fair.  It's -- you

11   say would have been infringing.  It's -- there's no

12   finding -- there's not even an allegation that the system

13   back then was infringing because there's no patent to cover

14   it.

15   Q.    Okay.  Let me maybe back up on this, and let's see if we

16   can get an agreement here.

17        Dr. Becker, you agree you have no idea what change and

18   at what time the App Store that is currently accused, you

19   don't know when that was implemented, right?  You just don't

20   know?

21   A.    When -- when the specific code that Dr. Jones points to

22   as infringing, no, I don't know when they put that in the

23   system.

24   Q.    Okay.  And if that was implemented in 2008, you would

25   agree with me, sir, that if that's the code that's pointed to

1    when the patent actually issues in late 2012, that Apple got

2    to use that for free because there wasn't an issued claim

3    yet?

4    A.   Oh, yeah, sure, that's -- that's the way the system

5    works.

6    Q.   Okay.  And -- and that time period was a time period

7    where Apple was successful with the iPhone, right?

8    A.   Sure.

9    Q.   Okay.  And if that time period is the same functionality

10   that's accused in 2012, that would not be fair to use that

11   time period to say, well, that was successful prior to the

12   invention?

13   A.   You know, if -- if I had been pointing to the -- the

14   very same functionality and saying, look, this -- this

15   created the success, but it wasn't covered by a yet issued

16   claim, I would agree with you, that wouldn't be fair.  But

17   that's not what I was pointing to.

18   Q.   Okay.  Dr. Becker, you showed the jury a number of

19   exhibits that were documents showing some kind of value of

20   the -- of the patented features or the patents as -- from Mr.

21   Racz's perspective; is that fair?

22   A.   Yes.

23   Q.   Did you actually do anything to confirm that those

24   documents were from Mr. Racz or -- or that Mr. Racz agreed

25   with those documents?

1    A.    I think I looked at the evidence that was available in

2    the record to let me know sort of which side of the table he

3    was on on some of those things.  I know that one of the

4    documents I presented he had been offered 150,000 pounds for

5    the technology and had rejected that.  Others, it appears

6    from the record, that he was in agreement with and willing to

7    do the deal.

8    Q.    Well, let me ask it this way, Dr. Becker:  The ones you

9    actually showed to the jury, did you confirm that those were

10   ones that Mr. Racz himself wrote or that he acquiesced to?

11   A.    Well, where it was -- I think in the ones I presented,

12   some of them were emails under his hand, and other ones I

13   looked at the evidence to determine sort of what the genesis

14   of the document was.  And as I said, some of them were deals

15   that he had agreed to or would -- apparently was willing to

16   do, and others were deals that he was not willing to do but

17   they provided evidence of what others were willing to offer.

18   Q.    So that's a no, it doesn't matter whether it was Mr.

19   Racz acquiescing to it or not?

20   A.    That's more of a -- it's, no, the evidence that I

21   presented was not exclusively coming from Mr. Racz.

22   Q.    Okay.  One of the documents that you showed --

23            MR. CASSADY:  And if we could, I just want to see

24   the top portion of DX 214?

25   Q.    (By Mr. Cassady)  Now, Dr. Becker, do you know who wrote

1    this document?

2    A.    I don't know specifically.  I've seen emails back and

3    forth with Mr. Racz and someone else that indicate that he

4    was maybe reviewing this, but I don't know specifically who

5    authored it.

6    Q.    You don't know the name of the individual?

7    A.    I don't recall.  I did -- I think I did at one point.

8    Q.    Okay.  Isn't it true, sir, that when this draft was sent

9    to Mr. Racz, that he, in fact, was so offended, that he

10   didn't even respond to this draft offer?

11   A.    I'm not aware of that, no.

12   Q.    You didn't know that?

13   A.    Well, I know that there was a -- there was an offer

14   maybe in early 20 -- 2010 that he rejected, but I'm not aware

15   of evidence that when this formulation of the deal was being

16   put together, that he was, you know, quote, offended by it.

17   I --

18   Q.    Well, you're not going to show the jury any email or any

19   document that shows that Mr. Racz approved of this evaluation

20   or that he even responded to this evaluation when it was sent

21   to him, are you, sir?

22   A.    This document?  I can't say specifically, no.

23   Q.    Now, you'd also agree with me that after that document

24   is made, that the '720 patent issues, correct?

25   A.    After this document?

1   Q.   Yes.

2   A.   The -- well, you have the patents in 2012 issue.

3   Q.   Correct.  So after this document, the '772 patent

4   issues, correct?

5   A.   You said '720.

6   Q.   I apologize '772?

7   A.   That's what was stumping me.

8   Q.   '772 patent issues after that document, correct?

9   A.   Yes.

10  Q.   The '221 patent issues after that document, correct?

11  A.   Yes.

12  Q.   Okay.  And you agree with me that the accusations of the

13  App Store in this case, which are a lot of value, is from the

14  '772 patent that issued after that document; isn't that fair?

15  A.   It is.

16  Q.   Now, you also showed DX 215 --

17        MR. CASSADY:  Could you pull that up, just the top

18  of it, sir?  Just the top, the from and the to, please?

19  Q.   (By Mr. Cassady)  Now, this one is dated October 19th,

20  2005; isn't it, sir?

21  A.   Yes.

22  Q.   Now, as of this email, the '720 hasn't issued either?

23  A.   That's correct.

24  Q.   And the '772 hasn't issued, has it?

25  A.   Correct.

1  Q.   And the '221 hasn't issued?

2  A.   Correct.

3        MR. CASSADY:  Now, can we go ahead and get DX 205,

4  please, sir?  Just pull up the top for me.

5  Q.   (By Mr. Cassady)  You also showed this one.  This is a

6  deal with Saranite; isn't that true?

7  A.   It is.

8  Q.   Okay.  And this is an agreement that was never finally

9  executed; isn't that correct, sir?

10  A.   It's my understanding it wasn't finally executed, but it

11  was close.

12  Q.   Okay.  And this is one of the agreements that you put in

13  front of the jury and said it showed that Mr. Racz had a --

14  an interest in having lump-sum agreements; isn't that fair?

15  A.   Yes, that he was willing to accept for at least an

16  interest in the patents, a lump sum.

17  Q.   And that's -- that's the key thing here.  This agreement

18  is just for an interest in the patent for a lump sum; isn't

19  that true, sir?

20  A.   Right, and that's what Apple would be getting in their

21  license.

22  Q.   So Apple was going to pay a lump sum and a running

23  royalty?

24  A.   No, Apple gets -- in the structure of my license, they

25  pay a lump sum, and they get a non-exclusive right and

1    interest in the -- in the -- practicing the patented

2    inventions.

3    Q.    And you'd agree, sir, that this agreement -- this

4    agreement that we're looking at on the screen right now, Mr.

5    Racz gives up a portion and continues to have an interest

6    on a -- on a percentage or running royalty basis; isn't that

7    fair?

8    A.    Well, it's -- I would say he continues to have an

9    interest.  To the extent that Saranite is able to go get any

10   licenses, Mr. Racz would share in those.

11   Q.    Would you agree, sir, that any lump-sum payment that's

12   part of that agreement or any agreement you showed the jury,

13   all have additional fees or additional payments to Mr. Racz

14   as a percentage of what comes off of his patents; isn't that

15   fair?

16   A.    Either -- either he's getting a designated percentage of

17   what the party who purchases the patent might do, or he's

18   just retaining a portion of the patent itself.  Slight

19   difference.  But in either effect, he has an ongoing interest

20   in the patents.

21   Q.    Mr. Racz didn't just sell off the patent; he wasn't

22   offering to just sell it off in whole and not retain an

23   interest, fair?

24   A.    Fair.

25   Q.    Okay.  Now, you and Dr. Dhar have criticized the

1   questions in the survey by saying over and over again that

2   Mr. Racz didn't invent all the ways of purchasing apps; is

3   that fair?

4   A.   Yes.

5   Q.   Now, you know that's not really what the survey tested;

6   isn't that right, sir?

7   A.   The survey was testing the capability to purchase apps.

8   Q.   Right.  The survey actually says:  The capability to

9   purchase apps from Apple's App Store; isn't that true, sir?

10  A.   Well, sure.  It has to come from the App Store, from

11  Apple.

12  Q.   Okay.  So you weren't trying to mislead the jury by

13  leaving that phrase off the question that you described every

14  time, right?

15       I noted you never said from the Apple App Store anytime

16  you described it.  That's fair, right?

17  A.   Oh, I think that's fair, yes.

18  Q.   Okay.

19  A.   But I was -- certainly wasn't trying to mislead and

20  suggest that it was, you know, apps in general.  It's --

21  clearly, we're talking about Apple here.

22  Q.   Now, you understand that the functionality of purchasing

23  apps from the App Store works in a very particular way,

24  right?

25  A.   Yes.

1    Q.    And you're not trying to suggest to this jury that that

2    particular way doesn't infringe, fair?

3    A.    That's true.  I have to assume for my analysis that it

4    does.

5    Q.    And you're not aware of any limitation in Smartflash's

6    asserted claims that is sometimes, but not always, met when a

7    user purchases an app from the App Store, right?

8    A.    That's correct.  I'm not.

9    Q.    And Apple has provided no witness who has made that

10   claim, right?

11   A.    I'm not aware of any.

12   Q.    And you're not saying that Smartflash's claims prohibit

13   any aspect of the App Store beyond the capability of

14   purchasing apps, right?

15   A.    That's right.

16   Q.    And you'd agree that for the significant elements of the

17   iTunes Store or the App Store, you understand that those

18   elements could be implemented in Dr. Jones's non-infringing

19   alternative, right?

20   A.    It could be, yes.

21   Q.    Now, you'd agree, sir, that Apple doesn't have a

22   cornerstone on great inventions, right?

23   A.    I understand your question.  I would say no.  There are

24   many, many inventions out there.

25   Q.    Okay.  Now, sir, which one of the Georgia-Pacific

1  factors relates to non-infringing alternatives?

2  A.   Factors 9 and 10 is where they're typically discussed.

3  Q.   And you understand that Apple agrees that it has not

4  identified any design-arounds or non-infringing alternatives

5  in this case, right?

6  A.   Right.  It has not identified one.

7  Q.   And Apple hasn't made any changes to its product because

8  of this lawsuit, right?

9  A.   Not aware of any.

10  Q.   And, Dr. Becker, when I took your deposition, you didn't

11  even know what Apple's competitors, like Samsung, thought

12  about the competitive advantage the App Store gave them;

13  isn't that fair?

14  A.   I think that's fair.  I hadn't investigated what Samsung

15  thought about Apple's store.

16  Q.   Okay.  Now, Dr. Becker, you agree with me that a small

17  company can come up with a very huge and valuable invention,

18  right?

19  A.   It can.

20  Q.   You agree that even a single person with no resources

21  can come up with a very valuable invention; isn't that fair?

22  A.   That happens, yes.

23  Q.   Now, you understand that Smartflash and Mr. Racz

24  disagrees with your estimate of the damages, fair?

25  A.   Yes.

1    Q.    Now, that being said, your analysis in this case is

2    based on a portion of the money that Mr. Racz invested in

3    trying to develop a product using his patent; isn't that

4    fair?

5    A.    I think it's -- when you say based on, yes.  I -- I --

6    we -- as we saw, I derived the amount of what I think is the

7    reasonable royalty by looking at a portion of the investment

8    in the overall Smartflash enterprise and computing a return

9    on that.

10   Q.    Right.  So you take $3 million and you invest it in

11   either a venture capital fund or an equity fund, like if

12   someone went to their financial manager, and they gave them

13   that money, and they put it in those funds, fair?

14   A.    Yes.

15   Q.    And your model relies on your understanding of

16   Mr. Racz's expectations; is that fair?

17   A.    I think it's fair that it's relying on what the

18   documents from the time indicate his -- and others were

19   indicating their -- how they would structure a transaction.

20   Q.    Sir, your analysis relies on the expectations of Mr.

21   Racz, right?

22   A.    As expressed in those documents, yes.

23   Q.    Let's see what you said in your deposition.

24        MR. CASSADY:  Can I get Slide 34, please, sir?

25   Q.    (By Mr. Cassady) Now, the model you put together

1   affirmatively in this case is largely based on the

2   expectations of Mr. Racz?

3         You said:  Yes.

4         Did I read your testimony correctly, sir?

5   A.    You did.

6   Q.    Okay.  Now, that's based, at least in part, on an

7   understanding on what substantial return on investment -- a

8   term used by Mr. Racz in an email, what that means, right?

9   A.    Yes.

10  Q.    And you agree, sir, that you're not going to show this

11  jury any email that says:  Mr. Racz said substantial return

12  on investment equals $4.5 million.  You're not going to show

13  them a document like that.

14  A.    That's correct, I'm not.

15  Q.    Okay.  Now, were you here for Mr. Racz's testimony?

16  A.    I was.

17  Q.    Now, you'll agree with me, sir, that counsel for Apple

18  never asked Mr. Racz about return on investment or

19  substantial return on investment, did they?

20  A.    They did not.

21  Q.    And, you know, I went back and looked at the deposition,

22  and you'll agree with me, sir, that Apple's counsel never

23  once asked Mr. Racz any questions about those things in his

24  deposition either.

25  A.    That's correct.

1   Q.   And you know, sir, that Mr. Racz testified under oath

2   that $4.5 million wouldn't be a substantial return on

3   investment; is that fair?

4   A.   I understand that that's what he testified to here in

5   2015.

6   Q.   And you agree, sir, that he testified, in fact, that

7   that would be insulting, right?

8   A.   I understood that, yes.

9   Q.   Now, you'll agree with me, sir, that after all those

10  emails and documents you rely on, both the '221 and the '772

11  patents issue, correct?

12  A.   Yes.

13  Q.   And you agree, sir, that Mr. Racz and his partners had

14  to spend millions of dollars prosecuting those patents at the

15  Patent Office after those emails were written, right?

16  A.   They did.  That's my understanding.  I don't know the --

17  the exact amount they spent, but I do understand they spent

18  money after that.

19  Q.   Well, you heard the testimony in this case that it was

20  millions of dollars, right?

21  A.   Yes.

22  Q.   So let's go back to your model, fair?

23  A.   Sure.

24  Q.   So if -- if Mr. Racz had more money back in 1999 --

25  let's assume his -- his faucet business did even better than

1    the $3 million he had to invest here -- are you with me?

2    A.    I'm with you.

3    Q.    So under your arithmetic, if he'd had more money back

4    then to invest, then his running royalty right now or his

5    reasonable royalty right now would be more money, right?

6    A.    No, not necessarily.  Depending on what he had invested

7    it in.

8    Q.    If he took -- well, Dr. Becker, using your arithmetic,

9    if he invested more money in 1999, then the reasonable

10   royalty would be higher now, right?

11   A.    No, that's not how the model that I'm using works.  It

12   looks at what was invested in the technology up to the point

13   in time that Apple would have been there negotiating for a

14   license to that technology.

15   Q.    And you assumed $3 million, right?

16   A.    Right.

17   Q.    And you took that $3 million, and you compounded the

18   interest up until 2009, right?

19   A.    Yes.

20   Q.    All right.  So if we start with $6 million, sir, then

21   that would be a higher number in 2009, fair?

22   A.    That if he had poured 6 million, say, into the failed

23   Britney Spears endeavor, no, that wouldn't change what I

24   think would be reasonable in terms of what we, in fact, have.

25        We don't undo history.  We take what was on the ground

1    at the time, what Apple really would -- would have been

2    negotiating for, which was this patent that had issued at

3    that time.

4    Q.   Dr. Becker, if Mr. Racz invested 5 million in the

5    technology in 1999, using your arithmetic, your damages

6    number goes up, right?

7    A.   It -- I would have considered that, but I think if that

8    had, in fact, been the -- the -- what really happened as of

9    June of 2009, I think, mathematically, yes.

10   Q.   Okay.  Now, I want you to assume for me a different,

11   scenario, Dr. Becker, okay?

12       Are you with me?

13   A.   Yes.

14   Q.   Okay.  Let's assume that Mr. Racz didn't invest that

15   money, and let's assume he didn't have the gumption to go and

16   try and create this company with this patent.  Instead, he's

17   poor, he doesn't have the money, and he doesn't go forward.

18   He never meets Britney Spears.  He never partners with

19   Gemplus, so he invests zero dollars.

20       Using your arithmetic, that would mean in 2009, the

21   patents and the royalty in this case would be zero, right,

22   using your arithmetic?

23   A.   Well, I mean, if you just sort of blindly ignore the

24   fact that all of the evidence that I've looked at and

25   considered, the real-world evidence that I have to consider

```
1    wouldn't be present, we'd have a different circumstance, and

2    I would likely have looked for other evidence that would

3    inform that negotiation, but you don't -- we don't wipe away

4    history as it came to pass as of June of 2009.  That's the

5    reality that we have to consider in that negotiation.

6    Q.   Is the answer it would be zero, sir?

7    A.   No, I -- the answer is that model wouldn't be

8    appropriate if we didn't have the evidence that I considered

9    in front of us.  You've asked me to assume all that evidence

10   away.

11   Q.   Dr. Becker, the question I'm asking you is very clear.

12   I'm asking you, using your arithmetic, if he didn't invest

13   any money in 1999, would the answer be zero in 2009?

14   A.   No, there wouldn't be an investment for him to be

15   telling people that he was willing to sell it for a return on

16   that investment.  You wouldn't have the evidence.

17            MR. CASSADY:  Objection, nonresponsive, Your Honor.

18            THE COURT:  Sustained.

19   Q.   (By Mr. Cassady) Dr. Becker, using your arithmetic in

20   this case, assuming Mr. Racz didn't put a dime into his

21   company in 1999, your answer would be zero, assuming your

22   arithmetic?

23   A.   That arithmetic would yield zero.  It wouldn't be my

24   answer to the question of what the license would yield.

25            THE COURT:  But it would be the answer to the
```

1   question you were asked.  And you are to limit your responses

2   to the questions you are asked.  Counsel for the Defendant

3   will have an opportunity to redirect, and you know that, Dr.

4   Becker, so --

5          THE WITNESS:  Yes.

6          THE COURT:  -- limit your answers to the questions

7   that are asked.

8          THE WITNESS:  Yes.

9   Q.   (By Mr. Cassady) Dr. Becker, you agree that the

10  hypothetical negotiation date is in 2009, right?

11  A.   Yes.

12  Q.   And you agree that in your analysis, you had to assume

13  the patents were valid, right?

14  A.   Yes.

15  Q.   And you agree in your analysis you had to assume the

16  patents were infringed, correct?

17  A.   Yes.

18  Q.   And all those assumptions come from the law, don't they?

19  A.   They do.

20  Q.   And you were present in the courtroom during the

21  cross-examination of Mr. Mills, right?

22  A.   Yes.

23  Q.   And Apple's counsel insinuated that counsel for Apple --

24  or counsel for Smartflash told Mr. Mills what to do with

25  regards to that assumption.  Do you remember that?

1    A.    I was here, yes.

2    Q.    Okay.  You'd agree with me that both you and Mr. Mills

3    had to agree or had to assume infringement and validity in

4    order to do your work in this case, right?

5    A.    Yes.

6    Q.    Okay.

7              MR. CASSADY:  Can I get Dr. Becker's Slide 7.9?  Do

8    you have it, sir?

9    Q.    (By Mr. Cassady) Dr. Becker, do you remember showing

10   this slide to the jury?

11   A.    I do.

12   Q.    Now, you agree, sir, that Mr. Mills didn't, in fact, use

13   all the infringing products in this case in his damages

14   model, correct?

15   A.    I'm not sure I understand your question.

16   Q.    You'd agree with me, sir, that Mr. Mills asked for a

17   royalty on a subset of products in this case, right?

18   A.    Well, the -- I -- I guess I'm still not understanding.

19   I agree that the results -- the resulting damages is

20   something -- is a subset, as driven by these two percentages

21   that he uses.

22   Q.    You would agree with me, sir, that Mr. Mills asked for a

23   royalty on a subset of the products in this case that are

24   infringing, right?

25   A.    I'm still not understanding the question in terms of

1    what subset.  Is it --

2    Q.   Let's look at your deposition, and see if you're

3    confused there.

4              MR. CASSADY:  Slide 57, please.

5              THE COURT:  Counsel, we don't need sidebar comments

6    about whether he was confused in his deposition.  If you're

7    going to impeach him, just show the deposition.

8              MR. CASSADY:  Thank you, Your Honor.

9    Q.   (By Mr. Cassady) In Smartflash and Mr. Mills' analysis

10   of the App Store and iTunes --

11             MR. CASSADY:  One second.  My slide is messed up.

12   Slide 20, please.

13   Q.   (By Mr. Cassady) And you would agree that in this case,

14   Mr. Mills is not applying a royalty times all the accused

15   products?  He's applying a royalty times the subset of the

16   accused products?

