```
1                   IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
2                             TYLER DIVISION

3

    SMARTFLASH LLC and              )
4   SMARTFLASH TECHNOLOGIES              DOCKET NO. 6:13cv447
    LIMITED
5
         -vs-                       )
6
                                             Tyler, Texas
7                                   )        9:28 a.m.
    APPLE INC.                               February 24, 2015
8

9
                            TRANSCRIPT OF TRIAL
10                               ALL DAY
                      BEFORE THE HONORABLE RODNEY GILSTRAP,
11                      UNITED STATES DISTRICT JUDGE

12

13                        A P P E A R A N C E S

14

15   FOR THE PLAINTIFFS:

16
     MR. BRADLEY W. CALDWELL
17   MR. JASON D. CASSADY
     MR. JOHN AUSTIN CURRY
18   CALDWELL CASSADY & CURRY
     2101 Cedar Springs Rd., Ste. 1000
19   Dallas, Texas  75201

20

21   MR. T. JOHN WARD, JR.
     WARD & SMITH LAW FIRM
22   P.O. Box 1231
     Longview, Texas  75606
23

24

25
```

```
 1    FOR THE DEFENDANTS:

 2
      MR. JAMES R. BATCHELDER
 3    ROPES & GRAY LLP
      1900 University Ave., 6th Floor
 4    East Palo Alto, California  94303-2284

 5

 6    MS. CHING-LEE FUKUDA
      MR. KEVIN J. POST
 7    ROPES & GRAY LLP
      1211 Avenue of the Americas
 8    New York, New York 10036-8704

 9

10    MR. ERIC ALBRITTON
      ALBRITTON LAW FIRM
11    P. O. Box 2649
      Longview, Texas 75606
12

13

14

15
      COURT REPORTERS:        MS. SHELLY HOLMES, CSR, TCRR
16                            OFFICIAL COURT REPORTER
                              shelly_holmes@txed.uscourts.gov
17
                              MS. SHEA SLOAN, CSR, RPR
18                            OFFICIAL COURT REPORTER
                              shea_sloan@txed.uscourts.gov
19

20

21

22

23

24    Proceedings taken by Machine Stenotype; transcript was
      produced by a Computer.
25
```

```
 1                        P R O C E E D I N G S
 2              (Jury out.)
 3              COURT SECURITY OFFICER:  All rise.
 4              THE COURT:  Be seated, please.
 5              All right.  Are the parties ready to read into the
 6    record any items from the list of pre-admitted exhibits used
 7    during yesterday's portion of the trial?  I assume so, and
 8    Plaintiff may proceed with their rendition.
 9              MR. CASSADY:  Thank you, Your Honor.  The
10    Plaintiffs offer PX 24, PX 103.023, and PX 758.
11              And that's -- that's all, Your Honor.
12              THE COURT:  Is there objection from the Defendant?
13              MR. POST:  No objection, Your Honor.
14              THE COURT:  Does Defendant have a similar list to
15    read into the record?
16              MR. POST:  Yes, Your Honor.
17              THE COURT:  Please proceed.
18              MR. POST:  Defendants move to admit the following
19    exhibits into evidence:  DX 346, DX 91, DX 102, DX 201, DX
20    205, DX 215, DX 350, DX 451, and DX 214, the last of which is
21    subject to the redactions ordered this morning during the
22    conference.
23              THE COURT:  All right.  Is there objection from the
24    Plaintiff?
25              MR. CASSADY:  No, Your Honor.  And just so the
```

```
 1    Court is clear, I reviewed the documents they redacted and

 2    it's --

 3              THE COURT:  It comports with the Court's

 4    instruction?

 5              MR. CASSADY:  Yes, Your Honor.

 6              THE COURT:  All right.  Thank you.

 7              All right.  We will then move to the formal charge

 8    conference.

 9              After the close of evidence yesterday and after

10    having heard the parties' various motions offered under Rule

11    50(a), the Court proceeded to hold an informal charge

12    conference with counsel for both parties in chambers, during

13    which time the Court reviewed the parties' various joint

14    submissions as to the final jury instructions and the verdict

15    form and heard wide-ranging input from both sides as to

16    various sections and portions, both in the joint submission

17    and any possible additions anyone cared to raise.

18              After that informal charge conference, the Court

19    carefully considered all the input from both sides as to each

20    of the issues raised, and prepared and generated the final

21    jury instructions and verdict form that are before the

22    parties now.

23              That form of the final jury instructions and

24    verdict form was delivered electronically to the parties

25    probably very close to midnight last night.  It was about
```

1    that time when we got through.

2              The parties have had an opportunity since then to

3    review what the Court has sent, and the Court will now take

4    up and hear any objections as to those final jury

5    instructions and verdict form.

6              As I mentioned during the informal charge

7    conference yesterday evening, if we could have whoever is

8    going to speak for Plaintiff and Defendant on these matters

9    go to the podium and stay there jointly, it will save us time

10   as we go through these with any objections that either side

11   cares to offer.

12             So if counsel for each side that's going to address

13   the charge and the verdict form will go to the podium.

14             And we'll start with the final jury instructions.

15   Page 1 is the cover page with the style of the case.  Page 2

16   begins the substance of the instructions.

17             Is there any objection from either side as to

18   either Page 1 or Page 2 of the final jury instructions?

19             MS. RAYMOND:  Good morning, Your Honor.  May it

20   please the Court.

21             With respect to Page 2, the second to last

22   paragraph, there's a statement that regard -- "and regard the

23   fact as provided (sic)," which refers to a stipulation; and

24   there we would propose "and regard the fact as provided

25   (sic)" be deleted due to the fact that the joint stipulation

1   on the non-infringing alternatives is simply that Apple has

2   not identified any non-infringing alternatives.

3           THE COURT:  All right.  Does Plaintiff have any

4   objection to either Page 1 or Page 2 of the verdict form --

5   of the -- excuse me, the final jury instructions?

6           MR. SUMMERS:  No objection, Your Honor.

7           THE COURT:  Okay.  I'm going to overrule the

8   Defendant's objection to Page 2.

9           And we'll turn to Page 3 of the proposed final jury

10  instructions.  Is there objection from either party to

11  anything on Page 3?

12          MS. RAYMOND:  No objections, Your Honor.

13          MR. SUMMERS:  No objection, Your Honor.

14          THE COURT:  Anything on Page 4?

15          MS. RAYMOND:  No objections, Your Honor.

16          MR. SUMMERS:  No objections from the Plaintiff.

17          THE COURT:  All right.  Turning next to Page 5 of

18  the final jury instructions, either party wish to offer an

19  objection?

20          MS. RAYMOND:  No, Your Honor.

21          MR. SUMMERS:  No objection from the Plaintiff.

22          THE COURT:  Next is Page 6 -- 6.  Is there

23  objection from either party?

24          MS. RAYMOND:  No objection, Your Honor.

25          MR. SUMMERS:  No objection.

1            THE COURT:   Turning to Page 7, is there objection

2    from either party?

3            MS. RAYMOND:   Yes, Your Honor.   On this page, Page

4    7, there is a reference in the first paragraph to method

5    claims.   The method claims are no longer asserted in this

6    case, so we would propose deleting, "as well as method

7    claims."

8            Along the same lines in the second paragraph, the

9    second sentence, it says:   Divided into parts or steps.   We

10   would propose deletion of "or steps," again, because that's

11   seemingly a reference to method claims.

12           And then, finally, Your Honor, this page towards

13   the bottom says that Your Honor has determined the meaning of

14   certain claim terms; and that Your Honor has provided them to

15   the jury, those definitions.   And we object to the claim

16   constructions and would incorporate our arguments that were

17   in our objections to the report and recommendation on claim

18   construction.

19           THE COURT:   Well, with regard to the claim

20   construction, you're not waiving anything, Counsel, by not

21   raising it here.   This is simply as to the final

22   instructions.   Your position on the claim construction and

23   the underlying issue is well-documented in the record.   So

24   that objection clearly is overruled.

25           You spoke a little bit quickly for me to follow

1    you.  Give me, again, the first two matters you mentioned and

2    where they are.

3              MS. RAYMOND:  Certainly, Your Honor.  I apologize.

4              In the first paragraph, there is a statement at the

5    very end of that paragraph that says "as well as method

6    claims."  Here, the method claims are no longer asserted in

7    the case, so we would propose deleting that language, "as

8    well as method claims."

9              THE COURT:  All right.  And then in the next

10   paragraph you suggested what deletion?

11             MS. RAYMOND:  In the next paragraph, we suggest the

12   deletion of "or steps," which is in the second line of that

13   paragraph.

14             THE COURT:  All right.  Those objections are

15   granted, and I will make those changes.

16             MS. RAYMOND:  Thank you, Your Honor.

17             THE COURT:  Anything else from either party on Page

18   7?

19             MR. SUMMERS:  No, Your Honor.

20             THE COURT:  Turning next to Page 8 of the final

21   jury instructions, is there objection from either party?

22             MS. RAYMOND:   Yes, Your Honor.

23             On the fourth paragraph, about two-thirds of the

24   way down the page, there is another reference to "or method."

25             It says:  A product or method that meets all of the

1    requirements.  And we would propose deletion of "or method."

2              THE COURT:  That's in the last sentence of the

3    fourth paragraph?

4              MS. RAYMOND:  That's correct, Your Honor.

5              THE COURT:  Okay.  I'll grant that objection, and

6    delete that "or method" language.

7              Also, Counsel, in the very first line of Page 7,

8    beginning the last two words of that line it says:  Ordinary

9    and accustom meaning.  I intend to say plain or ordinary

10   meaning -- "plain and ordinary meaning," instead of "ordinary

11   and accustom."  If you have any problem with that, tell me

12   now.

13             MR. SUMMERS:  No, Your Honor.

14             MS. RAYMOND:  No, Your Honor.

15             THE COURT:  Then is there -- if there's not

16   anything on page -- anything further on Page 8, we'll move to

17   Page 9 of the jury instructions, and I'll ask if either party

18   has an objection to offer there?

19             MR. SUMMERS:  No objection from the Plaintiff.

20             MS. RAYMOND:  No objection from the Defendant, Your

21   Honor.

22             THE COURT:  All right.  Next is Page 10.  Is there

23   objection there?

24             MS. RAYMOND:  Yes, Your Honor.

25             We have an objection here due to the omission of an

1    instruction.  We discussed last night an issue regarding the

2    data supplier in the claims, and we believe that there should

3    be an instruction relating to the antecedent basis issue and

4    the data supplier being the same data supplier as a data

5    supplier in the relevant claims.

6              THE COURT:  All right.  That objection is

7    overruled.

8              Is there other objection from either party on Page

9    10?

10             MR. SUMMERS:  I don't believe so, Your Honor.

11             THE COURT:  Nothing else from Defendant on Page 10?

12             MS. RAYMOND:  No, Your Honor.

13             THE COURT:  Then let's turn to Page 11.  Does

14   either party care to offer an objection to anything on Page

15   11?

16             MR. SUMMERS:  Nothing from the Plaintiffs, Your

17   Honor.

18             MS. RAYMOND:  Yes, Your Honor.  We have two

19   objections on -- on this page.

20             One is the omission of the instruction:  Evidence

21   of a good-faith belief of either non-infringement or

22   invalidity of a patent can be evidence that Apple lacks the

23   required intent for induced infringement.

24             THE COURT:  And what's your second objection?

25             MS. RAYMOND:  Our second objection is the inclusion

1    of the willfulness instruction simply because we believe that

2    because the subjective prong is not met, the objective

3    prong -- excuse me, because the objective prong is not met,

4    the subjective prong should not go to the jury.

5         THE COURT:  All right.  Those objections are

6    overruled.

7         We'll turn next to Page 12.  Is there objection

8    from either party as to any matter on Page 12 of the final

9    jury instructions?

10        MS. RAYMOND:  Yes, Your Honor.  We have -- we have

11   an objection here, as well.  I apologize.  And that's the

12   omission of an i4i instruction.  Apple had proposed the

13   language:  Prior art differing from the prior art considered

14   by the Patent Office may carry more weight in meeting the

15   clear and convincing standard than the prior art that was

16   previously considered by the Patent Office.

17        THE COURT:  All right.  Anything else from the

18   Defendant on Page 12?

19        MS. RAYMOND:  Your Honor, we just have a question,

20   and that is if this i4i instruction is omitted, may we,

21   nevertheless, in closing use the language from the i4i case?

22        THE COURT:  Well, that's outside of this formal

23   jury -- excuse me, formal charge conference because we're

24   only focusing on the jury instructions and the verdict form.

25   I'll be glad to take that up outside of this after we finish

1      the formal charge conference.

2                MS. RAYMOND:  Thank you, Your Honor.

3                MR. SUMMERS:  Your Honor, may I briefly address the

4      i4i issue, extremely briefly?

5                THE COURT:  All right.  Very briefly.

6                MR. SUMMERS:  Your Honor, we would say that we are

7      not in opposition to an instruction culled from i4i.  We

8      believe that it may be necessary that that instruction be

9      given, and we would ask that our proposal, as it relates to

10     new prior art, be put into the instructions, as opposed to

11     Apple's proposal.

12               THE COURT:  All right.  Well, as I advised both

13     sides in the informal charge conference, there would be some

14     issues where I sided with the Plaintiff and some issues where

15     I sided with the Defendant, and there will be some issues to

16     where language you saw in the final version is the Court's

17     and it came from neither side and probably both of you would

18     object to it.  And that's what we have here.

19               And your objections are overruled.

20               All right.  We'll move to Page 13 of the final jury

21     instructions.  Any objections from either party here?

22               MS. RAYMOND:  Your Honor, just an issue here in the

23     second paragraph, the second line.  There's a reference to

24     "or method," and we would propose that language be deleted.

25               THE COURT:  All right.  I'll grant that objection

1   and delete those words.  Anything else --

2           MS. RAYMOND:  Sorry, Your Honor.  Secondly, in the

3   middle of the page at the bottom -- the end of the second

4   paragraph and then the third paragraph, there's a sentence

5   that's repeated, and so we would propose deleting the --

6   either the first or the second appearance of the sentence

7   that starts with:  Apple must prove by clear and convincing

8   evidence that an asserted patent claim was anticipated by the

9   prior art reference.

10          THE COURT:  All right.  I'll grant that objection,

11  and the second sentence, which for some reason is set apart

12  as its own paragraph, will be deleted.

13          MS. RAYMOND:  Thank you, Your Honor.

14          THE COURT:  Anything else on Page 13?

15          MR. SUMMERS:  Your Honor, just on the top of the

16  first sentence, the sentence is missing the word "and" Claims

17  13 in the '720 patent "and" 32 of the '221 patent.

18          THE COURT:  All right.  I'll insert the word "and"

19  after "patent" and before the number "32" on the top line of

20  Page 13.

21          Anything else?

22          MR. SUMMERS:  Nothing from the Plaintiff, Your

23  Honor.

24          MS. RAYMOND:  No, Your Honor.

25          THE COURT:  Okay.  We'll move next to Page 14.  Any

 1   objection from either party on anything on Page 14?

 2            MS. RAYMOND:  No, Your Honor.

 3            MR. SUMMERS:  No, Your Honor.

 4            THE COURT:  Next is Page 15.  Are there objections

 5   from either party here?

 6            MR. SUMMERS:  Your Honor, Plaintiff would object to

 7   the instruction as to specifically calling out whether --

 8   specifically instructing that there's no allegation that

 9   Apple copied the patented technology as it relates to

10   secondary considerations.

11            Alternatively, we would propose that the Court's

12   instruction instruct that there's no contention in this case

13   that Apple actually copied the patented technology.

14            THE COURT:  Can you give me a specific location of

15   the language you're talking about because quite honestly, I

16   thought we had covered that?

17            MR. SUMMERS:  It's the bottom of Page 15, No. 4.

18            THE COURT:  All right.

19            MR. SUMMERS:  Very last sentence.

20            THE COURT:  All right.  I understand.  There were

21   two issues involving copying we talked about yesterday.

22            MR. SUMMERS:  Yes, Your Honor.

23            THE COURT:  All right.  I understand your

24   objection, and it's overruled.

25            Anything else from either party on Page 15?

1          MS. RAYMOND:  No, Your Honor.  We simply note the

2    agreement from Smartflash in this case that Smartflash is not

3    going to allege copying.

