1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF TEXAS

3                     TYLER DIVISION

4   SMARTFLASH LLC, ET AL.          )(

5                                   )(    CIVIL DOCKET NO.

6                                   )(    6:13-CV-447-JRG

7   VS.                             )(    MARSHALL, TEXAS

8                                   )(

9   APPLE, INC., ET AL.             )(    AUGUST 13, 2015

10                                  )(    9:15 A.M.

11                     <u>MOTION HEARING</u>

12        <u>BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP</u>

13              <u>UNITED STATES DISTRICT JUDGE</u>

14

15  APPEARANCES:

16  FOR THE PLAINTIFFS: (See sign-in sheets docketed in
                         minutes of this hearing.)
17

18  FOR THE DEFENDANTS: (See sign-in sheets docketed in
                         minutes of this hearing.)
19

20  COURT REPORTER:      Shelly Holmes, CSR-TCRR
                         Official Reporter
21                       United States District Court
                         Eastern District of Texas
22                       Marshall Division
                         100 E. Houston Street
23                       Marshall, Texas  75670
                         (903) 923-7464
24

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

1                        I N D E X

2

3    August 13, 2015

4                                              Page

5         Appearances                            1

6         Hearing                                3

7         Court Reporter's Certificate          91

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              This is the time set for a hearing before the Court in

 4    the Smartflash, et al., versus Apple Inc. case.  This is Civil

 5    Action 6:13-CV-447.

 6              This is the time scheduled by the Court for hearing on

 7    the Plaintiffs' motion to reconsider, also on a general status

 8    conference as set by the Court.

 9              Let me call for announcements on the record.  What

10    says the Plaintiff?

11              MR. CALDWELL:  Good morning, Your Honor.  Brad

12    Caldwell on behalf of Smartflash.  And with me today,

13    Mr. Austin Curry, who may present, depending on the issue,

14    Mr. John Summers, Mr. Johnny Ward, and Mr. Daniel Pearson.  The

15    Plaintiff is ready, Your Honor.

16              THE COURT:  All right.  What says the Defendant?

17              MS. SMITH:  Good morning, Your Honor.  Melissa Smith

18    on behalf of Apple.  I'm joined today by Mr. Mark Perry,

19    Mr. Mark Lyon, Mr. Kevin Post, Mr. Brett Rosenthal,

20    Ms. Jennifer Rho.  And, Your Honor, Mr. Perry and Mr. Lyon hope

21    to present to you today.  And we're ready to proceed.

22              THE COURT:  All right.  Thank you.

23              Well, the Court originally scheduled this as a status

24    conference, and then in light of the motion to reconsider,

25    determined that it would be more efficient if that was folded
```

1   into the hearing regarding the status of the case, as well.

2   And so both are set.  I think both are complementary.

3        Probably what I will do this morning is I'll take up

4   first arguments on the motion to reconsider, and I may have

5   questions during that argument that go to a broader status and

6   scheduling-type inquiry.  Then once there's been completed

7   argument on the motion to reconsider, if there are other

8   status/scheduling-related issues that we haven't touched on

9   through the argument on the motion itself, then the Court will

10  take those up following the argument.

11       So with that, I'll hear argument from the movant

12  Plaintiff on their motion to reconsider the Court's previous

13  ruling of July the 7th, ordering a new trial on damages in this

14  case.

15       I'll hear from the Plaintiff first.

16       MR. CALDWELL:  Thank you, Your Honor.  May it please

17  the Court.

18       Your Honor, on behalf of Smartflash, we respect the

19  Court's time, and we're grateful for being heard on this issue

20  today.  We come to you in large part because Your Honor said on

21  a few occasions related to this issue that Your Honor is trying

22  to get it right, despite which way the parties have -- have

23  pointed and semantic confusion in the past and the way things

24  stand right now is not right.

25       Although it seems like there's some time that passed

1  and just as a reminder, the Court's order that granted the new

2  trial was on July 7th.  On July 9th -- well, actually the next

3  day I flew to D.C., and on July 9th, Mr. Perry and I argued the

4  appeal at the Federal Circuit, and then the case was

5  immediately stayed temporarily the next day.

6         So they -- we tried to get this on file with you as

7  soon as we could once the stay was lifted, which was entered

8  right after the new trial orders.  So I didn't want Your Honor

9  thinking that we didn't react quickly to that -- to that issue.

10        THE COURT:  And what was the time period, counsel,

11 between my order for the new trial and the Circuit's ultimate

12 decision not to stay the further progression of this case?

13 Wasn't it something like 19, 20 days?  Do you know that number?

14        MR. CALDWELL:  I don't know the number off the top of

15 my head.

16        THE COURT:  All right.

17        MR. CALDWELL:  And I want to say that it ended up

18 being -- well, I don't know.  I don't want to guess and be

19 incorrect.  I think it was the -- the last Thursday in August,

20 meaning that it had been a couple of weeks, about 20 days,

21 something like that.

22        THE COURT:  Well, part of why -- obviously, part of

23 why we're here is because whatever that ultimate period of time

24 was, that wasn't factored into the Court's setting the new

25 trial on damages on September the 14th, and that time has

1    obviously been lost to both parties.  And consequently, one of

2    the things I want to hear about today, either as part of the

3    argument in this motion or as a part of the status conference

4    is where both parties are with regard to being ready to proceed

5    on the new damages trial.

6          However, I really -- I think I need to precede that,

7    especially in regard to your position, in light of the briefing

8    that you filed.

9          Let me -- let me just ask you this.  My reading of

10   your briefing leads me to at least suspicion that your takeaway

11   position on all of this is that your damages evidence was

12   proper in the original trial, it's proper now, and even though

13   I've ordered a new damages trial, I at least suspicion, based

14   on your briefing, that what you're going to tell the Court is

15   you plan to offer the same evidence from the same witnesses if

16   we try this again.

17         If that's the case, I need to know that.  If -- if

18   that's not the case and you intend to develop a substantially

19   different damages model, supported by substantially different

20   evidence, then I need to know that, as well.

21         So what is the Plaintiffs' ultimate position, because

22   I certainly don't have time to waste on a damages trial if it's

23   going to be the same witnesses saying the same thing.  But if

24   it's not, then that obviously is different.  So tell me, where

25   are you?

1          MR. CALDWELL:  I feel -- I feel a little bit by the

2    question I'm put in the position of saying I can -- and we

3    won't have the other trial and maybe something goes on appeal

4    if I just say we'll repeat ourselves.  But with all due respect

5    to the Court's honor -- the Court's order --

6          THE COURT:  I'm trying to pin you down.

7          MR. CALDWELL:  No, I understand you are.

8          THE COURT:  I need a straight answer --

9          MR. CALDWELL:  I --

10         THE COURT:  -- to this question.

11         MR. CALDWELL:  I -- I absolutely understand you are.

12   And what I'm -- what I'm -- what I'm getting at is with all due

13   respect to the order that Your Honor put out, it said, I expect

14   you to come back with something different.  And so we've worked

15   on that, and if we are bound by the existing new trial order

16   and if Your Honor's not persuaded by the arguments I'd like to

17   present today on the reconsideration, we've been acting, based

18   on the express text of Your Honor's order that says, I expect

19   you to come back with a different model.

20         And so what we've been working on is putting out a

21   model that doesn't use new evidence that wasn't in the record

22   and wasn't known but is a substantially different model.  So,

23   in other words, in order to minimize the need to reinvent the

24   wheel on discovery or anything like that, it's all based on

25   evidence that the parties took discovery on long, long ago, but

 1   it's just a fundamentally different model, not based on

 2   surveys, for example.

 3          THE COURT:  Can you be any more precise than that?

 4          MR. CALDWELL:  I can, and I think if -- if we go into

 5   too much detail, that maybe Mr. Curry will take over.

 6          But fundamentally, the model would look at per device

 7   licensing rates that the predecessor Smartflash companies had

 8   considered and content rates that they had considered, as well,

 9   and then applying those to Apple but making some adjustments

10   that the economists feel are appropriate based on Apple's

11   profit margins, for example.

12          THE COURT:  Let me ask you this.  Is -- from a high

13   level -- I'm not trying to get specifics.  I'm not trying to

14   make you tip your hand in advance of the trial.

15          But to get an understanding of what -- what the Court

16   may be looking at, is it correct for me to assume that you'll

17   be using already developed evidence, but you'll be using it to

18   support this theory that you've set forth in your briefing

19   which essentially seeks to identify a sub-portion of the

20   overall market and then apply the Entire Market Value Rule to

21   that identified or carved out subset or sub-portion of the

22   entire market?  Is that -- is that where we're going, or is

23   it -- is that a placeholder, and I'm going to see something

24   different at the -- at the damages trial?

25          MR. CALDWELL:  I may have -- I may have misunderstood

 1  Your Honor's question, and I apologize.

 2        But if what -- if I understood it, we would be doing

 3  a -- an entirely different model that doesn't have anything to

 4  do with the total revenue of any full population or subset of

 5  population of products applied against the rate.

 6        So it isn't akin to the old model.  It'd be more of a

 7  per device price-type model, if that makes sense, something, I

 8  think, very different.

 9        THE COURT:  All right.  Let me see if I can ask a --

10  another question in this regard.

11        In your reply that was just filed yesterday --

12        MR. CALDWELL:  Yes, Your Honor.

13        THE COURT:  -- you talk about a sub-population of

14  products for which the Entire Market Value Rule's requirements

15  would be met and that you properly invoked this sub-population

16  application of the Entire Market Value Rule at the prior trial.

17  So -- and that's -- you know, I'm not going to comment on

18  that -- that assertion.

19        What I'm trying to decide, is that the thrust of your

20  new damages model and evidence, or is it not?  I mean, is

21  that -- is that the hook you've -- you're hanging your hat on

22  going forward, and you're going to use evidence previously

23  developed through existing discovery, but that is the target

24  that you're trying to hit and the -- the endpoint you're trying

25  to reach, as you've set forth in your briefing, or is that not

```
 1   where -- is that not where the damages evidence is going to go

 2   in a new damages trial?  I hope that's a clear question.

 3        MR. CALDWELL:  It is.  It is.  I understand your

 4   question.

 5        It is not where we believe the evidence would go with

 6   the new model in the new trial, but that's because we have been

 7   acting upon Your Honor's new trial order that is telling us I

 8   expect to see something substantially different.

 9        So the answer to your question is, no, that's not

10   where it would go.  I just don't want to be suggesting to Your

11   Honor that we're disavowing the proprietary of the old model

12   certainly.

13        THE COURT:  So in other words, what you're saying in

14   your motion to reconsider is you don't think we need a new

15   trial on damages, you think I should enter judgment based on

16   this theory and the evidence that was present -- produced and

17   presented at the earlier trial, but as an alternative to that,

18   if the Court doesn't accept that and adopt that, then you're

19   prepared to go forward at a new damages trial with a new

20   presentation using evidence that may have been previously

21   produced but not previously presented at the earlier trial; is

22   that accurate, counsel?

23        MR. CALDWELL:  I think that it's slightly more than

24   that.