17        And you said:  Yes.

18        Isn't that your testimony?

19   A.   Yes.

20   Q.   Okay.

21             MR. CASSADY:  Your Honor, may I approach the easel?

22             THE COURT:  You may.

23   Q.   (By Mr. Cassady) Dr. Becker, can you see the easel?

24   I'll do my best to move down to get to it --

25   A.   Yes.

1    Q.    -- but can you see it, at least the top of it right now?

2    A.    Yes.

3    Q.    Do you remember when I was asking Mr. Mills about what

4    Apple gets free and clear, is that -- does that sound

5    familiar to you?

6    A.    Yes.

7    Q.    Now, we just talked about the fact that Mr. Mills only

8    used a subset of the accused products in this case for his

9    royalty, right?

10   A.    Yes.

11   Q.    And you said yes?

12   A.    Yes.

13   Q.    Okay.  So we know the first one -- you agree that at

14   least in Mr. Mills's analysis, he only uses a subset of the

15   accused features or accused products in the case, right?

16   A.    Yes.  It's not a hundred percent of the iPhones and the

17   iPads.

18   Q.    Okay.  And you agree, sir, that Mr. Mills did not use

19   the content revenue for books, movies, apps, music?  He

20   didn't use those in his analysis, right?

21   A.    Correct.

22   Q.    Okay.  So Apple gets that, and there's no royalty on it,

23   right?

24   A.    Correct.

25   Q.    Okay.  And then you agree, sir, that in this case, Mr.

1   Mills used the Apple app survey and the movie survey to do

2   his damages, right?

3   A.   Yes.

4   Q.   He didn't do a survey -- or at least he didn't apply a

5   survey for books and music, right?

6   A.   Correct.

7   Q.   Okay.  So you'd agree with me that the portion of

8   motivation to buy or the value to buy for music and books,

9   Apple gets all that.  That's not part of Mr. Mills'

10  calculations?

11  A.   That's the way his math works, yes.

12  Q.   Okay.  And you'd agree, sir, that if Mr. Mills had used

13  the point estimate or the mean in Dr. Wecker's surveys,

14  rather than the lower bound, his damages asked would have

15  been 1.19 billion instead of 850 million?

16  A.   Yes.

17  Q.   And you understand that's about $350 million that goes

18  to Apple, based on that conservative assumption, right?

19  A.   I do understand that that's based on the assumption he

20  made.

21  Q.   Now, Dr. Becker, there's more than just this that Apple

22  gets, right?

23  A.   I'm not sure I understand your question.

24  Q.   The royalty base in this case that Mr. Mills calculated

25  was $43 billion?

1    A.    Correct.

2    Q.    And you'd agree with me, sir, that $43 billion is not on

3    this piece of paper yet, is it?

4    A.    Right.

5    Q.    Okay.  So the royalty that Mr. Mills asked for in this

6    case is 850 million, right?

7    A.    Yes.

8    Q.    So 43.4 billion minus the 850 million, gets you to about

9    what?

10   A.    Oh, it's 42 point something billion dollars.

11   Q.    42.6 billion?

12   A.    That's about right.

13   Q.    Okay.  So is it fair if I add on here that Apple gets

14   42.6 -- 42.6 billion?

15   A.    I think that's fair, yes.

16   Q.    Okay.  I'll have to write real small.

17         Now, you agree with me, sir, that it's common in

18   real-world licenses to include running royalty rates or per

19   unit rates for all infringing products; isn't that fair?

20   A.    Yes, it's -- that's pretty common in real licenses.

21   Q.    Okay.  And you've agreed that here in this case, Mr.

22   Mills only used a subset of the infringing products, right?

23   A.    Yes.

24   Q.    Now, this 77 percent of people, these, at least in Mr.

25   Mills' analysis, are the people that were not alone motivated

1    by either movies or apps, fair?

2    A.    Yes.

3    Q.    Okay.   That doesn't mean those people don't like apps

4    and those people don't like movies, right?

5    A.    No, that's not what that means.

6    Q.    Okay.   In fact, you'd agree with me, sir, that many,

7    many people have no idea those features are on the phone but

8    later love them, right?

9    A.    Yes.

10   Q.    And there's evidence in that -- there's evidence at

11   Apple that that's true; right?

12   A.    Yes.

13   Q.    Okay.

14        MR. CASSADY:   If you could, please, Slide 176 --

15   actually 146.

16   Q.    (By Mr. Cassady) And this is an iPad tracking study,

17   fiscal year 2011, Q2.

18        Do you see that?

19   A.    Yes.

20   Q.    And you've seen this document before, right, Dr. Becker?

21   A.    I have.

22   Q.    Okay.

23        MR. CASSADY:   Now, if you could, turn to Slide 149,

24   please.

25   Q.    (By Mr. Cassady) Now, here at the bottom, it says:   Did

```
 1    not intend to use and use at least weekly in the United
 2    States.
 3         Do you see that?
 4    A.   I do.
 5    Q.   Okay.  So these are people, for the features above, who
 6    didn't intend to use those features but ended up using them
 7    nonetheless, right?
 8    A.   Yes.
 9    Q.   Okay.  And on here, if you look at it, it says:  Use
10    apps from the App Store 75 percent.
11         That means there's a -- 75 percent of people who didn't
12    even intend to use the feature, of going to the App Store and
13    downloading apps and using them, they use it on a weekly
14    basis now; isn't that true, sir?
15    A.   Looks like that's what this is showing, yes.
16    Q.   You don't have any reason to disagree with Apple's
17    survey here, do you?
18    A.   No.
19    Q.   Okay.  And then all that being said, Dr. Becker, you're
20    telling this jury that Apple made $43 billion selling
21    products with the patented features in this case, like the
22    App Store and the iTunes Store, and you're saying Apple would
23    take advantage of Mr. Racz by paying him a lump sum of 4.5
24    million rather than a percentage of the money that Apple has
25    made using his invention?
```

```
 1   A.   It's my opinion that the 4.5 million, and that structure

 2   is a lump sum, are what the evidence indicates, yes.

 3             MR. CASSADY:  No more questions, Your Honor.  Pass

 4   the witness.

 5             THE COURT:  Redirect by the Defendant?

 6             Mr. Cassady, turn that demonstrative over before

 7   you're seated, please.

 8             Mr. Caldwell's got it.

 9             MR. CASSADY:  I apologize, Your Honor.

10             Thank you.

11             MR. ALBRITTON:  May it please the Court.

12             THE COURT:  Proceed, Mr. Albritton.

13             MR. ALBRITTON:  Thank you.

14             All right.  If you would, Mr. Lee, bring up

15   PX 103.028-1350.

16                     REDIRECT EXAMINATION

17   BY MR. ALBRITTON:

18   Q.   All right.  Dr. Becker, do you see that on the screen?

19   A.   I do.

20   Q.   Okay.  So this is a survey similar to, or exactly, that

21   Mr. Cassady asked you about that talks about the ability to

22   download apps is, quote, very high in all countries.

23        You see that?

24   A.   Yes.

25   Q.   And he said that 68 percent say it's very important,
```

1    right?

2    A.    Yes.

3    Q.    And then he added 24 percent that said somewhat

4    important?

5    A.    He did.

6    Q.    And that comes up to, what, about 98 percent?

7    A.    Yes.

8    Q.    Let's look at the page that immediately precedes that in

9    this presentation.

10          MR. ALBRITTON:   Or actually, two pages before that,

11   Mr. Lee.   Look at 1348.

12   Q.    (By Mr. Albritton) See, this is -- what is this showing

13   us?

14   A.    This shows us ease of use.   So this is showing that --

15   kind of using the same numbers, that 95 percent of people

16   rated ease of use as very important or somewhat important.

17   Q.    Okay.   And that's more than the -- the survey related to

18   apps, correct?

19   A.    Yes.

20          MR. ALBRITTON:   All right.   Mr. Lee, let's now look

21   at 1346.

22   Q.    (By Mr. Albritton) What's the title of that?

23   A.    Web capabilities is highest in overall importance in all

24   countries except Japan.

25   Q.    And if you add up the percentage of very important and

1    somewhat important, what does that add up to?

2    A.    96 percent.

3    Q.    Okay.  Dr. Becker, when you consider these three

4    surveys, one that deals with web capabilities, one that deals

5    with ease of use, and one that deals with downloading and the

6    use of apps, what does that tell you about the question of

7    whether the capability of downloading apps is the sole and

8    exclusive reason for somebody to purchase an iPhone?

9    A.    It tells us that -- it isn't.  It can't be.  And it --

10   it -- any conclusion that -- when you look at the one feature

11   by itself, that that's the sole motivator is just unreliable

12   in light of the fact that, clearly, all these other features

13   and capabilities also score as high or higher than this

14   app-related question.

15   Q.    Okay.  Dr. Becker, you heard some questions about the

16   dates of the -- the issuance of some of the patents in this

17   case.

18        Do you recall those questions?

19   A.    Yes.

20   Q.    Do all of the patents that are at issue in this case

21   claim priority to that 1999 application?

22   A.    They do.

23   Q.    Does that mean all of those inventions were disclosed in

24   that original 1999 application?

25   A.    Yes.

```
1    Q.    Did you see evidence that we went through earlier that

2    specifically addresses whether Mr. Racz, when talking about

3    potential transactions --

4              MR. CASSADY:  Objection, Your Honor, leading.

5              THE COURT:  Sustained.

6              MR. ALBRITTON:   Thank you.

7    Q.    (By Mr. Albritton) Did you see any documents --

8    contemporaneous documents where Mr. Racz made reference to

9    how many patents were going to be at issue in these proposed

10   transactions?

11   A.    Yes.

12   Q.    What did you see?

13   A.    Well, in all those transactions, the ones that predate

14   the issuance of all the patents, it's talking about a

15   transaction for the -- any patent that would issue from the

16   application.

17        And after the '720 patent issued, there's an indication

18   that the transactions were for the '720 and any subsequently

19   issued patents.

20        And at some point, they -- it appears that the

21   documents -- in the documents that they were aware -- or

22   expecting that they would get two additional patents.

23   Q.    Okay.  You said that the hypothetical license in this

24   case would be a non-exclusive license; is that right?

25   A.    Yes.
```

1   Q.   What does that mean to the -- to your analysis in this

2   case?

3   A.   Well, from the standpoint of the licensor, so

4   Smartflash, because it's a non-exclusive license, they still

5   retain the ability to go license it to others and kind of

6   the -- as opposed to an outright sale where you don't have

7   any upside.

8        In a non-exclusive license, you have the -- all the rest

9   of the available market.  If there are other companies that

10  you think you could go get a license from, you still have a

11  hundred percent of those rights.

12  Q.   So, for instance, in No. DX 205 --

13          MR. ALBRITTON:  If you would, Mr. Lee, bring that

14  up.

15  Q.   (By Mr. Albritton) In this document, is that similar or

16  different, or how does it relate to this issue of

17  non-exclusive license?

18  A.   Well, in a way, it's what Mr. Racz would have if he

19  entered into a non-exclusive license in 2009 as opposed to

20  selling the patent and keeping -- sorry -- keeping a 20

21  percent interest.

22       He -- he has more rights, more interest in the patent if

23  he does a non-exclusive license with, say, Apple than he

24  would under this Saranite deal where he sold a hundred

25  percent of the interest in the patent and only has 20 percent

1  of any future licensing revenues.

2  Q.   Why does that matter, Dr. Becker?

3  A.   Well, it's -- it -- helps me understand whether he would

4  have been willing to accept the deal that I've essentially

5  proposed, which is 4.5 million for a non-exclusive license

6  that's a lump sum.

7      As we saw, Apple represents approximately 20 percent of

8  the sort of total available market.  So Mr. Racz still has

9  the other 80 percent available to him.

10     If he does the Saranite deal for substantially less

11  money, he only has 20 percent of that available market that

12  he's going to share in.

13  Q.   Okay.  Dr. Becker, what's the appropriate date to focus

14  on in assessing damages in this case?

15  A.   June 2009.

16  Q.   Do you and Mr. Mills agree about that?

17  A.   Yes.

18  Q.   So do things that happen as a general matter about how

19  much money was spent after that date, do those figure

20  prominently into your analysis?

21  A.   No.  One considers those, but it's -- it's -- the

22  primary thing is what would have been happening and on the

23  ground as of June of 2009.

24  Q.   Mr. Cassady was asking you some questions about what the

25  arithmetic would have shown if -- if, hypothetically, Mr.

1    Racz had invented -- or invested nothing in his -- the

2    development of these patents.

3            Do you remember that line of questions?

4    A.   Yes.

5    Q.   If you would, explain to the jury what that has to do

6    with anything?

7    A.   Well, it -- that's a completely different situation.

8    If -- if that's -- had been at the fact pattern in this case

9    where Mr. Racz had filed this application and there was no

10   investment, no attempt to commercialize it, my analysis in --

11   of the situation in June 2009 would have been very different.

12           I certainly wouldn't have said, well, I'm going to go

13   down the path of doing the arithmetic on a zero investment.

14           Also, if he hadn't made an investment, I doubt that --

15   you know, almost certainly we wouldn't have found a

16   circumstance where he was telling people in 2009 that he

17   wanted to get a return on this investment that he'd made if

18   he hadn't made an investment.

19   Q.   Do you anticipate that under any circumstances you would

20   have been coming to this court and said that the reasonable

21   royalty was zero?

22   A.   No.

23   Q.   Does that make any sense to you, Dr. Becker?

24   A.   No.

25           MR. ALBRITTON:  Let's look at Slide No. 8, please,

1   sir, Mr. Lee?

2   Q.   (By Mr. Albritton) We talked about this before.  Do you

3   remember Mr. Cassady's questions about you're not relying on

4   all of the iPhones or the -- the royalty base is not based on

5   all of the iPhones.  Do you recall that --

6   A.   Yes.

7   Q.   -- line of questions?

8        Pointing out in this formula, can you explain why Dr. --

9   or Mr. Mills' damages base or royalty base is only a

10  percentage of those iPhones?

11  A.   Well, we can see in the equation on the left, it -- it

12  is true that he's not claiming as a royalty base a hundred

13  percent of the iPhones.  It's driven entirely by this alone

14  motivate percent question.  So whatever percentage that

15  question yields, that's what he has as the royalty base.

16  Q.   So if, in fact, the members of this jury come to the

17  conclusion that 23 percent or so of the folks didn't buy an

18  iPhone, okay, solely so -- for the capability to purchase

19  apps, would that affect this royalty base?

20  A.   Yes.  You can't rely on that royalty base if -- if the

21  question itself was not, in fact, getting at the sole and

22  exclusive motivation, then the whole construction that he's

23  put on this is wrong.

24       MR. ALBRITTON:  Pass the witness, Your Honor.  Or

25  actually, I apologize, one final question.

```
 1   Q.   (By Mr. Albritton) Dr. Becker, back in November of 2009,

 2   if you had some patents -- issued patents -- some patents you

 3   expected to issue and you thought it was $850 million, would

 4   you have taken 350,000 for -- to sell 80 percent of them?

 5   A.   No, that wouldn't be rational.

 6   Q.   Make any sense at all to you?

 7   A.   No.

 8            MR. ALBRITTON:  Pass the witness, Your Honor.

 9            THE COURT:  Further cross-examination.

10            MR. CASSADY:  No further questions, Your Honor.

11            THE COURT:  All right.  You may step down, Dr.

12   Becker.

13            MR. BATCHELDER:   Your Honor, Apple rests.

14            THE COURT:  All right.  The Defendant has rested

15   their case.

16            Does the Plaintiff have a rebuttal case to put on?

17            MR. CURRY:  Yes, Your Honor.

18            THE COURT:  Call your first rebuttal witness.

19            MR. CURRY:  Plaintiff calls Mark Thomas Jones back

20   to the witness stand.

21            THE COURT:  All right.

22            MR. CURRY:  And, Your Honor, may I get set up?

23            THE COURT:  Yes.

24            MR. CURRY:  Thank you.

25            THE COURT:  Dr. Jones, if you'll return to the
```

1  witness stand.  I remind you, you remain under oath.

2          MR. ALBRITTON:  Your Honor, may Dr. Becker be

3  finally excused?

4          THE COURT:  Is there objection?

5          MR. CASSADY:  No objection, Your Honor.

6          THE COURT:  You're excused, Dr. Becker.

7          All right.  Mr. Curry, you may proceed.

8          MR. CURRY:  Thank you, Your Honor.

9          May it please the Court.

10     DR. MARK JONES, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

11                    DIRECT EXAMINATION

12 BY MR. CURRY:

13 Q.   Good afternoon, Dr. Jones.

14 A.   Good afternoon, sir.

15 Q.   You understand you're still under oath?

16 A.   Yes, sir.

17 Q.   Will you be covering the same material that you covered

18 last week at trial?

19 A.   No, sir.

20 Q.   What will you be covering today?

21 A.   I'll be addressing certain arguments that Apple's

22 witnesses raised with regard to infringement and validity.

23 Q.   How long do you think you'll be testifying today?

24 A.   Approximately 30 to 45 minutes, sir.

25 Q.   And do you understand that you're the last witness that

1   will be testifying in this trial?

2   A.   I believe that may be the case.

3   Q.   Will you please preview the topics you'll discuss today?

4   A.   I'm going to address certain infringement arguments that

5   were raised by Apple, in particular, arguments raised by Dr.

6   Ligler and Mr. Wechselberger, as well as arguments related to

7   validity that were raised by Mr. Wechselberger.

8   Q.   And were you in court for Dr. Ligler's and Mr.

9   Wechselberger's testimony?

10  A.   Yes, sir, I've been here for all the testimony.

11  Q.   And in this litigation, did you review the reports they

12  had prepared in this case?

13  A.   Yes, I did, as well as filing my own reports.

14  Q.   Can we start with infringement?

15  A.   Yes, sir.

16  Q.   Dr. Jones, what is your response to Dr. Ligler's

17  argument that numbers can't be rules?

18  A.   Well, it's my opinion that that argument is incorrect,

19  based on the evidence that I've reviewed.  The numbers or

20  the -- the rules to which I point aren't just numbers sitting

21  in isolation.  These are -- as I showed in the evidence, they

22  are numbers that are part of structures that are analyzed --

23  or evaluating code.  They're read.  They're more than just

24  numbers sitting in isolation.

25  Q.   Take the rental -- movie rental scenario.  How do you

1   know that the numbers 30 and 24 aren't just numbers and

2   instead are use rules that govern how long someone can watch

3   that movie?

4   A.   Well, I presented evidence on that regarding both the

5   reading of those rules, how they operate in Apple's

6   documents, as well as in the source code -- for example, the

7   rental.C code that I put on the board during my presentation

8   last Tuesday.

9          MR. CURRY:  Mr. Mortensen, can I get my -- thank

10  you.

11  Q.   (By Mr. Curry)  And is this an example of the code you

12  showed last Tuesday?

13  A.   Yes, sir, it is.

14         MR. BATCHELDER:   Your Honor, sorry.  Could we have

15  this taken down?  We're going to need to seal the courtroom

16  if we're going to put Apple's source code on the screen.

17         MR. CURRY:  Your Honor, we're already moving on.

18         THE COURT:  All right.  Thank you.  Let's move on.

19         There are millions of lines of source code, and

20  that one little flash of it on the screen is not a problem.

21         Let's move on.

22         MR. CURRY:  Thank you, Your Honor.

23  Q.   (By Mr. Curry)  Now, with respect to payment data and

24  payment validation data, did you hear Mr. Wechselberger say

25  that there's no difference between the response that Apple's

1    servers return for free content and the response return for

2    content you have to pay for?

3    A.    Yes, I did, but I don't agree with that.

4    Q.    Did you hear him say it was identical?

5    A.    I did.

6    Q.    Is that -- is that true?

7    A.    No.  Based on my analysis of, for example, the network

8    captures that I did, the price that comes back in the

9    response indicates whether it was free or an actual purchase.

10   Q.    And for the -- let me say this:  What's on the screen

11   here, Dr. Jones?

12   A.    This is a slide from Mr. Wechselberger's presentation,

13   his Slide 8.

14   Q.    And for the Sinf and the information that's coming down

15   on the left, for content with no price, how does that differ

16   from the information coming down on the right in reality, Dr.

17   Jones?

18   A.    Well, this is actually -- what's being depicted here is

19   the response to a buy product request that I -- I showed last

20   Tuesday.  That response contains the -- the price information

21   as part of that response.  So the price that you paid is in

22   the response.

23   Q.    And now, do you recall Mr. Wechselberger's presentation

24   about the session model?