4          THE COURT:  Well, I'm going to tell the jury that

5    there's no contention that Apple copied, so --

6          MS. RAYMOND:  Thank you, Your Honor.

7          THE COURT:  -- if they want to argue contrary to my

8    direct instructions, I think that's a pretty foolish course

9    to take, and I don't expect it will happen.

10         Again, I'm not going to address the final jury

11   argument issues within the final charge conference.

12         Turning to Page 16, anything in the matter -- in

13   the manner of an objection from either party on Page 16?

14         MR. SUMMERS:  Nothing from the Plaintiffs, Your

15   Honor.

16         MS. RAYMOND:  Nothing from Defendant, Your Honor.

17         THE COURT:  Okay.  Turning next to Page 17, does

18   either party wish to offer an objection to anything on Page

19   17?

20         MR. SUMMERS:  Nothing from the Plaintiff, Your

21   Honor.

22         MS. RAYMOND:  No objection from Defendant.

23         THE COURT:  All right.  Next is Page 18.  Any

24   objection?

25         MR. SUMMERS:  Nothing from the Plaintiff.

1          MS. RAYMOND:  Yes, Your Honor.  In the middle of

2    that page where it says in the fourth full paragraph, the

3    statement:  Smartflash is entitled to recover no less than a

4    reasonable royalty.  We would propose that "no less than" be

5    stricken because Smartflash here is seeking a reasonable

6    royalty, not lost profits.

7          And, in addition, Your Honor, I would just note

8    that the lump sum -- the definition of lump sum has been

9    omitted from these instructions.  And because one of the

10   parties -- Apple here, their expert proposed a lump-sum

11   damages award, if there is one, we believe that there should

12   be a lump-sum instruction included.

13         THE COURT:  Okay.  So your first matter is you want

14   to remove "no less than"?

15         MS. RAYMOND:  Correct, Your Honor.  And the second

16   would be an addition of an instruction regarding lump sum.

17         THE COURT:  All right.  Well, I'll grant your first

18   objection and delete the words "no less than" from the second

19   line of what appears to be the fourth paragraph on Page 18.

20         With regard to your second objection, it's

21   overruled.

22         Anything else on Page 18?

23         MS. RAYMOND:  No, Your Honor.

24         MR. SUMMERS:  Your Honor, we would object to the

25   omission of the "no less than" language because it comes out

1    of -- straight out of U.S.C., Section 284.

2              THE COURT:  Counsel, if you were going to object to

3    what she offered, it would have been nice to have heard about

4    it before I responded to it.

5              So you oppose what Defendant asked for in the

6    fourth paragraph of Page 18, correct?

7              MR. SUMMERS:  Yes, Your Honor.

8              THE COURT:  Well, hearing nothing from the

9    Plaintiff, I granted the Defendant's objection because I

10   assumed it was unopposed.

11             Finding that it is now opposed, I do agree that the

12   language is not harmful and more accurately reflects the law.

13             So had it been opposed, I would have denied it.

14             Finding that it is now opposed, I will deny

15   Defendant's objection and set aside my prior grant of it,

16   which at the time I thought was unopposed because I heard

17   nothing from the Plaintiff.

18             So the three words "no less than" in the middle

19   line of Paragraph 4 of Page 18 will be returned.

20             MR. SUMMERS:  Thank you, Your Honor.

21             THE COURT:  And if either of you offer something

22   that the other wants to object to -- in other words, if you

23   oppose a change offered by the other one, make sure I know

24   about it.

25             MR. SUMMERS:  Yes, Your Honor.

1          THE COURT:  Okay.  Then we will -- unless I hear

2    anything else, turn to Page 19, and I'll ask if there are

3    objections on Page 19 of the final instructions.

4          MS. RAYMOND:  Yes, Your Honor.

5          The objection relates to the table that's in the --

6    on this page, as well as the word "hypothetical negotiation"

7    with "S" in parentheses above it.  Here, I believe that both

8    sides, both parties are in agreement that there would be one

9    hypothetical negotiation.

10          We would propose in that table, with respect to the

11   statement "for infringement of the '720 patent," to add some

12   language, such as "alone" or "in addition to infringement of

13   the '221 or '772 patents."

14          Similarly, with respect to the second row of that

15   table, referring to the '221 patent, we would propose an

16   addition along the lines of "alone" or "in addition to the

17   '772 patent."

18          And then with respect to the third row, we would

19   propose a parenthetical after '772 patent, "but no others."

20          And, Your Honor, what this would achieve would be

21   the jury would understand that there's one hypothetical

22   negotiation which starts just before infringement of the

23   first infringed patent, if infringement is indeed found.

24          MR. SUMMERS:  Your Honor, we believe that the

25   Court's current instructions are clear enough on that score,

1   and we would oppose that proposal.

2          THE COURT:  Well, we talked about this in the

3   informal charge conference, and the identification of the

4   various hypothetical negotiation dates relating to the three

5   patents-in-suit was suggested by the Defendant over the

6   objections last night of the Plaintiff, and now I find the

7   Defendant doesn't like the way I accepted their suggestion

8   and put it forward in the instructions.

9          And if I read the submission from the Defendant

10  last night correctly from the prior joint submission, it

11  identified a commencement of infringement for each patent.

12         I'm going to overrule the Defendant's objection as

13  raised on Page 19.

14         Anything else before we turn to Page 20?

15         MS. RAYMOND:  No, Your Honor.

16         MR. SUMMERS:  Nothing from the Plaintiffs.

17         THE COURT:  Then let's turn to Page 20.

18         Page 20 contains several of the 15 Georgia-Pacific

19  factors.  We also discussed last night that both sides

20  requested the Court charge the jury on all 15 of the factors

21  and agreed that doing so would not be error, even if one or

22  more of the factors themselves had not been particularly

23  raised or addressed in the evidence or the testimony.

24         Do you both still maintain that position?

25         MR. SUMMERS:  Plaintiffs still maintain that

1    position, yes, Your Honor.

2              MS. RAYMOND:  Yes, Your Honor.

3              THE COURT:  Okay.  Are there specific objections on

4    Page 20?

5              MR. SUMMERS:  Nothing from the Plaintiffs, Your

6    Honor.

7              MS. RAYMOND:  No, Your Honor.  Nothing from

8    Defendant.

9              THE COURT:  Okay.  Then let's turn to Page 21.

10             Are there objections there?

11             MR. SUMMERS:  Your Honor, just one objection from

12   the Plaintiffs.

13             In the entire market value rule instruction at the

14   bottom of Page 21, the second line of that last paragraph,

15   Your Honor uses the phrase "patented invention."  In the

16   prior paragraph, the discussion is "patented features or

17   components."

18             And Smartflash would object to changing the thing

19   Your Honor is discussing in the instructions between the

20   apportionment section and the entire market value rule

21   section.

22             MS. RAYMOND:  And, Your Honor, with respect to

23   Apple, we believe that the patented invention language is the

24   correct language and that the second to the last paragraph

25   that refers to patented features should be -- should use the

1    language "patented invention."

2              THE COURT:  All right.  Well, both objections are

3    overruled.

4              Anything else on Page 21?

5              MR. SUMMERS:  Nothing further, Your Honor.

6              MS. RAYMOND:  No, Your Honor.

7              THE COURT:  Turning then to Page 22, are there

8    objections there, Counsel?

9              MS. RAYMOND:  Yes, Your Honor.

10             With respect to the last sentence, which starts

11   with "however":  However, if you find that consumer demand

12   for the product --

13             THE COURT:  The last sentence before "the attorneys

14   on closing argument"?

15             MS. RAYMOND:  Correct, Your Honor.

16             THE COURT:  Okay.

17             MS. RAYMOND:  And that sentence refers to:

18   Consumer demand for the product is not based on the patented

19   invention.

20             And there, it's our position that the word "solely"

21   would need to be added between "based" -- between "based" and

22   "on the patented invention" to make it correct and consistent

23   with Federal Circuit law and damages.

24             MR. SUMMERS:  Your Honor, we would oppose that

25   proposal because that is addressed in the alone motivated

```
 1    language.
 2              MS. RAYMOND:  And, Your Honor, our position is that
 3    the alone motivated language needs to be explained and that
 4    this last sentence here that we've been looking at that
 5    starts with "however" is not an appropriate description of
 6    the -- of what the alone motivated means.
 7              THE COURT:  Okay.  So to make sure I understand,
 8    Defendant is proposing that on the second line of Page 22
 9    between the last two words "not" and "based," that the word
10    "solely" be inserted; is that correct?
11              MS. RAYMOND:  I believe it would be "is not solely
12    based on" -- or "based solely on," I believe would, in fact,
13    be more correct, Your Honor.
14              THE COURT:  So you don't want me to just say it
15    once; you want me to say it twice; is that right?  Or is
16    there a difference in what you're proposing?
17              MS. RAYMOND:  Your Honor, we're simply proposing
18    that the sentence that we've been looking at with the
19    language "based on" reflects "based solely on" because we
20    believe that the phrase "alone motivated" needs to be defined
21    and is not defined properly by this sentence that we've been
22    looking at.
23              THE COURT:  Well, let's do it this way, Counsel:
24    The sentence that begins "however, if you find," what we're
25    talking about, read that sentence to me as you would propose
```

1   on behalf of the Defendant that it should be submitted to the

2   jury.

3           MS. RAYMOND:  However, if you find that consumer

4   demand for the product is not based solely on the patented

5   invention, you should award damages based on the value of the

6   patented invention and not the entire value of the accused

7   products.

8           THE COURT:  All right.

9           MR. SUMMERS:  Your Honor, we would oppose that

10  proposal.

11          THE COURT:  All right.  Give me just a minute.

12          (Pause in proceedings.)

13          THE COURT:  All right.  I'm going to grant that

14  objection by the Defendant, and I'll add the word "solely"

15  after the word "based," "not based solely on the patented

16  invention."

17          MS. RAYMOND:  Thank you, Your Honor.

18          THE COURT:  Anything else on Page 22?

19          MS. RAYMOND:  Nothing else, Your Honor, from

20  Defendant.

21          THE COURT:  Anything else from the Plaintiff?

22          MR. SUMMERS:  Nothing else from Plaintiff, Your

23  Honor.

24          THE COURT:  All right.  Page 23, any objection from

25  either party?

1           MS. RAYMOND:  No objections, Your Honor.

2           MR. SUMMERS:  Nothing from the Plaintiff, Your

3    Honor.

4           THE COURT:  Page 24?

5           MS. RAYMOND:  No objections, Your Honor.

6           MR. SUMMERS:  Nothing from the Plaintiff.

7           THE COURT:  All right.  That's the last page of the

8    final jury instructions.

9           We'll turn next to the proposed verdict form.  The

10   first page is a cover page identifying the parties and the

11   style and the cause number.

12          Any objection on Page 1?

13          MR. SUMMERS:  Nothing from the Plaintiff.

14          MS. RAYMOND:  No, Your Honor.

15          THE COURT:  Turning to Page 2 of the verdict form,

16   which covers Question 1, is there objection from either

17   party?

18          MR. SUMMERS:  Nothing from the Plaintiff.

19          MS. RAYMOND:  No, Your Honor.

20          THE COURT:  Turning to Page 3, which covers

21   Question 2 of the verdict form, is there objection from

22   either party?

23          MR. SUMMERS:  Nothing from the Plaintiff.

24          MS. RAYMOND:  Your Honor, we have an objection only

25   to the extent that willfulness is included and sent to the

1    jury.

2              THE COURT:  I understand your substantive

3    objection; but not waiving what you've previously objected to

4    with regard to willfulness, you don't have any objection to

5    the form of the question?

6              MS. RAYMOND:  No, Your Honor.

7              THE COURT:  Then we'll turn to Page 4 of the

8    verdict form, which contains Question 3.  Is there objection

9    there?

10             MR. SUMMERS:  Nothing from the Plaintiff.

11             MS. RAYMOND:  Nothing from the Defendant, Your

12   Honor.

13             THE COURT:  Turning next to Page 5, which is the

14   last page of the verdict form, which contains Question 4 on

15   the verdict, is there an objection?

16             MR. SUMMERS:  Yes, Your Honor.

17             Plaintiff would object to the extent that the

18   question does not make clear that the compensation is only

19   for the infringement of Smartflash's patents up until the

20   time of trial.

21             THE COURT:  All right.  What's Defendant's

22   position?

23             MS. RAYMOND:  Your Honor, Defendants believe that

24   there should be a question that goes to whether the award is

25   a lump sum or whether it's a running royalty.

1          THE COURT:  All right.  Well, I considered both

2    submissions.  I believe what's here is proper, and I'll

3    overrule both objections.

4          That's the last page of the verdict form.  That

5    completes the formal charge conference.

6          Now, before the Court recesses to make these

7    changes and generate the final copies necessary, before we

8    begin final jury instructions, are there questions to be

9    raised with regard to final jury argument?  Do counsel wish

10   any clarification from the Court?

11          MR. CALDWELL:  None from the Plaintiff.

12          MR. WARD:  One -- one clarification, Your Honor.

13          It sounded like the Defendants are going to argue

14   that art that was not before the Examiner is to be -- should

15   be not subjected to the same burden that art that was before

16   the Examiner when the patents were issued.

17          And I just want clarification from the Court as to

18   whether or not they'd be permitted to do that.  We think it's

19   improper.  There's all kinds of issues going on with covered

20   business method reviews, and we think it would be improper to

21   suggest that the Patent Office has not considered the art

22   that is before this jury; and that there be some different

23   burden to be applied for the jury.

24          THE COURT:  All right.  Defendants clarify for me

25   what you particularly intend to do in this regard.

1          MR. BATCHELDER:  Good morning, Your Honor.

2          May it please the Court.

3          We believe under the i4i case, that it is proper

4    for the jury to consider whether when these patents were

5    granted, the art that we cited was before the Patent Office,

6    and here there's no evidence that the art -- that we relied

7    on it, any of it, was before the Patent Office when these

8    patents were granted.

9          And so I know Your Honor's overruled our request

10   for an instruction on that, but we think it makes sense, in

11   light of that, for Defendants to be able to read the language

12   from the Supreme Court decision to the jury to convey that

13   principle to them for their deliberations.

14          THE COURT:  All right.  Well, the Court considered

15   that request that was raised in the informal charge

16   conference yesterday.  The Court intentionally deleted that

17   suggested included instruction.

18          The language that Defendants seek to include is

19   based clearly upon dicta from a Supreme Court opinion that

20   says the Court may choose to charge the jury.

21          The Court's elected not to.  The Court is not bound

22   by dicta, and the Court intentionally did not include the

23   suggested instruction from the Defendants, and I think it

24   would be improper for you to argue contrary to my

25   instructions, and I think it would be highly improper for

either party to argue anything about what the law is except

to quote to the jury what the Court has instructed them on

what the law is.

So I would -- I would consider that type of

argument, Mr. Batchelder, to be improper jury argument, and

I'm instructing you not to present that argument in light of

this discussion.

MR. BATCHELDER:  Understood, Your Honor.  Thank

you.

May I, in closing, point out to the jury that there

is no evidence that any of this art was before the Patent

Office when the patents were issued and not comment on weight

to be assigned to that fact?

THE COURT:  You know, as to factual contentions,

that's what closing argument is about, but you're not to

attempt to advise the jury directly or indirectly that you

have a differing opinion about the instructions from the

Court on what the law is.

MR. BATCHELDER:  Thank you.

And Apple has one remaining question about the

closings, Your Honor, and it comes back to the point about

copying.  And I understand Your Honor's ruling, and we have

an objection on that point.

What I want to make sure of, though, is that we

don't hear from Plaintiffs in closing that Mr. Farrugia

1   showed up at Apple; and as a result of him having been

2   exposed to the patents or whatever, he was able to much more

3   quickly at Apple create this system, because that -- that

4   argument is copying without using that word.

5           THE COURT:  Well, I think that falls squarely

6   within the purview of jury argument.  I don't agree that

7   that's copying without using that word.  You certainly are

8   entitled to reference my instruction that there's no

9   contention of copying by Apple in the case.

10          I'm not going to -- I'm not going to micromanage

11  what the lawyers can argue to the jury, as long as those

12  arguments are based on the disputed facts in the case.

13          The law in the case is not in dispute, and it's as

14  given to the jury by the Court, and I won't sanction

15  differing arguments from counsel as to what the Court's

16  instruction on the law is.

17          MR. BATCHELDER:  I understand, Your Honor.  Thank

18  you.