25        THE COURT:  Okay.
```

1          MR. CALDWELL:  The evidence that we would use has

2    also, I believe, been presented at the old trial.  It just

3    wasn't packaged by the economist as the -- as the model.

4          So I think actually it's almost exclusively -- it --

5    it probably is exclusively admitted evidence from the old

6    trial.  It just came in, and it wasn't maybe applied in the way

7    that it would be applied in a -- in a new model.

8          And I'm -- and I'm not talking about even the surveys.

9    I just mean, for example, we were already talking about things

10   like Apple's profit margin.  We talked about old licensing

11   policies from the predecessor company and things like that.

12   These were admitted evidence in the record.

13         THE COURT:  Well, since I -- since I granted the new

14   trial on damages, there's been a lot of discussion in the

15   public domain about the instruction to the jury, but the

16   portion of my order that indicated the Court had material

17   concerns about the damages theory and model presented seems to

18   have been missed by most of the journalists out there.  I want

19   to make sure it's not missed by the counsel of the case.

20         And had I been convinced that your damages evidence

21   was adequate to support the verdict, I wouldn't have granted

22   the new trial.  But I had some -- I had material and -- and

23   serious concerns that it was not adequate.  So that's why I

24   really need to know, am I going to see the same thing and hear

25   the same arguments supporting the same theory, or am I not?

1   Because if it's -- if it's the same thing all over again, we

2   don't have time to do that.

3          MR. CALDWELL:  Understood.  Understood.  And -- and

4   we're not wanting to waste your time or a jury's time.  And,

5   no, it's not to be the same theory all over again, not at all.

6          THE COURT:  Let me ask you this then.  Given that

7   discussion, again, without revealing specifics, where are you

8   as far as being ready to go forward at a new damages trial?

9   How much more time do you think you need, and when do you think

10  it would be appropriate for the Court, in light of the delays

11  created by the Circuit's stay that make the current date fairly

12  untenable, and I think I signaled that in my order setting this

13  hearing?  When do you think on the calendar a tenable target

14  date for such a trial might be?

15         MR. CALDWELL:  I think it's -- I think it's very soon,

16  and I would say, you know, even as a practical matter, early in

17  October would be fine.  And here's why.  I think that it all

18  comes down to evidence that there's already been full discovery

19  on.

20         Now, that leads to a broader issue that we probably

21  need to talk about today.  And if we want to transition to that

22  issue, by all means, I'll -- I'll probably yield the microphone

23  to Mr. Curry.  But just a --

24         THE COURT:  As I clearly made it -- I mean, I made it

25  clear, or I tried to when I came out here, I'm pretty much

 1  melding your motion and the status conference together.

 2          MR. CALDWELL:  I understand.

 3          THE COURT:  So as long as we cover the entire

 4  waterfront, I'm not particularly concerned in -- about the

 5  order in which we do it.

 6          MR. CALDWELL:  Yes, Your Honor.  I just wanted to

 7  flag for the --

 8          THE COURT:  So if you need to bring co-counsel to the

 9  podium, you can feel free to do so.

10          MR. CALDWELL:  Thank you, Your Honor.  I appreciate

11  that.

12          The -- the thing I wanted to raise is, for example,

13  something that wouldn't probably be known to you because the

14  way the discovery happens.  Apple has recently just sent us

15  supplemental interrogatory answers saying I know we didn't have

16  non-infringing alternatives for the first couple years of this

17  case, but now we them, and there's a bunch of them.

18          Well, we went through the whole fact discovery period,

19  took all the 30(b)(1) depos, took all the 30(b)(6) depos, did

20  all the technical analysis, the -- the presentation, and ended

21  up with a stipulation that they had no non-infringing

22  alternatives, and now they want to change that.

23          Plus, you've heard counsel for Apple say they want a

24  do-over on infringement because of the intertwinement, which

25  we've not been able to make a lot of sense out of.  But, I

1   mean, just to put it succinctly, it seems like Apple wants to

2   basically treat the February trial like an ex -- a mock trial

3   where they tested some theories.  And they just want to come

4   back and retry any issue that didn't work out in their favor.

5          And I raise that because I think that we're dealing

6   with evidence that is -- has been discovered and the parties

7   have been aware of for a long time.  I think we wanted to see

8   if there's any guidance that came out of today's hearing, but

9   we can promptly put out the expert report after whatever we

10  learn from today's hearing, I think, probably within a day or

11  two.

12         And I think Apple can respond to it in short order.  I

13  mean, even when there were Daubert issues that came up during

14  the trial, we had to redo our whole damages in two weeks, and

15  they had to respond to it in two weeks.  There's -- there's no

16  reason something similar can't apply now, and I think we can be

17  ready for trial by the beginning of October.

18         If what Smartflash perceives as a fundamental

19  injustice that says, hey, look, we're going to just sort of

20  nullify that whole jury and start from scratch on a lot of

21  different issues, or we're going to just re-open fact discovery

22  on things, in theory, we could have told you a long time ago.

23  If that's the world in which we live, I suspect Apple -- and I

24  suspect Apple will say it is -- they're going to want to push

25  this back a lot longer and essentially re-open fact discovery,

1  which I can't see any reason in which that makes sense.

2        I mean, the -- the parties spent tons of money working

3  on -- on the case, tons of time working on the case, and the

4  liability side, even if we assume we're in the world where we

5  have to retry damages, the liability side and all of those

6  30(b)(1) depositions and document reviews and interrogatory

7  answers are water under the bridge.

8        There's no reason I can see that Apple should be able

9  to say, well, we didn't like how the choices we made before

10  panned out.  We want a do-over.  And that's why I think it --

11  it affects the -- the ultimate schedule a little bit.

12        Your Honor, may I walk over and grab my water?

13        THE COURT:  You may.

14        MR. CALDWELL:  Thank you.

15        THE COURT:  All right.  Well, having -- having heard

16  that, let me ask one more question, then I want to get back to

17  the substance of your motion to reconsider.

18        Whenever a new damages trial takes place, what do you

19  believe the necessary amount of trial time would be to try the

20  damages issue from jury selection to verdict?

21        MR. CALDWELL:  We're thinking approximately three

22  days.  It may be done in less than that.

23        THE COURT:  Three days for both sides, not just for

24  your side?

25        MR. CALDWELL:  I think so.  I think so.

```
 1          THE COURT:  Okay.

 2          MR. CALDWELL:  I mean, assuming it's a pick-and-go

 3  sort of jury selection, and -- and none of us are wasting time

 4  and whatnot, I don't see that there'd be any -- any real

 5  problem getting that done.

 6          THE COURT:  All right.  Well, let's step back now and

 7  let me hear from you on your remainder of your argument on your

 8  motion to reconsider.

 9          MR. CALDWELL:  Thank you.

10          Mr. Summers, will you put up Slide No. 2?

11          I think the new trial order suggests that the Court is

12  well aware of this, but the new trial order was based on

13  grounds that Apple neither pre -- preserved nor asked for, and,

14  in fact, if there were any error, which we don't believe there

15  were -- there was, it was error that was invited by Apple, and,

16  therefore, the order came under 59(d).

17          The Court found that Smartflash did not attempt to

18  apply the substantive legal rule known as the Entire Market

19  Value Rule, and the Court agreed with Apple's argument that a

20  new trial on damages was necessary in light of the instruction.

21  However --

22          Could we go to Slide 3?

23          -- there's really two issues, both of which -- it's

24  Smartflash's position both of these points -- or either of them

25  is really a better way to say it -- either of these points,
```

1    these questions, when answered, necessitates reversal of the

2    Court's new trial order.

3          The first issue, is a royalty calculated on total

4    revenue of a sub-population of accused products an application

5    of the Entire Market Value Rule?  We submit that the answer is

6    yes.  But even if the Court says, no, the second point, can a

7    legally correct but at worst inapplicable jury instruction on

8    the Entire Market Value Rule warrant the new trial?  And the

9    answer to that question is, no.

10         And we think there's a lot of confusion introduced on

11   that point at the last hearing which I'd like to address today.

12         But turning to the first issue.  The law is clear that

13   a patent owner can construct a royalty base of the revenue for

14   a sub-population of accused products if the products in that

15   sub-population satisfy the EMVR.

16         THE COURT:  What's your authority for that?

17         MR. CALDWELL:  Well, the authority for that is a

18   couple of different things.  It's both the Garretson case and

19   LaserDynamics, and I'll move through both of those if -- if --

20   and I can go directly to them if you want, but I -- I wanted to

21   show how we got there.

22         THE COURT:  All right.

23         MR. CALDWELL:  Okay.  And actually up until recently,

24   up until it was favorable for Apple to do so, Apple didn't

25   disagree.

1          I think one thing that you -- you saw in Apple's

2    response motion -- or response brief that they filed regarding

3    our request for reconsideration is Apple is almost mockingly

4    dismissing the -- the way in which Smartflash tried to bring

5    clarity to the point that there is certainly the total revenue

6    aspect of the EMVR, but there is also an aspect when you look

7    at a sub-population, but what you do is you take the entire

8    revenue of that sub-population.

9          Can I have Slide 4, please?

10         If we look back at where Apple was in attempting to

11   win the first Daubert, although Apple says we're making up

12   these terms, we got the term really for -- the phraseology from

13   Apple itself.  They referred to our model being a

14   sub-population of accused product sales that was, by

15   definition, an application of the Entire Market Value Rule.

16         And -- and just so that -- hoping to avoid a

17   he said/she said between them, that's actually why we referred

18   to this as the sub-population application.  That's Apple's own

19   words in their original -- their original motion to

20   strike/Daubert, which led to Smartflash having to redo its

21   survey.

22         But confusingly, that same notion, when you are

23   looking at a base that is based upon some sales but not all

24   sales, that can also properly be characterized as apportionment

25   of the base.  And, again, Apple has referred to it by that

 1    name.  In other briefing, Apple said for Mr. Mills'

 2    apportionment of the base to have been proper, the relied-on

 3    survey question would have needed to ask whether the patented

 4    feature alone motivated the purchase.  And this was in a

 5    paragraph just riddled with citations to LaserDynamics, which

 6    everybody looked at as being an Entire Market Value Rule case.

 7            In reaction to that argument, the Court was persuaded

 8    that the surveys asking were you motivated, as opposed to were

 9    you alone motivated, had to be redone.  And they were redone

10    with the very word Apple characterized as both appropriate for

11    the sub-population application and how you apportion the base.

12            But it's not just a go with us because Apple said this

13    before, and these are the case I was referring to.

14            If we can have Slide 5 for Garretson.

15            The notion that Smartflash is advancing in this

16    hearing finds its origin at least in the Garretson case from

17    the 1800s.  Garretson teaches that one way -- well, Garretson

18    teaches that the demand that the patented feature creates must

19    always be separated from the unpatented features.

20            And it teaches that one way to do that is by what we

21    typically think of as apportionment, the presenting evidence

22    tending to separate the Defendants' profits and the patentees'

23    damages between the patented feature and unpatented features.

24    But Garretson also refers to the Entire Market Value Rule.

25            What it doesn't do, it doesn't teach that the EMVR is

1    an alternative to separating the value of the patented features

2    from the unpatented features.  Rather, Garretson is teaching

3    that damages, in other words, the way of separating value of

4    patented from unpatented features, it can be calculated on the

5    entire value of the accused product if there is evidence that

6    the entire value is properly and legally attributable to the

7    patent feature, i.e., that the EMVR is the scenario where the

8    apportioned value of the patented feature is one and the same

9    as 100 percent of the value of the entire product.

10             But it doesn't just stop with Garretson, because when

11   we turn to LaserDynamics -- could we have the next slide,

12   please, here?

13             LaserDynamics tells us when the entire value of an

14   accused product is properly and legally attributable to the

15   patented feature -- well, it tells us how we know when it's

16   properly and -- and legally attributable to the patented

17   feature, and that's where we get the alone motivate question

18   that was crucial to Apple's original position before the trial

19   and crucial to the order striking our first damages report.

20             LaserDynamics tells us that evidence that an accused

21   feature alone motivates a consumer to purchase the accused

22   product is evidence that shows the entire computer, in that

23   case, can be attributed to whatever the patented feature is.

24   And that's cited on the screen, 694 F.3d 51 at Page 69.

25             THE COURT:  Let me ask you this, counsel.

1              MR. CALDWELL:  Yes, Your Honor.

2              THE COURT:  Of course, we all know that LaserDynamics

3    came out of this court.  I'd been on the bench eight months

4    when the decision came down, but it obviously was tried by my

5    predecessor.

6              LaserDynamics is clear that the entire market rule is

7    an exception -- a narrow exception to the general rule that you

8    have to apportion and you apply that exception when you can

9    show that the accused feature alone motivates or drives the

10   market for the entire product.

11             And I think all of us understand that multi-component

12   products have features that are alleged to have infringed, but

13   they also contain almost unavoidably multiple other features

14   that are not alleged to infringe.  And it's not fundamentally

15   fair to collect damages on the value of non-infringing

16   features, so you have the apportionment rule.

17             And you have the narrow exception, the EMVR, where you

18   can show that that allegedly accused feature, that infringing

19   functionality drives the market for the product.

20             Now, my question is, everything I've read in

21   LaserDynamics, VirnetX, the recent Ericsson opinion, indicates

22   that that is a question that's answered by viewing the entire

23   market as a whole.

24             What I glean from your briefing is that you're taking

25   a step away from that, and you're arguing that a Plaintiff can

 1  identify a sub-portion of the consuming public out there.

 2  Maybe it's 10 percent, and that 10 percent, if you can show

 3  that to them but not the other 90 percent of the public but to

 4  them the accused feature alone drove the market for the

 5  product, then you get to recover damages on a hundred percent

 6  of the value of the product as a whole as to that 10 percent of

 7  the -- of the consuming population.

 8        That's what I read your briefing to say.  I don't find

 9  that in LaserDynamics.  I don't find it in VirnetX.  I don't

10  find it in Ericsson.  I -- I find a discussion of the Entire

11  Market Value Rule being just that, the entire market.  Not a --

12  it's not the submarket value rule.  It's the Entire Market

13  Value Rule.

14        So if there's a basis -- if there's not what Apple

15  said but what the Federal Circuit or the Supreme Court said

16  that allows support for that concept, that's what I'd like you

17  to point out to me.

18        MR. CALDWELL:  Yes.  Yes, Your Honor.

19        So I think you've correctly stated our position,

20  because -- because Smartflash does not believe that in order

21  for your base to involve the entirety of a particular product,

22  it -- the alone motivation must apply to a hundred percent of

23  the entire market.  You are correct about that.

24        And I -- I'm going to direct you to what I think

25  LaserDynamics and Ericsson says on that.  But conceptually, I

1    think maybe it's helpful to think about it a little bit like

2    this.

3         For years, there have been lost profits cases, and,

4    for example, if Apple and Samsung are in a case against each

5    other where one of them wishes to assert that it is entitled to

6    lost profits, you still have to do things like what is your

7    capacity?  Are there other people in the market?  Would

8    somebody else have picked up the sales?  And it is often if not

9    usually the case that the party that lost profits can't pick up

10   its entirety of damages based on lost profits.  And then maybe

11   you say 27 percent of it is in lost profits, but the remaining

12   73 percent I have to get a reasonable royalty on in order to be

13   fully compensated.  And I think it's an analogous notion to

14   what's going on here.

15        What -- our position is that we are fairly obtaining

16   damages for those folks where Apple would have gotten no value

17   but for the patented features.

18        And with regard to -- to LaserDynamics, I think even

19   the quote that's on the screen, there's no evidence that this

20   feature alone motivates customers to purchase a laptop computer

21   such that the value of the entire computer can be attributed to

22   the patented dis -- discrimination method.

23        And I think that they're -- what they are noting is

24   that you are actually able to look at that on a -- essentially

25   a sale-by-sale basis.  I don't -- I don't think that what it's

1    saying is you can't apply this sort of proof to a

2    sub-population.  It's what's the threshold you have to meet

3    to look at all revenue of a given sale.  And I think

4    that's what -- that's what LaserDynamics is going for with

5    questions like this.

6           But if I can skip also to Slide 9 from Ericsson.

7           Ericsson is -- is similar.  Specifically, where the

8    entire value of a machine as a marketable article is properly

9    and legally attributable to the patented feature, the damages

10   owed to the patentee may be calculated by reference to that

11   value.

12          Now, I think if -- if what Smartflash had done was

13   said some people are alone motivated, so, therefore, let's look

14   at a hundred percent of the revenue of all of the products that

15   infringe, I think then we would -- we would have a problem.

16   But what we tried to do was actually track the law that said

17   for which of these products can we look at, can we make

18   reference to the entire value of the machine?

19          And I think that's exactly what our model did, and

20   as -- as I understand it, exactly -- I mean, I understand you

21   don't want me just to say, Apple said it.  I get that.  But

22   it's how Apple went to the Court, and it's how the Court

23   decided we had to redo our damages.

24          THE COURT:  All right.  How does this -- how does this

25   somewhat novel theory of yours, how does it square with the

1  notion that to apply the EMVR, which is clearly an exception to

2  the rule, how does it square with the notion that to apply the

3  EMVR, you're showing that the accused feature or functionality

4  is so important and persuasive that it drives the entire mar --

5  market for the product?  Is it logical then to assume that that

6  functionality would drive the entire market for a portion of

7  the consuming public, but it would not drive the entire market

8  for another portion of the consuming public?  Is it not a

9  threshold case where it either does or it doesn't?  And

10  where -- where is there support for the idea that you can have

11  it both ways?

12          You can say, this percent of the people that bought

13  this product were alone motivated by the accused functionality,

14  therefore, we get to count the value of the entire product,

15  including the uninfring -- the non-infringing features, but

16  this remaining portion that together adds up to a hundred

17  percent of the public was not alone motivated, and so for them,

18  we have to apportion and limit our recovery to only the value

19  of the accused functionality as separated from the

20  non-accuse -- non-infringing functionality?

21          I mean, if it alone drives the market, it alone drives

22  the market, doesn't it?  Or does it make sense to say there's

23  some of the people out there that are alone motivated by a

24  function that doesn't also motivate the rest of the people out

25  there?  Is the public such a -- a non-homogenous group that --