25   A.    Yes, I do.

1   Q.   Was anything missing from his presentation?

2   A.   His presentation didn't show the -- well, didn't explain

3   the validation -- the payment validation that's occurring at

4   Apple's servers in MZ Buy, and it didn't show the information

5   that is being returned in the response to the buy product

6   request to the client devices.

7   Q.   And what validation and responses in particular was not

8   depicted by Mr. Wechselberger in his presentation?

9   A.   Well, the validation, as I showed last Tuesday, includes

10  looking up the account using the DSID, doing the antifraud

11  checks using the MID and GUID, then looking at the xCard

12  business to see if the -- that account has sufficient balance

13  to pay for that fee on xCard.

14       And going on, it would do a pre-authorization request or

15  check to see if an authorization exists for the user's credit

16  card, checks to see if the user's account is in good

17  standing.  Basically, all the things that I covered last

18  week.

19  Q.   And setting aside the omissions that Mr. Wechselberger

20  had in this slide, was anything actually misrepresented?

21  A.   Yes.  I believe the -- if you look at the -- what's

22  entitled Download Response, in blue, that's really a response

23  to the buy product request.

24       It's -- it's not a separate -- or something entitled

25  Download Response.  It's entitled -- or as we saw in the

1    network captures, it's the response to the buy product

2    request, and it has the price that you paid and all the

3    payment validation data that I explained in my presentation

4    last Tuesday.

5         Also, at the bottom right, there's an indication that

6    the transaction doesn't occur until the very end.  As I said,

7    each one of these purchases of content here depicted in the

8    screen is a separate transaction that has a buy product

9    request and a buy product response.

10   Q.   And, Dr. Jones, how do you know that Apple's products

11   work this way?

12   A.   By examining the documents I examined, the source code,

13   network captures, and examining the testimony of Apple's

14   witnesses, all that information taken together.

15   Q.   Does Apple infringe the asserted claims in this case?

16   A.   Yes.  Just as I explained last week, Apple's products

17   infringe the claims of the -- infringe Claim 13 of the '720,

18   Claim 32 of the '221, and Claims 26 and 32 of the '772

19   patent.

20   Q.   May we move to Mr. Wechselberger's invalidity theories?

21   A.   Yes, sir.

22   Q.   In your view, did Mr. Wechselberger even come close to

23   establishing that Smartflash's patent claims are invalid?

24   A.   No, sir.  The -- the burden of proof is clear and

25   convincing evidence, and Mr. Wechselberger did not provide

1    either the evidence or the associated explanation of that

2    evidence that would meet that burden, in my opinion.

3    Q.   Then why are you here testifying about it?

4    A.   Well, it's my role to analyze that and provide a

5    rebuttal based on the reports I filed.

6    Q.   As background, will you please explain what date is,

7    relevant for invalidity purposes?

8    A.   Yes.  This timeline that I prepared indicates the

9    various dates that are relevant in this case, and the first

10   one shown on the far left is the priority date of October

11   25th, 1999.  That's the priority date when Mr. Racz filed his

12   first application.

13   Q.   And what are we seeing on the screen now, Dr. Jones?

14   A.   This is Mr. Wechselberger's slide that shows the dates

15   for certain of the prior art references that he discussed in

16   his presentation.

17   Q.   Is anything that came before Smartflash's priority date

18   prior art?

19   A.   Yes, that's -- that's the definition, is that the things

20   that come before are prior art.

21   Q.   Now, just because something is prior art, does that mean

22   that the patent is invalid?

23   A.   No.  No.  You have to analyze the prior art with respect

24   to the -- the invention to the claims themselves.  Every

25   patent has prior art that comes before it.

1   Q.   And for the sake of completeness, what are the relevant

2   dates for infringement in this case?

3   A.   Well, the relevant dates for infringement are with

4   respect to when the patents issue and when Apple starts

5   infringing those patents.

6        And as we've heard, the date of first infringement, with

7   respect to the purchase and renting of movies, is in June of

8   2009, and that is after the issuance of the '720 patent,

9   Claim 13, that we've discussed earlier.

10  Q.   Now, I see on your timeline here, you have iOS.   What's

11  that?

12  A.   That is the operating system, operating software that

13  runs on Apple's products at issue in this case:   The iPhone,

14  the iPod Touch, and the iPad.

15  Q.   So which iOS version was it that introduced movie

16  rentals on the Apple products in this case?

17  A.   Well, iOS 3.0 allowed the capability to purchase and

18  download and rent movies, and that was introduced in June of

19  2009.

20  Q.   What was introduced on Apple's products in iOS 2.0?

21  A.   That was the introduction of the App Store.

22  Q.   And what about iOS 1.1.1 on September 27th, 2007?

23  A.   That was the iTunes Store that would allow the -- for

24  example, the purchase and download of songs onto the device.

25  Q.   How did the other content types and accused

1   functionalities fit into this timeline, such as books,

2   parental controls, et cetera?

3   A.   Well, those were all -- books, parental controls, those

4   were all introduced in iOS 3.0.  The only new feature that

5   was introduced later was the actual parental controls on

6   books themselves.  That particular feature, not all parental

7   controls, was introduced in iOS 6.0.

8   Q.   Now, did you hear Dr. Becker emphasize how Apple's

9   products were successful before June of 2009?

10  A.   I did.

11  Q.   If the patents at issue in this case, Smartflash's

12  patents, had issued out of the USPTO before 2007, what would

13  be infringing, right off the bat?

14  A.   Well, iOS 1.1.1 would have begun infringing had those

15  patents issued at that time.

16  Q.   Now, how do you know that -- how do you know these dates

17  are correct for when Apple first released the accused

18  functionality?

19  A.   Well, I know that by -- based on my examination of the

20  evidence, Apple's press releases that I found in my own

21  investigation, as well as Apple's interrogatory responses.

22          MR. CURRY:  And for the record, Apple's

23  interrogatory responses are PX 24.

24  Q.   (By Mr. Curry) And just for clarity, Dr. Jones, why is

25  it that Apple's products weren't infringing on 7/11/08

1   immediately upon the introduction of 2.0?

2   A.   That's because, in the claims that are at issue in this

3   case, the Apple App Store, as I explained last Tuesday,

4   infringes the '772 claims, and the '772 patent didn't issue

5   until late 2012.

6   Q.   Can you infringe a patent application?

7   A.   No, sir.

8   Q.   Now, after the accused features were first introduced,

9   were there any significant changes for purposes of

10  infringement?

11  A.   No.   Once a feature was introduced, for the purposes of

12  this analysis, the infringement didn't change based on a new

13  feature that Apple added.

14      For example, once Apple added the App Store

15  functionality, with respect to my analysis, Apple's answers

16  indicated that that functionality didn't change in a

17  meaningful way.

18  Q.   Now, are you talking about changes on Apple's products

19  or its servers?

20  A.   I'm talking about Apple's products, because all of the

21  claims that are at issue, the four claims, all cover Apple's

22  client side devices.   We're not discussing Apple's servers as

23  being the infringing technology.   The code at issue in each

24  one of these claim elements is code that exists on the client

25  device.

1          MR. CURRY:  Your Honor, may I use the flip chart?

2          THE COURT:  You may.

3          MR. CURRY:  Thank you.

4          And may I inquire if the jury can see the flip

5   chart?

6          Thank you.

7   Q.    (By Mr. Curry) Now, keeping in mind that you're not here

8   to testify on the law, please explain the framework you

9   applied when analyzing the issues of invalidity.

10  A.    Well, first, I addressed the burden of proof, which is

11  clear and convincing evidence; and then within that, I

12  addressed two issues:  Anticipation and obviousness.  And

13  those were both addressed by Mr. Wechselberger.

14  Q.    In your analysis, what is your understanding of what it

15  means to be anticipated?

16  A.    Well, for a prior art reference to anticipate the claims

17  or anticipate an invention, that prior art reference has to

18  teach each and every element of that claim in the four

19  corners of that patent.

20      So within that patent -- or sorry -- within that prior

21  art reference, the teachings of each and every element, as

22  they're taught in the claims, needs to be in that reference.

23  Q.    What's it called when a claim isn't anticipated?

24  A.    Well, the -- the other analysis that Mr. Wechselberger

25  brought was called obviousness.

1    Q.   And can you explain your understanding of obviousness as

2    you applied it in your investigation in this case?

3    A.    Well, in my investigation, what I considered was what

4    one of ordinary skill in the art at the time of the

5    invention -- that is, back in 1999 -- how they would have

6    viewed the prior art and then been -- whether or not they

7    would have been motivated to make combinations of the prior

8    art and what those combinations would have been, how they

9    would have combined references, if they would have, and then

10   compared any resulting combinations to the claims of the

11   inventions.

12   Q.   And in an -- in an obviousness analysis, can you just

13   look at an invention and try to map the limitations back to

14   different pieces of prior art to get all the pieces?

15   A.    No.   That would be a hindsight analysis.   You can't take

16   the claims sitting here in 2015 and use that as a roadmap to

17   select elements that you would like from the prior art and

18   then put them all together.

19   Q.    But how can hindsight contaminate an obviousness

20   analysis?

21   A.    Well, what hindsight does is make you basically use what

22   you know now about what's already been taught in this

23   invention and take that back in time and say that's what I

24   would have -- I would know about this invention then, 1999,

25   and then I would take that knowledge and just take out pieces

1    of the prior art.  That's the -- the incorrect way to do the

2    analysis.

3    Q.   If you use hindsight, can you reach any other conclusion

4    other than the claim is obvious?

5    A.   No.  If you're using hindsight, you're just going to use

6    the patent as a roadmap, select out the elements that you

7    want, and you will reach a conclusion of obviousness.

8    Q.   Dr. Jones, in your view, did Mr. Wechselberger use

9    hindsight?

10   A.   Yes.  Given the way he explained what he did in his

11   analysis, he did.

12   Q.   Now, even if a person of skill in the art would have

13   combined two references, does that then mean that anything

14   taught in those two references can be combined and stitched

15   together in any way?

16   A.   No.  One -- one of ordinary skill in the art has to

17   examine, say, two references, and look at how you would be

18   motivated to combine them, based on the problem you were

19   trying to solve.

20   Q.   For any of Mr. Wechselberger's obviousness theories, in

21   your view, did he ever give a sufficient reason to combine

22   the different references he was combining?

23   A.   No.  The explanation he gave was that they were all

24   addressing effectively a high-level data piracy, and based on

25   that, he made the decision to combine them.  He didn't give

```
 1    an explanation for why he would combine them -- you know, why

 2    one of ordinary skill in the art would say I'm looking at

 3    this system over here, this patent over here, this one over

 4    here, how would I combine those and why would I combine them?

 5    Q.   Are you prepared to discuss the particular invalidity

 6    theories that Mr. Wechselberger presented on his slides?

 7    A.   Yes, sir.

 8    Q.   Now, when we do this, do we need to go through each one

 9    of Mr. -- Mr. Wechselberger's invalidity theories for every

10    limitation of every claim in this case?

11    A.   No, sir, we don't.

12    Q.   Why not?

13    A.   Because if the combination -- for example, if one of the

14    combinations does not teach any of -- or doesn't teach one or

15    more of the limitations of the patents, then it doesn't

16    invalidate that claim or that patent.

17    Q.   Can we start with the Poggio reference?

18    A.   Yes.

19    Q.   Dr. Jones, how does Poggio really work?

20    A.   Well, I -- I think I can explain that better if I can

21    look at a figure and -- and draw on that.

22              MR. CURRY:  Your Honor, may the witness approach

23    the flip chart?

24              THE COURT:  You may.

25              MR. CURRY:  Thank you.
```

1    Q.   (By Mr. Curry) Dr. Jones, what are the relevant pieces

2    in this figure from the Poggio patent?

3    A.   Well, there really are four basic components.  One is

4    the client computer.  That's this one here.  That would be

5    the computer the user is sitting at.

6         A second is the -- what's labeled the vendor here.  The

7    vendor would be the company that's actually supplying the

8    content to go into this third component, the -- the virtual

9    vending machine.  This really is virtually a vending machine.

10        So it's already loaded with the content, say music, from

11   each one of the vendors.

12   Q.   From the user's perspective, how does the client

13   computer interact with the other pieces in Poggio?

14   A.   Well, there's -- the user computer is selecting content

15   from the virtual vending machine, and it goes through a

16   particular set of transactions.

17   Q.   Where -- where does the virtual vending machine reside?

18   A.   It resides on a server, and we get an indication of that

19   here, that a portion of this virtual vending machine is this

20   web server that we see here on the virtual vending machine.

21   Q.   And Mr. Wechselberger's obviousness analysis, what does

22   he use the Poggio reference for?

23   A.   Well, he's -- he -- in his combinations, for example,

24   with the Ginter/InterTrust or the Stefik/Xerox or the

25   Ansell/Liquid Audio combinations, what he identifies it for

1    is the payment-related terms, payment data, payment

2    validation, payment validation system.  So those claim

3    elements, he says, should be taken from Poggio and combined

4    with the elements of those three references.

5    Q.    Well then, please explain how payment works in Poggio.

6    A.    All right.  So as a first step, the client makes a

7    request to the server that arrives at the web server, and

8    that's on the virtual vending machine.  In response, back

9    comes an invoice.

10   Q.    And what does that look like from the user's

11   perspective?

12   A.    Well, what the user will be shown is -- is a web page, a

13   form that gives them the opportunity to fill out, for

14   example, the payment information, like a credit card.

15   Q.    So what -- what does the user do after receiving that

16   web form?

17   A.    Well, the user would fill out the form with their

18   payment information; and then that form, when they submit it,

19   would be sent back to the web server on the virtual vending

20   machine.

21   Q.    And before we get to the next step, does filling out a

22   form with all your payment information meet the payment terms

23   of the claims of Smartflash's patents?

24   A.    No, it doesn't.  It fails to meet the repayment data of

25   the '720 and '221 claims.  It fails to meet the payment in

1  response to a first user selection of the '772 claims.

2  Q.   And will you identify here in this figure what all is

3  part of the virtual vending machine in Poggio?

4  A.   Yes.  Well, everything inside this large box here is

5  part of the virtual vending machine, and there -- there are a

6  bunch of elements here.

7  Q.   What does the virtual vending machine do when it

8  receives the filled-out form from the client?

9  A.   Well, what it -- a step that it takes is from this

10  interface here, it sends over to an electronic banking

11  network -- it sends over the -- essentially the information

12  it received here.

13  Q.   All right.  For the clarity of the record, please avoid

14  using "it."  What is performing actions here, Dr. Jones?

15  A.   In this case, the virtual vending machine, and more

16  particularly, the digital cache interface that's part of that

17  virtual vending machine is sending payment info or

18  information to the electronic banking network, which is

19  Element 118.

20  Q.   And then what happens next?

21  A.   The electronic banking network will return that back to

22  the digital cache interface, assuming it's approved.

23  Q.   And what does the virtual vending machine do when it

24  receives that response from the electronic banking network?

25  A.   It will send the content to the client.  And by "it," I

```
 1    mean the virtual vending machine will send the content to the
 2    client computer.
 3    Q.    Does the virtual vending machine re -- return payment
 4    validation data of any type to the client?
 5    A.    No, it doesn't.  That payment validation data is
 6    received on the virtual vending machine from the electronic
 7    banking network.  It doesn't go to the client computer.
 8    Q.    Okay.  I want you to stay up here while I pull up a
 9    slide that Mr. Wechselberger showed.
10          Are you familiar with the slide on the screen, Dr.
11    Jones?
12    A.    Yes.  This is Mr. Wechselberger's Slide No. 89.
13    Q.    Is that figure from Mr. Wechselberger's presentation
14    actually in the Poggio reference?
15    A.    No, sir.
16    Q.    All right.  Did Mr. Wechselberger mispresent the Poggio
17    reference?
18    A.    Yes, he did in several ways.
19    Q.    How many ways?
20    A.    Four -- four ways, at least, that I'll represent here.
21    Q.    Referencing both Mr. Wechselberger's screen, please
22    explain to the jury the ways that the Poggio reference was
23    mispresented to the jury.
24    A.    Well, one example would be you can see in the upper
25    left-hand corner, there's something colored purple there, the
```

1    library of vendor products.  That's actually something that's

2    part of the virtual vending machine here I've circled as Item

3    112 in this diagram.  It's not part of or associated with the

4    vendor.

5         Another way is the payment validation data or the

6    payment validation that's coming back here, this is actually

7    happening and taking place at the virtual vending machine,

8    this digital cache interface.

9    Q.   And what did Mr. Wechselberger show in his slide to the

10   jury about where that was happening?

11   A.   Well, he's showing it -- that it's -- it's coming back

12   to the web server; but when he applies it to the claims, he's

13   actually showing something quite different.

14   Q.   And what does he do when he actually goes to apply

15   Poggio to the claims?

16   A.   Well, remember, the code elements that are -- that are

17   in the claims actually are happening at the client device or

18   what he -- that's -- so that needs to be happening here to

19   meet the claim limitations.

20        Instead, that's happening -- that transaction or

21   interaction is happening between the virtual vending machine

22   and the electronic banking network.

23   Q.   And, finally, can you see on the screen how there's the

24   dotted arrow line with the music symbol from the vendor to

25   the server icon?

1   A.   Yes, sir.

2   Q.   Is delivery of content from the vendor to the web server

3   in Poggio even part of the payment sequence?

4   A.   No, sir.  As I indicated in my earlier demonstration,

5   the vendor has already supplied and put into the virtual

6   vending machine the content that's there.

7        So when payment is made, there's not a retrieval by the

8   virtual vending machine from the vendor of the content;

9   instead, the vendor is merely -- or virtual vending machine

10  is merely sending that directly to the client computer.

11  Q.   Thank you, Dr. Jones.

12       Will you please return to the witness stand?

13  A.   (Complies.)

14  Q.   Now, please remind the jury of the role that the Poggio

15  reference played in Mr. Wechselberger's obviousness theories.

16  A.   Well, in the three obviousness theories that I -- I

17  discussed earlier, the combination of Poggio with --

18  Poggio/Sun with the Ginter/InterTrust reference, as well as

19  Poggio/Sun with the Stefik/Xerox reference, and Poggio/Sun

20  with the Ansell/Liquid Audio, plus the Puhl reference, in

21  each of those cases, Mr. Wechselberger is relying on this --

22  the payment portions, essentially, of Poggio for the terms

23  that relate to payment data.

24  Q.   Now, for every invalidity theory that Mr. Wechselberger

25  presented relying on Poggio, even assuming that these

1   combinations are appropriate in the first place, does he

2   still fail to meet the limitations of any of Smartflash's

3   claims?

4   A.    Yes.   In each and every case, he -- there are still

5   missing limitations due to the way -- as I just explained,

6   how Poggio works, it doesn't meet those limitations even if

7   you combine -- make that combination.

8   Q.    All right.   Particularly what claims are not met even

9   after combining Poggio with the other references?

10   A.    Well, with respect to '720, Claim 13, the highlighted

11   three elements there are the ones that involve payment data

12   and payment validation data that I indicated before.

13        There's not code to read payment data, that element.

14   That exists on the client.   There's not code to receive

15   payment validation data.   That's part of what

16   Mr. Wechselberger identified as the data access terminal.

17        And, again, there's not code responsive to the payment

18   validation data to retrieve data.   As I indicated, that

19   doesn't occur in the Poggio/Sun reference.

20   Q.    What about with respect to the '772 patent?

21   A.    Well, with respect -- well, quickly covering the -- the

22   '221 has identical elements.

23        With respect to the '772, it's the same elements --

24   payment elements that Mr. Wechselberger's relying upon for

25   Poggio, and those elements include the -- sending the

1  payment -- sending the payment data responsive to the first

2  user selection, that's not done in Poggio, as well as the

3  code responsive to payment validation data.

4  Q.   Should I identify and cross out all combinations that

5  involve Poggio?

6  A.   Yes, because this is at least one element that's missing

7  from each and every one of the asserted claims.

8  Q.   Now, for the sake of completeness, would a person of

9  skill in the art combine Stefik/Xerox and Ginter/InterTrust

10 references with Poggio in the first place?

11 A.   No, I don't believe they would.  Stefik is -- the

12 Stefik/Xerox reference is a reference that, as

13 Mr. Wechselberger described, involves metering of content;

14 and it wouldn't make sense to combine a metering content

15 reference with the type of payment that's in Poggio/Sun.

16 Q.   What do you mean by metering content?

17 A.   Well, by that, I mean, in the case of -- of Stefik,

18 as -- as Mr. Wechselberger showed in his slides, the

19 content -- a user pays for the use of the content.  So, for

20 example, each time I play the content, I will pay for that

21 play of the content.

22 Q.   Is iTunes and the App Store metered content?

23 A.   No.  And iTunes, for example, if you purchase a movie,

24 you don't pay each time you watch the movie.