19          THE COURT:  Okay.  Are there any other questions we

20  need to get out of the way?  Because I expect the closings to

21  go off clearly, without interruption or without problems.  So

22  if anybody has a question in their mind about it, now's the

23  time to raise it.

24          I assume by your silence that there's not anything

25  else with regard to the manner of closings that needs to be

1    disclosed.

2              MR. BATCHELDER:  Nothing further from Apple, Your

3    Honor.

4              MR. WARD:  Nothing further from the Plaintiff.

5              MR. CALDWELL:  I believe -- do we have a minute or

6    two to work on the slides pursuant to how you --

7              THE COURT:  I expect the Court's going to need

8    somewhere around 20 minutes to do mechanically what I need to

9    do, and I expect between 10:20 and 10:30 to come back in and

10   bring the jury in and proceed with the final jury

11   instructions.

12             MR. CALDWELL:  All right.  Thank you, Your Honor.

13             THE COURT:  So you're free to use that intervening

14   time in any way you need to.

15             MR. CALDWELL:  Thank you.

16             THE COURT:  All right.  The Court stands in recess.

17             COURT SECURITY OFFICER:  All rise.

18             (Recess.)

19             (Jury out.)

20             COURT SECURITY OFFICER:  All rise.

21             THE COURT:  Be seated, please.

22             All right.  Ms. Mayes, please bring in the jury.

23             COURT SECURITY OFFICER:  All rise for the jury.

24             (Jury in.)

25             THE COURT:  Good morning, Ladies and Gentlemen.

1          Please be seated.

2          Ladies and Gentlemen of the Jury:  You've now heard

3   the evidence in this case.  I will now instruct you on the

4   law that you must apply.

5          Each of you will have a copy of these final jury

6   instructions for your review when you retire to deliberate in

7   a few moments.

8          Accordingly, there's no need for you to take

9   written notes on these written instructions unless you

10  particularly want to do so.

11         It's your duty to follow the -- the law as I give

12  it to you.  On the other hand, as I've said previously, you,

13  the jury, are the sole judges of the facts.

14         Do not consider any statement that I have made in

15  the course of the trial or may make in these instructions as

16  an indication that I have any opinion about the facts of the

17  case.

18         You're about to hear closing arguments from the

19  attorneys.  Statements and arguments of the attorneys are not

20  evidence and are not instructions on the law.  They're

21  intended only to assist the jury in understanding the

22  evidence and the parties' contentions.

23         A verdict form has been prepared for you.  You'll

24  take this to the jury room; and when you've reached unanimous

25  agreement as to your verdict, you will have your foreperson

1   fill in the blanks in that form, date it, and sign it.

2        Answer each question in the verdict form from the

3   facts as you find them to be.  Do not decide who you think

4   should win and then answer the questions accordingly.

5        Your answers and your verdict in this case must be

6   unanimous.

7        The parties have stipulated or agreed to some facts

8   in this case.  When the lawyers on both sides stipulate to

9   the existence of a fact, you must, unless otherwise

10  instructed, accept the stipulation as evidence and regard the

11  fact as proved.

12       In determining whether any fact has been proven in

13  this case, there are two types of evidence that you may

14  consider in properly finding the truth as to the facts in

15  this case.

16       One is direct evidence, such as the testimony of an

17  eyewitness.  The other is indirect or circumstantial

18  evidence; that is, the proof of a chain of circumstances that

19  indicates the existence or non-existence of certain other

20  facts.

21       As a general rule, the law makes no distinction

22  between direct or circumstantial evidence but simply requires

23  that you find the facts based on the evidence presented, both

24  direct and circumstantial.

25       You may, unless otherwise instructed, consider the

1    testimony of all the witnesses, regardless of who may have

2    called them, and all the exhibits received and admitted into

3    evidence, regardless of who may have introduced them in

4    answering any question.

5         By allowing the testimony or other evidence to be

6    introduced over the objection of an attorney, the Court did

7    not indicate any opinion as to the weight or effect of such

8    evidence.

9         As I've stated before, you are the sole judges of

10   the credibility of all the witnesses and what weight and

11   effect to give to the evidence in this case.

12        When the Court sustained an objection to a question

13   addressed to a witness, you must disregard the question

14   entirely, and you may draw no inference from its wording or

15   speculate about what the witness would have said if he or she

16   had been permitted to answer the question.

17        Now, at times during the trial, it's been necessary

18   for the Court to talk with the attorneys here at the bench

19   outside of your hearing or by calling a recess and talking to

20   them while you were out of the courtroom.  This happened

21   because, during a trial, things often arise that do not

22   involve the jury.

23        You should not speculate on what was said during

24   such discussions that took -- took place outside of your

25   presence.

1          Certain testimony in this case has been presented
2     to you through depositions.  A deposition is the sworn,
3     recorded answers to questions asked to a witness in advance
4     of the trial.
5          If a witness cannot be present to testify in person
6     from the witness stand, then that witness's testimony may be
7     presented under oath in the form of a deposition.
8          Before the trial, the attorneys representing the
9     parties for both sides of the case questioned these
10    deposition witnesses under oath.  A court reporter was
11    present, and their testimony was recorded.
12         Deposition testimony is entitled to the same
13    consideration as testimony given by a witness in person from
14    the witness stand in open court.
15         Accordingly, you should judge the credibility and
16    weigh the importance of deposition testimony to the best of
17    your ability just as if the witness had testified in person
18    in open court.
19         Ladies and Gentlemen, while you should consider
20    only the evidence in this case, you are permitted to draw
21    such reasonable inferences from the testimony and exhibits as
22    you feel are justified in the light of common experience.
23         In other words, Ladies and Gentlemen, you may make
24    deductions and reach conclusions that reason and common sense
25    lead you to draw from the facts that have been established by

1    the testimony and the evidence in the case.

2           Unless I instruct -- instruct you otherwise, the

3    testimony of a single witness may be sufficient to prove any

4    fact, even if a greater number of witnesses may have

5    testified to the contrary, if, after considering all of the

6    evidence, you believe that single witness.

7           When knowledge of a technical subject may be

8    helpful to the jury, a person who has special training or

9    experience in that technical field, called an expert witness,

10   is permitted to state his or her opinions on those technical

11   matters.

12          However, you're not required to accept that opinion

13   or those opinions.  As with any other witness, it's solely up

14   to you to decide whether to rely upon that or not.

15          In any lawsuit, the facts must be proved by a

16   required amount of evidence known as the burden of proof.

17          The burden of proof in this case is on the

18   Plaintiff, Smartflash, for some issues and on the Defendant,

19   Apple, for other issues.

20          As I mentioned at the beginning of the trial, there

21   are two burdens of proof that you will apply in this case:

22   Preponderance of the evidence and clear and convincing

23   evidence.

24          The Plaintiff, Smartflash, has the burden of

25   proving infringement and damages by a preponderance of the

evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true.  More probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

Apple, the Defendant, has the burden of proving invalidity by clear and convincing evidence.  And Smartflash, the Plaintiff, has the burden of proving willfulness by clear and convincing evidence.

Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the parties' factual contentions are highly probable.  An abiding conviction that the truth of the parties' factual contentions are highly probable.

Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard.

If proof establishes in your mind an abiding conviction in the truth of the matter, then the standard has been met.

In determining whether any fact has been proved by a preponderance of the evidence or by clear and convincing evidence, you may, unless otherwise instructed, consider the

stipulations, the testimony of all the witnesses, regardless

of who called them, and all the exhibits received into

evidence, regardless of who may have produced them.

As I did at the start of the case, I will first

give you a summary of each side's contentions in this case.

I'll then provide you with detailed instructions on what each

side must prove to win on each of its contentions.

As I previously advised you, this case concerns

United States patents:  Patent No. 7,334,720, referred to as

the '7-2-0 or '720 patent; Patent No. 8,118,221, referred to

as the '2-2-1 or '221 patent; and Patent 8,336,772, referred

to as the '7-7-2 patent or the '772 patent.

I will collectively refer to these three patents as

the patents-in-suit.

The Plaintiff, Smartflash, seeks money damages from

the Defendant, Apple, for allegedly infringing the

patents-in-suit by making, using, selling, or offering for

sale products that have technology that allows consumers to

purchase and use content.

Smartflash argues that such products are covered by

Claim 13 of the '720 patent and Claim 32 of the '221 patent

and Claims 26 and 32 of the '772 patent.  These claims are

the asserted claims of the patents-in-suit.

Smartflash also contends that Apple's infringement

has been willful.  Smartflash seeks damages in the form of a

1    reasonable royalty.

2            In response -- in response to Smartflash's

3    contentions, Apple contends that neither Apple nor its

4    customers have directly infringed the patents-in-suit.

5            Apple also contends that it has not induced the

6    direct infringement of the asserted claims.  Apple also

7    contends that all of the asserted claims are invalid because

8    they are either anticipated or rendered obvious by the prior

9    art.

10           Apple also contends that Claim 26 of the '772

11   patent is invalid because of a lack of an adequate written

12   description.

13           Apple also contends that Smartflash is not entitled

14   to damages for any infringement.

15           Your job is to decide whether Apple has infringed

16   the asserted claims of the patents-in-suit and whether the

17   asserted claims of the patents-in-suit are invalid.

18           If you decide that any claim of the patents-in-suit

19   has been infringed and is not invalid, you will then need to

20   decide what amount of money damages, if any, are to be

21   awarded to Smartflash to compensate it for that infringement.

22           Before you can decide many of the issues in the

23   case, you'll need to understand the role of the patent

24   claims.  Patent claims are the numbered sentence at the end

25   of the patent.  Claims are important because it's the words

1    of the claims that define what a patent covers.

2          The figures and the text in the rest of the patent

3    provide a description and/or examples of the invention and

4    provide a context for the claims, but it is the claims that

5    define the breadth of the patent's coverage.

6          Each claim is effectively treated as if it were a

7    separate patent, and each claim may cover more or less than

8    any other claim.  Therefore, what a patent covers

9    collectively depends on what each of its claims covers.

10         Claims may describe methods, apparatuses, products,

11   such as machines or chemical compounds or processes for

12   making or using a product.

13         In this case, Smartflash has asserted apparatus or

14   product claims.

15         Each patent claim sets forth in words a set of

16   requirements in a single sentence.  The requirements of a

17   claim are usually divided into parts called "limitations" or

18   "elements."

19         If a device satisfies each of the requirements in

20   the claim's sentence, then it is said that device is

21   "covered" by the claim, "falls under" the claim, or

22   "infringes" the claim.

23         For example, a claim that covers the invention of a

24   table may recite the tabletop, four legs, and the glue that

25   secures the legs to the tabletop.  In this example, the

tabletop, legs, and glue are each separate limitations of the claim.

If a device is missing even -- even one limitation or element of a claim, it does not meet all of the requirements of a claim and is not covered by the claim.  If a device is not covered by the claim, it does not infringe the claim.

You first need to understand each claim in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.

The first step is to understand the meaning of the words used in the patent claim.  The law says that it is my role as the Judge to define the terms of the claims, and it is your role as the jury to apply my definitions to the issues that you are asked to decide in this case.

Therefore, as I explained to you at the start of the case, I have determined the meaning of certain claim terms, and I have provided my definitions to you of those certain claims terms, and these definitions are in your juror notebooks.

You must accept my definitions of these words in the claims as being correct.  It's your job to take these definitions that I have supplied, and apply them to the issues that you are asked to decide, including both the issues of infringement and invalidity.

1          For claims that I have not construed or defined,

2     you are to use the plain and ordinary meaning of the terms as

3     understood by one of ordinary skill in the art, which is to

4     say, in the field of technology of the patent at the time of

5     the invention.

6          This case involves two types of patent claims:

7     Independent and dependent claims.

8          An independent claim does not refer to any other

9     claim of the patent.  An independent claim sets forth all the

10    requirements that must be met in order to be covered by that

11    claim.  It is not necessary to look at any other claim to

12    determine what an independent claim covers.

13         In this case, for example, Claim 32 of the '221

14    patent is an independent claim.

15         The rest of the claims being asserted in this case

16    are dependent claims.  A dependent claim does not itself

17    recite all of the requirements of the claim, but refers to

18    another claim for some of its requirements.

19         In this way, the claim depends on another claim.

20    The law considers a dependent claim to incorporate all of the

21    requirements of the claims to which it refers.  The depend --

22    the -- the dependent claim then adds its own additional

23    requirements.

24         To determine what a dependent claim covers, it's

25    necessary to look at both the dependent claim and any other

claims to which it refers.  A product that meets all of the requirements of both the dependent claim and claims to which it refers is covered by that dependent claim.

The beginning portion, or preamble, of a number of Smartflash's asserted claims use the word "comprising."  The word "comprising," when used in the preamble, means including but not limited to or containing but not limited to.

When "comprising" is used in the preamble, if you decide that an accused product includes all of the requirements of that claim, the claim is infringed.  This is true even if the accused instrumentality contains additional elements.

For example, a claim to a table comprising a tabletop, legs, and glue would be infringed by a table that includes a tabletop, legs, and glue, even if the table also includes wheels on the end of the table's legs.

A patent owner has the right to stop others using the invention covered by its patent claims in the United States during the life of the patent.

If a person makes, uses, sells, or offers to sell within the -- within the United States or imports into the United States what is covered by the patent claims without the patent owner's permission, that person is said to infringe the patent.

In reaching your decision on infringement, keep in

1    mind that only the claims of a patent can be infringed.  You

2    must compare the asserted patent claims, as I have defined

3    each of them, to the accused products and determine whether

4    or not there is infringement.

5           You should not compare the accused products with

6    any specific example set out in the patent or with the

7    patentholder's commercial products or with the prior art.

8           The only correct comparison is between the language

9    of the claim itself and the accused products, just as I've

10   explained to you.

11          You must reach your decision as to each assertion

12   of infringement based on my instructions about the meaning

13   and scope of the claims, the legal requirements for

14   infringement, and the evidence presented to you by both of

15   the parties.

16          Also, the issue of infringement is assessed on a

17   claim-by-claim basis.  Therefore, there may be infringement

18   as to one claim but no infringement as to another claim in a

19   patent.

20          In this case, there are two possible ways that a

21   claim may be infringed.  I'll explain the requirements for

22   each of these types of infringement to you.  The two types of

23   infringement are called direct infringement and indirect

24   infringement.

25          In order to prove direct infringement of a patent

claim, Smartflash must show by a preponderance of the evidence that the accused product includes each and every requirement of that claim.

In determining whether an accused product directly infringes a patent claim in this case, you must compare the accused product with each and every one of the requirements of that claim to determine whether the accused product contains each and every requirement recited in the claim.

A claim requirement is present if it exists in an accused product just as it is described in the claim language, either as I have explained the language to you; or if I did not explain it, as it would be understood by one of ordinary skill in the art.

If an accused product omits any product recited in a claim, then you must find that that particular product does not literally infringe that claim.

A patent can be directly infringed even if the alleged infringer did not have knowledge of the patent and without the infringer knowing that what it was doing was infringement of the claim.

A patent may also be directly infringed even though the accused infringer believes in good faith that what it is doing is not infringement of the patent.  Infringement does not require proof that a party copied the asserted patent claims.

In addition to alleging direct infringement of the asserted patent claims, Plaintiff, Smartflash, alleges that Defendant, Apple, induces infringement of its asserted patent claims.  The act of encouraging or inducing others to infringe a patent is called inducing infringement.

Smartflash alleges that Apple is liable for infringement by actively inducing another party or parties to directly infringe its patents.

As with direct infringement, you must determine inducement -- excuse me -- you must determine whether there has been active inducement on a claim-by-claim basis.

Apple is liable for active inducement of a claim if Smartflash proves by a preponderance of the evidence that:

(1) the acts are actually carried out by Apple's customers using the accused products and directly infringe that claim;

(2) Apple took action during the time the patent was in force intending to cause the infringing acts by Apple's customers using the accused products;

And (3) Apple was aware of or willfully blind to the patent and knew that the acts, if taken, would constitute infringement of the patent or that Apple was willfully blind to that infringement.

To prove willful blindness, Smartflash must prove by a preponderance of the evidence that there was a high

1  probability that a fact exists and that Apple took deliberate

2  acts to avoid learning of that fact.

3  In order to establish active inducement of

4  infringement, it's not sufficient that the other party or

5  parties themselves directly infringe the claim, nor is it

6  sufficient that Apple was aware of the acts by its customers

7  using the accused products that allegedly constitute the

8  direct infringement.