```
 1    that some of them will be driven by a feature that will not

 2    drive the rest of them?  Is that consistent with the concept of

 3    the EVMR (sic) which talks about driving the market, not a

 4    market, not a subpart of the market, but driving the market?

 5    That's --

 6              MR. CALDWELL:  I understand --

 7              THE COURT:  -- that seems somewhat illogical to me.

 8              MR. CALDWELL:  Okay.  Well, I understand the Entire

 9    Market Value Rule to be talking about what -- what drives the

10    sale of a machine or a product, and --

11              THE COURT:  As to the entire market --

12              MR. CALDWELL:  And --

13              THE COURT:  -- that's the question.

14              MR. CALDWELL:  Or --

15              THE COURT:  Or is it as to -- is it a

16    consumer-by-consumer analysis?  Are you going to have to

17    produce a survey for everybody that buys a smartphone?

18              MR. CALDWELL:  Well, certainly you don't have to

19    produce a survey for every single human being, and that's kind

20    of the -- one of the --

21              THE COURT:  While I'm taking the alternative to its

22    ultimate conclusion.

23              MR. CALDWELL:  Right.  But a -- but as we discussed at

24    trial, I think when there was a -- kind of a cross-examination

25    that implied we didn't survey the entire U.S. population, I
```

1   mean, it's -- it's basically the statistical purpose of the

2   survey is to -- to compute the statistics of it.

3         But I think -- I think, yes, we essentially did

4   produce a survey from which qualified statisticians can do that

5   analysis, because as I understand it, the EMVR comes down to

6   what drove the sale.  And it doesn't have to be was one thing

7   the motivator, the sole motivator for every single person that

8   consumed a device, that that's not -- that's not the standard.

9   I think it's entirely consistent with the Entire Market Value

10  Rule.

11        In fact, what I -- what I think Smartflash did is

12  actually, out of an abundance of caution, was in the Entire

13  Market Value Rule, the sub-population view that we took, we

14  weren't getting money on the folks where we couldn't show that

15  this was the sole motivation.  It's actually an abundantly safe

16  way to do it.

17        I can't remember the context in which this happened,

18  but I -- I mean, just anecdotally, I remember -- I think it was

19  an interview that Judge Rader had with a -- with a magazine or

20  something along those lines, just thinking about this

21  hypothetical issue of, well, if you go get data and it shows

22  that maybe 95 percent were motivated, can you look at the

23  entire 100 percent of the market?  What if it's 90?  What if

24  it's 87?  And -- and where's that line?

25        What we actually tried to do was do the far safer

1  calculation.  Rather than saying, how close can you get to some

2  arbitrary line and then extend it out to more of the market,

3  what we said is we won't touch the people beyond the ones we

4  know where the sale was driven because it's for those people

5  where the patented feature drove the sale that we meet the

6  standard that's put forth in Ericsson and in LaserDynamics.

7  The patented feature led to the sale of the machine.  And

8  that's --

9          THE COURT:  Let's talk about Ericsson a minute.  Judge

10 O'Malley wrote that opinion, goes to great lengths to discuss

11 not only the substantive aspects of the damages but the

12 evidentiary aspects of the damages.  And the Court there talks

13 about the need for trial courts to make sure that arguments and

14 evidence is not presented to a jury in the way that would skew

15 unfairly the jury's ability to apportion the damages and

16 account for only the value -- value attributable to the

17 infringing features.

18         So if you have a sub-portion of the consuming

19 population that you say meets the exception that is the EVMR

20 (sic) and you have the remainder of the population that doesn't

21 in which you have to apportion under the general rule, and

22 they're all in the same case before the same jury, how do you

23 put on your evidence of EVMR (sic) without skewing the record

24 for the rest of the damages case where you're apportioning and

25 not using the Entire Market Value Rule?  How do you -- how do

```
 1   you thread the needle between these instructions from the
 2   Federal Circuit about avoiding the kind of evidence that would
 3   skew the jury's ability to fairly apportion and still put on
 4   your entire market value evidence as to what you call the
 5   sub-portion where that applies?
 6          MR. CALDWELL:  Very fair question as to the
 7   evidentiary aspects of the Entire Market Value Rule.
 8          I think the -- the short answer is you do it exactly
 9   like we did in this trial.  And what I mean by that was we
10   never put the 187 billion in front of -- in front of the -- the
11   jury.
12          Now, from the Plaintiffs' perspective -- I mean, Your
13   Honor has seen what's happened with damages law over the last
14   eight or 10 years.  From the Plaintiffs' perspective, you --
15   you get it going and coming.  I mean, we -- we -- we know that
16   at some point, we have to show our work and how the calculation
17   was done, and the -- the expert has to have presented evidence
18   that shows exactly how the analysis was performed.
19          And when I came to Your Honor the day of opening and
20   we were talking about slides, we actually -- Smartflash had a
21   fear that we actually needed to show how we got to the base
22   that we used, but Your Honor said we actually -- we couldn't
23   show the 187 billion, we couldn't show how that was reduced
24   down.  And -- and fine, so those slides are gone.
25          All we did was show the number that we are permitted
```

1    to show under both the evidentiary and substantive aspects of

2    the EMVR.  We showed just that portion of sales that can be

3    attributed to the patented feature based on survey evidence

4    that those folks were alone motivated.  I think that alone

5    satisfies it.

6            And by comparison, if we think back to this -- the

7    notion of prejudice and skewing the damages and whatnot, I

8    mean, this is a far cry from something like Uniloc where, for

9    example, you have a model and the total revenue just really

10   doesn't have anything to do with it, and -- and then you have

11   a -- a patent owner saying, hey, by the way, as a sanity check,

12   look how much money they made overall so what we're asking for

13   isn't that much.

14           And -- and more recently, Your Honor put out an order

15   I think maybe last Thursday in the ContentGuard case.  And in

16   the ContentGuard case, I think Your Honor found -- made a lot

17   of findings that are applicable here as to how many of the

18   issues go to weight.  They don't go to methodology.  And I

19   think that -- that applies to a lot of issues, but not the

20   specific one I'm talking about right now.

21           Your Honor put out an order on the evidentiary aspects

22   of the Entire Market Value Rule, as I understood it, where you

23   were saying, listen, guys, if you think you're going to come in

24   here and just sort of blurt out the overall revenues, I'm

25   telling you, you can't do that.

1             And -- and it makes sense because their model was

2    wildly different.  What -- what ContentGuard did as a model is

3    this sort of willingness to pay.  It's -- it's just dollars per

4    device, and it looked at -- as I understood it, it looked at

5    some consumer willingness to pay and Apple's willingness to pay

6    for the feature -- the -- the device manufacturer's willingness

7    to pay, versus maybe the patentee's willingness to accept, and

8    then it had some negotiation schema that settles on a number.

9    But it's like a per device number.  You're not actually --

10   you're taking a per device and multiplying it by number of

11   devices.  It's not a place where a set of the revenue is

12   multiplied by a percentage.

13            And there it would be utterly gratuitous to blurt out

14   something about the total revenue.  I think perhaps like it

15   might have been if in this case someone had blurted out, oh, by

16   the way, what we're asking for isn't much.  Did you know they

17   made 187 billion?  We specifically didn't.

18            What we did is show the -- the least amount we needed

19   to show our calculations that properly applied the Entire

20   Market Value Rule.

21            THE COURT:  All right.

22            MR. CALDWELL:  We've -- we've kind of bounced all

23   over.  I don't know if -- if Your Honor wants me to resume on

24   anything in particular as to --

25            THE COURT:  I do want to do one thing, and you

1   triggered my memory when you're -- with this last argument.

2   I'm going to order both sides to file with the Court under

3   seal, within 48 hours, the demonstratives that were used before

4   the jury in the Smartflash trial last March.  I want you to

5   meet and confer if there's any question about what was or

6   wasn't used, but I want the benefit of reviewing those

7   demonstratives, as well as the admitted exhibits in the -- in

8   the record.

9           MR. CALDWELL:  Yes, Your Honor, certainly.

10          To the extent my last argument triggered that, what

11   I -- what I recall being --

12          THE COURT:  No, and let me -- let me finish, counsel.

13   I want those to cover openings, closings, and the direct and

14   cross of Mills and Wecker.  That's -- that's the scope of the

15   demonstratives I want filed.

16          MR. CALDWELL:  Not the stuff on the infringement?

17          THE COURT:  Nothing else.

18          MR. CALDWELL:  Got you.  Yes, Your Honor.

19          THE COURT:  Openings, closings, the direct and the

20   cross on Mills and Wecker, I want to see those demonstratives.

21          MR. CALDWELL:  I imagine we can meet and confer with

22   Mr. Post and probably get that together.  You said in the next

23   couple of business days?  Probably Monday?

24          THE COURT:  Today is Thursday.  File them by noon on

25   Monday.

 1          MR. CALDWELL:  Yes, Your Honor.

 2          THE COURT:  Okay.  Go ahead.  Just -- you made me

 3  think about that, so I wanted to say it while I had it on my

 4  mind.

 5          MR. CALDWELL:  Understood.

 6          So it is absolutely Smartflash's position that there

 7  is a sub-population application, and I think that, you know,

 8  Apple characterizes Smartflash as having made some big

 9  about-face.  And I think -- to be completely candid, I think

10  some of our briefing is probably inartful on it because there's

11  confusion over it.

12          Our position was originally, before we even asked the

13  alone motivate, that we thought that was probably okay under

14  the controlling law because if we weren't looking at the

15  entirety of every single sale, we may not be under the

16  requirement that we ask alone.

17          But we've been absolutely consistent after there

18  has -- there was the order granting a motion to strike and

19  telling us to re-run our survey, we've been absolutely

20  consistent on the substance that having done so, we absolutely

21  were able to look at the base that included the entirety of

22  sales of those who indicated through the surveys that they were

23  alone motivated.  And I think anything beyond kind of a

24  superficial confusion over the semantics shows that we've been

25  perfectly consistent with that and have really honestly been

1  consistent with everything Apple said up until they decided

2  that this is kind of an opportunistic route out of the verdict

3  at this point.

4          We've talked about Garretson.  We've talked about

5  LaserDynamics.  And we've talked about the evidentiary

6  principle of the Entire Market Value Rule.

7          Importantly, I think as to some of the confusion over

8  the Entire Market Value Rule, for a little bit of context, Your

9  Honor, back when all the pre-trial hearings were -- were

10  occurring in -- in Judge Mitchell's courtroom, there was also

11  an argument that was being raised by the Defendants that you

12  don't really hear much about now, and that was the Defendants

13  were taking all of Mr. Mills's calculations and all the various

14  inputs, and they would put them on a real big slide as this one

15  big formula that stretched from the left side to the right

16  side, and then they'd sort of merge the rate calculation and

17  the base calculation onto one slide and start striking off

18  inputs here or there to try to reduce it down and say to the

19  Court, look, really what they're doing is they're getting a

20  percentage off of total revenue.  They -- they kept trying to

21  actually change the math to say it was a percentage of total

22  revenue.

23          And consistent with one thing that Your Honor observed

24  in the ContentGuard order last week, as a practical matter, you

25  can always say that some number you get is some percentage of

```
 1   the entire revenues.  But that's not the way you look at it.  I

 2   mean, it's what Your Honor found in that ContentGuard -- that

 3   ContentGuard ruling, and I -- and I completely agree with it,

 4   that's not what you do.