25 Q.   But, Dr. Jones, under the session model, isn't the

```
 1   transaction posted to your card or your bank after content is
 2   downloaded?
 3   A.    That's correct.
 4   Q.    So how is that not metering content?
 5   A.    Well, again, the metering would be paying for it, for
 6   example, each time you use the content.  What Apple has is a
 7   system in which, as I described earlier, you send up payment
 8   data and back comes payment validation data that's been
 9   validated by a payment validation system.  Once you've done
10   that, that content is yours.
11   Q.    How do you know that Ginter teaches metering content?
12   A.    Well, in the Ginter/InterTrust reference, this is one of
13   the figures that Mr. Wechselberger showed in his
14   presentation.
15         This is Figure 3 of the Ginter/InterTrust reference, and
16   you can see here that a user can request the use of content,
17   and then their usage is viewed conceptually here like an
18   electric meter in that patent.
19         And, for example, in Ginter, you can be billed on a
20   regular basis for that and then make payment for that just
21   like you would an electric bill.
22   Q.    How do you know that the Stefik reference teaches
23   metering content?
24   A.    Now, this is Figure 1 -- 1 of the Stefik/Xerox
25   reference.  This is another figure that Mr. Wechselberger
```

1   showed in his slides, and you can see down at the -- the

2   bottom, on the far right in Step 108, that the repositories

3   are generating billing information, each one of them --

4   that's both the repository that's requesting data and the

5   repository that's providing it.  They put that together and

6   transmit that to a credit server.

7   Q.   Would a person of skill in the art be motivated to

8   combine Stefik/Xerox or Ginter/InterTrust with the Poggio

9   reference?

10  A.   No.  Each one of these references teaches a -- a

11  complete way of operating a system, both Stefik/Xerox and

12  Ginter/InterTrust.  And I do not know of any motivation for

13  combining that with Poggio/Sun, that type of payment system.

14       And -- and Mr. Wechselberger didn't give any description

15  of why one would do that -- what -- what would be my

16  motivation.

17  Q.   Should I put an extra strike through -- through

18  Mr. Wechselberger's combinations of Stefik and Poggio and

19  Ginter and Poggio?

20  A.   Yes.

21  Q.   Can we now turn to the Ansell/Liquid Audio patent?

22  A.   Yes.

23  Q.   In addition to the missing payment limitations, did

24  Mr. Wechselberger fail to show any other limitations, even

25  after combining the Ansell/Liquid Audio, Poggio/Sun, and

1    Puhl/Motorola references?

2    A.    Yes, he did.  The -- in the '772 claims, he was

3    referring to what he called the browsing and shopping claim

4    elements.  These are the ones shown in the left-hand side

5    here.

6    Q.    And for clarity, this is Mr. Wechselberger's slide --

7    A.    Yes.

8    Q.    -- from last week, right?

9          Okay.  And what did he show on the right that allegedly

10   met all the limitations on the left?

11   A.    He relied upon the Figure 1 of the Ansell/Liquid Audio

12   patent showing the computer system that was in place.

13   Q.    And -- and what did he say about how this system on the

14   right -- this picture on the right allegedly meets all the

15   limitations on the left?

16   A.    Well, he just went through for each code element and

17   said it was present in that computer, that the code would be

18   in that computer for each one of these elements.

19   Q.    Can I put another strike through Mr. Wechselberger's

20   Ansell, Poggio, Puhl combination?

21   A.    Yes, sir, because he didn't provide any evidence that

22   those elements were -- were in or supported by the Ansell

23   reference.

24   Q.    Can we move on to the IBM system now?

25   A.    Yes, sir.

1   Q.   Now, all the other prior art that was presented in this

2   trial is a patent reference, right?

3   A.   That's correct.

4   Q.   How can a system invalidate a patent?

5   A.   Well, if a system that was, for example, publicly

6   available before the priority date, had each and every

7   limitation of the claims, then it would invalidate those

8   claims.

9   Q.   But how can you know whether a system actually meets the

10  limitations of a claim?

11  A.   Well, you have to look at the available evidence that

12  describes that system.  For example, you could look at

13  manuals, you could look at press releases, as

14  Mr. Wechselberger did.  Whatever materials that describe that

15  system, including source code, you could look at.

16  Q.   And what types of evidence did Mr. Wechselberger rely on

17  for his invalidity theory of the IBM system?

18  A.   He relied on two primary sets.  One was the collection

19  of essentially press or news articles that he described, as

20  well as he relied on the Gruse patent as being a

21  description of the IB -- what he called the IBM system.

22  Q.   Now, did Mr. Wechselberger have to assume that the IBM

23  system had everything that's taught in the Gruse patent?

24  A.   No, he -- he didn't have to assume that, and he should

25  not have assumed that it did.

1   Q.   But did he?

2   A.   He assumed that it contained virtually everything.

3   Q.   Is that right?

4   A.   No, it doesn't.

5   Q.   All right.  In your investigation in this case, what did

6   you find missing in the IBM system?

7   A.   Well, I found quite a few elements that were not in the

8   IBM system, or what he refers to as the IBM system -- for

9   example, in the Album Direct trial that -- well, found quite

10  a few elements that are described in Gruse or that he

11  indicates are described in Gruse -- the Gruse patent, but

12  that are not present in the IBM Album Direct trial.

13  Q.   What particular claim limitations were not met in your

14  analysis of the IBM system, based on the evidence that was

15  presented?

16  A.   Well, for example, the payment-related claim elements,

17  the IBM Album Direct trial did not have the payment system of

18  Gruse that -- present in the Album Direct trial.  So to rely

19  upon Gruse for those elements would be incorrect.

20  Q.   Did the Album Direct trial have access rules that

21  depended on the amount of payment?

22  A.   No, it didn't.  The users in that trial could purchase

23  music.  They could burn it to -- and then burn it to a CD.

24  But they -- that was the only option that was available.

25       So that claim element, the one related, for example, to

1   access rules in Claim 13 of the '720 and Claim 32 of the

2   '221, that element wouldn't be met by the IBM system.

3   Q.    And do you remember that little purple Sony device that

4   Mr. Wechselberger had in front of him during his testimony?

5   A.    Yes, sir.

6   Q.    Was that actually part of the IBM system?

7   A.    No, it wasn't.  And, in fact, I believe that's why the

8   IBM system that the -- the theory that puts forward is

9   actually an obviousness combination of the IBM system in

10  Sony.  That device didn't function as part of the IBM system

11  before the Smartflash priority date.

12  Q.    And do you also recall that NTT DoCoMo press release

13  about the IBM system?

14  A.    Yes, sir, I do.

15  Q.    Can a press release about NTT DoCoMo might do in the

16  future beyond the patent's priority date invalidate a claim

17  in this case?

18  A.    Well, no, for two reasons.  First, that -- something's

19  that happening on a Japanese phone system is not part of the

20  IBM system in that there's no description of how that phone

21  does operate before the priority date, let alone how it would

22  operate sometime down the road after the priority date.

23  Q.    Dr. Jones, can I put an X through Mr. Wechselberger's

24  IBM system theories?

25  A.    Yes, sir.

1  Q.   Can we now turn to the Gruse/IBM patent?

2  A.   Yes, sir.

3  Q.   And what -- what is on screen, Dr. Jones?

4  A.   Now, this is another one of Mr. Wechselberger's slides,

5  and this one is addressing the Gruse/IBM patent.

6  Q.   Dr. Jones, did Mr. Wechselberger accurately present

7  what's taught in Gruse?

8  A.   Well, he actually gave two descriptions of it.  First,

9  he walked through it at the beginning and walked through the

10 elements of Figure 6; but then when he turned to the claim

11 analysis, he changed his description.  And at that point it

12 became inaccurate.

13 Q.   And now what's on the screen here has a citation to

14 Column 77 and a text highlighted in green.  And then also

15 it's showing Figure 6 with that arrow highlighted in green;

16 is that accurate?

17 A.   No, sir, it's not.  What -- what's -- what he discussed

18 and what he was -- what's being implied here is that the

19 arrow that proceeds from the end-user device to the

20 clearinghouse, that that is somehow what's represented in the

21 discussion in Column 77, when, in fact, what's described in

22 Column 77 is not part of the embodiment that's described in

23 Figure 6.  That's just simply incorrect.

24 Q.   Does the Gruse/IBM patent meet every limitation of the

25 '720 and '221 patents as required by anticipation?

A.   No, it doesn't.  For example, it's missing -- as shown

in this slide, the -- the code to read payment data element

is missing.

What Mr. Wechselberger is referring to here is a form

that collects credit card information, rather than reading

the payment data.  So that element is missing from this -- in

this instance.

Another example would be the access rule -- the code

responsive to payment validation data that will receive the

one access rule.

Q.   Let me talk about that.

What did Mr. Wechselberger identify for the payment

validation data and the access rule you're supposed to

receive responsive to payment validation data?

A.   Well, what he identified as the payment validation data

was the license SC, but then he also identifies the license

SC as actually containing the access rules to which he

refers.

Q.   And is the -- the same -- are -- the same elements not

bypass Gruse/IBM with respect to the '221 patent?

A.   Yes.  Those elements are the same in the '221, and

they're also not met.

Q.   Can I put an X through Mr. Wechselberger Gruse/IBM

theories?

A.   Yes, just for the '221 and '720 patents.

1   Q.   Let's move on to the Gruse/Puhl combination.   Did

2   Mr. Wechselberger establish that the '772 patent is obvious

3   by the combination of Gruse/Puhl -- I'm sorry -- Gruse/IBM

4   and Puhl/Motorola?

5   A.   No, he didn't, for similar elements that I discussed

6   here.   Similar elements are not met in the '772.

7   Q.   What particular elements are not met in the '772 patent,

8   even combining Gruse and Puhl?

9   A.   For example, the code responsive to first user selection

10  to transmit the payment data, that's not met, for similar

11  reasons to what I discussed in the '720 patent.

12       Also, Mr. Wechselberger failed to explain how payment

13  validation data is received or that there's a responsive

14  payment validation data to retrieve the content.   He failed

15  to explain those and failed to account for the fact that what

16  he was relying upon as being in Figure 6 in Column 77 was

17  simply not the same thing.

18  Q.   In Mr. Wechselberger's presentation, did he even give

19  any analysis for the payment terms of the claims of the '772

20  patent, Dr. Jones?

21  A.   No.   What he did was present a slide like this one for

22  the -- the -- for each one of the combinations, for example,

23  for the Gruse/IBM and Puhl/Motorola combination, and just

24  indicated because they were met before -- he just checked

25  them off here again without further explanation.

1  Q.   And does the combination of Gruse and the little picture

2  of the cell phone and the Puhl reference even necessarily

3  result in a handheld multimedia terminal that meets all the

4  limitations of Smartflash's claims in the '772 patent?

5  A.   No.  When one of ordinary skill in the art would look

6  to -- at these two references, one would look to Gruse,

7  Gruse/IBM, for how does Gruse/IBM handle a portable device,

8  and Gruse/IBM teaches that that portable device is actually

9  attached to a PC.

10  Q.   Is there a term for that?

11  A.   The PC or an example of the PC would be -- the PC is an

12  example of the end-user device of Gruse.

13  Q.   Is that called side loading?

14  A.   The process of -- of loading a mobile device or portable

15  device from a PC is referred to as side loading.

16  Q.   Can I put an X through Mr. Wechselberger's combination

17  of Gruse and Puhl for the '772?

18  A.   Yes.

19  Q.   Now, for any of Mr. Wechselberger's obviousness

20  theories, did he testify about secondary considerations and

21  related evidence?

22  A.   No, he didn't testify and give that -- give the analysis

23  of the evidence, no.

24  Q.   What's your understanding of what it -- what a secondary

25  consideration is?

1    A.    Well, in -- in the type of analysis that

2    Mr. Wechselberger was doing with respect to obviousness, he

3    needed to consider what are known as secondary considerations

4    as a part of the process to determine whether or not those

5    secondary considerations would lean towards obviousness or

6    not.

7    Q.    Now, in your understanding and in your analysis, are

8    secondary considerations something you have to consider

9    before you jump to a conclusion of obviousness?

10   A.    Yes.   It's a required part of the process or the

11   analysis.

12   Q.    Well, what are some of the types of secondary

13   considerations that Mr. Wechselberger could have testified

14   about but didn't?

15   A.    Well, he could have presented evidence with respect to

16   the success of the invention, the commercial success.

17         For example, Dr. Wecker testified about the connection

18   between the patented invention and the certain features in

19   Apple's products.

20         He could have also looked at what Mr. Mills described

21   as -- as stickiness, as a lock-in effect.   Once you -- within

22   the Apple ecosystem, these -- these particular features,

23   apps, and -- and purchasing movies and things, once I have

24   enough content, I have an increased motivation to stay with

25   an Apple product.

1  Q.   Would that be an unexpected result of the invention?

2  A.   Yes, it would.

3  Q.   Another type of secondary consideration that wasn't

4  addressed by Mr. Wechselberger was long-felt need and failure

5  of others.

6       Have you considered or seen evidence that cuts against

7  the finding of obviousness with respect to those types of

8  secondary considerations?

9  A.   Yes.  With respect to long-felt need, the -- the

10  problems related to data piracy and ease of use of -- for

11  consumers was a problem that we can see was recognized in

12  some of these early patents but still unmet by the solutions

13  offered in these prior art references.

14      Further, the failure of others, if we look, some of the

15  testimony earlier in the trial addressed solutions,

16  commercial solutions, such as PressPlay that were failures in

17  the marketplace.

18  Q.   So is Mr. Wechselberger correct that there are no

19  secondary considerations that cut against a conclusion of

20  obviousness?

21  A.   No, he's not correct.

22  Q.   Moving to Mr. Wechselberger's last invalidity theory, do

23  you remember that Mr. Wechselberger testified that he

24  couldn't find the written description for Claim 26 of the

25  '772 patent?

1   A.   I do.

2   Q.   What did he say?

3   A.   His testimony at trial was that this is -- that the only

4   function that he could find disclosed in the patent for what

5   a terminal was, was what he identified there; and he said,

6   nowhere in the specification does a Smartflash specification

7   indicate that a terminal has any other function than writing

8   data to a data carrier.

9   Q.   Well, Dr. Jones, were you able to identify a terminal

10  that wasn't limited to requesting and retrieving content?

11  A.   Yes, I would, and I can give you a couple of examples of

12  that, in Figure 7 of the patent and Column 4 of the patent.

13  Q.   All right.   What's shown in Figure 7 of the '772 patent?

14  A.   These are different -- what -- what are termed data

15  terminals with respect to Figure 7 that are taught in the

16  specification of the Smartflash patent.

17  Q.   And what are the different types of terminals that are

18  taught and shown in Figure 7 of the '772 patent?

19  A.   Well, just a couple of examples are the PC and the

20  mobile communications device that we see at 152 on the left

21  side of the figure.

22  Q.   And on this slide, Dr. Jones, you have Column 4, 7

23  through 29 of the '772 patent.   What is that telling us?

24  A.   Well, that's telling us that the -- if we look at the

25  top -- the data access terminal may be a conventional

1  computer, or alternatively, it may be a mobile phone.

2      And going down a little bit further, it says the mobile

3  phone can be used to download data to the data storage means.

4      It -- and then further examples are given of the types

5  of data that can be downloaded further down, including MP3,

6  software, games, et cetera.

7  Q.   So, Dr. Jones, was Mr. Wechselberger correct that Claim

8  26 of the '772 patent doesn't have written description

9  support?

10 A.   He was not correct.

11 Q.   Has Mr. Wechselberger or Apple carried its clear and

12 convincing burden of invalidating any claim for any theory in

13 this case?

14 A.   No, they have not.  They have not.  Not through the

15 anticipation or obviousness or through written description.

16 Q.   Okay.  Moving from invalidity, I want to return to a

17 couple of remaining topics.

18          THE COURT:  Counsel, approach the bench, please.

19          MR. CURRY:  Yes, Your Honor.

20          (Bench conference.)

21          THE COURT:  Mr. Curry, you told the jury you'd be

22 there 30 minutes.  You're about 58 minutes into this.  How

23 much longer do you have?

24          MR. CURRY:  I'm wrapping up, Your Honor.  I

25 probably have less than 10, probably more like 5 minutes,

1   Your Honor.

2           THE COURT:  All right.  Well, we'll take about a

3   10-minute recess after he finishes, then we'll come back and

4   then we'll do the cross.

5           MR. BATCHELDER:  Okay.  Thank you, Your Honor.

6           THE COURT:  Hopefully, that would be all the

7   evidence, correct?

8           MR. CURRY:  Yes, Your Honor.  Certainly from

9   Plaintiff.

10          MR. BATCHELDER:  So we're not going to hear from

11  Mr. Mills?

12          MR. CURRY:  That's correct.  We'll rest after

13  Jones.

14          MR. BATCHELDER:  Your Honor, while we're here, I

15  wanted to raise -- we have an agreed MIL that we can

16  reference the patent video, the content of it without

17  commenting on it, and I just wanted -- I'm going to ask him a

18  couple questions about that, and I just wanted to give Your

19  Honor the -- the heads-up that I intended to do that, in case

20  you had any problem.

21          THE COURT:  You're going to ask a couple questions

22  of Dr. Jones about what?

23          MR. BATCHELDER:  I wanted to ask him that -- that

24  he's applied the principles that are set forth in the patent

25  video that was shown to the jurors, and I'll quote them.  And

```
 1    we have an agreed MIL that says we can do that.  I just

 2    wanted to give Your Honor that heads-up.

 3              MR. CURRY:   Your Honor, I -- I object to that

 4    because that elevates that patent video to Your Honor's

 5    instructions that Your Honor will give on anticipation and

 6    obviousness.

 7              MR. BATCHELDER:  We have an agreed MIL that says we

 8    can do it.  I'm happy to show it to you.  It's No. 10.

 9              THE COURT:  I'll look at the MIL, and quite

10    honestly, as long -- I don't see any problem with that.

11              MR. CURRY:  Understood.

12              THE COURT:  He's not going to represent that that's

13    in lieu of the Court's final instructions.

14              MR. CURRY:  Understood.

15              THE COURT:   All right.  Let's proceed.

16              (Bench conference concluded.)

17              THE COURT:  All right.  Let's proceed.

18              MR. CURRY:  Thank you, Your Honor.

19    Q.   (By Mr. Curry)  Dr. Jones, are patents publicly

20    available?

21    A.   Yes, they are.  You can download them from the United

22    States Patent and Trademark Office.

23    Q.   Where else can you find a patent?

24    A.   You could find it on Google's website.  Just general

25    Internet searches will pull up patents for you.
```

1    Q.    And are Smartflash's patents available on USPTO and

2    Google's patent websites?

3    A.    Yes, they are, as well as Smartflash's website.

4              MR. CURRY:   Could I get the document camera,

5    please?

6              I'll do it without the document camera.

7    Q.    (By Mr. Curry)   Dr. Jones, are you aware, and do you

8    recall this slide being cross-examined with Mr. Mills by Mr.

9    Batchelder?

10   A.    Yes, I do.

11   Q.    Is the task of identifying a non-infringing alternative

12   as simple as nonchalantly flipping two steps of how a product

13   works?

14   A.    No, sir.   You have to actually describe the -- the new

15   system.   You can't just say I'll flip these couple of steps

16   and ignore the underlying technology.   You can't ignore the

17   user experience that results.   You can't ignore the effect on

18   content providers.   You have to fully describe the solution,

19   and then analyze the solution that you come up with.

20   Q.    And is there a well-thought-out way to unlock content

21   after downloading it?

22   A.    Yes, there is.   One way to -- a good way of doing that

23   is taught in other claims that haven't been at issue in this

24   case in the Smartflash patents.

25   Q.    And would it be an available non-infringing alternative

```
 1    to Apple to just move its infringement of some set of claims
 2    of its patents over to other claims of its patents?
 3    A.    No, sir, it -- it would not.  That alternative -- it's
 4    not an available alternative to just change the claims that
 5    you infringe.
 6    Q.    And when you identified Apple's best alternative to its
 7    infringing functionality, did you keep in mind Smartflash's
 8    other claims?
 9             MR. BATCHELDER:  Your Honor, I have to object and
10    ask to approach.
11             THE COURT:  Approach the bench.
12             (Bench conference.)
13             THE COURT:  What's your objection?
14             MR. BATCHELDER:  Mr. Curry just redirected the
15    witness to a non-asserted claim.  You can't do that.  There's
16    a MIL preventing that.
17             MR. CURRY:  No, Your Honor, the MIL protects the
18    parties from each other drawing an adverse inference from
19    dropping a claim.  What Dr. Jones is testifying to is that in
20    the context of identifying non-infringing alternatives, you
21    have to account for the fact that you might be moving
22    right -- right back into infringement, and Dr. Jones did so
23    without identifying any particular claim.
24             MR. BATCHELDER:  He's saying he'd be moving into
25    infringement of non-asserted claims.  You can't do that.
```

1        THE COURT:   Well, I'm going to sustain the

2   objection.   We need to move on.