9  Rather, you must find that Apple specifically

10  intended its customers using the accused products to infringe

11  the patent or that Apple believed there was a high

12  probability that its customers would infringe the patent but

13  deliberately avoided learning the infringing nature of its

14  customers' acts.

15  In this case, Ladies and Gentlemen, Smartflash

16  contends that Apple has willfully infringed its patents.  If

17  you've decided that Apple has infringed, you must address the

18  additional issue of whether or not that infringement was

19  willful.

20  Willfulness requires you to determine, by clear and

21  convincing evidence, that Apple acted recklessly.

22  To prove that Apple acted recklessly, Smartflash

23  must prove by clear and convincing evidence that Apple

24  actually knew or should have known that its actions

25  constituted an unjustifiably high risk of infringement of a

1    valid patent.

2          To determine whether -- to determine whether Apple

3    had this state of mind, consider all facts, which may include

4    but are not limited to:

5          (1) Whether or not Apple acted in accordance with

6    the standards of commerce for its industry;

7          (2) Whether or not there is a reasonable basis for

8    Apple to have believed that it did not infringe or had a

9    reasonable defense to infringement;

10          (3) Whether or not Apple made a good-faith effort

11    to avoid infringing the asserted claims of the asserted

12    patents, for example, whether Apple attended to design around

13    the asserted Smartflash patents;

14          And (4) whether or not Apple tried to cover up its

15    infringement.

16          None of these factors alone is determinative, and

17    this list of factors is not an exhaustive list of things that

18    you should consider.

19          Your determination of willfulness should

20    incorporate the totality of the circumstances based on the

21    evidence presented during this trial.

22          Again, Smartflash has the burden of proving

23    willfulness by clear and convincing evidence.

24          I'll now instruct you on the rules that you must

25    follow in deciding whether or not Apple has proven the

1    asserted claims of the patents-in-suit are invalid.

2              An issued patent is accorded a presumption of

3    validity based on the presumption that the United States

4    Patent and Trademark Office, which you've often heard

5    referred to simply as the PTO, acted correctly in issuing the

6    patent.

7              This presumption of validity extends to all issued

8    patents, including those that claim the benefit of an earlier

9    filed patent application -- application, such as so-called

10   "continuations" or "continuations-in-part."

11             To prove that any claim of a patent is invalid,

12   Apple must persuade you by clear and convincing evidence that

13   the claim is invalid.

14             Like infringement, validity is determined on a

15   claim-by-claim basis.  You must determine separately for each

16   claim whether that claim is invalid.

17             If one claim of a patent is invalid, this does not

18   mean that any other claim is necessarily invalid.  Claims are

19   construed the same way for determining infringement as for

20   determining invalidity.

21             Apple has challenged the validity of the asserted

22   claims on a number of grounds.  In making your determination

23   as to invalidity, you should -- you should consider each

24   claim separately.

25             Apple contends that Claims 13 of the '720 patent

and Claim 32 of the '221 patent are invalid for being anticipated by prior art.  Apple bears the burden of establishing anticipation by clear and convincing evidence.

A patent claim is invalid if the claimed invention is not new.  For a claim to be invalid because it is not new, all of its requirements must have existed in a single device that predates the claimed inventions or must have been described in a single, previous publication or patent that predates the claimed invention.

In patent law, a previous device, publication, or patent that predated the claimed invention is called a prior art reference.

If a patent claim is not new, we say that it is anticipated by the prior art or by a prior art reference.

Anticipation requires that a single reference, not only disclose all elements of the claim within the four corners of the document, but that it must also disclose those elements arranged or combined in the same way as in the claim.

Apple must prove with clear and convincing evidence that an asserted patent claim was anticipated by the prior art reference.

In determining whether or not -- whether or not the invention is valid, you must determine the scope and content of the prior art at the time the invention was made.

1              For prior art to anticipate a claim of a patent,

2     the disclosure in the prior art reference does not have to be

3     in the same words as in the claim, but all of the elements of

4     the claim must be there, either stated or necessarily

5     implied, so that someone of ordinary skill in the field of

6     the invention, looking at that one prior art reference, would

7     be able to make and use at least one embodiment of the

8     claimed invention.

9              Anticipation can occur when the claimed invention

10    inherently, and necessarily results from practice of what is

11    disclosed in the written reference, even if the inherent

12    disclosure was unrecognized or unappreciated by one of

13    ordinary skill in the field of the invention.

14             If you find that a patent claim is not new, that is

15    anticipated, as explained above, you should find that claim

16    invalid.

17             Apple contends that the asserted claims of the

18    patent-in -- patents-in-suit are invalid as obvious.  Even

19    though an invention may not have been identically disclosed

20    or described in a single prior art reference before it was

21    made by an inventor, the invention may have been obvious to a

22    person of ordinary skill in the field of technology of the

23    patent at the time the invention was made.

24             Apple bears the burden of establishing obviousness

25    by clear and convincing evidence.

1          In determining whether a claimed invention is

2    obvious, you, the jury, must consider the level of ordinary

3    skill in the field of technology of the patent that someone

4    would have had at the time the claimed invention was made,

5    the -- the scope and content of the prior art, any

6    differences between the prior art and the claimed invention,

7    as well as the ordinary knowledge of the person of ordinary

8    skill at the time of the invention.

9          The skill of the actual inventor is irrelevant

10   because inventors may possess something that distinguishes

11   them from workers of ordinary skill in the art.

12         Keep in mind that the existence of each and every

13   element of the claimed invention in the prior art does not

14   necessarily prove obviousness.  Most, if not all inventions,

15   rely on building blocks of prior art.

16         In considering whether a claimed invention is

17   obvious, you should consider whether, as of the priority date

18   of the patents-in-suit, there was a reason that would have

19   prompted a person of ordinary skill in the field to combine

20   the known elements in a way that the claimed invention does,

21   taking into account such facts as:

22         (1) Whether the claimed invention was merely the

23   predictable result of using prior art elements according to

24   their known function;

25         (2) Whether the claimed invention provides an

1    obvious solution to a known problem in the relevant field;

2            (3) Whether the prior art teaches or suggests the

3    desirability of combining elements in the claimed inventions;

4            (4) Whether the prior art teaches away from

5    combining elements in the claimed invention;

6            (5) Whether it would have been obvious to try the

7    combination of elements, such as when there is a design need

8    or market pressure to solve a problem, and there are a finite

9    number of identified, predictable solutions;

10           And (6) whether the change resulted more from

11   design incentives or other market forces.

12           To find that prior art rendered the invention

13   obvious, you must find that the prior art provided a

14   reasonable expectation of success.

15           In determining whether the claimed invention was

16   obvious, consider each claim separately.  Consider only what

17   was known at the time of the invention.

18           In making these assessments, Ladies and Gentlemen,

19   you should take into account any objective evidence

20   (sometimes called "secondary considerations") that may have

21   existed at the time of the invention, and afterwards, may

22   shed light on non-obviousness, such as:

23           (1) Whether the invention was commercially

24   successful as a result of the merits of the claimed

25   inventions (rather than the result of design needs or market

pressure, advertising, or similar activities);

(2) Whether the invention satisfied a long-felt need;

(3) Whether others had tried and failed to make the invention;

(4) Whether others copied the invention, understanding that there is no contention in this case that Apple copied the patented technology;

(5) Whether there were changes or related technologies or market needs contemporaneous with the invention;

(6) Whether the invention achieved unexpected results;

(7) Whether others in the field praised the invention;

(8) Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

(8) -- excuse me --

(9) Whether others sought or obtained rights to the patent from the patent-holder;

And (10) whether the inventor proceeded contrary to accepted wisdom in the field.

In support of obviousness, you may also consider whether others independently invented the claimed invention

before or at about the same time as the named inventor

thought of it.

If you find that Apple has proved obviousness by clear and convincing evidence, then you must find that that claim is invalid.

Apple contends that Claim 26 of the '772 patent is invalid for failure of the patent to provide an adequate written description of the claimed invention. Apple must prove by clear and convincing evidence that these claims lacked an adequate written description.

In deciding whether the patent satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of the technology of the patent when the application was filed.

The written description requirement is satisfied if a person having ordinary skill reading the original patent application would have recognized that it describes the full scope of the claimed invention as it is -- as it is finally claimed in the issued patent; and that the inventor actually possessed that full scope by the filing date of the original application.

The written description requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, et cetera, contained in the

1    patent application.

2         The full scope of a claim or any particular

3    requirement in a claim need not be expressly disclosed in the

4    original patent application if a person having ordinary skill

5    in the field of the technology of the patent at the time of

6    filing would have understood that the full scope or missing

7    requirement is in the written description in the patent

8    application.

9         Now, several times in my instructions I've referred

10   to a person of ordinary skill in the field of the invention.

11        Smartflash proposes that a person of ordinary skill

12   in the art would have a Bachelor's degree in electrical

13   engineering or its equivalent, or at least five years of

14   experience in manufacturing or engineering with significant

15   exposure to the digital content distribution and/or

16   e-commerce industries.

17        Apple proposes that a person of ordinary skill in

18   the art would alternatively have (1) at least a Bachelor's

19   degree in electrical engineering, computer science, or a

20   telecommunications-related field, and at least three years of

21   industry experience that included client-server

22   data/information distribution and management architectures;

23        Or (2) at least a bachelor of science degree in

24   electrical engineering, computer science, or

25   telecommunications-related field, and at least three years of

industry experience in that -- that includes client-server computer data/information distribution and management architectures.

If the person had one or more graduate degrees in the above fields, the amount of industry experience required for that person to be of ordinary skill in the art would be reduced accordingly.

If you find that Apple has infringed any valid claim of Smartflash's patents-in-suit, you must then consider what amount of damages to award to Smartflash.

I'll now instruct you about the measure of damages. By instructing you on damages, I'm not suggesting which party should win this case on any issue.

The damages you award must be adequate to compensate Smartflash for any infringement you may find.

Damages are not meant to punish an infringer.

Smartflash has the burden to establish the amount of its damages by a preponderance of the evidence.

The patent owner is not entitled to damages that are remote or speculative.

Smartflash seeks damages in the form of a reasonable royalty.

A reasonable royalty is defined as the money amount Smartflash and Apple would have agreed upon as a fee for Apple's use of Smartflash's invention at the time the

infringement began.

The determination of a damage award is not an exact science, and the amount need not be proven with unerring precision.  You may approximate, if necessary, the amount to which the patent owner is entitled.

In such case, while the damages may not be determined by mere speculation or guess, it is proper to award a damages amount if the evidence shows the extent of the damages as a matter of just and reasonable inference.

I'll give more detailed instructions regarding damages shortly.  Note, however, that under the patent laws, Smartflash is entitled to recover no less than a reasonable royalty for each infringing sale or use of its inventions.

A royalty is a payment to a patent-holder in exchange for the right to make, use, sell -- excuse me -- make, use, or sell the claimed invention.

A reasonable royalty is the amount of money to be paid for a license to make, use, or sell the invention that a willing patent owner and a willing prospective licensee would have agreed to immediately before the infringement began as the part of hypothetical negotiation.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent-holder and the infringer would have been had they entered into an agreement at that time and had they acted reasonably in their

1    negotiations.

2              In determining this, you must assume that both

3    parties believed the patent was valid and infringed and the

4    patent-holder and infringer were willing to enter into an

5    agreement.

6              The reasonable royalty you determine must be a

7    royalty that would have resulted from this hypothetical

8    negotiation and not simply a royalty either party would have

9    preferred.

10             Evidence of things that happened after the

11   infringement first began may be considered in evaluating the

12   reasonable royalty only to the extent that the evidence aids

13   in assessing what royalty would have resulted from a

14   hypothetical negotiation.

15             For the patents-in-suit, the dates of the

16   hypothetical negotiations are as follows:

17             For infringement of the '720 patent, June of 2009.

18             For infringement of the '221 patent, February 2012.

19             For infringement of the '772 patent, December 2012.

20             In determining the reasonable royalty, you should

21   consider all the facts known and available to the parties at

22   the time the infringement began.  Some of the kinds of

23   factors that you should consider in making your determination

24   are:

25             (1)  The royalties received by the patentee for

1    licensing of the patents-in-suit tending to prove --

2    patent -- I'll start over.

3              The royalties received by the patentee for

4    licensing of the patents-in-suit proving or tending to prove

5    an established royalty;

6              (2)   The rates paid by the licensee for the use of

7    other patents comparable to the patents-in-suit;

8              (3)   The nature and scope of the license as

9    exclusive or non-exclusive or as restricted or non-restricted

10   in terms of territory or with respect to the parties to whom

11   the manufactured products may be sold;

12             (4)   Whether the patent owner had an established

13   policy of granting licenses or retaining the patented

14   invention as its exclusive right or whether the patent owner

15   had a policy of granting licenses under special conditions

16   designed to preserve its monopoly;

17             (5)   The nature of the commercial relationship

18   between the patent owner and the licensee, such as whether

19   they are competitors or whether their relationship was that

20   of an inventor and a promoter;

21             (6)   The effect of selling the patented specialty

22   in promoting sales of other products of the licensee, the

23   existing value of the invention to the licensor as a

24   generator of sales of his non-patented items, and the extent

25   of such derivative or convoyed sales;

(7)   The duration of the patent and the term of the license;

(8)   The established profitability of the product made under patents, its commercial success, and its current popularity.

(9)   The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results;

(10)   The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

(11)   The extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

(12)   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

(13)   The portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

(14)   The opinion and testimony of qualified

1    experts;

2           And (15) the amount that a licensor (such as the

3    patentee) and a licensee (such as the infringer) would have

4    agreed upon at the time the infringement began if both sides

5    had been reasonably and voluntarily trying to reach an

6    agreement; that is, the amount which a prudent licensee who

7    desired, as a business proposition, to obtain -- obtain a

8    license to manufacture and sell a particular article

9    embodying the patented invention would have been willing to

10   pay as a royalty and yet be able to make a reasonable profit

11   and which amount would have been acceptable to a prudent

12   patentee who was willing to grant a license.

13          No one factor is dispositive, Ladies and Gentlemen,

14   and you can and you should consider the evidence that's been

15   presented to you in this case on each of these factors.

16          You may also consider any other factors which in

17   your minds would have increased or decreased the royalty the

18   infringer would have been willing to pay and the patent owner

19   would have been willing to accept, acting as normally prudent

20   business people.

21          Damages should be apportioned to the value

22   contributed by the invention; that is, Smartflash must

23   apportion the damages between the portion of the accused

24   products that are the patented features or components and the

25   unpatented features and components of the accused products.

1          Therefore, except as specifically provided in these

2     instructions, when applying the 15 factors I've just

3     discussed with you, you should only consider as the royalty

4     base the portion of the value that is attributable to the

5     patented features or components as compared to the portion of

6     the value associated with other features or components, such

7     as unpatented elements, features, components, or improvements

8     developed by Apple.

9          The law allows for the recovery of damages based on

10    the value of an entire product containing several features or

11    components only when the patented invention constitutes the

12    basis for consumer demand for the entire product.

13         Accordingly, if you find that Smartflash has proven

14    by a preponderance of the evidence that the demand for

15    Apple's accused products is alone motivated by the patented

16    invention, then you may award damages based on the entire

17    value of those accused products.

18         However, if you find that consumer demand for the

19    products is not based solely on the patented invention, you

20    should not -- you should award damages based on the value of

21    the patented invention and not the entire value of the

22    accused products.

23         With those instructions, Ladies and Gentlemen, you

24    will now hear closing arguments from counsel from each of the

25    parties.

1              The Plaintiff may now present its first closing

2    argument.

3              MR. WARD:  May it please the Court.

4              THE COURT:  You may proceed.

5              MR. WARD:  Counsel.

6              MR. ALBRITTON:  Yes, sir.

7              MR. WARD:  Members of the Jury, good morning.

8              I'm lucky.  I'm the one who gets to thank you

9    first, to thank you for your service.  You volunteered a

10   little over a week ago to show up for jury service.

11             You didn't necessarily volunteer to be on this

12   jury, but we drafted you to be on the jury, and you've worked

13   hard and you've paid close attention, and we appreciate that.

14             Every time I look at a jury, I'm reminded that we

15   live in the greatest country in the world.  It's a country

16   where a man like Patrick Racz gets to get on a level playing

17   field with a company the size of Apple, and it's a country

18   where a company like Apple gets to present its defenses to a

19   jury and you-all get to decide who is right in this case.