 5           So to some extent the reason that there's this

 6   semantic confusion is maybe a little lost with the current

 7   posture of the case, but from the early days, we were also

 8   having to defend against the Defendants making the I think

 9   somewhat red herring argument that everything is a percentage

10   of total revenue, therefore, we were actually using a total

11   value model.  And we were defending against that a lot of

12   times, and I think quite candidly, that led to some of the

13   inartful phraseology.

14           Because we also thought, since we weren't doing a

15   percentage of the total revenue in that fashion and we had

16   asked what motivated, we thought we were in an apportionment

17   world.  It's just that once we lost the Daubert, had to redo,

18   we were in the flavor of the apportionment world where your

19   evidence on the base is so extreme, you've shown that it's the

20   sole motivation.  And at that point, it uses -- it qualifies

21   for the entire market value exception.  It's the -- as you say,

22   the exception, the time in which you can tell the jury the

23   total revenue because we've shown it's sole motivated.

24           THE COURT:  Let me ask you this, counsel.  Can you

25   tell me off the top of your head what the effective profit
```

 1   margin that Mr. Mills used in his prior testimony?

 2           MR. CALDWELL:  For Apple's effective profit margin?

 3   I -- I would be completely making it up.  I mean, I -- we might

 4   know an approximation.

 5           Does Apple mind us saying it in open Court first,

 6   but --

 7           MR. LYON:  Uh-huh.

 8           MR. CALDWELL:  Okay.  Apple doesn't --

 9           THE COURT:  Check -- check with your co-counsel before

10   you leave, and we'll come back to that.  If I need to seal the

11   courtroom to get a response, I'll do that.  But I'd like --

12   that's one of the gaps I have in my materials that I've been

13   poring through.  And while I have the benefit of everybody in

14   the room, I want to try to clarify that just for my own

15   thinking.

16           MR. CALDWELL:  Yes, Your Honor.  And just -- just so

17   you know in terms of an effective profit margin, I think for

18   presentation to the jury, certain complexities were -- were

19   simplified in terms of the math.  But as I understand it,

20   Mr. Mills actually looked at -- because he was looking at, for

21   example, the iPod Touch and the iPad and the iPhone, and I

22   think they may have different effective profit margins, so I

23   don't know if -- the number that we submit to you, do you want

24   kind of the aggregate that's sort of like the weighted

25   average --

 1          THE COURT:  Let's do this.  As you're consulting with

 2   opposing counsel about the demonstratives, consult about this,

 3   and separately, but by noon on Monday file a notice with the

 4   Court as to this -- these effective -- this effective profit

 5   margin or these effective profit margins, if you're going to

 6   break them out by device, and file that under seal, as well.

 7          MR. CALDWELL:  Yes, Your Honor.  That -- perfect.

 8   Thank you.

 9          Now, I don't want to belabor this point, but Apple has

10   tried to accuse us of duplicitous behavior, saying that we made

11   some sort of an about-face.

12          To the extent we have changed a position, it is

13   actually a change in nomenclature as the issues that

14   crystallize when we saw what the Court was thinking in 59 -- in

15   the 59(d), and under -- beginning to understand that the Court

16   is of the mind -- perhaps inconsistent with the original

17   Daubert order, the Court is of the mind that maybe the EMVR

18   wouldn't apply to a sub-population when we were acting

19   consistent with the -- the motion to -- the ruling on the order

20   to strike that said we had to meet the EMVR because we were

21   looking at the entire revenue.

22          So I apologize for any inconsistency in the

23   terminology, but I think substantively, below the terminology

24   we've been absolutely consistent that this is a proper way to

25   compute the base looking at the entire revenue for a

 1   sub-population when we showed alone motivation.

 2          THE COURT:  Well, apologies aren't sought, and they

 3   aren't necessary.  And the Court's well aware we don't live in

 4   a static world.  In hindsight, it might have been nice if we'd

 5   had the Ericsson decision before the Daubert hearing in this

 6   case, instead of within a week of the Daubert hearing in this

 7   case, but that's the world in which we live.  So there aren't

 8   any apologies -- apologies needed from either side in the

 9   Court's view.

10          So to try and bring this argument to a close, counsel.

11          MR. CALDWELL:  Yes, Your Honor.

12          THE COURT:  What you're asking me to do is accept your

13   arguments with regard to the damages evidence that was

14   presented, and you're asking me to enter judgment based on

15   the amount awarded in the verdict returned by the jury?  Or in

16   the alternative, you want me to sever damages out to be treated

17   on a bifurcated basis so that the remainder of the case can go

18   up?

19          MR. CALDWELL:  That -- that's correct, Your Honor.

20   And -- and I think Your Honor really --

21          THE COURT:  What's the -- what's the basis for the

22   latter?  I know what the basis of your argument is on the

23   former.

24          MR. CALDWELL:  I think that it would be -- I think it

25   would be very efficient, quite frankly.  It was Judge

1   O'Malley's suggestion at the oral argument that Mr. Perry and I

2   had in -- in D.C.  She proposed it.  She proposed it, I think,

3   in Footnote 2 of the order that affirmed denial of the stay in

4   the Apple case that said:  Under our authority, you can do

5   that, referring to it as a way that efficiently gets the

6   liability issues in front of them, including 101.

7          Remember that there is also this parallel world in

8   which --

9          THE COURT:  Well, the Court's -- the Court's well

10  aware of the parallel world.

11         MR. CALDWELL:  Well, the parallel world is costing our

12  client a lot of money, and, you know, I query whether that's

13  one of the motives.  But it's -- it's an efficient route in

14  which to -- in which to address that issue.

15         But also I think Your Honor highlighted today one of

16  the inherent efficiencies of it because Your Honor expressed to

17  me an understanding of the Entire Market Value Rule as being --

18  I mean, not -- not to misquote you, but my understanding is

19  Entire Market Value Rule being an application limited to

20  basically everybody who buys anything in that -- you know, any

21  of those products needs to be so motivated.

22         In other words, it has to be sort of a sole -- the

23  sole driver for all purchases of the accused product, and --

24  and -- or, I mean -- or close to all.  My point being --

25         THE COURT:  I did say it is the Entire Market Value

1    Rule.

2            MR. CALDWELL:  So as -- as we know, semantics are

3    sometimes -- sometimes imprecise because I still think it's

4    the -- we're looking at the entire market value of those given

5    sales.  So I don't think our application is at all inconsistent

6    even with the name.

7            But the point is -- at least our point in requesting

8    that relief is that it seems like that there is a discrete

9    question there that -- on which there is a dispute.  It's a

10   controlling issue of law.  And, you know, with Judge O'Malley's

11   suggestion that maybe an efficient way to handle a lot of

12   things, including this -- the liability issues and the 101,

13   which is, again, an issue of law that is ultimately going there

14   anyway, if we --

15           THE COURT:  If the Court were to grant your

16   alternative request and bifurcate damages, then obviously, the

17   validity/infringement questions would go up.

18           But this argument about the sub-portion of the

19   consuming populace in which you say the EVMR (sic) may be

20   applied, while you apportion to the remainder, that would be

21   captured within the damages portion of the case and that would

22   still be awaiting a new trial on damages and having -- having

23   been bifurcated.

24           MR. CALDWELL:  Well, we --

25           THE COURT:  So how -- how would you get some guidance

1   on that by me doing what you're asking?

2         MR. CALDWELL:  What we asked Your Honor to do was to

3   certify that for interlocutory appeal, certify that question,

4   the controlling issue of law question, because that's -- that's

5   how --

6         THE COURT:  Okay.  All right.

7         MR. CALDWELL:  So the -- the second -- bouncing around

8   a little bit.

9         The second fundamental issue as -- not on the issue

10  whether there's this -- the sub-population is appropriate, the

11  second fundamental issue with regard to why we believe that the

12  new trial order should be reversed is the jury instruction was

13  correct.  It -- it was not legally flawed.

14        Your Honor recognized this actually in the new trial

15  order, but if the Court agrees with us on Point 1 that the

16  sub-population application is a viable application, then we

17  don't need to get to the second point.  But the second point

18  is, even if the Court still viewed that the Entire Market Value

19  Rule instruction was inapplicable, the Court committed legal

20  error in granting a new trial based on giving an instruction

21  that was legally correct, and at most, inapplicable.

22        Could we see Slide No. 10?

23        I'm confident Your Honor is familiar with this, but

24  near the end of the new trial order, you acknowledged that the

25  instruction was not an incorrect statement of law.  I -- I

 1   don't think Apple has contended it's an incorrect statement of

 2   law.  I don't think that Smartflash has contended it's an

 3   incorrect statement of law.  And we actually went to the jury

 4   on an Entire Market Value Rule-style instruction with no

 5   objection.

 6           And what we know is there's a Second Circuit case

 7   called U.S. v. Bell -- and if I could have Slide 11, please?

 8           What we know is that when the Court has given

 9   discretion -- while the Court has given dis -- discretion to

10   grant a new trial based on jury instruction, the jury

11   instruction needs to be wrong for that to be the case.

12           In U.S. v. Bell, the Second Circuit found it was an

13   abuse of discretion to grant a new trial, based on jury

14   instructions that were legally correct.  And that's a quote

15   here.  We hold the district court erred in ordering a new trial

16   because the district court's jury instructions on intentional

17   conduct were legally correct and did not constitute error.  It

18   was a plain error standard in that case, much less plain error

19   warranting a new trial.

20           Here, in this instance, the instructions were legally

21   correct, and they tracked LaserDynamics.

22           If we could have Slide 12?

23           Not to belabor this point, I -- since nobody's really

24   disputing the correctness of the instruction, I won't -- I

25   won't go through.  But we were focusing on the part of

1    LaserDynamics, if it can be shown that the patented feature

2    drives the demand for an entire multi-component product -- and

3    that -- it doesn't say anything about every single sale of them

4    or anything of that nature -- then you can look at the entire

5    revenue of the entire product.  And we tracked that in the

6    instruction.

7            The -- the Court's instruction was telling the jury

8    precisely what type of evidence is required for the jury to

9    calculate damages when applying a royalty rate against the

10   entire value of an accused product.  The instruction did not

11   instruct the jury to calculate damages based on the total

12   revenue of all accused products, although Apple has, I think,

13   more recently -- in its last brief, they've argued that now,

14   well, maybe the jury would have looked at the entirety of the

15   market, maybe they would have back calculated the market.  And

16   at that point, we're just speculating that the jury didn't

17   follow the instructions.  We're speculating that they did

18   something based on evidence that wasn't even presented to them

19   or arguments that weren't even presented to them, but that's

20   not the way that it works when reviewing a -- a jury

21   instruction.

22           I mean, there can't be any concern that the jury

23   misheard the instruction and mistakenly thought the Court was

24   instructing them to assess damages based on the total revenue

25   of accused products because that is not at all how the parties

1   joined issue on this during the case.

2        Nobody who was sitting there throughout the case would

3   have thought we were ever talking about total revenues.  It was

4   quite clear that we were not, and that's why Your Honor didn't

5   permit the parties to show total revenue.

6        Can I have Slide 13?

7        We know from the Sulzer case, which came out of the

8   Federal Circuit, that in reviewing the jury instructions, the

9   full trial record and the jury instructions in their entirety

10  must be examined because instructions take on meaning from the

11  context of what happened at trial, including how the parties

12  tried the case and their arguments to the jury.

13       And in that context, it leaves no room for any concern

14  that the Court's instruction was ambiguous or that some jurors

15  might have thought they were allowed to go and try and back