3        MR. CURRY:   Okay.   This is my last section.   Thank

4   you, Your Honor.

5        MR. BATCHELDER:   Your Honor, I move to strike that

6   testimony.

7        (Bench conference concluded.)

8        THE COURT:   All right.   I'll sustain the objection,

9   and I'll direct the jury to disregard the last question and

10   answer from --

11  Q.   (By Mr. Curry)  Dr. Jones --

12        THE COURT:   -- Mr. Curry to Dr. Jones.

13        MR. CURRY:   Sorry, Your Honor.

14        THE COURT:   Now, you may proceed.

15        MR. CURRY:   Thank you, Your Honor.

16  Q.   (By Mr. Curry)  Did you identify Apple's best

17  alternative to its infringing functionality in this case?

18  A.   Yes, I did.   And that's what I discussed with Dr. Wecker

19  when he was formulating the survey.

20  Q.   And in the alternative that you identified, did they

21  disable everything of the iTunes Store and the App Store, as

22  Dr. Becker explained?

23  A.   No, the -- the same functionality would have been in

24  place but with the modifications that -- that I described.

25        MR. CURRY:   Pass the witness.

1            THE COURT:  All right.  Ladies and Gentlemen, we're

2      going to take a very brief recess.  We'll be back, and the

3      Defendant will cross-examine the witness.  And unless I

4      misunderstood counsel, this should be the last witness and

5      the close of the evidence.

6            So if you will, leave your notebooks in your

7      chairs.  We're going to try to limit this to 10 minutes, be

8      back, and continue as quickly as we can.  You're excused for

9      recess at this time.

10            COURT SECURITY OFFICER:  All rise for the jury.

11            (Jury out.)

12            THE COURT:  Court stands in recess.

13            (Recess.)

14            LAW CLERK:  All rise.

15            THE COURT:  Be seated, please.

16            Bring in the jury, please.

17            COURT SECURITY OFFICER:  All rise for the jury.

18            (Jury in.)

19            THE COURT:  Please be seated.

20            All right.  Cross-examination of the witness by the

21      Defendant.  You may proceed, Counsel.

22            MR. BATCHELDER:  Thank you, Your Honor.

23            Mr. Lee, if we could start with the five-step

24      chart?

25                          CROSS-EXAMINATION

1   BY MR. BATCHELDER:

2   Q.   Dr. Jones, I just want to make sure that we're clear.

3        On the left we have the App Store process that you

4   explained, correct, sir?

5   A.   Yes.

6   Q.   And is it still your testimony that on the right, if you

7   flip Steps 3 and 4, that would be a non-infringing

8   alternative?

9   A.   It would not infringe.  I don't believe it's an

10  available alternative.

11  Q.   It would not infringe any of the four claims asserted in

12  this case, correct?

13  A.   That's correct.

14  Q.   Were you here for His Honor's preliminary instructions

15  to the jury?

16  A.   Yes, sir.

17  Q.   You heard His Honor say, then, that a patent cannot

18  remove from the public the ability to use what was known or

19  obvious before the invention was made or patent protection

20  was sought, correct?

21  A.   Yes.  Yes, sir.

22  Q.   All right.  And you understand that the law takes prior

23  art into account in imposing two requirements -- among

24  others, the two requirements on patent claims in order for

25  them to be invalid, correct?

1   A.    I'm not sure which two you have in mind, sir.

2   Q.    One thing, it has to be new, correct?

3   A.    Yes.

4   Q.    And it has to be non-obvious, correct?

5   A.    Yes.

6   Q.    All right.

7            MR. BATCHELDER:  Your Honor, may I approach the

8   easel?

9            THE COURT:  You may.

10           MR. BATCHELDER:  I'm going to put up a little

11  timeline and see if we can't illustrate that.

12  Q.    (By Mr. Batchelder)  All right, sir.  Can you see what

13  I've done?  I'll walk you through it.  On the left, we have a

14  series of prior art references.  They're called prior art.

15        And let's say they disclose A, B, C, E, F, G.  Do you

16  understand?

17  A.    At a high level, yes.

18  Q.    Okay.  And on the right, we have a later patent.  It's

19  later.  That's why it's on the right side of the timeline.

20        You understand that?

21  A.    Yes.

22  Q.    Okay.  So let's say that this later patent claims B.

23  That would be invalid because it's not new, right?  It's

24  already over here, correct?

25  A.    If that's what that means, yes, sir.

1    Q.   Okay.  So that would be an invalid claim.  And let's say

2    that in Claim D -- well, D's not over here.  But you'd agree,

3    sir, that if the prior art that is over here to one of

4    ordinary skill in the art as the priority date, if this prior

5    art would have rendered D obvious, then that claim, too,

6    would be invalid, correct?

7    A.   Yes.

8    Q.   All right.  So we'll cross that one out, too; correct?

9    Correct?

10   A.   Yes, sir.

11   Q.   All right.  When a company is accused of infringing a

12   patent, the law says that that company has a right to defend

13   itself, correct?

14   A.   Of course.

15   Q.   And it's fair for a company wrongly accused of

16   infringing a patent to do that, right?

17   A.   Of course.

18   Q.   When a company gets sued, accused of infringing a

19   patent, it's fair for it to point out the reasons it don't

20   infringe, correct?

21   A.   Yes.

22   Q.   And it's fair for it to point out the reasons that

23   invalid patent claims are invalid, right?

24   A.   If it believes that's the case, yes.

25   Q.   Okay.  One reason it's fair to challenge the validity of

1   a patent claim is that when the patent application is being

2   considered by the Patent and Trademark Office, or PTO, there

3   may be facts or arguments that the examiner did not consider,

4   such as prior art that was not located by the PTO or provided

5   by the applicant, correct?

6   A.   That's one reason, yes.

7   Q.   And when the patent application is being considered by

8   the PTO, there is, of course, the possibility that mistakes

9   were made or important information overlooked, correct?

10  A.   It's a possibility.

11  Q.   Examiners have a lot of work to do, and no process is

12  perfect, correct?

13  A.   I would say that no process is perfect; that's fair,

14  yes.

15  Q.   And unlike a court proceeding, prosecution of a patent

16  application takes place without input from people who might

17  later be accused of infringement, so it's important that we

18  provide a chance for someone who's accused of infringement to

19  challenge the patent in court, correct?

20  A.   That's fair.

21  Q.   Apple didn't have a seat at the table when the Patent

22  Office granted Mr. Racz's patents, correct?

23  A.   That's my understanding, yes.

24  Q.   And, in fact, in other cases, you represented companies

25  accused of infringing who defended themselves by pointing out

1    not just why they didn't infringe but why the asserted

2    patents were invalid, correct?

3    A.    Yes.

4    Q.    One of those cases was DVSI versus Walden?

5    A.    Yes.

6              MR. BATCHELDER:  All right.  Would you please pull

7    up Defendant's Exhibit 451?

8    Q.    (By Mr. Batchelder) It should be in your notebook, sir.

9         Can you confirm for us that this was a declaration that

10   you signed in that case?

11   A.    Yes, sir.

12             MR. BATCHELDER:  All right.  If we could turn to

13   Paragraph 15?

14   Q.    (By Mr. Batchelder) In the first few lines there, the

15   patents at issue in that case dealt with content delivery

16   over a large computer network, and more specifically a

17   computer network architecture for preventing unauthorized use

18   of the content and securing payment for use of such content,

19   correct?

20   A.    Yes.

21   Q.    That sounds familiar, doesn't it?

22   A.    That's what I recall, yes.

23   Q.    The relevant priority date, you say in the next line,

24   was March 1999, correct?

25   A.    Yes.

```
 1   Q.    Seven months before the priority date of the

 2   patents-in-suit here, correct?

 3   A.    Yes.

 4              MR. BATCHELDER:   If we could look at Paragraph 19?

 5   Q.    (By Mr. Batchelder) In the first sentence there, you

 6   say:  The use of networks of computers to deliver content

 7   online for a charge was practiced on a commercial level no

 8   later than 1998.

 9        Correct?

10   A.    Yes.

11              MR. BATCHELDER:   And if we could look at Paragraph

12   21?

13   Q.    (By Mr. Batchelder)  It begins:  As the Internet and

14   World Wide Web increased in popularity during the 1990s,

15   security became an increasing concern.

16        Correct?

17   A.    Yes.

18   Q.    A few lines later if refers to theft/copying of

19   intellectual property, such as music, correct?

20   A.    Yes.

21   Q.    And then you go on to say:  These challenges were

22   addressed by a range of research and development efforts that

23   by 1999, it led to the adoption of --

24        You see that?

25   A.    Yes.
```

1    Q.    And at the end of the next line you say:  Technological

2    schemes for protecting intellectual property, such as music.

3    The computing community drew upon a wide range of techniques,

4    including encryption, separation of functions, paren,

5    physical and logical, end paren, authentication models, and

6    access control methods.

7         Correct?

8    A.    Yes.

9    Q.    All before the priority date you were addressing in that

10   case, which was March 1999, correct?

11   A.    Yes.

12   Q.    Seven months before Mr. Racz's priority date, right?

13   A.    Yes.

14   Q.    All right.  And you said that under oath, correct?

15   A.    Yes, sir.

16   Q.    Same oath you took here, correct?

17   A.    Yes.

18   Q.    Now, every prior art patent that Mr. Wechselberger

19   relied on in this case is a written document, correct?

20   A.    Yes.

21   Q.    With a date, correct?

22   A.    Yes.

23   Q.    And there's no question they were all before the

24   priority date of Mr. Racz's patent applications, correct?

25   A.    Correct.

1    Q.    There's no hindsight in what they say, correct?

2    A.    That's correct.

3    Q.    There's no hindsight in when they happened, right?

4    A.    That's correct.

5    Q.    It's all there in black and white.  We know for a fact

6    what they say, and that they were before Mr. Racz's date,

7    right?

8    A.    Yes.

9    Q.    All right.

10              MR. BATCHELDER:  If we could pull up DX 23, please?

11   Q.    (By Mr. Batchelder) You recognize the Gruse/IBM patent?

12   A.    Yes.

13   Q.    All right.

14              MR. BATCHELDER:  Let's look at Column 1, Lines 55

15   through 63.

16   Q.    (By Mr. Batchelder) You see the Gruse/IBM patent

17   discloses in the second line there:  A system and related

18   tools for the secure delivery and rights management of

19   digital assets, such as print media, films, games, and music

20   over the Internet.

21         Correct?

22   A.    Yes.

23   Q.    And it also discloses end-user devices for purchasing

24   and accessing digital content, right?

25   A.    Yes.

1    Q.    It discloses an electronic digital content store,

2    correct?

3    A.    Yes.

4    Q.    It discloses a clearinghouse providing licensing

5    authorization for transactions that relate to the sale and/or

6    permitted use of encrypted content, correct?

7    A.    Yes.

8    Q.    The Gruse/IBM patent discloses a content supplier,

9    correct?

10   A.    Yes.

11   Q.    It discloses rules that discloses access to content,

12   correct?

13   A.    Yes.

14   Q.    As part of a purchase transaction, the Gruse/IBM patent

15   discloses a user selecting content to purchase, providing

16   personal and financial information, and agreeing to the

17   conditions of purchase, correct?

18   A.    Yes.

19   Q.    It discloses laptop computers as an example of an

20   end-user device, correct?

21   A.    Yes.

22   Q.    The Gruse/IBM patent discloses that content providers

23   may want to offer customized players on a variety of devices,

24   such as handheld devices and more, correct?

25   A.    Yes.

1  Q.   One of the combinations that Mr. Wechselberger addressed

2  was the Gruse/IBM patent, together with the Puhl/Motorola

3  patent, correct?

4  A.   Yes.

5          MR. BATCHELDER:  All right.  Can we see

6  Mr. Wechselberger's Slide No. 102?

7  Q.   (By Mr. Batchelder) You recognize this slide?

8  A.   I do.

9  Q.   And the Puhl/Motorola patent discloses a handheld

10 device, correct?

11 A.   Yes, it does.

12 Q.   And it says:  At least one server has been described

13 coupleable to the wireless Gateway delivering content items

14 to the wireless device.

15     Correct?

16 A.   Yes.

17 Q.   That's that handheld device right there in Figure 4,

18 right?

19 A.   Yes, it is.

20 Q.   Now, in 1990 --

21          MR. BATCHELDER:  You can take that down, Mr. Lee.

22 Q.   (By Mr. Batchelder) In 1998, laptop computers were

23 portable, correct?

24 A.   Yes.

25 Q.   In 1998, laptop computers existed that could play audio

1    data, correct?

2    A.    Yes.

3    Q.    And video data, correct?

4    A.    Yes.

5    Q.    Audio and video data are examples of multimedia content,

6    correct?

7    A.    Yes.

8    Q.    You agree that in one way or another a laptop computer

9    in 1998 would have had a data carrier, as that term has been

10   construed by the Court, correct?

11   A.    Yes.

12   Q.    Because a data carrier is a medium capable of storing

13   information.  That's what the Court has told us, right?

14   A.    Yes.

15   Q.    And you agree that any type of memory could be a data

16   carrier under the Court's construction, correct?

17   A.    It has that potential, yes.

18   Q.    The Gruse/IBM patent discloses that data that the user

19   enters into a web portal is stored at least temporarily on

20   the computer's memory before it's transmitted, correct?

21   A.    It could be.  I don't think it discloses that.

22            MR. BATCHELDER:  Can we pull up, please, Mr. Lee,

23   from Dr. Jones's September 26th deposition transcript, Page

24   203, Lines 16 through 21?

25   Q.    (By Mr. Batchelder) Question:  So doesn't Gruse, in

1   fact, disclose that data that the user enters in a web portal

2   is at least temporarily stored on the computer before it's

3   transmitted?

4        Answer:  It would be in some kind of temporary memory.

5        Correct?

6   A.   Yes.

7   Q.   And temporary memory is a medium capable of storing

8   memory, correct?

9   A.   Yes.

10  Q.   '772 patent, Claim 26, begins with the phrase "a

11  handheld multimedia terminal," correct?

12  A.   Yes.

13  Q.   And a handheld multimedia terminal, by definition, must

14  be a handheld device, right?

15  A.   Yes.

16  Q.   You agree that Mr. Racz did not invent handheld

17  multimedia devices, correct?

18  A.   Not the general category.  He invented the particular

19  one in the claims.

20  Q.   You agree that the Gruse/IBM patent discloses handheld

21  devices as the end-user device, right?

22  A.   Yes.

23  Q.   And you agree that the Gruse/IBM patent discloses

24  devices that can play both audio and video content, correct?

25  A.   Yes.

1   Q.   A handheld multimedia terminal must be wireless,

2   correct?

3   A.   I don't know that it must be, but it's likely to be.

4   Q.   And Gruse/IBM, that patent discloses wireless

5   communications infrastructures, correct?

6   A.   Yes.

7   Q.   It discloses satellite and wireless infrastructures in

8   particular, correct?

9   A.   Yes.

10  Q.   The Gruse/IBM patent also discloses that a user can

11  enter credit card information into a form, and that form gets

12  submitted directly to the clearinghouse for financial

13  settlement, correct?

14  A.   Yes.

15  Q.   And the Gruse/IBM patent discloses that encrypted credit

16  card info is included in what's called an order SC, correct?

17  A.   It's an optional field, but it can be included.

18  Q.   And it discloses that, right?

19  A.   Yes.

20  Q.   That's one of the things the patent teaches, right?

21  A.   Yes.

22  Q.   And this is information that's used to charge for the

23  purpose -- or excuse me -- that information we just talked

24  about is used to charge for the purchase when the

25  clearinghouse handles the billing, correct?

1    A.    Which is that -- I'm not sure what you're referring to.

2    Q.    That encrypted credit card information that we just

3    talked about.

4    A.    I would have to look back and see.

5    Q.    The order SC is sent from the end-user device to a

6    remote server, correct?

7    A.    It can be, yes.

8    Q.    And the Gruse/IBM patent teaches that, right?

9    A.    Yes, in Figure 6.

10   Q.    All right.  We've been using this phrase "SC from the

11   Gruse/IBM patent."  That's a secure container, right?

12   A.    That's correct.

13   Q.    And the order SC that gets sent to the clearinghouse

14   from the end-user device, right?

15   A.    Yes.

16   Q.    When the clearinghouse receives the order SC, it

17   performs verification checks on the data contained in the

18   order SC, correct?

19   A.    Yes.

20          MR. BATCHELDER:  If we could look at the Gruse/IBM

21   patent, Column 13, Lines 48 through 58, please.  This is DX

22   23.  Column 13, Lines 48 through 58.

23   Q.    (By Mr. Batchelder) And this passage describes those

24   verifications that we just discussed, correct, sir?

25   A.    Yes.

1   Q.    So if those verifications are successful, the

2   clearinghouse sends what's called a license SC to the user's

3   device, correct?

4   A.    Yes.

5   Q.    And the license SC provides an end user device with

6   everything that is needed to access a content item, correct?

7   A.    It provides it with needed information.  I don't recall

8   if it provides everything that's needed.

9   Q.    Well, let's take a look at Column 30 of the Gruse/IBM

10  patent, Lines 11 through 22.  Right at the beginning there,

11  it says:  A license SC provides an end-user device with

12  everything that is needed to access a content item.

13        Correct, sir?

14  A.    Yes, sir.

15  Q.    But if processing of an order SC does not complete

16  successfully, an error is returned, right?

17  A.    Yes.

18            MR. BATCHELDER:  Let's turn to Defendant's Exhibit

19  39.

20  Q.    (By Mr. Batchelder) This is the Stefik/Xerox reference,

21  correct, sir?

22  A.    Yes.

23            MR. BATCHELDER:  And let's look in the abstract at

24  the first six lines.

25  Q.    (By Mr. Batchelder) This patent discloses a system for

1   controlling use and distribution of digital works, correct?

2   A.   Yes.

3   Q.   And then a sentence later, it says:  The usage rights

4   define how a digital work may be used and further distributed

5   by the buyer.

6        Correct?

7   A.   Yes.

8   Q.   And digital works are stored in a repository.

9        Right?

10  A.   Yes.

11  Q.   And the repository will process each request for access

12  to a digital work by examining the corresponding usage

13  rights.

14       Correct?

15  A.   Yes.

16  Q.   The usage rights for the work define how it may be used

17  and distributed in the Stefik/Xerox patent.

18       Correct?

19  A.   Yes.

20  Q.   Repositories may be located on separate computers or

21  they may be combined in one device.

22       Right?

23  A.   Yes.

24  Q.   And when they're combined on one device, the check of

25  usage rights may be combined in one device.

1      Correct?

2    A.    I believe it could be, yes.

3    Q.    The Stefik/Xerox patent includes a credit server that

4    handles billing.

5      Correct?

6    A.    It does.

7    Q.    And that credit server can act as a debit card where

8    transactions occur in realtime against a user account.

9      Correct?

10   A.    Yes.

11   Q.    Now, you understand that Mr. Wechselberger, one of the

12   combinations he considered was combining the Stefik/Xerox

13   patent with the Poggio/Sun Microsystems patent, correct?

14   A.    Yes.

15   Q.    And he relied upon the Poggio/Sun Microsystems patent to

16   disclose in that combination prepayment for content, correct?

17   A.    I don't recall him using those words, but I do recall

18   that he was relying on Poggio/Sun for the payment element.

19   Q.    And the Poggio/Sun patent, payment is sent from the

20   end-user device, correct?

21   A.    Yes.

22   Q.    A receipt is generated in response to that payment,

23   correct?

24   A.    I'm not sure where you mean -- do you mean sent back to

25   the end-user device, or do you mean something else?

1    Q.   Sir, I said a receipt is generated in response to

2    payment.  That happens in the Poggio/Sun Microsystems patent,

3    correct?

4    A.   It's not a response to the payment.

5    Q.   After payment, is there a receipt that's generated?

6    A.   Yes.

7    Q.   As a result of the generation of that receipt, content

8    is sent to the device, correct?

9    A.   No.

10   Q.   Does payment happen in the Poggio/Sun Microsystems

11   patent before content is received by the device?

12   A.   Yes.

13   Q.   So the Poggio/Sun Microsystems patent does disclose

14   prepayment for content, correct?

15   A.   Yes.

16   Q.   Now, it's your opinion that in the Stefik/Xerox patent,

17   rules are not checked for content already stored on that

18   device; is that right?

19   A.   There are situations in which it's not.  It depends

20   on -- it would depend on the situation.

21   Q.   There are situations in which rules are checked for

22   content already stored on the device in the Stefik/Xerox

23   patent?