20             While Apple may make some great products, you've

21   gotten to see something that goes on behind the scenes, how

22   they don't respect Smartflash's intellectual property.  You

23   get to see behind the scenes of Apple, and you've gotten to

24   see a little bit about this entity referred to as Apple

25   Legal.

1          I want to go through the evidence and remind you

2    what we think the evidence has shown and how it instructs

3    your verdict in this case.  These are the topics that I'll

4    cover -- infringement, willful infringement, validity, and

5    damages.  You'll see those in the questions that you're going

6    to be asked.

7          Apple infringes.  I remind you briefly about the

8    burden of proof.  You've heard about the preponderance of the

9    evidence.  It's described as the greater weight and degree of

10   the incredible testimony.  That is our burden in this case.

11         We've got to prove to you that Apple infringes by a

12   preponderance of the evidence.

13         And you can see the citations to the Court's jury

14   instructions.  If you want to -- to read these, you're going

15   to have them and you can -- you can read them at your leisure

16   once you go back to the jury room.

17         But understand that we don't have to prove

18   knowledge of the patent in order to prove infringement.

19         We're going to talk about knowledge because there

20   is some evidence that Apple knew or should have known about

21   this patent.

22         I also want to remind you about the Court's

23   instruction about comparing the claims to the products

24   because that's the -- the comparison that you'll make for

25   determining whether or not Apple infringes, comparing the

1    claims at issue to its products.

2         You're specifically instructed not to compare the

3    accused product with an example from the patent or with the

4    patentholder's commercial products.  You remember Apple did

5    that early in the case.

6         They started trying to show you this card reader.

7         You're instructed that's not what you do.  That

8    might be -- in all these claims there might be a claim that

9    covered that, but the comparison you make is to the invention

10   that's claimed in the patent claims.

11        What did Mr. Racz testify that he invented?  I

12   invented particular devices and methods for combining payment

13   functionality, secure downloading, storage, and rules for the

14   use of content on one portable device that you would carry

15   with you.

16        That word I highlighted "combining" is important

17   because every once in a while, someone comes up with a new

18   and unique way of combining known elements.

19        It wasn't combined by anyone prior to Mr. Racz,

20   that 1999 date that you've heard about, and that's the date

21   you consider for infringement.  The later dates are relevant

22   for damages, but for infringement, you're looking at when did

23   he come up with his idea, and it was in 1999.

24        IBM didn't come up with it.  Motorola didn't come

25   up with it.  Sun Microsystems didn't come up with it.  And

1    certainly Apple did not come up with it.  They hadn't even

2    sold a cell phone until 2007.

3            They've wasted some of your time, in my opinion,

4    going through and saying you didn't invent the cell phone,

5    you didn't invent the microprocessor.  You remember those

6    lists that we've been hearing about?

7            But if you'll look at the Court's instruction on

8    Page 14, His Honor has instructed you:  Most, if not all,

9    inventions rely on building blocks of prior art.  Think about

10   that.  Folks are combining known building blocks into new and

11   unique inventions, and that's -- that's what is entitled to a

12   patent.

13           Smartflash is the -- the party in this case that

14   walked you through each of these claims, and I know it took

15   time, but we had to jump through each box.  We had to check

16   each box because Apple admits nothing.  They admit nothing in

17   this case.  We've proven it.

18           I remind you how we proved it.  You remember all

19   those boards that Dr. Jones got up and Mr. Curry tacked on

20   the evidence that he looked at, the software code, the screen

21   captures, the testimony.  He checked each box for you.

22           Remember this testimony from Mr. Mirrashidi.  The

23   truth is the code.  Remember that?  The truth is the code.

24           So if the code is the truth, what do we know?  We

25   know that no witness from Apple, no employee of Apple

reviewed the code to come in here and say it doesn't operate

the way that Dr. Jones told you it operated.

Dr. Ligler didn't review the relevant code.

Mr. Wechselberger, he didn't review the code.  Why is that?

Why won't they look at their own code?  It's

because if they took the stand, they know they'd be under

oath, and they'd have to admit infringement.

These are the disputed elements that -- that seem

to come out during the testimony.  Payment elements, use

access rules, data supplier.

Remember this chart from Dr. Jones describing how

their system works, specifically walking you through the

source code?  And Mr. Mirrashidi confirmed that the Apple ID

is used to make purchases.  Yes, sir.

Use and access rules.  Again, Dr. Jones walked you

through exactly how those use and access rules worked.  He

didn't have to do it by reading slides.  He understands how

the code works.  He understands how their products work.  He

got down here in front of you and explained these things to

you.

Remember this?  The code -- only one expert looked

at the code on any of these rules.  It was almost as if Apple

was saying, don't look, don't look, let's frog march Mr. Racz

out of the courtroom.  They don't want anyone to look at the

code, including their own employees, because the code

1    confirms what we've been telling you, and that is that these

2    products infringe.

3          Data supplier.  This is probably one of the most

4    interesting arguments, and it tells you about the credibility

5    of Apple's positions in this case.

6          Remember this diagram from Farrugia?  Mr. Farrugia

7    put this up here and tried to say, look, the content is

8    coming from Akamai, this third-party -- this third-party

9    content delivery network.

10         Yet on cross-examination, he said:  You're right,

11   it actually comes from Apple iTunes.  It goes over to Akamai,

12   and it's delivered to the end-user device.

13         And Mr. Mirrashidi, when he was under

14   cross-examination, admitted Apple then takes the encrypted

15   file and supplies that data to the user via Akamai, correct?

16   They confirmed these things.

17         And here's the questions that you'll be asked.  Did

18   Smartflash prove by a preponderance of the evidence that

19   Apple infringes these claims?  I submit to you the answer to

20   those questions is yes.

21         Willful infringement is the instruction that you'll

22   get.  Willfulness requires you to determine by clear and

23   convincing evidence that Apple acted recklessly.

24         Here are the things that you consider to consider

25   whether or not Apple acted recklessly, whether or not their

1  actions constituted an unjustifiably high risk of

2  infringement of valid patents.  And these are the things that

3  you can look at, and they're in the instructions.

4          Did you find it interesting that not a single

5  witness could be bothered with reviewing patents other than

6  the 15 minutes prior to when they walked into their

7  deposition?

8          Then Mr. Mirrashidi said, yeah, you know, I decided

9  I'd better read the patents when I figured out I was going to

10  have to come to court in Tyler, Texas, and maybe answer

11  questions about it.  That's years after they've been sued do

12  they finally get around to bo -- bothering to read these

13  patents.

14          What about Mr. Farrugia?  This gentleman, he told

15  us he was a director at Gemplus.  Consider his credibility.

16  Y'all saw the -- the transcripts from prior testimonies that

17  he gave.

18          Remember when he was under oath prior to this case,

19  he said he was an expert in securing digital content.  He

20  came straight from Gemplus to Apple.  He had DRM experience

21  from Gemplus.

22          Yet what does he say when he gets under oath in

23  this case?  He says, forget about that, I'm not an expert in

24  securing digital content.  There was a gap between my

25  employment.  I didn't have any DRM experience prior to coming

1    to Apple.  Why would he be taking those positions in this

2    case which are 180 degrees contrary to the sworn testimony

3    that he gave in a preceding case?  Consider that.

4          Consider the fact that Apple saw fit to pay fact

5    witnesses in this case to shield us from talking to those

6    witnesses.  You saw the email where witnesses were contacting

7    counsel for Apple saying I'm getting calls from this lawyer

8    in Texas, and what do they say?  Don't talk to them.  Let's

9    sign this engagement agreement.  We'll take care of you.

10          Willfulness.  I submit to you the answer to these

11   questions is yes.

12          Validity.  You're instructed that there is a

13   presumption -- a presumption of validity, and that's because

14   the Patent Office has looked at these patents, they've

15   considered the patents in the face of the prior art, and have

16   decided to issue the patents.

17          And remember who has the burden of proof.  That

18   burden of proof is on Apple, and they must prove to you by

19   clear and convincing evidence, and the Court defines that to

20   you, an abiding conviction that the truth of the parties'

21   contentions are highly probable.

22          And who do they bring to you to meet that burden?

23   Mr. Wechselberger, the man that doesn't even know what the

24   burden of proof is, yet he'll crawl up on that witness stand

25   and tell you to invalidate Mr. Racz's property.  Didn't even

1    know what the burden of proof was.

2           The only thing, I submit, is highly probable is

3    that Mr. Wechselberger could not tell you about any of the

4    prior art without reading it from a slide, racing through it.

5           I felt sorry for you.  I couldn't keep up with it.

6    I've never seen a mess like this.  And if you couldn't keep

7    up, you were not alone.  I've been doing patent cases for

8    over 10 years, and I couldn't keep up with what he was

9    saying.  And they want to submit to you that that's clear and

10   convincing evidence.

11          The only time I really understood this was when Dr.

12   Jones took the stand and came down here without notes,

13   without prompting, and described to you why what they were

14   telling you was not, in fact, true.

15          It's their burden.  Yet they want to tell you,

16   well, they're anticipated.  And if they're not anticipated,

17   all these patents are obvious.  And if we're wrong there,

18   well, they're invalid for written description.

19          I mean, which defense are they going to light on?

20   Let's see if they'll get up here and light on a defense in

21   their closing and say, yeah, we probably did confuse you, and

22   we've got our grab bag of prior art and I'm going to make

23   sense for it.

24          Let's see if they'll get up and explain something

25   that's coherent.  They're not going to.  Their intention is

1    to confuse you so that when they get to cross-examine Dr.

2    Jones, they say, we'll -- look, we'll pick something out of

3    this prior art, we'll pick something out of this prior art.

4              As the Court instructed you, that's not good

5    enough.  It's obvious that there are building blocks that are

6    there, but they've got to prove to you why one of skill in

7    the art would have been motivated to combine those building

8    blocks, as they say.  These patents are not invalid, and

9    Apple has not met its burden.

10             It paid fact witnesses -- all those folks on the

11   prior art and kept us from talking to them.  Turned out, it

12   didn't matter, I don't know, other than the fact that they're

13   willing to stoop to that level tells you something about the

14   levels to which Apple will go to avoid infringement.

15             The answer to these questions is no.

16             This is really a case about damages.  We've got to

17   jump through the hoops to get to damages, right?  They tell

18   you we don't trespass; but if we do, the deed is no good.

19   It's no good for all these reasons.  And if we're wrong

20   there, well, we don't really owe that much money.

21             Smartflash is entitled to recover no less than a

22   reasonable royalty.  We've brought you Dr. Wecker.  He showed

23   you his survey results.  And did you catch something during

24   the instructions?  All that fighting over the words alone

25   motivated.

1          When you get back to the jury room, you'll see that

2     that's the burden that we've got to meet to prove damages to

3     you.  On Page 21:  Accordingly, if you find that Smartflash

4     has proven by a preponderance of the evidence that the demand

5     for Apple's accused products is alone motivated by the

6     patented invention.

7          You know what would happen if we didn't use alone

8     motivate?  We'd be getting criticized.  They'd be saying,

9     Ladies and Gentlemen, the -- the burden is alone motivated.

10    Because you heard Dr. Dhar criticize us when we just used the

11    word "motivated."  He said, oh, they didn't say "alone."  We

12    go back and we conduct a survey with the words alone

13    motivated in it, and he says, oh, that's confusing to them.

14          You can't rely on that.

15          But what do Apple's own documents show?  Now, is

16    this document saying this is the only reason folks bought

17    their products?  No, because they're not going to show you

18    that survey.  They don't want to pay for that survey.  They

19    know what the answers are.  They know we're spot on.  Their

20    own surveys, 43 percent of folks say they wanted a phone that

21    combined music, email, web, and downloading games and apps,

22    wanted to use apps.

23          Dr. Dhar told you, I could run a survey, but no one

24    asked me to.  Instead, Apple said spend $300,000 running

25    surveys to say why their surveys are no good.  What does that

1   tell you?  They're not interested in showing you what the

2   value of these features are.  We are.  We're the ones who

3   conducted the survey.  That's our burden.  And we gladly meet

4   it.  And it's a lot of money.

5          Just 23 percent of infringing sales is $43.4

6   billion.  It is a lot of money.  They've made a lot of money

7   using Mr. Racz's invention.

8          Mr. Mills walked you through the reasonable royalty

9   rates.  You're to award damages for the use made of the

10   invention by the infringer.  But in no event, less than a

11   reasonable royalty.

12          $852 million, and I don't tell you that number

13   saying you know what, that's where this -- we got a high ask.

14   Shave some off of it, and we'll be happy because we walked

15   through how we did this math and we walked through what Apple

16   keeps, even under this royalty analysis.

17          77 percent of infringing units, not included.

18   Content revenue, not included.  Revenue from music and books,

19   not included.  We used the lower end of the -- the bounds,

20   right?  If we'd used the midpoint, we'd be entitled to

21   another $350 million, but we're not in here saying give us

22   $1.2 billion.  We're saying, here's the conservative number

23   using the surveys, using the damages that Mr. Mills

24   calculated, $852 million.

25          And they keep what?  $42.6 billion.

1          And without hesitation, I tell you that's what the

2    number is.   That is the fair compensation for Apple's use of

3    Mr. Racz's invention.   They seem like they're offended.

4    They'll jump up and say $43 billion.   $43 billion, how

5    offensive is that?   We want to keep it all, except for 4.5

6    million.   That's Apple's position.

7          And what do they tell you -- what do they tell you

8    about how you ought to calculate damages because what they

9    tell you ought to tell you a lot about what Apple thinks

10   about people like Mr. Racz and what they think about people

11   who are not other big companies, because they brought you Dr.

12   Becker and he said this is the number, 4.5 million.   And

13   think about how he went about calculating that.

14         He said, well, let's look at what Mr. Racz had

15   available to invest in the market.   We're not going to look

16   at the patented features.   It's not possible to do that,

17   right?   That's their story.   You can't do that.   It's not

18   possible, despite Dr. Dhar saying you can do it.

19         Dr. Becker says we're going to invest that $3

20   million.   It's going to grow between 30 and 20 and we'll take

21   a market share and we'll reduce it some to 4-and-a-half

22   million, that's what's fair.

23         But wasn't it interesting that when it was Apple's

24   ox getting gored, they had a different approach?   When Mr.

25   Muller was on the stand and I said:   Mr. Muller, what if it

1   was your piece of property and Exxon had come out there and

2   drilled a well and was pumping oil and it was the motherload

3   and they made $43 billion; and they said, you know what,

4   instead of paying me for what we took from your property, if

5   you only invested 3 million in it, let's just do some quick

6   math.  We'll run it through the market.  We'll do Exxon's

7   market share, and we'll tell you 4-and-a-half million dollars

8   and we'll call it a day.

9            THE COURT:  You've used 18 minutes, Counsel.

10           MR. WARD:  Do you remember what his answer was when

11  I asked:  Do you think that's fair?  No, that doesn't sound

12  fair.  But then flip the tables and do exactly what they want

13  to do to Mr. Racz, and it's Apple's position, that's fair,

14  4-and-a-half-million dollars is fair.

15           I'm going to sit down.  Apple's going to have an

16  opportunity to talk to you.  And make sure they talk to you

17  about the evidence.  See if they'll talk to you about the

18  evidence, as the Court has instructed the evidence to be

19  applied -- or the law to be applied to that evidence.

20           I bet if they don't, my co-counsel, Mr. Caldwell,

21  will point it out.

22           Thank you again for your time and your service.

23           THE COURT:  All right.  The Defendant may present

24  its closing argument.

25           Counsel, you may proceed.

1          MR. BATCHELDER:   Thank you, Your Honor.

2          Counsel.

3          Ladies and Gentlemen, every trial has a story, and

4  Smartflash would have you believe that the story of this

5  trial began in 1999.   But, in fact, we heard from

6  Mr. Wechselberger it actually began several years earlier in

7  the mid-1990s as a result of some improvements in the

8  industry at the time.

9          Let me pause us here and address the comments we

10  just heard about Mr. Wechselberger.   He was criticized for

11  not telling you what the legal burden is in this court.

12          Well, who's job is that?   His Honor just explained

13  to you what the legal burden is.   It's a legal issue.

14  Mr. Wechselberger is not a lawyer.   He's an expert in this

15  industry.   And as we'll hear, that was not true of Mr. Racz.