16  calculate a different base.  There was no ambiguity in the

17  Court's instructions.  And even if there had been, when read in

18  a vacuum outside the context of trial, the context of trial

19  negates any fear that the jury thought they were instructed in

20  a different way.

21       Go to Slide 14.

22       Looking at the Court's instructions, the jury was

23  never given the total revenue.  The jury was never given any

24  way to calculate damages on total revenue.

25       Apple is now claiming otherwise, but they didn't say a

1    word about it until now.  Presumably the reason that Apple

2    never mentioned this fear of some back calculation is the Court

3    must assume the jury understood the instruction to apply to the

4    sub-population application.

5           At the time Apple, just like Smartflash and the Court,

6    were handling the litigation in the context of the trial as

7    tried, and nobody in that courtroom thought that we had just

8    secretly not told them total revenue, and they needed to go

9    compute it to start their damages analysis.

10          Slide 15, please.

11          The law requires the Court to assume that the jury

12   read and followed the instructions given to them.  And this is

13   in the briefing.  I -- I don't want to belabor it, but the

14   Franklin -- the Francis v. Franklin case is very instructive on

15   this.  It's a Supreme Court case saying absent extraordinary

16   sit -- situations, you adhere to the crucial assumption that

17   underlies the constitutional system of trial by jury, that

18   juries carefully follow instructions.  We must assume that for

19   the most part, they understand and faithfully follow the

20   instructions.

21          The concept of a fair trial encompasses a decision by

22   a tribunal that has understood and applied the law to all

23   material issues in the case.

24          And I know many Judges are very sensitive to ellipses.

25   I think basically what's removed is they are quoting another

1   Supreme Court Justice in an earlier case, if I remember

2   correctly.

3        So as a result, even if the Court does not think that

4   Smartflash met the Entire Market Value Rule or that the -- or

5   the Court concludes the Entire Market Value Rule was entirely

6   inapplicable to this case, the law still requires the Court to

7   presume that the jury followed the apportionment instructions

8   and evaluated Smartflash's evidence under that construction.

9        So at worst, giving a legally correct instruction on

10  an issue for which a party offers insufficient proof, if that

11  were the case, is harmless error.  And we start with the

12  assumption that the verdict is otherwise supported with

13  substantial evidence.

14       The Court's order granting a new trial does not

15  address substantial evidence, and -- and I think that that

16  could be in part due to some confusion from the last hearing.

17       Counsel for Apple, in the -- in the last hearing,

18  represented that, well, if you have an extraneous instruction,

19  even if legally correct, you got to grant a new trial.  And

20  respectfully, that's just not the law.

21       The -- the law on this is, I think, controlled by the

22  Griffin case out of the Supreme Court.

23       Could we have Slide 16?

24       I understand it's -- it's a bit of a wordy slide, Your

25  Honor, but ultimately any -- any error in legally correct or

1    allegedly inapplicable instructions is harmless.  Jurors are

2    not generally equipped to determine whether a particular theory

3    of conviction in that case submitted to them is contrary to

4    law, whether, for example, the action in question is protected

5    by the Constitution is time barred or fails to come within the

6    statutory definition of the crime.  When, therefore, jurors

7    have been left the option of relying upon a legally inadequate

8    theory, there's no reason to think that their own intelligence

9    and expertise will save them from that -- that error.

10          Quite the opposite is true, however, when they have

11   been left the option of relying upon a factually inadequate

12   theory since jurors are well equipped to analyze the evidence.

13          And that's precisely the case we have here.  If, at

14   worst, the jurors were presented with a legally correct

15   statement of the law and the evidence doesn't rise to the

16   level, which is why because the instruction was legally

17   correct, a substantial evidence analysis would be needed to

18   find that there were any harm from that instruction.

19          Another case -- the next slide is i4i.  We saw this in

20   the i4i, which is applying Fifth Circuit law.  The Fifth

21   Circuit law that the Federal Circuit applied in i4i, I believe,

22   was this Walther case which goes back to that Griffin case in

23   1991.  That's the law.  Again, you may have instructed on some

24   legally correct secondary infringement-type theories -- well,

25   even if the evidence doesn't rise to it, that you don't give a

1    new trial on that basis, you presume that they read and

2    understand, but if it was a legally valid instruction and it

3    was a factual issue that didn't rise to the level, that's

4    not -- that doesn't rise to the level of a new trial.

5              And finally -- I'm sorry --

6              THE COURT:  Go ahead.

7              MR. CALDWELL:  Before I sit down, Your Honor, although

8    the Court's new trial order contains multiple independent legal

9    errors, in our view, that warrant reconsideration of the order,

10   I think it's imposs -- it's really important to highlight what

11   Apple's trying to do with a new trial order.

12             Apple doesn't just want to redo on -- on damages.

13   They want to redo their whole damages model, we think, which I

14   really don't understand.  They basically want to -- based on

15   our phone calls with them, it sounds like they want to disavow

16   their old -- their old model and come in with something that I

17   guess maybe they think would be more persuasive.  They want to

18   re-open fact discovery.  They've been supplementing

19   interrogatories, and they've been telling Your Honor that they

20   need to retry infringement and validity.

21             They're seizing on this new trial order as some sort

22   of a complete do-over.  We -- we didn't win on any issues

23   before.  Let us just retry all of them.  And respectfully,

24   that's just not justice, and that's what I meant before when I

25   was saying I -- I think Apple is trying to seize on this to

 1   just have a complete do-over and treat the old case almost like

 2   it was an experimental mock trial.  And this would utterly

 3   nullify the hard working jury that we had.

 4            Thank you, Your Honor.

 5            THE COURT:  All right.  Thank you, counsel.  Before I

 6   hear from the Defendant in response, we're going to take a

 7   short recess.  When we come back, I'll hear from the Defendant,

 8   both in regard to these status conference questions that were

 9   asked and their underlying arguments on the pending motion to

10   reconsider.

11            We stand in recess.

12            COURT SECURITY OFFICER:  All rise.

13            (Recess.)

14            COURT SECURITY OFFICER:  All rise.

15            THE COURT:  Be seated, please.

16            All right.  Let me now hear from the Defendant.

17   Before we get into the formal argument on the motion to

18   reconsider -- Mr. Perry --

19            MR. PERRY:  Thank you, Your Honor.

20            THE COURT:  -- let me ask you some of the same

21   questions I asked opposing counsel.  I suspicion I'm going to

22   get different answers, but where is your side of the case as

23   far as being ready for a new trial on damages?  What more do

24   you anticipate?  How long do you think a fair retrial on

25   damages will take, those kind of questions.  Let me have your

1    thoughts on those.

2            MR. PERRY:  Thank you, Your Honor.  And with the

3    Court's indulgence, Mr. Lyon may address some of the timing

4    questions, as well.

5            THE COURT:  That will be fine.

6            MR. PERRY:  We are waiting -- Apple is waiting, Your

7    Honor, for the Smartflash new damages model report.  We are

8    going to respond to that, obviously, but we don't know what it

9    is yet.

10           What we heard in open court this morning is the most

11   information we've had about that since the Court's new trial

12   order five weeks and two days ago.  We have heard -- we've

13   got -- we're not -- we don't have a new report.  We've been

14   given no preview of the new report, and, therefore, we are in

15   reactive mode.  We are in responsive mode.

16           Once we get the report, if it's tomorrow, as

17   Mr. Caldwell said, we need time to respond to it.  I think

18   there will be Daubert challenges, but I don't know because I

19   don't know what's in it.  I'm a little bit hampered by -- in --

20   in stating that definitively because we don't know what their

21   theory is.

22           THE COURT:  What's your -- what's your response to his

23   statements that your position with regard to damages is going

24   to be substantively different than your position in the earlier

25   trial?

1        MR. PERRY:  Well, I don't know if that's right because

2   we're going to be responding to their report.  Again, we --

3   we -- we need them to go first.  I do think that --

4        THE COURT:  Well, your position is not totally

5   responsive.  I mean, you do have -- you are, I assume, going

6   to respond to what they -- the position they take, but you're

7   also going to affirmatively come forward with what -- with what

8   you think the appropriate damages should be in the event the

9   issues and the determinations of validity and infringement

10  stand up.

11       MR. PERRY:  Yes, Your Honor.  But let me -- let me

12  explain why there is a responsive element to that.

13       The -- the last time around, the Smartflash damages

14  model was driven almost entirely by survey evidence.  We heard

15  this morning for the first time that they don't have a survey

16  for this new model.  That does change the Apple approach, and

17  we -- we had planned to do a new survey to respond to whatever

18  new survey Smartflash was going to do.  That would come out of

19  that.  I mean, the -- the ultimate damages approach is there.

20       We have, of course, put forward the return on

21  investment approach previously in the trial.  We stand by that

22  as -- as a -- as a methodology.

23       I believe Mr. Caldwell, if I heard him correctly this

24  morning, proposed a licensing-based approach -- that is, what

25  Smartflash was looking for in terms of licensing revenues -- I

1  think he had a per device licensing approach.  If that is what

2  Smartflash elects to do, I think in all fairness and justice,

3  Apple would be entitled to put on a licensing-based approach

4  showing what Apple pays for licenses for similar technology.

5  But, again, we don't know what Smartflash is going to do, which

6  is why I say we were in reactive or responsive mode.

7          We do know, as the Court observed a few minutes ago,

8  that the world is not static.  I would like to address

9  Mr. Caldwell's backhanded attack on our supplementation of the

10  interrogatory responses.

11          We have that obligation under the federal rules, as

12  the Court is aware.  We went through -- in light of the events

13  that transpired at trial and the verdict -- we don't yet have

14  their damages report -- and looked at whether there were

15  previous factual issues that needed to be supplemented.

16          And, Your Honor, Apple is now -- in this case, has

17  been adjudicated to infringe these patents.  Our position has

18  always been we don't infringe, as the Court is aware.  That's

19  behind us.  We have an appeal ahead of us, but that's behind

20  us.

21          Given that we are an adjudicated infringer, we have

22  developed non-infringing alternatives.  That should not

23  surprise Smartflash, nor should it surprise the Court.  What

24  else could Apple do?  If -- if we have a Court order against us

25  that we are an infringer of these patents, we are obligated to

1    come and either license these patents or come up with a way

2    around them.

3           We have come up with a number of ways around them.  We

4    have given those to Smartflash.  Smartflash can take them into

5    account, but we are not trying to change anything.  We are

6    responding to the verdict that was entered in this very case.

7           We have -- unless Smartflash's damages report raises

8    other new issues, we have supplemented our fact discovery.  I

9    mean, that's -- we did that already without even a schedule in

10   place because we want to keep -- keep things moving.

11          THE COURT:  Didn't Apple previously stipulate that

12   there were no infringing -- no non-infringing alternatives?

13          MR. PERRY:  No, Your Honor.  Apple's pre-trial

14   interrogatory response was that Apple had not developed a

15   non-infringing alternative at that time.  And -- and we entered

16   into a trial stipulation that Apple didn't have it.

17          THE COURT:  Okay.

18          MR. PERRY:  Another intervening event is that

19   Dr. Jones, the Smartflash expert, then testified, as the Court

20   will recall, at the trial regarding non-infringing

21   alternatives including, for example, the reversing the order of

22   the payment step in which -- based on that testimony, that

23   trial testimony that didn't exist before trial, Apple's

24   engineers have looked at alternatives in light of the --

25   Smartflash's own approach