24   A.   There can be.

25                MR. BATCHELDER:  Let's turn to Defendant's Exhibit

1   40.

2   Q.   (By Mr. Batchelder) This is the Ginter/InterTrust

3   patent, correct?

4   A.   Yes.

5   Q.   Let's look at the abstract in the first sentence:   The

6   present invention provides systems and methods for secure

7   transaction management and electronic rights protection.

8        Correct?

9   A.   Yes.

10  Q.   The -- the Ginter/InterTrust system can protect digital

11  content by helping ensure that information is accessed and

12  used only in authorized ways.

13       Correct?

14  A.   Yes.

15  Q.   The Ginter/InterTrust system can help ensure the content

16  providers will be paid for use of distributed information.

17       Correct?

18  A.   Yes.

19  Q.   And the Ginter/InterTrust system can protect the rights

20  of parties who have interest in electronic credit and

21  electronic currency storage, including electronic purchasing.

22       Correct?

23  A.   Yes.

24  Q.   The budget process disclosed in the Ginter/InterTrust

25  patent limits content usage.

1        Correct?

2    A.    It can by imposing a budget in that sense, yes.

3              MR. BATCHELDER:  Let's take a look at Column 58,

4    please, Line 25 through 30.

5    Q.    (By Mr. Batchelder) It discloses budget process limits

6    how much content usage is permitted, correct?

7    A.    Yes.  In the sense I just said.

8    Q.    And it teaches that, right?

9    A.    In a form, yes.

10   Q.    The Ginter/InterTrust patent discloses payment data,

11   correct?

12   A.    Yes.

13   Q.    It discloses assigning users ID numbers that are linked

14   to credit card information, correct?

15   A.    It can, yes.

16   Q.    And the Ginter/InterTrust patent further discloses that

17   these account numbers can be used to perform an electronic

18   funds transfer, correct?

19   A.    I don't recall one way or the other on that.

20             MR. BATCHELDER:  Can we pull up, please, Column

21   179, Lines 57 through 65?

22   Q.    (By Mr. Batchelder) It begins:  For example, audit

23   method 2520 at this point could call an external process to

24   perform, for example, an electronic funds transfer against

25   the user's bank account or some other bank account.

1        Correct, sir?

2   A.    Yes.

3   Q.    Now, sir, in your rebuttal expert report in this case,

4   you provided opinions on secondary considerations of

5   non-obviousness, correct?

6   A.    Yes.

7   Q.    And you concluded that Smartflash's products, the

8   Internet Plc Smartflash kits, were commercially successful.

9        And that's what you said in your report, right?

10  A.    I concluded that the Smartflash invention was

11  commercially successful.

12  Q.    Did you conclude that the Smartflash kits, the Britney

13  Spears, for example, kits, were commercially successful?

14  A.    The kits themselves, no.

15  Q.    So it's not your opinion that the Britney Spears cards

16  evidence non-obviousness in this case?

17  A.    It is my opinion that they do.

18  Q.    Now, you're not an expert in finance or commerce,

19  correct?

20  A.    That's correct.

21  Q.    Your background is in technology, not evaluating

22  investments, right?

23  A.    That's right.

24  Q.    You would agree that Internet Plc's financial advisers

25  and auditors were better positioned then than you are now to

1   opine about the commercial success of Internet Plc's

2   products, correct?

3   A.    Yes.

4   Q.    All right.

5           MR. BATCHELDER:   Can we see Defendant's Exhibit

6   139, Page 1, Paragraph 2?

7   Q.    (By Mr. Batchelder) You'll see down at the bottom, it

8   says:   Internet Plc bears the total financial risk of

9   developing, producing, and marketing Smartflash products and

10  can lose a significant amount of money in case its product is

11  not successful, as in the case of Britney Spears fan cards.

12        You see that?

13  A.    Yes, I do.

14  Q.    And this was written by Eco3 Capital, Internet Plc's

15  financial advisers and auditors, correct?

16  A.    Yes.

17  Q.    So they concluded that that project was not successful,

18  right?

19  A.    Yes.

20  Q.    All right.

21          MR. BATCHELDER:   Can we turn -- give me one moment.

22  Q.    (By Mr. Batchelder) Now, sir, when you signed your

23  rebuttal report expressing that opinion, you did that a month

24  after Mr. Racz himself admitted that any success of the

25  Britney Spears card project did not demonstrate in any way

1  the non-obviousness of any of his claimed inventions, right?

2  A.    I don't recall one way or the other on that.

3              MR. BATCHELDER:   Can we put up Mr. Racz's

4  deposition transcript, Volume 2, please, Page 390, Line 5

5  through 13.

6              Page 390.   Go up.   Let's see.   Okay.   Yeah.   So

7  starting at Line 5 through 13, please.

8  Q.    (By Mr. Batchelder) The question was posed:   Yesterday

9  you characterized the Britney Spears project as a commercial

10  success, correct?

11      Answer:   I qualified it in a certain way, and I

12  characterized it as a commercial success.   Yes, I did.   I

13  stand by that.

14      Question:   Does that commercial success, as you've

15  characterized it, demonstrate in any way the non-obviousness

16  of any of your claimed inventions?

17      Answer:   No.   No, it doesn't.

18      Do you see that?

19  A.    Yes.

20  Q.    Now, were you aware of that testimony when, a month

21  later, you said the opposite?

22  A.    No.   I -- I read his deposition, and perhaps he's

23  looking at it a different way.   I'm analyzing it from the

24  point of view of an expert looking at the secondary

25  considerations.

1    Q.    So you disagree with the named inventor on this subject?

2    A.    On that issue, yes.

3              MR. BATCHELDER:  Your Honor, I pass the witness.

4              THE COURT:  Any redirect?

5              MR. CURRY:  Briefly, Your Honor.

6                        REDIRECT EXAMINATION

7    BY MR. CURRY:

8    Q.    Dr. Jones, did Mr. Batchelder challenge you on any of

9    the reasons you gave that the claims in this case are valid?

10   A.    No, sir.

11   Q.    Is it enough to just go through and cherry pick pieces

12   from different parts of different prior art references that

13   say stuff similar to the claims?

14   A.    No, sir.  You have to do the analysis I described

15   earlier in terms of one of ordinary skill in the art at the

16   time of the invention, looking at what was available in the

17   prior art and then determining what motivations there were to

18   combine and what ways you would be motivated to combine them.

19   Q.    And I think you started your cross-examination by

20   pulling up a declaration from the DVSI case.  Do you remember

21   that?

22   A.    Yes, sir.

23   Q.    In the DVSI case, did you acknowledge the prior art?

24   A.    Of course.

25   Q.    Did you acknowledge it in this case?

1   A.   Of course.

2   Q.   And did you still find, even after acknowledging the

3   prior art, that Apple and Mr. Wechselberger failed to carry

4   their burden of clear and convincing evidence in invalidating

5   any claim in this trial?

6   A.   Yes, sir.

7   Q.   Now, you were also asked a bunch of questions about what

8   different pieces of prior art teach, right?

9   A.   Yes, sir.

10  Q.   Did Mr. Batchelder ever ask you what those references

11  didn't teach?

12  A.   No, sir.

13  Q.   You were asked the question about the debit card in

14  Stefik.  Can you please explain to the jury what's really

15  going on in that scenario?

16  A.   Yes.  What's going on in that scenario relates to Figure

17  1, the example I showed where the -- it's describing a

18  possible way of paying.  Rather than with a credit card, you

19  pay with a debit card, but it's the same metering that's

20  described in Stefik.

21          MR. CURRY:  And could I have my slides at the very

22  end, Mr. Mortensen, please?

23  Q.   (By Mr. Curry) Now, you were asked a lot of questions

24  about different teachings of Gruse, and I think reference was

25  made to Figure 6.  And then tacit reference was made to this

1    section, Column 77 of the Gruse patent.

2         Can you please explain what's really going on in this

3    embodiment and how it fits into the -- what Gruse invented?

4    A.   Sure.   This is one of the sections that were -- that was

5    relied upon by Mr. Wechselberger.   This is describing a

6    different way of doing things that's not in line with

7    Figure 6.

8         This is describing getting an offer SC directly to the

9    user computer, filling out that form, and then sending that

10   to the clearinghouse.   That's not according to the -- the

11   rest of the steps of Figure 6.

12   Q.   So in -- in this embodiment, in Column 77 in Gruse, is

13   this embodiment teaching the use of a transaction SC or an

14   order SC?

15   A.   No, it's -- it's not in line with what was taught by,

16   for example, Figure 6 and the description of it.   It's also

17   different from what Mr. Wechselberger described at the

18   beginning of his presentation regarding the Gruse/IBM patent.

19   Q.   What's the significance of how this embodiment and

20   Column 77 of Gruse doesn't use transaction SC or order SC?

21   A.   Well, the license SC is generated, based on information

22   that originates from both the order SC and the transaction

23   SC, as well as other sources.   But the teachings of Gruse

24   don't support the creation of a license SC based on this

25   column.

1    Q.   Is it appropriate to just mix and match different

2    embodiments of a reference?

3    A.   Well, you can't just mix and match them.  You can

4    combine them for obviousness, if you give an appropriate

5    explanation and motivation for doing so; but there's no

6    motivation given here.

7    Q.   Okay.  And you were asked questions about Poggio.  Do

8    you remember that?

9    A.   Yes, sir.

10   Q.   And I think that the questions that were asked to you

11   were not specific to where the code was in Poggio.  Do you

12   recall that?

13   A.   Yes, sir.

14   Q.   So the question was:  Where is the payment data sent?

15   Is there code to receive payment validation data or a

16   receipt?  Do you remember that?

17   A.   Yes, sir.

18   Q.   Okay.  Without saying it, was Mr. Batchelder tacitly

19   switching between virtual vending -- virtual vending machine

20   and the client computer?

21   A.   Well, if -- if he meant to be referring to what's

22   happening in the claims that are of the Smartflash patents,

23   then, yes, because the receipt of payment validation data in

24   Poggio would happen on the virtual vending machine, the big

25   box in the middle of that diagram.

1    Q.    And then I think Mr. Batchelder asked you about whether

2    temporary memory could be a data carrier.  Do you recall

3    that?

4    A.    I do.

5    Q.    Now, if Mr. Batchelder or Apple now wants a data carrier

6    to be temporary memory, how would that affect validity for

7    the remainder of the claims of the patents?

8    A.    Well, for example, in the '720 patent and the '221

9    patents, the data carrier is -- is the place not only where

10   payment is -- data is read from, it's also where the content

11   that's -- or the data that's downloaded is written to.

12       So Mr. Wechselberger, if he wanted to do that, would

13   have had to have shown that the same memory that -- or the

14   same data carrier was both the location where payment data

15   was read from and where the content was written to.

16   Q.    Again, and how can the Britney Spears and Star Trek and

17   Disney deals evidence non-obviousness, even though they had

18   lost money?

19   A.    Well, they can show that others at the time appreciated

20   the invention and that Mr. Racz was able to attract those

21   companies in ventures with his technology.

22                MR. CURRY:  Pass the witness.

23                THE COURT:  Further cross-examination?

24                MR. BATCHELDER:  Thank you, Your Honor.

25                         RECROSS-EXAMINATION

1  BY MR. BATCHELDER:

2  Q.   Sir, have you ever tallied the total number of claims in

3  these three asserted patents?

4  A.   No, sir, I don't believe I have.

5  Q.   Will you accept my representation that it's 87 total?

6  A.   That's fair.

7  Q.   Now, Apple is here challenging the validity of only four

8  of those 87, correct?

9  A.   Yes.

10          MR. CURRY:  Your Honor, objection.  This is a

11 violation of a motion in limine.  Can we approach?

12          THE COURT:  Approach the bench, Counsel.

13          (Bench conference.)

14          THE COURT:  Make your objection.

15          MR. CURRY:  Your Honor, my objection is that we

16 have a motion in limine that specifically covers the line of

17 questioning and the suggestion; that Mr. Batchelder is going

18 into, which is it's okay to invalidate certain claims because

19 Smartflash will have other claims remaining, that minimizes

20 the burden that Your Honor will instruct under the law.

21          And it's specifically addressed by a motion in

22 limine that I think is agreed to, Your Honor.

23          MR. CALDWELL:  This is the exact example you gave

24 Mr. Albritton, and he agreed to.

25          THE COURT:  What's your response?

1          MR. BATCHELDER:  I don't think it's all within the

2    motion in limine.  All I'm saying is that it's always done in

3    patent cases that if you invalidate these, there are others

4    left.  That's a totally fair line of cross.

5          MR. CURRY:  No, it is not.  It minimizes their

6    burden.

7          MR. CALDWELL:  Well, it also -- it also completely

8    undermines the need to reduce claims and streamline because

9    we get -- we get criticized for it later.  It's separate from

10   the motion in limine.

11         THE COURT:  I'm going to sustain the objection, and

12   I'll -- I'll instruct the jury to disregard that question.

13         All right.

14         MR. CURRY:  Thank you, Your Honor.

15         (Bench conference concluded.)

16         THE COURT:  Ladies and Gentlemen of the Jury:  I'm

17   going to sustain that objection and direct that you disregard

18   the last question asked by defense counsel.

19         MR. BATCHELDER:  Thank you, Your Honor.  I pass the

20   witness.

21         THE COURT:  Further direct?

22         MR. CURRY:  No, Your Honor.

23         THE COURT:  All right, then.  Dr. Jones, you may

24   step down.

25         Plaintiff, call your next rebuttal witness.

1          MR. WARD:  Plaintiff rests, Your Honor.

2          THE COURT:  All right.  Counsel, subject to motions

3     under Rule 50(a), final jury instructions, and closing

4     arguments, do both sides close their case?

5          MR. WARD:  Plaintiff does, Your Honor.

6          THE COURT:  Does Defendant?

7          MR. BATCHELDER:  With a proffer, Your Honor.  Thank

8     you.

9          THE COURT:  All right.  Ladies and Gentlemen of the

10    Jury:  You've now heard all the evidence in this case.  There

11    are certain things that I must now take up with counsel

12    outside of your presence.

13         The good news is you're no longer needed here at

14    the courthouse, and I'm about to excuse you for the day.  The

15    other good news is that there are certain things I must take

16    up with them first thing in the morning before I proceed to

17    give you my final jury instructions and you hear closing

18    arguments from both sides.

19         So I'm going to ask that you be here, not at 8:30

20    in the morning, but at 9:30 in the morning; and, hopefully,

21    that will help with the slushy conditions in the streets and

22    other people will have churned up the roads before you get on

23    them in the morning.

24         So, if you will, rather than be assembled and ready

25    to go at 8:30, be assembled and ready to go at 9:30.  I

 1   cannot guarantee you that at 9:30 sharp, I'll bring you out,

 2   and we'll proceed.  It depends on how certain things will go

 3   with counsel before the Court.

 4              I don't think there's any chance I will need you

 5   before 9:30, so that's why I'm saying 9:30 in the morning.

 6              You may have to wait for me a little bit in the

 7   jury room.  It might be 9:45.  It could even be 10:00

 8   o'clock.  But let's be here at 9:30 in case we're ready to go

 9   at that time.

10              I remind you don't discuss the case.  We're coming

11   to a critical point in the process where you'll hear my final

12   instructions on the law and closing arguments from the

13   attorneys.  I remind you to follow all my other instructions.

14              And with those instructions, one other thing, the

15   Clerk of our court has graciously agreed to take you in a

16   government van and drop you off at your respective cars, and

17   the Court Security Officer will direct you about that after

18   you retire to the jury room.

19              So I will see you at 9:30 in the morning.  You are

20   excused for the evening.  Please leave your notebooks on the

21   table in the jury room.  You are excused at this time.

22              COURT SECURITY OFFICER:  All rise.

23              (Jury out.)

24              THE COURT:  All right.  Be seated, please.

25              Counsel, the Court is going to take a brief recess,

1    and then I will reconvene and hear motions from both sides

2    under Rule 50(a).

3           As I know you are aware, my practice is that you

4    may file supplemental briefing in support of your motions,

5    but it must be filed by the time you present your oral

6    motions so that I'm not delayed in ruling on it.

7           After we hear the motions under Rule 50(a), then we

8    will take another short recess, and later this afternoon,

9    we'll engage in an informal charge conference with counsel in

10   chambers with the Court to discuss the proposed final jury

11   instructions and verdict form for tomorrow morning.

12          I will have a formal charge conference on the

13   record first thing in the morning at 8:30, and you'll be

14   certainly allowed to make formal objections to the Court's

15   charge and verdict form at that time, but this afternoon I

16   want to informally meet with you to discuss the joint

17   submission and my observations about some of the sections of

18   it and hear wide-ranging and informal input from both sides

19   about that.

20          If you are counsel in the case and you are not

21   involved in the process of crafting the charge, particularly

22   those of you that are going to be responsible for final

23   arguments in the morning, you're not required to be present

24   for that informal charge conference unless you just choose

25   to.

1            So with that, we will take a short recess for about

2    15 minutes.  At 4:00 o'clock or thereabouts, I'll be back in

3    the courtroom and be prepared to offer your motions under

4    Rule 50(a) at that time.

5            We stand in recess.

6            (Recess.)

7            LAW CLERK:  All rise.

8            THE COURT:  Be seated, please.

9            All right.  Do I understand that the Defendant has

10   a proffer to make for purposes of the record?

11           MR. POST:  Yes, Your Honor.

12           THE COURT:  All right, Mr. Post.  Please proceed.

13           MR. POST:  Thank you, Your Honor.

14           Defendants have a proffer of evidence that would

15   have been elicited at trial related to three general areas,

16   the first of which is indefiniteness, the second patent

17   ownership and patent valuation, and the third testimony and

18   evidence regarding Patent No. 6,385,596.  That's the Wiser

19   patent that was incorporated by reference into the Ansell

20   patent.

21           Your Honor, we've prepared a written proffer

22   relating the evidence and testimony that would have been

23   elicited.  And if Your Honor would prefer, we are happy to

24   file that, along with the evidence, as supporting evidence,

25   but we'll do whatever Your Honor would wish.

```
 1              THE COURT:  Well, it's for record purposes only.
 2   It seems to me the most logical purposes to do is for you to
 3   file it.
 4              MR. POST:  Okay.  We'll do that tonight, Your
 5   Honor.
 6              THE COURT:  All right.  Any objection from the
 7   Plaintiff?
 8              MR. CASSADY:  Objection to the proffer?
 9              THE COURT:  Yes.
10              MR. CASSADY:  Your Honor, for the reasons in the
11   case that we objected to the testimony and to the procedural
12   issues --
13              THE COURT:  I'm not asking to review the underlying
14   rulings.  I just --
15              MR. CASSADY:  I don't object to the proffer itself,
16   Your Honor.
17              THE COURT:  Okay.  That's what I'm trying to get
18   to.
19              All right.  Anything else, Counsel, before we take
20   up motions on Rule 50(a)?
21              MR. CASSADY:  Nothing from the Plaintiff.
22              THE COURT:  I'll note that the Defendants have
23   filed a written version of their motion, and I have that.
24              But I'll hear first from the Plaintiff as to any
25   motions under Rule 50(a) they care to offer.
```

1          MR. POST:  Your Honor, would you like a copy of the

2     motion?  We do have a printout.

3          THE COURT:  I have one, too.

4          MR. POST:  Okay.  Thank you, Your Honor.

5          THE COURT:  All right.  Proceed, Counsel.

6          MR. SUMMERS:  Thank you, Your Honor.  John Summers

7     for Smartflash.

8          Smartflash seeks judgment under Rule 50(a) that

9     Smartflash has established as a matter of law that Apple

10    directly infringes Claim 13 of the '720 patent, Claim 32 of

11    the '221 patent, and Claims 26 and 32 of the '772 patent by

12    making, using, selling, offering to sell, or importing into

13    the United States the accused iPhone, iPad, and iPod Touch

14    devices.

15         THE COURT:  Counsel, you are really going to have

16    to slow down.

17         MR. SUMMERS:  Absolutely, Your Honor.

18         THE COURT:  Okay.

19         MR. SUMMERS:  Smartflash has established as a

20    matter of law that Apple's accused products literally meet

21    Claim 13 of the '720 patent, Claim 32 of the '221 patent, and

22    Claims 26 and 32 of the '772 patent.

23         Smartflash adduced evidence through the testimony

24    of Dr. Mark T. Jones, who relied on Apple's source code and

25    deposition testimony, et cetera, showing that the accused

1    products meet each and every claim limitation.

2                THE COURT:  Counsel, you're going to have to slow

3    down.  I know you're reading, but it's been a long day.  This

4    is the end of the second back-to-back jury trial my staff has

5    had.  My Court Reporter is tired.

6                If you want me to listen to what you have to say

7    and if you want it to be accurate in the record, you're going

8    to have to slow down.