16          Mr. Wechselberger came in and explained that in the

17  1990s, some improvements happened, created some opportunities

18  but also some challenges.   All of a sudden we had portable

19  music players.   We had fast downloading of these digital bits

20  over the Internet.   We had easy copying as a result of that;

21  and also as a result, we had some piracy.

22          So because of all those things that were happening

23  in the mid-1990s, as he explained, experts everywhere in the

24  industry -- in the consumer electronics industry were

25  figuring out ways to allow those kinds of things, content

1    like music and movie apps to be sold over the Internet, but

2    protect them from piracy.

3           And he put up this timeline, and I'm sure you'll

4    remember.  He walked us through all this prior art, because

5    all these engineers from these world leading technology

6    companies were working on this very problem.

7           Mr. Wechselberger showed for every one of these

8    references, putting them on the left and Smartflash on the

9    right, that they recognized first this problem of piracy in

10   this industry result of the factors that we've been talking

11   about.

12          And, again, putting the reference on the left and

13   Smartflash on the right, as he does here, he showed that

14   every component that Mr. Racz came along later to say, hey, I

15   think we should use these to tackle this problem, all of

16   these other references, every single one of them had already

17   disclosed using those very components for that very problem.

18          Using this Gruse/IBM example, again,

19   Mr. Wechselberger showed you, taking the figures from the

20   patents themselves, he showed every single step that was

21   disclosed in these patents for accomplishing these purchase

22   transactions -- again, to sell content over a network like

23   the Internet, protected, pay electronically, the very problem

24   this industry was confronting; and all of these references

25   talked about various ways to do it, including the way that

1    Mr. Racz came along later and said he had thought of first.

2           And he didn't stop there.  Mr. Wechselberger went

3    on and for every single claim -- he was up there for three

4    hours, teaching these references.  And for every single claim

5    and every single limitation of the claim, every requirement,

6    he showed exactly where in each reference it was disclosed.

7           And so here you have, for example, this -- the red

8    limitation at the bottom from the claim, and he put right

9    next to it exactly where in the IBM/Gruse patent that element

10   was met.  And he did it element-by-element-by-element.

11          And he didn't just do it for one reference, for

12   each claim, he walked you through multiple references.  And

13   here we have four blue checks.  And you may remember, he said

14   I only need one to invalidate this claim, but here are four

15   of them.

16          These claims are not just invalid, they're invalid

17   many times over.  Mr. Racz was not the first to think of this

18   idea.

19          And is this hindsight?  Is this a he-said, she-said

20   situation?  No, again, these are patents.  These prior art

21   patents are dated.  They're written documents submitted to

22   the government.  There's no dispute about what they say or

23   when they said it.  All of it was before Mr. Racz came along.

24          Now, Mr. Jones came in here yesterday and said,

25   yeah, I think Mr. Wechselberger left out a couple things.  In

1   the IBM/Gruse patent, he said I don't think that the

2   IBM/Gruse patent discloses payment data stored on the data

3   carrier.  But I got a chance to question him and he admitted

4   that it does.

5         And then he said what about that Poggio/Sun

6   reference that Mr. Wechselberger used to combine with some of

7   the other references to show payment before content?  And Mr.

8   Jones said, I don't think the Poggio reference discloses

9   that; and, again, when I got a chance to question him, he

10  admitted that it does.  Prepayment for content?  Answer, yes.

11        So long before Mr. Racz came along, things he put

12  in his patent claims were already disclosed in writing and

13  would have been obvious to engineers at the time.

14        Now, were they obvious to Mr. Racz?  The answer is

15  no.  And that's understandable because he does not have a

16  background in this field.  And his background was in water

17  faucets.  And there's nothing wrong with that, of course, but

18  the Court has told us in its instructions -- and you'll get a

19  written copy -- that the standard for obviousness is based on

20  a person of ordinary skill in the art in this field, in the

21  field of these patents; and Mr. Racz has admitted he's not

22  that guy.

23        He's not a person of ordinary skill in the art in

24  the field of these patents.  Mr. Wechselberger, on the other

25  hand, has exactly those qualifications.  So he's the right

1   guy to speak to this.

2          And remember there's no evidence whatsoever that

3   any of these references were considered by the Patent Office

4   when they issued Mr. Racz's patents.  None of them appears on

5   the face sheet of any of these patents.

6          Let's talk about a couple of sanity checks for how

7   these patents are invalid.  One is, we know that Mr. Racz did

8   not invent anything new because of what happened to his

9   business, that he said he started to commercialize what he

10  said was his invention.

11         If he had invented some hot, new technology, you

12  think he would have shouted it out to the world and that his

13  company would have thrived.

14         Well, instead, how did he describe his business,

15  Internet Plc?  He said commercializes invention.  He said --

16  you may remember -- he reluctantly admitted that he said our

17  business is in promotional marketing, not technology.

18         And, of course, his company spiralled along for a

19  few years, ultimately lost millions of dollars and went

20  bankrupt.

21         Another important question:  What do other people,

22  people outside this courtroom with nothing to benefit, no

23  interest in the outcome here, what do they say?  Did they

24  agree with Mr. Wechselberger?  Remember what happened when

25  Mr. Racz reached out to InterTrust, an expert in this field.

1        He said, hey, I've got this patent, I think it's a

2   great idea.  Please invest.  And how did they respond?

3        Right there on the screen, our guys were pretty

4   thorough in their investigation.  Their feeling was that the

5   claims were broad, but there was generally little that gave

6   highly significant or distinctive advances over any prior

7   art.  That's just what Mr. Wechlesberger came in and said.

8        And, again, one course, one of the references that

9   he pointed to was the Ginter/InterTrust patent.

10       Ginter/InterTrust itself from this InterTrust

11  Company, the experts that Mr. Racz acknowledged and reached

12  out to, they had already thought of this stuff themselves.

13       Now, how did Mr. Racz respond to this?  Did he say,

14  InterTrust, what are you talking about?  I reached out to you

15  and you said there's really nothing distinctive over the

16  prior art.  What do you mean?  What prior art?  He didn't do

17  that.  He never called back.  He never wrote back.  He hasn't

18  spoken to them since.

19       Now, we're going to put up this board what I'm sure

20  you'll remember from the opening that Mr. Caldwell did in

21  this case.  So in his opening statement -- and they've said

22  that this is what shows what Mr. Racz thought of -- thank

23  you -- thought of before anyone else.

24       And you also may remember that when he was done, I

25  got up and I used their slide in my opening.  And I made a

1    commitment to all of you.  I said, I'm going to cross-examine

2    Mr. Racz this afternoon.  That was the first day of trial.

3            And he will admit he did not invent any of this,

4    even though they say that this is the thing that they -- that

5    shows what Mr. Racz thought of first.  And I hope you

6    remember that I made good on that commitment.

7            So here's what Mr. Racz had to say.  Didn't invent

8    MP3 players.  That's an MP3 player in the patent.  Didn't

9    invent downloading content over the Internet.  Didn't invent

10   payment data.  Didn't invent using payment data online.

11           What about rules?  Didn't invent use rules in

12   connection with online sale of content.  Didn't invent use

13   rules.  Didn't invent access rules or access rules in

14   connection with the online sale of content.  There is nothing

15   here that Mr. Racz thought of first.  There's nothing here

16   that he invented.

17           And they're saying, well, maybe he was the first to

18   combine them.  Mr. Wechselberger showed exactly the opposite.

19   He showed that all of these components were combined in these

20   prior art references before Mr. Racz came along.

21           So he made all those admissions in his

22   cross-examination.  And if he really was the first to think

23   of something, taking these old elements and combining them in

24   some new way, you really would have thought that he would

25   have come back up on redirect examination and said so.

1          And, in fact, Mr. Caldwell promised that that was

2     going to happen.  He was asked -- remember, when I finished

3     my cross toward the end of the day and His Honor said this is

4     a good juncture, Ladies and Gentlemen, recess for the day.

5          I assume the Plaintiff has redirect of this

6     witness.

7          Mr. Caldwell:  Absolutely, Your Honor.

8          We broke for the day, came in the next morning, and

9     what happened?

10          His Honor asked:  Does the Plaintiff additional

11     redirect?

12          Mr. Caldwell:  No, Your Honor, we don't.  No

13     further questions.

14          And we never heard from Mr. Racz again in this

15     trial.  He never came in and explained why if he didn't

16     invent any of his, somehow his patents -- his patented claims

17     here should be found valid.

18          Ladies and Gentlemen, these four patent claims are

19     not valid, and it is wrong that Apple is here being sued on

20     invalid patent claims.

21          Let me now turn to what happened in the 1990s back

22     to the time frame showing that Apple does not infringe.

23          Remember there was iTunes Invention of the Year

24     Award in 2003, the Apple iPhone in 2007.  What was Mr. Racz

25     saying in 2009?  When he was pointing out who he felt was an

1    infringer, was he pointing to Apple?  No, he was pointing to

2    SanDisk and other entities, not Apple.  That tells you a lot.

3            This is an unfounded accusation of infringement.

4    But this Court is giving you tools to stop it.  Because it

5    said to infringe, you have to prove each and every

6    requirement recited in the claim, each and every requirement.

7            It's not horseshoes.  It's not hand grenades.

8    Close is not good enough.  You have to prove every element

9    and it is their burden to do that and they have not met that

10   burden.

11           Now, is there a dispute about how Apple's products

12   work?  Their own man, Dr. Jones, said no.  Have you heard of

13   anyone at Apple disagree with how you say Apple's products

14   work?  No, I haven't.  For goodness sakes, Apple's

15   witnesses -- Apple's engineers wrote the code.

16           We all know how it works, and everybody agrees on

17   that.  The question is, do these legal requirements set forth

18   in the claim, are they met?  So this truth is in the code.

19   That's a sideshow.  Of course, the truth is in the code.  But

20   everyone agrees what the code says and everyone agrees how

21   the products work.

22           Thank you.

23           And the way they work turns out to be different and

24   better, frankly, than the way these patents say to do it.

25           So here's one example.  The patent claim requires

1    three things.  Once a user selects content, it requires

2    payment, it requires that payment be validated; and only

3    after it gets validated, does the content get retrieved.  So

4    you've got to pay -- you pay for it.  That payment gets

5    validated.

6            Only then do you get the stuff, the song, the

7    music, the app, the movie.  That's not the way Apple's

8    products work, and everybody agrees with that.

9            As we saw both from Mr. Mirrashidi and from

10   Mr. Wechselberger, Apple's system relies on something called

11   sessions.  Because if every time you bought something, every

12   time you bought a song Apple's system had to charge a credit

13   card, they'd have to pay a fee to the credit card company for

14   that.

15           So instead, they basically batch pay.  They batch

16   all these sessions.

17           So if you look right under the box on the left, you

18   ask to buy this song for $1.29, and it logs it.  The site

19   remains open for either 84 hours, until you've hit $9.99

20   worth of content; and before that, there is never any

21   payment.

22           So you send up the buy request.  You get the

23   download response, that blue box.  You get your content, the

24   song.  There's been no payment.  And yet it's that blue box

25   that Dr. Jones comes in here and said, that's payment

1  validation data.  There's been no payment.  How could it be

2  validated?  Apple doesn't do what this claim requires.

3       And, again, we're not living in a land of

4  horseshoes and hand grenades.  You can't be, well, it's kind

5  of like that.  It has to be the same thing, and it's not.  It

6  does not infringe, under the Court's instructions to you-all.

7       Here's another example.  Claim 13 of the '720

8  patent, code to read payment data from the data carrier.  All

9  of these claims require, and everybody agrees with this, that

10 there's got to be payment data on the phone itself.  And it

11 has to be sent every time there's some kind of a purchase.

12       THE COURT:  You've used 15 minutes, Counsel.

13       MR. BATCHELDER:  Thank you, sir.

14       Again, that's not the way Apple's products work.

15       So on the left of this slide, we have what

16 Smartflash's claims require.  The payment data must be read

17 from the user device.  It's got to be there, and it gets sent

18 up each time.

19       What happens with Apple?  We talked about this in

20 my opening statement to you.  With Apple, when you create an

21 iTunes's account, you provide your credit card.  But after

22 that, that credit card gets stored on that Apple server at

23 the top of the screen.  It's a secure server to protect the

24 customer's credit card.

25       Then when you buy a song or a movie or an app, you

1    never need to send that credit card.  All you send is the ID

2    information.  You see all that in the information packet, it

3    all ends in ID.  That's identifier information.  That's not

4    payment data.

5           Is there payment data in Apple's system?  Yeah, you

6    bet.  That's the credit card that goes from the server to the

7    bank.  But is it sent from a user device from the phone?  No.

8    It's not stored there.

9           And, again, why does Apple do it this way?  Well,

10   if you store the credit card on the phone, someone can hack

11   it and steal the credit card, steal the identity of the

12   customer.  Apple protects its customers.  It does things

13   differently and better than these claims require.

14          And, again, it can't just be close.  It has to be

15   exactly the same to infringe, as His Honor's instructions

16   have told you.

17          Also, how could this be payment data if the same

18   information, that same set of IDs is sent on the left even

19   when it's free?  It's the same information each time.  Free.

20   Not free.  Does that sound like payment data to you?  No,

21   it's identifier data.

22          Apple does not infringe these claims.  What it does

23   is different.  And that's all you need.  But it's also

24   better.  It protects its customers in a way that these

25   patents do not.

1          And remember, to be valid, the claim needs to

2    have -- have two requirements, as compared to the prior art.

3    It has to be new, and it can't be obvious.  And these claims

4    fail those tests.  And, again, obviousness is measured by one

5    of ordinary skill, and that's someone who Mr. Racz is not,

6    but Mr. Wechselberger is.

7          Ladies and Gentlemen, it's been an honor and a

8    privilege for me to spend this trial with you.  I'm now going

9    to ask my friend and colleague, Mr. Albritton, to say a few

10   final words on behalf of Apple.

11          MR. ALBRITTON:  May it please the Court.

12          THE COURT:  You may proceed.

13          MR. ALBRITTON:  Thank you.

14          Thanks, folks.  I am going to visit with you about

15   damages; but I'm going to tell you straight up front, the

16   majority of the things that I'm going to talk to you about

17   now aren't going to matter because I agree with what Jim

18   Batchelder just told you:  Apple does not use these patents,

19   and they are invalid.

20          But I have to talk to you about damages because

21   it's one of the issues that's potentially involved.

22          Whenever you do, Ladies and Gentlemen, one of the

23   things you have to think about first is:  What is the

24   invention?  There on the left where it say App Store process,

25   that's what Dr. Jones says Mr. Racz invented, a way to pay

1   for protected content on the App Store or when you buy

2   movies.  I'm going to focus on apps for simplicity.

3            On the right, Ladies and Gentlemen, it's the exact

4   same thing, but all you've done is flipped one step.  And Dr.

5   Jones yesterday told you that doesn't infringe.

6            So what's the point of that, Mr. Albritton?  The

7   point of that is this, this invention, if it's in -- if it's

8   valid, is very, very narrow.  And this invention only has to

9   do with the manner of payment.

10           So you might be asking yourself, well, if the

11   invention has to do with the way you pay for apps in the App

12   Store, well, then logically what they would be wanting is

13   some of the money Apple makes from selling apps, right?  That

14   would be logical, and you would think that that's what they

15   would be asking for.  But it's not, Ladies and Gentlemen.

16           Remarkably, what Smartflash is asking for is a --

17   is a portion of the revenue, the money, the sales, that Apple

18   makes from selling this device, the iPhone, the iPad, the

19   iPod Touch, products that were designed by Apple and that Mr.

20   Racz doesn't even claim he invented.

21           There's no dispute.  He did not invent the iPhone.

22   All he claims he invented is what Dr. Jones says is the way

23   to pay for protected content bought over the Internet.

24           So I've got on the screen, Ladies and Gentlemen,

25   the formula.  Remember, Dr. Becker worked through this with

1  you, okay?  And I just want to focus on the royalty base

2  side.

3        On the royalty base side, you've got three inputs.

4  You've got the percentage -- I'm sorry, there's a

5  typographical error.

6        It's the number of U.S. phone units, okay, a

7  hundred percent of the U.S. phone units, multiplied by the

8  Wecker alone motivated question, multiplied by the average

9  unit revenue.

10        Two of those three things, of course, are not

11  controversial and come directly from Apple.  So the only

12  thing that drives the damages, what Mr. Mills says that Apple

13  owes, in this -- for their primary model is the answer to

14  this alone motivated question.