```
 1   to this case.  And that's directly relevant to damages, as

 2   Mr. Cassady acknowledged in the last hearing on this subject.

 3            As far as the -- you know, where do we go from here,

 4   I think of everything I've heard this morning, I agree with

 5   Mr. Caldwell on one point, which is I think this is a three-day

 6   retrial --

 7            THE COURT:  Okay.

 8            MR. PERRY:  -- start to finish.  So I think we have at

 9   least agreement on that.

10            October, I think, is overly ambitious, to be quite

11   honest, Your Honor.  We don't have their damages report yet.

12   They've had five weeks to prepare it.  You know, I'm not going

13   to say we need exactly the same amount to respond to it, but it

14   wouldn't be out of bounds for us to ask for that.  I also think

15   there's going to be a round of motion practice after that.

16            We also have some witness availability issues.  You

17   know, setting a trial in September or October, Apple's expert

18   witnesses are engaged in many other lawsuits for many other

19   companies and -- and individuals, some in this Court, and

20   they're not -- they're not all available at any given date.

21            You know, if -- if we put it more out to early 2016,

22   we solve those problems.  If we put it to later 2015, we solve

23   most of those problems.  But I'm just -- whatever date the

24   Court picks or the parties settle on, we would have to perhaps

25   ask the Court's indulgence or Smartflash's indulgence as to
```

1    expert availability which is something beyond Apple's control.

2    If we get out to 2016, that -- that becomes a non -- non-issue.

3         THE COURT:  Do this for me, Mr. Perry, try to slow the

4    rapidity of your speech just a little bit.

5         MR. PERRY:  I -- I always have that problem.  I

6    actually wrote on my pad today, Your Honor, remembering last

7    week or the last time we were here, slow down.  So I need to

8    look down, as well.

9         Other questions about preliminaries?

10        THE COURT:  No, I'll -- I'll hear your responsive

11   arguments to the motion to reconsider.

12        MR. PERRY:  Thank you, Your Honor.

13        THE COURT:  We may talk slow in the South, and we may

14   hear slow in the South.  I don't concede that we think slow in

15   the South.

16        MR. PERRY:  I -- I don't think anybody in this

17   courtroom would -- would have any -- any thoughts along those

18   lines, Your Honor.

19        THE COURT:  Whenever you're ready.

20        MR. PERRY:  Thank you, sir.

21        We've heard Mr. Caldwell's argument this morning on

22   the appropriateness of the previous damages model.  There was

23   nothing new there.  That was the reprieve of the argument we

24   had at the post-trial hearing.  We're here on a motion for

25   reconsideration.  Just procedurally, there's no new evidence.

1    There's no new law.  There's no change in circumstances.

2    There's -- nothing has changed since the Court entered its

3    order.

4           The Court -- you know, 59(d) is in the rules to

5    account for this situation.  The parties were on notice.  We

6    argued it.  We've made that procedural point.  The Court has

7    enforced it against Apple with respect to the 101 issue.  We

8    suggest it should be forced against Smartflash, as well, but

9    the issue has been decided, let's move along.

10          On the merits.  To this day, Your Honor, Smartflash

11   does not argue that the EMVR instruction that was actually

12   given to the jury was warranted because this was an EMVR case.

13   They don't make that argument.  They don't say that this was a

14   straight up LaserDynamics, Ericsson-compliant situation, we

15   jumped through all the hoops of the EMVR, and, therefore, we're

16   entitled to the EMVR instruction.

17          What Smartflash's position is, is that the stock EMVR

18   instruction, which is absolutely correct.  We -- everyone in

19   this courtroom also agrees on this point.  In an -- in an

20   actual EMVR case, that -- that instruction describes the law,

21   as explained in LaserDynamics.

22          Smartflash's position is they were entitled to that

23   because their survey evidence supposedly showed that some

24   sub-population of consumers were interested in not the patented

25   invention but the features that were made possible by the

1  patented invention, a point they always skip over that's --

2  that's very important.

3         Our argument has always been, Your Honor, that

4  applying the EMVR to a subset of a case introduces all the

5  dangers with none of the benefits of the EMVR.  And we have to

6  back up and remember what the basic rule is.  And as the Court

7  observed earlier, Judge O'Malley's opinion in Ericsson is very

8  instructive on this.

9         The basic rule -- the rule in 99 percent probably of

10 patent cases involving multi-component products is the

11 Plaintiff has to apportion the damages to the value added by

12 the patented invention -- basic rule.

13        The exception, the narrow limited exception is

14 the Entire Market Value Rule.  The Court asked my friend,

15 Mr. Caldwell, this morning, what Federal Circuit case allows a

16 Plaintiff to mix and match, to combine, to take one from Column

17 A and one from Column B to say for 77 percent of consumers,

18 it's apportionment and for 23 percent of consumers, it's EMVR.

19 I didn't hear him answer that question, Your Honor.  He may

20 have.  I may not have heard it.

21        But the answer is there is no such case.  There is not

22 a single case in the history of the Federal Circuit that has

23 mixed and matched apportionment with EMVR.  It's because the

24 two approaches to damages -- one is not the implementation of

25 the other.  One is the alternative to the other.  It's a light

1  switch.  The EMVR is either on or it's off.  And in most cases,

2  99 percent of cases, it's off.

3         There's an evidentiary reason for that strict

4  limitation.  Judge O'Malley explained this.  LaserDynamics

5  explained this.  It is that the EMVR, by its nature, allows the

6  Plaintiff to give the jury the total revenues of a

7  multi-component device.

8         That is inherently prejudicial because the jury, given

9  information, will use it, could use it, may use it to calculate

10  the damages owing to that Plaintiff.

11         In the rare case of an EMVR, that's okay because by

12  hypothesis or by definition, the patented invention drives the

13  demand -- the entire demand for the product, and, therefore,

14  all the revenues can be considered by the jury.

15         But what we have here, this mix and match theory, this

16  Chinese menu theory, what happens is for 77 percent -- you

17  know, even taking their evidence which has its own problems,

18  which I'll talk about, but even taking their evidence on its

19  face, we know 77 percent of the consuming public doesn't have

20  the demand driven by this patented invention.  Yet the jury is

21  still given that dangerous tool, the total revenues from the

22  product.

23         Mr. Caldwell says, well, they were never told it's

24  187 million (sic).  They were told it was 43 billion for 23

25  percent.

1          I would suggest, Your Honor, that jurors in East Texas

2   may talk slow and listen slow, but they can multiply by four,

3   as well.  And having that information before them, they knew

4   exactly what the total revenues of these products were.  And

5   that's why mix and match doesn't work.  It's because it injects

6   into the case the very prejudicial evidence that the EMVR

7   limitation is designed to keep out.

8          Now, is it possible to construct a case that

9   knowing that the Court by instruction or limiting -- limiting

10  instructions or otherwise could cabin it to the 23 percent

11  and -- and insulate the 77 percent?  I doubt it.  I think it

12  would be very hard because once the toothpaste is out of the

13  tube, it's lying on the table.

14         But the reality is there was no such instruction given

15  here.  The EMVR instruction that was actually given, it says,

16  quote, if you find that Smartflash has proven by a

17  preponderance of the evidence that the demand for Apple's

18  accused products is alone motivated by the patented invention,

19  then you may award damages based on the entire value of those

20  accused products.

21         In its reply brief -- that's from the transcript, Your

22  Honor, of February 24th, at Page 62.

23         In the reply brief in a footnote, Smartflash

24  acknowledges that that instruction can be read exactly as Apple

25  reads it -- that is, that if you find that the -- that the

1  demand was driven for any of those products, you can award

2  damages based on all of them.  And that's the concern.  There

3  was never an instruction that limited that piece of it to this

4  sub-population that they now create.

5       So that even if there were a sub-population aspect,

6  which we dispute as a matter of law, the instruction actually

7  given didn't give the jury the tools necessary to limit their

8  consideration of the entire market value approach to that

9  sub-population.  That was --

10      THE COURT:  When you say earlier that could -- could a

11 Court hypothetically cabin the information as to the entire

12 revenue in such a way as to limit it to, in this analogy, the

13 23 percent and insulate the 77 percent, when you say I doubt

14 it, I take that to mean, counsel, you don't know because I'm

15 sure and I'm confident if you had a case that said you

16 couldn't, you'd be waving it in front of me.

17      MR. PERRY:  Well, the -- the issue has never arisen,

18 Your Honor.  That's exactly right.  The -- the mix and match --

19      THE COURT:  So you're aware of no authority on that

20 precise point?

21      MR. PERRY:  Either way, that's correct.

22      THE COURT:  Okay.

23      MR. PERRY:  The mix and match theory is, as far as I

24 know, unique to this case.  I think it's foreclosed by general

25 EMVR principles.  If we start with the more basic proposition

1  that either the EMVR is on or it's off, it's a light switch,

2  you never get to that problem.  You never get to the limit one

3  part of the case to the EMVR and another part to apportionment

4  because you've already gone a step beyond what the law allows,

5  which is you either have the EMVR or you don't, we would

6  submit.

7       THE COURT:  Let me ask this question.  Given the

8  argument that I've heard from Plaintiff today and given the

9  position they've staked out in their briefing, coupled with

10  your admission that there's not any guiding authority on this

11  at present, what's your response to the notion of seeking

12  guidance on an interlocutory basis from the appellate Court on

13  that issue before we go to the expense and trouble of retrying

14  damages?

15       MR. PERRY:  Your Honor, we would submit three things.

16  First, the requirements for 1292(b) certification aren't made.

17  This is a -- a -- there is a legal issue here, but it is one

18  that is of the Plaintiffs' own making that's not novel at all.

19       The first step, as I said, the inapplicability of the

20  EMVR is not a hard question at all, and it should never have

21  come into this case.  That's not something on which reasonable

22  jurists could -- could disagree, we would submit.

23       Second, it wouldn't advance the ultimate termination

24  of the litigation, which is the other requirement, of course,

25  of 1292(b) certification.  The -- the Plaintiffs are going to

1  have to do a new damages model anyway, if this is wrong, as we

2  submit it is, both as to an instructional matter and as a more

3  substantive doctrinal matter.  I mean, it's not -- we heard a

4  lot about the instruction today.  We heard very little about

5  the underlying problems with this method.

6          They -- they asked the wrong questions, and they drew

7  the wrong conclusions from them, and they presented the wrong

8  model to the jury, as I think the Court has -- has indicated

9  some concerns with that model, and rightly so.

10         The proprietary of the model isn't properly up for

11  interlocutory review, but it is the driver of this question

12  about the mix and match of the EMVR.  Even if that's in the

13  abstract a legal question, it is intertwined with the validity

14  of their model which we submit standing alone requires a new

15  trial.

16         In other words, whatever the Court might think about

17  the EMVR instruction or the applicability of the EMVR in this

18  case, if the Court were to either accept Mr. Caldwell's

19  argument today or even think about certifying it, we submit the

20  Court would have to make a resolution as to the propriety of

21  the model, an issue the Court essentially put off or put on --

22  put on Smartflash in light of the current order because of the

23  instruction.

24         So it -- it wouldn't solve the problem of the

25  underlying defect in the Smartflash approach.

1          It's also -- we do have this Gasoline Products issue.

2    Mr. Caldwell spoke rather derisively of it, but it -- it is a

3    constitutional dimension.  We talked about it last time, that a

4    new trial on damages or even issues similar to the damages are

5    not divorceable as a matter of law from liability in every

6    case.

7          The Court, again, in its order deferred ruling on that

8    issue on the theory that Smartflash would come up with a new

9    damages model that moots that concern.  We'll take the Court

10   and Smartflash -- you know, that that is possible.  I told you

11   last time it was possible.  If they do that, then that comes

12   out of the case.  But if they don't -- if they stand on this

13   model, we absolutely have that problem.  And then you've got

14   the whole case issue.  We -- we don't have a final ruling in

15   the case is the problem because of the way these damages issues

16   were tried.

17         THE COURT:  All right.  Let's get back to the

18   remainder of your response to their motion to reconsider.

19         MR. PERRY:  Your Honor, I'll -- I'll be brief on it,

20   unless the Court has specific questions.

21         There was no legal basis for the entire market value

22   instruction.  This is not a case in which a -- a factually

23   inapposite instruction was just sort of floating around in the

24   air, and, therefore, we can assume the jury disregarded it.

25   This was a case in which the jury was given the tool that the

1   EMVR is designed to preclude, that is, the total revenues

2   figure, and an instruction that authorized them to use that

3   tool and a verdict that makes clear they did use that tool.

4        To suggest that it was harmless to give them an EMVR

5   instruction upon this record ignores what actually happened in

6   the trial, we would submit.  It is, in fact, the case that this

7   is not -- it should not have been an EMVR case in whole or in

8   part.  We pointed this out in our post-trial motions, which is

9   why I think that the Smartflash first response is you're right,

10  this is not an EMVR case.  They said that four times in their

11  post-trial response brief, with no qualification.  Therefore,

12  the instruction is clearly wrong.

13       Now, in this motion for reconsideration, they say,

14  well, it's partly -- it's a 23 percent EMVR case, and,

15  therefore, the instruction was okay, but it's not a 23

16  percent instruction, it's a hundred percent instruction.  You

17  know, you -- you know, it doesn't -- the -- the current

18  argument doesn't match up with what the jury was told, so

19  there's no harmless error there.  It was simply an incorrect

20  instruction.

21       And underlying all of that, as I said, is the problem

22  with the damages model, the problem -- you can't have a mix and

23  match EMVR -- an -- an apportionment in the first place, and,

24  moreover, as to the EMVR piece, Smartflash didn't do it right.

25       Alone motivate is not a verb, Your Honor.  What

 1  LaserDynamics says is that the patented feature alone, pause,

 2  must motivate the purchase.  The patented invention alone has

 3  to be the motivating driver of the purchase of the -- of the

 4  multi-component invention.

 5      Smartflash never proved that.  They asked this obscure

 6  survey question that -- that did not isolate the value of the

 7  patented invention.  Rather, what they said is does the ability

 8  to download apps or to download movies alone motivate your

 9  purchase?  That's not the patented invention.

10      We had this argument before.  I'm not going to repeat

11  myself.  It's in the transcript from the post-trial hearing.

12  The patented invention is a very limited method of payment for

13  content.

14      The survey questions tested the functionality of

15  downloading apps and movies.  There is no evidence that the

16  patented invention drove the demand for even a single iPhone,

17  iPad, or iPod, much less 23 percent of them.

18      THE COURT:  Before you -- before you get any further,

19  let me back up a minute.

20      With regard to the instruction that was given to the

21  jury and in light of your argument that it wasn't harmless and

22  that it was, in fact, harmful, how do I square that with the

23  reality that it was Apple that asked for that instruction at

24  the trial, and it was Apple that argued for it over the

25  objection of Smartflash?

```
 1              MR. PERRY:  Your Honor --

 2              THE COURT:  Do you -- are you -- are you getting it

 3   both ways by saying we wanted it at the trial, but now we want

 4   to say it was harmful and shouldn't have been given and was

 5   error?

 6              MR. PERRY:  Absolutely not, Your Honor.

 7              THE COURT:  Okay.

 8              MR. PERRY:  At the Rule 50(a) stage, at the conclusion

 9   of evidence at trial, Apple made the same argument I'm making

10   today, which is this is not an EMVR case.  EMVR should be out

11   of this case.  There should be no reference to EMVR total

12   revenues or anything else.  We also made that in our Daubert

13   motions and before trial.

14              THE COURT:  Well, counsel, you weren't at the trial.

15              MR. PERRY:  No.

16              THE COURT:  I was at the trial.  This instruction was

17   of Apple's request.

18              MR. PERRY:  I -- Your Honor, I -- I'm -- I'm answering

19   the Court's question in steps, if I may.

20              THE COURT:  All right.

21              MR. PERRY:  At the 50(a) conference, Apple objected to

22   anything having to do with EMVR, and the Court overruled that

23   objection, denying the 50(a) motion.  And the case went forward

24   on the Plaintiffs' quasi hybrid made up EMVR theory.