9                MR. SUMMERS:  Thank you, Your Honor.

10               There is no substantial evidence to the contrary as

11   to any of the claims.  Not a single Apple fact or expert

12   witness disagreed with the analysis of Dr. Jones as the

13   precise operation of the accused products.

14               There was no substantial evidence that the GUID,

15   DSID, MI -- or MID were not collectively payment data under

16   the Court's claim construction, nor was there substantial

17   evidence to support Apple's non-infringement argument that

18   its products do not contain payment validation data in the

19   buy request.

20               Apple's arguments to the contrary aren't factual

21   disputes that misread the claims and fail to apply any

22   reasonable plain meaning interpretation of the term "payment

23   validation data," in light of the Court's constructions for

24   both payment data and payment validation system.

25               There's also no substantial evidence supporting

Apple's argument that Dr. Jones's evidence of use and access rules and use status data do not meet the claim terms.

There's also no essential evidence that Apple is not the data supplier in Claim 13 of the '720 and 32 -- and Claim 32 of the '221 patent.  Dr. Jones opined that a person of ordinary skill would understand the plain meaning of data supplier, including Apple and Akamai working in conjunction with one another.

Apple offered no testimony regarding a different plain meaning; instead, it pursued a divided infringement argument.

And that argument is wrong as a matter of law because the claims require code to retrieve from a data supplier on the end-user device.  They don't require a data supplier to actually perform any step or provide any additional code such that any divided infringement issue arises.

In sum, the evidence and argument in support of Apple's non-infringement positions are insufficient as a matter of law.  Smartflash has established its case by evidence that the jury would not be at liberty to disbelieve.

Smartflash also seeks judgment under Rule 50(a) that Smartflash has established as a matter of law that Apple's accused products -- that Apple induces the direct infringement of Claim 13 of the '720 patent, Claim 32 of the

1    '221 patent, and Claims 26 and 32 of the '772 patent.

2             Dr. Jones offered evidence from which any

3    reasonable juror would find the requirement -- the requisite

4    intent to induce Apple presold iTunes, the App Store, iBooks,

5    and the settings app, which contains the parental controls

6    restrictions on its accused products.

7             Apple markets these products and features and

8    instructs its users on how to use them.  Apple would -- is

9    willfully blind as a matter of law.  Apple's engineers

10   testified that they do not review patents, even though

11   patents are written for persons of ordinary skill in the art.

12            Mr. Farrugia even testified that he would not have

13   reviewed Smartflash's patents even if they were placed on his

14   desk when the patent issued.  He also testified that this

15   reaction was typical for his team.

16            Smartflash also offered evidence that the patents

17   were publicly available and, again, written for persons of

18   ordinary skill in the art like Apple's engineers.  No

19   reasonable juror could fail to find that this behavior

20   amounts to willful blindness.

21            There's also legally insufficient evidence that --

22   Apple's good-faith belief in either non-infringement or

23   invalidity.  Accordingly, Smartflash has established its

24   inducement by evidence that the jury would not be at liberty

25   to disbelieve.

1          THE COURT:  All right.  Let me stop you at this

2   point and hear a response from the Defendant.

3          MR. POST:  Thank you, Your Honor.

4          Defendant Apple is opposing Smartflash's Rule 50(a)

5   motion and also has its own corresponding motion addressing

6   both of those issues, so I'll -- with Your Honor's

7   indulgence, deal with both of those collectively.

8          With respect to infringement and non-infringement,

9   Smartflash has the burden to prove that the accused devices

10  contain each and every limitation in order to establish

11  infringement.

12         Smartflash has failed to proffer sufficient

13  evidence for a reasonable jury to find the accused products

14  practice at least the following claim terms:  The first,

15  payment data.  This is a claim term found in all asserted

16  claims.

17         Dr. Jones identified the DSID, GUID, and MID as

18  purportedly meeting the payment data limitation.  Evidence

19  and testimony proves that these -- the purpose of these three

20  data elements is to identify the user in the device, not to

21  make payment as the claims require.

22         These IDs are sent to Apple's servers regardless of

23  whether payment is to be made for the example -- for the

24  purposes of free content.

25         In contrast, payment data is stored at the Apple

1    server, and it is this data that's used to make payment for

2    content under the Court's construction.

3         With respect to payment validation data, this also

4    applies to all four asserted claims.  Dr. Jones identified a

5    response received by the user's device from MZ Buy, but after

6    the buy product request is processed at Apple's server.  But

7    the evidence shows that this cannot be payment validation

8    data, because the same message is sent whether or not payment

9    is ultimately made.

10        Moreover, this same information is sent back to the

11   device when a payment session is still open and no payment is

12   due because the purchasers have not met either a time or

13   total amount threshold.

14        With respect to use rules and use status data,

15   these terms appear in Claims 26 and 32 of the '772 patent.

16        Dr. Jones identified three items, the first being

17   rules related to movie rentals, the second parental controls,

18   and the third FairPlay, but provided no testimony about the

19   items parental control or FairPlay and didn't identify or

20   discuss or provide any testimony about source code that he

21   alleges meets the claim limitations.

22        With respect to movie rentals, the purported rule

23   that he identified is a number, which is not a rule.

24        The next claim element -- claim term is access

25   rule.  This appears in the '720, Claim 13, and the '221

1   patent, Claim 32.  For the same reasons as use rule, the

2   number identified as an access rule is not a rule.  It's

3   simply an integer.

4          Finally, with respect to non-infringement, Your

5   Honor, the data supplier term appearing in the '720 patent,

6   Claim 13, and '221, Claim 32, a proper claim interpretation

7   requires that the claimed data supplier must provide both the

8   claimed access rule and digital content data.

9          But according to the evidence in the case, Apple

10  provides the access rule -- the alleged access rule, whereas

11  Akamai provides the digital content, and there's no evidence

12  that was -- from which the jury can conclude that Apple

13  deserves the requisite control over Akamai.

14         With respect to no inducement, it's Apple's

15  position that the jury could not find that Apple had

16  knowledge that the induced acts constitute patent

17  infringement or that Apple was willfully blind, as required

18  to establish liability for the induced -- induced

19  infringement.

20  There's no evidence of any notice prior to litigation on the

21  record.  Moreover, the Racz to Gemplus to Farrugia to Apple

22  purported connection is attenuated, and entirely lacking in

23  supporting facts.  Moreover, Smartflash dropped any

24  allegations of copying.

25  With respect to willful blindness, there's no evidence that

1    Apple subjectively believed there was a high probability that

2    a fact exists or, two, that Apple took deliberate actions to

3    avoid learning of that fact as the law requires.

4    Moreover, Apple offered evidence that policies are in place

5    within Apple to address third-party IP issues which addresses

6    the -- the testimony that various Apple engineers had not

7    read the patents.

8    Even after Apple became aware of the patents when this case

9    was filed, Apple held and maintained good-faith beliefs in

10   its strong invalidity and non-infringement defenses, which

11   further demonstrates lack of the requisite intent.

12             THE COURT:  All right.  Well, the Court's heard and

13   considered the Plaintiff, Smartflash's, motion for judgment

14   as a matter of law that there is both literal infringement of

15   the claims in suit, and there is induced infringement.  That

16   motion is denied.

17   The Court has heard and considered the response by the

18   Defendant, Apple, objecting to the motions by the Plaintiff

19   and also asserting its motions under Rule 50(a) that there is

20   no literal infringement and no induced infringement as a

21   matter of law, and that motion by the Defendant is denied.

22   Let me next hear any motion on willfulness.  That will come

23   from the Defendant, I assume.  I'll hear from you first on

24   that, Mr. Post.

25             MR. POST:  Thank you, Your Honor.

1   Apple brings a motion under Rule 50(a) of a finding of no

2   willful infringement.  No reasonable juror would find that

3   Smartflash presented clear and convincing evidence that Apple

4   acted despite, one, an objectively high likelihood that its

5   actions constituted infringement of a valid patent; and, two,

6   that a risk was either known or so obvious that it should

7   have been known under the Federal Circuit's In Re: Seagate

8   decision.

9   Federal Circuit precedence states that the objective first

10  prong of Seagate tends not to be met where the accused

11  infringer relies on a reasonable defense to a charge of

12  infringement.  And that is the case here.

13  There was no pre-suit willfulness because there was no

14  notice.

15  Further, the speculations about Mr. Augustin Farrugia are

16  factually unsupported, and Smartflash does not allege

17  copying.

18  Additionally, there's no post-suit willfulness because, at a

19  minimum, Apple's reliance on its non-infringement/invalidity

20  defenses is and has been reasonable.

21  The testimony of Apple's expert witnesses at trial, including

22  Dr. Ligler and Mr. Wechselberger, make it impossible for a

23  reasonable juror to find that Apple lacked an objectively

24  reasonable defense to Smartflash's claims.

25             THE COURT:  Let me hear a response from the

1    Plaintiff.  And if the Plaintiff has a companion motion for

2    judgment as a matter of law finding that no reasonable jury

3    could fail to find willfulness, then I'll hear argument on

4    that at the same time.

5              MR. SUMMERS:  Thank you, Your Honor.

6              We would move under Rule 50(a) for judgment as a

7    matter of law that no reasonable juror could fail to find

8    willfulness, and there is also substantial evidence in the

9    record to support a jury's finding of willfulness.

10             Your Honor, the Defendants claim that there's no

11   direct evidence of willfulness because Mr. Farrugia never

12   explicitly said that he had been exposed to the patents prior

13   to going to Apple.

14             But the evidence in the record does show that Apple

15   acted, despite an objectively high likelihood, that its

16   actions infringed a valid patent and that this objectively

17   high risk was either known or so obvious that it should have

18   been known.

19             The objectively high likelihood is established by

20   Dr. -- Dr. Jones's testimony showing that Apple infringes and

21   his discussions today about the validity of the patents.

22             Smartflash offered evidence that Mr. Farrugia was

23   aware of Smartflash's patented technology prior to being

24   employed by Apple circumstantially.  After Mr. Farrugia

25   joined Apple, he worked on Apple's FairPlay, which is an

integral part of the accused products practicing the patented technology.

Mr. Farrugia joined Apple with little experience in digital rights management, yet he was hired as a director of Apple's DRM team.  Apple hired Mr. Farrugia because of his knowledge gained at Gemplus.

This knowledge included knowledge of Mr. Racz's patents via Mr. Racz's partnership with Gemplus at the time.

While Mr. Farrugia did not directly attest to that knowledge, Mr. Farrugia's pervasive inconsistencies in his testimony is evidence from which at least a reasonable juror could determine that Mr. Farrugia was hiding something about his awareness of Mr. Racz's patents before he joined Apple.

Apple has offered no evidence that it took steps to avoid infringing or designing around Mr. Racz's technology. There's a stipulation that there are no design-arounds or non-infringing alternatives that Apple has identified.

Mr. Farrugia also testified that he would not have read Mr. Racz's patent even if it had been placed on his desk when it issued.  And, again, patents are publicly available and written for persons of ordinary skill in the art like Apple's engineers who testified that they rarely, if ever, review patents.

The evidence adduced at trial demonstrates that Apple's defenses were objectively unreasonable.  Apple paid

1    fact witnesses to support its invalidity defense.  Again,

2    Apple never attempted to design around the asserted patents.

3    Apple took unreasonable positions regarding claim

4    construction, non-infringement, and invalidity, all of which

5    were developed post-filing, so that would go to only

6    post-filing willfulness.

7              Apple, as we'll talk about in a little bit, failed

8    to prove up one of its prior art references and offered an

9    expert opinion on invalidity developed and written almost

10   entirely by Apple's lawyers.

11             Apple lost its claim construction positions

12   relevant to the asserted claims and did not establish that

13   any of its failed positions would have resulted in a

14   non-infringement or invalidity position.

15             And, finally, Apple's experts did not even review

16   the source code to develop their incorrect positions.

17             As such, Smartflash is entitled to judgment of

18   willful infringement as a matter of law.

19             THE COURT:  All right.  Well, having considered the

20   Defendant's motion that it's entitled to judgment as a matter

21   of law, that there is no basis -- reasonable basis for

22   willfulness in this case, that motion is denied.

23             As to the Plaintiffs' motion for judgment as a

24   matter of law that it is entitled to a finding at this

25   juncture by the Court that there is willful infringement,

1    that motion is denied, as well.

2           Let me next -- next hear motions under Rule 50(a)

3    from the parties with regard to the topic of invalidity.

4           And, Counsel, since you're at the podium, I'll hear

5    from you first.

6           MR. SUMMERS:  Thank you, Your Honor.

7           Smartflash is entitled to judgment as a matter of

8    law under Rule 50(a) on Apple's invalidity assertions.

9           The only testimony presented on this issue was

10   unreliable and not competent expert testimony.  Apple's

11   expert failed to appreciate that the clear and convincing

12   evidence is a higher standard of proof than the preponderance

13   of the evidence standard, even though he opined as to issues

14   under each standard.

15          If an expert opines under the incorrect legal

16   standard, we submit that that is unreliable and incompetent

17   expert testimony.

18          Notwithstanding the unreliability of the expert,

19   Apple failed to meet its burden to produce legally sufficient

20   clear and convincing evidence that Claim 13 of the '720

21   patent or Claim 32 of the '221 patent are anticipated.

22          Specifically, Apple failed to prove by clear and

23   convincing evidence that all claim elements are met by the

24   Gruse reference.

25          Apple failed at least to produce any legally

sufficient clear and convincing evidence that Gruse discloses reading payment data from the data carrier or receiving an access rule responsive to payment validation data.

Dr. Jones testified that, although Apple pointed to the license SC as payment validation data, Apple also pointed to the same thing for the access rule that's supposed to be received in response to payment validation data.

Both of these limitations are present in Claim 13 of the '720 patent and Claim 32 of the '221 patent; and thus this deficiency means that as a matter of law, there's no anticipation.

Apple also failed to offer any evidence to meet its burden to produce legally sufficient clear and convincing evidence that Claim 13 of the '720 patent, Claim 32 of the '221 patent, or Claims 26 and 32 of the '772 patent are obvious.

As to all of the claims, Apple offered legally insufficient clear and convincing evidence of any teachings, suggestion, or motivation to combine the asserted references.

As to each and every claim, Apple also ignored secondary considerations of non-obviousness, which is part of their affirmative invalidity clear and convincing burden.

Further, as to each and every claim, Apple failed to establish by clear and convincing evidence that the IBM system, as presented by Mr. Wechselberger, was prior art.

1          Mr. Lotspiech testified that the IBM system, at

2    least as presented by Apple, was not fully operational during

3    the prior art period.

4          Regarding the specific combinations for Claim 13 of

5    the '720 patent, there's not legally sufficient clear and

6    convincing evidence that the IBM system, in combination with

7    Sony, discloses access rules dependent on payment, payment

8    data, or payment validation data.

9          Additionally, although Apple attempts to use the

10   NTT DoCoMo reference to support the IBM system, that was not

11   a specifically elected reference.  And in any event, Apple's

12   provided no evidence that the planned aspirational

13   implementation alluded to in DoCoMo was ever implemented in

14   the United States.

15         There's also insufficient clear and convincing

16   evidence that the Ginter plus Poggio or Stefik plus Poggio

17   references render Claim 13 of the '720 patent obvious.

18         Ginter and Stefik teach away from Poggio because

19   Ginter and Stefik are metered billing references while Poggio

20   is not.

21         Additionally, Apple uses Poggio for payment data,

22   payment validation data, and payment validation system, but

23   Poggio does not disclose reading payment data from memory,

24   nor is payment data transmitted in response to a user

25   selection.

1          Poggio also does not disclose the client device,

2    receiving payment validation data, or retrieving content

3    responsive to payment validation data.

4          Apple fails to offer legally sufficient clear and

5    convincing evidence of obviousness of Claim 32 of the '221

6    patent.

7          In addition to the universal deficiencies, the

8    three references involving Poggio all fail for the same

9    reasons as for Claim 13 of the '720 patent.

10          Ginter and Poggio and Stefik and Poggio also fail

11    for the reasons that Ginter and Stefik teach away from

12    Poggio.

13          IBM plus Sony fails for the same reasons as Claim

14    13 of the '720 patent, as well.

15          There's also legally insufficient clear and

16    convincing evidence that Claims 26 or 32 of the '772 patent

17    are invalid as obvious.

18          In addition to the universal deficiencies, Ginter

19    and Poggio and Stefik and Poggio were presented as to Claim

20    26 only.  So JMOL is appropriate for those references as to

21    Claim 32.

22          And as to Claim 26, there is legally insufficient

23    evidence of obviousness for the same reasons as Claim 13 of

24    the '720 patent and Claim 32 of the '221 patent, or both

25    Claims 26 and 32.

1          The IBM plus Sony combination is insufficient for

2     the same reasons as Claim 13 of the '720 patent and Claim 32

3     of the '22 (sic) patent as to the Gruse plus Puhl reference.

4          In addition to the deficiencies already discussed,

5     Apple failed to show legally sufficient clear and convincing

6     evidence that this combination disclosed transmitting payment

7     data responsive to a user selection or code to receive

8     payment validation data.

9          Additionally, the teachings of Gruse would teach

10    away from a handheld multimedia terminal because a person of

11    ordinary skill would think to connect to the phones, the PC,

12    rather than putting all the functionality onto the phone.

13         For the Ansell plus Poggio plus Puhl reference, the

14    payment deficiencies in Poggio --

15         Strike that.

16         Ansell does not actually disclose the relevant code

17    elements.

18         Finally, Smartflash moves for judgment as a matter

19    of law that Claim 26 of the '772 patent is not invalid for

20    lack of written description.  Apple failed to present legally

21    sufficient clear and convincing evidence.  The patent plainly

22    shows that handheld multimedia terminals are not limited to

23    requesting and retrieving content.

24         Smartflash also moves for judgment as a matter of

25    law that Claim 32 of the '772 patent is invalid for written

1   description because that defense was not presented to the

2   jury.

3            THE COURT:  Let me hear a response and any

4   competing motions on these topics from the Defendant.

5            MR. POST:  Thank you, Your Honor.

6            Apple does have a response and competing motions on

7   both anticipate -- anticipation and obviousness.

8            Apple moves for a judgment as a matter of law under

9   Rule 50(a) for a finding of anticipation and obviousness.

10            Apple's expert, Mr. Wechselberger, provided

11   specific clear and convincing evidence that each of the

12   asserted claims was either anticipated or obvious on the

13   basis of no fewer than three distinct prior art references or

14   combinations.

15            Moreover, there's no evidence that

16   Mr. Wechselberger applied the wrong standard during his

17   analysis.  Smartflash cross-examined Mr. Wechselberger on two

18   of his theories; and even for those, its cross-examination

19   focused on matters that were either legally irrelevant, such

20   as whether the IBM system actually practiced the claims, or

21   the inventions disclosed in the Gruse/IBM patent or in other

22   documents that were not related to the issues.

23            For each claim, there was at least one invalidating

24   reference explained by Mr. Wechselberger's trial testimony

25   that Smartflash's cross-examination did not address.

1          In the face of this evidence, any reasonable juror

2     would have to find that the claims were proven invalid by

3     clear and convincing evidence.

4          In addition, Smartflash failed to contest the

5     majority of the -- of the claimed combinations identified by

6     Mr. Wechselberger, including express evidence regarding the

7     teaching suggestions and motivations to combine, found

8     therein.

9          The specific grounds presented by Mr. Wechselberger

10    are as follows:  First, that the asserted Claim 13 of the

11    '720 patent and Claim 32 of the '221 patent are invalid as

12    anticipated or rendered obvious by the Gruse/IBM patent.

13         Second, that asserted Claims 26 and 32 of the '772

14    patent are obvious in view of the Gruse/IBM patent in

15    combination with the Motorola/Puhl patent.

16         Three, that the asserted claims are obvious in view

17    of the IBM system.

18         Four, that asserted Claims 13 of the '720 patent,

19    32 of the '221 patent, and 26 of the '772 patent are obvious

20    in view of the Stefik/Xerox patent in combination with the

21    Poggio/Sun patent application publication.

22         Five, that asserted Claims 13 of the '720 patent,

23    32 of the '221 patent, and 26 of the '772 patent are obvious

24    in view of the Ginter/InterTrust patent, in combination with

25    the Poggio/Sun patent application publication.

1          Six, that asserted Claim 32 of the '221 patent is

2    obvious in view of the Ansell/Liquid Audio patent, in

3    combination with the Poggio/Sun patent application

4    publication.

5          Finally, Item 7, that asserted Claims 26 and 32 of

6    the '772 patent are obvious in view of the Ansell/Liquid

7    Audio patent in combination with the Poggio/Sun

8    patent appli -- patent application publication and the

9    Puhl/Motorola patent.

10         Additionally, Apple moves for judgment as a matter

11   of law that Claim 26 of the '772 patent is invalid for lack

12   of written description.