15        Well, let's talk about alone motivated.

16        Mr. Ward stood up here and pointed it out to you,

17  and I couldn't agree more.  His Honor says the only way that

18  they can get a percentage of all of that, the average

19  revenue, multiplied by all of the units, the only way they

20  can do it is if they show that consumers were alone

21  motivated.

22        And the Judge uses the word "solely."  That means

23  that they bought this phone right here solely and exclusively

24  for the purpose of purchasing apps on the App Store.

25        Now, the beautiful thing about this system, and I

1   agree with Mr. Ward, I believe in this system.  And the

2   beautiful thing is you come here with your common sense.

3           Ask yourself this:  Does it make a lick of sense

4   that anybody, one person in the entire world would buy an

5   iPhone and not care about making calls on it?  That's what

6   they want you to buy.  That's what they're selling.  And if

7   you don't buy that, this completely fails, Ladies and

8   Gentlemen.

9           You don't even have to just rely on your common

10  sense.  This on the screen is the question that Dr. Wecker

11  asked.  He said:  Is the capability alone motivated?  And

12  they had to ask that question.  And Dr. Wecker said, 27

13  percent of the people said yes.

14          Well, Dr. Dhar came in and did a follow-up survey,

15  and he asked about other -- other features.  And he said, for

16  instance, consider the capability to browse the web.

17          Does that motivate your purpose?  He asked that for

18  a number of features.  And you know what he found, Ladies and

19  Gentlemen?  What he found was 100 percent of the people who

20  were asked about addit -- additional features said they were

21  motivated to buy the iPhone by those additional features.  It

22  completely comports with common sense.

23          They come back and they say, well, if that's not

24  right, maybe we've got an alternative way.  And they rely on

25  a different question.  And they say this Wecker percentage of

value.   Remember, it's telling us how much value, and they
asked about this capability to purchase apps, which isn't
even the invention.   Mr. Racz admitted that, okay?   And they
come up with an alternative way.

          Also, curiously, that gets them to about $800
million.

          Well, Dr. Dhar went through and ran a -- a survey
to see if it made -- to see if it was valid.   And what did he
show you?   He said that when you ask about other features to
respondents and then they add up, they should add up to no
more than a hundred percent.   In fact, less because he didn't
ask about all the features.   587 percent.

          Dr. Dhar told you -- he showed you, Ladies and
Gentlemen, that the inputs right there, the alone motivate
percentage, the percent of value percentage are absolutely
flawed.

          Dr. Dhar, you got to hear from him.   And one thing
that I thought was so interesting about Dr. Dhar's testimony
is did Dr. Wecker say a single solitary word about what Dr.
Dhar did?   No.   Did he criticize Dr. Dhar in any way?   No.

          And the reason he didn't is because Dr. Dhar did it
right.   His surveys show what common sense tells you.   People
do not buy iPhones solely and exclusively for the purpose of
purchasing apps.   It makes no sense.   It is scientifically
invalid.

1            So, Ladies and Gentlemen, if you mark this out

2    because it doesn't make any sense and it's scientifically

3    invalid, the damages they ask for right here are wrong.  And

4    why does that matter?  Because His Honor told you that it is

5    their burden to prove damages.

6            Now, we also heard lots of questions of Dr. Dhar

7    about why did you not run your own survey?  Dr. Dhar

8    explained to you, there are problems with running these kinds

9    of surveys.  We also heard tons and tons about Apple's

10   surveys.

11           Let's look at this, Ladies and Gentlemen.

12           It conclusively proves that their point is wrong.

13   There are lots of reasons people buy iPhones.  It is not

14   solely and exclusively because of the capability to purchase

15   apps.  That makes this formula fail.  That means they cannot

16   get to their damage number.

17           We heard Tim Cook talk about how great the

18   iStore -- the iTunes Store is and the App Store, and it is.

19           And that's because of the hard work of Apple's

20   engineers, not because of anything that Mr. Racz did related

21   to the way you pay for apps.

22           His Honor told you it is their burden to establish

23   damages by a preponderance of the evidence, and it can't be

24   remote and speculative.  This, folks, is remote and

25   speculative.  It is a scientific fact.  It does not measure

1    what they claim it measures.

2          So who can you rely on?  What's the only evidence

3    you got?  It's the evidence from Dr. Becker, and Dr. Becker

4    relied on what really happened in the real world, not things

5    that were done solely and exclusively for the purpose of this

6    lawsuit.

7          THE COURT:  Three minutes remaining, Counsel.

8          MR. ALBRITTON:  Thank you, Your Honor.

9          I'd like to talk to you about Augustin Farrugia,

10   and one of the things the Judge tells you.  In his charge, he

11   told you there is no contention in this case that Apple

12   copied the patented invention.  But nevertheless what they

13   want to do is they want to vilify this man.  They want you to

14   believe he's a bad guy.  There's no sugarcoating it.

15         And you heard him.  He's got a heavy, thick French

16   accent, not born in this country.  It was difficult at best.

17         But we heard questions over and over about things

18   like:  How many times have you been deposed?  I mean, Ladies

19   And gentlemen, they have misrepresented the facts, and what

20   they're trying to sell you is this:  That Augustin Farrugia

21   worked at Gemplus in the United States.  Patrick Racz was

22   doing some work for Gemplus or doing some work with Gemplus

23   in Europe.

24         There's no evidence that Augustin Farrugia had any

25   involvement whatsoever with Patrick Racz.  But they're trying

1    to say that this man who had decades of experience in

2    security, long before he came to Apple, they're saying that

3    Apple's technology is somehow built on some secret knowledge

4    he got.  And that is wrong.  That is a crazy conspiracy, and

5    I ask you to reject it.

6            Now, Ladies and Gentlemen, I got a couple of final

7    observations.  And all of us lawyers have heard this corny

8    phrase:  If the law is on your side, you argue the law.  If

9    the facts are on your side, you argue the facts.  And if you

10   got neither, you just argue real loud.

11           Well, what I suggest to you, Ladies and Gentlemen,

12   is there's been a lot of real loud arguing on this side.

13           And let me give you a few examples.  We have these

14   Apple engineers.  Max Muller sat at that stand, and they

15   said:  Well, you're not here to offer any opinion about

16   infringement, are you?  Ah-ha.  Well, the Judge -- you know

17   from hearing the charge, fact witnesses like Payam Mirrashidi

18   and Max Muller, they're here to talk about the facts.

19   Experts offer opinions.

20           So why are they giving you all those diversions?

21   It's because they know that the facts and the law are not on

22   their side.

23           Same thing, Ladies and Gentlemen, about

24   non-infringing alternatives.  How crazy is this?  Of course,

25   Apple didn't identify one because we don't infringe.  But we

1    darn sure know that there are other ways to do it because Dr.

2    Jones specifically told you that.

3          They also say Apple's engineers didn't read these

4    patents.  Well, Ladies and Gentlemen, there are lawyers, lots

5    of us on both sides, and it's our job to handle these legal

6    issues, not the job of engineers.  Their job is to build

7    beautiful, wonderful products like the iTunes Store and the

8    App Store; and that's what they did, Ladies and Gentlemen.

9          So I ask --

10          THE COURT:  Your time is up, Counsel.  Take 10

11    seconds.

12          MR. ALBRITTON:  Thank you, Your Honor.

13          So the answer -- the right answer to the questions

14    are no infringement; and, yes, the patents are invalid.

15          Thank y'all so much for your attention.  This is an

16    important case to us.

17          THE COURT:  All right.  You've heard the arguments

18    from the Defendant.  You'll now hear the final closing

19    argument from the Plaintiff.

20          You have 11 minutes and 20 seconds left, Counsel.

21          MR. CALDWELL:  Thank you, Your Honor.

22          Mr. Albritton.

23          MR. ALBRITTON:  Thank you.

24          MR. CALDWELL:  May it please the Court?

25          THE COURT:  Proceed.

1          MR. CALDWELL:  Ladies and Gentlemen, does it bother

2    you at all how Apple stands up here and attacks Mr. Racz?

3          And I'd like to start with one thing right off the

4    bat.

5          Mr. Batchelder makes a big deal about the fact that

6    I didn't question Mr. Racz on that next day.  I was sitting

7    there at dinner with his wife and I'm reading through the

8    cross-examination where they asked him about his personal

9    debts.  They asked him if he invented the Internet.  They

10   asked him if he invented screens.  And they didn't once put

11   up a claim that actually outlines what he invented.

12         Why would I?  What points?  They had the ability to

13   cross him on anything they wanted.  What points did they

14   score?

15         You heard in the instructions that the inventor may

16   possess something that distinguishes him.  And I would submit

17   to you that you can't get much more true than that when

18   you're referring to Mr. Racz.

19         Ladies and Gentlemen, you've heard the word "truth"

20   quite a lot; and the Latin root of that word is verdict, to

21   say the truth.  And it will shortly be time for you to write

22   down your verdict.

23         You've seen the evidence play out, and the truth is

24   becoming clear as the evidence piles up on one side or the

25   other.  The evidence that actually goes to the claims,

1  actually goes to the validity, and actually goes to the

2  questions of damages that are on the form and in His Honor's

3  instructions.

4         The truth is in the code, and the truth shows that

5  Apple infringes.  The claims are all valid, and not one thing

6  was clear and convincing about that presentation that

7  Mr. Wechselberger read a few days ago.

8         Finally, a very reasonable royalty is $852 million.

9  And that's based on the actual evidence.

10        I'd like to respond to some of the arguments from

11  counsel.

12        Regarding infringement, Mr. Batchelder talked about

13  payment data.  It looks like they're dropping that Akamai

14  argument we heard several times.  Apple doesn't actually

15  supply the data you buy from -- from -- from Apple.  It looks

16  like they're dropping that.

17        Also looks like Apple is dropping this argument

18  that we've heard over and over and over.  There are no use

19  rules.  It's just magic that your movie rental expires after

20  30 days or that you can't copy it from one device to another.

21  It looks like they've dropped that one, too.

22        And we're down to payment data.

23        May I have Slide 18, please, sir?

24        What you heard Mr. Batchelder argue -- I think this

25  typifies what you have to address as the jury in this case.

1     He argued to you:  We don't store credit cards on
2  our phone.  Have you seen credit card in any construction
3  from His Honor?  There's the payment constructions on the
4  screen.  Does it say storing credit cards?  Have you seen
5  credit cards in any claim?  There is no requirement in the
6  claim or in His Honor's instructions about storing credit
7  cards on a phone that makes it where Apple doesn't infringe.
8         Instead, what does the construction say for payment
9  data?  Data that can be used to make payment for content.
10        And a payment validation system is a system that
11 returns payment validation based on an attempt to validate
12 that payment data.  It's not validating a credit card.  It
13 was validating what was sent up.
14        What did we see in the evidence?  Dr. Jones walked
15 through the code.  I won't repeat that part.  We saw from
16 Mr. Mirrashidi.  He agrees an Apple ID corresponds to the
17 DSID and that it's sent up to make purchases.  And they agree
18 it's in every buy request message, the DSID, the GUID, the
19 MID.
20        And they also agree that it's validated because
21 Apple checks to see if there's enough store credit and a
22 valid credit card on file.  Looking at that information,
23 that's how Apple's system works, and it meets the claims
24 precisely as explained by Dr. Jones.
25        Then we hear about invalidity.  As I mentioned,

1   this hinges completely on Mr. Wechselberger, and I mean him

2   no disrespect but that jumbled mess we saw is not clear and

3   not convincing about anything.

4           It was very telling that he -- I understand Mr.

5   Batchelder says His Honor is going to instruct you on the

6   law, and I agree with that; but Mr. Wechselberger was on the

7   stand proving, he said, Apple doesn't infringe because of the

8   payment data and the patents should be taken away because of

9   the prior art.

10          He's actually looking at both validity and

11  infringement and didn't even know that on infringement,

12  Smartflash has a preponderance burden.  On invalidity, Apple

13  has clear and convincing.  He never took any of that into

14  account.  Yet he wants you to take away -- throw away Mr.

15  Racz's patents.

16          If I could, could I have the document camera,

17  please, sir?

18          Ladies and Gentlemen, I think this, again, typifies

19  what you're seeing from Apple.  Remember what was in the

20  instructions?  You compare the prior art or the infringement

21  to the claims.

22          What did Mr. Batchelder do?  He says:  Well,

23  there's some pink boxes I can point to in the patent over

24  here on this side, and there's some pink box I can color in

25  over here on the left, so the thing must be invalid.  But he

1    didn't go through the claims.

2         This very figure is one that I spent time going

3    through with Mr. Wechselberger; and when he found the right

4    slides that correlated to it, we talked about where data

5    went, which sequence happened, and not once did he actually

6    show you that the claims were met, that you read payment data

7    from the device.

8         You send the payment data to be validated by a

9    payment validation system.  You get back payment validation

10   data.  And in response to that, you get your content and

11   rules because it doesn't happen in Gruse.  It has this large

12   sequence of steps that is not at all like the claims.  And I

13   suspect that's probably why IBM is not the brand on the phone

14   in your pocket.

15        On this point about willfulness, Mr. Albritton

16   makes a big deal saying that we are blaming Mr. Farrugia for

17   everything.  You were instructed that willfulness takes into

18   account lots of factors, including whether Apple has done

19   what's commercially reasonable and the viewer should have

20   known that they are infringing.

21        The one thing that's -- should be clear as day in

22   this case is that the folks at Apple who have the ability to

23   decide to respect Mr. Racz's patents, have buried their heads

24   so deep in the sand, they will not look at the patents.

25        That's plain as day.  And Mr. Farrugia is one of

 1   those decision-makers, and he gets up here and talks out of

 2   both sides of his mouth.  I didn't have the experience.

 3         Okay.  I did.  It didn't come from Gemplus.

 4   Actually it did.  That's all the evidence you can consider on

 5   willfulness.  It's not about vilifying somebody.

 6         Regarding damages, they keep showing you from Mr.

 7   Racz documents from 2009.  He didn't even have the '221

 8   patent.  He didn't even have the '772 patent that he got

 9   later that covers the handheld multimedia terminals.

10         Why do they keep showing you those?  And even in

11   2009-2010 when Mr. Racz didn't have those patents, even

12   then -- and even though he didn't have the money then to do

13   all the prosecution work -- patent prosecution work, it was

14   going to take to get them, nothing they showed you showed

15   that he was willing to just take a little lump sum and be

16   done with it, like Apple says.

17         They just want you to guess that.  They didn't show

18   you a single document that confirms he would have taken a

19   lump sum.  He steadfastly refused because he always wanted to

20   be involved, and he always thought that the fair way to be

21   compensated was with a reasonable royalty.

22         THE COURT:  Three minutes remaining, Counsel.

23         MR. CALDWELL:  Thank you, Your Honor.

24         That way, if the invention is successful with any

25   partner he has, or with a licensee if they choose to get

1    permission to use his ideas, he is paid proportionally.

2         Now, what they submit to you you should do for

3    damages is mind-boggling.  Mr. Becker's theory is actually

4    let's pretend Mr. Racz never had an invention.  He never

5    tried to do anything.  He never had an invention.  All he

6    did, instead, was he gave up his business on these water

7    filters.  He took that money and threw it in the stock

8    market.  He never took any risks.  He didn't come up with

9    something that changed the world of technology.  He just

10   through it in the stock market and after awhile, he decided

11   to take it out of the stock market and split part of it with

12   Apple.

13        It is the most irrational thing you could be

14   presented with.  And that's why His Honor's instruction says

15   you have to look at the value of infringement to Apple.

16   You were told all he did was invent some way of buying apps.

17        When you go back, you know the claims, the four

18   claims:  '720, 13; '221, 32; '772, 26 and 32; not one of

19   those is just an app claim.  They are device claims.  That's

20   why the base is exactly what Mr. Mills and Dr. Wecker

21   presented to you.