25              Given that the Court had rejected Apple's legal
```

1  argument that EMVR cannot be submitted to the jury, Apple

2  proposed a legally sufficient -- a legally accurate EMVR

3  instruction at the beginning of the charge conference I was not

4  at, which I have read, though, Your Honor -- and the Court may

5  recall Apple specifically reserved all objections previously

6  made, including at the Rule 50 conference, that it was offering

7  those instructions over the Court's denial of the previous

8  motion because once the Court has ruled, the Court has ruled,

9  and Apple has to take those things into account.

10         Therefore, Apple has never waived the objection that

11  this is not an EMVR case, that the EMVR evidence was improperly

12  introduced, that the -- that the whole -- the whole construct

13  was wrong.  That has been Apple's consistent theory through the

14  entire case.

15         The instruction -- there is a problem with the

16  instruction.  As the Court may recall, both Apple and

17  Smartflash objected to the apportionment on EMVR instructions

18  but for different reasons.  One refers to the patented feature,

19  and one refers to the patented invention.  And there's an

20  inconsistency between the two.

21         There's also not any segregation -- a differentiation

22  between the two theories, as Mr. Caldwell is now arguing.  In

23  other words, there wasn't a -- for 77 percent, take this

24  apportionment, and for 23 percent, take this.  That is another

25  problem.

1            So that -- and I think the Court in the new trial

2    order pointed out that Apple proposed the instruction.  And,

3    again, the instruction is not legally erroneous.  In an EMVR

4    case, that is the instruction that should be given.  We agree

5    with that.

6            This is not an EMVR case.  Apple has made that point

7    before trial, during trial, after trial, today.  That's the

8    problem with the instruction.  It's not that it -- that

9    standing alone it's a legally incorrect instruction, but that

10   there's not legally sufficient evidence to warrant it here.

11           Or to put it in the terms of the i4i case that my

12   friend, Mr. Caldwell, talked about, the legal theory on which

13   the case went to the jury was itself deficient.  It was legally

14   deficient.  It never should have gone on that basis.  That's

15   the definition of harmful error in instructions, and that's the

16   problem here.

17           It's the reason, Your Honor, that the substantive

18   aspects of the model are related to the instructional error.

19   It's -- it's that this case proceeded on the wrong approach.

20           THE COURT:  All right.  I understand your response.

21           MR. PERRY:  Thank you, Your Honor.

22           THE COURT:  Let's return to the remainder of your

23   argument on the motion.

24           MR. PERRY:  Your Honor, I'll wrap up briefly with this

25   point that comes out of what I was just saying.  Setting

1    instructional error aside or assigning as harmless error that

2    instruction, the defects in the damages model independently

3    warrant a new trial.  There was no legally sufficient evidence

4    on which a jury could base a royalty determination on the

5    entire value of a single device, let alone 23 percent or a

6    hundred percent of the devices.

7         There was no legally sufficient evidence on which a

8    reasonable jury could base any royalty award on the value or

9    the revenues of the accused devices.  That is the fundamental

10   failure in Smartflash's case.  That is what requires a new

11   trial on damages, everything else aside.

12        It requires the Entire Market Value Rule applied in

13   whole or in part.  And for this part of my argument, I'm not

14   waiving the rest, but let's assume it could apply in part.  It

15   would still require legally sufficient evidence that the

16   patented invention drove the entirety of consumer demand for a

17   multi-function device.  There is no legally sufficient evidence

18   of that point in this record as to a single phone, a single

19   iPod, a single iPad.  That requires a new trial right there

20   because the jury clearly was instructed that it could do it.

21        The Court, we submit, Your Honor, should adhere to its

22   instructions that Smartflash should come up with a new and

23   materially different damages model for the new trial.  I was

24   actually very pleased to hear Mr. Caldwell tell us all this

25   morning that Smartflash has developed what he called a

1    fundamentally different model that works a different way.

2           We haven't seen it yet.  It may or may not have

3    problems.  It may be perfectly acceptable.  We don't know.  We

4    haven't seen it.  But it's different, and that's an important

5    thing.  That ruling should be sustained.

6           THE COURT:  Do you want to bet that you'll find

7    something to complain about when you see it?

8           MR. PERRY:  I won't take that bet, Your Honor, today,

9    but I haven't seen it, so we don't know.

10          That ruling should be sustained.  There's been no --

11   no basis offered to reconsider that ruling.  We should set a

12   reasonable schedule to get us all to a new trial with time for

13   responsive experts and depositions and Daubert motions, if

14   warranted.  And, again, I'll bet, yes, we will have a Daubert

15   challenge to their approach.  I don't know that, but I'll bet

16   so.

17          A quick --

18          THE COURT:  And I won't -- I won't take that bet

19   either.

20          MR. PERRY:  Fair enough.

21          THE COURT:  Go ahead.

22          MR. PERRY:  Unless the Court has further questions on

23   the substance of the motion for reconsideration, I would like

24   to just address briefly the bifurcated appeal proposal.

25          THE COURT:  Go ahead.

1              MR. PERRY:  Thank you, Your Honor.

2              Your Honor, the Robert Bosch case from the Federal

3    Circuit recognizes a limited and unusual procedure by which

4    damages issues can be set -- bifurcated and -- and dealt with

5    separately if all liability issues have been finally determined

6    in a case.

7              The request for bifurcation in this case is premature.

8    All liability issues have not been finally determined.  The

9    Court still has pending both Apple's and Smartflash's

10   post-trial motions on infringement, validity, remedies, and so

11   forth, so that -- that -- that we're not even at the point that

12   the Court could consider a Bosch bifurcation order.

13             It is discretionary, if -- if the Court got to that

14   point, and I understand the Court will -- will rule on those

15   motions in due course, then the question to bifurcate is

16   discretionary with the Court.

17             The Court doesn't have to do it and would need

18   persuading that it would be appropriate in a particular case.

19   It is an available procedure, we acknowledge that, but we

20   submit that Smartflash hasn't made out a case for why that

21   discretion should be exercised here.  They just assume it.

22             We have a couple of concerns, substantive concerns

23   with bifurcation here.  One is the Gasoline Products problem.

24   The Federal Circuit has made clear that bifurcation cannot be

25   employed where there is a -- an intertwinement of damages and

1   liability because the Seventh Amendment then jumps into play.

2           We have raised that concern already with the new trial

3   order.  The Court has ordered Smartflash to come up with a new

4   damages model that meets that issue.  If they do, that's fine;

5   but, again, we have a prematurity problem, which means we could

6   not -- we can't even opine on bifurcation without knowing

7   whether or not and how the Gasoline Products objection is going

8   to be resolved.

9           The third or another substantive concern is the

10  parallel universe in which the Court is aware of the PTAB.

11  The -- the proceedings in this Court will continue.  We

12  understand that.  And we are making every effort to -- to do

13  that, but for the Court to -- to jump this case ahead of the

14  PTAB, we submit would be going beyond simply denying a stay but

15  also moving the case in a way that Congress doesn't intend,

16  that that proceeding is going forward on a statutory schedule,

17  it ought to continue to do that, and this case should go

18  forward on its own schedule.

19          Most -- most fundamentally, and this applies really to

20  the bifurcation issue, as well as the inapposite request for

21  1292(b) certification, this case should stay together.  This is

22  an integrated request for remedies for patent infringement.

23          Smartflash has come forward and asserted certain

24  claims against Apple, accused Apple of infringement, has now

25  secured a verdict of that, has established the validity of

1    those claims, and we have yet to determine the -- the -- the

2    remedies that -- that are owing to Smartflash as a result of

3    that adjudicated infringement.

4         It would be better for this Court, we submit, it would

5    be better for the Federal Circuit, it would be better for the

6    parties to get all of that wrapped up so that when it's done,

7    everything can go to the Circuit at the same time, and the

8    Court can look at everything.  Hopefully we've all done it

9    right at that point, or whatever needs to come back will come

10   back at one point.  But if some part of it goes up, we're going

11   to have this ping pong game with multiple balls.  You know,

12   we're going to have a damages trial going on here while the --

13   while the liability issue is up in the Federal Circuit.  We get

14   something reversed on liability or just -- even just changed

15   and remanded on liability, we have to come back and do that

16   over.  Are we then going to have a third damages trial or maybe

17   a fourth damages trial?  I mean, really, it multiplies the

18   proceedings unnecessarily, the cost, expense, the jurors of

19   this district having to come back over and over again for these

20   parties, whereas as if we keep the case together in this court

21   until it's done, which, again, the 99 percent rule generally

22   has some -- some appeal.  You know, the way that cases are

23   usually handled, keep them all together until it's ready for a

24   final judgment to be entered ought to apply here because

25   there's nothing about this case that Smartflash has offered or

1    that we're aware of that would -- that would warrant the

2    extraordinary unusual bifurcation kind of request that they're

3    making.  It should just stay together.  Once there's a final

4    judgment, whoever is aggrieved, we'll take it up, and -- and

5    we'll be done.

6              THE COURT:  All right.  What else do you have?

7              MR. PERRY:  Your Honor, unless the Court has

8    questions, our -- our Apple submission is that the motion for

9    reconsideration should be denied as to the new trial.  We

10   should have a -- a date certain for a new trial.  Smartflash

11   can give us its damages model on an appropriate schedule, the

12   parties can negotiate the rest, and all the appeal requests

13   should be denied, and we can move on.

14             Thank you, Your Honor.

15             THE COURT:  Thank you, counsel.

16             Mr. Caldwell.

17             MR. CALDWELL:  May I reply, Your Honor?  Thank you.

18             THE COURT:  It's going to have to be brief.

19             MR. CALDWELL:  Yes, sir.

20             Your Honor, it sounds like Apple is basically morphing

21   off the -- what I understand to be the basis of the new trial,

22   and now the focus is kind of back to, well, we don't like these

23   survey questions which we think are weight issues, and, oh, now

24   the instruction actually told them to look at a hundred percent

25   of the revenue, even though that wasn't really presented.

 1              Again, on this point, which I won't belabor by any

 2     means, but anytime we said the MVR didn't apply, if you look in

 3     context, we were talking to the -- talking about the total

 4     revenue.  And we didn't think that applied, and now Apple is

 5     saying that the instruction you gave was a total revenue

 6     instruction.  But that just doesn't make sense in context

 7     and --

 8              THE COURT:  All right.  And you need to slow down,

 9     too, Mr. Caldwell.

10              MR. CALDWELL:  Yes, Your Honor.

11              THE COURT:  Go ahead.

12              MR. CALDWELL:  That just doesn't make sense in

13     context.  It absolutely doesn't say that, and I'll show you why

14     here in just a second.

15              The instruction was warranted on this case, as tried,

16     after the motion to strike ruling and the -- the redoing of the

17     survey.

18              You asked a question to counsel -- or it was a

19     question in part directed to me earlier, and I think it was

20     followed up on with Mr. Perry.  I'd like to look at the

21     Garretson case for a minute.

22              If we could go to Slide 5.

23              The question -- paraphrasing anyhow -- was basically

24     this notion of are we looking at the entire market or the --

25     essentially the entire market value of a product -- of a

1    product, of an item sold.  And I think if we go back to

2    Garretson, we don't have to stop there since Your Honor

3    observed kind of the more recency of -- of Ericsson, but I

4    think when we go back to even Garretson, what we saw --

5    starting about halfway, the profits and damages are to be

6    calculated on the whole machine for the reason that the entire

7    value of the whole machine as a marketable article is properly

8    and legally attributable to the patented feature.

9         And I think that's why there's this point that

10   we've -- that we've made that what we did is entirely

11   appropriate because you're saying that for however many sales

12   of the machine you can say that the entire value of that

13   particular whole machine was properly and legally attributable

14   to the patented feature, then you can look at that revenue as

15   the base.  And -- and so the suggestion that the case law

16   doesn't support it, we disagree with.

17        Go to the -- the next slide, if we could.

18        LaserDynamics, I think, because of the facts that were

19   before them, it's maybe a little less clear on this point, but

20   I -- I think it's not inconsistent with the read that we're

21   presenting to you.  Again, when it's -- it's -- in this

22   instance, instead of saying the words "the marketable article,"

23   it was that marketable article sold.  In this instance, it's

24   talking about a laptop computer.

25        But Your Honor mentioned Ericsson, and I'd like to

1   jump forward to Slide 9, if we could.

2           Ericsson actually goes back to just what I was reading

3   from Garretson.  So in this Ericsson opinion, again, where the

4   entire value of a machine as a marketable article is properly

5   and legally attributable to the patented feature, the damages

6   owed to the patentee may be calculated by a reference to that

7   value.  And -- and at this point, I think -- I think that this

8   very much supports our interpretation of a proper way to apply

9   the Entire Market Value Rule as not merely that you could look

10  at the entire market, which I don't dispute that that is one

11  way that it can apply.  We're on absolutely the same page as

12  far as that goes.

13          But also, as we see from Ericsson, you can also look

14  at the entire value of a machine as a marketable article.  And

15  that's what we did.  The articles as to whether the question

16  was sufficient and whatnot, I mean, these are weight issues.

17  They're subject to vigorous cross-examination.  Quite analogous

18  to Your Honor's ruling in ContentGuard on Thursday.

19          Jumping forward to the instruction, if we can go to

20  Slide 14.

21          Mr. Perry said that your instruction basically told

22  the jury -- I'm trying to quote, but don't -- my apologies if I

23  get any words wrong, but basically said your instruction says

24  if any of the articles satisfy the alone motivated, you can

25  base on all the revenue.  Your instruction plainly does not say

1    that, Your Honor.  And if it does, I suspect Apple would have

2    pitched a fit at the formal charge conference if it said that,

3    and we'd have been, well, heck, if that's true, why can't I

4    show the 187 billion.  That's not what it says at all.

5         It -- the instruction specifically tells you, you get

6    recovery of damages based on the value of an entire product

7    that has multiple features only when the patented invention

8    constitutes the basis for consumer demand.  And accordingly, if

9    you find that Smartflash has proven by a preponderance of the

10   evidence that the demand for Apple's accused products is alone

11   motivated by the patented invention, then you may award damages

12   based on the entire value of those accused products.

13        Also, however, if you find that consumer demand for

14   the products is not based solely on the patented invention, you

15   should not -- you should award damages based on the value of

16   the patented invention and not the entire value of the accused

17   products.

18        It was quite clear that the new interpretation of your

19   instruction that Apple's advancing now, which as I understand

20   wasn't even the basis of the new trial order, is just not the

21   correct read.  And it's extraordinarily not the correct read in

22   view of the context in which the case was tried.

23        Slight non sequitur, but on the 1292(b) issue, the

24   certification of this question for interlocutory appeal under

25   1292(b) is absolutely met in this case where you have a

 1   controlling question of law, which we've debated amply,

 2   substantial ground for difference of opinion, immediate appeal

 3   may materially advance the ultimate determination of the

 4   litigation.

 5          And the observation from Apple that it might be that

 6   you still have to come back and retry damages doesn't negate

 7   the fact that absolutely the test is met, that you may

 8   materially advance the ultimate determination of the litigation

 9   on this question.

10          THE COURT:  Was that -- was that addressed at all by

11   the Federal Circuit during your argument on the stay matter?

12          MR. CALDWELL:  I -- I don't think so, Your Honor.  I

13   think -- I think that because of how it -- how it came up, I

14   think Judge O'Malley asked a question maybe to Mr. Perry about

15   whether, well, couldn't Apple take this path and -- and try and

16   get the liability issues up?  And then when I was at the -- the

17   lectern, I believe she asked me the same question, and -- and I

18   said yes.  And then in the footnote that we have, I didn't have

19   a slide on this, but I think maybe it's helpful just to observe

20   the footnote that the Federal Circuit put, which I -- to answer

21   your question, I don't think it's on the 1292(b) per se because

22   her focus was on kind of timing as to liability, more on the

23   point that Mr. Perry is saying, but we're entitled to have the

24   PTAB go first.  And I think she's saying quite the opposite.

25   There's no reason that this can't be a perfectly streamlined

1    way to get liability to the Court.

2           The Court said, under our jurisprudence, the damages

3    proceeding could be bifurcated form the liability determination

4    such that we could review an appeal from the district court

5    even though the damages determination is still outstanding.

6    She's actually focusing on the liability.

7           And I think our observation is, well, the 1292(b) test

8    is certainly met, and it seems like you'd have a pretty good

9    chance of the Federal Circuit saying, yes, we will consider

10   that on an interlocutory appeal while they're already having to

11   dig into liability issues if we follow the suggestion of the

12   Court.

13          And so it seems like the test for 1292 is met, and

14   the -- our sort of motivations for why it maybe even makes

15   sense are -- are unusually high in this case where at the

16   Court's suggestion we might send up liability.

17          I heard counsel for Apple say something along the

18   lines that no reasonable jurist would say that an aspect of

19   EMVR applies or something similar here.  I mean, I just cannot

20   figure out how to reconcile that with what has happened.  I --

21   I absolutely understand that Your Honor raised something sua

22   sponte, something that is bothering Your Honor, and Your Honor

23   had doubts about is how it was expressed, if I recall

24   correctly, and we took a hearing on it.  And it -- it may be

25   something on which we differ, but the notion that no reasonable

1    jurist could have possibly gotten there strikes me as super

2    bizarre given that Apple got exactly what it wanted by telling

3    the Court we -- Smartflash has put forward a model using entire

4    market value on a sub-population.

5           And so at times, those unreasonable jurists have

6    included Apple itself, Smartflash, once we lost that and

7    pursued different evidence, and the Court system.  How we got

8    here, it's just -- I don't know any other way to say it than it

9    just strikes me as fundamentally unjust that we did everything

10   that Apple kind of told us we needed to do to make it

11   appropriate to make it both EMVR for the sub-population and

12   apportionment of the base.

13          Is that Slide 4, if you don't mind.

14          I mean, remember this is exactly what Apple was

15   telling us at the bottom here.  For Mr. Mills' apportionment of

16   the base to have been proper, the relied on survey question

17   would have needed to ask whether the patented feature alone

18   motivated the purchase.

19          My recollection -- you wouldn't want a slide that

20   would look like this -- but my recollection was that's

21   basically at the tail end of a paragraph that spans about

22   two-thirds of a page and cites LaserDynamics multiple times.

23          And for the notion that we are going to apply the EMVR

24   test for this apportionment, supporting this same thing with

25   the exact -- the same position that Smartflash has right now