13         As Mr. Wechselberger's testimony made clear, the

14   Claim 20 -- the handheld multimedia terminal claimed in Claim

15   26 lacks written description support.

16         The evidence submitted by Smartflash in response

17   demonstrates merely that terminals can download content,

18   including multimedia content, not that that content can be

19   played back.

20         Thank you.

21         THE COURT:  All right, Counsel.  Thank you.

22         With regard to Plaintiffs' motion for judgment as a

23   matter of law regarding obviousness and/or anticipation, that

24   motion is denied.

25         With regard to Defendant's motion regarding

1    invalidity based on obviousness and/or anticipation, that

2    motion is likewise denied.

3            With regard to the parties' competing motions

4    regarding --

5            Well, strike that.

6            With regard to the Defendant's motion for judgment

7    as a matter of law that Claim 26 of the '772 patent is

8    invalid for lack of a written description, that motion is

9    denied.

10           All right, Counsel.  I assume we next have

11   competing motions on -- for judgment as a matter of law with

12   regard to damages.

13           The Court has to take about a 15-minute recess.  I

14   have a scheduled conference call at 5:00 o'clock that will

15   take about five minutes.  We're going to break at this point,

16   unless you think in the next five minutes we can knock out

17   all the rest of these motions.

18           I'll come back and hear argument later unless we

19   can do it quickly.

20           MR. POST:  Your Honor, I think that 10 minutes

21   might be cutting it a little close.  We also have what were

22   contained in the written filings several issues that weren't

23   submitted to the jury.  I'm happy to submit those on the

24   papers or I can briefly summarize them following the break,

25   if you'd like.

1      THE COURT:  I know that Defendant Apple has a JMOL

2  on patent ownership indefiniteness as regards to data carrier

3  and payment data and 101 patentability.

4      MR. POST:  That's correct, Your Honor.

5      THE COURT:  I assume Plaintiff Smartflash has a

6  JMOL on damages.  Do you have any other -- other than that,

7  do you have any other JMOLs to present?

8      MR. SUMMERS:  Your Honor, we would reurge the --

9  that as a matter of law that Claim 32 of the '772 patent has

10  an adequate description.

11      THE COURT:  All right.  You're requesting judgement

12  as a matter of law that Claim 32 of the '772 patent has an

13  adequate description?

14      MR. SUMMERS:  Yes, Your Honor.

15      THE COURT:  Okay.  Well, that motion is denied.

16      That leaves basically, as I understand it,

17  Plaintiffs' damages JMOL, and then response to these other

18  JMOLs as raised by Defendant?

19      MR. POST:  And -- and we have our own corresponding

20  damages JMOL, Your Honor.

21      THE COURT:  I understand that, as well.

22      MR. POST:  Okay.

23      THE COURT:  All right.  I agree that's too much to

24  cover in the time we have, so we'll stand in recess for the

25  next 15 minutes.  We'll finish the argument on the motions

1    for judgment as a matter of law under Rule 50(a) after that,

2    and then we will break between that point and the informal

3    charge conference, which I mentioned earlier.

4              At this point, we stand in recess.

5              (Recess.)

6              LAW CLERK:  All rise.

7              THE COURT:  Be seated, please.

8              All right.  We'll continue with the Court hearing

9    argument from the parties on their motions under Rule 50(a)

10   for judgment as a matter of law, and we'll take up any

11   competing motions under Rule 50(a) from the two parties on

12   the issue of damages.  I'll hear from the Plaintiff first.

13             MR. SUMMERS:  Thank you, Your Honor.

14             Smartflash moves under Rule 50(a) for judgment as a

15   matter of law that it has established that it is entitled to

16   reasonable royalty damages in the -- in the amount of

17   $852,215,027.  No reasonable juror could find otherwise.

18             Mr. Mills went through a detailed Georgia-Pacific

19   analysis taking into account Dr. Wecker's survey results.

20             Mr. Mills' analysis relied on Dr. Wecker's surveys,

21   showing that the patented features alone motivated customers

22   to purchase their Apple devices -- the accused products.

23             Accordingly, there's conclusive evidence to support

24   Mr. Mills' entire market value rule royalty base.

25             Additionally, Mr. Mills relied on other of Dr.

1   Wecker's surveys to discover the portion of the value that is

2   attributable to the patented features.

3          Accordingly, there's substantial evidence to

4   support Mr. Mills' non-entire-market-value-rule royalty base

5   that complies with the demands of Garretson versus Clark and

6   its progeny.

7          Mr. Mills' royalty rates are also supported by

8   conclusive evidence Dr. Wecker's movie and App Store

9   scenarios which tested the only identified non-infringing

10  alternative and thus appropriately isolated the value of the

11  invention.

12         Using this result -- these results, Mr. Mills was

13  able to identify Apple's at-risk profits, if Apple had

14  changed its products to avoid infringement.  Deciphering a

15  reasonable royalty rate and base from this analysis

16  constitutes evidence which a jury would not be entitled to

17  disregard in supporting a reasonable royalty of $852,215,027.

18         Mr. Racz also presented evidence of a royalty of $4

19  a device, evidence which would support an award far in excess

20  of Mr. Mills' 852.2-million-dollar opinion.

21         Additionally, the only other evidence of damages is

22  Dr. Becker's damages theory, which is unreliable under

23  Daubert.  Dr. Becker admitted that he failed to measure the

24  value of the invention to Apple, and accordingly failed

25  entirely to address the requirements of 35 U.S.C. Section

1   284.

2           As such, the only reliable evidence of damages in

3   the case to be awarded is the evidence presented by Mr.

4   Mills.  And thus no reasonable juror could conclude that any

5   damages less than $852,215,027 should be awarded.

6           THE COURT:  Thank you, Counsel.

7           Let me hear a response from Defendant Apple and any

8   companion, yet opposite motion they might care to offer.

9           MR. POST:  Thank you, Your Honor.

10          Apple requests a motion for judgment as a matter of

11  law that Smartflash is not entitled to an award of damages.

12          Smartflash failed to provide sufficient evidence

13  from which a jury can reasonably award the damages requested

14  because there is no basis in fact for its requested

15  reasonable royalty of over $800 million or anything even

16  remotely close to that.

17          Smartflash's evidence is not only unreliable, it

18  also violates the entire market value rule because it fails

19  to provide a basis for apportionment -- for apportioning the

20  value of the accused function to isolate the value

21  contributed by the patented invention.

22          If the Court is unwilling to enter judgment for

23  zero damages, pursuant to Rule 50(a), the only alternative

24  estimate supported by the evidence is a 4.5-million-dollar

25  fully-paid-up lump sum.

1          First, the royalty base using the alone motivate

2     question violates the entire market value rule.  It is not

3     tied to the patented invention.

4          First, multiple flaws in the Plaintiffs' survey

5     methodology introduced bias and confusion to the results that

6     render it unreliable.  Separately, Dr. Wecker's survey and

7     Mr. Mills' reliance on that survey violate the entire market

8     value rule.

9          Under LaserDynamics, it is Smartflash's burden to

10    provide -- to prove by reliable and tangible evidence that

11    the allegedly infringing and patented functionality was the

12    basis for consumer demand.

13         Dr. Dhar's testimony demonstrated that Dr. Wecker's

14    survey failed to make this showing.  The evidence shows that

15    respondents did not understand the alone motivate question to

16    be asking if the capabilities to rent and purchase movies and

17    TV shows or the capability to purchase apps was the only

18    thing that caused the customer to purchase their device.

19         Even if the purchasers were alone motivated by a

20    feature, a patentee may not rely on the entire market value

21    rule where there was additional required but for

22    functionality that was also essential to purchase the

23    product.

24         In Fractus v. Samsung, 211 Westlaw 7563820, the

25    Court excluded the Plaintiff's evidence because the surveys

did not measure the value of Plaintiff's technology but merely measured the perceived consumer value of cell phones without any internal antennas.

Similarly here, Smartflash's patents do not claim all means of purchasing or renting content.  Thus Dr. Wecker's alone motivate question does not meet the standard for relying on the entire market value rule.

Additionally, Mr. Mills' royalty base does not apportion between the contribution of the patents and any -- any other complementary assets in the accused devices.

Mr. Racz admitted that he did not invent downloading content or securing content over the Internet using payment data with the online sales content, online sale, or payment for content, payment validation data, the online rental of content, or secure online payment for content.  Dr. Wecker or Mr. Mills did not apportion these as compared to Smartflash's inventions.

Second, the percent value question is not tied to the patented invention.  Because Smartflash cannot establish that the patented functionality creates the basis for customer demand or substantially creates the value of the component parts, it must base its damages base on the smallest salable unit of the accused products, which is a step toward meeting the requirement of apportionment.

Smartflash failed to identify the smallest salable

patent practicing unit, let alone the smallest salable unit whose demand was driven by the patented invention.

Further, Dr. Wecker's percent value questions are unreliable and do not measure anything relevant to damages. He made no showing or even a suggestion that the question was tied to the incremental amount Apple can charge for the patented invention.

Third, Mr. Mills' royalty rate calculations are not reliable.  Mr. Mills calculates a royalty rate by multiplying Apple's profit margin on the accused devices times Dr. Wecker's non-infringing alternatives questions, but failed to describe his best non-infringing alternative in the least burdensome way.

With respect to the non-infringing alternatives for apps, Dr. Jones described the alternative in an overly burdensome way.  Dr. Jones, for instance, explained that a user does not need to go to a separate website; and that his non-infringing alternative would allow for merely switching the order of downloading and entering a password.

However, this was not what was described in Dr. Wecker's question.

Similarly, Dr. Jones admitted that for movie rentals a non-infringing alternative would be to stream content, rather than purchasing it, or entering one's password after downloading content, rather than before

downloading it.  But Dr. Wecker did not describe either of these alternatives in his survey.

Fourth, Smartflash's damages calculations are not tied to the date of the hypothetical negotiation.  Mr. Mills' opinion should be excluded because they are untethered to any hypothetical negotiation date and include value respondents placed on the tested feature after the time of purchase.

Apple's survey showed that the value of apps and movies and TV shows has, in fact, increased over time since the date of the hypothetical negotiation.  And Mr. Mills did not take this increase into account.

At most, a reasonable jury could award Smartflash no more than $4.5 million, as calculated by Dr. Becker.

Apple's expert, Dr. Becker, determined that at most, Smartflash's damages would be a 4.5-million-dollar fully-paid-up lump sum.  Dr. Becker estimated a generous return on investment of 20 percent compounded annually, which is quite high, given comparisons to other rates of returns and Mr. Racz's own history of failed efforts.

A 26 percent compounded annual return on Mr. Racz's estimated personal investment of about $3 million over 10 years totals $21.4 million, which reduced for the fact of a non-exclusive license, the extent of Apple's success with its own products, and what Mr. Racz identified as a total available market for his technology, Dr. Becker determined

that 28 percent -- 28.4 percent of that amount should be attributed to Apple.

After applying the Georgia-Pacific factors and considering the various data points in the case relating to both Smartflash and Apple, Dr. Becker concluded that the 4.5-million-dollars would be reasonable to Apple -- for Apple to pay for a license to the patents-in-suit.

Thank you.

THE COURT:  All right.  Thank you, Counsel.

The Court having considered the parties' motion for judgment as a matter of law with regard to the issue of damages and specifically as to Plaintiffs' motion thereunder that no reasonable jury, if damages are to be awarded, should award a reasonable royalty less than $852,215,027, that motion is denied.

With regard to the Defendants' motion regarding damages and under Rule 50(a) asserting that no reasonable jury could award any damages in this case or under any scenario not above $4.5 million in damages, such motion for judgment as a matter of law by the Defendant is likewise denied.

Does the Plaintiff have additional motions under Rule 50(a) to present that the Court has not already heard?

MR. SUMMERS:  One more, Your Honor.

THE COURT:  All right.  Let's hear that next then.

 1            MR. SUMMERS:  Your Honor, Smartflash moves for

 2     judgment as a matter of law under Rule 50(a) -- 50(a) on

 3     Apple's pleaded defenses of equitable estoppel and laches.

 4            I don't believe Apple has reserved any trial time to

 5     present those evidence -- to present evidence of those

 6     defenses to the Court, and so we submit that judgment should

 7     be granted as to those defenses.

 8            THE COURT:  All right.  What says the Defendant

 9     Apple?

10            MR. POST:  Your Honor, with respect to laches, the

11     evidence -- the evidence at trial indicates that this is the

12     first issued patent, the '720 patent, issued in 2008, and

13     that Mr. Racz was -- was aware of purported infringement by

14     Defendants, including Apple, but no suit was filed until

15     2013.  During that time, substantial investment was made by

16     Apple in developing its products.

17            With respect to equitable estoppel, to the extent

18     that Smartflash maintains that -- that Apple had awareness or

19     knowledge of Smartflash patents through Mr. Farrugia, Apple's

20     reliance on a lack of -- a lack of infringement suit

21     justifies equitable estoppel.

22            THE COURT:  All right.  Certainly, Counsel, these

23     are not issues that would be submitted to the jury.  But as I

24     heard Plaintiff argue, it seems to be that Plaintiffs'

25     position is Defendant has surrendered those legal issues for

1    presentation to the Court post-jury.  That's not what I hear

2    from Defendant.

3              Can you clarify that for me, Mr. Post?

4              MR. POST:  So I believe that both on the issues of

5    laches and equitable estoppel, submissions were made in the

6    pretrial papers and proposed findings of fact and conclusions

7    of law.  But I do agree that those issues were not presented

8    during the trial.

9              THE COURT:  Well, and as I noted, they're not

10   proper for submission to this jury on a fact-finding basis.

11   But if proper, all would be taken up by the Court after a

12   verdict's rendered.

13             For clarity in the record, having heard the

14   Plaintiffs' motion for judgment as a matter of law on the

15   issue of laches and on the issue of equitable estoppel, the

16   Court denies the motion for judgment as a matter of law.

17             What and how the Court will choose to deal with

18   those at a later date, the Court will advise you after it has

19   the benefit of seeing what the jury's verdict is in this

20   case.

21             All right.  Plaintiff have any other motions under

22   Rule 50(a) to present?

23             MR. SUMMERS:  No, Your Honor.

24             THE COURT:  Defendant has a motion under Rule 50(a)

25   with regard to patent ownership, indefiniteness, and 101

1    patentability; is that correct?

2              MR. POST:  That's correct, Your Honor.

3              THE COURT:  Let me hear those in combination, if

4    you will, Counsel.

5              MR. POST:  Yes, sir.

6              With respect to ownership and standing, a dispute

7    exists as to whether Mr. Racz initially signed his interest

8    in the patents to Smartflash Limited, which subsequently,

9    unequivocally assigned, or at least attempted to assign, that

10   interest to Internet Plc, which never assigned that back, so

11   now that is owned by the British Crown.  Thus, Smartflash

12   lacks standing.

13             With respect to indefiniteness, Apple moves for

14   judgment as a matter of law that the terms "data carrier" and

15   "payment data" are indefinite.  Under Nautilus, claims must

16   inform a person of ordinary skill what is claimed with

17   reasonable certainty.

18             In 2009, Mr. Racz stated that his claimed "data

19   carrier" is narrower than the memory-containing devices

20   disclosed in a reference to Schneck and is limited to, in his

21   words, clearly, an intermediate device, as described in

22   Column 24 and 25 of my patents.

23             The code -- the Court's own position on claim

24   construction emphasizes the zone of uncertainty surrounding

25   the claimed data carrier and the types of memories required

by the asserted claims.

Despite an earlier finding that the asserted claims do not require separate memories, the Court nonetheless denied Apple's motion for summary judgment on 101 grounds because the claims are inventive because they do require distinct memory types.

As construed, there's no objective standard to determine when data becomes or ceases to become payment data because payment data is merely any data that can be used to make payment for content.

Thus, it covers numerous types of data that may differ depending on a system's design and the user's action in any given instance.

Finally, the asserted claims are invalid under Section 101 as a matter law.  The Supreme Court's decision in Alice v. CLS Bank provide the two-step analysis for determining patent eligibility.

First, whether the claims are directed to one of those patent ineligible concepts, for example, abstract ideas, and if so, two, whether there is an inventive concept in the claims that is sufficient to ensure that the patent and practice, amounts to significantly more than a patent upon the abstract idea itself.

The Court has already held that the concepts of payment and controlling access are abstract ideas that fall

1    outside the scope of 101.

2         The Court's Section 101 order identified two

3    elements or combination of elements that purportedly satisfy

4    Step 2 of the patent eligibility test, the first being the

5    evaluation of data using rules; in other words, evaluating

6    the use status data according to the use rules to determine

7    if access to content is permitted, and second, the use of

8    distinct memory types.

9         The second of these is not required by the claims

10   that Smartflash asserted at trial, which leaves only the

11   first.  The Federal Circuit has already found that the

12   evaluation of data using rules is insufficient to meet Step 2

13   of the test for patent eligibility.

14        In Ultramercial v. Hulu, the Federal Circuit held

15   that claims requiring, quote, accessing an activity log to

16   verify that the total number of times which the sponsor

17   message has been previously presented is less than the number

18   of transaction cycles contracted by the sponsor, the sponsor

19   message are, quote, conventional steps specified at a high

20   level of generality and are thus insufficient to supply the

21   inventive concept required by the Supreme Court to test for

22   patent eligibility.

23        Tellingly here, Mr. Racz acknowledged that

24   evaluating use status data by applying rules to restrict

25   access was not an inventive concept in the context of the

1    patent claims.

2            Thank you, Your Honor.

3            THE COURT:  Response, Mr. Summers, for the

4    Plaintiff?

5            MR. SUMMERS:  Thank you, Your Honor.

6            As the Court knows, all three of these issues have

7    been fully briefed and decided by, first, Judge Mitchell and

8    Your Honor.

9            Judge Mitchell and Your Honor both -- Judge

10   Mitchell made factual findings as to the standing issue which

11   Your Honor adopted, and so those factual findings are already

12   part of the record that Smartflash has standing.  That fact

13   has been found.

14           The legal decisions that go into that has also been

15   found.  The -- that applies just as well with the

16   indefiniteness briefing.  Judge Mitchell found these claims

17   definite as a matter of law, which Your Honor adopted.

18           And then, finally, with the Section 101 briefing,

19   Judge Mitchell also already determined all of these issues

20   which Your Honor also adopted, and so our position is that

21   all of these issues have been determined.

22           THE COURT:  All right.  Well, with regard to the

23   Defendant's motion for judgment as a matter of law concerning

24   standing and patent ownership, that motion is denied.

25           With regard to the Defendant's motion for judgment

1    as a matter of law as to indefiniteness concerning the terms

2    "data carrier" and "payment data," that motion is denied.

3              And with regard to the Defendant's motion for

4    finding -- for a -- excuse me -- judgment as a matter of law

5    that the patents-in-suit are flawed and defective under the

6    patentability requirements of Section 101, that motion is

7    also denied.

8              Are there any remaining matters under Rule 50(a),

9    Counsel, that have not been presented to and heard -- ruled

10   on by the Court?

11             MR. POST:  Nothing for Defendants, Your Honor.

12             MR. SUMMERS:  Nothing for Plaintiffs, Your Honor.

13             THE COURT:  All right.  Counsel, we're going to

14   take about a 20-minute break, and then those of you who are

15   actively participating in the preparation and development of

16   the Court's final jury instructions and verdict form are

17   invited to meet me in chambers.

18             I'm happy for you to bring your young associates

19   who have not otherwise had an opportunity to participate in

20   trial.  And at that time, we'll take up and discuss

21   thoroughly the joint submission from both parties as to those

22   final jury instructions and verdict form.

23             After that far-reaching and thorough, informal

24   charge conference, the Court will, considering all the input

25   of the parties, generate what it believes to be a proper

1    final set of instructions and verdict form and submit those

2    to you electronically later this evening.

3              In the morning, when we convene, after you've read

4    into the record the exhibits from the list of pre-admitted

5    exhibits that were used during today's portion of the trial,

6    I'll hear any formal objections on the record with regard to

7    the then existing final jury instructions and verdict form.

8              So with those instructions, Counsel, we'll recess

9    for about 20 minutes, and then I'll see you in chambers for

10   an informal charge conference.

11             We stand in recess.

12             LAW CLERK:  All rise.

13             (Court adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3               I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of our

6    abilities.

7

8

9    /s/_____
     SHEA SLOAN, CSR, RPR                    February 23, 2015
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/16

12

13

14

15

16   /s/_____
     SHELLY HOLMES, CSR, TCRR
17   Deputy Official Court Reporter
     State of Texas No.:  7804
18   Expiration Date  12/31/16

19

20

21

22

23

24

25