22        Can I have -- can I have Slide 102?  Thank you.

23        And what you were shown was that asking the very

24   question that's in the instructions about what alone

25   motivated consumers, consumers spent -- just those who were

```
 1   alone motivated for these features; and, of course, everybody

 2   wants to use the phone on -- the feature, but that's on all

 3   phones, right, the phone feature is?  Do people who were

 4   motivated to buy these devices constitute 23 percent of the

 5   purchases, and that revenue is 43.4 billion?  It's a big

 6   number because it's very successful for Apple when they

 7   infringe.  And a reasonable royalty is 852.

 8          Apple admitted, although they dispute the way the

 9   rate was calculated, which is based on non-infringing

10   alternatives, they admitted and stipulated you can't switch

11   Steps 3 and 4, like they want.  Oh, it's just 3 and 4.  Let's

12   switch those.  You can't.

13          The movie studios, there's no proof that movie

14   studios, book, anyone else will ever let you just go ahead

15   and send a content and hope to get paid later.

16          THE COURT:  10 seconds, Counsel.

17          MR. CALDWELL:  Ladies and Gentlemen of the Jury,

18   fate has made many interventions in the life of Mr. Racz

19   since he had his great idea, and it wasn't always clear where

20   he was headed.  But what's clear now is the United States

21   Patent Office has recognized his inventions.  Fate brought

22   him here to stand before this jury.  I applaud his resolute

23   determination.

24          On behalf of Mr. Racz and Smartflash, we look

25   forward to your verdict.
```

1          THE COURT:  All right.  Ladies and Gentlemen,

2    you've now heard the closing arguments from counsel from both

3    the parties.  I have a few final instruction to give you

4    before you begin your deliberations.

5          Again, you must perform your duties as jurors

6    without bias or prejudice as to any party.  The law does not

7    permit you to be controlled by sympathy, prejudice, or public

8    opinion.

9          All of the parties expect that you will carefully

10   and impartially consider all of the evidence, follow the law

11   as I've given it to you, and reach a just verdict regardless

12   of the consequences.

13         Answer each question in the verdict form from the

14   facts as you find them to be.  Do not decide who you think

15   should win and then answer the questions accordingly.

16         Again, Ladies and Gentlemen, your answers and your

17   verdict in this case must be unanimous.  You should consider

18   and decide this case as a dispute between persons of equal

19   standing in the community, of equal worth, and holding the

20   same or similar stages in life.

21         This is true in patent cases between corporations,

22   partnerships, and individuals.

23         A patent owner is entitled to protect its patent

24   rights under the United States Constitution.  This includes

25   bringing a suit in the United States District Court for money

1    damages for infringement as we have here.

2          The law recognizes no distinction between types of

3    parties.  All corporations, partnerships, and other

4    organizations stand equal before the law regardless of their

5    size, who owns them, and they are to be treated as equals.

6          When you retire to the jury room to deliberate on

7    your verdict, you will each have a copy of this charge, these

8    final jury instructions to take with you.

9          If you desire to review any of the exhibits which

10   the Court has admitted into evidence over the course of the

11   trial, you should advise me by a written note, delivered to

12   the Court Security Officer, and I will then send that exhibit

13   or those exhibits to you that you request.

14         However, certain documents that have been shown to

15   you during the trial were what we call demonstratives.

16         Demonstratives are a party's description, picture,

17   or model that's used to describe something in the trial.

18         If your recollection of the evidence differs from

19   the demonstrative, you should rely on your recollection.

20         Demonstratives are not evidence and they're not

21   able to be reviewed by you during your deliberations.

22         However, a witness's testimony that references the

23   demonstrative is evidence.

24         Once you retire, you should first select your

25   foreperson and then conduct your deliberations.

1    If you recess for any reason during your

2    deliberations, follow all the instructions that the Court's

3    given you about your conduct during the trial.

4    After you have reached your verdict, your

5    foreperson is to fill in your answers in the verdict form.

6    Those must be unanimous answers to the questions that are

7    found therein.  Then the foreperson should date the verdict

8    form and sign it and finally deliver it to the Court Security

9    Officer.

10    Contrary to my earlier instructions, which I gave

11    you repeatedly throughout the course of the trial, it is now

12    your sworn duty to discuss the case among yourselves in an

13    effort to reach agreement, if you can do so.

14    Each of you must decide the case for yourself, but

15    only after full consideration of all the evidence with the

16    other members of the jury.

17    While you're discussing the case, do not hesitate

18    to re-examine your own opinions and change your mind if you

19    become convinced that you were wrong.  However, don't give up

20    your honest beliefs solely because others think differently

21    or merely to finish the case.

22    Do not reveal your answers until such time as you

23    are discharged, unless otherwise directed by me.  And you

24    must never disclose to anyone, not even to me, your numerical

25    division on any question.

1          Any notes that you've taken during the trial are

2    only aids to your memory.  If your memory should differ from

3    your notes, then you should rely on your memory and not your

4    notes.  The notes are not evidence.

5          A juror who has not taken notes should rely on his

6    or her own independent recollection of the evidence and

7    should not be unduly influenced by the notes of other jurors.

8          Notes are not entitled to any greater weight than

9    the recollection or impression of each juror about the

10   testimony.

11         If you want to communicate with me at any time

12   after you retire to deliberate, please give a written note or

13   message to the Court Security Officer, who will bring it to

14   me.

15         I will then respond as promptly as possible, either

16   in writing or by having you brought back into the courtroom

17   where I can address you orally.  I will always first disclose

18   to the attorneys in the case your question and my response

19   before I answer your question.

20         After you've reached a verdict and I have

21   discharged you, you're not required to talk with anyone about

22   this case unless the Court orders otherwise.

23         However, Ladies and Gentlemen, you will then be

24   free to discuss it with anyone, if you choose to do so.

25         Whether or not you discuss this case or your

1   service as jurors after you have been discharged, is totally

2   and strictly up to you and you alone.

3           I'll now hand eight copies of the final jury

4   instructions and one clean copy of the verdict form to the

5   Court Security Officer to deliver to the jury once they

6   retire.

7           Ladies and Gentlemen of the Jury:  You may now

8   retire to deliberate.  We await your verdict.

9           COURT SECURITY OFFICER:  All rise for the jury.

10          (Jury out.)

11          THE COURT:  The Court stands in recess either

12  awaiting a note from the jury or a verdict in this case.

13          We are in recess.

14          (Jury deliberations.)

15          (Jury out.)

16          THE COURT:  All right.  Counsel, have a seat.

17          Do we have everybody here that's coming?

18          MR. CASSADY:  We're trying to get Brad -- I'm

19  sorry, Mr. Caldwell.

20          THE COURT:  I don't see Mr. Caldwell or Mr. Ward.

21  I see most of the defense counsel.

22          MR. CASSADY:  Your Honor, I sent them a text

23  message.  I'm not sure where they are.

24          THE COURT:  All right.  Well, we'll go ahead.  They

25  can join us when they get here.

```
 1              For the record, Counsel, I've just received a note

 2     from the jury.  It's marked Note No. 1, and it's dated

 3     today's date, and it reads as follows:

 4              Judge Gilstrap, we anticipate deliberations to take

 5     several more hours.  Should we set a stopping point this

 6     evening or continue until we come to a conclusion tonight,

 7     question mark?

 8              It's signed by looks like Mr. Godwin as jury

 9     foreperson.

10              It's 5:15.  Certainly I would suggest that the jury

11     continue to work for some additional period of time.  Do

12     counsel for either of the parties have any comments they'd

13     like the Court to consider?

14              MR. ALBRITTON:  Whatever the Court's preference is,

15     is fine with us, Your Honor.

16              MR. CASSADY:  Same here, Your Honor.  Whatever Your

17     Honor deems is the right thing to do here.

18              THE COURT:  Well, I have a pre-trial hearing in an

19     ANDA case set for 9:00 o'clock in the morning in Marshall,

20     and I have counsel that have traveled from both coasts to be

21     there.

22              So I'm reluctant to stop earlier than we have to

23     tonight.  I also understand there is the threat of some more

24     inclement weather.  I don't know exactly what the status of

25     that is, and I don't know what several more hours means,
```

1   whether that's two or whether that's 10, and they probably

2   don't know either.

3           My intention would be to return a response to the

4   jury that in effect says continue to deliberate.  And, you

5   know, if you reach a point later this evening that you feel

6   you cannot continue or it becomes nonproductive, let me know

7   or something to that effect.  I'm just speaking off the top

8   of my head.  And I'll certainly put any response in writing

9   and let counsel see it before it goes back.

10          Do I have any suggestions to say anything

11  additional or anything different?

12          MR. ALBRITTON:  Something like that sounds fine to

13  us, Your Honor.

14          MR. CASSADY:  Sounds fine to us, Your Honor.

15          THE COURT:  Okay.

16          MR. CASSADY:  I would suggest -- if I may.

17          THE COURT:  Please.

18          MR. CASSADY:  If they're going to stay late, should

19  we order them food or give them the option of food?  I mean,

20  I'm sure if you want to do that -- maybe you don't want them

21  to think they're going to be here forever, but I thought I'd

22  put it out there.

23          THE COURT:  We'll -- we'll see how it plays out.

24          MR. CASSADY:  Okay.

25          THE COURT:  All right.  Well, let's stand in

1    recess.

2         I'll hand Note 1 to the courtroom deputy to be part

3    of the record, and if you will stand by, counsel, when I get

4    some kind of written response crafted, I'll make sure you see

5    it and have an opportunity to approve or object on the

6    record.

7         We stand in recess.

8         (Recess.)

9         COURT SECURITY OFFICER:  All rise.

10        THE COURT:  Be seated, please.

11        Counsel, in response to the note from the jury,

12   which I read you just a minute ago, I have drafted a proposed

13   response.  I'm going to read it to you, and I'll take any

14   comments from both parties as soon as I've read it.

15   Members of the jury, in response to your Note No. 1, both the

16        Court and counsel suggest that you continue to

17   deliberate.  If you want dinner brought in, please advise the

18   Court Security Officer.  You should attempt to reach a

19   verdict this evening if at all possible.

20        Anybody have any objection to that language?

21        Plaintiff?

22        MR. CALDWELL:  No objection, Your Honor.

23        THE COURT:  Defendant?

24        MR. ALBRITTON:  No objection, Your Honor.

25        THE COURT:  Then I'll reduce it to writing, sign

1    it, and deliver it to the Court Security Officer to be given

2    to the jury.

3              We stand in recess.

4              COURT SECURITY OFFICER:  All rise.

5              (Recess pending verdict of the jury.)

6              (Jury out.)

7              (Court resumed at 8:40 p.m.)

8              COURT SECURITY OFFICER:  All rise.

9              THE COURT:  Be seated, please.

10             Would you bring in the jury?

11             COURT SECURITY OFFICER:  All rise for the jury.

12             (Jury in.)

13             THE COURT:  Please be seated.

14             Mr. Godwin, I understand you are the Foreperson of

15   the jury; is that correct?

16             FOREPERSON:  Yes sir.

17             THE COURT:  Has the jury reached a verdict?

18             FOREPERSON:  We have, Your Honor -- we have, Your

19   Honor.

20             THE COURT:  Would you hand the verdict form to the

21   Court Security Officer, who will bring it to me.

22             (Verdict given to the Court.)

23             THE COURT:  Ladies and Gentlemen, I am about to

24   announce the verdict.  I would like each of you to listen

25   very carefully, because once I have done that, I am going to

1    poll you and ask you if this is the verdict of each member of

2    the jury, so that we can confirm that the jury's verdict is

3    completely unanimous.

4           With that, I will turn to the completed verdict

5    form that has been delivered to me by the Foreperson of the

6    jury, Mr. Godwin.

7           I turn to the last page and see it is dated today's

8    date and signed by Mr. Godwin, as Jury Foreperson.

9           And then turning to the second page of the verdict

10   form:

11          Question 1:  Did Smartflash prove by a

12   preponderance of the evidence that Apple infringes the

13   following claims of the following patents?  Answer "yes" or

14   "no" for each claim.

15          For the '720 patent, Claim 13, the answer is:  Yes.

16          For the '221 patent, Claim 32, the answer is:  Yes.

17          For the '772 patent, Claim 26, the answer is:  Yes.

18          And the '772 patent, Claim 32, the answer is:  Yes.

19          Turning to Question 2 of the verdict:  Did

20   Smartflash prove by clear and convincing evidence that

21   Apple's infringement was willful?

22          For the '720 patent, the answer is:  Yes.

23          For the '221 patent, the answer is:  Yes.

24          For the '772 patent, the answer is:  Yes.

25          Turning to Page 4 of the verdict form, wherein I

find Question 3:  Did Apple prove by clear and convincing

evidence that any of the asserted claims of the following

patents are invalid?

Claim 13 of the '720 patent, the answer is:  No.

Claim 32 of the '221 patent, the answer is:  No.

Claim 26 of the '772 patent, the answer is:  No.

And Claim 32 of the '772 patent, the answer

is:  No.

Turning to the last page of the verdict form,

wherein I find Question 4.  The question is:  What sum of

money, if now paid in cash, do you find from a preponderance

of the evidence would fairly and reasonably compensate

Smartflash for Apple's infringement of Smartflash's patent?

The answer is:  $532,900,000.

Again, the verdict form is signed by the Foreperson

of the jury, Mr. Godwin, and is dated today's date.

For the record, I will hand the verdict form to the

Courtroom Deputy to be made part of the file in this case.

Ladies and Gentlemen of the Jury:  Let me poll you

and make sure this is the unanimous verdict of all 8 members

of the jury.

If this is your verdict as I have read it, would

you please stand.

(Jurors stand.)

THE COURT:  Thank you.  Please be seated.

1        Let the record reflect that all 8 members of the

2   jury immediately rose and stood in response to the Court's

3   question to poll the jury.

4        Ladies and Gentlemen, this now completes the trial

5   of this case.  From the very beginning I instructed you about

6   not discussing the case with each other until you retired to

7   deliberate and then only among yourselves, not discussing the

8   case with anyone until I release you.

9        I am now releasing you from your service as jurors.

10  You are now free to discuss the case, if you would like, with

11  anyone.

12       By the same token you are also free not to discuss

13  it with anyone.  The option is completely yours.

14       I can tell you that each of the lawyers who have

15  tried this case would be very interested in talking to you

16  about it if you want to.

17       But you need to understand the rules of this Court

18  are and the practice in this Court is that they cannot

19  initiate a conversation with you.

20       If you want to discuss the case with any of the

21  lawyers, you have to initiate the discussion with them.  They

22  will not bring it up, they will not engage you, they will not

23  talk to you, or start a conversation.

24       If you choose not to discuss the case, you simply

25  just walk on by and do what you have had in mind to do to

1  begin with.  If you want to discuss it, you are free to do

2  so, but the decision is completely and entirely yours.

3         I want you to know how very much the Court

4  appreciates and values your service as jurors in this case.

5         This is an important case to all of the parties.

6  It is important to our system of justice that trials like

7  this are able to take place; and they absolutely could not

8  take place without ordinary, working citizens, like each of

9  you, being willing to come and give of your valuable time and

10  serve as jurors in a case like this.

11         You have rendered very real and important public

12  service this week.  You should feel justly proud of the role

13  that you have played in administering justice in this

14  country.

15         In a very real way you have helped preserve,

16  protect, and defend the rights that we as Americans enjoy.

17         It is no small thing, Ladies and Gentlemen, and you

18  have the sincere and genuine thanks and appreciation of the

19  Court.

20         As a matter of fact, my personal practice since I

21  have been on the bench is after receiving a verdict in a

22  case, when the jurors have been dismissed and discharged, I

23  request, just as a personal favor, if before you leave, you

24  go back to the jury room and give me just a couple minutes to

25  come in; and I would like to personally shake each one of

1    your hands, and I would like to personally tell you face to

2    face how much I appreciate your service and how important it

3    is.

4              I will not keep you more than a few minutes.  I

5    know it has been a very long week; but if you would do me

6    that personal favor, I would appreciate it.

7              Also, understand you are not required to do that.

8    Now that I have released you, if you want to leave the

9    building, as soon as we recess in a minute, you will be free

10   to do that.

11             But if you will give me just a few minutes to come

12   thank you in person, I would certainly appreciate it.

13             This completes the trial of this case.  We stand in

14   recess.

15             Thank you, Ladies and Gentlemen.

16             COURT SECURITY OFFICER:  All rise.

17             (Jury leaves the courtroom.)

18             THE COURT:  Counsel, this completes the trial of

19   this case.  You are excused.

20             (Court adjourned.)

21

22

23

24

25

1                          CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of our

6    abilities.

7

8

9    /s/_____
     SHEA SLOAN, CSR, RPR                    February 24, 2015
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/16

12

13

14

15

16   /s/_____
     SHELLY HOLMES, CSR, TCRR
17   Deputy Official Court Reporter
     State of Texas No.:  7804
18   Expiration Date  12/31/16

19

20

21

22

23

24

25