```
 1   that what we did was use a sub-population application of the
 2   Entire Market Value Rule.
 3          THE COURT:  Are you -- are you saying that Apple
 4   suggested to you that applying the Entire Market Value Rule to
 5   a sub-population of the consuming public was what you should do
 6   in this case?
 7          MR. CALDWELL:  Well, I guess -- I guess it depends
 8   temporally where we're looking at it.  We had done what we
 9   thought was the original model or what was the original model
10   which did not invoke looking at the entire market.
11          THE COURT:  I think everybody will agree that from
12   where you started and where we are today is not a straight
13   line.
14          MR. CALDWELL:  Right, right.  But -- but what -- what
15   I'm saying is prior to that certainly -- certainly not, okay?
16   That wasn't some sort of suggestion by Apple.  But through its
17   motion to strike, Apple said, all right, if this is going to be
18   your base, here's how you have to ask it.  And that's what
19   appears to have persuaded Judge Mitchell, based on the hearing
20   and the -- the argument.  And so in that sense, I would answer
21   your question, yes.  I mean, this is what will solve -- this is
22   what will solve your problem in how you've apportioned your
23   base, using this -- this test out of the Entire Market Value
24   Rule.
25          And we had doubts as to whether we had to go to the
```

 1   level of asking alone, but once we did that, at Apple's

 2   request -- I mean, absolutely they suggested it, and -- and

 3   almost -- they effectively got us ordered to have to do it.

 4         I'll yield the microphone here in just one second.  I

 5   think in sum, though, for reasons that I won't repeat, you

 6   understand we -- Smartflash absolutely believes a new trial

 7   order was error and judgment should be entered on -- on the

 8   first verdict with resolution of the other pending JMOLs on

 9   infringement and validity, and that the whole case should just

10   go to final judgment and should go up on appeal, and if there's

11   a problem, it can be dealt with.

12         But we don't believe there is a problem.  We -- we

13   believe the jury was properly instructed, and we don't frankly

14   believe that Apple can go up there and challenge that

15   instruction.

16         I mean, I realize there's the goal of the Court

17   wanting to get things right, and I -- I don't dispute that at

18   all, but we think you did, and we feel like Apple can't really

19   be heard to say otherwise, given exactly how this record

20   developed.

21         But if the Court disagrees and doesn't agree with that

22   approach, bifurcation and appeal makes sense.  It -- it was --

23   you know, I think there's a reason Judge O'Malley suggested it.

24   She's understanding that in the context of analyzing the

25   Court's stay order and just all the different moving parts,

1    it's actually a very streamlined way to get resolution on a lot

2    of issues, including liability, including the 101 issue that's

3    leading to so much expense.  But we have an interesting

4    opportunity here to resolve what seems to be this gray area in

5    the law at that chance -- at -- at that appeal.

6           THE COURT:  All right.

7           MR. CALDWELL:  Now, Your Honor, on Gasoline Products,

8    I -- actually I think I was accused of deriding Gasoline

9    Products or something like that.  I don't actually believe I

10   mentioned it.  But Mr. Curry, if -- if the Court will indulge,

11   Mr. Curry will address Gasoline Products and this notion that

12   everything has to be a do-over if --

13          THE COURT:  Well, I mean, Apple argued that

14   previously, and my order granting the new trial did address

15   that your damages model needed to be new and different.  You've

16   told me I understand this morning that it will be.  So given

17   that and given the admission by the Defendant that if, in fact,

18   it is, that's not an issue any longer, why is that still a

19   matter we need to argue about this morning?

20          MR. CALDWELL:  Because I bet if you asked Mr. Perry

21   did you just agree to me that it's not an issue any longer and

22   we don't need to retry the liability, then he's going to say

23   no.  And I think it's if we're going forward towards a new

24   trial, this is --

25          THE COURT:  Well, let's put it this way.  He clearly

1   said he wanted to see your report, and I understand that.  But

2   I trust counsel for both sides are not going to take an

3   untenable position on what something clearly is or isn't.  And

4   that possibility, though I don't expect it notwithstanding, I

5   understand what that case says, and I understand what the

6   issues are.  I'm not sure that the Court will benefit by

7   additional extensive argument on that this morning.

8        This was a -- this was a matter I thought we would

9   handle in about an hour this morning, and we're into our third

10  hour since we started this morning, so I'd like to at least

11  wrap up before the noon hour gets here.

12       MR. CALDWELL:  Sure.  Apologies for -- for that.

13       THE COURT:  If I feel I need further argument on that,

14  I'll ask for further briefing.

15       MR. CALDWELL:  Yes, Your Honor.  Thank you.  And

16  apologies for the length.  We just --

17       THE COURT:  No problem.

18       MR. CALDWELL:  -- do appreciate the opportunity to --

19  to raise it.

20       THE COURT:  It's a significant case, and -- and I want

21  both sides to have their -- their opportunity to present their

22  positions.

23       MR. CALDWELL:  May I ask Mr. Curry what I'm -- what it

24  is I may be forgetting?

25       THE COURT:  You may consult with co-counsel.

```
 1          MR. CALDWELL:  Thank you.

 2          I believe, Your Honor, just super briefly, if -- if

 3  Your Honor is not going to reconsider and reverse the new trial

 4  order, which obviously is our first request for relief, or not

 5  do the bifurcation and send up to the Federal Circuit, we

 6  believe that we would need some sort of an order that we are

 7  not permitted to re-present that model and then we would make

 8  an offer of proof just to make sure that we've done everything

 9  we need to to preserve error.  And that's the only observation

10  I would make.

11          THE COURT:  All right.  All right.  Let me say this,

12  counsel, before we conclude today's hearing.

13          It's clear to the Court for several reasons, one of

14  which is the temporary stay imposed by the Circuit, that the

15  September 14th date is no longer tenable.  You've taken

16  differing positions, you've given me your reasons, and I

17  certainly will consider those.  I'm not prepared from the bench

18  today to give you a new date, but I will consider those and

19  give you as reasonable guidance on that as I can as promptly as

20  I can.

21          I do want those demonstratives submitted.  I do want

22  that profit number submitted, as I've instructed.  And I will

23  certainly consider your arguments this morning with regard to

24  the motion, and I'll -- that is under submission at this time,

25  and I'll attempt to get you some precise guidance on that as
```

     1  soon as possible.

     2          With that, I think we have covered the territory that

     3  the Court felt was necessary this morning.  Unless either side

     4  has something of a status-related nature that I've overlooked

     5  and you wish to raise, we'll bring this to a close.

     6          Is there anything further from the Plaintiff that

     7  we've not already taken up?

     8          MR. CALDWELL:  One -- one question of a status-related

     9  nature would be despite the -- the stipulation and the evidence

    10  that's the water under the bridge, we've got a supplemental

    11  interrogatory answer saying non-infringing alternatives that

    12  presumably Apple now wants to use, and obviously we didn't

    13  depose people and whatnot, we feel like we need to either

    14  orally or in written -- in writing make a motion to strike that

    15  answer or to preclude its use.

    16          THE COURT:  Well, I --

    17          MR. CALDWELL:  Your Honor, can we --

    18          THE COURT:  -- I -- I suggest, counsel, that when you

    19  get a new date for a new trial on damages, in advance of that,

    20  I'll get many motions filed.  And certainly you're going to

    21  have whatever date that is that's yet to be set, you're going

    22  to have an opportunity to present the related motions that you

    23  think are appropriate, just like I expect the Defendant --

    24  we -- we joked a little bit back and forth about taking a bet

    25  on whether there's another Daubert or not, but I suspect I'm

```
1    going to get that, as well.  So both sides are going to have an

2    opportunity to engage in appropriate motion practice, and

3    that's part of what the Court has to consider in setting a new

4    date.

5              MR. CALDWELL:  Thank you, Your Honor.

6              THE COURT:  But that's not today.

7              MR. CALDWELL:  No, very well.  I just wanted to make

8    sure that we weren't untimely by waiting until we get a

9    schedule and kind of acting with the schedule.  So I think

10   we're very much on the same page as far as -- as far as that

11   goes.  That answers my question.

12             THE COURT:  Well, you know, I'm not -- I'm not going

13   to address what is or isn't timely until something gets filed

14   and somebody objects to it as untimely.  But I anticipate that

15   there will be some, although I hope limited motion practice,

16   necessary before a new trial on damages takes place.

17             MR. CALDWELL:  Yes, Your Honor.  I just -- I didn't

18   want to file a motion if maybe there might be a more

19   appropriate time and -- or vice versa and get in trouble for

20   not having done it sooner.

21             THE COURT:  Well --

22             MR. CALDWELL:  I believe I understand Your Honor's --

23   Your Honor's instructions.

24             THE COURT:  You need to do what you think you need to

25   do.  If I don't think it's appropriate, you'll hear from me
```

1   that I don't think it's appropriate.

2          MR. CALDWELL:  Yes, Your Honor.  And --

3          THE COURT:  Okay.

4          MR. CALDWELL:  -- if the motion to reconsider is not

5   granted or we're not going up on appeal, does Your Honor

6   anticipate that along with the new trial setting, that Your

7   Honor will tell us a day for exchange of expert reports, or are

8   you envisioning if we're in that world, that you basically give

9   us sort of a target end date and a hearing date, and we need to

10  back populate?

11         THE COURT:  I haven't decided that yet.  Obviously,

12  those kind of parameters are going to have to be set.  Whether

13  I give you a trial date and ask you to meet and confer and

14  submit proposed other dates for an applicable but limited

15  docket control order or whether I do that for you and then hear

16  if you have objections, I haven't made that choice yet.

17         MR. CALDWELL:  Yes, Your Honor.

18         THE COURT:  Obviously, one way or the other, it's got

19  to get done.

20         MR. CALDWELL:  Yes, sir.  Thank you, Your Honor.

21         THE COURT:  Okay.  Anything of a related nature to

22  status of the case from the Defendant that we haven't raised

23  previously this morning?

24         MR. PERRY:  Nothing from Apple, Your Honor.

25         THE COURT:  All right.  As I say, these matters are

1  under submission.  Thank you for your argument, counsel.  You

2  are excused.

3          COURT SECURITY OFFICER:  All rise.

4          (Hearing concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes                        9/6/15
     SHELLY HOLMES, CSR-TCRR                   Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25